## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

DONALD AGEE, JR., an individual;
DENNIS LEORY BLACK, JR., an
individual; BEVERLY ANN BURRELL,
an individual; JEMELL COTTON, an
individual; KAREN FERGUSON, an
individual; MICHELLE KEEBLE, an
individual; NORMA McDANIEL, an
individual; GLENDA McDONALD, an
individual; SHIRLEY L. RADDEN, an
individual; DAVONTE SHERARD, an
individual; KENYETTA SNAPP, an
individual; and TANESHA WILSON, an
individual,

          Plaintiffs,

v.

JOCELYN BENSON, in her official capacity
as the Secretary of State of Michigan;

MICHIGAN INDEPENDENT CITIZENS
REDISTRICTING COMMISSION;

DOUGLAS CLARK, in his official capacity
as Commissioner of the Michigan
Independent Citizens Redistricting
Commission;

JUANITA CURRY, in her official capacity as
Commissioner of the Michigan Independent
Citizens Redistricting Commission;

ANTHONY EID, in his official capacity as
Commissioner of the Michigan Independent
Citizens Redistricting Commission;

RHONDA LANGE, in her official capacity as
Commissioner of the Michigan Independent
Citizens Redistricting Commission;

Case No. _____

**Three-Judge Panel Requested
28 U.S.C. § 2284(a)**

**COMPLAINT FOR DECLARATORY
RELIEF**

**This case is related to *Michael Banerian, et
al. v. Jocelyn Benson*, Case No. 1:22-cv-54,
under W.D. Mich. L. Rule 3.31(d)(iii)(2) in
that it arises out of the same transaction or
occurrence and involves one or more of the
same parties as the pending suit.**

STEVEN TERRY LETT, in his official
capacity as Commissioner of the Michigan
Independent Citizens Redistricting
Commission;

BRITTNI KELLOM, in her official capacity
as Commissioner of the Michigan
Independent Citizens Redistricting
Commission;

CYNTHIA ORTON, in her official capacity
as Commissioner of the Michigan
Independent Citizens Redistricting
Commission;

M.C. ROTHHORN, in his official capacity as
Commissioner of the Michigan Independent
Citizens Redistricting Commission;

REBECCA SZETELA, in her official
capacity as Commissioner of the Michigan
Independent Citizens Redistricting
Commission;

JANICE VALLETTE, in her official capacity
as Commissioner of the Michigan
Independent Citizens Redistricting
Commission;

ERIN WAGNER, in her official capacity as
Commissioner of the Michigan Independent
Citizens Redistricting Commission;

RICHARD WEISS, in his official capacity as
Commissioner of the Michigan Independent
Citizens Redistricting Commission; and

DUSTIN WITJES, in his official capacity as
Commissioner of the Michigan Independent
Citizens Redistricting Commission,

Defendants.

## COMPLAINT FOR DECLARATORY RELIEF

## INTRODUCTION

1.      The Michigan Independent Citizens Redistricting Commission (hereafter the "Commission") is comprised of thirteen citizens of this State who are charged with the exclusive authority to adopt district boundaries for the Michigan Senate and Michigan House of Representatives.

2.      On December 28, 2021, the Commission adopted district boundary maps for the Michigan Senate and Michigan House of Representatives.

3.      The Commission drew Michigan Senate Districts 1, 3, 5, 6, 8, 10, and 12 (hereafter the "Senate Districts" and/or the "Linden Plan") and Michigan House of Representatives Districts 2, 8, 10, 11, 13, 14, 16, and 26 (hereafter the "House Districts" and/or the "Hickory Plan") (collectively referred to as the "Districts", and/or the "District Plans", and/or some similar variation thereof) in violation of Section 2 of the federal Voting Rights Act, 52 U.S.C. § 10301, (hereafter "VRA") and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, U.S. Const. amend. XIV, § 1 (hereafter "Equal Protection Clause").

4.      For nearly a half-century, the Senate and House district maps located in southeast Michigan were drawn such that the Black voting age populations (hereafter "BVAPs") were sufficiently above 50% in order to comply with the VRA, and specifically to ensure that Black voters would have the opportunity to elect their candidates of choice.

5.      The Commission has deprived Black voters in the surrounding area of Metropolitan Detroit (hereafter "Metro Detroit")[1] of this protected opportunity.

---

[1] The specific House and Senate Districts relevant to this action are located within this area.

6.    The Commission reduced the amount of Black voter majority-minority House Districts (i.e., districts with BVAPs over 50%) from ten (10) to six (6).

7.    The Commission reduced the amount of Black voter majority-minority Senate Districts from two (2) to complete elimination (0).

8.    The Commission created the Senate and House Districts with race being the predominant consideration.

9.    Compliance with the applicable laws and standards was neither impossible nor onerous. Plaintiffs will provide an illustrative remedy map in the course of these proceedings that will show the Commission had ample ability to draw the Districts in such a way to comply with the United States Constitution, Section 2 of the VRA, and the Michigan Constitution.

10.    Because the Commission deprived each of them their voting rights secured under Section 2 of the VRA and the Equal Protection Clause, Plaintiffs bring this Complaint for declaratory relief and request that this Court order the maps be reconfigured to comply with applicable law.

## JURISDICTION AND VENUE

11.    Jurisdiction is proper with this Court pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343. All of Plaintiffs' claims arise under the Constitution and laws of the United States, respectively 52 U.S.C. § 10301 and U.S. Const. amend. XIV, § 1.

12.    Venue is proper as one or more of the Defendants resides in this District. 28 U.S.C. § 1391(b).

## THREE-JUDGE COURT REQUESTED

13.    A three-judge panel to hear and determine this case is proper pursuant to 28 U.S.C. § 2284. "A district court of three judges shall be convened . . . when an action is filed challenging

the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body." 28 U.S.C. § 2284(a).

**PARTIES**

14.     Plaintiffs have each individually been deprived of their rights secured by the Equal Protection Clause and the VRA (collectively hereafter referred to as "Plaintiffs").

15.     Each of the Plaintiffs is an individual, Black voter who regularly participates in federal, State of Michigan, and local elections and plans to do so in future elections.

16.     Each of the Plaintiffs is over the age of 18, registered to vote, and regularly participates in Democratic Primary Elections and plans to do so in future elections.

17.     Plaintiff Donald Agee, Jr. resides in House District 2 and Senate District 1. Plaintiff Donald Agee, Jr.'s address is 474 Oliver Ct., Ecorse, MI 48229.

18.     Plaintiff Dennis Leroy Black, Jr. resides in House District 13 and Senate District 10.  Plaintiff Dennis Leroy Black, Jr.'s address is 19140 Algonac St., Detroit, MI 48234.

19.     Plaintiff Beverly Ann Burrell resides in House District 8 and Senate District 1. Plaintiff Beverly Ann Burrell's address is 2434 Edison St., Detroit, MI 48206.

20.     Plaintiff Jemell Cotton resides in House District 10 and Senate District 3. Plaintiff Jemell Cotton's address is 1395 Antietam Ave., Unit 61, Detroit, MI 48207.

21.     Plaintiff Karen Ferguson resides in House District 7 and Senate District 8. Plaintiff Karen Ferguson's address is 20501 Livernois Ave #21073, Detroit, MI 48221.

22.     Plaintiff Michelle Keeble resides in House District 16 and Senate District 6. Plaintiff Michelle Keeble's address is 15667 Glastonbury Ave., Detroit, MI 48223.

23.     Plaintiff Norma McDaniel resides in House District 26 and Senate District 5. Plaintiff Norma McDaniel's address is 4411 Irene St., Inkster, MI 48141.

24.     Plaintiff Glenda McDonald resides in House District 8 and Senate District 3. Plaintiff Glenda McDonald's address is 251 Connecticut St., Highland Park, MI 48203.

25.     Plaintiff Shirley L. Radden resides in House District 10 and Senate District 12. Plaintiff Shirley L. Radden's address is 639 Rivard Blvd., Grosse Pointe, MI 48230.

26.     Plaintiff Davonte Sherard resides in House District 2 and Senate District 1.  Plaintiff Davonte Sherard's address is 3844 12th St., Apt #102, Ecorse, MI 48229.

27.     Plaintiff Kenyetta Snapp resides in House District 11 and Senate District 12. Plaintiff Kenyetta Snapp's address is 19702 Fleetwood Dr., Harper Woods, MI 48225.

28.     Plaintiff Tanesha Wilson resides in House District 14 and Senate District 10. Plaintiff Tanesha Wilson's address is 19354 Cliff St., Detroit, MI 48234.

29.     Defendant Jocelyn Benson ("Defendant Benson") is the Michigan Secretary of State. As Secretary of State, Defendant Benson is charged with enforcing District boundaries and accepting the declarations of candidacy for Michigan Senate and House candidates.

30.     Defendant Michigan Independent Citizens Redistricting Commission (hereafter the "Commission") is charged with adopting redistricting plans for the Michigan Senate and House Districts pursuant to Mich. Const. art. IV, § 6(1). The Commission adopted the maps for the Districts on December 28, 2021. The Commission consists of 13 commissioners. Four commissioners are associated with the Democratic Party and the Republican Party, respectively. Five commissioners are unaffiliated with either the Democratic or Republican parties.  Mich. Const. art. IV, § 6(1).

31.     Defendant Douglas Clark ("Defendant Clark") is a commissioner on the Commission and is affiliated with the Republican Party. Plaintiffs sue Defendant Clark in his official capacity.

32.     Defendant Juanita Curry ("Defendant Curry") is a commissioner on the Commission and is affiliated with the Democratic Party. Plaintiffs sue Defendant Curry in her official capacity.

33.     Defendant Anthony Eid ("Defendant Eid") is a commissioner on the Commission and is unaffiliated with both the Democratic and Republican parties. Plaintiffs sue Defendant Eid in his official capacity.

34.     Defendant Rhonda Lange ("Defendant Lange") is a commissioner on the Commission and is affiliated with the Republican Party. Plaintiffs sue Defendant Lange in her official capacity.

35.     Defendant Steven Terry Lett ("Defendant Lett") is a commissioner on the Commission and is unaffiliated with either the Democratic or Republican parties. Plaintiffs sue Defendant Lett in his official capacity.

36.     Defendant Brittni Kellom ("Defendant Kellom") is a commissioner on the Commission and is affiliated with the Democratic Party. Plaintiffs sue Defendant Kellom in her official capacity.

37.     Defendant M.C. Rothhorn ("Defendant Rothhorn") is a commissioner on the Commission and is affiliated with the Democratic Party. Plaintiffs sue Defendant Rothhorn in his official capacity.

38.     Defendant Cynthia Orton ("Defendant Orton") is a commissioner on the Commission and is affiliated with the Republican Party. Plaintiffs sue Defendant Orton in her official capacity.

39.     Defendant Rebecca Szetela ("Defendant Szetela") is a commissioner on the Commission and is unaffiliated with either the Democratic or Republican parties. Plaintiffs sue Defendant Szetela in her official capacity.

40.     Defendant Janice Vallette ("Defendant Vallette") is a commissioner on the Commission and is unaffiliated with either the Democratic or Republican parties. Plaintiffs sue Defendant Vallette in her official capacity.

41.     Defendant Erin Wagner ("Defendant Wagner") is a commissioner on the Commission and is affiliated with the Republican Party. Plaintiffs sue Defendant Wagner in her official capacity.

42.     Defendant Richard Weiss ("Defendant Weiss") is a commissioner on the Commission and is unaffiliated with either the Democratic or Republican parties. Plaintiffs sue Defendant Weiss in his official capacity.

43.     Defendant Dustin Witjes ("Defendant Witjes") is a commissioner on the Commission and is affiliated with the Democratic Party. Plaintiffs sue Defendant Witjes in his official capacity.

## **GENERAL ALLEGATIONS**

44.     Article I, Section 2 of the United States Constitution provides that the State of Michigan has the "primary responsibility for apportionment of their federal congressional and state legislative districts." *Growe v. Emison*, 507 U.S. 25, 34 (1993) (citing U.S. Const. art. I, § 2).

45.     Prior to 2018, the Michigan Legislature (hereafter the "Legislature") was responsible for adopting congressional and state legislature district boundaries. Mich. Const. art. IV, § 6(1).

46.    The Michigan legislative districts were redrawn following the release of the 2010 United States Census (hereafter the "2010 Districts").

47.    The 2010 Districts were effective until the Commission adopted the Hickory and Linden Plans on December 28, 2021.

48.    The 2010 Districts relevant to this action are largely contained within county lines, are extremely compact, and result in the creation of multiple Black voter majority-minority districts.

49.    The below maps represent the BVAP and white voting age population (hereafter "WVAP") for Detroit voting precincts in the 2020 election.[2]





---

[2] These maps cover both the House and Senate Districts.

**The Hickory Plan**

50.     Of the eighteen (18) highest BVAP 2010 House Districts in the area surrounding Metro Detroit, ten (10) were Black voter majority-minority districts.

51.     Black voters in these 2010 House Districts were given an adequate opportunity to elect the candidate of their choice.

52.     The Commission did not think including as many Black voter majority-minority districts was as important when it adopted the Hickory Plan, reducing this amount to six (6).

53.     The Commission significantly lowered the BVAP of the eighteen (18) highest BVAPs House Districts near Metro Detroit.

54.     In crafting the Hickory Plan, the Commission lowered the BVAP from Districts with an already high BVAP and redistricted Black voters to Districts with far lower BVAPs.







| BVAP in 18 Most Heavily Black Districts, Detroit Metro Area | | | |
|---|---|---|---|
| 2012-20 Map | | Hickory Plan | |
| District | BVAP | District | BVAP |
| 7 | 94.3% | 4 | 56.8% |
| 8 | 92.4% | 5 | 56.7% |
| 3 | 90.9% | 6 | 56.5% |
| 9 | 74.2% | 16 | 56.1% |
| 10 | 67.4% | 9 | 54.5% |
| 1 | 62.6% | 18 | 54.0% |
| 35 | 62.5% | 7 | 47.0% |
| 2 | 60.3% | 8 | 44.2% |
| 5 | 54.1% | 11 | 44.0% |
| 6 | 53.4% | 17 | 44.0% |
| 4 | 47.3% | 14 | 42.8% |
| 29 | 36.0% | 12 | 42.6% |
| 12 | 27.0% | 10 | 40.2% |
| 11 | 26.4% | 1 | 39.7% |
| 27 | 24.4% | 13 | 39.4% |
| 16 | 23.4% | 26 | 37.8% |
| 18 | 22.0% | 53 | 34.3% |
| 22 | 21.0% | 3 | 34.2% |

**The Linden Plan**

55.     Of the ten (10) highest BVAP 2010 Senate Districts in the area surrounding Metro Detroit, two (2) were Black voter majority-minority districts.

56.     Black voters in these 2010 Senate Districts were given an adequate opportunity to elect the candidate of their choice.

12

57.     During the span of elections from 2012-2020, each of these two (2) Senate Districts saw the Black voter candidate of choice win the Democratic Party Primary Election in addition to the general election.

58.     The Commission decided to eliminate all of the Black voter majority-minority districts when it adopted the Linden Plan.

59.     As it did with the Hickory Plan, the Commission significantly lowered the BVAP of the ten (10) highest BVAPs Senate Districts near Metro Detroit.

60.     District BVAPs in The Linden Plan are reduced by keeping same number of Districts with a BVAP of at least 40% while eliminating those above a BVAP over 46%.

61.     The Commission redistricted Black voters outward from the City of Detroit towards and into suburban areas with a traditionally higher WVAP.



Black VAP in Detroit Linden Plan House Districts





| BVAP in 10 Most Heavily Black Senate Districts, Detroit Metro Area | | | |
| 2012-20 Map | | Linden Plan | |
| District | BVAP | District | BVAP |
| --- | --- | --- | --- |
| 5 | 54.3% | 7 | 46.3% |
| 2 | 51.1% | 3 | 43.7% |
| 3 | 48.1% | 10 | 41.7% |
| 4 | 47.0% | 8 | 41.5% |
| 1 | 44.7% | 6 | 40.8% |
| 11 | 35.5% | 1 | 36.4% |
| 9 | 22.7% | 2 | 25.8% |
| 6 | 21.3% | 11 | 20.3% |
| 12 | 14.9% | 5 | 19.4% |
| 10 | 8.0% | 4 | 14.4% |

62.     The above maps and charts illustrate that the Commission's intentions in creating the Linden Plan was to replace Black voter majority-minority districts with so-called "influence districts."

<strong>The Commission's Unlawful Drawing Process</strong>

63.     Pursuant to the 2018 ballot proposal, the Michigan Constitution was amended to establish the Commission (hereafter the "Amendment"). Mich. Const. art. IV, § 6(1).

64.     According to the United States Census Bureau, 61.6% of Michigan voters identified their race as white alone in 2020. Another 12.4% identified their race as Black alone, while 18.7% identified their ethnicity as Hispanic. Asian residents constituted 6% of the population, while American Indians constituted 1.1% of the population. Hawaiians and Pacific Islanders were 0.2%

of the population. 8.4% of residents identified as "Some Other Race," while 10.2% of Michiganders responded that they identified with two or more races.[3]

65.    Michigan's non-white population is heavily concentrated in the Metro Detroit area, particularly western Detroit, in southern Wayne County, and around Pontiac.

66.    The Commission considered six total proposed Senate District plans prior to adopting the Linden Plan.[4]

67.    The Commission considered four total proposed House District plans prior to adopting the Hickory Plan.[5]

68.    The Commission hired Dr. Lisa Handley, a consultant with the ACE Electoral Knowledge Network,[6] to determine if the proposed maps would comply with Section 2 of the VRA.

69.    In her report (hereafter the "Handley Report"), Dr. Handley informed the Commission that a district with a 35% - 40% BVAP would allow Black voters in the area surrounding Metro Detroit to elect the candidate of their choice.[7]

---

[3] Note that these numbers do not add up to 100, because "Hispanic" is considered a separate, non-racial category.  Thus, a Michigan resident may identify as Hispanic White, non-Hispanic White, Hispanic Black, non-Hispanic Black, and so forth.
[4] https://www.michigan.gov/micrc/0,10083,7-418-107190_109075---,00.html
[5] https://www.michigan.gov/micrc/0,10083,7-418-107190_109075---,00.html
[6] https://aceproject.org/electoral-advice/author/handley
[7]  Handley, Lisa, *Report to the Michigan Independent Citizens Redistricting Commission* (hereafter *"Handley Report"*), p. 22.
https://www.michigan.gov/documents/micrc/MICRC_Dr_Handley_Final_Report_744296_7.pdf

70.     Accepting the Handley Report's threshold for BVAPs, the Commission lowered the amount of Black voter majority-minority House districts from ten (10) to six (6). The Linden Plan eliminates all Black voter majority-minority Senate districts.

| BVAP in 18 Most Heavily Black Districts, Detroit Metro Area | | | |
|---|---|---|---|
| 2012-20 Map | | Hickory Plan | |
| District | BVAP | District | BVAP |
| 7 | 94.3% | 4 | 56.8% |
| 8 | 92.4% | 5 | 56.7% |
| 3 | 90.9% | 6 | 56.5% |
| 9 | 74.2% | 16 | 56.1% |
| 10 | 67.4% | 9 | 54.5% |
| 1 | 62.6% | 18 | 54.0% |
| 35 | 62.5% | 7 | 47.0% |
| 2 | 60.3% | 8 | 44.2% |
| 5 | 54.1% | 11 | 44.0% |
| 6 | 53.4% | 17 | 44.0% |
| 4 | 47.3% | 14 | 42.8% |
| 29 | 36.0% | 12 | 42.6% |
| 12 | 27.0% | 10 | 40.2% |
| 11 | 26.4% | 1 | 39.7% |
| 27 | 24.4% | 13 | 39.4% |
| 16 | 23.4% | 26 | 37.8% |
| 18 | 22.0% | 53 | 34.3% |
| 22 | 21.0% | 3 | 34.2% |

17

| BVAP in 10 Most Heavily Black Senate Districts, Detroit Metro Area | | | |
| 2012-20 Map | | Linden Plan | |
| District | BVAP | District | BVAP |
| --- | --- | --- | --- |
| 5 | 54.3% | 7 | 46.3% |
| 2 | 51.1% | 3 | 43.7% |
| 3 | 48.1% | 10 | 41.7% |
| 4 | 47.0% | 8 | 41.5% |
| 1 | 44.7% | 6 | 40.8% |
| 11 | 35.5% | 1 | 36.4% |
| 9 | 22.7% | 2 | 25.8% |
| 6 | 21.3% | 11 | 20.3% |
| 12 | 14.9% | 5 | 19.4% |
| 10 | 8.0% | 4 | 14.4% |

71.     Per the findings from the Handley Report, the Commission replaced the deleted Black voter majority-minority House and Senate Districts with so-called "Minority Opportunity Districts."[8]

72.     These Districts are also known, per Defendant Benson, as "influence districts."

73.     The Commission's Minority Opportunity Districts intentionally lowered BVAP by placing Black voters in Districts where it is predicted that the District majority will vote for the Black voter candidate of choice. The Handley Report describes this as "white crossover voting."[9]

74.     White crossover voting is accomplished by "cracking" or "unpacking" Black voters into the desired Districts. See, *i.e., Gill v. Whitford*, 138 S. Ct. 1916, 1920, 201 L. Ed. 2d 313 (2018).

---

[8] Handley Report at pp. 17-18.
[9] *Id.* at p. 19.

75.     As noted by Defendant Benson, there are "dangers in allowing influence districts to replace majority-minority districts[.]"[10] Specifically, Defendant Benson has explained that while some "believe that a decrease in racially polarized voting makes it possible for communities of color to elect their candidates of choice by building coalitions with white voters, [Professor Pamela] Karlan argues it is still nearly impossible for minority candidates to elect the candidate of their choice outside of districts where more than 50% of the voting age population is a combination of minority groups. Karlan's arguments are supported by current empirical evidence."[11] That's why Defendant Benson "proposed a ban on reductions below 55% of covered minority populations in any currently majority-minority district, unless the jurisdiction can present convincing evidence that racially polarized voting is nonexistent or that minority voters' participation rates will remain unaffected."[12]

76.     The decision and support for relying on white cross over voting is flawed, speculative, contrary to Sixth Circuit precedent, and will deny Black voters the opportunity to elect their candidate of their choice.

77.     The Commission adopted the approach from the Handley Report despite other readily available data.

    a.   A non-partisan report conducted by the Michigan State University Institute for Public Policy and Social Research (the "MSU Report") found that most of the computer-generated models available to the Commission could "feature at least

---

[10] *Turning Lemons into Lemonade: Making Georgia v. Ashcroft the Mobile v. Bolden of 2007*, 39 Harv. C.R.- C.L. L. Rev. 485, 488 (2004).

[11] *Id.* at 495 (emphasis added).

[12] Bedoya, Alvaro, *The Unforeseen Effects of Georgia v Ashcroft on the Latino Community*, 115 Yale LJ 2112, 2141–42 (2006) (emphasis added).

seven" majority-minority House Districts, "including at least two with more than 80% Black VAP, and one more than 90% Black VAP."[13]

    b.  The MSU Report found that most of the computer-generated models available to the Commission could feature "at least two and probably three Michigan Senate" majority-minority districts.[14]

78.    The Handley Report relies on conclusions on general election data where white candidates are assumed to be the Black voter candidate of choice. In theory white voters vote as a bloc to elect the Black voter candidate of choice, thus resulting in outcomes not racially polarized.[15]

79.    These models do not consider elections that feature a Black candidate on the ballot running against the presumed white voter candidate of choice.

80.    The Handley Report fails to consider the possibility of racial polarization resulting in white-block voting where the candidate of choice for Black voters is non-white.

81.    The 2018 Michigan Gubernatorial Democratic Primary provides an example.

    a.  In the Metro Detroit area, Gretchen Whitmer was the candidate of choice among white voters, winning upwards of 60% of their vote in most of the House Districts.

    b.  On the other hand, Sri Thanedar, who is non-white, was the Black voter candidate of choice and received little support from white voters in the same Districts.

---

[13] *Michigan Redistricting Map Analysis, Institute for Public Policy and Social Research (*hereafter *"MSU Report")*, at p. 119 https://ippsr.msu.edu/sites/default/files/SOSS/data-publications/FINALInterimReportWebUpdated22-compressed.pdf
[14] *Id*. at p. 109.
[15] Handley Report at pp. 19-21.

  c. Thanedar carried House Districts 4, 5, 7, 8, and 9. When evaluating these results under the Hickory Plan, Thanedar does not prevail in any of these Districts because the BVAP is too low.

  d. Thus, adopting the white crossover theory can result in Black voters seeing their vote diluted and greatly increasing the probability that they will not have the adequate opportunity to elect the candidate of their choice.

82. The Sixth Circuit has already squarely rejected the Commission's application of the using the white crossover theory to evaluate whether Black voters can elect the candidate of their choice.

83. Data that considers elections featuring Black or non-white candidates provides evidence that is most probative. *Rural W. Tennessee Afr.-Am. Affs. Council v. Sundquist*, 209 F.3d 835, 837 (6th Cir. 2000).

  a. In this case, the Sixth Circuit held that the election outcomes of Black candidates vs. white candidates offers more probative evidence of vote dilution than the outcomes of elections featuring white candidate vs. other white candidates. *Id.*

  b. Stated differently, in determining whether a white voter majority in a district votes sufficiently as a bloc to enable it to usually defeat the Black voter's preferred candidate, it is best to examine how Black candidates fair in elections featuring white candidates.

  c. If the Black candidate prevails more often, there is not likely a white voter voting block preventing Black voters an adequate opportunity to elect the candidate of choice.

    d.   But, as was the case in the Gubernatorial Democratic Primary Election of 2018, racially polarized elections resulting in the routine victory of the white voter candidate of choice shows that Black voters cannot elect their candidate of choice.

84.    The Handley Report, and therefore the Commission, also erroneously relies on data from general elections. General election data is irrelevant and unreliable in determining if Black voters have an adequate opportunity to elect their candidate of choice.

85.    Each of the Districts with a BVAP of 35% or higher routinely and overwhelmingly elects the Democratic candidate in the general election.

86.    Because Black voters have historically and consistently voted cohesively for Democratic candidates, the Black candidate of choice will almost certainly win the general election.

87.    Thus, the proper analysis is whether the Black voter candidate of choice can prevail in a Democratic Primary Election.

88.    In the course of these proceedings, Plaintiffs will submit an expert report by Sean P. Trende (hereafter "Expert Report), which uses a statistical technique known as ecological regression to examine how varying levels of BVAP may predict the success rate of the Black voter candidate of choice in a Democratic Primary Election.

89.    While the Handley Report engages in similar analysis to estimate group voting behavior from aggregate data, it fails to consider, let alone justify the BVAPs levels in the Hickory and Linden Plans.

90.    This is especially troublesome given the increased difficulty facing Black candidates in Democratic Primary Elections in these Districts.

91.     Yet the Commission relies on BVAP levels with no proven record of success in electing Black candidates of choice.

   a.   The 2010 House District Maps contain one (1) District with a BVAP between 36% and 53%.

      i.   The Hickory Plan features ten (10) Districts with a BVAP between 36% and 53%, with six (6) Districts exceeding 53%.

   b.   The 2010 Senate District Maps contain only one (1) District with a BVAP between 35.5% and 47%.

      i.   The Linden Plan features six (6) Districts with BVAP level between 35.5% and 47%.

92.     The Commission's decision to lower the BVAP from the 2010 District Maps across the board in the Hickory and Linden Plans will result in Black candidates struggling to find success in future elections.

93.      As a result, Black voters will not have an adequate opportunity to elect the candidate of their choice.

94.     Examining past Democratic Primary Elections illustrates this.

<u>Senate Primary Elections</u>

95.     A Black voter candidate of choice (Vincent Gregory) prevailed in District 11 (35.5% BVAP) during the 2014 Democratic Senate Primary Election by 0.4% over the white candidates.

96.     However, Senator Gregory's vote share mirrored the Black voter share of the electorate. In keeping with Sixth Circuit precedent and assigning probative value to candidate race,

it is likely that had the BVAP been lower, or had the white voter vote been less divided between the two white candidates, Senator Gregory would not have prevailed.

97.     In District 4 (47% BVAP), the Black candidate (Virgil Smith) prevailed narrowly over a Middle Eastern candidate and a white candidate in the 2014 Democratic Senate Primary Election. But again, his vote share followed the BVAP closely. If the BVAP were lower than 47%, a Black candidate may have lost against unified opposition.

98.     District 5 contained the highest BVAP (54.3%) and featured three (3) Black candidates. Yet the Black voter candidate of choice did not prevail in 2014 Democratic Primary Election. The total vote share for the Black candidates was 61%, about seven (7) points higher than the BVAP, suggesting that a BVAP of less than 43% would make it difficult for Black candidates to prevail.

99.     In the 2018 Democratic Senate Primary Election, District 1 (44.7% BVAP) saw the white voter candidate of choice (who the Handley Report estimates won 77% of the white vote but just 23% of the Black vote) won a near-majority of the vote. Note that this District has a higher BVAP than all but one of the newly drawn Senate Districts.

100.    The following table summarizes Democratic Senate Primary Elections in the Metro Detroit area that features a competitive race and racial polarization amongst the electorate:

| Summary of Senate Primary Elections, Detroit Metro Area | | | | | | |
|---|---|---|---|---|---|---|
| District | Year | BVAP | Cand. of Choice Wins? | Winner Vote Share | Second Place | Fractured Voting? |
| District 5 | 2014 | 54.3% | No | 32.2% | 24.0% | Fractured Minority |
| District 5 | 2018 | 54.3% | Yes | 54.5% | 45.5% | Not Fractured |
| District 2 | 2018 | 51.1% | - | 25.2% | 21.0% | Fractured Minority |
| District 3 | 2018 | 48.2% | Yes | 41.5% | 38.7% | Fractured Majority |
| District 4 | 2014 | 47.0% | Yes | 49.8% | 41.9% | Not Fractured |
| District 1 | 2018 | 44.7% | No | 49.8% | 26.4% | Fractured Minority |
| District 11 | 2014 | 35.5% | - | 34.7% | 34.3% | Fractured Majority |
| District 11 | 2018 | 35.5% | - | 51.7% | 21.2% | Fractured Minority |

101.    This table shows three (3) occasions where the Black voter candidate of choice prevailed. These victories were not by large margins. The vote share for the Black voter candidate of choice closely mirrored the respective BVAPs.

102.    The totality of this evidence illustrates that the Black voter candidate of choice has not been successful in any racially polarized election in the greater Metro Detroit area where the BVAP is below 47% and have even lost where the BVAP exceeds this percentage.

103.    Because the Linden Plan creates only two (2) districts with BVAP over 42% and does not create any district with a BVAP that has historically allowed Black candidates to succeed in Democratic Senate Primary Elections, it will deprive Black voters an adequate opportunity to elect their candidate of choice.

<u>House Primary Elections</u>

104.    There is no evidence to conclude that the Black voter candidate of choice can routinely prevail in a racially polarized Democratic House Primary Election in a district with a BVAP below 47%. Yet the Hickory Plan creates twelve (12) Districts with a BVAP range from 36% to 47%.

105.    To help justify the BVAP of these districts the Commission relied on a single example from the Handley Report, the 2018 District 11 Democratic House Primary Election. The Black voter candidate of choice was an incumbent, who was initially selected by district delegates via special election.

106.    While historical examples from House Democratic Primary Elections are not as conclusive because they often feature multiple candidates, it is clear that Black voters already face difficulty in electing the candidate of their choice.

107.    For example, the 2018 Democratic House District 2 Primary Election (60.3% BVAP), featured a crowded field of candidates. The winner prevailed with nearly 67% white voter support and roughly 10% of support from Black voters. Here, white voters coalesced behind a candidate while Black voters spread their support among multiple candidates.

108.    Yet, the Commission lowered the BVAP across the board despite the data from previous elections showing that Black voters cannot routinely elect their candidate of choice in Districts with BVAPs from 30% to roughly 45%, and still may struggle in Districts in the 50% range.

### The Commission's Predominant Consideration of Race

109.    The Amendment created rules of which the Commission must adhere to when creating each district. Article IV, Section 6(13) of the Michigan Constitution provides that the commissioners must abide "by the following criteria in proposing and adopting each plan, in order of priority":

A.    Districts shall be of equal population as mandated by the United States Constitution, and shall be geographically contiguous. Island areas are considered to be contiguous by land to the county of which they are a part.

B.    Districts shall reflect the state's diverse population and communities of interest. Communities of interest may include,

26

but shall not be limited to, populations that share cultural or historical characteristics or economic interests. Communities of interest do not include relationships with political parties, incumbents, or political candidates.

C.      Districts shall not provide a disproportionate advantage to any political party. A disproportionate advantage to a political party shall be determined using accepted measures of partisan fairness.

D.      Districts shall not favor or disfavor an incumbent elected official or a candidate.

E.      Districts shall reflect consideration of county, city, and township boundaries.

F.      Districts shall be reasonably compact.

110.    As will be shown by the simulation analysis described in Plaintiffs' forthcoming Expert Report, the Commission clearly drew the House and Senate District maps with race as the predominant consideration over others.

111.    This analysis involves generating numerous models (an "ensemble") of voting district maps. The ensemble is created without reference to a particular fixed factor, also known as a constraint of interest. In other words, it also allows the user to specify constraints under which district lines are drawn, such as compactness, population equality, and respect for municipal lines. The ensemble is then compared to the reference maps to determine if the constraint of interest was considered when created.

112.    For example, if a district map resembles the ensemble maps without reference to a specific constraint of interest factor, it is a reasonable conclusion that it was not a dominant consideration by the Commission.  If, however, the ensemble is an outlier when compared to the Commission's drawing, the logical conclusion is that the Commission's maps were likely drawn with respect to that factor.

113. Plaintiffs' analysis generated models as "race blind." In other words, racial data was tracked but was not used as a constraint. The results show that the Hickory and Linden Plans were drawn as race as the predominant consideration over the criteria in Section 6(13) and other traditional race-neutral considerations.

Racial Predominance in the Hickory Plan

114. To ensure that the ensemble generated the same number of districts as the Hickory Plan and to reflect the basic locations of potential race-based districting, Plaintiffs' analysis separates all Michigan House Districts into three divisions. The first division includes all precincts located within districts that were contained, in whole or in part, in Wayne, Macomb, Oakland, Monroe or Washtenaw counties. House Districts 1-33, 46-49, 51-63, 65, and 66 were included in this division. Two House Districts located in the northwest portion of Oakland were excluded as core districts for the second division.

115. The results reveal that House Districts 2, 8, 10, 11, 13, 14, 16, and 26 were drawn with race as the predominate factor.

116. A district drawn without consideration of race would ordinarily yield a BVAP between 93% and 94.5%. The lowest BVAP in a racially neutrally drawn district would yield a BVAP of 77.5%, this representing the outlier.

117. The Hickory Plan's highest district BVAP generated to 56.8%, roughly fourteen (14) standard deviations away from the average BVAP of the highest BVAP map produced in the ensemble.

118. The Hickory Plan should have without question included a seventh Black voter majority-minority District. It would be reasonable to draw an eighth or a ninth. Instead, the Hickory

Plan Districts with the seventh, eighth, and ninth highest BVAPs are 47%, 44%, and 44% Black, respectively.

119. A tenth Black voter majority-minority could also be drawn, though it would represent an outlier.

120. Districts 10-21 include a much higher WVAP than would be expected if drawn with racially neutral considerations.

121. Thus, the Hickory Plan Districts with higher BVAPs were constructed with racial considerations as the predominant factor. However, the Hickory Plan Districts with a higher WVAP were drawn with racially neutral considerations.

122. The Commission moved white voters from Districts with a moderate BVAP to Districts with a high BVAP to dilute Black voter voting strength.

### Racial Predominance in the Linden Plan

123. Analysis of the Linden Plan reveals the same conclusion. Had race not been a predominant consideration, the Linden Plan would have produced at least three Black voter majority-minority districts from Wayne and adjoining counties. Instead, it produced zero.

124. Districts in the Linden Plan with the four highest BVAPs significantly decreased, while the next five districts saw an increase in WVAP.

125. When ensembles were adjusted to consider other race-neutral factors, racial considerations were still present in the Linden Plan.

### Public Comments from Commissioners

126. Comments from several commissioners during the meeting to adopt to Hickory and Linden Plans likewise reveal that the Districts were drawn with race as the predominant factor.

127.    Defendant Lange expressed that more consideration was given to "certain groups" such that the Districts may have issues with VRA compliance.[16]

128.    Agreeing with Defendant Lange's comment, Defendant Wagner proposed the Commission spend more time on developing the Hickory Plan.[17]

129.    In Defendant Kellom's view "I also happen to think we could do better for the City of Detroit and for people of color all over the State of Michigan in terms of representation to have a more equitable map."[18]

130.    Defendant Szetela remarked that the Commission "received very vigorous public comment particularly around VRA issues and particularly with primaries and democratic primaries and are these maps representative and do they actually provide the Black community in Detroit with the ability to elect."[19]

131.    Following public comment, Defendant Lange summarized by saying "I think the consensus with the public comment is everybody wants the maps to be fair. They want more consideration given to communities of interest. More consideration given to VRA."[20]

## COUNT I
### Violation of Section 2 of the Voting Rights Act
### (House Districts 2, 8, 10, 11, 13, 14, 16, and 26)

132.    Plaintiffs incorporate by reference all preceding allegations as if fully restated herein.

---

[16] Michigan Independent Citizens Redistricting Committee Dec 28. 2021 Meeting Transcript, https://www.michigan.gov/documents/micrc/MICRC_Mtg_Transcript_12_28_21_745567_7.pdf p. 30.
[17] *Id.*
[18] *Id.* at p. 33.
[19] *Id.*
[20] *Id.* at p. 30.

133.    The VRA prohibits any "State or political subdivision" to impose, or cause to be applied, any voting "standard, practice, or procedure" which "results in a denial or abridgment of any right of any citizen of the United States to vote on account of race or color." 52 USC § 10301.

134.    To prevail on a claim under Section 2 of the VRA, Plaintiffs have the burden to prove the following three preconditions, as articulated by the United States Supreme Court in *Thornburg v. Gingles,* 478 U.S. 30, 50-51 (1986): 1) that the minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district," 2) that the minority group is "politically cohesive," and 3) that the rest of the electorate, or the white majority, votes sufficiently cohesively as a bloc to defeat the candidate preferred by the minority.

135.    Once these preconditions are established, courts examine the totality of circumstances. *Id.*

136.    Factors encompassing the totality of the circumstances include, but are not limited to, the extent to which the minority group members are affected by discrimination in education, employment and health, and the extent to which discrimination hinders effective participation in elections. *Id.* at 36-37.

137.    Plaintiffs have satisfied the first precondition.

138.    Prior to the Hickory Plan, there were ten (10) Black voter majority-minority House Districts in the Metro Detroit Area, providing Black voters the opportunity to elect candidates of their choice and facilitating the House's membership interests in the Michigan Legislative Black Caucus.

139.    The Commission lowered this amount to six (6) Districts even though they could have feasibly drafted ten (10).

140.    Plaintiffs have also established the second precondition. Historically, Michigan

Black voters have voted cohesively, first in favor of the pro-abolitionist Republican Party

following the Civil War, and then transitioning to the Democrat Party following the New Deal in

the 1930s and increasing with the civil rights legislation enacted by United States Presidents John

F. Kennedy and Lyndon B. Jonson, to the point that by 2016, only 8% of Black voters identified

as Republicans, and 70% as Democrats. In the 2016 Presidential Election, 88% of Black voters

voted for the Democratic nominee.[21]

141.    Michigan Black voters have voted "politically cohesively," as exhibited by the fact

that 94% of Detroit electorate voted for Democratic nominee in the 2020 Presidential Election.

Black voters encompass 71% of Detroit's population.  The Democratic nominee received 50.6%

statewide.[22]

142.    The political cohesiveness is further exemplified by the fact that Black voters

account for 14% of Michigan's statewide population, but account 20% of Democratic vote.[23]

143.    The Commission has even confirmed the political cohesiveness of Michigan Black

voters, stating in a memorandum prepared by its attorney, that "[p]ursuant to the VRA and *Gingles*,

Dr. Lisa Handley conducted a racially polarized voting analysis for the Michigan Independent

---

[21] See *Black Party Affiliation,* BLACK DEMOGRAPHICS: THE AFRICAN AMERICAN POPULATION,
(last accessed Feb. 1, 2022), https://blackdemographics.com/culture/black-politics/.
[22] Warikoo, Niraj, *Black Voters in Detroit key for Joe Biden and Gary Peters' Victories,
Advocates Say,* DETROIT FREE PRESS, (Pub. Nov. 6, 2020)
https://www.freep.com/story/news/politics/elections/2020/11/06/joe-biden-detroit-michigan-
vote-election-2020/6168971002/; Ray, Rashawn, *How Black Americans saved Biden and
American Democracy,* Brookings, (November 24, 2020) https://www.brookings.edu/blog/how-
we-rise/2020/11/24/how-black-americans-saved-biden-and-american-democracy/.
[23] Ray, Rashawn, *How Black Americans saved Biden and American Democracy,* Brookings,
(November 24, 2020) https://www.brookings.edu/blog/how-we-rise/2020/11/24/how-black-
americans-saved-biden-and-american-democracy/.

Citizens Redistricting Commission in which she concluded that racial bloc voting exists in Michigan."[24]

144.    Most importantly, there is cohesive voting among Black voters in favor the Black or non-white candidate in Democratic Primary Elections in House Districts 2, 8, 10, 11, 13, 14, 16, and 26.

145.    The third precondition is also met. As discussed herein and detailed in the forthcoming Expert Report, white voters generally vote as a bloc to defeat Black voters' candidate of choice, here being the Black candidate in Democratic Primary Elections.

146.    Because each of the Districts with a BVAP of at least 35% historically elects Democratic candidates at an overwhelming rate, the proper analysis is whether the Black voter candidate of choice can prevail in a Houses Democratic Primary Election.

147.    The Commission's actions in lowering the BVAP in each of these Districts dilutes the ability of Plaintiffs' ability to elect candidates of their choice in future House Democratic Primary Elections.

148.    The totality of the circumstances likewise establishes that the House Districts violate Section 2 of the VRA. Black voters have historically born the effects of discrimination in education, health, education, and employment opportunities, and continue to bear the effect of this discrimination, hindering their ability to effectively participate in the political process. The following demonstrate the historical and continuation of racial discrimination and inequality in Michigan:

A.  Black persons were enslaved in Detroit until 1815.[25]

---

[24] See Adelson, The History of Discrimination in the State of Michigan and its Influence on Voting, available at https://bit.ly/3qNcYna.

[25] Banerjee, Mandira, *Detroit's Dark Secret: Slavery*, MICHIGAN TODAY (Feb. 19, 2018),

B.  The initial Michigan Constitution prohibited African-Americans from voting. [26]

C.  Detroit was a stronghold for the Ku Klux Klan in the early 20th century, and a splinter group called the Black Legion continued to operate in Detroit until the 1930s.[27]

D.  It was not until 1885 that Michigan enacted a statute to make "discrimination in public places illegal," and not until 1925 that the statute was enforced.[28]

E.  Today, racially restrictive covenants and redlining practices denying low interest mortgages to Black persons are illegal, but have continued segregating effects, as they are still dissuaded from buying properties with old restrictive covenants and are still denied mortgages that are routinely given to white persons with similar credentials and circumstances.[29]

---

https://michigantoday.umich.edu/2018/02/19/detroits-dark-secret-slavery/.

[26] Jaehnig, Chris, *African American Michigan: The Reconstruction Era*, THE DAILY MINING GAZETTE (May 9, 2020),
https://www.mininggazette.com/news/features/2020/05/african-american-michigan-the-reconstruction-era/.

[27] Bak, Richard, *The Dark Days of the Black Legion,* HOUR DETROIT, (February 23, 2009),
https://www.hourdetroit.com/community/the-dark-days-of-the-black-legion/.

[28] Michigan Legal Milestones 22. Ending Jim Crow, State Bar of Michigan,
https://www.michbar.org/programs/milestone/milestones endingjimcrow (last accessed Feb. 16, 2022)

[29] See Shannon Stocking, Shannon, *U-M Research Raises Awareness of Racially Restrictive Covenants in Ann Arbor Housing,* THE MICHIGAN DAILY (2021),
https://www.michigandaily.com/ann-arbor/u-m-professors-reveal-racially-restrictivecovenants-ann-arbor-housing/;  *History of Housing Discrimination Against African Americans in Detroit* (last visited Feb.1, 2022), https://www.naacpldf.org/files/our-work/Detroit%20Housing%20Discrimination.pdf;  Smith, et. al*, Data Analysis: "Modern-Day Redlining" Happening in Detroit and Lansing*, NPR (Feb. 15, 2018),
https://www.michiganradio.org/news/2018-02-15/data-analysis-modern-day-redlining-happening-indetroit-and-lansing.

F.  As a result, Detroit is the most segregated city in the United States, and the Greater Detroit Area is the fourth most segregated metropolitan area in the country. [30]

G.  Additionally, because property ownership is a primary method of accumulating wealth, denying ownership to Black persons can lead to increased wealth disparity between Black and white persons.[31] This in turn affects voting, as persons with lower socioeconomic status are less likely to vote.

H.  Black persons, Indigenous Persons, and Hispanic persons also suffer disparities and unequal treatment in education.  These groups are between 13% and 11% less likely to obtain a bachelor's degree than their white counterparts.[32]

I.  At the grade school lever, low income, urban public schools, which are predominantly Black, suffer from resource disparities.

149.   As noted, the Commission's attorney acknowledges that minority groups in Michigan, particularly Black individuals, suffer a variety of barriers to voting due to discrimination in education, employment and health.[33]

---

[30] Stevens, Matt, *Poorer Americans Have Much Lower Voting Rates in National Elections than the Nonpoor, A Study Finds*, NEW YORK TIMES (Aug. 11, 2020), https://www.nytimes.com/2020/08/11/us/politics/poorer-americans-havemuch-lower-voting-rates-in-national-elections-than-the-nonpoor-a-study-finds.html.

[31] Lanes, Caroline, *Detroit Ranked as One of the Most Segregated Cities in the Country*, MICHIGAN RADIO NPR (June 21, 2021), https://www.michiganradio.org/post/detroit-ranked-one-most-segregated-cities-country.

[32] Rossman, Alex, *Michigan Has Stark Racial Disparities in Educational Attainment, Ranks Third Worst in Nation for Number of Bachelor Degrees Earned By Black Students*, MICHIGAN LEAGUE FOR PUBLIC POLICY (May, 29, 2020), https://mlpp.org/michigan-has-stark-racial-disparities-in-educational-attainment-ranks-third-worst-in-nation-fornumber-of-bachelor-degrees-earned-by-black-students/.

[33] Adelson, Bruce L., MICRC Voting Rights Act Legal Counsel For the Michigan Independent Citizens Redistricting Commission (MICRC): *The History of Discrimination in the State of Michigan and its Influence on Voting*, available at:

150.    The totality of circumstances coupled with the establishment of the three preconditions prove House Districts 2, 8, 10, 11, 13, 14, 16, and 26 violate Section 2 of the VRA.

**COUNT II**
**Violation of Section 2 of the Voting Rights Act**
**(Senate Districts 1, 3, 5, 6, 8, 10, and 12)**

151.    Plaintiffs incorporate by reference all preceding allegations as if fully restated herein.

152.    To prevail on a claim under Section 2 of the VRA, Plaintiffs have the burden to prove the following three preconditions, as articulated by the United States Supreme Court in *Thornburg v. Gingles* 478 U.S. 30, 50-51 (1986): 1) that the minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district," 2) that the minority group is "politically cohesive," and 3) that the rest of the electorate, or the white majority, votes sufficiently cohesively as a bloc to defeat the candidate preferred by the minority. 478 U.S. 30, 50-51 (1986).

153.    Once these preconditions are established, courts examine the totality of circumstances to determine if a proposed redistricting map violates Section 2 of the VRA. *Id.*

154.    Factors encompassing the totality of the circumstances include, but are not limited to, the extent to which the minority group members are affected by discrimination in education, employment and health, and the extent to which discrimination hinders effective participation in elections. *Id.* at 36-37.

155.    Plaintiffs have satisfied the first precondition.

---

https://www.bridgemi.com/sites/default/files/2021-12/P%26C%20Memoradum%20on%20Voting%20Discrimination%20Oct%2026%20Released%20Dec%2020.pdf

156.    Prior to the Commission's redistricting, there were two (2) Black voter majority-minority Senate Districts in the Metro Detroit Area.

157.    The Linden Plan eliminates all Black voter majority-minority Senate Districts in this area.

158.    The Linden Plan could have included at least three minority-majority districts.

159.    Thus, Black voters in these Senate Districts are sufficiently large and geographically compact to produce a majority.

160.    Plaintiffs have also met the burden of establishing the second precondition.

161.    In addition to voting in a politically cohesive matter for Democratic candidates nationally, as a state, and in the challenged Senate Districts surrounding Detroit, the data discussed herein shows Black voters vote in a politically-cohesive manner for Black candidates in Democratic Primary Elections. The Commission disregarded this.

162.    The third precondition is also met. As discussed herein and detailed in the forthcoming Expert Report, white voters generally vote as a bloc to defeat Black voters' candidate of choice.

163.    Because each of the Districts with a BVAP of at least 35% historically elects Democratic candidates at an overwhelming rate, the proper analysis is whether the Black voter candidate of choice can prevail in a Democratic primary.

164.    The Commission's actions in eliminating Black voter majority-minority Districts dilutes the ability of Black voters' ability to elect candidates of their choice, specifically in future Democratic Primary Elections.

165.    The totality of circumstances coupled with the establishment of the three preconditions prove Senate Districts 1, 3, 5, 6, 8, 10, and 12 violate Section 2 of the VRA.

<u>COUNT III</u>
**Violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution – Racial Gerrymandering
(House Districts 2, 8, 10, 11, 13, 14, 16, and 26)**

166.    Plaintiffs incorporate by reference all preceding allegations as if fully restated herein.

167.    Plaintiffs are entitled to the equal protection of law under the Fourteenth Amendment of the United States Constitution, which provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."

168.    An Equal Protection violation arises when persons are treated disparately or in an arbitrary fashion under the law.

169.    The Equal Protection Clause prohibits government from treating citizens along racial lines, including when it comes creating voting districts. *Miller v. Johnson*, 515 U.S. 900, 911, 115 S. Ct. 2475, 2485, 132 L. Ed. 2d 762 (1995).

170.    Under the Equal Protection Clause, district maps that have been racial gerrymandered are "constitutionally suspect . . . whether or not the reason for the racial classification is benign or the purpose remedial." *Shaw v. Hunt*, 517 U.S. 899, 905 (1996).

171.    In drafting the House Districts, the Commission subordinated traditional race-neutral principles, such as compactness, contiguity, and respect for political subdivision or communities to race as the predominant consideration for drawing district lines. See *Miller v. Johnson*, 515 U.S. 900, 915, 115 S.Ct. 2475 (1995); see also *Easley v. Cromartie*, 532 U.S. 234, 241, 121 S.Ct. 1452 (2001).

172.    The Commission stacked Black voters into districts that traditionally have a majority white VAP with the intent to have the lowest BVAP as could be rationalized.

173.    The House Districts discriminate against Plaintiffs on the basis of race in one or more of the ways set forth below, each sufficient to demonstrate race-based discrimination used to include or exclude Plaintiffs in these House Districts with race being the predominant consideration:

(a) As evidenced by the demographics of the plan as a whole, the Commission drafted the House Districts with a racially discriminatory purpose;

(b) The House Districts were drafted with a discriminatory purpose evidenced by the fact that traditional redistricting principles and natural population shifts were ignored in favor of a racial classification used to artificially manipulate the BVAP of each district.

    i.   In its analysis of the proposed House Districts, the MSU Report acknowledges that the Commission ignored traditional redistricting principles in forming oddly shaped, non-compact maps: "Viewers can confirm, by visual inspection, that compactness was not a guiding factor in the design of these maps."[34]

    ii.   The MSU report further concludes that the "cross city, cross-county districts," with "elongated, serrated, tool-like or key-like shapes" and "intertwining" arms were "racially motivated" to split the BVAP that had existed in the two majority-Black districts.[35]

    iii.   The "non-compact, earmuff-shaped districts" do not reflect Communities of Interest within the state.[36]

    iv.   Furthermore, the House Districts create a large number of districts with large populations of Black voters that nevertheless fall short of creating majority

---

[34] MSU Report at p. 129.
[35] *Id.*
[36] *Id.* at p. 130.

districts by arranging the districts so that Black voters were divided into the neighboring suburban areas, thus diluting their voting strength.[37]

(c) Defendants' purpose in enacting the House Districts, either in whole or in part, was motivated by race and/or the goal of drawing House Districts with specific racial composition in each district;

     i.     According to the MSU Report, the Hickory Plan arranges the House Districts with a high BVAP in such a way that "urban Black majorities get partially diluted to smaller majorities in these hybrid urban-suburban districts."[38]

(d) The shape of the House Districts disregards existing county lines and are drawn so irrational that they can only be explained as a race-based gerrymander.

174.   Because Plaintiffs have established that the Commission used race as the predominant factor in creating the House Districts, the redistricting scheme is subject to strict scrutiny. *Mille*r, 515 U.S. at 916, 115 S.Ct. 2475.

175.   The use of race in creating the House Districts is not narrowly tailored to achieve a compelling governmental interest.

176.   The Commission cannot provide adequate justification for its racial discrimination against Plaintiffs.

177.   While remedying past discrimination may serve as a compelling state interest, the Commission has not, and cannot, provide strong evidence of such a remedy. See *Id*. at 922, 115

---

[37] *Id.* at p. 137.
[38] *Id*.

S.Ct. 2475. Mere compliance with federal antidiscrimination laws alone will not alone always serve as a compelling governmental interest. *Id.* at 921, 115 S.Ct. 2475.

178.　The Commission cannot argue that Section 2 VRA compliance satisfies strict scrutiny because the House Districts are not in compliance.

179.　The Commission's' use of race in drawing the House Districts is not the least restrictive means available to give Plaintiffs an opportunity to participate equally in the political process.

180.　Plaintiffs will provide an illustrative remedy map in the course of these proceedings that will show the Commission had ample ability to draw the Districts with less restrictive means that provide Plaintiffs with an opportunity to participate equally in the political process.

181.　Plaintiffs have been, and continue to be, denied equal protection under the law and injured by the Commission's use of race-based discrimination.

182.　Plaintiffs have no adequate remedy at law other than the judicial relief sought here. Implementation of these House Districts will irreparably harm Plaintiffs by violating their constitutional and statutory rights.

### COUNT IV
**Violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution – Racial Gerrymandering**
**(Senate Districts 1, 3, 5, 6, 8, 10, and 12)**

183.　Plaintiffs incorporate by reference all preceding allegations as if fully restated herein.

184.　Plaintiffs are entitled to the equal protection of law under the Fourteenth Amendment of the United States Constitution, which provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."

185. An Equal Protection violation arises when persons are treated disparately or in an arbitrary fashion under the law.

186. The Equal Protection Clause prohibits government from treating citizens along racial lines, including when it comes creating voting districts. *Miller v. Johnson*, 515 U.S. 900, 911, 115 S. Ct. 2475, 2485, 132 L. Ed. 2d 762 (1995).

187. Under the Equal Protection Clause, district maps that have been racial gerrymandered are "constitutionally suspect . . . whether or not the reason for the racial classification is benign or the purpose remedial." *Shaw v. Hunt*, 517 U.S. 899, 905 (1996).

188. The Commission's redistricting of the Senate Districts discriminates against Plaintiffs on the basis of race in one or more of the ways set forth below, each sufficient to demonstrate race-based discrimination used to include or exclude Plaintiffs from these Senate Districts with race being the predominant consideration:

(a) The Senate Districts have a discriminatory purpose evidenced by the demographics of the plan as a whole;

(b) The Senate Districts were drafted with a discriminatory purpose evidenced by the fact that traditional redistricting principles and natural population shifts were ignored in favor of a racial classification used to artificially manipulate the BVAP of each district;

      i.    The MSU Report concludes that at least three majority-minority districts could have been included, yet the Commission included none. Plaintiffs' forthcoming Expert Report will provide the same conclusion.

      ii.    The Commission divides Black voters in a way that creates urban-suburban cross-county districts, thus diluting their vote.

iii. According to the MSU Report, the "intent appears to be to create more total districts" with Black voters, in an "unconventional" way[39] to comply with Section 2 of the VRA.

iv. The MSU Report further expresses that there is insufficient data to know if districts with African-American VAP under 45% will allow Black voters an opportunity to elect candidates of their choice, amounting to a Section 2 VRA violation,[40] suggesting that "the MICRC reevaluate its approach towards compliance with the Voting Rights Act."[41]

(c) The Senate Districts have a discriminatory purpose evidenced by their irregular shape that ignore traditional redistricting principles and natural population shifts in favor of a racial classification used to artificially manipulate the BVAP of each district:

i. The Senate Districts feature elongated districts and are less compact than districts in the rest of the State and the two previous Senate District Maps.

ii. District 1 is elongated and oddly shaped, wrapping around the Southern and Eastern sides of District 2, with curved projections extending from the main body of the district.

iii. District 2 is oddly shaped, with a myriad of arms or tentacle like projections extending into the surrounding districts.

---

[39] MSU Report at p. 109.
[40] *Id.*
[41] *Id.*

    iv.    District 3 is elongated and oddly shaped with tentacle like projections extending into the surrounding districts.

    v.    District 4 is elongated and oddly shaped, with a pronounced indent into the district to accommodate oddly shaped District 1.

    vi.    District 5 is oddly shaped with a jigsaw like boarder with District 6.

    vii.    District 9 is oddly shaped, looking like a boot with a broad projection on its eastern side.

    viii.    District 11 is oddly shaped, and diagonally splits Macomb County, with a lot of jigsaw like projections.

    ix.    The Senate Districts move large concentrations of Black voters to districts with a significant higher amount of WVAP, thus diluting their vote.

    x.    The Senate Districts are so oddly shaped that the Commission could not have drew them to protect communities of interest.[42]

(d) The Commission's purpose in enacting the Senate Districts, either in whole or in part, was motivated by race and/or the goal of drawing Senate Districts with specific racial composition in each district;

    i.    There is not a single BVAP majority-minority district, even though at least three could have been drawn. Instead, Plaintiffs were moved to districts with lower BVAPs.

---

[42] MSU Report at p. 108.

      ii.      The MSU Report that the Senate Districts were drawn with race as the primary motivating factor.[43] Plaintiffs' forthcoming Expert Report will likewise establish that race was the primary motivating factor.

      iii.     The MSU Report found it "striking" and "unusual" that "no majority-minority district survive[d]."[44]

(e) The shape of the Senate Districts is so irrational that they can only be explained as a race-based gerrymander.

189. Because Plaintiffs have established that the Commission used race as the predominant factor in creating the Senate Districts, it is subject to strict scrutiny. *Miller*, 515 U.S. at 916, 115 S.Ct. 2475.

190. The Commission's use of race in drawing the Senate Districts is not narrowly tailored to achieve a compelling governmental interest.

191. The Commission cannot provide adequate justification for its racial discrimination against Plaintiffs.

192. While remedying past discrimination may serve as a compelling state interest, the Commission has not, and cannot, provide strong evidence of such a remedy. See *Id.* at 922, 115 S.Ct. 2475. Mere compliance with federal antidiscrimination laws alone will not alone always serve as a compelling governmental interest. *Id.* at 921, 115 S.Ct. 2475.

193. The Commission cannot argue that Section 2 VRA compliance satisfies strict scrutiny because the Senate Districts are not in compliance.

---

[43] MSU Report at 108.
[44] MSU Report at pp. 95-96.

194. The Commission's' use of race in drawing the Senate Districts is not the least restrictive means available to give Plaintiffs an opportunity to participate equally in the political process.

195. Plaintiffs will provide an illustrative remedy map in the course of these proceedings that will show the Commission had ample ability to draw the Districts with less restrictive means that provide Plaintiffs with an opportunity to participate equally in the political process.

196. Plaintiffs have been, and continue to be, denied equal protection under the law and injured by the Commission's use of race-based discrimination.

197. Plaintiffs have no adequate remedy at law other than the judicial relief sought here. Implementation of the redistricted Senate Districts will irreparably harm Plaintiffs' by violating their constitutional and statutory rights.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request this Court:

A. Convene a three-judge district court panel to hear and determine Plaintiffs' claims;

B. Declare that the and House and Senate District maps violate Section 2 of the Voting Rights Act (Counts I – II) and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution (Counts III – VI);

C. Establish a reasonable deadline by which Defendants must redraw the House and Senate District maps and/or adopt Plaintiffs' proposed Remedy Map, or, alternatively, should Defendants fail to meet the Court's deadline, that the Court assume jurisdiction, appoint a special master, and draw constitutionally compliant House and Senate District maps;

D.      Award Plaintiffs their costs, expenses, disbursements, and reasonable attorneys'

fees incurred as a result of filing this Complaint to defend their constitutionally and

statutorily protected voting rights, in accordance with 52 U.S.C. § 10310(e);

E.      Retain jurisdiction until such time were all Defendants have complied with all of

the Court's orders and mandates stemming from this action; and

F.      Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted,

/s/ John J. Bursch
John J. Bursch (P57679)
BURSCH LAW PLLC
*Attorney for Plaintiffs*
9339 Cherry Valley Ave SE, #78
Caledonia, Michigan 49316
(616) 450-4235
jbursch@burschlaw.com

Michael J. Pattwell (P72419)
James J. Fleming (P84490)
CLARK HILL PLC
*Attorneys for Plaintiffs*
212 E. Cesar E. Chavez Ave.
Lansing, MI 48906-4328
(517) 318-3100
mpattwell@clarkhill.com
jfleming@clarkhill.com

Nabih H. Ayad (P59518)
AYAD LAW, PLLC
*Co-counsel for Plaintiffs Agee and Sherard*
645 Griswold St., Suite 2202
Detroit, MI 48226
(313) 983-4600
nabihayad@ayadlawpllc.com

Troy Cumings (P63278)
WARNER NORCROSS + JUDD LLP

*Attorney for Plaintiffs*
150 Ottawa Ave NW, Ste 1500
Grand Rapids, MI 49503
(517) 679-7411
tcumings@wnj.com