UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DONALD AGEE, JR., an individual;
JEROME BENNETT, an individual;
DENNIS LEORY BLACK, JR., an individual;
JAMEE BURBRIDGE, an individual;
BEVERLY ANN BURRELL, an individual;
JEMELL COTTON, an individual; TERESA
DUBOSE, an individual; KAREN
FERGUSON, an individual; MICHELLE
KEEBLE, an individual; NORMA
McDANIEL, an individual; GLENDA
McDONALD, an individual; JANET MARIE
OVERALL, an individual; SHIRLEY L.
RADDEN, an individual; DAVONTE
SHERARD, an individual; MICHELLE T.
SMITH, an individual; KENYETTA SNAPP,
an individual; DONYALE STEPHEN-
ATARA, an individual; and TANESHA
WILSON, an individual,

     Plaintiffs,

v

JOCELYN BENSON, in her official capacity
as Secretary of State of Michigan;
MICHIGAN INDEPENDENT
REDISTRICTING COMMISSION;
DOUGLAS CLARK, JUANITA CURRY,
ANTHONY EID, RHONDA LANGE,
STEVEN TERRY LETT, BRITTNI
KELLOM, CYNTHIA ORTON, M.C.
ROTHHORN, REBECCA SZETELA,
JANICE VALLETTE, ERIN WAGNER,
RICHARD WEISS and DUSTIN WITJES, in
their official capacities as Commissioners of
the Michigan Independent Citizens
Redistricting Commission,

     Defendants.

No. 1:22-cv-00272

THREE-JUDGE PANEL
APPOINTED PURSUANT TO 28
U.S.C. § 2284(a)

**DEFENDANT MICHIGAN
SECRETARY OF STATE
JOCELYN BENSON'S BRIEF
IN SUPPORT OF MOTION TO
DISMISS**

John J. Bursch (P57679)
Attorney for Plaintiffs
9339 Cherry Valley Ave, SE, #78
Caledonia, Michigan 49316
616.450.4235
jbursch@burschlaw.com

Michael J. Pattwell (P72419)
James J. Fleming (P84490)
Attorneys for Plaintiffs
212 East Cesar E. Chavez Ave
Lansing, Michigan 48906
517.318.3100
mpattwell@clarkhill.com
jfleming@clarkhill.com

Nabih H. Ayad (P59518)
Co-Counsel for Pls Agee & Sherard
645 Griswold St, Ste 2202
Detroit, Michigan 48226
313.983.4600
nabihayad@ayadlawpllc.com

Heather S. Meingast (P55439)
Erik A. Grill (P64713)
Assistant Attorneys General
Attorneys for Defendant Benson
P.O. Box 30736
Lansing, Michigan 48909
517.335.7659
meingasth@michigan.gov
grille@michigan.gov

_____/

# DEFENDANT MICHIGAN SECRETARY OF STATE JOCELYN BENSON'S BRIEF IN SUPPORT OF MOTION TO DISMISS

Heather S. Meingast (P55439)
Erik A. Grill (P64713)
Assistant Attorneys General
Attorneys for Michigan Secretary of
State Jocelyn Benson
P.O. Box 30736
Lansing, Michigan 48909
517.335.7659
Email:  meingasth@michigan.gov
P55439

Dated:  June 14, 2022

# TABLE OF CONTENTS

Page

Table of Contents ................................................................................................. i

Index of Authorities .......................................................................................... iii

Concise Statement of Issue Presented ........................................................... vi

Introduction ......................................................................................................... 1

Counter-Statement of Facts .............................................................................. 2

    A.    Overview of the redistricting process in Michigan ............................... 2

        1.    The Independent Citizens Redistricting Commission ................ 2

        2.    The Commission must draft and approve redistricting plans. ............................................................................................ 4

    B.    The federal government's delay in releasing the 2020 census data delayed the Commission's adoption of plans. .................. 6

        1.    Use of census data in reapportionment and redistricting .......... 6

        2.    The U.S. Census Bureau did not meet statutory deadlines ........ 7

        3.    The Commission adopted plans on December 28, 2021. .............. 8

    C.    The Commission's unavoidable delay in adopting plans likewise delayed the Secretary's implementation of the maps. ......................... 10

        1.    The Secretary of State's duty to implement the new maps. ...... 10

        2.    The Bureau of Elections timely updated the qualified voter file to incorporate the Commission's adopted district maps. ......................................................................................... 11

Argument ........................................................................................................... 12

I.    Defendant Secretary of State Jocelyn Benson should be dismissed where Plaintiffs have failed to state a claim against the Secretary under the Equal Protection Clause or the Voting Rights Act. ....................... 12

    A.    Standard of review. ................................................................... 12

        1.    Rule 12(b)(6).................................................................. 12

i

2.      Rule 12(b)(1).................................................................. 13

B.      Plaintiffs fail to state a claim against the Secretary of State
        under the Equal Protection Clause where she is not sufficiently
        connected to, or responsible for, the alleged unlawful conduct........... 13

C.      Plaintiffs fail to state a claim against the Secretary of State
        under the Voting Rights Act because they lack standing to bring
        these claims against her. ...................................................... 18

Conclusion and Relief Requested .............................................................. 21

Certificate of Service.............................................................................. 21

# INDEX OF AUTHORITIES

Page

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)................................................................. 12

*Burns v. Richardson*, 384 U.S. 73 (1966) ............................................................. 7

*Citizens Protecting Michigan's Constitution v. Secretary of State,* 921 N.W.2d
    247 (Mich. 2018) ......................................................................................... 2

*Citizens Protecting Michigan's Constitution v. Secretary of State, et al.*, 922
    N.W.2d 404 (Mich. Ct. App. 2018)............................................................. 2

*Ex Parte Young*, 209 U.S. 123 (1908) ................................................................. 14

*Floyd v. Cnty. of Kent*, 454 Fed.Appx. 493 (6th Cir. 2012).............................. 14

*League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523 (6th Cir. 2007) ...... 13

*Lujan v. Defs. of Wildlife*, 504 U.S. 95 (1983) ................................................... 19

*Mezibov v. Allen*, 411 F.3d 712 (6th Cir. 2005)................................................. 14

*Ohio v. Raimondo*, 2021 W.L. 1118049 (March 24, 2021, S.D. Ohio)............... 8

*Reynolds v. Sims*, 377 U.S. 533 (1964)................................................................ 6

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016) ................................................. 19

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) ........................................ 19

*Thornburg v. Gingles,* 478 U.S. 30 (1986)........................................................ 18

*Top Flight Entertainment, Ltd. v. Schuette*, 729 F.3d 623 (6th Cir. 2013).......... 14, 17

*United States v. Ritchie*, 15 F.3d 592 (6th Cir. 1994)....................................... 13

*Wesberry v. Sanders*, 376 U.S. 1 (1964) ............................................................ 6

**Statutes**

Mich. Comp. Laws § 168.162......................................................................... 11

Mich. Comp. Laws § 168.163......................................................................... 11

Mich. Comp. Laws § 168.21............................................................................. 1

Mich. Comp. Laws § 168.509o .................................................................. 10

Mich. Comp. Laws § 168.509p(d) ............................................................ 10

Mich. Comp. Laws § 168.509q .................................................................. 10

Mich. Comp. Laws § 168.654a .................................................................. 10

Mich. Comp. Laws § 168.661 .................................................................... 10

Mich. Comp. Laws § 168.3(l) ..................................................................... 12

Mich. Comp. Laws § 168.641(1)(b) .......................................................... 12

Mich. Comp. Laws § 168.643 .................................................................... 12

**Other Authorities**

*Black's Law Dictionary* (8ᵗʰ ed) .................................................................. 6

**Constitutional Provisions**

13 U.S.C. § 141(b) ...................................................................................... 7

13 U.S.C. § 1 ............................................................................................... 7

13 U.S.C. § 2 ............................................................................................... 6

15 U.S.C. § 1511(5) .................................................................................... 6

Mich. Const. 1963, Art. II, § 4 .................................................................... 1

Mich. Const. 1963, Art. IV, § 2 ................................................................... 6

Mich. Const. 1963, Art. IV, § 3 ................................................................... 6

Mich. Const. 1963, Art. IV, § 6 ............................................................... 2, 3

Mich. Const. 1963, Art. IV, § 6(1) ............................................................... 3

Mich. Const. 1963, Art. IV, § 6(1)(4) ........................................................ 14

Mich. Const. 1963, Art. IV, § 6(4) ............................................................... 1

Mich. Const. 1963, Art. IV, § 6(9) ............................................................... 7

Mich. Const. 1963, Art V, § 3 ...................................................................... 1

Mich. Const. 1963, Art. XII, § 2 ........................................................................................... 3

Mich. Const. 1963, Art. 4, § 6 ............................................................................................... 3

## CONCISE STATEMENT OF ISSUE PRESENTED

1.    To survive a motion to dismiss, Plaintiffs must allege sufficient factual matter to state a claim to relief that is plausible on its face.  Where Plaintiffs fail to allege sufficient facts connecting the Secretary of State to the purported unlawful conduct – the drawing and adoption of the state house and senate redistricting plans – and where the Secretary could not provide the relief Plaintiffs seek – the drawing and adopting of new plans – should the amended complaint be dismissed as to Secretary Benson?

## INTRODUCTION

With respect to the redistricting process in Michigan, the Secretary of State performs two administrative functions.

First, under the state Constitution, the Secretary of State acts as a non-voting secretary to the Michigan Independent Citizens Redistricting Commission, tasked with providing administrative support for the work of the Commission. Mich. Const. 1963, Art. IV, § 6(4).  Secretary of State Jocelyn Benson fulfilled her duties under the Constitution with respect to the new plans adopted by the Commission in December 2021, and in doing so played no role in drawing or approving the new maps, including the plans challenged here.  And consistent with that role, the Secretary takes no position with respect to the constitutionality of the adopted plans.

Second, the Secretary of State is also the "chief election officer" with "supervisory control over local election officials in the performance of their duties under the provisions of this act."  Mich. Comp. Laws § 168.21.  The Michigan Legislature has delegated the task of conducting proper elections to the Secretary, an elected executive-branch officer, and the head of the Department of State.  Mich. Const. 1963, Art. II, § 4, Art. V, §§ 3, 9.  In this capacity, after the adoption of new redistricting plans, the Secretary, through her Bureau of Elections, must update Michigan's electronic voter list to ensure that voters are placed within the voting districts established by the Commission.  The Secretary fulfilled this labor-intensive process as well, updating the voter list in time for congressional and state house and senate candidates to file by the April 19, 2022 deadline for these offices.

Plaintiffs ask this Court to declare that the state house and senate plans violate the Voting Rights Act and the Fourteenth Amendment and order the Commission to redraw and adopt new plans.  But the Secretary played no role in drawing or adopting these plans, and thus engaged in no conduct that injured or deprived Plaintiffs of any legal rights they possess.  Further, the Secretary cannot provide the relief Plaintiffs seek since she cannot draw or adopt new plans.  For these reasons, the claims as to her must be dismissed.  If the Court orders the Commission to draw and adopt new plans, the Secretary will perform her administrative duties as required by Michigan law and consistent with any actions taken by the Commission in compliance with this Court's order.

## COUNTER-STATEMENT OF FACTS

Every ten years following the decennial United States Census, Michigan adjusts its state legislative and congressional district boundaries based on the population changes reflected in the census.  Under the Michigan Constitution, as amended in 2018, the Independent Citizens Redistricting Commission (Commission) is charged with redrawing state legislative and congressional district maps.  *See* Mich. Const. 1963, Art. 4, § 6.

**A.     Overview of the redistricting process in Michigan**

**1.     The Independent Citizens Redistricting Commission**

In 2017, a ballot proposal committee filed an initiative petition to amend the Michigan Constitution.  See *Citizens Protecting Michigan's Constitution v. Secretary of State*, 921 N.W.2d 247 (Mich. 2018); *Citizens Protecting Michigan's Constitution v Secretary of State, et al*, 922 N.W.2d 404 (Mich. Ct. App. 2018).  The proposal

principally sought to amend the apportionment provisions in article 4, § 6 of the
Michigan Constitution.  Identified as Proposal 18-2 on the November 6, 2018
general election ballot, the proposal passed overwhelmingly.  The amendments
became effective December 22, 2018.  *See* Mich. Const. 1963, Art. XII, § 2.

The amendments re-establish a commission—the Independent Citizens
Redistricting Commission—charged with redrawing Michigan's state senate, state
house, and congressional districts according to specific criteria.  Mich. Const. 1963,
Art. IV, § 6(1), (13).  And the Constitution makes clear that "no body, except the . . .
commission . . . [shall] promulgate and adopt a redistricting plan or plans for this
state."  Mich. Const. 1963, Art. IV, § 6(19).

The amendments prescribe eligibility criteria and a complex selection process
for membership on the Commission, which includes those who affiliate with the
Democratic Party, the Republican Party, and persons not affiliated with either
major party.  *Id.*, § 6(1)-(2).  The commissioners for this redistricting cycle were
initially selected by a random draw on August 17, 2020.[1]

The Commission is granted authority to provide for its own rules and
processes, and the Legislature must appropriate money to compensate the
commissioners and to enable the Commission to perform its functions.  *Id.*, § 6(4)-
(5).  The Secretary of State acts as a non-voting secretary to the Commission, and

---

[1] *See History made with selection of 13 commissioners to redraw election districts
statewide*, 8/17/20, available at https://www.michigan.gov/sos/0,4670,7-127-
1640_9150-536996--,00.html, (accessed June 14, 2022.)  One commissioner was
randomly selected on October 21, 2020, to fill a vacancy. Mich. Const. 1963, Art. IV,
§ 6(3).

"in that capacity shall furnish, under the direction of the commission, all technical services that the commission deems necessary." *Id.*, § 6(4).  Each commissioner is charged with "perform[ing] his or her duties in a manner that is impartial and reinforces public confidence in the integrity of the redistricting process." *Id.*, § 6(10).  And the Commission must conduct its business at open meetings and "conduct its hearings in a manner that invites wide public participation throughout the state." *Id.*

Under the Constitution, Secretary Benson was required to convene the Commission by October 15, 2020, which she did.  Mich. Const. 1963, Art. IV, § 6(7).  The first meeting was held September 17, 2020.  Thereafter, the Commission was required "to hold at least ten public hearings throughout the state for the purpose of informing the public about the redistricting process . . . and soliciting information from the public about potential plans," before the Commission may draft plans. *Id.*, § 6(8).  The Commission scheduled 16 public hearings to be held across the state to meet this requirement.[2]

### 2. The Commission must draft and approve redistricting plans.

After developing at least one plan for each type of district, the Commission must publish the plans, provide the supporting materials, and "hold at least five public hearings throughout the state for the purpose of soliciting comment from the

---

[2] *See* Independent Citizens Redistricting Commission, meeting schedule, available at MICRC - ICRC Meeting Schedule (michigan.gov), (accessed June 14, 2022.)

public about the proposed plans." *Id.*, § 6(9).  The Commission scheduled eight public hearings.[3]

Before voting to adopt a plan, the Commission must "provide public notice of each plan that will be voted on and provide at least 45 days for public comment on the proposed plan or plans.  Each plan that will be voted on shall include such census data as is necessary to accurately describe the plan and verify the population of each district, and shall include the map and legal description required in part (9) of this section." *Id.*, § 6(14)(b).  And "[n]ot later than November 1 in the year immediately following the federal decennial census, the commission shall adopt a redistricting plan under this section for each of the following types of districts: state senate districts, state house of representative districts, and congressional districts." *Id.*, § 6(7).  Thus, under the Constitution the Commission was to publish proposed plan(s), with supporting data, no later than September 17, 2021 and adopt a final plan by November 1, 2021 for this cycle.

After adopting a final plan, the Commission must "publish the plan and the material reports, reference materials, and data used in drawing it, including any programming information used to produce and test the plan." *Id.* § 6(15).  The Commission must also issue a report for each adopted plan "explain[ing] the basis on which the commission made its decisions in achieving compliance with plan requirements and shall include the map and legal description required in part (9) of this section." *Id.*, § 6(16).

---

[3] *Id.*

5

An adopted plan "become[s] law 60 days after its publication." *Id.*, § 6(17).

Under subsection § 6(19), the Michigan Supreme Court "may review a challenge to

any plan adopted by the commission and shall remand a plan to the commission for

further action if the plan fails to comply with the requirements" of state or federal

Constitution or superseding federal law. *Id.*, § 6(19).

**B.      The federal government's delay in releasing the 2020 census data delayed the Commission's adoption of plans.**

**1.      Use of census data in reapportionment and redistricting**

The U.S. Secretary of Commerce oversees the U.S. Census Bureau and the

decennial census activities.  15 U.S.C. § 1511(5), 13 U.S.C. § 2.  The decennial

census data, specifically the population count, is important because it determines

the number of representatives representing each state in Congress for the following

decade.  The more detailed dataset known as redistricting counts, or the Census

P.L. 94-171 data, is critical for redistricting because it provides geographic and

spatial detail on where people live and their key demographic characteristics.

The U.S. Constitution requires that districts are redrawn every decade to

ensure equal populations between districts.  *See* U.S. Const, Art. I, § 2, U.S. Const.,

Am. 14, *Wesberry v. Sanders*, 376 U.S. 1, 7-8 (1964).  The total number of seats in

the U.S. House of Representatives is fixed by law at 435, and the seats are

apportioned to the states in proportion to their populations.[4]  Similarly, the total

number of seats in the Michigan House of Representatives is fixed by law at 110, *see*

---

[4] "Reapportionment" means "realignment of a legislative district's boundaries to reflect changes in population." *Black's Law Dictionary* (8th ed.)

Mich. Const. 1963, Art. IV, § 3, the Michigan Senate is fixed by law at 38, *see* Mich. Const. 1963, Art. IV, § 2, and both the House and Senate are apportioned on the basis of population. *See Reynolds v. Sims*, 377 U.S. 533, 562-564 (1964).

Although the use of census data is the general practice of the states, no federal rule or statute requires states to use decennial census data in redistricting, so long as the redistricting complies with the U.S. Constitution and the federal Voting Right Act. *Burns v. Richardson*, 384 U.S. 73, 91 (1966) ("[T]he Equal Protection Clause does not require the States to use total population figures derived from the federal census as the standard by which this substantial population equivalency is to be measured."); e.g., *Burns*, 384 U.S. at 92-97 (State may draw districts based on voter-registration data).

While the Michigan Constitution does not expressly require that decennial census data be used to redistrict that appears to be the intent of the amendment. Numerous provisions in article IV, § 6 refer to the decennial census as the starting point of the redistricting process. *See* Mich. Const. 1963, Art. IV, § 6(2)(a)(i), (c)–(f), (5), and (7). And subsections 6(9) and (14)(b) both require that plans be distributed to the public with "such census data as is necessary to accurately describe the plan and verify the population of each district." Mich. Const. 1963, Art. IV, § 6(9), (14)(b).

### 2.     The U.S. Census Bureau did not meet statutory deadlines

Under the Census Act, 13 U.S.C. § 1 *et seq.*, for this census cycle, the apportionment data was due to the President by December 31, 2020, 13 U.S.C. § 141(b), and the redistricting data was to be released to the states by April 1, 2021,

13 U.S.C. § 141(c).  However, early in 2021 representatives from the U.S. Census Bureau announced a four-month delay for apportionment data[5] and a 6-month delay[6] for redistricting data.[7]  The U.S. Census Bureau cited the COVID-19 pandemic, wildfires in the western states, and the active hurricane season, among others, as causes of the delay in their 2020 census operations.  *See, e.g.*, *Ohio v. Raimondo*, 2021 W.L. 1118049 at *1-2 (March 24, 2021, S.D. Ohio).  As a result, the release of redistricting data was to be delayed until September 30, 2021.  In contrast, the 2010 census data was received by the Michigan Legislature on March 22, 2011.[8]

### 3.    The Commission adopted plans on December 28, 2021.

On August 12, 2021, the Census Bureau, in an unprecedented move, made available on its website a non-tabulated, legacy format version of the redistricting data.[9]  And on September 1, 2021, the Census Bureau announced it would release

---

[5] *See Census Bureau Statement on Apportionment Counts*, Release Number CB21-RTQ.06, 1/28/21, available at Census Bureau Statement on Apportionment Counts, (accessed June 14, 2022.)

[6] *See Census Bureau Statement on Redistricting Data Timeline*, Release Number CB21-CN.14, 2/12/21, available at Census Bureau Statement on Redistricting Data Timeline, (accessed June 14, 2022.)

[7] The redistricting data includes counts of population by race, ethnicity (Hispanic or Latino origin), voting age, housing occupancy status, and group quarters population at the smallest geographic level, which is a census block.

[8] Given the delay in the release of census data, Secretary Benson and the Commission sought an extension of the constitutional deadlines from the Michigan Supreme Court.  The court, however, declined to provide relief.  *See In re Independent Citizens Redistricting Commission*, Michigan Supreme Court Case No. 162891.

[9] Legacy format data is a non-tabulated version of census data that must be processed before use.  The data in the legacy format files is identical to the P.L. 94-171 redistricting data files.  The difference is in the format the census data is

the final, tabulated P.L. 94-171 redistricting data by September 16, 2021, instead of September 30,[10] which it ultimately did.[11]

The Commission utilized the legacy format data to commence drawing state legislative and congressional district maps with the intent to later reconcile the legacy format data with the final, tabulated data.[12]  The Commission proposed state and congressional district plans on November 12, 2021,[13] and subsequently held numerous public meetings to hear comment on the proposed plans.  Ultimately, the Commission adopted state and congressional district plans on December 28, 2021, including the "Hickory" and "Linden" plans at issue in the instant litigation.[14]

---

presented.  *See* 2020 Census Statistics Highlight Local Population Changes and nation's racial and ethnic Diversity, August 12, 2021, available at Local Population Changes and Nation's Racial and Ethnic Diversity (census.gov), and Decennial Census P.L. 94-171 Redistricting Data, August 12, 2021, available at Decennial Census P.L. 94-171 Redistricting Data Summary Files, (accessed June 14, 2022.)

[10]  *See* Census Bureau Announces Release Date for Easier-to-Use Formats for Redistricting Data, September 1, 2021, available at Release Date for Easier-to-Use Formats for Redistricting Data (census.gov), (accessed June 14, 2022.)

[11] *See* Decennial Census P.L. 94-171 Redistricting Data, September 16, 2021, available at Decennial Census P.L. 94-171 Redistricting Data Summary Files.

[12] *See* MLIVE, August 13, 2021, With census data in hand, Michigan's redistricting commission to start drafting new political maps next week - mlive.com, (accessed June 14, 2022.)

[13] *See* Public Notice, November 12, 2021, available at MICRC_Plan_Publication_Notice_741252_7.pdf (michigan.gov), (accessed June 14, 2022.)

[14] *See* Commission's Proposed December 28, 2021, Meeting Minutes, available at MICRC_Proposed_Meeting_Minutes_2021_12_28_745307_7.pdf (michigan.gov), (accessed June 14, 2022.)

**C.    The Commission's unavoidable delay in adopting plans likewise delayed the Secretary's implementation of the maps.**

**1.    The Secretary of State's duty to implement the new maps.**

The Michigan Bureau of Elections, housed within the Department of State, maintains the state's qualified voter file (QVF), which is an electronic list of all registered voters in the state—currently over eight million people.  Mich. Comp. Laws § 168.509o.  For each voter, the QVF contains the list of all districts in which a voter lives, i.e., federal and state house and senate districts, as well as county, city, and school board districts, etc., which is used, among other things, to determine what ballot[15] a voter receives.  Mich. Comp. Laws § 168.509q.  The QVF also includes a "street index" of addresses for all registered voters in the state.  Mich. Comp. Laws § 168.509p(d).  After new maps are adopted by the Commission, the Bureau must update the QVF.

The update generally takes place in three phases.  In phase one, the new district lines are added to the QVF.  In phase two, the "street index" is reviewed to identify where districts have changed, and an update to registrations is made where voters' districts have changed.  To accomplish these updates, the Bureau does what it can to electronically move large groups of voters at one time.  Even so, manual, address-by-address changes is still required for thousands and thousands of voters where district boundaries limit the use of large or global moves.  In the third and final phase, the Bureau of Elections in collaboration with the over 1,500 local clerks

---

[15] In a statewide election year, there are upwards of 50,000 unique ballot styles in use around the state after accounting for the many and varied layers of offices up for election.

manually reviews and modifies voting precincts, as necessary.  *See* Mich. Comp. Laws §§ 168.654a, 168.661.  This is an extensive and time-intensive process with several discussions between the local clerks and the Bureau.

The updates to the QVF need to be completed in time to accommodate candidates seeking to run in the August primary election cycle.

> ### 2. The Bureau of Elections timely updated the qualified voter file to incorporate the Commission's adopted district maps.

The Commission adopted the new congressional and state house and senate plans on December 28, 2021.  Shortly thereafter, the Bureau began working to update the QVF.  Following the phases outlined above, the Bureau was able to update the QVF with the new districts in time to meet the filing deadline for candidates seeking to access the ballot for the August 2, 2022 primary election.

This year the deadline to collect signatures and file nominating petitions for accessing the primary ballot was April 19, 2022 (the 15th Tuesday before the primary).[16]  This included nominating petitions for congressional representatives, Mich. Comp. Laws § 168.133, and state senators and representatives, Mich. Comp. Laws § 168.163.  The completion of this process was essential to the nomination process so the potential candidates could know not only *whom* they would represent, but whether or not they *could*, as Michigan Election Law requires candidates to live in the state senate and house district they wish to represent.  Mich. Comp. Laws §

---

[16] *See* Michigan Election Dates 2022, p 3, available at 2022 Election Dates Booklet (michigan.gov), (accessed June 14, 2022.)

168.162.  But more significantly, the Bureau of Elections and the local clerks needed to have the QVF updated in order to canvass nominating petitions and determine whether petition-signers are registered to vote in the candidate's district. As a result, it was essential that the QVF updates for these offices was completed by the April 19 filing deadline.

At this point it is unclear what timeline the instant litigation will follow. After the November 2022 general election, the next regularly scheduled election using the adopted maps would be the August 2024 primary election.  *See* Mich. Comp. Laws § 168.3(l); 168.641(1)(b), (2); 168.643.  The filing deadline for candidates seeking to access the August 6, 2024, primary election would be April 23, 2022 (the 15th Tuesday before the election).  So, if this Court were inclined to order that new maps be drawn for state house and senate districts, this must occur sufficiently in advance of the April 23, 2024 filing deadline so that candidates can determine in which district they may run, and the Bureau can update the QVF.

## ARGUMENT

I.   **Defendant Secretary of State Jocelyn Benson should be dismissed where Plaintiffs have failed to state a claim against the Secretary under the Equal Protection Clause or the Voting Rights Act.**

A.   **Standard of review.**

1.   **Rule 12(b)(6)**

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests a complaint's legal sufficiency.  Indeed, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible

where the facts allow the Court to infer that the defendant is liable for the

misconduct alleged.  *Id.*  This requires more than "bare assertions of legal

conclusions"; a plaintiff must provide the "grounds" of his or her "entitlement to

relief." *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir.

2007); *Twombly*, 550 U.S. at 555 (while detailed factual allegations are not

required, a pleading must offer more than "labels and conclusions" or "a formulaic

recitation of the elements of the cause of action"); *Iqbal*, 556 U.S. at 678 (Rule 8

"demands more than an unadorned, the-defendant-unlawfully-harmed-me

accusation").

### 2.    Rule 12(b)(1)

Dismissal is appropriate under Federal Rule of Civil Procedure 12(b)(1)

where the court lacks subject matter jurisdiction over a plaintiff's claim. Fed. R.

Civ. P. 12(b)(1).  If a Rule 12(b)(1) motion challenges the court's subject matter

jurisdiction based on the sufficiency of the pleadings' allegations, the motion is a

facial attack. *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). In reviewing

a Rule 12(b)(1) facial attack, the court must accept all material allegations as true

and construe them in a light most favorable to the non-moving party. *Id*.

### B.    Plaintiffs fail to state a claim against the Secretary of State under the Equal Protection Clause where she is not sufficiently connected to, or responsible for, the alleged unlawful conduct.

In Counts III and IV of their amended complaint, Plaintiffs allege that the

Secretary has violated Plaintiffs' rights under the Equal Protection Clause.  (ECF

No. 8, PageID.143-151.)  But while Plaintiffs bring these claims against the

13

Secretary, they do not allege the Secretary engaged in any conduct that has

deprived them of any rights secured by federal law.

42 U.S.C. § 1983 creates a cause of action against government officials who

violate an individual's rights:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State .... subjects, or causes to be subjected,
> any citizen of the United States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party
> injured in an action at law.

42 U.S.C. § 1983. "To survive a motion to dismiss under § 1983, the plaintiff must

properly allege two elements: (1) the defendant was acting under color of state law,

and (2) the offending conduct deprived the plaintiff of rights secured under federal

law. *Mezibov v. Allen,* 411 F.3d 712, 716 (6th Cir. 2005).

In this case, Plaintiffs seek declaratory and prospective injunctive relief

against Secretary Benson in her official capacity.  Although the Court in *Ex Parte

Young* permitted claims against state officials in their official capacities despite

Eleventh Amendment immunity, this permission was not unlimited.  The Court

stated that "such officer must have some connection with the [unconstitutional act],

or else it is merely making him a party as a representative of the state, and thereby

attempting to make the state a party." *Ex Parte Young*, 209 U.S. 123, 157 (1908).

The sued official "must have, by virtue of the office, some connection with the

alleged unconstitutional act or conduct of which the plaintiff complains." *Floyd v.

Cnty. of Kent*, 454 Fed. Appx. 493, 499 (6th Cir. 2012). "A plaintiff must allege facts

showing how a state official is connected to, or has responsibility for, the alleged

constitutional violations." *Top Flight Entertainment, Ltd. v. Schuette*, 729 F.3d 623, 634 (6th Cir. 2013) (citing *Floyd*, 454 Fed. Appx. at 499).

But here Plaintiffs have alleged neither a sufficient connection between the Secretary and the alleged unlawful act—the drawing and adoption of the Linden and Hickory plans—nor that she was responsible for these actions, and so they cannot sustain their claims against the Secretary.  Plaintiffs instead allege only that "Defendant Jocelyn Benson . . . is the Michigan Secretary of State.  As Secretary of State, Defendant Benson is charged with enforcing District boundaries and accepting the declarations of candidacy for Michigan Senate and House candidates."  (ECF No. 8, Am. Compl., ¶ 41, PageID.109.)  Plaintiffs go on to identify the Commission as a defendant along with the individual members.  *Id.*, ¶¶ 42-55, Page ID.109-111.  Thereafter, Plaintiffs state in their amended complaint that "[e]ach of the named Defendants to this action are hereafter collectively referred to as the 'Defendants.'"  *Id.*, ¶ 56, PageID.111.  The only other instances where Secretary Benson is referenced specifically is in conjunction with statements she made in various articles before becoming Secretary of State.  *Id.*, ¶¶ 85, 88, PageID.121-122.

Otherwise, throughout their factual allegations, Plaintiffs specifically allege only actions or conduct engaged in by the "Commission" or specific Commission member defendants related to drawing the challenged maps.  *Id.*, ¶¶ 60, 65-67, 71-72, 74-75, 79-81, 83-84, 86, 90, 95, 97, 104-105, 118, 123, 125, 135, 140-144, and 146.  For example, ¶ 86 alleges that the "Commission's Minority Opportunity Districts

intentionally lowered BVAP by placing Black voters in Districts where it is
predicted that the District majority will vote for the Black voter candidate of
choice." This is also true with respect to the legal claims pleaded by Plaintiffs. *Id.*,
¶¶ 154, 158, 162, 171, 176, 186-189, 191-196, 203, 205-211. For example, § 162
alleges that the "Commission's actions in lowering the BVAP in each of these
Districts dilutes the ability of the House VRA Plaintiffs' ability to elect candidates
of their choice in future House Democratic Primary Elections."

> And in their "Prayer for Relief," Plaintiffs' request that the Court:
>
> B. Establish a reasonable deadline by which *Defendants* must *redraw the House and Senate District maps and/or adopt Plaintiffs' proposed Remedy Map*, or, alternatively, should Defendants failed to meet the Court's deadline, that the Court assume jurisdiction, appoint a special master, and draw constitutionality compliant House and Senate District maps; . . . .
>
> D. Retain jurisdiction until such time that all Defendants have complied with all of the Court's orders and mandates stemming from this action;

Am. Compl., ¶¶ B, D, PageID.151-152 (emphasis added).

As discussed above, while the Secretary does serve in an administrative
capacity to the Commission, Mich. Const. 1963, Art. 4, § 6(1)(4), she had no
substantive role in drawing or adopting district maps, including the Linden and
Hickory plans Plaintiffs challenge here. Consistent with that fact, the Secretary
will not be taking any substantive position with respect to the legality of the plans,
even if she is not dismissed from the lawsuit. Indeed, defense of the maps is best
left to the body that drew them—the Commission. But the Secretary is a bystander
to the map-drawing process. If the Court ordered "Defendants" to "redraw" the

House and Senate Districts or to "adopt" the Remedy Map, the Secretary would have no role or function to perform in relation to the actual drawing or adoption of the maps.

Here, Plaintiffs have not factually alleged any wrongdoing on the part of Secretary Benson.  They simply lump her in with the Commission defendants.  The only specific allegation they make as to her is that she "is charged with enforcing District boundaries," which Defendant understands to reference her obligation to update the QVF with new districts.  (ECF No. 8, Am. Compl., ¶ 41.)  But the Secretary's implementation of the new maps into the QVF is not the direct cause of any harm to Plaintiffs.  Updating the QVF is simply an administrative function that the Bureau of Elections must perform when new redistricting maps are adopted. Neither the Secretary nor the Bureau can change the plans or refuse to implement plans adopted by the Commission.  And if this Court were to order the Commission to draw and adopt new plans or to adopt the Remedy Map, the Bureau of Elections would update the QVF to reflect the new districts.  The Secretary would cause this to happen regardless of whether she is a party to this case.

In other words, the Secretary does not need to be a defendant in this matter in order to ensure that the QVF is updated with any new plans adopted by the Commission.  The Secretary and the Bureau would have a legal duty to do so regardless.  On the facts as alleged, the Secretary has neither engaged in the conduct that warrants prospective relief nor does she have the power to provide the relief sought—the drawing and adoption of new maps. *See Top Flight*

*Entertainment,* 729 F.3d at 634 (affirming dismissal of claim for declaratory and injunctive relief against Attorney General); *Kitchen v. Leach*, 2017 WL 1905871 at * 9 (W.D. Mich., May 10, 2017) (dismissing claim for declaratory and injunctive relief against state corrections officer).

Because Plaintiffs' factual allegations are insufficient to support plausible equal protection claims against the Secretary*, Iqbal*, 556 U.S. at 678, Counts III and IV should be dismissed as to her.

**C.     Plaintiffs fail to state a claim against the Secretary of State under the Voting Rights Act because they lack standing to bring these claims against her.**

In Counts I and II of their amended complaint, Plaintiffs assert claims under Section 2 of the Voting Rights Act (VRA).  (ECF No. 8, PageID.135-142.)

The VRA prohibits any "State or political subdivision" to impose, or cause to be applied, any voting "standard, practice, or procedure" which "results in a denial or abridgment of any right of any citizen of the United States to vote on account of race or color." 52 U.S.C § 10301.  To prevail on a claim under Section 2 of the VRA, House VRA Plaintiffs have the burden to prove the following three preconditions, as articulated by the United States Supreme Court in *Thornburg v. Gingles,* 478 U.S. 30, 50-51 (1986): 1) that the minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district," 2) that the minority group is "politically cohesive," and 3) that the rest of the electorate, or the white majority, votes sufficiently cohesively as a bloc to defeat the candidate preferred by the minority.

Here, Plaintiffs have failed to state a claim against the Secretary of State under Section 2 of the VRA because they do not have standing to bring their claim against her.

Article III of the United States Constitution limits the jurisdiction of federal courts to hear actual cases and controversies.  U.S. Const. Art 3, § 2. The analysis of whether a plaintiff has standing to bring suit assists in defining the contours of this constitutional limitation.  Plaintiffs bear the burden of establishing that they have standing to file suit.  *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). Standing requires that a plaintiff establish that: (1) she or he suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent rather than conjectural or hypothetical; (2) a causal connection between the injury and the defendant's alleged wrongdoing; and (3) an injury that can likely be redressed. *Lujan v. Defs. of Wildlife*, 504 U.S. 95, 101 (1983).  "[A]t the pleading stage, the plaintiff must 'clearly ... allege facts demonstrating' each element."  *Spokeo, Inc. v. Robins,* 136 S. Ct. 1540, 1547 (2016) (quoting *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975)).

Assuming for the sake of argument that Plaintiffs have pled sufficient facts to satisfy the first factor, they cannot satisfy their burden as to the Secretary on the second and third factors.

Regarding the second factor, Plaintiffs cannot show a causal connection between their alleged injury—the alleged adoption of unlawful district plans—and any conduct by the Secretary.  Plaintiffs' injury must be "fairly traceable to the

challenged action of the defendant." *Lujan*, 504 U.S. at 560.  But as discussed above, Plaintiffs have not alleged any facts showing that the Secretary of State engaged in any map-drawing or had any role in adopting the Hickory and Linden plans, other than providing administrative support to the Commission as its secretary.  Plaintiffs' purported injury simply is not fairly traceable to the Secretary.

Turning to the third factor, Plaintiffs' alleged injury would not be redressed by a favorable decision against the Secretary of State.  Again, for relief Plaintiffs' request that the Court order Defendants to redraw the House and Senate maps or adopt Plaintiffs' proposed Remedy Map.  (ECF No. 8, Am. Compl., ¶¶ B, D, PageID.151-152.)  But again, the Secretary does not sit on the Commission.  She does not participate in drawing maps, nor does she have a vote on whether any map should be adopted.  Further, as noted above, if the Court orders new maps be drawn and adopted, the Secretary's administrative duties to provide technical support to the Commission and to later update the QVF would commence by operation of law, regardless of any order by this Court.  Thus, Plaintiffs' alleged injury and the substantive relief Plaintiffs seek would not be redressed by a decision against the Secretary.

Because Plaintiffs have not met their burden to clearly allege facts demonstrating that each of the standing elements is met with respect to the Secretary of State, Counts I and II should be dismissed as to her.

## CONCLUSION AND RELIEF REQUESTED

For the reasons set forth above, Defendant Secretary of State Jocelyn Benson respectfully requests that this Court grant her motion to dismiss under Rule 12(b)(1) and (6).

Respectfully submitted,

*s/Heather S. Meingast*
Heather S. Meingast (P55439)
Erik A. Grill (P64713)
Assistant Attorneys General
Attorneys for Defendant Benson
P.O. Box 30736
Lansing, Michigan 48909
517.335.7659
Email:  meingasth@michigan.gov
P55439

Dated:  June 14, 2022

## CERTIFICATE OF SERVICE

I hereby certify that on June 14, 2022, I electronically filed the above document(s) with the Clerk of the Court using the ECF System, which will provide electronic copies to counsel of record.

*s/Heather S. Meingast*
Heather S. Meingast (P55439)
Assistant Attorney General
P.O. Box 30736
Lansing, Michigan 48909
517.335.7659
Email:  meingasth@michigan.gov
P55439