# Exhibit A

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DONALD AGEE, JR., an individual, et al

      Plaintiffs,

vs.

JOCELYN BENSON, in her official capacity
as the Secretary of State of Michigan, et al,

      Defendants.

Case No. 22-cv-00272-PLM-RMK-JTN
Hon. Paul L. Maloney
Magistrate Judge: Sally J. Berens

---

**BRIEF OF AMICI CURIAE COMMON CAUSE AND PROFESSOR JON X. EGUIA IN
SUPPORT OF NEITHER PARTY**

**SUMMARY OF ARGUMENT**

When Michigan voters passed Proposal 2 to create an independent citizens redistricting

commission, they adopted constitutional requirements for the redistricting that prioritized

compliance with the U.S. Constitution and the federal Voting Rights Act (VRA). According to

the *Thornburg v. Gingles* framework established by the U.S. Supreme Court, a court's

examination of whether a redistricting map caused impermissible vote dilution begins with three

pre-conditions: a racial minority population is sufficiently large and geographically compact to

constitute a majority of the voting-age population in a single-member district; the minority

population is politically cohesive; and the majority population votes sufficiently as a bloc to

defeat the minority group's preferred candidate. 478 U.S. 30 (1986).

Common Cause submits this amicus brief with Professor Jon X. Eguia to present

statistical evidence that pre-conditions for vote dilution are met with regard to the Michigan

Senate map drawn by the Michigan Independent Citizens Redistricting Commission (MICRC or

Commission). Most computer-generated maps using race-blind processes yield at least two

1

240169

majority-Black State Senate districts, and many produce three. Jon X. Eguia, *Michigan Redistricting Map Analysis*, MICHIGAN STATE UNIVERSITY INSTITUTE FOR PUBLIC POLICY AND SOCIAL RESEARCH 1, 12, 96 (Dec. 2021), https://ippsr.msu.edu/sites/default/files/SOSS/data-publications/FINALInterimReportWebUpdated22-compressed.pdf [hereinafter MSU Report]. The failure to draw any Senate seats with Black Voting Age Populations (BVAP)[1] of over 45% should trigger court scrutiny. Further, Detroit's Black community leaders and residents presented significant testimony about voting cohesiveness and evidence of shared communities of interest to commissioners that should have been considered.

The MICRC plays an important role in shaping a more fair and representative democracy. Michiganders sought to replace the secretive, partisan, and self-serving gerrymandering carried out by the legislature with a more transparent and responsive citizen-led process. Although the MICRC pursued the people's will with earnest sincerity, the Commission's difficult task included listening to the public's testimony, applying the laws correctly, and drawing maps that would undo the legislature's past wrongs. Michiganders instituted a process for court review to ensure maps would meet all the constitutional criteria, and in this instance, we believe the Michigan Senate map merits court scrutiny.

## STATEMENT OF INTEREST

**Common Cause** was founded by John Gardner in 1970 as a nonpartisan "citizens lobby" whose primary mission is to protect and defend the democratic process and make government accountable and responsive to the interests of ordinary people, not merely to those of special interests. Common Cause is one of the nation's leading democracy organizations and has over

---

[1] More specifically, BVAP is "*Voting Age Population who choose "Black" exclusively in the Census race question*" divided by "*Voting Age Population*". This is the definition used by the MICRC in the official data accompanying the public release of the maps.

240169

1.1 million members nationwide and local chapters in 35 states. Common Cause has been a leading advocate of reforms to address partisan and racial gerrymandering by creating more inclusive, impartial, and representative redistricting processes, including in Michigan. Common Cause consulted with local activists on the development of the ballot initiative creating the MICRC and was a key partner in the Commission's feedback and community outreach work. We also monitored the process in coalition with other democracy organizations and co-developed messaging and outreach strategies to increase turnout for in-person hearings.

**Jon X. Eguia** is a Professor of Economics and (by courtesy) of Political Science at Michigan State University. He is the lead author of the Report on the 2021 Michigan Redistricting Map Analysis published by the Institute of Public Policy and Social Research at Michigan State University. His research on redistricting is published in the peer-reviewed Election Law Journal.

**ARGUMENT**

**I.**     **The MICRC's Process for Drawing Voting Districts was a Significant Improvement Over Michigan's Former Politician-Led Process.**

     a.   **Michigan Voters Created the MICRC to Provide a More Open and Inclusive Process**

To understand the intent behind Proposal 2, Michigan's citizen-initiated ballot measure that passed by overwhelming margins in 2018 to create the Michigan Independent Citizens Redistricting Commission, it is important to recognize what voters were rejecting.

In the redistricting cycle following the 2010 census, legislators approved districts in a secretive process conducted without regard for public input and created some of the most extreme gerrymanders in the United States. *League of Women Voters of Mich. v. Benson*, 373 F. Supp. 3d 867, 902 (E.D. Mich. 2019) ("Using the efficiency gap measure, Dr. Warshaw

3

concluded that the Enacted Plan's congressional maps have one of the largest partisan biases of any congressional districting plan in history."), *rev'd sub nom.* Chatfield v. League of Women Voters of Mich., 140 S. Ct. 429 (2019) (finding violations of 14[th] Amendment Equal Protection rights and 1[st] Amendment free speech and association rights because the legislature plans intentionally diluted citizens' voting power to ensure partisan outcomes). These plans packed as many Democratic voters into as few districts as possible while distributing Republican voters among districts more evenly. *See id.*

> The federal court in *League of Women Voters of Mich. v. Benson* found:
>
> Project REDMAP proved wildly successful both nationally and in Michigan. As the [Republican State Leadership Committee] RSLC said in its 2013 report, in the 113th Congress, elected in November 2012 during the first elections after the 2011 redistricting cycle, . . . [t]he effectiveness of REDMAP is perhaps most clear in the state of Michigan. Id. at 3.

The REDMAP report explained that while "[t]he 2012 election was a huge success for Democrats at the statewide level in Michigan[,]" with voters "elect[ing] a Democratic U.S. Senator by more than 20 points and reelect[ing] President Obama by almost 10 points . . . Republicans at the state level maintained majorities in both chambers of the legislature and voters elected a 9-5 Republican majority to represent them in Congress." *Id. a*t 883. The court further found that the legislature intentionally drew the maps in secrecy, mapping in undisclosed locations and using personal emails to communicate about redistricting. *Id.* at 886.

Under the 2011 redistricting plans, party leaders in the Michigan Legislature also packed Black Detroiters into a small number of districts to dilute their influence in other districts. Clara Hendrickson, *Michigan districts 'packed' Detroit voters in the past, commission aims to change that*, DETROIT FREE PRESS (Sept. 2, 2021),

240169

https://www.freep.com/story/news/local/michigan/detroit/2021/09/02/michigan-redistricting-commission-fix-packed-districts/5655838001/.

Evidence exists that this racial packing of Black voters was intentional and discriminatory. For example, the court noted that Republican Congressman Thaddeus McCotter's Chief of Staff Jack Daly emailed the Republican mapper responsible for designing Michigan's congressional districts about the lower-than-expected census count from Detroit, saying "[i]n a glorious way that makes it easier to cram ALL of the Dem garbage in Wayne, Washtenaw, Oakland and Macomb counties into only four districts. Is there anyone on our side who doesn't recognize that dynamic?" *League of Women Voters of Mich.*, 373 F. Supp. 3d at 890.

Michigan voters passed Proposal 2 to change all of this by amending the Michigan Constitution to empower a citizen-led Commission to draw the state's congressional, Senate, and House districts. MICH. CONST. art. IV, § 6(1). The 2021 redistricting cycle represents the first time in Michigan history that ordinary Michigan residents drew these districts.

### b.  Michigan Voters Prioritize Transparency, Fairness, Public Input, and Respect for Communities in Redistricting

Michigan Proposal 2's people-centered approach to drawing voting districts was popular and resulted in overwhelming support for the Commission model. Polling conducted February 11-14, 2022, after the Commission completed the drawing of districts, showed that 65.5% of Michigan voters believed the state should continue using this model to draw districts, compared to the 10.1% of Michiganders opposed to the process. *Mich. Indep. Citizens' Redistricting Comm'n Mich. Voter Surv. 600 Sample,* GLENGARIFF GROUP, INC., at 2, 13 (Feb. 17, 2022), https://www.michigan.gov/micrc/-/media/Project/Websites/MiCRC/MISC5/MICRC-Post-Survey-Report.pdf.

240169

Voters with awareness of the redistricting commission's changes overwhelmingly supported the commission's work. *Id.* at 8.  A March 2021 survey found that Michigan voters identified the following aspects of the redistricting process as important:

1. The MICRC, and not politicians, designed districts (60.8% support)

2. Neither party gains an unfair advantage through gerrymandering (60.8% support)

3. Michigan voters, not elected officials, have input designing Michigan's new districts (60.1% support)

4. Ensuring that maps are designed in the public view, so all sides can watch the process unfold (57% support)

5. Ensuring citizen input into the design of new maps through public hearings and comments (55.4% support)

6. Communities with common historical, cultural, and economic interests are put in districts together, rather than divided up to weaken their voices (48.4% support, 19% disapprove, 10.5% neutral, 22.1% don't know)

7. Ensuring the MICRC's decision-making is transparent (45.7% support, 29% disapprove, 8.1% neutral, 17.1% don't know) *Id.* at *2, 8.*

More than 78% of voters who were aware of new voting districts, including a majority of all party affiliations, agreed that Michigan should continue to empower the Commission to draw Michigan's voting districts. *Id.* at 13.

6

240169

    **c.  Although the MICRC Made Strides to Promote Public Engagement and Address Partisan Fairness, the Senate Map Process should have Prioritized Compliance with the Voting Rights Act**

Following the 2020 census, the newly created citizen-led Commission engaged in a redistricting process that, for the first time, was constitutionally required to conduct the drawing of districts in full view of the public. As a result, the Commission led an open and inclusive process, holding 120 public hearings and receiving nearly 30,000 public comments through in-person and electronic means. *Communications and Outreach Update*, MICH. INDEP. CITIZENS REDISTRICTING COMM'N (Mar. 10, 2022), https://www.michigan.gov/micrc/-/media/Project/Websites/MiCRC/MISC5/MICRC-CO-031022.pdf?rev=e1e5911a7d264fa997475f9270d6380a&hash=D6FB5458F97A8339A47E7FAAFE75AEAE.

The Commission was presented with extensive data by experts about how the previous maps had been drawn to pack Democratic and Black voters. For instance, Dr. Lisa Handley, who conducted racial voting bloc analysis for the Commission reported on the number of state legislative seats in the 2011 maps that were majority Black or had sufficient Black population to enable the Black community to elect candidates of choice, pointing out three House districts that topped 90% BVAP. Lisa Handley, *Rep. to the Mich. Indep. Citizens Redistricting Comm'n* (2021), https://www.michigan.gov/micrc/-/media/Project/Websites/MiCRC/Nov82021TOJan312022/Handley_Final__Report_to_MICRC_with_Appendices.pdf?rev=44e5d468277240879b7d496e133d5e1c&hash=D0131E88C91486F842B29E88030D671C at 24-25 [hereinafter Handley Report].

Dr. Handley also reported that the 2011 Senate districts had four districts that empowered Black voters to elect candidates of choice, two of which were over 50% BVAP. The Handley

7

Report identified no single "threshold of representation," i.e., the lowest minority percentage above which minority candidates are consistently elected, that could be applied in every county. Instead, she took pains to point out that that threshold could vary, depending on the county based on differences of voter behavior, and recommended district specific analysis. Ibid at 20-24. While it is unclear if time constraints or inadequate access to information resulted in confusion about how to apply the Voting Rights Act, what is evident is the Commission voted to adopt Senate plans with no districts of more than 45% BVAP.

## II. The Michigan Constitution Mandates that Districts Comply with the Voting Rights Act

### a. The Michigan Constitution Prioritizes Adherence to the Voting Rights Act

The Michigan Constitution requires the Commission to map according to identified criteria, ranking adherence to the Voting Rights Act as a top priority. Michigan Constitution, Article IV § 6 (13)(a).

Section 2 of the Voting Rights Act prohibits states and any political subdivision from using any "voting qualification or prerequisite to voting or standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color."[1] To establish a Section 2 claim under the VRA, plaintiffs must prove three preconditions as outlined in *Thornburg v. Gingles.* 478 U.S. 30 (1986).

(1) The minority group must be "sufficiently large and geographically compact to constitute a majority in a single member district,"

(2) The minority group must be "politically cohesive," and

8

(3) the majority group votes sufficiently as a bloc to enable it to usually defeat the minority groups' preferred candidate. *Id.*

b. ***Gingles* 1 - Michigan's Black Communities are Sufficiently Large and Geographically Compact to Constitute a Majority in More than One District and a Sufficient Plurality in Others to Elect their Candidates of Choice.**

Michigan is home to large populations of people of color, most notably in Detroit, where the city's population is 77% Black, with significant populations of Latino, Middle Eastern, Asian and other groups. *QuickFacts, Detroit City, Mich.*, U.S. CENSUS BUREAU, https://www.census.gov/quickfacts/fact/dashboard/detroitcitymichigan/RHI225221#RHI225221. The Senate map Commissioner Kellom (SD Kellom) proposed and computer simulated ensemble maps show that reasonably compact districts can be drawn to give Black communities in the Detroit area opportunities to elect candidates of their choice, thereby satisfying *Gingles* 1.

1. <u>Computational Ensemble Maps Demonstrate the Likelihood of Drawing Constitutionally Compliant Maps with Majority Black Districts</u>

Michigan State University's Institute for Public Policy and Social Research published the Michigan Redistricting Map Analysis to assess draft and proposed maps by the MICRC. MSU Report at 10. The report's authors collaborated with other data and voting experts, including Professor Moon Duchin's Metric Geometry and Gerrymandering Group (MGGG) at Tisch College of Tufts University. *Id.* at 6.

MGGG randomly generated alternate districting plans through its Recombination algorithm. *Id.* at 6, 12. The resulting Computational Ensemble, or the package of alternate computer-generated plans, contained 100,000 maps for each type of districting requirement (House, Senate, and congressional). *Id.* at 12. All maps in the Computational Ensemble are "within 1% of the ideal district population, and attempt to respect county boundaries, but are not

9

240169

designed to follow any other criteria." *Id.* In other words, these generated plans were drawn with no consideration given to race.  *Id.* at 119.

**Almost all of the 100,000 computer-generated Senate maps featured two majority-Black districts, and close to a half contained three.** *Id.* **at 12, 96. This demonstrates it was not merely possible for Senate plans to include majority Black districts, it was probable. The adopted Senate map's lack of even one majority-Black district constitutes a significant statistical outlier.**

We do not propose the use of computer-generated maps to replace the drawing of maps based on community input. We note this compelling statistical evidence to demonstrate that an alternative approach to drawing a Senate map that more effectively empowered Black voters was the most likely statistical outcome.

2.   <u>Commissioner Kellom's Senate Map Presents At Least One Viable VRA-Compliant Alternative Map</u>

Unlike the adopted Senate map, SD Kellom creates one majority-Black Senate district and three with over 48% BVAP. MSU Report at 2, 110.[2]

When compared to MGGG's 100,000 simulated Senate maps, SD Kellom falls within the normal range of districts at each of the BVAP percentages in Figure 1.

**Figure 1: Number of Senate Districts with Black Voting Age Population (BVAP) above a given percentage.**

| BVAP | Adopted map (Linden) | Kellom map | "Normal" range of # of opportunity districts | |
|---|---|---|---|---|
| | | | 90% of simulated maps | 98% of simulated maps |
| 50% | 0 | 1 | 2 to 3 | 1 to 3 |
| 48% | 0 | 3 | 2 to 3 | 2 to 4 |
| 46% | 0 | 3 | 2 to 3 | 2 to 4 |

---

[2] The MSU report uses a more expansive definition of BVAP, i.e., counting persons who indicated on the Census at least one race is "black." Under that more expansive definition, SD Kellom has three districts with BVAP over 50%. The adopted Senate map does not have a single such BVAP majority district.

240169

| 45% | 0 | 3 | 2 to 3 | 2 to 4 |
| 44% | 1 | 3 | 2 to 3 | 2 to 4 |
| 42% | 2 | 4 | 2 to 4 | 2 to 4 |
| 40% | 4 | 4 | 2 to 4 | 2 to 4 |

c. *Gingles* **2 - The Commission's Expert Analysis Demonstrates that Detroit's Black Voters are Politically Cohesive.**

Dr. Handley's demographic analysis concluded that voting patterns in Michigan satisfy the second prong of the Gingles test. This analysis found that Detroit's Black voters are politically cohesive. "A showing that a significant number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim, and consequently establishes minority bloc voting within the meaning of § 2." Thornburg v. Gingles, 478 U.S. 30, 56 (1986). As Dr. Handley stated, "in every election contest considered [in the report's analysis,] at least 95% of Black voters supported the Black-preferred candidate." Handley Report at 21.

d. *Gingles* **3 - The Commission's Expert Found White Bloc Voting that Could Defeat Black Voters' Preferred Candidates.**

The third *Gingles* precondition is a showing of "a white bloc vote that normally will defeat the combined strength of minority support." *Gingles*, 478 U.S. at 56.

Dr. Handley demonstrated that this type of significant white bloc voting occurs in Michigan. Based on an examination of statewide election contests between 2012-2020, every statewide general election contest analyzed was polarized in Oakland County, 11 of 13 contests were racially polarized in Saginaw County, 9 of 13 in Genesee County, and 7 of 13 in Wayne County. Handley Report at 6-7. Dr. Handley states, "voting in Michigan is racially polarized, [so] districts that provide minority voters with an opportunity to elect their candidates of choice

11

240169

must be drawn. If they already exist – as many do in Michigan – they must be maintained." Handley Report at 17.

### e. The Commission's Expert Recommended a District-by-District Analysis to Ensure Voting Rights Act Compliance

Dr. Handley observed "[b]ecause Blacks who are age eligible to vote often turn out to vote at lower rates than white voters in Michigan, the Black VAP needed to ensure that Black voters comprise at least half of the voters in an election is often higher than 50%." Handley at 5, 18.

Because none of the districts in the adopted Senate map have a BVAP over 45%, additional analysis is needed to determine whether Black voters can elect candidates of their choice. Dr. Handley recommended that the Commission conduct a district-by-district analysis to ascertain what level of BVAP is necessary to ensure Black voters can elect a candidate of their choice:

> An analysis must be undertaken to determine if a proposed district is likely to provide minority voters with an opportunity to elect their candidates of choice to office. This analysis must be district-specific – that is, must recognize there are likely to be differences in participation rates and voting patterns in districts across the state – and it must be functional – that is, it must be based on actual voting behavior of whites and minorities. There is no single universal or statewide demographic target that can be applied for Black voters to elect their candidates of choice in Michigan. *Id.* at 17.

Without this district-specific analysis, the replacement of two majority-Black districts with districts that had BVAPs under 45% lacked justification and thus merits closer examination to ensure Voting Rights Act compliance.

240169

**f.  Detroit Voters' Testimony about Senate Map Raised Concerns about VRA Compliance**

When commissioners approved the Linden plan, on December 28, 2021, some Commissioners asserted that it received significant support during the 45-day comment period. *December 28 Hearing Transcript*, MICRC 1, 110 (Dec. 28, 2021), https://www.michigan.gov/micrc/-/media/Project/Websites/MiCRC/MISC4/MICRC_Mtg_Transcript_12_28_21.pdf?rev=e68f2cff7 d514147b24c1a89bb4f9ab3&hash=1571DB03392F79F1D167B8DECC382BD2 [hereinafter Dec. 28 Hearing]. The testimony from Detroit and Lansing suggests otherwise.

Hearings in Detroit and Lansing featured comments from members of the Black community in both cities urging reconsideration. No commenters vocally supported the Linden plan, and many favored redrawing it to include majority-minority districts. Many commended Commissioners Kellom and Juanita Curry for attempting to better draw Detroit districts.

The many people raising concerns about the failure to consider the voting rights of Black Detroiters included a Wayne County Commissioner, NAACP Branch Presidents, an Executive Director of the Michigan Department of Civil Rights, the Chair of the Oakland County Democratic Black Caucus, the Commissioner with Black Leadership Advising Counsel, school board members, union representatives, lifelong Detroit residents, and others. *October 20 Hearing Transcript*, MICRC 1, 24, 29, 39, 52, 54, 56, 62, 65, 80, 133 (Oct. 20, 2021), https://www.michigan.gov/micrc/-/media/Project/Websites/MiCRC/Transcripts1/MICRC_Meeting_Transcript_10_20_2021.pdf?re v=a378536e31c446a494555afb9672b019&hash=0E0BEC4295A48C46AEB4689E2C0299D4 [hereinafter Oct. 20 Hearing].

240169

Detroit resident and Wayne County Commissioner Jonathan Kinloch testified:

> I'm asking you to recognize the advancements that the Black people have made in our ability to be elected into public office. Specifically, the state legislature. If these maps move forward, you have a potentially a circumstance where you have created unintentional consequences from these maps where you would have the least amount of elected Black officials in the history of this state. Detroit deserves to have representation that is reflective of its will.
> *Id.* at 54.

On November 2, Southgate resident Kelly Bruley said that "Detroit is the largest city in the state and home to the largest population of Black voters, yet the Commission spent minimal time discussing public comments . . . the Commission constantly delayed [Kellom's] concerns due to changes you saw more important." *November 2 Hearing Transcript*, MICRC 1, 13 (Nov. 2, 2021), https://www.michigan.gov/micrc/-/media/Project/Websites/MiCRC/MISC4/MICRC_11_02_21_Mtg_Transcript.pdf?rev=047b5b9 b55d942a79905dc222253ad08&hash=C40E09D398C34C5921963CF4782E49B9 [hereinafter Nov. 2 Hearing].

On Nov. 2, Abby Clark said:

> We heard [in] the Detroit public hearing significant distrust, fear, and deep concern about the maps in Detroit. And that comes from a legacy in our country of disenfranchisement of Black voters. You spent tremendous time on other minority communities on Midland, even though I don't think any of you are from Midland. . . . Please do the same with Detroit. Work with Commissioner Kellom. And give Detroit and Detroiters and Black Michiganders the time, effort, and energy they deserve in this process. *Id.* at 15-16.

### g. Multiple Commissioners, Including the Chair, Expressed Doubt Regarding the Senate Map

The record strongly suggests that the Commission approved a Senate map despite concerns multiple Commissioners held, possibly because of perceived time constraints or lack of access to expert advice clarifying what the law allowed or mandated. When the Commission voted for the Linden map, Kellom and Curry cast dissenting votes. Dec. 28 Hearing at 110.

14

240169

Subsequently, Commission Chair Rebecca Szetela and other commissioners expressed reservations regarding adopted maps in a Dissenting Report draft submitted during the summer of 2022. *Report on 2021 Redistricting*, MICH. INDEP. CITIZENS REDISTRICTING COMM'N, https://www.michigan.gov/micrc/-/media/Project/Websites/MiCRC/MISC6/MICRC-Section16-Report-Draft-72122.pdf?rev=981f6c0df5f94f3ba45075e509216b2f&hash=D2663F1E2C344C6EFA963FC25B9FE041 at 73, 77, 92, 106 (2022). Szetela said that the Commission's counsel "aggressively" pushed the Commission to keep BVAP numbers as close to 35-40% as possible. *Id.* at 92-93. Commissioner Wagner remarked that "Detroit's voice was by far the largest and loudest and yet we still seem to have allowed that voice to fall on deaf ears." *Id.* at 85. According to Szetela, Commissioners were encouraged to disregard public comments calling for higher BVAP percentages.

Dr. Handley sought to correct the record on how the Commission should proceed. *Id.* On December 10, 2021, Dr. Handley told Commission staff that draft maps contained BVAP levels that were too low for Black voters to elect candidates of their choice. *Id.* at 94-95. However, this information was not relayed to the Commission. *Id.* at 94, FN 10. Staff members uncomfortable with this directive notified Chair Szetela of Dr. Handley's concerns.  *Id.*

Despite these concerns, alternative plans such as the Kellom map may not have been considered due to the proximity of the map deadline. *See* Dec. 28 Hearing at 31. The Michigan Constitution requires the Commission to open a 45-day public comment period on the final map before casting a final vote. MICH. CONST. art. IV, § 6(14)(b). In early November, Szetela expressed concern about the time Commissioners had left to approve its maps. Nov. 2 Hearing at

15

240169

104. In an effort to comply with the mandatory 45-day public comment period, mapping changes slowed to a halt in mid-November.

### h. The State House Map Better Incorporated Public Comments to Create Majority-Black and High BVAP Districts

The final House map the Commission approved contains some majority-Black districts. As the chart below shows, the number of majority-Black and high-BVAP districts the House map contains is well within the range of likely possibilities based on computational ensemble maps. As a result of more closely adhering to public input concerning the need for better representation for Detroit's Black communities, this map passed with the support of Commissioners Kellom and Curry. Dec. 28 Hearing at 123.

The House map contains seven majority-Black districts, six of which are in the Detroit metro area. MSU Report at 137. At each of these BVAP percentage markers, the number of districts in the approved map is within or above the range of 98% of computer-generated simulation maps and within an even more strict standard of 90% of all maps.

**Figure 2: Number of House Districts with Black Voting Age Population (BVAP) above a given percentage.**

| BVAP | Adopted map | "Normal" range of # of opportunity districts | |
|---|---|---|---|
| | | Strict: 90% of maps | Lax: 98% of maps |
| 50% | 7 | 6 to 9 | 5 to 9 |
| 48% | 7 | 6 to 9 | 5 to 10 |
| 46% | 7 | 6 to 9 | 6 to 10 |
| 45% | 7 | 6 to 10 | 6 to 10 |
| 44% | 8 | 7 to 10 | 6 to 10 |
| 42% | 11 | 7 to 10 | 6 to 11 |
| 40% | 13 | 8 to 11 | 7 to 11 |

After hearing public concerns about the reduction of majority-Black districts in Detroit to zero, the Commission changed the final House map to include six majority-Black districts in Detroit and one majority-Black district in Flint. Oct. 20 Hearing at 34, 91.

16

240169

## CONCLUSION

The Court should examine the adopted State Senate Map for compliance with the Voting Rights Act. Existing proposals and computational ensemble maps demonstrate that a Senate plan with multiple effective Black districts could have been adopted. Additional district-specific analysis is necessary to ensure that any adopted map does not dilute the ability of Black voters to elect candidates of their choice.

[1] 52 U.S.C.A. § 10301(a).
[2] *Gingles*, 478 U.S. at 44.
[3] S.Rep. No. 97-417, 97th Cong., 2d Sess. (1982).

Respectfully submitted,

Frank & Frank Law

By: */s/ Jonathan B. Frank*
      Jonathan B. Frank (P42656)
Attorneys for Common Cause and Jon X. Eguia
3910 Telegraph Road, Suite 200
Bloomfield Hills, MI  48302
(248) 723-8691
jonfrank@frankandfranklaw.com

Dated:  August 26, 2022

## PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing document was served upon the attorneys of record of all parties in the above cause by serving same to them via electronic mail on August 26, 2022 via:

X  Electronic Service                    __  Hand Delivery
__ First Class Mail                        ___Overnight Mail

*/s/ Amy Zielinski*
Amy Zielinski

17

240169