## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| DONALD AGEE, JR., an individual, *et al.*, <br><br>         Plaintiffs, <br><br> v. <br><br> JOCELYN BENSON, in her official capacity as the Secretary of State of Michigan, *et al.*; <br><br>         Defendants. | Case No. 1:22-cv-00272 <br><br> **Three-Judge Panel Appointed Pursuant to 28 U.S.C. § 2284(a)** <br><br> **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** <br><br> **ORAL ARGUMENT REQUESTED** |

Plaintiffs move for summary judgment against Defendants, the Michigan Independent Citizens Redistricting Commission, Douglas Clark, Juanita Curry, Anthony Eid, Rhonda Lange, Steven Terry Lett, Brittni Kellom, Cynthia Orton, M.C. Rothhorn, Rebecca Szetela, Janice Vallette, Erin Wagner, Richard Weiss, and Dustin Witjes, each in his or her official capacity as a Commissioner of the Michigan Independent Redistricting Commission (collectively, the "Commission") and Michigan Secretary of State Jocelyn Benson ("Secretary Benson") (the Commission and Secretary Benson are collectively referred to as "Defendants") on Counts I – IV of Plaintiffs' First Amended Complaint.[1]

---

[1] On May 1, 2023, Plaintiffs' counsel sought concurrence from Defendants' counsel and ascertained whether this motion would be opposed, in accordance with W.D. Mich. L. Civ. R. 7.1(d). Plaintiffs did not obtain concurrence in the relief sought herein.

Plaintiffs' Counts I and II are claims for violations of Section 2 of the federal Voting Rights Act, 52 U.S.C. § 10301 (VRA). ECF No. 8, PageID.135, 141. Counts III and IV are claims for racial gerrymandering under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, U.S. Const. amend. XIV, § 1. ECF No. 8, PageID.143, 146.

Plaintiffs are entitled to summary judgment on Counts I and II because there is ample evidence of racially polarized voting in Detroit Metropolitan Democratic primaries, so much so that the Voting Rights Act demands far more districts where Black voters have a fair opportunity to elect the candidates of their choice than the Commission created in its Michigan Senate and House maps.

Plaintiffs are also entitled to summary judgment on Counts III and IV because the reduced number of Black-majority districts was no accident. The Commission's bizarrely-shaped districts show that traditional redistricting criteria were subverted to the goal of drawing districts based on race when this was not necessary to achieve the Commission's goals.

For these reasons, and those stated in the accompanying brief in support of this motion, Plaintiffs respectfully request that the Court grant summary judgment in their favor on all four counts of their First Amended Complaint and order expedited briefing on the appropriate remedy.

Respectfully submitted,

Dated: May 9, 2023

 /s/ *John J. Bursch*
John J. Bursch (P57679)
BURSCH LAW PLLC
*Attorney for Plaintiffs*
9339 Cherry Valley Ave SE, #78
Caledonia, Michigan 49316
(616) 450-4235
jbursch@burschlaw.com

Michael J. Pattwell (P72419)
James J. Fleming (P84490)
Amia A. Banks (P84182)
CLARK HILL PLC
*Attorneys for Plaintiffs*
215 S. Washington Sq., Ste. 200
Lansing, MI 48933
(517) 318-3100
mpattwell@clarkhill.com
jfleming@clarkhill.com
abanks@clarkhill.com

3

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

DONALD AGEE, JR., an individual, *et al.*,

        Plaintiffs,

v.

JOCELYN BENSON, in her official capacity as the Secretary of State of Michigan, *et al.*;

        Defendants.

Case No. 1:22-cv-00272

**Three-Judge Panel Appointed Pursuant to 28 U.S.C. § 2284(a)**

**ORAL ARGUMENT REQUESTED**

## PLAINTIFFS' BRIEF IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF CONTENTS....................................................................................ii

INDEX OF AUTHORITIES ........................................................................... iv

CONCISE STATEMENT OF ISSUES PRESENTED.................................. vii

CONTROLLING OR MOST APPROPRIATE AUTHORITY....................viii

I.     INTRODUCTION ............................................................................... 1

II.    BACKGROUND ................................................................................. 2

       A.    Michigan's racial demographics................................................ 2

       B.    Recent Michigan redistricting history..................................... 3

       C.    The Commission's unlawful drawing of new Districts ........................ 4

       D.    The Commission ignored the concerns of Black voters and its own data. .................................................................................. 6

       E.    Plaintiffs ..................................................................................... 8

III.   STANDARD OF REVIEW ................................................................ 8

IV.   ARGUMENT ....................................................................................... 9

       A.    Summary judgment is proper as to Counts I and II because the Districts deny Plaintiffs their protected right under the VRA to elect their candidate of choice................................... 9

           1.    The VRA......................................................................... 9

           2.    Plaintiffs are entitled to summary judgment on each of the three *Gingles* preconditions..................................... 10

           3.    Plaintiffs are entitled to summary judgment under the totality of the circumstances................................. 26

       B.    Summary judgment is proper as to Counts III and IV because the Commission created the Districts with race as the predominant consideration in violation of the Equal Protection Clause. .................................................................... 35

1.    Overview of the Equal Protection Clause racial
      gerrymandering claim ................................................... 35

2.    Strict scrutiny ............................................................. 37

V.    CONCLUSION ......................................................................... 44

CERTIFICATE OF COMPLIANCE ............................................... 47

CERTIFICATE OF SERVICE ......................................................... 48

## INDEX OF AUTHORITIES

<u>CASES</u>

*Baldus v. Members of Wisconsin Gov't Accountability Bd.*,
849 F. Supp. 2d 840 (E.D. Wis. 2012) ............................................................. vii, 20, 31

*Bartlett v. Strickland*,
556 U.S. 1 (2009) ......................................................................................................... 11

*Bethune-Hill v. Virginia State Bd. of Elections*,
580 U.S. 178 (2017) ................................................................................................. 37, 38

*Black Pol. Task Force v. Galvin*,
300 F. Supp. 2d 291 (D. Mass. 2004) ................................................................. passim

*Bone Shirt v. Hazeltine*,
336 F. Supp. 2d 976 (D.S.D. 2004) ............................................................................ 13

*Bone Shirt v. Hazeltine*,
461 F.3d 1011 (8th Cir. 2006) ...................................................................... viii, 18, 19

*Bush v. Vera*,
517 U.S. 952 (1996) ............................................................................................... 10, 37

*Cooper v. Harris*,
 581 U.S. 285 (2017) ............................................................................................... 36, 38

*Galey v. May Dep't Stores Co.*,
9 Fed. Appx. 295 (6th Cir. 2001) ................................................................................. 9

*Growe v. Emison*,
507 U.S. 25 (1993) ...................................................................................................... 10

*Hirabayashi v. United States*,
320 U.S. 81 (1943) ...................................................................................................... 36

*In re Apportionment of State Legislature-1992*,
439 Mich 251; 483 NW2d 52 (1992) ........................................................................... 3

*In re Apportionment, State Legislature-1992*,
439 Mich 715 (1992) .................................................................................................... 3

*Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*,
4 F.3d 1103 (3d Cir.1993) ......................................................................................... 13

*Johnson v. De Grandy*,
512 U.S. 997 (1994) .................................................................................................... 32

iv

*Kramer v. Bachan Aerospace Corp.*,
  912 F.2d 151 (6th Cir. 1990)......................................................................... 8

*Miller v. Johnson*,
515 U.S. 900 (1995)...................................................................................... 36

*Mississippi Univ. for Women v. Hogan*,
 458 U.S. 718 (1982)...................................................................................... 37

*Mo. State Conf. of NAACP v. Ferguson-Florissant Sch. Dist.*,
201 F. Supp. 3d 1006 (E.D. Mo. 2016), aff'd, 894 F.3d 924 (8th Cir.
2018) ............................................................................................................ 28, 32

*NAACP v. Austin*,
857 F. Supp. 560 (E.D. Mich. 1994) ............................................................ 4

*Pack v. Damon Corp.*,
434 F.3d 810 (6th Cir. 2006)....................................................................... 9

*Pope v. County of Albany*,
94 F. Supp. 3d 302 (N.D.N.Y. 2015)........................................... 13, 18, 19, 20

*Quilter v. Voinovich*,
 981 F. Supp. 1032 (N.D. Ohio 1997), aff'd 523 U.S. 1043 (1998) ....................... 37, 44

*Rural W. Tennessee Afr.-Am. Affs. Council v. Sundquist*,
209 F.3d 835 (6th Cir. 2000)....................................................................... 18

*Sanchez v. Bond*,
875 F.2d 1488 (10th Cir. 1989)................................................................... 13

*Shaw v. Hunt*,
517 U.S. 899 (1996)...................................................................................... 36, 38

*Sta-Rite Indus., LLC v. Franklin Elec. Co.*,
519 Fed. Appx. 370 (6th Cir. 2013) ............................................................ 9

*Thornburg v. Gingles*,
478 U.S. 30 (1986).............................................................................. passim

*United States v. Eastpointe*,
378 F. Supp. 3d 589 (E.D. Mich. 2019) ..................................................... 11, 19

*Uno v. City of Holyoke*,
72 F.3d 973 (1st Cir. 1995) ......................................................................... 19

*Voinovich v. Quilter*,
507 U.S. 146 (1993)...................................................................................... 9

## STATUTES

52 U.S.C. § 10301 ................................................................................ 1, 9

MCL 168.21 ........................................................................................ 4

Public Act 129 of 2011 ...................................................................... 4

## RULES

Fed. R. Civ. P. 56(c) .......................................................................... 8

## CONSTITUTIONAL PROVISIONS

Mich. Const. art. IV, § 6(1) .............................................................. 4

Mich. Const. art. IV, § 6(2) .............................................................. 4

Mich. Const. art. IV, § 6(4) .............................................................. 4

Mich. Const. art. IV, § 6(7) .............................................................. 4

Mich. Const. art. IV, § 6(13)(a) ........................................................ 4

## OTHER  AUTHORITIES

*The Unforeseen Effects of Georgia v Ashcroft on the Latino Community*,
115 Yale LJ 2112 (2006) .................................................................. 5

*Turning Lemons into Lemonade: Making* Georgia v Ashcroft *the* Mobile
v Bolden *of 2007*,
39 Harv CR-CLL Rev 485 (2004) .................................................... 5

## <u>CONCISE STATEMENT OF ISSUES PRESENTED</u>

The government cannot "deprive a minority group of one majority-minority district and substitute for that two influence districts" because Section 2 of the Voting Rights Act provides minority groups "assurance that a bird in the hand really is better than two in the bush even though everyone realizes that a good hunter might actually snare both of the latter." *Baldus v. Members of Wisconsin Gov't Accountability Bd.*, 849 F. Supp. 2d 840, 857 (E.D. Wis. 2012). Yet that is precisely the tradeoff the Michigan Independent Citizens Redistricting Commission made here when it reduced Black-majority Senate districts in the Detroit area from two to zero and Black-majority House districts from ten to six in favor of Black "influence" districts that did not have Black majorities and forced Black metro Detroit candidates to campaign in white suburbs where they are ignored at best and discriminated against at worst.

The predictable result was that Michigan's Legislative Black Caucus was decimated in the 2022 elections, losing 20% of its members with more losses to come when term limits or life circumstances cause incumbent Black legislators to leave their offices. And Defendants selected that course despite vociferous objections from Black voters and the Commission chairwoman. Instead, Defendants chose to approve maps that can only be explained by race-conscious quotas that the Commission's counsel demanded. This context frames two questions presented for the panel's resolution:

1.     Whether Plaintiffs are entitled to summary judgment on their claims that Defendants' redistricting maps violated the Voting Rights Act by diluting Black voters' ability to select their candidates of choice (Counts I and II).

2.     Whether Plaintiffs are entitled to summary judgment on their Equal Protection claims (Counts III and IV) where the evidence shows that Defendants drew their redistricting maps using racial quotas or with race as a predominating purpose.

## <u>CONTROLLING OR MOST APPROPRIATE AUTHORITY</u>

**VRA violation:**

- *Thornburg v. Gingles*, 478 U.S. 30 (1986)
- *Black Pol. Task Force v. Galvin*, 300 F. Supp. 2d 291 (D. Mass. 2004)
- *Pope v. County of Albany*, 94 F. Supp. 3d 302 (N.D.N.Y. 2015)
- *Baldus v. Members of Wisconsin Gov't Accountability Bd.*, 849 F. Supp. 2d 840 (E.D. Wis. 2012)
- *Bone Shirt v. Hazeltine*, 461 F.3d 1011 (8th Cir. 2006)

**Equal Protection violation:**

- *Miller v. Johnson*, 515 U.S. 900 (1995)
- *Shaw v. Reno*, 509 U.S. 630 (1993)
- *Cooper v. Harris*, 581 U.S. 285, 291 (2017)

## I.    __INTRODUCTION__

For decades, Michigan has drawn redistricting maps with sufficient majority-minority districts to provide Metro Detroit's Black voters the opportunity to elect candidates of their choice. All that ended with the creation of Michigan's Redistricting Commission, which gutted these historical majority-minority districts, reducing their number from ten to six in the House, and two to zero in the Senate.

Last summer, Plaintiffs, all of whom are Black voters residing in the Detroit area, predicted the result: "decimation" of Michigan's Legislative Black Caucus. ECF No. 22, PageID.326. They were prescient. The 2022 election ended Detroit's 70-year stretch of Black representation in Congress and reduced the Michigan Legislative Black Caucus by a devastating 20%. As one political consultant put it, "Democrats, in large part, can thank the redistricting commission for their legislative majorities, but the way they accomplished that was diminishing Black representation."[2]

The Commission's actions violated Section 2 of the Voting Rights Act, 52 U.S.C. § 10301 (VRA), which protects Black voters' ability to elect candidates of their choice. *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986). Plaintiffs satisfy all three *Gingles* factors and the totality-of-the-circumstances analysis as a matter of law. Defendants say that their so-called "influence" districts—those with moderate percentages of Black voters but less than a majority—are sufficient for Black voters to elect their chosen candidate. But Defendants' "proof" consists of election results the Sixth Circuit and many other courts have deemed lacking probative value, such as general

---

[2] Alyssa Burr, *Democrats big midterm win overshadows loss of Black voices*, MLive (Nov. 15, 2022), https://bit.ly/3Vvfuxn.

elections, elections where the favored Black candidate was not Black, or elections involving a Black incumbent. Accordingly, Plaintiffs are entitled to summary judgment on Counts I and II.

The Commission also violated Plaintiffs' Equal Protection rights. As Plaintiffs' expert shows, consideration of race is the only way to explain the redistricting maps the Commission adopted. This is because there were numerous possible map configurations which would have satisfied the Commission's map-drawing directives without gerrymandering the districts in a way that disadvantaged Black voters. Plaintiffs are entitled to summary judgment on Counts III and IV as well.

## II.  BACKGROUND

### A.  Michigan's racial demographics

The United States 2020 Census found that 73.9% of Michigan residents identified their race as white alone, while 13.7% of Michigan residents identified as "Black alone."[3] A near super-majority of the State's residents who identify as "Black alone" reside in Wayne, Oakland, and Macomb counties with the epicenter of these residents hailing from Detroit, which is 77.9% "Black alone."[4] Figures 1, 3, and 5 of the Trende Report illustrate the numerosity and intense concentration of Michigan's Black Voting Age Population ("BVAP"). Trende.Expert.Report.12,14-15, J.A.319, 321-22.

---

[3] https://www.census.gov/library/stories/state-by-state/michigan-population-change-between-census-decade.html
[4] https://www.census.gov/quickfacts/detroitcitymichigan

B.    **Recent Michigan redistricting history**

Before the Michigan Redistricting Commission's work, it was accepted that legislative districts in the Detroit area needed to be structured with BVAPs of at least 50% so Black voters had a fair opportunity to elect candidates of their choice.

Following the 1990 census, the Michigan Supreme Court appointed three special masters to consider several proposed redistricting plans. Finding none of the plans acceptable, the special masters created their own. To ensure Black voters in the Detroit area had an adequate opportunity to elect the candidates of their choice— consistent with the VRA—the Court unanimously reconfigured five of the House districts in Wayne County "to provide a better racial balance throughout these districts" and approved the plan, adopting BVAPs between 85.73% and 68.17%. *In re Apportionment of State Legislature-1992*, 439 Mich 251, 253; 483 NW2d 52 (1992). This plan contained five Senate[5] and thirteen House[6] districts with BVAPs over 50%.

The court eventually issued a lengthier explication of its VRA analysis, applying the *Gingles* factors and concluding that that the slightly modified Senate and House maps did not violate the VRA. *In re Apportionment, State Legislature-1992*, 439 Mich 715, 735-36 (1992). The Court held that those maps neither deprived Black voters of the ability to elect their candidate of choice nor diluted Black votes by excessively packing Black citizens into the majority-minority districts. *Id.* at 747

---

[5]    http://www.legislature.mi.gov/(S(dkoujoq3h4lddyyucgtkepbh))/documents/2001-2002/michiganmanual/2001-mm-p0302-p0306.pdf
[6]    http://www.legislature.mi.gov/(S(dkoujoq3h4lddyyucgtkepbh))/documents/2001-2002/michiganmanual/2001-mm-p0309-p0323.pdf

n.75. The maps survived a similar federal-court challenge. *NAACP v. Austin*, 857 F. Supp. 560 (E.D. Mich. 1994).

More recently, following the 2010 census, the Michigan Legislature passed Public Act 129 of 2011, which apportioned Michigan's 110 representative districts and 38 senatorial districts. The 2011 plan provided for *two* senate districts with Black majorities—plus *three* more with BVAPs above 45%—and 11 House districts with Black majorities. Trende.Expert.Report.18, 21, J.A.325, 0328.

## C. The Commission's unlawful drawing of new Districts

In 2018, Michigan voters passed a ballot proposal that amended the state Constitution by transferring authority to create legislative districts from the Legislature to the Commission. Mich. Const. art. IV, § 6(1) and (7). The amendment directs that Michigan's Secretary of State and "chief election officer," Jocelyn Benson, oversee, assist with, and enforce the Commission's maps. Mich. Const. art. IV, § 6(2) and (4); MCL 168.21; Order, ECF.29, PageID.386-89. The amendment also specified that, as a first priority, the Commission should ensure that the plans "comply with the voting rights act and other federal laws." Mich. Const. art. IV, § 6(13)(a).

To assist in the map-drawing process, the Commission engaged Dr. Lisa Handley to analyze VRA compliance. Shockingly, she used general-election data to recommend lowering BVAPs across districts to 35% - 40%. 2021.Handley. Report.21, J.A.45. Her Report claimed this BVAP threshold would still allow Black voters in the area surrounding Detroit to elect the candidate of their choice. *Id.* at 22, J.A.46-47. No additional justification was ever offered at the time for this express racial target. As result, the Hickory Plan reduced the number of Black-majority House districts

from *ten* to *six*. The Linden Plan had *zero* Senate districts above 45% BVAP, even though the previous map "had two districts drawn in excess of 50% BVAP and three more in excess of 45% BVAP." Trende.Expert.Report.18-21, J.A.325-28.

Rather than create more Black-majority districts for the Michigan House—or *any* for the Senate—the Commission instead designed so-called Black "influence" or "opportunity" districts. In these districts, the Commission hypothesized, there was a sufficient percentage of Black voters to elect a Black candidate of choice. But as Secretary Benson had warned nearly a decade ago, there are "dangers [to Black voters] in allowing influence districts to replace majority-minority districts[.]" Jocelyn Benson, *Turning Lemons into Lemonade: Making* Georgia v Ashcroft *the* Mobile v Bolden *of 2007*, 39 Harv CR-CLL Rev 485, 495 (2004). In fact, Secretary Benson penned a law review article opining that based on empirical evidence, it is "nearly impossible for minority candidates to elect the candidate of their choice outside of districts where more than 50% of the voting age population is a combination of minority groups." *Id*. She "proposed a ban on reductions below 55% of covered minority populations in any currently majority-minority district, unless the jurisdiction can present convincing evidence that racially polarized voting is nonexistent or that minority voters' participation rates will remain unaffected." Alvaro Bedoya, *The Unforeseen Effects of Georgia v Ashcroft on the Latino Community*, 115 Yale LJ 2112, 2141-42 (2006).

To the detriment of Black voters, the Commission failed to heed Secretary Benson's advice when, on December 28, 2021, the Commission adopted the "Linden

Plan" for the Senate, and the "Hickory Plan" for the House.[7] In lieu of an adequate number of majority-BVAP districts, the Commission mixed Detroit-area Black voters into surrounding suburban areas with higher white-voting-age populations to create "influence" districts. 2021.Handley.Report.18-19, J.A.42-43. The Commission's ostensible justification for intentionally diluting Black voting strength was its hope for "white crossover voting." *Id.* at 19, J.A.43.

### D. The Commission ignored the concerns of Black voters and its own data.

In August 2022, the Commission issued a Report on 2021 Redistricting. J.A.570-692. Defendant Rebecca Szetela, who chaired the Commission when the District maps were adopted, issued a blistering dissent. Szetela.Dissenting.Report, J.A.603-691. Chairwoman Szetela, a Michigan licensed attorney, acknowledged that "the Commission cannot say with any degree of confidence whether [the Hickory and Linden Maps] will provide minorities, particularly Black voters in the metropolitan Detroit area, with an opportunity to elect their candidates of choice in **both** primary and general elections." *Id.* at 2, J.A.605.

Although the Commission began drawing maps for the Detroit area with BVAPs around 50%, "the Commission's counsel intervened and began aggressively pushing the Commission to reduce the BVAP numbers to as close to the general election percentages (35% to 40%) as possible." *Id.* at 5, J.A.608. This dilution strategy was apparently based on Dr. Handley's findings, but Chairwoman Szetela criticized the Handley Report for ignoring data showing that a BVAP of at least 48% in Senate

---

[7] Comm'n.Public.Notice (Nov. 12, 2021), https://bit.ly/3NEIGzW

Districts and between 47% and 52% in House Districts were necessary for Black voters to have the opportunity to elect their candidates of choice in *Democratic primary elections*. *Id*. at 4-5, J.A.607-08.

She opined that "[t]he Commission had no data or evidence to suggest that Black voters will have an opportunity to elect candidates of choice in the Democratic primary with BVAP percentages of 35%, 40%, or even 45%." *Id*. at 8, J.A.611; *accord* 12/27/21 Handley.Email.Ex.1 ("We simply do not know what would happen in a primary in which minority voters are cohesive"), J.A.623. "Because VRA compliance requires the ability to elect candidates of choice in both [primary and general] elections, the Commission should have taken a conservative approach by using higher BVAP numbers (approximately 48%) when constructing districts in all maps." *Id*. at 5, J.A.608.

Chairwoman Szetela highlighted that the Commission received hundreds of comments from Detroiters objecting to low BVAPs in the draft maps, expressing concerns of Black voters being denied an opportunity to elect their candidates of choice in *primary* elections. *Id*. at 6-8, J.A.609-11. Because Wayne County general elections overwhelmingly favor Democratic candidates, these voters pleaded with Commissioners that for "Black voters to be able to elect their candidate of choice, that candidate of choice must be able to succeed in the Democratic primary." *Id*. at 6, J.A.609. Yet when "Commissioners began questioning the validity of its attorneys' directives to draw districts using the general election BVAP percentages supplied by

Dr. Handley's Report," the Commissioners were directed to disregard Black voters' comments. *Id.* at 6-7, J.A.609-10.

### E.  Plaintiffs

Plaintiffs challenge Michigan Senate Districts 1, 3, 5, 6, 8, 10, and 11 (the "Senate Districts"/"Linden Plan") and Michigan House Districts 1, 2, 7, 8, 10, 11, 12, 13, 14, and 26 (the "House Districts"/"Hickory Plan") for violating VRA § 2 and the Equal Protection Clause of the Fourteenth Amendment. Each Plaintiff is an individual, Black voter, over the age of 18, who regularly participates in federal, State of Michigan, Democratic Primary, and local elections and plans to do so in the future. At minimum, there is one Plaintiff residing in each challenged District. The table at J.A.855-56 shows the individual Plaintiffs' claims and respective Districts.

## III.  STANDARD OF REVIEW

Summary judgment is proper when there is "no genuine issue as to any material fact and [ ] the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). No genuine issue of material fact exists when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Once the movant satisfies this burden, the non-moving party must come forward with specific facts showing there is a genuine issue for trial. *Kramer v. Bachan Aerospace Corp.*, 912 F.2d 151, 153-54 (6th Cir. 1990).

No genuine issue of a material fact exists if the record as a whole could not lead a rational trier of fact to find in the non-movant's favor. *Matsushita*, 475 U.S. at 587. "[T]he mere existence of a scintilla of evidence that supports the nonmoving party's

claims is insufficient to defeat summary judgment." *Pack v. Damon Corp.,* 434 F.3d 810, 814 (6th Cir. 2006). And "[m]ere allegations or denials in the non-movant's pleadings [or papers] will not meet this burden." *Sta-Rite Indus., LLC v. Franklin Elec. Co.*, 519 Fed. Appx. 370, 375 (6th Cir. 2013). "A court need not give credence to 'mere allegations,' or draw inferences where they are implausible or not supported by 'specific facts.'" *Galey v. May Dep't Stores Co.,* 9 Fed. Appx. 295, 297-298 (6th Cir. 2001).

## IV.   ARGUMENT

### A.   Summary judgment is proper as to Counts I and II because the Districts deny Plaintiffs their protected right under the VRA to elect their candidate of choice.

#### 1.   The VRA

A redistricting body can dilute a minority group's right to vote in two ways: (1) packing the minority into one or several districts so that the minority's influence is minimized in neighboring districts, or, as here, (2) fragmenting minority voters among several districts so that a majority bloc can usually outvote the minority. *Voinovich v. Quilter*, 507 U.S. 146, 154 (1993). But the VRA makes it illegal for any "State or political subdivision" to impose, or cause to be applied, any voting "standard, practice, or procedure" which "results in a denial or abridgment of any right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301. This protection includes a minority group's ability to elect candidates of their choice. *Thornburg v. Gingles*, 478 U.S. 30, 48-51 (1986).

To prevail on a vote dilution claim, a plaintiff must satisfy the following three *Gingles* preconditions by a preponderance of the evidence: (1) the minority group is

"sufficiently large and geographically compact to constitute a majority in a single-member district," (2) the minority group is "politically cohesive," and (3) the rest of the electorate, or the white majority, votes sufficiently as a bloc to defeat the candidate preferred by the minority. *Id.* Once these preconditions are established, courts examine the totality of the circumstances to determine whether a violation has occurred. *Id*. at 43-46.[8]

As demonstrated below, Plaintiffs satisfy each of the three *Gingles* preconditions and the totality of the circumstances, and thus establish that the Linden and Hickory Plans violate Section 2 of the VRA.

> ### 2. Plaintiffs are entitled to summary judgment on each of the three *Gingles* preconditions.
>
> #### (a) Black voters in the Detroit metropolitan area are sufficiently large and geographically compact to constitute a majority in a single-member district.

The overarching purpose of *Gingles I* is to ensure that, in the absence of the challenged practice, procedure, or structure, the minority group would have the *potential* to elect a representative of its choice in the relevant political subdivision. *Growe v. Emison*, 507 U.S. 25, 40 (1993). This first precondition is satisfied by showing that the minority-voting population is "sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50. It asks a simple question: whether the minority group can make up "more than 50 percent of the voting-age population in the relevant geographic area?" *Bartlett v.*

---

[8] To prevail, Plaintiffs need not establish that the Commission acted with a discriminatory purpose; it suffices to prove that the contested standard, practice, or procedure has a discriminatory effect. *Bush v. Vera*, 517 U.S. 952, 976 (1996).

*Strickland*, 556 U.S. 1, 18 (2009). Because the Detroit area has one of the largest Black populations in America, the question extant must be posed in the plural: whether the Black population here is sufficiently large and geographically compact as to form more majority-minority (*i.e.,* 50%+ BVAP) State Senate and House districts than were included in the Commission's Linden and Hickory plans.

This straightforward question is most often answered through the creation of illustrative plans that, using traditional redistricting principles, demonstrate the *possibility* of creating the threshold number of majority-minority districts. *Black Pol. Task Force v. Galvin*, 300 F. Supp. 2d 291, 299 (D. Mass. 2004); *United States v. Eastpointe*, 378 F. Supp. 3d 589, 602 (E.D. Mich. 2019).

*Gingles I* is easily met here. As a point of reference, Figures 1, 3, and 5 of the Trende Report illustrate the numerosity and intense concentration of Michigan's Black residents. Trende.Expert.Report.12,14-15, J.A.319,321-22. The shaded areas with high BVAPs are subject to VRA consideration. To illustrate the numerosity and compactness of the Black community in this area, Mr. Trende drew demonstration maps for both the Senate and House for the Detroit area. *Id.* at 22-26, 81-84, J.A.329-333, 388-91. These demonstration maps were assembled in accordance with traditional redistricting requirements and show how many majority-minority districts (*i.e.,* BVAPs over 50%) could reasonably be drawn for the Senate and House. *Id.* As explained in more detail below, these demonstration maps satisfy the first *Gingles* precondition and show that the Linden and Hickory plans radically fracture and dilute the voting strength of Detroit's Black community.

11

### (i)   Senate

The Linden Plan has zero Black-majority districts. Yet Plaintiffs' Senate Demonstration Map shows it is perfectly feasible to draw *five* majority-minority districts that are compact and contiguous. *Id.* at 81-84, J.A.388-91. Moreover, the districts in Plaintiffs' Senate Demonstration Map spilt fewer county boundary lines than the Linden Plan. *Id.* at 84, J.A.391. The boundary line between Macomb and Oakland counties is crossed only three times; the boundary line between Wayne and Macomb counties are crossed only once; and no other county boundary lines are crossed more than once. *Id.* With a few minor deviations, city and township boundary lines are crossed no more than once. *Id.* The Senate Demonstration Map's districts also have nearly the same compactness as the corresponding Districts in the Linden Plan. *Id.* at 83. Accordingly, *Gingles I* is satisfied, and the Senate VRA Plaintiffs are entitled to summary judgment on this precondition.

### (ii)   House

When compared to the 2011 redistricting map, the Hickory Plan reduced the number of Black-majority House Districts in the Detroit area from ten to six. Not surprising, like the 2011 redistricting map, Plaintiffs' House Demonstration Map composed ten reasonably configured districts with compact Black majorities. *Id.* at 22-26, J.A.329-33. An eleventh Black-majority district could have been included in this Demonstration Map if adjusted with more aggressive county splitting. *Id.* at 22, J.A.329. These districts are nearly as compact as the corresponding districts of the Hickory Plan. *Id.* at 26, J.A.333. They split fewer county lines than the Hickory Plan. *Id.* The boundary line between Macomb and Oakland counties is not crossed; the

boundary line between Wayne and Macomb counties are crossed only once, and with one exception, the House Demonstration Map does not cross any county line more than once.[9] *Id.* With a few minor deviations, city and township boundary lines are crossed no more than once. *Id.* Accordingly, *Gingles I* is satisfied, and the House VRA Plaintiffs are entitled to summary judgment on this precondition.

### (b)    Black voters in the Detroit metropolitan area are politically cohesive.

The second *Gingles* precondition is satisfied where the minority group is politically cohesive. *Gingles*, 478 U.S. at 51. Cohesiveness exists where "a significant number of minority group members usually vote for the same candidates," *id.* at 56, and can be established by demonstrating the existence of racially polarized voting, *i.e.*, "a consistent relationship between [the] race of the voter and the way in which the voter votes, or to put it differently, where black voters and white voters vote differently," *id.* at 53 n. 21 (cleaned up).[10] Plaintiffs may rely on both statistical and anecdotal evidence to show political cohesion. *Pope v. County of Albany*, 94 F. Supp. 3d 302, 333 (N.D.N.Y. 2015). "The experiences and observations of individuals involved in the political process are clearly relevant." *Sanchez v. Bond*, 875 F.2d 1488, 1494 (10th Cir. 1989).

---

[9] Specifically, the county line between St. Clair and Macomb is crossed three times, but two of those crosses were created to keep cities together in the same district. *Id.*
[10] This "consistent relationship" does not require black voters to vote "as an unbending monolithic block." *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1123 (3d Cir.1993). *Accord Bone Shirt v. Hazeltine,* 336 F. Supp. 2d 976, 1008 (D.S.D. 2004) ("[A] § 2 violation does not require proof that all members of the minority "think alike""). "[T]he degree of bloc voting which constitutes the threshold of legal significance will vary from district to district." *Gingles*, 478 U.S. at 55-56.

Here, there is no material dispute regarding the cohesiveness of Detroit-area Black voters. Professor Trende and Dr. Lockerbie identify significant political cohesion through racially polarized voting. Trende.Expert.Report.9,26-41,84-93,119, J.A.316,333-48,391-400,426; Lockerbie.Expert.Report.2,14-19, J.A.309,321-26.  For example, after a considerable analysis of relevant general elections, and more important, a multitude of Democratic state House and Senate primary elections between 2014 and 2020, Professor Trende concluded that there was "substantial evidence" of "racially polarized voting" in the 2018 gubernatorial primary, particularly in Detroit proper, and in competitive Democratic state House and Senate primaries in Detroit. Trende.Expert.Report.9,35, J.A.316,342. Similarly, based on his analysis of Dr. Handley's Report, Dr. Lockerbie concluded that "[t]here is a high degree of racial polarization in voting in Michigan" and "[t]here is high racial polarization in Michigan's Wayne, Oakland, Genesee, and Saginaw counties." Lockerbie.Expert.Report.2, J.A.280.[11]

These statistical findings—i.e., Black voters in Detroit usually vote alike— were supported by the testimony of former Detroit legislators, LaMar Lemmons III and Virgil K. Smith. Senator Smith is a Black man born and raised in Detroit. Smith.Aff.¶¶ 2, 4, J.A.509. Senator Smith continues to live in and is a community leader of the City and has substantial and intimate knowledge of its social, political, and economic matters, both historic and contemporary. *Id.* ¶¶2-5, J.A.509-10. Smith

---

[11] Even the quantity and quality of Black voter public comment regarding the Commission's fracturing of the community, shows a level of cohesiveness on important policy issues. Lockerbie.Expert.Report.6-13, J.A.284-91.

served three terms as a Democratic member of the Michigan House, District 7, between 2003 and 2008, as well as the Michigan Senate, District 4, from 2011-2016. *Id.* ¶¶7-9, J.A.510.

During his first Senate term, Senator Smith served on the 2011 Senate Redistricting Committee and formed the perspective that VRA compliance for Detroit required reasonably cohesive districts with BVAPs of at least 55%. *Id.* ¶¶9-10, J.A.510-11. He remains active in the Michigan Democratic Party Black Caucus. *Id.* ¶37, J.A.516.[12] And, he understands that Black voters from urban Detroit have different legislative priorities and different candidates of choice than white voters from Detroit's suburbs. *Id.* ¶¶44-52, J.A.517-19.

Representative Lemmons is a Black man who was born, raised, and continues to live in the City of Detroit. Lemmons.Aff.¶¶2-5, J.A.521-22. He was a Member of the Michigan House (former District 2) between 1999-2002 and 2005-2006, thereafter serving various positions, including Chief of Staff, to three different House Members. *Id.* ¶ 6, J.A.522. Representative Lemmons has worked on political campaigns for nearly 50 years, including "on the ground" campaigning efforts in predominately Black and white areas throughout metro Detroit. *Id.* ¶9, J.A.523.

His experience is that voter engagement with Black candidates and campaign staff in predominately white areas ranges from subtly to overtly discriminatory and

---

[12] The Caucus's "mission is to support and promote African Americans for political office and educate African Americans on current political issues." https://www.mdpbc.org/about

racist. *Id.* ¶¶10-16, J.A.523-25. This racial polarization translates into participation in the electoral process and voting patterns in Democrat primary elections:

> [A]ll things being equal, Black democrat primary voters from the predominately Black areas will generally prefer and vote for a Black democrat primary candidate over a White democrat primary candidate and, similarly, White democrat primary voters from the predominately White areas will generally even more strongly prefer and vote for a White democrat primary candidate over a Black democrat primary candidate. [*Id.* ¶ 17, J.A.525.]

This cohesion is intuitive where this Black community holds legislative interests very different from its suburban white neighbors. *Id.* ¶¶43-47, J.A.532-33.

The Commission cannot contest this fact. The very report upon which the Commission relied in drafting the Linden and Hickory Plans found substantial evidence of Black cohesion through racially polarized voting. 2021.Handley.Report.5-7,8-12,17, J.A.5-7,8-12,17. Dr. Handley found that almost all statewide elections analyzed in Oakland County were racially polarized, as were more than half the statewide elections analyzed in Wayne County. 2021.Handley.Report.6-7, J.A.6-7. Both the primary and general elections for the 2018 13th Congressional District featured racially polarized voting. *Id.* at 8-9, J.A.8-9. Of the six analyzed Wayne County Senate districts, Handley found that four experienced a racially polarized Democratic primary or general election in 2018. *Id.* at 9-10, J.A.9-10. Of the ten Wayne County House districts analyzed, Handley found that six experienced one or more racially polarized Democratic primary or general election between 2018 and 2020. *Id.* at 10-12, J.A.10-12. Of the four Oakland County House districts, three experienced a racially polarized Democratic primary or general election between 2018 and 2020. *Id.*

Based on this analysis, Dr. Handley concluded: "Because voting in Michigan is racially polarized, districts that provide minority voters with an opportunity to elect their candidates of choice must be drawn. If they already exist – as many do in Michigan – they must be maintained." *Id.* at 17, J.A.17. Indeed, the ostensible premise of the Commission's creation of influence districts, as opposed to majority-minority districts, was that Black cohesion coupled with white crossover support would lead to electoral success of the Black candidates of choice. As such, Plaintiffs easily satisfy *Gingles II* and are entitled to summary judgment on that precondition.

**(c)** **The white majority votes sufficiently cohesively as a bloc to defeat the candidate preferred by Black voters in the Detroit metropolitan area.**

The third *Gingles* precondition asks whether a white majority "vote[s] sufficiently as a bloc usually to defeat the minority's preferred candidates." *Gingles*, 478 U.S. at 56. When this happens, the challenged structure or composition of the district is likely to be the cause of the minority group's vote dilution. *Id.* at 51. Courts evaluate white bloc voting by: "(i) identify[ing] the candidates most preferred by the minority group; (ii) observ[ing] whether the white majority votes as a bloc for other candidates; (iii) determine[ing] whether the white bloc vote is of a magnitude that usually suffices to defeat minority-preferred candidates; and (iv) assess[ing] whether any of the electoral results should be discounted because of special circumstances." *Galvin*, 300 F. Supp. 2d at 303 (citing *Gingles*, 478 U.S. at 56-57).

As just discussed, Detroit elections are racially polarized such that white and Black voters are both politically cohesive and will vote for their candidate of choice. This is undisputed. Whether white voters typically succeed in defeating the Black

candidate of choice when they are a majority is the basis for ascertaining whether the Commission's experimental "influence districts" will provide Black voters the opportunity to elect their candidates of choice.

This analysis requires an examination of elections in the political subdivision at issue and their relative probative values. *Pope*, 94 F. Supp. 3d at 321. But not all elections are equally probative in assessing the extent of white bloc voting success; certain elections are far more probative than others. *Id.* at 332.

*First and foremost*, commonsense and caselaw dictate that multi-racial elections "are the best indicators of whether the white majority usually defeats the minority candidate." *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1020-21 (8th Cir. 2006); *Pope*, 94 F. Supp. 3d at 330 (collecting cases). Whether minority voters have an opportunity to elect their candidate of choice, "is best and most easily measured in elections that offer black voters the chance to support a viable black candidate against a viable white candidate." *Galvin*, 300 F. Supp. 2d at 304 (collecting cases).

For this reason, the Sixth Circuit accords less weight to elections where the supposed black candidate of choice was white. *Rural W. Tennessee Afr.-Am. Affs. Council v. Sundquist*, 209 F.3d 835, 837 (6th Cir. 2000) (Jones, J., concurring) (explaining why "equal opportunity in voting is not achieved when a minority group may elect representatives of choice when they are white, but are unsuccessful in electing members of their own group"). Similarly, in *Galvin*, Judge Bruce Selya of the United States Court of Appeals for the First Circuit, colorfully explained that "the choice presented to minority voters in an election contested only by two white

18

candidates is somewhat akin to offering ice cream to the public in any flavor, as long as it is pistachio." 300 F. Supp. 2d at 304. Conversely, an election where a black candidate of choice defeats a white candidate of choice in a district with a BVAP over 50% "robs the election of any probative force with respect to the third *Gingles* precondition," since "it should come as no surprise that a black-preferred candidate was successful in a majority black district with racially polarized voting." *Id.* at 305.

*Second*, endogenous elections are more probative than exogenous elections "as they are more probative of voting patterns in the relevant political subdivision." *Pope*, 94 F. Supp. 3d at 333; *see also Eastpointe*, 378 F. Supp. 3d at 606 ("Both parties agree that "endogenous elections" with black and white candidates on the ballot are the most probative in assessing whether the government can meet the third Gingles precondition"); *Galvin*, 300 F. Supp. 2d at 307 ("In the absence of a sufficient number of useful multi-race endogenous elections, the next most fertile field is composed of multi-race exogenous elections" which "mean those elections in which at least one black candidate competed against at least one white candidate for an elected office … in the general geographic area involved.").

*Third*, the more recent an election, the higher its probative value. *Bone Shirt*, 461 F.3d at 1020-21. *Accord Uno v. City of Holyoke*, 72 F.3d 973, 990 (1st Cir. 1995); *Pope,* 94 F. Supp. 3d at 321.

*Fourth*, where, as here, it is established that a majority of voters in an area heavily prefer Democrat candidates, *primary* elections "are far more probative" than *general* elections of racial voting patterns. *Pope*, 94 F. Supp. 3d at 321, 324. *Accord*

*Galvin*, 300 F. Supp. 2d at 306 ("an area in which the vast majority of citizens vote Democrat—makes general election results unreliable barometers of the second and third Gingles preconditions"); *Baldus v. Members of Wisconsin Gov't Accountability Bd.*, 849 F. Supp. 2d 840, 857 (E.D. Wis. 2012) (recognizing that Section 2 of the VRA applies to primary elections).

*Fifth*, "[i]ncumbency is a special circumstance that must be weighed, sometimes heavily, in assaying the probative value of election results." *Galvin*, 300 F. Supp. 2d at 306 (*citing Gingles*, 478 U.S. at 60 n.29). Consequently, elections where Black incumbents defeat white candidates of choice are not the best indicators of whether a white bloc voting will defeat the Black candidate of choice. *Id.*

*Finally*, courts give less weight to elections where minority candidates ran unopposed. *See Gingles*, 478 U.S. at 51, 60. *Accord Pope*, 94 F. Supp. 3d at 323, 333 (finding elections "where a minority candidate ran unopposed" to be of "little to no probative value for assessing whether minority-preferred candidates are usually defeated by white bloc voting").

Here, the Commission's experimental "influence" districts in the Detroit area—those constructed with low BVAPs between 11% and 45%—were built on an evidentiary house of sand. Despite acknowledging significant racial polarization throughout her reports, Dr. Handley erroneously premised her opinion—that white crossover voters will purportedly facilitate Black opportunity—on data from elections with only white candidates, elections where a white candidate is statistically considered to be the Black candidate of choice, general elections of tenuous import,

and contests where strong Black incumbents prevailed or where Black candidates ran unopposed.

For example, in Table 4 of her 2023 Report, Dr. Handley looked at 27 democratic primary elections from 2022 which she somehow found to support her opinion that the influence districts in the Linden and Hickory Plans are functioning. J.A.11. But only 11 of these 27 elections resulted in a Black candidate winning. Handley Table 4, Reconfigured, J.A.857. Seven of the 11 Black electoral victories were the result of Black incumbency. *Id*. Of the four Black non-incumbents, two ran in districts with BVAPs over 50%. The remaining two Black victors overcame low BVAPs of 42.7% and 42.6%, at least in part because they (Kimberly Edwards, who barely won, and Donavan McKinney) have English and Irish surnames.

In addition, in nine of the 18 elections in which Dr. Handley says the "black candidate of choice" won, *the supposed Black candidate of choice was not Black*. Of the other nine, three were in districts with BVAPs above 50%, and four were Black incumbents. Thus, of all the 2022 democratic primary elections viewed by Handley, only two Black non-incumbent candidates of the minority's choice were able to overcome low BVAPs (i.e., 42.7% and 42.6%). Not surprisingly, they were the two with the English and Irish surnames. By including election data of minimal probative value in her analysis, Dr. Handley diluted the potency of the most probative election data, which shows intense racial polarization.

As demonstrated by Professor Trende, when the analytical lens is refocused to recent primary elections featuring either non-incumbent, Black candidates versus

non-incumbent, white candidates, or incumbent, Black candidates versus incumbent, white candidates, it becomes clear the Linden and Hickory plans created "an environment where the House and Senate Black caucuses can hold their meetings in an Uber XL" after the next election cycle. Trende.Expert.Report.26-42, J.A.333-49. So, by following the above evidentiary precedents and assigning appropriate probative weight to the election data extant, Plaintiffs sufficiently establish that the Commission set BVAPs in the Detroit area too low to prevent white suburban bloc voting dominance and are entitled to summary judgment on the third *Gingles* precondition.

### (i)   <u>Senate</u>

Professor Trende found that with respect to the 2014 Senate elections "Black candidates' vote shares tend to mirror the BVAP of the district," which is "unsurprising, given the degree of racially polarized voting." Trende.Expert.Report.86, J.A.393. "The 2018 [Senate] elections tell a similar story." *Id.* Black voters are able to elect the candidate of their choice when the BVAP is sufficiently high, but "dropping the BVAPs as low as the [Commission] did" results "in districts that would not reliably perform. This is exactly what happened in 2022." *Id.* at 88-89, J.A.395-96.

Indeed, the only 2022 democratic primary Senate elections Dr. Handley identifies as "racially polarized" in Table 4 of her 2023 Report resulted in the Black

candidate of choice *losing*.[13] In District 1, the Black candidate of choice, Brenda Sanders, a former Judge from Detroit, lost to Erika Geiss, receiving just 7% of the vote from non-Hispanic whites. *Id.* at 89, J.A.396. And in District 8, an "ideal test case" featuring two well-funded Democratic incumbents, Mallory McMorrow (white), and Marshall Bullock (Black), McMorrow "was virtually guaranteed to win" because of the low BVAP and did. *Id.* "[C]utting the BVAPs of all of these senate districts below 47%—and all but one below 43%—is a recipe for disaster in the long run." *Id.* *See also* Lemmons.Aff.¶¶28-29, J.A.527-28.[14]

Professor Trende summarized the 2022 primary results in districts with substantial Black populations. Trende.Expert.Report.89, J.A.396. That chart is reproduced below. If a race was not polarized, it is shaded white. If it was polarized and the Black candidate of choice won, it is shaded green. If it was polarized and the Black candidate of choice lost, it is shaded red:

---

[13] Dr. Handley did not address the results of the 2022 democratic primaries in Senate District 5 and 11, both of which entailed the white candidate of choice defeating the Black candidate of choice. Lemmons.Aff.¶¶30-33, J.A.528-29.

[14] Senator Smith served as Bullock's campaign manager for this election. Smith.Aff.¶¶17-21, J.A.525-26. The campaign's efforts in the white-dominated portion of this baconmandered district were exceedingly difficult, marked by a discouraging lack of reception or willingness to interact from white voters. *Id.* ¶¶22-25, J.A.526-27.

**2022 Senate EI Summary**

| District | BVAP | Black 1st Choice | Black 1st Choice % | Black 2nd Choice | Black 2nd Choice % | White 1st Choice | White 1st Choice % | White 2nd Choice | White 2nd Choice % | Black Cand Margin% |
|---|---|---|---|---|---|---|---|---|---|---|
| Linden 7 | 44.80% | Jeremy Moss* | 91.24% | Ryan Foster | 8.76% | Jeremy Moss* | 92.80% | Ryan Foster | 7.20% | – |
| Linden 3 | 42.10% | Stephanie Chang* | 81.00% | Toinu Reeves | 19.00% | Stephanie Chang* | 93.07% | Toinu Reeves | 6.93% | – |
| Linden 10 | 40.40% | Unopposed | – | – | – | – | – | – | – | – |
| Linden 8 | 40.20% | Marshall Bullock* | 79.87% | Mallory McMorrow* | 20.13% | Mallory McMorrow* | 96.34% | Marshall Bullock* | 3.66% | –37.00% |
| Linden 6 | 39.10% | Mary Cavanagh | 48.78% | Darryl Brown | 38.73% | Vicki Barnett | 48.25% | Mary Cavanagh | 47.40% | 8.10% |
| Linden 1 | 35.00% | Brenda Sanders | 43.62% | Erika Geiss* | 18.41% | Frank Liberati | 46.38% | Erika Geiss* | 42.57% | 0.40% |

In Detroit-area districts where the BVAP exceeds 35%, only two senators were the Black candidate of choice when first elected. There are six Senators representing such districts: Erika Geiss (District 1), Stephanie Chang (District 3), Mary Cavanagh (District 6), Jeremy Moss (District 7), Malloy McMorrow (District 8) and Paul Wojno (District 10). Of those, McMorrow and Geiss defeated the Black-preferred candidate in 2022. Chang defeated the Black-preferred candidate during her first Senate election in 2018. Trende.Report.87, J.A.394. Wojno faced off against another white candidate in his first state Senate bid. That leaves Mary Cavanagh, who was not the Black-preferred candidate when first elected to the House in 2020 but was the white-preferred candidate, and Jeremy Moss, who is also white but does appear to have been the Black candidate of choice when first elected in 2018, albeit from a then-heavily white district.

As Professor Trende explains, this scene portrays the fate of these districts as the decade progresses. While Black voters may come to accept incumbents, the story of 2022 is that Black voters were largely unable to elect candidates that they

preferred in open seats in 2022, which will tend to wipe out Black-chosen representation over the course of the next decade. Trende.Expert.Report.90, J.A.397.

### (ii)   House

House primary data is more difficult to come by, and some of the races difficult to interpret due to multiple candidates. Trende.Reprort.35-36, J.A.342-43. Nonetheless, similar conclusions can be drawn as the Senate.

In 2014 races, even in overwhelming Black districts, Black candidates of choice had close calls. *Id.* at 40-41, J.A.347-48 (showing that Wendell Byrd had a "close call" in an 89% BVAP district, and Brian Banks won by just 7 points in a 63% BVAP district, taking only 15% of white votes). Likewise in 2016, we "see the Black candidate of choice pulling through, sometimes narrowly, in majority-Black districts." *Id.* at 41, J.A.348. "[T]here is little in the margin of victory for Black-preferred candidates that might suggest non-incumbent Black candidates would be successful in races with BVAP shares in the low 40s. *Id.*

Most significant, in the 2022 democratic primary elections that took place under the Hickory map, "[f]our Black candidates of choice were defeated. Perhaps most strikingly, in the *open* seats, Black candidates of choice lost four of the six races, including a race in a Black-majority district." Trende.Report.41, J.A.348. Black incumbents were more successful, but only because they lacked serious challengers. *Id.* at 42, J.A.349. Simply put, "there is *no* evidence suggesting that the Black candidate of choice can win a polarized primary in a district with a BVAP below 47%. *Id.* at 35-36, J.A.342-43 (emphasis added).

In fact, in House District 5, which has a BVAP of approximately 55% and which is "perhaps the most egregious district on the map," the Black candidate of choice, Reggie Davis, lost to the white candidate of choice, Natalie Price, in a polarized race. Trende.Expert.Report.42,47, J.A.349,354. Senator Smith served as Davis' campaign manager for this election. Smith.Aff.¶¶26-29, J.A.513-14. The campaign's efforts in the white-dominated portion of this baconmandered district were exceedingly difficult, marked by a discouraging lack of reception from or willingness to interact from white voters. *Id.* ¶¶30-35, J.A.514-15.

Because the most probative endogenous primary election results demonstrate that the white majority districts imposed by the Hickory Plan adversely impact Black opportunity, Plaintiffs are entitled to summary judgment under *Gingles* III.

### 3.  <u>Plaintiffs are entitled to summary judgment under the totality of the circumstances.</u>

"Although it would be a very unusual case where a plaintiff establishes the *Gingles* factors and fails to establish a Section 2 violation, courts still must consider the totality of the circumstances—additional indicia that tend to show a pattern and history of discrimination and a need for redress." *Pope*, 94 F. Supp. 3d at 310 (cleaned up). The relevant factors are derived from the Senate Report on the 1982 VRA amendments and include: (1) the history of voting-related discrimination; (2) the extent of racially polarized voting; (3) the use of voting practices that enhance the opportunity for discrimination against the minorities; (4) the exclusion of members of the minority group from candidate slating processes; (5) the extent to which minorities bear the effects of past discrimination in areas such as education,

employment, and health, which hinder their ability to participate effectively in the political process; (6) the use of overt or subtle racial appeals in political campaigns; and (7) the extent to which minorities have been elected to public office in the jurisdiction. *Gingles*, 478 U.S. at 44-45, (citing S.Rep. No. 97-417, at 28-29 (1982), U.S. Code Cong. & Admin. News at 177, 205-207).[15] This list is not exhaustive.

Here, there appears to be little dispute regarding the non-*Gingles* Senate factors. The Final Report of Dr. Brad Lockerbie, J.A.277, the Memorandum of Bruce L. Adelson, the Commission's VRA Legal Counsel, entitled "The History of Discrimination in the State of Michigan and its Influence on Voting," ("Adelson Memo"), J.A.438, the 2021 Handley Report, J.A.25, the affidavits of former Detroit legislators LaMar Lemmons, J.A.521, and Virgil Smith, J.A.509, and a plethora of publicly-available demographic and election data and other reports demonstrate a pattern and history of discrimination against Black residents in the Detroit area and an imminent need for redress from the offending Linden and Hickory plans. A practical evaluation of the totality of the circumstances weighs heavily in favor of Plaintiffs' summary-judgment request.

(a) **Senate Factors 1, 3, and 5 - Racial discrimination and its impact on the Black electorate in the Detroit area.**

These three Senate Factors ask whether: (1) any history of official discrimination touched the right of the members of the minority to participate in the

---

[15] The Senate Report also notes that there may be probative value to evidence demonstrating that elected officials are unresponsive to the particularized needs of minorities. *Id.* at 45.

democratic process, (3) voting practices in the area tend to enhance the opportunity for discrimination against minorities; and (5) minorities bear the effects of discrimination in such areas as education, employment and health. *Mo. State Conf. of NAACP v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006, 1066, 1079 (E.D. Mo. 2016), aff'd, 894 F.3d 924 (8th Cir. 2018). The answer to those questions is a resounding "yes."

After conducting a detailed study and relying on his training and experience as a political scientist, Dr. Lockerbie found that "Michigan has a long history of official discrimination," which is "both political and non-political," and the "effect of that discrimination is still being felt today." Lockerbie.Expert.Report.3, J.A.281. As a result, "[m]inority groups are considerably less educated and have fewer economic resources than whites in Michigan." *Id*. These disparities have been found to relate to diminished political participation. *Id*. at 19, J.A.297.

These findings of discrimination and resulting economic and political disparities were consistent with those of the Commission's legal counsel, Bruce Adelson, who detailed at length historic events of racial discrimination in employment, housing, banking, policing, education, voting, public accommodations, and even targeted violence specific to Detroit's Black residents. Adelson.Memo.5-8, 12-17,25-29, J.A.442-45,449-54,462-66. Even today, Adelson reports, "there has been a general upward trend in racial harassment and White Supremacist activity in the state" and "people of color are still denied mortgages that are routinely given to White people in similar circumstances." *Id*. at 12-14, J.A.49-51. Detroit has one of the

"highest rates of property tax foreclosures in the nation" and "[o]ften foreclosed houses and properties end up being sold to White-owned corporations or White families." *Id.* at 15, J.A.452.

Adelson found that Detroit's history of discrimination has led to disparities in wealth, education, and voting access. *Id.* at 17,22-25, J.A.454,459-62. For instance, "[a]round 90% of voters of color had increased vote times compared to their White counterparts." *Id.* These waits are compounded by the fact that "about one-third of people living in the city do not have a car" and "even getting to the polling place might be difficult for those with lower income." *Id.* The lack of access is exacerbated by Michigan law preventing ridesharing services like Uber from providing a discounted rate to transport people to polling places. *Id.* at 17-18, J.A.454-55. Furthermore, he found racial disparities in health which negatively impact likelihood to vote. *Id.* at 18-22, J.A.455-59.

After reviewing several months of testimony before the Commission, Dr. Lockerbie also found evidence that racial discrimination in Michigan is historic and ongoing, Lockerbie.Report.5-14,19, J.A.283-92,297, and that the Commission's dilution of Black voters in the Linden and Hickory plan will further disenfranchise communities of color. *Id.* at 5-11, J.A.283-89. Of import was a comment from John Johnson, Executive Director of the Michigan Department of Civil Rights, who testified that the Commission's proposed maps "dilute majority minority districts and strip the ability for minority voters to elect legislatures reflect their community and effect any meaningful opportunity to impact public policy and law making." *Id.* at 9,

J.A.287. Also probative was a comment from the President of the Detroit Chapter of the NAACP, Reverend Wendell Anthony, who stated that "the proposed maps violate the Voting Rights Act." *Id.* at 11, J.A.289.

Even more palpable is the testimony of former Detroit legislators LaMar Lemmons and Virgil Smith. Both testify at length regarding the racial tribulations of campaigning while Black in the white dominated suburbs of western Wayne and southern Oakland and Macomb Counties ranging from low engagement (i.e., 10% or less) from white residents to outright harassment and racial intimidation. Smith.Aff. ¶¶12-13, 22-23, 31-33, J.A.511, 513, 515; Lemmons.Aff.¶¶10-15, 30, J.A.523-24, 528.[16] Both men describe the many economic and educational disparities between voters in the poorer and less educated Black urban areas and the wealthy, higher educated white suburban areas. Smith.Aff.¶¶42-51, J.A.517-19; Lemmons.Aff.¶¶17-20, 25-27, 39-40, 42-48, J.A.525-27, 532-34.

### (b)   Senate Factor 8 - Lack of Responsiveness

Senate Factor 8 examines whether there is "evidence demonstrating that elected officials are unresponsive to the particularized needs of the members of the minority group." *Gingles*, 478 U.S. at 45. LaMar Lemmons and Virgil Smith testified conclusively regarding how the legislative issues important to Black voters in the urban areas are not attended to by white representative from the white suburban areas. Smith.Aff.¶¶42-51, J.A.517-19; Lemmons.Aff.¶¶17-20, 25-27, 39-40, 42-48,

---

[16] This same issue was brought to the Commission's attention during the redistricting process where the State Representative for District 1 noted the racism he endured when out canvassing. He argued that the creation of majority-Black districts was needed. Lockerbie.Report.10, J.A.288.

J.A.525-27,532-34. This lack of representation of the Black community is exacerbated by the racial design of the Linden and Hickory plans, which allows white candidates from white suburban areas to win Democratic primaries without spending any meaningful time directly campaigning in the poorer and heavily Black urban areas. Smith.Aff.¶¶24-25, 34-35, 49-52, J.A.513-15, 518-19; Lemmons.Aff.¶¶16, 29, 32. Concerns regarding the lack of responsiveness were brought to the Commission's attention during the redistricting process. For example, Reverend Steve Bland Jr, the Senior Pastor of Temple Baptist Church, argued that districts needed 50% African American so that his voting block would have fair representation and a voice on the issues. Lockerbie.Expert.Report.7, J.A.285.

### (c)   Senate Factor 2 - The degree of racially polarized voting.

Senate Factor 2 evaluates "the extent to which voting in the elections of the State or political subdivision is racially polarized." *Gingles*, 478 U.S. at 44-45. As detailed above, elections in the Detroit area suffer from stark racial polarization. *Supra* Sections IV.A.2.(a) and (b) (analysis of *Gingles* II and III). This factor weighs heavily in favor of Plaintiffs.

What's more, at least one court has found that where the *Gingles* preconditions are met, "influence districts" like those here have no basis in VRA jurisprudence. *Baldus*, 849 F. Supp. 2d at 855 (state cannot "deprive a minority group of one majority-minority district and substitute for that two influence districts" because Section 2 provides minority groups "assurance that a bird in the hand really is better

than two in the bush even though everyone realizes that a good hunter might actually snare both of the latter.")

    **(d)**    **Senate Factor 7 - The Linden and Hickory plans lack of racial proportionality and the corresponding adverse impact on Black electoral success in the Detroit area.**

Senate Factor 7 evaluates "the extent to which members of the minority group have been elected to public office in the jurisdiction." *Gingles*, 478 U.S. at 45. From a historical perspective, this factor is not as probative where previous redistricting plans provided far more majority-Black districts in the Detroit area with much higher (and thus safer) BVAPs. Because the Commission radically lowered the number of Black-majority districts, it is more helpful to analyze the retrogressive trend of minority electoral success effected by the new plans as well as the racial proportionality of the new districts. *E.g., Johnson v. De Grandy*, 512 U.S. 997, 1017-20 (1994); *Ferguson-Florissant*, 201 F. Supp. 3d at 1064-66; *Galvin*, 300 F. Supp. 2d at 311-315. Both these important factors weigh in favor of Plaintiffs.

Before the Linden Plan, Michigan had five Black Senators from the Detroit area: Adam Hollier, Sylvia Santana, Marshall Bullock, Betty Jean Alexander, and Erika Geiss.[17] After the 2022 elections, which implemented the Linden Plan, the number of Black Senators in the Detroit area shrunk to two: (1) Incumbent Sylvia Santana, and (2) Incumbent Erika Geiss.[18] Most notably, due to the racial dilution of "baconmandered" Senate District 8, Incumbent Marshall Bullock lost a racially

---

[17] https://legislature.mi.gov/(S(ix3loiorex4t0i2tchrrougv))/documents/2021-2022/michiganmanual/2021-MM-P0138-p0138.pdf

[18] https://www.senate.michigan.gov/senators/senatorinfo_complete.html

polarized democratic primary to the white candidate of choice, Incumbent Mallory McMorrow. Trende.Expet.Report.7-8, 88-90, J.A.314-15, 395-97; Smiff.Aff.¶¶18-25, J.A.512-14. It is likely the next election will lead to further retrogression. *Id.* There are no majority-Black Senate districts. *Id.* Erika Geiss, who was not the Black candidate of choice, may again defeat a future Black candidate of choice due to Senate District 1 being drawn with only a 35% BVAP. *Id.*; Lemmons.Aff.¶35-36, J.A.530-31. Sylvia Santana is term limited, leaving future Black candidates to compete in Senate District 2, drawn with a nominal BVAP of only 25%. *Id.*; Lemmons.Aff.¶37, J.A.531.

Before the Hickory Plan, Michigan had nine Black Representatives from the Detroit area: Tenisha Yancey, Joe Tate, Cynthia Johnson, Tyrone Carter, Helena Scott, Stephanie Young, Karen Whitsett, Jewell Jones, and Kyra Bolden.[19] After the 2022 elections, which implemented the Hickory Plan, the number decreased by just one due to the presence of five incumbents and one race with no white opponent: Incumbent Tyrone Carter, Incumbent Karen Whitsett, Incumbent Helena Scott, Incumbent Joe Tate, Kimberly Edwards, Donavan McKinney, Incumbent Stephanie Young, and Jason Hoskins (no white opponent).[20] Trende.Expert.Report.41-43, J.A.348-50.

The most striking feature of the Hickory Plan's debut was that "in the open seats, Black candidates of choice lost four of the six races, including a race in a Black-majority district." *Id.* "Even then, Kimberly Edwards barely won, while [Incumbent]

---

[19] https://legislature.mi.gov/(S(ix3loiorex4t0i2tchrrougv))/documents/2021-2022/michiganmanual/2021-MM-P0184-p0185.pdf
[20] https://house.mi.gov/AllRepresentatives

Helena Scott had a surprisingly poor showing, despite overwhelming support for Black voters." *Id.* This evidence bodes poorly for Black electoral success the remainder of the decade. *Id.*

From a statewide perspective, the lack of racial proportionality in elected legislators is deeply troubling. Approximately 13.7% of Michigan's residents identify as Black alone. For Black Michiganders to have proportional representation, there would need to be *five* Black Senators and *fifteen* Black Representatives. After the first elections following the Commission's gambit, Michigan has only *three* Black Senators and *eleven* Black Representatives across the entire state—a stunning 30% proportionality deficit in Black legislative representation.

This retrogressive and disproportional electoral outcome follows from the Commission's reduction in the number of Black-majority districts. The previous Senate Plan "had *two* districts drawn in excess of 50% BVAP and *three* more in excess of 45% BVAP." Trende.Expert.Report.21, J.A.328. The Linden Plan has *zero* districts drawn above 45% BVAP. *Id.* at 22, J.A.329. Similarly, the Hickory Plan reduces the number of Black-majority districts by 35% from *11* to *seven*. *Id.* at 17-19, J.A.324-26. The predictable result is a shift of political power away from Detroit's Black population and into the white suburbs. *Id.* at 21, J.A.328.

From a statewide perspective, the number of Black-majority districts flunks the proportionality test. The *Galvin* Court opined that this test is "[o]ne of the most revealing questions a court can ask in assessing the totality of the circumstances" and clarified that a proper proportionality analysis delves into "whether the number

of majority minority districts is in proportion to the minority group's share of the relevant population." 300 F. Supp. 2d at 311-12. Because Michigan has a Black-alone population of 13.7%, for Michigan's legislative lines to be proportional, the Linden Plan would have needed to create *five* Senate districts and *15* House districts with BVAPs above 50%. Instead, the Linden Plan created *zero* Black-majority Senate districts and the Hickory Plan only *seven* for the House. 2021.Redistricting.Report.24, 41-43, J.A.578, 589-591.[21] Michigan thus has a 65% proportionality deficit in majority-Black legislative districts.

Conversely, because Michigan has a white-alone population of 73.9%, for Michigan's legislative lines to be proportional, the Linden Plan would have needed to create only 28 Senate districts and 81 House districts with white-voting-age populations above 50%. Instead, the Linden Plan created 34 white-majority districts while the Hickory Plan created 97 white-majority districts. *Id.* Michigan thus has an approximately 17% proportionality surplus in white-majority legislative districts.

**B.**    **Summary judgment is proper as to Counts III and IV because the Commission created the Districts with race as the predominant consideration in violation of the Equal Protection Clause.**

**1.**    **Overview of the Equal Protection Clause racial gerrymandering claim**

The Fourteenth Amendment provides that no state may "deny to any person within its jurisdiction the equal protection of the laws." Its purpose is to prevent government from purposefully discriminating between individuals based on race.

---

[21] https://bit.ly/3pmK0xw

*Washington v. Davis*, 426 U.S. 229, 239 (1976). Classifications of citizens solely based on race "are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943).

The Equal Protection Clause prohibits government from treating citizens along racial lines, including when creating voting districts. *Miller v. Johnson*, 515 U.S. 900, 911 (1995). A plaintiff bringing an Equal Protection racial gerrymandering claim must first prove that "race was the predominant factor motivating the . . . decision to place a significant number of voters within or without a particular district." *Id.* at 916. Racially gerrymandered district maps are "constitutionally suspect . . . whether or not the reason for the racial classification is benign or the purpose remedial." *Shaw v. Hunt*, 517 U.S. 899, 905 (1996).

"[A] plaintiff challenging a reapportionment [plan] … under the Equal Protection Clause may [do so] by alleging that the [redistricting plan], though [facially] race neutral, rationally cannot be understood as anything other than an effort to separate voters into different districts on the basis of race, and that the separation lacks sufficient justification." *Shaw v. Reno*, 509 U.S. 630, 649 (1993). In other words, race was the predominant factor behind the "'decision to place a significant number of voters within or without a particular district.'" *Cooper v. Harris*, 581 U.S. 285, 291 (2017) (quoting *Johnson,* 515 U.S. at 916). This entails demonstrating that the redistricting plan considered race above other traditional redistricting factors: "compactness, respect for political subdivisions, [and] partisan advantages." *Id*.

A plaintiff may make this showing with "'direct evidence'" of the plan's intent or "'circumstantial evidence of a district's shape and demographics[.]'" *Id.* (quoting *Johnson,* 515 U.S. at 916). A plaintiff may use a mix of both direct and circumstantial evidence. *Id.*

### 2.    Strict scrutiny

If race was the predominant consideration in drafting the district(s), it must face strict scrutiny. *Vera*, 517 U.S. at 958-59. The burden then shifts to the government to prove that its race-based sorting of voters was narrowly tailored to achieve a compelling governmental interest. *Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. 178, 193 (2017). The state must demonstrate the alleged objective was the "'actual purpose'" for the racial classification.  *Shaw*, U.S. at 908, n.4, (quoting *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 730 & n.16. (1982)). And there must have been a strong basis in evidence to determine the racial classification necessary. *Id.*  Avoiding potential litigation under the VRA is not a compelling interest to justify a racial gerrymander even where there is a strong basis in evidence for believing there would be a violation of the VRA but for the race-based action. *Id.* at 911.

Districts that (1) are bizarrely shaped, (2) not compact, and (3) significantly deviate from traditional districting principles are not narrowly tailored to serve a governmental interest, failing strict scrutiny. *Vera*, 517 U.S. at 978-80. In addition, compliance with traditional principles alone cannot be a compelling state interest. *Quilter v. Voinovich*, 981 F. Supp. 1032 (N.D. Ohio 1997), judgment summarily aff'd, 523 U.S. 1043 (1998).

**(a)** **The Commission's BVAP threshold requires strict scrutiny.**

At the outset, the evidence shows that "race was the predominant factor motivating the [Commission]'s decision to place a significant number of voters within or without [ ] particular district[s]," triggering strict scrutiny. *Bethune-Hill*, 580 U.S. at 187 (2017). Racial considerations predominate where mapmakers purposefully established a set racial target. *Cooper v. Harris*, 581 U.S. 285, 300 (2017).

The Commission set racial quotas—and Chairwoman Szetela kept the receipts. As she explained, the Commission's counsel "intervened and aggressively push[ed] the Commission to reduce the BVAP numbers to as close to the general election percentages (35% to 40%) as possible. Szetela.Report.89, J.A.608 (citation omitted). And at the Commission's September 30, 2021 meeting, "the Commission was expressly directed to identify 'anything that is higher than 40% for the black voting age population' and 'those quote unquote fixes can be dealt with.'" *Id.* at 6, J.A.609 (citations omitted). "Despite Dr. Handley's analysis showing that the required BVAP for primary elections was likely higher than the required BVAP for general elections, the Commission acquiesced to its counsel and redrew each of its existing maps in the Metropolitan Detroit area based on the general election BVAP 'targets' of 35% to 40%." *Id.* (And as explained below, simulations show the 40% target was adhered to.)

These racial quotas trigger strict scrutiny. Where there is evidence of a set BVAP threshold, courts cannot reach "any conclusion other than that race was the predominant factor." *Shaw v. Hunt*, 517 U.S. 899, 906 (1996) (cleaned up).

**(b)**   **Circumstantial evidence of race in the creation of the maps requires strict scrutiny.**

The direct evidence of unlawful racial quotas is supported by circumstantial evidence in the form of simulated data analysis.

Professor Trende conducted a simulation of the Hickory and Linden Maps using Sequential Monte Carlo analysis. Trende.Expert.Report.63, J.A.370. The simulation "creates an 'ensemble' of maps that reflect what we would expect in a state if maps were drawn without respect to a certain criteria – here, racial criteria." *Id.* Professor Trende ran the simulation 150,000 times. *Id.* at 66, J.A.373. The first batch of 50,000 simulations were drawn without respecting county boundaries. *Id.* "If the Hickory Map was not drawn with a heavy reliance on racial data, or did so only moderately, it should hew closely to the results produced by the simulated maps (which were, of course drawn blind to race)." *Id.* at 67, J.A.374. But the Commission's map was an outlier; "[o]f particular note is how closely the BVAPs hew to the 40% goal described in the Szetela Report, where we would not expect that from race-neutral maps." *Id.* at 67-8, J.A.374-75.

Indeed, when looking at the Commission map's deviation from BVAP share in the ensemble, the "Hickory Plan is a grotesque outlier," with the gray shaded areas in Figure 28 representing the 50,000 race-neutral maps and the red line representing the Commission's map:



Figure 28

*Id.* at 70, J.A.377. When the same exercise is performed respecting county boundaries, the result is no different:



Figure 30

*Id.* at 72, J.A.379. (Professor Trends also performed the analysis to account for communities of interest by keeping intact any jurisdiction the Commission chose to keep intact. The conclusion was the same.) "Taken together, these findings demonstrate that drawing districts to a 40% BVAP total was an overriding goal of the commission," *id.*, just as the Commission's counsel directed.

The Commission will no doubt say that because Black votes and Democrat votes are closely correlated, the simulations could merely be reflective of a political outcome, not a racial one. But that's not what the data shows. "[T[he weight of the evidence suggests that is was the racial composition of the districts that drove the politics." *Id.* at 77, J.A.384.

Unsurprisingly, the Linden Plan shows similar deviations from race-neutral simulation maps, "again reflecting the instructions relayed in the Szetela report to draw districts down to a 40% target." *Id.* at 108, J.A.415. And the shocking extent of the variation from race neutrality is present both in the simulations that do not pay attention to county boundaries:



*Id.* at 109, J.A.416. And those that do:



*Id.* at 111, J.A.418. As Professor Trende explains, "again, this cannot be justified by a supposed desire to achieve a political outcome. While there are significant deviations, those deviations do not occur in the areas where they would significantly affect political outcomes. Instead, they occur in the most heavily Democratic districts.

In other words, this is once again a case where the political deviations are almost certainly driven by the racial considerations." *Id.*

There's more. The Commission's maps cross multiple natural boundaries to create bizarre districts shaped like "bacon strips," a "basic tool in the gerrymandering toolbox, where concentrations of voters are split up among multiple different districts." *Id.* at 43-63, 93-107, J.A.353-70, 400-14. "These bizarrely-shaped districts result in racial breakdowns that are extremely unlikely to have occurred under a race-neutral draw." *Id.* at 120, J.A.427.

### (c)   <u>The maps fail strict scrutiny.</u>

The racially drawn Districts cannot survive strict scrutiny. There is no compelling interest justifying the Commission's race-based sorting of Senate or House EP Plaintiffs.

First, compliance with the VRA cannot serve as a compelling interest. The Commission's counsel insisted on, and a majority of Commissions acquiesced to, a BVAP threshold of 35%-40%. That this threshold was required for VRA compliance was a mistaken belief not founded on a strong basis in evidence. As discussed, the Commission's BVAP reductions across the Districts deprive Black voters the opportunity to elect their preferred candidates. The Commission ignored the established voting patterns in Democratic primaries that show the inability of a Black candidate of choice prevailing with this percentage of BVAP.

As noted, the Commission's attorneys insisted on Districts with a BVAP below 40%, presumably because they believed that higher percentage BVAP districts would be to the detriment of partisan fairness. *Accord* Rodden.Expert.Report.2-4, J.A.228-

30. But partisan fairness is never a compelling interest to discriminate based on race. *Voinovich*, 981 F. Supp. 1032. The VRA's whole point is to protect Black voters' representation against partisan interests. And the Commission had no evidentiary basis to conclude that lowering BVAPs would support partisan fairness; as Professor Trende explained, lowering the BVAPs across the board did *not* achieve that result. Precincts with heavy Black populations were combined with white precincts in the suburban area. But all these precincts tend to vote Democrat. The result was ensuring that Democratic candidates prevail but at the expense of Black voters' choices.

## V.    CONCLUSION

Analyzing redistricting maps for VRA compliance is often difficult because courts are forced to make predictions about how newly drawn districts will perform in future elections based on past data. This case is different. Because the Commission drew maps shortly before an election, and Plaintiffs did not seek emergency relief, we have the benefit of the 2022 election. And those returns reflect the outcomes that Secretary Benson's academic work and Dr. Handley's data predicted: a precipitous 20% decline in Michigan's Black Legislative Caucus. That outcome is a direct result of the Commission's decision to substitute "opportunity" districts for majority-minority districts.

Indeed, the adverse effects of the Commission's gambit on metro Detroit's Black voters are only beginning. As term limits and circumstances force Black incumbent legislators out of office, it is easy to predict that Michigan's Black Legislative Caucus will shrink further. And while the VRA is not intended to assure

44

that every racial minority group has precisely a proportional representation in the Legislature, it is a VRA problem for Black voters to experience a 30% proportionality deficit that will inevitably get worse. Plaintiffs are entitled to summary judgment on Counts I and II.

"Equally important, this was not an accident. Both qualitative and quantitative analyses of the [Commission's] districts demonstrate that traditional redistricting criteria were subverted to the goal of drawing districts based on race." Trende.Report.120, J.A.427. This is consistent with the Commission's use of BVAP ceilings to draw opportunity districts. Summary judgment is warranted on Counts III and IV, too.

Accordingly, Plaintiffs request summary judgment on all four Counts and expedited briefing on the appropriate remedy.

<div style="margin-left:40%">

Respectfully submitted,

/s/ John J. Bursch
John J. Bursch (P57679)
BURSCH LAW PLLC
*Attorney for Plaintiffs*
9339 Cherry Valley Ave SE, #78
Caledonia, Michigan 49316
(616) 450-4235
jbursch@burschlaw.com

Michael J. Pattwell (P72419)
James J. Fleming (P84490)
Amia A. Banks (P84182)
CLARK HILL PLC
*Attorneys for Plaintiffs*
215 South Washington Square
Suite 200

</div>

<div style="text-align:center">45</div>

Lansing, MI 48933
(517) 318-3100
mpattwell@clarkhill.com
jfleming@clarkhill.com
abanks@clarkhill.com

Dated: May 9, 2023

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the word limit of W.D. Mich. LCivR 7.2(b)(i) because, excluding the parts exempted by this rule, it contains 10,745 words. The word count was generated using Microsoft Word for Microsoft 365.

<div style="text-align:right">

Respectfully submitted,

*/s/ John J. Bursch*
John J. Bursch (P57679)
BURSCH LAW PLLC
*Attorney for Plaintiffs*
9339 Cherry Valley Ave SE, #78
Caledonia, Michigan 49316
(616) 450-4235
jbursch@burschlaw.com

Michael J. Pattwell (P72419)
James J. Fleming (P84490)
Amia A. Banks (P84182)
CLARK HILL PLC
*Attorneys for Plaintiffs*
215 South Washington Square
Suite 200
Lansing, MI 48933
(517) 318-3100
mpattwell@clarkhill.com
jfleming@clarkhill.com
abanks@clarkhill.com

</div>

Dated: May 9, 2023

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 9, 2023, I electronically filed the above document(s) with the Clerk of the Court using the ECF System, which will provide electronic copies to counsel of record.

Respectfully submitted,

*/s/ John J. Bursch*
John J. Bursch (P57679)
BURSCH LAW PLLC
*Attorney for Plaintiffs*
9339 Cherry Valley Ave SE, #78
Caledonia, Michigan 49316
(616) 450-4235
jbursch@burschlaw.com

Michael J. Pattwell (P72419)
James J. Fleming (P84490)
Amia A. Banks (P84182)
CLARK HILL PLC
*Attorneys for Plaintiffs*
215 South Washington Square
Suite 200
Lansing, MI 48933
(517) 318-3100
mpattwell@clarkhill.com
jfleming@clarkhill.com
abanks@clarkhill.com

48