**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

DONALD AGEE, JR. et al.,

                   Plaintiffs,

      v.

JOCELYN BENSON, et al.,

                  Defendants.

**Case No. 1:22-CV-00272-PLM-RMK-JTN**

<u>**THE COMMISSION'S BRIEF IN**</u>
<u>**SUPPORT OF MOTION FOR**</u>
<u>**SUMMARY JUDGMENT**</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................................... iii

INTRODUCTION ................................................................................................... 1

BACKGROUND..................................................................................................... 2

    A.   Factual Background ............................................................................. 2

    B.   Procedural History ............................................................................... 8

THE LEGAL STANDARD ..................................................................................... 11

ARGUMENT .......................................................................................................... 12

I.    Threshold Deficiencies Preclude Plaintiffs' Claims Against Three Challenged Districts (HD13, HD26, and SD5)........................................................... 12

    A.   Article III Jurisdiction ......................................................................... 12

    B.   *Res Judicata* ..................................................................................... 13

II.   Plaintiffs' Claims Under the VRA Fail as a Matter of Law ................................ 15

    A.   The Legal Standard............................................................................. 15

    B.   The First *Gingles* Precondition ......................................................... 16

    C.   The Second and Third *Gingles* Preconditions ................................... 22

III.  Plaintiffs' Racial-Gerrymandering Claims Fail as a Matter of Law ....................... 24

    A.   The Legal Standard............................................................................. 25

    B.   Predominance ..................................................................................... 26

    C.   Narrow Tailoring ................................................................................ 28

CONCLUSION ....................................................................................................... 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez,*
   138 S. Ct. 2305 (2018) ............................................................. 16, 17, 25, 28

*Adair v. State,*
   470 Mich. 105, 680 N.W.2d 386 (Mich. 2004) ........................................14

*Alabama Legislative Black Caucus v. Alabama,*
   575 U.S. 254 (2015)............................................................................*passim*

*Arizona v. Biden,*
   40 F.4th 375 (6th Cir. 2022) ......................................................................12

*Banerian v. Benson,*
   589 F. Supp. 3d 735 (W.D. Mich. 2022) ..................................................... 4

*Banerian v. Benson,*
   597 F. Supp. 3d 1163 (W.D. Mich. 2022)................................................4, 5

*Bartlett v. Strickland,*
   556 U.S. 1 (2009) ..............................................................................*passim*

*Bethune-Hill v. Virginia State Bd. of Elections,*
   580 U.S. 178 (2017)...........................................................................*passim*

*Cano v. Davis,*
   211 F. Supp. 2d 1208 (C.D. Cal. 2002).....................................................23

*Chen v. City of Houston,*
   9 F. Supp. 2d 745 (S.D. Tex. 1998) ...........................................................13

*Cooper v. Harris,*
   581 U.S. 285 (2017)............................................................................*passim*

*Cousin v. Sundquist,*
   145 F.3d 818 (6th Cir. 1998) .....................................................................22

*Covington v. North Carolina,*
   316 F.R.D. 117 (M.D.N.C. 2016) ........................................................ 29, 33

*Detroit Caucus v. Indep. Citizens Redistricting Comm'n,*
   969 N.W.2d 331 (Mich. 2022) ....................................................8, 9, 13, 14

*Easley v. Cromartie*,
   532 U.S. 234 (2001) (*Cromartie II*) ........................................................ 25, 26, 27

*Fusilier v. Landry*,
   963 F.3d 447 (5th Cir. 2020) ...................................................................... 16

*Gen. Motors Corp. v. Lanard Toys, Inc.*,
   468 F.3d 405 (6th Cir. 2006) ................................................................ 11, 18

*Georgia v. Ashcroft*,
   539 U.S. 461 (2003) ................................................................................ 2, 3

*Gill v. Whitford*,
   138 S. Ct. 1916 (2018) ........................................................................... 12, 13

*Growe v. Emison*,
   507 U.S. 25 (1993) ..................................................................................... 24

*Hall v. Virginia*,
   385 F.3d 421 (4th Cir. 2004) ...................................................................... 21

*Harding v. County of Dallas, Texas*,
   948 F.3d 302 (5th Cir. 2020) ................................................................ 16, 17

*Harvey v. Campbell Cnty., Tenn.*,
   453 F. App'x 557 (6th Cir. 2011) ................................................................ 11

*Hines v. Mayor & Town Council of Ahoskie*,
   998 F.2d 1266 (4th Cir. 1993) .................................................................... 16

*In re Indep. Citizens Redistricting Comm'n for State Legislative & Cong. Dist.'s Duty
   to Redraw Districts by Nov. 1, 2021*,
   507 Mich. 1025, 961 N.W.2d 211 (Mich. 2021) ...................................... 4, 5

*Jacksonville Branch of NAACP v. City of Jacksonville*,
   2022 WL 7089087 (M.D. Fla. Oct. 12, 2022) ............................................ 32

*Johnson v. De Grandy*,
   512 U.S. 997 (1994) .............................................................................. 18, 19

*League of United Latin Am. Citizens v. Abbott*,
   604 F. Supp. 3d 463 (W.D. Tex. 2022) ...................................................... 22

*League of United Latin Am. Citizens v. Perry*,
   548 U.S. 399 (2006) ................................................................................... 20

*League of Women Voters of Mich. v. Benson*,
   373 F. Supp. 3d 867 (E.D. Mich. 2019) ...................................................... 2

*League of Women Voters of Michigan v. Indep. Citizens Redistricting Comm'n,*
  509 Mich. 885, 971 N.W.2d 595 (Mich. 2022) ........................................................ 9, 27

*Levy v. Lexington Cnty., S.C.,*
  589 F.3d 708 (4th Cir. 2009) ................................................................................ 23, 24

*Lewis v. Alamance Cnty., N.C.,*
  99 F.3d 600 (4th Cir. 1996) ......................................................................................... 23

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) ....................................................................................................... 13

*Miller v. Johnson,*
  515 U.S. 900 (1995) ................................................................................................ 25, 26

*Nipper v. Smith,*
  39 F.3d 1494 (11th Cir. 1994) ..................................................................................... 16

*Osborn v. Ashland Cnty. Bd. of Alcohol, Drug Addiction & Mental Health Servs.,*
  979 F.2d 1131 (6th Cir. 1992) ..................................................................................... 13

*Petteway v. Galveston Cnty.,*
  -- F. Supp. 3d --, 2023 WL 2782704 (S.D. Tex. Mar. 30, 2023) ................................. 12

*Reno v. Bossier Par. Sch. Bd.,*
  528 U.S. 320 (2000) ....................................................................................................... 16

*Romans v. Michigan Dep't of Hum. Servs.,*
  668 F.3d 826 (6th Cir. 2012) ....................................................................................... 11

*Rucho v. Common Cause,*
  139 S. Ct. 2484 (2019) ................................................................................................... 3

*Shaw v. Hunt,*
  517 U.S. 899 (1996) ....................................................................................................... 13

*Shaw v. Reno,*
  509 U.S. 630 (1993) ......................................................................................... 19, 25, 26

*Sinkfield v. Kelley,*
  531 U.S. 28 (2000) ......................................................................................................... 13

*Tafflin v. Levitt,*
  493 U.S. 455 (1990) ....................................................................................................... 14

*Thornburg v. Gingles,*
  478 U.S. 30 (1986) ................................................................................................ *passim*

*Tillamook Country Smoker, Inc. v. Tillamook Cnty. Creamery Ass'n.*,
    333 F. Supp. 2d 975 (D. Or. 2004) ............................................................................28

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021) ..............................................................................................13

*United States v. Hays*,
    515 U.S. 737 (1995).....................................................................................................12

*Voinovich v. Quilter*,
    507 U.S. 146 (1993).....................................................................................................17

## Constitutions and Statutes

28 U.S.C. § 1738 ...................................................................................................................13

52 U.S.C. § 10301...........................................................................................................1, 15

Mich. Const. art. IV, § 6 ..........................................................................................4, 5, 8, 26

U.S. Const. art. III...........................................................................................................12, 15

U.S. Const. art. IV, § 1 ........................................................................................................13

## Rules

Fed. R. Civ. P. 36(b)...........................................................................................................27

## INTRODUCTION

The parties agree that Michigan's state house and senate redistricting plans must be configured in the Detroit metropolitan region to ensure that members of the Black community enjoy the same "opportunity [as] other members of the electorate to participate in the political process and to elect representatives of their choice," as Section 2 of the Voting Rights Act (VRA) requires, 52 U.S.C. § 10301(b). But they disagree as to how that should occur. Plaintiffs contend that, because Detroit-area voting exhibits a degree of racial polarization, the VRA mandates majority-minority districts with Black voting-age populations (BVAPs) above 50%. And because many district BVAPs in this region in the Commission's plans fall below that proposed majority-minority threshold, Plaintiffs claim the Commission violated the VRA and the Equal Protection Clause.

That position is legally wrong. It is constitutionally erroneous to "mechanically rely upon numerical percentages," divorced from the "circumstances" of local voting patterns, in assessing whether a plan affords equal electoral opportunity. *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 277 (2015). The VRA analysis is "functional," not mechanical. *Id.* at 276 (citation omitted). The statute mandates majority-minority districts only where "effective white-bloc voting exists," meaning that enough white voters vote against Black-preferred candidates to "thwart black voters' preferences." *Cooper v. Harris*, 581 U.S. 285, 304 (2017). Accordingly, redistricting authorities must account for "pattern[s] of white crossover voting," i.e., voting by members of the white majority for candidates preferred by the minority, which can obviate the need for majority-minority districts. *Id.* at 304.

The Michigan Independent Citizens Redistricting Commission (the Commission) employed exactly the kind of functional analysis commanded in precedent. Its data-driven approach may be the most thorough and precise a federal court has ever seen in any redistricting

case. The Commission relied on a comprehensive election analysis and determined that white crossover voting can facilitate equal Black opportunity without majority-minority districts. Its plans delivered results in the 2022 elections, sending more Black-preferred candidates to the state legislature from greater Detroit than Plaintiffs' demonstrative plans could even arguably have achieved. None of this is amenable to a genuine dispute of fact, and summary judgment is warranted in the Commission's favor.

## BACKGROUND

### A.  Factual Background

1.      After each decennial census, "[s]tates must redistrict to account for any changes or shifts in population." *Georgia v. Ashcroft*, 539 U.S. 461, 489 n.2 (2003). For most of Michigan's history, redistricting was the responsibility of the state legislature. During the 2011 redistricting, the Republican Party "had a trifecta" in the state government, controlling "the House, Senate, and governorship." Joint Appendix (JA) 00486, Trende Dep. 31:20–22.[1] This enabled Republican politicians to craft and enact redistricting plans to benefit their own electoral fortunes "at least to some extent," JA00486, Trende Dep. 31:22–23, and a federal court found that the legislature "packed" Democratic voters into Detroit-area districts, "making the surrounding districts . . . more Republican." *See League of Women Voters of Mich. v. Benson*, 373 F. Supp. 3d 867, 882–93 (E.D. Mich. 2019), *vacated sub nom*, 140 S. Ct. 429 (2019).

That was not difficult. Michigan's Black population is concentrated in a few metropolitan areas, including Detroit. *See* JA00318–20, Trende Rep. 11–13. Race and political preference correlate in Michigan, with Black voters consistently preferring Democratic candidates in general elections. JA00334, Trende Rep. 27; *see also* JA00489–90, Trende Dep. 44:24–45:3.

---

[1] Sean Trende, a senior elections analyst for the website RealClear Politics, JA00309, Trende Rep. 2, is Plaintiffs' principal expert witness, whose opinions they offer on all threshold Section 2 elements and all equal-protection issues. *See* JA00313, Trende Rep. 6–7.

As a result, drawing compact districts wholly within Detroit will naturally "pack" voters who are Black and lean Democratic and dilute their voting strength elsewhere, to Republican statewide benefit. JA00232–37, Rodden Rep. 6–11. The Michigan legislature did that in 2011. JA00243, Rodden Rep. at 17. It defended this approach by claiming the VRA commands this concentration of Black voters into a few districts with high BVAPs. *Id.* In the 2011 state house plan, 11 districts were majority-Black, including districts with BVAPs as high as 92% (HD7), 90% (HD8), 88% (HD3), and 72% (HD9). JA00326, Trende Rep. 19. In the state senate plan, one or two districts were majority-Black (depending on the calculation).[2] JA00329, Trende Rep. 22.

Between 2011 and 2020, Black voters did not need majority-Black districts to elect their preferred candidates in legislative elections. In the state house, Black-preferred candidates frequently won elections in districts from 26.53% to 47% BVAP. *See* JA00049, 2021 Handley Rep. 25. In state senate elections, Black-preferred candidates also won in districts below 50% BVAP, including SD6 (21.29% BVAP), SD11 (35.48%), SD4 (47%), and SD3 (48.14%). JA00050, 2021 Handley Rep. 26; *see also* JA00034, 2021 Handley Rep. 10.

2.    In 2018, "voters in . . . Michigan approved [a] constitutional amendment[] creating [a] multimember commission[] that [is] responsible . . . for creating and approving district maps for congressional and legislative districts." *Rucho v. Common Cause*, 139 S. Ct. 2484, 2507 (2019) (citing Mich. Const. art. IV, § 6). The amendment "transferred the power to draw

---

[2] From the census, there are "slightly different" ways of calculating a district's BVAP, "depend[ing] upon whether the total number of blacks includes those people who self-identify as both black and a member of another minority group, such as Hispanic." *Georgia*, 539 U.S. at 474 n.1. The Commission's principal VRA expert, Dr. Lisa Handley, utilized a method excluding persons who identify as both Black and Hispanic, *see* JA00003, 2023 Handley Report 3 n.5, and Plaintiffs' expert, Sean Trende, utilized different measures at different points of his report. The differences are minor (about one or one-and-a-half percentage points) and immaterial to any case issue. This memorandum states BVAPs according to the source material cited in each given instance.

those lines from the State Legislature to a newly created" Commission, *Banerian v. Benson*, 597 F. Supp. 3d 1163, 1165 (W.D. Mich.) (three-judge court), *appeal dismissed*, 143 S. Ct. 400 (2022), which is composed of 13 registered voters, randomly selected by the secretary of state, four of whom identify as Republicans, four of whom identify as Democrats, and five of whom affiliate with neither major party. Mich. Const. art. IV, § 6(2)(f).

The amendment directs the Commission to draw districts according to seven redistricting criteria in descending "order of priority." *Banerian v. Benson,* 589 F. Supp. 3d 735, 736–37 (W.D. Mich. 2022) (three-judge court) (quoting Mich. Const. art. IV, § 6(13)). These include that districts comply with federal law, be contiguous, "reflect the state's diverse population and communities of interest," "not favor or disfavor an incumbent elected official or a candidate," and "reflect consideration of county, city, and township boundaries." Mich. Const. art. IV, § 6(13). The fourth-ranked criterion dictates that "[d]istricts shall not provide a disproportionate advantage to any political party." *Id.* § 6(13)(d). The provision explains that "[a] disproportionate advantage to a political party shall be determined using accepted measures of partisan fairness." *Id.* This criterion is above, and superior to, the consideration of political-subdivision boundaries and compactness. *Cf. Banerian*, 589 F. Supp. 3d at 738.

3.     The Commission first convened in September 2020 in preparation for its inaugural redistricting. But this decade's redistricting proved uniquely challenging. The Commission found itself in "the difficult and unenviable position of undertaking its inaugural redistricting cycle without the full benefit of tabulated decennial census data," because the U.S. Census Bureau released the necessary redistricting data "six months late" due to the global pandemic. *In re Indep. Citizens Redistricting Comm'n for State Legislative & Cong. Dist.'s Duty to Redraw Districts by Nov. 1, 2021*, 507 Mich. 1025, 961 N.W.2d 211, 212 (Mich. 2021) (Welch,

J., concurring). This delay made it impossible for the Commission to achieve its constitutional duty to prepare and enact plans by November 1. Mich. Const. art. IV, § 6(7).

Despite these challenges, the Commission "act[ed] diligently pursuant to its constitutional mandate." *In re Indep. Citizens Redistricting Comm'n*, 961 N.W.2d at 212 (Welch, J., concurring). The Commission met or surpassed every metric of public observation and participation, holding nearly 140 public meetings as of the time it adopted redistricting plans and receiving nearly 30,000 public comments. *See Banerian*, 597 F. Supp. 3d at 1166.

4.    To ensure its plans would "comply with the voting rights act and other federal laws," Mich. Const. art. IV, § 6(13)(a), the Commission engaged accomplished VRA experts. The Commission hired an internationally recognized expert, Dr. Lisa Handley, who has in her career of more than 30 years advised redistricting authorities across the nation, the U.S. Department of Justice Voting Rights Section (the Voting Rights Section), and civil-rights organizations. JA00016–17, 2023 Handley Rep., CV at 1–2. The Commission also retained a nationally recognized voting-rights attorney, Bruce Adelson, who formerly worked with the Voting Rights Section and has also advised redistricting authorities. Mr. Adelson or Dr. Handley (or both) spoke at 36 Commission meetings between April and December 2021.[3] Dr. Handley provided the Commission with written presentations in September and November 2021 and submitted a final report in late December 2021.[4]

---

[3] The specific dates included April 8, June 28 and 30, July 8 and 9, August 6 and 19, September 1, 2, 9, 14, 20, 21, 22, 23, 27, 28, 29, and 30, October 1, 2, 4, 5, 6, 7, 8, 11, 27, 28, 29, November 1, 3, 4, 5, and December 2 and 28, 2021. *See Meeting Notices & Materials Archives*, Michigan Indep. Citizens Redistricting Comm'n, https://www.michigan.gov/micrc/meeting-notices-and-materials-archives (last visited May 4, 2023).

[4] The report was finalized as of January 4, 2022, but is referred to here as Dr. Handley's "2021 Report" because the Commission had a near final version as of December 28, 2021. Dr. Handley also submitted an expert report in this case, referred to as her "2023 Report," JA00001, which incorporates the 2021 Report as Appendix A, JA00024.

Dr. Handley conducted a polarized voting analysis of every county in Michigan having large enough minority populations to accurately estimate voting preferences. JA00029, 2021 Handley Rep. 5. Because of the secret ballot, voting preferences of different racial or ethnic groups cannot be discerned from precinct-level returns, and experts must infer them by statistical means. JA00026, 2021 Handley Rep. 2; JA00565, Sept. 2, 2021 Tr. 20. To do this, Dr. Handley used industry standard methods, ecological inference (EI) and ecological regression (ER). JA00026–27, 2021 Handley Rep. 2–3. Dr. Handley analyzed all federal and statewide general election contests from 2012 through 2020, including the only statewide Democratic primary in the prior decade (the 2018 gubernatorial race). JA00029–30, 2021 Handley Rep. 5–6. Dr. Handley found consistent (but not uniform) polarization between Black and white voters, meaning that Black and white voters generally prefer different candidates in both general and Democratic primary elections.[5] JA00030–36, 2021 Handley Rep. 6–12. Dr. Handley concluded: "Because voting in Michigan is racially polarized, districts that provide minority voters with an opportunity to elect their candidates of choice must be drawn." JA00041, 2021 Handley Rep. 17.

However, both Dr. Handley and Mr. Adelson advised the Commission not to "choose an arbitrary target" of BVAP for these districts, such as that "50% voting age population is what we need to maintain these minority districts." JA00567, Sept. 2, 2021 Tr. 25; *see also* JA00569, Sept. 2, 2021 Tr. 29, MICRC_005388 (Adelson). Instead, they advised the Commission to rely on "a District specific functional analysis in each area." JA00567, Sept. 2, 2021 Tr. 25. Dr. Handley examined "estimates of participation rates[,] minority cohesion[,] and white cross over" voting for Black-preferred candidates. JA00567, Sept. 2, 2021 Tr. 25; JA00041–48, 2021 Handley Rep. 17–24. Dr. Handley also looked to election results from the

---

[5] Very few Black voters participate in Republican primaries, so those elections are not informative as to Black voting preferences.

6

prior decade in districts ranging between 20% and more than 90% BVAP. JA00048–50, 2021 Handley Rep. 24–26. Dr. Handley concluded that white crossover voting affords Black voters an equal opportunity to elect their representatives of choice in districts with BVAPs below a majority, and she advised the Commission that "in no county is a 50% BVAP district required for the Black-preferred candidates to carry the district in a general election." JA00045, 2021 Handley Rep. 21. Dr. Handley's analysis shows that districts of 35% BVAP or higher in Wayne and Genesee Counties, and of 40% BVAP or higher in Oakland and Saginaw Counties, would preserve equal Black electoral opportunity. *See id.*

Drawing districts of significantly higher BVAPs would, Dr. Handley observed, "pack[]" Black voters into a few districts and dilute their voting strength in neighboring districts. JA00565, Sept. 2, 2021 Tr. 20. Dr. Handley observed the 2011 state house districts with high BVAPs and concluded: "Those are packed." JA00568, Sept. 2, 2021 Tr. 28.

5.    The Commission relied on this advice. In their draft plans, Commission members did not carry forward Detroit-area districts with 70%, 80%, and 90% BVAPs. The plans the Commission ultimately adopted were the Hickory plan (for the state house) and the Linden plan (for the state senate). Plaintiffs' expert, Sean Trende, reports that the Hickory plan contains 16 districts in the Detroit metropolitan region above 35% BVAP, ranging from 35.8% BVAP (HD26) to 55.6% BVAP (HD4), JA00326, Trende Rep. 19, and Dr. Handley's report shows similar (slightly higher) BVAPs for the same districts, JA00011, 2023 Handley Rep. 11, table 4; *see* note 2, *supra*. The Linden plan contains six Detroit-area districts within the range Dr. Handley identified as affording equal electoral opportunity. JA00329, Trende Rep. 22. Both plans contain districts that fall below BVAP majorities but are within the ranges demonstrated by Dr. Handley to afford equal Black opportunity in conjunction with reliable white crossover voting. In redistricting parlance, these are called "crossover districts." *See*

*Cooper*, 581 U.S. at 303; *Bartlett v. Strickland*, 556 U.S. 1, 13 (2009) (plurality opinion). The Commission looked to Dr. Handley's report, and past election results recompiled within the new district boundaries, to ensure that these districts would likely ensure equal Black electoral opportunity. *See* JA00050–51, 2021 Handley Rep. 26–27.

This was not the Commission's only goal. Among many other things, the Commission took care to avoid affording a "disproportionate advantage" to any political party. Mich. Const. art. IV, § 6(13)(d). Toward that end, Dr. Handley provided guidance to the Commission on partisan-fairness analyses in addition to her racial-bloc-voting analysis, identifying standard measures of partisan fairness and acceptable ranges of fairness under those standards. JA00052–57, 2021 Handley Rep. 28–33. Commissioners worked to achieve neutral partisan-fairness scores—i.e., scores that do not favor one major party over the other—and they avoided packing Democratic voters into a few Detroit-area districts. JA00579–84, Commission Rep. 26–31; JA00592–602, Commission Rep. 45–55; JA00239, Rodden Rep. 13, Tbl. 1.

### B.    Procedural History

1.    The Commission adopted the Linden and Hickory plans on December 28, 2021. Its plans drew legal challenges from across the political spectrum. One group of Black voters and an advocacy group filed suit in the Michigan Supreme Court, contending that the Hickory and Linden plans (as well as the Commission's congressional plan) lack a sufficient number of majority-minority districts to satisfy the VRA. *Detroit Caucus v. Indep. Citizens Redistricting Comm'n*, 969 N.W.2d 331, 331 (Mich.), *reconsideration denied*, 509 Mich. 859, 969 N.W.2d 515 (2022). The Michigan Supreme Court denied relief, concluding that evidence showed "significant white crossover voting for Black-preferred candidates that had the effect of affording Black voters an equal opportunity to elect representatives of their choice even in the absence of 50%+ majority-minority districts." *Id.* at 333. The Michigan Supreme Court

rejected the plaintiffs' argument that "the mere absence of an equivalent number of race-based, majority-minority districts in the adopted plans as compared to Michigan's existing congressional and state legislative districts" is "the measure of vote dilution under the VRA." *Id.* at 332.

In a separate case, the League of Women Voters and other advocacy organizations challenged the Linden plan's compliance with the Michigan Constitution's partisan-fairness requirement, contending that the plan was improperly biased in favor of Republican Party electoral interests, and the Michigan Supreme Court rejected that challenge as well.[6] *See League of Women Voters of Michigan v. Indep. Citizens Redistricting Comm'n*, 509 Mich. 885, 971 N.W.2d 595 (Mich. 2022).

2.      Plaintiffs in this case are Black Michigan voters who live in the Detroit metropolitan region. They filed the original complaint on March 23, 2022, and the operative amended complaint (the Complaint) on April 13, 2022. ECF No. 8, PageID.83. In four causes of action, the Complaint challenges 10 Detroit-region house districts (HD1, HD2, HD7, HD8, HD10, HD11, HD12, HD13, HD14, and HD26) and seven Detroit-region senate districts (SD1, SD3, SD5, SD6, SD8, SD10, and SD11) under VRA Section 2 and the Equal Protection Clause. Compl. ¶¶ 147–212, PageID.135–51. Most of the challenged districts are crossover districts falling within the BVAP ranges Dr. Handley identified as affording equal opportunity; Plaintiffs do not challenge the seven majority-minority districts in the Hickory plan, *see* JA00326, Trende Rep. 19. However, three challenged districts (HD2, SD5 and SD11) have respective BVAPs of around 11%, 18%, and 19%—well below the majority-minority line. JA00326, JA00329, Trende Rep. 19, 22; *see also* JA00578, JA00589, Commission Rep. 24, 41.

---

[6] The 2022 elections confirmed that the Commission's plans do not disproportionately favor Republican electoral interests.

In their VRA claims, Plaintiffs contend that the challenged districts must be configured as majority-minority districts to satisfy the VRA. *See* Compl. ¶¶ 147–180, PageID.135–42. In their equal-protection claims, Plaintiffs contend that the Commission's choice to configure these districts within BVAP ranges supported by Dr. Handley's report amounts to racially predominant redistricting and that the Commission "cannot argue that Section 2 VRA compliance satisfies strict scrutiny because the [Challenged] Districts are not in compliance." Compl. ¶¶ 193, 208, PageID.146, PageID.150.

3.      In August and November 2022, the Hickory and Linden plans were used in primary and general elections. Black-preferred candidates won every general-election contest in Detroit-area districts with a BVAP greater than 25%. JA00010, 2023 Handley Rep. 10. In the Democratic primaries, candidates preferred by Black voters won 16 of 22 state legislative contests in the Detroit-area, including in districts with BVAPs of 25.5% (SD2), 34% (HD3), 39.7% (HD1), and 39.8% (HD13). JA00013, 2023 Handley Rep. 13. Meanwhile, the Black-preferred candidate did not succeed in one of the Hickory plan's majority-minority districts (HD5 (56.9%)), and Black voters did not cohesively support Black candidates who lost in other districts. *Id.* As a result of these elections, five senate and 14 house candidates preferred by Black voters in the Detroit-area are now seated in the Michigan legislature. *See* JA00011, 2023 Handley Rep. 11. In only three of 17 challenged districts (SD8, HD26, and SD1) did a cohesive Black voting bloc not succeed in electing its preferred candidate in a Democratic primary. *Id.*

4.      This case has been in discovery since November 2022. Plaintiffs did not depose any Commission members or any of the Commission's disclosed experts, including Dr. Handley. Plaintiffs rely on the expert opinions of Mr. Trende, who prepared alternative plans reconfiguring Detroit-area house and senate districts to include 10 majority-minority house

districts—including districts with BVAPs of 92%, 81%, 74% and 63%, JA00331, Trende Rep. 24—and five majority-minority Senate districts—for an increase of three (arguably four) majority-minority districts from the 2011 senate plan, JA00390, Trende Rep. 83. The "thrust" of Plaintiffs' claims is that the Linden and Hickory plans are legally infirm because they fall short of these demonstrative plans in providing Black electoral opportunity. *See* JA00496, Trende Dep. 80:1–5.

## THE LEGAL STANDARD

"Summary judgment is appropriate where there is 'no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Romans v. Michigan Dep't of Hum. Servs.*, 668 F.3d 826, 835 (6th Cir. 2012) (quoting Fed. R. Civ. P. 56(a)). The moving party "bears the initial responsibility of informing the district court of the basis for its motion" and "demonstrat[ing] the absence of a genuine issue of material fact." *Harvey v. Campbell Cnty., Tenn.*, 453 F. App'x 557, 560 (6th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

Where the moving party does not bear the ultimate trial burden, the threshold summary-judgment "burden may be discharged by 'showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.'" *Gen. Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 412 (6th Cir. 2006) (citation omitted). If that showing is made, "the nonmoving party must 'go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate 'specific facts showing that there is a genuine issue for trial.'" *Harvey*, 453 F. App'x at 560 (quoting *Celotex*, 477 U.S. at 325) (internal quotation marks omitted). "[T]he facts and any inferences that can be drawn from those facts, must be viewed in the light most favorable to the non-moving party." *Gen. Motors*, 468 F.3d at 412 (citation omitted).

11

## ARGUMENT

## I. Threshold Deficiencies Preclude Plaintiffs' Claims Against Three Challenged Districts (HD13, HD26, and SD5)

Plaintiffs' claims cannot be established as to three districts (HD13, HD26, and SD5) based on threshold deficiencies.

### A. Article III Jurisdiction

Plaintiffs lack a continued basis of standing to challenge HD13. "Article III of the U.S. Constitution permits federal courts to adjudicate 'cases or controversies,' not any political dispute that happens to arise" among willing litigants. *Arizona v. Biden*, 40 F.4th 375, 383 (6th Cir. 2022). To have standing to challenge a law, plaintiffs "must show that they have suffered an 'injury in fact' 'caused' by the [law] that a favorable decision would 'redress.'" *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992)). Applying that standard to racial-gerrymandering claims, the Supreme Court held in *United States v. Hays*, 515 U.S. 737 (1995), that a plaintiff who "resides in a racially gerrymandered district" has standing to challenge that district, but a plaintiff who "does not live in such a district" generally does not. *Id.* at 745–46. Subsequently, the Supreme Court extended that rule to claims of vote dilution. *See Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018); *see also, e.g.*, *Petteway v. Galveston Cnty.*, -- F. Supp. 3d --, 2023 WL 2782704, *5 (S.D. Tex. Mar. 30, 2023) (holding that voter who did not reside in a challenged district lacked standing to bring VRA vote-dilution claim).[7]

Here, no Plaintiff resides in HD13, and any challenge to it is, at best, "a generalized grievance against governmental conduct . . . ." *Gill*, 138 S. Ct. at 1930 (citation omitted). Although two Plaintiffs formerly resided in HD13, both have since moved and no longer reside there. Compl. ¶ 18, PageID.89 (Bennett); Compl. ¶ 19, PageID.90 (Black, Jr.); JA00537, Pl.

---

[7] Because redistricting claims proceed district-by-district, the Commission has provided a chart appended to this brief clarifying which of its discrete arguments apply to each respective challenged district.

Bennett's Objs. & Responses to ROG No. 1 (now resident of HD14); JA00542, Pl. Black, Jr.'s Objs. & Responses to ROG No. 1 (now resident of HD9). As a result, HD13's configuration does not impose "individual harm," and an injunction would not "vindicate the individual rights" of any Plaintiff. *Gill*, 138 S. Ct. at 1932–33. Because "[p]laintiffs must maintain their personal interest in the dispute at all stages of litigation," *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021), and establish the elements of standing "with the manner and degree of evidence required at the successive stages of the litigation," *Lujan*, 504 U.S. at 561, these Plaintiffs no longer have standing to challenge HD13. *See Shaw v. Hunt*, 517 U.S. 899, 904 (1996) (*Shaw II*) (holding that claim could proceed only as to plaintiffs who resided in allegedly racially gerrymandered district and only against that district); *Sinkfield v. Kelley*, 531 U.S. 28, 29–30 (2000) (dismissing entire action on this basis). Moreover, any prior claim to standing no longer presents a live controversy, and the claims against HD13 are moot. *See Chen v. City of Houston*, 9 F. Supp. 2d 745, 749 (S.D. Tex. 1998), *aff'd*, 206 F.3d 502 (5th Cir. 2000) (finding moot claims by voters who moved from challenged districts).

**B.    *Res Judicata***

Plaintiffs' claims against HD26 and SD5 are barred by *res judicata*. Under the Constitution's Full Faith and Credit Clause, U.S. Const. art. IV, § 1, and the Full Faith and Credit Act, 28 U.S.C. § 1738, "federal courts are to give the judgments of state courts the same preclusive effect as would be given in the state in which the judgment was rendered." *Osborn v. Ashland Cnty. Bd. of Alcohol, Drug Addiction & Mental Health Servs.*, 979 F.2d 1131, 1133 (6th Cir. 1992). In this case, the only Plaintiff residing in HD26 and SD5 was a plaintiff in *Detroit Caucus*, which rejected a claim asserting that the Commission's state legislative and congressional redistricting plans are dilutive "in violation of the Voting Rights Act of 1965." 969 N.W.2d at 931.

Under Michigan law, "a second, subsequent action" is barred by a prior action "when (1) the prior action was decided on the merits, (2) both actions involve the same parties or their privies, and (3) the matter in the second case was, or could have been, resolved in the first." *Adair v. State*, 470 Mich. 105, 121, 680 N.W.2d 386, 396 (Mich. 2004). These elements are met here as to HD26 and SD5. The *Detroit Caucus* case was decided on the merits, as the Michigan Supreme Court rejected the claims for relief. *Detroit Caucus*, 969 N.W.2d at 331 ("[T]he relief requested is DENIED"). Both actions involve the same plaintiff: the Plaintiff residing in HD26 and SD5 (Norma McDaniel) was a plaintiff in *Detroit Caucus*. Compl. ¶ 28, PageID.99; JA00546–47, Pls.' Objs & Responses to RFA No. 7; JA00553, *Detroit Caucus* First Amend. Verified Compl., Parties ¶ 10(w). And the *Detroit Caucus* case involved challenges to the Linden and Hickory plans, which sound in the same VRA § 2 theory tendered in this case. JA00554–559, *Detroit Caucus* First Amend. Verified Compl., ¶¶ 40–57.

Although the *Detroit Caucus* plaintiffs formally brought their VRA challenge as funneled through the Michigan Constitutional requirement that Commission plans "comply with the voting rights act and other federal laws," *see* 969 N.W.2d at 331 (quoting Mich. Const. art. 4, § 6(13)(a)), and although they presented no racial-gerrymandering claim, that is immaterial. Michigan Supreme Court precedent "has taken a broad approach to the doctrine of res judicata, holding that it bars not only claims already litigated, but also every claim arising from the same transaction that the parties, exercising reasonable diligence, could have raised but did not." *Adair*, 470 Mich. at 121, 680 N.W.2d at 396. With reasonable diligence, the plaintiffs in *Detroit Caucus* could have formally stated a VRA claim and joined to it a racial-gerrymandering claim. *See Tafflin v. Levitt*, 493 U.S. 455, 458–59 (1990) ("[S]tate courts have inherent authority . . . to adjudicate claims arising under the laws of the United States."). They did not. This element, too, is satisfied.

14

Finally, no other Plaintiffs have standing to challenge HD26 and SD5, as they do not reside there. *See* § I.A, *supra*. Thus, through a combination of *res judicata* and Article III standing doctrine, the claims against these districts must be dismissed.

## II.     Plaintiffs' Claims Under the VRA Fail as a Matter of Law

Plaintiffs have alleged that 10 Michigan house districts (HD1, HD2, HD7, HD8, HD10, HD11, HD12, HD13, HD14, and HD26) and seven Michigan senate districts (SD1, SD3, SD5, SD6, SD8, SD10, and SD11) violate the VRA. *See* Compl. ¶¶ 147–80, PageID.135–42. However, they cannot create a triable question of fact on these claims.

### A.     The Legal Standard

VRA § 2 prohibits any voting "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). Such a violation occurs if "members of a [protected] class . . . have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* § 10301(b). A redistricting plan may violate § 2 if it results in "the dispersal of blacks into districts in which they constitute an ineffective minority of voters or . . . the concentration of blacks into districts where they constitute an excessive majority." *Thornburg v. Gingles*, 478 U.S. 30, 46 n.11 (1986) (plurality opinion).

Plaintiffs advancing a vote-dilution theory under VRA § 2 must prove "three threshold conditions": that (1) the relevant minority group is "'sufficiently large and geographically compact to constitute a majority' in some reasonably configured legislative district"; (2) that the group is "politically cohesive"; and (3) that the white majority votes "'sufficiently as a bloc' to usually 'defeat the minority's preferred candidate.'" *Cooper*, 581 U.S. at 301–02 (quoting *Gingles*, 478 U.S. at 50–51). "If a plaintiff makes that showing, it must then go on to prove

15

that, under the totality of the circumstances, the district lines dilute the votes of the members of the minority group." *Abbott v. Perez*, 138 S. Ct. 2305, 2331 (2018).

> **B.**     **The First *Gingles* Precondition**

Plaintiffs cannot create a triable question of fact under the first precondition in three distinct respects.

1.     There is no triable question whether an "alternative to the districting decision at issue would . . . enhance the ability of minority voters to elect the candidates of their choice." *Abbott*, 138 S. Ct. at 2332. Because a plaintiff cannot establish that an existing electoral procedure abridges the right to vote without "a hypothetical alternative" demonstrating "what the right to vote *ought to be*," *Reno v. Bossier Par. Sch. Bd.*, 528 U.S. 320, 334 (2000), the first *Gingles* precondition "dictates that the issue of remedy is part of the plaintiff's prima facie case," *Nipper v. Smith*, 39 F.3d 1494, 1530 (11th Cir. 1994); *see also Hines v. Mayor & Town Council of Ahoskie*, 998 F.2d 1266, 1273 (4th Cir. 1993). A Section 2 challenger must establish that at least "another opportunity district is possible at the present time."[8] *Abbott*, 138 S. Ct. at 2333.

For example, in *Abbott*, a Section 2 challenger's illustrative remedial plan created a second majority-Latino district in a county where the challenged plan created only one. *Id.* But the evidence failed to establish that the second district would be a "*performing* Latino district," and the Supreme Court therefore reversed the lower court's finding of Section 2 liability. *Id.* at 2332–34. Following *Abbott*, the Fifth Circuit in *Harding v. County of Dallas, Texas*, 948 F.3d 302 (5th Cir. 2020), rejected a Section 2 claim because the "plaintiffs did not offer *any* evidence at trial that would show how" candidates preferred by the allegedly

---

[8] Although some courts locate this requirement under the totality-of-the-circumstances inquiry, rather than the first *Gingles* precondition, *see Fusilier v. Landry*, 963 F.3d 447, 462 (5th Cir. 2020), the requirement of proof is the same regardless of labelling, *see id.* (rejecting claim on this basis).

aggrieved racial group "would fare in commissioner elections under their Remedial Plan." *Id.* at 311; *see also id.* at 308–15.

There is no triable fact question under this standard here. Plaintiffs' expert, Mr. Trende, prepared alternative, demonstrative configurations of the greater Detroit metropolitan area containing more majority-Black districts than the Linden and Hickory plans. But Plaintiffs have no evidence to show how candidates preferred by the Black community would fare in elections under their demonstrative plans. The mere inclusion of majority-Black districts proves nothing. "[T]he creation of majority-minority districts[] does not invariably minimize or maximize minority voting strength. Instead, it can have either effect or neither." *Voinovich v. Quilter*, 507 U.S. 146, 154 (1993). "Which effect the practice has, if any at all, depends entirely on the facts and circumstances of each case." *Id.* Accordingly, a Section 2 plaintiff must show that an alternative scheme will functionally enhance minority electoral opportunity. *Harding*, 948 F.3d at 310. Plaintiffs have no evidence to show this.

Mr. Trende did not analyze whether the majority-minority districts in his illustrative plans will provide minority opportunity that does not exist under the challenged plans. JA00500–01, Trende Dep. Tr. 157:18–24, 158:3–17. Mr. Trende also did not analyze whether the majority-minority districts in his illustrative plans will perform (i.e., enable Black voters to elect candidates of their choice). JA00491–92, Trende Dep. 51:24–52:6.[9] Improved minority opportunity cannot be assumed in this way: "an alternative map containing an additional majority-minority district does not necessarily establish an increased opportunity." *Harding*, 948 F.3d at 310. As in *Abbott* and *Harding*, Plaintiffs have nothing but BVAP percentages and bald assertions.

---

[9] In addition to demonstrative plans, Mr. Trende produced computer-simulated plans, but he did not analyze whether they would improve minority opportunity. JA00501, Trende Dep. 158:11–23.

Moreover, the record shows that the 50% BVAP mark carries no electoral significance. Black-preferred candidates can prevail, even in Democratic primaries, in districts below 50% BVAP, as the 2022 elections show, *see* JA00011–13, 2023 Handley Rep. 11–13, and as Mr. Trende concedes, *see* JA00487–88, Trende Dep. 32:23–33:1. And, sometimes, Black-preferred candidates lose in districts above 50% BVAP (as occurred in HD5, a majority-minority district not challenged in this case). JA00011–12, 2023 Handley Rep. 11–12. The number 50% is not a talismanic divide between effective and ineffective districts. The question of performance is instead an evidentiary one. No evidence sustains Plaintiffs' burden to show that their illustrative districts are likely to perform, and there is otherwise "an absence of evidence" on this element. *Gen. Motors*, 468 F.3d at 412. By failing to analyze district performance, Plaintiffs have established "only that lines could have been drawn elsewhere, nothing more." *Johnson v. De Grandy*, 512 U.S. 997, 1015 (1994).

2.      Even if it were assumed (against the law and evidence) that majority-minority districts will *per se* perform as opportunity districts, there is still no evidence that Mr. Trende's plans will *outperform* the Linden and Hickory plans, which were configured to ensure equal electoral opportunity in light of observed voting patterns. The Hickory and Linden plans have already matched and even outperformed the minority opportunity Mr. Trende's demonstrative plans could ever purport to deliver.

Although VRA § 2 does not require that redistricting authorities create crossover districts, the Supreme Court has signaled that states may voluntarily create them "as a matter of legislative choice or discretion." *Bartlett*, 556 U.S. at 23 (plurality opinion). Indeed, Supreme Court precedent encourages crossover districts because they "may serve to diminish the significance and influence of race by encouraging minority and majority voters to work together toward a common goal." *Id.* at 23. Majority-minority districts "rely on a quintessentially race-

conscious calculus aptly described as the 'politics of second best,'" and the Supreme Court has discouraged them in "communities in which minority citizens are able to form coalitions with voters from other racial and ethnic groups, having no need to be a majority within a single district in order to elect candidates of their choice." *Johnson*, 512 U.S. at 1020 (citation omitted). For this reason, the Court has explained that "States can—and in proper cases should—defend against alleged § 2 violations by pointing to crossover voting patterns and to effective crossover districts." *Bartlett*, 556 U.S. at 24. To compel states to draw majority-minority districts even where crossover districts perform would "tend to entrench the very practices and stereotypes the Equal Protection Clause is set against." *Johnson*, 512 U.S. at 1029 (Kennedy, J., concurring in part and concurring in the judgment). Yet that is the constitutionally problematic compulsion Plaintiffs advocate.

Here, the Linden and Hickory plans have delivered as much as, if not more, minority success than Mr. Trende's demonstrative plans purport to facilitate, and they have done so without the "deliberate segregation" involved in majority-minority districts, *Shaw v. Reno*, 509 U.S. 630, 641 (1993) (*Shaw I*). The Hickory plan provides 16 Detroit-area districts above 35% BVAP, JA00326, Trende Rep. 19, compared to 11 in Mr. Trende's demonstrative house plan, JA00331–33, Trende Rep. 24–26, and the Linden plan provides six such districts, JA00329, Trende Rep. 22, compared to Mr. Trende's five. JA00390, Trende Rep. 83. According to the evidence-based approach of Dr. Handley—employing the "functional" approached endorsed by the Supreme Court, *Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. 178, 187 (2017)— Mr. Trende's plans pack Black voters into a limited number of districts and "minimize their influence in the districts next door." *Johnson*, 512 U.S. at 1007. The 2022 election outcomes confirm that the Commission's approach is at least as good if not better for Black voters. In the Hickory plan, at least 14 candidates who were preferred by Detroit-area Black voters in

both primary (if applicable) and general elections prevailed in 2022. JA00011, 2023 Handley Rep. 11. Under the Linden plan, at least five candidates who were preferred by Detroit-area black voters in both primary (if applicable) and general elections prevailed. *Id.* Mr. Trende represented that the "whole thrust of the Voting Rights Act challenge here" is Plaintiffs' contention that the Commission must "have ten districts" in the house "that will regularly elect the minority candidate of choice" and five in the senate. JA00496, Trende Dep. 80:1–5. But the indisputable evidence shows 14 Black-preferred-candidate wins in the house and five in the senate, so the plans already do what Plaintiffs insist they must do.

Even if Mr. Trende's majority-minority districts were assumed to perform (without evidence), his demonstrative plans would still, at best, fall short of the Hickory plan and match the Linden plan. There is no record evidence to the contrary. This is a case where "crossover voting patterns and . . . effective crossover districts" are a defense to a Section 2 claim, *Bartlett*, 556 U.S. at 24, because majority-minority districts can do no better and likely would fare worse for Black voters. Moreover, "States retain broad discretion in drawing districts to comply with the mandate of § 2." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 429 (2006) (plurality opinion) (citation omitted). On this record, with no possibility of showing meaningful improvement, Plaintiffs have no room to challenge the Commission's lawful discretion in securing minority opportunity through crossover districts.

3.      All that aside, Plaintiffs cannot create a triable question of fact as to three districts they challenge, HD2, SD5, and SD11, because they cannot reasonably be redrawn as majority-minority districts. As noted, a Section 2 plaintiff "must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50. That is, the group must, at a minimum, show that it could be "a group concentrated within a hypothetical single-member district" to achieve at least a

majority of the VAP. *Hall v. Virginia*, 385 F.3d 421, 428–29 (4th Cir. 2004). That showing cannot be made as to HD2, SD5, and SD11. Each of these has a BVAP between 11% and 19%, which is far from the majority-minority line. JA00578, JA00589, Commission Rep. 24, 41. They cannot be reasonably reconfigured into a majority-minority districts, so any assertion of dilution would, at best, be targeted to neighboring districts.

Each occupies territory that is not embraced by a majority-minority district in Mr. Trende's demonstrative configurations. HD2 (11.04% BVAP) occupies territory redrawn by Mr. Trende as HD11 (13.2% BVAP) and HD12 (11.6% BVAP). *See* JA00324–26, Trende Rep. 17–19; JA00330–31, Trende Rep. 23–24; *see also* JA00429–30, Trende App'x C 12–13. Mr. Trende's report demonstrates that HD2 "cracks" no Black community. *See* JA00353, Trende Rep. 46.

SD5 (18.25% BVAP) primarily occupies territory redrawn by Mr. Trende as SD8 (8.88% BVAP) and SD7 (13.68% BVAP). *See* JA00327–29, Trende Rep. 20–22; JA00389–90, Trende Rep. 82–83; *see also* JA00432–35, Trende App'x C 67–68 & 70–71. While small portions of SD5 overlap with territory Mr. Trende reconfigures into majority-minority districts (demonstratives SD4 (50.01% BVAP) and SD5 (50.16% BVAP)), that area of overlap is not the location of the compact Black communities grouped in those demonstrative districts, and SD5 does not "crack" any minority community. *See* JA00403, Trende Rep. 96. Districts neighboring SD5 to the east (SD1, SD2, and SD6) contain the BVAP supporting Mr. Trende's demonstrative majority-minority districts (SD4 and SD5). *See id.* JA00389, JA00403, Trende Rep. 82, 96.

SD11 (19.19% BVAP) is anchored in Macomb County, which does not have a large concentration of Black voting-age persons and is reconfigured in Mr. Trende's plan primarily as SD12 (11.33%) and SD 13 (4.60%). JA00327–29, JA00389–90, Trende Rep. 20–22, 82–83;

*see also* JA00431, Trende App'x C 64; JA00436–37, Trende App'x C 75–76. Although a small portion of SD11 is brought into Mr. Trende's demonstrative SD1 (50.60% BVAP), that district is a redrawing of the Linden plan's SD10 (40.4% BVAP), and Mr. Trende has not demonstrated that, if SD10 is raised to more than 50% BVAP, as Plaintiffs demand, its neighbor SD11 could also cross that line. JA00389, JA00403, Trende Rep. 82, 96. No reasonable trier of fact could conclude that districts so far below the majority-minority line might reasonably be reconfigured as majority-minority districts, and the Section 2 claims against these districts present no triable fact question.

### C.  The Second and Third *Gingles* Preconditions

Plaintiffs create no triable fact question as to 12 out of 17 challenged districts under the second and third *Gingles* preconditions, which together relate to "racially polarized voting." *Gingles*, 478 U.S. at 56. The second precondition asks "whether minority group members constitute a politically cohesive unit," and the third asks "whether whites vote sufficiently as a bloc usually to defeat the minority's preferred candidates." *Id.* Each of these preconditions must be independently shown as to each challenged district. *See League of United Latin Am. Citizens v. Abbott*, 604 F. Supp. 3d 463, 496 (W.D. Tex. 2022) (three-judge court) ("It bears emphasizing that each of these preconditions must be shown on a district-by-district basis."); *Cousin v. Sundquist*, 145 F.3d 818, 823 (6th Cir. 1998) ("[A] Section 2 claim cannot proceed unless all three *Gingles* pre-conditions are satisfied.").

Plaintiffs' record fails to create a triable question of fact as to the vast majority of challenged districts. For districts HD1, HD7, HD10, HD12, HD13, HD14, SD3, and SD6, no evidence plausibly shows the third precondition, which requires proof that "a white bloc vote that normally will defeat the combined strength of minority support plus white 'crossover' votes." *Gingles*, 478 U.S. at 56. In each district, the candidate all experts' estimates identified

22

as Black preferred *won* the 2022 Democratic primary.[10] JA00011, 2023 Handley Rep. 11; *see also* JA00349, JA00396, Trende Rep. 42, 89. Plaintiffs cannot create a triable fact question on the third precondition based solely on evidence of Black-preferred-candidate *victories*, since that precondition requires them to prove that Black-preferred candidates usually *lose*. *See Cano v. Davis*, 211 F. Supp. 2d 1208, 1235 (C.D. Cal. 2002) (three-judge court), *aff'd*, 537 U.S. 1100 (2003) (granting summary judgment because all evidence showed "SD 27 is a district in which Latino candidates and other candidates preferred by Latino voters can win").

Likewise, for two districts, HD8 and HD11, there is no triable question under the second precondition, which requires proof "that a significant number of minority group members usually vote for the same candidates." *Gingles*, 478 U.S. at 56. Because "[p]olitical cohesion . . . implies that the group generally unites behind a single political 'platform' of common goals," this element is not established "if their votes are split among several different minority candidates for the same office." *Levy v. Lexington Cnty., S.C.*, 589 F.3d 708, 720 (4th Cir. 2009) (citation omitted). The 2022 Democratic primary contests in HD8 and HD11 were fractured, with five candidates in HD8 and nine in HD11. All expert analysis shows that not even a clear plurality of the minority community supported a single candidate. JA00012–13, 2023 Handley Rep. 12–13; *see also* JA00349, Trende Rep. 42. In HD8, Dr. Handley reports that the top two choices of Black voters "each receiv[ed] about 32% of the Black vote," with the election's winner receiving "slightly less than 25% of the Black vote." JA00012, 2023 Handley Rep. 12. In HD11, "Black voters primarily spread their votes across four candidates," with

---

[10] Plaintiffs assert that only primary elections are relevant to Section 2 claims. That is legally incorrect. *See Gingles*, 478 U.S. at 52–53, 80 (looking to both primary and general elections); *Lewis v. Alamance Cnty., N.C.*, 99 F.3d 600, 614–16 (4th Cir. 1996) (rejecting the argument "that Democrats should be treated as black-preferred only if they were also black-preferred in the primary election"). But to demonstrate clearly the absence of any material fact dispute, the Commission assumes only primary election results are relevant for the purpose of this section of this motion only.

support levels of 24.2%, 22.2%, 18.7%, and 17.1%, respectively. JA00013, 2023 Handley Rep. 13. A racial group is considered cohesive only if a "significant number of [its] members usually vote for the same candidates." *Gingles*, 478 U.S. at 31. A fracturing of Black voters among multiple candidates, as occurred in these two districts, falls short of the mark, even if Black voters do not prefer a candidate or candidates preferred by white voters, *Levy*, 589 F.3d at 720 (quoting *Monroe v. City of Woodville, Miss.*, 881 F.2d 1327, 1332 (5th Cir.1989)).

For two other districts, SD10 and SD11, there is no evidence supporting Plaintiffs' claims on either polarization factor. In SD10, no Democratic primary occurred in 2022, and a Democratic candidate prevailed in the general election. JA00396, Trende Rep. 89. Mr. Trende acknowledges that Democratic candidates are Black-preferred, so even assuming general elections are irrelevant, no evidence could *prove* the second or third preconditions. Likewise, Mr. Trende omitted any analysis of polarization of SD11 from his report, and Dr. Palmer's analysis of Mr. Trende's data likewise shows that SD11 was not polarized in 2022 because, when taking into account statistical uncertainty, there was not evidence that a majority of Black voters supported the same candidate. JA00134, Palmer Rep. ¶ 47. With no evidence at all, Plaintiffs cannot create a triable fact question on either the second or third preconditions. "Section 2 'does not assume the existence of racial bloc voting; plaintiffs must prove it.'" *Growe v. Emison*, 507 U.S. 25, 42 (1993) (citation omitted).

## III.   Plaintiffs' Racial-Gerrymandering Claims Fail as a Matter of Law

Summary judgment is warranted on the racial-gerrymandering claims (Counts III and IV). *See* Compl. ¶¶ 181–212, PageID.143–51. The challenged districts do not violate the Equal Protection Clause, and no trial is necessary to see why that is so.

### A.    The Legal Standard

"The Equal Protection Clause prohibits a State, without sufficient justification, from 'separating its citizens into different voting districts on the basis of race.'" *Bethune-Hill*, 580 U.S. at 187 (citation and edit marks omitted). However, "redistricting differs from other kinds of state decisionmaking in that the legislature always is *aware* of race when it draws district lines." *Shaw I*, 509 U.S. at 646. The "evidentiary difficulty" of distinguishing awareness from purpose, "together with the sensitive nature of redistricting and the presumption of good faith that must be accorded legislative enactments, requires courts to exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race." *Miller v. Johnson*, 515 U.S. 900, 916 (1995).

Accordingly, it is the "plaintiff's burden . . . to show . . . that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Id.* "Race must not simply have been *a* motivation for the drawing of a majority-minority district, but the *predominant* factor motivating the legislature's districting decision." *Easley v. Cromartie*, 532 U.S. 234, 241 (2001) (*Cromartie II*) (internal citations and quotation marks omitted). This is a "demanding" standard, *id.*, that "applies district-by-district," *Alabama Legislative Black Caucus*, 575 U.S. at 262. "Where a challenger succeeds in establishing racial predominance, the burden shifts to the State to 'demonstrate that its districting legislation is narrowly tailored to achieve a compelling interest.'" *Bethune-Hill*, 580 U.S. at 193 (quoting *Miller*, 515 U.S. at 920), which includes "complying with operative provisions of the Voting Rights Act of 1965." *Cooper*, 581 U.S. at 292; *accord Abbott*, 138 S. Ct. at 2315.

A racial-gerrymandering claim is "analytically distinct" from a vote dilution claim. *Shaw I*, 509 U.S. at 652. The vote-dilution question is whether an electoral scheme enables

25

"white bloc voting" to "'minimize or cancel' black voters' ability to elect representatives of their choice." *Gingles*, 478 U.S. at 56 (internal citation omitted). The question in a racial-gerrymandering claim, by contrast, is whether a "racial classification[]" was utilized and, if so, whether that classification is "benign" because it "satisfies strict scrutiny." *Shaw I*, 509 U.S. at 653. The racial-gerrymandering doctrine therefore turns on whether a redistricting authority has "*good reasons* to believe" the use of race is "required," not whether the actions were actually "necessary for statutory compliance." *Alabama Legislative Black Caucus*, 575 U.S. at 278.

## B.    Predominance

Plaintiffs cannot create a triable question under the threshold predominance standard. *See Miller*, 515 U.S. at 916.

1.    Plaintiffs have admitted that the Commission's political considerations were its predominant motive for creating the challenged districts, and this admission precludes a finding that race predominated. In racial-gerrymandering cases, "[c]aution is especially appropriate . . . where the State has articulated a legitimate political explanation for its districting decision, and the voting population is one in which race and political affiliation are highly correlated." *Cromartie II*, 532 U.S. at 242. In such cases, it is the challenger's burden to prove "that race *rather than* politics predominantly explains" each challenged district's "boundaries." *Id.* at 243.

Here, the Commission offers a legitimate political explanation for the challenged districts' boundaries. The Michigan Constitution provides that "[d]istricts shall not provide a disproportionate advantage to any political party," as "determined using accepted measures of partisan fairness." Mich. Const. art. 4, § 6(13)(d). The Commission interpreted this provision to demand an effort to avoid a partisan effect favoring either major party. And it faced a

26

distinct challenge because Democratic constituents are concentrated in a few cities; to create districts with high levels of Democratic constituents in the Detroit metropolitan area would dilute statewide Democratic voting strength under accepted partisan-fairness measures.[11] JA232–37, Rodden Rep. 6–11. The parties agree that Black voters support Democratic candidates at high levels, so this is a case where "race and political affiliation are highly correlated." *Cromartie II*, 532 U.S. at 242.

The Complaint alleges that the Commission removed Black voters from the challenged districts for predominantly racial reasons, *see, e.g.*, Compl. ¶¶ 66, 72, PageID.113, PageID.116, but "politics is as good an explanation as is race for the district[s'] boundaries." *Cromartie II*, 532 U.S. at 252. As the Commission's expert Dr. Rodden demonstrates, it is equally plausible that the comparative reduction of BVAP as measured by the 2011 plans resulted from the Commission's obligation to avoid concentrating Democratic supporters into a few districts and otherwise dilute their voting strength statewide. *See* JA00237, Rodden Rep. 16. As a result, the difference in racial demographics between the Linden and Hickory plans, on the one hand, and other comparators Plaintiffs cite (such as the 2011 plans and plans simulated by their expert, Mr. Trende), on the other hand, does not show that race *rather than* politics predominated. JA00242–59, JA00263–67, Rodden Rep. 16–33, 37–41.

Plaintiffs have made a binding judicial admission that politics predominated, and that forecloses any fact dispute on this question. In response to requests to admit the Commission propounded, Plaintiffs stated: "it appears inescapable that the Commission's primary motivation was to increase the number of Democratic-majority districts at the expense of Detroit-area Black voters." JA00547–48, Pls.' Objs. & Responses to RFA No. 8. By this admission, the fact that politics predominated "is conclusively established." Fed. R. Civ. P. 36(b). This

---

[11] Indeed, the Commission was accused of doing too little to even the proverbial playing field for Democratic Party interests. *See League of Women Voters*, 509 Mich. 885, 971 N.W.2d 595.

admission compels summary judgment on the racial-gerrymandering claims. *See Tillamook Country Smoker, Inc. v. Tillamook Cnty. Creamery Ass'n*., 333 F. Supp. 2d 975, 983–84 (D. Or. 2004), *aff'd*, 465 F.3d 1102 (9th Cir. 2006) (summary judgment warranted where binding admission forecloses fact dispute on dispositive question).

2.     At a minimum, there is no evidence of racial predominance as to HD2, SD5, and SD11. As discussed, these districts have respective BVAPs of 11.04%, 18.25%, and 19.19%. JA00578, Commission Rep. 24; JA00589, Commission Rep. 41. But Plaintiffs' theory is that the Commission "intentionally lowered BVAP by placing Black voters in Districts where it is predicted that the District majority will vote for the Black voter candidate of choice," based on "white crossover voting." Compl. ¶ 86, PageID.121. Dr. Handley did not predict that any districts would perform as crossover districts at BVAPs of less than 20%, and there is no evidence that the Commission purposefully configured any districts below 20% BVAP for any racial reasons, let alone predominantly racial reasons. Accordingly, there is no triable question of fact related to these districts.

### C.     Narrow Tailoring

Even if race were presumed to predominate in some or all challenged districts, they would not violate the Equal Protection Clause because the Commission's racial considerations were narrowly tailored to the compelling interest of VRA compliance. Because the VRA "obviously demand[s] consideration of race," the Supreme Court has assumed "that compliance with the VRA may justify the consideration of race in a way that would not otherwise be allowed." *Abbott*, 138 S. Ct. at 2315; *see Bethune-Hill*, 580 U.S. at 193 (rejecting challenge to district that was narrowly tailored to VRA compliance). The Supreme Court has recognized that "[t]he law cannot lay a trap for an unwary legislature" and holds that "the narrow tailoring requirement insists only that the legislature have a 'strong basis in evidence' in support of

the (race-based) choice that it has made." *Alabama Legislative Black Caucus*, 575 U.S. at 278 (citation omitted). "[T]he requisite strong basis in evidence exists when the legislature has 'good reasons to believe' it must use race in order to satisfy the Voting Rights Act, 'even if a court does not find that the actions were necessary for statutory compliance.'" *Bethune-Hill*, 580 U.S. at 194 (quoting *Alabama Legislative Black Caucus*, 575 U.S. at 278). This inquiry is made based on the record before the redistricting authority at the time of redistricting. *See Cooper*, 581 U.S. at 302–03; *Covington v. North Carolina*, 316 F.R.D. 117, 166–67 (M.D.N.C. 2016) (three-judge court), *aff'd*, 137 S. Ct. 2211 (2017).

1.     There can be no doubt that the Commission had a compelling interest in VRA compliance. A compelling interest exists under Section 2 if the redistricting authority "has good reason to think that all the '*Gingles* preconditions' are met." *Cooper*, 581 U.S. at 302.

The Commission had good reasons to conclude this. First, it understood that the Black population of the Detroit metropolitan region "is heavily concentrated in the Metro Detroit area, particularly in western Detroit, southern Wayne County, and around Pontiac." Compl. ¶ 78, PageID.119. It is undisputed that many majority-minority districts can be created in this region in house and senate plans. *See* JA00329, JA00388–89, Trende Rep. 22, 81–82. Second, the Commission had good reasons to believe the second and third *Gingles* preconditions could be met from the expert report of Dr. Handley, who concluded that Detroit-area voting exhibits sufficient racial polarization that white bloc voting would usually defeat Black-preferred candidates in the absence of districts drawn to ensure equal Black opportunity. JA00041, 2021 Handley Rep. 17; *see also* JA00566, Sept. 2, 2021 Tr. 24. Mr. Trende testified that he has located no inaccuracies or errors in Dr. Handley's analysis. JA00493–95, JA00498–99, Trende Dep. 60:6–15, 61:4–9, 61:16–62:1, 140:16–141:3. Finally, although the Supreme Court has not identified it as a strict requirement, the Commission also had good reasons to

believe a Section 2 claim could be made out under the totality of the circumstances, as its attorney, Bruce Adelson, presented a memorandum establishing ongoing effects of past discrimination. JA00438, Adelson Rep. Plaintiffs' expert, Dr. Lockerbie, endorses that report. JA00473–74, Lockerbie Dep. 36:20–37:20.

2.     There is no triable question on the narrow-tailoring inquiry. The Commission ensured that BVAPs in Detroit-area districts were neither too low, such that the Black vote would be "cracked" across districts, nor too high, such that it would be "packed" into a few districts. *Gingles*, 478 U.S. at 46 n.11. Its data-driven approach may be the most thorough and precise a federal court has ever seen in any redistricting case.

A redistricting authority's use of race is narrowly tailored if it adheres to "a functional analysis of the electoral behavior within the particular election district." *Bethune-Hill*, 580 U.S. at 194 (citation and edit marks omitted). The Commission, in reliance on its advisors, conducted and adhered to "a District specific functional analysis in each area." JA00567, Sept. 2, 2021 Tr. 25; *see* JA00569, Sept. 2, 2021 Tr. 29 (Adelson). To avoid the twin evils of cracking and packing, the Commission relied on Dr. Handley's exhaustive analysis, which examined levels of minority turnout, minority cohesion, and white crossover voting. The challenged districts' BVAPs fall near or above the ranges Dr. Handley identified as sufficient to ensure equal electoral opportunity, JA00326, JA00329, Trende Rep. 19, 22, and Plaintiffs in fact alleged this, *see* Compl. ¶¶ 76–86, PageID.119–21. The Commission's basis in evidence was considerably more robust than the approach approved in *Bethune-Hill*, where the Supreme Court upheld a district based on legislative discussions about the BVAP need it needed to preserve minority opportunity, even though "that analysis was not memorialized in writing" and involved no data analysis. 580 U.S. at 195; *see also id.* at 194–96.

There is no room for a material fact dispute. Although Plaintiffs advocate majority-minority districts, *see* Compl. ¶¶ 88–89, PageID.122, they present no functional analysis demonstrating that they are necessary. Instead, they "mechanically rely upon numerical percentages," which the Supreme Court condemned in *Alabama Legislative Black Caucus*, 575 U.S. at 277. Moreover, Plaintiffs' expert, Mr. Trende, has no material quarrel with Dr. Handley's polarized voting analysis. His analysis is "just replicating what Dr. Handley did." JA00497, Trende Dep. 131:10–11. Even if Mr. Trende disagrees with Dr. Handley's conclusion that "in no county is a 50% BVAP district required for the Black-preferred candidates to carry the district in a general election," JA00045, 2021 Handley Rep. 21, such a dispute would not speak to whether the Commission had "good reasons" for its choice "under these circumstances," *Bethune-Hill*, 580 U.S. at 196. The narrow tailoring analysis does not require a redistricting authority to "determine *precisely* what percent minority population" a district needs to perform. *Id.* at 195 (citation omitted). There would, then, be no purpose for a trial to decide that question. To second guess it at this time, on this record, would "ask too much from state officials charged with the sensitive duty of reapportioning legislative districts." *Id.* If the Commission cannot satisfy strict scrutiny while relying on a gold-standard analysis of a renowned expert, it is hard to see how any redistricting authority could ever satisfy that standard. *But see Bethune-Hill*, 580 U.S. at 194–96 (finding that standard satisfied).

3.      Plaintiffs' quarrels with the Commission are legal, not factual. They appear to believe that, once the Commission had a strong basis to avoid Section 2 liability, it had to utilize majority-minority districts toward that end. That view is incorrect.

The Supreme Court rejected Plaintiffs' position in *Cooper*, where it invalidated a majority-minority congressional district because the legislature that enacted it failed to consider a "pattern of white crossover voting in the area." 581 U.S. at 304. The Court observed that

"in five successive general elections" in the prior decade's district, which was "around 48% BVAP," "the candidates preferred by most African–American voters won their contests." *Id.* at 294. That crossover-voting pattern mattered because only "a white bloc vote that normally will defeat the combined strength of minority support *plus white 'crossover' votes* rises to the level of legally significant white bloc voting." *Gingles*, 478 U.S. at 56 (emphasis added). Where white crossover voting permits a minority group an equal opportunity to elect its preferred candidates at a given level of the voting-age population, the district creating that opportunity satisfies Section 2, even if it is not a majority-minority district, *Bartlett*, 556 U.S. at 24, because white bloc voting in that instances does not usually prevent the election of minority-preferred candidates, *Gingles*, 478 U.S. at 56. A redistricting authority therefore must evaluate white crossover voting to ascertain whether a majority-minority district is tailored to secure equal opportunity (and thus to avoid unjustified racial classifications). To unnecessarily create or maintain majority-minority districts violates the Equal Protection Clause rather than vindicates it. *See Jacksonville Branch of NAACP v. City of Jacksonville*, 3:22-cv-493, 2022 WL 7089087, at *9–48 (M.D. Fla. Oct. 12, 2022), *appeal dismissed*, 2023 WL 2966338 (11th Cir. Jan. 12, 2023) (enjoining redistricting plan drawn to maintain prior packed minority districts).

In *Cooper*, crossover voting would facilitate equal Black opportunity at less than a numerical BVAP majority, so the legislature's majority-minority district was not narrowly tailored. 581 U.S. at 303–05. The Supreme Court recognized that, in *Bartlett*, it held that only groups sufficiently numerous and compact to constitute numerical voting-age population majorities are entitled to Section 2 protection. *Id.* at 305 (discussing *Bartlett*, 556 U.S. at 8). But the Court in *Cooper* clarified that Section 2 may nonetheless be "*satisfied* by crossover districts," such that creating majority-minority districts is unnecessary and, by consequence, not narrowly tailored to Section 2 compliance. *Id.* Subsequently, the Supreme Court affirmed a three-

judge trial court's decision invalidating more than 30 majority-minority districts on the ground that the legislature failed to consider "the differing levels of non-African-American crossover voting" to assess whether majority-BVAP districts were necessary. *Covington*, 316 F.R.D. at 171.

This case presents the *Cooper* and *Covington* fact pattern, but the roles are reversed. Here, the Commission undertook the analyses the legislatures in *Cooper* and *Covington* failed to undertake, and it configured districts according to observed voting patterns. That is precisely the "functional analysis" Supreme Court precedent demands. *Bethune-Hill*, 580 U.S. at 801. By contrast, Plaintiffs present no functional analysis. They insist that 50% BVAP should have been the Commission's floor even though no evidence supports it, and the Commission was advised—based on a report *not challenged* here—that majority-minority districts are unnecessary. Plaintiffs demand the very "mechanically numerical view" Supreme Court precedent rejects, *Alabama Legislative Black Caucus*, 575 U.S. at 277, under the very circumstances where Supreme Court precedent holds that majority-minority districts are racial gerrymanders, *Cooper*, 581 U.S. at 305; *Covington*, 316 F.R.D. at 171. Plaintiffs are on the wrong side of this narrow-tailoring debate. Had the Commission done what Plaintiffs demand, *then* its choices would *not* have been narrowly tailored.

In short, Plaintiffs asks this Court to force the Commission into the very "legal mistake" condemned in *Cooper*. 581 U.S. at 306. Their position, in effect, is that "whenever a legislature *can* draw a majority-minority district, it *must* do so—even if a crossover district would also allow the minority group to elect its favored candidates." *Id.* at 305. The argument fares no better here than in *Cooper* and *Covington*. Plaintiffs cannot credibly demand racial gerrymandering through the vehicle of a racial-gerrymandering claim.

## CONCLUSION

The Court should grant summary judgment in the Commission's favor and dismiss Plaintiffs' claims.

Dated: May 9, 2023

Respectfully submitted,

/s/ David H. Fink

BAKER & HOSTETLER LLP
Katherine L. McKnight
E. Mark Braden
Richard B. Raile
Dima J. Atiya
1050 Connecticut Ave., NW,
Suite 1100
Washington, D.C. 20036
(202) 861-1500
kmcknight@bakerlaw.com
mbraden@bakerlaw.com
rraile@bakerlaw.com
datiya@bakerlaw.com

BAKER & HOSTETLER LLP
Patrick T. Lewis
Key Tower, 127 Public Square,
Suite 2000
Cleveland, Ohio 44114
(216) 621-0200
plewis@bakerlaw.com

BAKER & HOSTETLER LLP
Erika D. Prouty
200 Civic Center Drive
Suite 1200
Columbus, Ohio 43215
(614) 228-1541
eprouty@bakerlaw.com

FINK BRESSACK
David H. Fink
Nathan J. Fink
38500 Woodward Ave., Suite 350
Bloomfield Hills, Michigan 48304
(248) 971-2500
dfink@finkbressack.com
nfink@finkbressack.com

*Counsel for Defendants, Michigan Independent Citizens Redistricting Commission, and Douglas Clark, Juanita Curry, Anthony Eid, Rhonda Lange, Steven Terry Lett, Brittni Kellom, Cynthia Orton, M.C. Rothhorn, Rebecca Szetela, Janice Vallette, Erin Wagner, Richard Weiss, and Dustin Witjes, each in his or her official capacity as a Commissioner of the Michigan Independent Citizens Redistricting Commission*

### CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.2(b)(ii), Counsel for the Commission certifies that this brief contains 10,678 words, as indicated by Microsoft Word 365, inclusive of any footnotes, citations, and quotations, and exclusive of the caption, signature block, tables, attachments and exhibits, and any certificates.

Dated: May 9, 2023                     Respectfully submitted,

/s/ David H. Fink