# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

DONALD AGEE, JR. et al.,

                Plaintiffs,

   v.

JOCELYN BENSON, et al.,

                Defendants.

**Case No. 1:22-CV-00272-PLM-RMK-JTN**

---

## <u>JOINT APPENDIX: Volume III of V (JA00438 to JA000569)</u>

### Table of Contents

**Volume I**

Expert Report of Dr. Lisa Handley, CV, and Appendices .......................................JA00001

Expert Report of Maxwell Palmer, Ph.D. .................................................................JA00116

Expert Report of Jonathan Rodden, Ph.D. ...............................................................JA00227

**Volume II**

Plaintiffs' Expert Report of Dr. Brad Lockerbie .....................................................JA00277

Plaintiffs' Expert Report of Sean P. Trende ............................................................JA00308

Excerpts from Trende Report Appendix C ...............................................................JA00428

**Volume III**

"The History of Discrimination in the State of Michigan and its Influence on Voting," by Bruce L. Adelson..................................................................................................JA00438

Excerpts from April 10, 2023 Deposition of Brad Lockerbie, Ph.D..........................JA00468

Excerpts from April 20, 2023 Deposition of Sean P. Trende...................................JA00482

Affidavit of Virgil K. Smith, dated March 8, 2023...................................................JA00509

i

Affidavit of LaMar L. Lemmons III, dated March 28, 2023 .....................................JA00521

Excerpts from Plaintiff Bennett's Objections & Responses to the Commission's First Set of Interrogatories .......................................................................................................JA00535

Excerpts from Plaintiff Black, Jr.'s Objections & Responses to the Commission's First Set of Interrogatories .......................................................................................................JA00540

Excerpts from Plaintiffs' Objections & Responses to the Commission's First Set of Requests for Admission.......................................................................................................JA00545

Excerpts from *Detroit Caucus v. Independent Citizens Redistricting Commission* First Amended Verified Complaint ..................................................................................................JA00549

Excerpts from September 2, 2021 MICRC Meeting Transcript...............................JA00563

**Volume IV**

Excerpts from the Commission's Report on 2021 Redistricting, adopted on Aug. 18, 2022 (part 1) ...........................................................................................................JA00570

**Volume V**

Excerpts from the Commission's Report on 2021 Redistricting, adopted on Aug. 18, 2022 (part 2) ...........................................................................................................JA00643

Michigan State University Institute for Public and Social Research Report..............JA00692

Plaintiffs' Districts Demonstrative..........................................................................JA00855

Handley Table 4 Reconfiguration Demonstrative ....................................................JA00857

Released Pursuant to 12/20/21 Court Opinion; MSC No. 163823

**For the Michigan Independent Citizens Redistricting Commission (MICRC)**

# The History of Discrimination in the State of Michigan and its Influence on Voting

**By Bruce L. Adelson, MICRC Voting Rights Act Legal Counsel[1]**

**<u>CONFIDENTIAL – Attorney Client Privileged</u>**

This memorandum presents an introductory overview and summarizes various barriers faced by minority groups in Michigan regarding their voting rights and the overall history of discrimination in this state. This memorandum is not all inclusive and is provided as background information for redistricting.

Under the Voting Rights Act ("VRA"), there is a "permanent nationwide prohibition on voting practices that discriminate on the bases of race, color, or membership in a language minority group."[2] Section 2 of the VRA, specifically, is broadly construed. VRA §2 prohibits practices or standards that "result in citizens being denied equal access to the political process on account of race, color, or membership in a language minority group."[3]

---

[1] We gratefully thank and acknowledge the invaluable assistance of our subcontractor, Praneeta Govil (JD, MPH, Bar pending) for her research and writing in preparing this memorandum. We also gratefully acknowledge the historical sleuthing inspiration and acumen of Michael Adelson (Ursinus College '23, Zacharias Honors Scholar, Writing Fellow, Summer Fellow).

[2] DEPARTMENT OF JUSTICE, GUIDANCE UNDER SECTION 2 OF THE VOTING RIGHTS ACT, 52 U.S.C. 10301, FOR REDISTRICTING AND METHODS OF ELECTING GOVERNMENT BODIES (2021).

[3] *Id.*

JA00438

Under *Thornburg v. Gingles,* which the U.S. Supreme Court considers "our seminal §2 vote-dilution case," there are three preconditions that need to be established to prove vote dilution in redistricting.[4] These preconditions generally require that (1) the minority group is large and compact enough to be a majority in a single-member district, (2) there is significant political cohesiveness within the minority group, and (3) the current majority group is able to vote as a bloc to usually defeat the current minority's preferred candidate.[5] If these preconditions are met, then a court will evaluate the alleged violation in a holistic manner incorporating certain factors called the Senate Factors.

The factors are:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
2. the extent to which voting in the elections of the state or political subdivision is racially polarized;
3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
6.  whether political campaigns have been characterized by overt or subtle racial appeals;

---

[4] *Id.*

[5] *Id.*

7.  the extent to which members of the minority group have been elected to public office in the jurisdiction;
8.  whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and
9.  whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.[6]

The Senate Factors and the federal courts indicate that only one of these factors need exist for an electoral device or redistricting plan to be considered as discriminatory when all three *Gingles* preconditions are also satisfied. This list is not exhaustive, allowing courts to consider additional evidence at their discretion.[7]

A recent example of *Gingles* being applied in Michigan is the case of *United States of America v. Eastpointe*. In *Eastpointe*, the court found that the city's at large election system was potentially diluting the vote of Black citizens, thus running afoul of Section 2 of the VRA.[8] The court looked at the history of discrimination in Eastpointe extensively.[9] Aside from deliberating whether the three preconditions were met, the court also considered how the Black community in the area voted and whether the community was ever successful in electing their preferred

---

[6] *Id.*

[7] *Badillo v. City of Stockton*, 956 F.2d 884 (9th Cir. 1992), *Nixon v. Kent County*, 76 F.3d 1381 (6th Cir. 1996) (en banc), and Mulroy, Steven J., *The Way Out: A Legal Standard for Imposing Alternative Electoral Systems as Voting Rights Remedies*, Harv. Civil Rights-Civil Liberties L. Rev. (1998).

[8] *United States v. Eastpointe*, 378 F. Supp. 3d.  589 (2019).

[9] *See generally, Id.*

JA00440

candidates.[10] Ultimately the court considered both the *Gingles* preconditions test and several of the Senate Factors in its decision.[11]

Pursuant to the VRA and *Gingles,* Dr. Lisa Handley conducted a racially polarized voting analysis for the Michigan Independent Citizens Redistricting Commission in which she concluded that racial bloc voting exists in Michigan.[12]Applying *Gingles* and the Senate factors, we have prepared this memorandum to address the history of discrimination in Michigan.

## I.       Slavery and Historic Discrimination in Michigan

Michigan is viewed as a Northern abolitionist state that was not affected by the Jim Crow laws seen in the deep South. However, some of Detroit's first families were slaveholders.[13]  From 1760 to 1815, Indigenous people and Black people were enslaved and considered property in Detroit.[14] A 1782 census showed 78 male and 101 female slaves living in the Michigan Territory. [15]In 1805, only 15 African Americans lived in Detroit, but it is unknown how many were enslaved people. Many if not most of the enslaved people living in Michigan may have fled to British Canada after the Revolutionary War and the subsequent Treaty of Paris. The 1830 census reveals that 32 enslaved people lived in the Michigan Territory. Slavery persisted in Michigan but

---

[10] Id. at 589-594.

[11] *See generally*, *Id.*

[12] Michigan Independent Citizen Redistricting Commission, *Lisa Handley Presentation: Determining if a Redistricting Plan Complies with the Voting Rights Act* (September 2, 2021, https://www.michigan.gov/micrc/0,10083,7-418-106525---,00.html.

[13] Mandira Banerjee, *Detroit's Dark Secret: Slavery,* MICHIGAN TODAY (Feb. 19, 2018), https://michigantoday.umich.edu/2018/02/19/detroits-dark-secret-slavery/.

[14] *Id.*

[15] http://absolutemichigan.com/michigan/slavery-in-the-northwest-territory/

JA00441

gradually declined until statehood was granted and slavery abolished in the new state on January 26, 1837.

Slavery in the Detroit area began under French control of the region as the fur trade flourished in the 18th century. Merchants wanted an inexpensive labor force for their burgeoning business and eventually "trading in the pelts of beavers and trading in the bodies of persons became contiguous endeavors in Detroit, forming an intersecting market in skins that takes on the cast of the macabre."[16] Slavery continued under subsequent British control of the Great Lakes. In the late 18th century, French and British settlers already living in the Michigan Territory when it was acquired by the United States were allowed to keep their slaves even though the federal government banned slavery in the unincorporated territory.[17]

After statehood, slavery's legacy remained. For example, the state's initial constitution prevented Black people from voting or serving on a jury, as was true in some other states in the 19th century.[18] The Michigan legislature banned *de jure* segregation after the Civil War, but Detroit did not follow the statewide call and instead determined that schools in the city would be segregated by race.[19]

During & after the 20th Century's Great Migration, many Black migrants to Michigan from the South faced intense racial discrimination in employment. Higher-paying jobs in the industrial

---

[16] *Id.*

[17]  https://www.michiganradio.org/arts-culture/2017-12-08/detroits-forgotten-history-of-slavery-detailed-in-new-book)

[18] Chris Jaehnig, *African American Michigan: The Reconstruction Era*, THE DAILY MINING GAZETTE (May 9, 2020), https://www.mininggazette.com/news/features/2020/05/african-american-michigan-the-reconstruction-era/.

[19] *Id.*

sector were primarily held by White Detroiters, while Black Detroiters typically held lower-paying ones. This continued through the post-World War II era – Jobs in Detroit's police force, fire department, and other city departments were primarily held by whites. [20]

By the early 20th century, Detroit had become a stronghold of the Ku Klux Klan (KKK). In the 1920s, there reportedly were more Klansmen living in Michigan than in any state in the country. Roughly half of Michigan Klansmen lived in metro Detroit. [21] Even after the later dissolution of the KKK, a splinter vigilante group called the Black Legion continued to exist into the 1930s in Detroit. An estimated one third of the Black Legion's members (approximately 5,000-10,000 people) operated in Detroit and targeted the city's black population in the '30s.[22]

> "By the 1940s Detroit already had a long history of racial conflict. Race riots had occurred in 1863 and as recently as 1941. By the 1920s the city had become a stronghold of the Ku Klux Klan…. The industrial plants provided jobs but not housing…. As a result, the city's 200,000 black residents were cramped into 60 square blocks on the East Side and forced to live under deplorable sanitary conditions.
>
> In 1943 the National Association for the Advancement of Colored People held an emergency war conference in Detroit and accused the nation of its hypocritical commitment to personal freedoms abroad and discrimination and segregation at home."

On the evening of June 20, 1943, several racial incidents occurred on Belle Isle, including multiple fights between teenagers of both races. As violent confrontations continued into the next day, silence reigned over the city as 6,000 U.S. Army troops were stationed throughout Detroit in an ultimately successful effort to quell the violence. Twenty-five Black people and nine White people were killed in the violence that began on Belle Isle. The number injured approached 700 while the property damage, including looted merchandise, destroyed stores, and burned automobiles, totaled approximately $2 million.

---

[20] SUGRUE, THOMAS J., "THE ORIGINS OF THE URBAN CRISIS : RACE AND INEQUALITY IN POSTWAR DETROIT : PRINCETON, NJ, PRINCETON UNIVERSITY PRESS, 2005

[21] https://www.hourdetroit.com/community/the-dark-days-of-the-black-legion/,

6

**JA00443**

What became known as the "12th Street Riot" occurred in 1967, initially as a confrontation between Black Detroiters and the largely White Detroit police force. In response, President Johnson deployed federal troops. The violence resulted in 43 dead, 467 injured, and more than 2,000 buildings destroyed. The "Riot" occurred mostly in Black communities. As a result, thousands of small businesses relocated out of Detroit and the affected area remained in a state of disrepair for decades. [23]

Aforementioned 20th century racial disparities in employment led to unequal housing opportunities in Detroit. Housing options available to Black Detroiters were extremely limited throughout most of the 20th century. Black Detroiters were often left with unsanitary and eventually unsafe areas as their few housing options. Banks and federal housing groups frequently denied black home-owners' loans, gave them unfairly inflated  interest rates, and denied them the chance to improve their housing conditions. According to Author Thomas Sugrue, "you cannot underestimate the intensity [of] segregation in housing and the role that it played in dividing metropolitan Detroit by race." [24]

Detroit and its suburbs continued the segregation of public schools into the 1970s. On August 18th 1970, the NAACP filed a lawsuit against Michigan state officials and the governor, accusing them of maintaining racial segregation in education. Part of the lawsuit also alleged a direct relationship between unfair housing practices and educational segregation. The composition

---

[23] Sidney Fine, *Violence in the Model City: The Cavanaugh Administration, Race Relations, and the Detroit Riot of 1967* (1989)

[24] SUGRUE, THOMAS J., "*THE ORIGINS OF THE URBAN CRISIS : RACE AND INEQUALITY IN POSTWAR DETROIT* : PRINCETON, NJ, PRINCETON UNIVERSITY PRESS, 2005

of students in schools adhered closely to segregated neighborhoods. The U.S. Supreme Court eventually ruled 5-4 against the NAACP's allegations of racial discrimination in education. [25]

Throughout the early to late 20th century, Detroit remained highly segregated by race.[26] In addition, relators often did not show houses in predominantly White neighborhoods to Black people while educational and financial racial discrimination and racially motivated violence persisted.[27]

Grand Rapids was another area of high racial tension and inequality during Michigan's Jim Crow era.[28] A small but prominent middle class African-American community made its home in Grand Rapids after World War I. However, Black people in the city were denied equal rights of access to and use of many public places. Such discriminatory practices were known nationally as "Jim Crow." Despite state laws against racial discrimination, Grand Rapids decided to go its own way and implemented local *de jure* and *de facto* racial discrimination.[29] Black people came to Grand Rapids wanting equality but instead experienced racism.[30] In one telling event, KKK members marched through the streets of Grand Rapids without wearing their hoods on July 4, 1925

---

[25] *Milliken v. Bradley*: The Northern Battle for Desegregation: The State Bar of Michigan: http://www.michbar.org/file/journal/pdf/pdf4article1911.pdf

[26] *Historian: Divide Between "White Detroit" and "Black Detroit" Led to City's 1967 Rebellion,* MICHIGAN TODAY (July 17, 2017), https://www.michiganradio.org/families-community/2017-07-17/historian-divide-between-white-detroit-and-black-detroit-led-to-citys-1967-rebellion.

[27] *Id.*

[28] Chris Jaehnig, *African American Michigan: The People v. Jim Crow,* THE DAILY MINING GAZETTE (May 16, 2020), https://www.mininggazette.com/news/features/2020/05/african-american-michigan-the-people-v-jim-crow/.

[29] *Id.*

[30] *A History of the Civil Rights Movement in Grand Rapids, Michigan* (last visited Sept. 26, 2020), https://www.arcgis.com/apps/MapJournal/index.html?appid=0642f76537354f3982b58f09ed514932.

in a show of defiance and demonstration of their local power.[31] In Grand Rapids, business owners refused to serve Black patrons. Even though the city was known for furniture manufacturing, Black people were routinely denied these skilled-labor jobs.[32] Instead, they often worked lower paid, service jobs like busboy or other waitstaff.[33] Black citizens tried to counteract the discrimination, ultimately without full success, by forming the Grand Rapids Study Club, which focused on education, social and moral support, and a safe space for women of color.[34]

An 1885 Michigan statute made "discrimination in public places illegal," but it was not enforced until 1925 when Emmett Bolden asked for seating on the main floor of Keith's Theatre in Grand Rapids.[35] The theater refused his seating request, instead directing him to its segregated balcony. Keith's Theater was blatant in its racism, with its balcony where the theater segregated Black people known as "N***** Heavens."[36] Mr. Bolden sued the theater for discrimination. The Michigan Supreme Court overturned a lower court decision in favor of Keith's Theatre. Chief Justice Nelson Sharpe ruled that "the public safety and general welfare of our people demand that, when the public are invited to attend places of public accommodation, amusement, and recreation, there shall be no discrimination among those permitted to enter because of race, creed, or color. (The Civil Rights Statute) is bottomed upon the broad ground of the equality of all (persons) before the law." Even though the state Supreme Court found that the theater's behavior was against the

---

[31] *Id.*

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] *Supra* note 22.

[36] *Id.*

law, the court nevertheless limited how and when the 1885 non-discrimination statute would apply.[37]

There was racial discrimination in affordable housing, education, and politics as well.[38] For example, in 1908, the Grand Rapids Medical College began refusing re-admittance of students of color it had once accepted. A lawsuit followed and the court ruled in favor of the students: "All citizens according to the court's findings are entitled to the privilege of education… and the drawing of the color line is an unjust discrimination." After the decision, several white students protested and walked out of class, declaiming "This is a white man's school," and "Lynch 'em if they don't keep out." White students placed an effigy of an African American in the school's lobby and paraded the effigy through the streets. In response, the college barred the two Black students who had sued the school. The college claimed that as a private institution, they could "discriminate as they pleased." The ruling in favor of the Black students was eventually overturned by the state Supreme Court in favor of the college.[39]

While the state Supreme Court made progress towards *de jure* racial equality in Michigan, the court still limited the non-discrimination statute to governmental discrimination only and upheld racial covenants in housing and other matters the court deemed to be private.[40]

In another pivotal case, *Meisner*, the defendant bought the Bois Blanc Island and chartered a boat from Detroit to the island for his patrons to enjoy recreational activities.[41] However, the defendant, a private citizen, was allowed to deny patronage, including denials based on race, at his

---

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40]  *Jim Crow Laws: Massachusetts, Michigan, Minnesota and Mississippi,* AMERICANS ALL, https://americansall.org/legacy-story-group/jim-crow-laws-massachusetts-michigan-minnesota-and-mississippi.

[41]  Case Law Access Project, *Meisner v. Detroit, Belle Isle & Windsor Ferry Co.,* 154 Mich. 545 (1908), https://cite.case.law/mich/154/545/.

JA00447

sole discretion.[42] The plaintiff was denied passage on the boat on multiple occasions because he had previously "created [unspecific] disturbances."[43] Ultimately, the Michigan Supreme Court found that, "theaters, circuses, racetracks, private parks, and the like were private enterprises," and could engage in discriminatory activity.[44]

After the Keith's Theater case, the state Supreme Court pivoted to holding that discrimination in public places was prohibited.[45] In *Bolden*, the state Supreme Court found that the state's civil rights statute §15570 not only applied to criminal charges explicitly stated in the statute, but also allowed individuals to bring civil actions against a violator.[46] The case helped to end "customary segregation" or *de facto* segregation in Michigan.[47]

In terms of voting, Indigenous people were afforded the right to vote in Michigan with the passage of the Snyder Act in 1924.[48] In 1867 Michigan legislators intended to give Black people the right to vote. However, although the 1867 constitutional convention supported Black suffrage, Michigan voters rejected such suffrage changes to the state constitution.[49] A majority at the convention decided not to make Black suffrage its own separate provision, a decision which

---

[42] *Id.*

[43] *Id.*

[44] *Supra* note 22.

[45] *Id.*

[46] *Bolden v. Operating Corporation,* 239 Mich. 318, 323 (1927).

[47] *Supra* note 22.

[48] *Voting Rights for Native Americans,* Library of Congress, https://www.loc.gov/classroom-materials/elections/right-to-vote/voting-rights-for-native-americans/#:~:text=Nast.,rights%20granted%20by%20this%20amendment.

[49] *Supra* note 15.

contributed to the defeat of voting rights for Black Michiganders.[50] It would not be until 1869 that Black people would have the right to vote in Michigan.[51]

Today, Michigan is experiencing an increase in incidents of intolerance, ranking in the top 20 of all 50 states for Asian American and Pacific Islander (AAPI) hate incidents.[52] Nationally, there has been a recent rise in anti-Asian sentiment, specifically against Chinese people due in part to China being blamed for the Coronavirus-19 pandemic.[53] Further, there has been a general upward trend in racial harassment and White Supremacist activity in the state.[54] In 2019, the FBI reported 434 hate crimes in Michigan with 313 of the crimes being racially motivated.[55]

## II.    Discriminatory Housing Practices and Voting Impacts

### A.    Racially Restrictive Covenants Survive Though They are Legally Unenforceable

Racially restrictive covenants, prohibiting home sales to Black people for example, though illegal, still influence housing patterns. Indeed, in a series of court cases from 1925[56] through 1963, the Michigan Supreme Court held that "racial covenants" were not illegal under Michigan or federal civil rights laws. While the court ruled in favor of Black people who were denied access to

---

[50] *Id.*

[51] *Id.*

[52] Russell Jeung et. al, *Stop AAPI Hate National Report*, (March 31, 2021), https://stopaapihate.org/wp-content/uploads/2021/05/Stop-AAPI-Hate-Report-National-210506.pdf.

[53] Malachi Barrett, *Racial Harassment, White Supremacist Propaganda on the Rise in Michigan*, Michigan Live (May 7, 2021), https://www.mlive.com/politics/2021/05/racial-harassment-white-supremacist-propaganda-on-the-rise-in-michigan.html.

[54] *Id.*

[55] *Id.*

[56] *Parmalee v. Morris—Michigan*, 1925 (188 N.W. 330).

JA00449

theaters and other public accommodations, the court repeatedly made clear that it would not give civil rights precedence over private property rights, until the court reversed itself in 1963 in the case of *McKibbin v. Corporation & Securities Commission*, (119 N.W.2d 557, 1963).

Although such covenants are legally unenforceable today, their lingering presence in deeds can still result in segregation.[57] For example, many houses in Ann Arbor suburbs still have racially restrictive covenants in their deeds.[58] These covenants often state that "no part of such land shall be occupied by persons not of the Caucasian race except as guests or servants," and are usually found under the homeowner obligations detailed in closing documents.[59] When Professor Michael Steinberg bought his house in the 1980s, he also had this racially restrictive covenant and tried to have it removed but was told that the removal process would be long and that it "would not be worth it."[60]

These covenants have an impact on housing segregation as a stark reminder of pervasive, historical housing discrimination. For example, according to Kiera O'Connor, who is helping develop community education programs around these covenants:

> You know you're buying this wonderful house and you're so excited…and then you see this [covenant] and you just don't really feel welcome in the community. And it's just, it's really just imagining how uncomfortable that would be. And also,

---

[57] Shannon Stocking, *U-M Research Raises Awareness of Racially Restrictive Covenants in Ann Arbor Housing,* THE MICHIGAN DAILY (2021), https://www.michigandaily.com/ann-arbor/u-m-professors-reveal-racially-restrictive-covenants-ann-arbor-housing/.

[58] *Id.*

[59] *Id.*

[60] *Id.*

these restrictive covenants have kind of created Ypsilanti in a way, because they drove people of color out of Ann Arbor.[61]

## B.  Redlining Still Affects Community Demographics

Redlining is the historical practice of denying Black people low interest loans and mortgages that are routinely granted to White people based on where they lived.[62] The practice made it inordinately difficult or practically impossible to have home ownership in communities where much of the population was Black.[63] Though the practice is now illegal, areas where redlining occurred remain highly segregated today.[64] Redlining has led to disparities in wealth among Black and White Americans.[65] Data and studies reveal that people of color are still denied mortgages that are routinely given to White people in similar circumstances.[66] The legacy of redlining, residential, and housing discrimination continue today.

> The wall in Watson's backyard was built by white real estate developers who struggled to secure financing for their white neighborhood until they cut it off from a Black one. It is one of a number of segregation walls built in the mid-20th century for this purpose and one of a few still standing.

---

[61] *Id.*

[62] *History of Housing Discrimination Against African Americans in Detroit* (last visited Sept. 26, 2021), https://www.naacpldf.org/files/our-work/Detroit%20Housing%20Discrimination.pdf.

[63] Kelsey Yandura, *Redlining was Banned Over 50 Years Ago. It Still Makes Voting Difficult for Black Americans Today*, SUPERMAJORITY NEWS (Oct. 6, 2020), https://supermajority.com/2020/10/redlining-was-banned-over-50-years-ago-it-still-makes-voting-difficult-for-black-americans-today/.

[64] *Id.*

[65] Andre Perry and David Harshbarger, *America's Formally Redlined Neighborhoods Have Changed, and So Must Solutions to Rectify Them*, BROOKINGS (Oct. 14, 2019), https://www.brookings.edu/research/americas-formerly-redlines-areas-changed-so-must-solutions/.

[66] Lindsey Smith et. al., *Data Analysis: "Modern-Day Redlining" Happening in Detroit and Lansing*, NPR (Feb. 15, 2018), https://www.michiganradio.org/news/2018-02-15/data-analysis-modern-day-redlining-happening-in-detroit-and-lansing.

JA00451

The divider — called the "Birwood Wall," the "Eight Mile Wall" or the "Wailing Wall" — can't be blamed for inventing segregation. But the barrier, and the policies that led to its existence, would have far-reaching repercussions for the people, both Black and white, who lived in its shadow. [67]

With the sale of a parcel of land to Grosse Pointe Park, that city and the city of Detroit are working out a deal to remove a physical barrier that separates the two cities.

The barrier at the intersection of Kercheval Ave. and Alter Road is symbolic according to Detroit and removing it would end long-simmering racial tensions between the wealthier and majority white city of Grosse Pointe Park and majority black Detroit. [68]

In addition to the consequences of redlining, in Detroit, unlawful foreclosures have arisen as its ostensible successor. [69] Detroit has one of the "highest rates of property tax foreclosures in the nation." [70] In 2010, property tax assessments were 10 times higher than the legal limit and this practice is disproportionately applied when assessing lower-valued homes. [71] Often foreclosed houses and properties end up being sold to White-owned corporations or White families. [72]

---

[67] Built to keep Black from White: NBC News: https://www.nbcnews.com/specials/detroit-segregation-wall/

And see:

[68] WXYZ, 2019: HTTPS://WWW.WXYZ.COM/NEWS/DETROIT-IS-DEMANDING-GROSSE-POINTE-PARK-REMOVE-PHYSICAL-BARRIER-WITH-SALE-OF-LAND AND SEE: 'DETROITERS STAY OUT': RACIAL BLOCKADES DIVIDE A CITY AND ITS SURBURBS: THE GUARDIAN: HTTPS://WWW.THEGUARDIAN.COM/US-NEWS/2015/FEB/03/DETROIT-APARTHEID-CITY-SURBURBS-GROSSE-POINTE

[69] Steven Shelton, *How Redlining Produced Poverty in Detroit,* TELEGRAM NEWSPAPER (Sept. 26, 2019), https://www.telegramnews.net/story/2019/09/26/news/how-redlining-produced-poverty-in-detroit/750.html.

[70] *Id.*

[71] *Id.*

[72] *Id.*

The 2020 census shows movement of Black people from Detroit to suburbs like Eastpointe.[73] The 2020 census further reveals that 25% of children in Eastpointe are White but only 13% attend the public school in their district.[74] There is also a misconception that such flight leads to a reduction in property value, which can then motivate others to leave, but the property value in areas that have diversified have remained stable.[75]

C.  Disparities and Poverty Can Adversely Affect Voting

Generally, those with lower socioeconomic status tend to vote less frequently.[76] Owning property in the United States is one of the primary ways to accumulate wealth such that denying property ownership can continue the cycle of poverty.[77] Banks and other lenders may engage in the practice of reverse redlining.[78] Reverse redlining is defined as "targeting residents within certain geographic boundaries, often based on income, race, or ethnicity, and giving those targeted borrowers credit on unfair terms."[79] [internal quotes omitted]. Such behavior was seen in Detroit

---

[73] *Id.*

[74] *Id.*

[75] *Id.*

[76] *Supra* note 7 at 591.

[77] Caroline LLanes, *Detroit Ranked as One of the Most Segregated Cities in the Country,* MICHIGAN RADIO NPR (June 21, 2021), https://www.michiganradio.org/post/detroit-ranked-one-most-segregated-cities-country.

[78] Khristopher J. Brooks, *Redlining's Legacy: Maps are Gone, but the Problem Hasn't Disappeared*, CBS NEWS (June 12, 2020), https://www.cbsnews.com/news/redlining-what-is-history-mike-bloomberg-comments/.

[79] Asma Husain, *Reverse Redlining and the Destruction of Minority Wealth,* MICH. J. L. & RACE (Nov. 2, 2016), https://mjrl.org/2016/11/02/reverse-redlining-and-the-destruction-of-minority-wealth/.

prior to the 2008 housing crash. Commentators and experts opine that the city has yet to recover from these lending practices.[80]

The persistent segregation that remains today due in large part to redlining results in lower local government resources for voting.[81] Redlining has led to disparities in wealth among Black and White Americans.[82] Places that have larger communities of color and/or have lower income generally experience longer polling wait times during elections.[83] Around 90% of voters of color had increased vote times compared to their White counterparts.[84]

Voting in elections can be expensive for some. Voting requires time, skills, information, a certain level of health, and access to transportation, among others. Thus, even getting to the polling place might be difficult for those with lower income.[85] In Detroit, about one-third of people living in the city do not have a car.[86] Many Detroiters have expressed concerns about reliable public transportation to polling locations.[87] Further, the state Supreme Court recently held that

---

[80] *Supra* note 87.

[81] *Supra* note 63.

[82] *Supra* note 65.

[83] Justine Coleman, *Minority, Low-Income Districts Saw Longer Wait Times to Vote in 2018: Study,* The Hill (Nov. 4, 2019), https://thehill.com/blogs/blog-briefing-room/news/468943-minority-low-income-districts-saw-longer-wait-times-to-vote-in.

[84] *Id.*

[85] Matt Stevens, *Poorer Americans Have Much Lower Voting Rates in National Elections than the Nonpoor, A Study Finds,* NEW YORK TIMES (Aug. 11, 2020), https://www.nytimes.com/2020/08/11/us/politics/poorer-americans-have-much-lower-voting-rates-in-national-elections-than-the-nonpoor-a-study-finds.html.

[86] Monica Williams, *Need a Ride to the Polls? Amid a Court Ban, Detroiters Giving Free Lifts,* BRIDGE DETROIT (Oct. 28, 2020), https://www.bridgedetroit.com/need-a-ride-to-the-polls-amid-a-court-ban-detroiters-giving-free-lifts/.

[87] *Id.*

JA00454

ridesharing services like Lyft or Uber cannot provide a discounted rate to transport people to polling places, thus reducing public transportation options to facilitate voting.[88]

D.  Housing and the Coronavirus-19 Pandemic's Disparate Impacts

Segregation in housing and income inequality have played a role in the rates of coronavirus cases among minority populations.[89] Such disparities are especially apparent in metropolitan areas. Cities where Black and Hispanic populations are more segregated from the White population had higher rates of death due to COVID.[90] Coronavirus rates can also be impacted by implicit racial bias in healthcare.[91] Michigan implemented a coronavirus task force on racial disparities and the resultant report found that the rate of cases of the virus among the Black population was 40% higher than among the White population.[92]

The rates of death due to the coronavirus are three times higher among the Black population in comparison to the White population in Michigan.[93] Michigan has an above average mortality

---

[88] Id.

[89] Jared Wadley, *Segregation, Income Disparity Fueled High COVID-19 Numbers,* MICHIGAN NEWS Feb. 18, 2021), https://news.umich.edu/segregation-income-disparity-fueled-high-covid-19-numbers/.

[90] Id.

[91] Id.

[92] Michigan Department of Health and Human Services, *Michigan Coronavirus Racial Disparities Task Force Interim Report,* 4 (Nov. 2020), https://www.michigan.gov/documents/coronavirus/Interim_Report_Final_719168_7.pdf.

[93] Id.

rate for Black Americans due to the virus.[94] COVID case rates have also been higher among the state's Hispanic population at 70% compared to the White population.[95]

### III . Michigan Today

Detroit remains the most segregated city in the United States with Detroit and the surrounding areas of Warren and Livonia being the fourth most segregated metropolitan area in the United States.[96] Detroit and other similarly situated places, such as Flint, have also historically experienced disinvestment.[97]

As the auto industry in Detroit grew through the early to mid-20th century,  many Black Americans who lived in the city experienced income growth that enabled them to move into the majority White, middle-class, suburban neighborhoods.[98] However, many White Americans in those neighborhoods were staunchly against this change.[99] For instance, Grosse Pointe had a point system in the 1950s that measured how "ethnic" a potential homeowner was along with a ban on selling homes to Black and Jewish people.[100] Both Dearborn and Warren are areas where Black

---

[94] Rashawn Ray et. al., *Examining and Addressing COVID-19 Racial Disparities in Detroit,* BROOKINGS (Mar. 2, 2021), https://www.brookings.edu/research/examining-and-addressing-covid-19-racial-disparities-in-detroit/.

[95] *Supra* note 106 at 5.

[96] *Supra* note 86.

[97] *Id.*

[98] Gordon Trowbridge and Oralandar Brand-Williams, *Cost of Segregation: Policies of Exclusion* Created Boundaries Between Black, White Suburbs, DETROIT NEWS (Apr. 15, 2020), https://www.detroitnews.com/story/news/special-reports/2020/04/15/segregation-policies-create-boundaries-between-white-black-suburbs/5142654002/.

[99] *Id.*

[100] *Id.*

people have historically been denied housing.[101]   One of Dearborn's past mayors, Orville Hubbard, aimed to keep Dearborn "clean" and made it clear that "[Black people] can't get in here."[102] However, a street and a senior center are named after Orville Hubbard, the city made his birthday a holiday, and there was a statute of him in front of City Hall until its removal in June 2020.[103]

### A.  Michigan's Emergency Manager Laws and Their Impact on Voting

Michigan's Emergency Manager Law, Public Act 436 allows the state government to replace all locally elected officials in cities and school boards where there is a finding that the area is financially distressed.[104] In such situations, the community affected does not have the ability to elect their local representatives.[105] The electoral power instead goes to state-appointed "emergency managers" who have historically been appointed more frequently in communities of color.[106] Such managers had effective political control over Detroit, Flint, Highland Park, Benton Harbor, and

---

[101] *Id.* and Niraj Warikoo, *Statue of Former Dearborn Mayor Orville Hubbard Taken Down,* DETROIT FREE PRESS (June 5, 2020),   https://www.freep.com/story/news/local/michigan/wayne/2020/06/05/statue-dearborn-mayor-orville-hubbard-removed/3161044001/.

[102] *Supra* note 118.

[103] *Id.*

[104] *Michigan Residents Ask Supreme Court to Review Law that Led to Flint Water Crisis,* CENTER FOR CONSTITUTIONAL RIGHTS (March 31, 2017), https://ccrjustice.org/home/press-center/press-releases/michigan-residents-ask-supreme-court-review-law-led-flint-water.

[105] *Id.*

[106] *Id.*

Pontiac for 18 years.[107] These cities each have a predominately Black population.[108] In 2018, Emergency Managers were removed from those cities and school districts.[109]

The Flint Water Crisis resulted from a cost cutting measure taken by the emergency manager and against the advice of the EPA in 2014.[110] Because the water was now being drawn from the Flint River, which is the waste disposal site for local industries, rather than from Detroit's treated water plant, it has high levels of lead, legionnaires disease bacteria, and total trihalomethanes, which are cancer-causing chemicals.[111] The lead levels are particularly harmful to children and the health effects from consuming the water are long lasting.[112]

Studies have shown, generally, that those who are chronically sick are less likely to vote.[113] It is unclear what the exact relationship is between health and voting but "people who had poor self-rated health, no insurance, disabilities, and less emotional support were also less likely to vote

---

[107] Paul Egan, *Michigan Without State-Appointed Emergency Managers for First Time in 18 Years*, DETROIT FREE PRESS (June 27, 2018), https://www.freep.com/story/news/local/michigan/2018/06/27/michigan-without-emergency-managers-first-time-18-years/737821002/.

[108] Julie Mack, *See List of Michigan Cities with Most African American Residents, and Geographic Shifts Since 1970*, MICHIGAN LIVE (June 23, 2020), https://www.mlive.com/public-interest/2020/06/see-list-of-michigan-cities-with-most-african-american-residents-and-geographic-shifts-since-1970.html.

[109] *Supra* note 138.

[110] ACLU 2016 IMPACT REPORT, https://www.aclu.org/sites/default/files/field_document/2016_impact_report.pdf.

[111] Melissa Denchak, *Flint Water Crisis: Everything You Need to Know*, NRDC (Nov. 8, 2018), https://www.nrdc.org/stories/flint-water-crisis-everything-you-need-know.

[112] *Id.*

[113] Chloe Reichel, *How Health Affects Voter Turnout: A Research Roundup*, JOURNALIST'S RESOURCE (Oct. 29, 2018), https://journalistsresource.org/politics-and-government/voter-turnout-health-research/.

than the general population."[114] Experts have concluded that the likelihood of voting can be reduced when an individual suffers from chronic, debilitating illness. [115]

## B. Educational Disparities in Michigan

There are significant barriers faced by Indigenous families and their children. In Michigan, there are 12 federally recognized tribes and four state recognized tribes, which when taken together means that there are about 100,000 Indigenous people living in Michigan.[116] Thus, Michigan ranks among the top ten states with the largest Indigenous populations.[117]

In exit poll surveys, Indigenous people are often not recognized as a distinct group and are instead within the catch all group of "others."[118] Many are also stopped from voting due to the address listed on their ID because they are likely to have a P.O box listed if they live on a reservation.[119] Poll workers are not given clear instructions on the various forms of a valid address and because of this, many Indigenous people can be turned away from voting.[120] The polling places that normally serve Indigenous people can be far away from reservations, can require

---

[114] *Id.*

[115] *Id.*

[116] Meghanlata Gupta, *Debunking 10 Misconceptions About Michigan's' Native Americans*, BRIDGE MICHIGAN (June 24, 2020), https://www.bridgemi.com/guest-commentary/opinion-debunking-10-misconceptions-about-michigans-native-americans.

[117] *Id.*

[118] *Often Overlooked Native American Voters Poised to Become Powerful Voting Bloc in Michigan*, MICHIGAN RADIO NPR (Nov. 11, 2020), https://www.michiganradio.org/post/often-overlooked-native-american-voters-poised-become-powerful-voting-bloc-michigan.

[119] *Id.*

[120] *Id.*

JA00459

traversing inadequate roads, and typically lack funding and equipment.[121] Even registering to vote can be challenging because many reservations do not have adequate broadband access, thus making it difficult to access the internet.[122]

There is also a clear divergence in the percentages of bachelor's degrees earned by Indigenous people, African Americans, and Hispanic individuals in Michigan when compared to Caucasian and Asian individuals. In the total Michigan population, only 14% of Indigenous people have their bachelor's degree; 18% of Black people have their bachelor's degree; and 20% of Hispanic people have their Bachelor's degree.[123] These percentages are quite low when compared to the percentages of Bachelor's degrees held by White people, 31%, and Asians, 66%.[124]

There are disparities in resources available to lower income, urban public schools, many of which are predominantly Black.[125] This is partially because funding for schools does not consider the additional costs associated with teaching in low-income communities.[126] On average,

---

[121] Native American Rights Fund, *Obstacles at Every Turn: Barriers to Political Participation Faced by Native American Voters* (2020), https://www.narf.org/wordpress/wp-content/uploads/2020/05/NARF_2020FieldHearingReport_SummaryDocument.pdf and Native American Rights Fund, *Barriers to Casting a Ballot* (2020), https://vote.narf.org/wp-content/uploads/2020/06/obstacles_ballot_summary.pdf.

[122] Native American Rights Fund, *Vote By Mail in Native American Communities* (2020), https://vote.narf.org/wp-content/uploads/2020/06/obstacles_votebymail_summary.pdf.

[123] Alex Rossman, *Michigan Has Stark Racial Disparities in Educational Attainment, Ranks Third Worst in Nation for Number of Bachelor Degrees Earned By Black Students*, MICHIGAN LEAGUE FOR PUBLIC POLICY (May, 29, 2020), https://mlpp.org/michigan-has-stark-racial-disparities-in-educational-attainment-ranks-third-worst-in-nation-for-number-of-bachelor-degrees-earned-by-black-students/.

[124] *Id.*

[125] Peter Ruark, *Expanding the Dream: Helping Michigan Reach Racial Equity in Bachelor's Degree Completion*, MICHIGAN LEAGUE FOR PUBLIC POLICY (May 29, 2020), https://mlpp.org/expanding-the-dream-helping-michigan-reach-racial-equity-in-bachelors-degree-completion/.

[126] *Id.*

JA00460

providing education to a grade school child costs around $9,590 annually but these costs can be higher for students who live in poverty.[127] Schools located in wealthier areas can buffer their expenses with revenue from property taxes in the area.[128] Low-income schools do not have this buffer.[129] Teacher turnover in low-income schools or schools with larger populations of color is high.[130] It is common for a low-income school to train a teacher and for that teacher to take a job at a higher-income school that could offer a higher salary.[131] There are also issues of low literacy rates in low-income schools especially those located in communities of color.[132] In Muskegon Heights, for example, only 6% of students were proficient in English as of 2018.[133]

Black people may have relatively lower rates of bachelor's degrees due to poverty.[134] Michigan has high college tuition costs, and the amount of financial aid has not kept pace with increases in tuition.[135] Simply put, college education is expensive. Over the years, Michigan state government grants on average approximately $5,466 in student aid to White students while

---

[127] Michigan Association of School Boards, *Cost of Educating a Child* (last visited Sept. 26, 2021), https://www.masb.org/SFRC.

[128] Lily Altavena, *Report: High Poverty Districts Bear the Brunt of the Teacher Turnover in Michigan,* DETROIT FREE PRESS (May 18, 2021), https://www.freep.com/story/news/education/2021/05/18/edtrust-report-teacher-turnover/5128745001/.

[129] *Id.*

[130] *Id.*

[131] *Id.*

[132] Melissa Frick, *High-Poverty Michigan School Districts Awarded $3M to Help Improve Reading, Writing Skills,* MLIVE (Mar. 10, 2021), https://www.mlive.com/news/2021/03/high-poverty-michigan-school-districts-awarded-3m-to-help-improve-reading-writing-skills.html.

[133] *Id.*

[134] *Supra* note 163.

[135] *Id.*

granting about $4,461 in student aid to students of color.[136] The total average of student aid provided in Michigan is the 12th lowest in the nation.[137] In 2018, Michigan used 4.1% of its total budget on higher education, which is significantly lower than the national average of 10.1%.[138]

The disparities in higher education attainment also vary by location. Cities that have a predominantly Black population have even lower levels of Bachelor's degrees.[139] Places like Benton Harbor, Muskegon, and Saginaw can have as few as 10% of residents with Bachelor's degrees.[140] Generally, Michigan is found to be the third worst in the nation for its percentage of Bachelor's degrees earned by Black students in comparison to the total Black population in Michigan.[141] Specifically, only 6.8% of Black students in the state earned a Bachelor's degree, which is less than the national average of 17.1%.[142]

## IV.    Voting in Michigan: VRA Section 5 Coverage and Language Barriers

In 1976, the U.S. Attorney General and Census Director added Michigan to the list of only 14 states, and the only Midwestern State, to be covered by Section 5 of the Voting Rights Act, which required advance approval or preclearance from the Department of Justice or the U.S. District Court for the District of Columbia before any "change affecting voting" could be

---

[136] Allison Donahue, *Study: Low-income, Students of Color Squeezed in Michigan's College Affordability Crisis,* MICHIGAN ADVANCE (Sept. 7, 2019), https://michiganadvance.com/2019/09/07/study-low-income-students-of-color-squeezed-in-michigans-college-affordability-crisis/.

[137] *Id.*

[138] *Id.*

[139] *Supra* note 160.

[140] *Id.*

[141] *Id.*

[142142] *Id.*

JA00462

implemented.  In 2007, the Department of Justice used Section 5 to prevent the State of Michigan from closing a Secretary of State branch office in Buena Vista Township,  deciding that the State could not prove that the closure did not discriminate against minorities and could not prove that the closure "neither has the purpose nor will have the effect of effect of denying or abridging the right to vote on account of race."[143]

Michigan's Section 5 coverage applied to Clyde Township in Allegan County and Buena Vista Township in Saginaw County as a result of the townships not providing election materials in Spanish pursuant to the Voting Rights Act. [144], [145]

In 2020, the Secretary of State for Michigan started the Language Access Task Force that aimed to translate voter information into various languages.[146] The voter information translated is on the state government's website, however, this translation effort does not include absentee or in-

---

[143] December 26, 2007 Section 5 objection letter from DOJ to State of Michigan: https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/l_071226.pdf

[144] FEDERAL REGISTER, VOL. 41, NO. 158— FRIDAY, AUGUST 13, 1976

[145] On June 25, 2013, the United States Supreme Court held that it is unconstitutional to use the coverage formula in Section 4(b) of the Voting Rights Act to determine which jurisdictions are subject to the preclearance requirement of Section 5 of the Voting Rights Act, Shelby County v. Holder, 133 S. Ct. 2612 (2013). The Supreme Court did not rule on the constitutionality of Section 5 itself. The effect of the Shelby County decision is that the jurisdictions identified by the coverage formula in Section 4(b) no longer need to seek preclearance for the new voting changes, unless they are covered by a separate court order entered under Section 3(c) of the Voting Rights Act. (USDOJ)

[146] Malak Silmi, *Michigan Secretary of State Rolls Out Voter Information in 10 Languages,* DETROIT FREE PRESS (Oct. 10, 2020),         https://www.freep.com/story/news/politics/elections/2020/10/10/michigan-voter-information-translations-arabic-bengali-korean-spanish-tagalog/5916704002/. The languages now provided are Arabic, Bengali, Burmese, Hindi, Korean, Mandarin, Spanish, Tagalog, Thai, and Urdu. *Id.*

person ballots.[147] About 10% of Detroiters speak a different language than English at home and Hamtramck has around 67% of individuals speaking a different language at home.[148]

About 38.1% of individuals in Michigan who were born outside the United State are Limited English Proficient ("LEP"), among the highest rates in the United States, while 0.6% of individuals who were born anywhere in the United States are LEP.[149] The 2020 census data for Wayne County show that the LEP percentages in Michigan range from 3.5% to 13.1%.[150] However, some census tracts that are located in Hamtramck and Dearborn show that limited English proficiency among the population is 32.5% or higher.[151]

Some LEP voters may prefer in-person translation while voting rather than seeking out information online, especially when the online translation is done poorly.[152] Further, though a voter can ask individuals not associated with a candidate or their labor union to assist them while voting, poll workers get inconsistent guidance on the matter.[153] Thus, poll workers have turned

---

[147] *Id.*

[148] Maggie McMillin, *Michigan Made it Easier than Ever for Non-English Speakers to Vote This Year. But the Work's Not Done,* DETOUR DETROIT (Nov. 9, 2020), https://detourdetroiter.com/michigan-voting-other-languages-access/.

[149] Migration Policy, *State Immigration Data Profiles: Michigan* (last visited Sept. 26, 2021), https://www.migrationpolicy.org/data/state-profiles/state/language/MI.

[150] United States Census, *People that Speak English Less than "Very Well" in the United States* (Apr. 8, 2020), https://www.census.gov/library/visualizations/interactive/people-that-speak-english-less-than-very-well.html.

[151] *Id.*

[152] *Supra* note 193.

[153] *Id.*

JA00464

away individuals who are accompanied to the polls by a voting individual to help them understand the ballot.[154]

The federal government sued Hamtramck for discriminatory election practices in 2003 for the city's conduct in a 1999 local election.[155] At the time, Hamtramck allowed challenges to an individual's voter registration under Michigan Law.[156] The "Citizens for a Better Hamtramck" were able to register as polling place challengers claiming that their aim was to keep the election "pure."[157] This group of challengers brought citizenship challenges only against people of color and those with Arab sounding names.[158] No White voter's citizenship was challenged during this election.[159] When complaints were made to the elections office, city officials did not address the issue.[160] Some Arab citizens decided not to vote in that election citing this racial intimidation and harassment.[161] The United States brought suit to enforce the non-discriminatory requirements of the Voting Rights Act and U.S. Constitution.

As part of the 2003 consent decree settling the United States' lawsuit,  Hamtramck was ordered to cease discrimination against voters based on race or color as prohibited by federal law, ordered to  train  election  officials  and  polling  place  challengers  about  non-discrimination  in

---

[154] *Id.*

[155] *United States v. Hamtramck*, No. 0073541 at 1 (Mich. Sept. 3, 2003) (First Amended Consent Order and Decree).

[156] *Id.*

[157] *United States v. Hamtramck,* No. 00-73541 at 2 (Mich.) (Complaint).

[158] *Id.* at 3.

[159] *Id.*

[160] *Id.* at 4.

[161] *Id.* at 2.

JA00465

elections, ordered to provide both Bengali and Arabic interpreters at the polls, voting information and ballots in both languages, and notices in the major newspapers for both communities about the consent order.[162] In 2021, Hamtramck was again in violation of the VRA because the city did not provide Bengali interpreters nor voting information and ballots in Bengali.[163] The most recent consent order states that the city must provide these resources, with the court order effective until July 13, 2025.[164] In other Michigan jurisdictions such as Dearborn, where nearly half the population is Arabic speaking, there have also been issues of not providing citizens with translated materials or providing sample ballots that are translated only three days before an election.[165]

---

[162] *Supra* note 200 at 9.

[163] *U.S. District Court for the Eastern District of Michigan Enters Consent Decree and Order in Voting Rights Act Lawsuit—Hamtramck's Bengali Language Election Program Ordered for Four Years,* ASIAN AMERICAN LEGAL DEFENSE & EDU. FUND (July 13, 2021), https://www.aaldef.org/press-release/u.s.district-court-for-the-eastern-district-of-michigan-signs-and-enters-consent-decree-and-order-in-voting-rights-act-lawsuit-hamtramck-s-bengali-language-election-program-ordered-for-four-years/.

[164] *Id.*

[165] Beenish Ahmed, *Dearborn Needs Arabic-Language Election Materials, Arab-American Advocates Say,* NPR (July 29, 2021), https://www.michiganradio.org/post/dearborn-needs-arabic-language-election-materials-arab-american-advocates-say.

**Conclusion**

Minority groups in Michigan face several barriers to voting. *Gingles* and the Senate Factors provide guidance on what the state can consider when evaluating election and voting barriers. The U.S. Supreme Court has ruled that such considerations can include income, education, and health inequalities along with the presence of significant segregation in an area. This memorandum has attempted to address the various issues raised by the U.S. Supreme Court under *Gingles* and the Senate Factors while also providing the context of historical discrimination in Michigan dating to its time as a slave holding territory in the 18th century.

```
                                                      Page 1
 1              UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF MICHIGAN
 2                   SOUTHERN DIVISION

 3

 4   DONALD AGEE, JR.,           )
     an individual, ET AL.,      )
 5                               )
                 Plaintiff(s),   )
 6                               )
         vs.                     )
 7                               ) Case No. 1:22-cv-00272
     JOCELYN BENSON, in her      )
 8   official capacity as the    )
     Secretary of State of       )
 9   Michigan, ET AL.,           )
                                 )
10              Defendant(s).   )
11                    - - - - -
12       ZOOM DEPOSITION OF BRAD LOCKERBIE, Ph.D.
                Monday, April 10, 2023
13

                      - - - - -
14
     Zoom Deposition of BRAD LOCKERBIE, Ph.D., called by
15
     the Defendants for examination under the Federal Rules
16
     of Civil Procedure, taken before me, the undersigned,
17
     Lorraine A. Litvin, a Notary Public in and for the
18
     State of Ohio, at Cleveland, Ohio, commencing at
19
         a.m. the day and date above set forth.        11:03
20
                      - - - - -
21
22
23
24
25
```

Page 2

```
 1    APPEARANCES (All via Zoom):
 2              On Behalf of the Plaintiffs:
 3                  John Bursch, Esq.
                    Bursch Law, PLLC
 4                  9339 Cherry Valley Avenue, SE
                    Suite 78
 5                  Caledonia, MI 49316
                    616-450-4235
 6                  jbursch@burschlaw.com
 7                       and,
 8                  James Fleming, Esq.
                    Clark Hill, PLC
 9                  215 South Washington Square
                    Suite 200
10                  Lansing, MI 48933
                    517-318-3100
11                  jfleming@clarkhill.com
12              On Behalf of the Defendants Michigan
                Independent Citizens Redistricting
13              Commission, Douglas Clark, Juanita Curry,
                Anthony Eid, Rhonda Lange, Steven Terry
14              Lett, Brittni Kellom, Cynthia Orton, M.C.
                Rothhorn, Rebecca Szetela, Janice Vallette,
15              Erin Wagner, Richard Weiss, Dustin Witjes
                each in his or her official capacity as a
16              Commissioner of the Michigan Independent
                Citizens Redistricting Commission:
17
                    Nathan Fink, Esq.
18                  Fink Bressack
                    38500 Woodward Avenue
19                  Suite 350
                    Bloomfield, MI 48304
20                  248-971-2500
                    nfink@finkbressack.com
21
                    Erika Prouty, Esq.
22                  Baker & Hostetler, LLP
                    200 Civic Center Drive
23                  Suite 1200
                    Columbus, OH 43215
24                  614-228-1541
                    eprouty@bakerlaw.com
25
```

Page 3

1    APPEARANCES CONTINUED (All via Zoom):
2                    Katherine McKnight, Esq.
                     Baker & Hostetler, LLP
3                    1050 Connecticut Avenue, NW
                     Suite 1100
4                    Washington, D.C.  20036
                     202-861-1500
5                    kmcknight@bakerlaw.com
6              On Behalf of the State of Michigan:
7                    Erik Grill, Esq.
                     Assistant Attorney General
8                    State of Michigan
                     525 W. Ottawa Street
9                    P.O. Box 30758
                     Lansing, MI 48933
10                   Grille@michigan.gov
11                        - - - - -
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1                    EXAMINATION INDEX
2     BRAD LOCKERBIE, Ph.D.
            EXAMINATION BY MS. PROUTY. . . . . . . . .   4
3         EXAMINATION BY MR. FLEMING . . . . . . . .  92
4

                        - - - - -
5

                    EXHIBIT INDEX
6

      Exhibit                                    Marked
7     Exhibit 1 Lockerbie Expert Report              8
      Exhibit 2 IPPSR                                44
8     Exhibit 3 MI Redistricting Map Analysis        46
      Exhibit 4 Handley Expert Report                55
9

                        - - - - -
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1                    BRAD LOCKERBIE, Ph.D.

2    called for examination, under the Federal Rules of

3    Civil Procedure, after having been first duly sworn,

4    as hereinafter certified, was examined and testified

5    as follows:

6                         EXAMINATION

7    BY MS. PROUTY:

8    Q    Could you please state your full name and current

9    address for the record.

10   A    Brad Lockerbie, 9 Justin Drive, Etowah, North

11   Carolina, 28729.

12   Q    I'm Erika Prouty.  I'm one of the attorneys for

13   the defendants, Michigan Independent Citizens

14   Redistricting Commission and the individual

15   commissioners in their official capacity.

16        For the record, the parties have stipulated to

17   this deposition being conducted remotely and to the

18   witness being sworn in via videoconference.

19        Dr. Lockerbie, before we get started, there are a

20   few things I want to go over first.  First, your

21   deposition is being transcribed.  To make sure the

22   transcript is accurate, we need to keep a few things

23   in mind that might differ from how we speak in normal

24   conversations.

25        Number one, we need to make sure we don't talk

Page 36

```
 1   did, but I did not reference them in my report.

 2   Q    Sitting here today, you can't tell me

 3   specifically what those are?

 4   A    I would need to basically look at my writings

 5   here to do that.

 6   Q    In another sentence here in paragraph 10 you say:

 7   "As much of his report is contrary to the apparent

 8   interests of the commission, I accept them as given."

 9        Can you tell me what specific statements in

10   Mr. Adelson's report are contrary to the apparent

11   interests of the commission?

12   A    I would assume any problem he identified with

13   racial polarization and economic disparities that

14   cause problems would cause problems for the commission

15   in that they have an interest in their report being

16   accepted and approved.

17   Q    Do you have any background as to why the report

18   was authored in the first place?

19   A    I'm not privy to that.

20   Q    I would like to turn your attention to paragraphs

21   12 through 17 now.  Here, you're quoting from or

22   citing from Mr. Adelson's report about the history of

23   discrimination in Michigan.

24        Do you generally agree with Mr. Adelson's

25   findings that you cited here?
```

Page 37

1    A    I trust what he has said there, yes.

2    Q    The same in paragraphs 46 to 49, do you agree

3    with Mr. Adelson's findings that you cited here?

4    A    I trust that he has reported accurately.

5    Q    With paragraphs 58 to 64 under the heading of

6    Economic Disparities in your report, do you agree with

7    Mr. Adelson's findings that you cited here?

8    A    I trust his report.  The only thing I catch there

9    is a typo in my own writing there where it says

10   relining it should be redlining.

11   Q    Thank you for clarifying that.  Would it be fair

12   to say you agree with Mr. Adelson's findings and

13   conclusions in his report?

14   A    I believe it's accurate.

15   Q    Do you believe it was thoroughly researched and

16   analyzed?

17   A    I would have no reason to doubt that.

18   Q    Would the commission have been justified in

19   relying on his report when they drew the maps?

20   A    It would be a valuable piece of information, yes.

21   Q    I would like to now turn to your discussion of

22   some of the public testimony offered to the commission

23   during the 2021 redistricting.  We will start with

24   paragraph 18.

25        Can you describe your methodology for selecting

Page 97

1            (Deposition concluded at 2:10 p.m.)

2

3

4            _____

             Brad Lockerbie, Ph.D.

5

                    - - - - -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 98

```
 1  The State of Ohio,   )
                         ) SS:          CERTIFICATE
 2  County of Cuyahoga.  )

 3
         I, Lorraine A. Litvin, Notary Public within and
 4  for the State of Ohio, duly commissioned and
    qualified, do hereby certify that the within-named
 5  BRAD LOCKERBIE, Ph.D., was by me first duly sworn to
    testify the truth, the whole truth, and nothing but
 6  the truth in the cause aforesaid; that the testimony
    then given by him/her was by me reduced to stenotypy
 7  in the presence of said witness, afterwards
    transcribed on a computer, and that the foregoing is a
 8  true and correct transcript of the testimony so given
    by him/her as aforesaid.

 9
         I do further certify that this deposition was
10  taken at the time and place in the foregoing caption
    specified and was completed without adjournment.
11
         I do further certify that I am not a relative,
12  employee of, or attorney for any of the parties in the
    above-captioned action; I am not a relative or
13  employee of an attorney for any of the parties in the
    above-captioned action; I am not financially
14  interested in the action; I am not, nor is the court
    reporting firm with which I am affiliated, under a
15  contract as defined in Civil Rule 28(D); nor am I
    otherwise interested in the event of this action.
16
         IN WITNESS WHEREOF I have hereunto set my hand
17  and affixed my seal of office at Cleveland, Ohio, on
    this 17th day of April, 2023.
18
19
20
21
22
23           Lorraine Litvin
             Lorraine A. Litvin, Notary Public
24           in and for the State of Ohio.
             My commission expires August 4, 2026
25
```

Page 100

```
 1                    DEPOSITION REVIEW
                    CERTIFICATION OF WITNESS
 2
             ASSIGNMENT REFERENCE NO: 5854094
 3           CASE NAME: Agee, Jr., Donald, et al. v. Benson, Jocelyn,
     etc., et al.
             DATE OF DEPOSITION: 4/10/2023
 4           WITNESS' NAME: Brad Lockerbie, Ph.D.
 5           In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
 6   my testimony or it has been read to me.
 7           I have made no changes to the testimony
     as transcribed by the court reporter.
 8

     _____          _____
 9   Date                      Brad Lockerbie, Ph.D.
10           Sworn to and subscribed before me, a
     Notary Public in and for the State and County,
11   the referenced witness did personally appear
     and acknowledge that:
12
             They have read the transcript;
13           They signed the foregoing Sworn
                 Statement; and
14           Their execution of this Statement is of
                 their free act and deed.
15
             I have affixed my name and official seal
16
     this _____ day of_____, 20_____.
17
                     _____
18                   Notary Public
19                   _____
                     Commission Expiration Date
20
21
22
23
24
25
```

Page 101

1                        DEPOSITION REVIEW
                   CERTIFICATION OF WITNESS

2

         ASSIGNMENT REFERENCE NO: 5854094
3        CASE NAME: Agee, Jr., Donald, et al. v. Benson, Jocelyn,
    etc., et al.
         DATE OF DEPOSITION: 4/10/2023
4        WITNESS' NAME: Brad Lockerbie, Ph.D.
5        In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6    my testimony or it has been read to me.
7        I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
8    well as the reason(s) for the change(s).
9        I request that these changes be entered
    as part of the record of my testimony.

10

         I have executed the Errata Sheet, as well
11    as this Certificate, and request and authorize
    that both be appended to the transcript of my
12    testimony and be incorporated therein.
13    _____          _____
    Date                     Brad Lockerbie, Ph.D.

14

         Sworn to and subscribed before me, a
15    Notary Public in and for the State and County,
    the referenced witness did personally appear
16    and acknowledge that:
17        They have read the transcript;
         They have listed all of their corrections
18            in the appended Errata Sheet;
         They signed the foregoing Sworn
19            Statement; and
         Their execution of this Statement is of
20            their free act and deed.
21        I have affixed my name and official seal
22    this _____ day of_____, 20_____.
23         _____
         Notary Public

24

         _____
25    Commission Expiration Date

Page 102

1                    ERRATA SHEET

       VERITEXT LEGAL SOLUTIONS MIDWEST

2            ASSIGNMENT NO: 4/10/2023

3      PAGE/LINE(S) /       CHANGE        /REASON

4      _____

5      _____

6      _____

7      _____

8      _____

9      _____

10     _____

11     _____

12     _____

13     _____

14     _____

15     _____

16     _____

17     _____

18     _____

19

       _____        _____

20     Date                    Brad Lockerbie, Ph.D.

21     SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

22     DAY OF _____, 20_____ .

23                   _____

             Notary Public

24

                     _____

25           Commission Expiration Date

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

Page 1

1                  UNITED STATES DISTRICT COURT

                   WESTERN DISTRICT OF MICHIGAN

2                      SOUTHERN DIVISION

3

4                          * * *

5

6    DONALD AGEE, JR., et al.,

7         Plaintiffs,

8

          vs.                    CASE NO. 1:22-CV-00272

9

10   JOCELYN BENSON, et al.,

11        Defendants.

12                         * * *

13

14

15        Deposition of SEAN TRENDE, a witness herein,

16   called by the defendants for examination pursuant to the

17   Rules of Civil Procedure, taken before me, Emma Jane

18   Troyer, a Notary Public within and for the State of

19   Ohio, at the Offices of Baker Hostetler, LLP, 200 Civic

20   Center Drive, Suite 1200, Columbus, Ohio, 43215, on

21   April 20th, 2023, at 9:00 a.m.

22

23                         * * *

24

25

Page 2

1                          I N D E X

2

3    SEAN TRENDE                                      PAGE
4        Examination by Ms. McKnight.....................4
         Examination by Mr. Pattwell...................168

5

6

                              * * *

7

8                     INDEX OF EXHIBITS

9

     EXHIBIT                 DESCRIPTION              PAGE

10

11   Exhibit 1...Expert Report of
                             Sean Trende................5

12

     Exhibit 2...Appendix A

13                           Sean Trende C.V............7

14   Exhibit 3...Appendix C

                             Demonstration Plan Details..40

15

     Exhibit 4...Constitution of MI 1963

16                           Excerpt....................45

17   Exhibit 5...Dr. Handley's Report to the

                             MI Independent Citizens

18                           Redistricting Commission....63

19   Exhibit 6...Expert Report of

                             Jonathan Rodden, Ph.D.......68

20

     Exhibit 7...Expert Report of

21                           Maxwell Palmer, Ph.D........146

22   Exhibit 8...Code Excerpts...............160

23

24

25                            * * *

```
                                           Page  3

 1   APPEARANCES:
 2
 3         On behalf of the Plaintiffs:
 4
                 Clark Hill, LLP
 5
           By:  Michael J. Pattwell
 6              215 South Washington Square, Suite 200
                Lansing, Michigan 48933
 7              Mpattwell@clarkhill.com
 8
 9
           On behalf of the Defendants:
10
11              Baker & Hostetler, LLP
12         By:  Katherine McKnight
                1050 Connecticut Avenue, NW, Suite 1100
13              Washington, D.C. 20036
                Kmcknight@bakerlaw.com
14
                &
15
                Erika Prouty
16              200 Civic Center Drive, Suite 1200
                Columbus, Ohio 43215
17              Eprouty@bakerlaw.com
18
19
20                           *  *  *
21
22
23
24
25
```

Page 4

1                           SEAN TRENDE,

2      a witness herein, having been first duly sworn as

3      hereinafter certified, was examined and deposed as

4      follows:

5

6                           EXAMINATION

7      BY MS. McKNIGHT:

8          Q.  Good morning.

9          A.  Morning.

10         Q.  I'm Kate McKnight, and I'm here today on behalf

11     of defendants in the Agee versus Benson case in the

12     Western District of Michigan.  Would you state your full

13     name for the record?

14         A.  Sean Patrick Trende, T-R-E-N-D-E.

15         Q.  And I understand you've been deposed before; is

16     that correct?

17         A.  Yes.

18         Q.  Okay.  So therefore I'll keep my introductory

19     statements brief.  First, I'll endeavor to take a break

20     every hour or so.  This is not an endurance contest.  If

21     you need to take a break between them, just let me know.

22     All I ask is that you finish answering a question posed

23     before we do take any break.

24             Please ask for any clarification if my question

25     does not make sense.  You're the expert here, and I'll

Page 31

1    Q.  I see.  And does it serve as a basis for

2  comparison against the enacted plan?

3    A.  Yeah.  So more directly in a Section 5 context,

4  which we are not, but it's just an example of what

5  things had looked like before and what things looked

6  like afterwards.

7    Q.  And in this case, did you use it as a basis of

8  comparison?

9    A.  I think, again, this is an area where your

10  experts read more into what I had done than what I had

11  intended.  I used it more as a narrative device.  It is

12  a comparison, but not in the same sense that you would

13  do it in Section 5.  It's more a narrative device to

14  show how things have changed.

15    Q.  And do you have an understanding of how the House

16  and Senate maps in Michigan were drawn in 2011?

17    A.  Yes.

18    Q.  And do you have a sense of why they were drawn

19  that way?

20    A.  I have some sense that -- excuse me --

21  republicans had the trifecta, as we call it.  They

22  controlled the House, Senate, and governorship, and at

23  least to some extent they were trying to draw maps in a

24  different political environment, but nevertheless, maps

25  that would help them.

Page 32

1      Q.  And do you have a sense of how courts viewed the

2   drawing of maps from 2011?

3      A.  I can't remember if these maps were ever

4   challenged.  I know the congressional maps were, but I

5   don't know about the State House or State Senate maps.

6      Q.  Okay.  So as you sit here today, you're not aware

7   of whether federal courts reviewed the 2011 legislative

8   maps for compliance with the Constitution?

9      A.  I'm trying to remember, and I can't.  I know that

10   the congressional maps were challenged at least until

11   the Rucho decision came down -- R-U-C-H-O -- but I can't

12   remember if the State House and State Senate maps were

13   part of that challenge or not.

14      Q.  Would it surprise you to know that a federal

15   court found the legislative maps to represent a

16   political gerrymander of historical proportions?

17      A.  It wouldn't surprise me.  They did the same

18   thing -- wrongly, I think -- but did it for the

19   congressional districts.

20      Q.  Would you agree with the statement that black

21   preferred candidates are not always black?

22      A.  Oh, yeah, obviously.

23      Q.  And would you agree that it is possible for a

24   non-majority minority district to be represented by a

25   candidate of choice of the black community?

Page 33

1    A.  Yes.  I mean, theoretically, you could have a

2    district with one black resident of voting age, and if

3    he prefers -- let's just make it simple and use a

4    general election.  If he votes for democrats and the

5    district elects a democrat, then you would say that the

6    black candidate of choice won that district.

7    Q.  And is it possible for a candidate of choice of

8    the black community to not be black?

9    A.  Yes.  Gary Peters in 2020 is an example of that

10   for a general election.  I think courts -- and I

11   don't -- again, this is where you get into the details

12   of circuit law, but I believe courts have given some

13   weight to the race of the candidates.  But again, I

14   think that 2020 Senate race is a nice example of a

15   counter-narrative where the white candidate was the

16   candidate of choice of the black community.

17   Q.  I think we're at about an hour, so why don't we

18   take the break for the court reporter, for you, and then

19   we'll come back in ten minutes, if that's okay?  So it's

20   10:05 now.  We'll return at 10:15.

21

22        (Recess from 10:05 a.m. to 10:17 a.m.)

23

24   BY MS. McKNIGHT:

25   Q.  Mr. Trende, I wanted to clarify something that we

Page 44

1    to ensure that those maps were not reinforcing red

2    lining practices?

3              MR. PATTWELL:  Objection; form.

4      A.  I didn't consult those maps.  I didn't consult

5    the maps at all.  I don't know what the causal

6    relationship would be between drawing a state

7    legislative district today and red lining practices from

8    100 years ago, to the extent that's implied in your

9    question, but I didn't consult the maps.

10     Q.  If that was an issue that mattered to voters and

11   the Commission, you wouldn't be aware of it as you sit

12   here today; is that right?

13     A.  That's right.

14     Q.  Okay.  Did you interview any voters in preparing

15   your report?

16     A.  No.

17     Q.  Do you have any specific knowledge of requests

18   for changes in districts made at public hearings?

19     A.  No.

20     Q.  In preparing your report, did you come to have an

21   understanding of the voting behavior of Michigan's black

22   voters?

23     A.  At least to some level, yes.

24     Q.  And based on that understanding, do you

25   understand whether Michigan's black voters generally

Page 45

1  vote for democratic candidates as opposed to republican

2  or independent candidates?

3      A.  They generally vote for democratic candidates.

4      Q.  Are you familiar with the criteria that the

5  Commission used to draw its plans?

6      A.  To the extent it is the state constitutional

7  requirements, yes.  At least, that would be what was

8  purported to be the criteria to draw the plans.

9      Q.  So let's mark this as Exhibit 4.

10

11      (Defendant's Exhibit 4 marked for identification.)

12

13      Q.  Mr. Trende, do you recognize what this document

14  is?

15      A.  This is at least a copy of Section 6 of the

16  Michigan Constitution.

17      Q.  And I'd like to draw your attention to Section 13

18  on Page 3.  Do you understand this section to detail the

19  criteria the Commission should have used to follow in

20  proposing and adopting any plans?

21      A.  Yes.

22      Q.  Okay.  And do you understand this list of

23  criteria to be ranked in order of priority?

24      A.  Yes.

25      Q.  Did you use this criteria in preparing your

Page 51

1      A.  So as Justice O'Connor put it, I think in Shaw,

2  but it might be one of the Bush V. Vera, redistricting

3  is an area where appearances matter, and so there is a

4  bit of, I know it where I see it, when I see it aspect

5  that's built into the court's case law.

6          I don't think any reasonable person could look

7  at, say, the Fifth District and say to themselves, that

8  is a compact, reasonably drawn district that makes

9  sense.

10     Q.  And which Fifth District are you talking about --

11  the House Fifth District?

12     A.  Yes.

13     Q.  Are you aware that the House Fifth District is

14  not challenged in this case?

15     A.  Yes.  I'm also aware that in a racial

16  gerrymandering case, you're allowed, or it's acceptable

17  to look at evidence presented beyond the context of the

18  district's challenge.  So, for example, in Alabama Black

19  Legislative Caucus, Justice Breyer says you can look at

20  statewide evidence, but ultimately the focus is on the

21  districts themselves, the challenged districts

22  themselves, and you can't just have a blunderbuss

23  statewide assault on a map.

24     Q.  I have a question about your demonstration maps.

25  Did you conduct a performance analysis for districts in

Page 52

1    the demonstration maps?

2       A.  No, because again, these aren't remedial maps.

3    These are districted to demonstrate under Gingles Prong

4    1 that the black community is numerous enough to

5    constitute a majority in a reasonably configured

6    district.

7       Q.  Were you ever aware of the political performance

8    of the demonstration maps?

9       A.  No.

10      Q.  So you were never aware of how many democrats or

11   republicans they elected?

12      A.  No, because the point is to demonstrate, under

13   Gingles Prong 1, that you can draw reasonably configured

14   districts where minority groups constitute a majority of

15   the population, which would trump, regardless of whether

16   the constitution explicitly provided for it or not,

17   lower-tiered concerns.

18      Q.  Now, we've talked a bit about what you didn't

19   look at in preparing your demonstration maps.  I'd like

20   to try and get an understanding of how you prepared

21   those maps and what kind of check you placed on it, and

22   I'll take those two issues in turn.  First, how did you

23   prepare the demonstration maps in this case?

24      A.  In what sense?

25      Q.  How were they made?

Page 60

1   or if it's a chapter, but I did read it.

2        I know she does a lot of work on doing racially

3   polarizing analysis.  She was, I believe, the RPV

4   analyst for the map drawer in the Arizona case.  Or,

5   it's not a case -- the Arizona matter.

6        Q.  I see at the top of Page 28 in your report that

7   you thought your findings are largely consistent with

8   Handley's report in this respect; do you see that?

9        A.  Yes.

10       Q.  Okay.  In what respect?

11       A.  So it says the Handley report engages some of

12   this analysis, which is responsive to ecological

13   regression, or referencing ecological regression and

14   ecological inference, and the analyses that I have

15   conducted are largely consistent with hers.

16       Q.  And in reading your report -- please correct me

17   if I'm wrong -- do I have the correct understanding that

18   you don't have qualms with the reliability or quality of

19   Dr. Handley's analysis; instead, you seem to take issue

20   with how the analysis played out in the Commission's map

21   drawing process; is that a fair understanding?

22            MR. PATTWELL:  Objection; form.

23       A.  That's a little bit of a broad sweep.  If we're

24   talking as a general matter, I could probably agree with

25   that frame, but I don't remember every single conclusion

Page 61

1   within the Handley report, so there may be specific

2   examples that I would disagree with.

3       Q.  Okay.

4       A.  But my approach was generally to, at least with

5   respect to the ecological inference calculations, to

6   just take her findings as they were, since they were

7   consistent with what I found with my own analysis, and

8   then just supplement them with additional data that I'd

9   be able to find.

10      I know one of the experts -- Palmer, I think --

11  suggested that this is cherry picking, and I think he

12  missed what was going on.  Dr. Handley had reported the

13  data out, and I didn't see a reason to duplicate it in

14  what was already a 120-page report, or on its way to

15  being, when I wrote it.

16      Q.  Now, setting aside how you view the Commission

17  employed Dr. Handley's analysis, do you have any

18  reservations about a map drawing commission relying on

19  the analysis that Dr. Handley prepared for the Michigan

20  Commission?

21          MR. PATTWELL:  Objection; form.

22      A.  If we mean relying on the findings of her

23  ecological inference and ecological regression,

24  certainly not.  Like I said, her results are pretty much

25  the same as the results that I came up with, which is

Page 62

1   why there was no need to duplicate them in the report.

2        I don't think Dr. Palmer was being needlessly

3   aggressive.  I don't mean to imply that, when he said I

4   was cherry picking.  That's why we do the depositions.

5     Q.  Okay.  Now actually may be a good time to take a

6   break.  We're at -- it's 11:08.  Is it okay to take a

7   ten-minute break?  Let's do ten minutes.  So we'll be

8   back at 11:18.

9

10            (Recess from 11:08 a.m. to 11:25 a.m.)

11

12  BY MS. McKNIGHT:

13    Q.  I'd like to pass out what will be marked as

14  Exhibit 5.

15    A.  Before we get to this, I did have one other tweak

16  on a response.

17    Q.  Okay?

18    A.  Which is that when I was putting this report

19  together, I did notice that the calculations I had done

20  for the first version of my map were done with any part

21  black as the definition, and those are included in the

22  appendix -- those original maps.  And so the maps

23  included in my plan, those maps had to be adjusted.

24        The maps in the appendix were the first maps I

25  drew back in the spring of 2022.  Because they utilized

Page 80

1     A.  Yes.  That is, I think you have to have ten

2   districts that comply with the Voting Rights Act that

3   will regularly elect the minority candidate of choice.

4   That's the whole thrust of the Voting Rights Act

5   challenge here.

6     Q.  Okay.

7     A.  Who knows, though.  I mean, the Milligan case is

8   acting like a sword of Damocles in this whole

9   litigation, and if this case is tried, it may be tried

10   under a completely different voting rights regime.

11     Q.  Pardon me, Mr. Trende.  I just need to organize

12   my papers here.  I'd like to step back for a minute from

13   Dr. Rodden's report and ask you some questions about the

14   benchmark plan.  Are you familiar with statements made

15   by some of the map drawers within the 2011 map drawing

16   phase?

17     A.  I've read them in some of the expert reports.

18     Q.  Do you recall reading a quote from a political

19   strategist named Jeff Timmer who was involved with

20   drawing the 2011 plans as saying, quote, there were two

21   main keys to gerrymandering in Michigan when I sat down

22   to draw maps ten and twenty years ago.  Relying on

23   county and city or township geography, keeping those

24   intact helps republicans.  The other thing that helps

25   republicans was the Voting Rights Act, packing the

Page 131

1      Q.  We have some pulled.  I'll bring it after the

2   break.

3      A.  Oh, good.  But yeah, you can see on Page 92 where

4   I'm taking something directly from my code and just

5   putting it on, and the code that I had in place gives

6   lower 95 percent and upper 95 percent, so it's a 95

7   percent credible interval.

8           But that's just because it's the code that I had.

9   For the most part, I am just doing -- when I do my

10  summary charts and whatnot, I'm just replicating what

11  Dr. Handley did.

12     Q.  Okay.  Let's turn to Page 28 and 29 of your

13  report.  This has to do with your analysis of the 2018

14  gubernatorial election.  Again, this is on Page 28 and

15  29 of your report.

16          Now I'm looking at Page 29.  About halfway down

17  that first paragraph, you note that you found that 37 --

18  I want to make sure you're --

19     A.  I'm listening.

20     Q.  Okay -- that 37.4 percent of blacks voted for

21  Whitmer, and 41.1 percent voted for Thanedar; do you see

22  that?

23     A.  I do.

24     Q.  Do these figures, a difference of about four

25  percentage points, support a conclusion that black

Page 140

1      Q.  And here you report the BVAP for House District 4

2  at 45.5 percent; do you see that?

3      A.  Yes.

4      Q.  And do you know whether the black candidate of

5  choice won the 2018 primary in House District 4?

6      A.  Certainly not off the top of my head.

7      Q.  Okay.  Where in your report do you focus on the

8  wins, the 2018 primary?  I'll see if I can help.

9      A.  So for 2018, Dr. Handley had done the work, and

10  so I don't do anything differently from what she has.

11      Q.  Okay.

12      A.  So all I'm doing here with 2 and 5, I believe,

13  are providing data where she did not.

14      Q.  Okay.  I see.  What pages are 2 and 5 on?

15      A.  2 is on 37; 5 is on 39.

16      Q.  And would you have relied on Dr. Handley's data

17  if you didn't agree with it?

18      A.  So I never did any individual assessment of -- I

19  never saw her code.  What I did do was note that we

20  produced substantially similar results with our

21  different approaches, and so I felt comfortable relying

22  on her, or, you know, using her findings for 2018 and

23  2020.  I don't know if that's the same as agreeing with

24  it, because I didn't go through and look through all of

25  her code and whatnot.

Page 141

1      Q.   Okay.

2      A.   But I don't have any reason to disagree with her,

3   is maybe a better way to put it.

4      Q.   Okay.  Thank you.  Let's move to Page 25 of the

5   Handley report.  This is Page 25 of Exhibit 5.  Take a

6   minute to look at this, Mr. Trende, and then I'll ask

7   you some questions about it.

8      A.   Okay.

9      Q.   Do you recall looking at this chart the first

10   time you reviewed Dr. Handley's report?

11      A.   Yes.

12      Q.   Okay.  And Dr. Handley states here, an

13   Examination Table 9 indicates that every Michigan State

14   House District with a BVAP of at least 35 percent elects

15   a minority representative to the State House; do you see

16   that?

17      A.   Yes.

18      Q.   Do you have any reason to disagree with that?

19      A.   No.  Well, this is as of 2021, so I don't know if

20   that's true as of today, but with that stipulation,

21   yeah.

22      Q.   With that stipulation, you don't have any reason

23   to disagree with that statement as it relates to this

24   table?

25      A.   Yeah.  If we say every Michigan district in the

Page 157

1    area of Dr. Handley's elections.  Both House District 4

2    and House District 11 are in the Detroit area, aren't

3    they?

4       A.  Yes.

5       Q.  Okay.  Let's turn to Page 7 of your report.  Here

6    I'm looking at the second to last paragraph, and a

7    reference to Marshall Bullock was an African-American

8    senator who had been elected in a 45 percent BVAP

9    district four years earlier; do you see that?

10      A.  Yes.

11      Q.  Did you conduct a percent needed to win analysis

12   for Michigan minority voters?

13      A.  No.

14      Q.  And you would agree that Marshall Bullock had

15   been elected in a district that was drawn below majority

16   BVAP?

17      A.  Yes.

18      Q.  Did you conduct any form of analysis about

19   whether the majority minority districts in your

20   demonstration plan provide minority opportunity to elect

21   that does not exist under the challenged plans?

22      A.  Except to the extent that the -- there's analysis

23   of whether there would be opportunity to win under the

24   challenged plans, no.

25      Q.  Okay.  So you never compared opportunity to win

Page 158

1   under the challenged plans to -- pardon me -- I want to

2   make sure I understand what you just said.

3       A.  Could I rephrase my answer?  Because the

4   demonstration plan is only there to prove under Gingles

5   Prong 1 that the black population of Detroit is numerous

6   enough to support 10 majority black districts in a

7   reasonably configured -- in reasonably configured

8   districts.  So again, that's not necessarily a map that

9   was meant to be a remedial map or anything of the sort.

10  It's simply to demonstrate Gingles Prong 1.

11      Q.  Okay.  So you never conducted an analysis where

12  you compared the opportunity to elect in the

13  demonstration plan as compared to the opportunity to

14  elect in the challenged plans; is that fair?

15      A.  I never made that direct comparison, because

16  that's not the purpose of the demonstration plan.  It's

17  just meant to illustrate numerosity and compactness.

18      Q.  Did you conduct any kind of comparison of

19  opportunity to elect between the challenged plans and

20  the simulation plans?

21      A.  No, because the simulation plans are only put

22  into place to illustrate that race predominated in the

23  drawing of the district.  To the extent you were able to

24  demonstrate that there tend to be RA compliant

25  districts, I suppose that would give you defenses for 10

Page 170

1    STATE OF OHIO)

2    COUNTY OF MADISON)        SS:  CERTIFICATE

3

4         I, Emma Jane Troyer, a Notary Public within and

5    for the State of Ohio, duly commissioned and qualified,

6         DO HEREBY CERTIFY that the above-named SEAN

7    TRENDE was by me first duly sworn to testify the truth,

8    the whole truth, and nothing but the truth.

9         Said testimony was reduced to writing by me

10   stenographically in the presence of the witness and

11   thereafter reduced to typewriting.

12        I FURTHER CERTIFY that I am not a relative or

13   attorney of either party, in any manner interested in

14   the event of this action, nor am I, or the court

15   reporting firm with which I am affiliated, under a

16   contract as defined in Civil Rule 28(D).

17        IN WITNESS WHEREOF, I have hereunto set my hand

18   and seal of office at Plain City, Ohio, on this 25th day

19   of April, 2023.

20

21

22

23   EMMA JANE TROYER

24   NOTARY PUBLIC, STATE OF OHIO

25   My commission expires 01-09-2027

Page 172

```
1              DEPOSITION REVIEW
            CERTIFICATION OF WITNESS
2

        ASSIGNMENT REFERENCE NO: 5857187
3       CASE NAME: Agee, Donald, Jr., Et Al. v. Benson, Jocelyn, Et Al.
        DATE OF DEPOSITION: 4/20/2023
4       WITNESS' NAME: Sean P. Trende
5            In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7            I have made no changes to the testimony
    as transcribed by the court reporter.
8

    _____      _____
9   Date                  Sean P. Trende
10           Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:
12
            They have read the transcript;
13          They signed the foregoing Sworn
                Statement; and
14          Their execution of this Statement is of
                their free act and deed.
15
            I have affixed my name and official seal
16
    this _____ day of_____, 20_____.
17
                    _____
18                  Notary Public
19                  _____
                    Commission Expiration Date
20
21
22
23
24
25
```

Veritext Legal Solutions

Page 173

1               DEPOSITION REVIEW
              CERTIFICATION OF WITNESS

2

        ASSIGNMENT REFERENCE NO: 5857187
3       CASE NAME: Agee, Donald, Jr., Et Al. v. Benson, Jocelyn, Et Al.
        DATE OF DEPOSITION: 4/20/2023
4       WITNESS' NAME: Sean P. Trende
5       In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7       I have listed my changes on the attached
   Errata Sheet, listing page and line numbers as
8  well as the reason(s) for the change(s).
9       I request that these changes be entered
   as part of the record of my testimony.

10

        I have executed the Errata Sheet, as well
11 as this Certificate, and request and authorize
   that both be appended to the transcript of my
12 testimony and be incorporated therein.
13 _____          _____
   Date                     Sean P. Trende

14

        Sworn to and subscribed before me, a
15 Notary Public in and for the State and County,
   the referenced witness did personally appear
16 and acknowledge that:
17      They have read the transcript;
        They have listed all of their corrections
18           in the appended Errata Sheet;
        They signed the foregoing Sworn
19           Statement; and
        Their execution of this Statement is of
20           their free act and deed.
21      I have affixed my name and official seal
22 this _____ day of_____, 20_____.
23           _____
             Notary Public

24

             _____
25           Commission Expiration Date

Page 174

1                    ERRATA SHEET
          VERITEXT LEGAL SOLUTIONS MIDWEST
2               ASSIGNMENT NO: 5857187
3      PAGE/LINE(S) /        CHANGE        /REASON
4      _____
5      _____
6      _____
7      _____
8      _____
9      _____
10     _____
11     _____
12     _____
13     _____
14     _____
15     _____
16     _____
17     _____
18     _____
19

       _____      _____
20     Date                  Sean P. Trende
21     SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22     DAY OF _____, 20_____ .
23                    _____
                      Notary Public
24
                      _____
25                    Commission Expiration Date

Ohio Rules of Civil Procedure

Title V. Discovery

Rule 30

(e) Submission to Witness; Changes; Signing.
When the testimony is fully transcribed, the
deposition shall be submitted to the witness for
examination and shall be read to or by the witness,
unless examination and reading are waived by the
witness and by the parties. Any changes in form or
substance that the witness desires to make shall be
entered upon the deposition by the officer with a
statement of the reasons given by the witness for
making them. The deposition shall then be signed by
the witness, unless the parties by stipulation
waive the signing or the witness is ill, cannot be
found, or refuses to sign. The witness shall have
thirty days from submission of the deposition to
the witness to review and sign the deposition. If
the deposition is taken within thirty days of a
trial or hearing, the witness shall have seven days
from submission of the deposition to the witness to
review and sign the deposition. If the trial or
hearing is scheduled to commence less than seven
days before the deposition is submitted to the
witness, the court may establish a deadline for the

witness to review and sign the deposition. If the deposition is not signed by the witness during the period prescribed in this division, the officer shall sign it and state on the record the fact of the waiver or of the illness or absence of the witness or the fact of the refusal to sign together with the reason, if any, given therefor; and the deposition may then be used as fully as though signed, unless on a motion to suppress the court holds that the reasons given for the refusal to sign require rejection of the deposition in whole or in part.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DONALD AGEE, JR., an individual, *et al.,*

         Plaintiffs,

v.

JOCELYN BENSON, in her official capacity
as the Secretary of State of Michigan, *et al.*;

         Defendants.

Case No. 1:22-cv-00272

**Three-Judge Panel Appointed Pursuant to 28 U.S.C. § 2284(a)**

## AFFIDAVIT OF VIRGIL K. SMITH

STATE OF MICHIGAN    )
                           )  ss.
COUNTY OF WAYNE    )

I, Virgil K. Smith, having been first duly sworn, deposes and states as follows:

1.    I have personal knowledge concerning the statements contained in this Affidavit, and if called to testify, can testify competently to the facts stated in this Affidavit.

2.    I am a Black man, former Legislator, current community leader, and son of Detroit.

3.    I have substantial and intimate knowledge regarding my hometown of Detroit, Michigan, which spans a wide array of social, political, and economic matters both historic and contemporary.

4.    I was born and raised in the City Detroit, attended Detroit Public Schools for some time, and ultimately graduated from Detroit's Benedictine High School in 1998.

5.     During my upbringing, my father, Virgil C. Smith, represented Detroiters as both a member of the Michigan House of Representatives and member of the Michigan Senate. He later served as a Judge on Michigan's Third Circuit Court from 2004 to 2018; serving as the Chief Judge from 2009 to 2013.

6.     Local government, policy development, and elections were omnipresent in my formative development and an academic concentration during my time in higher education. Specifically, I conducted my undergraduate studies at Michigan State University earning a degree in political science in 2002. I later earned a master's degree in public administration from Western Michigan University in 2012.

7.     I served three terms as a Democratic member of the Michigan House of Representatives between 2003 and 2008 representing House District 7 which encompassed the northern tier of Detroit. This District did not include Highland Park.

8.     In 2010, I ran for the Michigan State Senate (District 4) defeating former House Appropriations Committee Chair George Cushingberry in the August Democratic Primary and then going on to win the general election by a wide margin.

9.     During my first term as a State Senator of District 4, my duties included serving on the Senate Committee on Redistricting. During my service on the Redistricting Committee, one of my objectives was ensuring that the Legislature's reapportionment plan would be compliant with the federal Voting Rights Act and thus protect the right of my majority/minority community (which are Black residents in the Detroit area) to have a fair opportunity to elect our candidates of choice.

10.     Based, in part, on the evidence considered by the Senate Redistricting Committee as well as my lived experiences, I formed the perspective that compliance with the Voting Rights

JA00510

Act at that time generally required reasonably cohesive districts with Black Voting Age Populations ("BVAPs") or majority/minority precincts of, at least, 55%. This was the position I held during that process.

11.     In 2014, I ran for reelection in Senate District 4 (which had been reapportioned to include not only a majority/minority portion of Detroit but also the predominately white suburbs of Lincoln Park, Allen Park, and Southgate). I defeated Rashida Tlaib in the democratic primary election and then defeated Keith Franklin in the general election.

12.     Although I was victorious in the election, my personal experience campaigning in the predominately White portions of the newly apportioned Senate District 4 was met with much less success and reception than my campaign efforts in the predominately Black portions of my District. It is suffice to say the three new predominantly white cities were not too energized to welcome my campaign efforts. My campaign was not successful in gaining a majority of the vote. In fact, against my campaign's best efforts, I did not receive over 35% of the vote in any of the three cities. The only reason why I won that race was because approximately over 50% of the voter precincts were majority minority precincts located in inner city Detroit.

13.     In fact, while campaigning in the predominately white Allen Park during that election cycle, I had the very unfortunate experience of being aggressively confronted by a White code enforcement officer of the municipality who threatened to issue me a citation for illegally "soliciting" despite my being a sitting State Senator donned in campaign attire and carrying campaign literature. This is just one personal example of "campaigning while Black" but I'm aware of other examples experienced by my colleagues.

14.     I resigned from the State Senate in 2016.

3

15. In 2018, I served as the campaign manager for Marshall Bullock for State Senate. Senator Bullock won election in 2018 and represented Senate District 4 from 2019 to 2023.

16. In 2020, I served as the Campaign Manager for Shri Thanedar who ran for State Representative for the 3rd District

17. In 2022, I again served as the campaign manager for Marshall Bullock for State Senate. This election was for a new senate district (i.e., Senate District 8) which had been redrawn by the Michigan Independent Citizens Redistricting Commission (the "MICRC") as part of the "Linden Plan" for the State Senate.

18. The MICRC's Senate District 8 is an elongated district with its southern 1/3 comprising a predominately Black portion of the City of Detroit in Wayne County and its northern 2/3s comprising a conglomeration of predominately White suburbs such as Ferndale, Berkley, Birmingham, Royal Oak, and portions of Clawson in Oakland County.

19. These two southern/northern portions of the District are also characterized by starkly different economic demographics, communities of interest, and legislative priorities.

20. During the election, it became immediately apparent that because Senate District 8's BVAP had been lowered by the MICRC to only 40.2% (a meaningful portion of which consists of Black Voters who have relocated to white dominated suburbs in Oakland County), Senator Bullock—who is Black and who is from Wayne County—would need to perform well not only in the southern predominately Black portion of the District located in Wayne County but also obtain a sizable percentage of votes from the northern predominately White portion of the District located in Oakland County.

21. Unfortunately, based on my experience guiding former Senator Bullock's campaign (which, of course, included an extensive amount of voter outreach efforts), it became

4

**JA00512**

obvious that the democratic primary election would be racially polarized with Senator Bullock being the clear Black candidate of choice and Senator McMorrow, a White woman from Oakland County, being the clear White candidate of choice.

22. Our campaign efforts in the White dominated portion of the District were exceedingly difficult and marked by a discouraging lack of reception from White voters. For example, while "door knocking" efforts (a critical component of voter outreach) in the predominately Black portions of the District yielded an average "door open rate" approximating 60% - 70%, those same efforts in the predominately White portions of the District yielded a low door open rate approximating only 10%.

23. All too often, residents in predominately White portions of the District would peer through their windows or doors, notice the campaign and presumably the skin color of the candidates and/or campaign staff, knowingly chose not to engage, and thus provide no opportunity to be educated about the campaign's priorities and values.

24. On the other side of the electoral equation, it was my observation that Senator McMorrow did very little, if any, serious direct voter outreach into the predominately Black neighborhoods in the District. In fact, Senator McMorrow's campaign plan to win was built on the fact that voter precincts on her side of Eight Mile had higher voter turnout than the voter precincts on the Detroit side of Eight Mile. Senator McMorrow had an excel spreadsheet prepared to explain this difference that she passed out to the Michigan Capitol Lobbying organizations.

25. In the end, Senator Bullock, an incumbent, lost the democratic primary to Senator McMorrow, also an incumbent. This was the result despite the lack of any meaningful effort on

5

the part of the McMorrow Campaign to directly engage Black Voters in the predominately Black portions of the District.

26.  In 2022, I also served as the campaign manager for Reggie Reg Davis for the Michigan House of Representatives. This election was for a new house district (i.e., House District 5) which had been redrawn by the MICRC as part of the "Hickory Plan" for the State House.

27.  The MICRC's House District 5 is an oddly slender and elongated district with its southern 1/3 comprising a predominately Black portion of the City of Detroit in Wayne County and its northern 2/3 stretching up through Oakland County's predominately White suburbs such as the affluent Berkley, Beverly Hills, and Birmingham areas.

28.  These two southern/norther portions of the District are also characterized by starkly different economic demographics, communities of interest, and legislative priorities.

29.  During the election, it became apparent that because House District 5's BVAP had been lowered by the MICRC to approximately 55% (a meaningful portion of which consists of Black Voters who have relocated to white dominated suburbs in Oakland County), Candidate Davis, who is Black and who is from Wayne County, would need to perform well not only in the southern predominately Black portion of House District 5 located in Wayne County but also obtain a sizable percentage of votes from the northern predominately White portion of the District located in Oakland County.

30.  Unfortunately, based on my experience running candidate Davis' campaign (which, of course, included an extensive amount of voter outreach efforts), it became obvious that the primary election would be racially polarized with candidate Davis being the clear Black

6

candidate of choice and candidate Natalie Price, a native Ohioan and Berkley resident, being the clear White candidate of choice.

31.    Our campaign efforts in the White dominated portion of the District were exceedingly difficult and marked by a discouraging lack of reception from White voters. For example, while door knocking efforts (a critical component of voter outreach) in the predominately Black portions of the District yielded an average door open rate approximating 60% - 70%, those same efforts in the predominately White portions of the District yielded a low door open rate approximating only 10%.

32.    All too often, residents in the predominately White portions of the District would peer through their windows or doors, notice the campaign and presumably the skin color of the candidates and/or campaign staff, knowingly chose not to engage, and thus provide no opportunity to be educated about the campaign's priorities and values.

33.    By way of further example, I distinctly recall canvassing six precincts in Berkley (three precincts in State House District 5, and three precincts in State House District 6) and only succeeding in have three doors opened the entire time. This disappointment was exacerbated by one of the White residents who *did* open her door to speak with the campaign expressing that she would not be supporting any candidate "from Detroit."

34.    On the other side of the electoral equation, it was my observation that Candidate Price did very little if any serious direct voter outreach into the predominately Black neighborhoods in the District.

35.    Despite winning an overwhelming portion of the Black vote, candidate Davis lost to candidate Price, who won an overwhelming portion of the White vote.

7

36.     I presently reside in a portion of the City of Detroit located within current Senate District 10 and House District 14.

37.     A few of my community activities include serving as the executive vice chair for the 13th Congressional District of the Michigan Democratic Party, the vice chair of the Michigan Democratic Party Black Caucus, and executive director of Detroit Unity – a social welfare organization promoting voter engagement inside Michigan's African American communities. To achieve this goal, Detroit Unity has partnered with the National Democratic Party Black Caucus.

38.     I also have spent significant time following the MICRC's redistricting efforts and reviewing the Hickory and Linden Plans.

39.     The portions of Hickory and Linden Plans touching the historically protected majority/minority areas around the Detroit Metropolitan Area mark a radical change from the state House and Senate Maps adopted by the State Legislature during my tenure as a State Senator and member on the Senate's Committee on Redistricting.

40.     The most obvious and devious change is the blatant fracturing or cracking of historically protected majority/minority areas to dilute the BVAP and percentage of majority/minority precincts in the new districts touching Detroit. Tellingly, the MICRC did not implement this same fracturing of Black voters in Saginaw, Flint, and Pontiac because doing so was not necessary to benefit the electoral success of democrats generally.

41.     Setting aside statistics, any person familiar with the area demographics and communities of interest in this area surrounding Detroit can readily see (i.e., just by viewing the geography of these districts touching Detroit) the partisan strategy employed by the MICRC to maximize the electoral success of Democrats generally at the expense of the opportunity of Black Voters to elect our candidates of choice.

8

42.     Historically, Eight Mile Road has represented a line of segregation with the majority and heavily democratic Black population residing south of the line and the majority and politically mixed White population residing north of the line. Both the Hickory and Linden Plans have districts which transect this historic line of segregation in a way where the majority of the district's engaged voting population predominates north of the line.

43.     My perception and experience has been that this line of segregation is becoming more blurred between Eight Mile Road and Ten Mile Road with more Black residents relocating from Detroit to places like Eastpointe, Southfield, Oak Park, and southern Warren. However, my perception and experience has been that those Black voters who have relocated from the City of Detroit into Oakland County are now more likely to support and vote for democratic candidates from their immediate area who are mostly White candidates of choice and not the Black candidates of choice. That is, I've seen a voting preference change based on relocation of community (i.e., Wayne to Oakland County).

44.     Furthermore, it has been my perception and experience that the governmental, policy, and economic issues of voters within the City of Detroit are vastly different than the issues of the voters in the Oakland County suburbs. Just a few examples of issues of concern for predominately Black voters within Detroit that are not shared by voters within the predominately White Oakland County suburbs include gun violence, property crime, blight, illegal trash dumping, insurance rates, drag racing, and ineffective or inaccessible governmental assistance.

45.     Even where the general issues are the same, the *impact* of the issues is generally very different on Black voters in Detroit as compared to White voters in Oakland County. Black voters in Detroit have a higher tendency to need and depend on basic governmental functions in our everyday lived existence while the relationship with government of White voters in the

9

Oakland County suburbs tends to be more theoretical or academic. One example is youth education. There is a difference between meeting basic reading, writing and math standards (something important in Detroit) and how certain social concepts are taught in schools (something pronounced in the white suburbs).

46. The different needs of the very different communities of interest (i.e., the predominately Black Detroit areas and the predominately White Oakland County areas) emphasize the importance of majority/minority candidates being represented in the State Legislature by our candidates of choice.

47. Black Detroiters being represented by a White Oakland County Democratic Legislator is not a sufficient conciliation prize for being disenfranchised from being represented by our actual candidate of choice.

48. In fact, while I served in both the State House and State Senate, my colleagues and I in the Black Caucus had success addressing the specific needs of our majority/minority constituents by raising important policy issues and working with both Democrats and Republicans to enact good policy. But without Black candidates of choice serving in the Legislature in sufficient numbers, my experience is that the issues important to the majority/minority communicates will not be raised and remain unattended to.

49. If Black candidates cannot achieve a campaign door open rate in the White Oakland County suburbs above 10%, they cannot win elections in these overly diluted districts created by the Hickory and Linden Plans. And, if the prevailing White candidates do not need to or bother campaigning in the Black dominated areas of the districts created by the Hickory and Linden Plans, those White officials cannot honestly be expected to seriously focus on the issues

10

important to the majority/minority areas with which they have no lived experience and for which they devoted little, if any, time getting to know the residents and asking for their vote.

50.     Moreover, for a variety of reasons resulting from discrimination, as well as economic and educational disparity, my experience has been that -- as a starting point -- Black voters in the majority/minority areas tend to engage less in the political and electoral process than the White voters in Oakland County, creating a need for higher concentrations of Black voters in districts to elect our candidates of choice.

51.     The dilution of the Black vote effected by the Hickory and Linden Plans and associated disenfranchisement that already occurred this past election will only further discourage Black participation in future elections, creating a downward spiral of disenfranchisement.

52.     My hope and goal is that the MICRC will take these facts and experiences into consideration and redraw the Hickory and Linden Plans to create new districts where my majority/minority community will have a fair opportunity to elect candidates of our choice and candidates who will be attentive to our legislative priorities. At present, we stand disenfranchised, as already evidenced by the 2022 Democratic Primary Elections.

*[Signature page follows]*

FURTHER, Affiant sayeth not.

I DECLARE THE ABOVE STATEMENTS TO BE TRUE TO THE BEST OF MY KNOWLEDGE, INFORMATION, AND BELIEF.

Dated: March 8 , 2023

VIRGIL K. SMITH

Subscribed and sworn to before me
this 8th day of March , 2023.

Christineann Charlene Silva , Notary Public
Wayne County, Michigan .
My Commission Expires: September 15, 2024
Acting in the county of: Wayne

CHRISTINEANN CHARLENE SILVA
NOTARY PUBLIC, STATE OF MI
COUNTY OF WAYNE
MY COMMISSION EXPIRES Sep 15, 2024
ACTING IN COUNTY OF *Wayne*

12

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

DONALD AGEE, JR., an individual, *et al.,*

        Plaintiffs,

v.

JOCELYN BENSON, in her official capacity
as the Secretary of State of Michigan, *et al.*;

        Defendants.

Case No. 1:22-cv-00272

**Three-Judge Panel Appointed Pursuant to
28 U.S.C. § 2284(a)**

## AFFIDAVIT OF LAMAR LEMMONS III

STATE OF MICHIGAN    )
                   ) ss.
COUNTY OF WAYNE     )

I, LaMar Lemmons III, having been first duly sworn, deposes and states as follows:

1. I have personal knowledge concerning the statements contained in this Affidavit, and if called to testify, can testify competently to the facts stated in this Affidavit.

2. I am a Black man, former Democrat Legislator, community educator and leader, and current resident of Detroit within the recently apportioned House District 13 and Senate District 12.

3. I have substantial and intimate knowledge regarding my hometown of Detroit, Michigan, which spans a wide array of social, political, and economic matters both historic and contemporary.

4.      I grew up in the City of Detroit, attended Detroit Public Schools, and served as a social studies tutor (African American Studies) and reading instructor for the Inner-City Community Center.

5.      Over the past 50 years, I have represented my community in a wide array of various governmental and civic capacities including roles ranging from Precinct Delegate, State Legislative Staffer/Researcher, Black Slate Member, and aide to the campaign of former Detroit Mayor Coleman Young to more senior positions such as State Legislator, Detroit Public Library Commissioner, President/Member of the Detroit Board of Education, and Chief of Staff to several Detroit Legislators.

6.      Of particular import, I served as a Democrat Member of the Michigan House of Representatives (former District 2) between 1999-2002 and 2005-2006. I also served as Chief of Staff to my father, LaMar Lemmons Jr. during his second and third terms as a Democrat Member of the Michigan House of Representatives (former District 2) between 2007-2008 and 2009-2010, Policy Director to Sherry Gay-Dagnogo during her second term as a Democrat Member of the Michigan House of Representatives, and Chief of Staff to Betty Jean Alexander during her first term as a Democrat State Senator (former District 5) between 2018-2022.

7.      Since the 1970's I have served as a candidate recruiter, political/election consultant and/or campaign manager to a number of local and state-wide candidates from the City of Detroit and surrounding Metropolitan Area and been involved in or affiliated with over 100 campaigns for local or state offices. These roles demanded significant time and study of demographics, political boundaries and apportionment, voting patterns and outreach, electoral advocacy strategies, election processes, campaign finance, and, most importantly, local policy priorities.

2

8. I am also a longstanding member of the Michigan Democratic Party Black Caucus and an Alumnus of the Michigan Legislative Black Caucus. I am currently an active member of the Black Citizens Lobby which focuses on policy issues critical to Black Detroiters such as insurance, education, policing, banking, housing, affirmative action, and reparations.

9. These various civic, professional, and volunteer roles I have held over the last 50 years involved significant physical "on the ground" outreach and campaigning in both predominately Black portions of the Detroit Metropolitan Area (mostly Detroit, Inkster, Highland Park, Southfield, Harper Woods, and Lathrup Village) as well as predominately White portions of the Detroit Metropolitan Area (mostly in the suburbs of Oakland and Macomb Counties).

10. My personal experience campaigning as a Black man has been that there is a marked difference in voter reception and engagement between the predominately Black portions of the Detroit Metropolitan Area and predominately White portions of the Detroit Metropolitan Area.

11. When campaigning in predominately Black residential areas, my experience has been that voter engagement could fairly be characterized as high with general door open rates approximating 60%-70% and voters generally willing to engage in a level of listening and feedback. For partisan races, these outreach efforts focus on homes of registered Democrat voters. For ballot initiatives, these efforts focus on homes of all registered or likely voters.

12. When campaigning in predominately White residential areas, I have typically employed a strategy of canvassing homes associated with registered voters believed to be Democrats or Independents. My experience has been that voter engagement could fairly be characterized as low with general door open rates approximating 10% and voters generally unwilling to engage in a level of listening and feedback. One strategy I have employed to obtain

3

higher voter engagement when canvassing in predominately White areas is to form multiracial teams of two (e.g., one Black and one White campaign staff) and have these teams knock doors together. While this strategy improves engagement levels, it is a less efficient usage of campaign resources and not a feasible option for all campaigns.

13.     Furthermore, my experience and perception has been that voter engagement with Black candidates and campaign staff in the predominately White areas ranges, more often than one might expect, from subtly to overtly discriminatory.

14.     For example, residents in the more upper or middle class predominately White areas will often peer through their windows or doors (or even cameras now), notice the campaign and presumably the skin color of the candidates and/or campaign staff, knowingly chose not to engage, and thus provide no opportunity to be educated about the campaign's priorities and values. Residents in the more lower-class predominately White areas engage in this same behavior but will on occasion also engage in hostile and derogatory behavior ranging from dismissive rudeness to outright racial name calling and threats to leave the property or neighborhood. My observation has been that this more hostile behavior is most frequent in areas like Warren, Roseville, Centerline, and even St. Clair Shores.

15.     Unfortunately, I have not perceived any material change in the quality or quantity of these discriminatory behaviors over the last fifty years and I still encourage the exercise of caution for candidates who chose to campaign while Black in these areas. In fact, a colleague and current African American State Legislator I know reported that he recently had a White resident brandish a gun at him while campaigning in a predominately White area during the 2022 election. This occurred a in a predominately White trailer-park.

4

16.     Conversely, my experience and perception has been that White candidates from the predominately White suburbs of Detroit do very little direct voter outreach into the predominately Black neighborhoods in Detroit.

17.     My observation has been that this racial polarization generally carries over into participation in the electoral process and voting patterns in Democrat primary elections. My observation has been that, all things being equal, Black democrat primary voters from the predominately Black areas will generally prefer and vote for a Black democrat primary candidate over a White democrat primary candidate and, similarly, White democrat primary voters from the predominately White areas will generally even more strongly prefer and vote for a White democrat primary candidate over a Black democrat primary candidate. There are exceptions, but this has been my personal experience over the last 50 years in the Detroit Metropolitan Area.

18.     My further perception has been that electoral outcomes between Black democrat primary candidates of choice and White democrat primary candidates of choice are often not equal where (i) Black residents from the predominately Black portions of the Detroit Metropolitan Area tend to vote at lower rates than White residents from the predominately White portions of the Detroit Metropolitan Area; and (ii) White democrat primary candidates from the predominately White portions of the Detroit Metropolitan Area have more financial support and resources than Black democrat primary candidates from the predominately Black portions of the Detroit Metropolitan Area.

19.     This second point is worth emphasizing as my perception has been that a disparity of financial support and resources can have a significant impact on an election. There is a readily apparent and tremendous economic divergence between the predominately Black portions of the

5

Detroit Metropolitan Area, which tend to have less economic resources, and the predominately White portions of the Detroit Metropolitan Area which tend to have more economic resources.

20.     Indeed, my personal experience has been that a sizable portion of the funding of Democrat primary campaigns originates from what I have long referred to as the "Oakland County Money Machine." White Democrat primary candidates from these predominately White and significantly more wealthy areas in Oakland County have a natural fundraising advantage over Black Democrat primary candidates from the predominately Black and more economically disadvantaged areas in Wayne County. This has been evident not only in my review of campaign finance reports of candidate committees and political action committees but also my review of the all-too-often obscured political advocacy communications funded by so-called social welfare organizations operating under Section 501(C)(4) of the Internal Revenue Code.

21.     I spent considerable time following the efforts of the Michigan Independent Citizens Redistricting Commission (MICRC), analyzing the MICRC's Linden Plan for the State Senate, and participating in and analyzing the 2022 Democrat Primary Elections for Senate Districts 1, 2, 5, 6, 7, 8, and 11.

22.     The Senate Districts from the Linden Plan that touch the historically protected majority/minority portions of the Detroit Metropolitan Area are fundamentally different geographically and demographically from the previous Senate Districts in that same area that had been adopted by the State Legislature over the last fifty years.

23.     The most palpable modification is the MICRC's splintering of long established and protected majority/minority areas to lower the Black Voting Act Population (BVAP) and percentage of majority/minority precincts in the new districts touching Detroit and other predominately Black communities in the Detroit Metropolitan Area.

6

24.     A simple understanding of the racial demographics and history of discrimination in the Detroit Metropolitan Area reveals the partisan strategy employed wittingly or unwittingly by the MICRC or its professional staff to maximize the electoral success of Democrats generally at the expense of the opportunity of Black voters to elect our candidates of choice.

25.     Historically, Eight Mile Road has represented a line of segregation with the majority and heavily democratic Black population residing south of the line in Wayne County and the majority and politically mixed White population residing north of the line in Oakland and Macomb Counties. That historic line of segregation has shifted slightly north with Ten Mile Road now being the new Eight Mile Road in my estimation. But leave no doubt, the Linden Plan's multi-county Senate Districts blatantly transect this line of segregation in a way where the majority of those districts' voting-age population predominates north of the line in the predominately White and more wealthy areas.

26.     The historic lines of segregation to the west and south of Detroit are more complex but, just like the obvious transection to the north, the Senate Districts in the Linden Plan intentionally transect these lines to splinter the Black community and create Senate Districts with White majorities.

27.     My view is that the Linden Plan represents an obvious and intentional effort to splinter Black communities of interest, dilute Black voting power, discourage Black candidates from running for office, and destroy the Detroit Democratic Black Caucus.

28.     One example from the 2022 election cycle of the adverse impact of the Linden Plan on my Communities' ability to elect our candidates of choice is Senate District 8 which is an elongated district with its southern 1/3 comprising a predominately Black portion of the City of Detroit in Wayne County and its northern 2/3s comprising a conglomeration of predominately

7

White suburbs such as Ferndale, Berkley, Birmingham, Royal Oak, and portions of Clawson in Oakland County. These two southern/northern portions of the District are also characterized by starkly different economic demographics, communities of interest, and legislative priorities. Because the MICRC set Senate District 8's BVAP at only 40.2% and because of the economic, educational, and other advantages enjoyed by White candidates hailing from the northern predominately White portions of this District, I was concerned that it would be exceedingly difficult for any Black candidate of choice to prevail in a Democrat primary election for this District.

29. That concern materialized in the 2022 Democrat primary where Senator Marshall Bullock, a Black man from Wayne County and the clear Black candidate of choice, lost to Senator McMorrow, a White woman from Oakland County and the clear White candidate of choice. Senator McMorrow attracted significantly more financial resources and support to her election effort than Senator Bullock and, to my knowledge, she did not conduct any serious direct voter outreach into the predominately Black neighborhoods in the District.

30. Another example from the 2022 election cycle of the adverse impact of the Linden Plan on my communities' ability to elect our candidates of choice is Senate District 5 which connects the predominately Black community of Inkster with several predominately White communities including the much more wealthy and politically powerful communities of Canton and Livonia. With respect to Livonia, in particular, I am personally aware of this City's history of discrimination against people of color including local government intervention during the early 1990s to prevent bus route into the community from Detroit and other predominately Black neighborhoods.

8

31. In any event, Inkster has starkly different economic demographics, communities of interest, and legislative priorities than the rest of the District especially Canton and Livonia. Because the MICRC placed Inkster in Senate District 5 which has a BVAP at only 18.3%, I was concerned that it would be exceedingly difficult for any Black candidate of choice to prevail in a Democrat primary election for this District.

32. That concern materialized in the 2022 Democrat primary where Senator Dayna Polehanki, a White woman from Livonia and the clear White candidate of choice, defeated Velma Jean Overman, a Black woman from Inkster and clear Black candidate of choice, by a margin closely related to racial demographics. Dayna Polehanki attracted significantly more financial resources and support to her election effort than Velma Jean Overman and, to my knowledge, she did not conduct any serious direct voter outreach into the predominately Black neighborhoods in the District.

33. Another example from the 2022 election cycle of the adverse impact of the Linden Plan on my communities' ability to elect our candidates of choice is Senate District 11 which connects the predominately Black communities of Detroit and Eastpoint with the predominately White Macomb County suburbs of Clinton Township, Fraser, and Roseville. These areas represent very different communities of interest with different economic demographics and legislative priorities. Because the MICRC placed Detroit and Eastpointe in Senate District 11 which has a BVAP at only 19.2%, I was concerned that it would be doubtful for any Black candidate of choice to prevail in a Democrat primary election for this District. That concern materialized in the 2022 Democrat primary where Veronica Klinefeldt, a White council woman from Eastpointe and the clear White candidate of choice, defeated Monique Owens, a Black woman and first African American Mayor of Eastpointe.

9

34.     Another concerning District is Senate District 6 with a BVAP of only 39.1%. The prevailing candidate from the 2022 Democrat primary election for this District was the former State Representative Mary Cavanaugh, a well-known woman from the predominately White City of Redford and who has a very light complexion. She is part Latina/Caucasian with an Irish last name, and not surprisingly was the clear White candidate of choice. One of her primary challengers, Darryl Brown, a Black man from Detroit and former Detroit Police Commissioner and Firefighter, won a large percentage of the Black vote but only a very small percentage of the White vote. With a BVAP of 39.1% my perception is that it will be exceedingly difficult for Black voters from the Detroit portion of District 6 to elect their candidates of choice where again a large portion of this District spans into the White dominated suburbs of Redford, Livonia, Farmington, and Farmington Hills.

35.     Despite the 2022 cycle resulting in women of color winning Senate Districts 1 (BVAP 35%) and 2 (BVAP 24.5%), I still maintain my concern that the MICRC set the BVAPs for those Senate Districts far too low for Black candidates of choice to prevail in future elections. Like a few of the Senate Districts I briefly discuss above, Senate Districts 1 and 2 appear to be based on the same stratagem of splintering the Black vote and mixing Black communities into the predominately White political boundaries created by the MICRC. I view the 2022 Democrat primary results, where women of color prevailed, as anomalies and due to the unique circumstances and characteristics of the candidates themselves.

36.     By way of example, incumbent Senator Erica Geiss, a Black woman from the predominately White City of Taylor, has a Caucasian sounding name and is married to Doug Geiss, a white man who serves as Chairman of the Taylor City Council and who formerly served as a State Representative in this area. Senator Geiss won a crowed primary to become the Democrat

10

candidate for Senate District 1 despite being neither the White nor Black candidate of choice. The clear Black candidate of choice for Senate District 1 was Brenda Sanders, a former Judge from Detroit. Not surprisingly, candidate Sanders did not get much traction with the White electorate. With a BVAP of only 35%, my perception is that it will be exceedingly difficult for Black voters from the Detroit portion of District 1 to elect their candidates of choice where again the majority portion of this District wraps from Detroit down into the White dominated suburbs of Allen Park, Lincoln Park, and Taylor.

37.     By way of further example, incumbent Senator Sylvia Santana, a former State Representative and Black woman from Detroit, easily won her reelection bid for Senate District 2 against Maurice Sanders, a Black man. What is notable is that Senator Santana did not have a White challenger but this was arranged by way of a compromise. Senate Candidate Adel Mozip from Dearborn withdrew his candidacy and supported the long-term incumbent Santana after the two met at Haraz Coffee and the National Arab-Yemeni Association's main office in Dearborn. Senator Santana then received the endorsement from Adel Mozip and the Arab American PAC. With only a 24.5% BVAP and a population dominated by the wealthy and politically powerful Middle-Eastern community (which is coded as White in the census) from Dearborn, Black voters from Detroit are not likely to have any success electing their candidate of choice in future elections.

38.     Another sign of adverse impacts to come from the Linden Plan on my communities' ability to elect our candidates of choice is Senate District 7, an elongated district which mixes the predominately Black communities of Detroit, Southfield, and Pontiac in with the predominately White, ultra-wealthy, and exceedingly powerful communities of Franklin, Bloomfield, Bloomfield Hills, Beverly Hills, and Auburn Hills. The predominately Black communities of District 7 have

11

vastly different economic demographics and legislative priorities than the predominately White communities of District 7.

39.     And, while District 7 has the highest BVAP (i.e., 44.8%) in the Linden Plan, I was nonetheless concerned that it would be exceedingly difficult for any Black candidate of choice to prevail in a Democrat primary election for this District where the predominately White portions of the District are comprised of a sizeable portion of what I refer to as the "Oakland County Money Machine." Both financial advantages and incumbency dissuade challengers especially minority challengers with less resources.

40.     That concern was not contradicted in the 2022 Democrat primary where the incumbent Senator Jeremy Moss, a White man from Southfield, soundly defeated the newcomer Ryan Foster, a Black man from Detroit. Senator Moss had a significant incumbency advantage and attracted significantly more financial resources and support to his election effort than Ryan Foster who ran on a simple platform aimed at the average working person.

41.     In conclusion, my concern is that the dilution of the Black democrat primary voters effected by the Linden Plan and associated disenfranchisement that already occurred this past election will only further discourage Black participation in future elections, creating a downward spiral of disenfranchisement.

42.     Black Democrat voters from the predominately Black portions in the Detroit Metropolitan Area being represented by White Senators from the predominately White portions in the Detroit Metropolitan Area is not a sufficient representation of majority/minority interests.

43.     There is a massive disparity of interest on insurance, education, policing and criminal justice banking, housing, affirmative action, and reparations policies between Black urban voters and White suburban voters in the Detroit Metropolitan Area.

12

44.     One prime example involves viewpoints and policy decisions related to the Michigan Emergency Manager Referendum, also known as Public Act 4 of 2011, Local Government and School District Fiscal Accountability Act, which was on the November 6, 2012 statewide ballot in Michigan as Proposal 1 of 2012. While 82% of Detroit voters opposed the Emergency Manager Law, only 53% of voters statewide opposed the Emergency Manager Law representing a clear distinction between White and Black policy preference.

45.     There are several other geographic examples demonstrating the racial polarization of this issue. In Oakland County, 80% of the predominately Black City of Pontiac voted "no" whereas over 80% of the predominately White City of Birmingham voted "yes." In Macomb County, another telling contrast is the predominately Black area of Eastpointe which voted "no" by a huge margin and the predominately White areas of Shelby, Bruce, and Washington Townships which voted "yes" by a big margin. Similarly, another massive difference from Wayne County was the predominately Black areas of Detroit/Inkster which overwhelming voted "no" and the predominately White areas of Grosse Point, Plymouth, and Northville which voted "yes" by a wide margin.

46.     What's more, my further understanding is that, at that time, 52% of Michigan's African American population resided in cities with an emergency manager, a consent agreement, or a transition advisory board. While, at the same time, only about 2% of Michigan's white citizens lived in communities governed by an emergency manager.

47.     Similar examples of racially polarized issue voting in the Detroit Metropolitan Area are the 2006 affirmative action ballot initiative and then legislation removing the largest and only Black elected school board which became Act 10 of 1999.

48.     My hope and goal is that the MICRC will take these facts and experiences into consideration and redraw the Linden Plan to create new districts where my majority/minority community will have a fair opportunity to elect candidates of our choice and candidates who will be attentive to our legislative priorities. At present, we stand disenfranchised, as already evidenced by the 2022 Democratic Primary Elections and the lack of the current State Legislature prioritizing any of the primary policy issues of the Black community.

FURTHER, Affiant sayeth not.

I DECLARE THE ABOVE STATEMENTS TO BE TRUE TO THE BEST OF MY KNOWLEDGE, INFORMATION, AND BELIEF.

Dated: March 28, 2023                    LaMar Lemmons III

Subscribed and sworn to before me
this 28th day of March, 2023.

Mary M. LaCroix, Notary Public
Macomb County, MI
My Commission Expires: 03/19/2029
Acting in the county of Wayne

MARY M. LACROIX
NOTARY PUBLIC, STATE OF MI
COUNTY OF MACOMB
MY COMMISSION EXPIRES Mar 19, 2029
ACTING IN COUNTY OF Wayne

14

**JA00534**

DocuSign Envelope ID: 7EF0EA88-5523-456F-B4C9-3C5993A40541

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

DONALD AGEE, JR., an individual, *et al.,*

     Plaintiffs,

v.

JOCELYN BENSON, in her official capacity as the Secretary of State of Michigan, *et al.*;

    Defendants.

Case No. 1:22-cv-00272

**Three-Judge Panel Appointed Pursuant to 28 U.S.C. § 2284(a)**

## PLAINTIFF JEROME BENNETT'S OBJECTIONS AND RESPONSES TO THE COMMISSION'S FIRST SET OF INTERROGATORIES

Plaintiff Jerome Bennett ("Plaintiff"), by and through his counsel, pursuant to Federal Rule of Civil Procedure 33, objects and responds as follows to the First Set of Interrogatories submitted by Defendant Michigan Independent Citizens Redistricting Commission, and Douglas Clark, Juanita Curry, Anthony Eid, Rhonda Lange, Steven Terry Lett, Brittni Kellom, Cynthia Orton, M.C. Rothhorn, Rebecca Szetela, Janice Vallette, Erin Wagner, Richard Weiss, and Dustin Witjes, each in his or her official capacity as a Commissioner of the Michigan Independent Redistricting Commission (collectively, the "Commission").

### GENERAL OBJECTIONS

Plaintiff interposes the following general objections to the Commission's First Set of Interrogatories. Plaintiff's objections set forth in a certain response are in addition to the general limitations and objections set forth in this section. These limitations and objections form a part of Plaintiff's response to each and every Interrogatory; thus, the absence of a reference to a general

21.     Plaintiff objects to the Commission's "Definitions and Instructions" as improper and unduly burdensome to the extent that any of them purport to impose any obligation broader than those set forth in the Federal Rules of Civil Procedure or purport to define terms or phrases in a manner different from their ordinary common meaning.

22.     Plaintiff objects to the Interrogatories to the extent that any Interrogatory assumes or implies the existence of any rule of law or that Plaintiff consents to or agrees with the Commission's interpretation of any law or any legal duty or obligation on the part of Plaintiff.

23.     Plaintiff objects to the extent any Interrogatory calls for Plaintiff or Plaintiff's counsel to interpret terms, including legal terms and terms calling for the formation of a legal conclusion, on the grounds that the Interrogatories are vague and susceptible to differing interpretations, may call for lay witnesses to form legal conclusions, and may invade the attorney-client privilege.

24.     Plaintiff's objections and responses are based upon information presently known and available and Plaintiff reserves the right to amend, correct, or supplement these responses up to the close of discovery.

Subject to the foregoing general objections and limitations, and further subject to the particular objections set forth below, Plaintiff responds as follows:

## INTERROGATORIES

**INTERROGATORY NO. 1**
For each Plaintiff, Describe in detail the Plaintiff's voter registration history since January 1, 2008, including the Plaintiff's

    A. full legal name
    B. date of birth
    C. each address where the Plaintiff was registered to vote since January 1, 2008
    D. the district number of each Michigan State House resided in since January 1, 2008
    E. the district number of each Michigan State Senate district the Plaintiff resided in since January 1, 2008
    F. and, if the Plaintiff became registered to vote after January 1, 2008, the date the

5

Plaintiff became registered to vote in Michigan.

**RESPONSE: Plaintiff objects to this Interrogatory as overly-broad, unreasonably-burdensome, oppressive, and harassing. Plaintiff further objects to this Interrogatory as it requires review of information and documents that are not reasonably accessible because they cannot be retrieved or produced without undue burden and/or cost. Plaintiff further objects to this Interrogatory as it requests information Plaintiff simply does not know or could reasonably know. Plaintiff further objects to this Interrogatory as it requests to produce information or documents which are not in Plaintiff's possession, custody or control, and which are equally available to, or are already in the possession of the Commission and/or Defendant Benson. Plaintiff further objects to this Interrogatory as it requests information that is publicly available. Plaintiff further objects to this Interrogatory as it seeks information not relevant to the claims and defenses at issue in this action and, therefore, outside the proper scope of discovery. To the extent that a response is required, and without waiving any objections, Plaintiff responds to this Interrogatory as follows:**

A. **Jerome Charles Bennett.**
B. **July 31, 1978.**
C. **1159 Gray St., Detroit, MI 48215 (2008 – 2019); 13112 Couwlier Ave., Warren, MI 48089 (2019 - 2022); 8318 Maxell, Warren, MI 48089 (August 2022 – present).**
D. **House District 2 (2011 – 2019); House District 22 (2019 – 2021); House District 13 (2022); House District 14 (August 2022 – present).**
E. **Senate District 1 (2011 – 2019); Senate District 9 (2019 – 2021); Senate District 10 (2022 – present).**
F. **N/a. Plaintiff has been registered to vote in Michigan prior to January 1, 2008.**

**INTERROGATORY NO.  2**

For each Plaintiff,

A. Describe in detail all political party affiliations the Plaintiff has had since January 1, 2008,
B. including but not limited to any political parties the Plaintiff has been a member of,
C. the date(s) during which the Plaintiff was so affiliated,
D. and any party offices, roles, or positions the Plaintiff has held.

**RESPONSE: Plaintiff objects to this Interrogatory as overly-broad, unreasonably-burdensome, oppressive, and harassing. Plaintiff further objects to this Interrogatory as it requires review of information and documents that are not reasonably accessible because they cannot be retrieved or produced without undue burden and/or cost. Plaintiff further objects to this Interrogatory as it requests information Plaintiff simply does not know or could reasonably know. Plaintiff further objects to this Interrogatory as it requests to produce information or documents which are not in Plaintiff's possession, custody or control, and which are equally available to, or are already in the possession of the Commission and/or Defendant Benson. Plaintiff further objects to this Interrogatory as it requests information that is publicly available. Plaintiff further objects to this Interrogatory as it seeks information not relevant to the claims and defenses at issue in this action and, therefore, outside the proper**

6

## **VERIFICATION**

STATE OF MICHIGAN        )
                                      )ss.
COUNTY OF MACOMB        )

       Jerome Bennett, being first duly sworn, deposes and says that he has read the foregoing Responses to The Commission's First Set of Interrogatories, and knows the content thereof; that said responses were prepared with the assistance and advice of counsel; that the responses set forth therein, subject to inadvertent or undiscovered errors, are based on and therefore necessarily limited by the records and information still in existence, presently recollected and thus far discovered in the course of the preparation of the responses; that consequently he reserves the right to make any changes in the responses if it appears at any time that omissions or errors may have been made therein or that more accurate information is or may become available; and that subject to the limitations set forth herein, the said responses are true to the best of his information, knowledge and belief.

_____

By: Jerome Bennett

CLARKHILL\L1503\442579\270796060.v2-3/6/23

As to objections only pursuant to Fed. R. Civ. P. 33(b)(5):

Dated: March 7, 2023

/s/ *John J. Bursch*
John J. Bursch (P57679)
BURSCH LAW PLLC
*Attorney for Plaintiffs*
9339 Cherry Valley Ave SE, #78
Caledonia, Michigan 49316
(616) 450-4235
jbursch@burschlaw.com

Michael J. Pattwell (P72419)
James J. Fleming (P84490)
Amia A. Banks (P84182)
CLARK HILL PLC
*Attorneys for Plaintiffs*
215 South Washington Square, Suite 200
Lansing, MI 48933
(517) 318-3100
mpattwell@clarkhill.com
jfleming@clarkhill.com
abanks@clarkhill.com

20

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

DONALD AGEE, JR., an individual, *et al.*,

    Plaintiffs,

v.

JOCELYN BENSON, in her official capacity
as the Secretary of State of Michigan, *et al.*;

    Defendants.

Case No. 1:22-cv-00272

**Three-Judge Panel Appointed Pursuant to
28 U.S.C. § 2284(a)**

## PLAINTIFF DENNIS LEROY BLACK, JR.'S OBJECTIONS AND RESPONSES TO THE COMMISSION'S FIRST SET OF INTERROGATORIES

Plaintiff Dennis Leroy Black, Jr. ("Plaintiff"), by and through his counsel, pursuant to Federal Rule of Civil Procedure 33, objects and responds as follows to the First Set of Interrogatories submitted by Defendant Michigan Independent Citizens Redistricting Commission, and Douglas Clark, Juanita Curry, Anthony Eid, Rhonda Lange, Steven Terry Lett, Brittni Kellom, Cynthia Orton, M.C. Rothhorn, Rebecca Szetela, Janice Vallette, Erin Wagner, Richard Weiss, and Dustin Witjes, each in his or her official capacity as a Commissioner of the Michigan Independent Redistricting Commission (collectively, the "Commission").

## GENERAL OBJECTIONS

Plaintiff interposes the following general objections to the Commission's First Set of Interrogatories. Plaintiff's objections set forth in a certain response are in addition to the general limitations and objections set forth in this section.  These limitations and objections form a part of Plaintiff's response to each and every Interrogatory; thus, the absence of a reference to a general

21.     Plaintiff objects to the Commission's "Definitions and Instructions" as improper and unduly burdensome to the extent that any of them purport to impose any obligation broader than those set forth in the Federal Rules of Civil Procedure or purport to define terms or phrases in a manner different from their ordinary common meaning.

22.     Plaintiff objects to the Interrogatories to the extent that any Interrogatory assumes or implies the existence of any rule of law or that Plaintiff consents to or agrees with the Commission's interpretation of any law or any legal duty or obligation on the part of Plaintiff.

23.     Plaintiff objects to the extent any Interrogatory calls for Plaintiff or Plaintiff's counsel to interpret terms, including legal terms and terms calling for the formation of a legal conclusion, on the grounds that the Interrogatories are vague and susceptible to differing interpretations, may call for lay witnesses to form legal conclusions, and may invade the attorney-client privilege.

24.     Plaintiff's objections and responses are based upon information presently known and available and Plaintiff reserves the right to amend, correct, or supplement these responses up to the close of discovery.

Subject to the foregoing general objections and limitations, and further subject to the particular objections set forth below, Plaintiff responds as follows:

## INTERROGATORIES

**INTERROGATORY NO. 1**
For each Plaintiff, Describe in detail the Plaintiff's voter registration history since January 1, 2008, including the Plaintiff's

      A. full legal name
      B. date of birth
      C. each address where the Plaintiff was registered to vote since January 1, 2008
      D. the district number of each Michigan State House resided in since January 1, 2008
      E. the district number of each Michigan State Senate district the Plaintiff resided in since January 1, 2008
      F. and, if the Plaintiff became registered to vote after January 1, 2008, the date the

Plaintiff became registered to vote in Michigan.

**RESPONSE: Plaintiff objects to this Interrogatory as overly-broad, unreasonably-burdensome, oppressive, and harassing. Plaintiff further objects to this Interrogatory as it requires review of information and documents that are not reasonably accessible because they cannot be retrieved or produced without undue burden and/or cost. Plaintiff further objects to this Interrogatory as it requests information Plaintiff simply does not know or could reasonably know. Plaintiff further objects to this Interrogatory as it requests to produce information or documents which are not in Plaintiff's possession, custody or control, and which are equally available to, or are already in the possession of the Commission and/or Defendant Benson. Plaintiff further objects to this Interrogatory as it requests information that is publicly available. Plaintiff further objects to this Interrogatory as it seeks information not relevant to the claims and defenses at issue in this action and, therefore, outside the proper scope of discovery. To the extent that a response is required, and without waiving any objections, Plaintiff responds to this Interrogatory as follows:**

    A. **Dennis Leroy Black, Jr.**
    B. **June 22, 1991.**
    C. **Various addresses within the campus of Wayne State University (2010 – 2014); 243 Field St., Detroit, MI 48214 (2014 – 2015); 487 Baldwin St., Detroit, MI 48214 (2015 – 2017); 861 Taylor St., Detroit, MI 48202 (2017 – 2020); 19341 Schoenherr St., Detroit, MI 48205 (2020 – 2021); 19140 Algonac St., Detroit, MI 48234 (2021 – 2022); 9491 McDougall St., Hamtramck, MI 48212 (August 2022 – present).**
    D. **House District 6 (2014 – 2017); House District 4 (2017 – 2020); House District 3 (2020 – 2021); House District 13 (January 2022 – August 2022); House District 9 (August 2022 – present).**
    E. **Senate District 1 (2014 – 2017); Senate District 2 (2017 – 2021); Senate District 10 (January 2022 – August 2022); Senate District 3 (August 2022 – present).**
    F. **To the best of Plaintiff's knowledge and recollection, Plaintiff became eligible and registered to vote in approximately 2009.**

**INTERROGATORY NO.  2**

For each Plaintiff,

    A. Describe in detail all political party affiliations the Plaintiff has had since January 1, 2008,
    B. including but not limited to any political parties the Plaintiff has been a member of,
    C. the date(s) during which the Plaintiff was so affiliated,
    D. and any party offices, roles, or positions the Plaintiff has held.

**RESPONSE: Plaintiff objects to this Interrogatory as overly-broad, unreasonably-burdensome, oppressive, and harassing. Plaintiff further objects to this Interrogatory as it requires review of information and documents that are not reasonably accessible because they cannot be retrieved or produced without undue burden and/or cost. Plaintiff further objects to this Interrogatory as it requests information Plaintiff simply does not know or could reasonably know. Plaintiff further objects to this Interrogatory as it requests to produce**

### **VERIFICATION**

STATE OF MICHIGAN                )
                                               )ss.
COUNTY OF WAYNE               )

      Dennis Leroy Black, Jr., being first duly sworn, deposes and says that he has read the foregoing Responses to The Commission's First Set of Interrogatories, and knows the content thereof; that said responses were prepared with the assistance and advice of counsel; that the responses set forth therein, subject to inadvertent or undiscovered errors, are based on and therefore necessarily limited by the records and information still in existence, presently recollected and thus far discovered in the course of the preparation of the responses; that consequently he reserves the right to make any changes in the responses if it appears at any time that omissions or errors may have been made therein or that more accurate information is or may become available; and that subject to the limitations set forth herein, the said responses are true to the best of hid information, knowledge and belief.

*Dennis Black*

_____

By: Dennis Leroy Black, Jr.

20

As to objections only pursuant to Fed. R. Civ. P. 33(b)(5):

Dated: March 21, 2023

/s/ *John J. Bursch*
John J. Bursch (P57679)
BURSCH LAW PLLC
*Attorney for Plaintiffs*
9339 Cherry Valley Ave SE, #78
Caledonia, Michigan 49316
(616) 450-4235
jbursch@burschlaw.com

Michael J. Pattwell (P72419)
James J. Fleming (P84490)
Amia A. Banks (P84182)
CLARK HILL PLC
*Attorneys for Plaintiffs*
215 South Washington Square, Suite 200
Lansing, MI 48933
(517) 318-3100
mpattwell@clarkhill.com
jfleming@clarkhill.com
abanks@clarkhill.com

21

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

|  |  |
|---|---|
| DONALD AGEE, JR., an individual, *et al.*, | |
| Plaintiffs, | Case No. 1:22-cv-00272 |
| v. | **Three-Judge Panel Appointed Pursuant to 28 U.S.C. § 2284(a)** |
| JOCELYN BENSON, in her official capacity as the Secretary of State of Michigan, *et al.*; | |
| Defendants. | |

## PLAINTIFFS' OBJECTIONS AND RESPONSES TO THE COMMISSION'S FIRST SET OF REQUESTS FOR ADMISSIONS

Plaintiffs ("Plaintiffs"), by and through their counsel, pursuant to Federal Rule of Civil Procedure 36, object and respond as follows to the First Set of Requests for Admissions submitted by Defendant Michigan Independent Citizens Redistricting Commission, and Douglas Clark, Juanita Curry, Anthony Eid, Rhonda Lange, Steven Terry Lett, Brittni Kellom, Cynthia Orton, M.C. Rothhorn, Rebecca Szetela, Janice Vallette, Erin Wagner, Richard Weiss, and Dustin Witjes, each in his or her official capacity as a Commissioner of the Michigan Independent Redistricting Commission (collectively, the "Commission").

### GENERAL OBJECTIONS

Plaintiffs interpose the following general objections to the Commission's First Set of Requests for Admissions. Plaintiffs' objections set forth in a certain response are in addition to the general limitations and objections set forth in this section. These limitations and objections form a part of Plaintiffs' response to each and every Request for Admission; thus, the absence of a

susceptible to differing interpretations. Plaintiffs further object to this Request for Admission as vague and ambiguous because it is unclear what is meant by the phrase "2011 Redistricting Criteria." Plaintiffs further object as this Request for Admission seeks information pertaining to the Commission's process for configuring a Redistricting Plan that Plaintiffs simply do not know or could not reasonably know. To the extent that a response is required, and without waiving any objections, Plaintiffs admit the corresponding Request for Admission only to the extent that the Commission is responsible for complying with all laws, statutes, rules, regulations, and/or case law applicable to the Commission in carrying out its duties proscribed under law or otherwise.

## REQUEST FOR ADMISSION NO. 6

Admit that there has only been one statewide Democratic primary in the state of Michigan in the Previous Decade.

**RESPONSE: Plaintiffs object to this Request for Admission as it seeks publicly available information already available to the Commission. Plaintiffs further object to this Request for Admission as not relevant to the claims and defenses at issue in this case. To the extent that a response is required, and without waiving any objections, and as relevant in this case, Plaintiffs admit the corresponding Request for Admission.**

## REQUEST FOR ADMISSION NO. 7

Admit that Plaintiff Norma McDaniel was a plaintiff in *Detroit Caucus v. Independent Citizens Redistricting Commission*, 969 N.W.2d 331 (Mich. 2022).

**RESPONSE: Plaintiffs object to this Request for Admission as it seeks publicly available information already available to the Commission. Plaintiffs further object to this Request for Admission as not relevant to the claims and defenses at issue in this case. To the extent**

CLARKHILL\L1503\442579\270407087.v4-3/6/23

that a response is required, and without waiving any objections, and as relevant in this case, Plaintiffs admit the corresponding Request for Admission only to extent that the names of the plaintiffs in the above-captioned case, that has been fully disposed for over one-year, are self-evident.

**REQUEST FOR ADMISSION NO. 8**

Admit that the Commission did not set a mechanical threshold of obtaining 50% BVAP in any Challenged District.

**RESPONSE: Plaintiffs object to this Request for Admission as it calls for an interpretation of legal terms and terms calling for the formation of a legal conclusion and is thus improper under Fed. R. Civ. P. 36(a)(1)(A).** *United States v. Petroff-Kline***, 557 F.3d 285, 293 (6th Cir. 2009). Plaintiffs further object on the grounds that this Request for Admission is vague and susceptible to differing interpretations. Plaintiffs further object to this Request for Admission as outside of the scope of discovery pursuant to Fed. R. Civ. P. 26(b)(1). Plaintiffs further object to this Request for Admission as vague and ambiguous because it is unclear what is meant by the phrase "mechanical threshold." Plaintiffs further object as this Request for Admission seeks information pertaining to the Commission's process for configuring a Redistricting Plan that Plaintiffs simply do not know or could not reasonably know. To the extent that a response is required, and without waiving any objections, Plaintiffs neither admit nor deny the corresponding Request for Admission due to a lack of knowledge or information under Fed. R. Civ. P. 36(a)(4) regarding the Commission's intent. That said, based solely on the objective criteria shown in the Expert Report of Sean P. Trende dated January 18, 2023, and the Benchmark Plan discussed therein ("Benchmark Plan") — it appears inescapable that the Commission's primary motivation was to increase the number**

10

of Democratic-majority districts at the expense of Detroit-area Black voters. Specifically, the Benchmark Plan contained nine House districts with a BVAP of 56.0% or higher and the adopted Hickory Plan contained zero such districts. In addition, the Benchmark Plan contained four Senate districts with a BVAP of 45.0% or higher and the adopted Linden Plan contained zero.

Respectfully submitted,

Dated: March 6, 2023

/s/ *John J. Bursch*
John J. Bursch (P57679)
BURSCH LAW PLLC
*Attorney for Plaintiffs*
9339 Cherry Valley Ave SE, #78
Caledonia, Michigan 49316
(616) 450-4235
jbursch@burschlaw.com

Michael J. Pattwell (P72419)
James J. Fleming (P84490)
Amia A. Banks (P84182)
CLARK HILL PLC
*Attorneys for Plaintiffs*
215 South Washington Square, Suite 200
Lansing, MI 48933
(517) 318-3100
mpattwell@clarkhill.com
jfleming@clarkhill.com
abanks@clarkhill.com

CLARKHILL\L1503\442579\270407087.v4-3/6/23

**IN THE STATE OF MICHIGAN**
**IN THE SUPREME COURT**

DETROIT CAUCUS; ROMULUS CITY COUNCIL; INKSTER CITY COUNCIL; TENISHA YANCY, as a State Representative and individually; SHERRY GAY-DAGNOGO, as a Former State Representative and individually; TYRONE CARTER, as a State Representative and individually; BETTY JEAN ALEXANDER, as a State Senator and individually, Hon. STEPHEN CHISHOLM, as member of Inkster City Council and individually, TEOLA P. HUNTER, as a Former State Representative and individually; Hon. KEITH WILLIAMS, as Chair MDP Black Caucus and individually; DR. CAROL WEAVER, as 14th Congressional District Executive Board Member and individually; WENDELL BYRD, as a Former State Representative and individually; SHANELLE JACKSON, as a Former State Representative and individually; LAMAR LEMMONS, as a Former State Representative and individually; IRMA CLARK COLEMAN, as a Former Senator & Wayne County Commissioner and individually; LAVONIA PERRYMAN, as representative of the Shirley Chisholm Metro Congress of Black Women and individually; ALISHA BELL, as Chair of the Wayne County Commission and individually; NATALIE BIENAIME, as a Citizen of the 13th District; OLIVER COLE, as a resident of Wayne County;   ANDREA THOMPSON, as a resident of Detroit; DARRYL WOODS, as a resident of Wayne County, NORMA D. MCDANIEL, as a Resident of Inkster; MELISSA D. MCDANIEL, as a resident of Canton, CHITARA WARREN, as a resident of Romulus; JAMES RICHARDSON, as a resident of Inkster, ELENA HERRADA, as a resident of Detroit

*Plaintiffs,*

*v.*

Supreme Court Case No.  163926

Jurisdiction: Original Pursuant to Mich. Const. Art. 4, §6(19).

**FIRST AMENDED VERIFIED COMPLAINT**

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

RECEIVED by MSC 1/10/2022 9:35:08 PM

JA00549

RECEIVED by MSC 1/10/2022 9:35:08 PM

MICHIGAN INDEPENDENT CITIZENS
REDISTRICTING COMMISSION,

*Defendant.*

| | |
|---|---|
| AYAD LAW, PLLC | MICHIGAN INDEPENDENT |
| Nabih H. Ayad (P59518) | REDISTRICTING COMMISSION |
| William D. Savage (P82146) | Julianne Pastula (P74739) |
| *Attorney for Plaintiffs* | *Attorney for Defendant* |
| 645 Griswold St., Ste 2202 | PO Box 30318, Lansing MI 48909 |
| Detroit, MI 48226 | PastulaJ1@michigan.gov |
| P: 313.983.4600 | |
| F: 313.983.4665 | FINK BRESSACK |
| nabihayad@ayadlawpllc.com | David H. Fink (P28235) |
| williamsavage@ayadlawpllc.com | *Attorney for Defendant* |
| | 645 Griswold Street, Suite 1717 |
| YANCEY LAW, PLLC | Detroit, MI 48226 |
| Tenisha Yancey (P78319) | P: (248) 971-2500 |
| *Attorney for Plaintiffs* | F: (248) 971-2600 |
| 18640 Mack Ave. | |
| Grosse Pointe, MI 482336 | |
| tenisha.yancey@gmail.com | |

**A Y A D  L A W , P.L.L.C.**
645 Griswold St., Ste 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

### **FIRST AMENDED VERIFIED COMPLAINT**

NOW COMES, the above-named Plaintiffs (hereinafter "Plaintiffs"), by and through their attorneys at Ayad Law, PLLC, and hereby make the following complaint:

### **INTRODUCTION**

1. On November 6, 2018, Michiganders voted to amend the Michigan Constitution of 1963 to create the Michigan Independent Citizens Redistricting Commission (hereinafter "Defendant" or "the Commission").

2. The amendment added, in pertinent part, the following language to Michigan's Constitution:

> (13) The commission shall abide by the following criteria in proposing and adopting each plan, in order of priority:
> (a) Districts shall be of equal population as mandated by the United States constitution, and shall comply with **the voting rights act** and other federal laws.

…

(c) Districts shall reflect the state's diverse population and **communities of interest**. Communities of interest may include, but shall not be limited to, populations that share cultural or historical characteristics or economic interests. **Communities of interest do not include relationships with political parties, incumbents, or political candidates**.

Mich Const 1963, art 4, §6(13)(a) and (c) (emphasis added).

3. After being created, the Commission has maintained that its mission and vision are:

> **Mission**: To lead Michigan's redistricting process to assure Michigan's Congressional, State Senate, and State House district lines are drawn fairly in a citizen-led, transparent process, meeting Constitutional mandates.
>
> **Vision**: To chart a positive course for elections based on fair maps for Michigan today and for the future.
>
> (See   https://www.michigan.gov/micrc/0,10083,7-418-92033---,00.html, last visited January 3, 2022, emphasis in original.)

4. This Supreme Court has already ruled that the Commission failed in its self-stated mission of 'transparency' when on December 20, 2021, it ruled that the Commission had violated Michigan's Open Meetings Act, and ordered the commission to make public the meetings they had been having in private.

5. On December 28, 2021, the Commission officially approved its redistricting maps (or "Plans") for the state of Michigan's Congressional, State Senate, and State House voting districts.

6. It is clear from the Commission's current proposed Plans that they will also be falling woefully short of their vision: "To chart a positive course for elections based on fair maps for Michigan today and for the future."

7. Pursuant to the Michigan Constitution of 1963, Article IV, Section 6(19) these Black Plaintiffs now challenge the three discriminatory and unlawful Plans of the Michigan Independent Redistricting Commission.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

**THE PARTIES**

8.  The Detroit Caucus is a group of Legislators from the Michigan House of Representatives that represent constituents within the City of Detroit.

9.  The Romulus City Council is a legislative body of elected officials in the city of Romulus, MI.

10. The individual Plaintiffs are all, first and foremost, members of the Black community of Michigan and residents of Wayne County who stand to lose their ability to elect their chosen candidates into office:

   a.  The Detroit Caucus;

   b.  The Romulus City Counsel;

   c.  The Inkster City Council

   d.  State Representative and Detroit Caucus Chair, Tenisha Yancey

   e.  Former State Representative & Detroit Caucus Chair Sherry Gay-Dagnogo, M.Ed., DPSCD Board Member, resident of Detroit, Michigan;

   f.  State Representative Tyrone Carter

   g.  Senator Betty Jean Alexander, Senate District 5, resident of Detroit, Michigan;

   h.  Hon. Stephen Chisholm, Inkster City Council

   i.  Former State Rep. Teola P. Hunter, First Female Speaker *Pro Tem*, resident of Detroit, Michigan;

   j.  Hon. Keith Williams, Chair MDP Black Caucus, resident of Detroit, Michigan;

   k.  Dr. Carol Weaver, 14th Congressional District Executive Board Member, resident of Detroit, Michigan;

JA00552

RECEIVED by MSC 1/10/2022 9:35:08 PM

l.   Former State Representative Wendell Byrd, resident of Detroit, Michigan;

m.  Former State Representative Shanelle Jackson, resident of Detroit, Michigan;

n.   Former State Representative Lamar Lemmons, resident of Detroit, Michigan;

o.   Former Senator and Wayne County Commissioner Irma Clark Coleman, resident of Detroit, Michigan;

p.   Lavonia Perryman, The Shirley Chisholm Metro Congress of Black Women, resident of Detroit, Michigan;

q.   Alisha Bell, Wayne County Commissioner and Chair, resident of Detroit, Michigan.

r.   Natalie Bienaime, Citizen the 13th District, resident of Detroit, Michigan;

s.   Oliver Cole, Resident of Wayne County;

t.   Andrea Thompson, Resident of Detroit;

u.   Darryl Woods, Resident of Wayne County.

v.   Darryl Woods, as a resident of Wayne County;

w.  Norma D. Mcdaniel, as a Resident of Inkster;

x.   Melissa D. Mcdaniel, as a resident of Canton,

y.   Chitara Warren, as a resident of Romulus;

z.   James Richardson, as a resident of Inkster,

aa.  Elena Herrada, as a resident of Detroit

11. Defendant Michigan Independent Citizens Redistricting Commission ("MICRC") is a permanent commission in the legislative branch of government.  Const 1963, art 4, §6(1).

**JURISDICTION**

12. The Court has original subject-matter jurisdiction over this action under Article IV, Section 6(19), of the Michigan Constitution of 1963.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

37. Throughout the redistricting process, the Michigan Independent Redistricting Commission has been opaque with the public in regards to its compliance with the Voting Rights Act, in contravention of its mandate under the Michigan Constitution to perform its "duties in a manner that is impartial and reinforces public confidence in the integrity of the redistricting process. The commission shall conduct all of its business at open meetings." Mich. Const. Art. 4, § 6(10).

38. In fact, this honorable Court recently ruled that a recording of MICRC's October 27, 2021 meeting, during which two (2) memoranda were discussed involving the proposed maps compliance with the Voting Rights Act, must be disclosed to the public because the meeting involved the development of the redistricting map.[9]

39. This court further ruled that seven (7) additional memoranda out of 10 must be disclosed to the public as "supporting materials" under Const 1963, art 4, § 6(9).[10]

### COUNT I
### Violation of Mich Const 1963, art 4, §6(13)(a) and (c):
### Dilution of Minority Voting Power

40. Plaintiffs reallege the prior paragraphs as if restated fully hereunder.

41. The Michigan Constitution of 1963 provides:

> (13) The commission shall abide by the following criteria in proposing and adopting each plan, in order of priority:
>  (a) Districts shall be of equal population as mandated by the United States constitution, and shall comply with the **voting rights act [of 1965]** and other federal laws.

> Mich Const 1963, art 4, §6(13)(a) (emphasis added).

42. The Voting Rights Act of 1965 holds, in pertinent part:

> No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision

---

[9] Mich Sup. Ct. Docket No. 163823
[10] *Id.*

RECEIVED by MSC 1/10/2022 9:35:08 PM

in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color…

52 USC § 10301.

43. In determining whether the Voting Rights Act statute has been violated, this Court follows "the guidance of the United States Supreme Court, [as] stated in *Thornburg v. Gingles*, 478 U.S. 30, 43–46, 106 S.Ct. 2752, 2762–2764, 92 L.Ed.2d 25 (1986)…" *In re Apportionment of State Legislature-1992*, 439 Mich 715, 735; 486 NW2d 639, 650 (1992).

44. In *Thornburg v. Gingles*, 478 U.S. 30, 43–46, 106 S.Ct. 2752, 2762–2764, 92 L.Ed.2d 25 (1986), Supreme Court of the United States has held that a successful Section 2 vote dilution claim has two components. First, a plaintiff must satisfy three preconditions by showing: (1) that the minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district": (2) that the minority group is "politically cohesive": and (3) that bloc voting by other members of the electorate usually defeats the minority-preferred candidates. Satisfaction of these three preconditions is necessary but not sufficient to establish liability. Second, "[i]f these three preconditions are met, the district court must then examine a variety of other factors to determine whether, under the totality of the circumstances, the challenged practice impairs the ability of the minority voters to participate equally in the political process and to elect a representative of their choice." As stated in *Gingles*, 478 U.S. at 36-37, additional "objective factors" used in determining the "totality of circumstances" surrounding an alleged violation of Section 2 of the Voting Rights Act include (but are not limited to) the extent to which the members of the minority group bear the effects of discrimination in areas like education, employment, and health, which hinder effective participation, is one measure.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

RECEIVED by MSC 1/10/2022 9:35:08 PM

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

45. (1) The Black citizens of the City of Detroit are a minority group that is "sufficiently large and geographically compact to constitute a majority in a single-member district" as its population is 77.7% Black as per the 2020 cencus.

46. (2) The Black citizens of the City of Detroit are "politically cohesive" as is shown by their voting record where Detroit Black persons account for 79.1% of the total population of Detroit.[11] Biden won the city of Detroit with 94% of the vote while Trump received 5%.[12] Yet statewide in Michigan voter turnout was 71% and Biden defeated Trump by merely 50.6% to 47.9%, meaning that it was the Detroit Black community who, voting as a cohesive group, won the Presidential election for President Joseph Biden in this State and, potentially, the Country.

47. (3) Bloc voting by other members of the electorate usually defeats the minority-preferred candidates: Until the 1954 election of Charles Diggs in the old 15th District (13th today) followed by the election of John Conyers 10 years later in 1964 in the old 1st District (14th today) Detroit's majority-minority community could not elect a Congressional candidate of their choice.

48. The Black citizens of the City of Detroit bear the effects of discrimination in the area of education:

    bb. In the city of Detroit the majority of the residents in the suburb area are predominantly White, while in the actual city majority of the residents are Black.[13]

    cc. As of the mid-2000's, school funding per pupil in Wayne County (where Detroit is located) was approximately $930.33, the lowest in the State. The second highest

---

[11] https://www.census.gov/quickfacts/fact/table/detroitcitymichigan,mi/PST045217
[12] https://www.freep.com/story/news/politics/elections/2020/11/06/joe-biden-detroit-michigan-vote-election-2020/6168971002/
[13] Checkoway, Barry; Lipa, Todd; Vivyan, Erika; Zurvalec, Sue (2017). "Engaging Suburban Students in Dialogues on Diversity in a Segregated Metropolitan Area". Education and Urban Society. Sage Journals. 49 (4): 388–402.

RECEIVED by MSC 1/10/2022 9:35:08 PM

was $1,239.47 per pupil, in Macomb County, almost 50% more than that of Wayne County and far below the average for Southeastern Michigan of $1,807.17.[14]

dd. Detroit public schools have high illiteracy rates and low academic performance compared to cities across the United States, with Detroit "eighth graders scor[ing the] lowest in math and reading in the nation."[15]

ee. According to the National Institute for Literacy, 47% (200,000) of adults in Detroit are functionally illiterate, and half of the 200,000 adults do not have a high school diploma or GED, showing that the lack of these skills learned in an academic setting is generationally embedded into different groups of society.

49. The Black citizens of the City of Detroit bear the effects of discrimination in the area of employment:

ff. Detroiters have a lower employment rate compared to others living in Wayne County and those in neighboring counties such as Macomb and Oakland. In July 2020, unemployment in Detroit reached nearly 40 percent.[16] This is much higher than the national unemployment average of even The Great Depression nearly a century ago.[17]

gg. As of 2016, Detroit's poverty rate was 35.7%, with a median household income of just over $28,000.[18]

---

[14] D., Rollandini, Mark. Michigan intermediate school districts: funding and resource allocation. p. 22.

[15] Rosenbaum, Mark (2018-01-30), The Miseducation of America, Center for Political Studies (CPS).

[16] Wileden, Lydia. 2020. "emplyment Dynamics in Detroit During the COVID-19 Pandemic." Detroit Metro Area Communities Study, University of Michigan. https:// detroitsurvey.umich.edu/wp-content/uploads/2020/08/ Unemployment-August-2020.pdf.

[17] Rashawn Ray, Jane Fran Morgan, Lydia Wileden, Samantha Elizondo, and Destiny Wiley-Yancy; Examining and Addressing COVID-19 Racial Disparities in Detroit; The Brookings Institution, p. 14.

[18] Williams, Corey (14 September 2017). "Census Figures Show Drop in Detroit Poverty Rate". U.S. News.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

RECEIVED by MSC 1/10/2022 9:35:08 PM

50. The Black citizens of the City of Detroit bear the effects of discrimination in the area of health:

    hh. Because of the legacies of underinvestment, redlining, jobs without benefits, poor or nonexistent and culturally incompetent health care, Black residents are less likely to be able to transcend the challenges presented by COVID-19 and are more likely to contract and die from the virus.[19]

    ii. In Detroit, Black people represent a comparable over 75 percent of known COVID-19 diagnoses by race, yet account for a disproportionate nearly 90 percent of deaths. *Id.*

51. Therefore, according to the analysis handed down in *Thornburg v. Gingles*, 478 U.S. 30, 43–46, 106 S.Ct. 2752, 2762–2764, 92 L.Ed.2d 25 (1986), the redistricting Plans approved by Defendant violate the Voting Rights Act of 1965 (52 USC § 10301) by implementing impermissible dilution of the Black vote in Michigan. As the Plans violate the Voting Rights Act, they also violate the Michigan Constitution at article 4, §6(13)(a) and (c).

## COUNT II
### Declaratory Action

52. Plaintiffs reallege the prior paragraphs as if restated fully hereunder.

53. The Court has the power to enter declaratory judgments. MCR 2.605(A)(1).

54. A case of actual controversy exists between these parties as Plaintiffs will imminently have their rights under the Michigan Constitution, the United States Constitution, and federal law (the Voting Rights Act of 1965) violated and be effectively completely disenfranchised.

---

[19] Rashawn Ray, Jane Fran Morgan, Lydia Wileden, Samantha Elizondo, and Destiny Wiley-Yancy; Examining and Addressing COVID-19 Racial Disparities in Detroit; The Brookings Institution, p. 1.

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

JA00558

RECEIVED by MSC 1/10/2022 9:35:08 PM

55. Guidance is needed by the Court to assist the parties in their conduct going forwards, so that Plaintiffs and the entire Black community of Michigan do not suffer the egregious and inexcusable injury of being racially discriminated against, disenfranchised, and having their legal, political, and civil rights eroded in one fell swoop.

56. The case in controversy is within the jurisdiction of this Court as, were the rights at issue violated, this Court would have original jurisdiction to hear causes of action arising out of those violations pursuant to Mich Const 1963, art 4, §6(19).

57. Specifically, Plaintiff requests a declaration from this Court that Defendant's proposed Michigan's Congressional, State Senate, and State House district voter districts Plans are unconstitutional and unlawful as they do not comport with the requirements of the Voting Rights Act of 1965 and the Michigan Constitution of 1963, article 4, §6(13)(a)-(c).

### CONCLUSION AND RELIEF REQUESTED

The new voting district maps drawn by the Commission will thwart the Black Civil Rights Movement that this nation is famous for; that this nation is proud of. Should this Court not stop the Defendant from implementing their Plans, the Black voters of Michigan will be cast backwards in time to the days before Civil Rights heroes like Martin Luther King, Jr. and Rosa Parks led the fight for the representation that the Black community of Michigan currently has. The community of interest that is the Detroit Black community, will go from one that can unite to become powerful enough to win the United States presidency for their chosen candidate to one that cannot even elect state congress persons and senators; no matter what their voter turnout.

Under the Voting Rights Act of 1965, and therefore, the Michigan Constitution, it does not matter what the intentions of Defendant's members were, only what the effects of their redistricting will be. The effects are clear: By breaking the majority-Black US Congressional districts into eight voter districts from its previous two voter districts, it will dilute the vote of the Black community

AYAD LAW, P.L.L.C.
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

RECEIVED by MSC 1/10/2022 9:35:08 PM

in Michigan into meaninglessness. Similarly, the Plans for the Michigan Senate and Michigan House of Representatives inexcusably reduce the ability of Black voters to be represented in this state and nationally. The Michigan Legislature was able to create voting districts with majority-Black districts in 1980, 1990, 2000, and 2010. Defendant's Plan for the US Congressional districts, the number of majority Black districts would be reduced from two to zero; under the State Senate Plans, from four to zero; and under the State House Plans, from twelve to six. That is a total of 18 majority-minority districts reduced to just six. In 1980, 1990, and 2000, partisan Michigan legislatures were able to draw up Plans which gave consideration (and majority-Black districts) to Michigan's Black community and there is no reason that the newly created should not have done the same.

The Commission was supposedly created to assure that the Voter Rights Act of 1965 was not violated. Unfortunately, that is exactly what is happening here. As the Voter Rights Act assures that majority-minority districts are not to be diluted in newly redrawn districts so that minority communities cannot elect their candidates of choice. This map falls far short of such mandates under the Voter Rights Act and, if this Court does not act decisively to curb Defendant's ill-made Plans, then Black Michiganders, and the Black community everywhere, will suffer an egregious and despicable injury. As the late Martin Luther King, Jr. one said: "Injustice anywhere is a threat to justice everywhere." This Honorable Court should act swiftly to save the State of Michigan from the shame and embarrassment that will be associated with Defendant's redistricting Plans.

WHEREFORE, Plaintiff requests that this Honorable Court enter judgement in their favor against Defendant and issue an order containing the following relief:

a)  Declaring that Defendant's currently proposed redistricting plans violate the Michigan Constitution of 1963, art 4, §6(13)(a) and (c) and the Voting Rights Act of 1965 by impermissibly diluting the Black voting power in Michigan;

A Y A D   L A W ,   P . L . L . C .
645  Griswold St.,  Ste.  2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

b) Ordering that Defendant be required to redraw their redistricting plans in accordance with the Michigan Constitution of 1963, art 4, §6(13)(a) and (c) the order of this Court;

c) Awarding reasonable attorneys fees pursuant to Michigan Constitution of 1963, art 4, §6(5), (13)(a), and 52 U.S.C. § 10310(e); and

d) Any and all such other relief that this Court deems just and equitable including any tolling of limitations periods necessary to accomplish justice.

Respectfully submitted;

AYAD LAW, PLLC

*/s/Nabih H. Ayad*
Nabih H. Ayad (P59518)
William D. Savage (P82146)
*Attorneys for Plaintiff*
645 Griswold St., Ste 2202
Detroit, MI 48226
P: 313.983.4600
F: 313.983.4665
Dated: January 10, 2022            nabihayad@ayadlawpllc.com

*Verifications on following pages.*

**A Y A D   L A W ,   P. L . L . C .**
645 Griswold St., Ste 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

**VERIFICATION**

I declare under the penalties of perjury that this Complaint has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

Executed on: _____1/10/2022_____

Signed: _____

Plaintiff

RECEIVED by MSC 1/10/2022 9:35:08 PM

**AYAD LAW, P.L.L.C.**
645 Griswold St., Ste. 2202
DETROIT, MICHIGAN 48226
P: (313) 983-4600 | F: (313) 983-4665

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

MICRC
09/02/21-1300 Meeting
Captioned by Q&A Reporting, Inc., www.qacaptions.com


>> VICE CHAIR SZETELA: We will bring the Michigan
Independent Citizens
Redistricting Commission to
order at 1:06 p.m.
Greetings to Ann Arbor. We are happy to be here today. There are several groups that are making this meeting possible. I would like to thank Tom Ivako, Bonnie Roberts and Logan Woods of the center for local, state and urban policy here at the University of Michigan. Ellen Werman and Nate Hall, campus election management project. Landon Meyers, campus vote project. It's gratifying that so many groups are here to assist the MICRC in engaging people in redistricting here in Michigan.

This Zoom webinar is being live streamed at YouTube at www.YouTube.com/MICHSO office/videos.

For anyone in the public watching who would prefer to watch via a different platform than they are currently using, please visit our social media at Redistricting MI to find the link for viewing on YouTube.

Our live stream today includes closed captioning. Closed captioning, ASL interpretation, and Spanish and Bengali and Arabic translation services will be provided for effective participation in this meeting. Please E-mail us at Redistricting@Michigan.Gov for additional viewing options or details on accessing language translation services for this meeting.

People with disabilities or needing other specific accommodations should also contact Redistricting at Michigan.gov.

This meeting is also being recorded and will be available at www.Michigan.gov/MICRC for viewing at a later date and this meeting is being transcribed and closed-captioned transcriptions will be made available and posted on Michigan.gov/MICRC along with the written public comment submissions.

There is also a public comment portal that may be accessed by visiting Michigan.gov/MICRC, this portal can be utilized to post maps and comments which can be viewed by both the Commission and the public.

Members of the media who may have questions before, during or after the meeting should direct those questions to Edward Woods III, our Communications and Outreach Director for the Commission at WoodsE3@Michigan.gov or 517-331-6309.

For the purposes of the public watching and for the public record I will now turn to the Department of State staff to take note of the Commissioners

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

present.

>> MS. SARAH REINHARDT: Please say present when I call your name.
If you are attending the meeting remotely, and unless your absence is due
to military duty, please disclose your physical location by stating the
County, City, Township or Village and the State from which you are attending the
meeting remotely.
I will start with Doug Clark.

>> COMMISSIONER CLARK: Present.

>> MS. SARAH REINHARDT: Juanita Curry.

>> COMMISSIONER CURRY:

>> MS. SARAH REINHARDT: Anthony Eid?

>> COMMISSIONER EID: Present.
Brittini Kellom?
Rhonda Lange?

>> COMMISSIONER LANGE: Present; attending from Reed
City, Michigan.

>> MS. SARAH REINHARDT: Steve Lett?

>> COMMISSIONER LETT: Present.

>> MS. SARAH REINHARDT: Cynthia Orton?

>> COMMISSIONER ORTON: Present.

>> MS. SARAH REINHARDT: MC Rothhorn?

>> COMMISSIONER ROTHHORN: Present.

>> MS. SARAH REINHARDT: Rebecca Szetela?

>> VICE CHAIR SZETELA: Present.

>> MS. SARAH REINHARDT: Janice Vallette?

>> COMMISSIONER VALLETTE: Present.

>> MS. SARAH REINHARDT: Erin Wagner?

>> COMMISSIONER WAGNER: Present; attending remotely from
Charlotte, Michigan.

>> MS. SARAH REINHARDT: Richard Weiss?

>> COMMISSIONER WEISS: Present.

>> MS. SARAH REINHARDT: Dustin Witjes?

>> COMMISSIONER WITJES: Present.

>> MS. SARAH REINHARDT: 11 Commissioners are present.
And there is a quorum.

>> COMMISSIONER LETT: You can view the agenda at www.Michigan.gov/MICRC.
I would now entertain a motion to approve the meeting agenda.
We have a motion made by Commissioner Lett, seconded by Commissioner Eid.

JA00564
Agee et al. v. Benson et al., Case No. 1:22-cv-00272          MICRC_005361

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

The first and Foremost criteria are the U.S. Constitution and Federal law and the Voting Rights Act is Federal law.

And it applies everywhere in the country including Michigan.

It prohibits any voting standard practice or procedure including a redistricting plan that results in the denial or dilution of minority voting strength.

A redistricting plan that dilutes minority voting strength is one that either cracks or packs a geographically concentrated minority group.

A top example to the left is or to the right is an example of a District, a set of districts that cracks the minority community by dividing it among four districts, five districts so that they cannot elect a minority preferred candidate in any of those districts.

The lower example on the right is an example of a District or District center that packs minority voters so that they have an impact on only one District and no impact on any of the other districts despite the fact that you could probably have drawn two districts in which they had the ability to elect communities, to elect candidates of choice.

When the Voting Rights Act was amended in 1982 to make it clear that you did not have to show that the redirectors intended to discriminate only that the plan that they drew actually resulted in discrimination.

The Supreme Court first considered this case in 1986 in a case called Thornburg versus Jingles and had to prove three conditions in order to satisfy Section Two and get a District drawn in which they could have the ability to elect a candidate of choice.

First is that the group must be sufficiently large and geographically compact to form a majority in a single member District.

This is in essence so there was actually a remedy available.

There is a solution to the problem of how do we elect candidates of choice.

The second is that the minority group must be politically cohesive.

That is, they must vote for the same candidates.

And, third, whites must vote as a bloc to usually defeat the minority-preferred candidates.

If they were not voting as a bloc to defeat these candidates, these candidates would win, and you wouldn't need to draw a minority District.

So how do we know how the minority group is voting? How do we know how whites are voting? What you do is conduct a racial bloc voting analysis.

And my job in this particular situation is to actually carry out what's called a racial bloc voting analysis that is analyze voting patterns by race to determine if voting is polarized. If whites are voting against a cohesive minority community.

I mentioned that first of all we have, of course, a secret ballot.

We don't know the race of the voters when they cast the ballot.

So, we have to use estimation techniques.

JA00565
Agee et al. v. Benson et al., Case No. 1:22-cv-00272          MICRC_005379

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

And that is around 35% of Black voting age population turned out and cast a ballot for the Governor in 2018.

While the number was higher almost double for white voters.

This contest is racially polarized.

If Blacks voting alone had voted alone Whitmer would have been elected.

She was.

And then of course if whites voted alone, it would have been the republican candidate who was elected.

Below I have the primary for this election.

I have the gubernatorial primary of 2018.

We have the three candidates listed here.

We have they are all democrats.

We have their race.

We have the percentage of votes they received.

And you will see that this contest is also polarized.

This contest you have a plurality of the Black voters supporting Thanedar and majority of the white voters supported Whitmer.

So, this contest is also polarized.

Okay, now I did this, and you will see tables in the report that I eventually produce for every election but I'm going to show you summaries of this in a little bit.

So, over all statewide in the 13 elections that I looked at, 12 were polarized.

And those elections that are most probative to the courts, that is those that included minority candidates, 6 out of the 6 were polarized in the democratic primary which there was only one it was polarized.

And I money -- mentioned I looked at four counties and these are the results of the analysis in four counties in Genesee County we have nine of the 13 contests polarized with five of the six with minority candidates.

The democratic primary was polarized.

And Saginaw it's 11 out of 13 of the contests, six out of six of those contests with minority candidates.

And the democratic primary was polarized.

In Oakland all 13 of the general elections were polarized including the six with minority candidates but the democratic primary was not.

And finally in Wayne County where voting is less polarized you will see that 7 of the 13 contests were polarized, three of those were minority candidates and the democratic primary was polarized.

What this tells me is that voting is polarized in Michigan.

And what that means is the Voting Rights Act comes into may in districts that provide minority voters with the opportunity to elect their candidates must be drawn.

Okay, so voting is polarized.

JA00566
Agee et al. v. Benson et al., Case 1:22-cv-00272                MICRC_005383

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

You have to create districts if they can be created, but more importantly perhaps is that those districts that exist must be maintained.

It's important to continue to provide minority voters with the opportunity to elect their candidates of choice.

So, if districts can be drawn, they should be drawn.

If districts exist and minority candidates are winning only because the districts exist, those districts must be maintained.

Those districts must be maintained in a way that gives minorities an opportunity to elect their candidates of choice.

But you don't just choose an arbitrary target.

You don't just say 50% voting age population is what we need to maintain these minority districts.

And it is the Supreme Court that has told us this, and Bruce gets to talk about this later. But the fact is you have to do a District specific functional analysis in each area that you are to determine what an effective minority District looks like.

No arbitrary percentages.

So how do we do a District-specific functional analysis? By functional we mean we have to look at actual voting behavior and look at election results.

By District specific I told you already we are going to look first at voting patterns not just statewide but District or broader areas like counties.

Now the first approach I'm going to discuss with you today, and that is taking the estimates of participation rates minority cohesion and white cross over from the RV B analysis I conducted and using that to calculate the percent minority population needed in a specific area for the minority preferred candidates to win a District in that area.

But there's another approach that you can use that the Commissioners can use as they're drawing and that is to look at the election results of what I call bellwether elections to determine if that election had occurred within the proposed boundaries of the districts that you're creating if those minority preferred candidates would have carried those districts.

There are four bellwether contests in particular that you are going to focus on.

You will recall I said six contests include minority candidates and two of those contests the minority candidate was not the candidate preferred by minority voters.

That was in 2018 Senate and the 2020 Senate.

That was the republican John James.

So, the four bellwether contests you will be focusing on to determine if the districts you have drawn will allow minorities to elect candidates of choice will be the other four contests the 2012 presidents contest for president, the 2014 contest for treasurer, the 2018 gubernatorial contest and the 2020 Presidential contest.

And you can recompile election results and determine if the minority preferred candidates would carry the districts.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

Even though many of those would have been effective districts.

This last slide before I turn it over to Bruce is a maps of the State House and the State Senate districts because I wondered why there weren't any 35-45% Black districts and what the shapes of the districts were that were electing Blacks to office.

And I will tell you that there are some, let's see if I can go back, there are some very hacked Black districts.

We have some districts that I could not produce estimates of white voting behavior because there were virtually no whites voting in these districts.

We have State House Districts that are well -- we have three of them that are well over 90%.

And the Black preferred candidates are getting well over 90% of the vote.

Those are packed.

Doesn't like me going back.

Okay.

.

And those are not necessarily shaped districts.

It was not like they were creating districts that were nice little compact districts.

>> CHAIR KELLOM: Doctor Handley we have a question from Commissioner Lange.

>> DR. LISA HANDLEY: Yes.

>> COMMISSIONER LANGE: Dr. Handley I'm sorry to interrupt your presentation. I just have a quick question.

When doing the racial bloc voting, is it only based off from African/American votes or is it based off from any other ethnicities?

>> DR. LISA HANDLEY: That is a good question, and I should have said that earlier on now and many jurisdictions of course you would look at other ethnicities and I would have liked to have done so in Michigan.

But it turns out there are no counties with the sufficient number of Hispanics or Asian Americans or Native Americans to do the analysis.

But, yes, typically you could and should do the analysis if there was a sufficient number of minorities to do the analysis.

>> CHAIR KELLOM: Commissioner Lange does that satisfy your question?

>> COMMISSIONER LANGE: Yes, thank you very much.

>> CHAIR KELLOM: Dr. Handley you have another question from Commissioner Rothhorn?

>> COMMISSIONER ROTHHORN: Dr. Handley I'm thinking about the census data and how we have a significant population of Arab Americans in Dearborn so following up on what Dr. Or excuse me what Commissioner Lange was saying do we have any or is there any way to understand the Arab American or the Mena vote in this analysis?

>> DR. LISA HANDLEY: There is not because we don't have the composition of the precincts.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

We don't have the Mena composition of the precincts available from the census. And I need to know the composition and I'm going to let Bruce expand on I'm just providing the factual information and Bruce gets to expand on why you might also not be doing that kind of analysis.

In fact, I am done.

I'm going to finish with this last map.

So, before I hand it over to Bruce, are there any questions specifically for me? Or should we hand it over to Bruce then you can ask us questions in concert?

>> CHAIR KELLOM: Looks like you have a question from Commissioner Eid?

>> COMMISSIONER EID: Well first off thank you so much for the presentation. I'm sure that was quite challenging to put together in such a short amount of time. You had two counties there Genesee and Wayne County where the 35% minority population picked the minority candidate.

The majority of the time.

But for both of those counties it looked like it could possibly be even lower than 35%. Was this data tabulated maybe to 30% or 25%? To see if it or add those numbers the minority candidate was still preferred?

>> DR. LISA HANDLEY: Theoretically you could do that but at that point you would not have sufficient enough minority population to use the word effective minority District in that case.

And in those instances, it might well be the case that voting just wasn't polarized at all.

>> COMMISSIONER EID: I have one more question.

Thank you for that answer.

So maybe Bruce will expand on this in a minute, but I mean, this says the Districts are packed.

Purposely packed.

So how do we unpack them? Is the question at hand.

>> DR. LISA HANDLEY: I will give that to Bruce.

>> MR. BRUCE ADELSON: Good afternoon.

Well, thank you very much, Dr. Handley, for your presentation.

There are a couple points I wanted to make and in part they may address the last comment from Commissioner Eid.

I wanted to remind everybody that we've previously talk about packing.

And Dr. Handley addressed the Alabama case.

We talk about before.

And I wanted to really stress the fact that picking arbitrary numbers for minority populations is routinely regarded as unconstitutional as racial gerrymandering. That was true in the Alabama case.

That was true in the reverse Harris case we talk about.

JA00569
Agee et al. v. Benson et al., Case No. 1:22-cv-00272          MICRC_005388