# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

DONALD AGEE, JR. et al.,

            Plaintiffs,

   v.

JOCELYN BENSON, et al.,

            Defendants.

**Case No. 1:22-CV-00272-PLM-RMK-JTN**

---

## <u>JOINT APPENDIX: Volume V of V (JA00643 to JA000858)</u>

### Table of Contents

**Volume I**

Expert Report of Dr. Lisa Handley, CV, and Appendices ........................................JA00001

Expert Report of Maxwell Palmer, Ph.D.................................................................JA00116

Expert Report of Jonathan Rodden, Ph.D. ..............................................................JA00227

**Volume II**

Plaintiffs' Expert Report of Dr. Brad Lockerbie ....................................................JA00277

Plaintiffs' Expert Report of Sean P. Trende ...........................................................JA00308

Excerpts from Trende Report Appendix C ..............................................................JA00428

**Volume III**

"The History of Discrimination in the State of Michigan and its Influence on Voting," by Bruce L. Adelson..................................................................................................JA00438

Excerpts from April 10, 2023 Deposition of Brad Lockerbie, Ph.D.........................JA00468

Excerpts from April 20, 2023 Deposition of Sean P. Trende...................................JA00482

Affidavit of Virgil K. Smith, dated March 8, 2023..................................................JA00509

Affidavit of LaMar L. Lemmons III, dated March 28, 2023 ....................................JA00521

Excerpts from Plaintiff Bennett's Objections & Responses to the Commission's First Set of Interrogatories ......................................................................................................JA00535

Excerpts from Plaintiff Black, Jr.'s Objections & Responses to the Commission's First Set of Interrogatories ......................................................................................................JA00540

Excerpts from Plaintiffs' Objections & Responses to the Commission's First Set of Requests for Admission......................................................................................................JA00545

Excerpts from *Detroit Caucus v. Independent Citizens Redistricting Commission* First Amended Verified Complaint ..................................................................................................JA00549

Excerpts from September 2, 2021 MICRC Meeting Transcript...............................JA00563

**Volume IV**

Excerpts from the Commission's Report on 2021 Redistricting, adopted on Aug. 18, 2022 (part 1) ...............................................................................................................JA00570

**Volume V**

Excerpts from the Commission's Report on 2021 Redistricting, adopted on Aug. 18, 2022 (part 2) ................................................................................................................JA00643

Michigan State University Institute for Public and Social Research Report..............JA00692

Plaintiffs' Districts Demonstrative..........................................................................JA00855

Handley Table 4 Reconfiguration Demonstrative ....................................................JA00857

Exhibit 5



## NORTH CAROLINA LAW REVIEW

Volume 79 | Number 5                                                          Article 12

6-1-2001

# Drawing Effective Miority Districts: A Conceptual Framework and Some Empirical Evidence

Bernard Grofman

Lisa Handley

David Lublin

Follow this and additional works at: http://scholarship.law.unc.edu/nclr

 Part of the Law Commons

Recommended Citation

Bernard Grofman, Lisa Handley & David Lublin, *Drawing Effective Miority Districts: A Conceptual Framework and Some Empirical Evidence*, 79 N.C. L. REV. 1383 (2001).
Available at: http://scholarship.law.unc.edu/nclr/vol79/iss5/12

This Comments is brought to you for free and open access by Carolina Law Scholarship Repository. It has been accepted for inclusion in North Carolina Law Review by an authorized administrator of Carolina Law Scholarship Repository. For more information, please contact law_repository@unc.edu.

# DRAWING EFFECTIVE MINORITY DISTRICTS: A CONCEPTUAL FRAMEWORK AND SOME EMPIRICAL EVIDENCE

BERNARD GROFMAN, LISA HANDLEY, AND DAVID LUBLIN[*]

*When applying the Voting Rights Act, courts and commentators alike have too often fixated on the distinction between "majority-minority" districts and "majority-white" districts, while paying relatively little attention to the likely electoral outcomes that any given districting plan will actually generate. In this Article, three political scientists provide a conceptual framework for predicting minority electoral success, taking into account the participation rates and voting patterns of minority and white voters, as well as incorporating the multi-stage election process (primaries plus general elections, and sometimes runoff elections). The Authors also analyze empirical election data to demonstrate how the model can be applied to address voting rights disputes.*

INTRODUCTION .................................................................................1384
I.      THE VOTING RIGHTS ACT AND EFFECTIVE MINORITY
        DISTRICTS .................................................................................1386
II.     THE POLITICAL SCIENCE DEBATE ON EFFECTIVE
        MINORITY DISTRICTS .............................................................1390
III.    AN ANALYSIS OF MINORITY DISTRICTS IN THE SOUTH IN
        THE 1990s ..................................................................................1394
        A.    *Black Congressional Districts in the South* ......................1394
        B.    *Factors that Affect the Opportunity to Elect Minority-
              Preferred Candidates:  Data from the U.S. House of*

---

        * The listing of co-authors is alphabetical:  Bernard Grofman, School of Social Sciences, University of California, Irvine, C.A.; Lisa Handley, Frontier International Electoral Consulting, Washington, D.C.; David Lublin, Department of Government, American University, Washington, D.C.  This research was partially funded by grant 99-6109, Program in Political Science, National Science Foundation (to Lublin) and grant SBR 97-30578 (to Grofman and Anthony Marley), Program in Methodology, Measurement and Statistics, National Science Foundation.  Basic research for this Article was begun under an earlier grant to Grofman from the Ford Foundation.  We are indebted to Clover Behrend and Annabel Azim for library assistance.  Many of the ideas discussed in this Article, including the graphic representation of the formal model, originated in discussions between the co-authors and Sam Hirsch, an attorney with the Washington, D.C. office of Jenner & Block.

1410          *NORTH CAROLINA LAW REVIEW*          [Vol. 79

general election[74]—and sometimes the highest percentage is in the
runoff, sometimes in the general election.   Both Bishop and
McKinney, for example, needed a higher percentage black to win the
Democratic runoff than to win the general election in their districts in
1992.

| Table 6:  Percent Black Needed for Black Candidate to Win, Incorporating Cohesion & Crossover:  Selected Southern Congressional Primary, Runoff & General Elections with Black Candidates | | | | | | | |
|---|---|---|---|---|---|---|---|
| Congressional District | Year | % Black Participation | % White Participation | % Black Needed To Equalize Turnout | % Black Votes for Black Candidate* (Cohesion) | % White Votes For Black Candidate* (Crossover) | % Black Needed Given Both Cohesion & Crossover |
| DEMOCRATIC PRIMARY | | | | | | | |
| FL 3 (Brown) | 1992 Primary | 28.7 | 21.6 | 42.9 | 93.5 | 34.4 | 31.9 |
| GA 2 (Bishop) | 1992 Primary | 39.8 | 44.4 | 52.7 | 84.4 | 31.2 | 43.7 |
| GA 11 (McKinney) | 1992 Primary | 27.3 | 38.2 | 58.3 | 89.7 | 60.4 | 27.4 |
| GA 4 (McKinney) | 1996 Primary | 30.5 | 12.8 | 29.6 | 93.3 | 24.6 | 27.0 |
| DEMOCRATIC RUNOFF | | | | | | | |
| FL 3 (Brown) | 1992 Runoff | 24.0 | 14.5 | 37.7 | 92.0 | 15.8 | 36.7 |
| GA 2 (Bishop) | 1992 Runoff | 35.3 | 30.3 | 46.2 | 79.0 | 25.5 | 45.7 |
| GA 11 (McKinney) | 1992 Runoff | 20.9 | 34.6 | 62.3 | 90.8 | 26.5 | 49.3 |
| GENERAL ELECTION | | | | | | | |
| FL 3 (Brown) | 1992 General | 57.8 | 68.6 | 54.3 | 97.1 | 25.6 | 41.7 |
| GA 2 (Bishop) | 1992 General | 55.9 | 62.6 | 52.8 | 98.3 | 32.4 | 36.5 |
| GA 11 (McKinney) | 1992 General | 60.3 | 57.8 | 48.9 | 96.7 | 36.0 | 33.0 |
| GA 4 (McKinney) | 1996 General | 58.3 | 66.4 | 53.2 | 98.1 | 31.2 | 37.5 |

\* The estimates of % white & black votes for black candidates is the % of whites & blacks voting for any of the black candidates, not
simply the winning black candidate.

The highest of the three percentages necessarily interests us most
because it is the percentage needed for the black-preferred candidate
to win all three elections—the Democratic primary, the Democratic
runoff and the general election—and attain a seat in the legislature.
The fact that the highest percentage black needed to win is not always
found in the general election illustrates the importance of examining

74. The percent black needed to win the Democratic primary is somewhat misleading
if more than one black candidate ran in the primary—the estimates for the percentage of
whites crossing over and the percentage of blacks voting cohesively are a reflection of the
percentage of whites and blacks voting for any of the black candidates, not simply the
winning black candidate.  For example, in the 1992 Democratic primary in the Georgia
11th, 60.4% of the whites voted for one of the four black candidates running, but not
necessarily the black candidate (McKinney) who won.

all stages of the election process, and not simply relying on an analysis of the general election.

Before we conclude that black Democratic candidates can win in congressional districts that are not majority black, several cautionary notes must be added. First, black candidates may not have been persuaded to compete for congressional office in the South if majority black districts had not been created—and black candidates cannot win if they cannot be convinced to run. Second, black voters may not have turned out to vote in such high numbers if they did not think black-preferred candidates had a chance to win. Third, a district that was less than majority black may have attracted more experienced and well-funded white candidates, and that in turn could lower the level of white crossover voting and result in the defeat of black candidates. Fourth, white incumbents can play a major role in retarding the prospects for black electoral success. Only one of the congressional contests examined included a white incumbent; if white incumbents had run in more of these districts, the black electoral success rate almost certainly would have been much lower. For example, in the Georgia 10th, which is 38% black, a black Democratic candidate was easily defeated by the white Republican incumbent in the 1998 general election. Finally, and perhaps most importantly, we must not over-generalize from the congressional data to other offices. As the data from state legislative districts in South Carolina demonstrate, sometimes legislative districts well in excess of 50% black are necessary to provide black voters with an equal opportunity to elect black candidates to office—a district-specific analysis is essential to make this determination.

## C.  *Factors that Affect the Opportunity to Elect Minority-Preferred Candidates: Data from South Carolina State Legislative Elections*

Our examination of the outcome of elections in black majority districts for the South Carolina House of Representatives during the 1990s reinforces the importance of a jurisdiction-specific analysis of the factors that affect the opportunity to elect minority-preferred candidates to office. Table 7 lists the election results for all majority black state house districts in South Carolina for the 1992, 1994, 1996 and 1998 elections.[75]

---

75. Table 7 does not include results from special elections, including the round of special elections held in 1997 due to court-ordered redistricting.

Exhibit 6

| From: | Pastula, Julianne (MICRC) |
|---|---|
| Sent: | Monday, September 13, 2021 5:19 PM |
| To: | Szetela, Rebecca (MICRC); Rothhorn, MC (MICRC) |
| Cc: | Badelson1 |
| Subject: | Privileged & Confidential: Significant Concerns from General Counsel and VRA Counsel |

THIS EMAIL IS A PRIVILEGED AND CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATION THAT CONSTITUTES ATTORNEY WORK PRODUCT
AND CONTAINS LEGAL ADVICE.
PLEASE DO NOT COPY, DISTRIBUTE, SHARE OR DISCLOSE THE PRIVILEGED & CONFIDENTIAL INFORMATION IN THIS EMAIL.

Dear Chair Szetela and Vice Chair Rothhorn,

Bruce and I are very concerned and alarmed about the drafting of packed districts that is occurring during today's
mapping session.  While the work is preliminary and future steps can be taken to remediate - this will become much
more difficult the more packed districts that are drawn.  In addition to not being able to justify the numbers coming out
of today to a court, these drafts also create expectations on behalf of the public that will also be difficult to address
moving forward.

The disaggregated election data was not available last Thursday when the Commission first moved into areas where the
VRA is implicated.  This was the data Lisa highlighted during her presentation on Sept 2nd which is critical for the
Commission (and Bruce) to move forward.  Today, the data appears to be loaded but there was no coordination of a
presentation by Kim (which he offered over the weekend) to introduce the data and orient the Commission to it in
advance of your mapping work.  It has been 2 weeks and the Commission still does not have the critical updates it needs
to the software even scheduled.  This cannot be accepted by Commission any longer.

This complete breakdown of communication and the lack of information the Commission needs to perform its work is
unacceptable and will continue to negatively impact its work unless it is addressed.  The Commission desires to create
best practices which will be measured by a successful defense of its maps after all legal challenges are done not by any
other metric.  The complete opposite is being done by the lack of information and coordination.  The Commission is
running out of time and have an enormous amount of work to do.  The current course of action is against the advice of
counsel and your RPV expert.

Everyone is making personal sacrifices but there needs to be uniform emergency among a majority of the Commission
and unanimous understanding of the law.  The current environment is not allowing either to take center stage.

The Commission should consider extending its meeting time for Mon-Wed, consolidating locations (instead of driving 6
hours round trip for a 6 hour meeting) and consider adding Friday meetings in order for the work to get done.

I recommend we have a call to discuss this email as soon as possible and would be happy to coordinate it to
accommodate everyone's busy schedules.

Sincerely,

**Julianne Pastula**
*General Counsel*
State of Michigan

1

Independent Citizens Redistricting Commission
517.331.6318
PastulaJ1@Michigan.gov

**Julianne Pastula**
*General Counsel*
State of Michigan
Independent Citizens Redistricting Commission
517.331.6318
PastulaJ1@Michigan.gov

2

DISCLAIMER:  This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning.  The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

MICRC
09/30/21 10:00 am Meeting
Captioned by Q&A Reporting, Inc., www.qacaptions.com

**Exhibit 7**

>> VICE CHAIR ROTHHORN: As Vice Chair of the Commission, we will bring the Michigan Independent Citizens Redistricting Commission to order at 10:02 a.m.

This Zoom webinar is being live streamed on YouTube at redistricting MI.

For anyone in the public watching who would prefer to watch via a different platform than they are currently using, please visit our social media at Redistricting MI to find the link for viewing on YouTube.

Our live stream today includes closed captioning.  Closed captioning, ASL interpretation, and Spanish and Arabic and Bengali translation services will be provided for effective participation in this meeting.  Please E-mail us at Redistricting@Michigan.Gov for additional viewing options or details on accessing language translation services for this meeting.

People with disabilities or needing other specific accommodations should also contact Redistricting at Michigan.gov.

For the public record, this meeting is also being recorded and will be available at www.Michigan.gov/MICRC for viewing at a later date and this meeting also is being transcribed and those closed captioned transcriptions will be made available and posted on Michigan.gov/MICRC along with the written public comment submissions.

There is also a public comment portal that may be accessed by visiting Michigan.gov/MICRC, this portal can be utilized to post maps and comments which can be viewed by both the Commission and the public.

Members of the media who may have questions before, during or after the meeting should direct those questions to Edward Woods III, our Communications and Outreach Director for the Commission at WoodsE3@Michigan.gov or 517-331-6309.

For the purposes of the public watching and for the public record I will now turn to the Department of State staff to take note of the Commissioners present.

>> MS. SARAH REINHARDT: Good morning, Commissioners.  Please say present when I call your name.  If you are attending the meeting remotely, please Announce during roll call you are attending remotely and disclose your physical location.  I will call on Commissioners in alphabetical order starting with Doug Clark.

>> COMMISSIONER CLARK:  Present.

>> MS. SARAH REINHARDT:  Juanita Curry.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

I understand that that may cause some level of uneasy and disappointment in people who are watching these hearings and are voters of Michigan.

But that's part of redistricting.

The Voting Rights Act and the U.S. Constitution say what they do.

And that has been my ongoing advice to the Commission.

Thank you.

>> VICE CHAIR ROTHHORN: Commissioner Witjes? Then Commissioner Orton.

>> COMMISSIONER WITJES: Based on advice of General Counsel this needs to be finalized and be reviewed so we can quote unquote start fixing it I move that we stop working on the house map and let it go in for analysis over the next two days so we can fix it next week.

>> VICE CHAIR ROTHHORN: Okay that was a motion and I just want to make sure that because I think the fixing there was a District 18 that I think needed to be quote unquote fixed.

>> MS. JULIANNE PASTULA: And 16.

>> VICE CHAIR ROTHHORN: And 16.

>> MS. JULIANNE PASTULA: Pardon me 6 and 18 specifically.

>> VICE CHAIR ROTHHORN: Yeah 6 and 18.

And then in District -- and I do think that Commissioner Eid pointed out there is a community of interest in Hamtramck in District 10 we might sort of try to pull into 2 just to comply and I don't think it's going to be a voting rights thing but that's meaning I think it's going to be okay but I just want to acknowledge that, that I think is where the spirit of fixing, it's in this map and it's District 18, District 16, and District 1.

No.

General Counsel please help.

>> MS. JULIANNE PASTULA: What I would recommend is that the Commissioner consider doing is for the active matrix to scroll starting with 1 and glance at the districts, anything that is higher than 40% for the Black voting age population and the population difference I mean just to glance at and just go down the list and then when we get to I anticipate number 6, number 18, and others that those quote unquote fixes can be dealt with and then this map can be ready for the partisan fairness analysis.

That would be my recommendation.

And if the Commission was desiring of having an alternate house map, then the map that is the product of this analysis could be used to start the clone for the new one.

But this would that changed.

Did you scroll John?

>> MR. MORGAN: Sorry I moved the two yesterday where we were comparing Commissioners Szetela's plan with the previously done plan and I was making this matrix show the combined so we could do what you described which is look at each individual District I can also bring it up in the active matrix.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject
to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as
such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> VICE CHAIR ROTHHORN: Thank you for that helpful direction General Counsel?
It's Commissioner Curry's turn and so I want to acknowledge Commissioner Orton first
and turn it back to you Commissioner Curry and direct of fixing 6 and 18 so yeah it will
be your turn after Commissioner Orton Commissioner Curry.

>> COMMISSIONER ORTON: So General Counsel I guess, I can't see you guys
over there but I think we have been asking for specifics and the specific that I heard is
that 6 and 18 need to be further unpacked? And you gave a number and 1 through all
of them and if it's over a certain percent we need to look at that.
So can you tell me again what that number was.

>> MS. JULIANNE PASTULA: My suggestion was and Mr. Morgan was very helpful
with it, however the data is best displayed but that the Commission start with the data
chart and look at the list starting with one and I would recommend anything with a
higher than 40% Black voting age population be looked at.
This will also give the Commission an opportunity to look at their population numbers at
this time and that way by the time we get to District 110 we will know this map is okay
for -- to have Dr. Handley run the partisan fairness measures.
So that would be my recommendation is just scrolling down the data and if there is
anything, again, that looks percentages that look kind of high, the Commission can take
a closer look.
But again with the modifications that the Commission has made, again, looking at the
current data percentages would be what I would recommend and then when we see
those districts, we can address them and make sure that all of them are addressed is
my goal.
By going through the chart in this fashion.

>> VICE CHAIR ROTHHORN: Okay so our Chair has returned.
So I'm going to turn it over to Chair Szetela and.

>> CHAIR SZETELA: Yep so, I will take over from here.
First, I'd like to remind everyone, take it off? Commissioner Woods were you going to
ask me to remind everybody?

>> MR. EDWARD WOODS: Yes.

>> CHAIR SZETELA: That is what I was about to do remind everybody we are
required to wear masks in the building so if everybody could get their masks on, I would
appreciate that.
This map we have open right now just so I'm oriented this is a full map we have of the
full state with the changes I had suggested yesterday.
Is that.

>> MR. MORGAN: Yes, that's correct.
I made the changes as directed.
We stipulated I would do that.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

But it does bring our percentages down in most districts below 40% and we have a few like 53, 52, I think the highest is 53.

So I did send that over to John if you guys want to look at it.

I think it might be easier than having us do it individually.

Again I'm not vouching for these districts.

I just I tried.

I did what Mr. Adelson asked and tried to lower the numbers.

And we've got some crazy show string districts but if everybody wants to look at that, I think it might and have Mr. Adelson look at it and see if this is what you are thinking we might do to be compliant that might be helpful.

>> MS. SARAH REINHARDT: Is this draft distinct from the version submitted the day before yesterday?

>> CHAIR SZETELA: Yes.

>> MS. SARAH REINHARDT: Okay, per our process they must be submitted to the Secretary of State one day before so they can be publicly posted.

>> CHAIR SZETELA: Okay

>>VICE CHAIR ROTHHORN: Commissioner Clark I saw your hand and want to make sure General Counsel gets in while we are waiting for mapping for Commissioner Eid because I think partisan fairness was something we wanted to address Commissioner Clark do you have something quick?

>> COMMISSIONER CLARK: Rebecca.

>> CHAIR SZETELA: Yes.

>> COMMISSIONER CLARK: Changes you made you just referred to are they just in the Detroit area?

>> CHAIR SZETELA: Yes.

>> COMMISSIONER CLARK: Okay thank you.

>> VICE CHAIR ROTHHORN: Okay while we are waiting for our mapping software to boot up Commissioner or General Counsel would you like to address partisan fairness?

>> MS. JULIANNE PASTULA: I would thank you so much Vice Chair Rothhorn. So very briefly I wanted to highlight again for the benefit of the public that partisan fairness according to subsection 13 of the Constitution, which sets forth the ranked criteria that the Commission is legally required to follow, the language regarding partisan fairness is districts shall not provide a disproportionate advantage to any political party.

A disproportionate advantage to a political party shall be determined using accepted measures of partisan fairness.

That language does not require and actually prohibits the Commission from considering the election results while they are mapping.

Accepted measures of pardon sand fairness and measures are run on statewide plan. Which the Commission run on statewide plans.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

They cannot map in the manner in which the public is advocating.
They are legally prohibited from doing so.
The partisan fairness measures when run again the Commission's expert Dr. Lisa Handley will be here tomorrow to run those partisan fairness measures on the statewide plans.
And then the Commission will be able to make amendments, if necessary, based on those measures.
And again the language is shall not provide a disproportionate advantage.
This language is key.
This language is what must be followed and the Commission cannot vary this language or modify the Constitution or not follow the Constitution or else the entire map will be put in jeopardy.
In legal jeopardy.
So it really is critical I think for the public to understand and appreciate the position that the Commission is in.
And that they are required to follow the Constitution as adopted.
By the voters in Michigan.
Again, to the goal was to end partisan gerrymandering and not draw maps based on political considerations which is what this Commission has done to date and will continue to do, get the partisan fairness results and then their legal team can advise on appropriate next steps.
Thank you Mr. Vice Chair se Szetela thank you General Counsel so Anthony I think we will hand it over to you to direct the line drawers.
Looks like Mr. Morgan over there.
    >> MR. BRUCE ADELSON: Madam Chair can I interject.
    >> CHAIR SZETELA: Yes.
    >> MR. BRUCE ADELSON: Thank you for your ongoing efforts and there is something that occurred to me that I wanted to make clear.
One of the things that this Commission is doing, which is quite different than the typical approach to redistricting, you are essentially unpacking districts.
You are essentially leveling the playing field as the Voting Rights Act was intended when it was passed in 1965.
And the Supreme Court has said that is a more challenging process than just packing people of color together willy-nilly.
Frankly that is not difficult to do.
But you are doing the opposite.
And I think it's really important that everybody realize that.
And that, that is why the process is challenging and the process does involve many steps here and there, so I just wanted to make that clarification because I think it is a very salient one.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

MICRC
10/20/21 1:00 pm Public Hearing
Captioned by Q&A Reporting, Inc., www.qacaptions.com

**Exhibit 8**

>> CHAIR SZETELA:
Thank you, good afternoon I apologize in the delay, on getting started.
As Chair of the Commission, we will bring the Michigan Independent
Citizens Redistricting Commission to order at 1:25 p.m.
   This Zoom webinar is being live streamed on YouTube at the
www.Michigan.gov/MICRC Commission YouTube channel.
   For anyone in the public watching who would prefer to watch via a different platform
than they are currently using, please visit our social media at Redistricting MI
   Our live stream today includes closed captioning. Closed captioning, ASL
interpretation, and Spanish and Arabic and Bengali translation services will be provided
for effective participation in this meeting. Please E-mail us at
Redistricting@Michigan.Gov for additional viewing options or details on accessing
language translation services for this meeting.
   People with disabilities or needing other specific accommodations should also
contact Redistricting at Michigan.gov.
   This meeting is also being recorded and will be available at www.Michigan.gov/MICRC
for viewing at a later date and this meeting also is being transcribed and those
closed captioned transcriptions will be made available and posted on
Michigan.gov/MICRC along with the written public comment submissions.
   There is also a public comment portal that may be accessed by visiting
Michigan.gov/MICRC, this portal can be utilized to post maps and comments which can
be viewed by both the Commission and the public.
   Members of the media who may have questions before, during or after the meeting
should direct those questions to Edward Woods III, our Communications and
Outreach Director for the Commission at WoodsE3@Michigan.gov or
517-331-6309.
   For the purposes of the public watching and for the public record I will now turn to
the Department of State staff to take note of the Commissioners present.
   >> MS. SARAH REINHARDT: Good afternoon, Commissioners.
Please say present when I call your name. If you are attending the meeting remotely,
please announce you are attending remotely and disclose your physical location where
you are attending from.
   I will call on Commissioners in alphabetical order starting with
Doug Clark.
   >> COMMISSIONER CLARK: Present.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

Dispensing them in less compact districts that radiate out for the City of Detroit to suburban parts of Macomb and Oakland County.

As a result the maps feature 0 Black majority districts.

I'm asking Detroiters to stay and if we cannot consist have a consistent on the map I would recommend that we should look.

>> CHAIR SZETELA: Your allotted 90 seconds has ended could you please conclude your statement.

Ma'am, out of respect for the fellow ma'am you are being disruptive we have a lot of people here who want to speak today so please honor the time limits.

Thank you.

Five, six, seven and eight.

>> Number five you can go ahead when you reach the podium.

>> Good afternoon, Commission and staff my name is Sharon Wilson.

I was born, raised and educated in the City of Detroit.

I now serve on the board of Delta manor which is a senior apartment complex located on the west side of the City.

I am vested.

Please note issues important to the African/American community have not been given sufficient attention.

Commissioners, now is the time to address these injustices via a correction of the proposed maps.

VRA districts must be created to allow Black voters to elect representatives of their choice.

Thus consideration of voting participation and election results must be taken into consideration.

Currently you have cracked multiple districts and have weakened our voice.

I support the promote the vote maps for Congress, map ID0615.

And the Michigan State University institute for social policy and public research recommendation that the MICRC reevaluate its approach towards compliance with the V RA.

No excuses.

We are demanding fair and equitable maps.

Thank you for listening.

>> CHAIR SZETELA: Thank you for addressing the Commission. Number six.

>> Good afternoon my name is Christine Peck and I'm a resident of Birmingham I was also an active volunteer in the 2018 prop two ballot initiative.

I participated in the process and continue to be invested because I believe a basic requirement of a true democracy is the right for citizens to choose their elected officials by vote.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

However, if the proposed map this Commission has published stands it's as if the democratic party and independents on this Commission had their voices completely silenced.

Primarily in the City of Detroit.

This proposed map spreads the African/American block into multiple districts where their voting influence is greatly diminished and probably violates what is left of the Federal Voting Rights Act.

By the Trump support Court it was supposed to protect a voting groups ability to elect candidates but this Commission proposed map will rob the African/American community of the biggest City the edge in the population of Detroit allowing carpet baggers from suburbs and Lansing to dictate policy where and how state and Federal funds are spent for so many necessary endeavors in our City.

For shame.

This is not what we sent you here to do.

>> CHAIR SZETELA: Thank you for addressing the Commission. Number 12.

>> My name is Marianne and live in hunting ton Woods Michigan.

I appreciate what you're doing Commissioners and as I delved into the maps, I cannot imagine the complexity of the work however today I want to focus on my State House District 21 on all of the maps.

The efficiency gap is between 5.7 and 7.4% this is definitely completely wrong.

If you keep in mind that many elections in our state are decided by less percentages than that, that needs to be reconsidered so first of all District 21 you drew part of 7 cities Detroit, Huntington Woods, Berkeley, Royal Oak, Oak Park, and Clawson, parts of all of these cities which amounts to an African/American population between 48-50% depending on the particular map. You have not drawn a majority minority District even though I believe that some of your work has been to do vertical as opposed to horizontal districts.

But this did not accomplish the goal of having any kind of minority majority districts so what I believe that you need to do is you need to create horizontal districts in the area between Woodward and green field north of 8 mile and the same thing, the same area south of 8 mile.

So this could give you a majority Black District.

Otherwise you will be totally disenfranchising the votes of Black Americans thank you.

>> CHAIR SZETELA: Thank you for addressing the Commission. Commenters 13, 14, 15 and 16 may approach the microphone and number 13 when you reach the podium you are free to speak.

>> Good afternoon, Commission my name is Norman from Detroit.

I'm here today to ask you guys to make sure you are listening to the people out here in the community.

I understand that you guys have a tough job to do.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

This is not my first time speaking to you guys.

And how you have done the districts using 35 percentage of how you are drawing is inaccurate based on the primary of what happened last year and Michigan has low primaries so I'm asking you to go back and redraw the maps not as fast as you can but as accurate as you can and increase it up to 50% and you get the accurate message you need out here.

Also think about the people you represent.

Hear what we are saying and not go by idly and hear what I say.

That is all I ask.

Thank you.

>> CHAIR SZETELA: Thank you for addressing the Commission. Number 14.

>> Hi can you hear? You got my thing on the screen.

Can you throw yours up Congressional up on the screen next to it before you start the clock.

>> MS. SARAH REINHARDT: We are only able to share one map at a time.

>> Yeah, so this is the Congressional you know map I came up with.

It's not really the best option but at least it's something different this is Anthony in southwest Detroit and care about southwest and Down River.

Your Congressional maps have the same configuration throughout Apple, Birch, Cedar, Maple and V1RAS240 all use the same configuration for Congressional one and it's not the UP Commissioner Lange and Kellom when you were on the thing yesterday Congressional District one is right here in Detroit and they use the same for six out of your 7, 8 maps.

There was nothing methodical about it Commissioner Rothhorn and you said it was methodically drawn and we lean on the data and it drove us here.

I watched every meeting the data did not drive you to what you draw for Congressional District one for Detroit.

If I want to ride a bus from the bottom to the top, I have to make a transfer.

If I ride a bus from the bottom of mine where Down River is to the top, I can pick 3, 4, 5, 6 buses to take me all the way.

That is one basis by which I just came up with that.

And so you copied and pasted it.

Then Commissioner Eid you just switched out Warren for Romulus and that is different not really.

Commissioner Lange I appreciate you for at least trying to draw something different so please make wholesale change.

>> CHAIR SZETELA: Thank you for addressing the Commission. Number 15.

>> Nina from south Oakland.

In the State House and Senate maps two different communities of interest are being treated unfairly.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

Specifically in District 110.

Every one of these maps divides.

>> CHAIR SZETELA: Your 90 seconds is up.

Thank you for addressing the Commission. Number 17, 18, 19 and 20 and number 17 when you reach the microphone you may begin speaking.

>> Hello Commissioners and thank you for your work.

I appreciate the effort to remove politics from the political process.

However, I also want to express my concerns of elimination of a District and possible of decreased representation of a minority community that needs it the most in Detroit.

My name is and my family and I live in the City of Rochester. I'm a member of the Sikh faith.

I'm here today to speak on behalf of my religious community in Oakland and Macomb Counties because we have not yet advocated for ourselves in this progress. As a smaller community we used to be together to amplify our voice and have our Congress person notice us as a constituency group.

Our concerns are not only for our own religious community, but the communities at large which we live in. That is why I'm supporting the Birch version of the draft map, which keeps the Sikh places of worship in Oakland, Macomb Counties together by keeping Troy, Rochester, Rochester Hills and Sterling Heights in one District.

We will see many comments from my community on the Birch map. I ask you to consider Michigan six of community of interest on the final Congressional map. Thank you for the opportunity to comment today.

>> CHAIR SZETELA: Thank you for addressing the Commission. Number 18.

>> This Commission was set up to prevent partisan fairness gerrymandering.

The members on this committee should be ashamed of the stacking cracking and packing these so called maps put forward and show.

People see through this.

How much influence has Alec had on Commissioners and the map, ALEC, how much influence have they had on you guys? Start over.

Those maps are garbage.

Go with the maps with the AFLCIO, promote the vote and the Showers, Schwartz maps. Start with those and start over.

>> CHAIR SZETELA: Thank you for addressing the Commission. Number 19.

>> Good afternoon, Commission my name is Yvette Anderson.

We need you to draw maps that are 51% Black.

We know that you can draw better maps for Black Michiganders.

Honor the Voting Rights Act to ensure Black people are able to elect leaders that look like themselves.

Let's not return to the Jim crow politics of old.

Going from 17 majority Black districts to 0 is unacceptable.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

It's important to me that Detroit be able to elect its own representatives and I'm not sure your maps will guaranty that.

Look at the AFLCIO fair maps project for ideas on how to get to partisan fairness while respecting real communities of interest.

Thank you.

>> CHAIR SZETELA: Thank you for addressing the Commission. Number 23.

>> I am Susan.

I live in northwest Detroit in north Rosedale Park and I'm a proud member of Congressional District 13.

I've lived in Detroit since 1975.

I know you have a very difficult job and I know you're doing it to the best of your ability.

However, the currently drawn map cracks my neighborhood and puts my neighborhood in a Congressional District combined with suburban Livonia which I think is 95 percentage white.

I and my neighbors in Detroit in this northwest Detroit are truly a community of interest and have different concerns and needs than suburban Livonia.

I know the intent of this map is not racist.

But it is functionally racist because it dilutes the Black vote.

And will decrease Black representation.

There are examples of maps that are fairer.

Check out the AFLCIO and one fair vote as possible guides.

I think it is incumbent upon you to draw maps that are fair for my neighbors or me and for all Detroiters.

>> CHAIR SZETELA: Thank you for addressing the Commission. Number 24.

>> My name is Rick blocker.

And excuse me.

I come today to ask again that you draw majority-minority maps and districts.

We have Black people in the State of Michigan representing 14% of the population.

We currently represent 12% of the people in the State Senate and the State House.

We represent six percent of people in the Congress of the United States.

Under your current proposal that number could be eliminated to no representatives in the Congressional and very few, if any, in the State House and State Senate.

You must do better.

We deserve fair representation.

The people in this area have fought hard.

We cannot go backwards.

We are sick and tired of being sick and tired.

We need fair maps now.

We need for you to stop, no excuses, draw fair maps.

Make sure we have Black representation.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

If that current Congressional maps you have, neither one of them and I looked at all the maps on the portal goes to 50%.

If you have to go to other communities where Black people are to get 50%, you need to do so.

It is not acceptable for us to have the maps that does not reflect our community and does not protect Black people in this area.

Thank you.

>> CHAIR SZETELA: Thank you for addressing the Commission. Numbers 25, 26, 27, and 28 please approach the microphone and number 25 you can begin speaking. And just to orient people online watching proceedings, we are at 25 and at it for about 35 minutes.

We currently have 116 people signed up for in person public comment.

So it is likely that we will not get to online remote public comments before the 3:30 close and I think we are probably going to push a little past 3:30 to give people more time to speak so orient the people online we are 25 and have 116 in person.

Go ahead number 25.

>> Thank you, good afternoon, everyone my name is Michael and I'm here with my vice president Tonya Ray and Michelle Thomas and Pam Smith and other members of labor unions.

Michigan independent Redistricting Commission you are failing us.

Congress will not end the filibuster so John Lewis Voting Rights Act and freedom to vote act are laying in the waste land.

States right has been the excuse for not passing that legislation and it has been historically been the reason for the disenfranchise of Black Brown Jews and others and needs to focus on Michigan rights and do the right thing for the state and citizens.

Fair should be the benchmark your plan negates what fairness and voting democracy in the communities.

Your plan for the next ten years denies Black Brown in Michigan the opportunity to select representatives from their neighborhoods to send to Lansing, Washington or the school boards.

You can incorporate the AFLCIO maps project or the Michigan Black caucus or even come to the UAW or CBT and we will improve your product to present to the people that will provide racial justice and ensure nonpartisan fairness.

Do the right thing.

Do not put barriers on our boundaries and chains on our voting machines.

Please do not sell the citizens of Michigan by offering a youth that divides us and greatness and power of our democracy.

We all know the big lie.

We ask you today why.

We are asked to have maps on behalf of the politicians or the people in power.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

We must protect the voice of people.

Do the right thing.

Listen, think and act.

Thank you.

>> CHAIR SZETELA: Thank you for addressing the Commission. Number 26.

>> Good afternoon my name is Carla Meijer and I'm from Troy and Oakland County. New House District 32 which is all of Troy is perfect.

Thank you.

New Congressional District 6 not so much.

Troy and Oakland County share new districts with Macomb County.

I lived in Troy since the early 70s but I have always been employed in Oakland I'm sorry always been employed in Macomb County and I know we are not communities of common interest nor do we share common characteristics.

The new Congressional District 6 needs work.

It needs work.

As proposed currently proposed it weighs heavily republican.

Troy should be with Oakland County as proposed on the Juniper maps all other maps it's with Macomb and affiliates with Oakland County and school and library affiliations bus teams Commerce and our Oakland County water resource efforts and goes to Lake St. Clair and the City of St. Clair shores a Lake voting community with nothing similar to Troy.

My ask is that Troy and other Oakland cities that have been placed in CD6 be moved to neighboring CD3 it just makes sense.

Over all maps must be completely nonpartisan and must, must comply with the Voting Rights Act rules.

Thank you.

>> CHAIR SZETELA: Thank you for addressing the Commission. Number 27.

>> Good afternoon, Commissioners.

My name is Betty Edwards, I'm a lifelong Detroiter who has voted in every election since I was 18.

I'm a concerned citizen.

And also a member of Delta Sigma Theta sorority. It was created for Black people to elect representatives that look like them and of their choosing.

Your current maps crack Detroit and make this impossible by radically changing districts.

Today that means congresswoman Tali, Senator Stephanie Chang and Guise and rep Sarah Anthony's community should not be carved up into districts that do not keep their communities' interests together.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> Good afternoon my name is Danielle Steven I'm a retired public servant, native Detroiter and member of multiple civic including Delta significant that and Detroit alumni chapter and Detroit Branch NAACP.

I thank you for this opportunity to provide comment again.

But after review of the maps you submitted, I do not believe they best represent the interests of African/American voters and they're about to select other African/Americans to represent them.

A report recently issued by the Michigan State University's institute for public policy and social research concludes that the methodology used by the Commission, quote, breaks apart the geographical compact Black majority in the City of Detroit dispensing them with less compact districts.

That radiate outward from the City of Detroit towards suburban parts Macomb County and Oakland County.

As a result this engineered partial dilution of concentrated Black vote the maps future 0 Black majority districts.

The purpose of the Voting Rights Act was to ensure equity and the ability for African/Americans to fully participate and a state with African/American population of 13.79 percentage there should be some consideration of our community.

We also point out the majority of this percentage resides in Southeast Michigan and in Detroit furthering our argument.

We strongly recommend that the Commission look to the promote the vote maps.

I have my full statement in the portal.

Thank you.

>> CHAIR SZETELA: Thank you for doing that.

And to clarify we welcome people to also submit their statements into the portal particularly if you feel you don't have time to complete it or just in general because it gives us a written record and you can access that outside the room here there are people there who can assist you or go to the website at www.Michigan.gov/MICRC.

And you can submit your comments there as well.

Thank you, number 48.

>> Good afternoon Honorable Commissioner I'm Eddie McDonough and I think I'm your last speaker before we break.

I would just like to say I've been around for a little while.

70 years old.

I've had the opportunity of growing up in Pontiac.

But I have lived in Wayne County, I've lived in other parts of Oakland County and lived in Canton, I've lived in Farmington Hills, I've got a relatives all over Southeast Michigan. The one thing that I know plain and simple is in all of my living whoever we chose to represent us were part of us from those various communities.

That needs to stay the same.

DISCLAIMER:  This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject
to the inherent limitations of realtime captioning.  The primary focus of realtime captioning is general communication access and as
such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

Speaking as respectfully and as candidly as possible we know the lawsuits are coming
so why are we compromising on the integrity of this constitutional amendment.
I urge you not to compromise our chance at representation for the sake of numbers.
As you know because of the lack of census representation there is no Federal
protections, no Federal Voting Rights Act, no grant funding or research no recognition
for Arab Americans and the battle for basic equity will be even harder because all the
current maps will restrict the only opportunity to gain legislative representation.
The only avenue we have left for a voice.
I'm frustrated because we are making history at the local level with record numbers of
Arabs voting and running for office and done what we are told to do on the table instead
we are put at the menus.

  >> CHAIR SZETELA:  Your allotted 90 seconds is up please conclude your
statement.

  >> P6764 and P6762 which have been collectively drafted by our community thank
you.

  >> CHAIR SZETELA:  Thank you for addressing the Commission. .
Number 56.

  >> Okay looks like we don't have 56 so 57 if you want to go ahead.

  >> Hello, my name is Anthony Watkins.
And I'd like to thank you for the opportunity to share my important comments on the
public hearing.
I would like to comment on how the Commission has gone from 17 majority Black
districts primarily based in Detroit to 0.
That's a problem.
That is a serious problem.
The Detroit neighborhoods and communities should be drawn together.
Majority Black districts are important.
And we can draw them.
NAACP has drawn them.
Several community groups have drawn them.
Fellow Detroit citizens have drawn them.
But these maps need to be seriously looked at and seriously considered and not just
request to be submitted.
So we are aware we can beat this and we are aware that we need to have this done.
Because districts do not have a majority of Blacks.
In large part having elected Black individuals.
Black issues are important.
And led by Black people.
And it's Black people continuously able to lead on these issues.
I thank you.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> CHAIR SZETELA: Thank you for addressing the Commission. Numbers 58, 59, 60 and 61.

>> What number are you sir?

>> 59.

>> CHAIR SZETELA: I don't see 58 so go ahead number 59.

>> I'm Percy Johnson, UAW cap chairman, Local 22.

I'm also a member of liberty temple Baptist church.

We were involved with getting the petitions for you guys to be able to have the position that you have today.

And I need you to get me out of the hot seat because right now the encouragement that I gave our voters in Detroit and people who signed the petition and were willing to participate and be in one of your you know we took names of people to also be a Commission in our church and union halls.

And they were encouraged this will give them a chance to have a fair vote to represent their communities.

And we, seriously I got over 8, 900 signatures on our petitions for this to be on the ballot.

And 90% of them were Detroiters.

So please I'm asking you to please give Detroiters a 50% or plus better to represent their vote when they vote.

So to weaken them and give them a weak vote would hurt them.

I'm from Troy but yet I know if I see -- when I see something that is not justly done or unfair, I'm going to speak up for them and represent them.

My heart and soul is in Detroit and Detroit deserves to have fair, good representation and they can't get it if you take away their strength of their vote.

Give them a 51 plus vote.

Thank you.

>> CHAIR SZETELA: Thank you for addressing the Commission. Number 60.

>> All right we will move on to 61, 62, 63, 64 and just in case there is in I confusion it's my understanding when people were first arriving that people who were higher than 50 were told we might not get to them.

So I'm keeping track of everyone who is not here so if those people happen to show up at 5:00 you will be given a chance to speak.

So I don't want people to think because they are not here, we won't give you a chance to speed because I know some people were given that guidance what number are you ma'am.

>> 64.

>> CHAIR SZETELA: 54.

>> No 64.

>> CHAIR SZETELA: 61, 62 or 63.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

It has the second largest Asian community of any City and Township behind Troy which you basically kept whole in the State House and it's 28 percentage Asian and the number has risen significantly over the decade and projected to grow.

African/American voters which I agree with the folks in the room we need more of and better off there are few communities in Michigan that have large populations of color from different racial backgrounds like Hispanic and Asian community.

I want the Commissioner to consider Novi and Troy has significant Asian population and this community should be kept whole to keep it intact and elect districts that we can select a candidate of choice.

I think the map that has gone the most right direction is the one that is proposed by Commissioner Szetela for the State House.

But it's missing several Novi and precincts out to livings ton county and for Ann for partisan fairness and do not include it with Livingston County and I would take Commissioner Szetela and swap precincts in lion Township for remaining in Novi it does not deserve to be split three ways and have much with Livingston County border and increases the Asian share of population and fits within the population deviation I did double check.

Thank you for your time and being here to take comments.

>> CHAIR SZETELA: Thank you for addressing the Commission. At this time I'll call up 66, 67, 68 and 69 and 66 as soon as you reach the microphone you can start speaking.

>> Good afternoon my name is Reno, 892 out of Saline Michigan and asking the Commission to withdraw the maps so it's fair for democrats and republicans the entire purpose of the independent redistrict Commission is making things fair.

And their work is not complete until they have maps that are fair across the board. I'm also asking for the Ypsilanti centric districts Ypsilanti voters should not have their voices silenced by getting packed into the shadow of Ann Arbor. It's okay if they have Ypsilanti and only a portion of Ann Arbor share districts. But they should not have Ypsilanti and all of Ann Arbor packed together.

This is because Ypsilanti is a major population centered with different demographics than Ann Arbor.

Some newer maps made the split and hope they will follow through. Thank you.

>> CHAIR SZETELA: Thank you for addressing the Commission. Number 67.

>> Hello, my name is Yancey and representing 892 and concerned how you sliced Detroit into thin strips and put with heavy white areas in the suburban.

The democratic Commissioners and in particular need to stay strong and veto any unfair maps until we get fairness.

And under 13 Commissioners should approve any maps that has a boundless advantage to a particular party.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject
to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as
such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

All of the maps so far have been approved by democrats of the Commission and all of them favor the republic party.

Where is the fairness in that?  The fairness is a priority above all local boundaries and compactness.

Do not be afraid to unpack the City.

And by doing so it may make a weird shape in the map but that is okay.

What is not okay if the map does not represent Michigan, it's important Detroit be able to elect its own representative and I'm not sure your maps warrant that.

I believe Detroiters should be represented by Detroiters who understand their concerns. Thank you.

>> CHAIR SZETELA:  Thank you for addressing the Commission.  Number 68 or 69. Do we have number 70, 71, 72 or 73?  If you could just let me know your number, ma'am.

73 thank you.

>> Hi, I'm Sherri from Livingston County and while as I listen to the people speaking here today, I realize I don't have as much on the line as many of them.

So I'm hoping that you all take it to heart and listen to what these people are saying. As a member of the League of Women Voters, I was very strong support of the independent redistricting committee.

And my -- I do live in a currently horribly gerrymandered District that has taken away my voice and my community.

And although the maps are significantly better than they were, they are still skewed in the U.S. Congress and the Senate to favor the GOP by 5-8%.

That's not good enough.

We want fair maps.

The partisan fairness is one of the criteria in the Michigan Constitution.

And I hope you all take that to heart.

Basic principle is that the party that receives the most votes statewide should receive the most seats in the Michigan legislature.

I would urge you to look again at the AFLCIO and the one fair vote maps.

And I'm requesting that you please make partisan fairness a priority in your map. Thank you.

>> CHAIR SZETELA:  Thank you for addressing the Commission.  A call for 70, 71 and 72 what number are you ma'am?

>> 74.

>> CHAIR SZETELA:  Go ahead.

>> My name is Ethyl.

I'm a resident of White Lake Michigan in northern Oakland County.

I want to mention that I appreciate the work you're doing.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> I'm number 95 and I'm a republican and did not vote for proposal two but people of the state did and it's the law of the land and a process that has to go forward and so I commend you for doing work but your work needs work and the one thing you failed to do or at least not at the start but as you got going and sort of listened to your experts first of all Voting Rights Act expert I think I would fire your first order of business after these hearings should be to fire the voting rights expert because he has it dead wrong that is why this community here is dissected as bad as. It has been smashed like a toothpaste tube all over southeast Michigan and I think that is wrong.

But you stopped looking at people and stopped looking at communities and started looked at numbers on a spreadsheet. And all you wanted to do is come up with numbers on the spreadsheet. From the partisan fairness you are. And you couldn't have over 40% African/American in any District, so on and so forth. And then you started dividing things up. And I just want to point out District 15 on the State House map, which begins Schoolcraft and Greenfield in Detroit, an area I grew up very close to. And goes through Oak Park, Berkley, Southfield Township, Bloomfield Township and Birmingham and ends at Long Pine and Loser.

Schoolcraft and Greenfield have very little, if nothing in common with Long Pine and Loser, so get back to work and understand politics.

I know you were not supposed to be involved, and it's clear you weren't. So get back to work and draw fair districts and draw African/American districts. It needs to be done.

>> CHAIR SZETELA: Thank you for addressing the Commission. Sir. If you would like to go ahead and speak and let me know what number you are as well, that will be helpful.

>> Hi. Excuse me. My name is Bruce.

My number is 101.

>> CHAIR SZETELA: We can't hear you it's okay to take your mask off while speaking in the microphone.

>> With the mask.

How you doing my name is Bruce I want to thank the Commission for letting me speak today and I'm blind and I see clearly what is going on with redistrict.

And y'all can see but y'all are blind.

My parents came here from Georgia and Tennessee.

I represent Detroit and northwest area.

And I'm going to speak for the kids that don't have a vote that we are supposed to represent they are our future and for y'all to have districts where I'm not represented by my color and my community, I hope y'all do the right thing and represent the minorities and people of Detroit and the people of my District to represent me and the kids who can't speak for themselves.

I am grateful to see everybody coming out to let you all know how we feel about Districting stuff here.

## Szetela, Rebecca (MICRC)

| | |
|---|---|
| **From:** | Pastula, Julianne (MICRC) |
| **Sent:** | Wednesday, October 20, 2021 10:12 PM |
| **To:** | Pastula, Julianne (MICRC) |
| **Subject:** | Privileged & Confidential: VRA/Partisan Fairness |

**Follow Up Flag:**     Follow up
**Flag Status:**         Flagged

THIS EMAIL IS A PRIVILEGED AND CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATION THAT CONSTITUTES ATTORNEY WORK PRODUCT AND CONTAINS LEGAL ADVICE. **PLEASE DO NOT COPY, DISTRIBUTE, SHARE OR DISCLOSE THE PRIVILEGED & CONFIDENTIAL INFORMATION IN THIS EMAIL.** PLEASE DO NOT "REPLY ALL" OR CREATE "CONSTRUCTIVE QUORUMS" AMONG A QUORUM OF THE PUBLIC BODY THROUGH CONVERSATIONS WITH OTHER COMMISSIONERS OR THROUGH SHARED ELECTRONIC COMMUNICATIONS. DELIBERATIONS BETWEEN A QUORUM OF COMMISSIONERS CAN ONLY OCCUR AT AN OPEN MEETING. PLEASE DO CONTACT JULIANNE AT 517.331.6318 WITH QUESTIONS ABOUT THESE DISCLAIMERS.

Dear Commissioners and Staff,

Congratulations on a very successful first public hearing! As expected, many of the comments centered around the VRA and partisan fairness. Many speakers advocated for strong consideration of the MDP backed AFL-CIO and Promote the Vote maps which are based on criteria and methodologies that are simply not in the MI Constitution (resulting in partisan fairness numbers so different from the MICRC maps which adhered to the MI Constitution and still score very well).

I circulated a privileged and confidential summary prepared by Bruce Adelson in regard to the Voting Rights Act on October 14th. Under MI law, this memorandum (which is an attorney-client communication) can serve as a basis to convene a closed session. This would enable the MICRC to have a frank and direct discussion with their legal counsel in regard to the memo and address the issues surrounding VRA compliance in more detail. This would benefit the MICRC by having one conversation where all members present hear the same information at the same time, benefit from hearing questions of your colleagues and, more importantly, receiving the answers and legal advice from your team. This is a far more effective communication option than one-on-one conversations which lack the depth or breadth of a collective conversation.

If the Commission would like to pursue this option, coordination of this conversation would be needed to facilitate participation of remote members and preparation of the appropriate script to satisfy the legal requirements of holding closed session in MI. This could be arranged in very short order.

Please do not hesitate to reach out with any questions or concerns.

Sincerely,

**Julianne Pastula**
*General Counsel*
State of Michigan
Independent Citizens Redistricting Commission
517.331.6318
PastulaJ1@Michigan.gov

Exhibit 10

## Szetela, Rebecca (MICRC)

| | |
|---|---|
| **From:** | Pastula, Julianne (MICRC) |
| **Sent:** | Monday, October 18, 2021 10:07 AM |
| **To:** | Pastula, Julianne (MICRC) |
| **Subject:** | Privileged & Confidential Information and Update |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

THIS EMAIL IS A PRIVILEGED AND CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATION THAT CONSTITUTES ATTORNEY WORK PRODUCT AND CONTAINS LEGAL ADVICE. **PLEASE DO NOT COPY, DISTRIBUTE, SHARE OR DISCLOSE THE PRIVILEGED & CONFIDENTIAL INFORMATION IN THIS EMAIL.** PLEASE DO NOT "REPLY ALL" OR CREATE "CONSTRUCTIVE QUORUMS" AMONG A QUORUM OF THE PUBLIC BODY THROUGH CONVERSATIONS WITH OTHER COMMISSIONERS OR THROUGH SHARED ELECTRONIC COMMUNICATIONS. DELIBERATIONS BETWEEN A QUORUM OF COMMISSIONERS CAN ONLY OCCUR AT AN OPEN MEETING. PLEASE DO CONTACT JULIANNE AT 517.331.6318 WITH QUESTIONS ABOUT THESE DISCLAIMERS OR THE CONTENTS OF THIS EMAIL.

Good morning Commissioners and Staff!

Congratulations on all of your hard work to date. As we move into the second round of public hearings and the final deliberation/adjustment period I wanted to provide the following information and reminders:

- Please do not respond to comments in the portal. Similar to the presentations, this creates a record that will give your opponents the ammunition for your sworn deposition and trial testimony on your intent and rationale for your mapping selections and on whom you chose to engage.
- Some individual Commissioner maps were submitted after 10 am deadline on Thursday due to ongoing software and data issues. Given each of your individual constitutional rights to submit maps and the difficulty in resolving technical issues for some Commissioners, I strongly recommend any maps received after the deadline be welcomed by the Commission. In addition, the Constitution does not empower the Commission to reject these individual commissioner maps. All published collaborative and individual maps will receive feedback from the public and vetting by the Commission itself.
- Another language reminder:
  - o The rationale provided during the deliberations and adjustment period must be very specific and provide the legal justifications your mapping decisions. The privileged and confidential document titled *Legal Considerations and Discussion of Justifications Re: Criteria* circulated on October 7th provides appropriate legal guidance. The compliance tracking form can also assist in capturing rationale and must be completed for each final map. This rationale is the basis for your decisions that will be highlighted in court (used to challenge or support your work), as has happened with other state commissions, such as in Arizona. Remember, Arizona's transparent, thorough compliance justifications enabled the Arizona Commission to successfully defend all its maps, achieve DOJ preclearance for the first time in state history, and win 9-0 before the US Supreme Court. Let's follow their lead and match their track record.
  - o During the post public hearing deliberation and adjustment period (only 8 days) it is appropriate to highlight that you are responding to public comments, looking to unite/reunite communities of interest and/or increasing diversity. Statements about eliminating blacks or adding whites cannot be made at the table or placed on the public record. There is already too much on the record that can be used against the Commission's work taken out of context and without full appreciation of the MICRC's process.

- ○ It is critical for compliance with the 5th criteria (districts shall not favor/disfavor incumbents or candidates) that Commissioners not consider, know, discuss, analyze, look at, listen to or otherwise allow incumbent information to infiltrate your process, deliberations or work product.
- I would urge the Commission to avoid hyperbole and personal attacks during deliberation and adjustment period. As expected, criticism and attempts to split the Commission into factions will be increasing, particularly during the public hearings.
- If you choose to speak to the media, please remember Friday's great PR training sessions by Edward and Mike (which also reinforced the Subsection 11 messaging that started in January). In addition to "I don't know" or "playing it by ear" and giving an answer that could potentially damage the ongoing work of the MICRC, an appropriate answer can reference legal advice given or redirect to your lawyers (Edward always reaches out to me and I anticipate Mike would not hesitate to as well). By design, the Commission is comprised of 13 regular citizens that should not be expected to have a command of a body of law dating back to the 1960s.
- If you would like to discuss the contents of the Privileged & Confidential VRA memo circulated on October 14th Bruce and I are available to you. We are concerned that the misinformed media narrative will result in additional complications in the Commission's compliance with the VRA. Remember the MICRC has been consistent in its data driven process. The draft proposed maps are based on RBV analysis and the law. Creating districts with overwhelmingly minority or "safe" districts is not supported by either the data or the law. This media narrative is being advanced by lobbyists and politicians driving emotion in a very sensitive and critical area.

**PLEASE consult with your lawyers if you have any questions, concerns, or uncertainties. Our job and ethical obligation is to advise and guide you through this final, more difficult mapping phase.**

Sincerely,

**Julianne Pastula**
*General Counsel*
State of Michigan
Independent Citizens Redistricting Commission
517.331.6318
PastulaJ1@Michigan.gov

# Exhibit 11

| | |
|---|---|
| **From:** | Szetela, Rebecca (MICRC) |
| **Sent:** | Wednesday, December 15, 2021 10:10 PM |
| **To:** | Pastula, Julianne (MICRC); Lett, Steven (MICRC); Rothhorn, MC (MICRC); Woods, Edward (MICRC); Hammersmith, Suann (MICRC); Clark, Douglas (MICRC); Kellom, Brittni (MICRC); Orton, Cynthia (MICRC) |
| **Subject:** | Re: P&C: Update on Proposed Legislation |

Julianne:

I do not appreciate you attempting to put words in my mouth. I did not say I no longer have concerns. In fact, I have grave concerns regarding your conduct.

Specifically, I am deeply concerned to have learned that you personally became aware of critical issues with Dr. Handley's VRA analysis earlier this week and, in addition to not notifying the Commission about this alarming development, have also directed staff members, vendors, and the SOS not to alert Commissioners as to the issue until the week of December 28th - almost two weeks away. It's my understanding that Dr. Handley has informed you, staff, vendors, and members of the SOS that her analysis was deeply flawed and that, as a result of her flawed analysis, not a single one of our Senate maps are VRA compliant. Accordingly, the Commission will likely need to redraw and republish, at a minimum, our Senate maps with BVAP numbers closer to 45-48%, which will require significant map revisions. The alternative is for us to approve non-VRA compliant maps and let our lawyers attempt to defend them, which would be an affront to this entire process.

This information should have immediately been communicated to the Commission and certainly should have been placed on the agenda for tomorrow. The fact that you have instructed other staff members and the SOS to not disclose this information to the Commission for a further two weeks is outrageous and is a perfect example of you exceeding the scope of your duties and making decisions that should be made by the Commission. As an attorney, you have an ethical obligation to keep your client informed. Squirreling away critical information for weeks and hiding it from the client does not satisfy this obligation.

In addition, it's my understanding that you were hoping to conceal this information from the public by having yet another closed session the week of the 28th, which contradicts our mission, vision, and values.

I was planning on discussing this situation with you in person in the morning to encourage you to share this information immediately with Commissioners. Unfortunately, your email made me reconsider that path.

See you in the morning.

Rebecca

**From:** Pastula, Julianne (MICRC) <PastulaJ1@michigan.gov>
**Sent:** Wednesday, December 15, 2021 8:59 PM
**To:** Szetela, Rebecca (MICRC); Lett, Steven (MICRC); Rothhorn, MC (MICRC); Woods, Edward (MICRC); Hammersmith, Suann (MICRC)
**Cc:** Clark, Douglas (MICRC)
**Subject:** RE: P&C: Update on Proposed Legislation

Dear Rebecca,

My offer to connect was in response to your statement during the Dec 2nd meeting that I had stepped outside of my role as General Counsel. I was confused by those allegations. I'm glad to hear it's no longer a concern and I look forward to seeing you in the morning.

Sincerely,

**Julianne Pastula**
*General Counsel*
State of Michigan
Independent Citizens Redistricting Commission
517.331.6318
PastulaJ1@Michigan.gov

---

**From:** Szetela, Rebecca (MICRC) <SzetelaR@michigan.gov>
**Sent:** Monday, December 13, 2021 11:57 AM
**To:** Pastula, Julianne (MICRC) <PastulaJ1@michigan.gov>; Lett, Steven (MICRC) <LettS@michigan.gov>; Rothhorn, MC (MICRC) <RothhornM@michigan.gov>; Woods, Edward (MICRC) <WoodsE3@michigan.gov>; Hammersmith, Suann (MICRC) <HammersmithS@michigan.gov>
**Cc:** Clark, Douglas (MICRC) <ClarkD32@michigan.gov>
**Subject:** RE: P&C: Update on Proposed Legislation

Julianne:

Thank you for your note. While I appreciate your offer to connect, I don't believe there are any issues we need to discuss at this time? If there is something in particular you are concerned about that I am unaware of, you are certainly free to reach out to me at my number below. Keep in mind I am back to working full time and may be tied up in meetings, so please leave a message if you call and I don't answer.

Rebecca Szetela
Commissioner
Michigan Independent Citizens Redistricting Commission
szetelar@michigan.gov
(517) 898-9366



**JA00672**

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

MICRC                                                    Exhibit 12
09/30/21 5:00 pm Meeting
Captioned by Q&A Reporting, Inc., www.qacaptions.com


>> CHAIR SZETELA: As Chair of the Commission, we will bring the Michigan Independent Citizens Redistricting Commission to order at 5:00 p.m.

This Zoom webinar is being live streamed on YouTube at the Michigan Independent Citizens Redistricting Commission on the YouTube channel.

For anyone in the public watching who would prefer to watch via a different platform than they are currently using, please visit our social media at Redistricting MI to find the link for viewing on YouTube.

Our live stream today includes closed captioning. Closed captioning, ASL interpretation, and Spanish and Arabic and Bengali translation services will be provided for effective participation in this meeting. Please E-mail us at Redistricting@Michigan.Gov for additional viewing options or details on accessing language translation services for this meeting.

People with disabilities or needing other specific accommodations should also contact Redistricting at Michigan.gov.

This meeting is also being recorded and will be available at www.Michigan.gov/MICRC for viewing at a later date and this meeting also is being transcribed and those closed captioned transcriptions will be made available and posted on Michigan.gov/MICRC along with the written public comment submissions.

There is also a public comment portal that may be accessed by visiting Michigan.gov/MICRC, this portal can be utilized to post maps and comments which can be viewed by both the Commission and the public.

Members of the media who may have questions before, during or after the meeting should direct those questions to Edward Woods III, our Communications and Outreach Director for the Commission at WoodsE3@Michigan.gov or 517-331-6309.

For the purposes of the public watching and for the public record I will now turn to the Department of State staff to take note of the Commissioners present.

>> MS. SARAH REINHARDT: Good Evening, Commissioners.

Please say present when I call your name. If you are attending the meeting remotely, please disclose you are present and you are attending remotely.

I will call on Commissioners in alphabetical order starting with Doug Clark.

>> COMMISSIONER CLARK: Present.

>> MS. SARAH REINHARDT: Juanita Curry.

>> COMMISSIONER CURRY: Attending from Detroit Michigan.

>> MS. SARAH REINHARDT: Anthony Eid?

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

People are represented in our legislatures, not geography.

My second concern is about partisan fairness.

As was discussed before too.

We need you to reconsider the maps that are currently drawn to ensure that this principle is applied.

I understand that the current drafts are pretty much all leaning towards one party.

And that's the republicans.

This is contrary to the criteria established for the Commission and cannot stand.

Those elected from such districts whether they are one party or the other dominant will not feel as compelled to take into consideration conflicting sets of opinions and to be willing to compromise on legislation.

And that's what we have going on now.

Now, this is a major reason why many of us voted for the proposition, so we are asking you to please work harder on this point. Thank you.

>> CHAIR SZETELA: Thank you for addressing the Commission.

Number five.

>> Hi, can you hear me all right? Is this good? Hey, everyone, my name is Max and live in Wayne County and thank you to the Commission I know this task is complicated and difficult and thank you for your time and dedication on it.

I was here this afternoon and compelled to respond to something.

The Commission was told they cannot use partisan data while making the maps.

But I just want to say that is nowhere in our state Constitution.

That prohibits saying that you cannot use partisan data while making your maps.

I do understand there are some partisan fairness measures such as the efficiency gap that you need a full complete statewide map of districts to use.

But let's not kid ourselves.

The current draft maps as they stand are heavily favored towards one party over the other and tomorrow's analysis is going to show that.

So the question I have for the Commission is: How are we supposed to un-gerrymander the current draft maps if we are not able to use partisan data while you are actually making the maps themselves? I know there was a lot of fun metaphors earlier this afternoon I want to try one for myself.

This is like saying that the Constitution is requiring you to bake a cake and yet you are also being told the Constitution prohibits you from measuring ingredients or taste testing the batter that you simply are supposed to put it in the oven and hope it turns out great. Which it begs the question then what? Like what are you supposed to do for the next cake do you want to guess and check and do trial and error? To me it sound like a waste of cake baking and map drawing time.

Just like everyone else I want a delicious slice of fair constitutional cake.

## Exhibit 13

| | |
|---|---|
| **From:** | Pastula, Julianne (MICRC) |
| **Sent:** | Wednesday, October 6, 2021 7:12 PM |
| **To:** | kbrace@aol.com |
| **Cc:** | Hammersmith, Suann (MICRC); Szetela, Rebecca (MICRC); Rothhorn, MC (MICRC); Reinhardt, Sarah (MDOS); Badelson1 |
| **Subject:** | Partisan Data/Partisan Fairness Measures |
| **Importance:** | High |

Dear Kim,

We urgently need to have a telephone conference this evening to address this issue. The manner in which the partisan data is being presented does not assist the Commission in determining how and where to make focused adjustments to districts. The "trial and error" approach being employed today is far too time consuming and does not have any cognizable methodology. Even worse the time spent is not resulting in productive improvements. Given that the Commission only has 3 days left to finalize its draft proposed maps this must be addressed immediately.

On or about August 6th, I expressed concern with the display of partisan data as the Commissioners were focusing on the displayed political data and because we don't have competitiveness as a criteria, drawing with partisan data was inappropriate. At the time, you indicated it could be "hidden" leading me to believe it is in the active matrix. We need to discuss a more productive way forward so the Commission can interact with partisan data in a more meaningful and time efficient way.

I have taken the liberty of sending an invite for 8:30 pm. I acknowledge you are traveling to the East coast, please advise an alternate time this evening is needed.

Sincerely,

**Julianne Pastula**
*General Counsel*
State of Michigan
Independent Citizens Redistricting Commission
517.331.6318
PastulaJ1@Michigan.gov

# Exhibit 14

| From: | Pastula, Julianne (MICRC) |
|---|---|
| Sent: | Sunday, October 3, 2021 9:49 PM |
| To: | Kim Brace |
| Cc: | Hammersmith, Suann (MICRC); Szetela, Rebecca (MICRC); jmorgan4@cox.net; wkstigall@gmail.com |
| Subject: | RE: Plan to Score |

Dear Kim,

I am available to discuss tomorrow. I will be remote in the morning/early afternoon so it may be best to connect when I arrive in person or after the meeting - depending on Sue's availability of course!

Also, can you please confirm Polsby-Popper in the software.  If so, does the report display individual district scores as well as the plan min/max/median/standard deviation?

Thanks,

**Julianne Pastula**
*General Counsel*
State of Michigan
Independent Citizens Redistricting Commission
517.331.6318
PastulaJ1@Michigan.gov

---

**From:** Kim Brace <kbrace@aol.com>
**Sent:** Sunday, October 3, 2021 9:22 PM
**To:** Szetela, Rebecca (MICRC) <SzetelaR@michigan.gov>; jmorgan4@cox.net; wkstigall@gmail.com
**Cc:** Kim Brace <kbrace@aol.com>; Hammersmith, Suann (MICRC) <HammersmithS@michigan.gov>; Pastula, Julianne (MICRC) <PastulaJ1@michigan.gov>
**Subject:** Re: Plan to Score

**CAUTION: This is an External email. Please send suspicious emails to abuse@michigan.gov**

Rebecca — OK, your plan is uploaded and viewable by the public on the MyDistricting site..

Attached is also the report on political fairness that I ran on your plan.

Sue & Julianne — One of the things that staff and I need to discuss on Monday is how much of some of the additional reports do you want to unveil.  Like this political fairness report there are a bunch of other data, tables and reports that are possible in EDGE, but we should talk about what do we want to release.

Thanks

Kimball Brace
Election Data Services, Inc.
6171 Emerywood Ct
Manassas, VA 20112-3078
(202) 789-2004 or (703) 580-7267 <-- landline
Fax: 703-580-6258
Cell: 202-607-5857
KBrace@aol.com or KBrace@electiondataservices.com
www.electiondataservices.com

NOW AVAILABLE: 2020 Election Results Poster
Order at www.edsposters.com


-----Original Message-----
From: Szetela, Rebecca (MICRC) <SzetelaR@michigan.gov>
To: Kim Brace <kbrace@aol.com>; jmorgan4@cox.net <jmorgan4@cox.net>; wkstigall@gmail.com <wkstigall@gmail.com>
Cc: Kim Brace <kbrace@aol.com>
Sent: Sun, Oct 3, 2021 7:20 pm
Subject: Re: Plan to Score

Yes, unveil it

**From:** Kim Brace <kbrace@aol.com>
**Sent:** Sunday, October 3, 2021 7:13:01 PM
**To:** Szetela, Rebecca (MICRC) <SzetelaR@michigan.gov>; jmorgan4@cox.net <jmorgan4@cox.net>; wkstigall@gmail.com <wkstigall@gmail.com>
**Cc:** Kim Brace <kbrace@aol.com>
**Subject:** Re: Plan to Score

**CAUTION: This is an External email. Please send suspicious emails to abuse@michigan.gov**

Hey Rebecca --

Will do, now that I'm in our Lansing hotel.

Dustin sent me a CD plan he worked on yesterday, and Sue wanted me to upload it to our MyDistrictinng site for the public. Are you ok with unveiling your plan?

Let me know.

Thanks

Kimball Brace
Election Data Services, Inc.
6171 Emerywood Ct
Manassas, VA 20112-3078
(202) 789-2004 or (703) 580-7267 <-- landline
Fax: 703-580-6258
Cell: 202-607-5857
KBrace@aol.com or KBrace@electiondataservices.com
www.electiondataservices.com

NOW AVAILABLE: 2020 Election Results Poster
Order at www.edsposters.com

-----Original Message-----
From: Szetela, Rebecca (MICRC) <SzetelaR@michigan.gov>
To: Kim Brace <kbrace@aol.com>; John Morgan <jmorgan4@cox.net>; Kent Stigall <wkstigall@gmail.com>
Sent: Sun, Oct 3, 2021 6:38 pm
Subject: Plan to Score

Can you run this through the software and send back the spreadsheet reflecting the Partisan Balance scores? Thanks!

Rebecca Szetela
Commissioner
Michigan Independent Citizens Redistricting Commission
szetelar@michigan.gov
(517) 898-9366



# Exhibit 15

| | |
|---|---|
| **From:** | Pastula, Julianne (MICRC) |
| **Sent:** | Monday, October 4, 2021 7:23 PM |
| **To:** | Rothhorn, MC (MICRC); Szetela, Rebecca (MICRC) |
| **Cc:** | Badelson1 |
| **Subject:** | P&C:  Congressional Map Considerations |

| | |
|---|---|
| **Importance:** | High |

Dear Rebecca and MC,

Bruce and I have reached back out to ▇▇▇▇ in an effort to get context on his map submissions.  Given that his initial map analyzed by Dr. Handley received near perfect scores, why should he try to better what is arguably incomparable, particularly if subsequent maps do not score as well as the initial analyzed map.  Our concern is that the map was influenced by partisan data or considerations that are not allowed under MI criteria.  While it is clear the AFL/CIO maps were drawn focused on partisan data (both competitiveness and proportionality by districts) to better their overall partisan fairness scores (also near perfect) – this cannot taint the Commission's collaborative work.  A map that does not follow the criteria can never be "better" than those that do.

Bruce and I remain steadfast in our recommendation to ▇▇▇▇ that he not advance his map we discussed with him last week and strongly encouraged him to submit any desired drafts as an individual Commissioner map, not insert it into the collaborative pool.

Please do not hesitate to reach out with any questions or concerns.

Sincerely,

**Julianne Pastula**
*General Counsel*
State of Michigan
Independent Citizens Redistricting Commission
517.331.6318
PastulaJ1@Michigan.gov

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

MICRC
12/28/21 10:00 am Meeting
Captioned by Q&A Reporting, Inc., www.qacaptions.com          **Exhibit 16**

>> CHAIR SZETELA: As Chair of the Commission, I call the meeting of the Michigan Independent Citizens Redistricting Commission to order at 10:06 a.m.

This Zoom webinar is being live streamed on YouTube at Michigan Independent Citizens Redistricting Commission YouTube channel.

For anyone in the public watching who would prefer to watch via a different platform than they are currently using, please visit our social media at Redistricting MI.

Our live stream today includes closed captioning. Closed captioning, ASL interpretation, and Spanish and Arabic and Bengali translation services will be provided for effective participation in this meeting. Please E-mail us at Redistricting.gov or details for language translation services for this meeting.

People with disabilities or needing other specific accommodations should also contact Redistricting at Michigan.gov.

This meeting is also being recorded and will be available at www.Michigan.gov/MICRC for viewing at a later date and this meeting also is being transcribed and those closed captioned transcriptions will be made available and posted on Michigan.gov/MICRC along with the written public comment submissions.

There is also a public comment portal that may be accessed by visiting Michigan.gov/MICRC, this portal can be utilized to post maps and comments which can be viewed by both the Commission and the public.

Members of the media who may have questions before, during or after the meeting should direct those questions to Edward Woods III, our Communications and Outreach Director for the Commission at WoodsE3@Michigan.gov or 517-331-6309.

For the purposes of the public watching and for the public record I will now turn to the Department of State staff to take note of the Commissioners present.

>> MS. SARAH REINHARDT: Good morning, Commissioners. please say present when I call your name. If you are attending the meeting remotely, please disclose you are attending remotely and as well as your physical location you are attending from.
I will call on Commissioners in alphabetical order starting with Doug Clark.

>> COMMISSIONER CLARK: Present.

>> MS. SARAH REINHARDT: Juanita Curry.

>> COMMISSIONER CURRY: I'm present, attending remotely from Detroit Michigan.

>> MS. SARAH REINHARDT: Anthony Eid?
Brittini Kellom?

>> COMMISSIONER KELLOM: Present, attending remotely from Detroit, Michigan.

>> MS. SARAH REINHARDT: Rhonda Lange?

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

My name is mark Payne a resident of Detroit, I ask that the vote process you have established be adhered to on the actual vote so the public can witness a transparent conclusion to your work.

In addition these lines will last ten years and have a lasting impact.

You can still do better especially on the State House maps Hickory is least bad but you can do better for Michigan taking a little bit more time drafting.

Please take more time to additionally address our ability to elect candidates of choice and assure compliance with the voter rights act z, as a voting rights expert Handley says in 2C we compile election results where all draft districts can be used whether your proposed will provide minority voters with the opportunity to elect.

No mention of this however no mention of this being done is made.

>> CHAIR SZETELA: Thank you for addressing the Commission. Next in line is number 28, Nicole Bedi.

>> Hi everyone.

My name is Nicole Bedi from Birmingham I'm in support of the Birch Congressional map.

We are part of the congregation of a Sikh technical of Rochester Hills.

You heard a lot from my community earlier in the process we support the Birch map because it keeps together the neighborhoods of Sterling Heights Troy and Rochester Hills so that our religious community as well as the south Asian cultural community can be a constituency with member of Congress.

I've been following this process really closely and I've actually taken the time to tally the pins on the portal.

And I want you to pay attention to the fact that there are actually 1500 comments between the Birch and Chestnut maps where 67% of comments are positive on the Birch map where only 55% are positive on or green on the Chestnut map.

There has been a lot of T attention on these verbal comments like mine organized by groups but a ton of individuals do not have the luxury to take time away.

>> CHAIR SZETELA: Thank you for addressing the Commission. Next in line is number 29, Claudia Warren.

>> Good morning.

Good morning, Commissioners and thank you for your service in this extremely important process.

I am one of the many Voters Not Politicians volunteers residing in Midland County.

We collected 21,000 signatures to get proposal two on the ballot.

50-60% of Midland County voters approved proposal two.

50-60% of Midland County voters understood that Michigan's redistricting process was rigging the election in favor of one party.

In Midland County and in the rest of the state we all witnessed what happens when one party dominates with a closed mindset.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

Comments, thoughts? Views? Cheerleading for your plan? Commissioner Eid?

>> COMMISSIONER EID: Well, in my opinion I think the Chestnut plan is the one we should adopt.

I see it as kind of a compromise between all of the plans that we have.

For example, you know we have Ottawa County and Apple it's not split at all.

And Birch it's split twice.

Chestnut there is a compromise and only split once with part of it going in the lower District and the other half going in the Grand Rapids-Muskegon District.

Likewise I see a compromise in Midland County.

And this map almost all of Midland is kept whole except for a few sparsely populated Townships that only have about 9500 people in them total.

Which is less than some single precincts in the more populated areas of the state.

And I see that as a compromise because most of that County is kept whole.

And finally I think the next biggest difference is the BVAP is a little bit higher on districts 12 and 13 in Metro Detroit.

They are at about I believe they are, I will find it out now, they are about 45 and 43.8%.

Which are just a couple of percentage points higher on Birch and Apple configuration.

And finally I think while it wasn't made to be this way, I would ends up shaking out is it also has more competitive districts than Apple or Birch.

So I think it's the best one.

I think that is what we should adopt.

And I also like Commissioner Szetela's individual map.

And I also like Birch.

>> CHAIR SZETELA: Any additional discussion? Rhonda, I can't see you Commissioner Wagner I can't see you, miss Reinhardt?

>> MS. SARAH REINHARDT: Thank you.

Per the Commission's adopted final vote procedure, if you're entering into step two for U.S. Congressional, the first step or step 2A states a motion will be made that each Commission shall state the top plans under consideration and then proceed into discussion after disclosure of your top two favorite plans.

Did you hear me okay? Do you want to repeat it.

>> CHAIR SZETELA: Thank you for the reminder I would entertain a motion for Commissioners to state their top two favorites among the Congressional plans.

Motion made by Commissioner Eid and seconded by Commissioner Witjes is there any discussion or debate on the motion? Hearing none let's vote we have a motion by Eid and seconded by Commissioner Witjes to request that Commissioners identify their top two favorite Congressional plans all in favor please raise your hands and say aye.

Opposed raise your hands and say nay.

>> COMMISSIONER LANGE: Nay.

>> CHAIR SZETELA: Commissioner Lange.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> CHAIR SZETELA:  No, we are not voting at this point, identifying the top two favorite maps and move into a discussion.

And per our planned document we are supposed to do it in alphabetical order so starting with collaboratives that would be in Apple.

Is there any discussion or debate on the Apple?

>> MS. SARAH REINHARDT:  Commissioner Wagner for your reference, in the voting procedure document, the final vote procedure we are moving into 2B which the Commission will discuss each published plan for the District type under consideration in alphabetical order.

>> COMMISSIONER WAGNER:  Thank you.

>> CHAIR SZETELA:  I'm not seeing any hands on the Apple.

Okay, do you want to talk about the Birch, any comments about the Birch? Commissioner Rothhorn?

>> VICE CHAIR ROTHHORN:  So I think the reason I'm choosing Birch is because there has been in the southeast Michigan area it's the most populated area.

And I guess concerned about the way that and recognizing that Grand Rapids is our second most populated City.

But with I believe Detroit and then I think Warren and Sterling Heights it has the top four cities are the most populated area and I think Birch treats that area that the communities of interest that are preserved or the community of interest that we heard from during our process are most reflected in that Birch map.

I recognize that it's not perfect as many have said.

But that is why because it's the most populated area that has the most communities of interest, the most diverse communities of interest preserved that is why I'm leaning towards Birch.

>> CHAIR SZETELA:  Commissioner Witjes then Commissioner Clark then Commissioner Lett.

>> COMMISSIONER WITJES:  I'm basing my decision I know we are talking about Birch here for a good second but going to hit two birds with one stone.

1  I'm taking my own personal beliefs here out of almost everything we are doing when coming to voting.   There has been an overwhelmingly positive response to Chestnut. More so than Birch.

So that would be the reason why I put Chestnut above Birch however both maps are decent.

>> CHAIR SZETELA:  Commissioner Clark?

>> COMMISSIONER CLARK:  Yeah, and I'd like to talk about Birch and Chestnut together.

2  The reason I selected Chestnut was I felt it had more swing districts that depending who the candidates are I could go republican or democrat and that is one of the things we

DISCLAIMER:  This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning.  The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

heard from the public a lot, they used the word competitiveness and I just associated that word with the way Anthony configured this.

So I think that's a very positive thing and something the public talked about quite a bit.

>> CHAIR SZETELA:  Commissioner Lett?

>> COMMISSIONER LETT:  Yeah, I agree with Commissioner Clark and Commissioner Witjes.

3  Clearly the sentiment from the public was for Chestnut.

Really without many reservations at all as I recall.

And it seems I recall that people would say you know Birch looks good but Chestnut looks better.

And number two I think our deliberations as we develop Birch and develop Chestnut, I think we made the corrections to the Birch that provided us with Chestnut and therefore I believe that is the one that should be voted in.

>> CHAIR SZETELA:  Okay, so I have some comments on this.

I think in terms of the public comment it's been frankly equal and actually favors the Birch and that was something I believe Chris Andrews mentioned today that when you tally that 67% of the comments related to the Birch are positive 55% of the comments related to Chestnut are so I think the Birch actually has more favorable comments.

I think the Chestnut in particular it wasn't something that we drew as a collaborative map.

It was something this Commissioner Eid did on his own and adopting it and making it a collaborative map.

Unlike the Birch where we did draw it in live meetings and discussed at length what we were doing and why we were doing it we never had that sort of background with the Chestnut and I think you see that reflected the in the communities of interest on the two maps because for the Birch we have particular configurations particularly Detroit and Oakland County where we have you know little jut outs here and there and done with a deliberate purple and we went through the communities of interest.

We were specifically discussing the Bengali and Asian and Chaldean, the Hispanic communities, the Arab and Muslim in Dearborn in particular and really trying to preserve those communities of interest and we ended up with the lines we drew.

Where I feel the Chestnut disease not preserve those communities of interest in the same way and I think from a defensibility perspective that makes it difficult to go in and say Yeah, we considered the Bengali in Birch we carved out its own District for it yet we completely threw that in the dumpster when it came to Chestnut.

If it was important for us to incorporate in the Birch it should have been incorporated in the Chestnut as well and a big weakness with the plan.

I feel that is a big weakness that a lot of people have identified with the Chestnut in particular including outside entities that have looked at both maps.

DISCLAIMER:  This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning.  The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

Have consistently rated the Chestnut as being the lowest on communities of interest in terms of taking those into account.

And I think that is concerning because we have the Birch which does well with communities of interest.

We have the Apple which does well with the communities of interest then we have the third ranked which is the Chestnut.

So I think if you are looking at all things being equal which they mostly are because the public impression of it is equal if slightly favoring Birch and we have different metrics we are looking at.

Whether it be population, whether it be efficiency gap, whether it be mean median.

They are pretty equal.

And so the big differentiating factor for me is the COIs and we have one map that I think does a really good job of respecting the COIs and in addition to that was well documented as to why we were doing that.

And very open to the public then we have another map that frankly I think compromises COIs.

In favor of competitiveness which is not even one of our constitutional criteria.

Nowhere in our constitutional criteria is competitiveness and I'm sure our General Counsel will jump in on that point so that is not something we should be considering as a factor.

4

And when people are asking us to consider that they are asking us to deviate from the 7 ranked criteria we are supposed to be following.

So I think they are both good maps.

It's not going to kill me either way if we adopt one or the other but I definitely think in terms of complying with our constitutional mandate I think the Birch is superior.

And I would encourage everybody to think about that and consider whether we want to make sure that we are going with the map with better COIs versus the map that is more competitive.

Commissioner Witjes I think you had your hand up first then Commissioner Eid.

I'm sorry can we let Commissioner Curry go first thank you.

   >> COMMISSIONER CURRY:  I just want to reply that I agree with Madam Chair in her response to the Birch map.

I agree wholeheartedly with that.

   >> CHAIR SZETELA:  Thank you Commissioner Curry.

Commissioner Witjes then Commissioner Eid.

   >> COMMISSIONER WITJES:  Between the two I think communities of interest are represented both quite well in the Birch and the Chestnut map.

That being said when it came to percentages that were brought up today in public comment by the individual from Haslett I'm wondering if he went on to the actual public

5

DISCLAIMER:  This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning.  The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

comment not the portal but the website with the proposed maps where you can place the pins.

I'm taking it in account when we actually had our first maps to that we published and all of our public comments hearings we went on the next five plus everything that we've heard in our public meetings that we had every two weeks Chestnut is indeed superior out of the two in regards to what the public has said.

>> CHAIR SZETELA:  Commissioner Eid?

>> COMMISSIONER EID:  A couple things.

One I just want to point out that the Detroit configuration that is in Chestnut was also in map Juniper that went on the second round of public comments which was a collaborative map and we came back and selected this map and made it a collaborative map on Chestnut based on what Commissioners said was the preferred Detroit configuration.

So that is the first thing.

Second, just looking at how people said their preferences, there were 7 preferences, 7 first place preferences for Chestnut.

And four for Birch.

And out of those for Chestnut there were more than -- there were two independents two republicans and one democrat and just wanted to point that out.

Finally I think the independent analysis actually shows the opposite.

I think independent analysis are good tools we should use but most of the ones I read specifically IPPSR report from MSU preferred the Chestnut map.

I looked at other things, the Princeton gerrymander project, which has the maps as A's, which are good.

And 538 also has them all being the same.

So I think from an independent analysis standpoint they are all pretty good all three of them.

As far as community of interest goes, I think the Chestnut map is better in supporting communities of interest because the biggest community of interest here is the you know minority community in Detroit.

And the BVAP being higher I think it does a better job of having that community of interest being represented.

While we have the Bengali community of interest represented very well in other versions of maps.

You know we said all along that not everybody is going to get every single thing they want in every map but I think it's a good compromise.

There are other pluses to as far as Oakland and Troy is included with the Oakland County District which is something that at Oakland University the community made very clear to us, they want to be in with most of Oakland County.

There are negatives though, you know.

DISCLAIMER:  This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning.  The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

It's not a perfect map.

I don't like how Chestnut has upper Oakland County.

I think the Birch map is superior to Chestnut in that regard.

But overall looking at all things in totality, I prefer Chestnut and going by what most people said 7 people said Chestnut was their preference.

So I'm wondering if we can get any wiggle room, maybe have somebody change their mind so we can come to consensus something like that.

>> CHAIR SZETELA:  Commissioner Lange?

>> COMMISSIONER LANGE:  This is why I have a problem of listing the top two it's like a round Robin and I don't think that this is how we should do it.

I don't think we should be forced to say which ones we are.

And put somebody on the spot saying oh, well, 7 Commissioners think this one is the way to go so we just need to swing the last one.

That is round Robin in my opinion and I don't like it.

I just want to put that out there.

>> CHAIR SZETELA:  Thank you for your comment, Commissioner Lange.

So I do want to address the MSU report because I did read that in full like I read everything.

And the primary reason why MSU tipped in favor of Chestnut is because number one they are of the opinion that we are required to have 50% BVAP in order to have voting rights compliance and they favored Chestnut because it has a slightly higher BVAP in District 12 and 13 so to me I disregard that entirely because I trust the expert opinion of Mr. Adelson and he what's said we do not have to have 50% so the fact they are favoring one map over another because it has a slightly higher BVAP when that is not what we are supposed to be -- that is not a goal we are trying to achieve, I disregarded that analysis entirely.

Otherwise their analysis was there was no difference between the Birch and Chestnut they were functionally the same in terms of every factor they looked at.

All right, I feel like we talked about Birch and Chestnut so do we want to talk about I think Lange would be next on the list.

Any discussion, comments about Lange?  And anything about Szetela?  Did you have a comment Commissioner Eid?

>> COMMISSIONER EID:  I was going to say I like the Szetela version.

It would rank after Chestnut and Birch because I think the collaborative maps should be ranked first but just generally speaking, I think I saw what you are trying to do.

I saw you did a good job of trying to put together the best parts of both maps.

>> CHAIR SZETELA:  All right so let's go back to our.

>> MS. JULIANNE PASTULA:  Madam Chair.

>> CHAIR SZETELA:  Let's go to Clark.

DISCLAIMER:  This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning.  The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> COMMISSIONER CLARK:  I liked the Lange map and represented some of the areas that I think needed more representation than they have had.

I think she did a decent job on that.

>> CHAIR SZETELA:  Commissioner Witjes?

>> COMMISSIONER WITJES:  Okay this is okay so we just discussed the Congressional maps now we are going to move on to Senate then the house basically do the same thing.

Does that make sense?  Now we actually discussed the Congressional map, wouldn't it make more sense to go through the voting process now?

>> CHAIR SZETELA:  I think Ms. Reinhardt wants to chime in and General Counsel probably wanted to chime in too.

>> MS. SARAH REINHARDT:  Yes, Commissioner Witjes that is how what the voting plan contemplates is that we will go through all of the steps for each plan sequentially and then move on to the next District type.

So first we would go through all the steps for U.S. Congressional and then move on to the next set, which I believe is State Senate.

>> CHAIR SZETELA:  Just to clarify going through all the steps you are saying voting at this point.

Okay that is what I understood.

Commissioner Lange?

>> COMMISSIONER LANGE:  There was the topic of potentially making changes to the maps.

At the beginning that said we would be coming back to after discussion.

So when do we come back to that?

>> CHAIR SZETELA:  Commissioner Witjes?

>> COMMISSIONER WITJES:  I'm going to make a motion right now that we do not make any changes to the maps.

>> CHAIR SZETELA:  Is that all maps or just these Congressional maps?

>> COMMISSIONER WITJES:  All maps.

>> CHAIR SZETELA:  Okay so we have a motion by Commissioner Witjes seconded by Commissioner Vallette to oh, gosh, how do I want to say this not make any changes to the map I guess, any maps, just any District type maps any discussion or debate on the motion?

>> COMMISSIONER WAGNER:  My hand has been up a while this is Commissioner Wagner.

>> CHAIR SZETELA:  I can't see you.

Please go ahead.

>> COMMISSIONER WAGNER:  Thank you I also wanted to get back to actually amending the maps because as everyone on the Commission is aware I've got a letter of demand out there.

# Exhibit 17

| | |
|---|---|
| **From:** | Pastula, Julianne (MICRC) |
| **Sent:** | Monday, September 20, 2021 12:25 AM |
| **To:** | Pastula, Julianne (MICRC) |
| **Subject:** | Privileged & Confidential: Update |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

THIS EMAIL IS A PRIVILEGED AND CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATION THAT CONTAINS LEGAL ADVICE.

OPEN MEETINGS ACT REMINDER:  DO NOT "REPLY ALL" OR CREATE "CONSTRUCTIVE QUORUMS" AMONG A QUORUM OF THE PUBLIC BODY THROUGH CONVERSATIONS WITH OTHER COMMISSIONERS OR THROUGH SHARED ELECTRONIC COMMUNICATIONS.  DELIBERATIONS BETWEEN A QUORUM OF COMMISSIONERS OR MEMBERS OF A COMMITTEE CAN ONLY OCCUR AT AN OPEN MEETING.  PLEASE CONTACT JULIANNE AT 517.331.6318 WITH QUESTIONS.

Dear Commissioners and Staff,

I wanted to provide updates on the following issues:

**Competitiveness.**  I have consistently stated that competitiveness is not a constitutional criteria in Michigan.  Attempting to add this consideration as a criteria creates a significant legal problem and leaves the MICRC wide open to a court challenge.  First, there is no legal basis for including competitiveness in the criteria that the MICRC is constitutionally mandated to follow.  This would likely be viewed as arbitrary and capricious by a court, particularly after receiving legal advice against inserting competitiveness.  To date, it has been included in the not only the drawing of districts but establishing it as part of the MICRC record as well as the rationale by which districts were evaluated.  Second, as I indicated again during the second meeting last Thursday, the data in the active matrix is disaggregated election results utilized for VRA compliance analysis and is not an approved method to evaluate political advantage (competitiveness).   The full election dataset is not currently included in the data cube.  I acknowledge that the MICRC has received public comment advocating for competitiveness to be considered.  Again, there is no legal basis for this and inserting it as a consideration undermines our legal risk management strategy.  Political considerations are expressly excluded from diverse population/COI criteria so that argument would also fail and put the MICRC's work at risk.  Political boundaries (county, city, townships) are a discrete criterion so attempting to align under diverse population/COI criteria absent demonstration of shared characteristics is also highly inadvisable as the MICRC will have to defend its' decision to identify entire counties or other political units as a COI when it is defending its maps. Other examples of redistricting principles that are not included in Michigan's criteria and therefore cannot be considered are nesting, establishing multi-member districts, and maintaining cores of districts.

In his prior work, Mr. Adelson evaluated political competitiveness in a state that has competitiveness as a specific constitutional redistricting criterion, He well understands the difference between complying with that state's requirements and Michigan's and will share those distinctions with the MICRC. Again, competitiveness is NOT in Michigan's constitution and cannot be included now by the MICRC in its drafting. Looking at VRA selected election results is NOT an approved method for evaluating "disproportionate advantage" and "fairness" and must be avoided.

**Partisan Fairness.**  This is one of the constitutional criteria in Michigan but it cannot and should not be intertwined with competitiveness.  The mathematical models accepted by the courts are employed on statewide plans to determine symmetry and measure partisan fairness by establishing whether a statewide seats to vote comparison and relevant statistical analysis demonstrate disproportionate advantage.  As I indicated during the second meeting on Thursday, the

1

data in the active matrix is disaggregated election results utilized for VRA compliance analysis. Courts have held that election results cannot be used to demonstrate disproportionate advantage or competitiveness. The partisan fairness measures will require another update by EDS.

**Additional Analysis by Dr. Handley.** Dr. Handley is available to perform the partisan fairness analysis as well as additional evaluation of voting patterns by race and ethnicity to identify whether homogeneous populations that are too small for RBV analysis or are not a separate racial category in the census (i.e., concentration of Hispanic voters or MENA population being categorized as White in the census form). A draft Appendix to amend the EDS contract is being finalized for the Commission to discuss and consider.

**Incumbents.** The language of the 5th constitutional criteria "[d]istricts shall not favor or disfavor an incumbent elected official or a candidate" also demonstrates the intent of the constitutional amendment to remove partisan considerations from the MICRC's work. The most effective way to accomplish this and shield the MICRC from individual requests of individuals stating where they intend to run is to not take into consideration any incumbent data and rely upon the partisan fairness measures in the 4th criteria. Any intentional actions taken by the MICRC relative to incumbents will need to be explained and rationale provided for the record. This will be almost impossible in heavily gerrymandered areas of Michigan allowing for a challenge of favoring out state candidates. Additionally, there is no meaningful way to gauge compliance with this criteria once that information is taken into consideration intentionally. Your legal team advises against incumbent considerations and has asked the Communications and Outreach Director to stop including articles outlining the impact of the MICRC's work on current or prospective elected officials.

**Compactness.** The Polsby-Popper test is currently in the EDS software. This test is essential to evaluate legal compliance with the final constitutional criteria. Mr. Adelson has indicated it is a best practice method used across the country and compactness cannot be legally evaluated without it.

**Reconciliation of Legacy Data.** EDS has indicated that the reconciliation between the legacy data released August 12th and the PL 94-171 data released September 16th is complete and the data sets have been verified. As you recall, this was an important part of mitigating legal risk and demonstrating that the data set is accurate, particularly earlier this year when there was uncertainty about the releases.

**Another Michigan Supreme Court Order.** On Saturday, I received an Administrative Order from the MSC stating that until emergency rules are adopted, the MSC will be issuing case management orders for any lawsuits brought by or against the MICRC. A copy of the Order is attached for your convenience. These case management orders will set forth dates/deadlines and procedural requirements and will be extremely helpful. However, it does note the likelihood of shorter timeframes and "nonuniform" periods which underscores the need to secure local counsel as soon as practicable. The Baker Hostetler contract has been signed but the engagement letter has not been finalized. The proposed engagement letter was not consistent with the contract terms or the terms set forth in the RFP. I forwarded recommended edits so that process is ongoing and I am hopeful it will be concluded this week.

**Analysis of VRA Compliance.** Barring any travel delays, Mr. Adelson will arrive at tomorrow's meeting about 1 pm which coincides with the end of the recess period for lunch. He has reviewed the Senate and Congressional plans drafted last week, is happy to address questions the Commissioners may have and he also has questions for the Commission. He will share his thoughts in regard to the draft districts drawn last week and discuss overall VRA compliance at the beginning of the afternoon session.

Lastly, another reminder to be thoughtful in your terminology to ensure it is not freighted as each of you are creating a record that you will need to defend not only collectively as a public body but also as individual Commissioners. Again, I urge that public engagement consist of active listening as opposed to talking. The MCIRC has shifted into the mapping phase of its work, advocacy efforts have significantly increased, and the increased risk of creating a record that will undermine the MICRC's work is too great.

As always, I remain committed to the work of the MICRC and each of you individually.  Please do not hesitate to reach out to me.

Sincerely,

**Julianne Pastula**
*General Counsel*
State of Michigan
Independent Citizens Redistricting Commission
517.331.6318
PastulaJ1@Michigan.gov

JA00691

INSTITUTE FOR PUBLIC POLICY
AND SOCIAL RESEARCH

# MICHIGAN REDISTRICTING MAP ANALYSIS

**PLEASE SEE LATEST DRAFT AT IPPSR.MSU.EDU/REDISTRICTING**

**WITH SUPPORT FROM
THE JOYCE FOUNDATION**

**DECEMBER 2021**

Version 2.1

JA00692



Institute for Public Policy
and Social Research
MICHIGAN STATE UNIVERSITY

# EXECUTIVE SUMMARY

Michigan has embarked on an historic redrawing of boundaries for its 13 U.S. House, 38 Senate and 110 House districts. Redistricting was entrusted this year to 13 members of the Michigan Independent Redistricting Commission (MICRC) randomly selected from a pool of qualified applicants.

This report provides a quantitative analysis of the collaborative Draft maps and of the Proposed maps. The collaborative Draft maps were, as their name indicates, collaboratively drawn by the MICRC and released on Oct. 11, 2021. The Commission voted to release four congressional maps, three Michigan Senate maps, and three Michigan House maps. These Draft maps were subject to a round of public hearings to conducted around the state from Wednesday, Oct. 20 to Tuesday, Oct. 26. Following these public hearings, the MICRC released the Proposed maps during the week from Nov. 1-5, 2021, which are the maps that advance to the final 45-day period of public hearings to stretch from Nov. 15, 2021 to Dec. 29, 2021.

In this report, the Institute for Public Policy and Social Research at Michigan State University analyzes 10 collaborative Draft maps and nine Proposed maps, each bearing a number identifier and the names of trees found in Michigan's forests, orchards and backyards.

This report offers a powerful tool and a guide the Commission and the public can use to compare and evaluate each of the maps to weigh the benefits of adhering closer to some criteria over others, and how maps can change characteristics as they change shape and move toward different metrics. The unique feature is a comparison of the Draft maps and the Proposed maps against maps submitted by the public as well as computer-generated maps, enabling an assessment of where MICRC maps stand out.

The report also includes a brief description of answers to survey questions posed to Michigan citizens, and to Michigan policy leaders who work in state politics, about their understanding of the MICRC and likelihood of engaging with the commission. Michigan's citizens seem positive about the MICRC and its goal of preventing gerrymandering and bringing about more fairness in new districts and elections.

This review doesn't evaluate whether a complete map is "good" or "bad;" it proposes a battery of objective quantitative analyses reflecting how each Draft map and each Proposed map performs on each of the seven criteria specified in a modification of the Michigan Constitution in 2018.

This updated report on Proposed maps, first released on Nov. 15, 2021, and based on analysis to that date, makes a set of observations:

- Plan Chestnut scores well on our measures of meeting the criteria, with notable advantages on some metrics among the three congressional redistricting plans.
- Any deviations from perfect Population Equality in congressional plans need justification.
- All collaborative Michigan Senate plans pursue a controversial path to comply with the Voting Rights Act. They all split the City of Detroit in such a way that every district has less than 45 percent African-American population. Individual Plan SD Kellom (named for Democratic commissioner Brittni Kellom of Detroit) offers an alternative approach in drafting three such districts.

- House plans Pine V5 and Hickory, and to a lesser extent Magnolia, lead to more Democratic seats than almost any computer-generated map. In an attempt to reduce Republican geographic advantages, these plans became outliers not expected by chance.
- It remains unclear how the Commission prioritized or selected among Communities of Interest submitted by the Michigan public for protection.
- The Commission would give itself more options and reduce legal risk by taking the time to make insubstantial edits to improve Population Equality in its congressional plans and by elevating Plan SD Kellom to an official Proposed collective state Senate map.

The first report on the Draft maps, released on Oct. 18, 2021, and based on analysis to that date, made a set of observations due immediate consideration:

- Some maps appear to be incomplete, with a number of U.S. Census blocks not assigned to districts, a finding that can be repaired with revision.
- Population deviations from perfect equality may need justification.
- Draft plans pursue an unusual path to compliance with the Voting Rights Act, maximizing districts that are near 40 percent African-American population, but that are below majority.
- It isn't yet clear whether the MICRC has followed a systematic way to choose among which Communities of Interest to honor.
- Most Commission maps help Democrats to partially --- but not fully --- compensate for the unfavorable geographic concentration of Democratic voters. All maps favor Democrats according to some measures and favor Republicans according to other measures. Taking both views into account, we argue such maps generally follow Criterion F.

Since our first report, the Commission has repaired incomplete and non-contiguous maps. They also modified their Voting Rights Act compliance strategy for state House districts. Population equality, Voting Rights Act compliance, Communities of Interest prioritization, and partisan fairness measures all still deserve further consideration. But we are confident that the maps produced by the Commission will better meet the criteria outlined in the Constitution than the prior maps. Despite some complaints, the Michigan public and policymaking community share our confidence. This report is designed to help the Commission best achieve its objectives and help the public hold the Commission accountable.

Some maps await analysis and some measures are not yet available. Please see https://ippsr.msu.edu/redistricting as analysis continues to be updated. Under MICRC's published schedule, a final vote on all approved maps is expected Thursday, Dec. 30, 2021. In addition to this initial analysis, IPPSR plans a full report of Michigan's new redistricting initiative in 2022.

# INTRODUCTION

As Michigan's Independent Citizens Redistricting Commission embarked on its history making work, Michigan State University's Institute for Public Policy and Social Research helped provide training and technical assistance to the fledging commission. In all its work, the Institute for Public Policy and Social Research (IPPSR) applies research to pressing public policy issues and builds problem-solving relationships between the academic and policymaking communities. For the Michigan Independent Citizens Redistricting Commission (MICRC) and its staff, IPPSR has played a role in promoting and conducting research on redistricting and related public policy issues, has provided survey research, and produced education and training programs.

In this role, IPPSR worked alongside the University of Michigan's Center for Local, State and Urban Policy in the Ford School of Public Policy at the University of Michigan (CLOSUP).  All work was under the direction of IPPSR Director Dr. Matt Grossmann and CLOSUP Executive Director Tom Ivacko. This work was undertaken with the support of The Joyce Foundation, which invests in evidence-informed public policies and strategies to advance racial equity and economic mobility in the nation's Great Lakes heartland states.

Before the Redistricting Commission began drawing any lines, IPPSR and CLOSUP were involved in orienting the Commission. The first day, on the afternoon of Sept. 17, 2020 the Commission heard about the Basics of Article IV, Section 6 of the Michigan Constitution. That article and section held the constitutional mandate giving the MICRC the exclusive authority to redistrict the state. The discussion included information on process and especially the mapping criteria, the constitution's seven priorities – in order – for proposing and adopting a redistricting plan. As part of that session, the panel presentation brought together Dr. John Chamberlin, professor emeritus of public policy, University of Michigan, and Dr. Jon X. Eguia, professor of economics, at MSU. Dr. Grossmann moderated the session.

The following morning, Ivacko moderated a discussion on redistricting history and the Voting Rights Act. That panel included Ellen Katz, professor of law, University of Michigan Law School, and Justin Levitt, professor of law, Loyola Law School.

Dr. Grossmann moderated a second panel presentation that day on redistricting in Michigan. The panelists were Chris Thomas, former director of the Michigan Bureau of Elections, and John Pirich, veteran elections attorney and faculty member, Michigan State University Law School.

A third session, on Michigan demographics and the U.S. Census, took place just a month later. In that session, the Redistricting Commission heard from Michigan State Demographer Eric Guthrie; Lisa Neidert, retired data archivist from the U of M Population Studies Center and Noah Durst, an MSU assistant professor of urban and regional planning whose expertise focuses on population measures of housing and location. Commissioners heard about Michigan's diversity of people, economic sectors and regional interests, especially as those are measured through the U.S. Census. The goal: to give redistricting commissioners the knowledge needed to identify most likely Michigan locations for public hearings and to understand population dynamics.

The following spring brought a series of four panels outlining and explaining redistricting duties as they relate to the Voting Rights Act, Communities of Interest and Map-Drawing. These duties are essential to complying with laws and constitutional requirements of Michigan's newly enacted redistricting mandates calling for a fairly drawn, citizen-led and transparent process to map boundaries for the state Congressional, House and Senate district lines.

Three experts were scheduled to speak about the Voting Rights Act details and requirements. Those specialists were Leah Aden, deputy director of litigation, NAACP Legal Defense and Educational Fund, Inc.; David J. Becker, executive director and founder, Center for Election Innovation & Research and Michael Li, senior counsel, Brennan Center for Justice. IPPSR Director Grossmann moderated.

A second spring session featured a panel of experts who described and defined Communities of Interest for the MICRC work. Those specialists were Mariana C. Martine, Director of Civic Engagement Initiatives, Michigan Nonprofit Association; Susan Smith, Vice President – Advocacy, League of Women Voters of Michigan. Ivacko, CLOSUP executive director, moderated.

In a highly interactive presentation, IPPSR then brought together software expertise, a demographer and political scientists to lead the discussion of how maps would ultimately be drawn and the challenges in outlining their shapes and the people who would vote within them. The first session presented tips about understanding trade-offs among the criteria and difficulties in the mapping process, led by Dr. Grossmann and Guthrie. Members of the Redistricting Commission were then invited to begin their own map drawing practice of the State of Ohio and receive feedback from experts on their practice maps.

IPPSR and CLOSUP consulted with experts to review the commissioners' maps and to conclude the exercise with a process of collectively practicing map-drawing. Those experts were Dr. Moon Duchin, professor of mathematics, Tufts University; Dr. Ashton Shortridge, professor, Department of Geography, Environment and Spatial Sciences, MSU; Dr. Corwin Smidt, interim director, Department of Political Science, MSU; Chamberlin, of the University of Michigan; Ivacko of CLOSUP, and Dr. Jon X. Eguia. State Demographer Guthrie and Dr. Grossmann of IPPSR led the collective practice mapping process of Ohio Congressional Districts.

In the fall of 2021, IPPSR, with CLOSUP, helped produce three online webinars sharing resources on redistricting and communities of interest (COIs). Recordings of these events, open to the public, illuminated the importance of public input, data collection and aggregation and how, even as preliminary redistricting commission maps were made available for public hearings, members of the public were still invited and empowered to make their views known.

From the start, IPPSR helped to prepare and compile – in conjunction with the Michigan Department of State, which oversees elections and redistricting within Michigan, CLOSUP and the Princeton Gerrymandering Project, a set of publicly available Commissioner Orientation and Resource Materials. These materials outlined an initial agenda for the commission's convening, constitutional language setting forth required redistricting criteria, hands-on mapping resources, draft timelines for meetings and decision-making and a glossary of terms.

IPPSR also provided race-of-candidate data from Dr. Eric Gonzales Juenke for use in the Commission's Voting Rights Act analysis by Dr. Lisa Handley, president of Frontier International Consulting, an election consulting firm.

In 2021, Michigan State University's Institute for Public Policy and Social Research was the recipient of a two-year, $250,000 grant extended from The Joyce Foundation of Chicago.

The grant engaged IPPSR to provide training and technical assistance to the Michigan Independent Citizens Redistricting Commission. IPPSR was also to evaluate the state's first redistricting process under the MICRC.

MICHIGAN REDISTRICTING                                                                                    PAGE 5

Through the life of the two-year grant, IPPSR is working with the University of Michigan's Center for Local, State, and Urban Policy, sharing resources, conducting educational programming and evaluating the redistricting process. This report represents the interim version of the evaluation. In addition to updating this report, IPPSR and CLOSUP will provide a final report on the full redistricting process in 2022. This report is designed to provide information and materials that the Commission and the public can still use now before voting on final maps.

IPPSR is engaging with Dr. Eguia, lead author of this report, to coordinate the analysis and reporting on the maps. This analysis brings together results from independent research teams at Tufts University, Yale University, Princeton University, University of Michigan, Duke University, and Michigan State University, all of them contributing their work to provide a better understanding of these maps and their consequences for the citizens of Michigan.

We rely primarily on materials made public by Prof. Moon Duchin's Metric Geometry and Gerrymandering Group (MGGG Redistricting Lab) at Tisch College of Tufts University, which include many metrics and scores for the MICRC plans, the plans submitted by the public, and randomly generated alternative plans. On partisan fairness, we use five independent sources of results: first, the results provided by the MGGG Redistricting Lab; second, results obtained by Dr. Christian Cox from Yale University; third, results from computational ensembles generated by the Princeton Gerrymandering Project (directed by Professor Samuel Wang) and released to the public through the project's Redistricting Report Cards; fourth, results from computational ensembles generated by the University of Michigan Redistricting Team (directed by Professor Timothy Ryan) in collaboration with the Duke Redistricting Group led by Professor Jonathan Mattingly and Professor Joseph Herschlag at Duke University; and fifth, results made freely available to the public by the redistricting application DRA 2020, available due to the work of a team of volunteers and housed online at davesredistricting.org

We are grateful that this entire network of researchers has generously contributed their expertise to this report.

Under the U.S. Constitution, congressional and legislative districts must be redrawn every 10 years upon completion of a new U.S. Census. A state constitutional amendment, forwarded by the grassroots organization Voters Not Politicians and approved by Michigan voters in 2018 empowered a commission randomly selected from a pool of pre-qualified applicants to draw the boundaries outlining the state's U.S House, state Senate and state House of Representative districts.

The constitutionally revised task that had traditionally been overseen by Michigan's Legislature and governor instead moved into the hands of the 13-member MICRC – constituted of four people aligned with the Democratic Party, four identified as Republicans and five members who claimed allegiance to no specific party.

This effort was complicated by the COVID pandemic and associated delay in receiving U.S. Census data. This redistricting will be written about, evaluated, tested, retested and challenged in the coming months and years – potentially decades – as Michigan and its populace, policy and politics follow this new path to drawing the boundaries from which voters will cast their ballots. Our full evaluation of the Commission and its final maps will come in the summer of 2022 and we are excited to be a part of such a comprehensive effort.

We are indebted to The Joyce Foundation, to postdoctoral fellow Christian Cox at the Jackson Center for Global Affairs at Yale University, to IPPSR Director Dr. Matt Grossmann and CLOSUP Executive Director Tom Ivacko, to Dr. Duchin and her team at MGGG, to the Princeton Gerrymandering Group, to Mike Wilkinson at Bridge Michigan, to Dr. Ellen Katz and Henry Fleischmann at the University of Michigan, to Alec Ramsay at DRA 2020, to MICRC Director Suann Hammersmith and staff, and to all those at Michigan State University and the University of Michigan who contributed to this informative and educational effort, especially Cindy Kyle, Bonnie Roberts, Nick Pigeon, Julian Trevino, Natalie Harmon and Lia Bergin.

JA00698

# LEAD AUTHOR



**Jon X. Eguia**, Ph.D., is a Professor of Economics and (by courtesy) of Political Science at Michigan State University. He joined Michigan State in 2014. He has also worked at New York University, the University of Bristol and at Harvard University. He serves as an Associate Editor for the *Journal of the European Economic Association*. His expertise is in Collective Choice, Institutional Design and Political Economy. His work on partisan fairness in redistricting is forthcoming in the *Election Law Journal*. He earned his doctorate in Social Sciences at Caltech in 2007.

JA00699

# TABLE OF CONTENTS

PART I        About This Report                                        … Page   10.

PART II       The Seven Constitutional Criteria                        … Page   14.

PART III      Draft Maps for Michigan's Congressional Districts        … Page   15.

PART IV       Proposed Maps for Michigan's Congressional Districts     … Page   47.

PART V        Draft Maps for Michigan's State Senate Districts         … Page   72.

PART VI       Proposed Maps for Michigan's State Senate Districts      … Page   91.

PART VII      Draft Maps for Michigan's State House Districts          … Page 113.

PART VIII     Proposed Maps for Michigan's State House Districts       … Page 131.

PART IX       Assessing Michigan's New Redistricting Process           … Page 150.

PART X        Recommendations                                         … Page 158.

PART XI       Michigan's Redistricting History                        … Page 163.

# PART I. ABOUT THIS REPORT

This report provides a quantitative analysis of the collaborative Draft maps and the Proposed maps for Michigan Congressional Districts, for Michigan Senate districts, and for Michigan House of Representatives districts. The collaborative Draft maps were released to the public by the Michigan Independent Citizen Redistricting Commission (MICRC) to be considered during a second round of public hearings conducted from Oct. 20, 2021 to Oct. 26, 2021. The Proposed maps were released by the MICRC to be considered during a final round of public hearings scheduled from Nov. 15, 2021 to Dec. 29, 2021.

On October 11, the Commission voted to release four congressional maps, three Michigan Senate maps and three Michigan House maps, all drawn collaboratively by commissioners. We analyze these 10 collaborative Draft maps. The Commission assigned each plan a name, and a codename based on a tree native to Michigan. We refer to the Draft maps by these codenames. Here is a table with the Draft maps and their names, obtained from the Commission's website at https://www.michigan.gov/micrc/.

| TABLE 1. List of Collaborative Draft Maps | | |
|---|---|---|
| **Type of District** | **Codename** | **Plan Number** |
| State Senate | Elm | 199 |
| State Senate | Cherry | 220 |
| State Senate | Spruce | 226 |
| State House | Peach | 228 |
| State House | Oak | 229 |
| State House | Pine | 227 |
| Congressional | Apple | 201 |
| Congressional | Birch | 230 |
| Congressional | Maple | 219 |
| Congressional | Juniper | 218 |

Each Commissioner also had an opportunity to submit an individually drawn map of each type (Congressional, state House, state Senate) of district, which are not detailed in this report. Analyses are available here.

From Nov. 1, 2021 to Nov. 5, 2021, the Commission voted to release three collaborative congressional maps, three collaborative Michigan Senate maps, and three collaborative Michigan House maps. We analyze these nine collaborative maps, advanced to a 45-day public comment period, and to differentiate them from earlier maps, deemed Proposed maps. The Commission assigned each map a name based on a tree native to Michigan. Here is a table with the Proposed maps and their names. The information was obtained from the Commission's website.

| TABLE 2. List of Collaborative Proposed Maps | | |
|---|---|---|
| **Type of District** | **Codename** | **Plan Number** |
| State Senate | Cherry V2 | 251 |
| State Senate | Linden | 260 |
| State Senate | Palm | 261 |
| State House | Pine V5 | 259 |
| State House | Hickory | 262 |
| State House | Magnolia | 263 |
| Congressional | Apple V2 | 252 |
| Congressional | Birch V2 | 253 |
| Congressional | Chestnut | 254 |

To inform the public in a timely manner, the first report on the Draft maps yielded analysis available in time for the first of the second round of public hearings. We subsequently complemented this initial report with additional analyses. The report is thus intended as a "living document," updated as more content becomes available. This document is version 2.1. of the report. The history of versions is as follows:

-Initial release on Oct. 18, 2021.

-Version 1.1: Includes a check of Contiguity in House maps, and a new recommendation to remedy House maps to address this criterion.

-Version 2.0: Introduces an analysis of Proposed maps.

-Version 2.1: Adds an abridged analysis of congressional plans CD Lange and CD Szetela, and expands on the analysis of Criterion E (fairness to candidates).

The latest version of this report is available at: ippsr.msu.edu/redistricting

Our report evaluates whether each map is complete and how well it meets the Commission's criteria. A complete redistricting plan must divide the entire area of the state into districts, so that each point in the geography of the state is in one — and only one — district in each of three maps: districts for the U.S. Congress, for the state House, and for the state Senate. The Michigan Constitution, Art IV, § 6(13) states that in proposing and adopting each redistricting plan, the Commission shall abide by _seven criteria_, ranked in order of priority.

We first check that each map is a complete redistricting map that assigns each place of residency to exactly one district. We then assess each map on the basis of these seven criteria. We assess the congressional district maps in Part III (Draft maps) and in Part IV (Proposed maps); the Senate district maps in Part V (Draft maps) and Part VI (Proposed maps); and the House district maps in Part VII (Draft maps) and Part VIII (Proposed maps). For each type of map, and for each criterion, we describe quantitative measures of performance. Then, we report how each map performs

according to each of these measures. Our analysis is based on the map boundaries reported on the Commission website, though the Commission is using different software to produce the maps than to make them publicly available, so some variations are possible.

For comparison, we report the distribution of scores across all maps in what we term the "Public Ensemble," which are all the maps submitted by the public on the MICRC online portal, and what we term the "Computational Ensemble," which is a set of 100,000 computer-generated maps. For each type of map, and for each criterion, we describe quantitative measures of performance on the basis of this criterion. The Commission has reviewed measures of its maps' performance, but it has compared them against a theoretical baseline, rather than the range of maps submitted by the public and a range of computer-generated maps.

The scores on some of our measures are easy to interpret directly. For instance, if we have a measure of "contiguity" (Criteria Two) that assigns a value "1" if each district is connected in one piece, and a value of "0" if it is not. If a proposed map scores a "1" on this measure, then we know that all the districts on this map are connected. Other measures follow more complicated mathematical formulas, and any given score is harder to interpret in isolation. Comparing the performance of the MICRC maps to both the Public Ensemble and the Computational Ensemble makes scores interpretable on a distribution of potential maps.

For each of the three types of districts (Congressional, Michigan Senate, and Michigan House), the Public Ensemble is the collection of all complete and sufficiently close-to-valid maps of districts submitted by the public through the MICRC's submission portal at https://www.michigan-mapping.org by Oct. 1, 2021.[1] The Public Ensemble of congressional district maps contains 112 maps; the Public Ensemble of Senate maps contains seven maps. Unfortunately, all Michigan House plans submitted by the public have a population difference across districts greater than 25%, so we are not able to include any to construct the Public Ensemble for the state House. In other words, no citizen succeeded in drawing 110 Michigan House districts of near equal population (in part because many maps were drawn before the new Census data was available).

For each of the three types of districts, the Computational Ensemble contains 100,000 maps created by the MGGG Redistricting Lab using the Recombination (ReCom) algorithm. All the computationally generated maps are within 1% of the ideal district population, and attempt to respect county boundaries, but are not designed to follow any other criteria. This algorithm starts with a starting map, also known as a "seed" map. From that start, the algorithm constructs new maps following a random path (what we know in statistics as a "Markov Chain Monte Carlo" or "MCMC") that at each step transforms a given map into the next map. At each step of this path, the algorithm randomly selects two adjacent districts in the current map, it merges them, and then re-splits the merger into two new districts, thus generating a new map.[2] At each step, the change from the prior map to the next one is therefore small.

In this way, our report offers a powerful tool and a guide that the public can use to compare and evaluate each of the maps so members of the public can weigh the benefits of adhering closer to

---

[1] MGGG deemed a map sufficiently close to valid if it leaves unassigned no more than five Census' Voting Tabulation Districts (all must be assigned); the maximum population deviation from the ideal equal population across its districts is below 5% (it must be much lower than that), and if it violates contiguity, it is only in a minor way.

[2] https://mggg.org/uploads/ReCom.pdf

some criteria over others, and how maps can change characteristics as they change shape and move toward different metrics.

We stress that we do not evaluate whether a complete map is "good" or "bad," nor do we offer an opinion as to whether it is legal or illegal under the Michigan Constitution. We leave it up to each Michigan citizen to decide whether each map sufficiently meets the criteria, and up to jurists and courts to determine if the maps meet legal tests.

What we offer is a battery of objective quantitative analyses reflecting how every collaboratively Draft map and every collaboratively Proposed map performs on each of the seven criteria specified in the Michigan Constitution, noting concerns for further consideration and issuing recommendations based on our quantitative analysis.

# PART II. THE SEVEN CONSTITUTIONAL CRITERIA

Article IV §6 (13) of the Michigan Constitution instructs that *"The commission shall abide by the following criteria in proposing and adopting each plan, in order of priority:*

*Criterion A. Districts shall be of equal population as mandated by the United States constitution, and shall comply with the [Voting Rights Act] and other federal laws.*

*Criterion B. Districts shall be geographically contiguous. Island areas are considered to be contiguous by land to the county of which they are a part.*

*Criterion C. Districts shall reflect the state's diverse population and communities of interest. Communities of interest may include, but shall not be limited to, populations that share cultural or historical characteristics or economic interests. Communities of interest do not include relationships with political parties, incumbents, or political candidates.*

*Criterion D. Districts shall not provide a disproportionate advantage to any political party. A disproportionate advantage to a political party shall be determined using accepted measures of partisan fairness.*

*Criterion E. Districts shall not favor or disfavor an incumbent elected official or a candidate.*

*Criterion F. Districts shall reflect consideration of county, city, and township boundaries.*

*Criterion G. Districts shall be reasonably compact."*[3]

---

[3]

http://www.legislature.mi.gov/(S(4kdli1sqztuxeeo1svfgodhz))/mileg.aspx?page=getObject&objectName=mcl-Article-IV-6

# PART III. ANALYSIS OF DRAFT MAPS FOR MICHIGAN'S CONGRESSIONAL DISTRICTS

## III.1. THE DRAFT CONGRESSIONAL DISTRICT MAPS

On October 11, the MICRC approved the following collaborative Draft maps for U.S. Congressional Districts, for consideration in the Second Round of Public Hearings (Oct 20th – Oct 27, 2021): [4]

-**Plan "Apple," name "10-05-21 v1 CD DW"** (map number #201), on a vote of 13-0.



**Plan Apple**

---

[4] These maps are available for download here:
https://michigan.mydistricting.com/legdistricting/michigan/comment_links

-**Plan "Juniper," name "10-07-21 v1 CD AE"** (map number #218), on a vote of 13-0.
Note that the Juniper map appears to <u>not be a valid redistricting plan</u>, as it fails to assign a district to all the areas of Michigan. A triangle contained in Census Block 2000 in Ray Township (Macomb Co.) is unassigned to any district. This triangle is delimited by 29 Mile Rd, Indian Trail, and the line divider between Ray Township and Lenox Township, and contains 14 residents.[5]



**Plan Juniper**

---

[5] See grid map 7 in Census map
https://www2.census.gov/geo/maps/DC2020/DC20BLK/st26_mi/county/c26099_macomb/DC20BLK_C26099.pdf

-**Plan "Maple", name "10-07-21 v1 CD DC"** (map number #219), on a vote of 13-0.



**Plan Maple**

JA00708

-**Plan "Birch," name "10-08-21 v1 CD RAS"** (map number #230), on a vote of 12-1.

Note that the Birch map appears to <u>not be a valid redistricting plan</u>, as it fails to assign a district to all the areas of Michigan. Plan Birch fails to assign any district to census blocks 1010 and 1014 in census track 1724 in Oak Park (Oakland County.) These blocks contain 25 inhabitants. These blocks must be assigned to a district.[6]



**Plan Birch**

---

[6] See grid map 35 and Inset J on Census map
https://www2.census.gov/geo/maps/DC2020/DC20BLK/st26_mi/county/c26125_oakland/DC20BLK_C261 25.pdf

## III.2. MEASURING PERFORMANCE ON EACH CRITERIA

## CRITERION A: POPULATION BALANCE AND VOTING RIGHTS ACT

"*Districts shall be of equal population as mandated by the United States constitution, and shall comply with the voting rights act and other federal laws.*"

**Understanding the Criterion.**
This criterion has three parts. The first is that districts shall be of equal population. The second is that they shall comply with the Voting Rights Act. And the third is an open-ended guarantee for future redistricting cycles that complying with criteria B through F will always be secondary to complying with any future federal law.

With regard to equal population, the population is the total number of inhabitants, as measured according to the most recent U.S. Census, in this case the 2020 U.S. Census. The Michigan population according to the 2020 U.S. Census is 10,077,331 inhabitants. Michigan has 13 Congressional Districts. So, the ideally equal population is 775,179 inhabitants per district. The United States Supreme Court has ruled that any deviation from exact equal population must be "necessary to achieve some legitimate state objective," but "small differences in the population of Congressional Districts" are acceptable if these differences are required to satisfy a state's redistricting criteria. [7]   In practice, The Court has accepted a deviation as large as 0.79% of difference between the most and least populous district.[8] Therefore, any deviation from perfect population equality must be required to better satisfy one of the criteria A-F, and such deviation must be small, probably not much larger than 0.79%. If there is any substantial deviation from population equality, supporters of one party should not be systematically placed in larger districts.[9]

With regard to the Voting Rights Act, its Section 2 as amended by Congress, currently prohibits enacting electoral maps that have "*the result of denying a racial or language minority an equal opportunity to participate in the political process.*"[10]

The "*equal opportunity to participate*" clause includes an equal opportunity to elect candidates of their choice. It does not require that, nor is it necessarily satisfied if, members of the relevant minority are themselves elected in any proportion. For a district to provide to a minority an opportunity to elect its preferred candidate requires that if the minority overwhelmingly votes for a candidate, then this candidate wins both the party primary and the general election, given the standard voting patterns of voters not in this minority. Any such district is a "district of opportunity" for the relevant minority. This opportunity to elect candidates of their choice does not require –but it is guaranteed— if the relevant minority is a majority of the population in the district (a so called "majority-minority" districts).

---

[7] Karcher v. Daggett, 462 U.S. 740-741 (1983).
[8] Tennant v. Jefferson County 567 U.S. 758 (2012).
[9] Cox v. Larios, 542 U.S. 947.
[10] https://www.justice.gov/crt/section-2-voting-rights-act#sec2

**Measures of performance on Criterion A.**

**A1. Measure of population inequality.**
We compute the difference between the most and least populous district, using the formula:

$$\frac{Population\ of\ most\ populous\ district}{Population\ of\ least\ populous\ district} - 1,$$

in percentage points.

For convenience, we also report the largest deviation to the ideal population size of a district, namely,

$$\frac{Population\ of\ most\ populous\ district}{775,179} - 1,$$

again, in percentage points.

**A2. Number of Districts of Opportunity.**
The ideal way to quantify a measure of compliance with the Voting Rights Act is to use past election results by race and precinct, in both primary and general elections, to estimate how many districts of opportunity for minorities there are there in a new redistricting plan.

To determine whether a new district is a district of opportunity for a given minority, we need to know which candidate the minority preferred in each past election under consideration, and whether or not the candidate preferred by the minority won most votes in the primary and in the general in this district.

We first need to determine which candidate is preferred by the minority under consideration. Because voting is private, this is not a given. Rather, we infer it from the difference in voting patterns in precincts with a large share of minority adult population, compared to precincts with a small such share. Popular methods to estimate this minority vote are the Ecological Inference methods proposed by Gary King, and other ecological regression method. [11] While the precise statistical methods vary, the idea is always that if Candidate A's vote share grows with the share of minority voting age population, we can infer that minority voters for Candidate A more than non-minority ones, and under some assumptions, we can quantify how much more.

Having established minorities' preferences, we could then check whether these candidates won the most votes in the proposed districts to determine how many districts of opportunity exist in the proposed redistricting plan. We can then compare this number to the proportion of minority population. For instance, the "Black Alone" population is 13.7% of the Michigan population, a percentage that corresponds to approximately two Congressional Districts. We can also compare it to the number of opportunity districts in the previous redistricting plan, which is again two districts. Further, the U.S. Supreme Court has ruled that a pre-condition for the VRA to apply to any given minority is that this minority is *"sufficiently large and geographically compact to constitute a majority in a single-member district."*[12] We can then find how many such

---

[11] King, Gary, Martin A. Tanner, and Ori Rosen, eds. *Ecological inference: New methodological strategies.* Cambridge University Press, 2004.
[12] Thornburg v. Gingles, 478 U.S. 30.

geographically independent minority groups we can construct in Michigan, and we can estimate whether each of these minority groups lives in a district of opportunity.

Unfortunately, the data for this preferred analysis is insufficiently available. In particular, there is no centralized repository of primary election results by precinct, precluding the preferred analysis. That means the Commission can estimate how often a minority population has succeeded in having its preferred candidate win general elections, but is severely limited in assessing whether a minority party would have succeeded in nominating its preferred candidate in a contested primary election. The 2018 Democratic primary for Governor included two candidates from the Detroit area against the eventual winner; group voting determinants in this primary may have had idiosyncratic determinants that would not match racial group preferences in congressional primaries.

Nonetheless, following the Commission's intent, we pursue a simpler analysis that bypasses the need for the unavailable data by race and precinct. We refer to "determining if a redistricting plan complies with the Voting Rights Act" by Dr. Handley, presented to the MICRC. Based on an analysis of four counties (Wayne, Oakland, Genesee, and Saginaw) and on only one election with a primary on the Democratic side (the 2018 gubernatorial race), plus an additional 12 general elections with no primary on the Democratic side, she estimates that any district that is at least 40% Black would be likely to elect the Black-preferred candidate, and most districts having a population at least 35% Black would as well. This analysis was based on Dr. Handley's finding that there is significant shared support for the same candidates among black and non-black voters in many of the Detroit area precincts. This is undoubtedly true in general elections, but there may be insufficient data to know how true it is in primary elections.

In a simpler analysis that bypasses the need for the unavailable data by race and precinct, we can use Dr. Handley's estimates, and simply compute the number of districts in the proposed plan that are at least 35% or at least 40% Black. If Dr. Handley's estimates are correct, any 40% Black district is a district of opportunity and will elect candidates preferred by the Black minority. We report these measures:

-Number of districts with >50% of their voting age population identifying as Black.

-Number of districts with >40% of their voting age population identifying as Black.

-Number of districts with >35% of their voting age population identifying as Black.

We compare these measures to the number of districts (two) proportional to the Black population in the state, and to the number of districts with these percentages of Black voting age population in the previous Congressional Districts plan.

We do not find a sufficient geographic concentration of Hispanic or Latino, or other minorities, in any county, to constitute a majority in a geographically compact district.

The data for these measures is from the 2020 US Census.

**Results.**

We present the results of Population Equality in the following table. Each row lists a redistricting plan for Michigan Congressional Districts. The first column reports difference between the most and the least populated district. The second column reports the maximum deviation from the ideal district population.

| TABLE 3. *Population Equality in congressional maps.* | | |
|---|---|---|
| | **Population difference** | **Maximum deviation** |
| | % | % |
| **Plan Apple** | 0.12% | 0.07% |
| **Plan Juniper** | 0.20% | 0.12% |
| **Plan Maple** | 0.28% | 0.17% |
| **Plan Birch** | 0.27% | 0.15% |

Note that all these population deviations are small; they are less than half the deviation that the U.S. Supreme Court has deemed admissible if necessary to pursue appropriate state goals. But such small deviations require justification. If any of these plans were adopted, the Commission should explain why these small population differences were necessary to better comply with other criteria in the state Constitution, such as, for instance, to preserve whole precincts in order to evaluate VRA claims more accurately (Criterion A), or to preserve Communities of Interest (Criterion C).

We report the number of districts in which more than 50%, more than 40%, and more than 35% of the Voting Age Population (VAP) identifies as "Black" or "African-American" (alone), as computed by the MGGG Lab for this report, in the following table. These numbers serve as proxy for the number of Black-minority districts of opportunity. As comparison benchmarks, we list the numbers for the Congressional map in place in the 2012-2021 redistricting cycle, and the number that would be proportional to the share (13.7%) of the state population that identifies as "Black."

| TABLE 4. *Black minority districts of opportunity in congressional Draft maps.* | | | |
|---|---|---|---|
| | **# > 50% VAP Black** | **# >40% VAP Black** | **# >35% VAP Black** |
| **Plan Apple** | 0 | 2 | 2 |
| **Plan Juniper** | 0 | 2 | 2 |
| **Plan Maple** | 0 | 2 | 2 |
| **Plan Birch** | 0 | 2 | 2 |
| **2012-2021 Official Plan** | 2 | 2 | 2 |
| **Proportional to Population** | 2 | | |

The most striking result is that neither of the two majority-minority districts in the previous plans survives in any of the four proposed plans. The following graph shows the Black share of the Voting Age Population in each district. Districts are ordered from lowest to highest Black share (that is, the labels in the horizontal axis are not the district number in the Plan; rather, they should be interpreted as lowest Black VAP share (1), 2nd lowest Black VAP share (2), all the way to the district with the highest Black VAP share (13). The colored dots represent each map. The boxes represent the typical Black VAP shares in maps in the Computational Ensemble, and the arms stretching out of the boxes represent the Black VAP share at the least common maps such that only 2.5% of maps have shares above or below the range covered by the arms.



*Figure 1. Distribution of Black VAP by Congressional District*

As we can see, the four congressional plans are unusual, but not extremely so, in that they take what in most maps are a pair of districts — in and around Metro Detroit — with Black VAP shares of about 55% and 30%, and reconfigure them into two districts, both with slightly over 40% of Black VAP. Keep in mind that the computer-generated maps are just drawing lots of different districts that would maintain equal population and are not designed to maximize Black representation or comply with the VRA.

## CRITERION B: CONTIGUITY

"*Districts shall be geographically contiguous. Island areas are considered to be contiguous by land to the county of which they are a part.*"

**Understanding the Criterion.**
Contiguity means that a district is all connected in a single piece.

Two issues arise. The first is about islands. Islands are physically disconnected into a separate piece, separated from the mainland by water. The criterion says that islands are to be imagined to be physically attached to the county of which they are a part. If the county of which a given island is a part of is split into two districts is the island interpreted to be contiguous to the nearest point of mainland in the county? Or are commissioners free to imagine the island attached to any part of the county of their choosing? For example, Mackinaw Island is to the Southeast of Mackinaw County. Suppose a map assigned the island to a district that took only the westernmost part of Mackinaw County. Would that satisfy "contiguity"? It would not if we imagine the physical attachment to land to be at the nearest point, i.e. by St. Ignace.
The second issue is about what constitutes contiguity. A laxer definition, so called "queen contiguity" allows for contiguity only at a single point, like the diagonal pieces of a chess board that queen, king and bishop chess pieces can transit but other pieces cannot. A stricter definition is "rook contiguity", which requires that the connection between pieces be everywhere by more than a single point. For instance, Van Buren County and St. Joseph County satisfy queen contiguity, as their corners touch upon a single point, but they do not satisfy rook contiguity.

**Measure of Contiguity**.
We report a binary "Yes" or "No" for whether a plan satisfies the stricter definition of contiguity, satisfying rook contiguity with islands attached to the land at the nearest point in the county of which they are a part of.

**Results.**
All four Draft congressional maps satisfy contiguity.

| TABLE 5. *Contiguity*. | |
|---|---|
| | Are all districts contiguous? |
| **Plan Apple** | Yes |
| **Plan Juniper** | Yes |
| **Plan Maple** | Yes |
| **Plan Birch** | Yes |

## CRITERION C: COMMUNITIES OF INTEREST

"*Districts shall reflect the state's diverse population and communities of interest. Communities of interest may include, but shall not be limited to, populations that share cultural or historical characteristics or economic interests. Communities of interest do not include relationships with political parties, incumbents, or political candidates.*"

**Understanding the Criterion.**
The Brennan Center for Justice defines communities of interest as "*groups of individuals who are likely to have similar legislative concerns, and who might therefore benefit from cohesive representation in the legislature.*"[13] The goal is to keep such communities of citizens with common legislative concerns together in the same district, so that they can better press their common concern to their representatives.

The difficulty is to identify which geographic areas represent one such community of interest. The language of the criterion gives a suggestion: "*populations that share cultural or historical characteristics or economic interests*", but this list is non-exclusive, and these common characteristics or interests are difficult to ascertain.

The Brennan Center for Justice suggests two means to identify communities of interest.[14] One is top-down, in which mapmakers can use quantitative data to find geographic areas of the state with aligned indicators of shared cultural, historical or economic characteristics. A second approach is bottom-up, in which mapmakers, instead of trying to pro-actively find communities in the data, can sit back and allow the public report the communities of interest that mapmakers should consider.

The Michigan Independent Citizen Redistricting Commission in 2021 has followed this second option, a bottom-up approach, inviting the public to submit maps and descriptions of communities of interest for the Commission to consider. We can distinguish two ways in which communities of interest could be revealed from public input.

One is for communities to be self-declared: every geographic area has some elected boards that represents it (neighborhood associations; city, town or county councils; county commissions, etc.). Any such organization could declare that the community it represents is a community of interest with shared cultural, historical and economic interests. Any community of interest that cuts across several of these units of democratic representation (for instance, a community of interest comprising parts of two adjacent townships) could be self-declared by a proclamation made jointly by representatives of units of democratic representation that together cover the entire community.

---

[13] "Communities of Interest." *Brennan Center for Justice* report, November 2010. Retrieved from https://www.brennancenter.org/sites/default/files/analysis/6%20Communities%20of%20Interest.pdf on Sept. 2021.
[14] Yurij Rudenski and Annie Lo. "Creating strong rules for drawing maps." *Brennan Center for Justice* report, last updated January 29, 2020.

A second mode of public input allows individual members of the public to submit their conceived community of interest, without requiring democratic consent from the rest of the conceived community to be grouped in this manner. A stricter version of this form of individual submissions requires the individual to be a member of the community, so that submissions amount to "*This is my community and we should be together*" A laxer forms waives this requirement, allowing submissions of the kind "*that is their community and they should be together.*"

The Michigan Independent Citizen Redistricting Commission allowed for the laxer form of public input, encouraging any form of public input on communities of interest, including through submissions by individual citizens about communities that do not include the individual making the submission.

The public responded, uploading — as of Oct. 13, 2021 — 1,225 Community of Interest (COI) submissions through the Commission's portal.

Such broad collection of public submissions poses challenges for rigorous quantitative analysis. The submissions vary in their nature, from the whimsical (a combination of dislocated precincts whose geography spells out the word "Hello"), to those more thoughtful; some explaining in detail the common interests that bind the community together, while others lacking such explanation. And while undoubtedly many of the public submissions were drawn in a good-faith to communicate a true community of interest to commissioners, it is impossible to rule out that some were calculated attempts to influence commissioners for partisan gain.

We also note that some submissions were as large as Congressional Districts and may have been more designed as full-district proposals rather than communities to be kept together within larger districts. Some citizens used this criterion as an invitation to describe more broadly what kinds of people and geographic areas they wanted to see in their districts and what kinds of people and areas they wanted to see out of their districts. Commissioners sometimes referred to these public comments, stating that one area wanted to be with another or did not want to be with another without identifying a particular community of interest. This criterion is not a general attempt to maximize district homogeneity, but to respect communities that can be contained within districts.

It would therefore be somewhat misleading to treat all individual public submissions equally, as if they all represent equally true and valid communities of interest. It would be more informative to conduct a qualitative analysis, sifting through each of the submissions to ascertain which of them constitute a veritable community of interest with a valid explanation. If we could, without controversy, separate the submissions that truly reflect communities of interests, from ones that do not, we could then consider the subset of submissions that do represent communities of interest, and we could quantify how many of these had been kept together in the Commission's maps.

Alas, we cannot easily evaluate whether individual submissions are valid or not. We are left then with a limited quantitative analysis of the pool of submissions. But evaluating an aggregate measure of communities enables less responsiveness to any one submission or type of submission.

**Measure of Respect for Communities of Interest**.

The MGGG Redistricting Lab and Open-Maps Coalition have released a report on "Communities of Interest Clusters for Michigan."[15] This report identifies 34 communities of interest clusters that were identified through aggregation from all Community of Interests submissions by the public up to September 1, 2021. A "cluster" is a geographic area in which several individual submissions overlap. The choice of how to organize the hundreds of submissions into a smaller number of clusters presents a trade-off: we can have either more clusters, each of them backed by fewer individual submissions; or fewer clusters, each of them backed by more individual submissions. In settling for 34 clusters, the MGGG and Open-Maps report aimed to strike a balance between having enough testimony of support for each cluster and having clusters that are small enough to demonstrate tightly connected themes in the submissions supporting each of them.

At the website districtr.org/Michigan, viewers can observe the 34 clusters, and the individual COI submissions supporting each of them. After uploading or opening a new district map of Michigan, under the tab "communities," viewers can toggle each of the clusters "on" or "off" to superimpose its boundaries on the Michigan district map, so as to visually observe the overlap with the map's districts.

Respect for communities of interest should be assessed holistically, taking into account not just the number or share of COI submissions that an individual map respects, but also the strength of the arguments in support of each individual submission. We can report the number of clusters that are split and that are mostly contained within a district, together with the population and demographics of each cluster. We use a cut off of 90 percent to establish whether a COI cluster either has 90 percent of its residents contained within a district or a district has 90 percent of its residents within a COI cluster. This accounts for COI clusters that are smaller and larger than the district size. It is easier to fit a COI cluster within a larger district and easier to fit a smaller district within a COI cluster.

IPPSR plans to release further analyses on individual COI simulations, if and when they become available. Districting plans could preserve individual COIs even if they do not preserve clusters.

**Results.**

As seen in the COI preservation in Michigan (Congress) histogram by the MGGG lab, the Tree maps do not stand out for their preservation of Community of Interest clusters, at least not as these clusters are computed by the MGGG Lab. Out of 34 submitted COIs, Apple preserves 11, Birch preserves 13, Maple preserves 12, and Juniper preserves 12. That means most COI clusters are not 90 percent contained within districts and most districts are not 90 percent contained within COI clusters, but that is also what would be expected of randomly-drawn maps.

---

[15] We follow version 2.0 of this report, dated Sept. 13, 2021.



*Figure 2. Community of Interest Preservation in Congressional Maps*

# CRITERION D: PARTISAN FAIRNESS

*"Districts shall not provide a disproportionate advantage to any political party. A disproportionate advantage to a political party shall be determined using accepted measures of partisan fairness."*

**Understanding the Criterion.**
The "seat outcome" of an election is the number of seats each party obtains. This seat outcome depends on how each registered voter in the state votes, and on the redistricting map in use to aggregate votes by district. The idea behind partisan fairness is that given how people vote, there is a fair seat outcome, and that the redistricting plan is fair if the seat outcome under this plan is close to the fair seat outcome. The following question is fundamental: what is the "fair" seat outcome, given the vote tally in each precinct in an election?

There are two alternative ideas as to what is "fair." One notion of fairness is an idea of symmetry: each party must be equally able to translate statewide vote share into seats. For instance, if two parties each net exactly half the votes, symmetry requires that they each are awarded half the seats. Despite its intuitive appeal, the Supreme Court of the United States has ruled that this idea of fairness as symmetry is "*based on a norm that does not exist in our electoral system.*"[16]

The Supreme Court of Pennsylvania proposed a different notion of fairness: the seat outcome is "neutral" if it is similar to the outcome we would expect if the electoral institutions were designed without considering partisan considerations. A redistricting map is "fair" under this second notion if it leads to neutral seat outcomes.

In practice, the symmetry and the neutrality notions lead to the same fair seat outcomes if voters for each party are distributed similarly across the state. However, if voters are distributed geographically so that even if two parties split the vote evenly, one party wins heavy landslides in a few areas while another party wins smaller majorities in a larger share of communities across the state, then the symmetric and the neutral notions of fairness diverge. Namely, if the redistricting map is drawn without partisan considerations, the party that wins smaller majorities over more communities will win most seats. Under the neutral notion, this unequal outcome is "fair," as it corresponds to the actual geographic distribution of voters' political preferences. Whereas, under the symmetry notion of fairness, the districts should be drawn to favor the party with concentrated support, until the map leads to an equal split of seats.

If the geographic distribution of partisan support is sufficiently uneven, the quest for symmetric outcomes comes into tension with other criteria, such as respecting Communities of Interest (Criterion C), respecting county and town boundaries (Criterion E), or compactness (Criterion F), because in order to favor the party with concentrated support enough for this party to attain a symmetric seat outcome, non-compact districts that break communities of interest and jurisdictions apart must be drawn. In Michigan, Democratic voters are more geographically concentrated, especially in urban areas, which might make it more difficult to draw districts with fully symmetric outcomes that also meet these other criteria.

We evaluate the maps according to several measures of symmetry and neutrality.

---

[16] Opinion of the Court in Rucho v. Common Cause, 139 S. Ct. 2484, 2499 (2019).

**Measures of partisan fairness.**

### D1. **Partisan Bias.**

The Partisan Bias[17] is a measure of symmetry for a given pair of parties, and for a given vote share. It is most often computed for an equal vote share between the two largest parties. Following the MGGG Lab definition, we compute it for the pair of two largest parties (Republican and Democratic), and for an equal average district vote share between these two parties.[18]

The Partisan Bias is then the difference between the number of seats that the Republican Party wins, and the number of seats that the Democratic Party wins, given that each of the two parties obtains the same number of votes. Perfect fairness, under the symmetry notion, requires a Partisan Bias of zero. For less than perfectly fair values, it is standard to report them as percentages of the total number of seats in the delegation.

The Partisan Bias is a value obtained in a hypothetical election in which both parties obtained an equal number of votes. No such election exists. Instead, MGGG uses actual results from five elections to construct this tied hypothetical: the Governor's election, the U.S. Senate election, the Secretary of State election and the Attorney General election in 2018; and the Presidential election in 2016. For each of these elections, we construct a hypothetical election result in which the statewide vote share is tied, and in which the party that won the most votes in the real election wins only the districts in which it won the real election by a greater vote share margin than its statewide vote share margin. For instance, if the GOP candidate won the 2016 Presidential election by 0.2% of the vote, in the hypothetical tied election constructed from the 2016 Presidential results, GOP candidates only win districts in which in the real election the GOP candidate won by more than 0.2%.[19] We therefore obtain a Partisan Bias score for each of the five hypothetical elections. We average across all five to obtain the Partisan Bias score.

### D2. **Efficiency Gap.**

The Efficiency Gap[20] is a measure of symmetry in how parties translate statewide votes into seats. The Efficiency Gap is the difference in the number of "wasted" votes for each party, where all votes cast for a losing candidate and all votes cast for a winning candidate beyond the 50%+1 number necessary to win are deemed "wasted." The Efficiency Gap is typically expressed as a percentage of the total number of votes, so that it can be interpreted as the share of votes for a party that did not contribute to giving the party more seats.

---

[17] Butler, David E. 1951. ''Appendix: An Examination of the Results.'' In The British General Election of 1950, ed.
H.G. Nicholas, 306–333. London, UK: McMillan.
[18] This average is the sum of vote shares in each district over the number of districts; if turnout varies across districts, then it does not coincide with the statewide vote share.
[19] This construction is based on the idea of a "uniform swing", by which we shift vote share results by an equal percentage in every district, but it avoids the logical impossibility that arises when uniform swing pushes the vote share in some district below 0% or above 100%.
[20] Stephanopoulos, Nicholas O., and Eric M. McGhee. "Partisan gerrymandering and the efficiency gap." U. Chi. L. Rev. 82 (2015): 831.

If turnout is equal across districts, then the Efficiency Gap is just the difference between seat share, and 50% + 2(vote share – 50%). That is, under equal turnout, this symmetry measure defines the fair seat outcome to be such that parties with vote share between 25% and 75% get 2% seat share per each 1% of vote share above 25%. The measure is not meaningful, and not intended to be used in states in which a party gets more than 75% of votes.

This is one of four measures used by Dr. Handley in her memo on Partisan Fairness, presented to the MICRC on Oct. 1, 2021.[21]

D3. **Deviations from proportionality.**
This is perhaps the simplest measure of symmetry. The deviation from proportionality is the difference between the seat share and the vote share. This is a second of the four measures used by Dr. Handley in her memo on Partisan Fairness, presented to the MICRC on Oct. 1, 2021.

D4. **Median-Mean difference.**
The median-mean is a measure of symmetry that captures how difficult it is for a party to obtain a majority of the delegation.[22] Suppose we order the districts from least to most Republican, by vote share in a previous election. The median-mean difference then compares the vote share in the 7th most Republican district (the median in a delegation with 13 seats) to the statewide vote-share (the mean). If this number is positive, then the party can win seven districts (a majority of the delegation) even if it loses the vote statewide, and the magnitude of the median-mean difference shows by how much it can lose the statewide vote and still win seven seats.

This measure is more informative for state legislatures where winning the median district gives a party a majority. This is a third of the four measures used by Dr. Handley in her memo on Partisan Fairness, presented to the MICRC on Oct.1, 2021.

D5. **Lopsided Test.**
The lopsided test is a measure of symmetry defined as the difference between the average vote share of Party A in the district won by Party A, and the average vote share of Party B in districts won by Party B. [23]

This is the fourth of the four measures used by Dr. Handley in her memo on Partisan Fairness, presented to the MICRC on Oct. 1, 2021.

D6. **Partisan Advantage.**
The Partisan Advantage is a measure of neutrality that computes the difference between the seat outcome and a neutral benchmark based on the state's jurisdictions. This benchmark is the seat outcome in which seats are assigned to jurisdictions in proportion to their population.[24] The neutral benchmark depends on which list of jurisdictions we use: counties, or cities and towns. For the U.S. Congressional map in Michigan, we use the counties. For each county, the benchmark assigns seats in proportion to the population of the county, to the party that won most votes in

---

[21]  Handley, Lisa. "Measuring Partisan Fairness." Presented on Oct 1, 2021. Retrieved from: https://www.michigan.gov/documents/micrc/MICRC_Measuring_Partisan_Fairness_737248_7.pdf
[22] McDonald, Michael D., and Robin E. Best. "Unfair partisan gerrymanders in politics and law: A diagnostic applied to six cases." *Election Law Journal* 14.4 (2015): 312-330.
[23] Sam Wang, "Three Tests for Practical Evaluation of Partisan Gerrymandering," Stanford Law Journal, 16, June 2016.
[24] Jon X. Eguia. "A measure of partisan fairness in redistricting." *Election Law Journal*, forthcoming.

this county. Aggregating by counties in this manner, the benchmark takes into account the geographic distribution of votes for each party across the state. The Partisan Advantage based on this county benchmark is then the difference between the seats that a party obtains given the map, and the seats that it would obtain under this county benchmark.

D7. **Outlier test.**

The outlier test is a measure of neutrality based on comparing the seat outcome under a given map, to the distribution of seat outcomes under a large ensemble of alternative, computationally generated maps. It answers the question as to how exceptional is the seat outcome we see under the map under consideration.

We compare the seat outcome under this map to the seat outcomes under the maps in a County-aware computational ensemble containing one million maps, generated by the Princeton Gerrymandering Project.

Their methodology is explained at https://gerrymander.princeton.edu/reforms/MI

We use their ensemble to answer the following question: how many of those maps would give more seats to the Democratic party than the map under consideration? How many of them would give more seats to the Republican party? If almost all maps would give more seats to, say, the Democrats, then the analyzed map is an outlier, and thus suspect.

D8**. Other measures.**

We note here that other measures of partisan fairness, some capturing a notion of symmetry, and others capturing a notion of neutrality, are publicly available through the web redistricting application DRA 2020 at www.davesredistricting.org

For readers' convenience, we published the four draft congressional maps in DRA 2020 under the names: "MICRC Plan Apple", "MICRC Plan Juniper", "MICRC Plan Maple" and "MICRC Plan Birch." Under the "Advanced" tab, DRA 2020 displays several measures of partisan fairness, including variations of the ones we include in this report, for the Democratic Party. Included in their display is a votes-to-seats curve, mapping the Democratic seat share for any vote share. They also include a measure of Partisan Bias (D1), which they call "Seat Bias"; a measure of median-mean difference (D4), which they call "Votes Bias"; a measure of the Efficiency Gap (D2); a measure of deviation from Proportionality (D3); and a measure of Partisan Advantage (D6), which they call "Boundary Bias."

All these alternative measures are computed using a smoothing function of past election results: instead of recording whether a party lost or won a district as a binary 0 or 1 value, as in our report, the measures of DRA 2020 assign to the party a fraction between 0 and 1 of the seat in this district that is increasing in the party's vote share. The motivation is that DRA 2020 uses voting tallies in past elections not to determine what would have happened give those voting tallies under the new map (as we do in this report), but rather, to estimate what will probably happen in the future under the new maps. A narrow win in the past is then only a small indication that the party will win again in the future.

-     -     -

The election data that we use to compute the measures in this section is as follows:

The 2018 Governor election; the 2018 Secretary of State election; the 2018 Attorney General election; the 2016 presidential election; and the 2018 U.S. Senate election, are used by the MGGG lab to report results on Partisan Bias (D1), Efficiency Gap (D2), Deviations from Proportionality (D3), Median-Mean Difference (D4), and the Outlier test (D7). The 2014, 2016, 2018, and 2020 US House election, and the 2016 and 2020 U.S. Presidential election, are used by Dr. Christian Cox from Yale University to compute the Lopsided Margins (D5) and the Partisan Advantage (D6). For all these measures, we compute results election by election, and then we average out. The Princeton Gerrymandering Project uses the 2018 MI Governor, 2020 US Senate and 2020 US Presidential election, first averaging them out to construct an electoral composite in each precinct, and then using this composite to compute the results reported under the Outlier Test (D7).

DRA 2020 allows users to choose their preferred election data input to compute the measures described under D8.

**Results.**

We present the results on partisan fairness across all Draft maps for Michigan Congressional Districts in the following table. Each row indicates a redistricting plan. Each column indicates a measure of partisan fairness, from D1 to D7. Positive numbers indicate deviations from the fair ideal that favor the Republican Party, and negative values indicate deviations that favor the Democratic Party. Zero indicates perfect fairness according to each measure. The values of some measures are in seats; others are in percentage of the total number of votes. The "Outlier" (D7) indicates a party ("D" for Democratic or "R" for Republican) and a range of percentages. The letter indicates the party that this map favors, relative to the one million other maps in the Princeton Gerrymandering Project ensemble. The first number is the share of maps in the ensemble that are less favorable to this party (in the sense that the party would obtain fewer seats), and the second is the share of maps that are even more favorable (in the sense that the party would obtain more seats).

TABLE 6. *Measures of Partisan Fairness for Congressional District plans.*

|  | Bias | Eff. Gap | Proport. | Med-mn | Lopsided | Advantage | Outlier |
|---|---|---|---|---|---|---|---|
|  | D1 | D2 | D3 | D4 | D5 | D6 | D7 |
| **Plan Apple** | +0.7 seats | +0.7% | −0.33 seats | +1.8% | +3.4% | +0.06 seats | D: 82% - 2% |
| **Plan Juniper** | +1.7 seats | +6.7% | +0.47 seats | +2.0% | +4.5% | +0.39 seats | D: 82% - 2% |
| **Plan Maple** | +1.7 seats | +6.7% | +0.47 seats | +2.1% | +4.5% | +0.73 seats | D: 82% - 2% |
| **Plan Birch** | +0.7 seats | +5.0% | +0.27 seats | +1.7% | +4.1% | +0.06 seats | D: 82% - 2% |

Compare these results to the results on the measures of partisan fairness used by the Commission, as advised by Dr. Handley, displayed in the table below. The values below were obtained from a composite of all 13 statewide elections (Presidential, U.S Senate, Governor, Secretary of State, and state Attorney General) from 2012 to 2020, and we report them here directly from the MICRC website.

| TABLE 7. *Selection of Measures of Partisan Fairness used by the Commission.* | | | | | | |
|---|---|---|---|---|---|---|
| | Bias | Eff. Gap | Proport. | Med-mn | Lopsided | Advantage | Outlier |
| | D1 | D2 | D3 | D4 | D5 | D6 | D7 |
| **Plan Apple** | -- | +1.3% | -1.5% | +2.4% | +4.0% | -- | -- |
| **Plan Juniper** | -- | +0.8% | -1.5% | +2.2% | +4.0% | -- | -- |
| **Plan Maple** | -- | +0.8% | -1.5% | +2.7% | +4.1% | -- | -- |
| **Plan Birch** | -- | +0.7% | -1.5% | +2.2% | +4.1% | -- | -- |

The values, and their differences across tables, can be interpreted as follows: first, on the measures common to both tables, measures D2, D4 and D5 are measures of symmetry that capture ways in which the political geography of Michigan favors the GOP. With the heavy concentration of Democratic voters in and around Metro Detroit, and smaller majorities for the GOP in most other areas of the state, Democratic candidates end up winning their districts (particularly the Detroit-based ones) by more lopsided margins (D5), so they waste more votes (D2), and their vote share in their seventh-best district is typically worse than the statewide vote share (D4).

Figure 3 illustrates this regularity, using the election results from the 2018 Senatorial election.[25] The horizontal axis shows the value of the median-mean difference, where greater values favor the GOP more. The gray bars represent the frequency of the observed value among the 100,000 computationally generated map, and the blue columns, among the 112 maps submitted by the public. When added together, nearly all 100,112 maps favor Republicans according to this measure. Values between 4% and 5% are typical. The four proposed plans are less favorable to Republicans than most others, with their values around 2%.

---

[25] All graphs are based on whichever is the most representative of the five elections for which MGGG provided results for all 100,112 maps in the ensembles. That is, two of the other five elections would show results even more skewed to the right, and the other two would show results distributed closer to zero, so this one graph is the one least misleading, relative to comparing all five graphs side to side.



*Figure 3. Median-Mean Difference, Congressional Maps, Senate 2018 Election*

Proportionality (D3), in contrast, captures one way in which the political geography of the state favors Democrats. Since our election system favors more than proportionally parties that win more votes, and since the Democrats typically win more votes in Michigan statewide elections, if they were to replicate in U.S. House elections the kind of win margins that they obtained in, say, U.S. Senate elections, then they would win a more than proportional number of seats.

Second, the difference between the values in these measures from Table 4 to Table 5 is due to the different selection of election results to use to compute them; only the five statewide elections from 2016 and 2018 in Table 4, and the thirteen such elections from 2012 to 2020 in Table 5.

Third, Partisan Bias (D1) is another measure of symmetry that also reflects how the political geography of the state favors the GOP, so depending on the map, the GOP would likely win an extra seat or two in an election with tied vote share. In contrast, the Partisan Advantage (D6) finds it fair that a party with a better distribution of voter support gets more seats for the same votes, and it only deems unfair the additional advantage attributable to electing representatives through districts drawn according to these plans. Under this standard, plans Apple, Birch and Juniper pass with flying colors: their deviation rounds out to zero. Only Maple shows a small Republican advantage.

The Outlier test (D7) finds a map unfair if the outcomes it generates are unusual, relative to what is normal under other maps. The test can be applied to any of the other measures, but it is most easily interpretable if applied to the number of seats, as in Figure 4.



*Figure 4. Number of Seats Democrats Would Win with Senate 2018 Results*

The horizontal axis in Figure 4 are numbers of seats that Democrats could win, with vote tallies according to the Senate 2018 election results (Stabenow (D) 52%-46% James (R)). The gray and blue bars, respectively, represent how many of the 100,000 Computer maps and the 112 maps submitted by the public would lead to such a number of Democrat seats with those election results. As we can see, under most maps, Democrats would obtain 6 or 7 (out of 13) seats, as they would under Birch, Juniper or Maple. These are normal maps that lead to normal outcomes. Under Apple they would obtain 8. That's among the most favorable maps for Democrats, and it is close to, but not quite an outlier, because quite a few maps would give them 8 maps as well. The publicly submitted maps that would let Democrats win nine or even 10 seats are outliers, never generated by the computer. But then, the computer is not motivated to draw partisan maps, the way passionate citizens can be. Since Democrats won this statewide election, some would argue that they should clearly win a majority of seats under a scenario where voters made the same partisan choices. All Commission maps meet this standard, but not all ensemble maps do.

Across the 10 elections for which we have computed results (all five statewide elections in 2016 and 2018, the Presidential one in 2020, and all four U.S. House elections from 2014 to 2020), and across most measures, Plan Apple is the most favorable to Democrats, followed by Plan Birch and Plan Juniper, and Plan Maple the least so. It is easy to see why. Plans Birch, Juniper and Maple have six likely or safe Republican seats: one around Grand Rapids (number 4), others along the South (8), West (9), Thumb (10), Central LP (13) and UP (12). Plan Apple makes the Grand Rapids district a likely Democratic one, instead, by dropping its GOP-leaning suburbs and linking urban Grand Rapids to urban (and Democratic-leaning) Kalamazoo.

All four of these plans appear to favor Republicans if measured according to measures that rate (almost) any plan as favoring Republicans, but the magnitudes of the values are not large. According to measures that discount the effect of the better geographic distribution of Republican voters, or that compare the performance of the plans to that of other possible maps, these four maps perform well. They generate a range of normal outcomes that one would expect to arise under maps that are not politically motivated.

These maps differ in their details, and some are slightly friendlier to one or the other party. Their differences notwithstanding, considering a range of measures of partisan fairness, Plan Apple, Plan Juniper, Plan Maple and Plan Birch are all generally fair to political parties. The Commission has sometimes discussed aiming for zero, or no partisan bias. That could still be a different useful benchmark, but it might be difficult to achieve given the rest of its mandates. Compared to maps not explicitly trying to achieve any partisan outcome, Commission maps mostly fall within the middle range. The same is true compared to maps generated by the public.

## CRITERION E: FAIRNESS TO CANDIDATES

*"Districts shall not favor or disfavor an incumbent elected official or a candidate."*

**Understanding the criterion.**
This criterion prevents the kind of bipartisan gerrymander that arises when a cross-party coalition of mapmakers draws a redistricting map that makes districts safer for incumbents. It also rules out using the redistricting process to reward or to punish particular incumbent by drawing a district in which it is easier or harder to be reelected.

This criterion can be interpreted as a "process" criterion, or as an "outcome" criterion. As a "process" criterion, it would mean that districts shall not be drawn with the intent of favoring or disfavoring an incumbent or candidate; and that districts shall be drawn without considering their impact on any individual candidate. Interpreted as a "outcome" criterion would mean to leave aside the motivations, and it would require that the map approved do not favor or disfavor any candidate. Arguably, a literal, absolutist "outcome" interpretation would render the criterion impossible to satisfy (any map that reduces the number of districts from 14 to 13 must be unfavorable to at least one incumbent), the "outcome" interpretation must be laxer, and relative to what is feasible. We suggest a possible "outcome" interpretation to be that districts shall not favor or disfavor incumbents more than other potential alternative maps.

**Measures of fairness to candidates.**
This criterion is one of two criteria in the Michigan Constitution that is not endorsed by the Brennan Center for Justice,[26] and the social science literature around it is much more limited. If we interpret it as a "process" criterion, the best evaluation is qualitative: analyzing the publicly posted videos of the MICRC meetings to check whether implications for a given incumbent or candidate were taken into account. Although we did not observe all ICRC meetings, we did not see any overt attempt to harm or help a particular candidate or incumbent.

Interpreted as an "outcome" criterion, we can quantify two measures of favoring or disfavoring incumbents as a whole.

The first is so-called "double-bunking", by which two (or more) non-term limited incumbents are placed in the same new district.

The second is to consider the competitiveness of the new districts. While competitiveness is not a criterion in the Michigan Constitution, and thus it is not an in itself a legally desirable district characteristic, competitiveness relates to favoring or disfavoring incumbents. Low competitiveness favors incumbents; high competitiveness disfavors them. We thus argue that the criterion of neither favoring nor disfavoring incumbents indirectly calls for intermediate, or normal according to historical standards, levels of competitiveness.

We can quantify competitiveness (or, more accurately, "swingness" or "flippability") by the fraction of recent elections in which a party other than the one that most frequently wins, won the most votes in the district. A district in which other parties -- besides the one that typically wins -- never

---

[26] Yurij Rudenski and Annie Lo. "Creating strong rules for drawing maps." *Brennan Center for Justice* report, last updated January 29, 2020.

win is under this measure non-competitive, whereas a district in which other parties win quite often is highly competitive (or "highly swingy" or "easy to flip").

**Results.**
The analysis on double-bunking (placing two incumbents in the same district) is seen in the histogram below. Compared to the computer-generated maps, the publicly drawn maps have a greater tendency to double-bunk incumbents. The Apple and Birch maps both feature three districts with two incumbents, while Maple and Juniper feature four.



*Figure 5. Districts with Multiple Incumbents in Congressional Maps*

On competitiveness, plans Apple, Maple and Juniper have two closely contested, competitive districts that can swing and be won by either party under the range of recently observed election results: A Capital Region district centered in the Greater Lansing area (# 5), and district based on the southern half of Macomb Co. (#6). Plan Birch makes the Macomb Co. District 6 lean clearly Democratic by shifting it westward into heavily Democratic areas in Oakland County, reducing the number of competitive or swing districts to just one (the "Capital Region" district #5).

If we compare these results to those of the ensembles, we see that most maps feature three or four competitive districts. In other words, these plans, especially Birch, would feature a higher number of safe incumbents than most other plans. Under Plan Birch, the only challenges likely to succeed in unseating an incumbent in a general election would be those in District 5. Figure 6 illustrates this finding. Perhaps in an effort to respond to public requests for districts that fit local views of the boundaries of their areas, the Commission seemed to have moved toward politically homogenous districts. Although staff have advised the Commission that competitiveness is not an explicit criterion, we note that respecting Communities of Interest does not require creating homogenous districts or responding to public requests that advise not joining together Democratic and Republican areas.



*Figure 6. Number of Competitive Districts in Congressional Maps*

# CRITERION F: JURISDICTIONAL BOUNDARIES

*"Districts shall reflect consideration of county, city, and township boundaries."*

**Understanding the criterion.**
This criterion says that, to the extent possible, jurisdictions such as counties, cities and townships should each be kept whole in the same district. District boundaries should follow county or township boundaries and should not cut across jurisdictions splitting them into pieces that belong to different districts. This is a traditional redistricting criterion. Indeed, representation by county, city and township historically precedes the drawing of electoral districts, and at the origins of American democracy, counties were drawn precisely to have the right size and shape to serve as units of representation.[27]

Some counties, cities and townships can also be communities of interest, and respecting the boundaries of these jurisdictions is then covered as a higher criterion. But even the boundaries of jurisdictions that are not communities of interest shall be considered, albeit as a lower priority.

Population equality requires splitting some counties, cities and towns. Given that some splits are necessary, questions arise: is it better to minimize the number of jurisdictions that get split? Or to minimize the number of times that a jurisdiction is split?

**Measures of respect for jurisdictional boundaries.**
The standard way to measure satisfaction of this criterion is to count the number of splits. But we can compute what is the minimum number of county, city and township splits, and we can compare it to the number of county, city, and township splits in the map.

With given weights for county splits, city splits, and township splits, we could even produce a single measure of splits. But the Constitution does not provide such weights.

We count:

E1. Number of counties, cities and towns that are split.

E2. Total number of times that counties, cities and towns are split, resulting in the total number of pieces of each of these units assigned to different districts.

**Results.**
We present results on splits.

| TABLE 8. Split counties and County Splits | | |
|---|---|---|
| | Split Counties | Number of Pieces |
| **Plan Apple** | 17 | 40 |
| **Plan Juniper** | 13 | 31 |
| **Plan Maple** | 13 | 33 |
| **Plan Birch** | 13 | 33 |
| **2011 Map** | 10 | 14 |

---

[27] Kromkowski, Charles A. 2002. Recreating the American Republic. Cambridge, UK: Cambridge University Press. In particular, county lines were drawn so that a horse rider could reach the county seat in one day of riding from any point in the county.



*Figure 7. Split Municipalities in Congressional Maps*

As seen in the Split Municipalities histogram, the Tree maps and publicly drawn maps split municipalities far less than computer generated maps do. Maple splits 36 municipalities, Birch splits 39, and Maple and Juniper both split 40. Most publicly drawn maps and nearly all computer-generated maps split more municipalities (including townships, cities, and villages).

These maps do a poor job at respecting county boundaries compared to the ensembles.

As Figure 8 shows, they are outliers in their disregard for county boundaries, compared to the maps in the Computer Ensemble, and compared to the official congressional district map for 2011-2020 (even though that one required to draw 14 districts, which induces a greater number of county splits). Plan Apple's connection of urban Grand Rapids with urban Kalamazoo comes at the cost of splitting the counties of Kent, Allegan, Barry and Kalamazoo, which are kept whole in the other plans.



*Figure 8. Number of Split Counties in Congressional Maps*

JA00734

# CRITERION G: COMPACTNESS

*"Districts shall be reasonably compact."*

**Understanding the criterion.**
Reasonably compact districts are chunky and squat, with shapes that are square, rounded, or like potatoes without arms, legs, tendrils and tentacles venturing out and away from the heart of the district. Formally, there are shapes that have a lot of area relative to their perimeter (the length of their border), and that have all their area relatively close to their center. This criterion can be visually apprehended: if a district seems weirdly or funnily shaped, it is likely not compact.

This criterion, however, is the last and lowest priority, secondary to all the others. It is the only one of the seven criteria in the Michigan Constitution that the Brennan Center for Justice explicitly recommends against taking into account. Because compactness is the easiest criterion to assess at first glance, there a risk that a superficial evaluation may be overly swayed by compactness. Redistricting plans with very compact districts may be unacceptable if they fail to satisfy higher-ranked criteria, and conversely, less compact districts in other plans that better satisfy higher-ranked criteria may be "reasonably compact" enough.

**Measures of compactness.**

G1. **Polsby-Popper** compactness score.
This measure is the ratio of the area of the district to the area of a circle whose circumference is equal to the perimeter of the district. Mathematically, it is defined for each district as: $4\pi$ times the area of the district, divided by the square of the district's perimeter (boundary). $\frac{4\pi\ Area}{(Perimeter)^2}$

A score of 1 is maximally compact (a circle attains this score), while a score of 0 is minimally compact (a straight line). We report the minimum and the average score across all districts.

G2. **Reock** compactness score.
The Reock compactness score of a district is defined as the ratio of the area of the district to the area of the smallest circle that would completely enclose the district.

Again, the minimum value is zero, and the maximum compactness, attained by a circular district, is 1.

We report the minimum and the average score across all districts.

G3. **Number of cut edges.**
An alternative approach is to consider compactness -- not with respect to the physical geography of the land -- but with respect to the network graph of voting precincts. Construct a network by considering each precinct a node (informally, a dot), and drawing a connecting edge (link) between any two nodes that are physically adjacent. Then superimpose a district map on this network, and then count the number of edges (links) that connect nodes in separate districts. These edges are interpreted to be "cut" by the district map. Compact districts will cut few edges, whereas snaking non-compact ones will cut many more.
We report the number of cut edges.

**Results.**

In the next table, for each redistricting plan in each row, we provide the Polsby-Popper, Reock and Cut Edges measures of compactness, respectively in columns 1, 2 and 3.[28]

TABLE 9. *Compactness Measures in Congressional District Plans*

|  | Polsby-Popper | Reock | Cut Edges |
|---|---|---|---|
| **Plan Apple** | 0.38 | 0.38 | 715 |
| **Plan Juniper** | 0.38 | 0.39 | 697 |
| **Plan Maple** | 0.38 | 0.39 | 682 |
| **Plan Birch** | 0.38 | 0.40 | 697 |
| **2011 map** | 0.29 | 0.36 | n.a. |

Recall that Polsby-Popper and Reock are measures of compactness from 0 (not compact), to 1 (a perfectly compact circle); whereas, Cut Edges is a measure of violation of compactness that loosely, tracks the number of precincts located at the borders of a district (the less compact, the greater number of precincts at the border). The maps perform similarly, with once again Apple slightly worse than the others, probably due to that elongated configuration of District 4 from Grand Rapids to Kalamazoo.

All four maps are reasonably compact, much more so than the official map in the previous redistricting sample, and about as much as typical maps in the Ensembles, as illustrated in Figure 9.



*Figure 9. Number of Cut Edges (fewer is more compact)*

---

[28] The Reock and Polsby-Popper measure are as reported by DRA 2020. The Cut Edges measure is computed by MGGG for this report.

## III.3. SUMMARY OF RESULTS

Plans Apple and Maple are complete redistricting plans. Plans Juniper and Birch are not, as they leave a score of residents each in a single U.S. Census block unassigned to any precinct. These omissions are easy to fix by assigning these two U.S. Census blocks to the district of an adjacent block, which would not alter results in any meaningful way.

All four plans feature small deviations from population equality, below 0.3%.

All four feature two districts with more than 40% of their Voting Age Population identifying as "Black," but none feature a district with a majority of the VAP identifying as "Black" (the previous plan featured two).

All four satisfy contiguity. While all four feature districts that represent geographically recognizable areas that can be meaningfully described in few words, we cannot say that they fully reflect the collection of Communities of Interest submitted by citizens.

All four plans perform well overall according to a collection of accepted measures of partisan fairness.[29] Plan Apple is the most favorable to Democrats of the four, and Plan Maple the most favorable to Republicans, but the differences between them amount to less than a seat on average.

While the exact boundaries vary, these four plans are similar. Juniper and Maple feature five districts that are safe or leaning Democratic, two swing districts, and six districts that are safe or leaning Republican. The five Democratic districts are: one based on Detroit (1), one on West Wayne County (2), one on Oakland County (3), one on Ann Arbor (7), and one on the Tri-cities/Flint (11). The two swing districts are one in the Capital Region (5), and one based on Macomb County (6). The six Republican districts are one around Grand Rapids (4), one along the South (8), one along the West Lakeshore (9), one based on the Thumb (10), one in the North and UP (12) and one in the Central-North Lower Peninsula (13). Plan Birch pushes the Macomb swing district (6) westward into Oakland, making it into a 6th Democratic district. Plan Apple keeps the two swing districts (5 and 6), but it transforms the Republican Grand Rapids district (4) into a 6th Democrat district by shedding its outer suburbs and connecting Grand Rapids to Kalamazoo instead.

These plans feature relatively few competitive seats, so most districts will be deemed safe for their incumbents.

These plans do not reflect consideration of county boundaries as much as the ensemble plans, but they are reasonably compact.

---

[29] The plans do not perform well on each individual measure. It is impossible to score well on all at the same time, as different measures have conflicting demands. We mean that, overall, taking their scores across all measures, the maps perform well on this criterion.

# PART IV.ANALYSIS OF PROPOSED MAPS FOR MICHIGAN'S CONGRESSIONAL DISTRICTS

## III.1. THE PROPOSED CONGRESSIONAL DISTRICT MAPS

On Nov. 1, 2021, the MICRC approved the following Proposed maps for U.S. Congressional Districts, for consideration in what is expected to be the final round of public hearings (Nov. 15 – Dec. 29, 2021): [30]

-**Plan "Apple V2",** (map number #252), on a vote of 11-2 (Commissioners Clark (R) and Wagner (R) opposed; Curry (D) and Lange (R) not voting).



**Plan Apple V2**

---

[30] These maps are available for download here:
https://michigan.mydistricting.com/legdistricting/michigan/comment_links

-**Plan Birch V2** (map number #253), on a vote of 9-2 (Commissioners Wagner (R) and Kellom (D) opposed; Curry (D) and Lange (R) not voting).



**Plan Birch V2**

JA00739

-**Plan Chestnut,** (map number #253), on a vote of 10-1 (Commissioner Wagner (R) opposed; Curry (D) and Lange (R) not voting).



**Plan Chestnut**

## IV.2. MEASURING PERFORMANCE ON EACH CRITERIA

## CRITERION A: POPULATION BALANCE AND VOTING RIGHTS ACT

"*Districts shall be of equal population as mandated by the United States constitution, and shall comply with the voting rights act and other federal laws.*"

**Understanding the Criterion.**
We refer to the discussion under Section III.2.A.

**Measures of performance on Criterion A.**
We refer to the discussion under Section III.2.A.

**Results.**
We present the results of Population Equality in the following table. Each row lists a redistricting plan for Michigan Congressional Districts. The first column reports difference between the most and the least populated district. The second column reports the maximum deviation from the ideal district population.

| TABLE 10. *Population Equality in Congressional Maps.* | | |
|---|---|---|
| | **Population difference** | **Maximum deviation** |
| | % | % |
| **Plan Apple V2** | 0.48% | 0.26% |
| **Plan Birch V2** | 0.26% | 0.15% |
| **Plan Chestnut** | 0.14% | 0.08% |

Note that the population difference in Plan Apple V2 (0.48%) is close to a population difference that the Supreme Court, in at least one instance, has found unjustified (0.7%), rendering that plan unconstitutional.[31] Even the smaller deviations in Plan Birch V2 and Plan Chestnut require justification. If any of these plans were adopted, the Commission should explain why these small population differences were necessary to better comply with other criteria in the state Constitution, such as, for instance, to preserve whole precincts in order to evaluate VRA claims more accurately (Criterion A), or to preserve Communities of Interest (Criterion C).

Justifying the small deviation in Plan Chestnut (about 1,000 inhabitants; less than a typical precinct) would be easier than justifying the deviation in Plan Birch V2 (about 2,000 inhabitants, about as much as a typical precinct). Justifying the deviation in Plan Apple V2 (over to 3,700 inhabitants, much larger than a typical precinct) would be hardest of all three.

---

[31] Karcher v. Daggett, 462 U.S. 725 (1983), ruling on the New Jersey 1981 congressional plan.

For the sake of comparison, across all 43 states that were apportioned as more than one congressional district by the 2010 U.S. Census, only one (West Virginia) adopted a plan with a population difference at least as large as that of any of the three Proposed plans, and that one plan was challenged in Court due to its deviation from population equality.[32] In other words, these population deviations are unusually large. [33] In particular, in terms of population deviation, Plan Apple V2 is closer to what has been ruled unconstitutional, than to any deviation level that was not challenged in Court in the latest redistricting cycle.

With regard to districts of opportunity, we report the number of districts in which more than 50%, more than 40%, and more than 35% of the Voting Age Population (VAP) identifies as "Black" or "African-American" (alone), as computed by the MGGG Lab for this report, in the following table. These numbers serve as proxy for the number of Black-minority districts of opportunity. As comparison benchmarks, we list the numbers for the congressional map in place in the 2012-2021 redistricting cycle, and the number that would be proportional to the share (13.7%) of the state population that identifies as "Black."

| TABLE 11. *Black Minority Districts of opportunity in Congressional Proposed Maps.* | | | |
|---|---|---|---|
| | **# > 50% VAP Black** | **# >40% VAP Black** | **# >35% VAP Black** |
| **Plan Apple V2** | 0 | 2 | 2 |
| **Plan Birch V2** | 0 | 2 | 2 |
| **Plan Chestnut** | 0 | 2 | 2 |
| **2012-2021 Official Plan** | 2 | 2 | 2 |
| **Proportional to Pop.** | 2 | | |

The most notable result is that neither of the two majority-minority districts in the previous plans survives in any of the three Proposed plans. The following graph shows the Black share of the Voting Age Population in each district. Districts are ordered from lowest to highest Black share (that is, the labels in the horizontal axis are not the district number in the Plan; rather, they should be interpreted as lowest Black VAP share (1), 2nd lowest Black VAP share (2), all the way to the district with the highest Black VAP share (13). The colored dots represent each map. The boxes represent the typical Black VAP shares in maps in the Computational Ensemble, and the arms stretching out of the boxes represent the Black VAP share at unusual maps such that only 2.5% of maps have shares above or below the range covered by the arms.

---

[32] *Tennant v. Jefferson County Com'n*, 133 S. Ct. 3, 567 U.S., 183 L. Ed. 2d 660 (2012).
[33] 2010 Redistricting Deviation Table. National Conference of State Legislatures. Available at https://www.ncsl.org/research/redistricting/2010-ncsl-redistricting-deviation-table.aspx



*Figure 10. Distribution of Black VAP by Congressional District*

As we can see in Figure 10, these three plans are unusual, but not extremely so, in that they take what in most maps are a pair of districts — in and around Metro Detroit — with Black VAP shares of about 55% and 30%, and reconfigure them into two districts, both with approximately 42% of Black VAP in plans Apple V2 and Birch V2, and approximately 44% of Black VAP in Plan Chestnut.

While the difference between 42% and 44% VAP share may seem small, the consequences could be important. There is no exact threshold of Voting Age Population that turns a district into a district of opportunity, and we lack sufficient data on recent primaries to be confident about our predictions on racially polarized voting. Based on the estimates we have, a 42% share of VAP probably suffices for a minority to be able to elect its candidates of choice, but districts with a 44% share are safer, stronger districts of opportunity, in which the minority can most likely elect its preferred candidates if it votes cohesively.

Therefore, as with population equality, we find that Plan Chestnut may measure up better than plans Apple V2 or Birch V2 on any question about compliance with the VRA that a reasonable person might harbor.

## CRITERION B: CONTIGUITY

"*Districts shall be geographically contiguous. Island areas are considered to be contiguous by land to the county of which they are a part.*"

**Understanding the Criterion.**
We refer to the discussion under Section III.2.B.

**Measure of Contiguity**.
We report a binary "Yes" or "No" for whether a plan satisfies the stricter definition of contiguity, satisfying rook contiguity with islands attached to the land at the nearest point in the county of which they are a part of.

**Results.**
All three Proposed congressional maps satisfy contiguity.

| TABLE 12. *Contiguity of Proposed Congressional Maps* | |
|---|---|
| | Are all districts contiguous? |
| **Plan Apple V2** | Yes |
| **Plan Birch V2** | Yes |
| **Plan Chestnut** | Yes |

# CRITERION C: COMMUNITIES OF INTEREST

"*Districts shall reflect the state's diverse population and communities of interest. Communities of interest may include, but shall not be limited to, populations that share cultural or historical characteristics or economic interests. Communities of interest do not include relationships with political parties, incumbents, or political candidates.*"

**Understanding the Criterion.**
We refer to the discussion under Section III.2.C.

**Measure of Reflection of Communities of Interest.**
The MGGG Redistricting Lab and Open-Maps Coalition have released a report on "Communities of Interest Clusters for Michigan."[34] This report identifies 34 communities of interest clusters that were identified through aggregation from all Community of Interests submissions by the public up to September 1, 2021. A "cluster" is a geographic area in which several individual submissions overlap. In settling for 34 clusters, the MGGG and Open-Maps report aimed to strike a balance between having enough testimony of support for each cluster and having clusters that are small enough to demonstrate tightly connected themes in the submissions supporting each of them.

At the website districtr.org/Michigan, viewers can observe the 34 clusters, and the individual COI submissions supporting each of them. After uploading or opening a new district map of Michigan, under the tab "communities," viewers can toggle each of the clusters "on" or "off" to superimpose its boundaries on the Michigan district map.

Respect for communities of interest should be assessed holistically, taking into account not just the number or share of COI submissions that an individual map respects, but also the strength of the arguments in support of each individual submission.

For a quantitative measure that can aid —but not supplant— the holistic evaluation, we report the share of clusters that overlap with a district, in the sense that either at least 90% of the population of a district is inside the cluster, or at least 90% of the population in the cluster is inside a district, and we compare this share with the shares across all maps in the computational ensemble.

**Results.**
Of the 34 COI clusters, Apple V2 meets the criteria for 11, Birch V2 for 12, and Chestnut for 10. Most county-aware ensembles meet the criteria for at least 10 and up to 15. That means the plans do not show a lot of responsiveness to COI clusters compared to computer maps drawn without attention to COIs.

---

[34] We follow version 2.0 of this report, dated September 13, 2021.



*Figure 11. Communities of Interest Preservation in Congressional Maps*

## CRITERION D: PARTISAN FAIRNESS

"*Districts shall not provide a disproportionate advantage to any political party. A disproportionate advantage to a political party shall be determined using accepted measures of partisan fairness.*"

**Understanding the Criterion.**
We refer to the discussion under Section III.2.D.

**Measures of partisan fairness.**
We refer to the discussion under Section III.2.D.

For the measures described under D8, for readers' convenience, we published the three Proposed congressional maps in DRA 2020 under the names: "CD Apple V2", "CD Birch V2", and "CD Chestnut".

-     -     -

The election data that we use to compute the measures in this section is as follows:

The 2018 gubernatorial, the 2018 Secretary of State; the 2018 Attorney General elections; the 2016 Presidential election; and the 2018 U.S. Senate election, are used by the MGGG lab to report results on Partisan Bias (D1), Efficiency Gap (D2), Deviations from Proportionality (D3), Median-Mean Difference (D4), and the Outlier test (D7). The 2014, 2016, 2018, and 2020 U.S. House election, and the 2016 and 2020 U.S. Presidential election, are used by Dr. Christian Cox from Yale University to compute the Lopsided Margins (D5) and the Partisan Advantage (D6). For all these measures, we compute results election by election, and then we average out. The Princeton Gerrymandering Project uses the 2018 Michigan Governor, 2020 U.S. Senate and 2020 U.S. Presidential election, first averaging them out to construct an electoral composite in each precinct, and then using this composite to compute the results reported under the Outlier Test (D7).

DRA 2020 allows users to choose their preferred election data input to compute the measures described under D8.

**Results.**
We present the results on partisan fairness across all Proposed Maps for Michigan Congressional Districts in the following table. Each row indicates a redistricting plan. Each column indicates a measure of partisan fairness, from D1 to D7. Positive numbers indicate deviations from the fair ideal that favor the Republican Party, and negative values indicate deviations that favor the Democratic Party. Zero indicates perfect fairness according to each measure. The values of some measures are in seats; others are in percentage of the total number of votes. The "Outlier" (D7) indicates a party ("D" for Democratic or "R" for Republican) and a range of percentages. The letter indicates the party that this map favors, relative to the million other maps in the Princeton Gerrymandering Project ensemble. The first number is the share of maps in the ensemble that are less favorable to this party (in the sense that the party would obtain fewer seats), and the second is the share of maps that are even more favorable (in the sense that the party would obtain more seats).

TABLE 13. *Measures of Partisan Fairness for Congressional District Proposed Plans.*

|  | Bias | Eff. Gap | Proport. | Med-mn | Lopsided | Advantage | Outlier |
|---|---|---|---|---|---|---|---|
|  | D1 | D2 | D3 | D4 | D5 | D6 | D7 |
| **Plan Apple V2** | +0.7 seats | +0.6% | −0.33 seats | +1.8% | +3.4% | +0.06 seats | D: 82% - 2% |
| **Plan Birch V2** | +0.7 seats | +5.0% | +0.27 seats | +1.7% | +3.3% | +0.06 seats | D: 82% - 2% |
| **Plan Chestnut** | +1.3 seats | +0.4% | −0.33 seats | +1.7% | +1.9% | −0.28 seats | D: 82% - 2% |

Compare these results to the results on the measures of partisan fairness used by the Commission, as advised by Dr. Handley, displayed in the table below. The values below were obtained from a composite of all 13 statewide elections (Presidential, U.S. Senate, Governor, Secretary of State and State Attorney General) from 2012 to 2020, and we report them here directly from the MICRC website.

TABLE 14. *Selection of Measures of Partisan Fairness Used by the Commission.*

|  | Bias | Eff. Gap | Proport. | Med-mn | Lopsided | Advantage | Outlier |
|---|---|---|---|---|---|---|---|
|  | D1 | D2 | D3 | D4 | D5 | D6 | D7 |
| **Plan Apple V2** | -- | +1.2% | -1.5% | +2.4% | +4.0% | -- | -- |
| **Plan Birch V2** | -- | +0.7% | -1.5% | +2.2% | +4.1% | -- | -- |
| **Plan Chestnut** | -- | +0.6% | -1.5% | +2.3% | +4.0% | -- | -- |

The values, and their differences across tables, can be interpreted as follows: first, on the measures common to both tables, measures D2, D4 and D5 are measures of symmetry that capture ways in which the political geography of Michigan favors the GOP. With the heavy concentration of Democratic voters in and around Metro Detroit, and smaller majorities for the GOP in most other areas of the state, Democratic candidates end up winning their districts (particularly the Detroit-based ones) by more lopsided margins (D5), so they waste more votes (D2), and their vote share in their seventh-best district is typically worse than the statewide vote share (D4).

Figure 3 in Section III.2.D illustrated this regularity, using the election results from the 2018 U.S. Senate election. The horizontal axis showed the value of the median-mean difference, where greater values favor the GOP more. Nearly all 100,112 maps in the computational or public ensembles favor Republicans according to this measure. Values between 4% and 5% are typical. The three proposed plans are less favorable to Republicans (or, equivalently, more favorable to Democrats) than most others, with their values much closer to 0%.

Proportionality (D3), in contrast, captures one way in which redistricting maps favor Democrats. Since our election system favors parties that win more votes more than proportionally, and since the Democrats typically win more votes in Michigan statewide elections, if they were to replicate in U.S. House elections the kind of win margins that they obtained, in, say, U.S. Senate elections, then they would win a more than proportional number of seats.

Second, the difference between the values in these measures from Table 13 to Table 14 is due to the selection of election results used to compute them, the five statewide elections from 2016 and 2018 in Table 13 and the thirteen such elections from 2012 to 2020 in Table 14.

Third, Partisan Bias (D1) is another measure of symmetry that also reflects how the political geography of the state favors the GOP. As a result, under this measure and depending on the map, the GOP would likely win an extra seat or two in an election with tied vote share.

In contrast, the Partisan Advantage (D6) compares the seat outcome to a benchmark based on county and city boundaries, which captures what would happen under a neutral electoral system designed without partisan considerations. According to this standard, all three plans perform very well, delivering approximately the same number of seats as the neutral benchmark.

The Outlier test (D7) finds a map unfair if the outcomes it generates are unusual, relative to what is normal under other maps. The test can be applied to any of the other measures, but it is most easily interpretable if applied to the number of seats, as in Figure 12.



Figure 12. Outlier test (D7) for Congressional Maps

Figure 12 is copied from the Redistricting Report Cards elaborated by the Princeton Gerrymandering Project for these three maps. The horizontal axis in Figure 12 are numbers of seats that Democrats would win, in a hypothetical composite election with vote tallies that were equal to the average tallies of the most recent race for Michigan governor (2018), U.S. Senate in Michigan (2020) and U.S. President in Michigan (2020). The bars represent the number of maps (from among a million) in the Princeton Gerrymandering Project's ensemble in which Democrats would obtain such number of seats in such a composite election. The diamonds locate where the three Proposed maps in this distribution of columns. As desired by this test, the maps are not outliers; rather, they locate among the tall stacks at the center of the distribution. Most maps would give Democrats five, six or seven seats. These maps do too, and are thus fair according to this criterion.

All three plans feature six leaning, likely or safe Republican districts, six leaning, likely or safe Democratic districts, and a seventh, marginal district in the Capital region around Greater Lansing.

Five districts based in the Upper Peninsula (1); north-central-west Lower Peninsula (2); Southwest Lakeshore (3 or 4; number varies); Indiana border (5); and the Thumb (9) lean

Republican in all maps. Another five districts, around Ann Arbor (6), the Tri-cities and Flint (8), Oakland County (11), western Wayne County (12) and the city of Detroit (13) lean Democrat in all maps, albeit District 8 weakly so.

The sixth Republican-leaning district in plans Apple V2 and Chestnut is District 10 in Macomb County; in Plan Birch, District 10 has a different configuration that makes it lean Democrat, and instead, the 6th Republican-leaning district is District 3 around Grand Rapids. Plans Apple V2 and Chestnut tilt the Grand Rapids district Democrat by pairing Grand Rapids with Kalamazoo (Apple V2) or with Muskegon (Chestnut).

On any elections with a close to tied or slightly more Democratic vote share, as in the 2016 and 2020 Presidential elections, all three of these maps would be likely to generate 7-6 delegations, with either party capable of attaining a majority, depending on the outcome in the Capital Region district (7). At their recent electoral peak, under plans Apple V2 or Chestnut, Democrats could carry the Macomb-based district (8) and obtain an 8-5 majority. Republicans, at their recent electoral peak, could carry the Tri-Cities district (11) and obtain an 8-5 majority under plans Apple V2 or Birch V2. But a 7-6 majority on either side remains far more likely with any of these maps.

Considering a range of measures of partisan fairness, Plan Apple V2, Plan Birch V2, and Plan Chestnut are all fair to political parties. All three maps score within the range of acceptable values in every measure. Compared to maps not explicitly trying to achieve any partisan outcome, these maps are a bit more favorable than average to Democrats, but they fall within the middle range of normal maps. The same is true if we compare the Proposed maps to maps generated by the public.

## CRITERION E: FAIRNESS TO CANDIDATES

*"Districts shall not favor or disfavor an incumbent elected official or a candidate."*

**Understanding the criterion.**
We refer to the discussion under Section III.2.E.

**Measures of fairness to candidates.**
We refer to the discussion under Section III.2.E.

**Results.**
We present first results on double-bunking, i.e. assigning two incumbents to the same district.

| TABLE 15. Districts with Two Incumbents in Proposed Congressional Plans | |
|---|---|
| **Plan Apple V2** | 3 [4] |
| **Plan Birch V2** | 3 [4] |
| **Plan Chestnut** | 4 [4] |

We present two numbers. The first uses the incumbents' addresses reported in the 2020 Candidate Listing made public by the MI Secretary of State. Using these addresses, the typical range in the computational ensemble is from 1 to 3, and in the public ensemble, from 2 to 4.

The second number, in brackets, is computed using incumbents' addresses obtained from the Michigan Voter file by Mike Wilkinson for Bridge Michigan.[35]

On competitiveness, all three plans have a competitive district (#7) in the Capital Region centered in the Greater Lansing area. District 8 (Tri-Cities Flint) in plans Apple V2 and Birch V2, and District 10 (Macomb County) in plans Apple V2 and Chestnut are somewhat competitive as well.

In the five elections used by MGGG to compute results for the ensembles (namely, the 2018 Senate, Governor, Secretary of State, and Attorney General elections, and the 2016 Presidential election), only one district in Plan Birch V2 ever switched, with six staying Democrat and six staying Republican throughout; two districts switched in Plan Apple V2, with six staying Democrat and five staying Republican throughout, and three switched in Plan Chestnut, with five staying with each of the two parties.

If we define a "competitive district" as one that each of the two parties won in at least one of the five elections in the MGGG data set, and we compare these results to those of the ensembles, Figure 13 shows that most maps feature at least two, three or four competitive districts. In other words, Plan Birch V2 features fewer competitive districts than most other maps, while Plan Apple V2 and Plan Chestnut are typical in this regard.

Plans Apple V2 and Birch V2 also feature fewer results decided by a less than 6% margin: 9 and 10, respectively, among 65 results (5 elections in each of 13 districts). Plan Chestnut features 13 competitive elections, more in line with most maps in the ensembles, which feature anywhere

---

[35] Sergio Martinez-Beltrán and Mike Wilkinson, "Redistricting may oust half of incumbents in Michigan, analysis finds", November 23, 2021, Bridge Michigan.

between 12 and 22 competitive elections. Competitiveness is not a criterion in the Michigan Constitution, but too much or too little might be perceived as an environment that favors or disfavors incumbents as a class. In this regard, Plan Chestnut performs better, more like a typical plan, while Apple V2 and Birch V2 will feature more safe incumbents than most other maps.



*Figure 13. Number of Competitive Congressional Districts*

## CRITERION F: JURISDICTIONAL BOUNDARIES

*"Districts shall reflect consideration of county, city, and township boundaries."*

**Understanding the criterion.**
We refer to the discussion under Section III.2.F.

**Measures of respect for jurisdictional boundaries**
The standard way to measure satisfaction of this criterion is to count the number of times that a single unit of government is split – or geographically subdivided into potentially smaller units. One could compute the minimum number of county, city and township splits, and compare it to the number of county, city, and township splits in the map. With given weights for county splits, city splits, and township splits, we could even produce a single measure of splits. But the Michigan Constitution does not provide such weights.

We count:

E1. Number of counties that are split.

E2. Total number of times that counties are split, resulting in the total number of pieces of each county assigned to different districts.

E3. Number of U.S. Census "County Subdivisions" (COUSUB variable in the Census data; typically, cities, towns, and townships) that are split.

E4. Total number of times that county subdivisions are split, resulting in the total number of pieces of each county assigned to different state House, state Senate or U.S. Congressional Districts.

**Results.**
We first present the results in table format.

| TABLE 16. Split Jurisdictions and Jurisdictional Splits | | | | |
|---|---|---|---|---|
| | Split Counties | Number of Pieces | Split Municipalities | Municipality Pieces |
| **Plan Apple V2** | 18 | 40 | 40 | 98 |
| **Plan Birch V2** | 13 | 31 | 39 | 98 |
| **Plan Chestnut** | 14 | 34 | 38 | 91 |
| **2011 Map** | 10 | 14 | n.a. | n.a. |

These maps, and specially Plan Apple V2, do a poor job at respecting county boundaries compared to the map adopted in 2011. We also compare these three maps to the ensembles.

It is important to note here that the computational ensemble aims to preserve counties, but is entirely oblivious to municipal boundaries.[36] Therefore, the computational ensemble offers a benchmark of comparison with complete disregard to city and township boundaries (the maps ought to outperform this benchmark), and a more challenging benchmark with 100,000 maps that tried moderately hard to keep counties intact. The MICRC maps may not do as well if counties

---

[36] Informally, the algorithm that generates maps may be thought of as treating a boundary that cuts through a county as three times more economically costly than one that goes along the borders, and trying to keep the total cost of these boundaries low.

are split to satisfy higher ranked criteria (which are not included aside from population equality by the computational algorithm). No such consideration applies to the public ensembles; public submissions may or may not follow city, county, city or township boundaries.

As Figure 14 shows, these maps do not reflect county boundaries as well as those in the computational ensemble; but Plan Birch V2 and Plan Chestnut perform about as well as the maps submitted by the public; Plan Apple V2 underperforms Birch V2, Chestnut, and most of the maps submitted by the public.



*Figure 14. Number of Split Counties*

As shown in Figure 15, all three MICRC Proposed plans reflect city and township boundaries about as well as is typical of maps submitted by the public, and better than the computational benchmark that was entirely unaware of municipalities. This indicates that the MICRC has taken municipal boundaries into account. We infer that the MICRC has also taken county boundaries into account, though not as much perhaps as the 2011 plans or computer-generated plans. It is relevant to this comparison that neither 2011 mapmakers nor the computational algorithm were required to consider additional criteria reflecting communities of interest or partisan fairness that currently take precedence over respect for boundaries in the current redistricting round.



*Figure 15. Number of Split Municipalities (County Subdivisions)*

## CRITERION G: COMPACTNESS

*"Districts shall be reasonably compact."*

**Understanding the criterion.**
We refer to the discussion under Section III.2.G.

**Measures of compactness.**
We refer to the discussion under Section III.2.G.

**Results.**
In the next table, for each redistricting plan in each row, we provide the Polsby-Popper, Reock and Cut Edges measures of compactness, respectively in columns 1, 2 and 3.[37]

| TABLE 17. *Compactness Measures in Congressional District Plans* | | | |
|---|---|---|---|
| | Polsby-Popper | Reock | Cut Edges |
| **Plan Apple V2** | 0.38 | 0.37 | 710 |
| **Plan Birch V2** | 0.39 | 0.40 | 685 |
| **Plan Chestnut** | 0.39 | 0.38 | 700 |
| **2011 map** | 0.29 | 0.36 | n.a. |

Recall that Polsby-Popper and Reock are measures of compactness from 0 (not compact), to 1 (a perfectly compact circle); whereas, Cut Edges is a measure of violation of compactness that loosely, tracks the number of precincts located at the borders of a district (the less compact, the greater number of precincts at the border). The maps perform similarly, with once again Apple V2 slightly underperforms the others.

All three maps are reasonably compact, much more so than the official map in the previous redistricting sample, and about as much as most maps in the Ensemble group, as illustrated in Figure 16.

---

[37] The Reock and Polsby-Popper measures are as reported by DRA 2020. The Cut Edges measure is computed by MGGG for this report.



*Figure 16. Number of Cut Edges*

## III.3. SUMMARY OF RESULTS AND PLAN COMPARISON

Plan Apple V2, Plan Birch V2, and Plan Chestnut are all complete redistricting plans that divide the entire state into 13 districts, as required by the latest U.S. Census of the state.

Plan Chestnut features a small deviation from population equality: 0.14%, or just over 1,000 inhabitants, which is less than the size of a typical voting precinct. Plan Birch V2 features a twice as large deviation: 0.28% or just over 2,000 inhabitants; close to the size of the average voting precinct. Plan Apple V2 features a substantially larger population deviation: 0.48%, or over 3,700 inhabitants, which is a greater population than the population in most voting precincts in Michigan. These differences across the three plans are large relative to the magnitude of the deviations exhibited in Congressional District plans across all states. Therefore, on population equality, Plan Chestnut performs significantly better than either Plan Birch V2 or Plan Apple V2, and Plan Apple V2 underperforms either of the other two.

None of these three plans feature a district in which a majority of the Voting Age Population identifies as "Black." All three plans feature two districts with at least 40% Black Voting Age Population, but Plan Chestnut features two districts with greater than 43% Black Voting Age Population. Therefore, Plan Chestnut provides stronger and safer districts of opportunity for the Black minority population to elect candidates of its choice.

Plan Chestnut, therefore, outperforms Plan Birch V2 and Plan Apple V2 with regard to all aspects of Criterion A.

All three plans satisfy contiguity.

While all three plans feature districts that represent geographically recognizable areas that can be meaningfully described in few words, we cannot say that they fully reflect the collection of Communities of Interest submitted by citizens. There are slight variations between the plans in their preservation of COI clusters, but none perform significantly better than most randomly-drawn maps.

All three plans perform well overall according to a collection of accepted measures of partisan fairness.[38] Under any of these three plans, and with election results similar to those in the recent past, the most likely outcome would be a congressional delegation with a 7-6 or 6-7 Democratic-Republican partisan split.

Plan Chestnut features a normal number of districts and elections in which the incumbent party has lost or come close to losing. This number is typical in maps drawn by the public or by computational algorithms that did not take incumbency into account. Plans Apple V2 and Birch V2 feature relatively few districts and few elections in which the incumbent party has lost or has come close to losing, so they may be regarded as plans that relatively favor incumbents.

Plans Chestnut and Birch V2 reflect county, city and township boundaries more closely than Plan Apple V2.

All three maps are reasonably and similarly compact; Plan Birch V2 slightly more so.

---

[38] The plans do not perform well on each individual measure. It is impossible to score well on all at the same time, as different measures have conflicting demands. We mean that, overall, taking their scores across all measures, the maps perform well on this criterion.

Proposed Plan Apple V2 is immediately derived from the earlier Draft Plan Apple, with some adjustments that lowered population equality scores. The plan's score was lowered by adding Koylton Township to the now-largest district (District 9), and taking half of Lyndon Township out of what is now the smallest district (District 6). Notably, each of the two assignments also create a county split, also lowering performance on Criterion F.

Proposed Plan Birch V2 is immediately derived from the earlier Draft Plan Birch, with some adjustments to the district boundaries around the city of Midland that did not materially affect any of the compliance.

Proposed plans Apple V2, Apple, Birch V2 and Birch are all ultimately variations rooted on a shared draft, and their commonalities remain visible in many of their districts. We find that the changes from Draft Apple to newer Proposed Apple V2 actually lowered rather than improved performance on Criteria A and F.

Proposed Plan Chestnut offers more differences. It is originally rooted in, or at least inspired by, the same draft that is a common predecessor to Apple and Birch and the newer Apple V2 and Birch V2.

In each, the basic configuration outlines District 1 in the Upper Peninsula and the northern Lower Peninsula (including Marquette and Traverse City); District 2 in the mid/central/northern Lower Peninsula (including Mt. Pleasant); District 3 or 4 around Grand Rapids; District 4 or 3 on Michigan's southwestern lakeshore; District 5 along the state's southern border; District 6 around Ann Arbor; District 7 based on the Capital Region around Greater Lansing; District 8 including the Tri-cities and Flint; District 9 covering the Thumb; District 10 taking in much of the population of Macomb County; District 11 based on Oakland County; District 12 in western Wayne County; and District 13 in and around the city of Detroit. This framework is common to all three plans and all their predecessors.

The most distinctive geographic feature of Apple and newer Apple V2 turns the Grand Rapids district into a north-south strip that brings in Kalamazoo and leans Democratic. The most distinctive feature of Birch and the updated Birch V2 is that they move the Macomb County district (District 10) westward into Oakland County and turn it into one that leans Democratic. Plan Chestnut's most geographic distinctive feature is arguably its solution for the Grand Rapids district, stretching the district to Lake Michigan at Muskegon and yielding a district that tilts toward the Democratic Party. Plan Chestnut also introduces many other border adjustments. The overall effect of these changes improves population equality and strengthens the two districts of opportunity.

In summary, Plan Chestnut performs better than the other two plans on the top-ranked Criterion A (population equality and compliance with the Voting Rights Act). It performs at least as well or better than Plan Birch V2 in most other criteria, and at least as well or more sharply improved than Apple V2 on most other criteria.

Overall, we conclude that, across our measures, Plan Chestnut performs best on these seven ranked criteria, with Plan Birch V2 second best, and Plan Apple V2 ranked lowest of the three.

We next reorganize the material above, reiterating the key points by plan, instead of by criterion, and discussing possible concerns or considerations about these plans.

**Proposed Plan Chestnut.**

Proposed Plan Chestnut features a small population deviation at 0.14%. It features two districts of opportunity in which the share of Voting Age Population that identifies as "Black" is above 43%.

This plan performs well on a collection of partisan fairness measures, and on fairness to candidates. It shows some consideration for county, city and township boundaries and is reasonably compact.

The small population deviation from equality would need to be justified as necessary to satisfy other criteria. Since the deviation is smaller than the population size of most precincts, greater population equality may require breaking up a precinct. However, since this plan follows pre-existing precinct lines (which helps with compliance with the VRA), the deviation can probably be justified as stemming from a desire to preserve whole precincts, which in and of itself helps satisfy other criteria.

Given public concern about the Commission's approach to Black representation, the Commission may need to explain that this plan complies with the Voting Rights Act by creating two districts of opportunity in which voting-age residents who identify as "Black" constitute more than 43% of the population of the district.

**Proposed Plan Birch V2.**

Proposed Plan Birch V2, compared to Proposed Plan Chestnut, features a larger population deviation, at 0.28%. It features two districts of opportunity in which the share of Voting Age Population that identifies as "Black" is above 40% but below 43%.

It performs well on a collection of partisan fairness measures. It performs less well on measures of fairness to candidates, as it appears to create many seats that will be safe to incumbents. It shows some consideration for county, city and township boundaries, and is reasonably compact.

The larger population deviation from equality would need to be justified as necessary to satisfy other criteria. This might be more difficult, given that Proposed Plan Chestnut exists as an alternative.

It outperforms other maps on compactness, the lowest ranked of the criteria.

**Plan Apple V2.**

Plan Apple V2 features a much larger population deviation of 0.48%. It features two districts of opportunity in which the share of Voting Age Population that identifies as "Black" is above 40% but below 43%.

It performs well on a collection of partisan fairness measures. It performs less so on fairness to candidates, as it appears to create districts that will see very few competitive elections. County, city and township boundaries are less favored and the updated Apple map appears slightly less compact than the other two alternatives.

Since it performs no better than the other plans on any criteria, based on our measures, it appears much more difficult to justify why the large population deviation present in this plan is necessary to satisfy some other of the state's redistricting criteria.

We next provide an abridged analysis of individually submitted congressional plans in an Appendix to Part IV within this report.

# IV. APPENDIX. PROPOSED CONGRESSIONAL PLANS SUBMITTED BY INDIVIDUAL COMMISSIONERS.

There are two individual commissioner submissions for congressional District plans:

- Proposed Szetela Congressional District Map Number #275, submitted by Commissioner Rebecca Szetela, Independent, of Canton.
- Proposed Lange Congressional District Map Number #273, submitted by Rhonda Lange, Republican of Reed City.

Proposed congressional District Map Szetela incorporates the Grand Rapids area districts from Plan Chestnut with the remaining districts from Plan Birch V2.

Proposed congressional District Map Lange keeps the overall framework of Plan Birch V2 and keeps its six districts around Washtenaw, Wayne, Oakland and Macomb counties and the thumb intact, but makes considerable border adjustments elsewhere.

| TABLE 10 Appendix. *Population Equality in Proposed Congressional Individual Plans* | | |
|---|---|---|
| | **Population difference** | **Maximum. Deviation** |
| **Plan Apple V2** | 0.48% | 0.26% |
| **Plan Birch V2** | 0.26% | 0.15% |
| **Plan Chestnut** | 0.14% | 0.08% |
| **Plan CD Lange 273** | 0.25% | 0.15% |
| **Plan CD Szetela 275** | 0.22% | 0.12% |

Plan Chestnut continues to outperform all other plans on population equality once we take into consideration the two individual submissions.

| TABLE 11 Appendix. *Districts of Opportunity in Proposed Congressional Individual Plans* | | | |
|---|---|---|---|
| | **# > 50% VAP Black** | **# >40% VAP Black** | **# >35% VAP Black** |
| **Plan Apple V2** | 0 | 2 | 2 |
| **Plan Birch V2** | 0 | 2 | 2 |
| **Plan Chestnut** | 0 | 2 | 2 |
| **Plan CD Lange 273** | 0 | 2 | 2 |
| **Plan CD Szetela 275** | 0 | 2 | 2 |
| **2011 Official map** | 2 | 2 | 2 |
| **Proportional to Population** | 2 | | |

On VRA, plans CD Lange 273 and CD Szetela 275 follow Plan Birch V2 in the Greater Detroit and surrounding areas, and thus obtain the same scores on districts of opportunity as Plan Birch V2. Again, we prefer Plan Chestnut. Both individually submitted plans satisfy contiguity.

| TABLE 13 Appendix. *Partisan Fairness in Proposed Congressional Individual Plans* | | | | |
|---|---|---|---|---|
| | Efficiency Gap | Proportionality | Median-mean | Partisan Advantage |
| | D2 | D3 | D4 | D6 |
| **Plan Apple V2** | +1.2% | +0.14 seats | +2.4% | +0.06 seats |
| **Plan Birch V2** | +0.7% | +0.14 seats | +2.2% | +0.06 seats |
| **Plan Chestnut** | +0.6% | −0.20 seats | +2.3% | −0.28 seats |
| **Plan CD Lange 273** | +1.0% | +0.47 seats | +2.0% | +0.39 seats |
| **Plan CD Szetela 275** | +0.6% | -0.03 seats | +2.4% | −0.11 seats |

Both of the individually submitted plans perform similarly to the collaborative ones on partisan fairness measures, albeit CD Lange 273 is slightly more favorable to Republicans.

| TABLE 16 Appendix. Split Counties and County Splits in Proposed Congressional Maps. | | |
|---|---|---|
| | Split Counties | County Pieces |
| **Plan Apple V2** | 18 | 40 |
| **Plan Birch V2** | 13 | 31 |
| **Plan Chestnut** | 14 | 34 |
| **Plan CD Lange 273** | 13 | 31 |
| **Plan CD Szetela 275** | 17 | 39 |

Plan CD Lange 273 splits counties as much as much as Plan Birch V2; Plan CD Szetela inherits the county-splitting configuration of Plan Apple V2 around Grand Rapids and Kalamazoo. Plan CD Lange 273 is the best performing on compactness, together with Plan Birch V2, whereas, Plan CD Szetela 275 is the worst performing map on compactness.

| TABLE 17 Appendix. Compactness Measures in Proposed Congressional maps | | |
|---|---|---|
| | Polsby-Popper | Reock |
| **Plan Apple V2** | 0.38 | 0.37 |
| **Plan Birch V2** | 0.39 | 0.40 |
| **Plan Chestnut** | 0.39 | 0.38 |
| **Plan CD Lange 273** | 0.38 | 0.41 |
| **Plan CD Szetela 275** | 0.37 | 0.37 |

The results on Tables 10 Appendix, 11 Appendix and 31 Appendix are from DRA 2020, using the 2020 U.S. Census population data. On Table 13 Appendix, the measures for the Efficiency Gap and the Median-Mean difference are from the MICRC Compliance Sheet, using all 10 statewide elections from 2012 to 2020; and the deviation from proportionality and the Partisan Advantage are computed by Dr. Christian Cox of Yale University and based upon 2016 and 2020 presidential elections and the 2014, 2016, 2018 and 2020 U.S. House election in Michigan. Deviations from proportionality or from the neutral jurisdictional benchmark in the partisan advantage are measured in seats; whereas, the Efficiency Gap and the Median-Mean measure differences in shares of votes.

# PART V. ANALYSIS OF DRAFT MAPS FOR MICHIGAN'S SENATE DISTRICTS

## V.1. THE DRAFT MICHIGAN SENATE DISTRICT MAPS

On Oct. 11, 2021 the MICRC approved the following Draft maps for Michigan Senate districts, for consideration in the Second Round of Public Hearings (Oct 20 – Oct 27, 2021): [39]

**-Plan "Spruce," name "10-08-21 v1 SD"** (map number #226). Voted for publication 13-0.



**Plan Spruce**

---

[39] These maps are available for download here:
https://michigan.mydistricting.com/legdistricting/michigan/comment_links

**-Plan "Elm," name "10-04-21 v2 SD"** (map number #199). Voted for publication 12-1.

Note that the Elm map does not appear to be a valid redistricting plan, as it fails to assign a district to all the areas of Michigan. Plan Elm fails to assign any district to Census Block 4006 in Census Track 1590, in Southfield Township (Oakland County).[40] This block has 13 inhabitants.



**Plan Elm**

---

[40] https://tigerweb.geo.census.gov/tigerweb2020/

JA00764

**-Plan "Cherry," name 10-07-21 SD RAS BK** (map number #220). Voted for publication 13-0.

Note that the Cherry map does not appear to be a valid redistricting plan, as it fails to assign a district to all the areas of Michigan. Plan Cherry fails to assign any district to a precinct with population 1,946 in the neighborhood of Anchor Bay Shores in Macomb County. This area, highlighted in red in the inset map below, must be assigned to a district.



**Plan Cherry (incomplete)**

## V.2. MEASURING PERFORMANCE ON EACH CRITERIA

## CRITERION A: POPULATION BALANCE AND VOTING RIGHTS ACT

*"Districts shall be of equal population as mandated by the United States constitution, and shall comply with the voting rights act and other federal laws."*

**Understanding the Criterion.**
The Michigan population according to the 2020 U.S. Census is 10,077,331 inhabitants. Michigan has 38 districts for state Senate elections. So, the ideally equal population is 265,193 inhabitants per district. The United States Supreme Court has ruled that, solely on U.S. constitutional grounds, the population in state legislative districts must be roughly equal; however, "some deviations from the equal-population principle are constitutionally permissible," for a rational state interest, and in particular to respect jurisdictional boundaries of counties, cities and towns.[41] In particular, population differences of up to 10% between the least and most populous districts are "minor" and do not require "justification from the State."[42] Population deviations greater than 10% must be justified by the State, and instances with a deviation as large as 89% away from the ideal size have been deemed legitimate.[43] However, the Equal Population federal requirement under the U.S. Constitution is much tighter for federal elections to the U.S. House of Representatives, in which any population deviation requires justification, and the largest deviation that has been found acceptable is 0.79% (as discussed in the section relating to Criterion A in the evaluation of the Congressional District map).

If there is any substantial deviation from population equality, supporters of one party cannot be systematically placed in larger districts.[44]

In explicitly mentioning "equal population as mandated by the U.S. Constitution" as the first clause of the top priority criterion, the Michigan Constitution might open a question as to whether this clause means no more than the lax standard of equal population for state legislative districts under the U.S. Constitution (our interpretation), a stricter standard of equal population for federal elections to the U.S. House of Representatives, or something in between these two extremes.

With regard to the Voting Rights Act, we refer verbatim to the discussion of Criterion A under Section III.2. for the Congressional District maps.

---

[41] Reynolds v. Sims, 377 US 579-580.
[42] Brown v. Thomson, 462 US 842.
[43] Brown v. Thomson, 462 US 835.
[44] *Cox v. Larios*, 542 U.S. 947

**Measures of performance on Criterion A.**

A1**. Measure of population inequality.**
We compute the difference between the most and least populous district, using the formula:

$$\frac{Population\ of\ most\ populous\ district}{Population\ of\ least\ populous\ district} - 1,$$

in percentage points.
For convenience, we also report the largest deviation to the ideal population size of a district, namely,

$$\frac{Population\ of\ most\ populous\ district}{265,193} - 1,$$

again, in percentage points.

If the difference between the most and least populous district surpasses 1%, we also compare the average population of districts won by Democratic Party candidates to the average population of districts won by Republican Party candidates, in all U.S. Presidential or Michigan Senate elections from 2014 to 2020 (namely, the 2016 and 2020 Presidential elections, and the 2014 and 2018 Michigan Senate elections). This is a measure of partisan malapportionment.

A2. **Number of Districts of Opportunity**.
As discussed in Section III.2.A2 with regard to the application of the Voting Rights Act to Congressional District maps, we seek to compute the number of districts of opportunity for ethnic and linguistic minorities. We can then compare this number to the proportion of minority population. For instance, the "Black Alone" population is 13.7% of the Michigan population (with a percentage as high as 37.6% in Wayne Co.), a statewide percentage that corresponds to at least five state Senate districts. Further, 5.6% of the Michigan population is Hispanic or Latino, a percentage that corresponds to two state Senate districts (though in this case the highest concentration by county is 15.4% in Oceana County.); and 3.3% of the state population is Asian-American (with 9% in Washtenaw County.), a percentage that corresponds to one state Senate district.

We can also compare the number of opportunity districts for the Black minority to the number of such opportunity districts in the previous redistricting plan. We refer to the report "determining if a redistricting plan complies with the Voting Rights Act" by Dr. Lisa Handley, presented to the MICRC. If Dr. Handley's estimates are correct, any 40% Black district is a district of opportunity and will elect candidates preferred by the Black minority.

If so, there were three (or six at the lower threshold of 35%) Black districts of opportunity in the previous redistricting plan.

So, the measure we report is:

-Number of districts with >50% of their voting age population identifying as Black.

-Number of districts with >40% of their voting age population identifying as Black.

-Number of districts with >35% of their voting age population identifying as Black.

We compare these measures to the number of districts (five) proportional to the Black population in the state, and to the number of districts with these percentages of Black voting age population in the previous Congressional Districts plan (two, five and six).

We do not find a sufficient geographic concentration of Hispanic or Latino, or other minorities, in any county, to constitute a majority in a geographically compact district.

**Results.**

We present the results on Population Equality in the following table. Each row indicates a redistricting plan for Michigan Senate districts. The first column reports the population difference between the most and the least populated district. The second column reports the maximum deviation from the ideal district population. And the third column reports the partisan malapportionment measure, with a result bigger than zero meaning that districts won by Democrats have more population (which indicates an advantage to the Republican Party), and thus negative numbers indicating that districts won by Republicans have more population (which indicates an advantage to the Democratic Party).

| TABLE 18. *Population Equality in Draft Senate Plans* | | | |
|---|---|---|---|
| | **Population. difference** | **Maximum. deviation** | **Partisan malapportion.** |
| **Plan Spruce** | 9.02% | 4.89% | +0.32% |
| **Plan Elm** | 9.45% | 5.22% | -0.03% |
| **Plan Cherry [*]** | *5.06%* | *2.50%* | *-0.29%* |

[*] Recall that Plan Cherry is not a valid plan, as it fails to assign a district to each precinct. Population Equality measures will change if the plan is remedied by assigning a district to each precinct.

These deviations are within the range that is acceptable for state legislative districts under the US Constitution, but they are not within the range of deviations that are potentially acceptable (if suitably justified) for Congressional Districts under the US Constitution. If the explicit Population Equality clause under the Michigan Constitution were understood to be stricter than the population equality requirement implicit in the federal Equal Protection clause, then these deviations would be too large.

We report the number of districts in which more than 50%, more than 40%, and more than 35% of the Voting Age Population identifies as "Black" or "African-American" (alone), as computed by the MGGG Lab, in the following table (with official map numbers from IPUMS NHGIS, University of Minnesota, www.nhgis.org, that reflect current numbers rather than those at adoption). These numbers, serve as proxy for the number of Black-minority districts of opportunity.

| TABLE 19. *Black Minority Districts of Opportunity in State Senate Draft Maps* | | | |
|---|---|---|---|
| | **# > 50% VAP Black** | **# >40% VAP Black** | **# >35% VAP Black** |
| **Plan Spruce** | 0 | 3 | 6 |
| **Plan Elm** | 0 | 3 | 6 |
| **Plan Cherry [*]** | *0* | *3* | *6* |
| **2011 Official map** | 1 | 5 | 5 |
| **Proportional to Population** | 5 | | |

As in the case of the Congressional District maps, the most striking result is no majority-minority districts in these three proposed plans. The following graph shows the Black share of the Voting Age Population in each district. Districts are ordered from lowest to highest Black share (that is, the labels in the horizontal axis are not the district number in the Plan; rather, they should be interpreted as lowest Black VAP share (1), 2nd lowest Black VAP share (2), all the way to the district with the highest Black VAP share (38). The colored dots represent each map. The boxes represent the typical Black VAP shares in maps in the Computational Ensemble, and the arms stretching out of the boxes represent the Black VAP share at unusual maps such that only 2.5% of maps have shares above or below the range covered by the arms.



*Figure 17. Distribution of Black VAP by Senate District*

As we can see, these three Senate plans are unusual in engineering maps without a single majority-Black district. Almost all Senate maps in the Computer Ensemble feature two majority-Black districts; and half feature three. These maps appear to deliberately dilute concentrations of Black voting age population above 50%, to create instead as many districts as possible in which the Black vote constitutes a large minority above 35%. All three of these plans generate six such districts with a large Black minority, which is twice as many as in most other maps.

The large distance between the dots representing these three plans, and the arms of the boxes representing the computer-generated plans imply that the probability that plans like these without a Black-majority district arise by chance are remote. Rather, these plans' outcome with no majority-Black district, and twice as many districts with a large minority of Black voters as in most other plans, is attained by design, following the advice to the Commission from its Voting Rights Act legal counsel and consultant.

## CRITERION B: CONTIGUITY

*"Districts shall be geographically contiguous. Island areas are considered to be contiguous by land to the county of which they are a part."*

**Understanding the Criterion.**
See the discussion under Section III.2.B on the analysis of Congressional Districts.

**Measure of Contiguity.**
We report a binary "Yes" or "No" for whether a plan satisfies the stricter definition of contiguity, satisfying rook contiguity with islands attached to the land at the nearest point in the county of which they are a part of.

**Results.**
All three Draft Michigan Senate maps satisfy contiguity.

| TABLE 20. *Contiguity in Draft Michigan Senate maps* | |
|---|---|
| | Are all districts contiguous? |
| **Plan Spruce** | Yes |
| **Plan Elm** | Yes |
| **Plan Cherry** | Yes |

JA00770

# CRITERION C: COMMUNITIES OF INTEREST

*"Districts shall reflect the state's diverse population and communities of interest. Communities of interest may include, but shall not be limited to, populations that share cultural or historical characteristics or economic interests. Communities of interest do not include relationships with political parties, incumbents, or political candidates."*

**Understanding the Criterion.**
See the discussion under Section III.2.C on the analysis of Congressional District maps.

**Measure of Respect for Communities of Interest.**
See the discussion under Section III.2.C on the analysis of Congressional district maps.

**Results.**
All of the draft plans preserve 26 COI clusters out of 34 at the 90 percent inclusion criteria. Many computer-generated maps include fewer, so each map shows some evidence of taking COI clusters into consideration.



*Figure 18. Community of Interest Preservation in State Senate Maps*

## CRITERION D: PARTISAN FAIRNESS

"*Districts shall not provide a disproportionate advantage to any political party. A disproportionate advantage to a political party shall be determined using accepted measures of partisan fairness.*"

**Understanding the Criterion.**
See the discussion under Section III.2.D on the analysis of the Congressional district maps, verbatim.

**Measures of partisan fairness.**

D1. **Partisan Bias.**

D2. **Efficiency Gap.**

D3. **Deviations from proportionality.**
Measures D1-D3 are exactly as described in Section III.2.D.

D4. **Median-Mean difference.**
The median-mean is a measure of symmetry that captures how difficult it is for a party to obtain a majority of the delegation.[45] Suppose we order the districts from least to most Republican, by vote share in a previous election. The median-mean difference then compares the vote share in the average of the 19th and 20th most Republican districts (these two are the median districts in a map of 38 senatorial districts) to the statewide vote-share (the mean). If this number is positive, then the party can win nineteen seats (half of the Michigan Senate) even if it loses the vote statewide, and the magnitude of the median-mean difference shows by how much it can lose the statewide vote and still win nineteen seats and come closer to winning the 20th than to losing the 19th.

This measure is more informative for state legislatures, where winning the median district gives a party a majority.

D5. **Lopsided Test.**
Exactly as described in Section III.2.D.

D6. **Partisan Advantage.**
The Partisan Advantage is a measure of neutrality that computes how much the seat outcome deviates from a neutral benchmark based on the state's map of jurisdictions (counties, cities and towns). This benchmark is the seat outcome in which seats are assigned to jurisdictions in proportion to their population.[46] The list of jurisdictions we use to compute the neutral benchmark for the redistricting plan for the Michigan Senate, contains the seventy-nine counties with population smaller than two ideal Senate districts (530,396 inhabitants). It also contains the largest cities and townships in the four counties with population greater than this threshold (Wayne, Oakland, Macomb and Kent), taking out from each county and adding to the list as many

---

[45] McDonald, Michael D., and Robin E. Best. "Unfair partisan gerrymanders in politics and law: A diagnostic applied to six cases." *Election Law Journal* 14.4 (2015): 312-330.

[46] Jon X. Eguia. "A measure of partisan fairness in redistricting." *Election Law Journal*, forthcoming.

of the largest cities and towns as needed until the rest of the county has fewer than 530,396 residents; this rest of the county is then also included in the list. For each jurisdiction in this list, the jurisdictional benchmark assigns seats in proportion to the population of the jurisdiction, to the party that won most votes in this jurisdiction. Aggregating by jurisdictions in this manner, the benchmark considers the geographic distribution of votes for each party across the state. The Partisan Advantage based on this jurisdictional benchmark is then the difference between the seats that a party obtains given the map, and the seats that it would obtain under this jurisdictional benchmark.

**D7. Outlier test.**
Exactly as described in Section III.2.D.

**D8. Other measures.**
We note here that other measures of partisan fairness, some capturing a notion of symmetry, and others capturing a notion of neutrality, are publicly available through the web redistricting app DRA 2020 at [www.davesredistricting.org](www.davesredistricting.org)

For readers' convenience, we published the three Draft Senate maps in DRA 2020 under the names: "MICRC Plan Spruce", "MICRC Plan Elm" and "MICRC Plan Cherry". Under the "Advanced" tab, DRA 2020 displays several measures of partisan fairness, including variations of the ones we include in this report, for the Democratic Party. Included in their display is a votes-to-seats curve, mapping the Democratic seat share for any vote share. They also include a measure of Partisan Bias (D1), which they call "Seat Bias"; a measure of median-mean difference (D4), which they call "Votes Bias"; a measure of the Efficiency Gap (D2); and a measure of deviation from Proportionality (D3).

All these alternative measures are computed using a smoothing function of past election results: instead of recording whether a party lost or won a district as a binary 0 or 1 value, as in our report, the measures of DRA 2020 assign to the party a fraction between 0 and 1 of the seat in this district that is increasing in the party's vote share. The motivation is that DRA 2020 uses voting tallies in past elections not to determine what would have happened give those voting tallies under the new map (as we do in this report), but rather, to estimate what will probably happen in the future under the new maps. A narrow win in the past is then only a small indication that the party will win again in the future.

-     -     -

The election data that we use to compute the measures in this Section is again:

Michigan's 2018 Governor election; the 2018 Secretary of State election; the 2018 Attorney General election; the 2016 Presidential election; and the 2018 U.S. Senate election, are used by the MGGG lab to report results on Partisan Bias (D1), Efficiency Gap (D2), Deviations from Proportionality (D3), Median-Mean Difference (D4), and the Outlier test (D7). The 2014, 2016, 2018, and 2020 US House election, and the 2016 and 2020 US Presidential election, are used by Dr. Christian Cox from Yale University to compute the Lopsided Margins (D5) and the Partisan Advantage (D6). For all these measures, we compute results election by election, and then we average out. The Princeton Gerrymandering Project uses the 2018 Michigan Governor, 2020 U.S. Senate and 2020 U.S. Presidential election, first averaging them out to construct an electoral

composite in each precinct, and then using this composite to compute the results reported under the Outlier Test (D7).

DRA 2020 allows users to choose their preferred election data input to compute the measures described under D8.

**Results.**

We present the results on partisan fairness across all Draft maps for Michigan Senate districts in the following table. Each row indicates a redistricting plan. Each column indicates a measure of partisan fairness, from D1 to D7. Positive numbers indicate deviations from the fair ideal that favor the Republican Party, and negative values indicate deviations that favor the Democratic Party. Zero indicates perfect fairness according to each measure. The values of some measures are in seats; others are in percentage of the total number of votes. The "Outlier" (D7) indicates a party ("D" for Democratic or "R" for Republican) and a range of percentages. The letter indicates the party that this map favors, relative to the 1,000,000 other maps in the Princeton Gerrymandering Project ensemble. The first number is the share of maps in the ensemble that are less favorable to this party (in the sense that the party would obtain fewer seats), and the second is the share of maps that are even more favorable (in the sense that the party would obtain more seats).

| TABLE 21. *Measures of Partisan Fairness for Senate District Plans* | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Bias | Eff. Gap | Proport. | Med-mn | Lopsided | Advantage | Outlier |
| | D1 | D2 | D3 | D4 | D5 | D6 | D7 |
| **Plan Spruce** | +5.3% | +3.0% | -0.3 seats | +3.0% | +5.4% | +0.4 seats | D: 85%-3% |
| **Plan Elm** | +5.3% | +3.1% | -0.3 seats | +3.5% | +5.2% | +0.2 seats | D: 85%-3% |
| **Plan Cherry[*]** | +2.7% | +2.5% | *-0.5 seats* | +2.8% | +4.5% | −0.3 seats | D: 97%-0% |

[*] Recall that Plan Cherry is not a complete plan, as it fails to assign a district to each precinct. Results will change if Plan Cherry is remedied by assigning all precincts to become a complete redistricting plan.

Compare these results to the results on the measures of partisan fairness used by the Commission, as advised by Dr. Lisa Handley, displayed in the table below. The values below were obtained from a composite of all thirteen state-wide elections (Presidential, U.S. Senate, Governor, Secretary of State, and State Attorney General) from 2012 to 2020, and we report them here directly from the MICRC website.

| TABLE 22. *Selection of Measures of Partisan Fairness Used by the Commission.* | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Bias | Eff. Gap | Proport. | Med-mn | Lopsided | Advantage | Outlier |
| | D1 | D2 | D3 | D4 | D5 | D6 | D7 |
| **Plan Spruce** | -- | +3.1% | −0.3% | +2.7% | +4.0% | -- | -- |
| **Plan Elm** | -- | +6.2% | +2.1% | +3.4% | +4.0% | -- | -- |
| **Plan Cherry[*]** | -- | +3.4% | *-0.3%* | +2.2% | +4.1% | -- | -- |

Once again, because the political geography of Michigan concentrates Democratic voters more than Republican voters, measures that seek symmetric outcomes (D1, D2, D4 and D5) for both parties detect that under these maps (just as under almost any other map), the GOP is favored. The measure that sets the advantage stemming from a favorable political geography aside and evaluates only the net partisan added effect of the maps (D6) shows that these maps are all very close to fair. And proportionality (D3) ends up close to fair again, through two opposing factors

that cancel out: proportionality requires winning parties to win smaller seat majorities that they typically do, and this effect favors the Democrats, just about cancelling the effect of political geography.

Figure 19 illustrates that these plans are more favorable to Democratic candidates than many other maps (Democratic candidates win one additional seat than under the average map), but with these election results, they are within the normal range, not extreme outliers. The public and computer ensembles both produce more maps that would favor Republicans more than these.



*Figure 19. Number of Seats Democrats would Win with Senate 2018 Results*

Figure 19 illustrates outcomes under one particular election result. Under other election results in our sample, Democratic candidates win an additional seat under Plan Cherry.

Overall, the Spruce and Elm plans are fair to parties. Their differences are small, and well within the range we would expect under typical maps that were not designed to favor or disfavor a party.

Plan Cherry introduces some questions: while it appears to favor Republicans on some measures, it also appears to be an unusual map in favor of Democrats according to the outlier test, as conducted by the Princeton Gerrymandering group.

## CRITERION E: FAIRNESS TO CANDIDATES

> *"Districts shall not favor or disfavor an incumbent elected official or a candidate."*

**Understanding the criterion.**
See the discussion under Section III.2.E on the analysis of the Congressional district maps, verbatim.

**Measures of fairness to candidates.**
See the discussion under Section III.2.E on the analysis of the Congressional District maps. In addition, two considerations apply differently to candidates to the Michigan Senate.

The first is that, unlike Representatives to the U.S. House, incumbent Michigan senators who have already served two terms are term-limited; placing a term-limited incumbent in the same district as another incumbent does not pose an advantage or disadvantage to any candidate.[47] We can also test whether two (or more) non-term limited incumbents are placed in the same new district, assessing whether non-term-limited incumbents are treated differently than term-limited incumbents.

The second is that, unlike Representatives to the U.S. House, candidates for a seat in the Michigan Senate must be registered voters in the district they seek to represent.[48] Therefore, incumbents put in the same district cannot avoid facing each other simply by seeking to represent a different district.

**Results.**
The analysis on double-bunking (placing two incumbents in the same new district) can be seen in the histogram below. The Tree maps keep fewer districts from double bunking incumbents. Cherry, Spruce, and Elm maps each double bunk 6 incumbents. That is fewer than would be expected by chance and fewer than most publicly-generated maps.

---

[47] Mich. Constitution, Article IV § 54.
[48] Mich. Constitution, Article IV § 7.



*Figure 20. Double Bunked Incumbents in State Senate Maps*

On competitiveness, plans Spruce, Elm and Cherry each have exactly six "swing" districts that have been won at least once by each of the two parties in a statewide election in 2016 or 2018. This is the average number of such districts in the Computer Ensemble.



*Figure 21. Number of Swing Senate Districts*

## CRITERION F: JURISDICTIONAL BOUNDARIES

*"Districts shall reflect consideration of county, city, and township boundaries."*

**Understanding the criterion.**
See the discussion under Section III.2.F on the analysis of the Congressional district maps, verbatim.

**Measures of respect of jurisdictional boundaries.**
See the discussion under Section III.2.F on the analysis of the Congressional district maps, verbatim.

**Results.**
We present results on county splits.

| TABLE 23. Split Counties and County Splits in Senate Maps | | |
|---|---|---|
| | Split Counties | Number of Pieces |
| **Plan Spruce** | 21 | 73 |
| **Plan Elm** | 21 | 73 |
| **Plan Cherry** | 25 | 84 |

Plan Cherry features more splits than plans Spruce or Elm. The number of splits in Plan Spruce and Plan Elm is larger than average, but still typical of maps in the Computational Ensemble, whereas the high number of splits in Plan Cherry is an outlier. These findings are illustrated in Figure 22. Note that the computer-generated plans are explicitly taking counties into consideration, so they succeed in limiting county splits more than the publicly-generated plans.



*Figure 22. Split Counties in Senate Maps*

As indicated by the histogram below, the Tree maps split municipalities far less than the computer-generated maps do and fewer than most publicly-drawn maps. Cherry splits 57 municipalities while Elm and Spruce split 53 each.



*Figure 23. Number of Split Municipalities in State Senate Maps*

## CRITERION G: COMPACTNESS

*"Districts shall be reasonably compact."*

**Understanding the criterion.**
See the discussion under Section III.2.F on the analysis of the Congressional district maps, verbatim.

**Measures of compactness.**
See the discussion under Section III.2.F on the analysis of the Congressional district maps, verbatim.

**Results.**
In the next table, for each redistricting plan in each row, we provide the Polsby-Popper, Reock and Cut Edges measures of compactness, respectively in columns 1, 2 and 3.

| TABLE 24. Compactness measures in Senate district plans. | | | |
|---|---|---|---|
| | Polsby-Popper | Reock | Cut Edges |
| **Plan Spruce** | 0.40 | 0.39 | 1338 |
| **Plan Elm** | 0.41 | 0.39 | 1330 |
| **Plan Cherry** | 0.39 | 0.38 | 1335 |
| **2011 Official Map** | 0.39 | 0.40 | n.a. |

All three of these plans are similarly and reasonably compact, more so than more than half in the computational ensemble, as illustrated by Figure 24.



*Figure 24. Number of Cut Edges in Senate District Plans*

## V.3. SUMMARY OF RESULTS

Plan Spruce appears to be the only complete Senate map. Plan Elm misses one U.S. Census block, with 13 residents unassigned to any district. Plan Cherry has a more major deficiency, leaving an entire precinct with more than 1,900 inhabitants unassigned to any district. These omissions are easy to fix. The omission in Plan Elm is easy to fix by assigning the omitted U.S. Census block to the district of adjacent blocks, which would not alter results in any meaningful way. The larger deficiency in Plan Cherry involves population close to 1% of that of a district, but the omitted precinct is surrounded by an underpopulated district that would remain underpopulated if this precinct were added to it. Therefore, Plan Cherry could be remedied as well by assigning the unassigned precinct to the district that surrounds it.

These three plans feature large deviations from population equality: more than 5% in all three plans, and more than 9% in Plan Spruce and Plan Elm.

All three of these plans feature three districts with more than 40% of their Voting Age Population identifying as "Black", and six with more than 35%, but none feature a district with a majority of the VAP identifying as "Black" (the previous plan featured two). This absence of majority-Black districts is their most striking feature. It is achieved by breaking apart the large concentration of Black voters in the City of Detroit and reconfiguring them in thin North-Sound strip districts (numbers 5, 6, 7 and 8) that radiate northbound beyond the city limits and across county boundaries into suburban and mostly non-Black Macomb and Oakland counties.

All three plans satisfy contiguity.

It is unclear how the districts in these plans — and in particular the cross-county North-South strip districts 5, 6, 7 and 8 — reflect Communities of Interest in the state of Michigan. Multiple small communities of Interest may be contained within these districts, even if they do not reflect county geography and did not request to be districted together, but they have not been fully specified. The maps reflect more Community of Interest clusters than computer-generated maps.

All three plans perform well overall according to a collection of accepted measures of partisan fairness.[49] Plan Cherry is the most favorable to Democratic candidates, but the differences between the three plans are small, amounting to less than a seat on average.

While the exact boundaries vary, these three plans are very similar, offering variations on the same scheme, rather than three truly distinct plans.

These plans feature a standard number of seats that change hands across elections.

Plan Cherry fails to reflect consideration of county boundaries, while Plan Spruce and Plan Elm perform not as poorly in this regard. All three plans are compact.

---

[49] The plans do not perform well on each individual measure. It is impossible to score well on all at the same time, as different measures have conflicting demands. We mean that, overall, taking their scores across all measures, the maps perform well on this criterion.

# PART VI. ANALYSIS OF PROPOSED MAPS FOR MICHIGAN'S SENATE DISTRICTS

## VI.1. THE PROPOSED MICHIGAN SENATE DISTRICT MAPS

On Nov. 1, 2017 the MICRC approved the following Proposed map for Michigan Senate districts for consideration in the final round of public hearings now set for (Nov 15 – Dec 29, 2021): [50]

> **-Plan Cherry V2** (map number #251). Voted for publication 11-2 (Commissioners Kellom (D) and Lange (R) opposed).



**Plan Cherry V2**

---

[50] These maps are available for download here:
https://michigan.mydistricting.com/legdistricting/michigan/comment_links

On Nov. 4, 2021, the MICRC approved the following Proposed maps for Michigan Senate districts to be forwarded for what is expected to be the final round of Public Hearings now scheduled for Nov 15 – Dec 29, 2021): [51]

-**Plan Linden** (map number #260), voted 11-2 for publication. Opposed: Commissioners: Lange (R) and Wagner (R).



**Plan Linden**

---

[51] These maps are available for download here:
https://michigan.mydistricting.com/legdistricting/michigan/comment_links

**-Plan Palm** (map number #261). Voted 8-5 for publication. Opposed: Commissioners Eid (I), Kellom (D), Szetela (I), Valette (I), and Witges (D).



**Plan Palm**

JA00784

## VI.2. MEASURING PERFORMANCE ON EACH CRITERIA

## CRITERION A: POPULATION BALANCE AND VOTING RIGHTS ACT

*"Districts shall be of equal population as mandated by the United States constitution, and shall comply with the voting rights act and other federal laws."*

**Understanding the Criterion.**

With regard to population equality, we refer to the discussion under Section V.2.A.

With regard to the Voting Rights Act, we refer to the discussion of Criterion A under Section III.2. for the Congressional maps.

**Measures of performance on Criterion A.**

A1. **Measure of population inequality.**

We compute the difference between the most and least populous district, using the formula:

$$\frac{Population\ of\ most\ populous\ district}{Population\ of\ least\ populous\ district} - 1,$$

in percentage points.

For convenience, we also report the largest deviation to the ideal population size of a district, namely,

$$\frac{Population\ of\ most\ populous\ district}{265,193} - 1,$$

again, in percentage points.

If the difference between the most and least populous district surpasses 1%, we also compare the average population of districts won by Democratic Party candidates to the average population of districts won by Republican Party candidates, in all U.S. Presidential or Michigan Senate elections from 2014 to 2020 (namely, the 2016 and 2020 Presidential elections, and the 2014 and 2018 Michigan Senate elections). This is a measure of partisan malapportionment.

A2. **Number of Districts of Opportunity**.

As discussed in Section III.2.A2 with regard to the application of the Voting Rights Act to Congressional district maps, we seek to compute the number of districts of opportunity for ethnic and linguistic minorities. We can then compare this number to the proportion of minority population. For instance, the "Black Alone" population is 13.7% of the Michigan population (with a percentage as high as 37.6% in Wayne Co.), a statewide percentage that corresponds to at least five senatorial districts. Further, 5.6% of the Michigan population is Hispanic or Latino community, a percentage that corresponds to two senatorial districts (though in this case the highest concentration by county is 15.4% in Oceana Co.); and 3.3% of the state population is Asian-American (with 9% in Washtenaw Co.), a percentage that corresponds to one senatorial district.

We can also compare the number of opportunity districts for the black minority to the number of such opportunity districts in the previous redistricting plan. We refer to the report "determining if a redistricting plan complies with the Voting Rights Act" by Dr. Lisa Handley, presented to the

MICRC. If Dr. Handley's estimates are correct, any 40% Black district is a district of opportunity and will elect candidates preferred by the Black minority.

If so, there were three (or six at the lower threshold of 35%) Black districts of opportunity in the previous redistricting plan.

So, the measure we report is:

-Number of districts with >50% of their voting age population identifying as Black.

-Number of districts with >40% of their voting age population identifying as Black.

-Number of districts with >35% of their voting age population identifying as Black.

We compare these measures to the number of districts (five) proportional to the Black population in the state, and to the number of districts with these percentages of Black voting age population in the previous Congressional Districts plan (two, five and six).

We do not find a sufficient geographic concentration of Hispanic or Latino, or other minorities, in any county, to constitute a majority in a geographically compact district.

**Results.**

We present the results on Population Equality in the following table. Each row indicates a redistricting plan for MI Senate districts. The first column reports the population difference between the most and the least populated district. The second column reports the maximum deviation from the ideal district population. And the third column reports the partisan malapportionment measure, with a result bigger than zero meaning that districts won by Democrats have more population (which indicates an advantage to the Republican Party), and thus negative numbers indicating that districts won by Republicans have more population (which indicates an advantage to the Democratic Party).

TABLE 25. *Population Equality in Proposed Senate Plans*

|  | Pop. difference | Max. deviation | Partisan malapportion. |
|---|---|---|---|
| **Plan Cherry V2** | 4.91% | 2.96% | −0.06% |
| **Plan Linden** | 4.91% | 2.96% | −0.13% |
| **Plan Palm** | 5.00% | 2.46% | −0.08% |

These deviations are within the range that is acceptable for state legislative districts under the U.S. Constitution.

We report the number of districts in which more than 50%, more than 40%, and more than 35% of the Voting Age Population identifies as "Black" or "African-American" (alone), as computed by the MGGG Lab (with official map current numbers from IPUMS, not at the time of adoption). These numbers serve as proxy for the number of Black-minority districts of opportunity.

TABLE 26. *Black Minority Districts of Opportunity in State Senate Proposed Maps*

|  | # > 50% VAP Black | # >40% VAP Black | # >35% VAP Black |
|---|---|---|---|
| **Plan Cherry V2** | 0 | 4 | 5 |
| **Plan Linden** | 0 | 4 | 5 |
| **Plan Palm** | 0 | 4 | 5 |
| **2011 Official map** | 1 | 5 | 5 |
| **Proportional to Pop.** | 5 | | |

As in the case of the congressional maps, the most striking result is that no majority-minority district survives in any of these three proposed plans. The following graph shows the Black share of the Voting Age Population in each district. Districts are ordered from lowest to highest Black share (that is, the labels in the horizontal axis are not the district number in the Plan; rather, they should be interpreted as lower Black VAP share all the way to the district with the highest Black VAP share (38). The colored dots represent each map. The boxes represent the typical Black VAP shares in maps in the Computational Ensemble, and the arms stretching out of the boxes represent the Black VAP share at unusual maps such that only 2.5% of maps have shares above or below the range covered by the arms.



*Figure 25. Distribution of Black VAP by Senate District*

As we can see, these three Senate plans are unusual in engineering maps without a single majority-Black district. Almost all Senate maps in the Computer Ensemble feature two majority-Black districts; and half feature three. These maps appear to deliberately dilute concentrations of Black voting age population above 50%, to create instead as many districts as possible in which the Black vote constitutes a large minority above 35%. All three of these plans generate five such districts with a large Black minority.

The large distance between the dots representing these three plans, and the arms of the boxes representing the computer-generated plans imply that the probability that plans like these without a Black-majority district arise by chance are remote. Rather, these plans' outcome with no majority-Black district, and twice as many districts with a large minority of Black voters as in most other plans, is attained by design, following the advice to the Commission formulated by its VRA Legal Counsel and its VRA Consultant.

This strategy toward compliance with the VRA is inherited from Draft Plan Cherry, and it received ample criticism during the second round of public hearings earlier this fall from Black community members and elected representatives in the city of Detroit. Our initial report released on Oct. 18,

2021, and its sentiment echoed by Voters Not Politicians, recommended that the Commission reassess this strategy. On Oct. 20, the Michigan Department of Civil Rights, through its director, declared that these districts "*violate federal civil rights law*" and "*dilute majority-minority districts and strip the ability for a minority voter to elect legislators who reflect their community.*"[52]

Subsequently, and at the intense urging of Detroiter commissioner Kellom, the Commission abandoned this strategy in its revision of its House plans that led to developing Proposed House Plan Magnolia. In the discussion associated with this revision of House plans, some commissioners questioned whether the VRA allows for majority-Black districts; this doubt could explain why the Commission would adhere to plans with no such districts. The Commission's VRA legal counsel resolved this doubt, explaining that districts with a Black majority drawn are allowed under the VRA if they are drawn to respect neighborhoods or communities, and not to concentrate minority voters in a district in order to reduce their influence in adjacent districts (i.e. "packing"). The revision of House plans thus proceeded apace, leading to the inclusion of several Black-majority districts in Proposed Plan Pine V5, Proposed Plan Hickory, and Proposed Plan Magnolia for the state House.

However, even after the Commission clarified that majority-minority districts constructed to reflect communities of interest are consistent with the VRA, the Commission did not conduct a revision of state Senate maps analogous to the one it conducted in the state House maps.

The racial composition of districts in Proposed plans Cherry V2, Linden and Palm are very similar to each other and to the results in the original Draft map Cherry from which all three are derived. Minor adjustments to better preserve some neighborhood boundaries in the city of Detroit lead only to small changes in the racial composition of districts.

---

[52] Clara Hendrickson. "Redistricting commission told its draft maps violate federal Voting Rights Act." *Detroit Free Press, Oct. 20, 2021.*

## CRITERION B: CONTIGUITY

"*Districts shall be geographically contiguous. Island areas are considered to be contiguous by land to the county of which they are a part.*"

**Understanding the Criterion.**
See the discussion under Section III.2.B on the analysis of Congressional Districts.

**Measure of Contiguity.**
We report a binary "Yes" or "No" for whether a plan satisfies the stricter definition of contiguity, satisfying rook contiguity with islands attached to the land at the nearest point in the county of which they are a part of.

**Results.**
All three proposed Michigan Senate maps satisfy contiguity.

| TABLE 27. *Contiguity in Proposed Michigan Senate Maps* | |
|---|---|
| | Are all districts contiguous? |
| **Plan Cherry V2** | Yes |
| **Plan Linden** | Yes |
| **Plan Palm** | Yes |

JA00789

## CRITERION C: COMMUNITIES OF INTEREST

*"Districts shall reflect the state's diverse population and communities of interest. Communities of interest may include, but shall not be limited to, populations that share cultural or historical characteristics or economic interests. Communities of interest do not include relationships with political parties, incumbents, or political candidates."*

**Understanding the Criterion.**
See the discussion under Section III.2.C on the analysis of Congressional district maps.

**Measure of Respect for Communities of Interest.**
See the discussion under Section III.2.C on the analysis of Congressional district maps.

**Results.**
Each proposed map preserves 24 or 25 COI clusters, based on the 90 percent inclusion criteria (either the COI cluster is 90 percent within a district or a district is 90 percent within the COI cluster). In this case, most COIs are preserved by having districts within them because most are large. The results are similar to the computer-generated maps, which were not designed to preserve COIs but were designed to try to preserve counties. This does not show much Commission effort to preserve COI clusters, with little variation across plans.



*Figure 26. Community of Interest Preservation in State Senate Maps*

JA00790

## CRITERION D: PARTISAN FAIRNESS

"*Districts shall not provide a disproportionate advantage to any political party. A disproportionate advantage to a political party shall be determined using accepted measures of partisan fairness.*"

**Understanding the Criterion.**
See the discussion under Section III.2.D on the analysis of the Congressional District maps, verbatim.

**Measures of partisan fairness.**

D1. **Partisan Bias.**

D2. **Efficiency Gap.**

D3. **Deviations from proportionality.**
Measures D1-D3 are exactly as described in Section III.2.D.

D4. **Median-Mean difference.**
Measure D4 is exactly as described in Section V.2.D on the Draft maps for state Senate districts.

D5. **Lopsided Test.**
Exactly as described in Section III.2.D.

D6. **Partisan Advantage.**
Exactly as described in Section V.2.D.

D7. **Outlier test.**
Exactly as described in Section III.2.D.

D8. **Other measures.**
We note here that other measures of partisan fairness, some capturing a notion of symmetry, and others capturing a notion of neutrality, are publicly available through the web redistricting app DRA 2020 at www.davesredistricting.org

For readers' convenience, we published the three Proposed Senate maps in DRA 2020 under the names: "SD Cherry V2", "SD Linden" and "SD Palm". Under the "Advanced" tab, DRA 2020 displays several measures of partisan fairness, including variations of the ones we include in this report, for the Democratic Party. Included in their display is a votes-to-seats curve, mapping the Democratic seat share for any vote share. They also include a measure of Partisan Bias (D1), which they call "Seat Bias"; a measure of median-mean difference (D4), which they call "Votes Bias"; a measure of the Efficiency Gap (D2); and a measure of deviation from Proportionality (D3).

All these alternative measures are computed using a smoothing function of past election results: instead of recording whether a party lost or won a district as a binary 0 or 1 value, as in our report, the measures of DRA 2020 assign to the party a fraction between 0 and 1 of the seat in this district that is increasing in the party's vote share. The motivation is that DRA 2020 uses voting tallies in past elections not to determine what would have happened give those voting tallies under the new map (as we do in this report), but rather, to estimate what will probably happen in the future

JA00791

under the new maps. A narrow win in the past is then only a small indication that the party will win again in the future.

-       -       -

The election data that we use to compute the measures in this Section is again:

The 2018 Governor election; the 2018 Secretary of State election; the 2018 Attorney General election; the 2016 Presidential election; and the 2018 U.S. Senate election as they are used by the MGGG lab to report results on Partisan Bias (D1), Efficiency Gap (D2), Deviations from Proportionality (D3), Median-Mean Difference (D4), and the Outlier test (D7). The 2014, 2016, 2018, and 2020 US House election, and the 2016 and 2020 US Presidential election, are used by Dr. Christian Cox from Yale University to compute the Lopsided Margins (D5) and the Partisan Advantage (D6). For all these measures, we first compute results election by election, and second, calculate averages. The Princeton Gerrymandering Project uses the 2018 Michigan Governor, 2020 U.S. Senate and 2020 U.S. Presidential elections, first averaging them to construct an electoral composite in each precinct, and then using this composite to compute the results reported under the Outlier Test (D7).

DRA 2020 allows users to choose their preferred election data input to compute the measures described under D8.

**Results.**

We present the results on partisan fairness across all Proposed maps for Michigan Senate districts in the following table. Each row indicates a redistricting plan. Each column indicates a measure of partisan fairness, from D1 to D7. Positive numbers indicate deviations from the fair ideal that favor the Republican Party, and negative values indicate deviations that favor the Democratic Party. Zero indicates perfect fairness according to each measure. The values of some measures are in seats; others are in percentage of the total number of votes. The "Outlier" (D7) indicates a party ("D" for Democratic or "R" for Republican) and a range of percentages. The letter indicates the party that this map favors, relative to the one million other maps in the Princeton Gerrymandering Project ensemble. The first number is the share of maps in the ensemble that are less favorable to this party (in the sense that the party would obtain fewer seats), and the second is the share of maps that are even more favorable (in the sense that the party would obtain more seats).

| TABLE 28. *Measures of Partisan Fairness for Senate District Plans* | | | | | | |
|---|---|---|---|---|---|---|
| | Bias | Eff. Gap | Proport. | Med-mn | Lopsided | Advantage | Outlier |
| | D1 | D2 | D3 | D4 | D5 | D6 | D7 |
| **Plan Cherry V2** | +1.0 seat | +1.5% | −0.92 seats | +1.9% | +3.5% | −1.1 seats | D: 99.8% -0.0% |
| **Plan Linden** | +1.0 seat | +1.4% | −0.92 seats | +1.9% | +3.5% | −1.1 seats | D: 97% - 0.0% |
| **Plan Palm** | +2.0 seats | +4.2% | +0.08 seats | +3.1% | +4.9% | −0.1 seats | D: 85% - 3% |

Compare these results to the results on the measures of partisan fairness used by the Commission, as advised by Dr. Lisa Handley, displayed in the table below. The values below were obtained from a composite of all 13 statewide elections (Presidential, U.S. Senate, Governor, Secretary of State, and State Attorney General) from 2012 to 2020, and we report them here directly from the MICRC website.

| TABLE 29. *Selection of Measures of Partisan Fairness Used by the Commission.* | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Bias | Eff. Gap | Proport. | Med-mn | Lopsided | Advantage | Outlier |
| | D1 | D2 | D3 | D4 | D5 | D6 | D7 |
| **Plan Cherry V2** | -- | +3.4% | −0.3% | +1.2% | +4.6% | -- | -- |
| **Plan Linden** | -- | +3.3% | −0.3% | +1.2% | +4.5% | -- | -- |
| **Plan Palm** | -- | +6.2% | +2.3% | +3.2% | +5.7% | -- | -- |

Once again, because the political geography of Michigan concentrates Democratic voters more than Republican voters, measures that seek symmetric outcomes (D1, D2, D4 and D5) for both parties detect that under these maps (just as under almost any other map), the GOP is favored. The measure that sets the advantage stemming from a favorable political geography aside and evaluates only the net partisan added effect of the maps (D6) shows that these maps are close to fair. And proportionality (D3) ends up close to fair again, through two opposing factors that cancel out: proportionality requires winning parties to win smaller seat majorities that they typically do, just about cancelling the effect of political geography.

Figure 27 illustrates that these plans are more favorable to Democratic candidates than many other maps. Compare Figure 27 to Section V.2D, which showed the same figure for the Draft. Under Proposed Plan Palm, Democratic candidates win one seat more than under the average map, which is within the normal range, not an outlier. But under Proposed Plan Cherry V2 or Plan Linden, they win two seats more than under the average map.



*Figure 27. Number of Seats Democrats would Win with Senate 2018 Results*

This is not a fluke from this particular election. Take instead the independent results with the Princeton computer ensemble (one million maps) and the Princeton election composite (the average of the 2020 Presidential, 2020 U.S. Senate in Michigan, and 2018 Governor elections).



*Figure 18. Democratic Seats with Princeton Composite Election Results.*

Once again, Proposed Plan Palm appears within range of computer-generated maps, but Proposed Plan Linden and Proposed Plan Cherry V2 become outliers that give more seats to Democrats than almost any other map. It is easy to see why: Proposed Plans Cherry V2 and Linden split a potential Democratic district in Ann Arbor into two urban-rural districts for a partisan gain of one seat to Democrats. Proposed Cherry V2 creates two, four-county districts heading west from the city. Linden creates two, more compact two-county districts.

Proposed Plan Cherry V2 and Proposed Plan Linden's appearance may make them susceptible to legal claims on grounds of inadmissible partisan intent and partisan outcome. We do not venture a prediction as to how courts would view such claims, since under other measures of partisan fairness neither Proposed Plan Cherry V2 nor Proposed Plan Linden favor Democrats enough. If courts consider measures of symmetry, concerns about neutrality could be mitigated. In prior cases, criticized maps often scored poorly on both symmetry and neutrality, meaning they did not raise the trade-off between an intent to improve symmetry by drawing maps that would be unlikely to be drawn without partisan intent. We note that the Michigan Constitution states that the advantage to a political party shall be determined using "*accepted measures of partisan fairness,*" and under one such measure -- the outlier test -- that Courts have deemed acceptable, these maps are more favorable to Democrats.

We also note that it is possible to draw maps (such as Plan Spruce and Plan Elm among the Draft plans) that fall within the normal range in all measures. Such maps could favor Democrats in some measures, and Republicans by other measures, but always in small to moderate amounts. Proposed Plan Cherry V2 and Plan Linden instead move toward symmetry at the cost of neutrality.

## CRITERION E: FAIRNESS TO CANDIDATES

*"Districts shall not favor or disfavor an incumbent elected official or a candidate."*

**Understanding the criterion.**
See the discussion under Section III.2.E on the analysis of the Congressional district maps, verbatim.

**Measures of fairness to candidates.**
We refer to the discussion under Section V.2.E on the analysis of the Draft state Senate maps.

**Results.**
We present first results on double-bunking, i.e. assigning two incumbents to the same district. We report two numbers. The first considers all incumbents and uses addresses from the 2020 Michigan Candidate Listing file made public by the MI Secretary of State. With this data, the typical range in the computational ensemble is from 5 to 9, and in the public ensemble, from 6 to 9, so these three maps all fall within these ranges.

| TABLE 30. Districts with Two Incumbents in Proposed State Senate Plans | |
|---|---|
| **Plan Cherry V2** | 7 [4] |
| **Plan Linden** | 6 [4] |
| **Plan Palm** | 6 [4] |

However, many incumbents are term-limited, and cannot run again, so placing them in the same district with another incumbent is irrelevant. The second number, in brackets, considers only incumbents who are not term-limited, and uses addresses obtained from the Michigan Voter file by Mike Wilkinson for Bridge Michigan.[53]

On competitiveness, if we define a "competitive district" as one that each of the two parties won in at least one of the five elections in the MGGG data set (namely, the 2018 Senate, Governor, Secretary of State, and Attorney General elections, and the 2016 Presidential election), then all three Proposed Senate plans feature five such districts, close to the middle of the range of the computational ensemble (among those maps, most feature between three and nine competitive districts, with the most frequent result being six).

Proposed Plans Cherry V2 and Linden feature 23 election results decided by a less than 6% margin, from among 190 total election results (five elections in each of 38 districts). Proposed Plan Palm features 26 competitive districts, more in line with what is typical of maps in the Computational Ensemble.

---

[53] Sergio Martinez-Beltrán and Mike Wilkinson, "Redistricting may oust half of incumbents in Michigan, analysis finds", November 23, 2021, Bridge Michigan.



*Figure 29. Number of Elections within 6% Margin, Senate Maps*

JA00796

## CRITERION F: JURISDICTIONAL BOUNDARIES

*"Districts shall reflect consideration of county, city, and township boundaries."*

**Understanding the criterion.**
See the discussion under Section III.2.F on the analysis of the Congressional District maps, verbatim.

**Measures of respect of jurisdictional boundaries.**
See the discussion under Section III.2.F on the analysis of the Congressional district maps, verbatim.

**Results.**
We first present the results in table format.

| TABLE 31. Split Jurisdictions and Jurisdictional Splits in Proposed State Senate Maps. | | | | |
|---|---|---|---|---|
| | Split Counties | County Pieces | Split Municipalities | Municipality Pieces |
| **Plan Cherry V2** | 28 | 92 | 65 | 154 |
| **Plan Linden** | 31 | 95 | 61 | 146 |
| **Plan Palm** | 27 | 90 | 59 | 142 |

Proposed Plan Palm features fewer splits than Proposed Plan Cherry V2 or Proposed Plan Linden. All three plans are variations on the original Draft Plan Cherry, but Proposed Plan Palm keeps Ann Arbor whole. The original Proposed Plan Cherry splits 25 counties. Proposed Plan Cherry V2 and Proposed Plan Linden split Ann Arbor into two cross-county districts.



*Figure 30. Split Counties in Proposed Senate Maps*

# CRITERION G: COMPACTNESS

*"Districts shall be reasonably compact."*

**Understanding the criterion.**
See the discussion under Section III.2.F on the analysis of the Congressional district maps, verbatim.

**Measures of compactness.**
See the discussion under Section III.2.F on the analysis of the Congressional district maps, verbatim.

**Results.**
In the next table, for each redistricting plan in each row, we provide the Polsby-Popper, Reock and Cut Edges measures of compactness, respectively in columns 1, 2 and 3.

| TABLE 32. Compactness Measures in Proposed Senate District Plans | | | |
|---|---|---|---|
| | Polsby-Popper | Reock | Cut Edges (fewer is better) |
| **Plan Cherry V2** | 0.40 | 0.38 | 1368 |
| **Plan Linden** | 0.40 | 0.39 | 1353 |
| **Plan Palm** | 0.41 | 0.40 | 1319 |
| **2011 Official Map** | 0.39 | 0.40 | n.a. |

All three of these plans are reasonably compact. Plan Palm is more so.



*Figure 31. Number of Cut Edges in Proposed Senate District Plans*

## VI.3. SUMMARY OF RESULTS

Proposed Plan Cherry V2, Plan Linden, and Plan Palm are all complete redistricting plans that divide the entire state into 38 contiguous districts. All three stem from the Draft Plan Cherry, offering three different configurations for the City of Ann Arbor and its surrounding area: Plan Palm would keep the City of Ann Arbor whole in a district; while Plan Linden would split it into two two-county urban-rural districts, and Plan Cherry V2 would split it into two, four-county East-West rural-urban strips, with adjustments reverberating into nearby districts and counties. They are otherwise very similar to each other, and to their common predecessor Draft Plan Cherry, with many district boundaries common to all four plans.

All three of these plans feature large deviations from population equality, between 4.9% and 5%, or between 12,600 and 13,000 inhabitants.

All three follow the same strategy toward compliance with the VRA, inherited from Draft Plan Cherry: they feature four districts with more than 40% of their Voting Age Population identifying as "Black," and five with more than 35%. None feature a district with more than 45% of its Voting Age Population identifying as "Black" (the previous plan featured two). This absence of more than 45% Black districts is the most striking feature within these Proposed maps. It is achieved by breaking apart the large concentration of Black voters in the city of Detroit and reconfiguring them in thin North-South strip districts (numbered 3, 10, 11 and 12 in Proposed Cherry V2 and Proposed Linden; and numbered 7, 8, 9 and 10 in Proposed Palm) that radiate northbound beyond the city limits and across county boundaries into suburban and less Black Macomb and Oakland counties.

It is not readily apparent how the districts in these plans — specially the cross-county North-South strip districts 5, 6, 7 and 8 — reflect Communities of Interest in the state of Michigan.

All three of these plans perform well on most measures of partisan fairness, but Proposed Plan Cherry V2 and Proposed Plan Linden are outliers on tests of neutrality: they create more Democratic districts than almost every computationally generated map created without partisan considerations. Plan Palm performs well on all partisan fairness measures, though it is more favorable toward Republicans on tests of symmetry. Plans Cherry V2 and Linden thus create maps more favorable to Democrats and closer to symmetry than maps drawn without partisan considerations, while Plan Palm preserves a bit more of the Republican geographic advantage.

These plans feature a standard number of seats that change hands across elections.

Proposed Plan Palm reflects county, city and township boundaries better than Proposed Plan Cherry V2 or Proposed Plan Linden. All three plans are reasonably compact; Proposed Plan Palm more so.

These three plans are very similar. They offer different solutions for the city of Ann Arbor and the surrounding areas stretching into neighboring counties, but they are three variations of the same general plan, rather than three truly distinct plans. Proposed Plan Palm performs better on lower-ranked criteria.

Again, we stress a concern that applies to all three of these plans. The city of Detroit contains more than half a million inhabitants who identify as "Black." Under any map that keeps this urban community as a whole or regions of the city with more Black residents together, Blacks would

constitute a majority in at least two and probably in three Michigan Senate districts. Proposed Plan Cherry V2, Proposed Plan Linden and Proposed Plan Palm slice this community in order to create urban-suburban cross-county districts, diluting the Black urban vote in such a way that Black voters do not constitute more than 45% of voters in any district. The intent appears to be to create more total districts of opportunity for Black voters, but it is unconventional.

We lack sufficient data to know that districts in and around Detroit with 40%-42% of Black Voting Age Population will allow the Black minority population to elect its candidates of choice in both primaries and general elections. If it cannot elect its candidate of choice, then these three plans do not comply with the Voting Rights Act. Members of the public, elected representatives, and the Michigan Department of Civil Rights expressed this concern during the second round of public hearings prior to the drawing of the current Proposed maps.

Thereafter, the Commission revamped state House District maps in its latest iteration of Proposed maps scheduled for another round of public comment. State Senate District maps, however, appear little changed and again be subject to question.

We understand that many candidates preferred by Black voters elsewhere in the United States are able to be elected in districts with minority Black populations. If that is true of these districts, the proposed maps would likely increase Black representation in the State Senate. But perceptions of opportunity also matter for its realization. If African-American candidates and other candidates preferred by Black voters do not perceive these districts as favorable, that could reduce the chance they compete in primary elections, reducing Black representation.

We continue to recommend that *the MICRC reevaluate its approach toward compliance with the Voting Rights Act.* And that the Commission give due consideration to draw state Senate District maps demonstrating more robust districts of opportunity for the Black community in the city of Detroit, especially if they better reflect communities of interest. We find Proposed Plan Cherry V2, Proposed Plan Linden and Proposed Plan Palm share the problems we identified in the Draft maps. These maps could fail to adequately represent the communities of interest of the citizens of Detroit or its surrounding areas, based on their neighborhoods.

Since these considerations reflect concerns about the performance of these maps on constitutional Criteria A, population balance and Voting Rights Act, and Criteria C, population diversity and Communities of Interest, these concerns dominate consideration of other criteria.

Because none of these collaboratively proposed Michigan Senate plans showed responsiveness to our recommendations (unlike some state House maps), we look to plans submitted by individual commissioners that create plans with different approaches toward compliance with the Voting Rights Act that are less open to criticism or question. We present a plan with at least two districts with a Black Voting Age Population of at least 45 percent and with three districts with a Black Voting Age Population of at least 43% in the following Appendix.

# VI. APPENDIX. PROPOSED SENATE PLANS SUBMITTED BY INDIVIDUAL COMMISSIONERS.

There are three individual commissioner submissions for state Senate District plans:

- Proposed Szetela Senate District Map Number #268, submitted by Commissioner Rebecca Szetela, Independent, of Canton.
- Proposed Kellom Senate District Map, Number #270, submitted by Commissioner Brittni Kellom, Democrat of Detroit
- Proposed Senate District Map Lange, Number #274, submitted by Rhonda Lange, Republican of Reed City.

Proposed Senate District Map Szetela and Proposed Senate District Map Lange follow the same strategy toward compliance with the Voting Rights Act as Proposed Cherry V2, Plan Linden and Plan Palm. Districts are arranged in a similar manner. We do not analyze these plans further.

Proposed Senate District Map Kellom, on the other hand, presents a distinct alternative, and a very different configuration of the region including Detroit, with three Black-majority districts, similar to race-blind maps in the Computational Ensemble. We thus analyze SD Kellom further, appending some its scores to those of the Proposed plans.

| TABLE 25 Appendix. *Population Equality in Proposed Senate Plans and SD Kellom* | | | |
|---|---|---|---|
| | **Population difference** | **Maximum. Deviation** | **Partisan malapportionment** |
| **Plan Cherry V2** | 4.91% | 2.96% | −0.06% |
| **Plan Linden** | 4.91% | 2.96% | −0.13% |
| **Plan Palm** | 5.00% | 2.46% | −0.08% |
| **Plan SD Kellom** | 4.27% | 2.27% | n.a. |

Plan SD Kellom slightly outperforms all three Proposed plans on population equality. Table 26 Appendix returns to the number of potential districts of opportunity for the Black minority in Table 26, but from a different source (DRA 2020), and a different categorization. Where Table 26 defined "Black" as "Black or African-American only" in the U.S. Census, the DRA 2020 results feeding into Table 26 Appendix categorize as "Black" any individual who identifies as "Black," possibly as one of multiple racial identifications.

| TABLE 26 Appendix. *Districts of Opportunity in Proposed Senate Plans and SD Kellom* | | | |
|---|---|---|---|
| | **# > 50% VAP Black** | **# >40% VAP Black** | **# >35% VAP Black** |
| **Plan Cherry V2** | 0 | 5 | 6 |
| **Plan Linden** | 0 | 5 | 6 |
| **Plan Palm** | 0 | 5 | 6 |
| **Plan SD Kellom** | 3 | 4 | 5 |
| **2011 Official map** | 2 | 5 | 6 |
| **Proportional to Population** | 5 | | |

We find that SD Kellom outperform alternative maps in the number of districts of opportunity. When multiple Black racial identities are taken into consideration, the Proposed Kellom map's four Black 40% Black VAP districts actually measure in excess of 45% Black VAP. Only one in

five of all other Proposed maps assessed measures at more than 45% VAP Black. Proposed SD Kellom map also satisfies contiguity requirements.

| TABLE 28 Appendix. *Partisan Fairness in Proposed Senate Plans and SD Kellom* | | | | |
|---|---|---|---|---|
| | Efficiency Gap | Proportionality | Median-mean | Partisan Advantage |
| | D2 | D3 | D4 | D6 |
| **Plan Cherry V2** | +3.4% | +1.1 seats | +1.2% | −1.1 seats |
| **Plan Linden** | +3.3% | +1.1 seats | +1.2% | −1.1 seats |
| **Plan Palm** | +6.2% | +2.3 seats | +3.2% | −0.1 seats |
| **Plan SD Kellom** | +3.2% | +1.4 seats | +2.1% | −0.8 seats |

On Partisan Fairness measures, SD Kellom looks similar to Proposed Plan Linden or Proposed Plan Cherry V2, but we await an analysis of its outlier status.

| TABLE 31 Appendix. Split Counties and County Splits in Proposed State Senate Maps. | | |
|---|---|---|
| | Split Counties | County Pieces |
| **Plan Cherry V2** | 28 | 92 |
| **Plan Linden** | 31 | 95 |
| **Plan Palm** | 27 | 90 |
| **Plan SD Kellom** | 30 | 87 |

Plan SD Kellom performs about as well on respecting boundaries and on compactness as other Proposed Senate District maps.

| TABLE 32. Compactness Measures in Proposed Senate District Plans and Proposed SD Kellom | | |
|---|---|---|
| | Polsby-Popper | Reock |
| **Plan Cherry V2** | 0.40 | 0.38 |
| **Plan Linden** | 0.40 | 0.39 |
| **Plan Palm** | 0.41 | 0.40 |
| **Plan SD Kellom** | 0.40 | 0.39 |
| **2011 Official Map** | 0.39 | 0.40 |

The results on Tables 25 Appendix, 26 Appendix and 31 Appendix are from DRA 2020, using the 2020 U.S. Census population data. On Table 28 Appendix, the measures for the Efficiency Gap and the Median-Mean difference are from the MICRC Compliance Sheet, using all 10 statewide elections from 2012 to 2020; and the deviation from proportionality and the Partisan Advantage are computed by Dr. Christian Cox of Yale University and based upon 2016 and 2020 presidential elections and the 2014 and 2018 elections to the Michigan Senate. Deviations from proportionality or from the neutral jurisdictional benchmark in the partisan advantage are measured in seats; whereas, the Efficiency Gap and the Median-Mean measure differences in shares of votes.

SD Kellom outperforms all three Proposed Plans for state Senate districts (Plan Cherry V2, Plan Palm and Plan Linden) on both aspects of Criterion A.

We note that SD Kellom may also appear as a partisan outlier, giving more seats to Democrats than computer-generated maps, and perhaps one additional seat than Proposed Plan Palm. Proposed Plan SD Kellom follows the Proposed Plan Linden split for the Ann Arbor area, resulting in partisan scores similar to those of Proposed Plan Linden.

Yet we advise consideration of SD Kellom because it creates an alternative path toward compliance on the top-ranked Criterion A, which could outweigh any loss on partisan fairness measures based on neutrality compared to Plan Palm. As with plans Cherry V2 and Linden, plan SD Kellom sacrifices neutrality to achieve slightly more symmetry.

# PART VII. ANALYSIS OF DRAFT MAPS FOR MICHIGAN'S STATE HOUSE DISTRICTS

## VII.1. THE DRAFT MICHIGAN HOUSE DISTRICT MAPS

The MICRC approved the following Draft maps for Michigan House of Representatives districts, for consideration in the second round of public hearings (Oct 20 – Oct 27, 2021): [54]

**-Plan "Pine," name "10-08-21v1HD RAS"** (number #227). Voted for publication 13-0.



**Plan Pine**

---

[54] These maps are available for download here:
https://michigan.mydistricting.com/legdistricting/michigan/comment_links

**-Plan "Peach," name "10-08-21v2 HD"** (number #228). Voted for publication 13-0.

Note that the Peach map does <u>not appear to be a valid redistricting plan</u>, as it fails to assign a district to all the areas of Michigan. Plan Peach fails to assign any district to a precinct with population 3,204 in the village of Blissfield (Lenawee County). This area — highlighted in <span style="color:red">red</span> on the inset map below — must be assigned to a district.



**Plan Peach (incomplete)**

**-Plan "Oak," name "10-08-21v1HD"** (number #229). Voted for publication 13-0.

Note that the Oak map does <u>not appear to be a valid redistricting plan</u>, as it fails to assign a district to all the areas of Michigan. Plan Oak fails to assign any district to a precinct with population 3,204 in the village of Blissfield (Lenawee County). This area —highlighted in red on the inset map below — must be assigned to a district.



**Plan Oak (incomplete)**

## VII.2. MEASURING PERFORMANCE ON EACH CRITERIA

## CRITERION A: POPULATION BALANCE AND VOTING RIGHTS ACT

"*Districts shall be of equal population as mandated by the United States constitution, and shall comply with the voting rights act and other federal laws.*"

**Understanding the Criterion.**

The Michigan population according to the 2020 US Census is 10,077,331 inhabitants. Michigan has 110 districts for state house elections. So, the ideal equal population is 91,612 inhabitants per district.

The U.S. Supreme Court has ruled that, solely on U.S. constitutional grounds, the population in state legislative districts must be roughly equal; however, "some deviations from the equal-population principle are constitutionally permissible," for a rational state interest, and in particular to respect jurisdictional boundaries of counties, cities and towns.[55] In particular, population differences of up to 10% between the least and most populous districts are "minor" and do not require "justification from the State."[56] Population deviations greater than 10% must be justified by the State, and instances with a deviation as large as 89% away from the ideal size have been deemed legitimate.[57]

If there is any substantial deviation from population equality, supporters of one party cannot be systematically placed in larger districts.[58]

With regard to the Voting Rights Act, we refer verbatim to the discussion of Criterion A under Section III.2. for the congressional maps.

**Measures of performance on Criterion A.**

A1**. Measure of population inequality.**

We compute the difference between the most and least populous district, using the formula:

$$\frac{Population\ of\ most\ populous\ district}{Population\ of\ least\ populous\ district} - 1,$$

in percentage points.

For convenience, we also report the largest deviation to the ideal population size of a district, namely,

$$\frac{Population\ of\ most\ populous\ district}{91,612} - 1,$$

again, in percentage points.

If the difference between the most and least populous district surpasses 1%, we also compare the average population of districts won by Democratic Party candidates to the average population of districts won by Republican Party candidates, in all U.S. Presidential or Michigan Senate

---

[55] Reynolds v. Sims, 377 US 579-580.
[56] Brown v. Thomson, 462 US 842.
[57] Brown v. Thomson, 462 US 835.
[58] *Cox v. Larios*, 542 U.S. 947

elections from 2014 to 2020 (namely, the 2016 and 2020 Presidential elections, and the 2014 and 2018 Michigan Senate elections). This is a measure of partisan malapportionment.

## A2. **Number of Districts of Opportunity.**

As discussed in Section III.2.A2 with regard to the application of the Voting Rights Act to Congressional district maps, we seek to compute the number of districts of opportunity for ethnic and linguistic minorities. We can then compare this number to the proportion of minority population. For instance, the "Black Alone" population is 13.7% of the Michigan population (with a percentage as high as 37.6% in Wayne Co.), a statewide percentage that corresponds to fifteen Michigan House districts. Further, 5.6% of the Michigan population is Hispanic or Latino community, a percentage that corresponds to six Michigan House districts (though in this case the highest concentration by county is 15.4% in Oceana Co.); and 3.3% of the state population is Asian-American (with 9% in Washtenaw Co.), a percentage that corresponds to three or four Michigan House districts.

In addition, since a Michigan House district comprises only less than 92,000 inhabitants, a geographically concentrated ethnic or linguistic minority as small as 46,000 inhabitants (less than 0.5% of the state's population) can constitute a majority in a geographically compact district, being thus subject to consideration under the VRA.

We can also compare the number of opportunity districts for the black minority to the number of such opportunity districts in the previous redistricting plan. We refer to the report "Determining if a redistricting plan complies with the Voting Rights Act" by Dr. Lisa Handley, presented to the MICRC. If Dr. Handley's estimates are correct, any 40% Black district is a district of opportunity and will elect candidates preferred by the Black minority. We do not have any comparable estimate for Hispanic, Asian, or other minority districts of opportunity.

If Dr. Handley's estimate is correct for Black minority districts of opportunity, there were twelve (or up to 14 at the lower threshold of 35%) Black districts of opportunity in the previous redistricting plan.

We do not have such estimate for Hispanic, Asian, or other minority districts.

So, the measure we report is:

-Number of districts with >50% of their voting age population identifying as Black.

-Number of districts with >40% of their voting age population identifying as Black.

-Number of districts with >35% of their voting age population identifying as Black.

We also report the number of districts, if any, with >40% or >35% of their voting age population identifying as some other ethnic or linguistic minority (in the previous redistricting plan, there were none).

## **Results.**

We present the results on Population Equality in the following table. Each row indicates a redistricting plan for MI House districts. The first column reports the population difference between the most and the least populated districts. The second column reports the maximum deviation from the ideal district population. And the third column reports the partisan malapportionment measure, with a result bigger than zero meaning that districts won by Democrats have more

population (which indicates an advantage to the Republican Party), and thus negative numbers indicating that districts won by Republicans have more population (which indicates an advantage to the Democratic Party).

| TABLE 33. *Population Equality in House Plans* | | | |
|---|---|---|---|
| | **Population difference** | **Maximum deviation** | **Partisan malapport.** |
| **Plan Pine** | 7.20% | 3.49% | -0.22% |
| **Plan Peach [*]** | 8.36% | 4.12% | -0.24% |
| **Plan Oak [*]** | 8.83% | 4.32% | -0.24% |

[*] Note that Plan Peach and Plan Oak are not complete redistricting plans, as they fail to assign a district to each district. Results would change if these plans were remedied by assigning a district to each precinct.

As in the case of Senate maps, these deviations are within the range that is acceptable for state legislative districts under the U.S. Constitution, but they are not within the range of deviations that are potentially acceptable (if suitably justified) for Congressional Districts under the U.S. Constitution. If the explicit Population Equality clause under the Michigan Constitution were understood to be stricter than the population equality requirement implicit in the federal Equal Protection clause, then these deviations would be too large.

We report the number of districts in which more than 50%, more than 40%, and more than 35% of the Voting Age Population identifies as "Black" or "African-American" (alone) in the following table, as computed by the MGGG Lab for this report (except official map numbers again from IPUMS). These numbers serve as proxy for the number of Black-minority districts of opportunity.

| TABLE 34. *Black Minority Districts of Opportunity in State House Draft Maps* | | | |
|---|---|---|---|
| | **# > 50% VAP Black** | **# >40% VAP Black** | **# >35% VAP Black** |
| **Plan Pine** | 0 | 14 | 20 |
| **Plan Peach [*]** | *0* | *14* | *20* |
| **Plan Oak [*]** | *0* | *14* | *20* |
| **2011 Official Map** | 11 | 12 | 12 |
| **Proportional to Pop.** | 15 | | |

As in the case of the congressional maps and Senate maps, the most striking result is that none of the 11 majority-minority districts in the previous plans survives in any of these three proposed plans. This is truly extraordinary. The following graph shows the Black share of the Voting Age Population in each district. Districts are ordered from lowest to highest Black share (that is, the labels in the horizontal axis are not the district number in the Plan; rather, they should be interpreted as lowest Black VAP share (1), 2nd lowest Black VAP share (2), all the way to the district with the highest Black VAP share (38). The colored dots represent each map. The boxes represent the typical Black VAP shares in maps in the Computational Ensemble, and the arms stretching out of the boxes represent the Black VAP share at unusual maps such that only 2.5% of maps have shares above or below the range covered by the arms.



*Figure 32. Distribution of Black VAP by House District*

Almost all maps in the Computational Ensemble feature at least five Black-majority districts (most feature at least seven), including at least two with more than 80% Black VAP, and one more than 90% Black VAP. The 2011 redistricting map arguably packed Black voters around Metro Detroit so that the number of such Black-majority districts increased to eleven, higher than in almost any of the computational (race-blind) maps. These plans go in the opposite direction to an extraordinary degree, arguably cracking the large majorities of Black voters to studiously avoid configuring a single district that would cross the 50% threshold of Black voters. By diluting the concentration of Black voters in the districts with greatest share of them, these plans manage to generate an improbably high number of districts with over 40% and over 35% of Black voters.

The wisdom, appropriateness, or legality of maximizing the number of districts with Black VAP population between 35% and 49.9% while avoiding any Black-majority district may be questionable, but these three plans clearly reflect the Commission's success in achieving such a goal.

We note that all three plans also contain one district with Hispanic share of VAP above 35%, but none above 40% (39.2% of the Voting Age Population in District 1 identifies as "Hispanic"). There was no such district in the 2011 map, but this falls short of the number proportional to the Hispanic population in the state (5).

No district contains a share of Asian VAP above 35%.

# CRITERION B: CONTIGUITY

"*Districts shall be geographically contiguous. Island areas are considered to be contiguous by land to the county of which they are a part.*"

**Understanding the Criterion.**
See the discussion under Section III.2.B on the analysis of Congressional Districts.

**Measure of Contiguity.**
We report a binary "Yes" or "No" for whether a plan satisfies the stricter definition of contiguity, satisfying rook contiguity with islands attached to the land at the nearest point in the county of which they are a part of.

**Results.**
None of these plans satisfies contiguity.

| TABLE 35. *Contiguity in Draft State House plans* | |
|---|---|
| | Are all districts contiguous? |
| **Plan Pine** | No |
| **Plan Peach** | No |
| **Plan Oak** | No |

Each of these maps feature districts that violate contiguity by having small geographic areas isolated from the rest of the district. For instance, in all three maps, census block 2005 in census tract 4211 in Washtenaw County is in District 61, even though all the census blocks surrounding it are in District 65.

## CRITERION C: COMMUNITIES OF INTEREST

*"Districts shall reflect the state's diverse population and communities of interest. Communities of interest may include, but shall not be limited to, populations that share cultural or historical characteristics or economic interests. Communities of interest do not include relationships with political parties, incumbents, or political candidates."*

**Understanding the Criterion.**
See the discussion under Section III.2.C on the analysis of Congressional district maps.

**Measure of Respect for Communities of Interest.**
See the discussion under Section III.2.C on the analysis of Congressional district maps.

**Results.**
Each of the proposed maps preserves 31 COIs by the 90 percent inclusion criteria, mostly by having districts within larger COIs rather than COIs within districts. That is slightly below what would be expected from chance.



*Figure 33. Community of Interest Preservation in State House Maps*

## CRITERION D: PARTISAN FAIRNESS

"*Districts shall not provide a disproportionate advantage to any political party. A disproportionate advantage to a political party shall be determined using accepted measures of partisan fairness.*"

**Understanding the Criterion.**

See the discussion under Section III.2.D on the analysis of the Congressional district maps, verbatim.

**Measures of partisan fairness.**

D1. **Partisan Bias.**

D2. **Efficiency Gap.**

D3. **Deviations from proportionality.**

Measures D1-D4 are exactly as described in Section III.2.D.

D4. **Median-Mean difference.**

We refer to the discussion under Section VII.2.D on the analysis of the Draft state House maps.

D5. **Lopsided Test.**

Exactly as described in Section III.2.D.

D6. **Partisan Advantage.**

We refer to the discussion under Section VII.2.D on the analysis of the Draft state House maps.

D7. **Outlier test.**

Exactly as described in Section III.2.D.

D8. **Other measures.**

The measures available in DRA 2020 are as described in subsection V.2.D8 on the analysis of Draft district plans for the state Senate.

-     -     -

The election data that we use to compute the measures in this Section is again:

The 2018 Governor election; the 2018 Secretary of State election; the 2018 Attorney General election; the 2016 Presidential election; and the 2018 U.S. Senate election, are used by the MGGG lab to report results on Partisan Bias (D1), Efficiency Gap (D2), Deviations from Proportionality (D3), Median-Mean Difference (D4), and the Outlier test (D7). The 2014, 2016, 2018, and 2020 US House election, and the 2016 and 2020 U.S. Presidential election, are used by Dr. Christian Cox from Yale University to compute the Lopsided Margins (D5) and the Partisan Advantage (D6). For all these measures, we compute results election by election, and then we average. The Princeton Gerrymandering Project uses the 2018 Michigan Governor, 2020 U.S. Senate and 2020 U.S. Presidential election, first averaging them to construct an electoral composite in each precinct, and then using this composite to compute the results reported under the Outlier Test (D7).

DRA 2020 allows users to choose their preferred election data input to compute the measures described under D8.

**Results.**

We present the results on partisan fairness across all Draft maps for Michigan House districts in the following table. Each row indicates a redistricting plan. Each column indicates a measure of partisan fairness, from D1 to D7. Positive numbers indicate deviations from the fair ideal that favor the Republican Party, and negative values indicate deviations that favor the Democratic Party. Zero indicates perfect fairness according to each measure. The values of some measures are in seats; others are in percentage of the total number of votes. The "Outlier" (D7) indicates a party ("D" for Democratic or "R" for Republican) and a range of percentages. The letter indicates the party that this map favors, relative to the one million other maps in the Princeton Gerrymandering Project ensemble. The first number is the share of maps in the ensemble that are less favorable to this party (in the sense that the party would obtain fewer seats), and the second is the share of maps that are even more favorable (in the sense that the party would obtain more seats).

| TABLE 36. *Measures of Partisan Fairness for House District Plans* | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Bias | Eff. Gap | Proport. | Med-mn | Lopsided | Advantage | Outlier |
| | D1 | D2 | D3 | D4 | D5 | D6 | D7 |
| **Plan Pine** | +10.3% | +5.8% | +2.4 seats | +3.1% | +5.7% | -1.3 seats | D: 99.9%-0% |
| **Plan Peach [*]** | *+10.9%* | *+6.4%* | *+3.3 seats* | *+4.1%* | *+5.8%* | *-0.9 seats* | D: 99.3%-0% |
| **Plan Oak [*]** | *+10.9%* | *+6.6%* | *+3.5 seats* | *+4.2%* | *+5.9%* | *-0.8 seats* | D: 97%-1% |

Compare these results to the results on the measures of partisan fairness used by the Commission, as advised by Dr. Lisa Handley, displayed in the table below. The values below were obtained from a composite of all 13 state-wide elections (Presidential, US Senate, Governor, Secretary of State, and State Attorney) from 2012 to 2020, and we report them here directly from the MICRC website.

| TABLE 37. *Selection of Measures of Partisan Fairness Used by the Commission.* | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Bias | Eff. Gap | Proport. | Med-mn | Lopsided | Advantage | Outlier |
| | D1 | D2 | D3 | D4 | D5 | D6 | D7 |
| **Plan Pine** | -- | +5.7% | +1.4% | +2.7% | +5.8% | -- | -- |
| *Plan Peach [*]* | -- | +6.4% | +2.3% | +3.4% | +6.3% | -- | -- |
| *Plan Oak [*]* | -- | +8.4% | +3.2% | +3.8% | +6.8% | -- | -- |

 [*] Recall that Plan Peach and Plan Oak are not complete redistricting plans, as they fail to assign a district to each district. Results would change if these plans were remedied by assigning a district to each precinct.

The pattern is similar to the one we identified in Congressional and Senate maps, but the Republican political geography is more pronounced at the level of House legislative districts. For instance, the average map in the Computational Ensemble feature an Efficiency Gap of about 7%. Confronted with this large Republican advantage in the geographic distribution of its voters, the Commission's plans seem to have taken a deliberate step toward tilting the maps toward the Democratic Party, in order to partially — but only partially — cancel out the underlying Republican geographic advantage a little bit. This is reflected in the negative value of the Partisan Advantage (D6), which suggests that, net of the effect of political geography, the maps help Democratic candidates a little bit (by about one seat), but, as reflected by measures D1 through D5, this is help is nowhere near enough to compensate for the large underlying Republican advantage due to the political geography of the state.

This same effect is perhaps best illustrated by Figure 34. The Democratic candidate (J. Benson) won the 2018 Secretary of State election with an 8.9% vote margin. Across all states, parties and elections, an 8.9% vote margin typically translates to about a 17%-18% seat margin, which would be about 65 seats. But Michigan House elections don't work that way, and even with such a hefty margin, under a typical map, Democratic candidates would only win 60 or 61 seats. Plan Oak and Plan Peach would give the Democratic Party an extra seat, up to 62, and Plan Pine yet another one, up to 63. But all three plans stay within the range of normal outcomes, none stepping out into the extremes to aid any party. On the other hand, according to the computational ensemble and the composite election used by the Princeton Gerrymandering Project, the maps are outliers that favor the Democratic Party, especially Plan Pine and Plan Peach: under most plans Democrats would obtain between 50 and 55 seats, but under Plan Oak they would obtain 56, under Plan Peach 57, and under Plan Pine 58.

However, these plans, while outliers relative to that ensemble under that particular composite election results, are tilting the outcome in the direction that is more symmetric for the two main parties, so the fairness of the plans depends on the preferred notion of fairness.



*Figure 34. Number of Seats Democrats Would Win with 2018 SoS Results*

## CRITERION E: FAIRNESS TO CANDIDATES

"*Districts shall not favor or disfavor an incumbent elected official or a candidate.*"

**Understanding the criterion.**
See the discussion under Section III.2.E on the analysis of the Congressional district maps, verbatim.

**Measures of fairness to candidates.**
See the discussion under Section IIII.2.E on the analysis of the Senate district maps.

**Results.**
The analysis on double-bunking (placing two incumbents in the same new district) is available in the histogram below. The computer-generated maps double-bunk incumbents far more than the Tree maps do. Pine and Peach each double-bunk 19 incumbents while Oak double-bunks 20.



*Figure 35. Double Bunked Incumbents in State House Maps*

On competitiveness, plans Pine, Peach and Oak each have exactly 20 "swing" districts that have been won at least once by each of the two parties in a statewide election in 2016 or 2018. This is close to the average number of such districts in the Computer Ensemble.



*Figure 36. Number of Swing State House Districts*

## CRITERION F: JURISDICTIONAL BOUNDARIES

*"Districts shall reflect consideration of county, city, and township boundaries."*

**Understanding the criterion.**
See the discussion under Section III.2.F on the analysis of the Congressional district maps, verbatim.

**Measures of respect of jurisdictional boundaries.**
See the discussion under Section III.2.F on the analysis of the Congressional district maps, verbatim.

**Results.**
We present results on county splits, as computed by the MGGG Lab for this report.

| TABLE 38. Split counties, and county splits in Draft House Maps | | |
|---|---|---|
|  | Split Counties | Number of Pieces |
| **Plan Pine** | 47 | 202 |
| **Plan Peach** | 47 | 201 |
| **Plan Oak** | 46 | 199 |

The number of splits counties is large in all three maps, especially compared to the computer-generated maps that explicitly minimize split counties.

The computer-generated maps split municipalities far more than the Tree maps. Oak splits 117 municipalities, Peach splits 124, and Pine splits the most at 130.



*Figure 37. Split Municipalities in State House Districts*

## CRITERION G: COMPACTNESS

*"Districts shall be reasonably compact."*

**Understanding the criterion.**
See the discussion under Section III.2.G on the analysis of the Congressional district maps, verbatim.

**Measures of compactness.**
See the discussion under Section III.2.G on the analysis of the Congressional district maps, verbatim.

**Results.**
In the next table, for each redistricting plan in each row, provide the Polsby-Popper, Reock and Cut Edges measures of compactness, respectively in columns 1, 2 and 3. The Polsby-Popper and Reock scores areas reported by the Princeton Gerrymandering Project Redistricting Report Cards for Michigan maps, and the Cut Edges is as computed by the MGGG Lab.

| TABLE 39. Compactness Measures in Draft State House District Plans | | | |
|---|---|---|---|
| | Polsby-Popper | Reock | Cut Edges |
| **Plan Pine** | 0.36 | 0.41 | 2644 |
| **Plan Peach [*]** | 0.37 | 0.41 | 2600 |
| **Plan Oak [*]** | 0.38 | 0.42 | 2579 |

The Cut Edges scores are poor, at the high (bad) end of the distribution of the Computational Ensemble.



*Figure 38. Number of Cut Edges in House District Draft Plans*

Viewers can confirm, by visual inspection, that compactness was not a guiding factor in the design of these maps. The elongated, serrated, tool-like or key-like shapes of the North-South, cross-city, cross-country districts (such as 8, 16 or 21 in all three plans) respond to the racially motivated design of splitting the Black community in the City of Detroit so that no district be majority-Black. Districts 71 and 74 (again in all three maps) near Battle Creek are intertwined in each other's arms, and 71 straddles four counties. Such examples abound, and when aggregated and quantified, they lead to the non-compact result illustrated by Figure 38, which dovetails with the high number of county splits.

## VII.3. SUMMARY OF RESULTS

Plan Pine is the only complete House map. Plan Peach and Plan Oak leave a precinct with 3,204 inhabitants in the town of Blissfield (Lenawee County) unassigned to any district. This is a major omission, representing more than 3% of the population of a state House district. These omissions are fixable. The precinct could be assigned to the district surrounding it, but doing so would increase the population of the district beyond the ideal population, inviting perhaps further adjustments to the map.

These three plans feature large deviations from population equality: more than 7% in all three plans.

All three of these plans feature 14 districts with more than 40% of their Voting Age Population identifying as "Black", and an additional six with more than 35%, but none feature a district with a majority of the VAP identifying as "Black" (the previous plan featured two). This absence of majority-Black districts is extraordinary, and impossible to arise except by careful design. It is achieved by breaking apart the large concentration of Black voters in the City of Detroit, and reconfiguring them in thin strip districts that radiate outward, across city lines and across county lines.

It is unclear how the districts in these plans — in particular the thin cross-county strip districts and the non-compact earmuff-shaped districts — reflect Communities of Interest in the state of Michigan. We cannot say that they fully reflect the collection of Communities of Interest submitted by citizens.

The maps' performance on partisan fairness varies more across measures of fairness, than across maps. All three plans appear to favor the Republican Party according to some measures, and the Democratic Party according to other measures. Plan Pine is the most favorable to Democratic candidates, but the differences between the three plans are small, amounting to less than a State House seat on average over several elections.

While the exact boundaries vary, these three plans are very similar, offering variations on the same scheme, rather than three truly distinct plans.

These plans feature a standard number of seats that change hands across elections.

They all three reflect less consideration of county boundaries than the maps in the computational ensemble, and contain numerous districts that are not reasonably compact.

# PART VIII. ANALYSIS OF PROPOSED MAPS FOR MICHIGAN'S STATE HOUSE DISTRICTS

## VIII.1. THE PROPOSED MICHIGAN HOUSE DISTRICT MAPS

The MICRC approved the following Proposed maps for Michigan House of Representatives districts, for consideration in what is scheduled as the final round of public hearings (Nov. 15 – Dec. 29, 2021): [59]

   **-Plan Pine V5,** (number #259). Voted 7-4 on Nov. 3, 2021. Commissioners Clark (R), Kellom (D), Orton (R) and Rothhorn (D). Opposed; Curry (D) and Lange (R) not voting.



**Plan Pine V5**

---

[59] These maps are available for download here:
https://michigan.mydistricting.com/legdistricting/michigan/comment_links

-**Plan Hickory** (number #262). Voted 10-3 on Nov. 4, for publication. Opposed: Commissioners Lange (R), Wagner (R) and Witges (R).



**Plan Hickory**

JA00823

**-Plan Magnolia** (number #263). Voted 11-1 for publication on Nov. 4, 2021. Opposed Commission: Lange (R). Absent commissioner: Wagner (R).



**Plan Magnolia**

## VIII.2. MEASURING PERFORMANCE ON EACH CRITERIA

## CRITERION A: POPULATION BALANCE AND VOTING RIGHTS ACT

"*Districts shall be of equal population as mandated by the United States constitution, and shall comply with the voting rights act and other federal laws.*"

**Understanding the Criterion.**

With regard to population equality, we refer to the discussion under Section VII.2.A on the analysis of Draft maps for state House districts.

With regard to the Voting Rights Act, we refer to the discussion of Criterion A under Section III.2. for the Congressional maps.

**Measures of performance on Criterion A.**

A1. **Measure of population inequality.**

We compute the difference between the most and least populous district, using the formula:

$$\frac{Population\ of\ most\ populous\ district}{Population\ of\ least\ populous\ district} - 1,$$

in percentage points.

For convenience, we also report the largest deviation to the ideal population size of a district, namely,

$$\frac{Population\ of\ most\ populous\ district}{91,612} - 1,$$

again, in percentage points.

If the difference between the most and least populous district surpasses 1%, we also compare the average population of districts won by Democratic Party candidates to the average population of districts won by Republican Party candidates, in all U.S. Presidential or Michigan Senate elections from 2014 to 2020 (namely, the 2016 and 2020 Presidential elections, and the 2014 and 2018 Michigan Senate elections). This is a measure of partisan malapportionment.

A2. **Number of Districts of Opportunity.**

As discussed in Section III.2.A2 with regard to the application of the Voting Rights Act to Congressional district maps, we seek to compute the number of districts of opportunity for ethnic and linguistic minorities. We can then compare this number to the proportion of minority population. For instance, the "Black Alone" population is 13.7% of the Michigan population (with a percentage as high as 37.6% in Wayne Co.), a statewide percentage that corresponds to fifteen Michigan House districts. Further, 5.6% of the Michigan population is Hispanic or Latino community, a percentage that corresponds to six Michigan House districts (though in this case the highest concentration by county is 15.4% in Oceana Co.); and 3.3% of the state population is Asian-American (with 9% in Washtenaw Co.), a percentage that corresponds to three or four Michigan House districts.

In addition, since a Michigan House district comprises only less than 92,000 inhabitants, a geographically concentrated ethnic or linguistic minority as small as 46,000 inhabitants (less than 0.5% of the state's population) can constitute a majority in a geographically compact district, being thus subject to consideration under the Voting Rights Act.

We can also compare the number of opportunity districts for the black minority to the number of such opportunity districts in the previous redistricting plan. We refer to the report "Determining if a redistricting plan complies with the Voting Rights Act" by Dr. Lisa Handley, presented to the MICRC. If Dr. Handley's estimates are correct, any 40% Black district is a district of opportunity and will elect candidates preferred by the Black minority. We do not have any comparable estimate for Hispanic, Asian, or other minority districts of opportunity.

If Dr. Handley's estimate is correct for Black minority districts of opportunity, there were twelve (or up to 14 at the lower threshold of 35%) Black districts of opportunity in the previous redistricting plan.

We do not have such estimate for Hispanic, Asian, or other minority districts.

So, the measure we report is:

-Number of districts with >50% of their voting age population identifying as Black.

-Number of districts with >40% of their voting age population identifying as Black.

-Number of districts with >35% of their voting age population identifying as Black.

We also report the number of districts, if any, with >40% or >35% of their voting age population identifying as some other ethnic or linguistic minority (in the previous redistricting plan, there were none).

**Results.**
We present the results on Population Equality in the following table. Each row indicates a redistricting plan for MI House districts. The first column reports the population difference between the most and the least populated districts. The second column reports the maximum deviation from the ideal district population. And the third column reports the partisan malapportionment measure, with a result bigger than zero meaning that districts won by Democrats have more population (which indicates an advantage to the Republican Party), and thus negative numbers indicating that districts won by Republicans have more population (which indicates an advantage to the Democratic Party).

| TABLE 40. *Population Equality in Proposed State House Plans* | | | |
|---|---|---|---|
| | **Population difference** | **Maximum deviation** | **Partisan malapport.** |
| **Plan Pine V5** | 4.86% | 2.45% | +0.07% |
| **Plan Hickory** | 5.09% | 2.48% | +0.12% |
| **Plan Magnolia** | 4.80% | 2.48% | +0.15% |

As in the case of Proposed Senate District maps, these deviations are within the range that is acceptable for state legislative districts under the U.S. Constitution.

We report the number of districts in which more than 50%, more than 40%, and more than 35% of the Voting Age Population identifies as "Black" or "African-American" (alone) in the following table, as computed by the MGGG Lab for this report (except official map numbers again from IPUMS). These numbers serve as proxy for the number of Black-minority districts of opportunity.

| TABLE 41. *Black Minority Districts of Opportunity in State House Proposed Maps* | | | |
|---|---|---|---|
| | **# > 50% VAP Black** | **# >40% VAP Black** | **# >35% VAP Black** |
| **Plan Pine V5** | 3 | 13 | 19 |
| **Plan Hickory** | 7 | 13 | 17 |
| **Plan Magnolia** | 7 | 13 | 17 |
| **2011 Official Map** | 11 | 12 | 12 |
| **Proportional to Pop.** | 15 | | |

The following graph shows the Black share of the Voting Age Population in the districts with the highest Black populations. Districts are ordered from lowest to highest Black share but only the top 30 districts are included. The colored dots represent each map. The boxes represent the typical Black VAP shares in maps in the Computational Ensemble, and the arms stretching out of the boxes represent the Black VAP share at unusual maps such that only 2.5% of maps have shares above or below the range covered by the arms.



*Figure 39. Distribution of Black VAP by State House District*

Almost all maps in the Computational Ensemble feature at least five Black-majority districts and a typical map features seven such districts. Proposed Plans Magnolia and Hickory share a common map of districts for the city of Detroit and neighboring areas, and thus have the same results on the distribution of Black Voting Age Population by district. These two plans also feature seven Black majority districts, as is typical of the computational maps, but they arrange the districts radiating outward into suburban areas of Macomb and Oakland counties, and western Wayne County, so that the large urban Black majorities get partially diluted to smaller majorities in these hybrid urban-suburban districts. In addition to the seven majority-Black districts, these plans also create many more districts with a large (but short of a majority) Black Voting Age Population than the maps in the ensemble. The Magnolia/Hickory arrangement is the result of Commissioner Brittni Kellom's efforts to address the public comments during the second round of public hearings earlier this fall.

Proposed Plan Pine V5 follows a hybrid approach between that of Magnolia/Hickory and its predecessor Draft Plan Pine, resulting in only three Black-majority districts, but in a greater number of districts with Black VAP above 40% or above 35%.

We note that all three plans also contain one district with Hispanic share of VAP above 35%, but none above 40% (over 39% of the Voting Age Population in District 1 identifies as "Hispanic"). There was no such district in the 2011 map, but this falls short of the number proportional to the Hispanic population in the state, which would be five.

No district contains a share of Asian VAP above 35%.

## CRITERION B: CONTIGUITY

"*Districts shall be geographically contiguous. Island areas are considered to be contiguous by land to the county of which they are a part.*"

**Understanding the Criterion.**
See the discussion under Section III.2.B on the analysis of Congressional Districts.

**Measure of Contiguity.**
We report a binary "Yes" or "No" for whether a plan satisfies the stricter definition of contiguity, satisfying rook contiguity with islands attached to the land at the nearest point in the county of which they are a part of.

**Results.**
All three of these plans satisfy contiguity.

| TABLE 42. *Contiguity in Proposed State House plans* | |
|---|---|
| | Are all districts contiguous? |
| **Plan Pine V5** | Yes |
| **Plan Hickory** | Yes |
| **Plan Magnolia** | Yes |

## CRITERION C: COMMUNITIES OF INTEREST

"*Districts shall reflect the state's diverse population and communities of interest. Communities of interest may include, but shall not be limited to, populations that share cultural or historical characteristics or economic interests. Communities of interest do not include relationships with political parties, incumbents, or political candidates.*"

**Understanding the Criterion.**
See the discussion under Section III.2.C on the analysis of Congressional district maps.

**Measure of Respect for Communities of Interest.**
See the discussion under Section III.2.C on the analysis of Congressional district maps.

**Results.**
Hickory and Magnolia preserve 30 COI clusters and Pine V2 preserves 31. That is slightly below the number preserved by computer-generated maps. Again, most of the preservation comes from districts within large COI clusters rather than COI clusters within districts. We do not see much evidence of responsiveness to COI clusters, though there could be more responsiveness to individual COI maps submitted by the public and selected by the Commission.



*Figure 40. Community of Interest Preservation in State House Maps*

# CRITERION D: PARTISAN FAIRNESS

"*Districts shall not provide a disproportionate advantage to any political party. A disproportionate advantage to a political party shall be determined using accepted measures of partisan fairness.*"

**Understanding the Criterion.**
See the discussion under Section III.2.D on the analysis of the Congressional district maps, verbatim.

**Measures of partisan fairness.**

D1. **Partisan Bias.**

D2. **Efficiency Gap.**

D3. **Deviations from proportionality.**
Measures D1-D3 are exactly as described in Section III.2.D.

D4. **Median-Mean difference.**
Measure D4 is exactly as described in Section VII.2.D on the analysis of Draft plans for state House districts.

D5. **Lopsided Test.**
Exactly as described in Section III.2.D.

D6. **Partisan Advantage.**
Measure D4 is exactly as described in Section VII.2.D on the analysis of Draft plans for state House districts.

D7. **Outlier test.**
Exactly as described in Section III.2.D.

D8. **Other measures.**
The measures available in DRA 2020 are as described in subsection V.2.D8, on the analysis of Senate district plans.

For readers' convenience, we published the three Proposed state House maps in DRA 2020 under the names: "HD Pine V5", "HD Hickory" and "HD Magnolia".

-       -       -

The election data that we use to compute the measures in this Section is again:

The 2018 Governor election; the 2018 Secretary of State election; the 2018 Attorney General election; the 2016 Presidential election; and the 2018 U.S. Senate election, are used by the MGGG lab to report results on Partisan Bias (D1), Efficiency Gap (D2), Deviations from Proportionality (D3), Median-Mean Difference (D4), and the Outlier test (D7). And the 2014, 2016, 2018 and 2020 Michigan House election, and the 2016 and 2020 U.S. Presidential election, are used by Dr. Christian Cox from Yale University to compute the Lopsided Margins (D5) and the Partisan Advantage (D6). DRA 2020 allows users to choose their preferred election data input to compute the measures described under D8.

**Results.**

We present the results on partisan fairness across all Proposed maps for Michigan House districts in the following table. Each row indicates a redistricting plan. Each column indicates a measure of partisan fairness, from D1 to D7. Positive numbers indicate deviations from the fair ideal that favor the Republican Party, and negative values indicate deviations that favor the Democratic Party. Zero indicates perfect fairness according to each measure. The values of some measures are in seats; others are in percentage of the total number of votes. The "Outlier" (D7) indicates a party ("D" for Democratic or "R" for Republican) and a range of percentages. The letter indicates the party that this map favors, relative to the 1,000,000 other maps in the Princeton Gerrymandering Project ensemble. The first number is the share of maps in the ensemble that are less favorable to this party (in the sense that the party would obtain fewer seats), and the second is the share of maps that are even more favorable (in the sense that the party would obtain more seats).

| TABLE 43. *Measures of Partisan Fairness for Proposed State House District Plans* | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Bias | Eff. Gap | Proport. | Med-mn | Lopsided | Advantage | Outlier |
| | D1 | D2 | D3 | D4 | D5 | D6 | D7 |
| **Plan Pine V5** | +11.4 seats | +2.9% | –1.3 seats | +2.3% | +5.1% | –2.1 seats | D: 100%-0% |
| **Plan Hickory** | +11.6 seats | +3.1% | –0.9 seats | +2.4% | +4.8% | –2.4 seats | D: 99.9%-0% |
| **Plan Magnolia** | +11.4 seats | +3.4% | –0.7 seats | +2.6% | +5.1% | –2.1 seats | D: 99.9%-0% |

Compare these results to the results on the measures of partisan fairness used by the Commission, as advised by Dr. Lisa Handley, displayed in the table below. The values below were obtained from a composite of all 13 state-wide elections (Presidential, U.S. Senate, Governor, Secretary of State, and State Attorney General) from 2012 to 2020, and we report them here directly from the MICRC website.

| TABLE 44. *Selection of Measures of Partisan Fairness Used by the Commission.* | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Bias | Eff. Gap | Proport. | Med-mn | Lopsided | Advantage | Outlier |
| | D1 | D2 | D3 | D4 | D5 | D6 | D7 |
| **Plan Pine V5** | -- | +4.3% | +0.5% | +2.7% | +5.3% | -- | -- |
| **Plan Hickory** | -- | +4.3% | +0.5% | +2.7% | +5.3% | -- | -- |
| **Plan Magnolia** | -- | +5.4% | +1.4% | +2.9% | +5.7% | -- | -- |

The pattern is similar to the one we identified in Congressional and Senate maps, but the Republican political geography advantage is more pronounced at the level of House legislative districts. For instance, the average map in the Computational Ensemble (a computer suite of maps created for comparison purposes) feature an Efficiency Gap of about 7%. Confronted with this large Republican advantage in the geographic distribution of its voters, the Commission's plans make expected results more favorable for the Democratic Party, in order to partially — but only partially — cancel out the underlying Republican geographic advantage. This is reflected in the negative value of the Partisan Advantage (D6), which suggests that, net of the effect of political geography, the maps slightly favor Democratic candidates (by a bit more than two seats), but not enough to compensate for the large underlying Republican advantage due to the political geography of the state, as shown by measures D1, D2, D4 and D5.

The Commission edited and adjusted Proposed state House maps toward more favorable likely outcomes for Democrats, halving the Efficiency Gap from the 7% that is typical of computational maps (drawn neutrally without partisan considerations), to around 3% in Proposed plans Pine V5, Hickory and Magnolia. However, in doing so, the maps preformed less well on the Outlier Test (D7). State House district maps that minimally reflect county boundaries and compactness are extremely unlikely to bring the Efficiency Gap close to zero. The Commission thus drew proposed maps that are more favorable to Democrats than computer-generated maps. In other words, these maps — and any maps close to 0% Efficiency gap — are outliers, and they do not meet the Outlier test, which calls on maps to be typical rather than more favorable to one or another political party than maps drawn without partisan intent.



*Figure 41. Efficiency Gap given 2018 US Senate Election Results*

This is well illustrated by Figure 41. The range of normal Efficiency Gap scores, according to the proposers of this measure, is from -8% to +8%, an area shaded in gray (the horizontal axis goes from more favorable to Republicans to less favorable to Republicans from left to right). It is easy to satisfy this bar, as most maps in the Computational Ensemble fall within this range (as denoted by the height of the bars in the figure). Whereas, hitting zero proved virtually impossible for our computational algorithm. In its effort to draw maps that achieve closer to zero Efficiency Gap, the Commission collaboratively drew maps that feature a lower Efficiency Gap than the vast majority of other maps we have assessed. A lower Efficiency Gap translates into a higher number of seats for the Democratic party, beyond the number proportional to its statewide vote, as shown in the next figure.



*Figure 42. Democratic House seats Given 2018 U.S. Senate Election Results*

Based on the 2018 U.S. Senate election results under computer-generated maps, Democrats would predictably win between 54 and 60 seats, with 57 being the most typical number. But under Proposed plans Pine V5, Hickory or Magnolia, Democrats would win 62 seats, overperformance compared to maps drawn without partisan considerations. As a result, these maps are outliers compared to computer-generated maps.

Democrats won this statewide election 52 percent to 46 percent, so the proportional number of seats for Democrats is between 58 and 59. The winning party would normally win a greater share of seats than votes. Reducing the efficiency gap or improving other symmetry scores would achieve outcomes that would give Democrats and Republicans a similar share of House seats in elections in which they won a similar share of the statewide vote. But the concentration of Democrats in urban areas makes that unlikely absent efforts to construct districts with that purpose in mind.

These efforts, if too intense, could put the maps at risk of judicial review, if Courts use the Outlier Test they have used in the past to identify whether a map provides a disproportionate advantage to a political party, and without considering scores on symmetry. If Courts instead compare the maps against symmetric baselines, these maps would be seen as performing well, as they generate slightly more seats for Democrats than the proportional baseline, and slightly less than the number required to fully close the efficiency gap or the median-mean difference.

The next figure replicates an analysis of neutrality with the Princeton computational ensemble of a million maps, using Princeton's composite election results. We get similar results: all three maps are outliers compared to computer-generated maps; Plan Pine V5 more so; in fact, Plan Pine V5 is tied for the most favorable to Democrats among all one million maps in the Princeton Gerrymandering Project's computational ensemble. Again, under these plans, Democrats obtain two or three more seats than under most maps drawn without partisan considerations, and five

or six more than typical for computer-generated maps. By pursuing the goal of better scores on some measures of symmetry, these maps result in lower scores on neutrality.



*Figure 43. Democratic Seats with Princeton Composite Election Data*

## CRITERION E: FAIRNESS TO CANDIDATES

"*Districts shall not favor or disfavor an incumbent elected official or a candidate.*"

**Understanding the criterion.**
See the discussion under Section III.2.E on the analysis of the Congressional district maps, verbatim.

**Measures of fairness to candidates.**
See the discussion under Section IIII.2.E on the analysis of the Senate district maps.

**Results.**
We present first results on double-bunking, i.e. assigning two incumbents to the same district. We report two numbers. The first considers all incumbents and uses addresses from the 2020 Michigan Candidate Listing file made public by the MI Secretary of State. With this data, the typical range in the computational ensemble is from 19 to 29, so these three maps all fall within this range.

| TABLE 45. Districts with Two Incumbents in Proposed State House District Plans | |
| --- | --- |
| **Plan Pine V5** | 22 [11] |
| **Plan Hickory** | 21 [10] |
| **Plan Magnolia** | 21 [10] |

However, many incumbents are term-limited, and cannot run again, so placing them in the same district with another incumbent is irrelevant. The second number, in brackets, considers only incumbents who are not term-limited, and uses addresses obtained from the Michigan Voter file by Mike Wilkinson for Bridge Michigan.[60]

On competitiveness, if we define a "competitive district" as one that each of the two parties won in at least one of the five elections in the MGGG data set (namely, the 2018 Senate, Governor, Secretary of State, and Attorney General elections, and the 2016 Presidential election), then all three Proposed Senate plans feature 20 such districts, close to the middle of the range of the Computational Ensemble (most maps feature between 13 and 23, with the most frequent being result being 18).

Proposed Plan Pine V5 features 84 election results decided by a less than 6% margin, from among 550 total election results (five elections in each of 110 districts). Proposed Plan Hickory features 91, and Proposed Plan Magnolia features 88. Most maps in the Computational Ensemble feature between 73 and 108, with the most typical number being 90, so the three Proposed plans fall within the normal range.

There is no indication that the Proposed maps favor or disfavor incumbents as a class.

---

[60] Sergio Martinez-Beltrán and Mike Wilkinson, "Redistricting may oust half of incumbents in Michigan, analysis finds", November 23, 2021, Bridge Michigan.

## CRITERION F: JURISDICTIONAL BOUNDARIES

*"Districts shall reflect consideration of county, city, and township boundaries."*

**Understanding the criterion.**
See the discussion under Section III.2.F on the analysis of the Congressional district maps, verbatim.

**Measures of respect of jurisdictional boundaries.**
See the discussion under Section III.2.F on the analysis of the Congressional district maps, verbatim.

**Results.**
We first present the results in table format.

| TABLE 46. Split Jurisdictions and Jurisdictional Splits in Proposed State House Maps. | | | | |
|---|---|---|---|---|
| | Split Counties | County Pieces | Split Municipalities | Municipality Pieces |
| **Plan Pine V5** | 48 | 201 | 129 | 328 |
| **Plan Hickory** | 48 | 202 | 129 | 329 |
| **Plan Magnolia** | 48 | 200 | 127 | 323 |

These plans are very similar with respect to reflecting consideration of county, city and township boundaries. They reflect municipal boundaries more than the computer-generated maps drawn without any attention to municipal boundaries, but they reflect county boundaries less than the computer-generated maps drawn to reflect these boundaries.

This is evidence that the plans reflect jurisdictional boundaries somewhat, more than not at all, but not as much as computer algorithms trained to do so.

## CRITERION G: COMPACTNESS

*"Districts shall be reasonably compact."*

**Understanding the criterion.**
See the discussion under Section III.2.G on the analysis of the Congressional district maps, verbatim.

**Measures of compactness.**
See the discussion under Section III.2.G on the analysis of the Congressional district maps, verbatim.

**Results.**
In the next table, for each redistricting plan in each row, we provide the Polsby-Popper, Reock and Cut Edges measures of compactness, respectively in columns 1, 2 and 3. The Polsby-Popper and Reock scores areas reported by DRA 2020, and the Cut Edges is as computed by the MGGG Lab.

| TABLE 47. Compactness Measures in Proposed State House District Plans | | | |
|---|---|---|---|
|  | Polsby-Popper | Reock | Cut Edges |
| **Plan Pine V5** | 0.39 | 0.41 | 2631 |
| **Plan Hickory** | 0.38 | 0.40 | 2668 |
| **Plan Magnolia** | 0.39 | 0.41 | 2635 |

The Cut Edges scores are poor, at the very high (bad) end of the distribution of the Computational Ensemble. Viewers can confirm, by visual inspection, that compactness was not a guiding factor in the design of these maps.



*Figure 44. Number of Cut Edges in Proposed House District Plans*

## VIII.3. SUMMARY OF RESULTS

Proposed plans Pine V5, Hickory, and Magnolia are all complete redistricting plans that divide the entire state into one 110 contiguous districts. The three plans are similar, as they all stem from Draft Plan Pine, and many districts share the same boundaries across all four of these plans. Further, all three Proposed plans feature adjustments to bring the population differences down to approximately 5%, or less than 5,000 inhabitants.

Plan Magnolia and Plan Hickory introduce a new configuration of Detroit districts, as sought by Commissioner Kellom, resulting in compliance with the Voting Rights Act in a manner designed to reflect the communities in the city of Detroit that lessens the consideration of race in the creation of districts (the distribution of racial shares across districts deviates less from the distribution under maps drawn by computer algorithm). Proposed Plan Hickory differs from Proposed Plan Magnolia mostly in Ann Arbor, where Proposed Plan Hickory develops a distinct configuration with a four-district split, while Proposed Plan Magnolia kept the original configuration from Proposed Plan Pine. Proposed Plan Pine V5 adopts neither of these two new configurations in Detroit or Ann Arbor, staying closest to Proposed Plan Pine.

These three plans feature moderately large deviations from population equality: about 5%.

Proposed Plan Magnolia and Proposed Plan Hickory feature seven districts in which a majority of the Voting Age Population identifies as "Black," and an additional six districts with a Black Voting Age Population share above 40%. Proposed Plan Pine V5 features only three districts with a majority of such population, but an additional ten districts with a share above 40%.

Commissioners made efforts to adjust boundaries in response to requests by specific neighborhood-based communities of interests, but the overall approach to reflect communities of interest remains somewhat unsystematic. Specifically, how the Commission prioritized reflecting communities of interest over lower-ranked criteria remains unclear.

Regarding partisan fairness, different measures put starkly different demands on state House District maps in Michigan. The Commission strained to approach a perfect score in two or three measures selected by consultant Dr. Lisa Handley, but in doing so, lowered the score in other measures. In one measure that has been accepted by courts — the Outlier Test — the scores worsened, so that Proposed Plan Pine V5, Proposed Plan Hickory and Proposed Plan Magnolia all appear as outlier maps that give the Democratic Party a higher number of seats than maps drawn without partisan considerations.

These maps appear fair to incumbents and challengers. They reflect county, city and township boundaries to some extent, but less so than maps designed by algorithms instructed to reflect county boundaries. These maps contain several districts that do not appear reasonably compact by visual inspection, and aggregate numerical scores and their comparison to computationally generated maps confirm that the maps perform worse on compactness than other maps.

We find that the approach toward compliance with the VRA in Proposed Plan Magnolia and Proposed Plan Hickory better address the concerns expressed by Detroit residents, including two Democratic Commissioners Juanita Curry and Brittni Kellom, both of Detroit, and by the Department of Civil Rights, regarding representation of the Black community in Detroit.

Both Proposed plans Hickory and Magnolia appear as outlier maps that give a state House advantage to the Democratic Party than almost any computer-generated map. But these maps perform well instead on measures of symmetry that do not consider the geographic distribution of Democrats and Republicans. Both proposed plans Hickory and Magnolia evolved from Draft Plan Pine, itself something of an outlier. In the most recent map drawing, Proposed plans Hickory and Magnolia updated Draft Pine in a way that would be expected to add an extra seat or two for the Democratic party.

Proposed Plan Hickory and Proposed Plan Magnolia perform well on several other measures of partisan fairness, but it would be possible to redraw both to score within a normal range in a larger class of accepted measures of partisan fairness.[61] The Commission has pursued greater partisan fairness on some measures that aim toward symmetry at the expense of scores on measures of neutrality that they did not consider.

---

[61] Plan HD Szetela (#276), which is the only House plan submitted by an individual commissioner, also fails the Outlier Test, as it too gives more seats to Democrats than almost any map drawn without partisan considerations. It thus has the same advantages and disadvantages on this criterion.

# PART IX. EVALUATING MICHIGAN'S NEW PROCESS

As we write this report, we look to the start of Michigan's next election cycle – midterm elections that take place Tuesday, Nov. 8, 2022. Yet in reality, they are already underway. Michigan's primary for statewide candidates takes place Tuesday, Aug. 2, 2022. Even now, candidates are sharpening their campaign tools, anxious to know the boundaries that will govern their election success – or loss.

No one could predict that a novel Coronavirus, named COVID-19, would entangle presidential politics at its first strike and persist as decennial U.S. Census data were gathered and as Michigan's Independent Citizens Redistricting Commission was empaneled to draw voting boundaries. The Commission faced immediate lawsuits and complaints related to its formation and then was unable to meet its initial deadlines due to the Census delay and unable to get full legal certainty regarding its amended processes. Ultimately, the COVID-19 pandemic and other issues forced significant delays in release of the 2020 Census data, which in turn delayed the MICRC's ability to begin drawing maps, and stretched its timeline for release of final maps.

Under the new constitutional amendment, Michigan's Secretary of State would set the stage for redistricting under the MICRC. From October 24, 2019 to June 1, 2020, the Secretary of State invited Michigan citizens to apply to serve on the MICRC. Some 9,367 applications were processed, 55% male and 45% female. Sixty-one percent of them were over the age of 55. More than 48 percent of the applicants identified themselves as not affiliated with any political party, 38.5 percent of them identified as Democrats and 13 percent as Republican.

Between June and August, the Secretary of State completed the process to randomly draw commissioners from eligible applicants, a three-step process. The MICRC convened September 17-18, 2020, on a fast track to draw legally defensible boundaries governing a decade of citizen voting.

A website was designed, executive director and staff hired and a structure put in place for educating commissioners, inviting public input, hosting a series of public hearings, asking members of the public to draw maps of their own design and submit them through a special online portal. The website included space for preliminary maps as they were drawn and also for housing final maps. Legal resources were also engendered, expecting court battles to come.

After hiring its staff and preparing for public input, the Commission began gathering that input through the online portal and a series of sixteen public hearings around the state in May and June 2021. By late August, the MICRC began to draw draft maps. However, the Commission's early map drawing efforts were significantly influenced by delays in data access and related challenges, including data for the U.S. Census, partisanship, racial voting patterns, and Communities of Interest (COI). Each of these types of data have direct relevance to the criteria the Commission must utilize in drawing maps, making data challenges a key factor in the MICRC's early mapping efforts.

While waiting for the U.S. Census data to arrive, the MICRC made a number of decisions to help guide pending map drawing efforts. In one particularly important decision, the MICRC decided to

begin its efforts with a "blank" slate, rather than relying on either Michigan's 2010 maps or the hometowns of incumbent Michigan politicians.

The Commission also considered and agreed on a set of regional definitions, dividing that blank slate into manageable geographic areas in hopes of helping to organize and rationalize their mapping approach.

By August 19, 2021, the MICRC had debated and adopted a detailed mapping process to guide their pending efforts. The process included a flowchart detailing district design steps, a regional approach, steps to review proposed Communities of Interest, opportunities for individual commissioner-drafted mapping as well as a collaborative drawing approach, the handling of alternative maps, documentation and record keeping, and a structured approach to designing decisions.

After the 2020 Census Redistricting Data Summary File was released on August 12, the Commission's mapping consultant, Electronic Data Services, needed a few days to integrate the data into its GIS systems. At this point the MICRC did not yet have advice from its Voting Rights Act (VRA) consultant or VRA legal counsel—Dr. Lisa Handley and Bruce Adelson, respectively— on whether Michigan's new maps would need to protect minority voting rights according to the VRA, as was required of the 2010 maps. This information was provided for the first time at the Commission's meeting in Ann Arbor on September 2. Nor did it yet have COI data integrated into the GIS mapping system, which became available on September 1, or information to help understand how their line drawing would impact measures of partisan fairness.

Thus, when it was finally able to begin drawing maps on August 20,2021, the MICRC focused primarily on equal population, geographic contiguity, and jurisdiction boundaries, without significant regard to the other criteria. The Commission began by drawing Michigan Senate districts in their previously defined south-central and southeast Michigan regions. One of the newly proposed Senate maps was the first released.

As it began mapping, the Commission settled on a round-robin process whereby each commissioner took a turn designing districts, with the statewide map constructed in a stepwise progression moving from one commissioner to the next. During any commissioner's turn, all other commissioners were generally able to provide feedback and suggestions in real-time.

While the Commission began the map drawing with state senate districts, it quickly followed with Michigan House districts in the same region. Since most of the state's Congressional Districts necessarily cover larger geographic areas, the Commission postponed any focus on congressional seats until later in September.

As this map drawing process proceeded, the Commission continued to assess public input, made numerous modifications to previously designed districts, moved into additional regions of the state to continue drafting districts, and began to create additional sets of maps to address the variety of public input they had received. At times, the Commission chose to try to adhere to general public requests that were not associated with specific criteria, such as citizen views on how to split sections of the state or which areas should not be connected in the same district.

While most of the early focus was on equal population, geographic contiguity, and jurisdiction boundaries, commissioners also attempted to incorporate at least some Community of Interest

(COI) input early in the process. Much of this was based initially on jurisdictional relationships, reflecting public input from the first round of public hearings. For instance, the commissioners recalled substantial input on broad COI concepts such as keeping lakeshore communities together, and in many cases keeping urban and rural areas separate from one another, or about other regional relationships such as joining areas of a particular county with parts of a neighboring county due to cultural, economic, historic, and other relationships.

By August 26, 2021, the Commission had received initial maps of COI clusters, prepared by the MGGG group, and began using these as overlays in the GIS system on September 1. As the Commission spent more time considering Communities of Interest, it encountered a difficult learning curve to efficiently and effectively consider the hundreds of submissions it had gathered, and how those submissions interact with each other and with other criteria such as equal population and compactness. These challenges began with consideration of COIs in the Upper Peninsula and northern Lower Peninsula, including tribal communities, lakeshore communities, and rural communities, but over time broadened as the Commission attempted to consider many additional COIs. After trying a few different approaches, including full MICRC consideration during meetings for every COI submission, not just the COI clusters, by early September the Commission decided their approach was taking too much time. They decided instead to have each of the commissioners' review COI information on their own, outside of meetings, and to bring that knowledge to bear while jointly designing maps during their meetings.

Through September 2021, numerous commissioners used their own laptop computers to analyze the available data and draft alternative versions of districts, to examine options and inform the full Commission's discussion.

By early September 2021, the Commission ended the regional approach and focused on completing initial versions of the Michigan Senate maps. After many revisions, this was accomplished on September 15. The Commission then quickly turned to drafting Michigan's U.S. Congressional Districts, completing initial versions of statewide maps in just days, before turning back to Michigan state House maps again on September 20.

The Commission's mapping process through this initial set of draft maps featured significant collaboration, much discussion of input from their consultants and the public, and many rounds of revisions. We note that MICRC tried to respond to its criteria but often did so with incomplete data. It also went beyond its requirements in incorporating public feedback in an effort to be responsive.

With the first round of 16 statewide public hearings concluded on July 1 and the necessary Census data made available on August 20, the Michigan Independent Citizens Redistricting Commission met approximately 39 times over 15 weeks for intensive map drawing sessions to design and publish maps for public comment during its second round of five statewide public hearings.

From that public feedback, the Commission published six maps each for the state House of Representatives and state Senate, and eight maps outlining Michigan's Congressional Districts. For each set of those map types, half had been created collaboratively by the entire Commission, while the other half had been designed and submitted by individual commissioners.

The second round of hearings then took place in Detroit, Lansing, Grand Rapids, Gaylord, and Flint from Oct. 20-27, with hundreds of Michigan residents turning out to voice their opinions and

submit additional mapping suggestions. A number of central themes emerged, including those raising questions about:

- **The Voting Rights Act.**
  One of the most common topics addressed by residents was whether the Commission had adequately addressed the U.S. Voting Rights Act (VRA). While the Commission had designed a number of "majority minority" districts, the Commission hadn't designed any with majorities of Black voting age population residents.

  During the earlier August-October mapping sessions, the Commissioners had been advised by their Voting Rights Act consultant and legal counsel that compliance with the VRA could be achieved in Detroit with as little as 35%-40% Black voting age population in a district, and that rising significantly above those targets might unnecessarily pack Black voters into fewer districts than would be appropriate. The Commission followed that advice in drawing the draft districts, but then heard extensive negative feedback about this approach during the second round of public hearings.

- **Partisan Fairness.**
  Another common theme of public comments focused on partisan fairness. Again, following its consultants' advice, the Commission had adopted four measures of partisan fairness: *lopsided margins*, *mean-median difference*, *efficiency gap*, and *seats-vote ratio*. In most of the maps presented during the second round of hearings, many measures demonstrated relatively small but consistent advantages to the Republican Party. In numerous other scenarios, the Democratic Party was projected to win a slight majority of seats. Many commenters urged the MICRC to pursue metrics reflecting zero partisan advantage, though others called for prioritizing other criteria.

- **Communities of interest.**
  A third major theme of feedback focused on Communities of Interest, though public comments often went beyond desires to keep COIs within districts. Many addressed geographic relationships (such as keeping lakeshore districts together or Ottawa County whole) or urban-rural characteristics (such as keeping the City of Midland in an urban district with Bay City and Saginaw vs. keeping Midland in a rural district with Midland and surrounding counties). There was more consensus about avoiding splits of small COIs in the Detroit area.

Following the second round of public hearings, the MICRC went back to the drawing board to adjust its maps in nine additional meetings from Oct. 27 to Nov. 8. During this period, the Commission spent significant time discussing citizen Community of Interest feedback, the Voting Rights Amendment requirement and partisan fairness, while working to ensure the latest maps met all seven constitutional mandates. The Commission continued to receive significant public feedback throughout this final mapping process, much of it mutually conflicting – as had been the case for months. Two controversies rose to prominence during this deliberation period.

- **Transparency of Proceedings.**
  During fall deliberations, the Commission also faced public questions about whether it had the authority to meet in closed session. The Commission had moved into a private session to discuss circumstances of the Voting Rights Act and the history of voting-related discrimination in Michigan. The commission's staff cited attorney-client privilege,

Michigan's Open Meetings Act and Freedom of Information Act in supporting the closed session. The move has prompted lawmakers to seek a state Attorney General review.

- **Collaborative or Individual maps.**
  One more potentially significant debate emerged on Nov. 5, when the Commission broke off mapmaking to seek legal advice asking when individual commissioners could submit their own redistricting plans. The commission asked whether individual commissioners could submit their maps for public comment at the present time or after the final 45-day public comment period. The constitutional amendment governing redistricting, as now understood, allows 45 days of public comment.

  Thereafter, the commission -- late on Monday, November 8 -- paved the way for final public comments and final adoption of the House, Senate and Congressional maps that will govern elections for the next 10 years, barring future legal challenges. The commission forwarded 15 maps – nine collaborative and an additional six from individual commissioners – for public comment.

  These 15 maps are at least one vote away from their final version, and available to view online here. The Commission's action, barring further updated maps, now calls for processing the proposed maps, data and legal descriptions necessary for official publication. That work, once completed, will start the 45 days allowed for further public comment before final map adoption. The commission's calendar now calls for a public hearing at the University of Michigan in Ann Arbor on Thursday, Nov. 18, a meeting in downtown Lansing on Thursday, Dec. 2, a session on Thursday, Dec. 16 in downtown Detroit and a final 2021 meeting on Thursday, Dec. 30 in a Lansing location to be determined.

  The state Constitution requires for a majority (seven) Commission vote – from at least two Republicans, two Democrats and three independents – for maps to be approved. Lacking a majority, the commission will rank maps for final approval. If the Commission cannot agree upon a ranking, the Michigan Secretary of State will randomly select final maps among those forwarded by the Commission.

On the positive side, the Commission has not divided into partisan factions, each with a map for consideration. Given the work of other commissions, this was a distinct possibility that has been avoided due to the cooperation and intent of commissioners. The Commission has largely worked cooperatively to propose and edit maps. But that does not mean the process has been free of drama. Commissioners have at times been in open conflict with one another on some issues. There has also been controversy regarding the role of the Chair relative to other Commissioners in determining drawing processes and making judgements comparing the importance of criteria. We are hopeful that the final maps can be approved with consensus and less acrimony.

To test Michigan's attitudes and opinions about this historic undertaking – more in the public light than past redistricting efforts, Michigan State University's Institute for Public Policy and Social Research added questions about the MICRC to its September 2021 State of the State Survey. These questions were also asked in the Michigan Policy Insiders Panel, a group of legislative and executive staff and others that work in and around Michigan government.

Michigan's citizens expressed a range of opinions about the MICRC. Among them:

- Though around 4% more respondents indicated they were familiar with the MICRC than respondents in the same poll during the previous spring, more than half of respondents are still unfamiliar or have never heard of the Commission. Only 35.9% of respondents have seen or heard about the progress the Commission has made. In contrast, 91.5% of the policy insiders panel were very aware of the Commission. Much of the public said they were moderately familiar with the Commission, either somewhat familiar (29%) or mostly unfamiliar (26%).

- Of those who have heard of the MICRC, opinions are generally positive. In the fall survey, 53.4% of those responding said that they believe that requiring districts to be drawn by an independent citizen's commission is better than the prior alternative. This figure is up 7.7% from the earlier survey. However, 17.1% of respondents, an increase of 2.6% higher than the earlier survey, said they considered the new redistricting process somewhat or significantly worse than Michigan's earlier redistricting efforts. What is evident is that people are making up their mind and engaging with the Commission, as 7.2% more respondents had an opinion on utilizing a Commission rather than leaving redistricting to the legislature. But still 43% of the Michigan public said they had no positive or negative opinion of the Commission and another 17% said they did not know. In the future, 78.4% say they will pay close or some attention to the commission, while only 8.2% won't pay attention at all. Policy insiders had a comparatively more positive view about the Commission with 51% showing approval. They were also more opinionated, with only 14% having no opinion and 3% saying they did not know.

- Respondents, those close and outside the capital, are, by and large, happy with the process and rules governing the commission. They indicated that it's important that commission members were randomly selected, represent all political parties, and that the Commission conduct 10 public hearings. Around 20% of respondents are interested in sending questions or even attending one of these public hearings. Most will at least engage with the media surrounding the Commission, with 60.1% indicating they will do so. However, though respondents thought it was important that the Commission is transparent and holds public hearings, only 40.6% believe that participating in one of these meetings will have an impact on the Commission's work. Among insiders, 70.5% of those responding believed that engaging in the public portion of the MICRC meetings will have no impact on the Commission's work.

- The public and policy insiders largely agreed that most aspects of the commission's design were important, rating its criteria and structure highly. Policy insiders were less positive about the importance of taking or following public input.

- To date, redistricting has been seen as more of an insider topic, one that attracted policy and media following. But as more of these Commissions have emerged across the country, the issue of gerrymandering has permeated the public's conscious. Michiganders like the idea of the MICRC, but aren't as confident that public input will matter or that will be likely to venture to engage in one of its public hearings.

We also asked both the Michigan public and Michigan policy insiders open-ended questions about what they had heard about the commission, why they had a positive or negative opinion, and what changes they expected from the Commission.

Among Michigan citizens, one of the most common things they reported hearing was that independent members of the commission were actually partisans. One response stated "[two] independents are really Democrats." Another stated that "I recently learned that one of the "independents" really isn't independent; he has always voted for one party's candidates and initiatives, instead of having a mix over the years."

Another common negative response was that the redistricting commission had accomplished little or had many disagreements. One individual stated "they cannot agree on the maps that need to be drawn and will not finish on time. They can't agree in general."

Positive responses included that the redistricting commission will prevent gerrymandering and bring about more fairness in districting and elections. One person said they heard "that it's supposed to make things more fair and cut down on gerrymandering." Some individuals said the redistricting commission would fix gerrymandering, often pointing to prior efforts by Republicans.

Another common response indicated that individuals believed that it was best to have an independent redistricting commission to draw districts without the input or influence of politicians or parties. One person said "It's important for our districts to be identified by an impartial commission rather than the legislators who have a clear stake in the decision."

Overall, many citizens mentioned that they expected the Commission to bring more fairness in elections and districts. One person said "I hope that it's a more fair system. One where voters choose their legislators, not the other way around." Another common answer indicated that many people expected no change to come from the redistricting commission. Several responses were just simply the word "nothing" or "none."

Among Lansing political insiders who work professionally in state politics, when asked "what have you heard?", many responded that the commission was moving slowly and failing to meet deadlines. One individual said the commission "moves too slowly. Not particularly competent. But may be best way to draw districts. At least transparent and balanced." Another political elite stated they "Read about in the media. Sounds like a bunch of people that have no clue performing a duty they know nothing about. Sounds like there will be a ton of legal challenges."

Many political insiders believed that the standards set to become a commissioner encouraged underqualified individuals to become commissioners. One person said "In what other line of work, are people hired by people who don't know what or understand the job is, based on the qualification that the people they get to hire are also the least qualified people to do the job?" Several also mentioned they had heard that many of the commissioners were repeatedly absent from meetings. One person said "People keep resigning or not showing up to the meetings that were appointed to the commission"

On the positive side, many political elites said they believed the process was fairer and would help to eliminate gerrymandering, much like the public. One stated "lines should be drawn in a fairer way. It would eliminate gerrymandering."

Another common answer praised the redistricting commission for its transparency in the redistricting process. One person stated "generally the committee is operating transparently and making an effort to achieve appropriate districts. Some challenges are evident, but the public knowledge of the problems indicates the openness of the process."

Overall, political elites commonly said they hope the Commission brings more fairness in elections and less gerrymandering. One expected a "reduction in gerrymandering and more equitable districts based on county, city, townships, etc. As a politician, it is your job to listen to ALL of your constituents and not be able to cherry pick certain geographic areas, because they fit the kind of constituency you desire."

# PART X. RECOMMENDATIONS

In light of our assessment of the new redistricting process so far, and our quantitative analysis of each of the Proposed maps, as of December 1, 2021, we issue a number of suggestions for consideration by the Commission as the redistricting process moves forward toward a final vote on adopted plans, at this point expected on December 30, 2021.

We stress that these are not final recommendations on the entirely of the redistricting process. Rather, we restrict our suggestions to recommendations that are actionable at that stage of the process -- before the Commission votes on adopting the official redistricting plans for 2022-2031, on December 30, 2021. We postpone a more comprehensive review of the entire redistricting process, with broader recommendations for 2030, to a Final Evaluative Report that we will conduct in 2022.

In the first version of this Report, made public on Oct. 18, 2021, we issued an earlier set of recommendations for consideration during the Second Round of Public Hearings, and up to the vote on Proposed plans on November 5. Those earlier recommendations are below, at the end of this section. We celebrate that the Proposed maps reflect much progress toward resolving many of the concerns expressed in those earlier recommendations.

The Commission fully addressed our first and third recommendations by resolving all the discrepancies between the population assigned to districts and the total population of Michigan, and resolved all of the contiguity violations as well, so that all the Proposed maps are complete redistricting plans with contiguous districts. It partially addressed our second recommendation, by revising the state legislative maps toward greater population equality. And it partially addressed our fourth recommendation by reassessing its approach toward compliance with the VRA in the Proposed plans for state House districts.

In the version 2.0 of this report, made public on Nov. 15, 2021, we suggested that if it were possible to revisit their decisions, the Commission could correct problems that unnecessarily reduce their compliance with constitutional criteria and increase their legal risk. We made two suggestions for immediate consideration. The first was to reduce population inequality in its Congressional maps. The current maps unnecessarily put the Commission at legal risk and reduce performance on the top constitutional criterion without any substantive gain. We noted that the task of reducing the deviations from population equality could be delegated or performed quickly by moving small border areas from districts with above-average population to neighboring districts with below-average population, and would not require substantial edits, nor focusing on controversial areas of prior maps.

Second, we suggested that the Commission should elevate Plan SD Kellom's state Senate map to the status of a Proposed map with equal standing with the collaborative ones, so that it can be considered in the initial round of voting without moving to a more complicated ranked choice procedure. It is currently the only state Senate map that uses a revised Voting Rights Act compliance strategy, matching the Commission's collaborative efforts in their state House maps. Not considering this map again exposes the Commission to unnecessary risk at not achieving its top criterion.

We also made —and we nor reiterate— the following recommendations for consideration during the final round of public hearings:

1. With regard to the maps for Congressional Districts, we recommend that the Commission not adopt Plan Apple V2 without considerable explication, as the other two Proposed plans perform better on most criteria. Given the better performance of Plan Chestnut over Plan Birch V2 on some criteria, and their similar performance across other criteria, we recommend that the Commission articulate why it would prefer Plan Birch V2 over Plan Chestnut, if it chooses to do so, as to justify the greater population inequality.

2. With regard to the maps for state Senate district, we recommend that the Commission consider individual commissioner Plan SD Kellom (#270) as an alternative. We believe that Plan SD Kellom #270's compliance with the Voting Rights Act is less controversial than the three collaborative Proposed Senate plans. Further, we find that Plan SD Kellom #270 scores better than Plan Cherry V2 or Plan Linden on many other measures of compliance with the criteria.

3. With regard to the maps for state House districts, we recommend that the Commission not adopt Plan Pine V5 without considerable explication, as Plan Magnolia and Plan Hickory comply with the Voting Rights Act in a manner that is less controversial and that reflects Black communities in and around Detroit. A possible concern with both Plan Magnolia and Plan Hickory is that they are outlier maps that deliver more seats to candidates of one party (the Democratic party) than maps drawn without partisan considerations, but mitigating this concern, Plan Magnolia and Plan Hickory perform well on most other notions of partisan fairness that aim for symmetry without regard to the geographic distribution of Democrats and Republicans.

4. We recommend that the Commission accompany the final adoption of a congressional Plan with a written memorandum justifying why the population inequality in the adopted plan is needed to fulfill the seven criteria spelled out in the Michigan Constitution.

5. We recommend that the Commission accompany the final adoption of each Plan with a written memorandum explaining how the adopted plan complies with the Voting Rights Act, and how it reflects specific communities of interest in the state of Michigan. Those explanations should explain not just which communities were protected in each plan, but why they selected those communities to protect among the many that were submitted by the Michigan public. Their explanation for Voting Rights Act compliance should include more than a target percentage of Black residents in each district, with attention to the non-racial considerations that drove their decisions.

6. We recommend that the Commission bear in mind that reflecting Communities of Interest is a high constitutional priority. We acknowledge that our measures of COI cluster inclusion were not those the Commission chose to maximize. We offer them as guides only because we lacked a Commission-approved list of COIs that they sought to protect. Some criteria for exclusion of COIs might include that they are too large to include in districts or that they reflect attempts by citizens to design their entire district, rather than submit a cohesive community that could be included within one district.

7. With regard to Partisan Fairness, we recommend that the Commission consider a broader set of accepted measures of partisan fairness, and in particular measures that Courts have used to rule on partisan gerrymandering cases.[62] We acknowledge that the Commission has selected some accepted measures of partisan fairness, those based on symmetry, and sought to draw fair maps. But we note that the maps may be challenged under notions of fairness based on neutrality, where maps are compared against maps drawn without partisan considerations.

8. We recommend that in considering public comments, the Commission keep its focus on constitutional criteria. The Commission does not need to adopt the maps that have the most positive overall public feedback if other maps would best meet its criteria.

We remain ready and able to assist the Commission in evaluating their maps on their own interpretations of the criteria or those offered by the public.

For completeness and archiving, here are the recommendations we made for consideration during the second round of public hearings.

1. Six of the 10 Draft plans appear to be incomplete, leaving some (small) populated geographic areas of Michigan unassigned to any district. While the size of the population excluded from any district is small —ranging from 13 inhabitants in one instance, to a maximum of 3,204 inhabitants without a district in two plans — it is imperative that these omissions be remedied. Further, any Proposed Plan must assign every geographic area to a district, and the MICRC should check that any plan satisfies this essential requisite before publishing it as a Proposed Plan. Further, the following discrepancies between total population assigned to districts (according to the MICRC's compliance sheet), and the total population in Michigan according to the 2020 Census, must be resolved and brought to zero for any Draft Map that advances to Proposed Map.

| Type of District | Codename | Total Pop. in all districts | Total Pop. in Michigan | Discrepancy |
|---|---|---|---|---|
| Congressional | Apple | 10,077,331 | 10,077,331 | 0 |
| Congressional | Birch | 10,077,306 | 10,077,331 | -25 |
| Congressional | Maple | 10,077,331 | 10,077,331 | 0 |
| Congressional | Juniper | 10,077,317 | 10,077,331 | -14 |
| State Senate | Elm | 10,080,132 | 10,077,331 | 2,801 |
| State Senate | Cherry | 10,075,385 | 10,077,331 | -1,946 |
| State Senate | Spruce | 10,079,459 | 10,077,331 | 2,128 |
| State House | Peach | 10,074,127 | 10,077,331 | -3,204 |
| State House | Oak | 10,075,381 | 10,077,331 | -1,950 |

---

[62] League of Women Voters v. Commonwealth, 178 A.3d 737 (Pa. 2018) in Pennsylvania and Common Cause v. Lewis, 358 F. Supp. 3d 505 (D.N.C. 2019) in North Carolina.

| State House | Pine | 10,077,356 | 10,077,331 | 25 |

Deficits in the Birch, Juniper, Cherry and Peach plans can be fully accounted by the unassigned census blocks (or parts thereof). Once these are assigned, the discrepancies will vanish to zero. Surpluses in the Elm and Spruce plans are harder to account for and raise questions about the quality of the data in the compliance sheet.

2. The population deviations from perfect equality may need justification. The population deviation in congressional maps is small. We recommend that in announcing a Proposed Plan, the Commission articulate in writing which appropriate state interest (such as better complying with any of the seven criteria) justifies maintaining the small population deviations across Congressional Districts. The population deviation in state legislative maps for the Michigan Senate and Michigan House are large, and they require further justification. It may be prudent to adjust these maps to reduce the population deviation across districts to levels closer to those in the congressional maps.

3. All three House plans feature small violations of contiguity: isolated census blocks are assigned to a different district than all the census blocks around them. We recommend that these violations of contiguity be fixed by reassigning each isolated census block to the district that surrounds it (or to any of the districts adjacent to them, if the isolated block is at a district boundary.)

4. The Draft plans pursue an unusual path to seek compliance with the VRA. They all appear to maximize the number of districts in which 35% to 49.5% of the Voting Age Population identifies as Black. Such outcome is accomplished, in large part, by breaking apart geographically compact Black majorities in the City of Detroit and dispersing them in less compact districts that radiate outward from the City of Detroit toward suburban parts of Macomb Co. and Oakland Co. As a result of this engineered partial dilution of the concentrated Black vote, the maps feature zero Black-majority districts (down from over a dozen in previous maps). An argument in support of this approach to comply with the VRA is an estimate that a bit less than 40% of Black Voting Age Population suffices for a district to be a "district of opportunity" for Black voters, so that a candidate preferred by this Black minority would prevail in the primary and in the general election. Yet this estimate is based on incomplete data, especially for primaries. If 35% suffices, the strength of the Black vote is elevated beyond proportionality to population and may separate non-Black suburban and rural populations from their representatives. If it turns out too low, the Black vote, stripped of its majorities in geographically compact areas in the City of Detroit, may not be able to elect its preferred candidates in many of the districts. Black leaders in Detroit have expressed concern about this scenario.[63] We recommend that the MICRC reevaluate its approach toward compliance with the VRA in light of these questions. Since primary data is largely unavailable, they need to assess whether their districts are likely to enable preferred candidates to win racially-polarized primary elections. If the MICRC decides that its approach toward compliance with the VRA is indeed optimal, we suggest that it accompany its maps with a justification of how the plans comply with the Voting Rights Act and with the related Equal Protection clause in the U.S. Constitution.

---

[63] https://www.freep.com/story/news/local/michigan/2021/10/12/detroit-officials-activists-decry-redistricting-maps/6056535001/

5. With regard to Communities of Interest, it is not clear whether the MICRC has followed a systematic way to choose among COIs, nor how the Draft plans reflect them. Some districts others appear to break apart communities.[64] In attempting to incorporate publicly submitted COIs, the Commission sometimes goes beyond its criteria to assess whether local residents like the people and places included in their districts. We recommend that the Commission focus on identifiable COIs within districts, not general comments about what areas should go with others. They can accompany any Proposed Map with an explanation of how the map reflects specific COIs, and how any splits were necessary. Reflecting communities of interest does not require creating fully homogenous districts. The congressional maps appear to lean in this direction, creating few competitive seats.

6. With regard to Partisan Fairness, we recommend that the Commission embrace a broader set of measures and take into account court rulings on partisan gerrymandering.[65] These determined that redistricting maps should be such that the partisan outcomes should not deviate greatly from the outcomes that we would expect under maps that did not take into account partisan considerations. Under this standard, a map may not always be better the closer to zero it brings symmetry measures such as the Efficiency Gap or the Lopsided Margin. Rather, a map is appropriate if its outcomes look normal, relative to what would happen under most maps drawn to satisfy other criteria. In this light, the maps proposed by the Commission perform well: they are not outliers, but within the normal range we would expect. From a symmetry standard, most maps tilt Republican; from a neutrality standard, most maps tilt Democratic. That means they go in the direction of symmetry from a neutral baseline (compared to maps that do not incorporate partisanship) and in the direction of neutrality from a symmetry baseline (compared to maps that were constructed to be exactly even in partisan outcomes).

7. In considering public comments, the Commission should keep its focus on their mapping criteria. General public comments about how well a citizen likes a district's shape or requests to maintain a district that excludes certain areas or types of people will be less helpful than those that point out how the Commission can meet its criteria. Where Communities of Interest can be identified, the public should point those out and should certainly expect the Commission to be responsive. But the Commission does not need to select maps that have the most positive overall public feedback if other maps would best meet its criteria. We remain ready and able to assist the Commission in evaluating their maps on their own interpretations of the criteria or those offered by the public.

These recommendations complete our interim report on Proposed Redistricting Plans for Michigan. A full Final Report will follow in 2022. We thank commissioners for their work on behalf of all citizens of Michigan, and we look forward to a final vote and to the adoption of Michigan electoral district plans for 2022-2031.

---

[64] For instance, the congressional Plan Apple splits the suburbs of Greater Grand Rapids, to form instead a narrow district connecting the urban core of Grand Rapids with Kalamazoo. Similar examples arise in Senate and House maps. Public complaints that districts split apart communities are discussed here: https://www.freep.com/story/news/local/michigan/detroit/2021/10/14/local-leaders-redistricting-commission-keep-communities-intact/6050257001/
[65] League of Women Voters v. Commonwealth, 178 A.3d 737 (Pa. 2018) in Pennsylvania and Common Cause v. Lewis, 358 F. Supp. 3d 505 (D.N.C. 2019) in North Carolina

# PART XI. MICHIGAN'S REDISTRICTING HISTORY

In Article 1, Section 2 of the United States Constitution, it is specified that every decade an enumeration, or census, of every free person in a state must be utilized to apportion members of congress into districts of at most thirty thousand people. The same magnitude of people within] a district was later implemented in 1964 in the Supreme Court Case *Reynolds v. Sims,* 377 U.S. 533 (1964) in the adoption of the 'One-Person, One-Vote Rule. This rule specified that states had to apportion their populations equally among their state senate districts.[66]

The first U.S. census was initiated in 1790.[67] The census was a way to permit the framers of the Constitution to prioritize the population, rather than monetary status or land ownership, within the context of political power distribution.[68] Their goals were to ensure the government could determine the population outlook to better strategize and govern in reflection of the people. The data collected from the census would then lead to a redistricting effort that would result in allocation of resources, benefits, and population knowledge.[69] The manner and execution of how this is conducted and how districts are to be apportioned are left to the states to decide.

The original Michigan Constitution of 1835 set forth its parameters on how to apportion districts for members of its state legislature, stipulating that the quantity of state Senate seats must equate to one third of the state House seats, and the State House should not exceed 100 seats and have a minimum of 48 seats. Then in the Michigan Constitution of 1850, 32 State Senate districts were set which are "representative of the population" and do not split the boundaries of any county. In the ratification of the 1908 Michigan Constitution the number of apportioned State House districts was set to 110 under the similar conditions to the State Senate except that their districts cannot split the boundaries of cities or townships. Only slight provisions were made in the most recently ratified Michigan Constitution of 1963, changing the amount of apportioned state Senate districts to 38 and adding the constraint that state House districts must be contiguous, or that all parts of the district must be adjacent to one another.[70]

In 2018, Michiganders took the drastic initiative to take power over the redistricting process and join only seven other states that utilize an independent commission to redistrict their congressional, state Senate, and state House districts for every census. It was an effort to redraw districts in the best interests of the people and not politicians or more specifically, a particular party. The initiative won 61% of the population's approval, achieving majorities within both Democratic and Republican counties.[71]

The next step is to achieve that shared vision for an improved redistricting process. The Commission has the power to improve its maps, following the criteria outlined in the Constitution. We are pleased to continue assisting in that effort to improve democracy.

---

[66] https://supreme.justia.com/cases/federal/us/377/533/
[67] https://www.census.gov/history/www/faqs/demographic_faqs/when_was_the_first_census_in_the_united_states.html
[68] https://www.census.gov/programs-surveys/decennial-census/about/why.html
[69] https://www.census.gov/programs-surveys/decennial-census/about/why.html
[70] http://www.legislature.mi.gov/(S(3as5j3btq3hebs3e5vyet0xc))/mileg.aspx?page=getObject&objectName=mcl-Constitution
[71] https://www.brennancenter.org/our-work/analysis-opinion/attack-michigans-independent-redistricting-commission

**Plaintiffs' Districts Demonstrative**

| Plaintiff Name | House District Challenged | Senate District Challenged | Count(s) |
|---|---|---|---|
| Donald Agee, Jr. | 2 | 1 | I, II, III, IV |
| Jerome Bennett[1] | 14 | 10 | I, II, III, IV |
| Dennis Leroy Black, Jr. | 13 | 10 | I, II, III, IV |
| Jamee Burbridge | 14 | 10 | I, II, III, IV |
| Beverly Ann Burrell | 8 | 1 | I, II, III, IV |
| Jemell Cotton | 10 | 3 | I, II, III, IV |
| Teresa DuBose | | 10 | II, IV |
| Karen Ferguson | 7 | 8 | I, II, III, IV |
| Michelle Keeble | | 6 | II, IV |
| Kimberly Hill Knott | 7 | 8 | I, II, III, IV |
| Barbara Gail London | 12 | 11 | I, II, III, IV |
| Norma McDaniel | 26 | 5 | I, II, III, IV |
| Glenda McDonald | 8 | 3 | I, II, III, IV |

---

[1] At the time of the First Amended Complaint, Plaintiff Jerome Bennett resided in House District 13 and Senate District 10. Thereafter, Bennett then changed his residence. His new residence falls within House District 14, though his Senate District remains unchanged. This information was provided to Defendants as part of Bennett's Responses to the Commission's First Set of Interrogatories. ECF.49, PageID.528. But this change does not alter the challenged Districts asserted in Plaintiffs' First Amended Complaint. ECF.8, PageID.88–107. Plaintiffs Jamee Burbridge and Tanesha Wilson were already challenging House District 14 under both the VRA and Equal Protection Clause. Plaintiff Dennis Leroy Black, Jr., was already challenging House District 13 under both the VRA and Equal Protection Clause.

| | | | |
|---|---|---|---|
| Janet Marie Overall | 1 | 1 | I, II, III, IV |
| Shirley L. Radden | 10 | | I, III |
| Davonte Sherard | 2 | 1 | I, II, III, IV |
| Michelle T. Smith | | 6 | II, IV |
| Kenyetta Snapp | 11 | | I, III |
| Donyale Stephen-Atara | 14 | 10 | III, IV |
| Tanesha Wilson | 14 | 10 | I, II, III, IV |

2

## Handley Table 4, Reconfigured

| BVAP | Type | District | Winner | Winner Race | Unopposed | Incumbent | # Black opponents | # White opponents | Handley Polarization? | Black CoC Lose? |
|---|---|---|---|---|---|---|---|---|---|---|
| 0.572 | House | 4 | Whitsett | Black | - | x | 1 | 1 | x | - |
| 0.569 | House | 5 | Price | White | - | - | 3 | 1 | x | x |
| 0.565 | House | 6 | Weiss | White | - | x | 2 | 1 | - | - |
| 0.565 | House | 16 | Young | Black | - | x | 1 | 1 | - | - |
| 0.540 | House | 18 | Hoskins | Black | - | - | 2 | - | - | - |
| 0.532 | House | 9 | Aiyash | ME | - | x | 4 | - | - | - |
| 0.465 | Senate | 7 | Moss | White | - | x | 1 | - | - | - |
| 0.463 | Congress | 13 | Thanedar | Asian | - | - | 7 | - | - | - |
| 0.459 | House | 7 | Scott | Black | - | x | - | 2 | x | - |
| 0.457 | House | 8 | McFall | White | - | - | 1+ | 1+ | x | x |
| 0.453 | Congress | 12 | Tlaib | ME | - | x | 3 | - | - | - |
| 0.440 | House | 11 | Paiz | Hispanic | - | - | Several | Several | x | x |
| 0.440 | House | 17 | Pohutsky | White | x | x | - | - | - | - |
| 0.437 | Senate | 3 | Chang | Asian | - | x | x | - | - | - |
| 0.427 | House | 14 | McKinney | Black | - | - | - | 2 | x | - |
| 0.426 | House | 12 | Edwards | Black | - | - | - | 1 | x | - |
| 0.417 | Senate | 10 | Wojno | White | x | x | - | - | - | - |
| 0.416 | Senate | 8 | McMorrow | White | - | x | 1 | - | x | x |
| 0.406 | Senate | 6 | Cavanagh | Hispanic | - | - | 1 | 1 | - | - |
| 0.402 | House | 10 | Tate | Black | - | x | 1 | - | - | - |
| 0.398 | House | 13 | Stone | White | - | x | 1 | - | - | - |
| 0.397 | House | 1 | Carter | Black | - | x | - | 1 | - | - |
| 0.378 | House | 26 | Wegela | White | - | - | 2 | 1 | x | x |
| 0.366 | Senate | 1 | Geiss | Black | - | x | - | 1 | x | x |
| 0.343 | House | 53 | Carter | Black | x | x | - | - | - | - |
| 0.340 | House | 3 | Farhat | ME | - | - | - | - | - | - |
| 0.255 | Senate | 2 | Santana | Black | - | x | 1 | - | - | - |

## Handley Table 4, Reconfigured, No Incumbents

| BVAP | Type | District | Winner | Winner Race | Unopposed | # Black opponents | # White opponents | Handley Polarization? | Black CoC Lose? |
|---|---|---|---|---|---|---|---|---|---|
| 0.569 | House | 5 | Price | White | - | 3 | 1 | x | x |
| 0.540 | House | 18 | Hoskins | Black | - | 2 | - | - | - |
| 0.463 | Congress | 13 | Thanedar | Asian | - | 7 | - | - | - |
| 0.457 | House | 8 | McFall | White | - | 1+ | 1+ | x | x |
| 0.440 | House | 11 | Paiz | Hispanic | - | Several | Several | x | x |
| 0.427 | House | 14 | McKinney | Black | - | - | 2 | x | - |
| 0.426 | House | 12 | Edwards | Black | - | - | 1 | x | - |
| 0.406 | Senate | 6 | Cavanagh | Hispanic | - | 1 | 1 | - | - |
| 0.378 | House | 26 | Wegela | White | - | 2 | 1 | x | x |
| 0.340 | House | 3 | Farhat | ME | - | - | - | - | - |