## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| DONALD AGEE, JR., an individual, *et al.*, | |
| | Case No. 1:22-cv-00272 |
| Plaintiffs, | |
| | **Three-Judge Panel Appointed Pursuant to 28 U.S.C. § 2284(a)** |
| v. | |
| | **ORAL ARGUMENT REQUESTED** |
| JOCELYN BENSON, in her official capacity as the Secretary of State of Michigan, *et al.*; | |
| Defendants. | |

## PLAINTIFFS' BRIEF IN OPPOSITION TO THE COMMISSION DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INDEX OF AUTHORITIES ......................................................................... iii

CONCISE COUNTER-STATEMENT OF ISSUES PRESENTED ............................ vi

COUNTER-STATEMENT OF CONTROLLING OR MOST
    APPROPRIATE AUTHORITY ........................................................... vii

I.     INTRODUCTION ........................................................................ 1

II.    ARGUMENT .............................................................................. 2

    A.    The Court has jurisdiction to consider Plaintiffs' challenge
        to House District 13 ...................................................................... 2

    B.    Res Judicata does not bar Plaintiffs' challenges to House
        District 26 or Senate District 5. .................................................. 4

    C.    Summary judgment is proper as to Counts I and II
        because the Districts deny Plaintiffs their protected right
        under the VRA to elect their candidate of choice. .................................. 8

        1.    Plaintiffs are entitled to summary judgment on the
            first *Gingles* precondition. ................................................. 8

        2.    Plaintiffs are entitled to summary judgment on the
            second and third *Gingles* preconditions. ....................................... 14

        3.    Plaintiffs are entitled to summary judgment under
            the totality of the circumstances. ............................................... 31

    D.    Summary judgment is proper as to Counts III and IV
        because the Commission created the Districts with race as
        the predominant consideration in violation of the Equal
        Protection Clause. ...................................................................... 31

III.   CONCLUSION .......................................................................... 36

CERTIFICATE OF COMPLIANCE ........................................................... 39

CERTIFICATE OF SERVICE .................................................................. 40

# INDEX OF AUTHORITIES

## **CASES**

*Abbott v. Perez,*
138 S. Ct. 2305 (2018) .................................................................. 9, 10, 11, 12

*Adair v. State,*
680 N.W.2d 386 (Mich. 2004) ................................................................ 4

*Baldus v. Members of Wisconsin Gov't Accountability Bd.,*
849 F. Supp. 2d 840 (E.D. Wis. 2012) .......................................................... vi

*Baraga Co. v. State Tax Comm.,*
645 N.W.2d 13 (Mich. 2002) ................................................................. 4

*Bartlett v. Strickland,*
556 U.S. 1 (2009) ............................................................................ 8

*Bethune-Hill v. Virginia State Bd. of Elections,*
580 U.S. 178 (2017) ......................................................................... 32

*Black Pol. Task Force v. Galvin,*
300 F. Supp. 2d 291 (D. Mass. 2004) ............................................... 9, 17, 22

*Bone Shirt v. Hazeltine,*
461 F.3d 1011 (8th Cir. 2006) ........................................................... 11, 14

*Cooper v. Harris,*
581 U.S. 285 (2017) ......................................................................... 33

*Detroit Caucus v. Indep. Citizens Redistricting Comm'n,*
969 N.W.2d 331 (Mich. 2022) ........................................................ 4, 5, 6, 7

*Dickinson v. Ind. State Election Bd.,*
933 F.2d 497 (7th Cir. 1991) ................................................................ 11

*Duncan v. Michigan,*
832 N.W.2d 761 (Mich. App. 2013) .......................................................... 7

*Gillespie v. First Interstate Bank of Wisconsin,*
717 F. Supp. 649 (E.D.Wis.1989) ............................................................ 3

*Harding v. County of Dallas, Texas,*
948 F.3d 302 (5th Cir. 2020) ............................................................... 10

*Hays v. State of La.*,
936 F. Supp. 360 (W.D. La. 1996) ................................................................... 33

*Hoffman v. Silverthorn*,
100 N.W. 183 (Mich. 1904) ........................................................................ 7

*Johnson v. De Grandy*,
512 U.S. 997 (1994) ................................................................................... 5

*Kremer v. Chem. Constr. Corp.*,
456 U.S. 461 (1982) ................................................................................... 6

*Lab. Council, Michigan Fraternal Ord. of Police v. Detroit*,
525 N.W.2d 509 (Mich. App. 1994) ........................................................... 8

*Lamkin v. Hamburg Twp. Bd. of Trustees*,
899 N.W.2d 408 (Mich. App. 2017) ........................................................... 7

*League of United Latin Am. Citizens v. Perry*,
548 U.S. 399 (2006) ................................................................................. 10

*Newman-Green, Inc. v. Alfonzo-Larrain*,
490 U.S. 826 (1989) ................................................................................... 2

*Pope v. Cnty. of Albany*,
687 F.3d 565 (2d Cir. 2012) ............................................................... 11, 21

*Reich v. State*,
204 N.W.2d 226 (Mich. App.1972) ........................................................... 7

*Rural W. Tennessee Afr.-Am. Affs. Council v. Sundquist*,
209 F.3d 835 (6th Cir. 2000) ............................................................... 16, 17

*Salisbury v. Detroit*,
249 N.W. 841 (Mich. 1933) ........................................................................ 7

*Shaw v. Hunt*,
517 U.S. 899 (1996) ............................................................................... 2, 33

*Storey v. Meijer, Inc.*,
429 N.W.2d 169 (Mich. 1988) .................................................................... 4

*Thornburg v. Gingles*,
478 U.S. 30 (1986) ........................................................................... passim

*UBS Securities, Inc. v. Tsoukanelis*,
852 F. Supp. 244 (S.D.N.Y.1994) .............................................................. 3

*United States v. Eastpointe*,
378 F. Supp. 3d 589 (E.D. Mich. 2019) ............................................................. passim

*United States v. Hays*,
515 U.S. 737 (1995) ........................................................................................... 2

*Uno v. City of Holyoke*,
72 F.3d 973 (1st Cir. 1995) ............................................................................... 20

## OTHER AUTHORITIES

Bankole,
*Democrats in Lansing have misplaced priorities*, The Detroit News
(May 10, 2023) .................................................................................................. 29

Bankole, *Democrats cater to unions at expense of Black issues*,
The Detroit News (Mar. 19, 2023) ................................................................... 30

Bankole, *Whitmer, Dems ignore Highland Park water crisis*,
The Detroit News (Apr. 12, 2023) .................................................................... 30

## RULES

Fed. R. Civ. P. 15(a)(2) ....................................................................................... 3

Fed. R. Civ. P. 15(b)(2) ....................................................................................... 3

MCR 2.502 ........................................................................................................... 7

MCR 7.306 ........................................................................................................... 4

## CONSTITUTIONAL PROVISIONS

Const. 1963, art. 4, § 6 ....................................................................................... 5

## CONCISE COUNTER-STATEMENT OF ISSUES PRESENTED

The government cannot "deprive a minority group of one majority-minority district and substitute for that two influence districts" because Section 2 of the Voting Rights Act provides minority groups "assurance that a bird in the hand really is better than two in the bush even though everyone realizes that a good hunter might actually snare both of the latter." *Baldus v. Members of Wisconsin Gov't Accountability Bd.*, 849 F. Supp. 2d 840, 857 (E.D. Wis. 2012). Yet that is precisely the tradeoff the Michigan Independent Citizens Redistricting Commission made here when it reduced Black-majority Senate districts in the Detroit area from two to zero and Black-majority House districts from ten to six in favor of Black "influence" districts that did not have Black majorities and forced Black metro Detroit candidates to campaign in white suburbs where they are ignored at best and discriminated against at worst.

The predictable result was that Michigan's Legislative Black Caucus was decimated in the 2022 elections, losing 20% of its members with more losses to come when term limits or life circumstances cause incumbent Black legislators to leave their offices. And Defendants selected that course despite vociferous objections from Black voters and the Commission chairwoman. Instead, Defendants chose to approve maps that can only be explained by race-conscious quotas that the Commission's counsel demanded. This context frames two questions presented for the panel's resolution:

1.      Whether Plaintiffs are entitled to summary judgment on their claims that Defendants' redistricting maps violated the Voting Rights Act by diluting Black voters' ability to select their candidates of choice (Counts I and II).

2.      Whether Plaintiffs are entitled to summary judgment on their Equal Protection claims (Counts III and IV) where the evidence shows that Defendants drew their redistricting maps using racial quotas or with race as a predominating purpose.

## <u>COUNTER-STATEMENT OF CONTROLLING OR MOST APPROPRIATE AUTHORITY</u>

**VRA violation:**

- *Thornburg v. Gingles*, 478 U.S. 30 (1986)
- *Bartlett v. Strickland*, 556 U.S. 1 (2009)
- *Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. 178 (2017)
- *Black Pol. Task Force v. Galvin*, 300 F.Supp.2d 291 (D. Mass. 2004)
- *Pope v. County of Albany*, 94 F.Supp.3d 302 (N.D.N.Y. 2015)
- *Baldus v. Members of Wisconsin Gov't Accountability Bd.*, 849 F.Supp.2d 840 (E.D. Wis. 2012)
- *Bone Shirt v. Hazeltine*, 461 F.3d 1011 (8th Cir. 2006)
- *United States v. Eastpointe*, 378 F.Supp.3d 589 (E.D. Mich. 2019)

**Equal Protection violation:**

- *Miller v. Johnson*, 515 U.S. 900 (1995)
- *Shaw v. Reno*, 509 U.S. 630 (1993)
- *Cooper v. Harris*, 581 U.S. 285 (2017)

## I.    INTRODUCTION

The Parties agree on many things. The Commission Defendants agree with Plaintiffs that there are good reasons to conclude that "all the *Gingles* preconditions are met." Comm'n.Br.29, PageID.666 (cleaned up). "It is undisputed that many majority-minority districts can be created in [southeast Michigan] in house and senate plans," *id.*, and "Detroit-area voting exhibits sufficient racial polarization that white bloc voting would usually defeat Black-preferred candidates," *id.* The Commission also agrees that a VRA § 2 "claim could be made out of the totality of the circumstances" based on the "ongoing effects of past discrimination." *Id.* at 29-30, PageID.666-67. Finally, the Commission agrees that the parties' "quarrels" are largely "legal, not factual," making summary judgment appropriate. *Id.* at 31, PageID.668.

Where the Commission Defendants go awry is their reliance on an experimental theory that "white crossover voting can facilitate equal Black opportunity without majority-minority districts" in southeast Michigan. Comm'n.Br.2, PageID.639. Indeed, that's the Commission's entire defense (which shows that this is a summary judgment question). *E.g.*, *id.* at 1-2 (PageID.638-39), 7 (PageID.644), 18-20 (PageID.655-657), 22 (PageID.659), 28 (PageID.665), 31-33 (PageID.669-70).  That theory is the product of non-probative election results, such as those involving non-Black candidates of choice or incumbency. The most probative primary elections—bi-racial primaries that do not feature incumbents, Pls'.SJBr.18-20, PageID.599-600—show that such crossover is highly unlikely, as demonstrated by the precipitous 20% decline in Michigan's Black Legislative Caucus in the first

1

election using the Commission's new maps, resulting in a 30% proportionality deficit in Black legislative representation. Plaintiffs are entitled to summary judgment.

## II.   ARGUMENT

### A.   The Court has jurisdiction to consider Plaintiffs' challenge to House District 13.

For vote dilution and racial gerrymandering claims, standing exists where a plaintiff resides in the specific challenged district or where the plaintiff has "personally been subjected to racial classification." *United States v. Hays*, 515 U.S. 737, 745 (1995); *accord Shaw v. Hunt*, 517 U.S. 899, 904 (1996). "The existence of federal jurisdiction ordinarily depends on the facts as they exist *when the complaint is filed.*" *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 830 (1989) (emphasis added).

Plaintiffs Bennett and Black established standing to challenge HD13 when Plaintiffs filed their First Amended Complaint because both resided there at that time. PageID.89-90. These Plaintiffs and all Black voters in HD13 were subjected to the Commission's racial classification through its drawing of HD13. As Plaintiffs' expert, Mr. Trende, explained it: "[T]he racial intent is clear." Defendants do not dispute that District 13 "stop[s] abruptly before reaching the more diverse center of downtown Detroit." Trende.Report.48, J.A.355. Moreover, Plaintiff Black only recently and temporarily moved to HD13, located in Hamtramck. And it is inevitable that he will move back to the City of Detroit and HD13, as his two most recent residences are both within this district and he has resided in Detroit for an overwhelming majority of his life. Black.Aff.¶¶8-9, Exhibit A.

2

At a minimum, Plaintiffs should be granted leave to file an amended complaint to conform to the evidence such that Plaintiff Black can challenge HD9 instead. Federal Rule of Civil Procedure 15(a)(2) allows a party to amend its complaint by consent or by leave of court, and the "court should freely give leave when justice so requires." Moreover, under Rule 15(b)(2), a party "at any time" may "amend the pleadings to conform them to the evidence and to raise an unpleaded issue."

Where the opposing party does not provide consent, courts evaluate multiple factors in deciding to grant leave. First, they consider possible prejudice to the opposing party. *UBS Securities, Inc. v. Tsoukanelis*, 852 F. Supp. 244, 247 (S.D.N.Y.1994). Second, they evaluate whether further discovery is required. *Id*. And third, they ask whether the opposing party did not object to the insertion of the issue into the proceedings. *Gillespie v. First Interstate Bank of Wisconsin*, 717 F. Supp. 649, 653 (E.D.Wis.1989).

Even if the Commission Defendants do not consent to an amendment, the Court should grant leave to amend. Plaintiff Black is already a named Plaintiff to this action that challenges the immediately surrounding House Districts. And no further discovery would be required, as experts on both sides have already analyzed HD9 relative to the claims due to its proximity to the other challenged House Districts. Trende.Report.17-18, 23-24, 31, 34, 40-45, 48, J.A.324-25, 330-31, 338, 341, 347-52, 355; 2023.Handley.Report.4, 9, 11, 81, 85, 106, 113, J.A.4, 9, 11, 81, 85, 106, 113. Accordingly, amendment is appropriate if necessary.

**B.     Res Judicata does not bar Plaintiffs' challenges to House District 26 or Senate District 5.**

"The doctrine of collateral estoppel must be applied so as to strike a balance between the need to eliminate repetitious and needless litigation and the interest in affording litigants a full and fair adjudication of the issues involved in their claims." *Storey v. Meijer, Inc.*, 429 N.W.2d 169, 171 (Mich. 1988) (citation omitted). As the party asserting res judicata, the Commission bears the burden of proving that the doctrine bars Plaintiff Norma McDaniel's challenges to HD26 and SD5. *Baraga Co. v. State Tax Comm.*, 645 N.W.2d 13, 16 (Mich. 2002). For five reasons, the Commission cannot satisfy that burden.

1. Res judicata applies under Michigan law only if "the prior action was decided on the merits." Comm'n.Br.14, PageID.651 (quoting *Adair v. State*, 680 N.W.2d 386, 396 (Mich. 2004)). And the Michigan Supreme Court's summary decision in *Detroit Caucus v. Indep. Citizens Redistricting Comm'n*, 969 N.W.2d 331, (Mich.), reconsideration denied, 969 N.W.2d 515 (2022), was not a merits decision. The Michigan Supreme Court, in a 4-3 decision, *declined* to address the merits of the Detroit Caucus's sole VRA claim. *Id.* 334 n.3 ("It is not at all unusual for this Court to dismiss an original action brought under MCR 7.306 without further proceedings"). As dissenting Justices Zahra, Viviano, and Bernstein explained—and the majority did not dispute—the dismissal was made "without *any* analysis of whether plaintiffs have stated a claim" or giving the Caucus "any opportunity for further factual development if they ha[d] stated a claim." *Id.* at 335.  The majority summarily rejected the case "because plaintiffs failed to present sufficient evidence at this

4

threshold stage of the case—something neither common practice nor our court rules required them to do." *Id.* at 335.

In so doing, the majority engaged in a "completely unprecedented" process that did not "accord with any notion of fair play" and "will do much to undermine the public's confidence that this Court will take seriously original complaints filed in our Court under Const. 1963, art. 4, § 6." *Id.* at 341-42 (Zahra, Viviano, and Bernstein, JJ., dissenting). The majority provided no advance notice as to how the case would be adjudicated; the Commission did not even move to dismiss the Caucus's claim. *Id.* at 335-40. The majority neither accepted the Caucus's factual allegations as true nor conducted any analysis of whether those allegations satisfied the *Gingles* preconditions or totality of the circumstances. *Id.* Nor did the majority say it was dismissing with prejudice.

In *Johnson v. De Grandy*, 512 U.S. 997, 1004-06 (1994), the U.S. Supreme Court declined to give res judicata effect to a similar state supreme court ruling. There, the Florida Supreme Court did more than the Michigan Supreme Court by at least accepting "evidentiary submissions." *Id.* at 1005. But, as in *Detroit Caucus*, the Florida Supreme Court failed "to conduct the complete factual analysis contemplated by the Voting Rights Act," *id.*, comprised of the three *Gingles* factors and the totality of the circumstances, as the Florida Supreme Court acknowledged. *Id.* Accordingly, the U.S. Supreme Court ruled, "the plaintiffs [we]re free to litigate in any court with jurisdiction," including a federal forum. *Id.* Just like *De Grandy*, res judicata does not apply here, either.

2. For a federal court to grant full faith and credit to a state court judgment, state proceedings must "satisfy the minimum procedural requirements of the Fourteenth Amendment's Due Process Clause." *Kremer v. Chem. Constr. Corp*., 456 U.S. 461, 481 (1982). In *Detroit Caucus*, the Michigan Supreme Court majority faulted the Caucus for purportedly failing to present sufficient evidence at the outset, something the court "never requested or required [the plaintiffs] to present (and that would never be presented at this stage in any [Michigan] trial court)." 969 N.W.2d at 334-35, 339 (Zahra, Viviano, and Bernstein, J.J., dissenting). The majority relied heavily on statements made at an expedited oral argument by the Caucus's legal counsel, who was attempting to explain that the Commission's cracking of the Detroit area's Black population was such an obvious VRA violation that discovery and expert testimony were unnecessary. *Id*. at 332. That "admission" was not dispositive, as the dissenting Justices noted:

> While plaintiffs did not specify at oral argument the precise pieces of evidence they would submit, their counsel nonetheless observed that their filing of the complaint and brief did not waive their opportunity for factual development in this case. Plaintiffs' counsel at argument actually invited the Court to appoint an expert. And while he said he did not think further factual development was necessary for plaintiffs to prevail, he said that plaintiffs would welcome the opportunity for further factual development. The majority makes much of counsel's assertion that plaintiffs had presented enough information to prevail. But is this so damning? Was the only way for plaintiffs to obtain factual development for their counsel to concede that their claim, on the record presently presented, lacked factual support? Requiring such an admission is patently unfair, given the fact that our court rule placed plaintiffs in a precarious position: it was unclear to them—as it was unclear to us before the present majority order—whether this Court would reject a claim at the pleading stage for failure to adduce sufficient proof. [*Id*. at 340 n.36.]

The procedural irregularities and lack of a fair opportunity for the *Detroit Caucus* plaintiffs to present their evidence did not satisfy the Fourteenth Amendment's minimal due-process requirements. *Lamkin v. Hamburg Twp. Bd. of Trustees*, 899 N.W.2d 408, 411 (Mich. App. 2017).

3. Michigan law requires the same result. While there is no directly analogous case, the Michigan Supreme Court's disposal of *Detroit Caucus* without any merits analysis must be (a) a dismissal for failure to prosecute, (b) a dismissal for procedural shortcoming, or (c) a dismissal based on the exercise of discretion. In Michigan, such dismissals are not on the merits and have no preclusive effect.

First, "[a] judgment is not final if it merely disposes of the proceedings because of a procedural shortcoming." 6A Mich. Pl. & Pr. § 42:129 (2d ed.) (*citing Reich v. State*, 204 N.W.2d 226, 229 (Mich. App.1972)). Second, the Michigan Court Rules specify that dismissals for lack of progress are without prejudice and therefore not res judicata. MCR 2.502. Third, the Michigan Supreme Court's exercise of discretion in refusing to grant relief is not a "merits" ruling. *Salisbury v. Detroit*, 249 N.W. 841, 841-42 (Mich. 1933); *Hoffman v. Silverthorn*, 100 N.W. 183, 185 (Mich. 1904).

4. "[T]he purpose of res judicata is to prevent inconsistent decisions, conserve judicial resources, and protect vindicated parties from vexatious litigation." *Duncan v. Michigan*, 832 N.W.2d 761, 771 (Mich. App. 2013). None of those purposes are advanced by depriving Plaintiff Norma McDaniel a fair opportunity to have her claims adjudicated here. Because the Michigan Supreme Court did not decide the merit of her VRA claim, there is no risk of an inconsistent judgment. This panel will

necessarily render a final opinion regarding the other Plaintiffs' claims, so conservation of judicial resources is not at issue. And based on the Commission Defendants' admissions, this litigation is hardly vexatious.

5. Finally, the Commission did not publicly disclose Chairwoman's Szetela's dissenting report until July 21, 2022, nearly five and half months after the Michigan Supreme Court dismissed *Detroit Caucus*. That critical party admission describes the recklessness of the Commission's dilution of Black-voting strength and the intentional use of race. Furthermore, neither the *Detroit Caucus* Plaintiffs nor the Michigan Supreme Court had the benefit of the 2022 Democratic Primary Elections which show that the challenged districts have failed and will continue to fail to provide Black voters an opportunity to elect their candidates of choice. Such new facts render res judicata inapplicable as a matter of law. *Lab. Council, Michigan Fraternal Ord. of Police v. Detroit*, 525 N.W.2d 509, 511 (Mich. App. 1994).

**C.    Summary judgment is proper as to Counts I and II because the Districts deny Plaintiffs their protected right under the VRA to elect their candidate of choice.**

**1.    Plaintiffs are entitled to summary judgment on the first *Gingles* precondition.**

The first *Gingles* precondition is not difficult to satisfy. It merely asks whether a minority group *could* make up "more than 50 percent of the voting-age population in the relevant geographic area," *Bartlett v. Strickland*, 556 U.S. 1, 18 (2009)—or in this case, in more VRA-compliant Senate and House districts than the Commission included in its Linden and Hickory plans. Typically, this precondition is satisfied if plaintiffs can create an illustrative plan, using traditional redistricting principles,

that demonstrate the *possibility* of creating the threshold number of majority-minority districts. *Black Pol. Task Force v. Galvin*, 300 F. Supp. 2d 291, 299 (D. Mass. 2004) (Selya, J.); *United States v. Eastpointe*, 378 F. Supp. 3d 589, 602 (E.D. Mich. 2019). Here, Plaintiffs' expert, Mr. Trende, drew demonstration maps showing that far more majority-minority districts could be reasonably drawn than in Defendants' Linden and Hickory plans. Pls'.SJBr.11-13, PageID.592-594.

The Commission does not dispute that these "majority-minority districts can be created in this region in house and senate plans." Comm'n.Br.29, PageID.666 (citing Trende.Report.22, 81-82). That alone shows Plaintiffs are entitled to partial summary judgment on *Gingles* precondition one. Instead, the Commission Defendants cite *Abbott v. Perez*, 138 S. Ct. 2305, 2333 (2018), and say that Plaintiffs must not only show *possible* majority-minority districts but must also prove at this stage that those districts will "perform" for Black voters. Comm'n.Br.16, PageID.653.

This is a grotesque distortion of *Perez*. Had the Supreme Court substantially redefined the scope of *Gingles*' first precondition by extending plaintiffs' burdens beyond simple demonstrations of numerosity and compactness, it would have done so expressly. Unsurprisingly, in the cited portion of *Perez*, the Court was *not analyzing the first precondition at all* but rather the "ultimate question" of a VRA § 2 dilution claim: "whether a districting decision dilutes the votes of minority voters." *Id.* at 2332.

With respect to the two Latino-majority districts the plaintiff claimed the VRA required in *Perez*, "one performed for Latinos in only 7 out of 35 relevant elections, and the other did so in *none* of the 35 elections." *Id.* Plaintiffs here wholeheartedly

endorse the suggestion that such poor performances in districts demonstrate that VRA districts do not perform. That is what happened in many of the Linden and Hickory districts in 2022, and that is why Plaintiffs are entitled to summary judgment. But the *Perez* Court said nothing about the first *Gingles* precondition in this discussion. In fact, when the *Perez* Court *did* address the first *Gingles* precondition, it required plaintiffs to show only a "*possibility* of creating more than the existing number of reasonably compact' opportunity districts." *Id.* at 2331 (emphasis added, quoting *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 430 (2006)).

The Commission Defendants' other case, *Harding v. County of Dallas, Texas*, 948 F.3d 302 (5th Cir. 2020), Comm'n.Br.16-17, PageID.653-54, fares no better. In the portions of the opinion that the Commission cites, the court was once again *not* analyzing the first *Gingles* precondition. Rather, the court was again concerned with the ultimate question of whether "minority voters [ ] have the potential to elect another candidate of their choosing." *Id.* at 310. The Fifth Circuit did not disturb the "able district court" in its conclusion "that Plaintiffs satisfied the first prong of *Gingles*—the Anglo minority group was large and compact." *Id.* at 309.

The Commission Defendants ignore on-point caselaw rejecting this flawed argument involving the Commission's own expert, Dr. Handley. In the *Eastpointe* case, the district court explained that "[s]atisfying the first *Gingles* precondition typically requires submitting a hypothetical redistricting plan that includes an electoral district with a greater-than-50-percent voting age minority population. 378

10

F. Supp. 3d at 602 (citation omitted). *Accord, e.g., Pope v. Cnty. of Albany*, 687 F.3d 565, 576 (2d Cir. 2012) ("the first *Gingles* question is straightforward and statistical: does the identified minority group form at least a simple majority of the relevant population in the proposed district?").

The *Eastpointe* court further explained that "[t]he ultimate end of the first *Gingles* precondition is to prove that a solution is possible, and not necessarily to present the final solution to the problem." *Id.* at 603 (quoting *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1019 (8th Cir. 2006). That is why, the Court elaborated, "the Supreme Court at this stage requires *only* that the government establish black voters *could be* a 'simple majority' of voters in a single-member district." *Id.* at 603-04 (emphasis added, quoting *Dickinson v. Ind. State Election Bd.*, 933 F.2d 497, 503 (7th Cir. 1991), itself citing *Gingles*, 478 U.S. at 50-51) (emphasis supplied).

The *Eastpointe* court then found the first *Gingles* precondition satisfied by Dr. Handley's creation of "an illustrative four-district plan" that included one district with a BVAP majority. 378 F.Supp.3d at 602-03. That court elaborated: "efficacy of the illustrative redistricting plan," is *not* a factor "to be considered in assessing whether the [plaintiff] has met the first *Gingles* precondition." *Id.* at 603. If Dr. Handley's illustrative map was sufficient in *Eastpointe*, then so is Mr. Trende's illustrative map here.

Yet there's more. Like the Commission Defendants, the *Eastpointe* defendants cited *Perez* for the exact same "prove it works" proposition for *Gingles* precondition one. But the *Eastpointe* court did not read *Perez* "to expand the first *Gingles*

preconditions to require that a plaintiff prove the proposed illustrative redistricting plan *would* enhance the ability of minority voters to elect their preferred candidates." 378 F. Supp. 3d at 604 (emphasis added). In the context of discussing plaintiffs' burden of proof on the merits, the "Supreme Court [in *Perez*] was not specifically discussing the first *Gingles* precondition." *Id.*

The panel can quicky dispense with the Commission Defendants' alternative arguments. Defendants' first backup argument is that Plaintiffs lack evidence that "Mr. Trende's plans will *outperform* the Linden and Hickory plans." Comm'n.Br.18, PageID.655. As a threshold matter, Mr. Trende's plans contain five Senate districts where Black adults constitute a majority of the population, as opposed to the Commission's zero. Since there are at most five VRA-protected senate districts in the Detroit area, it is unclear how Mr. Trende's map could *not* perform better there. But as just discussed, that's not Plaintiffs' burden under *Gingles*' first precondition; the only requirement is to show that drawing majority-minority districts is *possible*. And it is offensive to Black voters for the Commission to suggest that the Linden and Hickory plans—which reduced Michigan's Black Legislative Caucus by a staggering 20%—delivered *more* success for Black voters than they could expect under alternative plans. Comm'n.Br.19-20, PageID.656-57.

The Commission Defendants' second backup argument is that HD2, SD5, and SD11 "cannot reasonably be redrawn as majority-minority districts." Comm'n.Br.20, PageID.657. That misses the point of the first *Gingles* precondition: the requirement is to demonstrate that it is possible to draw majority-minority districts, not to show

that those hypothetical districts can be crammed into a particular configuration. Moreover, just because each of these districts "occupies territory that is not embraced by a majority-minority district in Mr. Trende's demonstrative configurations," Comm'nBr.21, PageID.658, does not mean they could never be.

For example, in creating SD11, the Commission split off the majority-Black population of northeast Detroit and Eastpointe and combined it with the majority-white population of Macomb County. This disenfranchised Black voters from Detroit, like Plaintiff Barbara Gail London, who live in the bottom of SD 11 and were redrawn into a predominately white district. As shown in SD 11 of Mr. Trende's demonstration map, the majority-Black portion of SD11 could easily be rejoined with the historically protected VRA area to create a majority-minority district there. Trende.Report.82-83, J.A.389-90.

Likewise, the majority of the BVAP in SD5 comes from Inkster. To be sure, Inkster is somewhat isolated from other pockets of concentrated black voters. Yet in the 2011 Senate Plan adopted by the Michigan Legislature, Inkster was included within former SD 5 which had a BVAP of 52.5%. Trende.Report.22,82-83,94 J.A.329,389-90,401. Because it has been done before, it is possible.

All this to say that there is an enormous concentration of Black voters in southeast Michigan. Pls'.SJBr.2, PageID.583; Trende.Report.12, 14-15, J.A.319, 321-22. The fact that *many* demonstration maps could be drawn encompassing Black-majority districts in a multiplicity of ways does not weigh *against* a conclusion that there is a sufficient number of black voters that a "solution" of sufficiently numerous

Black-majority districts is "possible." *Eastpointe*, 378 F.Supp.3d at 603 (quoting *Bone Shirt*, 461 F.3d at 1019).

In short, the facts here are not disputed. Everyone agrees that Mr. Trende has drawn maps with five compact majority-Black districts for the Senate and ten for the House. The only question pertains to the legal significance. As shown, the Commission Defendants' legal argument is flawed, and it would be a waste of judicial resources to hear testimony about how large and compact Black voters are in and around Detroit. Plaintiffs are entitled to partial summary judgment on the first *Gingles* precondition.

### 2.      Plaintiffs are entitled to summary judgment on the second and third *Gingles* preconditions.

The second and third *Gingles* preconditions are satisfied if a plaintiff can show that a minority group is "politically cohesive," and the rest of the electorate (here, the white majority), votes sufficiently as a bloc to defeat the minority's preferred candidates. *Gingles*, 478 U.S. at 43-46. Plaintiffs explained in their opening brief that statistical and anecdotal evidence shows overwhelmingly that Black voters in southeast Michigan tend to prefer the same candidate in races pitting a Black candidate against a white one, and that racial polarization and a lack of white-crossover voting often prevents the Black candidate of choice from prevailing. Pls'.SJBr.13-26.

Again, there is no dispute of fact here, and again, there is no doubt that the Commission Defendants are not entitled to summary judgment; Plaintiffs are. The Commission's own expert opined that the key to understanding *Gingles* preconditions

two and three is the existence of racially polarized voting: "What do we mean when we say minority voters must be politically cohesive? And how do we know if white voters usually vote as a bloc to defeat the candidates preferred by minority voters? According to the Court, racially polarized voting is the evidentiary linchpin of a vote dilution claim." 2021.Handley.Report.1, J.A.25. Dr. Handley, found that "[b]ecause voting in Michigan is racially polarized, districts that provide minority voters with an opportunity to elect their candidates of choice must be drawn." Comm'n.Br.6, PageID.643, quoting 2021.Handley.Report.17, J.A.41. Indeed, this evidence of polarization and cohesiveness is so compelling that the Commission admits it has "good reasons to believe the second and third *Gingles* preconditions could be met" from Dr. Handley's expert report alone. Comm'n.Br.29, PageID.666. That single-handedly warrants summary judgment on these preconditions, meaning the Court should proceed to evaluate the totality of the circumstances and whether the Commission did, in fact, draw five VRA-compliant districts for the Senate and ten for the House.

Moreover, the Commission's districts do *not* perform. And, because of racially polarized voting, Black-preferred candidates cannot emerge from open primaries against White-preferred candidates in the most probative elections. Specifically, in six Detroit-area Senate districts in the 2022 Democratic primaries where the BVAP exceeds 35% (*i.e.,* SD1, SD3, SD6, SD7, SD8, and SD10), only one Black candidate—Geiss—prevailed but only by defeating the Black-preferred candidate, Brenda Sanders, with significant help from white voters. 2023.Handley.Report,App.C2, J.A.

110-11; Palmer.Report.Table14, J.A. 151; Trende.Report.89, J.A.396. On the House side, Black-preferred candidates even had close calls even in districts with BVAPs exceeding 50% because of a lack of white-crossover voting and in the 2022 democratic primary, Black-preferred candidates lost four of six races, including one in a Black-majority district. Pls'.SJBr.25, PageID.606 (citation omitted). Accordingly, Plaintiffs are entitled to summary judgment on the second and third preconditions.

As Plaintiffs predicted in their opening brief, Commission Defendants stake their case on elections of questionable probative value and ignore contrary evidence. Defendants start by asserting—with no detailed analysis—that for "districts HD1, HD7, HD10, HD12, HD13, HD14, SD3, and SD6, no evidence plausibly shows the third precondition" because in "each district, the candidate all experts' estimates identified as Black preferred *won* the 2022 Democratic primary." Comm'n.Br.22-23, PageID.659-60. But this is what actually happened in those elections, starting with the two Senate districts:

- **SD3 (42.10% BVAP):** Under the Commission's rationale, incumbent Senator Stephanie Chang—an Asian woman and indisputably the white candidate of choice— was purportedly the Black candidate of choice in the 2022 Democratic Primary Election. But "equal opportunity in voting is not achieved when a minority group may elect representatives of choice when they are [non-Black], but are unsuccessful in electing members of their own group." *Rural W. Tennessee Afr.-Am. Affs. Council v. Sundquist*, 209 F.3d 835, 837 (6th Cir. 2000) (Jones, J., concurring). And as Dr. Handley acknowledges, in the 2018 Democratic Primary in former Senate District 1 (45.1% BVAP), Alberta Tinsley Talabi, the Black candidate of choice, "lost to Stephanie Chang, the candidate supported by a large majority of White voters (76.7%) *and the distant second choice (27.1%) of Black voters*." 2023.Handley.Report.5, J.A.5 (emphasis added). Due to incumbency status and a massive fundraising disparity— incumbent Chang's $300,000 to Black-challenger Toinu Reeves' $27,000[1]—this

---

[1] https://cfrsearch.nictusa.com/documents/530282/details/filing/summary?changes=0

election evidences Black-crossover voting for the incumbent white candidate of choice even though Reeves was supported by former Black-candidate-of-choice Talabi.[2] It does *not* support the Commission's hope for white-crossover voting, especially where challenger Reeves received almost no support from white voters (less than 7%), 2023.Handley.Report.App.C2, J.A.110.

- **SD 6 (40.6% BVAP)**: Winner Mary Cavanagh, the Commission's purported Black-candidate-of-choice, is Hispanic/Caucasian with one of the most politically advantageous surnames in Michigan politics. Lemmons.Aff.¶ 34, J.A.530. The Commission's characterization is legally meritless, *Sundquist*, 209 F.3d at 837 (Jones, J., concurring), and factually inaccurate considering in the 2020 Democratic Primary Election for former HD10, Cavanagh, the clear white candidate of choice, defeated the two Black-preferred candidates, Kevin Harris and Diajah Ruffin, Palmer.Report.Table11, J.A.149. Moreover, the data from the 2022 primary shows that white voters in SD6 provided almost no support to Darryl Brown, a Black man from Detroit and a former Detroit Police Commissioner and Firefighter. Lemmons.Aff.¶ 34, J.A.530; *accord* 2023.Handley.Report.App.C2, J.A.110 (estimating that 4.2% of white voters supported the Black candidate and nearly 96% favored the white or white/Hispanic candidates). Again, we see negligible white-crossover support for the leading Black candidate.

- **HD 1 (38% BVAP)**: With 87.4% of the vote, Black incumbent Tyrone Carter beat Black challenger Jermaine Tobey. 2023.Handley.Report.App.C3, J.A.112. Because this race involved two Black candidates, one of whom was an incumbent, the election is not probative of Black opportunity and does not support the theory that white voters will crossover and vote for Black candidates.

- **HD 7 (44.3% BVAP)**: With 53.2% of the vote, Black-incumbent Helena Scott edged out two white candidates, Melanie Macey and Grant Rivent, who together received 46.8% of the vote. Despite Rep. Scott's incumbency and fundraising advantage, she was *not* the white candidate of choice; Melanie Macey was—by 22 points, 2023.Handley.Report.App.C3, J.A.113,[3] a shocking disparity for an incumbent. Without Rep. Scott's incumbency and financial advantages, it is unlikely that a 44.3% BVAP facilitates Black opportunity in this "bacconmandered" district, which stretches from Detroit up to the predominately white Oakland County suburbs of Ferndale and Royal Oak. "Incumbency is a special circumstance that must be weighed, sometimes heavily, in assaying the probative value of election results." *Galvin*, 300 F. Supp. 2d at 306.

---

[2] https://www.transparencyusa.org/mi/candidate/toinu-reeves/contributions
[3] https://www.transparencyusa.org/mi/race/michigan-house-of-representatives-district-7

- **HD 10 (38.8% BVAP)**: With 81.3% of the vote and a massive fundraising advantage, Black-incumbent Joe Tate beat Black-challenger Toni Mua. 2023.Handley.Report.App.C3, J.A.113. Because this race involved two Black candidates, one of whom was an incumbent, the election is not probative of Black opportunity or white-crossover voting. In fact, it is undisputed that Speaker Tate, a former professional football player, was *not* the black candidate of choice when he first ran for the Michigan House in 2018. Trende.Report.36, J.A.343. Although Black voters did not coalesce behind a single candidate in that race, white voters did. That candidate was Tate, who earned 67% of the white vote, but was Black voters' fifth choice. By contrast, white voters gave just 8% of the vote to the Black-preferred candidate. Trende.Report.36, J.A.343. This election proves the opposite of the Commission's prediction that white voters from the wealthy Grosse Pointe area will cross over and vote for Black candidates of choice.

- **HD 12 (41% BVAP)**: With 51.9% of the vote, Black-challenger Kimberly Edwards edged out white-incumbent Richard Steenland by 300 votes. Edwards' significant white-crossover support could be attributable to her English surname or the fact that she ran on a reproductive-freedom platform in a year where that was the primary issue for democratic voters.[4] The outcome of this election—white voters picking the white candidate over the Black candidate by a 16-point margin, 2023.Handley.Report.App.C3, J.A.114, – does not decidedly sustain the influence experiment in this district straddling Macomb/Wayne Counties.

- **HD 13 (38.4% BVAP)**: With 73.7% of the vote, white-incumbent and clear white-candidate-of-choice, Lori Stone, soundly defeated Black-challenger Myles Miller. 2023.Handley.Report.App.C3, J.A.114. Dr. Handley says that Stone, who is white, was the Black candidate of choice. But Stone's middling support from the Black community is easily attributable to her incumbency and massive *40 to 1* fundraising advantage.[5] And even if Stone had not received modest support from Black voters, with a 38.4% BVAP she would have still prevailed where Miller received scarce support—less than 9%— from white voters. 2023.Handley.Report.App.C3, J.A.114. Again, there is scant evidence of white-crossover voting.

- **HD 14 (41.1% BVAP)**: With 59.3% of the vote, Black candidate Donavan McKinney beat two white candidates who collectively received 40.7% of the vote. 2023.Handley.Report.App.C3, J.A.114. His white-crossover support (which he still *lost* by a 3:2 margin, *id.*) could be attributable to his Irish

---

[4] https://www.facebook.com/photo/?fbid=113848438054508&set=pcb.113854791387206

[5] https://www.transparencyusa.org/mi/race/michigan-house-of-representatives-district-13

surname, the fact he was a Whitmer appointee, and that he ran a solid campaign with significant fundraising from the Unions. Such special circumstances hardly prove an outpouring of white-crossover voting given the results in all the primary elections in the surrounding area, especially those featuring bi-racial, two-candidate elections for open seats.

The Commission Defendants next claim a lack of a triable question in HD8 and HD11 because the 2022 election featured multiple candidates, five in HD8 and nine in HD11. Comm'n.Br.23, PageID.660. Again, Plaintiffs do not have to show a lack of white-crossover voting solely in the 2022 election to prevail on their claims. Yet Plaintiffs can do exactly that:

- **HD 8 (44.7% BVAP)**: It is a bit of a headscratcher why the Commission Defendants suggest that they are the ones entitled to summary judgment here. With 37.8% of the vote, Mike McFall, the clear white candidate of choice, beat two Black candidates, Durrel Douglas and Ernest Little, and two white candidates, David Soltis and Ryan Nelson. 2023.Handley.Report.App.C3, J.A.113. The three white candidates in this election received 61.2% of the vote while the two Black candidates received 38.8% of the vote. *Id.* Significantly, *while the two Black candidates were favored by a supermajority of Black voters, they received miniscule support (less than 13% combined) from white voters. Id.* The result of this racially polarized election was entirely predictable based on the low BVAP of this "bacconmandered" district which stretches from mid-town Detroit up through the Oakland County suburbs of Hazel Park and Madison Heights. This election is strong evidence of a lack of white-crossover voting, as well as what happens to Black-preferred candidates in races where such crossover voting fails to materialize.

- **HD 11 (42.8% BVAP)**: This is another headscratcher. In an incredibly polarized election, Hispanic candidate Veronica Paiz edged out four Black candidates and four white candidates. 2023.Handley.Report.App.C3, J.A.114. What matters for the panel's analysis is that the parties agree Rep. Paiz was the clear white candidate of choice, and that she received negligible support from Black voters. At the same time, the four Black candidates received scant support from white voters—four Black candidates *combined* received less than 30% of the white vote. *Id.* This polarized election's result was entirely predictable based on the low BVAP of this district, which straddles Detroit and the Macomb County suburbs of St. Clair Shores. The Commission's influence-district experiment failed yet again, with Black voters once again bearing the brunt of the impact.  Summary judgment for Plaintiffs is warranted.

19

For SD10 and SD11, the Commission Defendants assert that "there is no evidence supporting Plaintiffs' claims on either polarization factor." Comm'n.Br.24, PageID.661. Consider the evidence though:

- **SD 10 (41.7% BVAP):** White-incumbent Senator Paul Wojno ran unopposed in the 2022 democratic primary. The Commission Defendants say that means Plaintiffs lack evidence regarding "the second or third preconditions." Comm'n.Br.24, PageID.661. But it is likely that Black candidates of choice in a 41.7% BVAP district saw a white-incumbent Senator in their district and did not think it worth the time and money to run against him. *Cf. Uno v. City of Holyoke*, 72 F.3d 973, 986–87 (1st Cir. 1995) (collecting cases for the proposition that low minority turnout "may actually be probative of vote dilution"). It is the same reason that Democrat or Republican incumbents run unopposed in districts that overwhelmingly favor their party.

- **SD 11 (19.2% BVAP):**  Veronica Klinefelt, the clear white candidate of choice, soundly defeated Monique Owens, the first African American Mayor of Eastpointe and the candidate favored by Black voters. Lemmons.Aff.¶33, J.A.529; Palmer.Report.Table14, J.A.151. This contest is yet more compelling evidence of racial polarization and a lack of white-crossover voting in the Detroit area. From her prior work, Dr. Handley knows that Owens has been the leading Black candidate of choice in local elections. *Eastpointe*, 378 F. Supp. 3d at 607 ("The government's expert, Dr. Handley, found that most black voters supported Owens, who received 53.4% of black votes according to CVAP demographic data and 94.7% of black votes based on ecological inference analysis of BISG data"). Yet Handley ignores this race because there is limited evidence of white-crossover voting for Owens. Additionally, because it is an easy task to include the predominately Black southern portion (i.e., the portion encompassing Detroit and Eastpointe) of SD11 into a majority-Black district—something accomplished in Professor Trende's Senate Demonstration as District 1 and accomplished in part in the 2011 Senate Plan as former District 2—the Commission's SD11 illegally dilutes the voting strength of this Black community in violation of the VRA. Trende.Report.82, 94, J.A.389, 401.

The Commission Defendants highlight the above 12 districts presumably because they provide *the best* evidence of white-crossover voting for Black candidates that their experts could identify. But these districts at worst create a question of fact regarding the ultimate question; at best, they require that summary judgment be entered in favor of Plaintiffs. But the panel need not decide. That's because the

districts the Commission Defendants chose *to omit* in their opening brief prove that white-crossover voting for Black candidates barely exists in southeast Michigan, eviscerating Defendants' sole theory of the case. Start with the Senate districts the Commission Defendants ignored:

- **SD 1 (BVAP 36.6%)**: The Commission's expert acknowledges that SD1 did not perform for Black voters in the crowded and quite polarized 2022 Democratic Primary where incumbent, and white-candidate-of-choice, Erica Geiss, defeated Brenda Sanders, who was the clear Black candidate of choice. As Rep. Lemmons explains, this result was not surprising where Senator Geiss has a Caucasian sounding name and is married to Doug Geiss, a well-known white politician from Taylor. Lemmons.Aff. ¶¶36, J.A. 530-31. Consequently, Senate District 1's low BVAP makes it "exceedingly difficult for Black voters from the Detroit portion of District 1 to elect their candidate of choice where again the majority portion of this District wraps from Detroit down into the white-dominated suburbs of Allen Park, Lincoln Park, and Taylor." *Id.*

- **SD 2 (25% BVAP):** The Commission correctly identifies incumbent-Senator Sylvia Santana as the Black candidate of choice in the 2022 Democratic Primary and that she prevailed. 2023.Handley.Report.App.C2, J.A.110. But the Commission fails to note that the losing candidate, Maurice Sanders, was also Black, Lemmons.Aff.¶¶37, J.A. 531, making this race of limited probative value. *Pope*, 94 F. Supp. 3d at 333; *Eastpointe*, 378 F. Supp. 3d at 606. The Commission does not identify that this district is predominately Middle Eastern and, as a result of Senator Santana's incumbency and nearly $200,000 war chest, the Middle Eastern candidate, Adel Mozip, withdrew after striking a compromise deal with Senator Santana. Lemmons.Aff.¶¶37, J.A. 531.[6]  What is clear is that "[w]ith only a 25% BVAP and a population dominated by the wealthy and politically powerful Middle-Eastern community . . . , Black voters from Detroit are not likely to have any success electing their candidate of choice" in the next election after Senator Santana is term limited. *Id.* This intuitive point is buttressed by the 2018 Democratic Primary results for former Senate District 3 (46.7% BVAP), where then Representative Santana managed to win by just 2.8% in a race where she was the only candidate who raised more than $5,000 according to Transparency USA, Trende.Report.86-87, J.A.393-94, and where, despite being a siting state representative, Santana attracted minimal white-crossover support. 2023.Handley.Report.App.B, J.A.89 (Gary Woronchak, the white candidate of choice, took 71% of the white vote and

---

[6] https://cfrsearch.nictusa.com/documents/538775/details/filing/summary?changes=0

Sylvia Santana, the Black candidate of choice, took only 20.2% of the white vote).

- **SD 5 (BVAP 18.3%):** The Commission does not address the racially polarized 2022 Democratic Primary in this district between white-incumbent Senator Dayna Polehanki and Black-challenger Velma Overman. That's because Senator Polehanki, the clear white candidate of choice, soundly defeated Velma Overman, the clear Black candidate of choice. Lemmons.Aff. ¶¶30-32, J.A. 528-29. This election contest is compelling evidence of racial polarization and a lack of white-crossover voting in the Detroit area. *Id.* Additionally, because it is possible to include the overwhelmingly Black community of Inkster in a majority-Black District—something accomplished in Professor Trende's Senate Demonstration as District 4 and in the 2011 Senate Plan as District 5—the Commission's SD5 dilutes the voting strength of this Black community in violation of the VRA. Trende.Report.82, 94, J.A.389, 401.

- **SD 7 (44.78% BVAP):** The way the Commission Defendants see it, white-incumbent Senator, Jeremey Moss, indisputably the white candidate of choice, was purportedly the Black candidate of choice in the 2022 Democratic Primary Election. But the election of a white candidate does not provide Black voters equal opportunity. *Sundquist*, 209 F.3d at 837 (Jones, J., concurring). And history shows that. In the 2018 Democratic Primary for the former Senate District 11, then Representative Senator Moss was the clear *white* candidate of choice but not the candidate of choice for Black voters. Moss defeated three Black candidates including Crystal Bailey who received the most support of Black voters. 2023.Handley.Report.App.B, J.A.89. In the 2022 Democratic Primary, incumbent Senator Moss easily defeated Ryan Foster, a Black candidate, who ran on a working-class message in a district containing some of the most affluent municipalities in Michigan. While Senator Moss raised approximately $180,000 (most of which he spent leading into the August primary), Ryan Foster raised and spent nothing.[7] This election shows that SD7's BVAP of 44.78% is too low to attract and provide opportunity for serious Black candidates of choice. Lemmons.Aff.¶¶38-40, J.A.531-32 (explaining that coupling a low BVAP with an extremely affluent white-majority population, as the Commission did with SD7, makes it extremely difficult for any Black candidate of choice to prevail in a democratic primary election).

- **SD 8 (BVAP 40.25%):** By way of omission, the Commission Defendants concede that SD8 did not perform in the racially polarized 2022 Democratic Primary between incumbent Marshall Bullock, the clear Black candidate of choice, and incumbent Mallory McMorrow, the clear white candidate of choice. Consistent with other "influence" districts, a staggering *95.9%* of white voters cast their ballot for McMorrow and against Bullock, disenfranchising Black

---

[7] https://cfrsearch.nictusa.com/documents/530595/details/filing/summary?changes=0

voters in the district. 2023.Handley.Report.App.C2, J.A.111. This result shows the near complete lack of white-cross overvoting in what was one of the most legally probative districts: a competitive, endogenous, biracial, Democratic primary. This is irrefutable proof of a VRA violation.

In sum, the Commission's Linden Plan created zero majority-Black Senate districts but nine majority-white districts that reach into the predominantly Black portions of the Detroit area (including Detroit, Southfield, Inkster, etc.). This area has historically been protected under the VRA and contains a sizeable and compact BVAP from which five majority-Black districts can easily be drawn. The Commission Defendants say that in the 2022 election cycle, five of these "influence" districts resulted in Black candidates of choice prevailing in the primary (if applicable) and general elections. But in four of these nine senate races—SD1, SD5, SD8, and SD11—the Black candidate of choice *lost* to the white candidate of choice in a racially polarized election *because the BVAPs were too low.*

In three of the remaining five races, the Commission's "Black" candidate of choice was not Black: SD3 (Asian), SD6 (White/Hispanic), and SD7 (White). Two of these prevailing candidates (Senators Chang and Moss) were incumbents with massive financial resources while the other prevailing candidate (then Representative Mary Cavanagh) had the advantage of quasi-incumbency and a popular surname. None of those races provide confirmation of the elusive white-crossover vote.

Of the remaining two races, SD10 involved an incumbent white Senator, Paul Wojno, which deterred any Black primary entry. And while SD2 did have a primary,

it involved two Black candidates due to the Middle Eastern candidate withdrawing under special circumstances.

The Commission Defendants lack probative evidence demonstrating that its experimental influence districts have or will in the future allow Black voters to elect the candidates of their choice in the so-called "influence" districts. The Senate VRA Plaintiffs are already disenfranchised and will be further decimated when, at the next election, Senator Sylvia Santana—the only current Black candidate of choice who is Black—will be term limited. The evidence of polarized voting—and a lack of white-crossover voting—is even more lopsided when considering the House districts the Commission Defendants ignored in their opening brief:

- **HD 2 (11.04% BVAP):** With no primary challenger, white incumbent Tullio Liberati won the democratic primary. So, the majority-Black population of Ecorse—which the Commission fractured from the adjoining and predominately Black River Rouge and Detroit—is without a Black representative. Dr. Handley did not evaluate this election.

- **HD 3 (32.8% BVAP):** With 54.3% of the vote, Middle Eastern candidate Alabas Farhat prevailed over two other Middle Eastern candidates. 2023.Handley.Report.App.C3, J.A.112. Pairing a BVAP of only 32.8% with Dearborn, widely known as having the largest Middle eastern and Muslim population in America, ensures that no Black candidate will ever run, much less be elected, in this Black "influence" district.

- **HD 4 (55.6% BVAP):** With 55.2% of the vote, incumbent Black candidate Karen Whitsett defeated Black candidate Lori Turner and Middle Eastern candidate Gus Tarraf. 2023.Handley.Report.App.C3, J.A.112. A Black incumbent beating two minority candidates is hardly evidence of white-crossover voting. Notably, white voters favored Tarraf over the Black *incumbent* by a 72% to 17% margin!, *id.*, decimating the Commission's white-crossover theory.

- **HD 5 (55.3% BVAP):** With 38.4% of the vote, white candidate Natalie Price beat a bi-racial field of candidates including the clear Black candidate of choice Reggie Reg Davis. 2023.Handley.Report.App.C3, J.A.112; see also Smith.Aff.¶¶26,35, J.A.514-15. In this primary election, the three white

candidates (Price, Wooddell and Milstein) significantly outraised the two Black candidates (Davis and Hughes), underscoring the tremendous advantage of what LaMar Lemmons calls the "Oakland County Money Machine." Lemmons.Aff.¶20, J.A.526.[8] When well-funded white candidates from Oakland County faceoff against Black candidates from poor, urban areas of Detroit, the outcome is predictable. White voters supported the white candidates over the Black candidates by a 93% to 7% margin. 2023.Handley.Report.App.C3, J.A.112.

- **HD 6 (54.9% BVAP):** White incumbent Reginia Weiss (62%) defeated Black candidate Myya Jones (14.8%), Black candidate Danielle Hall (14.8%), and white candidate Mark Murphy (8.4%). 2023.Handley.Report.App.C3, J.A.112. The two Black candidates received only 38% of the vote in this 54.9% BVAP district. Weiss outspent Hall $115,429 to $4,659,[9] underscoring the "Oakland County Money Machine," Lemmons.Aff.¶20, J.A.526. When well-funded candidates from Oakland County faceoff against candidates from poor, Black, urban areas of Detroit, the outcome is inevitable. Most important, white voters provided almost no support—less than 7% combined—for the two Black candidates. 2023.Handley.Report.App.C3, J.A.112.

- **HD 9 (51.7% BVAP):** With 61.3% of the vote, Middle Eastern incumbent Abraham Aiyash defeated four Black candidates who *collectively* received only 22% of the white vote. 2023.Handley.Report.App.C3, J.A.113. According to Dr. Handley, Rep. Aiyash was the supposed Black candidate of choice. But as discussed, elections where the supposed Black candidate of choice is not Black are not probative and, as in this case, better explained by Aiyash's incumbency advantage. Rep. Aiyash was the clear white candidate of choice, with support from 77.9% of white voters. *Id.* Telling, incumbent Aiyash outspent the four Black candidates $84,896 to $0.[10]

- **HD 16 (54.9% BVAP):** Black incumbent Stephanie Young beat Black candidate Ishmail Terry. 2023.Handley.Report.App.C3, J.A.115. Because this race involved two Black candidates, the election is not probative of white-crossover voting.

- **HD 17 (42.4% BVAP):** With no primary challenger, white incumbent Laurie Pohutsky won the democratic primary. As a result, the majority-Black

---

[8] https://www.transparencyusa.org/mi/race/michigan-house-of-representatives-district-5

[9] https://cfrsearch.nictusa.com/documents/530889/details/filing/summary?changes=0 and https://cfrsearch.nictusa.com/documents/530889/details/filing/summary?changes=0

[10] https://www.transparencyusa.org/mi/race/michigan-house-of-representatives-district-9

population of West Detroit is without a Black representative after being combined with a Livonia-based and predominately white district to create a Black "influence" district. Dr. Handley did not evaluate this election.

- **HD 18 (52.2% BVAP):** With 55.1% of the vote, Black candidate Jason Hoskins beat Black candidate Caprice Jackson. 2023.Handley.Report.App.C3, J.A.115. Because this race involved two Black candidates, the election is not probative of white-crossover voting, though it is interesting that Hoskins, with a more Caucasian sounding name than Jackson, received a much higher percentage of the white vote (65% to 35%). *Id.*

- **HD 19 (25.11% BVAP):** Incumbent white candidate Samantha Steckloff unsurprisingly ran unopposed in this district which fractures the predominately Black community of Southfield and joins it with the predominately white and wealth areas of Farmington and Farmington Hills. Dr. Handley did not evaluate this district, which provides no opportunity to the fractured Black voters residing in Southfield. Black voters from Southfield are not likely to ever be represented by a Black candidate of choice in this district.

- **HD 26 (35.8% BVAP):** In this heavily polarized election, white candidate Dylan Wegela won with 42.1% of the vote, defeating one other white candidate who received 9.3% of the vote and two Black candidates who collectively received 48.6% of the vote. 2023.Handley.Report.App.C3, J.A.115. Rep. Wegela was the clear white candidate of choice but received no meaningful support from Black voters. *Id.* Conversely, the two Black candidates of choice received overwhelming support from Black voters (collectively, about 88%) but no meaningful support from white voters (collectively, about 18%). *Id.* As a result, the predominately Black community of Inkster is without Black representation. This could have been avoided, but the Commission opted to include a heavily white portion of Garden City in HD26 and fracture out a significant part of the Black population in Romulus, instead placing those Black voters in HD31, which has only a 15.72% BVAP.

- **HD 31 (15.72% BVAP):** With 80% of the vote, white candidate Reggie Miller defeated Black candidate Glenn Morrison.[11] Dr. Handley did not evaluate this district which provides no opportunity to the Black voters who have been wrongly fractured out of House District 26.[12]

- **HD 53 (32.59% BVAP):** With no primary challenger, Black incumbent Brenda Carter won the democratic primary. But even here, Dr. Handley acknowledges

---

[11] https://ballotpedia.org/Michigan_House_of_Representatives_District_31
[12] https://www.mlive.com/news/ann-arbor/2022/07/meet-the-primary-candidates-for-michigan-house-seat-covering-southeast-washtenaw-county.html

that when presented with other Black candidates in earlier elections, Brenda Carter was not the Black candidate of choice. 2023.Handley.Report.5, J.A.5.

In sum, leaving aside elections with little to no probative value (general elections, primary elections where the supposed Black candidate of choice is not Black, primary elections where a Black incumbent prevails, etc.), the panel is left with HD5, HD6, HD8, HD11, HD12, HD14, and HD26 as districts with racially polarized 2022 democratic elections. Shockingly, but not surprisingly given the BVAPs, Black candidates of choice lost five of these seven elections. (Dr. Handley does not consider HD6 to be a loss for Black voters, but it certainly was.) The only two Black candidates who prevailed had Caucasian surnames and other unique circumstances. Regardless, an occasional successful performance for a minority group in a district is insufficient to demonstrate that a state's obligations under the VRA have been met.

Strikingly, in 8 of the 10 districts with a bi-racial election involving a non-incumbent Black candidate (HD 5, HD6, HD8, HD9, HD11, HD13, HD26, and HD31), the non-incumbent Black candidates do not receive any material white-crossover support. Two prime examples are HD9, where the Middle Eastern candidate defeated four Black challengers who received scant support from white voters (collective 22%), and HD13, where the white candidate defeated the lone Black challenger 91.5% to 8.5% among white voters.

Even in districts like HD4, where the Black incumbent prevailed, there is minimal white-crossover support (17%) for an *incumbent* Black candidate (72% of white votes went to the Middle Eastern challenger). In HD2, HD3, and HD19, the

BVAPs are so low that Black candidates did not emerge at all. The same was true in HD17, where the BVAP was higher (though still well below a majority) but potential Black candidates were faced with a white suburban incumbent with an enormous fundraising advantage, an insurmountable obstacle. And in HD31, where a Black candidate *did* emerge despite a low BVAP, he was crushed by the white candidate with almost no white-crossover voting.

The Commission Defendants' next argument is that BVAPs above 50% somehow constitute packing. Comm'n.Br.7,19,30, PageID.640,644,656,667. This is not supported by the evidence. HD4, HD5, HD6, HD9, HD16, and HD18 all have BVAPs slightly above 50%. Of the six districts with BVAPs above 50%, Black candidates won only three. And in what will be a surprise to only the Commission Defendants, Black candidates in bi-racial elections lost in both of the two "bacon-mandered" majority-minority districts (HD5 and HD6) that stretch from Detroit deep into the wealthy and predominately white Oakland County suburbs as well as HD9, which combines portions of Detroit with the predominantly Middle Eastern and white communities residing in Hamtramck and the newly gentrified downtown corridor. This recent evidence from the few majority-minority districts the Commission actually did draw shows that for Black candidates of choice to prevail in districts stretching into white democratic strongholds, the BVAP must be set higher than 50%. Finally, the Commission fails to cite a single case suggesting that drawing districts above 50% BVAP would constitute some type of legal violation. In fact, as Mr. Trende's simulations demonstrate, race-neutral drawings would produce many

heavily-Black districts.  Because a state can draw districts with BVAPs above 50% while still producing ten House districts and five Senate districts—the maximum number of VRA-protected districts—that will elect the Black candidate of choice, this argument is inapposite.  Indeed, as demonstrated below, setting an artificial target below 50% raises 14th Amendment concerns.

In sum, the Commission's "influence" districts only have the appearance of functionality when the purported Black candidate of choice *is not Black* or is a firmly entrenched incumbent. Outside of those circumstances—which are *not* indicative of true Black opportunity—the Commission's influence districts are abject failures.

The consequences are painful. The Commission's Hickory Plan weeds out Black urban representatives and replaces them with white or Middle Eastern suburban representatives. The result is that legislative issues critical to the Black population in Detroit are not being addressed by white Democrats in Lansing. This tragedy is already playing out following the 2022 elections. As Bankole Thompson of *The Detroit News* recently explained, "the Democrats who claim that they are committed to taking care of Black communities have yet to map out a serious plan that could mitigate any potential contamination of drinking water resulting from corrosive pipes. … The sad part about the misplaced priorities of Lansing is that it is happening under the leadership of the first Black speaker of the House, Rep. Joe Tate [previously a white candidate of choice], who seems to have no real priorities and no bold agenda to tackle the deeper urban issues." Bankole, *Democrats in Lansing have misplaced priorities*, The Detroit News (May 10, 2023). Exhibit B.

"As [Governor] Whitmer and House Speaker Joe Tate dance out after moonwalk to the tune of the big union party taking place in the Legislature, there doesn't seem to be any serious proposals to lift urban communities from the economic doldrums. Many Black people will have to wait until the unions are taken care of, and then the crumbs left on the table will be given out to urban cities." Bankole, *Democrats cater to unions at expense of Black issues*, The Detroit News (Mar. 19, 2023). Exhibit C. "What good is it to have a Legislature with a Black speaker who seems to be putting more effort in satisfying unions than bringing attention to issues affecting Black Michigan." *Id.* "What good is it to have Democrats in power in Lansing, with control of the executive and legislative branches, if they are showing trepidation in solving the crisis facing Black Michigan"? Bankole, *Whitmer, Dems ignore Highland Park water crisis*, The Detroit News (Apr. 12, 2023). Exhibit D.

These are precisely the concerns expressed by former Detroit legislators Lemmons and Smith in their Affidavits. White democrats from Oakland and Macomb counties do not understand or care about Black urban issues. Smith.Aff.¶¶42-51, J.A.517-19; Lemmons.Aff.¶¶17-20, 25-27, 39-40, 42-48, J.A.525-27, 532-34. And when Black candidates of choice try to campaign in the wealthy, white suburbs of western Wayne and southern Oakland and Macomb Counties, they are met with low engagement, racial intimidation, and outright harassment. Smith.Aff.¶¶12-13, 22-23, 31-33, J.A.511, 513, 515; Lemmons.Aff.¶¶10-15, 30, J.A.523-24, 528.  If left intact over the course of the decade, as term limits remove Black incumbents, they will be replaced by incumbents from the wealthy, white suburbs.  The law does not allow the

Commission to do this at the expense of reducing Black representation to the point where the Black Caucus would be able to hold its meetings in the back seat of an Uber XL. Trende.Report.28, J.A. 335. Plaintiffs are decisively entitled to summary judgment on *Gingles* preconditions two and three.

> **3.**   **Plaintiffs are entitled to summary judgment under the totality of the circumstances.**

Plaintiffs explained at length in their opening brief why they are entitled to summary judgment under the totality of the circumstances. Pls'.SJBr.26-35, PageID.607-616. The Commission Defendants agree that they "also had good reasons to believe a Section 2 claim could be made out under the totality of the circumstances, as [the Commission's] attorney, Bruce Adelson, presented a memorandum establishing ongoing effects of past discrimination." Comm'n.Br.30, PageID.667 (citing Adelson.Report, J.A.438). The Commission Defendants present no arguments whatsoever on the totality of the circumstances in their brief in support of summary judgment. Accordingly, Plaintiffs are entitled to summary judgment as to the totality of the circumstances.

> **D.**   **Summary judgment is proper as to Counts III and IV because the Commission created the Districts with race as the predominant consideration in violation of the Equal Protection Clause.**

As documented above, the Commission Defendants' arguments opposing Plaintiffs' VRA claims are based on mistaken legal premises and faulty analyses of the relevant elections. In contrast, Defendants' opposition to Plaintiffs' Equal Protection claims is based on a nonexistent concession.

Defendants say that "Plaintiffs have admitted that the Commission's political considerations were its predominant motive for creating the challenged districts." Comm'n.Br.26, PageID.663. Defendants make this assertion based on a request to admit that had nothing to do with the relationship between partisanship and race and a single sentence of Plaintiffs response which stated: "it appears inescapable that the Commission's primary motivation was to increase the number of Democratic-majority districts at the expense of Detroit-area Black voters." J.A.547-48. This is not an admission that politics predominated over racial considerations any more than an admission that a Republican Legislature intentionally packed Black voters into districts to increase the number of Republican-majority districts. To put it differently: while parties may validly (in federal court) gerrymander with respect to politics, and might even have that as their primary goal, they cannot draw lines that single out Black communities *as Black communities* to achieve this goal, which is precisely what happened here. In either case, a court must still determine whether racial considerations predominate.

Crucially, "[t]he racial predominance inquiry concerns the *actual considerations* that provided the essential basis for the lines drawn, *not* post hoc justifications the [map drawer] in theory could have used but in reality did not." *Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. 178, 189-90 (2017) (emphasis added). For example, Dr. Rodden's post-hoc partisan explanations for the challenged districts' construction are meaningless where there is no record evidence the Commissioners actually considered those justifications when adopting the Plans. *E.g.*, *Hays*

32

*v. State of La.*, 936 F. Supp. 360, 369 (W.D. La. 1996) (rejecting redistricting body's three "weak race-neutral explanations" for reason that they were "patently post-hoc rationalizations" that were not factors actually "relied on by legislators at the time of the drawing of the district").

Here, there is *direct* evidence that in the process of creating and adopting the Linden and Hickory plans, the Commission Defendants' predominant consideration was race. Recall that "[r]acial considerations predominate when mapmakers purposefully established a set racial target." Pls'.SJBr.38, PageID.619 (citing *Cooper v. Harris*, 581 U.S. 285, 300 (2017). Indeed, when the evidence shows that those engaged in the redistricting process used a set BVAP threshold, courts cannot reach "any conclusion *other than* that race was the predominant factor." *Shaw v. Hunt*, 517 U.S. 899, 906 (1996) (emphasis added, cleaned up).

As Defendant Chairwoman Szetela explained, the Commission members initiated the redistricting process by adhering to Dr. Handley's data for primary results, which suggested that higher BVAPs were likely necessary to assure Black voters their candidates of choice: "48% in the State Senate and between 47% and 52% in the State House." Szetela.Report.89, J.A.608. (As detailed above, even those numbers are too low, but leave that point aside.) So, "the Commission began drawing maps following this approach and drew districts in the Metropolitan Detroit area with BVAP percentages around 50%." *Id.* But, "[a]fter completing districts in most of the Metropolitan Detroit area, the Commission's counsel intervened and began

aggressively pushing the Commission to reduce the BVAP numbers to as close to the general election percentages (35% to 40%) as possible. *Id.* (citations omitted).

"This pressure," Chairwoman Szetela continued, "was most evident at the September 30, 2021, Commission meeting in Rochester Hills, where the Commission was *expressly directed to identify* 'anything that is higher than 40% for the black voting age population' and 'those quote unquote fixes can be dealt with.'" Szetela.Report.89-90, J.A.608-09 (emphasis added, citations omitted). Accordingly, "[d]espite Dr. Handley's analysis showing that the required BVAP for primary elections was likely higher than the required BVAP for general elections, the Commission acquiesced to its counsel and redrew each of its existing maps in the Metropolitan Detroit area *based on the general elections BVAP 'targets' [i.e., "quotas"] of 35% to 40%.*" *Id.* at 90, J.A.609. Not only that, as Mr. Trende's dotplots demonstrate, *this is exactly what the Commission did*. There is an abnormal 'ledge' in the BVAP of districts in the low 40s, where the Commission obviously attempted to impose a ceiling on the BVAP of districts, drawing them as closely to 40% as possible. Trende.Report.68, 71-72, 108, J.A.375, 378-79, 415.

To be sure, there is also plenty of circumstantial evidence that race predominated the Commission Defendants' work. Pls'.SJBr.39-43, PageID.620-24. But the racial quotas alone trigger strict scrutiny, leaving a compelling interest and narrow tailoring analysis.

The Commission Defendants say they had "a compelling interest in VRA compliance" by acknowledging their belief that *Gingles* preconditions one, two, and

three, as well as the totality-of-the-circumstances analysis all show that VRA coverage is triggered, Comm'n.Br.29-30, PageID.666-67. This is in full agreement with Plaintiffs and, again, demonstrates that at the least, there is no need to hear testimony on *Gingles* and, at the very least, partial summary judgment should be awarded to Plaintiffs here on the three *Gingles* preconditions and the totality of the circumstances.

Where the parties differ is over the narrow-tailoring analysis, in which the Commission Defendants assert that their "data-driven approach," perhaps "the most thorough and precise a federal court has ever seen in any redistricting case," shows that majority-minority districts are unnecessary if replaced with influence districts. Comm'n.Br.30-31, PageID.667-68. But as explained above, the Commission's "influence" district theory did not in 2022, and will likely never, perform the way the Commission Defendants hoped because of a lack of white crossover voting. And, given outcomes in primary elections from 2014-2020, it should have been patently obvious to the Commission that its approach would not work. Trende.Report.40-43, J.A.347-50.

Plaintiffs do not disagree with Defendants that in conducting a VRA analysis, a court should consider "the combined strength of minority support *plus white 'crossover' votes*" to determine whether Black candidates of choice can be elected. Comm'n.Br.32, PageID.669 (quoting *Gingles*, 478 U.S. at 56). The problem is that the overwhelming evidence from the 2014-2022 primary elections shows that white-crossover voting *does not occur* in southeast Michigan. That *is* Plaintiffs' "functional

analysis." *Contra* Comm'n.Br.33, PageID.670. The Commission Defendants' sole defense to Plaintiffs' Equal Protection claim—white-crossover voting—fails as a matter of fact and a matter of law.

## III.    CONCLUSION

The Commission Defendants' self-proclaimed "data-driven approach" was neither "thorough" nor "precise." *Contra* Comm'n.Br.1-2, PageID.638-39. As revealed by Chairwoman Szetela's Dissenting Report and Dr. Handley's admission, the Commission's so-called "influence districts" were a blind gamble that did not payout for the Black voters of Metro Detroit. The Commission's lawyers and experts now try to obscure that failed bet by placing unwarranted emphasis on election results courts do not find probative while ignoring the elections courts find highly relevant.

Based on the most predictive election data, no trier of fact could find that there is sufficient evidence of white-crossover voting that Black candidates of choice will prevail in large numbers in the Commission's so-called "influence" districts. In four of the most predictive test cases, HD5 (three white candidates, two Black candidates), HD6 (two white candidates, two Black candidates), HD13 (one white candidate, one Black candidate), and SD8 (one white candidate and one black candidate) white voters picked the white candidates over the Black candidates 92.7% to 7.2%, 93.3% to 6.7%, 91.5% to 8.5%, and 95.9% to 4.1%, respectively. 2023.Handley.Report.App.C2 and C3, J.A.111-114.

Indeed, given the data, it takes considerable chutzpah for the Commission Defendants to say that Black voters in and near Detroit are better off after the 2022 elections than they were before. Comm'n.Br.2, PageID.639. That election instead

reflects the outcomes that Secretary Benson's academic work and Dr. Handley's primary data predicted: a precipitous 20% decline in Michigan's Black Legislative Caucus, Pls'.SJBr.32-33, PageID.613-14; losses by Black candidates of choice in four of the six races featuring open seats, including in a Black-majority district, *id.* at 33, PageID.613; a stunning 30% proportionality deficit in Black legislative representation, *id.* at 34, PageID.614; a 65% proportionality deficit in majority-Black legislative districts, *id.* at 35, PageID.615; and a 17% proportionality surplus in white-majority legislative districts, *id.* Far from being data driven, the Linden and Hickory maps may have inflicted the most devastating results on Black voters "a federal court has ever seen in any redistricting case."  Comm'n.Br.1-2, PageID.638-39.

Plaintiffs request summary judgment on all four Counts and expedited briefing on the appropriate remedy.

Respectfully submitted,

*/s/ John J. Bursch*
John J. Bursch (P57679)
BURSCH LAW PLLC
*Attorney for Plaintiffs*
9339 Cherry Valley Ave SE, #78
Caledonia, Michigan 49316
(616) 450-4235
jbursch@burschlaw.com

Michael J. Pattwell (P72419)
James J. Fleming (P84490)
Amia A. Banks (P84182)
CLARK HILL PLC
*Attorneys for Plaintiffs*
215 S Washington Square, #200
Lansing, MI 48933

(517) 318-3100
mpattwell@clarkhill.com
jfleming@clarkhill.com

Dated: June 6, 2023

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of W.D. Mich. LCivR 7.2(b)(i) because, excluding the parts exempted by this rule, it contains 10,644 words. The word count was generated using Microsoft Word for Microsoft 365.

Respectfully submitted,

*/s/John J. Bursch*
John J. Bursch (P57679)
BURSCH LAW PLLC
*Attorney for Plaintiffs*
9339 Cherry Valley Ave SE, #78
Caledonia, Michigan 49316
(616) 450-4235
jbursch@burschlaw.com

Michael J. Pattwell (P72419)
James J. Fleming (P84490)
Amia A. Banks (P84182)
CLARK HILL PLC
*Attorneys for Plaintiffs*
215 South Washington Square
Suite 200
Lansing, MI 48933
(517) 318-3100
mpattwell@clarkhill.com
jfleming@clarkhill.com
abanks@clarkhill.com

Dated: June 6, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on June 6, 2023, I electronically filed the above document(s) with the Clerk of the Court using the ECF System, which will provide electronic copies to counsel of record.

Respectfully submitted,

/s/ John J. Bursch
John J. Bursch (P57679)
BURSCH LAW PLLC
*Attorney for Plaintiffs*
9339 Cherry Valley Ave SE, #78
Caledonia, Michigan 49316
(616) 450-4235
jbursch@burschlaw.com

Michael J. Pattwell (P72419)
James J. Fleming (P84490)
Amia A. Banks (P84182)
CLARK HILL PLC
*Attorneys for Plaintiffs*
215 South Washington Square
Suite 200
Lansing, MI 48933
(517) 318-3100
mpattwell@clarkhill.com
jfleming@clarkhill.com
abanks@clarkhill.com