**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| DONALD AGEE, JR. et al., | **Case No. 1:22-CV-00272-PLM-RMK-JTN** |
| Plaintiffs, | |
| v. | **THE COMMISSION'S BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| JOCELYN BENSON, et al., | |
| Defendants. | |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

THE LEGAL STANDARD .................................................................................. 2

ARGUMENT ....................................................................................................... 3

I.     Threshold Deficiencies ................................................................................ 3

II.    Plaintiffs Are Not Entitled To Summary Judgment on Their VRA Claims ................ 3

     A.     The First *Gingles* Precondition ............................................. 4

     B.     The Second and Third *Gingles* Preconditions ................................. 9

     C.     The Totality of the Circumstances ........................................... 26

III.    Plaintiffs Are Not Entitled To Summary Judgment on Their Racial-Gerrymandering Claims ................................................................................................ 27

     A.     Racial Predominance ............................................................... 28

     B.     Narrow Tailoring ..................................................................... 33

CONCLUSION .................................................................................................. 35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez,*
138 S. Ct. 2305 (2018) ...................................................................................4, 7

*Abrams v. Johnson,*
521 U.S. 74 (1997) ............................................................................................ 5

*Alabama Legislative Black Caucus v. Alabama,*
575 U.S. 254 (2015)...................................................................................*passim*

*Allen v. Milligan,*
12-1086 (oral argument conducted Oct. 4, 2022) ........................................... 9

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986)........................................................................................... 2

*Arnett v. Myers,*
281 F.3d 552 (6th Cir. 2002) ............................................................... 2, 4, 31

*Backus v. South Carolina,*
857 F. Supp. 2d 553 (D.S.C. 2012)...............................................................29

*Baldus v. Members of Wisconsin Gov't Accountability Bd.,*
849 F. Supp. 2d 840 (E.D. Wis. 2012)................................................... 12, 25

*Banerian v. Benson,*
597 F. Supp. 3d 1163 (W.D. Mich.)............................................................... 6

*Bartlett v. Strickland,*
556 U.S. 1 (2009) ....................................................................... 8, 24, 25

*Bennett v. City of Eastpointe,*
410 F.3d 810 (6th Cir. 2005) ................................................................2, 12

*Bethune-Hill v. Virginia State Bd. of Elections,*
326 F. Supp. 3d 128 (E.D. Va. 2018)......................................................24, 29

*Bethune-Hill v. Virginia State Bd. of Elections,*
580 U.S. 178 (2017)........................................................................28, 29, 31, 32

*Black Pol. Task Force v. Galvin,*
300 F. Supp. 2d 291 (D. Mass. 2004) ...................................................... 10, 12

*Bone Shirt v. Hazeltine*,
    461 F.3d 1011 (8th Cir. 2006) ................................................................16

*Bradley v. Work*,
    154 F.3d 704 (7th Cir. 1998) ................................................................... 3

*Burton v. City of Belle Glade*,
    178 F.3d 1175 (11th Cir. 1999) ............................................................... 3

*Calderone v. United States*,
    799 F.2d 254 (6th Cir. 1986) ................................................................... 2

*City of Boerne v. Flores*,
    521 U.S. 507 (1997)................................................................................ 8

*Clarke v. City of Cincinnati*,
    40 F.3d 807 (6th Cir. 1994) .............................................................. 11, 13

*Cockrel v. Shelby Cty. Sch. Dist.*,
    270 F.3d 1036 (6th Cir. 2001) ................................................................ 2

*Cooper v. Harris*,
    581 U.S. 285 (2017)......................................................................*passim*

*Covington v. North Carolina*,
    316 F.R.D. 117 (M.D.N.C. 2016) ............................................... 29, 34, 35

*Detroit Caucus v. Indep. Citizens Redistricting Comm'n*,
    969 N.W.2d 331 (Mich. 2022) ................................................................ 3

*Easley v. Cromartie*,
    532 U.S. 234 (2001)......................................................................... 28, 32

*Georgia State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*,
    775 F.3d 1336 (11th Cir. 2015) ........................................................... 1, 4

*Georgia v. Ashcroft*,
    539 U.S. 461 (2003).............................................................................. 24

*Gonzalez v. Harris Cnty., Tex.*,
    601 F. App'x 255 (5th Cir. 2015) ............................................................ 6

*Growe v. Emison*,
    507 U.S. 25 (1993) ......................................................................... 11, 23

*Harding v. Cnty. of Dallas, Texas*,
    948 F.3d 302 (5th Cir. 2020) .................................................................. 4

*Harris v. Arizona Indep. Redistricting Comm'n*,
    993 F. Supp. 2d 1042 (D. Ariz. 2014)........................................................13

*Harvell v. Blytheville Sch. Dist. No. 5*,
    71 F.3d 1382 (8th Cir. 1995) ...................................................................13

*Harvell v. Blytheville School Dist. No. 5*,
    126 F.3d 1038 (8th Cir. 1997) .................................................................30

*Hunt v. Cromartie*,
    526 U.S. 541 (1999)...............................................................1, 2, 27, 33

*Johnson v. De Grandy*,
    512 U.S. 997 (1994).........................................................................10, 27

*Johnson v. DeSoto Cnty. Bd. of Commr's*,
    204 F.3d 1335 (11th Cir. 2000) .................................................................3

*Kingman Park Civic Ass'n v. Williams*,
    348 F.3d 1033 (D.C. Cir. 2003) .................................................................3

*Laster v. City of Kalamazoo*,
    746 F.3d 714 (6th Cir. 2014) ....................................................................3

*League of United Latin Am. Citizens v. Abbott*,
    604 F. Supp. 3d 463 (W.D. Tex. 2022).......................................................9

*League of United Latin Am. Citizens v. Perry*,
    548 U.S. 399 (2006)..................................................................................5

*Lee v. City of Los Angeles*,
    908 F.3d 1175 (9th Cir. 2018) .................................................................28

*Lewis v. Alamance Cnty., N.C.*,
    99 F.3d 600 (4th Cir. 1996) ...............................................................13, 14

*Luna v. Cnty. of Kern*,
    291 F. Supp. 3d 1088 (E.D. Cal. 2018)................................................5, 6, 7

*Magnolia Bar Ass'n, Inc. v. Lee*,
    994 F.2d 1143 (5th Cir. 1993) ...................................................................4

*Miller v. Johnson*,
    515 U.S. 900 (1995)...........................................................................28, 31

*N.A.A.C.P. v. Fordice*,
    252 F.3d 361 (5th Cir. 2001) ...................................................................26

*Pope v. Cnty. of Albany*,
   94 F. Supp. 3d 302 (N.D.N.Y. 2015) ................................................................... 12, 14

*Quigley v. Tuong Vinh Thai*,
   707 F.3d 675 (6th Cir. 2013) ........................................................................................ 7

*Reno v. Bossier Par. Sch. Bd.*,
   528 U.S. 320 (2000) ...................................................................................................... 8

*Reyazuddin v. Montgomery Cnty., Md.*,
   789 F.3d 407 (4th Cir. 2015) ....................................................................................... 7

*Rodgers v. Monumental Life Ins. Co.*,
   289 F.3d 442 (6th Cir. 2002) ....................................................................................... 7

*Romans v. Michigan Dep't of Hum. Servs.*,
   668 F.3d 826 (6th Cir. 2012) ....................................................................................... 2

*Ruiz v. City of Santa Maria*,
   160 F.3d 543 (9th Cir. 1998) ..................................................................................... 13

*Rural W. Tennessee Afr.-Am. Affs. Council v. Sundquist*,
   209 F.3d 835 (6th Cir. 2000) ..................................................................................... 14

*Shaw v. Hunt*,
   517 U.S. 899 (1996) ...................................................................................................... 9

*Shaw v. Reno*,
   509 U.S. 630 (1993) ...................................................................................................... 8

*Shelby Cnty. v. Holder*,
   570 U.S. 529 (2013) ...................................................................................................... 8

*Thornburg v. Gingles*,
   478 U.S. 30 (1986) ............................................................................................*passim*

*Uno v. City of Holyoke*,
   72 F.3d 973 (1st Cir. 1995) ................................................................... 10, 12, 14, 16

*Valladolid v. City of National City*,
   976 F.2d 1293 (9th Cir. 1992) ..................................................................................... 3

*White-Battle v. Moss*,
   222 F. App'x 304 (4th Cir. 2007) ............................................................................... 4

*Wisconsin Legislature v. Wisconsin Elections Comm'n*,
   142 S. Ct. 1245 (2022) ........................................................................................5, 7, 8

**Constitutions**

Mich. Const. art. IV, § 6(13) ........................................................................6, 7

**Rules**

Fed. R. Civ. P. 26................................................................................................21

Fed. R. Evid. 701 ...............................................................................................21

Fed. R. Evid. 702 ...............................................................................................21

# INTRODUCTION

Plaintiffs do not even attempt to argue to the summary-judgment standard. It is "unusual" for plaintiffs to obtain summary judgment in Section 2 Voting Rights Act (VRA) cases, *Georgia State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1345 (11th Cir. 2015), and it is "rarely granted in a plaintiff's favor" in racial-gerrymandering cases, *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999) (*Cromartie I*). Plaintiffs cite no case where this has happened under either theory.

Instead, Plaintiffs ask this Court to address the "probative weight" of evidence and decide fact disputes in their favor. Plaintiffs' Motion for Summary Judgment (MSJ) 22, PageID.603; *see also id.* at 1, 18–22, 26, 27, 30–32, 41, PageID.582, 599-603, 607, 608, 611-613, 622 (using variants of "weigh" or "probative"). But the governing standard forbids "the weighing of the evidence," *Cromartie I*, 526 U.S. at 552 (citation omitted), and the mere existence of conflicting evidence defeats Plaintiffs' motion. On material elements, the Commission's three experts challenge the opinions of Plaintiffs' expert, Mr. Trende, and demonstrate that he cherrypicked evidence and withheld information from his report that contradicts his assertions. The Commission also submits a detailed declaration of Commissioner Anthony Eid, which addresses various districting considerations informing the Commission's configuration of the challenged districts. Material fact disputes regarding, *inter alia*, the proper meaning of compactness in this context and the Commission's primary motivation in configuring each challenged district preclude summary judgment.

The Court should summarily deny Plaintiffs' motion, without oral argument, because it does not argue to the controlling standard. It should focus the July 13 hearing on the Commission's motion for summary judgment, which argues to the correct test.

## THE LEGAL STANDARD

"Summary judgment is appropriate where there is 'no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Romans v. Michigan Dep't of Hum. Servs.*, 668 F.3d 826, 835 (6th Cir. 2012) (quoting Fed. R. Civ. P. 56(a)). The burden is "on the moving party to show that no genuine issue of material fact exists," *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005), and the facts and inferences must be viewed in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

When the party with the burden of persuasion moves for summary judgment, that party must satisfy a "substantially higher hurdle." *Cockrel v. Shelby Cty. Sch. Dist.,* 270 F.3d 1036, 1056 (6th Cir. 2001) (citation omitted). In that situation, "the moving party's initial summary judgment burden is 'higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it.'" *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002) (quoting *Cockrel*, 270 F.3d at 1056). A party with the burden of proof must show at the summary-judgment stage "that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986).

"Summary judgment in favor of the party with the burden of persuasion . . . is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Cromartie I*, 526 U.S. at 553. "[T]he nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in that party's favor.'" *Id.* at 552 (citation and edit marks omitted). The Court may not "make credibility determinations nor

weigh the evidence when determining whether an issue of material fact remains for trial."
*Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citation omitted).

## ARGUMENT

### I.      Threshold Deficiencies

The Commission's motion for summary judgment (Comm'n MSJ) explains that Plaintiffs have no viable claim against HD13, HD26, and SD5 based on threshold deficiencies. Comm'n MSJ 12–15, PageID.649–652. Plaintiffs' summary-judgment motion does not address these deficiencies. Plaintiffs say nothing of *Detroit Caucus v. Indep. Citizens Redistricting Comm'n*, 969 N.W.2d 331 (Mich.), *reconsideration denied*, 969 N.W.2d 515 (Mich. 2022), or their basis to press the claims of a Plaintiff who was denied relief by the final judgment in that case.

Plaintiffs do discuss standing, acknowledging that Plaintiff Jerome Bennett no longer resides in HD13 but asserting that Plaintiff Dennis Leroy Back, Jr. continues to have standing to challenge that district.   JA00855, PageID.1542. But Plaintiff Black resides in HD9, not HD13. *See* JA00542, Pl. Black, Jr.'s Objs. & Responses to ROG No. 1, PageID.1224. Because no Plaintiff resides in HD13, Plaintiffs are not entitled to summary judgment on that district.

### II.     Plaintiffs Are Not Entitled To Summary Judgment on Their VRA Claims

Plaintiffs cannot obtain summary judgment on their Section 2 claims. Although summary judgment in Section 2 cases is often "granted to the *defendants*,"[1] "it is unusual to

---

[1] Summary judgment is often granted to the defense where plaintiffs fail to produce evidence on one or more elements of their Section 2 claims. *See, e.g., Kingman Park Civic Ass'n v. Williams,* 348 F.3d 1033, 1042 (D.C. Cir. 2003); *Johnson v. DeSoto Cnty. Bd. of Commr's*, 204 F.3d 1335, 1343 (11th Cir. 2000); *Burton v. City of Belle Glade*, 178 F.3d 1175, 1199 (11th Cir. 1999); *Bradley v. Work,* 154 F.3d 704, 710–11 (7th Cir. 1998); *Valladolid v. City of National City,* 976 F.2d 1293, 1297 (9th Cir. 1992). *See also, e.g., White-Battle v. Moss*, 222 F. App'x 304, 305 (4th Cir. 2007) (affirming summary-judgment to defendant in vote-denial claim).

find summary judgment awarded to the plaintiffs in a vote dilution case." *Georgia State Conf. of NAACP*, 775 F.3d at 1345. That is because "the ultimate finding of vote dilution [is] a question of fact," that requires the court "to consider the 'totality of the circumstances,'" based "'upon a searching practical evaluation of the 'past and present reality'" of the jurisdiction in an analysis "peculiarly dependent upon the facts of each case." *Thornburg v. Gingles*, 478 U.S. 30, 78–79 (1986) (plurality opinion). Plaintiffs cite no case awarding summary judgment to a Section 2 plaintiff, and this case is not a plausible candidate to be the first.

### A.       The First *Gingles* Precondition

1.       The first precondition requires proof that the minority group is "sufficiently large and geographically compact to constitute a majority in some reasonably configured legislative district." *Cooper v. Harris*, 581 U.S. 285, 301 (2017) (quotation marks omitted). This precondition "specifically contemplates the creation of hypothetical districts." *Magnolia Bar Ass'n, Inc. v. Lee*, 994 F.2d 1143, 1151 (5th Cir. 1993). But as the Commission's summary-judgment memorandum demonstrates, Comm'n MSJ 16–20, PageID.653-657, no evidence shows that an "alternative to the districting decision at issue would . . . enhance the ability of minority voters to elect the candidates of their choice." *Abbott v. Perez*, 138 S. Ct. 2305, 2332 (2018).

In their summary-judgment motion, Plaintiffs do "not offer *any* evidence . . . that would show how" Black-preferred "candidates would fare . . . under their Remedial Plan." *Harding v. Cnty. of Dallas, Texas*, 948 F.3d 302, 309 (5th Cir. 2020). The record therefore does not "contain[] evidence satisfying the burden of persuasion,'" *Arnett*, 281 F.3d at 561 (citation omitted), that Plaintiffs' alternatives provide "an increased opportunity," *Harding*, 948 F.3d at 309. Even if such evidence existed, it would at best create a triable fact question. The

Commission's expert Dr. Maxwell Palmer analyzed the performance of Mr. Trende's plans under the 2018 Democratic gubernatorial primary and concluded that the candidate Mr. Trende identifies as Black-preferred would lose in all but two districts. JA00141, Palmer Rep. 26, PageID.820.

2.       Plaintiffs' motion fails the first precondition for the independent reason that their demonstrative plans do not honor criteria governing the Commission's work. Plaintiffs assert that the first precondition presents a "straightforward question" that is "easily" answered in their favor. Comm'n MSJ 11, PageID.592. Not so. Supreme Court precedent addressing the "compactness" component of the first precondition explains that "no precise rule has emerged" to define it. *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 433 (2006) (*LULAC*) (plurality opinion). Section 2 districts must be "reasonably configured," *Cooper*, 581 U.S. at 301; *accord Wisconsin Legislature v. Wisconsin Elections Comm'n*, 142 S. Ct. 1245, 1248 (2022), which means they "should take into account traditional districting principles such as maintaining communities of interest . . . ," *Abrams v. Johnson*, 521 U.S. 74, 92 (1997) (quotation marks omitted); *accord LULAC*, 548 U.S. at 432–33 (plurality opinion).

In this fact-intensive inquiry, "local districting preferences are certainly relevant." *Luna v. Cnty. of Kern*, 291 F. Supp. 3d 1088, 1113 (E.D. Cal. 2018). When a legislative body "adopts a redistricting plan according to certain traditional districting principles . . . , the district court must consider all such principles relied on by the locality, any opposition to such reliance by § 2 plaintiffs, and any traditional districting principles which § 2 plaintiffs may incorporate into their hypothetical plan in an effort to demonstrate comparable consistency with the plan." *Gonzalez v. Harris Cnty., Tex.*, 601 F. App'x 255, 260 (5th Cir. 2015). Although this inquiry might not demand that traditional principles be applied "in the same manner" as the

redistricting authority applied them, courts "must, at a minimum, give *some* consideration" to the authority's "principles." *Luna*, 291 F. Supp. 3d at 1112. Triable fact questions exist under this standard in at least two respects.

First, the Commission was obligated to prepare and pass plans that "reflect the state's diverse population and communities of interest." Mich. Const. art. IV, § 6(13)(c). Under this criterion, redistricting in Michigan is "animated by a principle of self-determinism" based on "public comments." *Banerian v. Benson*, 597 F. Supp. 3d 1163, 1167 (W.D. Mich.), *appeal dismissed*, 143 S. Ct. 400 (2022). As in *Banerian*, the Commission in crafting the Linden and Hickory plans was informed by public comments concerning communities of interest. *See* Exhibit 1, Declaration of Anthony Eid ¶¶ 5–6. The Commission was also informed by a detailed map of Detroit's more than 200 neighborhoods. *See id.* ¶ 5. The attached declaration of Commissioner Eid identifies how communities of interest and neighborhoods were grouped in both the Linden and Hickory plans on a district-by-district basis. *See* Ex. 1, Eid Decl. ¶¶ 8–73; *see also* Exhibit 2, Declaration of Kimball Brace ¶ 8.

As in *Banerian*, "plaintiffs' own plan[s] do[] not preserve those communities of interest or even attempt to; instead it does not apply the community-of-interest criterion at all, apart from the plan[s'] emphasis on preserving county and municipal lines." 597 F. Supp. 3d at 1167. Mr. Trende made no effort to respect Detroit neighborhood lines, Exhibit 3, Trende Dep. 42:13–19, he did not consider public input about which neighborhoods in Detroit should be joined into electoral districts, *id.* at 40:11–14, and he did not recall reviewing a Detroit neighborhood map to inform his line-drawing, *id.* at 42:9–12. Mr. Trende's demonstrative plans divide Detroit neighborhoods in practically every challenged district, Ex. 1, Eid Decl. ¶¶ 8–74, do not incorporate public feedback the Commission deemed probative, *id.* ¶¶ 14, 30–

32, 36, 60–62, 65, and combine neighborhoods and communities the Commission concluded should not be joined, *id.* ¶¶ 36, 49, 52, 58. The court "must, at a minimum, give *some* consideration" to this information, *Luna*, 291 F. Supp. 3d at 1112, and that can occur only after trial.

Second, the Commission's plans could not "provide a disproportionate advantage to any political party." Mich. Const. art. IV, § 6(13)(d). If illustrative comparators violate the state constitution, they are not "reasonably configured." *Cooper*, 581 U.S. at 301; *see Abbott*, 138 S. Ct. at 2332 (rejecting alternative configuration that would result in "breaking" a rule of "the Texas Constitution"). Yet Plaintiffs do not address the partisan-fairness requirement. *See* MSJ 10–13, PageID.591-594. Mr. Trende conceded he "didn't look at the partisan fairness of [his] demonstration plan," according to the metrics the Commission applied to its own plans. Ex. 3, Trende Dep. 49:3–7. The Commission's expert Dr. Rodden concludes that Mr. Trende's demonstrative plans "packed Democrats into extremely homogenous districts," diluting their statewide voting strength. JA00247, Rodden Rep. 21,  PageID.925; *see also* Ex. 1, Eid Decl. ¶¶ 75, 77–79. This raises a "battle of the experts," which is "a factual dispute." *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 682 n.4 (6th Cir. 2013); *see also, e.g., Reyazuddin v. Montgomery Cnty., Md.,* 789 F.3d 407, 417 (4th Cir. 2015). Trial is the forum for a court to decide which side's expert "was more credible" on an issue that could "affect the outcome of the lawsuit." *Rodgers v. Monumental Life Ins. Co.,* 289 F.3d 442, 449 (6th Cir. 2002).

3.     A third failure in Plaintiffs' first-precondition showing is that their illustrative districts cannot be deemed "reasonably configured," *Wis. Legislature*, 142 S. Ct. at 1248, when they "segregate the races for purposes of voting," *Shaw v. Reno*, 509 U.S. 630, 642 (1993) (*Shaw I*). Although Plaintiffs (wrongly) accuse the Commission of configuring districts with

racially predominant intent, MSJ 38–43, PageID.619-624, the record creates a triable fact question whether *Mr. Trende's plans* were the product of predominantly racial intent. Dr. Palmer and Dr. Rodden find that Mr. Trende's demonstrative plans fail the metrics he used to attempt to show predominant racial intent on the Commission's part. JA00142, Palmer Rep. 26, PageID.820; Rodden Rep. 27, 39–41, PageID.931, PageID.943-944. For his part, Mr. Trende admitted he made no effort to avoid racial predominance because he believes racial predominance is an acceptable feature of demonstrative districts. Ex.3, Trende Dep. 79:9–15, 159:2–12.

That cannot be correct. The alternative-map requirement exists because, without a viable alternative, a minority group "cannot claim to have been injured by [the challenged] structure or practice." *Gingles*, 478 U.S. at 51. A Section 2 "hypothetical" alternative attempts to show "what the right to vote *ought to be.*" *Reno v. Bossier Par. Sch. Bd.*, 528 U.S. 320, 334 (2000). But districting maps that "sort voters on the basis of race 'are by their very nature odious.'" *Wis. Legislature,* 142 S. Ct. at 1248 (citation omitted). The right to vote certainly ought *not* be something odious.

Should there be any doubt on this, Section 2 should be read to avoid constitutional doubts, *Bartlett v. Strickland*, 556 U.S. 1, 21 (2009) (plurality opinion), and thus not to demand presumptively unconstitutional redistricting. Section 2 enforces the Civil War Amendments. *See Shelby Cnty. v. Holder*, 570 U.S. 529, 542 n.1 (2013). Just as "Congress does not enforce a constitutional right by changing what the right is," *City of Boerne v. Flores*, 521 U.S. 507, 508 (1997), Section 2 cannot enforce these Amendments by compelling states to violate them. "Racial classifications are antithetical to the Fourteenth Amendment, whose central purpose was to eliminate racial discrimination emanating from official sources in the States." *Shaw v.*

*Hunt*, 517 U.S. 899, 907 (1996) (*Shaw II*) (quotation marks omitted). Congress may not enforce that principle by compelling states to employ racial classifications. Because there is a triable question on whether Mr. Trende's plans are the product of racial predominance, summary judgment is improper on the first precondition.[2]

### B.    The Second and Third *Gingles* Preconditions

Plaintiffs do not show polarized voting as a matter of law and are not entitled to summary judgment on the second and third *Gingles* preconditions. The second precondition asks "whether minority group members constitute a politically cohesive unit," and the third asks "whether whites vote sufficiently as a bloc usually to defeat the minority's preferred candidates." *Gingles*, 478 U.S. at 56. "As must be apparent, the degree of racial bloc voting that is cognizable as an element of a § 2 vote dilution claim will vary according to a variety of factual circumstances." *Id.* at 57–58. That standard resists a finding of liability as a matter of law, and this case is no exception.

### 1.    District-by-District Analysis

The Commission's summary-judgment motion explained that Plaintiffs have no evidence of at least one of the two polarized-voting preconditions as to 12 of 17 challenged districts. Comm'n MSJ 22–24, PageID.659-661. Because each precondition "must be shown on a district-by-district basis," *League of United Latin Am. Citizens v. Abbott*, 604 F. Supp. 3d 463, 496 (W.D. Tex. 2022) (three-judge court), Plaintiffs cannot prove a Section 2 claim as to

---

[2] The Supreme Court is currently considering various issues under Section 2, including the extent to which racial considerations in illustrative plans are permissible. *See Allen v. Milligan*, 12-1086 (oral argument conducted Oct. 4, 2022). A decision is likely to issue before the Court decides the competing summary-judgment motions, and the Commission will modify its position as appropriate depending on its guidance.

them as a matter of law. Plaintiffs' motion proves the Commission's point, as it fails to present evidence of polarization district-by-district.

Plaintiffs might plausibly cite some evidence of the second and third preconditions as to the five remaining districts, but that only gives rise to triable fact questions. Plaintiffs cite the 2022 Democratic primary elections, but a pattern is essential to prove the second and third preconditions. *Uno v. City of Holyoke,* 72 F.3d 973, 985 (1st Cir. 1995) ("to be legally significant, racially polarized voting in a specific community must be such that, over a period of years, whites vote sufficiently as a bloc to defeat minority candidates most of the time"). "Because loss of political power through vote dilution is distinct from the mere inability to win a particular election, a pattern of racial bloc voting that extends over a period of time is more probative of a claim that a district experiences legally significant polarization than are the results of a single election." *Gingles*, 478 U.S. at 57; *Johnson v. De Grandy*, 512 U.S. 997, 1014 n.11 (1994) ("[T]he ultimate right of § 2 is equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race."). Plaintiffs cannot show vote dilution as a matter of law by one election: "One swallow does not a summer make, and the results of a single election are unlikely, without more, to prove the existence or nonexistence of embedded racial cleavages." *Uno*, 72 F.3d at 985; *see also Black Pol. Task Force v. Galvin*, 300 F. Supp. 2d 291, 304 (D. Mass. 2004) ("the Supreme Court has cautioned that a pattern of polarized voting extending over a period of time is customarily more probative than the results of any single election").

As discussed below (§ II.B.2), the Commission's experts will demonstrate that the comparatively few Black-preferred-candidate losses are idiosyncratic and not probative of a

lack of equal opportunity, and their opinions must be weighed at any trial that might occur in this case.

### 2.    Aggregate Approach

Even assuming Plaintiffs were correct to aggregate all Detroit-area elections and all challenged districts into one inquiry, *see* MSJ 10–26, PageID.591-607, they have no plausible entitlement to summary judgment.

Dr. Handley's analysis of 51 contested elections in 2022 in 27 Detroit-area districts with BVAPs greater than 25% shows a combined success rate of Black-preferred candidates of 88.2% (27 of 27 general elections; 18 of 24 contested primaries). JA00010–11, 2023 Handley Rep. 10–11, PageID.688-689. Plaintiffs' own chart disproves their case under the third precondition: of 24 contested primary elections, the Black-preferred candidate prevailed in 18, for a 75% win percentage. *See* JA00857, Handley Table 4, Reconfigured, PageID.1543. When three uncontested Democratic primaries are included in the calculus, the Black-preferred-candidate success rate increases to 21 of 27, or 77.7%. *See id*. The third precondition requires proof "that the white majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate." *Growe v. Emison*, 507 U.S. 25, 40 (1993) (citation, quotation, and edit marks omitted). Section 2 is not "a floor on the success rates of [minority-preferred] candidates"; it guarantees "an equal *opportunity* to elect candidates of [the minority's] choice." *Clarke v. City of Cincinnati*, 40 F.3d 807, 812 (6th Cir. 1994). In *Clarke*, the Sixth Circuit found a 47% success rate of Black-preferred candidates precluded a Section 2 finding *after* trial. *Id.* at 813. Plaintiffs cannot obtain judgment *before* trial where the success rate of Black-preferred candidates is nearly twice as high—over 88%.

Plaintiffs ask the Court to "accord[] less weight" to most elections in this ensemble because of alleged "relative probative values." MSJ 18, PageID.599; *see also id.* at 19–26, PageID.600-607. But "the weighing of the evidence" is for trial. *Bennett*, 410 F.3d at 817. The Court must consider "*all elections* in the relevant time frame," *Uno*, 72 F.3d at 985, and the decisions Plaintiffs cite were issued after trial; none was decided on summary judgment. *See, e.g.*, *Pope v. Cnty. of Albany*, 94 F. Supp. 3d 302, 309 (N.D.N.Y. 2015); *Baldus v. Members of Wisconsin Gov't Accountability Bd.*, 849 F. Supp. 2d 840, 847 (E.D. Wis. 2012) (three-judge court); *Galvin*, 300 F. Supp. 2d at 301. Because the Commission is entitled to all reasonable inferences, the Court must accept that the relevant Black-preferred combined success rate in the Detroit area exceeds 88%, leaving Plaintiffs no colorable argument under at least the third precondition.

Seeking to avoid that result, Plaintiffs demand that this Court instead consider only "recent primary elections featuring either non-incumbent, Black candidates versus non-incumbent, white candidates, or incumbent, Black candidates versus incumbent, white candidates." MSJ 21–22, PageID.602-603. That would appear in effect to exclude 40 elections from evidence and leave only 11.[3] Even in that limited data set, Black-preferred candidates have a win percentage of 54.5%. *See* JA00857, Handley Table 4, Reconfigured, PageID.1543. The third precondition is not met even taking the evidence in the light most favorable to Plaintiffs. That is no basis to invalidate 17 legislative districts, with no trial.

Besides, Plaintiffs' arguments are either legally erroneous or raise material fact disputes that preclude summary-judgment in their favor.

---

[3] In fact, it is unclear precisely which elections Plaintiffs ask the Court to credit and what they believe the relevant Black-preferred-candidate success rate is.

Incumbency.  Plaintiffs ask the Court to ignore all elections where a Black or Black-preferred incumbent prevailed. *See* MSJ 20–21, PageID.601-602. Sixth Circuit precedent rejects that rule:

> [U]nlike other special circumstances, incumbency plays a significant role in the vast majority of American elections. To qualify as a special circumstance, then, incumbency must play an unusually important role in the election at issue; a contrary rule would confuse the ordinary with the special, and thus make practically every American election a special circumstance.

*Clarke*, 40 F.3d at 813–14 (quotation marks omitted). No evidence shows that incumbency in each contested primary election where the Black or Black-preferred incumbent candidate prevailed was "unusually important." These contests cannot be discounted, not now and not at trial.

Black-Preferred Candidates Of Different Races. Plaintiffs also ask the Court to ignore contests where the Black-preferred candidate is not Black. MSJ 18–19, 21, PageID.599-600, 602. That is erroneous. *Ruiz v. City of Santa Maria*, 160 F.3d 543, 551 (9th Cir. 1998) ("We join our sister circuits in rejecting the position that the 'minority's preferred candidate' must be a member of the racial minority. To hold otherwise would, in the words of Judge Cabranes, provide judicial approval to 'electoral apartheid.'" (quoting *NAACP v. City of Niagara Falls, N.Y.*, 65 F.3d 1002, 1016 (2d Cir.1995))); *see also id.* (collecting cases); *Harvell v. Blytheville Sch. Dist. No. 5*, 71 F.3d 1382, 1386 (8th Cir. 1995) ("We do not categorically state that a candidate is the minority-preferred candidate simply because that candidate is a member of the minority."); *Lewis v. Alamance Cnty., N.C.*, 99 F.3d 600, 607 (4th Cir. 1996) ("That is, a minority-preferred candidate may be a non-minority, just as a minority candidate may be the preferred candidate of the voters of the majority's race."); *Harris v. Arizona Indep. Redistricting Comm'n*, 993 F. Supp. 2d 1042, 1054 (D. Ariz. 2014), *aff'd*, 578 U.S. 253 (2016) ("A minority

group's preferred candidate need not be a member of the racial minority."). Plaintiffs' expert, Mr. Trende, agrees that a candidate need not be Black to be the Black-preferred candidate. JA00488, Trende Dep. 33:7–16, PageID.1170.

Plaintiffs are incorrect in asserting that "the Sixth Circuit accords less weight to elections where the supposed black candidate of choice was white." MSJ 18–19, PageID.599-600. First, the Court in the case they cite was discussing "white-white elections," *Rural W. Tennessee Afr.-Am. Affs. Council v. Sundquist*, 209 F.3d 835, 840 (6th Cir. 2000), but the elections at issue here are (with a single exception) *white-Black* elections where the *Black* vote went to the *white* candidate. *See* JA00857, Handley Table 4, Reconfigured, PageID.1543.[4] White-Black elections are probative because they present the electorate with a racial choice. The Black electorate's choice to support white candidates is probative against Plaintiffs' narrative of racial polarization. Second, the Sixth Circuit held the opposite of what Plaintiffs represent: "white-white elections are relevant in the analysis of a voting dilution claim." *Id.* at 840. Although these elections may be "less probative than those involving black candidates," they remain "relevant." *Id.* Only at trial may the Court may properly determine just how probative these elections are.

General Elections. Plaintiffs ask the Court to consider only primary elections, but the authority they cite deems "*all elections*" relevant. *Uno*, 72 F.3d at 985. This includes general elections. *Lewis v. Alamance Cnty., N.C.*, 99 F.3d 600, 614–16 (4th Cir. 1996). If Plaintiffs believe primary elections "are far more probative," they can argue that at trial. *Pope*, 94 F. Supp. 3d at 321, 324.

---

[4] The exception is HD3, and it involved candidates of Middle Eastern descent.

For now, what matters is that the Commission has sponsored expert opinion demonstrating that general elections can be—and are in this case—more probative than primaries. Dr. Palmer explains that "[d]istrict primaries are idiosyncratic, with different numbers of candidates, varying degrees of group cohesion in support of candidates, and levels of racially polarized voting." JA00125, Palmer Rep. 9, PageID.803; *see also id*. at 4–10, PageID.798-804. Some primaries may be uncontested, some may have two candidates, and some may be contested by multiple candidates so that no candidate receives a majority of the vote, which makes "the existence of a candidate of choice less obvious." *Id*. at 4–5, PageID.798-799. In primaries with more than two candidates, Black-preferred candidates may lose "not due to an insufficient Black voting population but due to candidate entry and a lack of coordination in the primary". *See id*. at Palmer Rep. 8, PageID.802. In contrast, "analyzing racially polarized voting is straightforward" in general elections because "there are usually two competitive candidates in the election." *Id*. at 4, PageID.798. And voter turnout is lower in primary elections than general elections, including in 2022, where votes cast in primaries in every challenged district were less than half of those cast in the general election. Primary elections therefore reveal no information about the preferences of a large share of the electorate, Black and white. *Id*. at 9, PageID.803. General elections, by contrast, "can reveal the preferences of all of the voters in the general election, if different groups had different preferred candidates, and, if so, if the Black-preferred candidate is able to win the election." *Id.* The Court must take these facts and the inferences in the Commission's favor at this stage.

Recent Elections. Plaintiffs also insist that "the more recent an election, the higher its probative value," MSJ 19, PageID.600, but the case law they cite considers elections "in the

past ten years" to be recent, *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1021 (8th Cir. 2006). All elections presented in this case qualify, and, as shown, Plaintiffs' claims fail under the 2022 elections, standing alone. Plaintiffs' expert reports discuss no "political evolution" in recent years that makes a material difference in this case, *Uno*, 72 F.3d at 990, and any question on that point would require trial.

Exogenous Races. Exogenous elections "hold some probative value." *Bone Shirt*, 461 F.3d at 1021. Plaintiffs are wrong to ask this Court to ignore that value as a matter of law.

Majority-Minority Districts Elections. Plaintiffs also ask the Court to discount elections in majority-minority districts, MSJ 19, PageID.600, but this asks the Court to weigh evidence. In fact, Dr. Handley did not examine majority-minority districts in a vacuum but as part of a comprehensive analysis of all elections in Detroit-area districts with BVAPs above 25%. *See* JA00010, 2023 Handley Rep. 10, PageID.688. This is a fact question unripe to address at this time. Besides, Plaintiffs do not establish a Section 2 violation even when majority-minority district contests are ignored: the Black-preferred win percentage in the 18 contested primaries in non-majority Black districts is 72.2% (13 of 18). *See* JA00857, Handley Table 4, Reconfigured, PageID.1543.

Inferences Regarding Elections.  Plaintiffs ask the Court to draw inferences about a few Black-preferred-candidate losses—affording them outsized weight—and about the many Black-preferred-candidate wins—affording them no weight. The summary-judgment standard directs the opposite approach.

First, Plaintiffs point to a Democratic primary in SD8 and ask the Court to infer that the Black-preferred candidate lost "because of the low BVAP." MSJ 23, PageID.604. But, according to Dr. Palmer, "[t]his single election does not reflect a consistent pattern of racial

polarization" in SD8, and instead "demonstrates the idiosyncrasies of primary elections." JA00134, Palmer Rep. 18, PageID.812. Plaintiffs describe this race as between "two well-funded Democratic incumbents," MSJ 23, PageID.604, but ignore the national attention and unprecedented level of funding the prevailing incumbent received after a widely publicized speech on transgender rights. JA00134, Palmer Rep. 18, PageID.812.[5] Senator McMorrow received support from 24% of Black voters, JA00013, 2023 Handley Rep. 13, PageID.691,and white voters "turned out at a very high rate relative to other districts." *Id.* That election says little about ordinary electoral conditions in the Detroit region.

Second, Plaintiffs emphasize a Black-preferred-candidate loss in the 2022 Democratic primary in SD1. MSJ 23, PageID.604. But this race featured six candidates, four of whom were Black, and most Black voters voted against the candidate Plaintiffs allege was Black-preferred, who was supported by a small plurality of Black voters (34%). JA00013, 2023 Handley Rep. 13, PageID.691. The prevailing candidate, incumbent Senator Erika Geiss, was the second choice of Black voters (24.3%) and currently serves as Chair of the Michigan Legislative Black Caucus. *See Michigan Legislative Black Caucus Announces Officers for the 102nd Legislature*, Michigan Legislative Black Caucus (Jan. 13, 2023).[6] It is difficult to see unequal electoral opportunity in that result.

---

[5] McMorrow reportedly raised over $1 million following her viral speech. *It's official: The attack on McMorrow backfired*, Politico (Jul. 28, 2022), https://www.politico.com/news/2022/07/28/mcmorrow-theis-michigan-senate-00048330. She reportedly raised $602k for the primary versus Senator Bullock's $127k. *Michigan State Senate District 8*, Transparency USA, https://www.transparencyusa.org/mi/race/michigan-state-senate-district-8 (last visited Jun. 2, 2023).

[6] *Michigan Legislative Black Caucus Announces Officers for the 102nd Legislature*, Michigan Legislative Black Caucus (Jan. 13, 2023), https://michiganlbc.org/2023/01/13/michigan-legislative-black-caucus-announces-officers-for-the-102nd-legislature/ (last visited Jun. 6, 2023).

Third, Plaintiffs ask the Court to afford outsized weight to 2022 house contests where "[f]our Black candidates of choice were defeated." MSJ 25, PageID.606. But Black voters were not cohesive in two of these races (in HD8 and HD11), and one loss occurred in a district Plaintiffs do not challenge (HD5).[7] JA00012–13, 2023 Handley Rep. 12–13, PageID.690-691. Hence, only one of these four results counts towards Plaintiffs' burden to prove polarized voting in the challenged districts.

Plaintiffs next ask the Court to discount elections where Black-preferred candidates prevailed. MSJ 21, 24–25, PageID.602, 605-606. But the inferences must be taken the other way, and these are highly probative of equal opportunity. In HD12 (42.6% BVAP), for example, the non-incumbent Black-preferred candidate defeated the white incumbent. JA00349, Trende Rep. 42, PageID.1029. Plaintiffs ask the Court to conclude, with no supporting evidence, that this victory and the one in HD14 occurred only because candidates had "English and Irish surnames," MSJ 21, PageID.602, but they are not entitled to that inference. Plaintiffs also contend that the eight Black-preferred incumbents were successful "only because they lacked serious challengers." MSJ 25, PageID.606. But no one knows what would have happened with "serious challengers," and Plaintiffs' expert acknowledged that "twelve Black candidates of choice won seats in this election."  JA00349, Trende Rep. 42, PageID.1029.

Remarkably, Plaintiffs assert about the 2022 elections that "there is no evidence suggesting that the Black candidate of choice can win a polarized primary in a district with a

---

[7] Plaintiffs discuss HD5 at length, calling it "perhaps the most egregious district on the map," MSJ 26, PageID.607, but do not explain why assertions about a majority-minority district they do not challenge justifies liability against crossover districts where Black-preferred candidates usually win.

BVAP below 47%," MSJ 25, PageID.606, but that quotes an assertion Mr. Trende made about the 2018 House primaries. JA00342, Trende Rep.35, PageID.1022. Mr. Trende was wrong about the 2018 primaries (*see* § II.B.3, *infra*), and Plaintiffs are wrong about the 2022 primaries. In 2022, Black-preferred candidates prevailed in three polarized primaries below 47% BVAP—HD7 (45.9%), HD14 (42.7%), and HD12 (42.6%). JA00011, 2023 Handley Rep. 11, PageID.689.

Plaintiffs also attempt to minimize Black-preferred wins in the Senate because "only two senators were the Black candidate of choice *when first elected*." MSJ 24, PageID.605 (emphasis added). Plaintiffs cite no authority for the proposition that the Court should disregard victories by Black-preferred candidates in the 2022 primaries based on the results of prior elections in prior years. Ultimately, Black-preferred candidates prevailed in four contested Senate primaries in the Detroit-area (SD2, SD3, SD6, SD7), JA00011, 2023 Handley Rep. 11, PageID.689; JA00396, Trende Rep. 89, PageID.1076.

### 3.    Admissibility and Credibility Deficiencies

Plaintiffs rely on evidence that is inadmissible and lacking in credibility. There is no reason to believe it will prove their case at trial and cannot be adjudged so now.

First, Mr. Trende was exposed by the Commission's expert, Dr. Palmer, as being less than candid in his report. Dr. Palmer identifies instances where Mr. Trende cherrypicked election results and reported them in misleading ways.

For example, as noted, Mr. Trende declared that "there is *no* evidence suggesting that the Black candidate of choice can win a polarized primary in a district with a BVAP below 47%" in the 2011 house districts. JA00342-43, Trende Rep. 35–36, PageID1022-1023. Plaintiffs misleadingly repeat this assertion in reference to the 2022 elections under the

challenged plans. MSJ 25, PageID.606. But that adds error upon error. Dr. Palmer showed not only that there *is* evidence in 2018 suggesting this, but also that Mr. Trende generated that evidence. JA00131, Palmer Rep. 15, PageID.809. According to Dr. Palmer, Mr. Trende's analysis showed evidence of racially polarized voting in HD4 (45.6% BVAP) in the 2011 house districts, where the Black-preferred candidate won the 2018 primary. *Id.* Mr. Trende "wrote code to perform this analysis himself, including code to generate a table presenting the results," *id.*, yet he omitted this information, the table, and any mention of this contest from his report.[8] Then, Mr. Trende made an assertion directly contrary to that omitted evidence.

Mr. Trende also did not report his own analysis of the results of HD11 (25.5% BVAP) where the Black-preferred candidate won a polarized primary, even though he wrote code to perform the analysis and generate a table with the results. *Id.* While Mr. Trende acknowledged in passing that this contest *is* evidence of Black-preferred candidate success in Detroit area districts with BVAPs lower than 47%, JA00343, Trende Rep. 36, PageID.1023, he could not credibly explain the clear contradiction between this race and his ironclad declaration that there was "no evidence." Ex. 3, Trende Dep. 153:1–156:24. What's more, Dr. Palmer found that Mr. Trende wrote code to analyze 11 districts in the 2018 primaries in the 2011 plan, but only reported the results for two districts. *See* JA00343–46, Trende Rep. 36–39 (HD2 and HD5 only), PageID.1023-46; *see also* JA00131, Palmer Rep. 15, PageID.809.

---

[8] At deposition, Mr. Trende attempted to attribute this omission to a difference in the definition of BVAP reported by him and Dr. Handley, Ex. 3, Trende Dep. 150:11–151:20, despite reporting HD4 at 45.5% BVAP in his report. JA00342, Trende Rep. 35. But Mr. Trende acknowledged that when using the "Black alone" definition of BVAP he uses throughout his report, there is evidence of Black-preferred candidate success in polarized primaries in HD4 and HD11. Ex. 3, Trende Dep. 156:13–24. Regardless, that does not explain why Plaintiffs repeated this exposed error in their summary-judgment brief.

Mr. Trende similarly omitted analyses of senate districts. Mr. Trende wrote code to analyze the 2022 primary election in current SD 11—one of the challenged districts—and to generate a table presenting those results, which showed that SD11 was not polarized in the 2022 primary. JA00131, Palmer Rep. 18, PageID.812. But Mr. Trende did not include those results in his report and did not mention that he analyzed SD11. *Id.*; *see* JA00396, Trende Rep. 89, PageID.1076. The Court cannot grant summary judgment based on an expert analysis of doubtful credibility.

Second, Plaintiffs rely on lay testimony by LaMar Lemmons III, but it consists of both improper expert testimony and assertions lacking in foundation and credibility. Plaintiffs cite Mr. Lemmons' affidavit as evidence of "racial polarization translat[ing] into participation in the electoral process and voting patterns in Democrat primary elections." MSJ 16, PageID.597. Mr. Lemmons purports to offer opinions about the voting patterns by race. *See, e.g.,* JA00525, Lemmons Aff. ¶ 17, PageID.1027 ("White democrat primary voters from the predominately White areas will generally even more strongly prefer and vote for a White democrat primary candidate over a Black democrat primary candidate."). Plaintiffs also rely on Mr. Lemmons' analysis of the 2022 Democratic primaries in SD5, SD8, and SD1, and his opinions that Black-preferred candidates lost in those districts. *See* MSJ 23, PageID.604.

But Plaintiffs did not disclose Mr. Lemmons as an expert witness, he did not prepare an expert report, and his opinions are not otherwise in compliance with the rules governing expert opinion. *See* Fed. R. Civ. P. 26(a)(2)(A) & (B). As a lay witness, Mr. Lemmons may not offer opinions that are "based on scientific, technical, or other specialized knowledge within the scope of Rule 702." *See* Fed. R. Evid. 701. In deposition, Mr. Lemmons attested that his opinions are grounded in "statistical techniques" and analyses of census data, voter

turnout, canvass reports, and election results. *See, e.g.,* Exhibit 4, Lemmons Dep. 76:23–77:24, 70:19–71:19 (election results), 72:22–73:13 (canvass reports), 105:23–106:11 (relied on precinct data to determine candidate supported by Black community in SD11). Mr. Lemmons testified that his "training and experience in analyzing elections" enabled him to analyze primary elections. Ex. 4, Lemmons Dep. 92:19–93:16, 77:19–23. Mr. Lemmons' opinions are inadmissible.

Mr. Lemmons' opinions also lack any foundation or credibility, and some conflict with his own testimony and the opinions of Mr. Trende. Mr. Lemmons cites the 2022 primary in SD7 as evidence that "it would be exceedingly difficult for any Black candidate of choice to prevail in a Democrat primary election," opining that "the incumbent Senator Jeremy Moss, a White man from Southfield, soundly defeated the newcomer Ryan Foster, a Black man from Detroit." JA00532, Lemmons Aff. ¶¶ 39–40, PageID.1214. But Mr. Trende's statistical analysis shows that the 2022 primary in SD7 was not polarized—Black and white voters overwhelming supported Senator Moss. JA00396, Trende Rep. 89, PageID.1076.

Mr. Lemmons also believes that "when there is a black candidate and a white candidate, it is clear that the general preference by the black community is to have a black candidate with similar experience in the primary." Ex. 4, Lemmons Dep. 70:19–71:2. This assertion belied by the expert analysis, *see* JA00396, Trende Rep. 89, PageID.1076; JA00488, Trende Dep. 33:7–16, PageID.1170; JA00857, Handley Table 4, Reconfigured, PageID.1543, and Mr. Lemmons' own experience of supporting a white candidate in SD11 over a Black candidate. Ex. 4, Lemmons Dep. 103:17–104:20. And while Mr. Lemmons claimed that other Black voters "overwhelmingly" supported the Black candidate, *id.* at 104:4–20, Mr.

Trende's analysis shows Black voters were not cohesive. JA00131, Palmer Rep. 18, PageID.812.

Mr. Lemmons' testimony on other issues is likewise flawed. For example, Plaintiffs rely on Mr. Lemmons' testimony regarding his experiences campaigning in Wayne, Oakland, and Macomb Counties and what he considers low engagement from white residents. MSJ 30, PageID.611. But Mr. Lemmons admitted he does not know why residents may not answer their doors during political canvassing, Ex. 4, Lemmons Dep. 65:21–66:14, which forecloses his opinion that racial animus is to blame. The Court should not credit this testimony at trial, and it cannot award summary judgment based on it now.

### 4.    Plaintiffs' Miscellaneous Arguments Miss Their Mark

Plaintiffs offer various other arguments and narrative devices. None is persuasive; none justifies the exceptional step of summary judgment.

First, Plaintiffs emphasize a law review article authored by Jocelyn Benson before she became Michigan's Secretary of State, which "proposed a ban on reductions below 55%" minority VAP under Section 5 of the VRA. MSJ 5, PageID.586 (quoting Jocelyn Benson, Turning Lemons into Lemonade: Making *Georgia v. Ashcroft* the *Mobile v Bolden* of 2007, 39 Harv CR-CLL Rev 485, 495 (2004)). As an initial matter, Secretary Benson was discussing "areas covered by VRA Section 5," Benson, *supra*, at 494, and this is not a Section 5 case. Moreover, the article relies on national studies of voting patterns between 1972 and 1994, *id.* at 494–95, and the Supreme Court held 30 years ago that a "law review article on national voting patterns" lacks probative force in evaluating the second and third *Gingles* preconditions. *Growe*, 507 U.S. at 42. The Court found clear error in a district court's reliance on such a law review article, *id.*, and this is no time to repeat that error.

Besides, the article predates intervening Supreme Court precedent. Under Section 2, the Supreme Court directs "that the most effective way to maximize minority voting strength may be to create more influence or [crossover] districts," and quotes *Georgia v. Ashcroft*—the case criticized in the law review article Plaintiffs cite—for that proposition. *See Bartlett*, 556 U.S. at 23 (quoting *Georgia v. Ashcroft*, 539 U.S. 461, 482 (2003)). As the Commission explained, Comm'n MSJ 18–20, PageID.655-657, *Bartlett* encourages states to defend Section 2 lawsuits by "pointing . . . to effective crossover districts," *Bartlett*, 556 U.S. at 24, and *Cooper* unanimously held that Section 2 to can "be *satisfied by* crossover districts (for groups in fact meeting *Gingles*' size condition)." 581 U.S. at 305. Likewise, under Section 5, a proposed rule barring BVAP reductions was rejected by the Supreme Court in *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 275–76 (2015).[9] A three-judge court last decade invalidated 11 legislative districts as racial gerrymanders because the Virginia legislature "employed a mandatory 55% BVAP floor in constructing" them. *Bethune-Hill v. Virginia State Bd. of Elections*, 326 F. Supp. 3d 128, 145 (E.D. Va. 2018) (three-judge court).

Second, Plaintiffs attack a straw man by labeling the challenged districts "influence" districts and insisting that "'influence districts' like those here have no basis in VRA jurisprudence." MSJ 31, PageID.612. But the challenged districts are actually (or may be found at trial to be) "crossover district[s]," in which "the minority population, at least potentially, is large enough to elect the candidate of its choice with help from voters who are members of the majority and who cross over to support the minority's preferred candidate."

---

[9] The dissenting opinion in *Georgia v. Ashcroft*, which Congress adopted by a 2006 amendment to Section 5 (but not Section 2) also rejects Plaintiffs' position, explaining that, "in districts with low racial bloc voting or significant white crossover voting, a decrease in the black proportion may have no effect at all on the minority's opportunity to elect their candidate of choice." 539 U.S. at 499 (Souter, J., dissenting).

*Bartlett*, 556 U.S. at 13. Record evidence establishes that white crossover voting in and around Detroit is sufficient that Black-preferred candidates can prevail in districts below 50% BVAP. *See* 2023 Handley Rep. 8, JA00008, PageID.686 ("The . . . contests analyzed by Mr. Trende do not alter my conclusions regarding whether majority Black districts are necessary to provide Black voters with an opportunity to elect their candidates of choice to the state legislature – they are not."). As discussed, crossover districts most certainly have a "basis in VRA jurisprudence" insofar as states may voluntarily use them to fulfill their Section 2 obligations. *See Bartlett*, 556 U.S. at 24; *Cooper*, 581 U.S. at 305.

*Baldus v. Members of Wisconsin Government Accountability Bd.*, 849 F. Supp. 2d 840 (E.D. Wis. 2012), a decision issued after trial, *id.* at 847, offers Plaintiffs no support against that clear Supreme Court precedent. *Baldus* invalidated two "influence" districts because the "evidence" of polarized voting established "that Latino voters have a distinctly better prospect of electing a candidate of choice with one majority-minority district than with two influence districts." *Id.* at 856. In this case, that evidence does not exist, the districts are crossover districts backed by evidence of reliable white crossover voting, and any doubt on those points only creates a triable fact dispute. To the extent Plaintiffs read *Baldus* to foreclose states' use of crossover districts to satisfy Section 2, they read it as bad law in conflict with *Bartlett* and *Cooper*.

Third, Plaintiffs make unsupported assertions. For example, they contend "that Michigan's Legislative Black Caucus was decimated in the 2022 elections, losing 20% of its members." MSJ vii, PageID.580; *see also id.* at 1, 22, PageID.582, 603. But no evidence accompanies that charge, none was exchanged in discovery, and it is incorrect. Michigan's Legislative Black Caucus remains robust, with at least 21 members in 2023—six more than

the combined 15 majority-minority districts in Mr. Trende's demonstrative plans.[10] An "Uber

XL" cannot hold 21 passengers. *See* MSJ 22, PageID.603. Likewise, Plaintiffs' assurance that

"more losses [are] to come" is speculation. Any crystal-ball inference the Court might be

inclined to entertain would have to await trial.

### C.    The Totality of the Circumstances

Plaintiffs are not entitled to summary judgment on the totality of the circumstances.

While the Commission recognizes that some relevant factors are likely to favor Plaintiffs at

trial, *see* Comm'n MSJ 29–30, PageID.666-667, the totality-of-the-circumstances is "fact-

intensive," requiring "a functional view of political life" in the relevant area. *N.A.A.C.P. v.*

*Fordice*, 252 F.3d 361, 367 (5th Cir. 2001). There is no "particular number of factors" that

must be satisfied, *id.*, and Plaintiffs improperly ask the Court to "weigh[]" factors in their

favor at this stage, MSJ 31, 32, PageID.612-613. That is premature.

Plaintiffs cannot claim victory on critical factors. First, to the extent the question of

alternative-district performance is a question under the totality-of-the-circumstances, it is

dispositive, *see* Comm'n MSJ 16 n.8, PageID.653, and Plaintiffs cannot prevail under it, *id.* at

16–20, PageID.653-657. Second, many "members of the minority group have been elected to

public office," so this factor favors the Commission. *Gingles*, 478 U.S. at 37. Third, the

"extent" of "racially polarized" voting, *id.*, though legally significant, is muted because of

strong white crossover voting, JA00045, 2021 Handley Rep. 21, PageID.723, notwithstanding

Plaintiffs' perfunctory assertions to the contrary, MSJ 31, PageID.612. Fourth, the "lack of

responsiveness" inquiry concerns "elected officials" generally, *Gingles*, 478 U.S. at 37, not just

---

[10] *About Us*, Michigan Legislative Black Caucus, https://michiganlbc.org/about/ (last
visited Jun. 6, 2023).

"white representative[s]," MSJ 30, PageID.611. Because many Black representatives serve in the legislature, this factor cannot be shown to favor Plaintiffs as a matter of law. Fifth, the proportionality inquiry turns on the opportunity available to Black voters not the success of Black candidates, *see Johnson*, 512 U.S. at 1014–15 & n.11, and Plaintiffs' discussion of proportionality is deficient and legally flawed, *see* MSJ 33–34, PageID.614-615.

Given these and other issues, the Court is not now positioned to weigh the totality-of-the-circumstances.

### III. Plaintiffs Are Not Entitled To Summary Judgment on Their Racial-Gerrymandering Claims

Plaintiffs fall far short of the summary-judgment mark on their racial-gerrymandering claims. In *Cromartie I*, the Supreme Court unanimously reversed the entry of summary judgment for plaintiffs on a racial-gerrymandering claim, as Plaintiffs demand here. 526 U.S. at 546. The Court reiterated that a racial-gerrymandering plaintiff must show "that race was the 'predominant factor' motivating the legislature's districting decision" and that "[t]he legislature's motivation is itself a factual question." *Id.* at 547, 549. The Court warned: "summary judgment is rarely granted in a plaintiff's favor in cases where the issue is a defendant's racial motivation," and explained that "the same holds true for racial gerrymandering claims of the sort brought here." *Id.* at 541 n. 9 (citing 10B Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure §§ 2730, 2732.2 (1998)).

Plaintiffs do not cite this authority or explain why this is the rare case where subjective motive of 13 public officers can be resolved as a matter of law. Their brief does not identify a single line of a single challenged district drawn for predominantly racial reasons and does not

say which alleged racial targets were achieved in which districts and how. It does not even name a challenged district. If anything, this weak showing may require that summary judgment be entered against Plaintiffs. *See Lee v. City of Los Angeles*, 908 F.3d 1175, 1185–86 (9th Cir. 2018) (granting summary judgment to defendants where evidence of racial considerations could not cross the threshold of predominance).

> ### A.    Racial Predominance

It is the "plaintiff's burden . . . to show . . . that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Miller v. Johnson*, 515 U.S. 900, 916 (1995). "Race must not simply have been *a* motivation for the drawing of a majority-minority district, but the *predominant* factor motivating the legislature's districting decision." *Easley v. Cromartie*, 532 U.S. 234, 241 (2001) (*Cromartie II*) (internal citations and quotation marks omitted). This is a "demanding" standard, *id.*, that "applies district-by-district," *Alabama Legislative Black Caucus*, 575 U.S. at 262.

1.    Plaintiffs are wrong to contend that evidence of "a set racial target" satisfies this high burden. MSJ 38, PageID.619. To qualify as predominant, racial considerations must also have "had a direct and significant impact" on each challenged district's configuration with enough force to "demonstrate[e] that the legislature 'subordinated' other factors— compactness, respect for political subdivisions, partisan advantage, what have you—to 'racial considerations.'" *Cooper*, 581 U.S. at 300. "A court faced with a racial gerrymandering claim therefore must consider all of the lines of the district at issue." *Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. 178, 192 (2017). "A holistic analysis is necessary to give" the "evidence its proper weight." *Id.*; *see also Alabama Legislative Black Caucus*, 575 U.S. at 273–74.

Decisions finding this standard met have been issued after trial and contained district-by-district findings of fact, even where there was a finding of an express racial target. *See, e.g.*, *Bethune-Hill v. Virginia State Bd. of Elections*, 326 F. Supp. 3d 128, 154–172 (E.D. Va. 2018) (three-judge court); *Covington v. North Carolina*, 316 F.R.D. 117, 140–165 (M.D.N.C. 2016), *aff'd*, 137 S. Ct. 2211 (2017). That is because "[a] racial gerrymandering claim . . . applies to the boundaries of individual districts." *Alabama Legislative Black Caucus*, 575 U.S. at 262. Although racial-gerrymandering challengers "can present statewide *evidence* in order to prove racial gerrymandering in a particular district," *id.* at 263, that evidence cannot be *dispositive* as a matter of *law* where an "undifferentiated statewide analysis is insufficient," *id.* at 264.

Plaintiffs in effect ask the Court to follow the concurring opinion of Justice Alito and the dissenting opinion of Justice Thomas in *Bethune-Hill*, which both advocated that strict scrutiny ought to apply whenever "a legislature intentionally creates a majority-minority district." 580 U.S. at 197 (Alito, J., concurring) (citation omitted); *see also id.* at 198 (Thomas, J., concurring in the judgment in part and dissenting in part). Even assuming Justices Alito and Thomas would apply the same rule where the Commission did not create majority-minority districts, this Court is bound by the opinion garnering seven votes, which calls for "a holistic analysis of each district." *Id.* at 191. Plaintiffs do not argue to that standard.

2.      Plaintiffs' showing falls short of the mark, even for trial. They do not address any "of the lines of the district[s] at issue," much less "all" of them. *Bethune-Hill*, 580 U.S. at 192; *see* MSJ 35–44, PageID.616-625. They have no "in-depth explanation" of "where and how" "predetermined demographic percentages" impacted district boundaries and thus no way to show that race predominated over neutral redistricting criteria. *Backus v. South Carolina*, 857 F. Supp. 2d 553, 564–65 (D.S.C. 2012) (three-judge court) (rejecting racial-

gerrymandering claim after trial based on such deficiencies); *see also Harvell v. Blytheville School Dist. No. 5*, 126 F.3d 1038, 1040–42 (8th Cir. 1997) (upholding districts drawn at "BVAP of 57.3% or higher" because the "plan preserve[d] communities with actual shared interests" and did "not reject traditional, non-racial districting criteria"). They do not say which target— 35% or 40%?—was used in which challenged district—there are 17 total—and they mistakenly believe quips—*e.g.*, "Chairwoman Szetela kept the receipts"—are a substitute for district-specific evidence. *See* MSJ 38, PageID.619.

Plaintiffs rely, first, on the partial dissenting report of Commissioner Szetela, but Commissioner Szetela voted for the Linden and Hickory plans.[11] Commissioner Szetela dissented as to the congressional plan, which is not challenged here, JA00604, PageID.1288, and the import of her dissent to the Linden and Hickory plans is at best unclear. Regardless, Commissioner Szetela's report discusses not one line of one district, let alone all lines of all challenged districts. Plaintiffs' discussion of her report makes no serious attempt at a holistic, district-specific analysis.

Plaintiffs also rely on a mapping-simulation analysis by Mr. Trende, which purports to show that a large ensemble of simulated plans does not produce districts with racial percentages like those of districts in the Linden and Hickory plans. MSJ 40–43, PageID.621-624. This method does not explain which district lines were fashioned to reach a racial target, the percentage of white versus Black voting-age persons added to or removed from districts (and at what point), the degree to which BVAP percentages were altered during drafting, or

---

[11] *See MICRC Proposed Meeting Minutes* (Dec. 28, 2021), https://www.michigan.gov/micrc/-/media/Project/Websites/MiCRC/Nov82021TOJan312022/MICRC_Proposed_Meeting_Minutes_2021_12_28.pdf?rev=ce551d9594804339a48bf1f6c5dd6af9&hash=A088673C2B018497A5B0F2B0C7D260FE.

anything else that could independently satisfy the requisite holistic analysis. *See Bethune-Hill*, 580 U.S. at 192. This does not "contain[] evidence satisfying the burden of persuasion." *Arnett*, 281 F.3d at 561.

3.      Even if this evidence could carry Plaintiffs' burden, it is in genuine dispute. Not one but two expert witnesses contest Mr. Trende's simulation analysis. Dr. Palmer concludes that "the simulations do not show that race was the predominant factor in drawing the maps." JA00139, Palmer Rep. 23, PageID.817. Dr. Palmer explains that, "if the constraints" applied to the simulated maps "do not accurately reflect the map-drawing process, then differences between the enacted map and the simulations will not be informative." *Id.* Dr. Palmer finds that Mr. Trende applied criteria the Commission did not apply and did not apply criteria the Commission did apply. JA00139–00141, Palmer Rep. 23–25, PageID.817-819. Likewise, Dr. Rodden concludes that Mr. Trende's algorithm "pays no attention to the requirements of the Michigan constitution," including "the partisan fairness requirement." JA.00263, Rodden Rep. 37, PageID.942. "To serve as a useful benchmark, the ensemble must produce plans that abide by the *same rules* that had to be followed by those drawing the districts." *Id.* Plaintiffs could hardly be further off course in directly asking the Court to find the "weight" of evidence in their favor in this battle of experts. MSJ 41, PageID.622.

4.      There is more. The record discloses extensive neutral criteria, provided on a district-by-district basis, which "may well suffice to refute a claim of racial gerrymandering." *Miller*, 515 U.S. at 919. The Court must weigh this evidence in the predominance matrix. *See Bethune-Hill*, 580 U.S. at 193 (remanding for district court "to determine in the first instance the extent to which . . . face directed the shape of these 11 districts"); *Alabama Legislative Black*

31

*Caucus*, 575 U.S. at 274–75 (remanding for the lower court to weigh traditional criteria against racial goals).

As noted, the Commission considered public input regarding communities of interest, as well as the neighborhood boundaries of more than 200 neighborhoods in and around Detroit. Eid. Decl. ¶¶ 5–7. The Linden and Hickory maps honor those communities of interest and neighborhoods as possible, *see* Eid. Decl. ¶¶ 7–74, and implement the Commission's other criteria, including the partisan-fairness requirement. *See* Eid. Decl. ¶¶ 7, 75–77. Based on expert analysis showing the high concentration of Democratic voters in Detroit, the Commission worked to "create more balanced districts that accounted for heavily Republican areas in other areas of the State due to Michigan's unique geographical layout." *See id.* at ¶ 7. The attached declaration of Commissioner Eid—unlike Plaintiffs' memorandum and evidentiary showing—explains these considerations district-by-district and amply creates material fact disputes as to whether "neutral considerations [were] cast aside." *Bethune-Hill*, 580 U.S. at 190.

5.     This case presents the dispute whether "race *rather than* politics *predominantly* explains" each challenged district's "boundaries." *Cromartie II*, 532 U.S. at 243. As the Commission's summary-judgment motion explained, Plaintiffs have made a binding judicial admission that "increas[ing] the number of Democratic-majority districts" was the Commission's "primary motivation," JA00547–48, Pls.' Objs. & Responses to RFA No. 8, PageID.1229-1230, which means race did not predominate, *see Cromartie II*, 532 U.S. at 243. That admission dictates summary-judgment against Plaintiffs, and if nothing else, it precludes summary judgment in their favor. In fact, Plaintiffs' witness, Mr. Lemmons, attests that political motive predominated, JA00527, Lemmons Aff. ¶ 24, PageID.1209, Commissioner

Eid also attests that the concern of partisan fairness influenced the shapes of the challenged districts' boundaries, Ex. 1, Eid Decl. ¶ 75, and the Commission's expert witnesses both attest that this explanation is plausible from the circumstantial evidence. JA00242–59, JA00263–67, Rodden Rep. 16–33, 37–41, PageID.920-937, 941-945; JA000139–41, Palmer Rep. 23–25, PageID.817-819.

Once again, Plaintiffs say the "weight of the evidence" favors them. MSJ 41, PageID.622 (quoting Trende Rep. JA384). And, again, this does not even pretend to satisfy a standard forbidding the "weighing of the evidence." *Cromartie I*, 526 U.S. at 552 (quoting *Anderson*, 477 U.S. at 255). The Commission's experts have criticized—indeed, debunked—each of the analysis of Mr. Trende that Plaintiffs cite. JA00136–141, Palmer Rep. 20–25, PageID.814-819; JA00242–59, JA00263–67, Rodden Rep. 16–33, 37–41, PageID.920-937, PageID.941-945; *see also* JA00259–61, Rodden Rep. 33–35, PageID.937-939 (compactness); *see also* JA00259–61, Rodden Rep. 35–37, PageID.939-941 (country splits).

## B.    Narrow Tailoring

Plaintiffs' discussion of the narrow-tailoring element, MSJ 43–44, PageID.624-625, confirms that the Commission is entitled to summary judgment. Plaintiffs argue that "the VRA cannot serve as a compelling interest," MSJ 43, PageID.624, but cite no authority for that claim and ignore that the Supreme Court "long assumed that one compelling interest is complying with the operative provisions of the Voting Rights Act of 1965." *Cooper*, 581 U.S. at 292. VRA compliance can be a compelling interest where the redistricting authority "has good reason to think that all the '*Gingles* preconditions' are met." *Id*. at 302. Plaintiffs do not, and could not, deny that the Handley report before the Commission established these elements. *See* Comm'n MSJ 29–30, PageID.666-667.

Plaintiffs argue that the alleged "BVAP reductions . . . deprive Black voters the opportunity to elect their preferred candidates" and refer the Court back to their Section 2 analysis. MSJ 43, PageID.624. Even on its own terms, that analysis does not avoid material fact disputes, for reasons already discussed (*see* § II, *supra*). But more importantly, Plaintiffs have the legal framework wrong. The narrow tailoring analysis looks to the "basis in evidence" available at redistricting and asks only whether the redistricting authority "had 'good reasons'" for its redistricting choice. *Cooper*, 581 U.S. at 293; *accord Alabama Legislative Black Caucus*, 575 U.S. at 278. The question is therefore not whether the districts actually performed as predicted, but whether the Commission had good reasons based on its own record to make the choices it made. *See Alabama Legislative Black Caucus*, 575 U.S. at 278 ("This standard . . . does not demand that a State's actions actually be necessary to achieve a compelling state interest in order to be constitutionally valid." (quotation marks omitted)).

To argue to the correct standard, Plaintiffs would need to point to material errors in the analysis of Dr. Handley present before the Commission. *See Cooper*, 581 U.S. at 302–03; *Covington*, 316 F.R.D. at 166–67. That evidence showed that there was a sufficient pattern of white crossover voting to ensure equal Black electoral opportunity at BVAPs in each relevant county below 50%. JA00045, 2021 Handley Rep. 21, PageID.723. Plaintiffs do not contest Dr. Handley's analysis in a material way, and they could not. Mr. Trende testified that he has located no inaccuracies or errors in it. JA00493–95, JA00498–99, Trende Dep. 60:6–15, 61:4–9, 61:16–62:1, 140:16–141:3, PageID.1175-1177, PageID.1180-1181. Meanwhile, Commissioner Szetela—whose report Plaintiffs rely on—praised "the excellent analysis Dr. Handley performed for the Commission." JA00604, PageID.1288. Thus, while Plaintiffs are right that there is no room for a material fact dispute, they are on the wrong side of the law.

Indeed, while Plaintiffs cite *Cooper* as "MOST APPROPRIATE AUTHORITY," MSJ. viii, PageID.581 (emphasis and underlying omitted), they misapprehend its meaning and application. *Cooper* invalidated a majority-minority district based on a "pattern of white crossover voting in the area." 581 U.S. at 304. Plaintiffs do not explain how the Commission could have justified majority-minority districts under materially identical conditions. Moreover, central to Plaintiffs' Section 2 analysis—which they restate as their narrow-tailoring analysis—is the assertion that only primary elections are relevant. But *Cooper* analyzed only "**general elections.**" 581 U.S. at 294 (emphasis added); *see also Covington*, 316 F.R.D. at 126 ("African-American candidates for the North Carolina House won thirty-nine **general elections** in districts without a BVAP majority . . . , and African-American candidates for the North Carolina Senate won twenty-four **such elections** . . . ." (emphasis added)). Besides, Dr. Handley analyzed the available primaries, the parties acknowledge that there were a limited number of primary elections available to analyze, and Plaintiffs cite no election that Dr. Handley failed to analyze and that would have changed the result. Thus, the Court has a clean record to decide that the Commission's basis in evidence was strong— indeed, as strong as it gets.

## CONCLUSION

The Court should deny Plaintiffs' motion in full and grant the Commission's motion.

Dated: June 6, 2023                         Respectfully submitted,

                                            /s/ David H. Fink
                                            _____

BAKER & HOSTETLER LLP                       FINK BRESSACK
Katherine L. McKnight                       David H. Fink (P28235)
E. Mark Braden                              Nathan J. Fink  (P75185)
Richard B. Raile                            38500 Woodward Ave., Suite 350

Dima J. Atiya
1050 Connecticut Ave., NW,
Suite 1100
Washington, D.C. 20036
(202) 861-1500
kmcknight@bakerlaw.com
mbraden@bakerlaw.com
rraile@bakerlaw.com
datiya@bakerlaw.com

BAKER & HOSTETLER LLP
Patrick T. Lewis
Key Tower, 127 Public Square,
Suite 2000
Cleveland, Ohio 44114
(216) 621-0200
plewis@bakerlaw.com

BAKER & HOSTETLER LLP
Erika D. Prouty
200 Civic Center Drive
Suite 1200
Columbus, Ohio 43215
(614) 228-1541
eprouty@bakerlaw.com

Bloomfield Hills, Michigan 48304
(248) 971-2500
dfink@finkbressack.com
nfink@finkbressack.com

*Counsel for Defendants, Michigan Independent Citizens Redistricting Commission, and Douglas Clark, Juanita Curry, Anthony Eid, Rhonda Lange, Steven Terry Lett, Brittni Kellom, Cynthia Orton, M.C. Rothhorn, Rebecca Szetela, Janice Vallette, Erin Wagner, Richard Weiss, and Dustin Witjes, each in his or her official capacity as a Commissioner of the Michigan Independent Citizens Redistricting Commission*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.2(b)(ii), Counsel for the Commission certifies that this brief contains 10,497 words, as indicated by Microsoft Word 365, inclusive of any footnotes, citations, and quotations, and exclusive of the caption, signature block, tables, attachments and exhibits, and any certificates.

 Dated: June 6, 2023                    Respectfully submitted,

                                        /s/ David H. Fink