# EXHIBIT 3

# EXHIBIT 3

Page 1

1       UNITED STATES DISTRICT COURT
        WESTERN DISTRICT OF MICHIGAN
2              SOUTHERN DIVISION

3

4                    * * *

5

6  DONALD AGEE, JR., et al.,

7       Plaintiffs,

8
        vs.                  CASE NO. 1:22-CV-00272
9

10 JOCELYN BENSON, et al.,

11      Defendants.

12                   * * *

13

14

15      Deposition of SEAN TRENDE, a witness herein,

16 called by the defendants for examination pursuant to the

17 Rules of Civil Procedure, taken before me, Emma Jane

18 Troyer, a Notary Public within and for the State of

19 Ohio, at the Offices of Baker Hostetler, LLP, 200 Civic

20 Center Drive, Suite 1200, Columbus, Ohio, 43215, on

21 April 20th, 2023, at 9:00 a.m.

22

23                   * * *

24

25

```
                                                             Page 2
 1                            I N D E X
 2
 3    SEAN TRENDE                                              PAGE
 4       Examination by Ms. McKnight......................4
         Examination by Mr. Pattwell....................168
 5
 6
                                * * *
 7
 8                        INDEX OF EXHIBITS
 9
      EXHIBIT                DESCRIPTION                       PAGE
10
11    Exhibit 1...Expert Report of
                             Sean Trende.................5
12
      Exhibit 2...Appendix A
13                           Sean Trende C.V.............7
14    Exhibit 3...Appendix C
                             Demonstration Plan Details..40
15
      Exhibit 4...Constitution of MI 1963
16                           Excerpt.....................45
17    Exhibit 5...Dr. Handley's Report to the
                             MI Independent Citizens
18                           Redistricting Commission....63
19    Exhibit 6...Expert Report of
                             Jonathan Rodden, Ph.D.......68
20
      Exhibit 7...Expert Report of
21                           Maxwell Palmer, Ph.D........146
22    Exhibit 8...Code Excerpts..............160
23
24
25                              * * *
```

Page 3

1  APPEARANCES:
2
3       On behalf of the Plaintiffs:
4
            Clark Hill, LLP
5
       By:  Michael J. Pattwell
6            215 South Washington Square, Suite 200
             Lansing, Michigan 48933
7            Mpattwell@clarkhill.com
8
9
       On behalf of the Defendants:
10
11           Baker & Hostetler, LLP
12     By:   Katherine McKnight
             1050 Connecticut Avenue, NW, Suite 1100
13           Washington, D.C. 20036
             Kmcknight@bakerlaw.com
14
             &
15
             Erika Prouty
16           200 Civic Center Drive, Suite 1200
             Columbus, Ohio 43215
17           Eprouty@bakerlaw.com
18
19
20
                       * * *
21
22
23
24
25

```
                                                              Page 4
1                      SEAN TRENDE,
2    a witness herein, having been first duly sworn as
3    hereinafter certified, was examined and deposed as
4    follows:
5
6                      EXAMINATION
7    BY MS. McKNIGHT:
8        Q.  Good morning.
9        A.  Morning.
10       Q.  I'm Kate McKnight, and I'm here today on behalf
11   of defendants in the Agee versus Benson case in the
12   Western District of Michigan.  Would you state your full
13   name for the record?
14       A.  Sean Patrick Trende, T-R-E-N-D-E.
15       Q.  And I understand you've been deposed before; is
16   that correct?
17       A.  Yes.
18       Q.  Okay.  So therefore I'll keep my introductory
19   statements brief.  First, I'll endeavor to take a break
20   every hour or so.  This is not an endurance contest.  If
21   you need to take a break between them, just let me know.
22   All I ask is that you finish answering a question posed
23   before we do take any break.
24           Please ask for any clarification if my question
25   does not make sense.  You're the expert here, and I'll
```

Page 40

1  Q. And of the transcripts that you reviewed related
2  to the Handley power point, what did you draw from it
3  that supported your report?
4  A. Well, I think what I said was that I didn't rely
5  on them. You asked me if I reviewed them in writing the
6  report, and I did review them. I don't know that I
7  relied on them in any way.
8  Q. And other than relying on them, did you
9  incorporate them in your report in any way?
10  A. I don't believe so.
11  Q. Okay. And did you consider any public testimony
12  about which neighborhood should be with which
13  neighborhoods in Detroit?
14  A. No.
15  Q. I'd like to pull up an example from your Appendix
16  C, just so we have something to illustrate our
17  understanding. This will be Exhibit 3.
18
19  (Defendant's Exhibit 3 marked for identification.)
20
21  Q. Mr. Trende, would you describe what this is?
22  A. This is demonstration districts to show
23  compliance with Gingles Prong 1.
24  Q. And you prepared this as part of your report; is
25  that right?

Page 42

1  a kind of proof of concept, which is how I understand
2  Gingles Prong 1.  The focus was different.
3     Q.  Okay.  Do you know anything about the history of
4  this area and the relationship between Inkster and
5  Dearborn Heights?
6     A.  I don't.  I know that Inkster is more heavily
7  African-American than Dearborn Heights, but I don't know
8  the specifics of the history here.
9     Q.  Okay.  You can set that aside.  In preparing your
10 report, did you review any neighborhood maps for the
11 City of Detroit?
12    A.  I don't remember.
13    Q.  Did you make any effort to respect neighborhood
14 boundaries in your demonstration maps?
15    A.  No.
16    Q.  And how about in your simulation exercise; did
17 you make any effort to respect neighborhood boundaries
18 there?
19    A.  No.
20    Q.  Okay.  And when I asked you questions about
21 whether you reviewed any transcripts of commission
22 meetings or public hearings to prepare your report, is
23 your answer the same for what you reviewed to prepare
24 your simulation plans?
25    A.  Yes.  Those were part of the report.  I'm not

Page 49

1  candidate.
2      Q.  Let's focus on that one, Mr. Trende -- the
3  partisan fairness criteria.  What kind of an analysis
4  did you conduct in your report on the partisan fairness
5  of your demonstration plan?
6      A.  Well, I didn't look at the partisan fairness of
7  the demonstration plan, because this isn't necessarily a
8  plan that would be recommended to the Commission to
9  enact.  It's to illustrate under Gingles Prong 1 that
10 the African-American community or the black community is
11 numerous enough to constitute a majority in a reasonably
12 configured district, which is a Voting Rights Act
13 analysis under 13-A, which would trump the remainder of
14 the requirements.
15     Q.  And what kind of partisan fairness analysis did
16 you run on your simulations?
17     A.  So for the simulations I took all the results and
18 calculated the partisanship of the districts that were
19 drawn, and while there were some slight deviations from
20 what you would expect from a neutral politically drawn
21 map, which I suspect may be downstream of an attempt to
22 lower partisan fairness metric, it doesn't explain the
23 extent of the deviations when it came with respect to
24 race.
25     Q.  So I asked a slightly different question.  It

Page 79

1  Representatives and the Senate; do you see that?
2      A.  Yes, I see that.
3      Q.  Okay.  So how do you explain this apparent
4  discrepancy between what compactness means in the House
5  and what compactness means in the Senate in terms of
6  racial motive?
7      A.  There's no tension between the two.
8      Q.  Why not?
9      A.  Because race can predominate, to my
10 understanding, at least for now, on the drawing of
11 districts, if you are complying with the Voting Rights
12 Act.  The courts assume that compliance with the Voting
13 Rights Act is a defense to an equal protection claim.
14 So race might have predominated, but under current law,
15 would be justified.
16     Q.  Okay.  So is it your view that race could
17 predominate for the benchmark plan in drawing the Senate
18 plan, but race could not have predominated for the
19 Voting Rights Act for the House plan and the enacted
20 plans?
21     A.  My entire report -- well, half of my report is
22 that the benchmark, or the enacted plans don't comply
23 with the Voting Rights Act.
24     Q.  Do you believe the Voting Rights Act applies to
25 districts in Detroit?

Page 150

1  Palmer is reporting results from prior House District 4,
2  the aspect of racially polarized voting; do you see
3  that?
4     A.  Yes.
5     Q.  Okay.
6     A.  And again, I had mentioned on -- yes, there is
7  other analysis in my code, but as I say on Page 40, and
8  I think earlier in this section, I had replicated the
9  analyses of 2018 and 2020 from Dr. Handley, so it's not
10 some hidden secret that I had analyzed other races.
11    Q.  Okay.  And then you came to a conclusion in your
12 report that there's no evidence suggesting that the
13 black candidate of choice can win a polarized primary in
14 a district with a BVAP below 47 percent; remember
15 looking at that?
16    A.  Yeah.
17         MR. PATTWELL:  What page was that?
18    Q.  Page 35 of his report.
19    A.  Yes, I remember that.
20    Q.  Okay.  And so here you have a district, House
21 District 4, that is drawn at 45.6 percent BVAP, correct?
22    A.  Correct.
23    Q.  Okay.  And the black preferred candidate won the
24 primary in that House district in 2018; isn't that
25 right?

Page 151

1  A. I think that's right, yeah.
2  Q. And so when you --
3  A. Oh, I know what happened here. Dr. Handley
4  reports -- I'm using her stuff -- and she reports that
5  out at 47.27 on Page 25 of her report.
6  Q. And so I think we went over this on your -- you
7  had reported it out on your Page 35 at 45.5 percent?
8  A. Right, right. But when I was doing this, looking
9  to see what Dr. Handley's conclusions were, and where I
10 wasn't really disagreeing with her, I was probably going
11 off of her calculations. That's how I would have done
12 it, since I'm mostly using what she reports there.
13 Q. Okay. So would you revise your statement to say
14 there's no evidence of a polarized district electing a
15 candidate of choice in a primary at 45.5 percent BVAP?
16 A. I think I must be using black alone there, and
17 she is probably using any part black here, and that's
18 probably where the discrepancy comes from. So I guess I
19 would just say below 45.6 percent black alone, or 47.27
20 percent any part black.
21 Q. Okay. So you would consider this -- whether
22 you're using any part black or black alone, you would
23 consider that to be the floor of examples of BVAP levels
24 that allow a polarized district to perform at the
25 primary; is that right?

Page 153

1    Let's look at another district that was in your
2    ecological inference analysis but was not reported in
3    your report.  Let's turn to House District 11, and --
4    whatever you need to look at.  I am referring now to the
5    analysis that Dr. Palmer did using your data at
6    Paragraph 35 of the Palmer report, Page 15.
7        A.   Okay.
8        Q.   This prior House District 11 is drawn at only
9    25.5 percent BVAP; do you see that?
10       A.   Yes.
11       Q.   Okay.  And here there was evidence of racially
12   polarized voting; do you see that?
13       A.   Yes.
14       Q.   And here, in the 2018 primary the black preferred
15   candidate defeated the white preferred candidate; do you
16   see that?
17       A.   Yes.
18       Q.   Okay.  So it looks like here is an example of a
19   House District in the 2018 primary that was polarized,
20   and the black preferred candidate won, and the BVAP was
21   lower than 47 percent; do you see agree with me?
22       A.   Yeah.  I can't remember if this one had some
23   quirk to it, but yeah.  If you have a fractured enough
24   republican opposition -- or, republican -- if the white
25   vote fractures, I'm sure you could win a polarized

Page 154

1 voting in that circumstance with a lower BVAP.
2    Q. Okay. And do you have any reason to disagree
3 with Dr. Palmer that your EI code ran the analysis for
4 prior House District 11 for the 2018 primary, but that
5 it's not report -- the results are not reported in your
6 report?
7    A. I don't think so, because he says that I note
8 that District 11 was polarized and that the black
9 preferred candidate won.
10    Q. But you did not report your own analysis; is that
11 right?
12    A. I think I did, if I said District 11 was
13 polarized and the black preferred candidate won.
14    Q. Okay. Let's see if we can take a look -- see if
15 we can find the reference for District 11 in your
16 district report. Go on Page 36 of your report. It's
17 the first full paragraph, the last sentence.
18      Here you state, the 2018 primary where the black
19 incumbents, who had initially been chosen by district
20 delegates in a special election, won in District 11; do
21 you see that?
22    A. Yeah.
23    Q. So this was an example of a black candidate of
24 choice being elected at a BVAP of 25.5 percent, but you
25 didn't report that as being evidence of a black

Page 155

1  candidate winning a racially polarized primary at BVAP
2  below 47 percent, right?
3     A.  I mean, you snipped off the first half of the
4  sentence, which says, in fact, there is just one example
5  of -- there's a typo there -- there is just one example
6  of a black candidate winning a racially polarized
7  primary in the Detroit area in districts with a BVAP
8  below 47 percent in districts the Handley report
9  examines.  Then the 2018 primary, where the black
10 incumbent won in District 11.
11        So that literally says exactly that, that a black
12 candidate won a racially polarized primary in a district
13 below 47 percent BVAP.  I also note that this is sort of
14 a quirky circumstance where she had been initially
15 chosen by district delegates in a special election, so
16 she was an incumbent.  She never had to be the first
17 time candidate.  She was always an incumbent.  But yeah,
18 she won a district at 26 percent BVAP.
19    Q.  Okay.  So can you explain why the contradiction
20 in your report saying between on one page saying there's
21 no evidence of a candidate winning below 47 percent, and
22 on the next page saying there is evidence?
23    A.  Well, in this example on Page 36, I say there is
24 an example of it occurring.
25    Q.  Right.  I'm just trying to get at the

Page 156

1  contradiction in your report where you first say there
2  is no evidence?
3      A.  Right.  And so this is acknowledging that there
4  is one example of a black candidate who won in a
5  district, in a polarized primary district below 47
6  percent.
7      Q.  I see.  Okay.  So there are at least two
8  districts, House District 4 and House District 11, where
9  a black candidate of choice won a racially polarized
10 primary in 2018 in Detroit; is that right?
11             MR. PATTWELL:  Objection to form.
12     A.  Wait, what?  Can you repeat that question?
13     Q.  Sure.  Let's break it down.  Can you answer the
14 question, are there any districts in the 2018 primary
15 where a black candidate won a racially polarized
16 election at a BVAP lower than 47 percent?
17     A.  Black alone, or any part black?
18     Q.  Either one?
19     A.  Any part black is just District 26.  Black alone
20 would be 4 and 26, and that's pursuant to -- not 26, 11.
21 I'm sorry.  And that difference, again, is a caveat on
22 this 47 percent, because I was probably looking at Dr.
23 Handley's reporting of the data here, which is 47.27
24 percent, almost certainly any part black.
25     Q.  Okay.  And before you had a concern about the

Page 159

1  of those districts.
2      Q.  But the simulated plans don't always form 10
3  districts, do they?
4      A.  No, they don't.  That's why you would be --
5  because the voting compliance, in compliance with the
6  Voting Rights Act, is a defense to a Shaw claim, which
7  allows race, at least until the Milligan decision comes
8  down, to predominate in the drawing of the districts.
9          If you're trying to comply with the Voting Rights
10 Act and you succeed, you have a defense which would
11 allow you at least in ten of your districts to run afoul
12 of what these simulations would show.  I don't know
13 about what would happen in the remainder of the
14 districts, but it's a completely different analysis.
15     Q.  And switching gears a little bit, I wanted to ask
16 about Senate District 11 and your analysis of
17 polarization in Senate District 11.  Can you take a
18 minute to go through your report and find where in your
19 report you analyze the polarization of Senate District
20 11?
21     A.  Yeah.  I read that in Dr. Palmer's report, and
22 what happened there was I ran the polarization analysis,
23 and then I realized that the district was only, I think,
24 20 percent BVAP, or something like that, which I can't
25 imagine is a VRA compliant district, so I think that's

```
                                                          Page 170
```

1   STATE OF OHIO)
2   COUNTY OF MADISON)    SS:   CERTIFICATE
3
4        I, Emma Jane Troyer, a Notary Public within and
5   for the State of Ohio, duly commissioned and qualified,
6        DO HEREBY CERTIFY that the above-named SEAN
7   TRENDE was by me first duly sworn to testify the truth,
8   the whole truth, and nothing but the truth.
9        Said testimony was reduced to writing by me
10  stenographically in the presence of the witness and
11  thereafter reduced to typewriting.
12       I FURTHER CERTIFY that I am not a relative or
13  attorney of either party, in any manner interested in
14  the event of this action, nor am I, or the court
15  reporting firm with which I am affiliated, under a
16  contract as defined in Civil Rule 28(D).
17       IN WITNESS WHEREOF, I have hereunto set my hand
18  and seal of office at Plain City, Ohio, on this 25th day
19  of April, 2023.
20
21
22  [signature: Emma J. Anderson]
23  EMMA JANE TROYER
24  NOTARY PUBLIC, STATE OF OHIO
25  My commission expires 01-09-2027

Page 172

1                DEPOSITION REVIEW
                CERTIFICATION OF WITNESS
2
         ASSIGNMENT REFERENCE NO: 5857187
3        CASE NAME: Agee, Donald, Jr., Et Al. v. Benson, Jocelyn, Et Al.
         DATE OF DEPOSITION: 4/20/2023
4        WITNESS' NAME: Sean P. Trende
5        In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7        I have made no changes to the testimony
    as transcribed by the court reporter.
8
    _____        _____
9   Date                  Sean P. Trende
10       Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:
12
         They have read the transcript;
13       They signed the foregoing Sworn
            Statement; and
14       Their execution of this Statement is of
            their free act and deed.
15
         I have affixed my name and official seal
16
    this _____ day of_____, 20____.
17
                   _____
18                 Notary Public
19                 _____
                   Commission Expiration Date
20
21
22
23
24
25

```
                                                            Page 173

 1              DEPOSITION REVIEW
              CERTIFICATION OF WITNESS
 2
         ASSIGNMENT REFERENCE NO: 5857187
 3       CASE NAME: Agee, Donald, Jr., Et Al. v. Benson, Jocelyn, Et Al.
         DATE OF DEPOSITION: 4/20/2023
 4       WITNESS' NAME: Sean P. Trende
 5          In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
 6   my testimony or it has been read to me.
 7          I have listed my changes on the attached
     Errata Sheet, listing page and line numbers as
 8   well as the reason(s) for the change(s).
 9          I request that these changes be entered
     as part of the record of my testimony.
10
            I have executed the Errata Sheet, as well
11   as this Certificate, and request and authorize
     that both be appended to the transcript of my
12   testimony and be incorporated therein.
13   _____         _____
     Date                    Sean P. Trende
14
            Sworn to and subscribed before me, a
15   Notary Public in and for the State and County,
     the referenced witness did personally appear
16   and acknowledge that:
17       They have read the transcript;
         They have listed all of their corrections
18           in the appended Errata Sheet;
         They signed the foregoing Sworn
19           Statement; and
         Their execution of this Statement is of
20           their free act and deed.
21       I have affixed my name and official seal
22   this _____ day of_____, 20____.
23                   _____
                     Notary Public
24
                     _____
25                   Commission Expiration Date
```

ERRATA SHEET

VERITEXT LEGAL SOLUTIONS MIDWEST

ASSIGNMENT NO: 5857187

PAGE/LINE(S) /           CHANGE           /REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____        _____
Date                     Sean P. Trende

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

DAY OF _____, 20_____ .

                    _____
                    Notary Public


                    _____
                    Commission Expiration Date