## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

DONALD AGEE, JR., an individual, *et al.,*

        Plaintiffs,

v.

JOCELYN BENSON, in her official capacity as the Secretary of State of Michigan, *et al.*;

        Defendants.

Case No. 1:22-cv-00272

**Three-Judge Panel Appointed Pursuant to 28 U.S.C. § 2284(a)**

**ORAL ARGUMENT REQUESTED**

## PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................ ii

INDEX OF AUTHORITIES ............................................................ iii

I.     INTRODUCTION ............................................................. 1

II.    ARGUMENT ................................................................. 1

       A.     Summary judgment is appropriate ............................................ 1

       B.     Summary judgment is proper as to Counts I and II because
              the baconmandered districts deny Plaintiffs their protected
              right under the VRA to elect their candidate of choice ........................ 2

              1.     Plaintiffs are entitled to summary judgment on the
                     first *Gingles* precondition. .......................................... 2

              2.     Plaintiffs are entitled to summary judgment on the
                     second and third *Gingles* preconditions. ........................... 7

              3.     Plaintiffs are entitled to summary judgment under
                     the totality of the circumstances. ................................. 14

       C.     Summary judgment is proper as to Counts III and IV
              because the Commission created the Districts with race as
              the predominant consideration in violation of the Equal
              Protection Clause. ....................................................... 15

III.   CONCLUSION ............................................................... 17

CERTIFICATE OF COMPLIANCE ....................................................... 19

CERTIFICATE OF SERVICE .......................................................... 20

# INDEX OF AUTHORITIES

## CASES

*Abbott v. Perez,*
138 S. Ct. 2305 (2018).................................................................................................... 3

*Allen v Milligan,*
2023 WL 3872517 (U.S. June 8, 2023)........................................................................... 4

*Bartlett v. Strickland,*
556 U.S. 1 (2009)...................................................................................................... 14, 17

*Bone Shirt v. Hazeltine,*
461 F.3d 1011 (8th Cir. 2006) ........................................................................................ 3

*Cooper v. Harris,*
581 U.S. 285 (2017) ...................................................................................................... 16

*Harding v. County of Dallas, Texas,*
 948 F.3d 302 (5th Cir. 2020) ......................................................................................... 3

*League of United Latin American Citizens (LULAC) v. Perry,*
548 U.S. 399 (2006) ...................................................................................................... 16

*Montes v. City of Yakima,*
40 F. Supp. 3d 1377 (E.D. Wash. 2014) ......................................................................... 7

*Pope v. Cnty. of Albany,*
No. 1:11-CV-0736, 2014 WL 316703 (N.D.N.Y. Jan. 28, 2014) ...................................... 1

*Rose v. Raffensperger,*
584 F. Supp. 3d 1278 (N.D. Ga. 2022).............................................................................. 1

*Shaw v. Hunt,*
517 U.S. 899 (1996) ...................................................................................................... 14

*Shaw v. Reno,*
509 U.S. 630 (1993) ...................................................................................................... 15

*Thornburg v. Gingles,*
478 U.S. 30 (1986) .............................................................................................. 1, 2, 3, 7

*United States v. Charleston Cnty.,*
318 F. Supp. 2d 302 (D.S.C. 2002), *aff'd,* 365 F.3d 341 (4th Cir. 2004) ...................... 1

*Wis. Legislature v. Wis. Elections Comm'n.,*
142 S. Ct. 1245 (2022)................................................................................................... 15

**CONSTITUTIONAL PROVISIONS**

Mich. Const. art. IV, § 6(13)(a) ................................................................................ 6

## I.     INTRODUCTION

The Commission Defendants used racial quotas (40% BVAP caps) to draw the Linden and Hickory maps, cracking Metro Detroit's Black voters into baconmandered districts and diluting their ability to elect candidates of their choice due to a proven lack of white-crossover voting. Plaintiffs are entitled to summary judgment.

## II.    ARGUMENT

### A.     Summary judgment is appropriate.

The Commission wrongly claims that Plaintiffs haven't argued the summary-judgment standard. Comm'n.Resp.Br.1,3, PageID.1639,1641. Plaintiffs' summary judgment papers all explain that Plaintiffs are entitled to a declaration that the Commission's Hickory and Linden plans violate the VRA and the Equal Protection Clause as a matter of law because no genuine issue of material fact exists.

The Commission also asserts that Plaintiffs fail to cite any case awarding summary judgment to a VRA-plaintiff on the *Gingles* preconditions, suggesting this would be the first. Comm'n.Resp.Br.3-4, PageID.1641-42. Not so. In *Pope v. Cnty. of Albany*, No. 1:11-CV-0736, 2014 WL 316703, at *13 (N.D.N.Y. Jan. 28, 2014) (Ex.A), the court granted partial summary judgment to plaintiffs on *Gingles 1*. Pls'.SJ.Br.13, 18-20, PageID.594, 599-601. And there are several others. *E.g.*, *United States v. Charleston Cnty.*, 318 F. Supp. 2d 302, 313 (D.S.C. 2002), *aff'd*, 365 F.3d 341 (4th Cir. 2004) (granting plaintiffs summary judgment on all three *Gingles* preconditions); *Rose v. Raffensperger*, 584 F. Supp. 3d 1278, 1292-95 (N.D. Ga. 2022) (same). Defendants' assertion that summary judgment is rarely granted is irrelevant; it should be granted here.

**B.    Summary judgment is proper as to Counts I and II because the baconmandered districts deny Plaintiffs their protected right under the VRA to elect their candidate of choice.**

The Commission says that Dr. Handley's report established their good-faith belief "that all the *Gingles* preconditions are met." Comm'n.Resp.Br.33, PageID1671 (cleaned up). For this, they are correct.

**1.    Plaintiffs are entitled to summary judgment on the first *Gingles* precondition.**

The Detroit area contains one of the largest, most compact, Black populations in America and for decades, its VRA-protected political boundaries included plentiful majority-minority districts. Pls'.SJ.Br.2-4, 32-35, PageID.583-85, 613-16. That's why the Commission hired a VRA expert who opined that "districts that provide minority voters with an opportunity to elect their candidates of choice must be drawn" or "maintained." 2021.Handley.Report.17, J.A.17. And it is why the Commission began drawing maps for the Detroit area with BVAPs around 50% until "the Commission's counsel intervened" and forced the Commission to adopt 40% BVAP caps in many districts. Szetela.Dissenting.Report.5, J.A.608.

The Commission nevertheless argues that Plaintiffs cannot establish the first *Gingles* precondition of numerosity and compactness. Comm'n.Resp.Br.4-9, PageID.1642-47. But the Commission's arguments are contrary to precedent, irrelevant to the liability phase of this proceeding, and seek to graft hyper-technical remedial considerations into the *Gingles* landscape. Plaintiffs have shown that the Detroit area's Black population is sufficiently large and geographically compact to draw more majority-minority districts than the Linden (0) and Hickory (6) plans.

2

Pls'.SJ.Br.10-13, PageID.591-94. The Commission cannot dispute this, so, Plaintiffs are entitled to summary judgment on the first *Gingles* precondition.

That's the forest. Now the trees. The Commission's primary argument is that Plaintiffs' demonstration maps—which leave predominately Black communities intact and contain higher BVAPs—will not lead to more Black electoral opportunity. Comm'n.Resp.Br.4-5, PageID.1642-43. If that argument sounds counter-intuitive, that's because it is. It is also contradicted by the Commission's VRA legal counsel, Bruce Adelson, who advised that the higher the BVAP, "the greater the opportunity for minority voters to be able to elect candidates of choice." MICRC_4871-72, Ex.B.

Moreover, the Court need not address performance questions at this stage because Plaintiffs' demonstration maps were proffered to illustrate liability, not a remedy. As explained in Plaintiffs' second Brief, neither *Abbott v. Perez*, 138 S. Ct. 2305 (2018), nor *Harding v. County of Dallas, Texas*, 948 F.3d 302 (5th Cir. 2020), support the Commission's requested expansion of *Gingles* precondition one, and other courts have rejected this argument outright. Pls'.Resp.Br.8-14, PageID.1582-88 (citations omitted). "[T]he Gingles preconditions are designed to establish liability, and not a remedy[,]" the "court may consider, at the *remedial* stage, what type of remedy is possible ...." *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1019 (8th Cir. 2006) (cleaned up); *accord Missouri State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*, 894 F.3d 924, 934 (8th Cir. 2018) (same).

The Commission's remaining arguments posit that there exist fact questions over whether Plaintiffs' demonstration maps are "reasonably configured."

3

Comm'n.Resp.Br.4-9, PageID.1642-47. But as Justice Kavanaugh's *Allen v. Milligan* concurrence explains, "a plaintiff's proposed alternative map and proposed majority-minority district are 'reasonably configured'—namely, by respecting compactness principles and other traditional districting criteria such as county, city, and town lines." 2023 WL 3872517, at *22 (U.S. June 8, 2023) (citations omitted). The Majority, too, discussed how egregious a map must look to be unreasonably configured and found that the alternative maps there were reasonable because they lacked "tentacles, appendages, bizarre shapes, or any other obvious irregularities that would make it difficult to find them sufficiently compact," and they "contained equal populations, were contiguous, and respected existing political subdivisions, such as counties, cities, and towns." *Id.* at *9-10, 13-14.

Mr. Trende's demonstration maps satisfy that standard. They are contiguous, compact, and honor county, city, and town lines—perhaps even more so than the Linden and Hickory plans. Pls'.SJ.Br.11-13, PageID.592-94. And since the Detroit area is home to one of the largest Black populations in the Country, drawing more reasonably configured majority-minority districts than the Commission—i.e., zero and six—is not arduous. The Commission does not really contend otherwise.

The Commission instead faults Mr. Trende's demonstration plans for not adhering to Commissioner Anthony Eid's post-hoc and subjective organization of 200+ Detroit "neighborhoods" he considers to be "communities of interest." Comm'n.Resp.Br.5-7, PageID.1643-45. Mr. Eid claims the Commission's maps— which fracture Black majorities—keep certain Detroit neighborhoods intact while

Mr. Trende's demonstration maps, which re-form Black majorities, split Detroit neighborhoods. *Id.* at Ex. 1. He also says Mr. Trende's maps wrongly combine Detroit neighborhoods that don't have "much in common" or "share similar characteristics" with each other. *Id.* This is not a serious argument.

Mr. Trende's maps do not need to win a community-of-interest "beauty contest"—though they certainly could here, where the Commission's maps gut traditional communities of interest with their long, baconmandered districts that blow through numerous municipal boundaries to combine poor, predominantly Black urban municipalities with wealthy, predominately white suburban municipalities. Lemmons.Aff.¶¶26-28,   31,   33,   34,   37-38,   43-45,   J.A.527,   529-531-533; Smith.Aff.¶¶18-19, 27-28, 40-47, J.A.512, 514, 516-17; Lockerbie.Report.¶¶19-45, J.A.285-89 (collecting public comments).[1] The *Milligan Court* held that an alternative map which reasonably addresses communities of interest need not be drawn in accord with the redistricting body's community-of-interest priorities. 2023 WL 3872517, at *10-11.

Here, Mr. Trende's focus on traditional communities of interest as reflected by municipal boundaries presents a more reasonable approach than Mr. Eid's. The Commission had difficulty defining "community of interest," describing the term as "vague," "elastic," "nebulous," and so on. Comm'n.Report.35-39, Ex.E.  Former

---

[1] Two of Mr. Eid's fellow Commissioners filed dissenting reports separate from this litigation criticizing the Commission's failure to properly honor communities of interest near Detroit.     Wagner.Dissenting.Report.81-84, Ex.C; Lange.Dissenting.Report.71-81, Ex.D.

Michigan Supreme Court Justice, Stephen Markman, cautioned against such a interminable definition because it creates a "standardless" process; he further explained why the "most obvious and genuine" communities of interest are "counties, cities, and townships." Markman.Memorandum.1-25, Ex.F. Accordingly, Mr. Trende's demonstration maps reasonably account for communities of interest, and Mr. Eid's more fluid approach does not change that result.

The Commission also faults Mr. Trende for not providing a detailed evaluation regarding whether his demonstration plans adversely impact the Commission's partisan-fairness goals. Comm'n.Resp.Br.7, PageID1645. This a curious argument where Democratic candidates in 2022 won all 27 general elections Dr. Handley analyzed in the Detroit area, 2023.Handley.Report.App.B, J.A. 101-07, and Mr. Trende's demonstration maps only entailed boundary shifts in Southeast Michigan, Trende.Report.22-23, 81-82, J.A.329-30, 388-89.

But again, the Court need not dive into the partisan-fairness weeds. Achieving a partisan outcome is not a "traditional redistricting principle" for purposes of determining whether a demonstration map is reasonably configured under *Gingles* precondition one. If it were, VRA § 2 would be subverted, and redistricting bodies could sacrifice VRA compliance in the name of partisan fairness. State election laws yield to the VRA by operation of the Supremacy Clause, and Michigan requires that same restraint. Mich. Const. art. IV, § 6(13)(a) (setting VRA compliance as the Commission's top priority). Thus, it is immaterial whether drawing more majority-

6

minority districts than the Commission would impact the Commission's partisan fairness goals.

Lastly, the Commission argues that Mr. Trende's demonstration maps are not "reasonably configured" because they may be a product of a predominantly racial intent, namely compliance with the VRA. Comm'n.Resp.Br.7-9, PageID.1645-47. The *Milligan* Court just rejected this same argument. 2023 WL 3872517, at *12, 15-16 (reaffirming that an illustrative map submitted under *Gingles 1* need not be race neutral).

Accordingly, there is no threshold flaw in Mr. Trende's demonstration maps, which satisfy traditional redistricting principles and show that it is possible to draw more majority-minority districts than the Commission. Any nuance regarding the configurations of the replacement maps is properly left to the remedial stage. *Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1398–99 (E.D. Wash. 2014) (granting summary judgment in recognition that the law does not require a demonstration map to perfectly harmonize every traditional redistricting criteria) (cleaned up).

### 2. Plaintiffs are entitled to summary judgment on the second and third *Gingles* preconditions.

The Commission purports to offer both a "district-by-district" and "aggregate" approach to showing why it prevails on the second and third *Gingles* preconditions. Neither works.

1. District-by-district

The 2022 primary elections were devastating for Black candidates of choice, particularly in the most probative districts: those pitting Black candidates against

white candidates. Pls'.SJ.Resp.Br.16-27, PageID.1590-1601. Indeed, in the seven most racially polarized elections—HD5, HD6, HD8, HD11, HD12, HD14 and HD26, Black candidates of choice lost five. *Id.* at 27, PageID.1601. And in 8 of the 10 districts with a bi-racial election involving a non-incumbent Black candidate—HD5, HD6, HD8, HD9, HD11, HD12, HD26, and HD31—the non-incumbent Black candidates received no material white-crossover support, contrary to the Commission's hopes. *Id.* Even Black *incumbents* received minimal white-crossover support. *E.g.*, *id.*

The Commission's response is to say that the 2022 election results are not enough; there must be a "pattern" of racially polarized voting. Comm'n.Resp.Br.10, PageID.1648. That's ironic since the Commission relied exclusively on 2022 election results in its opening summary judgment brief. Comm'n.Br.22-24, PageID.659-661. But no matter, here is the historical pattern:

- White voters rejected the preferred Black candidate in the 2018 gubernatorial race, Trende.Report.28-35, J.A.335-342;

- In 2014 House primaries, Black candidates of choice had "close calls," even in "overwhelmingly Black districts, *id.* at 40-41, J.A. 347-48;

- In 2016 open House primaries, Black candidates of choice lost four of six races, including a race in a Black-majority district, *id.* at 41, J.A.348;

- In the 2014 Senate primary, "the white candidate of choice (who earned just 7% of the vote from Black voters) won in a 52.5% BVAP district by just over eight points" due to a fractured Black field, *id.* at 84, J.A.391;

- In that same primary, "the Black candidates' vote shares tend[ed] to mirror the BVAP of the district, running within a few points of each other," *id.* at 86, J.A.393; and

- The 2018 Senate primaries showed racial polarization along the same order of magnitude as the disastrous 2022 primary elections, *id.* at 86-89, J.A.393-96.

Commission experts do not really disagree; that's why the Commission concedes that it "had good reasons to believe the second and third *Gingles* preconditions could be met from the expert report of Dr. Handley, who concluded that Detroit-area voting exhibits sufficient racial polarization that white-bloc voting would usually defeat Black-preferred candidates in the absence of districts drawn to ensure equal Black opportunity." Comm'n.Br.28, PageID.666. The problem is that the Commission failed to draw such districts.

2.    Aggregate

The Commission fares no better in the aggregate. The following facts are undisputed. The 2022 primary resulted in a 20% decline in Michigan's Black Legislative Caucus.[2] Pls'.SJBr.32-33, PageID.613-14. There is a 30% proportionality deficit in Black-legislative representation. *Id.* at 34, PageID.614. There is a 65% proportionality deficit in majority-Black legislative districts. *Id.* at 35, PageID.615. And there is a 17% proportionality surplus in white-majority legislative districts. *Id.*

The Commission touts that of the 11 most probative 2022 election results, "Black-preferred candidates have a win percentage of 54.5%." Comm'n.Resp.Br.12,

_____

[2] The Commission says this 20% number is "unsupported." Comm'n.Resp.Br.25, PageID.1663. But as the media reported after the 2022 election cycle, "the Capitol will lose two of five Black senators and two of 15 Black representatives." Ben Orner, *Black Michiganders voted heavily for Dems but were 'sacrificed' in representation*, Mlive (Nov. 28, 2022), https://www.mlive.com/politics/2022/11/black-michiganders-voted-heavily-for-dems-but-were-sacrificed-in-representation.html.    That's    20%. *Accord* Malachi Barrett, *What a Democratic majority in Lansing could mean for Detroit*,    Bridge    (Dec.    20,    2022)    https://www.bridgemi.com/michigan-government/what-democratic-majority-lansing-could-mean-detroit.    The Caucus' website (https://michiganlbc.org/about/, visited June 19, 2023) lists 30 members, *contra* Comm'n.Resp.Br.26 n.10, PageID.1664, but not all members are Black.

PageID.1650. Think about that. In the "influence" districts with high BVAPs, where Black-preferred candidates are supposed to win *nearly all the time* with white crossover, those candidates win only half the races. That's a reason to grant summary judgment to Plaintiffs on *Gingles* preconditions two and three, not a reason against.

So the Commission shifts gears and attacks which elections are most probative of racial polarization. Comm'n.Resp.Br.13-16, PageID.1651-54. To be clear, Plaintiffs are not arguing the Court should "ignore" all elections involving an incumbent, or a Black-preferred candidate who is not Black, or general elections, etc. *Contra id.* But in determining whether there is racially polarized voting in the Detroit area, such elections are far less probative than non-incumbent elections between Black and white primary contestants. In the *most* probative elections—HD5, HD6, HD13, and SD8—white voters picked the white candidates over the Black candidates by an average of 93.35% to 6.63%. Pls'.SJResp.Br.36, PageID.1610. There is no need for a trial on "white-crossover voting" given these undisputed and one-sided percentages, even if the Commission pans them as "idiosyncratic."[3] Comm'n.Resp.Br.17, PageID.1655.

---

[3] The Commission disregards the incredibly polarized election in SD8 (BVAP 40.25%) where Incumbent Senator Marshall Bullock, a Black man from Wayne County, was defeated by Incumbent Senator Mallory McMorrow, a white woman from Oakland County, with McMorrow receiving 95.9% of the white vote. Comm'n.RespBr.16-17, PageID.1654-55; 2023.Handley.Report.App.C2, J.A.111. The Commission says this loss of Black opportunity is better attributed to the attention McMorrow received from a speech on transgender rights than on the low BVAP of this white-dominated district stretching from Detroit into the Oakland County suburbs of Ferndale, Berkley, Birmingham, Royal Oak, and Clawson. *Id.* McMorrow, who hails from the center of what Rep. Lemmons refers to as the "Oakland County Money Machine" no doubt raised more funds going into the democratic primary (i.e., $662,689.21) than

3.    Admissibility and credibility

The Commission, through its expert, Dr. Palmer, suggests that Mr. Trende cherrypicked his data. Comm'n.Resp.Br.19, PageID.1657.  His claims mostly involve Mr. Trende's purported failure to report results from the 2018 and 2020 Democratic primaries. Palmer.Report.11-19, J.A.128-135. But Mr. Trende's express goal was not to report on every primary election in 2018 and 2020, *because the Commission's own expert had already done so*, in a report cited by Mr. Trende and submitted into evidence. 2021.Handley.Report.9-12, J.A.33-36; Trende.Report.27-28, 40, J.A.334-35, 347. Mr. Trende's report uses these detailed results. *Id.* at 40-42, J.A.347-49. Mr. Trende testified about this at his deposition. Comm'n.Resp.Br.Ex.3; Trende Dep.150:6-10, PageID.1735.

Dr. Palmer also criticizes Mr. Trende for not producing results for the HD4 2018 Democratic primary. Palmer.Report.15, J.A.131.  But as Mr. Trende explained, "[m]ost of the races here are difficult to interpret, because they often feature multiple candidates running." Trende.Report.36, J.A. 343. This is consistent with Dr. Handley's        conclusion—which    Mr.    Trende    already    indicated    he

---

Senator Bullock, but she retained almost half of those funds (i.e., $311,369.23) for the general election. Ex.G. More telling is that McMorrow's 2021 Annual campaign finance statement shows that before the contest even began—long before her speech—she had significantly more cash on hand ($185,937.40) than Bullock raised the entire cycle. Ex.H. What's more, McMorrow's speech appears not to have garnered her much support from the Black community in the southern portion of SD8 where, of the 9,747 itemized direct contributions McMorrow received between January 1, 2022, and August 22, 2022, only 17 (0.174%) were from Detroit residents. Ex.I; https://cfrsearchnictusa.com/documents/527336/details/filing/contributions?schedule=1A&changes=0&page=1

accepts. 2021.Handley.Report.12, J.A.36. And Mr. Trende *did* report the 2018 HD2 Democratic primary as an instance where the differences between the white-preferred and Black-preferred candidates were so stark that he disagreed with Dr. Handley's analysis, Trende.Report.36, J.A. 343; and that it was too difficult to determine if the 2018 HD5 Democratic primary was polarized. Trende.Report.38, J.A. 345. Dr. Palmer's criticism has no merit based on the experts' similar findings.

The Commission further claims that the results of the 2018 HD4 Democratic primary contradict Mr. Trende's claim that there is no evidence under the previous House District maps suggesting that the Black-preferred candidate can prevail with less than 47% BVAP. Comm'n.Resp.Br.19-20, PageID.1657-58. But Mr. Trende did not point to the results of the 2018 HD4 primary as an example of racially polarized voting. The context of this portion of Mr. Trende's report discusses Dr. Handley's finding that the BVAP in HD4 was 47.27%, consistent with his own. *Id.* at 34-35, J.A. 341-42. As Mr. Trende explained at deposition, there are different methods of measuring BVAPs (*e.g.*, Black alone, 'any part' Black). Due to this, he and Dr. Handley likely generated different BVAP figures. Comm'n.Resp.Br.Ex.3; Trende Dep.156:19-24, PageID.1740.

The Commission also criticizes Mr. Trende for not reporting the results of the 2018 HD11 Democratic primary. Curiously, they then concede that Mr. Trende did, in fact, discuss this election, where Jewell Jones won a racially polarized primary. Comm'n.Resp.Br.20, PageID.1658. Mr. Trende explained that the 2018 HD11 Democratic primary was unique, as it featured a Black incumbent who had been

12

appointed by the party committee and won his seat in a special election. Trende.Report.36, J.A. 3430.

The Commission's next attack on Mr. Trende is that he failed to report the results of the 2022 SD11 primary, which was not polarized. But SD11 is a supermajority-white district with a BVAP of just 20% and thus obviously not a Black-opportunity district. Comm'n.Resp.Br.Ex.3; Trende Dep.159:21-25, PageID.1741.

Defendants separately attack Rep. Lemmons as an inadmissible "expert" witness whose opinions lack "any foundation or credibility." Comm'n.Resp.Br.21-22, PageID.1659-60. But Rep. Lemmons does not purport to give opinions, only facts. *See generally* Lemmons.Aff., J.A.521. And it is facially absurd to say that a former Black legislator with 50 years of experience campaigning in Detroit and its suburbs has no foundation or credibility to say what happened on the ground in recent elections in which he directly participated. *Id.* at ¶¶1-9, J.A.521-23; Lemmons.Affidavit.6.16.23., Ex.J.

4.    The validity of "influence"/ "crossover" districts

The Commission criticizes Plaintiffs for insisting that "influence" districts (or "crossover" districts, to use the Commission's preferred term) have no basis in VRA jurisprudence. Comm'n.Resp.Br.24-25, PageID1662-63. But as the Commission's counsel, Baker Hostetler, conceded in recent North Carolina redistricting litigation, when the data "justifie[s] the use of race to draw districts to protect the state from Section 2 liability"—which is the Commission's contention here—"then the remedy is to require the state to adopt the majority-Black districts, and not crossover districts

13

that encompass only parts of the demonstrative districts. *Shaw* [*v. Hunt*], 517 U.S. [899,] 916 [(1996)]. States have the discretion to draw majority-Black districts when there is evidence of the three *Gingles* threshold conditions, but this does not give states the authority to replace majority-Black districts with crossover or influence districts. *Bartlett v. Strickland*, 556 U.S. 1, 23-24 (2009)." Legislative Defs.-Appellants'Br.60-61, *North Carolina League of Conservation Voters, Inc. v. Hall*, No.413PA21 (Sup Ct. of N. Carolina) (cleaned up). Per the Commission's counsel, "[t]here is simply no basis in law to argue that [a state] has an obligation to draw districts that Black-preferred candidates can win at levels of BVAP of less than 50%." *Id.* at 63.

### 3.   Plaintiffs are entitled to summary judgment under the totality of the circumstances.

The Commission also concedes that it had "good reasons to believe a Section 2 claim could be made out under the totality of the circumstances" based on the report of their expert, Bruce Adelson. Comm'n.Br.29-30, PageID667-68. Their new arguments in opposition to summary judgment fail.

First, this Court does not yet need to determine the "performance" of "alternative" districts. *Contra* Comm'n.Resp.Br.26, PageID.1664. That's a question of remedy. Second, it is irrelevant whether "members of the minority group have been elected to public office;" the question is whether Black voters' ability to elect candidates of their choice have been diluted. *Contra id.* Third, as shown above and in Plaintiffs' previous briefs, it is not reasonable to say there is "strong white crossover voting" in Detroit and its suburbs in racially polarized elections, unless by "strong"

the Commission means single-digit percentages. *Contra id.* Finally, the *only* evidence of whether Black voters are being adequately represented in the Michigan Legislature is that they are not. Smith.Aff.¶¶42-51, J.A.517-19; Lemmons.Aff.¶¶17-20, 25-27-39-40, 42-48, J.A.525-27, 532-34; *contra* Comm'n.Resp.Br.26-27, PageID.1664-65. Plaintiffs are entitled to summary judgment on the totality of the circumstances.

### C. Summary judgment is proper as to Counts III and IV because the Commission created the Districts with race as the predominant consideration in violation of the Equal Protection Clause.

It is unrebutted that the Commission used racial quotas—a cap of 40% BVAP—to draw the so-called crossover districts in the Detroit area. Pls'.SJ.Resp.Br.33-34. "Under the Equal Protection Clause, districting maps that sort voters on the basis of race 'are by their very nature odious.'" *Wis. Legislature v. Wis. Elections Comm'n.*, 142 S. Ct. 1245, 1248 (2022) (quoting *Shaw v. Reno*, 509 U.S. 630, 643 (1993)). *Contra* Comm'n.Resp.Br.28-31, PageID.1666-69 (arguing that racial quotas are o.k. in some circumstances). The Commission claims this is a post-trial, district-by-district determination. *See id.* But when the entire redistricting process—and every district line—was driven by racial quotas, then a trial is unnecessary.

The Commission claims that its racially gerrymandered maps are the product of considering communities of interest and politics. As to communities of interest, Plaintiffs explained above in Section I.B.1 that the Commission could not even define communities of interest, and it persistently paired some of the poorest, predominantly Black urban municipalities in the State with some of the wealthiest, white-dominated suburban municipalities. Again, this is not a serious argument.

As for politics, it is impermissible for map drawers to single out Black communities *as Black communities* to achieve any political goal. *Contra* Comm'n.Resp.Br.32-33, PageID.1670-71. Yet that is exactly what the Commission's own reports show. That testimony is "direct evidence" of improper racial intent, *Cooper v. Harris*, 581 U.S. 285, 291 (2017), and Mr. Trende's Sequential Monte Carlo analysis confirms it, Pls'.SJ.Br.39-43, PageID.620-43. The fact that the Commission may have used partisan-fairness goals that Mr. Trende did not, *see* Comm'n.Resp.Br.31, PageID.1669, hardly justifies the odious practice of race-based map drawing.

The Commission's narrow-tailoring argument is difficult to comprehend. In essence, the Commission is saying that because the *Gingles* preconditions are satisfied and VRA compliance is a compelling interest, the most narrow way to satisfy the VRA is to provide *fewer* majority-minority districts where Black candidates of choice will be elected in racially-polarized elections. That can't be right. Again, the crutch of the argument is a purportedly "sufficient patterns of white crossover voting to ensure equal Black electoral opportunity." Comm'n.Resp.Br.34, PageID.1672. But when 9 out of 10 white voters reject the Black candidate of choice in the most probative elections, Pls'.SJ.Resp.Br.36, PageID.1610, there is no such opportunity.

The argument is also legally faulty. In *League of United Latin American Citizens (LULAC) v. Perry*, 548 U.S. 399 (2006), the Supreme Court held that VRA § 2 does not justify a state's use of race to create crossover districts. *Id.* at 445. Assuming the opposite, as does the Commission, "would unnecessarily infuse race

into virtually every redistricting, raising serious constitutional questions." *Id.* at 445-46. Likewise, in *Bartlett v. Strickland*, 556 U.S. 1 (2009), the Court rejected the notion that an influence district is an "effective minority district." *Id.* at 14. Rather VRA § 2 only allows states to use race in redistricting if a geographically compact group of minority votes constitutes a majority of a district's voters. *Id.* at 14-18. That is because "claims in which success for a minority depends upon crossover majority voters would create serious tension with the third *Gingles* requirement that the majority votes as a bloc to defeat minority-preferred candidates." *Id.* at 16. Having conceded that it used race to draw redistricting maps because of the likelihood that Plaintiffs satisfy the three *Gingles* preconditions and the totality of the circumstances, the Commission is barred from arguing that influence or crossover districts are the appropriate (indeed, most narrowly tailored) way to solve the VRA problem.

## III.   CONCLUSION

The Commission implicitly concedes that (valid) concerns over potential VRA liability forced it to use race when drawing the Linden and Hickory plans. But rather than maintain the many majority-minority districts that historically existed in Metro Detroit, the Commission used racial quotas—40% BVAP caps—to draw bacon-mandered districts that diluted Black voting power due to a lack of white crossover voting that surprised only the Commission and its experts. A trial is not necessary to conclude that poorly funded Black candidates from Detroit have little chance of competing with cash-rich, white candidates from Macomb and Oakland Counties. The

result is liability as a matter of law under both the VRA *and* the Equal Protection

Clause.

Accordingly, Plaintiffs request summary judgment on all four Counts and

expedited briefing on the appropriate remedy.

Respectfully submitted,

*/s/ John J. Bursch*

John J. Bursch (P57679)
BURSCH LAW PLLC
*Attorney for Plaintiffs*
9339 Cherry Valley Ave SE, #78
Caledonia, Michigan 49316
(616) 450-4235
jbursch@burschlaw.com

Michael J. Pattwell (P72419)
James J. Fleming (P84490)
Amia A. Banks (P84182)
CLARK HILL PLC
*Attorneys for Plaintiffs*
215 S. Washington Sq., Ste. 200
Lansing, MI 48933
(517) 318-3100
mpattwell@clarkhill.com
jfleming@clarkhill.com
abanks@clarkhill.com

Dated: June 20, 2023

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the word limit of W.D. Mich. LCivR 7.2(c) because, excluding the parts exempted by this rule, it contains 4,284 words. The word count was generated using Microsoft Word for Microsoft 365.

Respectfully submitted,

<u>/s/ *John J. Bursch*</u>
John J. Bursch (P57679)
BURSCH LAW PLLC
*Attorney for Plaintiffs*
9339 Cherry Valley Ave SE, #78
Caledonia, Michigan 49316
(616) 450-4235
jbursch@burschlaw.com

Michael J. Pattwell (P72419)
James J. Fleming (P84490)
Amia A. Banks (P84182)
CLARK HILL PLC
*Attorneys for Plaintiffs*
215 South Washington Square
Suite 200
Lansing, MI 48933
(517) 318-3100
mpattwell@clarkhill.com
jfleming@clarkhill.com
abanks@clarkhill.com

Dated: June 20, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on June 20, 2023, I electronically filed the above document(s) with the Clerk of the Court using the ECF System, which will provide electronic copies to counsel of record.

Respectfully submitted,

/s/ John J. Bursch
John J. Bursch (P57679)
BURSCH LAW PLLC
*Attorney for Plaintiffs*
9339 Cherry Valley Ave SE, #78
Caledonia, Michigan 49316
(616) 450-4235
jbursch@burschlaw.com

Michael J. Pattwell (P72419)
James J. Fleming (P84490)
Amia A. Banks (P84182)
CLARK HILL PLC
*Attorneys for Plaintiffs*
215 South Washington Square
Suite 200
Lansing, MI 48933
(517) 318-3100
mpattwell@clarkhill.com
jfleming@clarkhill.com
abanks@clarkhill.com

20