# EXHIBIT F

# MEMORANDUM

## To
## Michigan Independent Citizens Redistricting Commission

**From**

**Stephen Markman**
**Michigan Supreme Court Justice (retired)**
**Professor of Constitutional Law, Hillsdale College**

*Commissioned by Hillsdale College*

*This page left blank*

# TABLE OF CONTENTS

**EXECUTIVE SUMMARY** ..................................................................................................... 4

**MEMORANDUM** ............................................................................................................... 5

    Hillsdale College .......................................................................................................... 5

    Purpose ....................................................................................................................... 5

    Formative Role ............................................................................................................ 5

    Absence of Perspective ............................................................................................... 6

    Oath of Office ............................................................................................................. 6

    Apol Standards ............................................................................................................ 6

    The Law ....................................................................................................................... 8

    Communities of Interest ............................................................................................. 8

    The Citizen (1) ............................................................................................................. 8

    The Citizen (2) ............................................................................................................. 9

    Duties of Commission .................................................................................................. 9

    Rule of Law ................................................................................................................. 9

    "Subjective" & "Not Well-Defined" ..........................................................................10

    Compounding the Confusion .....................................................................................10

    Reflections on Report ................................................................................................ 11

    Analysis: Counties .....................................................................................................14

    Analysis: Judicial Use of "Communities of Interest" .................................................15

    Analysis: § 13(c) .........................................................................................................17

    Analysis: § 13(f) .........................................................................................................17

    Analysis: Priorities .....................................................................................................18

    Analysis: Home ..........................................................................................................19

    Analysis: Fairness ......................................................................................................19

    Analysis: Gerrymandering ......................................................................................... 20

    Analysis: "A New Theory of Representation" ........................................................... 20

    Analysis: Summary .................................................................................................... 20

    Authority of the People ............................................................................................. 21

    Conclusion .................................................................................................................22

**COMMISSIONER RECOMMENDATIONS** .........................................................................23

**REDISTRICTING RECOMMENDATIONS** .......................................................................... 24

*This page left blank*

# EXECUTIVE SUMMARY

This Memorandum addresses the Report of the Center for Local, State, and Urban Policy at the University of Michigan, offering "Recommendations to the Michigan Independent Citizens Redistricting Commission." The recommendations of the Report are neither in full accord with the language of the Amendment nor with the "common understanding" of the Amendment on the part of the people of Michigan who ratified it.

In particular, the concept of the "community of interest" has been significantly distorted from its previous legal usage. The Report fails to acknowledge what the term historically has meant in Michigan—electoral boundaries built upon counties, cities, and townships, the genuine communities of interest to which all citizens of our state equally belong. In its place, the Report would define the "community of interest" on the basis of groups in support of and in opposition to "public policy issues;" media markets and special assessment tax districts; "shared visions of the future" of communities; and by introducing into the Michigan Constitution for the first time express consideration of "race, ethnicity, and religion." As a result, what the people of Michigan wished to see ended by their ratification of the Amendment—a redistricting process characterized by partisanship, self-dealing, and gerrymandering—risks being reintroduced under a different name.

The Report's reinterpretation of the "communities of interest" concept is predicated upon what its author describes as a "new theory of representation." This "new theory" would replace the citizen as the core of the democratic process with the interest group; it would substitute for the ideal of equal citizenship favored and disfavored voting blocs; it would replace partisanship with ideology; it would enhance the role of "race, ethnicity, and religion" in the construction of electoral districts; and it seeks to build an electoral and political foundation upon the judgments of "experts" rather than those of ordinary citizens.

The new Commission has the opportunity either to separate or to unite—to separate our people as members of interest groups and identity categories or to unite them as equal citizens, entitled to an equal role in the electoral process. Furthermore, the Commission is positioned to influence similar amendments being considered by other states, which are now assessing the Michigan experience. This memorandum presumes that in ratifying the Amendment, the people were doing exactly what was heralded at the time: they were establishing a redistricting process at whose core would be "voters not politicians" and not "reimagining" their democracy or experimenting with "new theories of representation."

# MEMORANDUM

To: Commission Members
From: Stephen Markman
Re: Role of the Commission

## Hillsdale College

Hillsdale College is a private liberal arts college in Hillsdale, Michigan with a student body of approximately 1400.  It was founded in 1844 by Free Will Baptist abolitionists and has long maintained a liberal arts curriculum grounded upon the institutions and values of Western culture and Judeo-Christian tradition.  Since its inception, Hillsdale has been non-denominational and takes pride in having been the first American college to prohibit discrimination based upon race, religion, or sex in its official charter, becoming an early force in Michigan for the abolition of slavery.  A higher percentage of Hillsdale students enlisted during the Civil War than from any other western college.  Of its more than 400 students who fought for the Union, four earned the Congressional Medal of Honor, three became generals, many more served as regimental commanders, and sixty students gave their lives.  Many notable speakers visited Hillsdale's campus during the Civil War era, including social reformer and abolitionist Frederick Douglass and the man whose remarks preceded those of Abraham Lincoln at Gettysburg, Edward Everett.  Hillsdale College plays no partisan role in American politics.

## Purpose

Hillsdale College commissioned retired Justice of the Michigan Supreme Court Stephen Markman to review the Report of the Center for Local, State, and Urban Policy at the University of Michigan ["Report"] issued last August.  This Report proposes "Recommendations to the Michigan Independent Citizens Redistricting Commission" ["Commission"] in implementing a state redistricting plan in accordance with the constitutional amendment ["Amendment"] ratified by the people by initiative in 2018.  While the Report and its recommendations are thoughtful in many ways, its conclusions and recommendations, in our judgment, are fundamentally mistaken.  The purpose of this Memorandum is to highlight the Report's deficiencies and to offer an alternative view that more closely adheres to the principles of American constitutionalism and incorporates more fully the legal and constitutional history of redistricting in Michigan.  Specifically, this Memorandum offers thoughts and recommendations in support of what we believe to be the common interest of Michigan citizens that our public institutions uphold principles fundamental to our State constitution: the principles of representative self-government.

## Formative Role

The present thirteen Commissioners comprise the Commission's formative membership and, as a result, your policies and procedures will come to define the work of this new institution.  These policies and procedures will continue to define the Commission as new members join it, as new political balances arise in Michigan, and as new public policy controversies and partisan disputes come to the fore.  Your legacy of

public service will determine the extent to which the Commission endures as an institution and its reforms become permanent. Each of you has been afforded a rare opportunity to help construct the constitutional course of our state. As with the best of public servants, you must rise to this occasion.

### Absence of Perspective

A threshold concern with the Center for Local, State, and Urban Policy's Report is the absence of historical and constitutional perspective. Of particular concern is the Report's failure to take into adequate consideration in its Recommendations aspects of our federal and state constitutional systems that may be relevant in effectively and responsibly implementing the new Amendment. While the Amendment has removed our state redistricting process from within the traditional purview of the legislative power, it has not removed this process from within the purview of our Constitution. State constitutional principles and values remain applicable to the work of the Commission, including that of judicial review, as do all federal constitutional and legal principles and values. These may include, for example, the guarantee to every state of a "republican form of government;" norms of democratic electoral participation; recognition of our nation as a continuing experiment in self-government; and such fundamental precepts as federalism, equal protection, due process, equal suffrage, checks and balances, and governmental transparency. In other words, the Commission, as with *all* public bodies, does not stand *outside* the "supreme law" of our federal and state constitutions. For that reason, debates and discussions within the Commission that proceed without reference to any value of government larger than how

best to define a "community of interest," or that reflect little historical or constitutional perspective, are likely to prove shallow, sterile, and stunted.

### Oath of Office

As Commissioners, you must bear in mind the oath you have each taken, affirming support for the "Constitution of the United States and the Constitution of this state" and vowing to "faithfully discharge the duties of [your] office according to the best of [your] ability." Const 1963, art 11, § 2. While you will exercise your own best judgments in satisfying these obligations, as with all who exercise public authority, you must each familiarize yourself with our federal and state constitutions, just as you have familiarized yourselves with Michigan's redistricting process and the new Amendment.

### Apol Standards

As just one illustration, there is an absence in the UM Report of even a single mention of the "Apol standards" which have guided our state's redistricting process for at least forty years in *name* and for far longer *in practice*. Named after Bernard Apol, a former State Director of Elections, and prepared under the leadership of Michigan Supreme Court Justice Charles Levin, these standards can offer practical guidance to the Commission in understanding and implementing the present Amendment. The Supreme Court has summarized these standards as follows:

1. The Senate consists of 38 districts.

2. The House consists of 110 districts.

3. All districts shall be contiguous, single-member districts.

4. The districts shall have a population not exceeding 108.2% and not less than 91.8% of the ideal district which, based on the 1980 census, would contain 243,739 persons in the Senate and 84,201 persons in the House.

5. The boundaries of the districts shall first be drawn to contain only whole counties to the extent this can be done within the 16.4% range of divergence and to minimize within that range the number of county lines which are broken.

6. If a county line is broken, the fewest cities or townships necessary to reduce the divergence to within 16.4% shall be shifted; between two cities or townships, both of which will bring the district within the range, the city or township with the least population shall be shifted.

7. Between two plans with the same number of county line breaks, the one that shifts the fewest cities and townships statewide shall be selected; if more than one plan shifts the same number of cities and townships statewide, the plan that shifts the fewest people in the aggregate statewide to election districts that break county lines shall be selected.

8. In a county which has more than one senator or representative, the boundaries of the districts shall first be drawn to contain only whole cities and townships to the extent this can be done within the 16.4% range of divergence and to minimize within that range the number of city and township lines that are broken.

9. If a city or township line is broken, there shall be shifted the number of people necessary to achieve population equality between the two election districts affected by the shift, except that, in lieu of absolute equality, the lines may be drawn along the closest street or comparable boundary; between alternate plans, shifting the necessary number of people, the plan which is more compact is to be selected.

10. Between two plans, both of which have the same number of city and township breaks within a particular county, the one that minimizes the population divergence in districts across the county is to be selected.

11. Within a city or township that is apportioned more than one senator or representative, election district lines shall be drawn to achieve the maximum compactness possible within a population range of 98%–102% of absolute equality between districts within that city or township.

12. Compactness shall be determined by circumscribing each district within a circle of minimum radius and measuring the area, not part of the Great Lakes and not part of another state, inside the circle but not inside the district. The plan to be selected is the plan with the least area within all the circles not within the district circumscribed by the circle. *In re Apportionment State Legislature-1992*, 439 Mich 715, 720-22.

Particular attention should be given to standards 5-10, each of which in some manner gives significant regard to counties and municipalities in Michigan's redistricting process. The Apol standards are emphasized because: (a) they offer useful perspective to the Commission that is missing from the Report; (b) the Michigan Supreme Court has observed that these standards are

compatible with the state *constitutional* value of "autonomy of local governmental subdivisions*,"* a value that also goes unmentioned in the Report; and (c) these standards are fair-minded, neutral and non-partisan, and unrelated in any way to the public concerns that led to the present Amendment. Those concerns—partisanship, self-dealing, and gerrymandering—are in no way related to or attributable to the Apol standards.

## The Law

The provision central to the UM Report, as well as to this Memorandum, is Const 1963, art 4, § 6, 13 (c), which states in relevant part,

> Districts shall reflect the state's diverse population and communities of interest. Communities of interest may include, but shall not be limited to, populations that share cultural or historical characteristics or economic interests.

## Communities of Interest

The UM Report makes clear its sense of the importance of the "communities of interest" concept to the implementation of the new Amendment, at least as the Report understands this concept. While recognizing that the concept is "subjective" and "not well-defined," the Report nonetheless proceeds to explain its own very broad understanding of this new political foundation upon which our governmental system allegedly now rests. "Communities of interest" comprise the new "building blocks" of our democracy; "communities of interest" will determine "how well a community is represented;" representatives will be assessed by how responsive they are to the 'community [of interest's] needs;" representatives will be "attentive" to "members [of the

"communities of interest"]; "communities of interest" will play a "leading role in the process;" "[t]o be an effective representative, a legislator must represent a district that has reasonable homogeneity of needs and interests;" "'communities of interest' can pick up the texture of bonds and interests within a political jurisdiction;" "'communities of interest' can capture the current patterns of community life;" and "'communities of interest' are "primary elements of the new redistricting process," whose recognition by the Commission "will lead to fairer and more effective representation." Although the term is not well defined in the Amendment (the Amendment largely sets forth examples or illustrations of what "may be included" within the term), the "community of interest" is enthusiastically embraced by the Report as the dominant institution mediating between voters and their elected officials.

## The Citizen (1)

While the Report has much to say concerning "communities of interest," it has little to say concerning the American political system's *genuine* "building block," the citizen. Each citizen participates in the electoral process, not as a component of vaguely defined interest groups accredited by a governmental commission, but by casting his or her vote in accord with individual judgment and personal conscience. Yes, the citizen is a part of a community. But it is not a community arbitrarily cobbled together by a public commission and its "experts" and legitimated only after a majority vote has been cast following months of public hearings and lobbying. And it is not a community to which only *some* citizens belong or a community in which its supposed members may not even have *known* of their affiliation until after the community had been officially endorsed by the Commission. Rather, the citizen belongs

to a *genuine* "community of interest," one to which *all* citizens belong *equally* and in which all share a common interest and influence. And it is one whose definition requires no prolonged hearings or votes or expert consultations. It is *this* "community of interest" that has always served as the foundation of our electoral process, the community to which each of us belongs and is actually *from*, the community that most embodies our status as free and independent citizens, the community we each call *home*.

## The Citizen (2)

To the extent American citizens are defined and officially separated by governmental agencies on the basis of their membership in arbitrarily-defined "communities of interest"—"communities" defined by "interest, identity and affinity" groupings, as the Report proposes—we are stereotyped and divided as a people. If we must be defined in collective terms, it should only be as part of "we the people," in whose name our constitutions were ratified, not compartmentalized in the most fundamental sphere of our citizenship on the basis of considerations such as race, nationality, ethnicity, religion, or skin color. The first obligation of the Commission is to ensure the enactment of a fair-minded, neutral, and non-partisan redistricting process—what would be a remarkable contribution to good government if it could be achieved. It is not an obligation, as the Report instead recommends, to assemble an electoral checkerboard upon which "interest, identity, and affinity" groups can compete for electoral advantage. Such a system would depart drastically from the fundamental principles of the consent of the governed and the equality of all under the law, as it inevitably would elevate some groups of citizens, but not others, to a privileged status.

## Duties of Commission

The Report appears to view the lack of clarity and the obscurity of definition of the "community of interest" concept as presenting an *opportunity*, empowering the Commission, with the assistance of the "philanthropic and non-profit sectors" and the "print and broadcast media," to fill an empty constitutional vessel as the Commission sees fit. Operating in accordance with the Report, the Commission is to be occupied in doing at least the following: (a) examining the qualifications of "interest, identity, and affinity" groups to determine which should be favored in the redistricting process as "communities of interest;" (b) assessing which of the resulting "communities of interest" should be "linked" or not "linked" with other "interest, identity, and affinity" groups, both within and across electoral districts, to establish larger "communities of interest;" and (c) deciding under which circumstances "communities of interest" should be concentrated within a single district in order that the "community" be capable of electing a member of that "community" as its representative, or dispersed among districts in order that the "influence" of that "community" be more broadly felt. Such a process is a zero-sum game in which there are winners *and* losers. The latter will be comprised not only of "interest, identity and affinity" groups rejected as "communities of interest," but also ordinary Michigan citizens, not belonging to any such "community," and who might not have appreciated that such affiliation was a prerequisite for their full exercise of equal suffrage rights in the redistricting process.

## Rule of Law

What is perhaps *most* troubling about this decision-making process imposed upon the

Commission is that it is an essentially standardless process. The rule of law—to which the Commission, as with all public bodies, must adhere—is all about standards: the setting of rules, criteria and procedures that are defined in *advance* of a decision and applied in an equal and consistent manner. Standards lie at the core of public decision-making, for these ensure that the law is applied today as it was yesterday, and as it will be tomorrow. The constitutional guarantees of both due process and equal protection, for example, are heavily dependent upon the government establishing and abiding by standards. As this pertains to "communities of interest"— which the Report describes as our new "building blocks" of democracy—these standards must ultimately be derived from our constitutions and laws, taking into account their language, structure, history, and purpose. In particular, the language of Michigan's constitution must be understood in the "sense most obvious to the common understanding . . . as reasonable minds, the great mass of the people themselves, would give it." *Traverse City Sch Dist v Att'y Gen*, 384 Mich 390, 405 (1971), quoting Thomas Cooley, Constitutional Limitations. In other words, vagueness and unclear language in the Amendment does not warrant the Commission 'making up' the law, acting in an arbitrary fashion, exercising merely personal discretion, or formulating rules and procedures on a case-by-case basis. This is not how the rule of law operates, particularly where the most fundamental institutions of our representative architecture are being constructed.

## "Subjective" & "Not Well-Defined"

What makes the meaning of "communities of interest" in Const 1963, art IV, § 6, 13(c), so challenging is not only the potentially

*boundless* implications of the "may include, but are not limited to" language, but also the potential breadth of other critical terms such as "diversity," "cultural," "historical," and "economic." For these reasons, the term "communities of interest" is correctly characterized by the Report as not only being "subjective" and "not well-defined," but as "opaque at best" in a recent article, Liscombe & Rucker, *Redistricting in Michigan*, Mich Bar J, Aug 2020. The Report further summarizes a survey of local officials responding to questions on the meaning and implications of "communities of interest." Significant numbers of these officials responded that "there were no significant local COIs" in their jurisdictions, that the matter was "inapplicable to their jurisdiction," that they "didn't understand what was being asked," or that the new constitutional provision was "not legitimate." In consequence, the Report describes the tenor of these responses as evidencing "uncertainty or skepticism," or, perhaps better put, "uncertainty and utter confusion." Despite this, the Report proceeds to give even the most obscure language of the Amendment meaning, its *own* meaning.

## Compounding the Confusion

Consider, for example, the threshold question of giving proper meaning to the term "community of interest." The definition in the Amendment is already highly confusing, stating merely that the term "may include, but are not limited to" populations that "share cultural or historical characteristics or economic interests." The Report then proceeds to *compound* what is confusing about the Amendment by introducing a host of additional and equally amorphous concepts, including: "racial, ethnic, and religious identities"; "common bonds"; "link[age] to a set of public policy

10

issues that are affected by legislation"; "shared vision[s] of the future of a community"; "communities concerned about environmental hazards"; "media markets"; "affinity groups among neighboring jurisdictions"; "invisible ["communities of interest"]"; "like-minded nearby communities"; "shared identities"; "what binds [the] community together"; "how the community currently engages with the political process"; "particular governmental policies that are high priority"; "nearby areas whose inclusion . . . would strengthen . . . and weaken representation for your community of interest"; and "metrics to transform [the term] 'reflect' into a clear measure of compliance with [the Amendment's redistricting] criteria."  All of this occurs with little explanation or analysis, and with no reference whatsoever to Michigan's constitutional history.  Of course, such complexity and convolution would be unnecessary if the Report viewed the Commission's work as "merely" redistricting Michigan in a "fair-minded, neutral, and non-partisan" way.  But far more is required if the "building block" of our democracy is to be reconfigured in pursuit of a reimagined "theory of representation."

### Reflections on Report

It is not entirely the fault of the Report's authors for promoting an incorrect understanding of "communities of interest" because this term, as used in the Amendment, is defined inadequately and confusingly.  Nonetheless, the Report is deeply flawed, and there is a far more reasonable understanding of "communities of interest" that should guide the work of the Commission, not only to render its efforts in better accord with our Constitution, but also to render this work more broadly unifying.

The following are several specific observations in this regard:

1.  The Report asserts that "communities of interest" must be somehow "linked" to a "public policy issue that [is] affected by legislation."  Why must this be so?  What if a "community" is simply distinguished by the warmth and neighborliness of its people; by people with a common love for the outdoors and who revel in local recreational opportunities; by people enamored with the peace and quiet of the community; by people who relish the quality of local schools, libraries, shops or restaurants; or by people who simply appreciate its proximity to their place of work or to family members, or its affordability?  What, of course, is logically implicit but unstated in the Report's assertion is that there must also be some common point-of-view on the "public policy issue that [is] affected by legislation," lest the "community of interest" join people among whom there is actually an absence of agreement on the "public policy issues."  And if there must be a common point-of-view on a "public policy issue that [is] affected by legislation," how is this consideration any different from the partisan considerations that were meant to be precluded by the Amendment in the first place?  After all, attitudes toward "public policy issues that [are] affected by legislation" are exactly what characterizes American political parties.  They are not fraternities or sororities, social clubs, or charitable societies, but rather groupings of citizens, broadly sharing "common points-of-view" on the role and responsibilities of government, and separated from other groupings of citizens, broadly sharing "contrary points-of-view."  Indeed, by the Report's own understanding, the political

party itself might be defined as a "community of interest," except that it was a dominant purpose of the Amendment to reduce partisan influence within the redistricting process, not to heighten it.

2. Furthermore, the Report's "linkage" requirement, apparently encompassing those with common "racial, ethnic, and religious identities," is seemingly in tension with its own definition of "communities of interest." Is the premise of the Report that those possessing common "racial, ethnic, and religious" identities will also tend to possess common attitudes on "public policy issues?" Or is its premise that "communities of interest" should be defined along more narrow, but also more politicized, lines such as, joining together "Asian-American communities favoring globalist and international perspectives," "Hispanic communities with liberal points-of-view," or "Christian communities with socially conservative attitudes?" In either case, the "linkage" requirement is inexplicable in both its rationale and its requirements.

3. The Report enumerates a variety of "geographically-oriented" groupings that "may" give rise to "communities of interest," including those predicated upon common "media markets," "enterprise zones," "special assessment tax districts," and "transportation districts". The Commission should bear in mind that recommendations of this sort are intended to preclude the Commission from treating actual communities—counties, cities, townships, and villages—as "communities of interest." Moreover, are any of the examples set forth by the Report indicative in any way of a bona fide

community? Is there a single citizen of Michigan with an allegiance to his or her NBC media market? Or a felt sense of attachment to his or her local "enterprise zone?" Or a kinship with fellow-citizens within his or her "transportation district?" Or a bond with his or her "special assessment tax district?" Are these the types of "building blocks" of a democracy to which a free citizenry would profess their sense of community? If so, what about such "communities of interest" as those based upon sewer districts, subdivisions, apartment complexes, zoning categories, health care centers, tourist areas, policing, firefighting and 911 precincts, downtown development districts, parks and recreational areas, zip-codes, nursing homes, strip malls, and internet protocol addresses? All this to avoid giving consideration to the most genuine of our "communities of interest" —counties, cities and townships, the places where people actually live their lives.

4. The Report specifies shared "racial, ethnic, or religious identities" as potential "communities of interest" in the redistricting process, while excluding without explanation other standard civil rights categories, including nationality, age, alienage, citizenship, gender, sexual preference, and handicap. The Report specifically offers "racial, ethnic, or religious identities" under the "may include" language of the Amendment, rather than under its "diverse population" language, perhaps because it recognizes that Michiganders are "diverse" in many ways that have nothing to do with identity considerations. However, the truly overarching question is one the Report neither asks nor answers: did the people of Michigan who ratified this Amendment

share a "common understanding" that, for the first time in Michigan's history, its Constitution would impose an affirmative obligation upon the state to take "race, ethnicity, and religion" into account in setting public policy even though that dictate, and those terms, nowhere appear in the Amendment? And did these same people also share a "common understanding" that, for the first time in Michigan's history, its Constitution would impose an affirmative obligation upon the state to arrange and configure electoral districts and political influence on the basis of express calculations of "race, ethnicity, and religion?"

5. And in this same regard, what is the relevance of Const 1963, art I, § 2? ("No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin.") Is the redistricting process not a zero-sum process, in which advantages accorded to one "community of interest" on the basis of "race, ethnicity, or religion" come necessarily at the expense of other "communities of interest," and other individuals? Moreover, what is the relevance of Const 1963, art I, § 26, enacted by an earlier constitutional initiative of the people in 2006, in supplying evidence of the people's "common understanding" of the present Amendment? The 2006 provision forbids the state—including expressly the "University of Michigan," the sponsors of the Report in question—from "discriminating against, or granting preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin," in the realms of "public employment, public education, and public contracting." Are these two express constitutional provisions relevant in affording some understanding of what the people meant, and did not mean, in 2018 in ratifying the present Amendment?

6. The Report states that, "communities concerned about environmental hazards" "may" also be designated as "communities of interest." What about communities concerned about the adequacy of policing or firefighting resources; communities concerned about the quality of local education; communities concerned about road infrastructure; or even communities concerned about levels of property taxation resulting from the policies favored by communities concerned about environmental hazards? Does this singular and specific recommendation of the Report, not offered as an illustration but as a formal recommendation, strike the Commissioners as satisfying the standards of "fair-mindedness, neutrality, and non-partisanship," to which the Commission itself is constitutionally obligated?

7. The Report observes that communities with a "shared vision of the future of a community" may also be designated as "communities of interest" (16). Does this really describe an inquiry of the sort that the Commission wishes to undertake, to distinguish between communities with and without a "shared vision" of the future and then to ascertain which specific "shared visions" should be given priority as "communities of interest?" The Commission should reject this invitation to serve as the "Planning Commission for the 21st Century" or as Michigan's

philosopher-kings.  Still, let us ask the obvious: what evidence of consensus would conceivably demonstrate a "shared community vision?"  How would this be demonstrated in the course of the Commission's hearings?  What would define a sufficiently ennobling "vision" to warrant recognition as a "community of interest?"  That the schools of the community might some day provide a quality education for every student without regard to race, ethnicity, or religion?  That the community might remain peaceable and responsibly policed?  That a supportive ethic among neighbors might arise and be sustained?  That small businesses might prosper?  Perhaps relevant to these inquiries, the Hillsdale College community of more than 6000 people also harbor what it believes to be a shared, and deeply-held, educational and moral vision for the future of the College, and it has adhered to this vision for 175 years.  Doubtless, it is a distinctive vision from that of the University of Michigan, but it is no less of a vision and each of our institutions, and our student bodies, are enhanced by these visions.  No public body, however capable and enlightened its members might be, should be engaged in comparing and ranking community "visions."  The Commission would be acting wisely and responsibly in rejecting this recommendation.

8. Finally, by the sheer breadth and invented character of its recommendations, the Report defines for the Commission a mission that extends well beyond eliminating partisan advantage, ending legislative self-dealing, and curtailing gerrymandering in the redistricting process.  For the Commission to succumb to this mission would constitute grievous error and a lost opportunity to bring the people of our state together in the contentious process of redistricting rather than dividing them further.  The Commission of thirteen engaged and public-spirited citizens should instead operate faithfully within its charter, act with energy and integrity in pursuit of its constitutional purpose, and define a responsible and lasting legacy for the generations of Commissioners who will follow in the years ahead.

## Analysis: Counties

What follows is an analysis concerning how the Commission should give reasonable and faithful meaning to the concept of "communities of interest" in Const 1963, art 4, § 6, 13 (c).  Just as there is no reference in the Report to the Apol standards that have long guided the redistricting process in Michigan, there is also no reference to relevant decisions of the Michigan Supreme Court—the highest tribunal of our state and a court possessing the authority to review the legal determinations of the Commission. Const 1963, art 4, § 6, 18-20.  There is an utter absence of historical memory in the Report. In 1982, in the course of reviewing the state's proposed redistricting plan, the Michigan Supreme Court unanimously held,

> We see in the *constitutional* history of this state dominant commitments to . . . single-member districts drawn along boundary lines of local units of government . . . Michigan has a consistent *constitutional history* of combining less populous counties and subdividing populous counties to form election districts.  As a result, county lines have remained inviolate.  The reason for following county lines was not the "political unit" theory of representation,

but rather that each Michigan Constitution has required preservation of the *electoral autonomy* of the counties. *In re Apportionment-1982*, 413 Mich 149, 187 (1982) (emphasis added).

And two Justices, Levin and Fitzgerald, in a bipartisan concurrence, separately wrote in this same regard,

> The "*constitutional* requirements" concerning county, city and township lines, which preserve the *autonomy of local government subdivisions* . . . were not part of the political compromise reflected in the weighted land area/population formulae. [Rather,] they are [among] separate requirements which carry forward provisions and concepts which extend back over 100 years from the Constitution of 1850 through the Constitution of 1908 and the 1952 amendment thereto. *In re Apportionment-1982*, 413 Mich 96, 139n24 (1982) (emphasis added).

And the Court unanimously reiterated this same constitutional understanding in assessing Michigan's 1992 redistricting,

> Recognizing the importance of local communities, and the harm that would result from splitting the political influence of these communities, each of [our past] *constitutions* explicitly protected jurisdictional lines . . . For instance, the 1835 constitution said that no county line could be broken in apportioning the Senate. Const. 1835, art. 4, § 6. The 1850 constitution repeated that rule and added that no city or township could be divided in forming a representative's district. Const. 1850, art. 4, §§ 2-3. [And as] originally enacted, the 1908 constitution continued those rules, though it permitted municipalities to be broken where they crossed county lines. Const. 1908, art. 5, §§ 2-3. *In re Apportionment-1992*, 486 Mich 715, 716, 716 n 6 (1992).

Although without the slightest doubt, our Constitution can be changed or altered by amendment, as it has been here, a responsible assessment of new constitutional language would take into account the interpretive counsel that might be derived from past constitutional provisions and court decisions. And in that regard, what the above decisions indicate is that, *at least* through 2018, "preservation of the electoral autonomy of the counties" was viewed by the highest court of this state as a substantial *constitutional* value, and reflected in our state's redistricting processes in 1982 and 1992 (and since) by the application of the Apol standards upholding where reasonably possible the integrity of county and municipal boundaries. Moreover, in assessing the "common understanding" of the people who ratified the Amendment in 2018, and in reviewing the language of the Amendment itself, we see no evidence that this constitutional value has been repudiated.

### <span style="color:red">Analysis: Judicial Use of "Communities of Interest"</span>

The Report incorrectly states that the concept of "communities of interest" is an entirely "new" concept in Michigan law. It is not. For example, in the course of a unanimous decision of the Michigan Supreme Court addressing the 1982 redistricting process, the following observations were made in a full concurrence to that decision by Justices Levin and Fitzgerald,

The Court considered whether, when cities or townships must be shifted, there should be shifted (i) the number of cities or townships necessary to equalize the population of the two districts, or (ii) only the number of cities or townships necessary to bring the districts within the range of allowable divergence. The Court concluded that the concept of minimizing the breaking of county lines extended to the shifting of cities and townships. A county is kept more intact as a *community of interest*, and fewer special election districts must be created, when the minimum necessary number of cities or townships are shifted. *In re Apportionment of State Legislature*- 1982, 413 Mich 149, 155n 8 (1982).

\* \* \*

There remained the possibility that two sets of cities or townships might satisfy the above rule; for example, each of two townships might contain the population required to be shifted. The Court again concluded that the concept of preserving counties as *communities of interest* to the fullest extent possible required that the township or set of townships with the fewest people necessary should be shifted. *In re Apportionment of State Legislature*- 1982, 413 Mich 149, 155n 8 (1982).

\* \* \*

The flaw in this method [of redistricting] is that it artificially divides the counties into two groups, treating one group differently than another . . . The historical [redistricting] practice of following county lines never rose to a level of a principle of justice, [but] it has always been simply a device for controlling gerrymandering,

facilitating elections and preserving *communities of interest*. Once the rule of following county boundary lines yielded to the principle of 'entitlement', the Court could not pretend to have a neutral and objective set of guidelines. *In re Apportionment of State Legislature*- 1982, 413 Mich 149, 193-5 (1982).

Each of these judicial excerpts employs "communities of interest" in a context referring to municipal boundaries and each was specifically made in the course of assessing the 'Apol standards,' with its emphasis upon preserving such boundaries wherever reasonably possible. The Supreme Court in the 1992 redistricting process again addressed the term and similarly observed,

The Masters determined that none of the plans submitted to them was satisfactory. They stated that these plans 'either fail to comply with the 1982 [Apol] criteria or do so only facially.' Further, the plans exhibited 'a disregard of some specific criteria, such as *community of interest*. . . . Thus the Masters drew their own plan. In doing so, they followed the same criteria used by Mr. Apol in 1982 *In re Apportionment of State Legislature*-1992, 437 Mich 715, 724 (1992).

\* \* \*

A legislator [can represent his constituents] only if there is some real *community of interest* among the represented group — without that, the legislator cannot speak effectively on the group's behalf. When a small portion of a jurisdiction is split from the remaining body and affixed to another governmental entity in order to reduce population divergence, the shifted area is likely to lose a great portion of its political

influence.  For that compelling reason, grounded in sound public policy, all four Michigan Constitutions have provided that jurisdictional lines, particularly county lines, are to be honored in the apportionment process. Id. at 732-33.

\* \* \*

Nor did the parties' proofs sufficiently demonstrate
a *community of interest* between      and among the voter populations of Oakland County and the voter populations of the City of Detroit and Wayne County.  Id. at 737 n 50.

There is, of course, additional language within Const 1963, art IV, § 6, 13(c), that must also be taken into consideration in giving meaning to "communities of interest" in the new Amendment.     By these excerpts, however, it is clear that the slate is not quite as blank concerning the meaning of "communities of interest" as the Report would suggest.  Especially in the context of an Amendment focused upon redistricting, and in which the critical term has been asserted by the Report to be "new," it might be thought that clarifying language from Michigan's highest court in the *two most significant redistricting decisions of the past half-century* would be welcomed and closely considered.  And it is clear that the term has specifically been understood to refer to municipal communities and their boundaries.

### Analysis: § 13(c)

Next, with regard to the language of the Amendment itself, the first sentence of § 13(c) specifies that the *only* entities that "shall" or "must" be reflected within an electoral district are "communities of interest," and the "state's diverse population."  However, the second sentence

of § 13(c) does not set forth anything that "shall" or "must" be designated as a "community of interest" and thus, by cross reference, also does not set forth anything within the first sentence that "shall" or "must" be reflected within an electoral district.  Instead, the second sentence communicates only that certain groups "may" be included as a "community of interest" and that a "community of interest" is not "limited to" such groups.  It defines nothing that "shall" or "must" be treated as such a community.  As a result, when viewed together, the operative language of the Amendment, the first sentence of § 13(c), provides only that communities of interest "shall" be reflected in the redistricting process but only *if* they have been designated in the first place.    The problem in focusing upon § 13(c), without also assessing § 13 as a *whole*, is that there may be *no* designated "communities of interest" that "shall" or "must" be reflected within electoral districts, despite an obvious intention that there be such communities.

### Analysis: § 13(f)

While the conundrum posed in the previous paragraph—that there may be *no* "community of interest" at all to be considered in the redistricting          process—reflects          one *conceivable* understanding of § 13(c), it is not the most *reasonable* understanding.  Rather, a more reasonable understanding of § 13(c), would be to read § 13 as a whole, and to include as "communities of interest" *precisely* the entities described in § 13(f): the "counties, cities, and townships," whose boundaries "*shall*" be reflected in the redistricting process.  Indeed, these are the *only* entities in the Amendment whose relevance in the redistricting process is made constitutionally *mandatory* and not merely a product of the Commission's *discretion,* thus avoiding any possibility    that    the    consideration    of

"communities of interest" in the process is rendered a nullity by the absence of any "community of interest" being *designated* pursuant to the second sentence of § 13(c). This understanding is made even more compelling by the fact that such "counties, cities, and townships" are reasonably understood as the *actual* "communities of interest" referred to in the first sentence of § 13(c). As result, an understanding of § 13 that harmonizes its subsections (c) and (f), which is the obligation of any interpreter of a provision of law, not only offers a more reasonable understanding of § 13(c) by filling in its gaps, but it is an understanding in closest accord with the genuine meaning of the term "community of interest" in Michigan redistricting law and history.

## Analysis: Priorities

The Report not only fails to harmonize § 13(c) and § 13(f), but seeks to "deprioritize" the latter provision (requiring the consideration of "counties, cities, and townships") on the grounds of its relative "order of priority within § 13." While such an "order of priority" makes sense in defining the organization or sequence of the process by which electoral districts are to be constructed, it runs the risk—one the Report seems content to run—that such an "order of priority" will effectively read out of the Constitution, or nullify, express constitutional provisions, in this instance, § 13(f) and its *exclusive* requirement that "counties, cities, and townships" "*shall*" be considered in the redistricting process. To understand this concern, we must again review decisions of the Michigan Supreme Court:

> [The challenged law in issue] provides for the establishment of a county apportionment commission and that such a commission "shall be

governed by the following guidelines in the stated order of importance: "The stated order is: (a) equality of population as nearly as is practicable; (b) contiguity; (c) compact and as nearly square in shape as is practicable; (d, e, f) not joining townships with cities and not dividing townships, villages, cities or precincts unless necessary to meet the population standard; (g) not counting residents of state institutions who cannot vote; and (h) that the district lines not be drawn to effect partisan political advantage.

If the stated order requires exhaustive compliance with each criterion before turning to a succeeding criterion, then criteria (a) through (c) alone would be determinative and criteria (d) through (f) could not be given any effect.

There are an endless number of ways in which one could construct the district lines consistent with criterion (a), equality of population, and criterion (b), contiguity. Criterion (c) requires that all districts shall be as compact and as nearly square in shape as is practicable, depending on the geography of the county area involved. Read literally and given an absolute priority, that criterion would require that the district lines be drawn *without regard* to township, village, city or precinct lines. The apportionment of a county would [then] be a mechanical task.

\* \* \*

We reject such a rigid reading of "stated order" because so read:

\* \* \*

**18**

(c) It would give no effect whatsoever to criteria (d) through (f) concerning the preservation of township, city, village and precinct lines, and thereby make meaningless those provisions. It is our duty to read the statute as a whole and to avoid a construction which renders meaningless provisions that clearly were to have effect.  *Appeal of Apportionment of Wayne County-1982*, 413 Mich 224, 258-59 (1982); see also *In re Apportionment of State Legislature*-1992, 439 Mich 715, 742n 65 (1992).

In sum, the UM Report seeks, <u>first</u>, to exclude "counties, cities, and townships" from within the purview of the "community of interest"; <u>second</u>, to elevate the role of its own preferred "communities of interest" by giving emphasis to the "may include, but are not limited to" language of the Amendment; and, <u>third</u>, to "deprioritize" and thereby "preempt" from any material role in the redistricting process "counties, cities, and townships." None of these approaches—by concocting creative and dubious "communities of interest" one the one hand, and by excluding the most obvious and historically-grounded "communities of interest" on the other—constitute a fair or reasonable way of understanding the Amendment.

### <u>Analysis: Home</u>

"Counties, cities, and townships" are not only reasonably understood as our fundamental "communities of interest" on the basis of judicial decisions and historical practice, as well as a close analysis of the Amendment itself, but also in terms of how the ordinary citizen would understand this concept. Such communities are where the people reside; where they sleep, play, relax, worship, and mix with families, friends and neighbors; where their children attend schools, make

and play with friends, compete in sports, participate in extracurricular activities, and grow to maturity; where they work, shop, dine, and participate in acts of charity; where their taxes are paid, votes cast, and library books borrowed; and where their police and firefighters serve and protect. In short, these places are meaningful to every Michigander, for they serve to define what we call "home" and they signify to the rest of the world where we are "from." Nonetheless, with no explanation or analysis, the Report summarily and confidently assures the Commission that a "community of interest is <u>not</u> a political jurisdiction."

### <u>Analysis: Fairness</u>

The Report defines "communities of interest" on the basis of "race, ethnicity, and religion;" "media markets;" "environmental hazards;" "creative arts;" "shared visions of the future;" "immigrant communities;" and "linkages to a set of public policy issues that are affected by legislation"—*none* of which is found anywhere within the law, except that each fits, as would *any other* conceivable entity, within the "may include, but are not limited to" language of § 13(c). Yet, the most obvious and genuine "communities of interest"—the "counties, cities, and townships" of Michigan, the *only* entitles that *"shall"* be given consideration in the redistricting process under the Amendment—are to be *excluded* from the term. This is done without the slightest consideration for what may be the *greatest* strength of treating our "counties, cities, townships" as "communities of interests"—namely, that every Michigan citizen is an equal part of *this* "community of interest" and there is no other "community of interest" whose establishment would be more "fair-minded, neutral, and non-partisan." That is, the definition proposed here—"communities of

interest" based upon "communities" of "interest"—has at least the minor virtue of enabling the Commission to avoid struggling with the impossible, and inapt, question, "which citizens should count, and which should count more and which should count less?"

## Analysis: Gerrymandering

The Amendment was popularly headlined as an "anti-gerrymandering" measure in such media as the *Detroit Free Press* (November 7, 2018).  Yet the Report, in its disdain for municipal "communities of interest", and in its preference for the dislocated and erratic boundaries of interest and identity groups, is far more likely to give rise to districts that are truly gerrymandered, albeit in different ways than they may sometimes have been gerrymandered in the past.  Relying upon county, city, and township lines is simply the most certain and fair-minded way of avoiding gerrymandering altogether, for there is no more neutral and established boundary, with almost all of these having been created either pre-statehood (as with Wayne County in 1796) or shortly thereafter.  District maps produced in accordance with the Report will not only appear oddly-shaped and irregular, but they will appear to be so precisely because they will have been constructed in pursuit of traditional gerrymandering considerations, dividing our citizens into winners and losers.

## Analysis: "A New Theory of Representation"

In a press release from the University of Michigan, the author of the Report has stated that the Report's recommendations offer a "new theory of representation." (closup.umich.edu/policy-reports/18/the-role-of-communities-of-interest-in-

michigans-new-approach-to-redistricting-recommendations, Aug 31, 2020.)  While its theory is indeed new to the history of American constitutionalism, it is foreign to it as well.  It is a "new theory" that replaces the citizen with the interest group as the core of the democratic process; a "new theory" that enhances the role of race, ethnicity, and religion in the construction of electoral districts; a "new theory" that substitutes for the ideal of equal citizenship that of favored and disfavored voting blocs; a "new theory" that replaces partisanship with ideology; a "new theory" that seeks to build a new political foundation upon the judgments of 'experts' rather than those of ordinary citizens.  Although the author's assertion that his Report's recommendations may be also correct, these do not have much to do with the intentions of several million citizens who cast their votes for Proposition 2.

## Analysis: Summary

In summary, regarding the threshold policy question that must be addressed by the Commission—the meaning of the "community of interest"—the Report essentially asserts that almost any entity, any asserted "community," can be included within the "may include, but are not limited to" language of § 13(c) and thus be considered as a "community of interest," with the singular and remarkable *exception* of the most genuine of these communities, our "counties, cities, and townships."  These are to be excluded, despite the fact:

❖ That "counties, cities, and townships" are by any reasonable and ordinary definition of the term *actual* "communities of interest;"

❖ That "communities of interests" has been defined in Michigan Supreme Court decisions to refer principally to "counties, cities, and townships;"

❖ That such Michigan Supreme Court decisions have pertained specifically and directly to the state's redistricting process;

❖ That "communities of interest," understood in the context of the 'Apol standards,' which have guided Michigan redistricting since at least 1982, have also been understood in terms of "counties, cities, and townships; "

❖ That "counties, cities, and townships" are the only entities that "shall" be reflected in the redistricting process and there is no alternative definition in the Amendment of what "shall" be considered a 'community of interest;"

❖ That "counties, cities, and townships," as with every other entity the Report would include within "communities of interests" on the basis of the "may include, but are not limited to" language of § 13(c), obviously could also be included on this same basis;

❖ That "counties, cities, and townships" would seem to be the most obvious "communities" for inclusion within the Amendment's undefined and discretionary "community of interest" categories of "shared cultural characteristics," "shared historical characteristics," and "shared economic interests;" and

❖ That the most reasonable and harmonized understanding of § 13 of the Amendment strongly suggests that the

"counties, cities and townships" referred to in § 13(f) are precisely the "communities of interests" referenced in the first sentence of § 13(c).

## Authority of the People

In response to this Memorandum, the authors of the Report may contend that the people of Michigan through their constitutional amendment process are entitled to repudiate the Apol standards, the decisions of the Michigan Supreme Court, and historical redistricting practices. This Memorandum would not dispute such an assertion, only that this is not what the people have, *done* by the present Amendment. While the law of Michigan has been modified in important regards—most significantly, by conferring the authority to administer the redistricting process upon the Commission instead of the Legislature—what the people have *not* done is enact *obligatory* changes in what is meant by the "community of interest." While the term has been made subject to change at the *discretion* of the Commission, the standards, decisions, and practices addressed in this Memorandum largely pertain to the *mandatory* obligations of the Commission in giving meaning to the "community of interest." ("Districts *shall* reflect consideration of county, city, and township boundaries.") In other words, while the Commission may possess the *discretion* to redefine the "community of interest," it also possesses the *obligation* to consider geographic "communities of interest. The Commission should act to carry out its *obligations* under the Amendment while at the same time exercising its *discretion* not to act *beyond* those obligations in designating "communities of interest." This would constitute the wisest and most responsible exercise of authority by the Commission and nothing in the debate over Proposition 2 or in

the assessment of the people's "common understanding" or in the language of the Amendment compels any different result.

## Conclusion

Districts should be drawn according to the proposition that each voter should be rendered as equal as possible in his or her participation and influence in the democratic process and as individual citizens, rather than as members of interest groups, and that districts should be drawn with a view to uniting rather than dividing society. The guiding ideal should be that the purpose of government is to secure the rights of individual citizens, their common good, and the strengthening of the right of all of our people to pursue happiness under our federal and state constitutions. The best way for the Commission to accomplish this is to rely upon the longstanding definition of "communities of interest" as being primarily "counties, cities, and townships."

# COMMISSIONER RECOMMENDATIONS

Respectfully, the Independent Citizens Redistricting Commission should consider the following recommendations in carrying out its responsibilities under the Amendment:

1. The Commissioners should seek in their decisions to act in a fair-minded, neutral, and non-partisan manner, in accordance with their responsibilities under the Constitution and in accordance with "common understandings" of the Amendment by the people of our state.

2. The Commissioners should work to secure an understanding and perspective, not only of the Amendment and our state's redistricting process, but of the principles and values underlying our two constitutions.  You should be guided in this process by your own best judgments as independent citizens and by the legal framework to which "we the people" have assented, not by the judgments of unelected 'experts.'

3. The Commissioners should take care in the redistricting process to maintain and preserve the greatest institution of our people, representative self-government under constitutional rules and principles.

4. The Commissioners should bear in mind that as formative members of the Commission, your decisions and judgments will continue to guide the Commission in the years ahead as partisan majorities, political incumbents, and legislative debates ebb and flow.  Your legacy will far outlast your public service, and so requires wisdom and foresight.

5. The Commissioners should show modesty in carrying out their mission.  What the people of Michigan understand most clearly of your work is that you have replaced the Legislature in the decennial process of reconstructing our electoral districts.  Do not succumb to the invitations of "experts" to broaden what is already a substantial and daunting mission.  As with all responsible public servants, you must act within your authority and not within your power.

6. The Commissioners should show humility in recognizing that, however capable and committed each of you might be, you are nonetheless in the unusual position of exercising crucial public responsibilities without ever having been elected or confirmed to your position by a democratic vote of those whom you now represent.

7. The Commissioners should avoid becoming enmeshed or embedded within factions or coalitions on the Commission.  You are a single Commission representing a single people.

8. The Commissioners should act as nonpartisans, not bipartisan.  Although the presence of independent members of the Commission is one important means of achieving a nonpartisan process, so too are members of the Commission with partisan backgrounds who respect that their constitutional obligation is to avoid a "disproportionate advantage to a political party."  Each of you thus constitutes your own personal "check and balance" upon the Commission to ensure that it acts in the necessary manner.

9.  The Commissioners must subordinate their individual attitudes and allegiances to the requirements of the law.  As with all public officers, your personal codes and consciences must conform to the rule of law.

10. The Commissioners should maintain their independence from political parties, incumbents, blocs, experts, interest groups, aspirant 'communities of interest,' and even from one another, but you cannot be independent of the people or their laws and constitutions.

11. The Commissioners should not seek or accept outside funding, or enter into partnerships, or engage in outreach with businesses, foundations, philanthropic organizations, non-profits, or educational institutions, as has been urged upon you.  Yours is an *independent citizens* commission, and the only reason these actions would be necessary would be if you were to expand upon your mission.  Do not leave as your legacy one more expensive governmental bureaucracy and carefully consider how dispiriting it would be to the people of this state if *this* Commission was to abuse its power and position.

## REDISTRICTING RECOMMENDATIONS

1.  Consider carefully the Apol standards and its variations.  Do not assume that these standards were repudiated in 2018 or that they contributed in any way to partisanship, legislative self-interest and self-dealing, or gerrymandering in the redistricting process.  Do not close yourself to learning from past practice and historical experience.  Although with exceptions, the history of Michigan has, by and large, been one of honest and responsible government.

2.  Consider defining "communities of interest" exclusively on the basis of fair-minded, neutral, and non-partisan applications of "county, city, and township" boundaries.  Every Michigan citizen is equally a member of such "communities of interest."  Once you begin to exercise increasingly broad discretion in defining and creating new "communities of interests," you will inevitably begin to pit citizens and interests against each other.  Resolving these disputes will inevitably place yourselves and the Commission into the type of political process the Commission was meant to transcend.

3.  Consider carefully whether you wish to introduce explicit considerations of "race, ethnicity, and religion" into the redistricting process.  Not only will such considerations come at the expense of other "races, ethnicities, and religions," but such policies implicate our nation's most profound and divisive issues.  To paraphrase former U.S. Supreme Court Justice William O. Douglas, "When such lines are drawn by the State, the diverse communities that our Constitution seeks to weld together become separated, and antagonisms are generated that relate to 'race, ethnicity, and religion,' rather than to political issues."  A unifying legacy on the part of the Commission would be a momentous legacy.

4. Consider *not* exercising the Commission's apparently limitless discretion to create new "communities of interests" under its "may include, but are not limited to" authority in § 13(c). This is truly the broadest-possible and most standardless delegation of power ever placed into our Constitution. The language does not reflect well upon the rule of law; do not let it also reflect poorly upon the Commission.

5. Consider carefully the wide variety of means, direct and indirect, obvious and subtle, by which legislators and political strategists have sometimes placed partisan and 'self-interested' thumbs on the scales of redistricting justice. For Members of the Commission to do the same would be no step forward in the pursuit of good government. Avoid doing acts of partisanship, as well as acts that are *tantamount* or *equivalent* to partisanship.

6. Consider carefully the regularity of shape of the districts you construct. "Gerrymanders" are not simply oddly shaped districts, but encompass also districts of a more regular character, but with erratic and 'squiggly' indentations and protrusions undertaken largely to achieve political or partisan purposes.

7. Consider carefully before you add to the complexity of the redistricting process by the adoption of new legal concepts, new statistical measurements, novel types of "communities of interests," amorphous political science terms, new 'metrics,' and pseudo-scientific concepts of redistricting. None of this complexity and convolution will be necessary if the Commission views its responsibilities simply as the preparation of a "fair-minded, neutral, and non-partisan" redistricting plan, rather than as "reimagining" representative government for Michigan.

8. Consider carefully the risk of nullifying or distorting express provisions of the Amendment, and thereby rewriting the Amendment, by an overly rigid application of the "order" of provisions, by reviewing Michigan Supreme Court decisions in this regard. See "Analysis: Priorities."

9. Consider carefully whether the phrases and concepts you will hear from the 'experts,' such as "common bonds," "affinities," "shared characteristics, "communities," "identities," and "like-mindedness" are largely employed to divide and separate people, rather than to join them together and unify.

10. Consider carefully whether "communities," "identities" "interests," "groups," or "populations" are more strengthened in the political process where their members are consolidated within districts or dispersed among districts. Then, consider carefully whether endless calculations of this sort are part of the proper and "common understanding" of the Commission's work by the people of Michigan who ratified the Amendment.

♦ This Memorandum was commissioned by Hillsdale College and authored by Stephen Markman, a retired Justice of the Michigan Supreme Court and a Professor of Constitutional Law at the College for 28 years.