**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

DONALD AGEE, JR. et al.,

                Plaintiffs,

   v.

JOCELYN BENSON, et al.,

                Defendants.

**Case No. 1:22-CV-00272-PLM-RMK-JTN**

**THE COMMISSION'S REPLY BRIEF IN**
**SUPPORT OF MOTION FOR**
**SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

ARGUMENT ...................................................................................................... 1

I.     Threshold Deficiencies Preclude Claims Against HD13, HD26, and SD5 .............. 1

       A.     Article III Jurisdiction ................................................................. 1

       B.     *Res Judicata* ............................................................................. 3

II.    Plaintiffs' VRA Claims Fail as a Matter of Law ....................................... 5

       A.     The First Precondition .................................................................. 6

       B.     The Second and Third Preconditions ............................................... 8

III.   Plaintiffs' Racial-Gerrymandering Claims Fail as a Matter of Law ...................... 12

CONCLUSION ................................................................................................. 15

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abbott v. Perez,*
   138 S. Ct. 2305 (2018) ....................................................................................6, 7

*Adair v. State,*
   680 N.W.2d 386 (Mich. 2004) ................................................................. 3

*Allen v. Milligan,*
   No. 21-1086, 599 U.S.--, 2023 WL 3872517 (June 8, 2023)...........................1, 8, 12, 13

*Bethune-Hill v. Virginia State Bd. of Elections,*
   580 U.S. 178 (2017)........................................................................ 12, 14, 15

*Blackman v. Busey,*
   938 F.2d 659 (6th Cir. 1991) ......................................................... 4

*Bush v. Vera,*
   517 U.S. 952 (1996)..........................................................................12

*Canfield Aviation, Inc. v. Nat'l Transp. Safety Bd.,*
   854 F.2d 745 (5th Cir. 1988) ......................................................... 4

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986)..........................................................................1, 6

*Chaidez v. United States,*
   568 U.S. 342 (2013)........................................................................ 5

*Cooper v. Harris,*
   581 U.S. 285 (2017)..........................................................................15

*D.C. Ct. of Appeals v. Feldman,*
   460 U.S. 462 (1983)........................................................................ 5

*Detroit Caucus v. Indep. Citizens Redistricting Comm'n,*
   969 N.W.2d 331 (Mich. 2022) .................................................. 3, 4, 5

*Easley v. Cromartie,*
   532 U.S. 234 (2001)..........................................................................12

*Gill v. Whitford,*
   138 S. Ct. 1916 (2018) ................................................................. 2

*Griffin v. Reznick*,
   609 F. Supp. 2d 695 (W.D. Mich. 2008) ................................................... 7

*Growe v. Emison*,
   507 U.S. 25 (1993) ...................................................................................8, 9

*Harding v. Cnty. of Dallas, Texas*,
   948 F.3d 302 (5th Cir. 2020) ...................................................................6, 7

*Harvey v. Campbell Cnty., Tenn.*,
   453 F. App'x 557 (6th Cir. 2011) ............................................................. 9

*Johnson v. De Grandy*,
   512 U.S. 997 (1994).................................................................................3, 4

*Jones v. Mineta*,
   150 F. App'x 893 (10th Cir. 2005)............................................................ 5

*Kremer v. Chem. Const. Corp.*,
   456 U.S. 461 (1982).................................................................................. 4

*Lab. Council, Michigan Fraternal Ord. of Police v. City of Detroit*,
   525 N.W.2d 509 (Mich. Ct. App. 1994) ................................................... 5

*Lawrence v. Welch*,
   531 F.3d 364 (6th Cir. 2008) ................................................................... 5

*League of United Latin Am. Citizens v. Abbott*,
   604 F. Supp. 3d 463 (W.D. Tex. 2022)..................................................9, 11

*Levy v. Lexington Cnty., S.C.*,
   589 F.3d 708 (4th Cir. 2009) ...................................................................10

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992)................................................................................... 2

*North Carolina v. Covington*,
   138 S. Ct. 2548 (2018) ............................................................................1, 2

*Petteway v. Galveston Cnty.*,
   2023 WL 2782705 (S.D. Tex. Mar. 30, 2023)......................................... 7

*Thornburg v. Gingles*,
   478 U.S. 30 (1986) ................................................................................6, 10

*TransUnion LLC v. Ramirez*,
   141 S. Ct. 2190 (2021) ............................................................................. 1

*United States v. City of Eastpointe,*
    378 F. Supp. 3d 589 (E.D. Mich. 2019) ..................................................6, 7

*Uno v. City of Holyoke,*
    72 F.3d 973 (1st Cir. 1995) .......................................................................10

*Washington v. Sinai Hosp. of Greater Detroit,*
    733 N.W.2d 755 (Mich. 2007) .................................................................. 3

*Wisconsin Legislature v. Wisconsin Elections Comm'n,*
    142 S. Ct. 1245 (2022) .............................................................................. 8

*Wittman v. Personhuballah,*
    578 U.S. 539 (2016) ................................................................................... 2

**Rules**

LCivR. 5.7(f) ...................................................................................................... 2

Mich. Ct. R. 7.306(C)(4) .................................................................................. 3

Mich. Ct. R. 7.306(J) ....................................................................................... 3

**Other Authorities**

Mich. Const. Art. 4, § 6(19) ............................................................................ 3

## INTRODUCTION

The competing summary-judgment motions could hardly take more different approaches. Whereas Plaintiffs demand an injunction without trial on fact-intensive claims based on a mapping-simulation method the Supreme Court recently deemed "flawed in its fundamentals," *Allen v. Milligan*, No. 21-1086, 599 U.S. --, 2023 WL 3872517, *18 (June 8, 2023), the Commission follows the recognized path of pointing out "an absence of evidence to support the nonmoving party's case," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Plaintiffs' motion should be denied and the Commission's granted.

## ARGUMENT

### I.    Threshold Deficiencies Preclude Claims Against HD13, HD26, and SD5

The Commission demonstrated that Plaintiffs' claims against three districts suffer fatal threshold deficiencies. Comm'n MSJ 12–15, ECF No. 69, PageID.649-652. Plaintiffs' responses are too little, too late.

### A.    Article III Jurisdiction

Plaintiffs acknowledge that Plaintiffs Bennett and Black do not reside in HD13. *See* Pls.' Opp. 2–3, ECF No. 75, PageID.1576-1577. Because "plaintiffs have standing to challenge racial gerrymanders only with respect to those legislative districts in which they reside," *North Carolina v. Covington*, 138 S. Ct. 2548, 2553 (2018), this Court lacks jurisdiction over HD13.

Plaintiffs respond that Plaintiffs Bennett and Black "both resided" in HD13 "when Plaintiffs filed their First Amended Complaint." Pls.' Opp. 2, PageID.1576. But "Plaintiffs must maintain their personal interest in the dispute at all stages of litigation," *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021), and cannot obtain relief from an alleged "racial

classification," Pls.' Opp. 2, PageID.1576, where redrawing HD13 would not afford them a personal benefit. *See Wittman v. Personhuballah*, 578 U.S. 539, 544 (2016). The same is true for their Section 2 claim. *See Gill v. Whitford*, 138 S. Ct. 1916, 1932 (2018). And, even if Plaintiffs once had standing to challenge HD13, that claim is moot. *See* Comm'n MSJ 13, PageID.650. Plaintiffs acknowledged these principles by impliedly admitting Bennett lacks standing to challenge HD13 because he moved out of it. JA00855, Plaintiffs' District Demonstrative, PageID.1541 n.1. The same is true of Black.

Plaintiffs next claim "it is inevitable that [Black] will move back to the City of Detroit and HD13," Pls.' Opp. 2, PageID.1576, which Plaintiff Black attests will occur "some point over the next 8 years," Black Decl. ¶9, ECF No. 75-2, PageID.1618. But Plaintiffs seek relief now, and individuals have standing to challenge only "those legislative districts in which they reside," *Covington*, 138 S. Ct. at 2553, not those they might reside in some day. "Such 'some day' intentions—without any description of concrete plans"—do not create standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992).

Plaintiffs exhibit no confidence in those arguments and seek in the alternative leave to file an amended complaint challenging HD9. Pls.' Opp. 3, PageID.1577. But the deadline to amend was February 6, 2023, Case Management Order, ECF No. 38, PageID.507, and Plaintiffs do not present a proposed amended pleading, *see* LCivR. 5.7(f). It is a mystery what claim Plaintiff Black believes he has against HD9, which is a majority-minority district in compliance with Plaintiffs' demand for "majority-minority districts," and it could not plausibly have been drawn with a 40% BVAP ceiling. *See* Pls.' MSJ 1, 38, ECF No. 67, PageID.582, 619. And the Court cannot permit an amendment to "conform to the evidence" that is neither

identified nor plausibly in existence. Pls.' Opp. 3, PageID.1577. It would be prejudicial for the Commission to learn a new theory of the case at this stage.

**B.**     ***Res Judicata***

Plaintiffs admit Plaintiff McDaniel was a plaintiff in *Detroit Caucus v. Indep. Citizens Redistricting Comm'n*, 969 N.W.2d 331 (Mich.), *reconsideration denied*, 509 Mich. 859, 969 N.W.2d 515 (2022). *See* Pls.' Opp. 4, PageID.1578. They cannot avoid its preclusive effect here.

1.     *Detroit Caucus* was a decision "on the merits" under Michigan law. *Adair v. State*, 680 N.W.2d 386, 396 (Mich. 2004). The Michigan Constitution grants the Michigan Supreme Court "original jurisdiction" to "review a challenge to any plan adopted by the commission," Mich. Const. Art. 4, § 6(19), and *Detroit Caucus* exercised that jurisdiction in holding that "Plaintiffs have not demonstrated that the Commission's adopted plans are noncompliant," 969 N.W.2d at 334–35. Plaintiffs suggest the supposed "summary" and "unprecedented" "process" somehow renders the decision not on the merits. Pls.' Opp. 4–5, PageID.1578-1579. But a "summary disposition" is a decision on the merits, *see Washington v. Sinai Hosp. of Greater Detroit*, 733 N.W.2d 755, 759 (Mich. 2007), and the court held that the *Detroit Caucus* plaintiffs had "not identified grounds or legal authority that would allow" a ruling in their favor, which is a merits ruling, *Detroit Caucus*, 969 N.W.2d at 334. The Michigan Supreme Court afforded the full process contemplated by its rules governing original proceedings, including the opportunity to present evidence. Mich. Ct. R. 7.306(C)(4) and (J). It reviewed all evidence presented and all that was forthcoming "[i]n light of plaintiffs' concession that further factual development is unnecessary for resolution of the case." 969 N.W.2d at 334. This case is not like *Johnson v. De Grandy*, 512 U.S. 997 (1994), where the Florida

3

Supreme Court admitted it did not "conduct the complete factual analysis contemplated by the Voting Rights Act" because of "time constraints." *Id.* at 1005 (citation omitted).

2.      There is no persuasive force to Plaintiffs' contention that the *Detroit Caucus* judgment does not satisfy "minimum" due-process requirements. Pls.' Opp. 6, PageID.1580. The Court "must bear in mind that no single model of procedural fairness, let alone a particular form of procedure, is dictated by the Due Process Clause." *Kremer v. Chem. Const. Corp.*, 456 U.S. 461, 483 (1982). The *Detroit Caucus* plaintiffs had "the right to submit all exhibits which [they] wish[ed] to present," they were "entitled to an opportunity to rebut evidence submitted by or obtained from the respondent," they "ha[d] an attorney assist" them, and they had the right to request a special master and fact-finding if they so desired. *See id.* (quotation marks omitted). While Plaintiffs complain that the Michigan Supreme Court failed to afford a "fair opportunity for the *Detroit Caucus* plaintiffs to present their evidence," Pls.' Opp. 7, PageID.1581, Plaintiff McDaniel took a different position in that court: "Plaintiffs' counsel expressly conceded that the case was 'ready' for adjudication and that there was no need for a court-appointed expert." *Detroit Caucus*, 969 N.W.2d at 332. The Court should "have no hesitation in concluding this panoply of procedures . . . is sufficient under the Due Process Clause." *Kremer*, 456 U.S. at 484.

Plaintiffs do not say what specific due-process right they were denied. *See* Pls.' Opp. 6–7, PageID.1580-1581. Due process does not require discovery, *see Canfield Aviation, Inc. v. Nat'l Transp. Safety Bd.*, 854 F.2d 745, 750 (5th Cir. 1988), and Plaintiffs have "not mentioned what particulars of discovery [the *Detroit Caucus* plaintiffs] would have sought had [they] been afforded more time," *Blackman v. Busey*, 938 F.2d 659, 664 (6th Cir. 1991). Moreover, summary disposition does not violate due process where the party seeking trial lacks the evidence

to create a triable fact question. *See, e.g., Jones v. Mineta*, 150 F. App'x 893, 897 (10th Cir. 2005).

Ultimately, Plaintiffs ask this Court to sit in review of the Michigan Supreme Court's judgment and to side with the dissent in that case. *See* Pls.' Opp. 6–7, PageID.1580-1581. But this Court "is without authority to review final determinations" of a state supreme court. *D.C. Ct. of Appeals v. Feldman*, 460 U.S. 462, 476 (1983); *see also Lawrence v. Welch*, 531 F.3d 364, 368 (6th Cir. 2008) (discussing the *Rooker-Feldman* doctrine). Plaintiffs' reliance on the dissent ignores that the majority opinion states the ruling and rationale of the Michigan Supreme Court. *Cf. Chaidez v. United States*, 568 U.S. 342, 354 n.11 (2013) ("Dissents have been known to exaggerate the novelty of majority opinions.").

3.      Plaintiffs claim that "new facts" supposedly disclosed in Commissioner Szetela's dissenting report defeat *res judicata*. Pls.' Opp. 8, PageID.1582. But they do not identify what those new facts are. They contend Commissioner Szetela supports their position that the Commission employed a 40% BVAP target, but Plaintiffs' two complaints—filed before Szetela's report was published—made the same allegation. Am. Compl., ¶¶82–83, PageID.120. Any facts material to that contention must have been disclosed already during the Commission's "open and public process," *Detroit Caucus*, 969 N.W.2d at 334, and Plaintiffs sought no discovery in this suit. This scenario does not involve "new facts" of the type that give rise to a new claim. *See Lab. Council, Michigan Fraternal Ord. of Police v. City of Detroit*, 525 N.W.2d 509, 511 (Mich. Ct. App. 1994).

## II.     Plaintiffs' VRA Claims Fail as a Matter of Law

The Commission demonstrated that Plaintiffs lack evidence to shoulder their trial burden on essential Section 2 elements. Comm'n MSJ 15–24, PageID.652-661. In response,

Plaintiffs fail to "designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (citation omitted).

### A.  The First Precondition

1.  On the first precondition, Plaintiffs depend solely on Mr. Trende's assertion that his demonstrative plans contain majority-minority districts. Pls.' Opp. 12, PageID.1286. But they cannot reach trial without evidence that an alternative would "enhance the ability of minority voters to elect the candidates of their choice," *Abbott v. Perez*, 138 S. Ct. 2305, 2332 (2018), and they cite none, *see* Pls.' Opp. 8–14, PageID.1582-1588. Because Plaintiffs do "not offer *any* evidence . . . that would show how" their preferred "candidates would fare in [legislative] elections under their Remedial Plan," and do not deny that they lack such evidence, they cannot prevail under Section 2. *Harding v. Cnty. of Dallas, Texas*, 948 F.3d 302, 311 (5th Cir. 2020).

Plaintiffs respond with an academic dispute, arguing that *Abbott* and *Harding* addressed the totality-of-the-circumstances inquiry, not the first precondition. Pls.' Opp. 8–11, PageID.1582-1585. The Commission acknowledged that this view is plausible, Comm'n MSJ 16 n.8, PageID.653, but it is not the better one. In recognizing that *Abbott* "did not raise the threshold for plaintiffs asserting § 2 claims," *Harding* located *Abbott*'s holding regarding performance in the "longstanding rule" that "minority voters must have the potential to elect another candidate of their choosing" and cited *Gingles*'s discussion of the first precondition. 948 F.3d at 310 & n.33. The logical home of an inquiry into whether an alternative system will "perform," *Abbott*, 138 S. Ct. at 2333, is the inquiry into whether the challenged scheme is "responsible for minority voters' inability to elect its candidates." *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986) (plurality opinion). On that point, *United States v. City of Eastpointe*, 378 F.

6

Supp. 3d 589 (E.D. Mich. 2019), which does not bind this court, is unpersuasive insofar as it opines on the proper locus of the performance inquiry.

But none of that impacts the result here. Whether *Abbott* addressed the first precondition or something else, it makes clear that a Section 2 plaintiff has "the burden to prove . . . performance." *Harding*, 948 F.3d at 310 (quotation marks omitted); *accord Petteway v. Galveston Cnty.*, 2023 WL 2782705, *11 (S.D. Tex. Mar. 30, 2023). Plaintiffs cite no evidence to carry their trial burden on that question. They assert only that Mr. Trende's plans contain majority-minority districts. Pls.' Opp. 12, PageID.1586. "But an alternative map containing an additional majority-minority district does not necessarily establish an increased opportunity." *Harding*, 948 F.3d at 309. Plaintiffs ask this Court to "find § 2 effects violations on the basis of *uncertainty*," in contravention of *Abbott*, 138 S. Ct. at 2333.

2.      Having no evidence to show that Plaintiffs' demonstrative plans will "perform better" than the challenged plans, Plaintiffs rely on unsupported lawyers' assertions. Pls.' Opp. 12, PageID.1586. But "statements, arguments, and remarks of counsel . . . are not evidence." *Griffin v. Reznick,* 609 F. Supp. 2d 695, 699 n.2 (W.D. Mich. 2008) (citation omitted). Regardless, Plaintiffs' math does not support their assertions. It is beyond genuine dispute that at least 14 Black-preferred candidates in the Detroit area now sit in the Michigan house and at least five sit in the senate. Comm'n MSJ 19–20, PageID.656-657. Mr. Trende's plans promise only ten Black-opportunity districts in the house and five in the senate. Plaintiffs have no basis to prove *improvement*. Moreover, their assertion that the Michigan Legislative Black Caucus has been reduced "by a staggering 20%" remains unsubstantiated. *See* Comm'n Opp. 25–26, ECF No. 76, PageID.1663-1664.

3.      It is Plaintiffs who "miss[] the point of the first *Gingles* precondition" in evalu-
ating HD2, SD5, and SD11. Pls.' Opp. 12, PageID.1586. The requirement is not generally
"to demonstrate that it is possible to draw majority-minority districts," *id.*, but rather to show
that *specific* challenged districts dilute the voting strength of *specific* plaintiffs. "[A] 'generalized
conclusion fails to meaningfully . . . address the relevant local question' [of] whether the pre-
conditions [are] satisfied as to each district." *Wisconsin Legislature v. Wisconsin Elections
Comm'n*, 142 S. Ct. 1245, 1250 (2022) (citation omitted). Plaintiffs suggest this Court could
strike down HD2, SD5, and SD11 because *neighboring* districts might be reconfigured as ma-
jority-minority districts. Pls.' Opp. 12–14, PageID.1586-1588. But, under the correct district-
specific framework, it would be those neighboring districts (if properly challenged by a plain-
tiff with standing) that would be reconfigured, not HD2, SD5, and SD11.

Under that standard, Plaintiffs' discussion of SD5 and SD11 (they do not even men-
tion HD2) creates no genuine fact question. As for SD11, Plaintiffs cite SD11 in Mr. Trende's
demonstrative plan as an appropriate comparator. Pls.' Opp. 13, PageID.1587. But Mr.
Trende's rendition of SD11 is not a majority-minority district; its BVAP is 31.77%. JA00389–
90, Trende Rep. 82–83, PageID.1069-1070. And, while Plaintiffs claim that SD5 can be
drawn as a majority-minority district because it was a majority-minority district in the 2011
plan, Pls.' Opp. 13, PageID.1587, the 2011 plan was "based on old census data" and cannot
prove what is possible now, *Allen*, 2023 WL 3872517, at *17.

### B.      The Second and Third Preconditions

Plaintiffs' analysis of the second and third preconditions does not address their burden
of proof. Pls.' Opp. 14–31, PageID.1588-1605. "Section 2 'does not assume the existence of
racial bloc voting; plaintiffs must prove it,'" *Growe v. Emison*, 507 U.S. 25, 42 (1993) (citation

omitted), for "each district." *League of United Latin Am. Citizens v. Abbott*, 604 F. Supp. 3d 463, 496 (W.D. Tex. 2022). The Commission demonstrated that Plaintiffs lack evidence of the second or the third preconditions (or both) as to 12 of 17 challenged districts. Comm'n MSJ 22–24, PageID.659-661. Plaintiffs respond by improperly attempting to shift the burden.

  1. The statistical estimates of Dr. Handley and Mr. Trende show that, in the 2022 Democratic primaries, a Black-preferred candidate won in HD1, HD7, HD10, HD12, HD13, HD14, SD3 and SD6. *Id.* at 22, PageID.659. Plaintiffs cannot show that Black-preferred candidates will usually lose with evidence of Black-preferred-candidate wins. *Id.*

  Plaintiffs attempt to explain away these Black-preferred wins, claiming for example, that "an Asian woman" supported by white voters cannot be "the Black candidate of choice" in SD3, that a Hispanic candidate with a "politically advantageous surname[]" cannot be the Black candidate of choice in SD6, and that a "Black incumbent" win in HD1 "does not support the theory that white voters will crossover and vote for Black candidates." Pls.' Opp. 16–17, PageID.1590-1591. But Mr. Trende's analyses shows that the Black community preferred these candidates, JA00349, 396, Trende Rep. 42, 89, PageID.1029, 1076, which is the legally relevant point, *see* Comm'n Opp. 13–14, PageID.1651-1652. That aside, Plaintiffs' commentary is not evidence that proves the third precondition as to these districts. Even if they could successfully explain away Black-preferred candidate wins, they have no affirmative evidence and achieve, at best, a zero-zero tie. *See Harvey v. Campbell Cnty., Tenn.*, 453 F. App'x 557, 560, 565–67 (6th Cir. 2011); *Growe*, 507 U.S. at 42. Doubling down on this error, Plaintiffs repeatedly say the Commission fails to disprove the third precondition. *See, e.g.*, Pls.' Opp. 17, PageID.1591 (SD3 result "does *not* support the Commission's hope for white-crossover voting"); *id.* at 18, PageID.1592 (HD12 result "does not decidedly sustain the influence

9

experiment"); *id.* ("Again, there is scant evidence of white crossover voting" in HD13). But this precondition is Plaintiffs' burden to prove, not the Commission's to disprove.

2.      For two districts, HD8 and HD11, there is no evidence of the second precondition, Black cohesion. Comm'n MSJ 23, PageID.660. In the 2022 Democratic primary, no Black-preferred candidate emerged. *Id.* Black cohesion cannot be proven by evidence that Black "votes are split among several different minority candidates for the same office." *Levy v. Lexington Cnty., S.C.*, 589 F.3d 708, 720 (4th Cir. 2009) (citation omitted).

As to both contests, Plaintiffs do not deny that no candidate received so much as a clean plurality of the Black vote. *See* Pls.' Opp. 19, PageID.1593. Rather than cite evidence of Black cohesion, Plaintiffs point to the *white* community, contending that, in HD8 and HD11, there were "clear white candidate[s] of choice." *Id.* But the second precondition requires proof "that a significant number of *minority* group members usually vote for the same candidates." *Gingles*, 478 U.S. at 56 (emphasis added). Plaintiffs cannot try the question of Black cohesion with evidence of white cohesion.

3.      For two districts, SD10 and SD11, Plaintiffs have no evidence supporting either polarized-voting precondition. Comm'n MSJ 24, PageID.661.

As to SD10, Plaintiffs agree there was no contested 2022 Democratic primary, but say "it is likely that Black candidates of choice" elected not to run out of discouragement with the district's 41.7% BVAP. Pls.' Opp. 20, PageID.1594. But they cite no evidence of that, and the term "Black candidates of choice" is an empirical conclusion that can only be reached after Black voters vote, not before. Meanwhile, *Uno v. City of Holyoke*, 72 F.3d 973 (1st Cir. 1995), addressed the evidentiary import of "low turnout," *id.* at 986–87, not unspecified choices of unknown would-be candidates.

As to SD11, Plaintiffs say that "the candidate favored by Black voters" lost, Pls.' Opp. 20, PageID.1594, but they rely on inadmissible lay-witness opinion. *See* Comm'n Opp. 21–23, PageID.1659-1661. Mr. Trende's analysis (which he withheld from his report) showed Black voters were not cohesive, so there was no Black-preferred candidate. *See* Comm'n Opp. 21, PageID.1659. Commission expert Dr. Palmer confirmed that the Black vote split in a statistical tie between two candidates. JA00134, JA00151, Palmer Rep. ¶ 47, Tbl. 14, PageID.812, 829. Plaintiffs have no evidence showing that a cohesive Black voting bloc will usually be outvoted by white bloc voting in SD11.

4.      Plaintiffs rely on elections from districts they do not challenge or as to which the Commission does not seek summary judgment (on this specific theory), Pls.' Opp. 20–31, PageID.1594-1605, and criticize the Commission for omitting these contests from its brief, *id.* at 21, PageID.1595. But the Commission—arguing to the summary-judgment standard— moved for summary judgment only as to those 12 districts as to which it is pellucid that Plaintiffs have no evidence of polarized voting. The analysis applies to "each district," *League of United Latin Am. Citizens*, 604 F. Supp. 3d at 496, so Plaintiffs' discussion of *other* districts gets them nowhere.

Plaintiffs ultimately assert that, under their approach, the analysis is "left with" only "five" elections. Pls.' Opp. 27, PageID.1601. "Shockingly," *id.*, Plaintiffs would have the Court strike down *17* districts based on primary election outcomes in only *five* districts. They cite no case where outcomes in five districts justified 17 districts' worth of relief, or anything like that. That bizarre result is symptomatic of legal error.

**III.  Plaintiffs' Racial-Gerrymandering Claims Fail as a Matter of Law**

Plaintiffs are not entitled to a trial on their equal-protection claims and certainly are not entitled to judgment without trial.

A.    Plaintiffs begin on the wrong legal foundation in asserting that "racial quotas alone trigger strict scrutiny." Pls.' Opp. 34, PageID.1608. But, even if Plaintiffs had evidence of racial quotas, the Commission has demonstrated that a "holistic" analysis of each district's boundaries is mandated by Supreme Court precedent. Comm'n Opp. 28–29, PageID.1666– 1667; *see Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. 178, 192 (2017). A plurality Supreme Court opinion recently reiterated that map-makers may "*consider* race" without crossing the predominance threshold so long as the map-maker also takes "several other factors into account" and affords "equal weighting," even if "express racial targets" are employed. *Allen*, 2023 WL 3872517, at *15 (plurality opinion) (cleaned up).

B.    Plaintiffs are not entitled to try their equal-protection claims because they have made a binding admission that "the Commission's primary motivation was to increase the number of Democratic-majority districts," as they now concede. Pls.' Opp. 32, PageID.1606 (quoting JA00547–48). Because partisan-fairness considerations predominated, race did not. *Easley v. Cromartie*, 532 U.S. 234, 243 (2001) (*Cromartie II*).

There is no merit to Plaintiffs' response that this is akin to the assertion "that a Republican Legislature intentionally packed Black voters into districts to increase the number of Republican-majority districts." Pls.' Opp. 32, PageID.1606. To be sure, race can predominate in theory where a redistricting authority uses race as "a proxy for political characteristics." *Bush v. Vera*, 517 U.S. 952, 968 (1996) (plurality opinion). But Plaintiffs have never alleged, argued, or presented evidence to show that the Commission used race in that way. From the

12

outset, their position has been that the Commission considered race for a racial goal—to achieve BVAP ranges recommended by Dr. Handley and Bruce Adelson for VRA-compliance purposes. Am. Compl., ECF No. 8, ¶¶ 187–93, 203–208, PageID.143-150. Plaintiffs identify no evidence that race was a proxy for partisan fairness in their expert reports or anywhere else, so even if that theory remains available under their binding admission, they have no evidence to prove it.

C.    Undeterred, Plaintiffs insist that they have evidence of racial predominance. Pls.' Opp. 33–34, PageID.1607-1608. But their binding admission precludes them from arguing that race predominated over the Commission's partisan-fairness goals. And their evidence does not satisfy the requisite holistic analysis, as they fail to identify how a single racial consideration impacted a single line of a single challenged district. *See id.* Indeed, the Commission challenged Plaintiffs to cite evidence of predominance for three specific districts, Comm'n MSJ 28, PageID.665, and Plaintiffs have no response, Pls.' Opp. 31–34, PageID.1605-1608.

Commissioner Szetela's dissenting report does not carry Plaintiffs' burden because, aside from not addressing the impact of race on district lines, it does not even establish the existence of racial quotas. Plaintiffs say there was a prohibition on BVAPs above 40%, *id.* at 34, PageID.1608, but many challenged districts exceed that mark, so 40% BVAP was not much of a quota. Likewise, Plaintiffs' reliance on Mr. Trende's simulations stands on uniquely poor ground, because the Supreme Court in *Allen* found that this type of simulation evidence "is flawed in its fundamentals." 2023 WL 3872517, at *18. Because "[d]istricting involves myriad considerations," and because no reliable method dictates which "metrics should be used" in the algorithm, courts cannot "judge a contest of computers" in deciding voting-rights cases. *Id.* at **18–19. For the same reasons, Mr. Trende's simulation evidence

proves nothing here. Commission experts criticized Mr. Trende's simulations on that very basis. JA00139–41, PageID.817-819 (Palmer); JA00263–265, PageID.941-943 (Rodden).

D.      Plaintiffs' narrow-tailoring arguments fare no better. They concede the Commission had good reasons to use racial data to avoid VRA liability. Pls.' Opp. 34–35, PageID.1608-1609. They cite the Commission's supposed "full agreement with Plaintiffs" on the VRA-liability question, *id.*, by which they seem to suggest the Commission has conceded districts it drew to *avoid* VRA liability actually *violate* the VRA. That is incorrect. The Commission's position is that it had good reasons to believe that, without considering race, it faced a pronounced VRA risk. For Plaintiffs to prove their VRA claims, they must show that, despite that effort, the districts the Commission configured actually violate the VRA. Plaintiffs cannot prove that, for reasons explained.

As for the narrow-tailoring defense, the question is whether the Commission had "*good reasons*" to justify any racially predominant redistricting that might have occurred. *Bethune-Hill*, 580 U.S. at 194. The Commission set forth those good reasons. Comm'n MSJ 28–33, PageID.666-670. Plaintiffs have remarkably little response. They agree the Commission was obliged to consider white crossover voting, and they do not deny that a renowned expert told the Commission 50% BVAP districts were unnecessary based on a comprehensive election analysis, but they insist without evidence that "white-crossover voting *does not occur* in southeast Michigan." Pls.' Opp. 35, PageID.1609. Yet they do not say what Dr. Handley did wrong in reaching the opposite conclusion; her reports show that Black and Black-preferred candidates routinely win in general and primary elections in districts below 50% BVAP. *See* JA00045, 2021 Handley Rep. 21, PageID.723; JA00003–14, 2023 Handley Rep. 3–14,

14

PageID.681-692. Mr. Trende found no flaws in this analysis. *See, e.g.*, JA00493–95, Trende

Dep. 60:6–15, 61:4–9, 61:16–62:1, PageID.1175-1176.

Further, Plaintiffs advance an overly constrained view of the relevant election data and

"ask too much from state officials charged with the sensitive duty of reapportioning legislative

districts." *Bethune-Hill*, 580 U.S. at 195. For example, the Supreme Court has looked to "general elections" in its narrow-tailoring precedent, *Cooper v. Harris*, 581 U.S. 285, 294 (2017),

and has not demanded that redistricting authorities "determine *precisely* what percent minority

population" the VRA demands, *Bethune-Hill*, 580 U.S. at 195. The mere fact that Plaintiffs

have some unspecified disagreement with Dr. Handley, based only on primary elections, does

not speak to the Commission's good reasons for its redistricting choices, which are amply

established in the summary-judgment record.

## CONCLUSION

The Court should grant the Commission's motion for summary judgment.


Dated: June 20, 2023

Respectfully submitted,

/s/ David H. Fink

BAKER & HOSTETLER LLP
Katherine L. McKnight
E. Mark Braden
Richard B. Raile
Dima J. Atiya
1050 Connecticut Ave., NW,
Suite 1100
Washington, D.C. 20036
(202) 861-1500
kmcknight@bakerlaw.com
mbraden@bakerlaw.com
rraile@bakerlaw.com
datiya@bakerlaw.com

FINK BRESSACK
David H. Fink
Nathan J. Fink
38500 Woodward Ave., Suite 350
Bloomfield Hills, Michigan 48304
(248) 971-2500
dfink@finkbressack.com
nfink@finkbressack.com

*Counsel for Defendants, Michigan Independent Citizens Redistricting Commission, and Douglas Clark, Juanita Curry, Anthony Eid, Rhonda Lange, Steven*

BAKER & HOSTETLER LLP
Patrick T. Lewis
Key Tower, 127 Public Square,
Suite 2000
Cleveland, Ohio 44114
(216) 621-0200
plewis@bakerlaw.com

BAKER & HOSTETLER LLP
Erika D. Prouty
200 Civic Center Drive
Suite 1200
Columbus, Ohio 43215
(614) 228-1541
eprouty@bakerlaw.com

*Terry Lett, Brittni Kellom, Cynthia Orton, M.C. Rothhorn, Rebecca Szetela, Janice Vallette, Erin Wagner, Richard Weiss, and Dustin Witjes, each in his or her official capacity as a Commissioner of the Michigan Independent Citizens Redistricting Commission*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.2(b)(ii), Counsel for the Commission certifies that this brief contains 4,297 words, as indicated by Microsoft Word 365, inclusive of any footnotes, citations, and quotations, and exclusive of the caption, signature block, tables, attachments and exhibits, and any certificates.

Dated: June 20, 2023                      Respectfully submitted,

                                          /s/ David H. Fink_____