1

2              *IN THE UNITED STATES DISTRICT COURT*
              *FOR THE WESTERN DISTRICT OF MICHIGAN*
3                       *SOUTHERN DIVISION*

4
      DONALD AGEE, JR., et al,
5
                  Plaintiffs,
6
      vs.                                Case No. 1:22-cv-272
7
      JOCELYN BENSON, et al,
8
                  Defendants.
9     _____/

10                       *MOTION HEARING*

11    *HELD BEFORE THE HONORABLE JANET T. NEFF, PAUL L MALONEY, and*
                   *RAYMOND L. KETHLEDGE*
12
                *Lansing, Michigan, Thursday, July 13, 2023*
13

14    APPEARANCES:

15    For the Plaintiffs:  AMIA BANKS
                          JAMES J. FLEMING
16                        MICHAEL J. PATTWELL
                          Clark Hill PLC (Lansing)
17                        215 S Washington Sq., Ste. 200
                          Lansing, MI 48933
18                        (517) 318-3026

19                        JOHN J. BURSCH
                          Bursch Law PLLC
20                        9339 Cherry Valley SE, #78
                          Caledonia, MI 49316
21                        616-450-4235

22

23

24

25

```
 1      APPEARANCES (Continued)

 2    For Defendant Commission:
                          ERIKA PROUTY
 3                        Baker & Hostetler LLP (Columbus)
                          200 Civic Center Dr., Ste. 1200
 4                        Columbus, OH 43215
                          (614) 462-4710
 5
                          RICHARD BRYAN RAILE
 6                        Baker & Hostetler LLP (DC)
                          1050 Connecticut Ave., NW, Ste. 1100
 7                        Washington, DC 20036
                          (202) 861-1711
 8
                          NATHAN JOSHUA FINK
 9                        Fink Bressack (Bloomfield Hills)
                          38500 Woodward Ave., Ste. 350
10                        Bloomfield Hills, MI 48304
                          (248) 971-2500
11

12
      For Defendant Benson: HEATHER S. MEINGAST
13                        MI Department of Attorney General
                          Civil Rights & Elections Division
14                        525 W Ottawa St.
                          P.O. Box 30736
15                        Lansing, MI 48909
                          (517) 335-7659
16

17

18

19    REPORTED BY:        GENEVIEVE A HAMLIN, CSR-3218, RMR, CRR
                          Federal Official Court Reporter
20                        110 Michigan Avenue NW.
                          Grand Rapids, MI 49503
21

22

23

24

25
```

1     Kalamazoo, MI

2     July 13, 2023

3     1:41 p.m.

4                           *PROCEEDINGS*

5             THE CLERK:  All rise, please.  The United States

6     District Court for the Western District of Michigan is now in

7     session.  The Honorable Paul Maloney, the Honorable Raymond

8     Kethledge, and the Honorable Janet Neff presiding.

9             All persons having business with this Court, draw

10    near, give attention, and you shall be heard.  God save these

11    United States and this Honorable Court.

12            You may be seated.

13            JUDGE MALONEY:  This is file number 22-cv-272, Agee,

14    et al versus Jocelyn Benson, Michigan Independent Citizen

15    Redistricting Commission, et al.  This matter is before the

16    Court for cross motion oral argument on the motions for

17    summary disposition filed by the plaintiff and the defendants.

18            The panel -- all panel members are present.  The

19    record should reflect that Attorneys John Bursch and Michael

20    Pattwell represent the plaintiffs.  Attorney Richard Raile,

21    Erika Prouty, Nathan Fink and Heather -- Nathan Fink

22    represents the Commission, Heather Meingast represents

23    Secretary Benson.  The plaintiffs are also represented by

24    Attorneys Banks and Fleming.

25            Counsel, the way the panel has decided to proceed

1  here, we're going to give you 45 minutes for each side, and

2  we're going to proceed in this fashion:  Principal arguments

3  on your motions for summary first.  We'll start with the

4  plaintiff, go to the defendant.  Response to the defendants'

5  motion is next.  Then response to the plaintiffs' motion, and

6  then rebuttal arguments in the same -- in the same fashion.

7  You've got 45 minutes total for all the arguments.

8          Anybody need any clarification on that issue?

9          MR. BURSCH:  Just wondering, who is going to be

10  keeping the running clock and will they be letting us know at

11  stage two and stage three how much time we have?

12          JUDGE MALONEY:  You'll have to rely on Mr. Pattwell

13  to warn you, Mr. Bursch.

14          MR. BURSCH:  All right.  Thank you.

15          JUDGE MALONEY:  I've got a clock right here.

16          MR. BURSCH:  Okay.

17          JUDGE MALONEY:  All right.  We are ready to proceed.

18  Mr. Bursch, you may proceed on behalf of the plaintiffs.

19          MR. BURSCH:  Good afternoon, Your Honor.  John Bursch

20  on behalf of the plaintiffs, a number of whom are in the

21  courtroom today, may it please the Court.

22          The Redistricting Commission reduced the historical

23  number of black majority-minority districts in the House, the

24  Michigan House, from 10 to six and in the Senate from two to

25  zero; reduced the number of black majority districts in an

1    area known for acute racially polarized voting, and what do

2    you get?  Fewer black elected representatives from 20 to 16

3    following the 2022 election.  That is a Voting Rights Act

4    problem.

5              Now, the Commission was banking on so-called

6    crossover districts in which districts with BVAPs in the

7    40 percent range or even lower would result in the election of

8    black candidates of choice, but when BVAPs are just generally

9    capped at 40 percent across districts, which is itself an

10   equal protection violation, then black candidates need

11   substantial support from white voters, and in southeast

12   Michigan, especially in the area of Oakland County, that

13   rarely happens.  In four of the most probative districts where

14   black candidates squared off against white candidates in House

15   districts five, six, and 13, and Senate District 8, white

16   voters picked white candidates over black candidates by an

17   average of more than 93 percent to less than 7 percent.

18             JUDGE KETHLEDGE:  That was in 2022?

19             MR. BURSCH:  Correct.  And I'll be getting to those

20   specifics because it's unusual in this case that we actually

21   have an election under the maps.  Usually we're trying to make

22   predictions about that, but we have much better data here

23   because rather than moving for preliminary junction, we

24   decided to wait and brief this on the merits, and so we

25   actually have election results under the maps.

1      Now, there's a lot of details and statistics in the

2  briefing, and so my primary goal today is to simplify things

3  for the Court, and for that reason I'm going to start with

4  Gingles precondition one.  This is an issue where the parties

5  have a dispute that's purely one of law, and if we're correct

6  on that, then the Commission essentially concedes that summary

7  judgment is appropriate for the plaintiffs on at least Senate

8  Districts 1 and 8, and that would necessitate that the Linden

9  plan be redrawn and the evidence, frankly, is overwhelmingly

10  one-sided in House districts eight, 11, and 26, and that means

11  the Hickory plan would have to be redrawn and so --

12      JUDGE KETHLEDGE:  Well, you have to get the other two

13  factors preconditions as well.

14      MR. BURSCH:  Yes, we do.  So the evidence is either

15  overwhelming or conceded on Gingles two and three and the

16  totality of the circumstances, it's basically conceded as to

17  those districts, so I focus on Gingles precondition one

18  because there's a --

19      JUDGE KETHLEDGE:  We'll see what --

20      MR. BURSCH:  --legal dispute --

21      JUDGE KETHLEDGE: -- Mr. Raile says, but I get it.

22      MR. BURSCH:  Yeah.  Again, we'll have some disputes

23  about the other districts under two and three, but I'll try to

24  walk your way through that so you can get to a point where you

25  don't have to do a district-by-district analysis for every

1    district at issue in this case.

2         So, starting with Gingles precondition number one, it

3    simply asks whether a minority group could make up more than

4    50 percent of the voting age population in a relevant

5    geographic area.  Why do we ask this?  Well, if you had a

6    minority population that was distributed all across the state

7    it wouldn't be possible to put them into a district, and so we

8    ask whether they are reasonably compact, and the question here

9    is whether the map must also perform.  The defendants say yes

10   and they cite two cases, the Supreme Court's decision in

11   Abbott versus Perez and the Fifth Circuit's decision in

12   Harding, but neither case actually says that.  In Perez, when

13   the Supreme Court addressed Gingles one it only required the

14   plaintiffs to show a possibility of creating more than the

15   existing number of reasonably compact opportunity districts

16   and quoted its own decision in LULAC on that point, L-U-L-A-C,

17   and then in Harding the Fifth Circuit didn't disturb the

18   District Court's conclusion that Gingles one was satisfied,

19   and so the best explanation rejecting the defendants' theory

20   on this is the Eastpointe decision from the Eastern District

21   of Michigan.  There the Court found that Gingles one was

22   satisfied by demonstration maps prepared by the same expert

23   that the defendants used in this case, Doctor Handley, and the

24   Court emphasized that the efficacy of the illustration plan is

25   not a factor to be considered in assessing Gingles one and, in

1    fact, it went through and rejected the exact Perez argument

2    that they made here.

3        In addition, we have the Supreme Court's decision in

4    Allen just last month and there again they found that Gingles

5    one was satisfied based solely on demonstration maps without

6    proof of performance.  Proof of performance is something that

7    comes later, does not come at the Gingles one stage.

8        Once that law is clear its application to this case

9    is pretty straightforward.  When you reduce the black

10   majority-minority districts from 10 to six in the House and to

11   two to zero in the Senate there is no question that better

12   maps could have been drawn.  In fact, every single map that

13   Michigan has had since 1965 had more majority-minority

14   districts in the Detroit area than their maps.  Certainly

15   having any maps with Senate districts with majority-minority

16   districts greater than zero is possible.  We're entitled to

17   summary judgment on Gingles one, and I really don't think that

18   is much of a dispute.

19       JUDGE KETHLEDGE:  Now, Mr. Bursch, you know and the

20   Supreme Court has told us over and over we have to do this

21   district by district.  We're not going to do this in sweeping

22   state-wide terms.

23       MR. BURSCH:  Correct.

24       JUDGE KETHLEDGE:  There is one district I wanted to

25   ask you about in particular, and let's say I'm accepting for

1   the moment your reading of Gingles one and Perez and so on,

2   and that we're just looking at, you know, can the plaintiff

3   from this district be a member of a reasonably drawn

4   majority-minority district.  HD2 seems to be kind of a

5   challenge for you in that respect.  This is one of these

6   districts where the black voting age population is 11 percent,

7   and if I understand correctly, it is not really contiguous to

8   a larger -- to an area of other black voters that they could

9   join to be in a majority-minority district, so I'm wondering

10  as to that one how there is a genuine issue of material fact

11  as to Gingles one?

12          MR. BURSCH:  Well, first I want to push back a little

13  bit on the district-by-district examination for --

14          JUDGE KETHLEDGE:  Really?

15          MR. BURSCH:  -- purposes of -- well --

16          JUDGE KETHLEDGE:  The Supreme Court has reversed

17  district courts four times in a row when they haven't done it

18  district by district, so tell me why I don't need to worry

19  about that.

20          MR. BURSCH:  I understand.  Because in the cases that

21  you're talking about it wasn't possible to draw a

22  demonstration map that included the requisite number of racial

23  minorities in each one of the districts identified as a

24  majority-minority district.  Here, the demonstration maps that

25  not only Mr. Trende but that the Michigan legislature in every

1    cycle since 1965 have drawn show that you can draw 10

2    majority-minority House districts.  Now, whether a particular

3    plaintiff in House District 2 fits in one of those districts

4    isn't as material for a Gingles one analysis as to whether 10

5    districts can be drawn.  Do you see the distinction I'm

6    drawing there?

7         JUDGE KETHLEDGE:  I mean, if we're looking at the

8    claim of the plaintiff from HD2, the question as to -- I mean,

9    you know, there's a distinct claim as to that person in that

10   district, and my question is, you know, how have you -- what

11   would you point to that shows that as to that plaintiff in

12   that district for that claim a fact -- reasonable factfinder

13   could say that plaintiff could join a reasonably drawn

14   majority district?

15        MR. BURSCH:  Why don't I come back to you on that in

16   the responsive part of this?  What I'll do is I'll sit down

17   with the map and --

18        JUDGE KETHLEDGE:  That's fine.

19        MR. BURSCH:  Rather than waste all my --

20        JUDGE KETHLEDGE:  I get it.

21        MR. BURSCH: -- time right now.

22        JUDGE KETHLEDGE:  I get it.  Well, it wouldn't be a

23   waste of your time.

24        MR. BURSCH:  We can append all the plaintiffs into

25   the demonstration map districts, but I'll come back to that.

1      JUDGE NEFF:  Could we just -- one question I have for

2  you, Mr. Bursch.  You said a little while ago that it's clear

3  that better districts could be drawn or better maps could be

4  drawn, right?

5      MR. BURSCH:  Well, I didn't say better.  What I said

6  is we could draw maps with a significant number of majority

7  and minority districts that don't exist in the --

8      JUDGE NEFF:  That's fine.  Thank you for the

9  correction.  But my question is is the perfect the enemy of

10  the good here, truly?  I mean, if the finding is that the

11  districts as drawn meet the tests that are before us, does it

12  make a difference if they could have been differently drawn to

13  achieve results that the plaintiffs think are proper?

14      MR. BURSCH:  If you would decide that the maps that

15  they've drawn are adequate substitutes for the maps that we

16  used to have, then maybe you could reach that conclusion, but

17  as I get into the Gingles two and three preconditions I'll be

18  able to show conclusively that that is not the case, that the

19  white crossover voting that the Commission is depending on in

20  order to get the requisite number of black influence or

21  crossover districts simply doesn't happen, especially when

22  you're talking about mixing Detroit, Wayne County areas with

23  Oakland County.  The Oakland County voters just overwhelm

24  their black counterparts in Detroit and Wayne County, so I

25  would not say that the perfect is the enemy of the good.  I

1    would say that for purposes of Gingles one that there is no

2    beauty contest here.  I think ours would win a beauty contest

3    if you had one, but so long as we can demonstrate that the

4    black population in Detroit is sufficiently compact that you

5    could draw 10 districts in the House, then that's sufficient

6    to get past Gingles one.  It is not an incredibly onerous

7    requirement.  That's why in the Allen case the Court looked at

8    the demonstration maps and said, sure, you could have two

9    districts not one.

10            Now let's get on to the meat of the Gingles analysis

11   which is factors two and three.  Any other questions about

12   Gingles one?

13            JUDGE NEFF:  No.

14            MR. BURSCH:  Okay.  With respect to Gingles two and

15   three, then, which I'll address together, it's not really in

16   dispute that black voters in metro Detroit generally vote

17   cohesively.  That's why the Commission felt compelled by the

18   Voting Rights Act to create crossover districts in the first

19   place, and so the primary question that you're looking at is

20   this -- the validity of this white crossover voting, and we

21   have two advantages here that we don't have in some cases.

22            The first I've already mentioned is that because we

23   did not move for a preliminary injunction motion we actually

24   have results under these maps from the 2022 primary, and

25   that's going to be extremely helpful, and, second, because

1    this isn't the typical case where you're just asking, for

2    example, in Alabama whether there should be one black

3    majority-minority district or two, but here you're talking

4    about a whole passel of state and senate districts.  We have

5    large pots of data to draw from.

6         And it's true, to kind of get back to your point,

7    Judge Kethledge, that we don't use state-wide data, for

8    example, to look at the districts in southeast Michigan, but

9    with respect to each one of these districts, it's fair to look

10   at the surrounding districts and see how they're performing.

11   The Supreme Court has not ruled that out.  If you look at the

12   Cooper v Harris case, footnote five, what they reject is using

13   other parts of the state, for example, to say what's going on

14   in Detroit.  We're not going to do that.

15        JUDGE MALONEY:  Which are more probative, the

16   primaries or the general?

17        MR. BURSCH:  Certainly the primaries are more

18   probative where everyone agrees that in the run of the mill

19   cases that the black voters are going to vote for the

20   Democratic candidates in the southeast Michigan region, so if

21   we want to know how white and black voters are going to be

22   reacting vis-à-vis each other, we have to look at the

23   primaries.

24        JUDGE MALONEY:  What about the final result of the

25   general election vote?

1      MR. BURSCH:  Far less probative, in our view.  So,

2   for example, if you had five influenced districts where the

3   BVAP was around 40 percent and in each one of those the white

4   candidate of choice prevailed because of the low BVAP number,

5   that white candidate of choice very well may be the black

6   candidate of choice in the general election, so if you look at

7   the general election results you say, oh, the black population

8   got their candidate in every single one of these districts,

9   but if you go back to the primary you can see they actually

10   went over five.

11      JUDGE MALONEY:  And obviously we're talking about the

12   Democratic primary.

13      MR. BURSCH:  Of course, yes.  Yeah.  So what I want

14   to do is focus first on the most probative districts and then

15   back up, and to help us walk through that, because there is so

16   much data, I took what I considered the 11 most probative

17   districts out of the joint appendix, mostly from Doctor

18   Handley's report, and pasted them on to an exhibit so we can

19   just look through that as opposed to bopping around in the

20   joint appendix.  I've got a couple copies here for opposing

21   counsel, and with your permission, I'll approach the bench and

22   make sure you each have one copy as well.  And, remember, the

23   key that we're going to be testing here is evidence of white

24   crossover voting in these key districts.

25      JUDGE KETHLEDGE:  What are your criteria for

1    identifying these as the most probative?

2         MR. BURSCH:  Where you've got primarily black and

3    white candidates facing off against each other, preferably

4    one-to-one, two-to-two, but in a couple instances the fields

5    are a little bit bigger than that.  Another is that you either

6    have both incumbents or no incumbents.  There is one instance

7    we have one incumbent, and I'll talk about that, but generally

8    that makes a difference if you have one incumbent against a

9    field of non-incumbents, so those are -- those are the biggest

10   criteria I'm using for most probative.

11        So, we're going to start with eight of our challenged

12   districts, which I consider highly probative, starting with

13   Senate District 1, and this is one, if you look at the chart

14   that the Commission defendants put in their joint appendix

15   papers, they don't even contest that -- that at least -- that

16   they're not entitled to summary judgment on Gingles factors

17   two and three.  I think based on this it's pretty clear that

18   we're entitled to summary judgment on Gingles two and three.

19   So, here it's a 36.6 percent BVAP.  That means that black

20   voters, under their theory --

21        JUDGE KETHLEDGE:  What are we talking about right

22   now, what district?

23        MR. BURSCH:  This is the very first district on here.

24   It is State Senate District 1.

25        JUDGE KETHLEDGE:  Thank you.

1    MR. BURSCH:  So, again, they don't argue that they

2    are entitled to summary judgment on Gingles two and three with

3    respect to this, so here the black candidate of choice,

4    Sanders, had 34 percent but only got 16.8 percent of the white

5    votes.  Just to be clear, the middle column -- I'm sorry, the

6    left column is the primary vote without regard to race.  The

7    middle column are the black voters.  The right column are the

8    white voters.  The primary columns in the left and the right

9    there, the ones that have the highlights in them, showed the

10   -- Doctor Handley's best guess as to how these percentages

11   broke down for each one of the candidates --

12   JUDGE KETHLEDGE:  None of these --

13   MR. BURSCH: -- on the bottom.

14   JUDGE KETHLEDGE: -- headings are over these columns

15   here, right?

16   MR. BURSCH:  They were all in the joint appendix.  I

17   was --

18   JUDGE KETHLEDGE:  Oh, okay.  All right.

19   MR. BURSCH: -- trying to --

20   JUDGE KETHLEDGE:  All right.

21   MR. BURSCH:  Yeah.

22   JUDGE KETHLEDGE:  Go ahead.

23   MR. BURSCH:  Yes.  So it's general -- I mean, you

24   know, the total vote, black vote, white vote.

25   You can see in Senate District 1 that Sanders was by

1    far running away the number one choice of black voters at

2    34 percent but was only able to take 16.8 percent of the white

3    voters, and that's why the black candidate of choice lost

4    Senate District 1.  The white candidate of choice took

5    55.9 percent of Senate District 1 and this is why the

6    Commission, at least on its chart, agrees it is not entitled

7    to summary judgment on Gingles two and three, and this is one

8    of its better crossover districts.

9         So now we move down to Senate District 8, and they

10   don't really contest that they're not entitled to summary

11   judgment on Gingles two and three either.  McMorrow is a

12   candidate from Oakland County, and you're going to see a

13   reoccurring theme in these that whenever black voters in

14   Detroit Wayne County are joined with Oakland County they are

15   put at a distinct disadvantage because of the white bloc

16   voting, so here the black candidate, Bullock, took

17   75.8 percent of the vote.  You know, in almost any election

18   that would be overwhelming victory except that the -- the

19   white voters picked their Oakland County candidate over the

20   black candidate 95.9 to 4.1.  That's about as definitive --

21   definitive rejection of their white crossover voting theory as

22   you can possibly have.  And, again, the Commission agrees that

23   at a minimum it is not entitled to summary judgment on Gingles

24   two and three with respect to this district.

25        One final Senate district before we move to some

1    House districts is Senate District 11.  This is only a

2    19.2 percent BVAP, so it is not a crossover district but it

3    does show compelling evidence of the -- the racial disparity.

4    The Commission's expert Handley doesn't even analyze this, but

5    you can see here that the black voters favored Owens over

6    Klinefelt but the white voters picked Klinefelt by an 80 to 20

7    margin, so, again, they picked the white candidate over the

8    black candidate by an overwhelming amount, something that

9    shows very little white crossover.

10           So, as you flip to page 2 now we start to pivot into

11   the House districts where we've got plaintiffs that have

12   brought a challenge.  So, the very first one is State House

13   District 7.  There is a 43.3 percent BVAP.  The Commission

14   would say this is a safe district for black voters.  It's

15   highly probative because it's only got one black candidate and

16   two white candidates, and here the white voters chose the

17   white candidates over the black 62 to 37.  Now, in the

18   abstract that doesn't sound as bad, not like 90 to 10 or 95 to

19   five as we just saw and we'll see again, but here Helena

20   Scott, the black candidate, is the incumbent and she couldn't

21   even carry 40 percent of her white constituents, so you can

22   imagine what happens in a future race when she's term limited

23   and we have nonincumbent black and white candidates running

24   against each other.  Again, this is Oakland County.  That --

25   the black candidates aren't going to stand a chance in a 44

1    percent BVAP district.

2              JUDGE KETHLEDGE:  What district are we talking about

3    again?

4              MR. BURSCH:  It's on the top left-hand corner of each

5    one of these.  This is House District 7.

6              JUDGE KETHLEDGE:  Oh, 7, all right.

7              MR. BURSCH:  Seven.  So right below that is House

8    District 8.  Another Oakland County bacon-mandered district.

9    44.7 percent BVAP.  Again, this should be an easy district for

10   the black candidates to take, according to the Commission.

11   Again, very probative.  You've got two black candidates, three

12   white candidates, no incumbents.  You can see that the black

13   voters picked the two black candidates by substantial margins,

14   32 percent, 31 percent, yet the white preferred candidate

15   still won handedly because white voters picked white

16   candidates by an 87 to 13 percent margin.  Again, overwhelming

17   evidence that there is not white crossover voting.

18             We flip to the next page.  This is State House

19   District 11.  Again, 42.8 percent BVAP.  Commission would say

20   this is a safe district for black voters.  We have, instead, a

21   Hispanic candidate who wins first place who was the sixth

22   choice of black voters with only 6.6 percent.  Well, how does

23   that happen?  Well, it's because the Hispanic candidate was

24   the overwhelming choice of white voters, and even though you

25   had four black candidates in this nine candidate race, they

1    received less than 30 percent support from white voters.

2    Again, overwhelming evidence against crossover.

3            And then State House District 13 right below that,

4    this is a 38.4 percent BVAP.  You should at least have a

5    strong chance to select your candidate of choice as a black

6    voter, and it is as probative as you can get.  It's one black

7    candidate, one white candidate, and the white voters picked

8    Stone over Miller 91 and a half percent to eight and a half

9    percent.  And now the Commission would say, well, this is a

10   win for black voters because, look, Stone, the white

11   candidate, was also the black voter -- or black candidate of

12   choice; 53 to 47.  Well, that's because Stone was from a

13   county where she could raise a lot more money than the black

14   candidate could and there was a 40-to-one fundraising

15   advantage so it's no wonder that she could squeak out a

16   victory among black voters.  What's clear is the white voters

17   would not vote for the black candidate.

18           JUDGE KETHLEDGE:  All right.  Go ahead.

19           MR. BURSCH:  Next page, this is the last of the

20   challenge for what I think very probative districts, this is

21   House District 26.  Here, 35.8 percent BVAP.  Again, the

22   Commission's view would be black voters have a strong chance

23   of prevailing here.  Highly probative.  We've got two white,

24   two black candidates, no incumbents.  The top black candidate

25   receives 55 percent of the vote.  The number two black

1    candidate gets 32 percent of the black vote.  Neither one of

2    them even come close to winning.  I mean, not even within

3    13 points, and why is that?  Because the white candidate of

4    choice, a white candidate, gets 76 percent of the vote, and in

5    all, white voters choose white candidates over black

6    candidates 82 to 18.  In every single one of these it is just

7    a tidal wave when it comes to this crossover voting theory.

8            So, we've got one additional challenged probative

9    district.  This one isn't, I think, as compelling until you

10   really dig into it.  This is Senate District 6.  And here Mary

11   Cavanagh is the winner, and if you look at the black votes,

12   you would say, oh, well, that makes sense because she was the

13   candidate of choice for black and for white voters, but then

14   when you dig into this a little bit deeper it's really not

15   quite that clear, and that's because Cavanagh was an incumbent

16   from the House, and if you look below in the previous district

17   that roughly mirrored this one, House District 10, and this is

18   also from the defendants' expert reports, when Cavanagh ran

19   for the House she wasn't even in the top two choices among

20   black voters.  Ruffin and Harris, both black voters took first

21   and second with well over 50 percent of the vote.  But

22   Cavanagh beat Harris, the white candidate over the black

23   candidate, 61.8 to 11.5.  So, although this was the black

24   candidate of choice in 2022 by virtue of the incumbency

25   designation, all you have to go back -- to do is go back

1    two years and you can see that the lack of white crossover

2    voting continues.

3            JUDGE KETHLEDGE:  Well, I mean, just by way of

4    example, Mr. Bursch, I mean, in that district I kind of -- I

5    struggle to see how we would grant summary judgment in your

6    favor as a matter of law and find that there is white

7    crossover -- I'm sorry, white bloc voting in that district

8    that denies African American voters an opportunity to elect

9    the person they want in a primary.  I mean, I understand the

10    argument -- the point you just made --

11            MR. BURSCH:  Right.

12            JUDGE KETHLEDGE:  -- you know, but --

13            MR. BURSCH:  So, I --

14            JUDGE KETHLEDGE: -- as a matter of law --

15            MR. BURSCH:  -- just -- yeah.  I was going to save

16    this for the end of this portion of the presentation but let

17    me just jump to it now.  With respect to some of these

18    districts, we're entitled to summary judgment now.  The ones I

19    identify specifically are Senate District 1 and 8, which the

20    defendants do not meaningly -- meaningfully contest, and House

21    Districts 8, 11, and 26.  You know, I think each one of those

22    on their face is overwhelming.

23            As we get out to these other districts, one like

24    this, I think it's entirely within the panel's discretion to

25    consider what's happening in all these surrounding districts.

1    Now, I know ordinarily when you look at the case law in a VRA

2    case you're just looking at one district or two districts, but

3    that's because we're talking about one congressional district

4    versus two congressional districts.  Here, when we have a map

5    that covers the entire Detroit metro area and it has

6    disparities in white bloc voting like the ones that we're

7    seeing, I think you can take the seven races -- or six races

8    that we looked at right before this one and apply it to this

9    one as well, particularly when you look at the 2020 primary

10   and you see those figures there.

11        Now, you know, how you go about this is entirely up

12   to you.  If you decide that we win two to three districts on

13   summary and they're redrawing the maps, you know, then -- then

14   maybe we decide that a trial isn't necessary.  They stipulate

15   to liability because they have to redraw the maps anyway and

16   then we all go back to the drawing board, so maybe that's one

17   way to resolve it.  Another way is you look at the collection

18   of evidence in southeast Michigan and you say that even if in

19   a particular district there could be a question of fact, we

20   can resolve it because on the whole when we look at the big

21   picture the material facts tell us that the existence of white

22   crossover voting in the key areas isn't there.

23        JUDGE KETHLEDGE:  As to the districts to which -- in

24   which -- or as to which you think you ought to get summary

25   judgment, the ones you just stated, I mean, you're pointing to

1    this 2022 data, which would seem to be --

2          MR. BURSCH:   The best data.

3          JUDGE KETHLEDGE:   -- very relevant but it's not

4    necessarily dispositive, right?   I mean, we're supposed to

5    look at the totality of the circumstances, and I think that

6    the Supreme Court would want us to probably see if there's

7    some more historical data that confirms or denies, and so why

8    do you think -- I mean, in your view is this enough for

9    summary judgment, just what you've been talking about now --

10         MR. BURSCH:   I think --

11         JUDGE KETHLEDGE: -- or are there more --

12         MR. BURSCH:   -- it is, but we have --

13         JUDGE KETHLEDGE: -- things you would point to?

14         MR. BURSCH:   Yeah.   I would point to two other

15   things.   Obviously we don't have these exact districts

16   represented in past elections, but we can look in the area and

17   look at districts that were similarly situated geographically.

18   We point to about, I don't know, seven or so -- or eight races

19   or so from the gubernatorial stage all the way down in our

20   reply brief from past elections that all showed the same type

21   of disparity between white candidates and black candidates

22   when white voters are voting, so that's number one.

23         But, number two, you don't even really need to look

24   at this data or that data.   Just take the word of their

25   experts.   Their expert said that they had to draft VRA

1    compliant districts because they acknowledged that there was

2    cohesive black voting and cohesive white voting in the area.

3    They tried to solve that problem by cracking black voters into

4    these influence or crossover districts as opposed to drawing

5    majority-minority voting districts, and the Supreme Court has

6    suggested as a matter of law that doing that was wrong.  That

7    if you've got enough voters to have a majority-minority

8    district and everybody acknowledges that the VRA is implicated

9    because of the cohesiveness of both black and white voters

10   then crossover districts is not the way to solve the problem,

11   and these 2022 elections prove why that's the case, because in

12   a highly racially polarized area like metro Detroit white

13   voters are not going to consistently support black candidates,

14   so I think we win on the 2022 data.  I think we win again when

15   you throw in the old data.  I think we win based on their

16   expert report, and, frankly, just on their acknowledgment that

17   there are VRA problems here, that's why they're considering

18   race in the first instance.

19           Briefly I'll just tick through the rest of these.  I

20   had two additional non-challenged districts, highly probative

21   districts.  Again, these aren't challenged districts, but

22   they're right in the same area.  House District 5, this is

23   another one that goes into Oakland County.  The black

24   candidate of choice, the black candidate himself, Mr. Davis,

25   55 percent of the black vote but yet he lost going away

1    because the white voters overwhelmingly supported white

2    candidates, and the exact same thing in House District 6, and

3    so, Judge Kethledge, to your point, you know, do we do this

4    district by district or do we look at this in the whole area,

5    because what do we do with the 2022 district that only had one

6    candidate running?  What do we do with the district that it

7    was a black candidate versus another black candidate?  Well,

8    on the very last page here, based on these most probative

9    districts, this is the evidence of white crossover voting in

10   Detroit in the best races that we have to determine that, and

11   you can look down the board here:  92 to seven, 93 to six, 87

12   to 12, 91 to 8, 87 to 13 essentially, 95 to four, and 80 to

13   20, yet these are not close cases.  We're not talking about

14   55/45 splits or even 70/30 splits.  They're evidence of white

15   crossover voting, which is what their whole case depends on,

16   doesn't exist in the 2022 election data.

17        So, I do want to pivot back briefly to this point

18   about creating white crossover districts, which was their

19   strategy.  You know, first we have the citation from their

20   lawyers' briefing, the Baker Hostetler's firm briefing in the

21   North Carolina redistricting that we cited in our reply brief

22   where they said in that case if you have black majority

23   districts that are sufficiently large to create those types of

24   districts that crossover voting districts are inappropriate,

25   but you've also got the Baldus decision that we cite in our

1   opening brief on page 31, and the point is a common sense one

2   that a bird in the hand is worth more than two in the bush.

3   That when it comes to Voting Rights Act compliance it's better

4   to have a black majority-minority district at 55 percent than

5   to have two districts that are at 40 percent and below with

6   the hope that black candidates might be able to overcome white

7   reluctance to vote for them.

8         JUDGE MALONEY:  Didn't one judge say pistachio ice

9   cream?

10         MR. BURSCH:  Pistachio ice cream?

11         JUDGE MALONEY:  Right.

12         MR. BURSCH:  Yes, yes.  In that very case, yes.

13   That's very good.  You know, so, you know, I don't think you

14   need to go district by district with this kind of evidence,

15   but at a minimum there's going to be five districts that you

16   can just scrape right off the top.

17         That -- that still doesn't get us all the way home

18   because we've got the totality of the circumstances, and they

19   don't really raise a meaningful argument here.  They did not

20   make a totality of the circumstances argument in their opening

21   summary judgment brief.  They devoted all of one page to it in

22   their response brief, and they did not address it in their

23   reply brief.  Simply, you know, on that basis alone you can

24   tell how serious it is, and the reason for that is because

25   their expert, Bruce Adelson, and our expert, Brad Lockerbie on

1   this issue are in total lockstep agreement.  There's no

2   difference of opinion about that at all.

3          In addition, we've got the lay testimony, the

4   affidavits from Lemmons and Smith, and they don't have

5   anything like that.  Not only do they fail to brief it, they

6   don't offer any evidence at all; no lay testimony, no expert

7   testimony.  They do raise a couple of questions, kind of

8   hypothetical lawyers' questions in their response brief in

9   that one page.  I'm happy to address those if you would like

10  me to, but I would prefer not to waste the valuable time I

11  have unless you have specific questions.  Okay.  Then I'll

12  move on.

13         So, you know, if we're right on the law on Gingles

14  one, we get summary judgment there.  They don't meaningfully

15  contest totality of the circumstances so we're entitled to

16  summary judgment on that point.  That leaves Gingles two and

17  three.  I've identified five districts for you that we're

18  entitled to summary judgment right now, and I think you could

19  use the totality of the evidence to hold that we're entitled

20  to summary judgment as to Gingles two and three with respect

21  to all the districts.

22         Then we get to equal protection, you know, and if

23  there's anything that we know about equal protection claims,

24  and this was emphasized in the Harvard and University of North

25  Carolina racial admissions cases that the Supreme Court just

1   decided at the end of the term, that you can't use quotas and

2   yet what the Commission did is they used 40 percent quotas.

3   They started to draw districts that had much higher BVAP

4   percentages, percentages that would have mirrored the maps in

5   the past that assured that black voters in Detroit had their

6   adequate representation, and the commissioners themselves --

7   this is in the defendants' admission, this isn't our point,

8   this is theirs -- that the attorney came in and started

9   pushing them, cramming the commissioners down to reduce all of

10  those districts to 40 percent wherever possible.  It's not

11  just their -- their own people who acknowledge it.  It's also

12  in the MSU report at page 153.  That's in the joint appendix

13  at page 844, and what we know from Shaw v Hunt and cases like

14  Cooper v Harris is that you can't set quotas, and, you know,

15  their point is, well, we were doing this all in the pursuit of

16  partisan balancing when it comes to the politics because the

17  Michigan constitution says we have to do that, but obviously

18  that principle in the Michigan constitution does not supersede

19  what the Voting Rights Act and the Equal Protection Clause

20  provide, and as your starting point --

21          JUDGE KETHLEDGE:  Let me ask a question.  I'm --

22          MR. BURSCH:  Absolutely.

23          JUDGE KETHLEDGE:  -- trying not to talk over you.

24          MR. BURSCH:  Ask as many questions as you want.  I

25  encourage those.  I want to know where your concerns are.

1          JUDGE KETHLEDGE:  I just want to try to understand

2     the law a little more clearly as to the question -- the legal

3     question that we're answering here, and so the Commission can

4     consider race, it can be aware of race --

5          MR. BURSCH:  Yes.

6          JUDGE KETHLEDGE:  -- right?

7          MR. BURSCH:  If they conclude that there is a VRA

8     problem, which they did.

9          JUDGE KETHLEDGE:  Well, I mean, they just generally

10    can be aware -- it's not just in a strict scrutiny phase,

11    correct?  The first step is did race predominate, right --

12         MR. BURSCH:  Yes.

13         JUDGE KETHLEDGE:  -- as a factor in drawing these

14    lines?

15         MR. BURSCH:  Yes.

16         JUDGE KETHLEDGE:  And my sense of that -- and I just

17    want to explore whether I'm right.  My sense of that is that

18    for race to predominate the Commission or -- you know, let's

19    say a legislator must use race not as a proxy for some other

20    object that they have in drawing the lines but they must be

21    considering race as race.

22         MR. BURSCH:  Yes.

23         JUDGE KETHLEDGE:  For example, we -- our object is to

24    thwart the election of candidates preferred by black voters in

25    the primary, that we want to reduce the success of those

1    candidates.  That would --

2           MR. BURSCH:  Can I pause there?

3           JUDGE KETHLEDGE:  Yeah.  Go ahead.

4           MR. BURSCH:  Clearly that would be sufficient --

5           JUDGE KETHLEDGE:  Sure, right.

6           MR. BURSCH:  -- but the Supreme Court said it doesn't

7    have to be subjective racial intent.  That if it has a

8    disparate impact, that's enough.

9           JUDGE KETHLEDGE:  Which case was that?

10          MR. BURSCH:  I'll grab that in response.

11          JUDGE KETHLEDGE:  That's okay.  You can do --

12          MR. BURSCH:  It's in our --

13          JUDGE KETHLEDGE: -- that when you come --

14          MR. BURSCH:  -- brief.

15          JUDGE KETHLEDGE: -- back.

16          MR. BURSCH:  Yeah.

17          JUDGE KETHLEDGE:  So my -- I mean, it seems to me

18   that one could certainly argue in this case that even taking

19   into account the chairperson's affidavit about the lawyer

20   getting involved and wanting to push the numbers below a

21   certain threshold that they were doing so for partisan -- for

22   partisan reasons.  They were -- they were treating race as a

23   proxy for party affiliation in doing so.  Their object was to

24   have a certain partisan balance which they did by distributing

25   different kinds of voters that they thought would vote certain

1    ways, and that it wasn't an effort to deny the preferences of

2    black voters as black voters.  That's --

3              MR. BURSCH:  Right.

4              JUDGE KETHLEDGE:  -- kind of the argument.  I just

5    wonder what your response is --

6              MR. BURSCH:  Yeah.  I'll get--

7              JUDGE KETHLEDGE:  -- at least on summary judgment.

8              MR. BURSCH:  -- you the case name to make the point

9    about the disparate impact.  We don't have to prove it was --

10              JUDGE KETHLEDGE:  Is that an equal protection

11    violation, I guess is my question?

12              MR. BURSCH:  Yeah, it is.

13              JUDGE KETHLEDGE:  They're really not worried -- they

14    have no interest in -- they just don't care if they're

15    thwarting black preferred candidates or not, they just want to

16    get more Democratic candidates, let's say.

17              MR. BURSCH:  Right.  If it has the effect of

18    disenfranchising black voters and that was a primary

19    consideration in drawing the lines then, yes, that is an equal

20    protection problem, so --

21              JUDGE KETHLEDGE:  And if it was a primary

22    consideration.

23              MR. BURSCH:  Which it clearly was.

24              JUDGE KETHLEDGE:  Let's say they're indifferent, they

25    don't care.

1      MR. BURSCH:  Well, they cared about the black voters

2  because just as a matter of geographic -- geography here.

3      JUDGE KETHLEDGE:  But they don't care about the

4  effect.  Don't they have to care about the effect --

5      MR. BURSCH:  No.

6      JUDGE KETHLEDGE: -- for there to be an equal

7  protection violation?

8      MR. BURSCH:  No, they do not have to care about the

9  effect any more than if Republicans wanted to elect more

10  Republicans and so they packed black voters into Republican

11  leaning districts, and they didn't do it because they wanted

12  to hurt black voters, they wanted to do it to elect more

13  Republicans.  That would be every bit as much of an equal

14  protection violation as what's happening here.

15      JUDGE KETHLEDGE:  Do you think the last plan which

16  did pack black voters pretty -- in high concentrations in

17  certain districts to the benefit of Republicans, most folks

18  would say, do you think that was -- I guess that wouldn't be a

19  violation.

20      MR. BURSCH:  It wouldn't be a violation because they

21  allowed the lines to fall naturally where the voters were.

22  What happened was, you've got a highly concentrated group of

23  black voters in Detroit.  That's why they know that there are

24  VRA issues when you get to Detroit, and what the Republicans

25  did, they let the lines fall where they fell.  With the

1   Democrats they took those -- and they make these

2   bacon-mandered districts, they look like pieces of bacon,

3   stretching out into Oakland County, stretching out into Macomb

4   County so they can dilute the impact of those Democratic

5   voters all being in the same district.  Well, they were doing

6   it specifically because they were black voters and they did it

7   with racial quotas, and so the fact that they may not have

8   been trying to hurt the black voters doesn't matter.  The fact

9   that they did hurt the black voters, 20 percent reduction in

10  the black legislative caucus from this area, is all the

11  evidence we need of an equal protection violation.

12          JUDGE KETHLEDGE:  When you come back give me the case

13  that --

14          MR. BURSCH:  I will.

15          JUDGE KETHLEDGE:  -- you think supports the

16  proposition that the Commission -- it doesn't matter whether

17  the Commission cares about the effect on minority voters.

18          MR. BURSCH:  Yeah.  I understand that's an important

19  piece of this.  I believe I'm under 10 minutes now, so unless

20  you have any more pressing questions, I'm going to try to save

21  a little time for response in rebuttal.  Thank you.

22          JUDGE KETHLEDGE:  Thank you, Mr. Bursch.  Mr. Raile.

23          MR. RAILE:  Thank you, Your Honor.  May it please the

24  Court, I'm Richard Raile for the Commission, and just to be

25  clear, am I in this phase arguing my summary judgment motion?

1          JUDGE MALONEY:  Yes.

2          MR. RAILE:  All right.  Although some of what I say

3   will rebut my friend, Mr. Bursch, who said many things that I

4   do not agree with --

5          JUDGE MALONEY:  Surprise, surprise.

6          MR. RAILE:  I'll begin the Gingles preconditions and

7   I'll address the threshold deficiencies at the end.

8          Mr. Bursch just cherry-picked his favorite elections

9   from the area and, in fact, shows that, even taking it in his

10  own terms, there's not a Voting Rights Act violation because

11  in the very exhibit, the demonstrative that he showed the

12  Court there are five black -- excuse me, four black preferred

13  wins, four --

14         JUDGE KETHLEDGE:  Are you talking primary or general?

15         MR. RAILE:  I'm talking about this.

16         JUDGE KETHLEDGE:  I know.  But are we talking wins --

17         MR. RAILE:  This is primaries.

18         JUDGE KETHLEDGE:  Primaries.

19         MR. RAILE:  These are the Bursch cherry-picked

20  elections.

21         JUDGE KETHLEDGE:  Well, we don't need some of these

22  characterizations.

23         MR. RAILE:  Fair enough.  Four wins for black

24  preferred candidates, four losses for black preferred

25  candidates, two that lacked cohesion, meaning they don't show

1    the second Gingles precondition, and one with a lack of

2    evidence.

3         In Clark versus the City of Cincinnati the Sixth

4    Circuit held that a 47 percent success rate for black

5    preferred candidates was a failed VRA claim, the plaintiffs

6    lost, because to establish the third precondition the

7    plaintiffs have to show that the black preferred candidate

8    usually loses.  47 percent success rate -- even under

9    50 percent -- showed that the black preferred candidate does

10   not usually lose.  That's the Sixth Circuit's word on this.

11        Mr. Bursch has identified a case that's no better for

12   him than Clark against the City of Cincinnati.  There is,

13   phrased in the best possible light for him, a 50/50 black

14   preferred candidate success rate.  Gingles three is not shown.

15   You can look at them together.  You can look at them

16   individually.  It doesn't work.  We have, in framing our

17   summary judgment motion, gone district by district as the

18   Supreme Court has directed again and again and again, and

19   there's a reason for that.  In, for example, Senate District 7

20   there's no voter who is also a voter in Senate District 8.

21   Plaintiffs want to take Senate District 8 to trial because of

22   the outcome there.  As Mr. Bursch said, we're not moving for

23   summary judgment on Senate District 8.  There are significant

24   material fact disputes that preclude him from obtaining

25   summary judgment, but that entitles, at best, the plaintiffs

1    to a trial on Senate District 8, not on other districts that

2    have different voters and different success rates.

3                JUDGE KETHLEDGE:  I mean, eight does look like

4    there's pretty strong white bloc voting against the black

5    preferred candidate.

6                MR. RAILE:  And we have not -- we are not asking for

7    judgment as a matter of law.  There's a material fact dispute.

8                JUDGE KETHLEDGE:  Which is?

9                MR. RAILE:  It's at -- our expert, Doctor Palmer, at

10   joint appendix 134 says that this election result is

11   idiosyncratic and it is not probative as to what future

12   elections are likely to show because the white preferred

13   candidate drew national attention from a speech that went

14   viral on YouTube and obtained an amount of funding that is

15   unusually high for these races, so that's not enough to strike

16   it down.

17                In addition, as Judge Selya points out in Uno versus

18   the City of Holyoke, you need a pattern of losses of black

19   preferred candidates, one election does not usually cut it.

20   My friend, Mr. Bursch, just said that this case is unusual in

21   having actual election results.  That is not true.  Generally

22   Voting Rights Act cases are brought either later in the decade

23   or they're brought to challenge at large systems that have

24   existed potentially for decades.  It is rare that they're

25   brought this early, and when they are, what litigants depend

1    on is reconstituted election analyses taking state-wide

2    elections and reconstituting them within the districts to show

3    that a minority preferred candidate will not win.  That can be

4    probative --

5          JUDGE MALONEY:  So how many elections do you need

6    with this map to know there is a problem?

7          MR. RAILE:  In --

8          JUDGE MALONEY:  Or that there is no problem?

9          MR. RAILE:  In Gingles there were three election

10    cycles.

11          JUDGE MALONEY:  So that's through the 26th election

12    in the House.

13          MR. RAILE:  In this case that would be so.  I am not

14    setting that as an essential vehicle.  There are several ways

15    that plaintiff could avoid this problem.  One, it could go to

16    exogenous elections and it could superimpose those on the

17    district and demonstrate a lack of success in those districts.

18    It could actually go lower, at the county level to county

19    commissioner races or city races and things like that, and

20    there is case law about that.  The plaintiffs are not doing

21    that.  The plaintiffs are arguing that based on a single

22    election result and a single district they're entitled to

23    judgment as a matter of law, and I'm skipping a little bit

24    ahead into rebutting their argument on this.

25          JUDGE KETHLEDGE:  That's fine.

1      MR. RAILE:  But they're not entitled to summary

2  judgment on any of this.  They cite no case where anyone has

3  ever won summary judgment in anything remotely like this.  The

4  Court is not permitted to weigh evidence to determine which

5  elections are most probative at this stage.  We have a

6  material fact dispute at joint appendix 134.

7      The same can be said about Senate District 1.  Our

8  position is that there's no cohesion in this district and that

9  can be seen at joint appendix 134.  Our expert opines that

10  given the levels of statistical uncertainty in the estimates,

11  it is unclear who the black preferred candidate is.  There is

12  no cohesion.  Gingles two is not met as to Senate District

13  Number 1.

14      JUDGE KETHLEDGE:  Whether it's at -- I'm just

15  curious.  I mean, whether it's at this stage or some later

16  stage of litigation like this, I mean, to what extent when we

17  have a fragmented preference, I guess, for black primary

18  voters, to what extent do we take into account that black

19  primary voters clearly, it would seem, are favoring candidates

20  who are themselves black and whites favoring whites?  Doesn't

21  that -- isn't that probative of cohesion and bloc and it's

22  more just a fortuity that we have multiple candidates of

23  races?

24      MR. RAILE:  It depends on the circumstances.  The

25  evidence --

1      JUDGE KETHLEDGE:  Is it a coincidence that it's

2  aligned that way?

3      MR. RAILE:  The evidence doesn't show that.  Very

4  often the black preferred candidates, even in elections that

5  Mr. Bursch chose to highlight, are voting for the white

6  candidate so that's --  it's not the case that black

7  candidates -- black voters are voting for black candidates.

8  It's just not true.

9      JUDGE KETHLEDGE:  Well, I'm just looking at Senate

10  District 1, and I do have this sort of district-by-district

11  mindset, just as fair notice, and I get your point that there

12  isn't a single candidate that gets more than 50 percent

13  support for black voters in this primary, but, you know, I

14  mean, the black candidates are definitely -- they're getting

15  way more -- they're getting almost total support and so --

16  right?  I mean --

17      MR. RAILE:  I would love to explain this, because

18  it's more complicated.

19      JUDGE KETHLEDGE:  So if it's one-on-one in the next

20  election it could be harder to get crossover voting if the

21  whites are doing the same.

22      MR. RAILE:  It may or it may not, but it's the

23  plaintiffs' burden to prove that.

24      JUDGE KETHLEDGE:  Right.  And I'm not saying -- all

25  I'm going toward is just that this might still be probative of

1      cohesion and bloc voting notwithstanding the numbers 24 and

2      34.

3              MR. RAILE:  That's why we didn't move for summary

4      judgment.  We recognized the summary judgment standard.  We're

5      the ones arguing to the summary judgment standard, but this

6      chart is problematic for several reasons.  One, what our

7      expert is saying is that those numbers 34 and 24 are estimates

8      and given statistical uncertainty is actually a statistical

9      dead heat.  Second, when you have fragmented votes and you

10     don't even have a clear plurality winner -- the case law is

11     clear, we cited the Levy case out of the Fourth Circuit which

12     cites in turn a Fifth Circuit case that says there's not

13     cohesion.  The black community has to be cohesive.  They have

14     to rally around a candidate.  If you have a fractured race,

15     even with many candidates, it's understandable, but that race

16     cuts against the cohesion.

17             If the plaintiff wants to prove Gingles two, the

18     plaintiff needs to find some other evidence.  Plaintiffs do

19     that.  Here, they don't have anything.

20             On the majority of the districts -- and let's be

21     clear, we're really talking in this case about three districts

22     above 35 percent black voting age population or BVAP where the

23     black preferred candidate loss.  In every other case the black

24     preferred candidate won or there was not black cohesion under

25     the legal standard for cohesion.

1          I can walk the Court through all of them.  They're

2     listed in our brief, in our summary judgment motion where we

3     go district by district, and our point is simple.  You heard

4     Mr. Bursch say many things about digging into the elections

5     and getting into the facts, but the problem is for him that he

6     has to prove the existence of Gingles three.  He has to prove

7     legally significant white bloc voting.  We do not have to

8     disprove that precondition, and everything that you heard Mr.

9     Bursch say this morning, he stood up and said -- this

10    afternoon, he stood up and said this case all depends on the

11    Commission's theory of white crossover voting.  That's not

12    true.  Nothing depends on the Commission's theory of white

13    crossover voting.  What -- this depends on their ability to

14    prove all of the Gingles' preconditions.  If they don't have

15    evidence explaining away our evidence, gets them to a zero

16    zero tie.

17          JUDGE KETHLEDGE:  So they bear the burden of proof.

18          MR. RAILE:  Yes.

19          JUDGE KETHLEDGE:  Well, we get that.

20          MR. RAILE:  This is a simple --

21          JUDGE KETHLEDGE:  I think what he --

22          MR. RAILE:  This is a point on those preconditions

23    and I can --

24          JUDGE MALONEY:  Why should we ignore Senate District

25    8?

1      MR. RAILE:  You should not ignore Senate District 8

2   when examining Senate District 8.  What I'm saying is as to,

3   for example, Senate District 3 --

4      JUDGE MALONEY:  No.  I want to talk about -- if I

5   appreciate your expert's opinion, a 95 to four split of white

6   voters is not significant?

7      MR. RAILE:  It's a triable fact question.

8      JUDGE MALONEY:  95 to four?

9      MR. RAILE:  Yes.

10      JUDGE MALONEY:  Seriously?

11      MR. RAILE:  Yes, Your Honor, because we have an

12   expert who is opining that that is not probative of future

13   races here.  It is not the Court's role to weigh that dispute

14   at this stage.  It's triable.  That's our argument on Senate

15   District 8.

16      As to the other districts that surround it, for

17   example, Senate District 3 where the black preferred candidate

18   won and won 76 percent of the black vote, they can't take

19   Senate District 3 to trial based on evidence about Senate

20   District 8.  They get to take Senate District 8 to trial.

21      JUDGE KETHLEDGE:  I understand your point and -- but

22   I think that we -- results like this in a neighboring district

23   might have some probative value about the prevalence of white

24   bloc voting, you know, three blocks away.

25      MR. RAILE:  And if that's the way the Court looks at

1    it, it has to acknowledge that the evidence can cut both ways,

2    and when you have a case where --

3              JUDGE KETHLEDGE:  Sure, that's fair.

4              MR. RAILE:  -- in a Democratic primary the success

5    rate of the black preferred candidates is 75 percent across

6    all of these districts, then -- if you look at it that way

7    then we still have well more than the Gingles' standard,

8    which, again, is not to guarantee the minority preferred

9    candidate wins but to have an equal opportunity.  A 50 percent

10   success rate is the Gingles three mark.  Looking at all the

11   district together, we're at 75.

12             JUDGE MALONEY:  Are you -- that 75 is primary

13   elections?

14             MR. RAILE:  Yes.

15             JUDGE MALONEY:  Okay.

16             MR. RAILE:  And I would -- I'll address the issue of

17   general versus primary in the context of our narrow tailoring

18   argument.  It matters more there, but for purposes of our

19   summary judgment motion against -- on offense, we're looking

20   at Democratic primaries, and there's a 75 percent success rate

21   in those primaries.  If you narrow it down to the 11 districts

22   that they said in their brief was most probative and they put

23   in the joint appendix, there's a 54 percent success rate, so

24   in all of those cases the Gingles three standard is not met,

25   so look at it regionally, look at it district by district,

1    either way we're on solid footing.

2        JUDGE KETHLEDGE:  Which case says that a 50 percent

3    success rate is the Gingles three mark?

4        MR. RAILE:  So in the Sixth Circuit it's actually

5    lower.  It's Clark versus Cincinnati, even a 47 percent

6    success rate was good enough there.  My understanding of the

7    law in other circuits is they generally apply a 50 percent

8    rate.  I believe the Meeks decision in the Eleventh Circuit

9    says that.  I don't have the cite off the top of my head.

10   We've relied on the Sixth Circuit in this case, but generally

11   you're talking about usually.  I mean, Gingles itself says

12   usually.

13       JUDGE KETHLEDGE:  That's your paraphrase, the

14   50 percent.  There's not a case -- like a Supreme Court case

15   that sort of lays that out succinctly.

16       MR. RAILE:  There are Circuit Court cases that lay

17   that out.

18       JUDGE KETHLEDGE:  I'm more interested in people who

19   can reverse us, so we're talking about the Supreme Court.

20       MR. RAILE:  Fair enough.

21       JUDGE KETHLEDGE:  Yeah.

22       MR. RAILE:  The Gingles standard is usually, and the

23   Sixth Circuit says usually 47 percent doesn't work for that.

24       JUDGE KETHLEDGE:  I get it.

25       MR. RAILE:  I don't know if the Supreme Court has

1    directly addressed that question.

2           JUDGE KETHLEDGE:  Okay.  So there's not a cut and

3    dry.  Go ahead.

4           MR. RAILE:  I want to address briefly the threshold

5    issues.  One of the districts that Mr. Bursch highlighted was

6    House District 26.  That district was challenged by the

7    plaintiff, Norma McDaniel, in the Detroit caucus case.  She

8    received a final judgment on the merits in that case rejecting

9    the VRA claim.  That's res judicata.  That defeats the claim

10   against House District 26 and Senate District 5 which she also

11   challenges.

12          Judge Kethledge mentioned a few districts of very low

13   BVAP that are not in areas that can easily be redrawn as

14   majority-minority districts.  House District 2 is an example.

15   You can see that at joint appendix 234.  It's down here well

16   south of that pocket of black, which is, I guess, purple

17   representing the black voters.  It's too far south to be

18   reasonably configured.

19          JUDGE MALONEY:  Was it down river?

20          MR. RAILE:  Yes, Your Honor, that's right.  It's too

21   far south to be reasonably configured.

22          JUDGE KETHLEDGE:  Is that the only one you would

23   point us to in this respect that, you know, it's too much of

24   an island to be reasonably configured, just so I understand

25   your argument?  HD2, I get that.  Are there any other House or

1    Senate?

2         MR. RAILE:  Senate District 5 and Senate District 11,

3    and they're in a similar scenario.

4         I would like to address the racial gerrymandering

5    claim, because there's a lot of confusion about what the

6    standard is.  There are two steps in a racial gerrymandering

7    claim, both of fact intensive.  The first step the question is

8    whether race was the predominant factor in the creation of a

9    given district line.  That is a district specific analysis,

10   and the one case that I'm aware of that went -- where a

11   plaintiff won summary judgment on the issue was unanimously

12   reversed in the Supreme Court.  That's Cromartie, Cromartie

13   one, so that's a fact intensive question, and the question is

14   whether the racial goal predominated over other goals and it

15   is necessarily a weighing of the many factors.

16        We have in our summary judgment motion restricted our

17   argument to one legal issue which is that the plaintiffs have

18   actually stipulated that political goals predominated over

19   racial goals.  That is at joint --

20        JUDGE KETHLEDGE:  If I can just ask you again about

21   kind of -- as I had Mr. Bursch about the standard itself here.

22   I mean, you say did the racial goal predominate, and so that,

23   I think, implies that there was an active intention to have

24   some effect on race -- on, you know, voters of a certain race.

25        MR. RAILE:  It is an intent to -- it is a racial

1     intent, intent to use race.  It doesn't necessarily have to be

2     an adverse intent.  It's just a racial intent.  So it --

3            JUDGE KETHLEDGE:  Intent as -- for what?  Intent to

4     have what happen?

5            MR. RAILE:  To place a large number of voters within

6     or without a given district on the basis of race.

7            JUDGE KETHLEDGE:  Okay.

8            MR. RAILE:  And that's Miller against Johnson.

9            JUDGE KETHLEDGE:  That's helpful.

10            MR. RAILE:  I think this discussion has been confused

11    with what we call a vote delusion claim under the Fifteenth

12    Amendment where there is an intent to dilute votes.

13    Plaintiffs have not brought that type of case.  It is not what

14    we're litigating here.  The question is whether the racial

15    goal predominates over other reasons that voters are getting

16    moved around, like communities of interest, like politics,

17    like compactness, like other constitutional criteria; which

18    one in each district had the overriding affect on the lines of

19    that specific district.  It's district by district and the

20    courts that do this walk through each one in findings of fact

21    with a bold heading that says, district 12, district 14, and

22    they talk about the evidence as to that district.

23            Plaintiffs in this case have answered a request to

24    admit stating that the Commission's overriding goal was

25    political.  It wanted to draw districts out of Detroit so that

1    there could be a fairer state-wide partisan vote share

2    pursuant to the Michigan constitution's partisan fairness

3    requirement.  Our position on this for our summary judgment

4    motion is simply that this admission that politics

5    predominated precludes them from arguing at trial that race

6    predominated.  Cromartie two is the legal argument on that.  I

7    have lots to say about predominance but it's more in the

8    defensive posture.

9         JUDGE KETHLEDGE:  I think -- I mean, we do understand

10   your argument about the admission, but I think we're going to

11   want to talk more about this issue than that.  I mean, you

12   said under Miller an intent to place a large number of voters

13   in a certain district based on race --

14        MR. RAILE:  Yes.

15        JUDGE KETHLEDGE:  -- is the forbidden intent.

16        MR. RAILE:  It is the intent that triggers strict

17   scrutiny.  It shows predominance.

18        JUDGE KETHLEDGE:  It's what shows predominance, and

19   I'm just wondering why isn't that satisfied hypothetically in

20   a district where the Commission or a similar body says, we

21   don't want to have more than, say, 40 percent black voter

22   population in any district because we're kind of -- period.

23   We'll stop right there, you know, which is what I think that

24   chairperson said was happening.

25        MR. RAILE:  So, first off, there's two problems with

1    this.  First is that it didn't actually happen.  Most of the

2    districts they're challenging went above that.  In the case

3    called Shaw two, which is Shaw against Hunt, the Court said --

4    the Supreme Court said that race has to be the one criterion

5    that could not be compromised.  If their allegation is that

6    there was a 40 percent cap and the cap was routinely

7    compromised, race did not predominant.

8           JUDGE KETHLEDGE:  Let's forget about that and just my

9    hypo, somebody said that and they meant it.

10          MR. RAILE:  If they actually applied it to the

11   district lines you would have to look at the qualitative

12   effect that the cap had on the district lines, and here's why.

13   Some quotas, as my friend Mr. Bursch called them, will have an

14   outsized effect on the movement of people and some were not.

15   Suppose, for example, that I have a district that I'm

16   configuring and it's at 65 percent BVAP and I say, I will have

17   a quota that it will not go below 40 percent BVAP.  That is

18   not a very constraining goal.  I don't have to think about it

19   that much.  I don't have to move very many people on that

20   basis, and I can go about with my other criteria and the

21   racial goal does not predominate.  The case on this is called

22   Bethune-Hill versus the Virginia State Board of Elections --

23          JUDGE KETHLEDGE:  I understand what you're saying.

24          MR. RAILE:  -- and in that case there was a

25   55 percent black voting age population floor.  That was found

1     as fact at trial to have been applied and met in every

2     district, unlike in this case where we haven't had a trial and

3     no quota has been found to exist and no quota could be found

4     to have been met.  In that case the Supreme Court entertained

5     the argument by the plaintiffs' lawyers in that case that is

6     exactly what Mr. Bursch said here.

7          JUDGE KETHLEDGE:  That was a floor and here's a cap

8     and I can see a difference between those two as to the success

9     of black preferred candidates.

10         MR. RAILE:  That would go to the narrow tailoring

11    analysis but --

12         JUDGE KETHLEDGE:  Well, not necessarily.  We're just

13    talking about the predominance requirement, and if they

14    have -- if they're trying to limit the percentage of black

15    voters in districts to a certain number, and to your point

16    earlier, which is an excellent point, and this limit is

17    actually affecting where they draw the lines, it's just not

18    something that didn't matter in the end, then isn't that

19    predominance, even if they're just trying to get more

20    candidates of one party or another elected?

21         MR. RAILE:  If you have evidence of all of those

22    things and rate that evidence.

23         JUDGE KETHLEDGE:  Just in that hypo.

24         MR. RAILE:  I think it could be.

25         JUDGE KETHLEDGE:  Well, why wouldn't it be?  Why

1    isn't it, period?  It's just a hypo.  I'm not saying, oh, now

2    I got you.

3            MR. RAILE:  Yes.  If that was the predominant goal

4    and it were a cap, it could be.  I'm not arguing that a cap

5    can't predominate.  That's not what we argued in this case.

6    What we're saying is this is an intensely fact intensive

7    question because you have to figure out just how constraining

8    it was.

9            JUDGE KETHLEDGE:  Let's say it was constraining.

10   Let's say they started with some lines and they said, you

11   know, we need to get it down to 40 percent, or whatever it

12   might be, and they changed the lines, so the cap does dictate

13   the lines in the end, that would seem to satisfy the standard

14   that you met.

15           MR. RAILE:  Yes.

16           JUDGE KETHLEDGE:  I'm not saying the facts align with

17   this here.  I'm just trying to understand the law.

18           MR. RAILE:  I think Your Honor has accurately

19   described the law.

20           JUDGE KETHLEDGE:  I appreciate the straight answer.

21           MR. RAILE:  The plaintiffs have not even mentioned --

22   if you read the predominant section of their brief they

23   haven't even mentioned a district, not any district, what was

24   the cap, how constraining was it, what traditional principles

25   were --

1          JUDGE KETHLEDGE:  I know.  That's not our case.  It's

2     always -- it's okay.  That's fine.

3          MR. RAILE:  Yeah.  And that's why they're very far

4     from summary judgment on that, and I think, frankly, their

5     showing across three briefs have been so weak under that

6     standard that the Court would be entitled to enter summary

7     judgment for the Commission on that basis because they lack

8     anything like the evidence that they need.

9          JUDGE KETHLEDGE:  What about Mr. Bursch's argument

10    that a disparate effect on minority voters can establish

11    predominance?  I mean --

12         MR. RAILE:  That's not right.  I think he may have

13    been conflating the Section 2 standard, which is completely

14    different where he's correct, as to Section 2 of the Voting

15    Rights Act a discriminatory effect on its own without intent

16    can establish a claim.  For a racial gerrymandering claim,

17    this is an equal protection claim, it's all about legislative

18    intent.  The effect is not the inquiry.  It is the intent.

19         That does lead me to the narrow tailoring argument

20    which I'm going to do as quickly as I can because I've already

21    gone 25 minutes.  The basic issue with narrow tailoring is

22    that the Commission hired an expert, looked at voting

23    patterns, concluded that there was a risk of Voting Rights Act

24    liability in the general elections in the area.  And I want to

25    repeat that very clearly.  It's the general elections

1    principally that Doctor Handley is concerned about, and you

2    can see this at joint appendix 30 through 31.  My friend Mr.

3    Bursch says that our own findings somehow undermine our claim

4    under the Voting Rights Act, but he's conflating general and

5    primary elections.  The Commission has to be concerned about a

6    Section 2 challenge to either the general election system or

7    the primary election system.  Doctor Handley identified that

8    problem at joint appendix 30 through 31 looking at general

9    elections.

10          The question, then, when you have to use race because

11   of the Voting Rights Act, you have to consider these issues,

12   the question becomes how do you use race?  The problem that

13   many legislatures had last decade and resulted in more than 50

14   districts being struck down throughout the United States was

15   that they picked a number like 50 or 55 percent and applied it

16   across districts without a functional analysis of district

17   performance.  That, the Supreme Court said in Cooper versus

18   Harris, is not narrow tailoring.  Narrow tailoring has to look

19   at what's the actual performance.

20          The strong basis in evidence for us is at joint

21   appendix 42 through 49 where Doctor Handley performs a

22   sophisticated algebraic calculation to do exactly the

23   functional analysis commanded in Cooper versus Harris.  That's

24   the strong basis in evidence.

25          It is also true that Doctor Handley looked at primary

1    elections.  The primary elections were less informative

2    because they were inconclusive.  The Court can see this at

3    joint appendix 32 through 37.

4         JUDGE KETHLEDGE:  She said she didn't really have

5    data on those.

6         MR. RAILE:  That's at joint appendix 48 where she

7    says it's inconclusive, there's not enough data.  At 32

8    through 37 she shows what she has, and it shows that in most

9    cases voting is not polarized.  There's not legally

10   significant bloc voting in the vast majority of cases.  So

11   that on its own doesn't tell the Commission much about what to

12   do with race.  It's really the general elections that are

13   driving it.

14        Doctor Handley did her best at joint appendix 49

15   through 50 where she did a crude analysis that does include

16   primaries and does show that the black preferred candidates

17   are able to win in districts even as low as 26 percent BVAP.

18   She -- yes, Your Honor.

19        JUDGE KETHLEDGE:  On page 48 she says, as the

20   percentage -- I'm quoting her.  It's the end of the second

21   full paragraph.  As the percentage black VAP of proposed

22   districts decreases, which is what happened under this plan,

23   it may become more challenging for black preferred candidates

24   to win not only the general election but the Democratic

25   primary but only if voting in Democratic primaries is racially

1    polarized.  That all sounds straightforward.  Unfortunately,

2    it is not possible to ascertain exactly how much more

3    difficult it would be or even if it would be more difficult

4    given the lack of primary -- Democratic primary election data,

5    and I guess when I read that I thought, so are we just taking

6    a flyer with this plan here, or is it ultimately, you know, do

7    we just sort of, you know, put our faith in pages 49 through

8    55 or whatever?

9          MR. RAILE:  What you do is you put your faith in the

10   earlier pages that I cited where she looks at the general

11   elections, because that's where the issue is.  The problem --

12         JUDGE KETHLEDGE:  How is that where the issue is?  In

13   what sense?

14         MR. RAILE:  Because that's where polarized voting was

15   shown.  In the last sentence that you read, but only if voting

16   in Democratic primaries is racially polarized.  If you don't

17   know that voting in Democratic primaries is racially polarized

18   then you don't have a strong basis in evidence to do anything

19   with race.

20         That was the problem in Virginia.  11 districts were

21   struck down as racial gerrymandering.  There wasn't Democratic

22   primary election data available except in HD 75.  That

23   district was actually upheld by the Supreme Court under the

24   narrow tailoring analysis because there was a functional

25   analysis as to District 75, but on remand the lower court said

1    you applied the 55 percent floor to districts that were

2    different, in different areas and even the neighbor districts

3    and struck down all of those as not being narrowly tailored.

4    This inconclusive statement tells us under the equal

5    protection standard that there's little to be done.  I agree.

6            JUDGE KETHLEDGE:  Yeah.  I get your point there.  I

7    was thinking back more about VRA, frankly, when I made that

8    remark.

9            MR. RAILE:  Yes.  It shows you how weak their VRA

10   claim is because they staked everything on the primaries, and

11   by the way, just --

12           JUDGE KETHLEDGE:  Well, I mean -- okay.  I will say,

13   you know, without having gone through all the data and so on,

14   it doesn't strike me as a fantastic proposition that there

15   would be white bloc voting in these districts.  That doesn't

16   seem pretty farfetched and --

17           MR. RAILE:  Correct.

18           JUDGE KETHLEDGE:  -- low and behold we do have some

19   results that seem to bear that out.

20           MR. RAILE:  Same is true in North Carolina, and the

21   Supreme Court struck down the majority-minority districts as a

22   racial gerrymander.  The question isn't whether there's white

23   voting preferences for a white preferred candidate.  There can

24   be support -- majority support for a candidate, but if there's

25   enough white crossover voting for the black candidate, the

1    district can still perform.

2         JUDGE KETHLEDGE:  Correct.

3         MR. RAILE:  And in Cooper versus Harris the Court

4    looked at general election data involving an incumbent,

5    Representative Butterfield, who had been sitting in that seat

6    since 2004 and said Representative Butterfield can win this

7    district.  There isn't a strong basis in evidence for a

8    majority-minority district.  We're striking it down.

9         In this case the Commission did the only thing that

10   was available, looked at the data it had.  This is as good as

11   it gets.  If Cooper versus Harris gets struck down when they

12   draw 50 percent districts on the same facts and these

13   districts get struck down, there's no way to redistrict.

14   There's nothing the Commission could have done better than

15   this.

16        JUDGE KETHLEDGE:  One thing I would say is sometimes

17   the Commission might need to worry about general elections and

18   sometimes they don't.  I mean, there are some districts that

19   are, you know, dark red, or whatever the phrase is, or dark

20   blue, and you win the primary and you've won the general and

21   everybody knows it and so there are some districts where this

22   business about the general is just utterly irrelevant and the

23   whole shooting match is in the primary, and if we're taking

24   the majority -- if we're going -- I mean, it is remarkable.

25   In the City of Detroit with, you know, 77 percent African

1    American population and not one single Senate district with a

2    majority black electorate?  You kind of have to go out of your

3    way to do that.

4         MR. RAILE:  The Court may find that based on the

5    evidence at trial.  We're very far from a finding like that,

6    and as far as narrow tailoring goes, this right here shows in

7    the general elections -- I've got the chart, joint appendix

8    31, Doctor Handley's finding, polarization in the general

9    elections.  That's why you play the game.  It's certainly true

10   that in some cases it wouldn't be a problem.  The Commission

11   has to be concerned when it's drawing the map about every type

12   of VRA claim that can be brought, not just the plaintiffs'

13   claim in this case.

14        I've gone for 35 minutes and I would like to reserve

15   some time for more rebuttal.

16        JUDGE MALONEY:  Thank you.  Mr. Bursch, response to

17   the defendants' motion.

18        MR. BURSCH:  First I want to clean up two items that

19   I left from the opening presentation.  First, Judge Kethledge,

20   House District 2, you could easily take the black population

21   that was there and bump it up into House District 1 which is

22   at 38 percent BVAP.  That's at page -- joint appendix 324, and

23   I'll show you the map where you can see the little bit that's

24   been fractured off.

25        JUDGE KETHLEDGE:  Does Mr. Trende say -- is this part

1    of what he did --

2        MR. BURSCH:  It's on the map but he doesn't discuss

3    it in his report.

4        JUDGE KETHLEDGE:  Doesn't that -- okay, it's on the

5    map.

6        MR. BURSCH:  It's on the map.  You can visually see

7    it on that page 324 of the appendix.  It's the bottom

8    illustration.  And then my friend Mr. Raile mentioned Senate

9    District 5 and 11.  Senate District 5 was part of a black

10   majority-minority district in the 2011 Senate plan.  That's in

11   our response brief pages 12 to 14.  And then Senate District

12   11, Trende did address that directly, and that's at 389 to 90

13   of the joint appendix, so that's all I had to say about

14   Gingles one.

15       JUDGE KETHLEDGE:  It's kind of an initial matter

16   stuff, you haven't addressed the jurisdictional issues.

17   There's no way your current plaintiff or HD whatever it is,

18   the person -- Mr. Black who moved.

19       MR. BURSCH:  Yes.

20       JUDGE KETHLEDGE:  There's no way he has standing

21   right now.  TransUnion all day long.

22       MR. BURSCH:  We're not going to contest that.

23       JUDGE KETHLEDGE:  Okay.  And so that district is out,

24   right?

25       MR. BURSCH:  It is.

1          JUDGE KETHLEDGE:  Okay.  I appreciate that straight

2     answer.

3          MR. BURSCH:  Yeah.

4          JUDGE KETHLEDGE:  And as to the -- I guess there's --

5     I mean, for the Michigan Supreme Court decision that we have

6     here --

7          MR. BURSCH:  Yes.  We do not concede that.

8          JUDGE KETHLEDGE:  You do not concede that?

9          MR. BURSCH:  We do not.

10         JUDGE KETHLEDGE:  So that's one House district and

11    one Senate district, right?

12         MR. BURSCH:  Correct.

13         JUDGE KETHLEDGE:  It sure reads like they said the

14    plaintiffs have not presented sufficient allegations or proof

15    or something.  It sounds like a merits decision on their part.

16    You criticize the process, but we have to respect their merits

17    decisions, and I'm still struggling to see how that's not a

18    merits decision that follows this.

19         JUDGE MALONEY:  Following up on that, didn't the

20    plaintiff make a concession that they didn't want to provide

21    any further evidence that was before the Supreme Court?

22         MR. BURSCH:  That was disputed.  There's a question

23    whether he meant that concession the way that the majority

24    interpreted it, and then later he kind of went back on that,

25    but that's not where we're resting our argument.

1          Judge Kethledge, if there had been a legal analysis

2     of the VRA claims then I think that we would be dead in the

3     water, but they don't do that.  All they do is they say

4     dismissed, and the Michigan Supreme Court, as we lay out in

5     our response brief, has a mechanism for simply not taking

6     cases within its original jurisdiction in its discretion, and

7     this looks very much like one of those cases.  The dissent

8     says, look, there's no substantive analysis in the majority

9     opinion at all.  The majority doesn't disagree with that, and

10     the key point for res judicata purposes is this Court can't do

11     something that would be in conflict with their analysis, and

12     if you adopt what we're saying here, either on summary

13     judgment or at trial, there would be no conflict between

14     anything that you say and a single word of that opinion

15     because it is that lacking in merits analysis.  The Supreme

16     Court has said that when that happens, that's not subject to

17     res judicata.

18          JUDGE KETHLEDGE:  How about collateral estoppel in

19     the sense that one could have brought a claim and didn't or

20     made an argument?

21          MR. BURSCH:  If the claim that she brought was

22     rejected on a discretionary basis, which I think is the best

23     fit -- if you -- in our response brief we have the whole --

24          JUDGE KETHLEDGE:  Yeah.

25          MR. BURSCH:  They could dismiss it.  If that's the

1    best fit, which I think it is, then that wouldn't come into

2    play because it's as if the case never existed.  It was just a

3    discretionary denial.

4        JUDGE KETHLEDGE:  I understand your argument.  I'll

5    let you get on to whatever you want.

6        MR. BURSCH:  Another big housekeeping matter.  On

7    page 36 we talk about the Supreme Court case -- and I should

8    have remembered this --Shaw v Hunt, Shaw v Reno.  Shaw v Hunt

9    says racially gerrymandered district maps are constitutionally

10   suspect whether or not the reason for the racial

11   classification is benign or the purpose remedial, and then

12   Shaw v Reno and Cooper v Harris make some of those similar

13   points.  The thing is under the Equal Protection Clause the

14   black voters are protected against the use of racial quotas

15   whether or not they were intentionally trying to hurt black

16   voters.

17        Now, a couple rebuttal points.  This idea that

18   somehow our best case scenarios in that chart that I presented

19   end up four to four, well, he focuses on races where the

20   candidate of choice was not black or you had a black

21   incumbent, and the courts have said consistently, including

22   the Sixth Circuit in Sundquist, that those aren't as probative

23   as the other cases, and while at a summary judgment stage this

24   Court isn't slicing and dicing facts and, you know, weighing

25   credibility and things like that, you do have the ability to

1    decide what facts are material, and so if you've got a race

2    where a nonblack candidate wins, you can say that's far less

3    material to a finding -- with respect to white crossover

4    voting than what they're talking about, and then when he says,

5    you know, four, four, so, you know, if you diminish those our

6    percentage is much higher, but even the case that he says

7    supports our proposition, not theirs.  In the Cincinnati --

8    Clark versus Cincinnati case, that was a city council case,

9    and originally they had a proportional representation rubric

10   for elections and they changed it to one where you could

11   select the top nine candidates of your choice, and after

12   the -- they went through that the black candidates fared more

13   poorly, and two of the key stats were that 74 percent of the

14   black -- of the black candidates of choice prevailed overall

15   but when you focused only on the black candidates it was that

16   47 percent, and the Sixth Circuit corrected the district court

17   which looked only at the 74 percent number and instead

18   analyzed the 47 percent number, the black candidates of

19   choice, not any candidates that black voters might prefer, and

20   if you do that here then it's not 50 percent, then it's a much

21   better number for us, and if you're doing a

22   district-by-district analysis, you know, this still doesn't

23   take away from the fact that we're entitled to summary

24   judgment on SD 1, 8, and House District 8, 11, and 26.

25           JUDGE KETHLEDGE:  What would you say in response to

1    Mr. Raile's argument that one election here isn't enough for

2    summary judgment and that, you know, for some of these there

3    were idiosyncractic reasons, like some video that went viral?

4    It's kind of a big ask to say, okay, one election, SJ, case

5    over as to that.

6          MR. BURSCH:  I think a bigger ask to hypothesize

7    about a video that went viral when you're talking about 95 to

8    five and 90 to 10 white crossover voting numbers in district

9    after district after district.  That's simply not a material

10   dispute of fact.

11         JUDGE KETHLEDGE:  How about the fact that it's just

12   one election?

13         MR. BURSCH:  So I wanted to go back to another

14   cleanup point.  Page 8 of our reply brief.  This is where we

15   go out and -- go back and look at some of the older elections.

16   They don't do this.  I mean, their briefing relies almost

17   entirely on 2022 primary data, but when Mr. Trende goes back

18   and looks at the previous elections -- this on, again,

19   page eight of our reply -- the 2014 Senate primary, the vote

20   -- the black candidate vote shares tended to mirror the BVAP

21   of district.  Again, 2018 Senate primary showed racial

22   polarization among the same order of magnitude as the

23   disastrous 2022 primary elections.  So, what does that mean?

24   It means if you take BVAPs that are consistently in the 60 or

25   higher and you reduce those to 47 percent or below and black

1    candidates are going to have overall numbers that mirror those

2    of the BVAP, more of them are going to lose, and that's

3    exactly what happened in 2022 so we don't need to stake our

4    flag in the ground on 2022.  All 2022 does is prove what they

5    saw in 2018 and 2014 were not aberrations.  This is a

6    consistent pattern of data.

7            And I also want to respond to Mr. Raile's point that

8    somehow the general elections are the most probative here.

9    Every single expert in this case agrees that the primaries are

10   what matter because all of the black and white voters in this

11   area vote for Democrats in the general.

12           JUDGE MALONEY:  How many Republicans won the general

13   elections in the contested districts?

14           MR. BURSCH:  Zero.  It was 27 out of 27 Democrats who

15   prevailed.  It is a joke to say we should be looking at the

16   general election.  We have case law on that, too.  The Pope,

17   Galvin, and Baldus cases all make that point, pages 19 to 20

18   of our opening brief.

19           He also said there's no evidence of black cohesion.

20   Well, not only is that completely belied by the data, they

21   admit that there is black cohesion or otherwise they wouldn't

22   have been able to consider race at all.  No black cohesion, no

23   worries about VRA, then we don't worry about anybody's race,

24   we just move forward and draw lines in the ordinary way.

25           JUDGE KETHLEDGE:  I think Mr. Raile was talking about

1    some specific districts when he said that.  Maybe SD 1.  I

2    mean, he was -- you know, he wouldn't -- he was talking about

3    so the districts --

4         MR. BURSCH:  And when he's talking about those

5    districts typically it's because there are multiple black

6    candidates and you don't have all the black voters aligning

7    behind one person, but whether you look at the districts I've

8    highlighted or you look at the districts across the board,

9    black voters generally almost overwhelmingly support black

10   candidates in this area in the same way that the white voters

11   do, and that's exactly what Doctor Handley concluded.  They're

12   kind of caught between a rock and a hard place on this point

13   because if there is no black cohesion and there is no white

14   cohesion then there are no VRA concerns and they should not

15   have considered race at all in drawing these maps, which they

16   clearly did.  If they admit there's black cohesion and they

17   admit there is white cohesion then they have got a Section 2

18   problem for the very reasons that we've stated, so the fact

19   that you've got the VRA Section 2 claim here and the equal

20   protection claim here, they can't have it both ways.  Either

21   they're cohesive or they're not, and either way we're entitled

22   to summary judgment.

23        JUDGE MALONEY:  One minute, Mr. Bursch.

24        MR. BURSCH:  I will save that for rebuttal.

25        JUDGE MALONEY:  Okay.  Two of us are considering

1    giving both sides more time for their last argument but I

2    haven't consulted with Judge Kethledge yet.

3              JUDGE KETHLEDGE:  You're in charge, sir.

4              JUDGE MALONEY:  Go ahead, Mr. Raile.

5              MR. RAILE:  Let me start where Mr. Bursch just ended

6    because he's not accurately addressing my -- the nuance of my

7    argument about both primary and general elections.

8              JUDGE MALONEY:  What impact does a general election

9    have on this analysis when the Democratic candidate wins and

10   the likelihood that the preferred African American candidate

11   is going to be the Democratic?  I'm having trouble

12   understanding the argument.  Go ahead.

13             MR. RAILE:  As to the vote -- the problem is they're

14   conflating our narrow tailoring argument with our Voting

15   Rights Act argument.  Under the Voting Rights Act for their

16   claim where they have the burden to establish Voting Rights

17   Act claims we are playing on the Democratic primary playing

18   field.  We are not relying on general elections much.  We have

19   made the argument that they are relevant.  It's a very small

20   part of our defense, and Judge Kethledge was right, we have

21   challenged black cohesion as to the districts where the data

22   does not support it, and I've already listed those in the

23   record.

24             Mr. Bursch has this argument that says we can't

25   defend the VRA claim and the narrow tailoring section of the

1    equal protection claim at the same time, and that's just

2    wrong.  First of all, it's wrong because we actually drew

3    districts to be performing districts.  Second, it's wrong

4    because the Commission has to be concerned about all the types

5    of claims that might be brought.  Judge Luttig in Lewis versus

6    Lexington County (sic) in -- I forget if it was 1995 or 1996

7    -- explained how the general elections and the primary

8    elections work.  A plaintiff --

9            JUDGE KETHLEDGE:  Can I interrupt you for a second?

10   And it's kind of the same question that Judge Maloney just

11   asked.  In districts where everyone knows the Democratic

12   candidate is going to win in the general, what VRA -- and so

13   the black preferred candidate in the general election is going

14   to win, everybody knows that, 27 out of 27 times, so what

15   relevance --

16           MR. RAILE:  In the --

17           JUDGE KETHLEDGE:  Let me finish.  What relevance does

18   a worry about the general election have to complying with the

19   VRA?

20           MR. RAILE:  Because Doctor Handley looked at the

21   analysis -- look at pages 34 -- and found polarization in

22   those elections.

23           JUDGE KETHLEDGE:  So what?  I mean, that's --

24           MR. RAILE:  Because if --

25           JUDGE KETHLEDGE:  That matters in the primary not in

1 the general.

2    MR. RAILE:  It does matter in the general because if

3 the black preferred candidate loses the general there's also a

4 Voting Rights Act violation.  That's the --

5    JUDGE KETHLEDGE:  Right.  I'm not trying to give you

6 a hard time, but -- so hypothetically we have a district that

7 has 95 percent of the registered voters are Democratic voters,

8 okay?

9    MR. RAILE:  If it's already drawn, sure.  But Doctor

10 Handley did her analysis before they were districts.  She's

11 looking at the counties.  She's looking at Wayne County.

12 She's looking at Oakland County --

13    JUDGE KETHLEDGE:  My point is -- I mean, you -- they

14 want majority -- they want to have some majority black

15 districts and more of them than there are now.  You're saying,

16 well, we need to be concerned about general election outcomes

17 and make sure the black preferred candidate's not going to

18 lose the general, right?

19    MR. RAILE:  The evidence supports that.

20    JUDGE KETHLEDGE:  That's what you're saying?

21    MR. RAILE:  You also have to be concerned with the

22 primary.  They were --

23    JUDGE KETHLEDGE:  If we're talking about the City of

24 Detroit and let's say Senate districts, okay, where there's

25 zero majority black districts right now, can we agree on this,

1    the Commission would have nothing to worry about with respect

2    to the success of black preferred candidates in the general

3    election in Senate districts in the City of Detroit that had a

4    majority -- if they granted a couple majority black voter

5    districts?

6              MR. RAILE:  They might if they're packed.  In other

7    words, you could be concentrating the black vote into a few

8    districts and diluting their vote in neighboring districts so

9    that a plaintiff could come in and show more opportunity

10   districts than you created.

11             JUDGE KETHLEDGE:  Okay.

12             MR. RAILE:  There's that possibility there.

13             JUDGE KETHLEDGE:  I understand that argument.

14             MR. RAILE:  You can go in both directions.  I'm

15   talking about the narrow tailoring.  The Commission has to be

16   worried not just about their suit but everyone's suit, so

17   they've got to be concerned about going too high and too low

18   based on the available data.  They did look at primaries.

19   They examined all of the primaries that there were, but the

20   primaries just didn't provide the same level of direction as

21   to really guide it.  To be clear, Doctor Handley did at pages,

22   I believe it's 48 and 49 -- I've already read it into the

23   record -- do the analysis with primaries and did the best she

24   could and demonstrated that as to the primaries the answer was

25   not different.  A 35 percent black voting age population

1    district in Detroit performs in the primaries.  That was borne

2    out in this past election.  Mr. Bursch says the --

3              JUDGE KETHLEDGE:  Not in some districts, though.  I

4    mean, Senate District 8 it didn't work out that way.  It's

5    40 percent BVAP, and I know you have, you know, reasons why --

6    I mean, --  but at least as, you know, for judgment -- well,

7    you're not asking for SJ, but I'm just expressing a general

8    skepticism that it has worked out in the manner you're

9    describing.

10             MR. RAILE:  In three races.  That's it.  There's only

11   three districts that didn't perform.  All of the others did.

12   And the plaintiffs' own demonstrative shows that.  Mr. Bursch

13   says that only a black black preferred candidate counts.

14   That's wrong.  Footnote one of the Clark versus Cincinnati

15   rejected that argument.  The Court said that a white candidate

16   or candidate of another race can be the black preferred

17   candidate.  They look at races where -- -

18             JUDGE KETHLEDGE:  That is true, but doesn't he have a

19   point, at least intuitively, that a white candidate who is

20   also the black preferred candidate might get more white votes

21   than a black candidate who's the black preferred candidate

22   would get from those same voters?

23             MR. RAILE:  That's true.  But if the black voters

24   prefer that candidate, that's the black voters' choice.

25             JUDGE KETHLEDGE:  I get it.  I get it.

1      MR. RAILE:  So it's not legally relevant.  What the

2   plaintiffs are saying is --

3      JUDGE KETHLEDGE:  Well, it's probative that people

4   vote along racial lines to some extent.

5      MR. RAILE:  It's probative that they don't.

6      JUDGE KETHLEDGE:  That whites do.  It doesn't

7   refute -- it really doesn't tell us anything about whether

8   whites will vote for a black candidate.

9      MR. RAILE:  But it does tell us that --

10      JUDGE KETHLEDGE:  I think that's kind of the --

11      MR. RAILE:  -- they will vote for the same candidate

12   and there are districts where that occurs and this is why --

13      JUDGE KETHLEDGE:  Hopefully, sure.

14      MR. RAILE:  No.  There are.  I mean, I have a list

15   of -- I lost my list, but I have a list of districts where

16   black preferred candidates won, but keep in mind, Mr. Bursch

17   cited case law where there's two white candidates and courts

18   have said when there's two white candidates the black vote for

19   one of the white candidates isn't that probative.  That's not

20   what we're talking about here.  We're talking about races

21   where there's a black candidate in the race and the black vote

22   isn't going for that candidate.  They have a racial choice.

23   They have the opportunity to vote along racial lines.  There's

24   the possibility of polarization, and they're not voting in a

25   polarized way.

1          JUDGE KETHLEDGE:  My question -- I'm not trying to

2     give you a hard time.  Which one are --

3          MR. RAILE:  Senate District 7, one district that --

4          JUDGE KETHLEDGE:  Okay.  Senate 7?

5          MR. RAILE:  Senate District 3, 76 percent of the

6     black vote went to Asian candidate Stephanie Chang --

7          JUDGE KETHLEDGE:  Okay.

8          MR. RAILE:  -- not the black candidate, Toinu Reeves.

9     In Senate District 6 Mary Cavanagh was 48 percent of the black

10    vote.  She's Hispanic.  She beats Darryl Brown.  He's a black

11    candidate.  The black vote chose the Hispanic.  The plaintiffs

12    are saying the Court should disagree with those votes even

13    though the voters, the black voters had a different preferred

14    candidate.  That's not what the Voting Rights Act does.  It

15    would be different if we were putting up white on white races,

16    but we're not.  We're looking at African American races.

17         Mr. Bursch also said -- he pointed to page eight of

18    his reply brief -- I know I'm about to run out of time.  He

19    says that page eight has all this evidence of polarized voting

20    in the past.  It's not true.  Most of the cases he's citing --

21    and Doctor Handley has this at joint appendix nine, these are

22    all the races.  In 2014 there's not a single Democratic

23    primary, not one, where both Gingles two and three are met.

24    Zero.  In 2016, not a single Democratic primary where both

25    Gingles two and three are met.  2020, not a single Democratic

1    primary where Gingles two and three are met.

2          JUDGE KETHLEDGE:  What page is that?

3          MR. RAILE:  This is joint appendix page nine.  Mr.

4    Bursch says that in the 26 open house primaries black

5    candidates loss four of six races.  That's not true.  Joint

6    appendix 348, the cite he gives refutes that, so does joint

7    appendix nine.  These statements are not true.  In all of

8    these races --

9          JUDGE MALONEY:  One minute, Mr. Raile.

10         MR. RAILE:  -- there are 40.  There's only two

11   elections over the course of four years where Gingles two and

12   three are both met.  That's the Democratic primaries.  That's

13   not a compelling voting rights claim.  It's certainly not one

14   that would be amendable to judgment as a matter of law.

15         JUDGE KETHLEDGE:  If we reject your argument of Perez

16   as to Gingles one and say you just have to put that plaintiff

17   in a district that has a majority of black voters, does

18   that -- at that point -- if we did that, would you concede

19   that they've met Gingles one as to some of these districts?

20         MR. RAILE:  No.  None.

21         JUDGE KETHLEDGE:  Really, none?

22         MR. RAILE:  Because we --

23         JUDGE MALONEY:  Isn't Abbott distinguishable?

24         MR. RAILE:  I'm not relying on Abbott per Judge

25   Kethledge's hypothetical because the reasonably configured

1    requirement requires an assessment of whether the districts

2    follow the redistricting criteria that govern the

3    redistricting authority.  We've created a material fact

4    dispute on that in the E declaration.

5         JUDGE KETHLEDGE:  You think they could do that with

6    Senate districts in Detroit?  You don't think that you could

7    have a reasonably configured district in Detroit that has a

8    majority of black voters in a city with 77 percent black

9    voting population generally?

10        MR. RAILE:  They haven't proven you can do five, and

11   we're entitled to try that question --

12        JUDGE KETHLEDGE:  Okay.

13        MR. RAILE:  -- to find Gingles --

14        JUDGE KETHLEDGE:  If there's a trial it's going to be

15   a long trial if we're having to try stuff like that.

16        MR. RAILE:  These cases can be long.  Hill went to

17   trial twice each time for a week.  This is the standard fare

18   in these cases.  Plaintiffs have not cited anything remotely

19   supporting judgment as a matter of law in this.  LULAC, the

20   case that they cite, that was a trial case.  Every single

21   Supreme Court case that they've addressed -- Abbott v Perez,

22   that was a trial case.  These cases get tried.  That's how the

23   voting act cases work.  It's highly fact intensive.  The

24   reasonably configured standard is so.  We've created a

25   material fact dispute.

1        JUDGE MALONEY:  Because I'm such a nice guy I'm going

2    to give each side four minutes in addition to the time you've

3    already expired.  Go ahead, Mr. Bursch.

4        MR. BURSCH:  Is that five total?  My friend, Mr.

5    Raile, proves our point, you know, when he says the black

6    preferred candidates win, the black candidate of choice

7    sometimes when they're not black.  He points to Senate

8    District 3, 6 and 7.  In each one of those the incumbent --

9    I'm sorry, the person who won was a incumbent, and as we

10   explained at length in our brief, each one of those in the

11   previous election where they became the incumbent was not the

12   black candidate of choice, so he can't look at those districts

13   and say that somehow that shifts all the other data that we

14   have with respect to polarized voting.

15        And he's just wrong when he's talking about these

16   bullet points on page eight of our reply brief.  These are all

17   from the Trende report.  He's not saying that the black

18   candidates of choice didn't win.  He's saying the voting was

19   polarized and the data supports that.  I don't think there's

20   really any big controversy about that.  Otherwise, they

21   wouldn't be asserting that they have to take race into

22   consideration because the VRA wouldn't be here.

23        Two other points he says right at the end there.  He

24   says on Gingles one, Judge Kethledge -- I think you might have

25   cut him off, he said the Eid declaration, Mr. E-i-d, somehow

1    he creates a question of fact because he points to all of

2    these communities of interest that weren't honored in the

3    demonstration map that Mr. Trende did.  Well, as we point out

4    at length in our reply brief, all this stuff he says about

5    communities of interest doesn't appear anywhere in the

6    Commission record.  It's post hac reasoning that makes it

7    irrelevant to whether Gingles was satisfied.

8            In addition -- this kind of goes to Judge Neff's

9    point earlier about perfect being the enemy of the good -- the

10   Gingles one analysis isn't a beauty contest.  It's simply can

11   this be done, and it clearly can.

12           He also points to a couple of handful of cases, says

13   these are always resolved on trial.  Well, that's not true.

14   It is true that there aren't many summary judgment cases, and

15   that's because many, many of these cases are resolved on

16   preliminary injunction where the Court is simply asking is

17   there a likelihood of success on the merits.  We would point

18   to more summary judgment cases except in the ones that are

19   clear, like ours, they get resolved on preliminary injunction.

20   The map gets redrawn before the election and that's the end of

21   it.  There is no more case law.

22           I think it would be difficult for you or your clerks

23   or anyone else to go find another case that shows how black

24   voters have been more harmed in one election cycle as a result

25   of the redrawing of a map using 40 percent racial quotas than

1    this one, and we have past evidence of this so it's not just a

2    cycle, but --

3             JUDGE KETHLEDGE:  What about Mr. Raile's point that

4    you talk about 40 percent caps.  The districts have numbers

5    higher than 40 percent, some of these, many of them.

6             MR. BURSCH:  Sure.  Only because the percentage of

7    black voters in this area is so high that inevitably you're

8    going to have some, but we know from the mouths of the

9    commissioners that during this process there was a cram down.

10   There were commissioners who were trying to draw maps that

11   would have looked like the maps we had since the 1960s with

12   adequate majority-minority districts and the attorney forced

13   them to have lower numbers.

14             JUDGE KETHLEDGE:  You say commissioners plural.  Is

15   there anyone besides the chairperson?

16             MR. BURSCH:  I don't know that anybody disagrees with

17   that.  I would rely on the MSU report which they took a close

18   look at all these proceedings and reached the exact same

19   conclusion.  There's really not a debate about that other than

20   to say, oh, a couple districts were over 40 percent.

21             The last point I want to make --

22             JUDGE MALONEY:  One minute, Mr. Bursch.

23             MR. BURSCH:  Yes.  We have plenty of historical data

24   to back up the 2022 election results.  The Commission's

25   contention is the black voters, the plaintiffs who are in this

1   courtroom have to wait until their candidates lose again in

2   2024 and again in 2026 and maybe 2028 before we have

3   sufficient data to give them a remedy under the Voting Rights

4   Act and the Equal Protection Clause.  That is not what the law

5   says.  When the evidence of white polarized voting is as

6   overwhelming as it is here, particularly in the five districts

7   that I've identified, the appropriate thing is to give them a

8   remedy now, and if you grant summary judgment on those five

9   districts, the map is going to have to be we redrawn.  That's

10  certainly what should happen here.

11          JUDGE MALONEY:  Thank you, sir.  Four minutes, Mr.

12  Raile.

13          MR. RAILE:  Thank you, Your Honor.  Just a few

14  rebuttal points.  First of all, the plaintiffs are just

15  legally wrong about incumbency.  Clark versus Cincinnati also

16  addressed that issue and said that incumbency is not to be

17  regarded as a special circumstance that this counsel raised

18  unless a -- something unique about the incumbency is shown by

19  the plaintiff.

20          JUDGE KETHLEDGE:  I'm not trying to be flippant but

21  we're not bound by Sixth Circuit precedence in this case,

22  right?

23          MR. RAILE:  So I can give you what I consider to be a

24  technically sound answer to that.

25          JUDGE KETHLEDGE:  That would be a good answer.

1          MR. RAILE:  My technically sound answer is this is

2     the U.S. District Court for the Western District of Michigan

3     case and it's in the Sixth Circuit.  Now you're going to

4     respond and say the Sixth Circuit can't reverse us and the

5     Supreme Court is not bound by that so how could you ever

6     enforce that, and I'll say touche', Judge Kethledge.

7          JUDGE KETHLEDGE:  So we are where we thought we were.

8          JUDGE MALONEY:  We have two district judges on the

9     bench here and the Sixth Circuit can't reverse us?

10          JUDGE KETHLEDGE:  It would be fun for all of us.

11          JUDGE MALONEY:  Go ahead, Mr. Raile.  Go ahead.

12          MR. RAILE:  What I would say is that what it said on

13     this point is highly persuasive because incumbency is very

14     common.  And what the Court has said about that it said in

15     Cooper v Harris.  Recall, Cooper versus Harris fails every

16     single one of their tests.  It was one district, Congressional

17     District 1.  The Court looked at general elections.  They say

18     you shouldn't do that.  The Court looked to an incumbent,

19     Butterfield, a long-term incumbent, a highly powerful member

20     of Congress who had been there since 2004.  The gist of the

21     Court's opinion in Cooper versus Harris is Butterfield can win

22     the district, ratcheting up to 50 percent is not narrowly

23     tailored.  The crossover district we performed, it satisfied

24     the Voting Rights Act.  Incumbency is being overplayed

25     substantially by the plaintiffs in this case.

1          JUDGE KETHLEDGE:  If I can ask you a quick question,

2     and I don't mean to steal your time but, you know, we were all

3     here for the last case and those were federal lines and

4     community of interest just had total primacy in drawing those

5     lines, was my recollection, and we're spending a lot of time

6     on this case, and just to be candid with you, Mr. Raile, I

7     look at this and some of these districts and I wonder, you

8     know, what happened to community of interest as opposed to

9     just trying to do this partisan balancing?

10          MR. RAILE:  Well, we have evidence at this stage from

11     the E declaration district by district of what the communities

12     of interests were, that's point one.  Two, there is an

13     important partisan angle here as well.  The Commission cannot

14     hack the Detroit area districts, concentrate the Democratic

15     vote in Detroit --

16          JUDGE KETHLEDGE:  Sure.

17          MR. RAILE:  -- and it has to cross county lines.  The

18     E declaration says that.  It looks at the Trende plan and says

19     it doesn't cross county lines, I don't see how this could be

20     fair from a partisan point of view.  Those are important

21     considerations.  We have declarations of Commissioner Eid

22     saying these were as important in my mind as the Voting Rights

23     Act.  We don't deny that race was considered.  Whether it was

24     predominant is a fact question, and the plaintiffs don't have

25     even a single assertion about a single challenged district to

1    satisfy their burden on that.  At a minimum, the case is

2    triable.  I have no -- nothing further to say unless the Court

3    has further questions.

4           JUDGE NEFF:  I have a question, Mr. Raile.  If this

5    case does go to trial, what would a trial look like?

6           MR. RAILE:  Can you be more specific in what you're

7    referring to?

8           JUDGE NEFF:  Yeah.  I mean, what are we -- what can

9    we expect by way of evidence and testimony on either side?

10          MR. RAILE:  So what I would say from the defense side

11   is we have three expert witnesses.

12          JUDGE NEFF:  So is this a battle of the experts?  Is

13   that what it's going to come down to?

14          MR. RAILE:  I think that is probably the lion's share

15   of the case.  Usually that's how it works.  We do have lay

16   witnesses, and we certainly would look at calling

17   commissioners to testify about questions regarding intent.

18   I'm not in a position to tell you who that is today because

19   we --

20          JUDGE NEFF:  I don't need names.  I'm just curious.

21          MR. RAILE:  We can look at the summary judgment

22   record.  I'm sure the plaintiffs will call Professor Trende as

23   their expert witness.  They have a second expert, Doctor

24   Lockerbie, who would testify for them.  I believe they would

25   sponsor two lay witnesses, Lemmons and Smith, and we have some

1   quarrels with that but that would be dealt with at trial.  I

2   don't know who else they would call.

3          There might be an issue of standing.  We're not sure

4   where House District 13 is going to end up.  I shouldn't say

5   that, Mr. Bursch has actually told us where it will end up, it

6   will come out of the case so I'm not sure if there would be a

7   standing issue that would require plaintiffs to testify.

8   Sometimes you see lay witnesses.  We would have three expert

9   witnesses talking about all these issues, and we would get

10  into the issues that the Court has asked about today, why is

11  this election probative, why is it not probative, what does

12  this tell us, what does this not tell us.

13         JUDGE MALONEY:  District by district, right?

14         MR. RAILE:  And it would go district by district,

15  yes.  Does that answer your question?

16         JUDGE NEFF:  It does.  Chillingly.

17         JUDGE MALONEY:  We'll consider the motions

18  submitted --

19         MR. BURSCH:  From our perspective, I think most of

20  that is very accurate, but we would put all of our plaintiffs

21  on the stand, and they will tell you from decades of history

22  from living in Detroit that black voters vote cohesively,

23  white voters vote cohesively, white candidates don't come to

24  Detroit, and when black candidates go to Oakland County, the

25  police gets called.  That would be our testimony.

1          JUDGE MALONEY:  Thank you.  We'll get an order out as

2    soon as we can.  Thank you.

3          THE CLERK:  All rise, please.  Court is adjourned.

4          *(Whereupon, hearing concluded at 3:29 p.m.)*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        *REPORTER'S CERTIFICATE*

2

3            I, Genevieve A. Hamlin, Official Court Reporter

4    for the United States District Court for the Western District

5    of Michigan, appointed pursuant to the provisions of Title

6    28, United States Code, Section 753, do hereby certify that

7    the foregoing is a full, true and correct transcript of the

8    proceedings had in the within entitled and numbered cause on

9    the date hereinbefore set forth; and I do further certify

10   that the foregoing transcript has been prepared by me or

11   under my direction.

12

13

14                        /s/ Genevieve A. Hamlin

15                        Genevieve A. Hamlin.
                          CSR-3218, RMR, CRR
16                        U.S. District Court Reporter
                          110 Michigan Avenue NW
17                        Suite 601
                          Grand Rapids, MI 49503
18                        (517) 881-9582

19

20

21

22

23

24

25