UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| DONALD AGEE, JR., *et al.*, ) | |
| Plaintiffs, ) | |
| ) | No. 1:22-cv-272 |
| v. ) | |
| ) | Three-Judge Court |
| JOCELYN BENSON, in her official ) | |
| capacity as the Secretary of State ) | |
| of Michigan, *et al.*, ) | |
| Defendants. ) | |
| ) | |

**ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

KETHLEDGE, Circuit Judge.  Twenty Michigan voters sued Michigan's Secretary of State and the Michigan Independent Citizens Redistricting Commission, claiming that Michigan's legislative districts had been racially gerrymandered. The plaintiffs argue that these districts violate the Constitution's Equal Protection Clause and Section 2 of the Voting Rights Act, 52 U.S.C. § 10301. The parties have filed cross-motions for summary judgment. We deny the plaintiffs' motion and grant the Commission's motion in part.

I.

A.

Once every decade, states must redraw their electoral districts "to account for any changes or shifts in population." *Georgia v. Ashcroft*, 539 U.S. 461, 489 n.2 (2003). State legislatures have long used that process to consolidate partisan power. *See Rucho v. Common Cause*, 139 S. Ct. 2484, 2495 (2019). Until recently, Michigan was no exception. In November 2018, however, Michigan voters approved a state constitutional amendment that shifted the power to draw state

legislative districts from the legislature to the Michigan Independent Citizens Redistricting Commission. Mich. Const. art. IV, § 6. As amended, the Michigan Constitution required the Commission to "abide by the following criteria in proposing and adopting" new redistricting plans, "in order of priority:"

> (a) Districts shall be of equal population as mandated by the United States constitution, and shall comply with the voting rights act and other federal laws.
> (b) Districts shall be geographically contiguous. Island areas are considered to be contiguous by land to the county of which they are a part.
> (c) Districts shall reflect the state's diverse population and communities of interest. Communities of interest may include, but shall not be limited to, populations that share cultural or historical characteristics or economic interests. Communities of interest do not include relationships with political parties, incumbents, or political candidates.
> (d) Districts shall not provide a disproportionate advantage to any political party. A disproportionate advantage to a political party shall be determined using accepted measures of partisan fairness.
> (e) Districts shall not favor or disfavor an incumbent elected official or a candidate.
> (f) Districts shall reflect consideration of county, city, and township boundaries.
> (g) Districts shall be reasonably compact.

Mich. Const. art. IV, § 6(13).

Secretary of State Jocelyn Benson formed the new Commission by randomly selecting 13 candidates—four Democrats, four Republicans, and five independents—out of a group of qualified applicants. The Commission thereafter began holding public meetings to solicit community input. In late 2020, the Commission began drafting new redistricting plans.

In doing so, the Commission retained a Voting Rights Act expert, Dr. Lisa Handley, and a voting-rights attorney, Bruce Adelson. Handley concluded that voting in Michigan was racially polarized—meaning that white and black voters tend to support different candidates—and advised the Commission to create so-called "opportunity districts" in which minority voters could elect their candidates of choice. Whether minority voters can do so, in districts with mostly Democratic voters, depends on whether candidates favored by minority voters prevail in the primary elections—because in such districts the Democratic nominee will very likely win the general.

The Commission eventually adopted the "Hickory Map" for the state house, and the "Linden Map" for the state senate. These maps reconfigured Detroit-area districts to include voters from the suburban counties—thereby lowering the percentage of black voters in those districts to 35-55%. In the old map, by contrast, the black voting-age population in some districts in Detroit exceeded 90%.

According to the Commission and its experts, the proposed maps scored substantially better than the old plans on accepted measures of partisan fairness. But they also reduced the number of majority-black districts ("majority-minority" districts) from eleven to seven for the state house, and from two to zero for the senate.

In 2022, a group of black voters, including some of the current plaintiffs, brought suit in the Michigan Supreme Court, alleging violations of the Voting Rights Act. They argued that the Hickory and Linden maps had diminished the ability of black voters to elect their candidates of choice in the Democratic primaries. *See Detroit Caucus v. Indep. Citizens Redistricting Comm'n*, 969 N.W.2d 331, 332 (Mich. 2022). The court disagreed and dismissed the case. *Id.*

The plaintiffs in this case—Detroit-area black voters who vote in Democratic primary elections—then filed this federal suit against the Commission and Secretary of State Jocelyn Benson. They likewise claim that ten Detroit-area House Districts—namely, House Districts 1, 2, 7, 8, 10, 11, 12, 13, 14, and 26—and seven Detroit-area Senate Districts—namely, Senate Districts 1, 3, 5, 6, 8, 10, 11—violate the Voting Rights Act and the Equal Protection Clause. Before us are the plaintiffs' and the Commission's cross-motions for summary judgment. Secretary Benson takes no position as to the merits of plaintiffs' claims; but she requests that, as to any claim on which the Commission is granted summary judgment, she be granted the same.

II.

"Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Tlapanco v. Elges*, 969 F.3d 638, 646 (6th Cir. 2020).

A.

1.

As an initial matter, the Commission argues that none of the plaintiffs has standing to assert a claim against House District 13. Voting-rights injuries are "district specific," so individual voters have standing to challenge only the district in which they live. *Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2017). Moreover, "plaintiffs must maintain their personal interest in the dispute at all stages of litigation." *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021). Here, two plaintiffs lived in House District 13 when the complaint was filed, but both have since moved to other districts. Their challenge against their former district is therefore moot. *Id.* And no other plaintiff can assert any injury resulting from House District 13. *Gill*, 138 S. Ct. at 1930. Thus, as plaintiffs conceded at oral argument, we lack jurisdiction over any claims involving that district.

Relatedly, plaintiffs seek leave to amend their complaint to replace their challenge against District 13 with claims related to District 9 (to which one of the former District 13 plaintiffs has moved). But plaintiffs' asserted injury is a lack of majority-minority districts—and District 9 already is such a district. Nor have the plaintiffs explained what other claims they would seek to assert. We therefore deny the motion to amend. *See Courie v. Alcoa Wheel & Forged Prod.'s*, 577 F.3d 625, 633 (6th Cir. 2009).

2.

The Commission next argues that res judicata bars plaintiffs' claims as to House District 26 and Senate District 5—because, it says, the Michigan Supreme Court finally decided those claims in *Detroit Caucus*.

Federal courts must afford a state judgment "the same preclusive effect that the judgment would have in state court." *In re Fordu*, 201 F.3d 693, 703 (6th Cir. 1999); 28 U.S.C. § 1738. In Michigan, res judicata bars a second action "when (1) the prior action was decided on the merits, (2) both actions involve the same parties or their privies, and (3) the matter in the second case was, or could have been, resolved in the first." *Adair v. State*, 680 N.W.2d 386, 396 (Mich. 2004).

Here, plaintiffs concede that—as to these two districts—the parties in this suit are the same as in *Detroit Caucus*. And the earlier case concerned the same Voting Rights Act (VRA) claim that plaintiffs assert here. *See Detroit Caucus*, 969 N.W.2d at 331. Moreover, though plaintiffs did not bring their equal-protection claim in state court, they plainly could have, since that claim relies on the same set of facts as their VRA claim. *Adair*, 680 N.W.2d at 396–98. Thus, the only question here is whether the Michigan Supreme Court decided that case "on the merits." *Id.* at 396.

Plaintiffs argue that the Michigan Supreme Court "declined to address the merits of the Detroit Caucus's sole VRA claim." We disagree: the Michigan Supreme Court expressly rejected plaintiffs' claims on the merits when it decided "that plaintiffs have not made the threshold showing of white bloc voting required by *Gingles*." *Detroit Caucus*, 969 N.W.2d at 333.

Plaintiffs relatedly argue that the Michigan Supreme Court's decision did not satisfy "the minimum procedural requirements of the Fourteenth Amendment's Due Process Clause." *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 481 (1982). In support, however, plaintiffs assert only that

5

the court should have permitted discovery. But the plaintiffs themselves conceded in *Detroit Caucus* that "further factual development is unnecessary for resolution of the case." *Detroit Caucus*, 969 N.W.2d at 334. They cannot argue now that such development was constitutionally required. Res judicata bars their challenges to House District 26 and Senate District 5.

B.

That leaves claims against House Districts 1, 2, 7, 8, 10, 11, 12, and 14, and Senate Districts 1, 3, 6, 8, 10 and 11. Plaintiffs challenge those districts under section 2 of the Voting Rights Act, arguing that the district boundaries prevent them from electing their candidates of choice during the Democratic primary elections.

Section 2 protects minority voters from "electoral structure[s]" that "minimize or cancel out [their] ability to elect their preferred candidates." *Gingles*, 478 U.S. at 48; *Allen v. Milligan*, 143 S. Ct. 1487, 1503 (2023). As the Supreme Court recently reiterated, plaintiffs must establish three "preconditions" to prove a section 2 claim:

> First, the minority group must be sufficiently large and geographically compact to constitute a majority in a reasonably configured district. A district will be reasonably configured, our cases explain, if it comports with traditional districting criteria, such as being contiguous and reasonably compact. Second, the minority group must be able to show that it is politically cohesive. And third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it to defeat the minority's preferred candidate.

*Allen*, 143 S. Ct. at 1503 (cleaned up). Plaintiffs who establish all three preconditions must also show that, "under the totality of the circumstances," the challenged district or political process "is not equally open to minority voters." *Id.*

1.

To establish the first precondition, each plaintiff need only show that he or she could be placed in a "reasonably configured district" in which a majority of the voting-age population is black. *See id.*; *Bartlett v. Strickland*, 556 U.S. 1, 18 (2009).

a.

Plaintiffs argue they are entitled to summary judgment as to the first precondition. That condition would seem relatively easy to meet here: the plaintiffs are Detroit-area voters, and Detroit's voting-age population is significantly more than 50% African-American. Yet plaintiffs' expert, Sean Trende, does not explain whether his proposed map would place each plaintiff in a majority-minority district. Rather, Trende shows only that his proposed maps would include more majority-minority districts than the Commission's map does. That is not enough to establish the first condition as a matter of law. *See Gill*, 139 S. Ct. at 1930; *Bartlett*, 556 U.S. at 18.

Nor have the plaintiffs yet shown that their expert's proposed districts are "reasonably configured." Specifically, they point to no evidence that their proposed map accounts for communities of interest, partisan fairness, or the effect on incumbents. *See* Mich. Const. Art. IV, § 6(13)(c), (d), (e). Thus, plaintiffs are not entitled to summary judgment on this precondition.

b.

The Commission, for its part, argues that it is entitled to summary judgment as to this precondition on two grounds. The first would apply to every district at issue here. Specifically, the Commission argues that the plaintiffs must show not only that they could be placed in a reasonably configured majority-minority district, but also that the plaintiffs' proposed districts would afford black voters a better chance to elect their candidates of choice than the current districts do. But that argument collapses the ultimate question in a section 2 case—vote dilution—

7

into the first precondition of the plaintiffs' claim. *See Gingles*, 478 U.S. at 51; *Perez*, 138 S. Ct. at 2332; *Milligan*, 143 S. Ct. at 1503. And the Supreme Court's definition of the showing required for a section 2 claim could hardly be clearer. *Milligan*, 143 S. Ct. at 1503. The first precondition is simply that: plaintiffs need only show that they could be placed in a reasonably configured majority-minority district. The Commission's argument is meritless.

The Commission also argues that House District 2 and Senate District 11 cannot be reasonably reconfigured into majority-minority districts because only a very small percentage of their voting-age population is black. But Trende's demonstrative maps would move plaintiff Gail London from Senate District 11 into a new Senate District 1—which would be 50.6% black. *See* ECF No. 76-3; ECF No. 71-1, PID1070; ECF No. 8, PID98. Thus, London—like other black voters in her community—could become a member of a majority-minority district. That is enough for her to proceed with her claim. *Cf. Gill*, 139 S. Ct. at 1930.

Conversely, plaintiffs cannot make out a claim against House District 2. Trende's map would move both plaintiffs in that district—Donald Agee and Davonte Sherard—into proposed District 12, which would have a black voting-age population of 11.63%. ECF No. 76-2; ECF No. 71-1, PID1011; ECF No. 8, PID103. Thus, the plaintiffs in House District 2 lack evidence creating a genuine issue as to whether they could be part of a majority-minority district, and the Commission is entitled to summary judgment as to that district.

2.

a.

The second precondition requires plaintiffs to establish that black voters in each challenged district are politically cohesive—meaning they generally support the same candidate. *Gingles*, 478 U.S. at 51. Plaintiffs seek summary judgment on this issue and assert, plausibly enough, that

black voters around Detroit are politically cohesive as a general matter. Yet the Supreme Court has said again and again that courts must analyze section 2 claims district-by-district. *See, e.g., Perez*, 138 S. Ct. at 2332 ("We have made clear that redistricting analysis must take place at the district level") (citations omitted); *Wisconsin Legislature v. Wisconsin Elections Comm'n*, 142 S. Ct. 1245, 1250 (2022) ("Rather than carefully evaluating evidence at the district level, the court improperly relied on generalizations to reach the conclusion that the preconditions were satisfied."). And for whatever reason, plaintiffs have made no attempt to prove political cohesion district-by-district here.

Instead, plaintiffs rely on Handley's report to the Commission, which concluded that "voting in Michigan is racially polarized." But that reliance is mistaken twice over. First, Handley's conclusion applied to voting in general elections, while plaintiffs' challenge concerns voting in the primaries. Second, racial polarization is different from political cohesion. A district is racially polarized when black and white voters tend to support different candidates. That can happen even where black voters are split between multiple candidates—and thus lack political cohesion. *See Levy v. Lexington Cnty., S.C.*, 589 F.3d 708, 720 (4th Cir. 2009). Conversely, black and white voters alike might support the same candidate in a particular district—meaning the groups are cohesive but not polarized. Thus, plaintiffs cannot rely on polarization to show cohesion. Plaintiffs have not established their entitlement to summary judgment as to this precondition.

b.

Meanwhile, the Commission seeks summary judgment on this precondition only as to House Districts 8 and 11, and Senate Districts 10 and 11—arguing that plaintiffs lack evidence of cohesion there. In the two house districts, the black vote was almost evenly split between two

9

primary candidates during the 2022 elections. Thus, in the only election conducted with the challenged maps, black voters in those districts were not cohesive. Nor does the 2022 election show cohesion in either senate district: the incumbent ran unopposed in District 10, and plaintiffs provide no evidence at all about District 11.

Plaintiffs could have remedied this problem with analysis of prior election returns in the precincts that now comprise these four districts, if those returns suggested that black voters' lack of cohesion in 2022 was unusual. But plaintiffs' experts provide no such analysis here. By way of example, what is now House District 8 occupies parts of former Districts 3, 7, 26, and 27. Trende lists two election results for former Districts 3 and 7 without analyzing them, and does not mention former Districts 26 and 27. This report therefore lacks a sufficient basis for any conclusions about past cohesion in those districts. Trende's analysis of House District 11 and Senate District 10 suffers from the same problems, and Senate District 11 is absent from his report altogether. And a jury could not infer cohesion in these districts without expert analysis.

Plaintiffs counter that white voters cohesively rejected black candidates of choice in these districts. But that goes to the third precondition—white-bloc voting—rather than the second. *See Gingles*, 578 U.S. at 51 ("the *minority group* must be able to show that it is politically cohesive") (emphasis added). And plaintiffs' anecdotal evidence of racial polarization in the Detroit area is not meaningful evidence of cohesion in these districts. Thus, as to these four districts, plaintiffs have not offered any evidence from which a jury could infer cohesion. The Commission is therefore entitled to summary judgment as to House Districts 8 and 11 and Senate Districts 10 and 11.

3.

a.

The third precondition requires plaintiffs "to demonstrate that the white majority votes sufficiently as a bloc to enable it to defeat the minority's preferred candidate." *Milligan*, 143 S. Ct. at 1503 (cleaned up); *see also Perez*, 138 S. Ct. at 2330-31. Whether plaintiffs can satisfy that precondition is the core factual dispute in this case. According to the Commission and its experts, "majority Black districts are not necessary to provide Black voters with an opportunity to elect their candidates of choice" in Democratic primaries—because, the Commission says, those black-preferred candidates enjoy substantial support from white voters. ECF No. 71, PID692. By contrast, plaintiffs and their expert predict that—even in districts where the black candidate of choice prevailed in 2022—support for black candidates of choice will decline precipitously in the coming years. On summary judgment, we cannot weigh these competing opinions; this disagreement between the parties' experts creates a genuine issue of material fact as to the degree of white cross-over voting in the remaining districts. *See Rodgers v. Monumental Life Ins. Co.*, 289 F.3d 442, 449 (6th Cir. 2002).

b.

Nor can either party obtain summary judgment on this factor by focusing on only the last election. The Commission says that it is entitled to summary judgment as to every district where the black candidate of choice prevailed in 2022. But plaintiffs need only show that a white majority is "*usually*" able to defeat candidates supported by the black minority. *Gingles*, 478 U.S. at 49. And plaintiffs have offered expert evidence suggesting that, as incumbents retire, black candidates will face greater difficulty being elected in the future.

Meanwhile, plaintiffs seek summary judgment as to every district where the black candidate of choice lost in 2022. They emphasize, correctly, that some of those election results suggest a remarkably cohesive white majority—as in Senate District 8, where 96% of white voters supported a candidate other than the black candidate of choice. But a single election loss, even if stark, does not prove as a matter of law that the black candidate of choice will usually lose. *See Gingles*, 478 U.S. at 49. And the Commission offers expert evidence here suggesting that the 2022 result in Senate District 8 was anomalous. *See* ECF No. 71, PID812. Thus, neither side is entitled to summary judgment on this precondition.

4.

For the plaintiffs to prevail on their section 2 claim, as noted above, they must also show that, "under the totality of the circumstances, the district lines dilute the votes of the members of the minority group." *Perez*, 138 S. Ct. at 2331. That determination depends on a variety of circumstances, such as any history of voting-related discrimination in the state, the effects of past discrimination, and the use of racial appeals in political campaigns. *See Gingles*, 478 U.S. at 44-45; *Johnson v. DeGrandy*, 512 U.S. 997, 1101 n.9 (1994). Plaintiffs seek summary judgment on this issue as well; but we cannot evaluate the totality of the circumstances when genuine issues of material fact remain as to each *Gingles* precondition. *See Milligan*, 143 S. Ct. at 1503. Thus, summary judgment is inappropriate as to this issue.

In sum, neither side is entitled to summary judgment on plaintiffs' VRA claims as to House Districts 1, 7, 10, 12, and 14, and Senate Districts 1, 3, 6, and 8. Those claims should therefore proceed to trial.

C.

Plaintiffs also challenge their districts on equal-protection grounds. The Fourteenth Amendment's Equal Protection Clause "limits racial gerrymanders in legislative redistricting plans." *Cooper v. Harris*, 581 U.S. 285, 291-92 (2017). Here, to prove an unconstitutional racial gerrymander, plaintiffs must prove that race was "the predominant factor" in drawing the boundaries for their districts. *Id.* If plaintiffs prove that, the districts "cannot be upheld unless they are narrowly tailored to achieving a compelling state interest." *Wisconsin Legislature*, 142 S. Ct. at 1248; *see also Bethune-Hill v. Virginia State Bd. of Elections*, 137 S. Ct. 788, 800 (2017). Moreover, the parties must make these showings district-by-district. *Wisconsin Legislature*, 142 S. Ct. at 1250.

1.

Plaintiffs seek summary judgment on their equal-protection claims as to every district. According to plaintiffs, the Commission established a 40% "ceiling" on districts' black voting-age population. As evidence, plaintiffs point to a dissenting report from Commissioner Szetala, who wrote that the Commission's counsel had aggressively pushed the Commission "to reduce the [black voting-age population] numbers as close to the general election percentages (35% to 45%) as possible." ECF No. 71-3, PID1292. At one meeting, Szetala says, counsel directed the Commission to "identify 'anything that is higher than 40% for the black voting age population'" so that those districts could be "dealt with." *Id.* at PID1293.

Plaintiffs argue that Szetala's dissent shows, as a matter of law, that race predominated in the Commission's redistricting decisions. In fact, however, the Commission ultimately drew many districts with a black voting-age population greater than 40%—thirteen for the House, and four for the Senate. Thus, the record shows that the Commission did not implement a 40% racial ceiling

13

across the map. That does not make the Szetala dissent irrelevant to plaintiffs' claims. But it does mean that her dissent alone does not establish that race predominated when the Commission drew plaintiffs' districts. Nor, suffice it to say, do the opinions of plaintiffs' experts entitle them to summary judgment on their equal-protection claims.

2.

a.

As to these same claims, the Commission seeks summary judgment on several grounds. The Commission argues, first, that plaintiffs conceded race did not predominate when they admitted, during discovery, that "the Commission's primary motivation was to increase the number of Democratic-majority districts at the expense of Detroit-area Black voters." But race can predominate "even if the evidence reveals that a legislature elevated race to the predominant criterion in order to advance other goals, including political ones." *Cooper*, 581 U.S. at 291 n.1. Plaintiffs' admission therefore does not control the outcome here.

The Commission also argues that plaintiffs lack evidence of racial predominance because, "when race and political affiliation are highly correlated"—as everyone agrees they are in Detroit—courts "must exercise extraordinary caution" before attributing racial intent to a redistricting body. *Easley v. Cromartie*, 532 U.S. 234, 242 (2001). Moreover, the Commission says, its experts opine that considerations of political fairness—not race—best explain the Hickory and Linden maps. *Cf. Cooper*, 581 U.S. at 320. According to Trende, however, the new-district boundaries cross the Wayne County boundary in ways designed "to take portions of the Black community and then stretch the districts out into the suburbs." ECF No. 71-1, PID1033. By way of example, Trende says that District 7 "reaches deeply into Detroit, but then carefully avoids high [black voting-age population] precincts in Oakland County." On this issue as well, therefore, the

14

competing expert opinions raise a genuine issue of fact as to the Commission's motivation. *See Hunt v. Cromartie*, 526 U.S. 541, 529 (1999).

b.

The Commission also seeks summary judgment as to plaintiffs' equal-protection claims regarding House District 2 and Senate District 11 in particular. Specifically, the Commission argues, the plaintiffs have offered no evidence that the Commission could have drawn those districts with a higher black voting-age population. We agree as to House District 2: the current black voting-age population in that district is 11.04%, and plaintiffs' proposed map would place the same black community in a district with a black voting-age population of 11.63%. Moreover, Trende's report shows that the black voting-age population was similarly low in the 2011 districts in this area. ECF No. 71-1, PID1004. Thus, plaintiffs have not offered any evidence that the Commission gerrymandered District 2 to reduce its black voting-age population.

But the same is not true as to Senate District 11. According to Trende, that district "cracks" the black community in Detroit by connecting it to suburban white areas further north. And Trende's map shows that the black community in District 11 could have been connected with neighboring communities to form a majority-minority district. Unlike District 2, District 11 could therefore have been drawn to have a much higher black voting-age population. Trende's opinions therefore create a genuine issue of fact as to District 11.

The Commission finally argues that, even if race had been its predominant motive, it should prevail under strict scrutiny as a matter of law. But that argument is plainly premature here. By way of background, the Supreme Court has assumed, without deciding, that compliance with the VRA can be a compelling interest that supports drawing districts along racial lines. *Bethune-Hill*, 580 U.S. at 193. Whether the Commission could show that compelling interest, if need be,

15

therefore depends on whether they had good reason to think that the lines drawn in the Linden and Hickory maps—as opposed to maps that reduced the black-voter percentages to, say, 55% rather than 45%—were necessary to comply with the VRA. And setting aside the "reason to think" issue, the question whether the Commission went too far in lowering black voter percentages in Detroit-area districts is what the trial in this case will be about.

*   *   *

Plaintiffs' motion for summary judgment is denied. We dismiss, for lack of jurisdiction, plaintiffs' VRA and Equal Protection claims challenging House District 13. The Commission's motion for summary judgment is granted, on res judicata grounds, as to plaintiffs' VRA and Equal Protection claims challenging House District 26 and Senate District 5. The Commission's motion for summary judgment is also granted as to plaintiffs' VRA claims challenging House Districts 2, 8, 11, 13, 26 and Senate Districts 5, 10, and 11, and as to plaintiffs' Equal Protection claim against House District 2. We grant summary judgment to Secretary Benson as to all the claims on which we grant the same to the Commission. The Commission's motion is denied as to plaintiffs' remaining claims.

**IT IS SO ORDERED**.

Date: August 29, 2023

    /s/ Raymond M. Kethledge
    Raymond M. Kethledge
    United States Circuit Judge


    /s/ Paul L. Maloney
    Paul L. Maloney
    United States District Judge


    /s/ Janet T. Neff
    Janet T. Neff
    United States District Judge