# EXHIBIT A

# EXHIBIT A

Page 1

1  UNITED STATES DISTRICT COURT

   WESTERN DISTRICT OF MICHIGAN

2  SOUTHERN DIVISION

3

4                      * * *

5

6  DONALD AGEE, JR., et al.,

7       Plaintiffs,

8

        vs.                    CASE NO. 1:22-CV-00272

9

10 JOCELYN BENSON, et al.,

11      Defendants.

12                     * * *

13

14

15      Deposition of SEAN TRENDE, a witness herein,

16 called by the defendants for examination pursuant to the

17 Rules of Civil Procedure, taken before me, Emma Jane

18 Troyer, a Notary Public within and for the State of

19 Ohio, at the Offices of Baker Hostetler, LLP, 200 Civic

20 Center Drive, Suite 1200, Columbus, Ohio, 43215, on

21 April 20th, 2023, at 9:00 a.m.

22

23                     * * *

24

25

```
 1                        I N D E X
 2
 3   SEAN TRENDE                                        PAGE
 4      Examination by Ms. McKnight.....................4
        Examination by Mr. Pattwell...................168
 5
 6
                              * * *
 7
 8                       INDEX OF EXHIBITS
 9
     EXHIBIT               DESCRIPTION                  PAGE
10
11   Exhibit 1...Expert Report of
                         Sean Trende.................5
12
     Exhibit 2...Appendix A
13                       Sean Trende C.V.............7
14   Exhibit 3...Appendix C
                         Demonstration Plan Details..40
15
     Exhibit 4...Constitution of MI 1963
16                       Excerpt....................45
17   Exhibit 5...Dr. Handley's Report to the
                         MI Independent Citizens
18                       Redistricting Commission....63
19   Exhibit 6...Expert Report of
                         Jonathan Rodden, Ph.D.......68
20
     Exhibit 7...Expert Report of
21                       Maxwell Palmer, Ph.D........146
22   Exhibit 8...Code Excerpts..............160
23
24
25                            * * *
```

```
 1   APPEARANCES:
 2
 3        On behalf of the Plaintiffs:
 4
             Clark Hill, LLP
 5
        By:  Michael J. Pattwell
 6            215 South Washington Square, Suite 200
              Lansing, Michigan 48933
 7            Mpattwell@clarkhill.com
 8
 9
          On behalf of the Defendants:
10
11           Baker & Hostetler, LLP
12       By: Katherine McKnight
             1050 Connecticut Avenue, NW, Suite 1100
13           Washington, D.C. 20036
             Kmcknight@bakerlaw.com
14
             &
15
             Erika Prouty
16           200 Civic Center Drive, Suite 1200
             Columbus, Ohio 43215
17           Eprouty@bakerlaw.com
18
19
20
                        * * *
21
22
23
24
25
```

Page 16

1   other expert reports, I'm not aware of them.
2       Q.   Do you know Dr. Brad Lockerbie?
3       A.   I'm familiar with him.
4       Q.   Okay.  Are you aware that he is serving as an
5   expert witness in this case for plaintiffs?
6       A.   Yes.
7       Q.   Did you have an understanding of Dr. Lockerbie's
8   work in this case when you prepared your report?
9       A.   I believe he came on board during the course of
10  my report preparation, so not during the entire part of
11  it, but by the time I was completed, I was aware -- or
12  the report was completed, I was aware that he would be
13  addressing the Senate factors, or at least an expert
14  would be addressing the Senate factors.  I'm not sure I
15  knew it was him.
16      Q.   Okay.  I heard you talk about reviewing the
17  reports of Dr. Rodden, Dr. Palmer, and Dr. Handley.  Did
18  you file any reply expert report in this case in
19  response to their reports?
20      A.   No.  My understanding is the scheduling order
21  didn't allow for it.
22      Q.   Okay.  How did you come to that understanding?
23      A.   Conversation with counsel.
24      Q.   Okay.  Did you want to prepare a reply report?
25      A.   I wanted -- yes, I wanted to prepare a reply

Page 17

1  report before I even read their reports, because I think
2  it's always better to try to get -- you know, respond to
3  criticisms of your work, and I assumed there would be
4  criticisms incoming.
5      Q.  Okay.  I understand you co-authored a book called
6  the 2014 Almanac of American politics; is that right?
7      A.  That's right.
8      Q.  Okay.  And here I'm referring to a reference you
9  make on Pages 2 to 3 of your report, if it's helpful for
10 you to see it.  But I saw there that you referenced your
11 work as focusing on researching the history of and
12 writing descriptions for many of the newly drawn
13 districts, including tracing the history of how and why
14 they were drawn the way that they were drawn; is that
15 right?
16     A.  That's right.
17     Q.  Okay.  Is it fair to say there are a variety of
18 reasons why electoral districts are drawn the way
19 they're drawn?
20     A.  There can be.
21     Q.  Is one of those reasons the geographic shape of
22 the state?
23     A.  Yes.  The geographic shape of the state would
24 constrain the drawing of districts.
25     Q.  And would a factor like population density affect

Page 28

1        MR. PATTWELL:  Objection; form.
2    A.  My understanding of whether a district performs
3    is whether it elects the minority candidate of choice.
4    But if it elects someone who was rejected by the
5    minority community, I think it pretty clearly did not
6    elect the minority candidate of choice.
7    Q.  I'd like to turn to Gingles and candidates of
8    choice, and understand your view on whether Gingles can
9    be satisfied where the black community does not coalesce
10   behind a preferred candidate?
11   A.  So I think this is another interesting legal
12   question that you all are likely going to have to fight
13   about and the judges decide.
14        My understanding is that that would almost
15   certainly have to be the case, because the Voting Rights
16   Act was enacted at a time where the south was, for all
17   intents and purposes, a one party state, and it was
18   amended -- well, the substantial amendment adding the
19   effects test, which gave rise to Gingles, occurred in
20   1982, where at the state legislative, and I would still
21   say the congressional level, the south was largely a one
22   party state.
23        So it implies an analysis of primary votes, and
24   as one of your experts ably notes, primaries can be
25   complicated with multiple candidates running.  I think

Page 49

1 candidate.
2 Q. Let's focus on that one, Mr. Trende -- the
3 partisan fairness criteria. What kind of an analysis
4 did you conduct in your report on the partisan fairness
5 of your demonstration plan?
6 A. Well, I didn't look at the partisan fairness of
7 the demonstration plan, because this isn't necessarily a
8 plan that would be recommended to the Commission to
9 enact. It's to illustrate under Gingles Prong 1 that
10 the African-American community or the black community is
11 numerous enough to constitute a majority in a reasonably
12 configured district, which is a Voting Rights Act
13 analysis under 13-A, which would trump the remainder of
14 the requirements.
15 Q. And what kind of partisan fairness analysis did
16 you run on your simulations?
17 A. So for the simulations I took all the results and
18 calculated the partisanship of the districts that were
19 drawn, and while there were some slight deviations from
20 what you would expect from a neutral politically drawn
21 map, which I suspect may be downstream of an attempt to
22 lower partisan fairness metric, it doesn't explain the
23 extent of the deviations when it came with respect to
24 race.
25 Q. So I asked a slightly different question. It

Page 57

1   like this?
2       A.  Well, I ensured that the black populations in all
3   the districts were, in fact, 50 percent plus one.  I
4   ensured that it -- again, keeping with the instructions,
5   that it was -- had as many or less county and township
6   splits, and that's in keeping with the reasonably
7   configured portion of Gingles, and that they were
8   roughly as compact or better than the enacted plans --
9   again, keeping with the reasonably configured portion of
10  Gingles.
11      Q.  So I hear you identifying county splits and
12  compactness as checks you ran on the demonstration map.
13  Are there any other of the criteria listed that you also
14  checked --
15      A.  Go ahead; finish your question?
16      Q.  -- in your demonstration maps?
17      A.  City and township splits.
18      Q.  Okay.  Criteria F?
19      A.  Yes.
20      Q.  And G; is that right?
21      A.  Yes.  But those weren't checked with respect to
22  the criteria here.  They were checked with respect to
23  reasonably configured districts, which is part of the
24  numerosity analysis of Gingles.
25      Q.  And wouldn't you view compliance with the other

Veritext Legal Solutions
www.veritext.com                                    888-391-3376

Page 58

1  criteria as supporting a finding of a reasonably
2  configured district?
3              MR. PATTWELL:  Objection; form.
4     A.   No.  I can't imagine that if, say, a state wanted
5  to draw a gerrymander, that that could trump Voting
6  Rights Act conditions.  Just because a state has some
7  law or criteria it's following, I don't think that would
8  necessarily go into a reasonably configured district
9  analysis.  I mean, that would kill the voting rights, if
10 Alabama could just say, we wanted to draw seven
11 republican districts, so we gutted the African-American
12 district.  That would be absurd.
13    Q.   Is that what the Michigan criteria is requiring
14 here?
15    A.   No.  I'm just giving an example of why the fact
16 that a state offers up criteria -- that can't be the
17 reasonably configured district analysis, otherwise that
18 would lose meaning.
19    Q.   Okay.  Let's move to Page 27 of your report.  At
20 the bottom of Page 27 and the top of Page 28 you
21 reference a Handley report; do you see that?
22    A.   Yes.
23    Q.   Is this the report that Dr. Lisa Handley prepared
24 for the Commission during the map drawing phase?
25    A.   Yes.  I believe it refers to -- and again, I'm

Page 134

1  black voters?
2      A.  Again, I don't think I made a specific finding
3  with respect to District 6, although I think it's fairly
4  clear, at least, that Whitmer is the candidate of choice
5  of white voters.
6          When I approach this as spelled out at the
7  beginning of that section on the 2018 gubernatorial
8  election, one way I agree with Dr. Palmer is that, you
9  know, these multi-candidate primaries are tricky to
10 figure out, and different than your traditional
11 republican democratic race.
12         Where I disagree with Dr. Palmer is that he seems
13 to want -- my interpretation of his report is he seems
14 to throw his hand up and say, we can't really do it for
15 purposes of a primary race, and I don't think that's
16 even an option to select.  So I don't think it's
17 sensible to keep that 50 percent threshold for a three
18 or four person race.
19     Q.  Okay.  I'd like to understand why you think it's
20 obvious that Whitmer was the white candidate of choice
21 in District 6, where I see a certain amount of overlap
22 between the lower 95 and upper 95 for both Thanedar and
23 Whitmer for white voters?
24     A.  Well, first, it's not clear.  It's a significant
25 amount of overlap, because just by looking at these

Page 146

1  which elections to use based on years or the geographic
2  area the election covers -- for example, statewide
3  versus regional versus local?
4      A.  I mean, if we had lots and lots of statewide
5  primary election data, it could be probative, but
6  unfortunately we don't have a whole lot of that,
7  especially not of the types that would raise these types
8  of issues.  That's why Dr. Handley, to the extent she
9  focuses on statewide, focuses on the Thanedar Whitmer
10 race, same as I do.
11     Q.  Let's introduce as Exhibit 7 --
12
13     (Defendant's Exhibit 7 marked for identification.)
14
15     Q.  Do you recognize what this is, Mr. Trende?
16     A.  Yes.  This is the expert report of Maxwell
17 Palmer, Ph.D., dated March 4th, 2023.
18     Q.  And is this the report that you reviewed in
19 preparing for this deposition?
20     A.  Yeah.  Of the three reports, this is probably the
21 one that I gave the most 30,000-ish foot review of, but
22 yes.
23     Q.  Which one is the one that you spent the most time
24 on?
25     A.  Probably Dr. Rodden's.

```
                                                          Page 170

 1   STATE OF OHIO)
 2   COUNTY OF MADISON)      SS:   CERTIFICATE
 3
 4        I, Emma Jane Troyer, a Notary Public within and
 5   for the State of Ohio, duly commissioned and qualified,
 6        DO HEREBY CERTIFY that the above-named SEAN
 7   TRENDE was by me first duly sworn to testify the truth,
 8   the whole truth, and nothing but the truth.
 9        Said testimony was reduced to writing by me
10   stenographically in the presence of the witness and
11   thereafter reduced to typewriting.
12        I FURTHER CERTIFY that I am not a relative or
13   attorney of either party, in any manner interested in
14   the event of this action, nor am I, or the court
15   reporting firm with which I am affiliated, under a
16   contract as defined in Civil Rule 28(D).
17        IN WITNESS WHEREOF, I have hereunto set my hand
18   and seal of office at Plain City, Ohio, on this 25th day
19   of April, 2023.
20
21   [signature: Emma J. Anderson]
22
23   EMMA JANE TROYER
24   NOTARY PUBLIC, STATE OF OHIO
25   My commission expires 01-09-2027
```