UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| DONALD AGEE, JR., an individual, *et al.,* | |
| Plaintiffs, | Case No. 1:22-cv-00272 |
| v. | **Three-Judge Panel Appointed Pursuant to 28 U.S.C. § 2284(a)** |
| JOCELYN BENSON, in her official capacity as the Secretary of State of Michigan, *et al.*; | **ORAL ARGUMENT REQUESTED** |
| Defendants. | |

**PLAINTIFF'S BRIEF IN OPPOSITION TO COMMISSION DEFENDANTS' MOTION TO STRIKE SUPPLEMENTAL AND REBUTTAL REPORT OF SEAN TRENDE AND *IN LIMINE* PRECLUDING PLAINTIFFS FROM OFFERING THE REPORT AT TRIAL**

2

## I. INTRODUCTION

Expert Sean Trende's supplemental and rebuttal report will streamline this case's time-sensitive trial, is of minimal surprise to Defendants, is largely factual, and is entirely appropriate.

In its Summary Judgment Order, this Court identified certain expert-related issues to be resolved at the expedited trial. To assist the Court and to give Defendants ample notice of Mr. Trende's expected testimony and demonstratives, Plaintiffs asked him to prepare a short supplemental report. Defendants received it five weeks before trial, and it is based on data already in the Commission's possession. This supplement falls squarely within the ambit of Rule 26.

The report should not be excluded under Rule 37 in any event. The allegedly "new" opinions are not new. In many instances, they are not even opinions. They are clarifications and provide a more nuanced reasoning to address the Court's questions; Trende's conclusions are the same as those offered in his initial report and explored at his deposition. Further, the data on which Trende relies is either the same as the data used in his original report or is taken from the Commission's data. The Commission cannot claim prejudice, especially given that Plaintiffs have offered Trende for a second deposition—which Defendants have not accepted.

In the end, Defendants' multi-million-dollar trial budget funds an army of lawyers and an arsenal of experts, two of whom are slated to refute Trende. And any failure to disclose the purported supplemental opinions is substantially justified where the Court's Order adopted a novel approach that asks Plaintiffs to measure the reasonableness of their *Gingles I* demonstration maps against partisan-fairness and community-of-interest factors that courts have not previously required, and which the Commission itself did not use at the time it implemented its 35%-40% BVAP racial quota. Trende's report and testimony should be allowed in their entirety.

2

## II.     ARGUMENT

**A.     Rule 26 allows supplementation here, so Rule 37 is inapplicable.**

If a case management order does not expressly provide for a supplemental expert report, then Rule 26 governs. *Miner v. Ogemaw Cnty. Road Comm'n*, 594 F.Supp.3d 912, 925–26 (E.D.Mich. 2022); *In re Flint Water Cases*, 2021 WL 5124253, at *1–2 (E.D.Mich. 2021). Rule 26 includes a duty to supplement that does not cease at discovery's close, *see* Fed. R. Civ. P. 26(e) (emphasis added); *Trapp v. Fed. Express Corp.*, 2022 WL 17832909, at *1 (E.D.Mich. 2022). "Indeed, the Sixth Circuit has noted that Rule 26 contemplates that an expert may 'supplement, elaborate upon, [and] explain' his expert report." *E.E.O.C. v. Tepro, Inc.,* 133 F.Supp.3d 1034, 1049 (E.D.Tenn. 2015) (citation omitted).

Supplementation is particularly appropriate in response to an inquiry from the court. For example, in *In re Flint Water Cases*, 2021 WL 5124253 at *1–2, the court framed certain questions that could be clarified by a supplemental expert report.  When the plaintiffs submitted one, the defendants moved to strike it under Rule 37. The court denied the motion because the case management order was silent about supplemental expert reports, and the supplement "was submitted in direct response to an inquiry by the Court," such that Rule 26 governed and Rule 37 was inapplicable. *Id. Accord Miner*, 594 F.Supp.3d at 925–26 ("Although a scheduling order currently governs discovery in this case, it is silent on supplemental expert reports. Yet Rule 26(e) plainly requires supplementation of an expert report in response to a court order… This Court will not prejudice Plaintiff for failing to follow a provision that does not exist in the scheduling order.").

Similarly, in *Woods Hole Oceanographic Inst. v. ATS Specialized, Inc.,* 557 F.Supp.3d 261, 270–71 (D.Mass. 2021), the court denied a motion to strike an expert's supplemental report as untimely where the supplemental was disclosed "more than 30 days before trial" "in response to criticisms raised by [the opposition's] counter-motion for summary judgment indicating that the

3

initial report was incomplete." Citing Rule 26, the court noted that "[m]otions to strike are generally disfavored" and that the "report was submitted to help this Court." *Id.*

Here, the Court identified certain areas of expert testimony it believed were particularly relevant in its MSJ Order, including (1) whether Trende's demonstration maps placed each Plaintiff in a majority-minority district, and (2) whether the demonstration maps' proposed districts were reasonably configured based on partisan fairness and communities of interest." ECF.No.81, PageID.2035. Within a few weeks, Trende proffered his supplement to address those issues. That was appropriate, particularly when the Court itself could raise these same inquiries.[1]

The reason Trende did not examine communities of interest or partisan fairness in his initial report is that courts have not traditionally required these factors for a demonstration map to be "reasonably configured." *E.g.*, *Allen v. Milligan*, 599 U.S. 1, 18 (2023) ("A district will be reasonably configured, our cases explain, if it comports with traditional districting criteria, such as being contiguous and reasonably compact."); *Bush v. Vera*, 517 U.S. 952, 959–60 (1996) (defining "traditional redistricting principles" such as "natural geographical boundaries, contiguity, compactness, and conformity to political subdivisions"); Yunsieg P. Kim & Jowei Chen, *Gerrymandered by Definition: The Distortion of "Traditional" Districting Criteria and A Proposal for Their Empirical Redefinition*, 2021 Wis. L. Rev. 101 (2021) (explaining why partisan advantage, incumbent protection, and communities of interest are nontraditional criteria).

Plaintiffs are aware of no authority permitting "non-traditional" factors—such as "partisan fairness"—to trump traditional factors in this context. *E.g.*, *Carter v. Chapman*, 270 A.3d 444, 462 (Pa.), cert. denied sub nom. *Costello v. Carter*, 143 S. Ct. 102 (2022) (while a court "may" examine

---

[1] "F.R.E. 614(b) allows the court to question witnesses, *Rodriguez v. Riddell Sports, Inc.*, 242 F.3d 567, 579 (5th Cir. 2001), particularly in bench trials. *Elof Hansson USA Inc. v. Santiago*, 2022 WL 2208266, at *2 (2d Cir. 2022).

4

"the subordinate historical considerations, including, *inter alia,* communities of interests, the preservation of prior district lines, and the protection of incumbents. . . we must keep in mind that these factors are wholly subordinate to the traditional core criteria"). Indeed, it would be strange to allow a state to deny Black voters the opportunity to participate in the political process fully because the state wished to achieve a predetermined partisan outcome; this is in large part what the Voting Rights Act is designed to avoid. Regardless, Michigan's Constitution—which purports to authorize the Commission to consider "partisan fairness" in its redistricting analysis *above* the traditional factors—is directly at odds with the protections afforded by the VRA, which preempts contrary Michigan law.[2]

That's why Defendants' expert, Dr. Handley, acknowledges that the three tests for "partisan fairness" she identifies in her report "have all been developed in the last decade and therefore do not have a long history of consideration by the courts," and these "political fairness" tests have only been introduced in the context of "partisan gerrymandering challenges"—*not* racial gerrymandering challenges—cases she admits the Supreme Court mooted after *Rucho v. Common Cause*, 139 S.Ct. 2484, 2502 (2019). Finally, as will be shown at trial, the Commission's deliberations reveal that its driving consideration shaping the ultimate maps was achieving the 35%-40% racial quota, and these non-traditional factors were at best secondary and at worst entirely pretextual. There is no factual basis to support such a defense.

---

[2] *E.g., Arkansas United v. Thurston*, 626 F.Supp.3d 1064 (W.D.Ark. 2022); *Disability Rights North Carolina v. North Carolina State Bd. of Elections*, 602 F.Supp.3d 872 (E.D.N.C. 2022); *Carey v. Wisconsin Elections Comm'n*, 624 F.Supp.3d 1020 (W.D.Wis. 2022). Plaintiffs reserve their argument at pages 3-7 of their SJ Reply Brief that partisan fairness metrics and subjective community-of-interest analyses are not necessary to show a demonstration map is reasonably configured. ECF.No.77, PageID.1785. The Michigan Constitution prohibits consideration of incumbency.

Against this backdrop, Plaintiffs' expert should not be penalized; he should be credited for promptly responding to the Court's questions fewer than four weeks after receiving the MSJ Order.

### B. Even under Rule 37, exclusion is unwarranted

Rule 37(c)(1) gives a court "broad discretion" to determine whether a party's untimely disclosure of evidence is so unjustified and harmful that the evidence should be excluded. *Bresler v. Wilmington Trust Co.*, 855 F.3d 178, 190 (4th Cir. 2017). "Rule 37(c)'s sanction is meant as a deterrent for discovery abuses, and is not a Swiss Army knife to be deployed in every situation where an expert elaborates on his or her report to the detriment of the opponent." *Guinn v. Norfolk S. Ry. Co.*, 441 F. Supp. 3d 1319, 1330 (N.D. Ga. 2020). Even if a violation is found, "Rule 37(c)(1) does not mandate the total exclusion of evidence filed in violation of the rules." *In re Flint Water Cases*, 2021 WL 5124253, at *1 (citing *Roberts ex rel. Johnson v. Galen of Virginia, Inc.*, 325 F.3d 776, 784 (6th Cir. 2003)).

To assess whether a party's late disclosure is "substantially justified" or "harmless," the Court considers the following factors:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*Howe v. City of Akron*, 801 F.3d 718, 747–48 (6th Cir. 2015) (citations omitted). "The first four factors listed above relate primarily to the harmlessness exception, while the last factor, addressing the party's explanation for its nondisclosure, relates mainly to the substantial justification exception." *Bresler,* 855 F.3d at 190. Thus, a party need not establish *both* substantial justification and a lack of harm; it need only proffer *either* "reasonable explanation" *or* lack of prejudice.

"Substantial justification" in the Sixth Circuit means merely a "reasonable explanation." *Howe*, 801 F.3d at 747 (citation omitted). Substantial justification exists where the expert's

6

supplementation was prompted by an inquiry from the court—as here. See *Black Warrior River-Keeper, Inc. v. Drummond Co., Inc*., 2022 WL 126535, at *1 (N.D.Ala., 2022) (citation omitted) (supplementation allowable where "there was an important change in law upon which the expert previously based the report, the supplemental report is consistent with the earlier one, and there is no substantial prejudice to the parties"); *Lucent Techs., Inc. v. Gateway, Inc*., 2007 WL 5289734, at *1 (S.D.Cal. Dec. 7, 2007) (allowing supplemental report issued "in response to the District Judge's opinion regarding this expert's damage theory presented at earlier proceedings" and where the report "relies on evidence already well-known to the defendants"); *Perez v. First Am. Title Ins. Co*., 810 F.Supp.2d 986, 989 (D.Ariz. 2011) (supplemental report "substantially justified," in part, due to legal issues raised via motions that "affected the content of the supplemental report" where report submitted within two months of court's ruling).

The Commission's four objections to Trende's Second Report will be addressed seriatim:

### 1. Demonstrative showing where Plaintiffs reside

Defendants first object to Trende's superimposing Plaintiffs' addresses on his House and Senate demonstration maps. Trende did this to address the Court's question whether the demonstration maps placed each Plaintiff in a majority-minority district. ECF.No.81, PageID.2035. Creating such a visual aide based on uncontroverted facts is not "prejudicial" to Defendants. And it will obviate the need to call each Plaintiff to testify to his or her address, something the Court has discouraged given the very tight time frame (three trial days per side).

Nor is there any surprise here, as Defendants have stipulated to the accuracy of Plaintiffs' addresses. Joint Uncontroverted Facts ¶¶ 3-21, ECF.No.87, PageID2079-82.[3] And these locational

---

[3] Based on the stipulation, two of Plaintiffs' residential addresses have been amended and the maps/chart revised accordingly. The revised maps/charts are attached as **Exhibit 1**.

maps/charts are admissible at trial under F.R.E. 201, 611, and 1006. *First*, F.R.E. 201 allows courts to take judicial notice of facts not subject to reasonable dispute in that they are capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned. Because Courts routinely take judicial notice of geographic facts such as these, this demonstrative should not be excluded. David J. Dansky, The Google Knows Many Things: Judicial Notice in the Internet Era, 39 Colo. Law. 19, 24 (2010) ("Most courts are willing to take judicial notice of geographical facts and distances from private commercial websites such as MapQuest, Google Maps, and Google Earth."); *United States v. McFadden*, 458 F.2d 440, 441 (6th Cir. 1972) (taking judicial notice that Ann Arbor is located within the Eastern District of Michigan); *League of United Latin Am. Citizens v. Abbott,* 2022 WL 4545757, at *16 (W.D. Tex. Sept. 28, 2022) (taking judicial notice in this VRA case of "the boundaries and locations of all districts we mention in this Order.").

*Second*, under F.R.E. 1006 parties may use a summary or chart for judicial efficiency. That is precisely what these map overlays do here, and courts routinely admit them. *Ammons v. Dade City, Fla.*, 594 F. Supp. 1274, 1279 (M.D. Fla. 1984), aff'd, 783 F.2d 982 (11th Cir. 1986) (under F.R.E. 1006, VRA plaintiffs could use maps that superimposed census block data reflecting number of black persons).

*Third*, F.R.E. 611(a) allows illustrative aids to assist in questioning witnesses and presenting evidence. As *United States v. Bray*, 139 F.3d 1104, 1111–12 (6th Cir. 1998), recognizes, "not only may such pedagogical-device summaries be used as illustrative aids in the presentation of the evidence, but they may also be admitted into evidence even though not within the specific scope of Rule 1006" if accurate and reliable. There is no basis to strike demonstrative evidence that merely illustrates facts that Defendants already agreed were admissible at trial.

8

Indeed, it is not even clear that this is an "opinion." Whether these are, in fact, the plaintiffs' addresses, and whether they are properly placed on a map, are factual questions for which lay witness testimony would suffice. This much should be obvious: if Mr. Trende's report is excluded, Plaintiffs' fallback option is to call all the Plaintiffs, something no one wants.

### 2. Partisan fairness and COI maps

The Court's MSJ Order stated that Plaintiffs had not "yet" shown that Trende's demonstration maps were "reasonably configured" for purposes of establishing the first *Gingles* precondition because they did not account for communities of interest or partisan fairness. ECF.No. 81, PageID.2035. As noted, no court to Plaintiffs' knowledge has held that a "reasonably configured" map under *Gingles I* must include partisan-fairness or community-of-interest analyses. Here, for example, the now-stipulated record shows that the Commission's partisan-fairness and community-of-interest considerations were secondary to and came *after* its use of racial quotas to draw the Commission's maps: (a) the Commission's initial draft House map contained ten Detroit districts with BVAPS from 43.74% to 69.29%,[4] and its Senate map contained four Detroit districts with BVAPs from 47.06% to 76.56%;[5] (b) Commission legal counsel objected on the purported basis that these draft maps allegedly packed districts in violation of the VRA and instructed the Commission to employee a 35%-40% racial quota in revising them[6]; (c) the Commission between September 30, 2021 and October 4, 2021 redrew the maps, hewing to the 35%-40% quota while acknowledging it was "breaking up" black communities of interest[7];

---

[4] Draft Map 183, 9-28-21 v1 HD; Draft Map 193, 9-30-21 HD.

[5] Draft Map 170, 9-14-21 v14 SD; Draft Map 165, 9-15-21 v16a SD.

[6] 9/13/21 Email of Julianne Pastula, **Exhibit 2**; 9/30/21 AM Meeting Transcript, MICRC_007219-20, 23, 25-31, 43, 77-78, 83-84, **Exhibit 3**.

[7] 9/30/21 PM Meeting Transcript, MICRC_007343-44, **Exhibit 4**; 10/4/21 Meeting Transcript, MICRC_007433-41, 44-47, 64, 79-92, **Exhibit 5**.

9

and (d) any material partisan fairness analyses came well *after* the use of racial quotas to reduce the BVAPs. Commission staff did not even activate the partisan fairness metrics on the individual Commissioner's mapping software until October 6, 2021.[8] This is the type of "direct evidence of racial predominance" the Supreme Court has identified as dispositive "with or without an alternative map." *Cooper v. Harris*, 581 U.S. 285, 318, 322 (2017).

All this to say that if the Commission did not consider partisanship and communities of interest before implementing its racial quotas, and previous courts did not require demonstrate maps to include such data, then Trende did not reasonably think he needed to do so either when drawing his demonstration maps. Nevertheless, to address the Court's direct inquiry regarding whether the demonstration maps were reasonably configured, Trende's supplemental report addresses both issues.

1. First, Trende prepared a chart which compares the partisan fairness metrics—calculated entirely from the Commission's data—of his demonstration maps with those of the Hickory and Linden Plans. Second Report at 6-7. He explains that these metrics are easily calculated *factual* matters and that they show his demonstration maps perform comparably to the enacted maps. *Id.* Because the metrics address a potential analytical "gap" raised by the Court in a previously disclosed expert opinion (i.e., his opinion that the demonstration plans are reasonably configured in accord with traditional redistricting criteria), the inclusion is appropriate supplementation.

In addition to being a mechanism to respond to a court's questions, Rule26(e)(2) allows experts to supplement their reports to respond to an opposing expert pointing out gaps in the supplementing expert's chain of reasoning. *Eiben v. Gorilla Ladder Co*., 2013 WL 1721677, at \*6

---

[8] 10/6/21 Email of Julianne Pastula, **Exhibit 6**.

10

Case 1:22-cv-00272-PLM-RMK-JTN   ECF No. 94,   PageID.2215   Filed 10/11/23   Page 11 of 15

(E.D. Mich. Apr. 22, 2013) (citations omitted); *e.g.*, *Hoskins Oil Co., LLC v. Equilon Enterprises, LLC,* 2019 WL 691394, at *2 (E.D. Tenn. Feb. 19, 2019) (denying motion to strike supplemental report where expert originally said a discount rate on lost profits was unnecessary, then corrected that opinion in the supplement).

Here, because the metrics are easily calculated *facts*, there is no prejudice to Defendants, whose experts already have this information and can readily verify it. Conversely, it would be highly prejudicial to exclude this *factual* information from use at trial when, to Plaintiffs' knowledge, no Court has previously held that a partisan fairness analysis is required to show that demonstration maps are reasonably configured under the first *Gingles* precondition.

Moreover, Defendants have an entire report authored by an expert whose exclusive focus is partisan fairness. Surely, (i) Trende can rebut that report, and (ii) Defendants are fully prepared to present evidence on the element of partisan fairness. There is no prejudice. *E.g.*, *deWit v. UPS Ground Freight, Inc.*, 2017 WL 5969349, at *3 (N.D. Fla. July 1, 2017) (expert's opinions "could not have come as a complete surprise to" opposing party where it "hired an accident-reconstruction expert to testify on this same topic").

Indeed, in addition to Mr. Trende's analysis, Drs. Handley and Rodden have already acknowledged that all the Detroit-area districts are so heavily Democratic that Democratic candidates almost always win general elections. Handley 2021 Report at 6; Rodden Report at 6; Trende First Report at 26-27. MICRC Commissioners acknowledged during the mapping process that major alterations in the Detroit-area districts were unlikely to impact partisan-fairness scores. E.g., 2021-10-04 Meeting Transcript, MICRC_007435, 007464 (Ex. 5) (Chair Szetela reiterated that the Commission was revising the draft maps to reduce BVAPs: "To 35-40 for VRA purposes per the direction of Bruce Adelson." Eventually, Commissioner Witjes expressed satisfaction that

11
CLARKHILL\L1503\442579\273618633.v3-10/11/23

as to the BVAPs "I think we have the districts in question at 40 or below 40" and that while the Commission can "also do a partisan fairness . . . *I don't think it's going to mat[ter] all that much.*").

Not only this, Mr. Trende testified at his deposition that while he had not run the partisan fairness metrics on his demonstration maps, he *had* run a significant amount of partisan fairness metrics on the Detroit area and, like the Commission, concluded the area was made up of "pretty much all Democratic voters." Trende Dep. Tr. at 65-73, attached as **Exhibit 7**. He testified that the Commission "could have drawn a map with . . . identical mean and median differences without doing county splits, and identical efficiency gaps," especially when appropriately weighting the more recent elections showing that suburban voters have shifted to the Democratic Party. *Id.* at 84-86. Trende's supplemental report should be allowed, and he should be allowed to testify to these things at trial.

2.      Trende also prepared a series of comparison maps on pages 7-11 of his Second Report which merely superimpose the Detroit-area communities of interest (identified at pages 9-12 of Commissioner Szetela's Dissenting Report) onto the Commission's final plans and his demonstration maps. Trende offers no real opinion; he merely provides the maps and relates the number of times each map splits the various communities of interest. Unsurprisingly, given the Commission's fixation with race when drawing its own maps, these comparison maps show that Trende's demonstration maps preserve those communities of interest *slightly* better than the Hickory and Linden Plans. Again, there is no new opinion or analysis to strike or preclude. These comparison maps are entirely based on existing evidence of record, are pedagogical, and admissible at trial under F.R.E. 201, 611, and 1006.

### 3.      Racial Polarization Tables for Open Democratic Primary Elections

Defendants next object to what they call Trende's new "polarized-voting analysis of primary elections." (Motion, p. 5; Second Report pp. 12-22). But Trende's *Gingles* Prong 2 & 3

12

tables are taken entirely from his first report and Dr. Handley's report to the MICRC; they are just reconfigured and reorganized. This was done because the Court expressed direct interest in this historical data. ECF.No.81, PageID.2038. Trende refers back to his initial report for certain information and adds some tables that "combine the findings of Dr. Handley and myself regarding racial polarized voting in ***open*** Democratic primaries in districts with at least 20% BVAP." Second Report, p. 12. This is neither "new" nor "surprising." It is nothing more than a demonstrative aide or a F.R.E. 1006 compilation and it should not be stricken. *Boyden v. Conlin*, 341 F.Supp.3d 979, 984 (W.D.Wis. 2018) ("If plaintiffs had not filed supplemental reports, their experts would likely have been able to offer most, if not all, of this testimony at trial since it falls properly within their timely, original expert disclosures. Plaintiffs presumably supplemented in an effort to cover the specific arguments raised by defendants in their summary judgment briefs, largely relying on defendants' expert's deposition testimony. *If anything, by providing defendants with this additional detail, plaintiffs ensured that defendants would not be blind-sided at trial and helped avoid otherwise needless dissection by the court* as to whether some detail was adequately disclosed in the original expert reports. The court is not going to penalize plaintiffs for either effort.") (Emphasis added).

      To reiterate, because all this information is in the record, Plaintiffs' counsel could extract all of it on direct examination of Trende at trial, going line by line and simply filling in the tables using Handley and Trende's existing numbers. Or counsel could ask the Court to flip back and forth between Handley's table and compare it with Trende's. Alternatively, counsel could walk Mr. Trende through this demonstrative, which Plaintiffs provided to Defendants over a month in advance of trial. That last option would be more expedient and more useful to the Court. As with

13

the addresses of the individual Plaintiffs, there appears to be no good reason why Defendants would demand that Plaintiffs proceed in either of the former, more inefficient fashions.

These tables are also proper "rebuttal." Rule 26(a)(2)(D)(ii) provides that rebuttal disclosures are those that relate to evidence that is "intended solely to contradict or rebut evidence on the same subject matter identified by another party" in its expert disclosure. Here, it is undisputed that the Defendants' expert reports cover the same substance that Trende's Second Report does, so he is free to refute those conclusions at trial.

### 4. 14th Amendment analysis

Finally, Defendants object to Trende's brief supplement regarding Plaintiffs' Equal Protection claim, again, in response to the MSJ Order. Second Report, pp. 23-34. There, Trende refers to a portion of his deposition testimony, then sets forth maps based entirely on the Commission's data. (Again, this is information or testimony that could be extracted from the expert at trial based on existing data; it has just been packaged to assist the Court.) Defendants characterize these maps as new demonstration maps. But as Trende explains, "this isn't intended as an additional demonstration map. It simply shows that the existing Demonstration Map proves you do not need grotesquely shaped districts that intentionally crack Detroit's Black population in order to achieve partisan fairness, and that any claim that this is the case is merely pretextual." Second Report, p. 26. The rest of the proposed demonstrative aides are merely rebuttal to Rodden and Handley—and Trende explicitly says so. He can also say so on the stand. Defendants are not prejudiced but benefitted by seeing this information in advance rather than for the first time at trial.

Moreover, it is highly probative. Dr. Rodden has suggested – as have Defendants' attorneys – that the Hickory Plan and the Linden Plan had to be drawn with bizarre, spoke-like districts to dilute the Republican vote in the suburbs and to help the Commission achieve its partisan fairness goals. Not so. Mr. Trende observed that this was wrong in his initial report and

14

did so in rebuttal here (and in response to an inquiry by the Court) by rearranging *only* the precincts contained in the spoke-like districts into compact districts that respect county and municipal boundaries. The result: majority Republican districts are not created; majority-Black districts *are* created. This Court will benefit from knowing that. Trende's report should be permitted.

### III. CONCLUSION

Defendants' Motion should be denied.

Respectfully submitted,

*/s/ John J. Bursch*
John J. Bursch (P57679)
BURSCH LAW PLLC
*Attorney for Plaintiffs*
9339 Cherry Valley Ave SE, #78
Caledonia, Michigan 49316
(616) 450-4235
jbursch@burschlaw.com

Michael J. Pattwell (P72419)
James J. Fleming (P84490)
Amia A. Banks (P84182)
CLARK HILL PLC
*Attorneys for Plaintiffs*
215 South Washington Square, Suite 200
Lansing, MI 48933
(517) 318-3100
mpattwell@clarkhill.com
jfleming@clarkhill.com
abanks@clarkhill.com

Dated: October 11, 2023