## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

DONALD AGEE, JR., et al.,

    Plaintiffs,

v.

JOCELYN BENSON, et al.,

    Defendants.

Case No. 1:22-CV-00272-PLM-RMK-JTN

**Three-Judge Panel Appointed Pursuant to 28 U.S.C. § 2284(a)**

## PLAINTIFFS' PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

Plaintiffs in the above-referenced caption, through their undersigned counsel, hereby file their Proposed Findings of Fact and Conclusions of Law pursuant to the Court's amendment to the Case Management Order (ECF No. 97, PageID.2300).

## PROPOSED FINDINGS OF FACT

### I.   THE PARTIES

#### A.   Plaintiffs

1.      Each of the Plaintiffs is an individual, Black voter who regularly participates in federal, State of Michigan, and local elections and plans to do so in the future. (Uncontroverted Facts, ECF No. 87, PageID.2079 ⁋ 1).

2.      Each of the Plaintiffs is over the age of 18, registered to vote, and regularly participates in Democratic Primary Elections and plans to do so in the future. (Uncontroverted Facts, ECF No. 87, PageID.2079 ⁋ 2).

3.      Plaintiff Donald Agee, Jr. resides in Senate District 1 (Linden Plan). His address is 474 Oliver Ct., Ecorse, MI 48229. (Uncontroverted Facts, ECF No. 87, PageID.2079 ⁋ 3). In Plaintiffs' demonstration map, he resides in House District 12 and Senate District 2. (PX20 at 122-125).

4.      Plaintiff Jerome Bennett currently resides in Senate District 10 (Linden Plan). He moved during the pendency of this action and his current address is 8318 Maxell, Warren, MI 48089. (Uncontroverted Facts, ECF No. 87, PageID.2079 ⁋ 4). In Plaintiffs' demonstration map, he resides in House District 25 and Senate District 1. (PX20 at 122-125).

5.      Plaintiff Dennis Leroy Black, Jr. currently resides in Senate District 3 (Linden Plan). He moved during the pendency of this action and currently resides at 9491 McDougall St., Hamtramck, MI 48212. (Uncontroverted Facts, ECF No. 87, PageID.2080 ⁋ 5). In Plaintiffs' demonstration map, he resides in House District 3 and Senate District 1. (PX20 at 122-125).

6.      Plaintiff Jamee Burbridge resides in House District 14 (Hickory Plan) and Senate District 10 (Linden Plan). Her address is 7558 East Robinwood, Detroit, MI 48234.

(Uncontroverted Facts, ECF No. 87, PageID.2080 ⁋ 6). In Plaintiffs' demonstration map, she resides in House District 3 and Senate District 1. (PX20 at 122-125).

7.      Plaintiff Beverly Ann Burrell resides in House District 8 (Hickory Plan) and Senate District 1 (Linden Plan). Her address is 2434 Edison St., Detroit, MI 48206. (Uncontroverted Facts, ECF No. 87, PageID.2080 ⁋ 7). In Plaintiffs' demonstration map, she resides in House District 4 and Senate District 2. (PX20 at 122-125).

8.      Plaintiff Jemell Cotton resides in House District 10 (Hickory Plan) and Senate District 3 (Linden Plan). His address is 1395 Antietam Ave., Unit 61, Detroit, MI 48207. (Uncontroverted Facts, ECF No. 87, PageID.2080 ⁋ 8). In Plaintiffs' demonstration map, she resides in House District 5 and Senate District 2. (PX20 at 122-125).

9.      Plaintiff Teresa DuBose resides in Senate District 10 (Linden Plan). Plaintiff Teresa DuBose's address is 3700 Chatsworth St., Detroit, MI 48224. (Uncontroverted Facts, ECF No. 87, PageID.2080 ⁋ 9). In Plaintiffs' demonstration map, she resides in House District 2 and Senate District 1. (PX20 at 122-125).

10.      Plaintiff Karen Ferguson resides in House District 7 (Hickory Plan) and Senate District 8 (Linden Plan). Her address is 20501 Livernois Ave. #21073, Detroit, MI 48221. (Uncontroverted Facts, ECF No. 87, PageID.2080 ⁋ 10). In Plaintiffs' demonstration map, she resides in House District 8 and Senate District 3. (PX20 at 122-125).

11.      Plaintiff Kimberly Hill Knott resides in House District 7 (Hickory Plan) and Senate District 8 (Linden Plan). Her address is 19391 Warrington Dr., Detroit, MI 48221. (Uncontroverted Facts, ECF No. 87, PageID.2080 ⁋ 11). In Plaintiffs' demonstration map, she resides in House District 8 and Senate District 3. (PX20 at 122-125).

12.     Plaintiff Michelle Keeble resides in House District 12 (Hickory Plan) and Senate District 11 (Linden Plan). Her address is 16015 East 7 Mile Road, Detroit, MI 48205. (Uncontroverted Facts, ECF No. 87, PageID.2081 ⁋ 12). In Plaintiffs' demonstration map, she resides in House District 8 and Senate District 5. (PX20 at 122-125).

13.     Plaintiff Barbara Gail London resides in House District 12 (Hickory Plan) and Senate District 11 (Linden Plan). Her address is 16508 Bringard Dr., Detroit, MI 48205. (Uncontroverted Facts, ECF No. 87, PageID.2081 ⁋ 13). In Plaintiffs' demonstration map, she resides in House District 1 and Senate District 1. (PX20 at 122-125).

14.     Plaintiff Glenda McDonald resides in House District 8 (Hickory Plan) and Senate District 3 (Linden Plan). Her address is 251 Connecticut St., Highland Park, MI 48203. (Uncontroverted Facts, ECF No. 87, PageID.2081 ⁋ 14). In Plaintiffs' demonstration map, she resides in House District 4 and Senate District 2. (PX20 at 122-125).

15.     Plaintiff Janet Marie Overall resides in House District 1 (Hickory Plan) and Senate District 1 (Linden Plan). Her address is 1864 S. Deacon St., Detroit, MI 48217. (Uncontroverted Facts, ECF No. 87, PageID.2081 ⁋ 15). In Plaintiffs' demonstration map, she resides in House District 11 and Senate District 2. (PX20 at 122-125).

16.     Plaintiff Shirley L. Radden resides in House District 10 (Hickory Plan). Her address is 639 Rivard Blvd., Grosse Pointe, MI 48230. (Uncontroverted Facts, ECF No. 87, PageID.2081 ⁋ 16). In Plaintiffs' demonstration map, she resides in House District 2 and Senate District 12. (PX20 at 122-125).

17.     Plaintiff Davonte Sherard resides in Senate District 1 (Linden Plan). His address is 3844 12th St., Apt #102, Ecorse, MI 48229. (Uncontroverted Facts, ECF No. 87, PageID.2081 ⁋

17). In Plaintiffs' demonstration map, he resides in House District 12 and Senate District 2. (PX20 at 122-125).

18.     Plaintiff Michelle T. Smith resides in Senate District 6 (Linden Plan). Her address is 36554 W. Lyman Rd., Farmington Hills, MI 48331. (Uncontroverted Facts, ECF No. 87, PageID.2081 ⁋ 18). In Plaintiffs' demonstration map, she resides in House District 53 and Senate District 9. (PX20 at 122-125).

19.     Plaintiff Kenyetta Snapp resides in House District 11 (Hickory Plan). Her address is 1405 Shore Club Drive, Saint Clair Shores, Michigan 48080. (Uncontroverted Facts, ECF No. 87, PageID.2081 ⁋ 19). In Plaintiffs' demonstration map, she resides in House District 1 and Senate District 1. (PX20 at 122-125).

20.     Plaintiff Donyale Stephen-Atara resides in House District 14 (Hickory Plan) and Senate District 10 (Linden Plan). Her address is 30403 Berghway Trail, Warren, MI 48092. (Uncontroverted Facts, ECF No. 87, PageID.2082 ⁋ 20). In Plaintiffs' demonstration map, she resides in House District 26 and Senate District 10. (PX20 at 122-125).

21.     Plaintiff Tanesha Wilson resides in House District 14 (Hickory Plan) and Senate District 10 (Linden Plan). Her address is 19354 Cliff St., Detroit, MI 48234. (Uncontroverted Facts, ECF No. 87, PageID.2082 ⁋ 21). In Plaintiffs' demonstration map, she resides in House District 3 and Senate District 1. (PX20 at 122-125).

**B.     Defendants**

22.     Defendant Michigan Independent Citizens Redistricting Commission (hereafter the "Commission") is charged with adopting redistricting plans for the Michigan Senate and House Districts pursuant to Mich. Const. art. IV, § 6(1). The Commission consists of 13 commissioners. Four commissioners are associated with the Democratic Party and the Republican Party,

respectively. Five commissioners are unaffiliated with either the Democratic or Republican parties. Mich. Const. art. IV, § 6(1). (Uncontroverted Facts, ECF No. 87, PageID.2082 ⁋ 22).

23.    Defendant Douglas Clark ("Defendant Clark") is a commissioner on the Commission and is affiliated with the Republican Party. Defendant Clark is named in this action in his official capacity. (Uncontroverted Facts, ECF No. 87, PageID.2082 ⁋ 23).

24.    Defendant Juanita Curry ("Defendant Curry") is a commissioner on the Commission and is affiliated with the Democratic Party. Defendant Curry is named in this action in her official capacity. (Uncontroverted Facts, ECF No. 87, PageID.2082 ⁋ 24).

25.    Defendant Anthony Eid ("Defendant Eid") is a commissioner on the Commission and is unaffiliated with both the Democratic and Republican parties. Defendant Eid is named in this action in his official capacity. (Uncontroverted Facts, ECF No. 87, PageID.2082 ⁋ 25).

26.    Defendant Rhonda Lange ("Defendant Lange") is a commissioner on the Commission and is affiliated with the Republican Party. Defendant Lange is named in this action in her official capacity. (Uncontroverted Facts, ECF No. 87, PageID.2083 ⁋ 26).

27.    Defendant Cynthia Orton ("Defendant Orton") is a commissioner on the Commission and is affiliated with the Republican Party. Defendant Orton is named in this action in her official capacity. (Uncontroverted Facts, ECF No. 87, PageID.2083 ⁋ 27).

28.    Defendant Erin Wagner ("Defendant Wagner") is a commissioner on the Commission and is affiliated with the Republican Party. Defendant Wagner is named in this action in her official capacity. (Uncontroverted Facts, ECF No. 87, PageID.2083 ⁋ 28).

29.    Defendant Brittni Kellom ("Defendant Kellom") is a commissioner on the Commission and is affiliated with the Democratic Party. Defendant Kellom is named in this action in her official capacity. (Uncontroverted Facts, ECF No. 87, PageID.2083 ⁋ 29).

30.    Defendant M.C. Rothhorn ("Defendant Rothhorn") is a commissioner on the Commission and is affiliated with the Democratic Party. Defendant Rothhorn is named in this action in his official capacity. (Uncontroverted Facts, ECF No. 87, PageID.2083 ⁋ 30).

31.    Defendant Dustin Witjes ("Defendant Witjes") is a commissioner on the Commission and is affiliated with the Democratic Party. Defendant Witjes is named in this action in his official capacity. (Uncontroverted Facts, ECF No. 87, PageID.2083 ⁋ 31).

32.    Defendant Steven Lett ("Defendant Lett") is a commissioner on the Commission and is unaffiliated with either the Democratic or Republican parties. Defendant Lett is named in this action in his official capacity. (Uncontroverted Facts, ECF No. 87, PageID.2083 ⁋ 32).

33.    Defendant Janice Vallette ("Defendant Vallette") is a commissioner on the Commission and is unaffiliated with either the Democratic or Republican parties. Defendant Vallette is named in this action in her official capacity. (Uncontroverted Facts, ECF No. 87, PageID.2084 ⁋ 33).

34.    Defendant Richard Weiss ("Defendant Weiss") is a commissioner on the Commission and is unaffiliated with either the Democratic or Republican parties. Defendant Weiss is named in this action in his official capacity. (Uncontroverted Facts, ECF No. 87, PageID.2084 ⁋ 34).

35.    Defendant Rebecca Szetela ("Defendant Szetela") is a commissioner on the Commission and is unaffiliated with either the Democratic or Republican parties. Defendant Szetela is named in this action in her official capacity. (Uncontroverted Facts, ECF No. 87, PageID.2084 ⁋ 35). Defendant Szetela served as the Commission's Vice Chair between March 2021 through September 2021 and Chair between September 2021 and March of 2022. (Szetela, Trial Tr. Vol. I at 15-17, ECF 112, PageID.3596-98). She attended 97% of the Commission's

meetings and was intimately involved in the drawing of the Detroit-area Senate and House districts. (*Id.*) She was born, raised, educated, and still resides in Wayne County, Michigan. (*Id.*) She is a mother of four and a practicing attorney specializing in intellectual property law. (*Id.*)

36.     Defendant Jocelyn Benson ("Defendant Benson") is the Michigan Secretary of State. As Secretary of State, among other responsibilities, Defendant Benson is charged with administering elections for the Michigan House of Representatives and Michigan Senate, and of accepting the declarations of candidacy for Michigan Senate and House candidates. (Uncontroverted Facts, ECF No. 87, PageID.2084 ⁋ 36).

## II.     **MICHIGAN'S RACIAL DEMOGRAPHICS**

37.     The United States 2020 Census found that 73.9% of Michigan residents identified their race as white alone, while 13.7% of Michigan residents identified as "Black alone." (Uncontroverted Facts, ECF No. 87, PageID.2084 ⁋ 37).

38.     A near super-majority of the State's residents who identify as "Black alone" reside in Wayne, Oakland, and Macomb counties. The 2020 Census reports that 37.6% of the State's population that identifies as "Black or African American alone" resides in Wayne County, 12.4% resides in Macomb County, and 13.4% resides in Oakland County. (Uncontroverted Facts, ECF No. 87, PageID.2084 ⁋ 38).

39.     The City of Detroit has a population, reported on the 2020 Census, of 639,111 residents, 77.9% of which identify as "Black or African American alone." (Uncontroverted Facts, ECF No. 87, PageID.2084 ⁋ 39).

40.     Figures 1, 3, 4, and 5 of the Trende Expert Report accurately illustrate the numerosity and intense concentration of Michigan's Black Voting Age Population ("BVAP"). (Trende Report, PX 20 at 13-17.)

41.     Based on the compactness of the BVAP in the Detroit Metropolitan Area, it is possible to draw at least five (5) reasonably configured majority-Black Senate districts and at least ten (10) reasonably configured majority-Black House districts while also complying with the other demands of the Michigan Constitution. (Trende Report, PX 20 at 9, 22-26, 81-84.)

### III.   MICHIGAN'S HISTORY OF RACIAL DISCRIMINATION

42.     Michigan has a long history of official political and non-political discrimination against its Black residents which is described in part in Bruce Adelson's Memorandum entitled "History of Discrimination in the State of Michigan and its Influence on Voting," (PX21 at 1-30), as well as Dr. Brad Lockerbie's January 15, 2023 Expert Report, (PX19 at 1-31).

43.     Examples of such discrimination include but are not limited to: (a) Black persons were enslaved in Detroit until 1815; (b) slavery continued in Michigan until it was officially abolished upon statehood; (c) Michigan's initial state constitution prevented Black residents from serving on juries and voting; (d) it was not until 1885 that Michigan enacted a statute to make "discrimination in public places illegal," and not until 1925 that the statute was enforced; (e) although the Michigan legislature banned de jure segregation after the Civil War, the City of Detroit still maintained racially segregated schools; (f) during the 20th century, Michigan, including the City of Detroit, was a stronghold of the Ku Klux Klan, the Klan regularly held its klonvocation at the state capital, and the Klan used dynamite to blow up 10 empty school buses in Pontiac to dissuade school desegregation efforts; (g) a race riot in 1943 on Belle Isle resulted in 34 deaths (25 blacks and nine whites), almost 700 people injured, and millions of dollars of property damage; (h) the "12th Street Riot" of 1967 was a confrontation between Black residents of Detroit and the police force that caused President Lyndon Johnson to deploy federal troops and resulted in 43 deaths, 467 injured, and over 2,000 buildings destroyed; (i) Michigan has employed discriminatory voting practices and people of color in Michigan generally have longer wait times

at election polling locations; (j) in 1976, the US Attorney General and Census Director added Michigan to the list of states covered by Section 5 of the Voting Rights Act and in 2007, the US Department of Justice used Section 5 to stop the state from closing a branch of the Secretary of State's office; and (k) high levels of racial segregation in housing, redlining, racially restrictive covenants, and unlawful foreclosures permeated the Detroit area during the 20th Century. (See, e.g., PX 19 at 7-15; PX 21 at 4-12, 25-29; Lockerbie, Trial Tr. Vol. II at 182-84, 187-189, ECF 102, PageID.2722-24, 2727-29.

44.     In particular, former Representative Lamar Lemmons testified regarding his growing up near the "Ossian Sweet" House and recounted memories of having a cross burned in the yard of a Black neighbor. (Lemmons, Trial Tr. Vol. II at 228, ECF 102, PageID.2768). Similarly, Defendant Szetela detailed her memories of racial discrimination in Dearborn aimed at keeping Black persons from owning homes in white neighborhoods and preventing Black children from playing at parks in white neighborhoods. (Szetela, Trial Tr. Vol. I at 115-17, ECF 112, PageID.3696-98).

45.     The effect of that racial discrimination against Black residents is still being felt today where Michigan's Black residents are considerably less educated than Michigan's White residents and it is an accepted finding in the study of American political science that education is positively related to voter turnout. Michigan's Black residents also have fewer economic resources than Michigan's white residents. This economic divide is exacerbated when comparing Black residents from urban areas of Detroit with white residents from the suburbs of Oakland, Macomb, and Wayne Counties. (See, e.g., PX 19 at 15-16, 21; PX 21 at 12-14, 22-25; Lockerbie, Trial Tr. Vol. II at 189-93, ECF 102, PageID.2729-33).

46.     Detroit's history of discrimination has led to disparities in voting access. For instance, studies show that around 90% of voters of color had increased vote times compared to their White counterparts. These waits are compounded by the fact that about one-third of people living in the Detroit do not have a car and even getting to the polling place might be difficult for those with lower income. The lack of access is exacerbated by Michigan law preventing ridesharing services like Uber from providing a discounted rate to transport people to polling places. Furthermore, racial disparities in health have negatively impacted likelihood of Black residents in Detroit to vote. (See, e.g., PX 19 at 15-16, 21; PX 21 at 16-19, 20-23, 30).

47.     These disparities adversely impact Black voter turnout, candidate emergence, and availability of financial resources to conduct campaigns. (See, e.g., PX 19 at 15-16, 21; PX21 at 21-22). Former Representative Lemmons testified that voter turnout is lower in the Black community in part due to poverty and a lack of education and, as a result, Black candidates have a harder time achieving electoral success than white candidates. (Lemmons, Trial Tr. Vol. II at 239, ECF 102, PageID.2779). Former Senator Smith explained that lower BVAPs in Detroit districts suppress candidate emergence such as occurred in Senate District 10 in 2020. (Smith, Trial Tr. Vol. II at 222, ECF 102, PageID.2762). Additionally, the lack of electoral success of Black-preferred candidates is known to suppress the future emergence of qualified, Black-preferred candidates. (Lockerbie, Trial Tr. Vol. II at 190-92, ECF 102, PageID.2730-32).

48.     Continued racial discrimination adversely impacts efforts by Black candidates to pursue and obtain legislative office especially when campaigning in predominately white areas. (See e.g., PX 21 at 12; Lockerbie, Trial Tr. Vol. II at 189-90, ECF 102, PageID.2729-30). For example, former Senator Smith recounted his experience having had police called on him while campaigning in Allen Park donned in campaign apparel. (Smith, Trial Tr. Vol. II at 208-09, ECF

11

102, PageID.2748-49). Former Representative Lemmons, illustrated the strategy of Black candidates needing to hire white campaign staff to achieve a higher connection rate in white neighborhoods. (Lemmons, Trial Tr. Vol. II at 233, ECF 102, PageID.2773).

49.     Several Black candidates and campaign staff (including those for Marshall Bullock and Reggie Reg Davis in 2022) have experienced varying levels of racial discrimination while campaigning in predominately white areas which include: (a) comparatively lower door open rates; (b) white voters comparatively lower willingness to engage in listening and feedback; and (c) white residents engaging in hostile and derogatory behavior ranging from dismissive rudeness to outright racial name calling and threats to leave the property or neighborhood. (See, e.g., Smith, Trial Tr. Vol. II at 209-14, ECF 102, PageID.2749-54; Lemmons, Trial Tr. Vol. II at 232-33, ECF 102, PageID.2772-73). Lockerbie, Trial Tr. Vol. II at 189-190, ECF 102, PageID.2729-30). As former Senator Smith explained, "[t]he more affluent the territory got, the more they did not want us [(i.e., Black candidates)] out there." (Smith, Trial Tr. Vol. II at 214, ECF 102, PageID.2754).

50.     Indeed, Mr. Adelson reported that there has been a general upward trend in racial harassment and White Supremacist activity in the state and people of color are still denied mortgages that are routinely given to White people in similar circumstances. (PX 21 at 12-16).

51.     Historically, Michigan Black voters have voted cohesively in general elections, first in favor of the pro-abolitionist Republican Party following the Civil War, and then transitioning to the Democrat Party following the New Deal in the 1930s and increasing with the civil rights legislation signed into law by United States Presidents John F. Kennedy and Lyndon B. Jonson, to the point that by 2016, only 8% of Black voters identified as Republicans, and 70% as Democrats. In the 2016 Presidential Election, 88% of Black voters voted for the Democratic nominee. (See, e.g., PX 19 at 16-21; PX21 at 3-4; Lockerbie, Trial Tr. Vol. II at 186, ECF 102, PageID.2726).

52.     Black voters in the Metro Detroit area vote "politically cohesively," as exhibited by the fact that 94% of Detroit electorate voted for the Democratic nominee in the 2020 Presidential Election. Black voters encompass 71% of Detroit's population. The Democratic nominee received 50.6% of the statewide vote. And, Black voters account for 14% of Michigan's statewide population, but account for 20% of the Democratic vote. (PX 19 at 16-21).

53.     There is also a general disparity of interest between Black urban voters and White suburban voters in the Detroit area on legislative policies regarding insurance, education, policing and criminal justice, prison reform, banking, housing, emergency management, affirmative action, and reparations. (Smith, Trial Tr. Vol. II at 210-11, 220-221, ECF 102, PageID.2750-51, 2760-61; Lemmons, Trial Tr. Vol. II at 237-38, ECF 102, PageID.2777-78).

54.     One example involves viewpoints and policy decisions related to the Michigan Emergency Manager Referendum, also known as Public Act 4 of 2011, Local Government and School District Fiscal Accountability Act, which was on the November 6, 2012 statewide ballot in Michigan as Proposal 1 of 2012. While 82% of Detroit voters opposed the Emergency Manager Law, only 53% of voters statewide opposed the Emergency Manager Law representing a clear distinction between White and Black policy preference.[12] (PX 21 at 19-22).

55.     In Oakland County, 80% of the predominately Black City of Pontiac voted "no" whereas over 80% of the predominately White City of Birmingham voted "yes."[3] In Macomb County, another contrast is the predominately Black area of Eastpointe which voted "no" by a huge margin and the predominately White areas of Shelby, Bruce, and Washington Townships which

---

[1] https://detroitmi.gov/sites/detroitmi.localhost/files/201805/general_eletion_nov_2012_official_local_summary__report_w_group_details.pdf

[2] https://ballotpedia.org/Michigan_Emergency_Manager_Referendum,_Proposal_1_(2012).
[3] https://results.enr.clarityelections.com/MI/Oakland/43747/114561/en/md_data.html?cid=0338&a=Pontiac%2017#Pontiac%2017

voted "yes" by a big margin.[4] Similarly, another difference from Wayne County was the predominately Black areas of Detroit/Inkster which overwhelming voted "no" and the predominately White areas of Grosse Point, Plymouth, and Northville which voted "yes" by a wide margin.[5]

56.     "Recent political campaigns in Michigan, particularly in regions with large black population centers, have been marred with direct and indirect racial appeals." *Michigan State A. Philip Randolph Inst. v. Johnson*, 209 F. Supp. 3d 935, 952–53 (E.D. Mich. 2016); see also Lockerbie, Trial Tr. Vol. II at 190, ECF 102, PageID.2730).

## IV.     PAST REDISTRICTING

57.     Prior to 2018, redistricting in Michigan was the responsibility of the state legislature. (Uncontroverted Facts, ECF No. 87, PageID.2085 ⁋ 40).

58.     Following the 1990 census, the Michigan legislature adopted redistricting plans which were challenged on several grounds. The Michigan Supreme Court appointed three special masters to consider several proposed redistricting plans. Finding none of the plans acceptable, the special masters created their own, which the Michigan Supreme Court approved with modification. (Uncontroverted Facts, ECF No. 87, PageID.2085 ⁋ 41 citing *In re Apportionment of State Legislature,* 439 Mich. 715, 747, 486 N.W.2d 639 (1992)).

59.     The final plan approved by the Michigan Supreme Court contained *five* Senate and *thirteen* House districts with BVAPs over 54% and 57% respectively.

---

[4] https://clerk.macombgov.org/sites/default/files/content/government/clerk/pdfs/electionresults/macomb_county_election_results_november_6_2012.pdf

[5] https://www.waynecounty.com/elected/clerk/november-6-2012-general.aspx

47

| Wayne County | Population | Divergence | Black Population |
|---|---|---|---|
| Senate District 1 | 230,664 | −13,949 (5.70%) | 126,448 (54.82%) |
| Senate District 2 | 229,997 | −14,616 (5.98%) | 162,704 (70.74%) |
| Senate District 3 | 227,783 | −16,830 (6.88%) | 159,973 (70.23%) |
| Senate District 4 | 227,314 | −17,299 (7.07%) | 192,798 (84.82%) |
| Senate District 5 | 226,121 | −18,492 (7.56%) | 158,043 (69.89%) |
| House District 2 | 81,492 | −3,011 (3.56%) | 52,722 (64.70%) |
| House District 3 | 82,454 | −2,049 (2.42%) | 72,918 (88.43%) |
| House District 4 | 82,133 | −2,370 (2.80%) | 73,833 (89.89%) |
| House District 5 | 80,058 | −4,445 (5.26%) | 52,365 (65.41%) |
| House District 6 | 82,732 | −1,771 (2.10%) | 56,842 (68.71%) |
| House District 7 | 82,977 | −1,526 (1.81%) | 68,790 (82.90%) |
| House District 9 | 81,439 | −3,064 (3.63%) | 65,369 (80.27%) |
| House District 10 | 80,748 | −3,755 (4.44%) | 74,513 (92.28%) |
| House District 11 | 81,669 | −2,834 (3.35%) | 78,241 (95.80%) |
| House District 12 | 80,522 | −3,981 (4.71%) | 73,498 (91.28%) |
| House District 13 | 80,124 | −4,379 (5.18%) | 45,747 (57.10%) |
| House District 14 | 82,260 | −2,243 (2.65%) | 55,146 (67.04%) |

[6]

60.     Following the 2010 census, Michigan's Republican controlled Legislature passed Public Act 129 of 2011, which apportioned Michigan's 110 representative districts and 38 senatorial districts (the "2011 plan"). (Uncontroverted Facts, ECF No. 87, PageID.2085 ⁋ 42).

61.     However, former Senator, Virgil Smith, a Democrat, served on the Senate Committee on Redistricting and testified that his objective for the 2011 plan was to keep the BVAPs of the Detroit districts between 51% and 55% and to avoid districts that crossed county lines. (Smith, Trial Tr. Vol. II at 206-07, ECF 102, PageID.2746-47).

62.     Similarly, former Representative, Lamar Lemmons, also a Democrat, testified that higher BVAPs for Detroit-area districts would make the success of either a Black candidate or a Black candidate of choice more likely. (Lemmons, Trial Tr. Vol. II at 234, ECF 102, PageID.2774).

---

[6] *In re Apportionment of State Legislature,* 439 Mich. 715, 735 n.47; 486 N.W.2d 639 (1992)).

63.      In the 2011 state house plan, 11 districts were majority-Black, including districts with Black voting-age populations (BVAPs) as high as 92% (HD7), 90% (HD8), 88% (HD3), and 72% (HD9). Ten of these majority-Black districts were in the Detroit-area. (Uncontroverted Facts, ECF No. 87, PageID.2085 ⁋ 43).

64.      The 2011 state senate plan provided for one or two senate districts with Black majorities, depending on the calculation of BVAP used, plus three or four more with BVAPs[7] above 45%. (Uncontroverted Facts, ECF No. 87, PageID.2085 ⁋ 44).

65.      The chart below shows percentage Black VAP and select election results from the 2018 general election, which speak for themselves:

---

[7] There are different means of calculating BVAP, depending on whether the total number of persons counted as "Black" includes those people who self-identify in the Census as Black alone or both Black and a member of another minority group. *Id.*

| State Senate District | Total VAP | Black VAP | Percent Black VAP | Name | party | race | Percent of vote 2018 |
|---|---|---|---|---|---|---|---|
| 5 | 203828 | 111418 | 54.66% | Betty Jean Alexander | D | Black | 77.4 |
| 2 | 169357 | 86961 | 51.35% | Adam Hollier | D | Black | 75.7 |
| 3 | 186758 | 90737 | 48.59% | Sylvia Santana | D | Black | 81.8 |
| 4 | 180199 | 85691 | 47.55% | Marshall Bullock | D | Black | 78.3 |
| 1 | 193087 | 87075 | 45.10% | Stephanie Chang | D | Asian | 72.0 |
| 11 | 229870 | 82336 | 35.82% | Jeremy Moss | D | White | 76.7 |
| 27 | 175918 | 54071 | 30.74% | Jim Ananich | D | White | 71.2 |
| 9 | 219325 | 50800 | 23.16% | Paul Wojno | D | White | 65.9 |
| 6 | 217734 | 46997 | 21.58% | Erika Geiss | D | Black | 61.4 |
| 12 | 211638 | 32206 | 15.22% | Rosemary Bayer | D | White | 49.4 |
| 18 | 243159 | 36228 | 14.90% | Jeff Irwin | D | White | 76.6 |
| 23 | 215527 | 30579 | 14.19% | Curtis Hertel Jr. | D | White | 68.5 |
| 32 | 202924 | 28006 | 13.80% | Ken Horn | R | White | 55.5 |
| 29 | 225476 | 30876 | 13.69% | Winnie Brinks | D | White | 56.9 |
| 20 | 204328 | 24631 | 12.05% | Sean McCann | D | White | 53.1 |
| 34 | 195673 | 19534 | 9.98% | Jon Bumstead | R | White | 50.7 |
| 21 | 207567 | 20185 | 9.72% | Kim LaSata | R | White | 58.1 |
| 10 | 232106 | 19162 | 8.26% | Michael Macdonald | R | White | 51.0 |
| 7 | 225553 | 17825 | 7.90% | Dayna Polehanki | D | White | 50.6 |
| 19 | 204186 | 15725 | 7.70% | John Bizon | R | White | 58.6 |
| 15 | 226099 | 16436 | 7.27% | Jim Runestad | R | White | 51.7 |
| 8 | 227952 | 15653 | 6.87% | Peter J. Lucido | R | White | 61.8 |
| 26 | 212280 | 14313 | 6.74% | Aric Nesbitt | R | White | 56.7 |
| 16 | 195953 | 12509 | 6.38% | Mike Shirkey | R | White | 62.7 |
| 14 | 201692 | 11250 | 5.58% | Ruth Johnson | R | White | 55.7 |
| 28 | 214199 | 10152 | 4.74% | Peter Macgregor | R | White | 58.4 |
| 24 | 213683 | 8997 | 4.21% | Tom Barrett | R | White | 53.5 |
| 13 | 229773 | 9353 | 4.07% | Mallory Mcmorrow | D | White | 51.9 |
| 33 | 193451 | 7781 | 4.02% | Rick Outman | R | White | 58.8 |
| 17 | 200526 | 6436 | 3.21% | Dale W. Zorn | R | White | 57.9 |
| 30 | 226068 | 5258 | 2.33% | Roger Victory | R | White | 63.3 |
| 25 | 206658 | 4409 | 2.13% | Dan Lauwers | R | White | 64.0 |
| 37 | 209210 | 4076 | 1.95% | Wayne Schmidt | R | White | 59.0 |
| 31 | 195335 | 3241 | 1.66% | Kevin Daley | R | White | 60.2 |
| 38 | 202739 | 3086 | 1.52% | Ed McBroom | R | White | 54.6 |
| 22 | 213082 | 2912 | 1.37% | Lana Theis | R | White | 56.0 |
| 35 | 204742 | 2729 | 1.33% | Curt VanderWall | R | White | 63.2 |
| 36 | 196947 | 1872 | 0.95% | Jim Stamas | R | White | 64.3 |

[8]

66.     As depicted in the previous chart, all districts with a BVAP of 48% or higher resulted in the election of a Black Senator.

67.     The 2011 plan provided for eleven House districts with BVAPs above 50%. (Uncontroverted Facts, ECF No. 87, PageID.2086 ⁋ 46).

68.     The chart below shows percentage Black VAP and select election results from the 2020 general election:

---

[8] (Uncontroverted Facts, ECF No. 87, PageID.2086 ⁋ 45).

| State House District | Total VAP | Black VAP | Percent Black VAP | Name | Party | Race | Percent of Vote 2020 |
|---|---|---|---|---|---|---|---|
| 7 | 60347 | 57256 | 94.88% | Helena Scott | D | Black | 93.0 |
| 8 | 62448 | 58042 | 92.94% | Stephanie A. Young | D | Black | 96.7 |
| 3 | 54130 | 49536 | 91.51% | Shri Thanedar | D | Asian | 93.3 |
| 9 | 62529 | 46806 | 74.85% | Karen Whitsett | D | Black | 94.2 |
| 10 | 69209 | 46977 | 67.88% | Mary Cavanagh | D | Hispanic | 84.8 |
| 1 | 59788 | 38993 | 65.22% | Tenisha R. Yancey | D | Black | 75.8 |
| 35 | 78306 | 49325 | 62.99% | Kyra Harris Bolden | D | Black | 82.9 |
| 34 | 49491 | 30419 | 61.46% | Cynthia R. Neeley | D | Black | 86.7 |
| 2 | 57031 | 33142 | 58.11% | Joe Tate | D | Black | 74.1 |
| 5 | 49290 | 27190 | 55.16% | Cynthia A. Johnson | D | Black | 93.4 |
| 6 | 67505 | 36182 | 53.60% | Tyrone Carter | D | Black | 100.0 |
| 4 | 68749 | 32761 | 47.65% | Abraham Aiyash | D | ME | 89.8 |
| 29 | 72319 | 26621 | 36.81% | Brenda Carter | D | Black | 72.9 |
| 95 | 58640 | 21320 | 36.36% | Amos O'Neal | D | Black | 70.1 |
| 49 | 64844 | 19308 | 29.78% | John D. Cherry | D | White | 68.9 |
| 54 | 72426 | 21212 | 29.29% | Ronnie Dean Peterson | D | Black | 77.7 |
| 12 | 73883 | 20207 | 27.35% | Alex Garza | D | Hispanic | 62.4 |
| 11 | 73586 | 19760 | 26.85% | Jewell Jones | D | Black | 65.2 |
| 92 | 66135 | 16957 | 25.64% | Terry J. Sabo | D | White | 65.3 |
| 27 | 73337 | 18051 | 24.61% | Regina Weiss | D | White | 74.4 |
| 75 | 76956 | 18127 | 23.56% | David LaGrand | D | White | 74.6 |
| 16 | 74617 | 17556 | 23.53% | Kevin Coleman | D | White | 62.5 |
| 68 | 71672 | 16808 | 23.45% | Sarah Anthony | D | Black | 75.9 |
| 18 | 75251 | 16519 | 21.95% | Kevin Hertel | D | White | 60.3 |
| 60 | 74176 | 15887 | 21.42% | Julie M. Rogers | D | White | 71.4 |
| 22 | 68758 | 14588 | 21.22% | Richard M. Steenland | D | White | 59.9 |
| 28 | 70132 | 14012 | 19.98% | Lori M. Stone | D | White | 60.3 |
| 79 | 65091 | 12312 | 18.92% | Pauline Wendzel | R | White | 56.6 |
| 31 | 71180 | 13047 | 18.33% | William J. Sowerby | D | White | 56.3 |
| 37 | 78055 | 14166 | 18.15% | Samantha Steckloff | D | White | 63.9 |
| 62 | 69641 | 11301 | 16.23% | Jim Haadsma | D | White | 51.3 |
| 21 | 77493 | 11721 | 15.13% | Ranjeev Puri | D | Asian | 59.2 |
| 76 | 79357 | 11258 | 14.19% | Rachel Hood | D | White | 62.8 |
| 72 | 79315 | 10619 | 13.39% | Steven Johnson | R | White | 55.1 |
| 50 | 72856 | 8173 | 11.22% | Tim Sneller | D | White | 54.2 |
| 24 | 73550 | 8072 | 10.97% | Steve Marino | R | White | 57.5 |
| 55 | 79483 | 8123 | 10.22% | Felicia Brabec | D | White | 72.4 |
| 64 | 65167 | 6497 | 9.97% | Julie Alexander | R | White | 60.6 |

[9]

69.     As depicted in the previous chart, nine of the eleven districts with BVAPs above 53% resulted in Black representatives.

---

[9] (Uncontroverted Facts, ECF No. 87, PageID.2087 ⁋ 47).

70.     The 2011 redistricting map districts were effective until the Commission adopted the Hickory and Linden Plans on December 28, 2021. (Uncontroverted Facts, ECF No. 87, PageID.2087 ⁋ 48).

V.     **THE COMMISSION'S REDISTRICTING PROCESS**

A.     **Mich. Const. art IV, § 6**

71.     In 2018, Michigan voters approved a ballot proposal that amended the state Constitution by transferring authority to create the State's congressional and legislative districts from the Legislature to the Commission. (Uncontroverted Facts, ECF No. 87, PageID.2088 ⁋ 49 citing Mich. Const. art. IV, § 6(1) and (7)).

72.     The amendment directs that Michigan's Secretary of State and "chief election officer," Jocelyn Benson, oversee, assist with, and enforce the Commission's maps. (Uncontroverted Facts, ECF No. 87, PageID.2088 ⁋ 50 citing Mich. Const. art. IV, § 6(2) and (4); MCL 168.21; Order, ECF.29, PageID.386-89).

73.     Article IV, Section 6(10) of the Michigan Constitution required transparency in Commission proceedings including that: (a) "[e]ach commissioner shall perform his or her duties in a manner that is impartial and reinforces public confidence in the integrity of the redistricting process;" (b) "[t]he commission shall conduct all of its business at open meetings;" (c) "[n]ine commissioners, including at least one commissioner from each selection pool shall constitute a quorum, and all meetings shall require a quorum;" (d) "[t]he commission shall provide advance public notice of its meetings and hearings;" (e) "[t]he commission shall conduct its hearings in a manner that invites wide public participation throughout the state;" and (f) "[t]he commission shall use technology to provide contemporaneous public observation and meaningful public participation in the redistricting process during all meetings and hearings." Mich. Const. art. IV, § 6(10).

74.     Article IV, Section 6(13) of the Michigan Constitution required the Commission to consider the following criteria in order of priority: (a) Districts shall be of equal population as mandated by the United States constitution, and shall comply with the voting rights act and other federal laws; (b) Districts shall be geographically contiguous. Island areas are considered to be contiguous by land to the county of which they are a part; (c) Districts shall reflect the state's diverse population and communities of interest. Communities of interest may include, but shall not be limited to, populations that share cultural or historical characteristics or economic interests. Communities of interest do not include relationships with political parties, incumbents, or political candidates; (d) Districts shall not provide a disproportionate advantage to any political party. A disproportionate advantage to a political party shall be determined using accepted measures of partisan fairness; (e) Districts shall not favor or disfavor an incumbent elected official or a candidate. (f)  Districts shall reflect consideration of county, city, and township boundaries; and (g) Districts shall be reasonably compact. (Uncontroverted Facts, ECF No. 87, PageID.2088 ¶ 51).

75.     Article IV, Section 6(14)(c) of the Michigan Constitution provided that "[a] final decision of the commission to adopt a redistricting plan requires a majority vote of the commission, including at least two commissioners who affiliate with each major party, and at least two commissioners who do not affiliate with either major party." Mich. Const. art. IV, § 6(14)(c).

76.     If no plan satisfies that requirement for a type of district, Article IV, Section 6(14)(c)(i)-(iii) required the commission shall use the following procedure to adopt a plan for that type of district:

(i)     Each commissioner may submit one proposed plan for each type of district to the full commission for consideration.

(ii)    Each commissioner shall rank the plans submitted according to preference. Each plan shall be assigned a point value inverse to its ranking among the number of choices, giving the lowest ranked plan one point and the highest ranked plan a point value equal to the number of plans submitted.

20

(iii)    The commission shall adopt the plan receiving the highest total points, that is also ranked among the top half of plans by at least two commissioners not affiliated with the party of the commissioner submitting the plan, or in the case of a plan submitted by non-affiliated commissioners, is ranked among the top half of plans by at least two commissioners affiliated with a major party. If plans are tied for the highest point total, the secretary of state shall randomly select the final plan from those plans. If no plan meets the requirements of this subparagraph, the secretary of state shall randomly select the final plan from among all submitted plans pursuant to part (14)(c)(i).

77.     The amendment required the maps to be adopted by November 1, 2021. Mich. Const. art. IV, § 6(7).

**B.    Initial Commission Business**

78.     The Commission meetings were conducted both in person and via zoom and were generally open to the public and transcribed. (Chair Szetela, Trial Tr. Vol. I at 17, ECF 112, PageID.3598).

79.     The parties stipulated that the Commission's record of proceedings, including all Commission-produced transcripts, are true and accurate copies of the Commission's records of its official proceedings. (Uncontroverted Facts, ECF No. 87, PageID.2089 ⁋ 53).

80.     The Commissioners, however, met to discuss and corresponded regarding official business in numbers less than a quorum and thus those meetings and correspondence were neither transcribed nor made a part of the official proceedings. (Chair Szetela, Trial Tr. Vol. I at 17-18, ECF 112, PageID.3598-99).

81.     Defendant Benson called the Commission's first meeting to order on September 17, 2020. (Uncontroverted Facts, ECF No. 87, PageID.2089 ⁋ 54; see also PX 34). At the outset of the meeting, Defendant Benson noted that: "You are a literally going to draw Michigan's future, and the decisions you will make in the next year throughout your tenure will impact every citizen in this state for years to come." (PX34 at 12).

82.     The Michigan Department of State provided the Commissioners with "Commissioner Orientation and Resource Materials." (PX34 at 241-285). Those orientation materials were prepared by "The Michigan Department of State; Michigan State University Institute for Social Policy and Public Research; the University of Michigan Ford School of Public Policy's Center for Local, State, and Urban Policy; and the Princeton Gerrymandering Project." (PX34 at 241).

83.     The Commission's initial orientation materials included discussion of the Voting Rights Act and Equal Protection Clause. (Uncontroverted Facts, ECF No. 87, PageID.2089 ¶ 56). Those orientation materials also made certain staffing recommendations including that the Commission hire a legal counsel with expertise in the Voting Rights Act as well as a racially polarized voting consultant. (PX34 at 254; see also Chair Szetela, Trial Tr. Vol. I at 18, ECF 112, PageID.3599)).

84.     The Commission's initial orientation materials included a proposed timeline for conducting its business which spanned from September 2020 to November 2021. (PX34 at 251).

85.     However, delay in the U.S. Census Bureau's release of redistricting caused by the global COVID-19 pandemic prevented the Commission from achieving its constitutional duty to prepare and enact maps by the November 1, 2021, deadline set forth in Michigan Constitution art. IV, § 6(7). (Uncontroverted Facts, ECF No. 87, PageID.2089 ¶ 52). The Commission petitioned the Michigan Supreme Court to extend the November 1, 2021 deadline but the Court declined to consider the petition. *In re Indep. Citizens Redistricting Comm'n for State Legislative & Cong. Dist.'s Duty to Redraw Districts by Nov. 1, 2021*, 507 Mich. 1025, 961 N.W.2d 211, 212 (2021). As a result, the Commission did not adopt its final redistricting plans until December 28, 2021.

86.     In total, the Commission's entire redistricting process took place over a 16-month period. (Chair Szetela, Trial Tr. Vol. I at 20, ECF 112, PageID.3601).

**C.      The Commission Hires Legal Counsel and Voting Rights Act Experts**

87.     On January 7, 2021, the Commission hired Julianne Pastula to serve as the Commission's General Counsel. (Uncontroverted Facts, ECF No. 87, PageID.2089 ⁋ 58).

88.     On March 4, 2021, the Commission hired Election Data Services, Inc. to services as its vendor for "Line Drawing and Redistricting Technical Services." Pursuant to the engagement Kim Brace would serve as the lead contract manager and Dr. Lisa Handley would advise the Commission on matters relating to voting rights. (Uncontroverted Facts, ECF No. 87, PageID.2090 ⁋ 59). The engagement also provided two mapping technicians, John Morgan and Kent Stigall. (Chair Szetela, Trial Tr. Vol. I at 20-22, ECF 112, PageID.3601-03).

89.     During the Commission's interview, Dr. Handley explained the process of conducting a racially polarized voting analysis and provided two ranges as to what might be an acceptable Black Voting Age Population ("BVAP") for Detroit-are districts. First, Dr. Handley suggested that if there was no white crossover voting for Black preferred candidates, districts with BVAPs between 50-60% might be sufficient for Black voters to elect their candidates of choice. Second, Dr. Handley suggested that  if there was white crossover voting for Black preferred candidates, districts with BVAPs between 40-50% might be sufficient for Black voters to elect their candidates of choice. (Chair Szetela, Trial Tr. Vol. I at 23, ECF 112, PageID.3604; see also PX43 at 24-26).

90.     On April 8, 2021, the Commission hired Bruce Adelson of Federal Compliance Consulting, LLC to serve as its Voting Rights Act Legal Counsel. (Uncontroverted Facts, ECF No. 87, PageID.2090 ⁋ 60; see also PX45 at 10-27).

23

91.     The ranking sheet for the position of Voting Rights Act Legal Counsel had been designed by the Michigan Department of State and the Michigan Department of State had conducted the scoring and ranking of the various applicants. (Chair Szetela, Trial Tr. Vol. I at 29-30, ECF 112, PageID.3610-11). The Michigan Department of State ranked Mr. Adelson well above the other six applicants. (Vendor Evaluation Ranking and Rationale, attached as **Exhibit A**). And ultimately, the Commission only interviewed Mr. Adelson believing him to be the only qualified candidate. (Szetela, Trial Tr. Vol. I at 29-31, ECF 112, PageID.3610-12).

92.     During the Commission's interview, Mr. Adelson signaled to the Commission that Detroit area districts with BVAPs in the 70-80% range might be unconstitutional but that he might be in favor of Detroit-area districts with BVAPs as low as 30% as he had experience drafting districts with such law minority voting age population when advising redistricting bodies in other jurisdiction.  (Szetela, Trial Tr. Vol. I at 24, ECF 112, PageID.3605; see also PX45 at 12-15).

93.     The Commission received a large number of public comments expressing concern with the Commission's decision to interview and later hire Mr. Adelson. Commission staff did not provide many of these adverse public comments to the Commission until after the Commission had already voted to hire Mr. Adelson. (Szetela, Trial Tr. Vol. I at 24-26, ECF 112, PageID.3605-07). The public comments expressed concern that Mr. Adelson was an extreme partisan, had made political contributions to Defendant Benson, and had given radical legal advice on redistricting matters.  (*Id.*; see also PX46 and PX49).

94.     The public comments were discussed at the Commission's April 15, 2021 meeting. Defendant Lange made a motion to reconsider the hiring of Mr. Adelson based on the public comments and her own research. In support of her motion, Commissioner Lange stated, inter alia, that: "Next, I came across an article written by a former coworker of Mr. Adelson at the

Department of Justice in regards to the California Redistricting Commission. This was from 2011 and it states, mind you he is talking about two finalists, one being Mr. Adelson and the other person. And I'm leaving that person out because it does not pertain to this. And he stated: Adelson and blank don't have a nonpartisan bone in their bodies. They are left wing ideologues I worked with when I was at the justice department. They would be ludicrous hires for a Commission whose alleged purpose is to take participation or -- pardon me, take partisanship out of the redistricting process. Adelson consistently pushed the most radical legal positions possible in the cases I reviewed, positions that went far beyond what the law required." (PX48-9-10).

95.     Defendants Lett and Clark spoke in opposition to the motion asserting that Mr. Adelson would only be providing advice and believing that the Commissioners would be able to identify if Mr. Adelson was providing extreme or partisan advice. The motion failed by a 5-4 vote. (Chair Szetela, Trial Tr. Vol. I at 26-29, ECF 112, PageID.3607-10; see also PX48 at 9-12).

96.     Commissioner Szetela regretted having hired Mr. Adelson and having been the deciding vote defeating Commissioner Lange's motion for reconsideration for reason that Mr. Adelson was (a) extremely involved and influential in the drawing the Detroit-area districts; (b) encouraged the Commissioners to follow to follow racial targets and "unpack Detroit"; and (c) even suggested to Commissioners how to shape the Detroit-area districts. (Chair Szetela, Trial Tr. Vol. I at 29-30, ECF 112, PageID.3610-11).

97.     On May 6, 2021, the Commission approved a request for proposal to hire litigation counsel. The Commission ultimately engaged Baker Hostetler in August 2021. (Uncontroverted Facts, ECF No. 87, PageID.2090 ⁋ 61). When hiring litigation counsel, the Commission sought out attorneys with expertise in the Voting Right Act and Equal Protection claims. (Chair Szetela, Trial Tr. Vol. I at 30-31, ECF 112, PageID.3611-12).

### D.   The Commission's Listening Tour

98.     The Commission conducted its first round of public hearings across the state between May and August of 2021. The Commission ultimately held nearly 140 public meetings as of the time it adopted redistricting plans in December 2021 and received nearly 30,000 comments. (Uncontroverted Facts, ECF No. 87, PageID.2090 ⸿ 62).

99.     The Commission's first round of public hearings was referred to as its listening tour and entailed the Commission traveling around different regions of the State to learn about what the public wanted to see in the maps and to better understand communities of interest. In particular, "Detroiters were very animate from the beginning that they were afraid that we were going to crack them up. That was specifically mentioned, don't crack us up, don't mix us with the suburbs, keep us together." (Chair Szetela, Trial Tr. Vol. I at 31-32, ECF 112, PageID.3612-13).

100.     Indeed, the Commission's own April 22, 2021 Communities of Interest Process document, attached as **Exhibit B**, recognized that racial groups were "communities of interest" and stated that one of the goals of the Commission was to "keep common interest groups intact, so they can elect representatives, who will be responsive to their unique interests." (Chair Szetela, Trial Tr. Vol. I at 32-33, ECF 112, PageID.3613-14) (explaining that to constitute a community of interest "[t]he group had to be within a -- kind of compact area, couldn't be spread out all over the place").

### E.   The Commission Begins Drawing Maps

101.     By July 29, 2021, the Commission determined that an ideal population for each of the 38 senate districts would be 265,193 residents. (Uncontroverted Facts, ECF No. 87, PageID.2090 ⸿ 64).

102.     By July 29, 2021, the Commission determined that an ideal population for each of the 110 house districts would be 91,612 residents. (Uncontroverted Facts, ECF No. 87, PageID.2090 ⁋ 65).

103.     The United States Census Bureau released its legacy format 2020 census data on August 12, 2021, and the Commission began preparing draft House and Senate maps by region. (Uncontroverted Facts, ECF No. 87, PageID.2090 ⁋ 63).

104.     The Commission prepared "collaborative" and individual maps. Collaborative maps were drafted in open meetings by all Commissioners working together whereas individual maps were drafted by individual Commissioners. The Commission drafted the collaborative maps in 100 regional tranches spanning the upper peninsula to the Detroit area. And, from an overall perspective, the Commission's mapping process functioned as a "funnel" and entailed the movement from draft maps to draft proposed maps to public comment to final proposed maps and then final adopted maps. (Chair Szetela, Trial Tr. Vol. I at 34, 53, ECF 112, PageID.3615, 3634)

105.     On August 20, 2021, the Commission met to start mapping the Senate districts in the Southeast and South-central regions of Michigan. (Uncontroverted Facts, ECF No. 87, PageID.2091 ⁋ 66).

106.     The Commission used Auto Bound Edge as its mapping software which in addition to the draft political boundaries conspicuously displayed reference data such as municipal and county boundaries, overall population, voting age population, and numerous racial demographics including BVAP. (Chair Szetela, Trial Tr. Vol. I at 34-36, ECF 112, PageID.3615-17).

107.     During the August 20, 2021 meeting Kim Brace of Election Data Services provided a technical demonstration on how to use the mapping software. As part of that presentation, Mr. Brace showed the Commission how to visualize the racial demographics of proposed districts

while structuring draft districts. (PX53 at 66-67, 75). Mr. Brace also explained that the racial voting age population could also be displayed by way of colored circles on the map. (*Id.* at 70.)

108.    In describing the functionality of the mapping software, the Commission's General Counsel, Julianne Pastula, also explained that the mapping software would display "the key data racial data, voting age population, the City and County boundaries and population all of that data will be visible." (PX53 at 60).

109.    At the meeting, Mr. Adelson explained the obvious correlation between the BVAP and electoral success of the Black candidate of choice, namely that the higher the BVAP the more likely the Black candidate of choice prevails in the election. (PX53 at 75-76; see also Szetela, Trial Tr. Vol. I at 36-37, ECF 112, PageID.3617-18).

110.    Even in advance of receipt of Dr. Handley September 2, 2021 Racially Polarized Voting Analysis, Commission Clark commented that as a matter of efficiency he would like to see the racial data displayed on the screen while mapping. (PX54 at 29).

111.    This constant visualization of racial data would facilitate the Commission's predominate use of and reliance on race when crafting the Detroit-area districts for both the State House and Senate. (See infra).

F.    **Dr. Handley's September 2, 2021 Racially Polarized Voting Analysis**

112.    On September 2, 2021, Dr. Handley gave a presentation to the Commission entitled "Determining if a Redistricting Plan Complies with the Voting Rights Act." (Uncontroverted Facts, ECF No. 87, PageID.2091 ¶ 67). The slide deck for the presentation is found at PX 15 pages 1-20 and the transcript of the presentation is reviewable at PX 55 pages 19-29.

113.    Dr. Handley used the following illustration in support of her explanation that "[a] redistricting plan that dilutes minority voting strength is one that either cracks or packs a

geographically concentrated minority group" and then provided an explanation of the Gingles preconditions including minority cohesion and majority bloc voting. (PX15 at 3).



114. Because Michigan has secret ballots, Dr. Handley's racially polarized voting analysis consisted of <u>estimates</u> of racial voting patterns using ecological regression (ER), ecological inference (EI), and homogeneous precinct (HP) techniques. (PX15 at 5; see also PX55 at 20-21, 23; Lockerbie, Trial Tr. Vol. II at 187, ECF 102, PageID.2727).

115. Dr. Handley's racially polarized voting analysis focused federal and state elections between 2012 and 2020. Those elections entailed thirteen (13) statewide <u>general</u> elections and only one (1) statewide <u>democratic primary</u> election. (PX5 at 7, 13; see also PX55 at 21).

116. As a lifelong resident of Wayne County and knowing that Wayne County is predominately democratic, Defendant Szetela correctly identified that Dr. Handley's near exclusive reliance on general elections was irresponsible where "the ability for black voters to pick their candidate of choice occurs in the primary." (Chair Szetela, Trial Tr. Vol. I at 40, ECF 112, PageID.3621; see also Lockerbie, Trial Tr. Vol. II at 187, 195-96, ECF 102, PageID.2727, 2735-

36 (explaining the reasons whey primary elections are most probative and that Dr. Handley should have looked at primary elections)). Similarly, former Senator Virgil Smith testified that "[t]hese are all what we call winner take all primary elections. The general election does not matter in Detroit, Michigan." (Smith, Trial Tr. Vol. II at 215, ECF 102, PageID.2755).

117.     With respect to the general elections analyzed, six involved either a Black candidate or Black running mate. In two of those general elections, however, it was the Republican candidate (John James) who was Black but not the Black candidate of choice and for that reason Dr. Handley discounted the probative value of those elections. Dr. Handley emphasized the four remaining elections as the "bellwether contests" and explained that these elections are the "most probative." Those bellwether elections were: (a) 2012 U.S. President (Barack Obama); 2014 Secretary of State (Godfrey Dillard); 2018 Governor (Gretchen Whitmer/Garlin Gilchrist); and 2020 U.S. President (Joseph Biden/Kamala Harris). (PX5 at 7; see also PX55 at 22, 25).

118.     The one primary election analyzed by Dr. Handley did not involve a Black candidate. Moreover, in that election, the Black candidate of choice, Shri Thanedar was defeated by the white candidate of choice Gretchen Whitmer. (PX5 at 7-8; see also PX55 at 24). Defendant Szetela pointed out that because the only democratic primary election analyzed by Dr. Handley did not involve a Black candidate, the 2018 gubernatorial democratic primary was of very little probative value to the Commission. (Chair Szetela, Trial Tr. Vol. I at 40, ECF 112, PageID.3621).

119.     In any event, Dr. Handley used these elections to produce estimates of racial voting patterns for Wayne, Oakland, Saginaw, and Genesee Counties. (PX5 at 6; see also PX55 at 21; Chair Szetela, Trial Tr. Vol. I at 39-40, ECF 112, PageID.3620-21).

120.     Dr. Handley did not produce estimates of racial voting patterns for Macomb County. (PX5 at 6; see also PX55 at 21; Chair Szetela, Trial Tr. Vol. I at 39-40, ECF 112,

PageID.3620-21). Dr. Handley, in fact, acknowledged that the Commission should conduct "an area specific analysis because it turns out that voting patterns are different depending [on] where you are in the state." (PX55 at 22). This was not done prior to the final maps being drafted.

121.     Based on this analysis of county-wide voting patterns in general elections (plus one primary election sans a Black candidate), Dr. Handley stated the following conclusion: "What this tells me is that voting is polarized in Michigan. And what that means is the Voting Rights Act comes into [play and] districts that provide minority voters with the opportunity to elect their candidates must be drawn. Okay, so voting is polarized. You have to create districts if they can be created, but more importantly perhaps is that those districts that exist must be maintained." (PX55 at 24-25).

122.     Dr. Handley, nevertheless, opined that the Commission did not need to create majority-Black districts for Black voters to have the opportunity to elect Black-preferred candidates. (PX5 at 16-17; see also PX55 at 26-28). In fact, she suggested that BVAPs between 35% or 40% "might" allow Black voters to elect their candidates of choice in Wayne and Oakland Counties, respectively. (*Id.*) Stated differently, Dr. Handley recommended that the Commission draw zero majority-Black Senate or House districts in one of the most heavily Black cities in the United States; something that had not been done in the history of Michigan redistricting. (Chair Szetela, Trial Tr. Vol. I at 46, ECF 112, PageID.3627).

123.     Despite suggesting that BVAPs between 35% or 40% "might" allow Black voters to elect their candidates of choice in Wayne and Oakland Counties, Dr. Handley identified in her presentation that under the 2011 redistricting plans there were no Senate Districts with BVAPs between 36% and 45% and no House Districts with BVAPs between 37% and 47%. (PX5 at 18-19).

31

124.    Defendant Szetela properly identified that it was neither responsible or prudent to for the Commission to follow Dr. Handley's advice and set the BVAPs in the Detroit-area districts within a range that lacked any previous election data. (Chair Szetela, Trial Tr. Vol. I at 42-43, ECF 112, PageID.3623-24) ("[T]he other huge glaring issue for me is we don't have anyone between 36 percent and 44 percent, so we just simply don't have data there showing that the very ranges that she was recommending to us were actually going to be effective to allow black candidates to elect their candidates").

125.    Dr. Handley also presented certain threshold representation data from the 2011 redistricting plan in an attempt to support her recommendation that the Commission not draw any majority-Black districts in the Detroit area. (PX5 at 18-19).

126.    For example, with respect to the Senate, Dr. Handley advised the Commission that 67% of districts with BVAPs over 35% elected minority candidates. (*Id.* at 18). But as identified by Defendant Szetela, closer scrutiny shows that (a) four of the five elections cited by Dr. Handley simply entailed Black candidates winning election in districts with BVAPs between 54.66% and 47.55%; and (b) with respect to the fifth election Senator Chang, who is not Black, was not a Black candidate of choice.  (Szetela, Trial Tr. Vol. I at 41-43, ECF 112, PageID.3622-24). Thus, a more accurate way for Dr. Handley to have conveyed this data would have been to identify that the threshold data showed that districts with BVAPs between 54.66% and 47.55% resulted in electoral success for Black-preferred candidates while districts with BVAPs below 47.55% did not. (*Id.*)

127.    For example, Dr. Handley advised the Commission that with respect to the House, 89% of districts with BVAPs over 25% elected minority candidates. (*Id.* at 19). But as identified by Defendant Szetela, closer scrutiny shows that 11 of these 19 districts had BVAPs between 94.88% and 53.60% explaining the success of Black preferred candidates. Moreover, of the

remaining 8 districts, which had BVAPs between 47.65% and 25.64%, only one district with a successful Black-preferred candidate (i.e., Jewell Jones) was located in Detroit. (Chair Szetela, Trial Tr. Vol. I at 43-44, ECF 112, PageID.3624-25).

128.    Amazingly, Dr. Handley did not provide the Commission with a *Gingles* Prong One analysis showing how many reasonably configured majority-Black Senate and House districts could be drawn in the Detroit area. (Chair Szetela, Trial Tr. Vol. I at 45-46, ECF 112, PageID.3626-27).

129.    Dr. Handley acknowledged that turnout amongst Black voters in Wayne County was significantly lower than white voters. (PX55 at 23-24). But she did not address how low turnout amongst Black voters in Detroit impacted the BVAPs necessary for Black voters to elect their preferred candidates. (Chair Szetela, Trial Tr. Vol. I at 41, ECF 112, PageID.3622).

130.    Dr. Handley did, however, advise that the Commission was to conduct a district-by-district functional analysis using the four bellwether general elections to determine whether the proposed district would perform for Black voters. (PX55-25; see also Chair Szetela, Trial Tr. Vol. I at 45-49, ECF 112, PageID.3626-30).

131.    Dr. Handley's colleague, Kim Brace from Election Data Services, then integrated the precinct data from the four bellwether general elections into the mapping software so that the Commission could assess whether the Black-preferred candidates from those bellwether general elections (i.e., Obama/Biden, Godfrey Dillard, Whitmer/Gilcrest, and Biden/Harris) would have prevailed in the proposed district configuration. (PX55-33-35; see also Chair Szetela, Trial Tr. Vol. I at 49-50, ECF 112, PageID.3630-31).

132.    The bellwether functionality in the software was described by Dr. Handley as a button the Commission could hit to see an "automatic visual" the Commissioners could then use

33

to assess whether their proposed district would provide opportunity for Black voters. (PX55 at 31; see also Chair Szetela, Trial Tr. Vol. I at 49-50, ECF 112, PageID.3630-31).).

133.    This tool would be repeatedly misused throughout the mapping session since the bellwether general elections were not germane to the question of whether Black preferred candidates could prevail in democratic primary elections in the proposed districts. (Chair Szetela, Trial Tr. Vol. I at 49-52, ECF 112, PageID.3630-33). For example, the bellwether button simply showed whether in a Detroit-area district (all of which are predominately democrat) Joe Biden would have prevailed over Donald Trump, Gretchen Whitmer would have prevailed over Bill Schuette and so on. (*Id.*)

134.    Perhaps unwittingly, the Commission, often prompted by Mr. Adelson, used the bellwether functionality button extensively to access whether the proposed Detroit-area districts would provide opportunity for Black voters. This function of the mapping software thus misled the Commission to believe that any Detroit area district they drew (even with low BVAPs) would result in Black opportunity. If fact, Defendant Szetela could not recall the bellwether button reporting that a proposed Detroit district would not perform for Black voters. (Chair Szetela, Trial Tr. Vol. I at 50, ECF 112, PageID.3631).

135.    After Dr. Handley's presentation, Mr. Adelson reiterated that "Dr. Handley has established there is racially polarized voting in the State of Michigan" and then began encouraging the Commissioners to "unpack" the districts in the Detroit area. For example, Mr. Adelson cautioned: "But to the point about packing, remember that the if a District can be established through analysis to be able to elect candidates of choice of the minority community at let's say 40%, if you add on population to that, that the courts constitute that as packing. Dr. Handley had talked about I think three districts that were over 90% minority population." (PX55 at 30).

34

136.     Defendant Clark asked: "So, we've got a District that's packed. And we want to unpack it. How do we ensure that we don't unpack it and then it becomes cracked?" (PX55 at 31). Perhaps negligently, Dr. Handley advised the Commission to utilize the bellwether button which recompiled results from four general elections. (*Id.* "But you look at the recompiled election results to make sure that the districts that you have drawn are effective minority districts. So those four contests that I mentioned as bellwether contests will be in the redistricting package and as you draw, as you draw you can hit the button that will tell you how those candidates are doing in the proposed districts. So, it's an automatic visual that is telling you if you are creating a District that will be effective or not.").

137.     Mr. Adelson quickly agreed with this "real time approach." (*Id.*) He then alluded that, although an academic extrapolation, a district with a BVAP at 20% might be cracked but the Commission will need to rely on the bellwether general election data. (*Id.*)

138.     Later in the meeting, Defendant Eid acknowledged that Dr. Handley's analysis provided a "lower bound" for minority population in Wayne, Oakland, Saginaw, and Genesee counties but asked for clarification as to an "upper bound" without the district being considered packed. General Counsel Pastula directed the Commissioners to use the bellwether election tool and guidance of Mr. Adelson. (PX55 at 34-35). As explained by Defendant Szetela, "[t]hat was a topic that was of great interest to us. We asked over and over and over again, like, what was the cap, what was the cap, and never received an adequate answer on that at all." (Chair Szetela, Trial Tr. Vol. I at 52, 58, ECF 112, PageID.3633, 3639).

139.     Nevertheless, moving forward the Commission used the bellwether function of the mapping software for all its Detroit area districts. But, again, the bellwether election data would tell the Commission little to nothing about whether Black-preferred candidates would experience

opportunity in democratic primary election in the draft districts. (Chair Szetela, Trial Tr. Vol. I at 50-52, ECF 112, PageID.3631-33).

### G. Initial Draft Collaborative Senate Maps

140.   The Commission began drafting the collaborative Senate map on September 7th and 8th of 2021 but did not begin working on southeast Michigan region until the meetings on September 9th and 13th of 2021. (Chair Szetela, Trial Tr. Vol. I at 54, ECF 112, PageID.3635). One of the reasons for not mapping the Detroit area until September 9, 2021 was the Commission was waiting for a day when Mr. Adelson would be present at the meeting. (PX56 at 26).

#### 1. September 9, 2021 Senate Collaborative Mapping Session

141.   During the collaborative mapping session on September 9, 2021, the Commission began to configure the Detroit-area districts based on a wide array of factors including race. (PX56 passim). For example, with respect to draft Senate District 19, Defendant Szetela commented that she did not want to combine Dearborn with Inkster because of racial tensions stemming from historical discrimination in Dearborn and for fear of diluting Black voting strength. (PX56 at 29-30). Later in this discussion, Defendant Eid noted that Voting Rights Act compliance was a higher priority than communities of interest. (PX56 at 37).

#### 2. September 13, 2021 Senate Collaborative Mapping Session

142.   During the next collaborative mapping session on September 13, 2021, the Commission began to refine many of the Detroit-area districts configured at the previous session. (PX57 passim). At this meeting racial considerations started to become more pronounced. For example, many of the Commissioners started asking the mapping technician, Mr. Stigall, to employ the racial population theme of the mapping software to assess the Black population. (PX57 at 26, 34-36, 47, 55, 58-59, 64-66, 74). Some Commissioners familiar with the area, like Defendant Kellom, commented that they were "anecdotally" aware of the boundaries of the Black population

in and around Detroit. (PX57 at 26, 62). Other Commissioners, like Commissioner Rothhorn, were able to infer minority population by comparing the overall population to the white population. (PX57 at 34-35).

143.    Defendant Eid, at one point during the mapping of draft Senate District 7, continued to express concern with Voting Rights Act compliance over communities of interest. In response, Defendant Wagner explained that she was concerned for the "African/American population in east Detroit" and reminded Defendant Eid that the predominately Black residents of East Detroit did not want to be mixed into a district with the predominantly white residents of Grosse Pointe municipalities and further that the residents of the Grosse Pointes had expressed an interest being kept together. (PX57 at 64-65).

144.    With respect to this same issue, Defendant Clark had commented that: "There are some Detroit neighborhoods that are still left unassigned. And the only way you're going to get them assigned is to group them with Grosse Pointe. And those neighborhoods specifically have said during the hearings that they don't want to be associated with Grosse Pointe because all the . . . influence tends to flow to Grosse Pointe because they have more money." (PX57 at 54.) Similarly, Defendant Clark commented that he did not believe the City of East Pointe (which is predominately Black) associated with St. Clair Shores and the Grosse Pointes (which are predominantly white). (PX57 at 67).

145.    Other Commissioners, like Defendants Rothhorn and Szetela, also commented that Voting Rights Act considerations might trump communities of interest. (PX57 at 54 (Defendant Szetela stating that "Voting Rights Act is our number one [priority] . . . and secondary is communities of interest") 55 (Defendant Rothhorn stating that "[t]here is ways to yeah there is

different communities of interest we with can take into consideration and I think looking at VRA is probably our most guiding, that will guide us the best").

146.    Defendant Eid commented that the Commission might have to "start drawing these districts into the suburbs" to which Defendant Clark responded by identifying that: "I really like the approach the only problem I see with it is the high percentage of minority population. And the only way to resolve that is to go into the suburbs but that is not what the people want. The people want their [neighborhoods] to stay together and be part of Detroit. That is what I heard in the two town halls or public hearings that we had in Detroit." (PX57 at 40).

147.    At this point, General Counsel, Julianna Pastula, intervened stated that: "The districts will do not appear to be able to be unpacked unless you go in the suburbs . . . And while I certainly acknowledge and respect the public comment received, the Voting Rights Act being the first criteria is going to need to be respected and adhered to." (PX57 at 41).

148.    Notably, the bellwether function had not yet been installed into the mapping software, and General Counsel Pastula suggested the Commission will be able to use the bellwether function shortly. (PX57-41).

149.    At this point in the process, Draft Map 162, 9-13-21 v2 SD, which was not a complete map yet, contained the following three proposed Senate Districts in the Detroit area: SD8 (BVAP 50.82%), SD9 (BVAP 76.56%), and SD13 (BVAP 63.77%). (PX 98 at 1-7; see also Senate Mapping Progression Demonstrative, PX136 at 32-33).

150.    Shortly after the September 13, 2021 mapping session ended, General Counsel Pastula sent an email to Chair Szetela and Vice Chair Rothhorn entitled "Significant Concerns from General Counsel and VRA Counsel" which stated, *inter alia*:

> Bruce and I are very concerned and alarmed about the drafting of packed districts that is occurring during today's mapping session. While the work is preliminary and future steps can be taken to remediate – this will become much more difficult the more packed districts that are drawn. In addition to not being able to justify the numbers coming out of today to a court, these drafts also create expectations on behalf of the public that will be difficult to address moving forward . . . The Commission is running out of time and have an enormous amount of work to do. The current course of action is against the advice of counsel and your RPV expert. [(PX5 at 45).]

151.    As explained by Defendant Szetela, General Counsel Pastula's allegations of packing were based on Dr. Handley's 9/2/21 racial bloc voting analysis, which did not analyze Macomb County and which was based only on general elections and a single primary election without a Black candidate. (Chair Szetela, Trial Tr. Vol. I at 57-58, ECF 112, PageID.3638-39). Moreover, the Commission's counsel and experts had not provided the Commission with an upper threshold of acceptable BVAPs for the Detroit-area districts, only the floor. (*Id.*)

### 3.    September 14, 2021 Senate Collaborative Mapping Session

152.    The Commission's next collaborative mapping session took place on September 14, 2021, by which time the bellwether function had been installed into the mapping software. Mr. Adelson was present at this session and actively directing the Commission to lower the BVAPs of the Detroit-area districts into the 40-45% range less the Commission be sued for purportedly violating the Voting Rights Acts. Mr. Adelson advised the Commission that the Voting Rights Act prohibited BVAPs beyond the percentages identified in Dr. Handley's 9/2/21 racially polarized voting analysis. (Chair Szetela, Trial Tr. Vol. I at 59-60, ECF 112, PageID.3640-41; see also PX 140 at 1573-75).

153.    Mr. Brace provided the Commission with tutorial on how to utilize the newly installed bellwether functionality of the mapping software referred to as Tab 6A. (PX140 at 1566-69). Mr. Brace also explained that the Commission would be unpacking districts during the session and emphasized the use of the racial dot feature to visualize accomplish the unpacking. (PX140 at

39

1575 ("I think it's important for everybody to kind of pay attention to this. Bruce is highlighting the districts and what they're minority percentages are but it's also important to see where the minorities are. And you see in this map where there is territory that you can do to to start to unpack that Bruce is talking about").

154.    In fact, Mr. Brace, the lead mapping technician, even when so far as to direct the Commission to stretch Detroit districts out into the suburbs. (PX140-1575 ("By going across the border into Oakland and Macomb, you can start unpacking these larger districts right there on the border. That's the way you can unpack them and most importantly you're tracking where the minority population is.").

155.    This baconmandering tactic was contrary to the Commission's initial instincts in drawing the Detroit-area districts and, of course, contrary to the Commission's concept of communities of interest as gleaned from the listening tour. (Chair Szetela, Trial Tr. Vol. I at 60, ECF 112, PageID.3641).

156.    As the Commission began to work on uncompleted districts in the four counties covered by Dr. Handley's racial bloc voting analysis, Mr. Adelson directed the racial features of the mapping software be utilized. (PX140-1585).

157.    The remainder of the mapping session was spent attempting to configure the Detroit area districts to fall within the BVAP range set by Dr. Handley and then analyzing those districts with the bellwether election button. (Chair Szetela, Trial Tr. Vol. I at 60, ECF 112, PageID.3641).

158.    For example, Defendant Kellom explained that during her mapping turn, "I'm also thinking about utilizing Bruce to look at the Metro Detroit area and kind of unpack. I know that can't happen in 15 minutes but we have him and I would really like his expertise on that." (PX140-

1588). Mr. Adelson and even the mapping technician, Mr. John Morgan, then coached Defendant Kellom in how to reconfigure the districts. (PX140 at 1589-93, 1595, 1600-02, 1605-06).[10]

159.    By way of further example, during Defendant Orton's mapping turn, Mr. Adelson and Defendant Szetela indicate that the focus should be on unpacking draft Senate Districts 8, 9, and 13. (PX140 at 1634). Defendants Szetela and Witjes then deliberate on the necessity of creating spoke-like districts that stretch from Detroit into the suburbs. (PX140 at 1635-37).

160.    By way of additional example, during Defendant Rothhorn's mapping turn, the focus was exclusively on implementing the "spoke" concept in order to lower the BVAPs in the targeted Senate Districts to within what Mr. Adelson confirmed was a 40% "threshold." (PX140 at 1641-45).

161.    When Commissioners acknowledged that they were making changes to "dilute the Black population" Mr. Adelson stepped in and coached the Commissioner's to use different rhetoric like shift or unassign the population. (PX140 at 1605). Mr. Adelson also opined that partisan fairness considerations would be addressed later in the process, (PX140 at 1609-10), and that "under populating a District if you need to, to comply with Voting Rights Act is an accepted way to go," (PX140 at 1640).

162.    At this point in the process, Draft Map 170, 9-14-21 v14 SD, which was still an incomplete collaborative map, contained the following four proposed Senate Districts in the Detroit area: SD6 (BVAP 49.38%), SD8 (BVAP 47.06%), SD9 (BVAP 76.56%), and SD13 (BVAP 63.77%). (PX 104 at 1-7; see also Senate Mapping Progression Demonstrative, PX136 at

---

[10] Defendant Clark expressed that he was "still not comfortable with that part of Detroit in Grosse Pointe being together. I know we discussed this some yesterday. I know the Detroit people were adamant that that did not take place. When we had them at the hearings. That was a very big deal with them. And so I say that in respect for their wishes as we go forward." (PX140-1592).

41

32, 34). The predominate consideration in forming the Detroit-area districts to this point was "reducing the black voting age population per the directions of Mr. Adelson" even if that meant disregarding other redistricting criteria such as communities of interest. (Chair Szetela, Trial Tr. Vol. I at 61-63, ECF 112, PageID.3642-44).

### 4.    September 15, 2021 Senate Collaborative Mapping Session

163.    The Commission's next collaborative mapping session took place on September 15, 2021. The primary focus of the Commission on this mapping day was bringing down the BVAP in those Detroit-area districts to the range set by Dr. Handley's racial bloc voting analysis. (Szetela, Trial Tr. Vol. I at 63-64, ECF 112, PageID.3644-45).

164.    At the start of his turn, Defendant Rothhorn explain his intent to continue the "spoke" concept for Senate Districts 9 and 13 in order to lower the BVAPs in those districts. (PX140 at 1659). As he moved district lines, he explained that "the reason I'm doing this also for rationale is to decrease the minority percentage, right, to have a more balanced Black-white ratio . . . ." (PX140-1661). To accomplish this endeavor, Defendant Rothhorn was guided by the racial population dots illustrated by the software. (PX140 at 1662-65 ("[O]ne of the things that have been useful for me is to see that theme. John and if you have if it's the top and so the population total in the circle and then non-Hispanic white at the bottom so those two so a bubble that has those two characteristics or those two fields is useful. And of course the difference is then where we have the minority percentage.")).

165.    Chair Szetela explained that this was "extraordinarily challenging" because it was requiring the Commission to "set aside all these communities of interest that we had been told about when we went on our listening tour." (Chair Szetela, Trial Tr. Vol. I at 64, ECF 112, PageID.3645).

166.   At one point in the process, Defendant Curry inquired into why predominately white municipalities were being kept whole but Detroit was being "split up." Chair Szetela explained that "we specifically split up Detroit because our expert, Bruce Adelson had -- was uncomfortable with the districts we originally came up with because they were highly concentrated African/American communities to the point where he said that it would likely violate the Voters' Rights Act. And so he had indicated we should try to get those percentages down to maybe 40% African/American population. So that was sort of the intention with redrawing Detroit the way we did was to ensure compliance with the Voters' Rights Act." (PX140 at 1700).

167.   At this point in the process, Draft Map 165, 9-15-21 v16a SD, which was now a completed collaborative map, contained the following four proposed Senate Districts in the Detroit Area: SD6 (BVAP 49.38%), SD8 (BVAP 44.87%), SD9 (BVAP 51.99%), and SD13 (BVAP 59.06%). (PX 101 at 1-7; see also Senate Mapping Progression Demonstrative, PX136 at 32, 35). Like the previous iterations, the primary factor in configuring this draft map was to stretch the Detroit-area districts "out into areas where we know that white voters are" which made  these "districts in Detroit skinnier, narrower to cut down on the black population." (Chair Szetela, Trial Tr. Vol. I at 65, ECF 112, PageID.3646).

### H.   Initial Draft Collaborative House Maps

168.   The Commission drafted the Detroit-area districts for the collaborative House map on September 20th (end of meeting), 21st,  22nd, 29th, and 30th of 2021. (See, e.g., PX140(a), PX140(b), PX140(c), PX62, PX63).

### 1.   September 20, 2021 House Collaborative Mapping Session

169.   Because the ideal population for a State House District is significantly less than the ideal population for a State Senate District, the Commission expressed deep concerns regarding

its ability to draw Detroit area district with BVAPs within the range set by Dr. Handley 9/2/21 racial bloc voting analysis. (PX140(a) at 84-85, 94, 98).

170.    To achieve the racial target set by Dr. Handley, the Commission began to craft house districts in the Detroit area utilizing the same "spoke" concept it employed with the draft Detroit-area Senate Districts. (PX140(a) at 99-100). Some Commissioners referred to this very racially motivated concept as "chimneys" and "chutes and ladders." (PX140(a) at 101.)

171.    At one point, Defendant Rothhorn noted Dr. Handley advise that because the Voting Rights Act was implicated, all the preexisting majority-Black districts from the 2011 plan were required to be preserved. Mr. Adelson, however, advised that the Commission was not so constrained, although his response was not entirely comprehensible. (PX140a at 96).

172.    Commissioner Eid raised a concern that "partisan fairness" measures seemed to be directly at odds with the Commission's race-based decisions and he inquired as to which factor should supersede the other. (PX-140(a) at 67-68). Eid says he is "struggling" with this issue and asks whether the goal of creating "competitive" districts can be reconciled with the concentration of Black voters in and around Detroit: "How do we reconcile information, the racial data with measures of partisan fairness like efficiency gap because they might not necessarily go together?" (*Id.*)

173.    In response to this question, Mr. Adelson advised that partisan fairness is a "lower" criteria and is preempted by federal law, and therefore, partisan fairness cannot be the rationale for drawing the maps if it conflicts with federal law concerns, explaining:

> One way for me to answer that is what I remember the Chairwoman in Arizona said… her response was that the Voting Rights Act is a priority number one consideration. If we can create them for competitive districts… than we can.  But we can't create a competitive District she said and have a retrogressive or dilutive effect can't do it… And it's not a close call in that perspective… So if you can

44

achieve other goals that are lower down the list of criteria, that's a policy choice for you all. If they conflict, the Voting Rights Act, the 14th amendment win." [(*Id.*)]

### 2. September 21, 2021 House Collaborative Mapping Session

174. The Commission continued to employ the "spoke" or "chutes and ladders" concept for configuring House Districts in the Detroit area with unnaturally low BVAPs. (PX140(b) at 22, 23, 42, 83, 88-89, 94, 115, 118, 123-24, 126-28).

175. Defendant Rothhorn acknowledged that the Commission was using the spoke concept of stretching districts into the predominately white suburbs to "break up Detroit so that we have more balanced districts with Black and white." (PX140(b) at 94). Defendant Clark explained that the Commission was "try[ing] to dilute the Black population to where it's we have more whites" in the Detroit-area districts. (PX140(b) at 127).

176. To accomplish this dilutive goal, the Commissioners were heavily reliant on the racial population "dots," "bubbles," "circles," or "thematic" supplied by the mapping software and wielded by Mr. Stigall. (PX140(b) at 22, 29, 38-39, 43, 48, 50, 71, 82, 84, 88, 90, 93-95, 99, 114-15, 122).

177. Drafting Detroit-area districts with such low BVAPs also required the Commission to stray from honoring municipal boundaries and communities of interest. (PX140(b) at 40-42).

178. Defendant Clark declared: "The only way I see getting the percentage down more is eliminate some down towards in the Detroit down towards the bottom and then moving up towards St. Clair shores." Defendant Orton observed that "The only way I see to make these districts make more of these [Districts] more balanced racially is to break up communities of interest." (PX140(b) at 40-42).

179. Defendant Eid agreed stating "we might have to break up Grosse Pointe because that is where the demographics are. The only place I wouldn't agree with is Dearborn because that has a different significant minority population that should also be protected." (PX140(b) at 40-42).

180. Defendant Szetela also agreed stating that "the first tier suburbs that are around Detroit that we are going to have to pull into them in order to balance out Detroit." (PX140(b) at 40-42).

181. And, Mr. Adelson also agreed stating "this conversation is what redistricting is all about, that, yes, you are making choices." (PX140(b) at 40-42).

182. More than making its own "choices," the Commission was following Mr. Adelson's advice of meeting the racial goal set from Dr. Handley's racial bloc voting analysis which was based on only general elections and one primary election without a Black candidate. (PX140(b) at 44).

183. Just a few minutes later Mr. Adelson stated "I'm still concerned that the Black voting age population is pretty high. And higher than Dr. Handley had analyzed. Yes, it is the adjustments have improved the population from a legal standpoint. But I would still have some questions about the number of the Black voting age population." (PX140(b) at 44).

184. Furthermore, in order to achieve the racial targets from Dr. Handley's 9/2/21 racial bloc voting analysis, the Commission often had to stray from its ideal population deviation; something Mr. Adelson advised was perfectly acceptable. (PX140(b) at 36 ("Deviation is judged on the plan as a whole. This is not a Congressional plan where you have really done it. You have some room to play with assuming you can legally justify the deviation so I would respectfully suggest a bit of a mind switch particularly in urban areas that the demographic population and election results are often can be more significant than the population deviation. You're doing so

46

well with the deviations. I mean I've done Districting where initial Districting are 12, 13%. Deviations are not coming in close to that").

### 3. September 22, 2021 House Collaborative Mapping Session

185.    The Commission continued its laser focus on attempting to draw Detroit-area districts with BVAPs within the range set by Dr. Handley's 9/2/21 racial bloc voting analysis. (PX140(c) passim).

186.    But the endeavor was proving to be a challenging one, and Commissioners were becoming frustrated with the need to sacrifice communities of interest to reach the racial target. (PX140(c) at 25 ("The communities of interest that was considered was the Black population and the white population"), 31 ("We are being challenged here in our House District and you know with sincere apologies to breaking up a COI but I think we had to do that with the Grosse Pointes like we are going to have to make hard choices."), 32 ("I'm really uncomfortable with all of the communities of interest we are cutting up"), 62 ("My concern with doing that is we added Hamtramck into the District we did because we were trying to avoid concentrating the African/American community"), 77 ("Yeah, I don't feel Royal Oak should be broken up. I'd rather have the increased Black population that we saw on the other configuration . . . the only direction is north and that still doesn't in my opinion doesn't fit in with those communities at all"), 78 ("So my feeling is I'm uncomfortable with the amount of communities and communities of interest that we are splitting up but from a Voting Rights Act perspective, Mr. Adelson can you give your opinion?"), 98 ("And I kind of don't know where to go from here to not just break up another community").

187.    Mr. Adelson's response was that "Federal law is supersedes state law" and "the number one criteria is the U.S. Constitution and Federal law." (PX140(c) at 78-79).

188.    To achieve the racial guidelines, the Commissioners continued to lean heavily on the racial population dots, bubbles, circles, or thematic provided by the mapping software wielded by the mapping technician. (PX140(c) at 22-23, 30-32, 39, 42-44, 57-58, 70-71, 75, 90, 99, 102).

189.    The Commission's goal for the proposed districts 14 and 15 was to "balance the white and Black population." (PX140(c) at17). In order to do so, Defendant Clark explained that "we decided to move west where there is less Black population and balance the districts... [t]he big problem we faced with was if we move north Southfield is predominantly or a large percentage of Black and end up with the same problem that is why we decided to move west." (PX140(c) at18).

190.    Defendant Curry agreed with Defendant Clark: "I know that we moved south there is a lot of Blacks in Redford... And the largest part of the Black population I think is to the south, to the west rather I'm sorry." (PX140(c) at18-19). Defendant Rothhorn concurred with the approach of moving into the white suburbs in order to lower the BVAP and stated this was the "pattern" he had employed during the mapping process, stating: "It looks good. This sort of is the pattern that we've been using... what we were looking at as we drew the districts east to west particularly 14 and 15, with the demographics and making sure we were not concentrating the Black population in any District as we were drawing, and so as you know right it gets whiter as we go west." (PX140(c) at 21).

191.    In configuring the map around Southfield, Defendant Orton specifically asked for the "thematic dots" to be pulled up because that "would help so that we can see if moving west would get us some more balanced population. Because we have pretty high non-Hispanic Black population right now." (PX140(c) at 22).

48

192.     Defendant Clark noted the BVAP was too high because Southfield was 65% Black, and it "looks like it's heavily populated on the south side with Black." (PX140(c) at 22-23).  As a result, a decision was made to "take out the portion near 7-Mile between [T]elegraph [Road] and Southfield or some of the extreme eastern part of Detroit inside of [L]odge [Freeway]." (PX140(c) at 23).  By taking out this small section, "it's already bringing down the African/American population" because that area "has a high concentration of African/American population" so the Commissioners agreed it "looks good" so Defendant Curry recommended "let's leave it like that then." (PX140(c) at 24).

193.     At this point, Sarah Reinhardt from the Michigan Department of State asked Defendant Curry and others who "assisted with the drawing of this District could you describe what communities of interest that was considered while drawing this District?" (PX140(c) at 25).

194.     Defendant Curry responded that she considered race, only: "The communities of interest that was considered was the Black population and the white population." Defendant Curry struggled to identify any other redistricting criteria and asked for "somebody help me out" and "what else" at which point, another commissioner mentioned that it also had the effect of keeping a neighborhood together. However, in the prior several pages of discussion about moving the map lines, there was zero reference to keeping those neighborhoods together. In fact, the next day during the mapping session, Defendant Curry reiterated that her primary concern in drawing the district was race, stating to the "Department of State staff" that the "communities of interest that I was interested in preserving was the African American community while trying to take into consideration of balancing the demographics so we are not packing the District." (PX140(c) at 35).

195.     After outlining the initial draft districts in Detroit, the Commission moved on to other areas in the state. (See e.g., PX59 and PX60).

196.    By the end of the September 28, 2021 meeting, the Commission had prepared a completed collaborative House map: Draft Map 183, 9-28-21 v1 HD which contained the following thirteen (13) proposed House Districts in the Detroit area: HD2 (BVAP 55.85%); HD4 (BVAP 42.74%); HD6 (BVAP 65.66%); HD8 (BVAP 54.09%); HD 10 (BVAP 38.33%); HD11 (BVAP 43.74%); HD12 (BVAP 46.94%); HD14 (BVAP 74.7%); HD15 (BVAP 63.28%); HD17 (BVAP 69.29%); HD18 (BVAP 79.04%); HD21 (BVAP 55.92%); and HD22 (BVAP 39.66%). (PX90 at 1-14; see also see also House Mapping Progression Demonstrative, PX136 at 38-44).

197.    Thus, the Commission's starting point was eight (8) House Districts with BVAPs between 54% and 79% and another five (5) House Districts with BVAPs between 38% and 47%. (Chair Szetela, Trial Tr. Vol. I at 65-66, ECF 112, PageID.3646-47). This map represented less majority-Black districts than in the preexisting 2011 plan and the Commission had almost no evidence that Black-preferred candidates in Detroit could win polarized primary elections in districts with BVAPs between 38% and 47%. (*Id.*) At the next mapping session, however, Mr. Adelson and General Counsel Pastula would urge the Commission to drive the BVAPs in the Detroit-area districts lower. (*Id.*)

### 4.    September 29, 2021 House Collaborative Mapping Session

198.    During the September 29, 2021 mapping session, Mr. Adelson and General Counsel Pastula continued to encourage the Commissioners to lower the BVAPs of the Detroit-area districts. (PX62 at 73, 76, 77, 91-92, 94-95, 107-08). The reason, Mr. Adelson said, was that the existing draft Detroit-area House districts were "packed" in violation of the Voting Rights Act. (PX62 at 73 ("I also wanted to make the point that as you recall . . . I believe these were the State House districts in the Wayne County area. That several of them are ... have the appearance of being packed. And that is something that must be addressed. That is one of the changes that I envision"), 76 ("There are many voting rights issues and just in talking about the packed districts in Wayne

County"), 111 ("So rather than just come and saying this should be majority minority this should be 80%, 60%, 70%, the Commission is following Supreme Court precedent and Federal law in figuring out the percentages to correspondence with Dr. Handley's analysis").

199.    The purpose of lowering the BVAPs of the Detroit-area districts was again to bring them within the 35%-40% racial benchmark set by Dr. Handley's 9/2/21 racial bloc voting analysis which consisted of general elections and one primary without a Black candidate. (PX62 at 107 (Mr. Adelson stating "The percentages are still higher than Dr. Handley's analysis but I think that is a good start to adjusting and to be more in line with her racially polarized voting analysis and the ability to elect. So while there is the Black population is still higher than her analysis determined it is  significantly improved from what it had been previously"), 108 (Mr. Adelson stating "what can be done to come closer to Dr. Handley's threshold, which is the threshold that the courts will be looking at. So as far as the election results, as I recall these districts all proved out pretty well. I think that I would recommend focusing on the percentages and comparing them to Dr. Handley's percentages for Wayne County which as I recall is 35-40%"), 108 (Mr. Adelson stating "That is exactly right the voting age population that is needed to elect candidates of choice and her range and what we discuss, what she and I discussed, which I'm comfortable with is that 35-40%").

200.    The Commission continued to comply with this directive. (PX62 at  51, 78, 91, 94-112). Indeed, Defendant Eid opined: "But it would seem to me that fixing those packed districts so they are at least in compliance with VRA and then they can undergo further analysis later would be the more time efficient way to proceed currently." (PX62 at 77). Defendant Rothhorn expressly acknowledged that "our goal is to do VRA analysis." (PX62 at 103). He then explained the basis for the changes to the Detroit-area districts was "to better comply with VRA bringing down the

Black voting age population to a range that is closer to 40% actually reducing it and in some cases to 50% but not quite to 40%." (PX62 at 110).

201.    To assess its progress in lowering the BVAPs of the Detroit-area districts, the Commission at the direction of Mr. Adelson, consistently turned to the bellwether election function of the software. (PX62 at  91-112). But the bellwether election data involved only four (4) general elections with a Black candidate or running mate and a single primary election without a Black candidate and thus only showed whether Democrat candidates would win general elections in the draft districts. (Chair Szetela, Trial Tr. Vol. I at 68, ECF 112, PageID.3649).  But democrats almost always win general elections in Wayne and Oakland counties. (*Id*.)

202.    Lowering the BVAPs in an area with such a heavily concentrated Black population continued to be difficult and continued to conflict with other redistricting criteria like shape and compactness, communities of interest, and ideal population equality. (PX62 at 79, 84-88, 91-92, 103, 108, 111).

203.    For example, with respect to shape and compactness, several Commissioners expressed concern and some even commented that the "skinny," "narrow," and "stretched out" districts they were creating looked like "bacon strips." (PX62 at 79, 84-88, 103, 111). Mr. Adelson assuaged the Commissioners concerns by telling that the odd shapes were permissible because the Commission was purportedly not "creating a shape for a constitutionally impermissive reason like a racial gerrymander. So I just wanted to point that out. That the shape is usually not a legal consideration unless there is a reach out to capture a racial minority." (PX62 at 87). But, of course, that is exactly what the Commission was doing.

204.    By way of further example, with respect to partisan fairness, Defendant Rothhorn explained that lowering the BVAPs in the Detroit-area districts took precedence over any partisan

fairness evaluations which would come later. (PX62 at 91-92 ("[S]o I'm not looking at partisan fairness but VRA compliance and what we can do today and tomorrow frankly with the districts as we tweak them using election results to understand how are we getting closer using the next two days how do we get closer to VRA compliance because . . . what I heard from General Counsel [is] we don't have any maps that are currently ready for partisan fairness because they are not truly VRA compliant").

205.    By way of final example, with respect to the tension with communities of interest, Chair Szetela testified that during this mapping session the Commission split up Hamtramck and Banglatown, communities of interest, to try to balance out the African American population. (Szetela, Trial Tr. Vol. I at 68-69, ECF 112, PageID.3649-50). Mr. Adelson's advice: "Where do you go when that is going to impact commenters preferences on keeping communities whole or not keeping communities whole. That's something that I'm happy to address more going forward. But . . . as you know the Voting Rights Act is the number one criterion together with one person one vote in the U.S. Constitution. So that I understand that that policy choice is complicated in a sense. But then in another sense from my perspective it's not complicated." (PX62 at 108).

### 5.    September 30, 2021 House Collaborative Mapping Session

206.    During the September 30, 2021 mapping session, Mr. Adelson and General Counsel Pastula continued to direct the Commissioners to lower the BVAPs of the Detroit-area districts and became increasingly more explicit in their guidance for the Commission to hew the districts to the racial target set by Dr. Handley. (PX63 at 18-27, 38 , 67; see also Chair Szetela, Trial Tr. Vol. I at 71-84, ECF 112, PageID.3652-65).

207.    Not all of this advice was made public, however. Mr. Adelson and General Counsel Pastula conducted sidebar meetings in the hallway with various Commissioners to encourage downward revisions to the BVAPs in the Detroit-area districts. As described by Chair Szetela:

"This is kind of the day I feel like the hammer came down on the Commission by Mr. Adelson and Ms. Pastula, because they were pulling me, in particular, out in the hallway and I was specifically told that we had to stop thinking about communities of interest, to stop thinking about keeping municipal boundaries together, that we had to solely focus on race because we needed to bring these districts down." (Chair Szetela, Trial Tr. Vol. I at 81-82, ECF 112, PageID.3662-63).

208.    Defendant Rothhorn too recalled this sidebar meeting and that it involved Mr. Adelson and General Counsel Pastula encouraging him to "back off" communities of interest and focus on the "number one" priority which was lowing the BVAPs of the Detroit-area districts to meet the racial target set by Dr. Handley. (Vice Chair Rothhorn, Trial Tr. Vol. I at 186-87, ECF 112, PageID.3767-68). Defendant Rothhorn also recalled "extreme tension" and the "feeling of having been yelled at" for drawing districts in Detroit that had BVAP levels that were higher than the racial target set by Dr. Handley. (Vice Chair Rothhorn, Trial Tr. Vol. I at 191, ECF 112, PageID.3772).

209.    In any event, at the beginning of the mapping session, Mr. Adelson stated that proposed House Districts 6 (BVAP 64%) and 18 (BVAP 77%) "are two serious districts that have significantly more [BVAP] population than Dr. Handley recommended in her analysis. And that she and I agree about. We have discussed." (PX63 at 18).

210.    The Commission's General Counsel, Julianne Pastula, then added: "What I would recommend is that the Commissioner consider doing is for the active matrix to scroll starting with 1 and glance at the districts, anything that is higher than 40% for the Black voting age population and the population difference I mean just to glance at and just go down the list and then when we get to I anticipate number 6, number 18, and others that those quote unquote fixes can be dealt

54

with and then this map can be ready for the partisan fairness analysis. That would be my recommendation." (PX63 at 21).

211.    In response to a clarifying question from Commissioner Orton, General Counsel Pastula then reiterated:

> I would recommend anything with a higher than 40% Black voting age population be looked at. This will also give the Commission an opportunity to look at their population numbers at this time and that way by the time we get to District 110 we will know this map is okay for -- to have Dr. Handley run the partisan fairness measures. So that would be my recommendation is just scrolling down the data and if there is anything, again, that looks percentages that look kind of high, the Commission can take a closer look. [(PX63 at 22).]

212.    Defendant Szetela reiterated, "so per General Counsel's request I think what she is suggesting we just go down the districts one by one and anything that is over 40% look if we can rebalance it." (PX63 at 23).

213.    Defendant Orton again asked for further clarification regarding what BVAP the Commission needed to hit:

> "So we are going to go through and we are going to look anything above 40% because we want to be make sure that the whole plan is VRA compliant. Does that mean so this is a -- this is a densely populated minority population City so does that mean anything above 40% is not VRA compliant?" (PX63 at 24). General Counsel Pastula responded "yes, I think as you start again with the list at District 1 and look at that the Black VAP, if it's above that 40% particularly in the Metro Detroit area how that can be minimized and I know from the chart that Mr. Morgan had displayed Chairperson Szetela mentioned District 2 but it's also 6, 8 and 14 from that list. But again looking at the chart, the data will enable you to verify the population deviation, look at the Black voting age population and proceed from there." [(PX63 at 24).]

214.    Then, in response to a similar question from Defendant Lange, Defendant Szetela reaffirmed the Commission's racial objective:

> Yeah, Commissioner Lange that is my understanding of what we are looking for is we are trying to bring things between 35-40% because based on Dr. Handley's analysis of racially polarized voting that those percentages would enable minority candidates to elect their candidate of choice in the Metro Detroit area because it's

so highly concentrated and so highly democratic. So that is sort of the sort of boundary line Mr. Adelson is encouraging us to bring the districts down to if we can. I'm not necessarily sure we will be able to just given the density of the area but that it is kind of what he is suggested we do is these Districts that are 59% African/American or 60% that we try to bring them closer to that 40%." (PX63 at 24-25).

215.     General Counsel Pastula then provided some additional nuance regarding how she arrived at the 40% racial targeting exercise:

> Dr. Handley's racial block voting analysis and offer to the Commission when you were drawing the original districts the range for Detroit was 35-40%, Oakland County was above 40%. So it's based on the area you were in, that is why that's why I flagged the 40% to kind of go through and have that just as the identifier to use. And then see what area you're in and then you can that will provide the further guidance. So again the goal is looking at the chart the data chart that will show the equal population deviation, it will show the Black voting age population, and that will enable the Commission to go through line by line and flag any issues either with equal population or with the Black voting age and my recommendation again I know District 18 was one of them but rather than try to remember or call out which districts might need to be looked at my recommendation is that you start with number 1 on the chart and just look through the data to identify what districts would need to be adjusted even if you just make a list and then go back and start fixing them. [(PX63 at 25).]

216.     Later Mr. Adelson reinforced the recommendation that the Commission utilize this "systematic approach" or "systematic pattern" of identifying each Detroit-area district with a BVAP above the 40% racial target for the exclusive purpose of lowering and spreading out the Black population. (PX63 at 74, 76-77).

217.     The Commissioners remained skeptical of the advice. Defendant Eid, for example, explained that:

> I think what is confusing everybody because it's definitely confusing me, I look at that number 53% that it's at now and it doesn't -- and this is more of a feeling, right, it does not feel that high compared to the population of the City itself. Now I know our analysis has said that it only takes about 35-40% of Black voting age population to elect the candidate of choice for that community. But I think my most basic question is: What is the highest percentage it can be to fend off legal challenges in the future? We might not be able to answer that now, but you know, examining that question and figuring out like what is the actual target we need to hit. As you said

56

earlier, we are not going to be able to get to 35-40 percent for every one of these Detroit districts I mean I don't see a way to do it. [(PX63 at 78).]

218. Although the floor of the racial target was firmly established, Mr. Adelson's advice regarding the upper bound or ceiling of the racial target was to continue to go lower:

> The Supreme Court takes a District by District functional analysis approach. If the people in this area, which they can, can elect candidates of choice below 50%, then rhetorically how do you justify creating distributes that are over 50%. So there is no like absolute magic bullet like you are guaranteed everything is cool. But 53.85% yes, it's an improvement. Yes, it is moving in the right direction. But my feeling is that there is more to be done here. Because I am low to just say creating 54, 55, 56% majority minority districts in an area that analysis is determined, Black voters can elect at percentages lower. I'm not prepared to do that. So the axiom that Commissioner Rothhorn with all due respect kind of said in my head is try. There is still more trying to do. We are not at the end of the line yet. [(PX63 at 78).]

219. Nevertheless, and despite the skepticism, the Commissioners continued to engage in the "systematic pattern" of flagging the Detroit-area districts they had drafted with BVAPs above 40% and then attempting to revise those districts to hit the 40% racial target as directed by Mr. Adelson and General Counsel Pastula. (PX63 passim).

220. For example, Defendant Szetela explained "so basically the goal of this was to target those VRA numbers because . . . they were originally 70% for 14, 15 and 17. So this brought it closer and a 15% drop. And Mr. Adelson's suggestion yesterday is we try to take them down further. And General Counsel's general suggestion we go through starting at one and identify where we might need additional work and start going through and start making those proposed changes." (PX63 at 26-27).

221. At another point, Defendant Szetela explained "The point is we have a lot of districts high African/American percentages and going down the list and looking at ones that were high and try to bring them in the range of 35-40 so you can start with any District that is high." (PX63 at 73).

222.    To assist with this process, the Commissioners relied on the racial population dot feature of the software which was sometimes referred to as the "African/American thematic map." (PX63 at 28 ("COMMISSIONER CURRY: The minority is the African/American minority was either too high is that what I'm hearing? What do we need to tweet on so I know which way I'm going? CHAIR SZETELA: I think the Thematic dots would be helpful for African/American population"), 29 ("MR. MORGAN: This shows the thematic dots and the numbers, just the population. COMMISSIONER CURRY: And we need to reduce that population by how much? It's over. MR.MORGAN: Current population of District 18 is 76.7% African/American voting age population. VICE CHAIR ROTHHORN: I think our goal Commissioner Curry is to reduce it. COMMISSIONER CURRY: 40, 45. VICE CHAIR ROTHHORN: Correct, yep.")

223.    Once the Commission identified a targeted district which had been initially drawn with a BVAP above 40%, it sought to lower the Black population which, from a mechanical perspective, most often entailed looking "for white population on the western and northern, southern edge of Detroit" and then stretching those districts out into the predominately white suburbs. (Chair Szetela, Trial Tr. Vol. I at 79, ECF 112, PageID.3660).

224.    For example, Defendant Eid explained one such downward revision as follows: "I think the purpose was to shift the Black voting age percentage from . . . District 6 which was at 67% lower. So now instead of having one District way over on the percent we [need] to hit we have two that are close both being around the 45-55% range which I think is a more in line with what we need to get than the 68% range it was at before." (PX63 at 72).

225.    To which Defendant Orton responded: "I thought we were going 35-40% so they are both way out from what I'm thinking." (PX63 at 72).

226.     Lowering the BVAPs in an area with such a heavily concentrated Black population continued to be difficult and continued to conflict with other redistricting criteria like shape and compactness, communities of interest, partisan fairness, and population equality. (PX63 at 14-15, 20, 37-38, 40, 66-67, 75, 79, 136, 138).

227.     For example, with respect to shape and compactness, Defendant Witjes commented: "Looking at the districts we have, how much thinner can they get and how much further can they extent out before they are one precinct or one actual voting precinct wide." (PX63 at 14).

228.     Defendant Szetela noted that many of the Detroit-area districts look "crazy" because "[t]hey are long, they are narrow and skinny." (PX63 at 138). She stated that "I did what Mr. Adelson asked and tried to lower the numbers. And we've got some crazy show string districts." (PX63 at 66).

229.     Defendant Clark explained that "the biggest thing I see with it is that we took these spokes and went so far north and so far west . . . But it's a tradeoff. I mean we have to get compliant so we have to do something and we made the decision to go the route with the spokes." (PX63 at 143).

230.     Defendant Rothhorn commented that "If you are thinking about the shape that is where I think we all recognize that shapes are going to be weird at this point." (PC63 at 40).

231.     By way of further example, with respect to population equality, Defendant Rothhorn acknowledged that the Commission had "deliberately under populated to try to address that the voting rights analysis so we are still higher at 61 % voting age non-Hispanic Black age voting population and it's lower than I think 73 or is it 76 or is it 76% so you reduced it significantly." (PX63 at 30-31, 35).

232.    And, Mr. Adelson continued to advise the Commission that it had leeway with the population deviations in order to meet the racial targets of Dr. Handley's racial bloc voting analysis. (PX63 at 75, 79).

233.    By way of further example, with respect to partisan fairness, Defendant Rothhorn explained that revising the maps to meet the racial targets took precedence over partisan fairness: "[W]e want to have a voting rights analysis first. Because that is our first criteria in the Constitution, we want to have as much compliance regarding the voting rights as possible before we move to the fourth criteria which is partisan fairness so that is the task today is to in those districts in Detroit and with our VRA expert with us in the room today yes that is the task." (PX63 at 15).

234.    In fact, General Counsel Pastula explained that the Michigan Constitution's partisan fairness criteria "does not require and actually prohibits the Commission from considering the election results while they are mapping. Accepted measures of pardon sand fairness and measures are run on statewide plan . . . They cannot map in the manner in which the public is advocating. They are legally prohibited from doing so." (PX63 at 66-67). "The language in the Michigan Constitution and again the courts have held that using election results to determine partisan fairness is improper. It is not acceptable." (PX63 at 136).

235.    By way of final example, with respect to communities of interest, Defendant Lange acknowledging that the Commissioners were "all novices when it comes to the VRA" but also recognizing that the public comments "contradict a lot of" Mr. Adelson's advice, asked Mr. Adelson if the Commissioners could set higher BVAP concentrations in the Detroit-area districts if the reason for doing so was to refrain from splitting communities of interest. (PX63 at 20).

236. Mr. Adelson responded stated that: "[T]he bottom line is that if keeping communities of interest, not splitting them, having them implicates the packing of minority voters, the dilution of minority voters then the number one criteria is the Federal criteria. So I've certainly seen in my career that adding communities of interest may dilute minority voting strength, may create voting rights issues may pack minority communities, implicating the 14th amendments. So the bottom line is the Federal criteria are the absolute priority." (PX63 at 20).

237. Defendant Orton also expressed her frustration regarding the splitting of communities of interest:

> I still think we should try and keep the communities of interest together. And we have heard so much about the points being together. I hate to split them up. Is it a way, is there a way to keep them together?" To which Defendant Eid responded: "You know I'm going to be honest I agree with you. And I hate to split them up but I think for this house map I don't see another way to do it because that is where the white population is around Detroit. We've already covered you know the other areas like Livonia for example. And Dearborn as well, which was split is up the other day. So I mean, I'd be welcome to any advice from anybody to figure out a way to not split it up but I think right now what we've heard is this map is currently not compliant and we need to get it to be compliant. [(PX63 at 37).]

238. And then Defendant Rothhorn explained that reaching the racial target must take priority over communities of interest, per the direction of Mr. Adelson, less the Commission be sued for violating the Voting Right Act. (PX63 at 37-38).

239. Finally, General Counsel Pastula confirmed that the district under consideration (i.e., district 17) was illegally packed and, per Dr. Handley's racial bloc voting analysis, the district should be drawn down to a 35% BVAP. (PX63 at 38).

240. During the mapping session, Mr. Adelson commended the Commissioners for continuing to lower the BVAPs of the Detroit-area districts: "One of the things that this Commission is doing, which is quite different than the typical approach to redistricting, you are essentially unpacking districts. You are essentially leveling the playing field as the Voting Rights

Act was intended when it was passed in 1965. And the Supreme Court has said that is a more challenging process than just packing people of color together willy-nilly. Frankly that is not difficult to do. But you are doing the opposite. And I think it's really important that everybody realize that." (PX63 at 67).

241.    This encouraged Defendant Eid who stated "Okay, well let's continue unpacking the districts." (PX63 at 68).

242.    Looking back, Defendant Szetela viewed this "kind of rah-rah-rah speech" as manipulative and overstepping for a lawyer. She also took issue with Mr. Adelson's statement that the initial draft maps with naturally higher BVAPs were somehow willy-nilly. Instead, she testified that those initial maps were based on communities of interest, population, trying to keep municipal boundaries together. (Chair Szetela, Trial Tr. Vol. I at 80, ECF 112, PageID.3661).

243.    By the end of the September 30, 2021 mapping session, the Commission had created a significantly revised collaborative House map, Draft Map #193, 9-30-21 HD, which contained the following fourteen (14) proposed House Districts in the Detroit area: HD1 (BVAP 36.58%); HD2 (BVAP 61.67%); HD4 (BVAP 58.44%); HD6 (BVAP 49.23%); HD8 (BVAP 50.37%); HD10 (BVAP 39.21%); HD11 (BVAP 43.74%); HD12 (BVAP 46.94%); HD14 (BVAP 48.46%); HD15 (BVAP 56.92%); HD17 (BVAP 64.16%); HD18 (BVAP 66.54%); HD21 (BVAP 66.79%); HD22 (BVAP 39.66%). (PX93 at 1-14; see also see also House Mapping Progression Demonstrative, PX136 at 38-44).

244.    This version of the collaborative House map contained only seven (7) House Districts with BVAPs between 50% and 67% and another seven (7) House Districts with BVAPs between 36% and 49%. (Chair Szetela, Trial Tr. Vol. I at 69-71, ECF 112, PageID.3650-52). This map thus represented less majority-Black districts than in the preexisting 2011 plan and the

Commission had scant evidence that Black candidates in Detroit could win polarized primary elections in districts with BVAPs between 36% and 49%. (*Id.*)

245.     The predominate factor for Detroit-area districts in this map was race. (Szetela, Trial Tr. Vol. I at 84, ECF 112, PageID.36). And Mr. Adelson would continue to push the Commission to lower even further the BVAPs of these districts. (*Id.*)

### 6.     October 4, 2021 Senate Collaborative Mapping Session

246.     During the October 4, 2021 mapping session, Mr. Adelson and General Counsel Pastula continued to direct the Commissioners to lower the BVAPs of the Detroit-area districts even further and became even more direct in their guidance for the Commission to more closely close in on the racial target set by Dr. Handley. (PX64 passim; see also Chair Szetela, Trial Tr. Vol. I at 84-94, ECF 112, PageID.3665-75).

247.     At the outset of the meeting, the Commissioners had some confusion as to whether the collaborative Draft Senate Map had been deemed compliant with the Voting Rights Act by Mr. Adelson. (PX64 at 12-13). Defendant Szetela was of the opinion that "[b]ecause the range we were suggested by in this area by Dr. Handley and Mr. Adelson was between 35% and 40% voting age population African/American. So I would look where we don't have that and those are areas where we would need to make adjustments." (*Id.*) Whereas, Defendant Eid "thought that Mr. Adelson said that it was VRA compliant for the Metro Detroit area." (*Id.*)

248.     Defendant Szetela therefore explained her understanding that "[l]ast week [h]e gave us slightly modified directions and remember he said if you can give the African/American population the ability to elect with 35% why would you go with 50, why would you go with 60 so that was why the House District was redrawn was based on that guidance that he had given. Because Dr. Handley's report says that the ability to elect in the Metro Detroit area because there is so much cross over voting 35 to 40% is really the threshold where you have a voting rights

compliant District because the people in that area can vote to elect and have a candidate of choice with only 35% because there is so much cross over voting." (PX64 at 14).

249.    Defendant Clark expressed that he too had thought Mr. Adelson "felt that this map was okay," and asked Defendant Szetela what was the Commission's "target." (PX64 at 15).

250.    Defendant Szetela explained the basis for the Commission's racial target as follows:

Do you remember Dr. Handley's report where she broke down for Wayne County for the racial polarized voting and gave a chart with percentages that is what Bruce was mentioning last week and that's what I'm referring to. The very last Page where she listed the percentage of voters in that particular demographic that you needed in order for it to be an opportunity to elect District. And for Metro Detroit region it was 35%. So that is what Bruce was saying to us last week and said it repeatedly we should aim between 35-40% African/American because those numbers it is VRA compliant, they can elect their candidate of choice and his point that he mentioned was why would you put 50 or 60% African/American in a population if you can achieve compliance with 35 so that was kind of his point. (*Id.*)

251.    Defendant Clark asked for clarification: "You are trying to reduce the African/American population"? Defendant Szetela reiterated "To 35-40 for VRA purposes per the direction of Bruce Adelson." (*Id.*)

252.    Initially, General Counsel Pastula stated that "[t]his was the map that Mr. Adelson indicated was compliant," but then quickly backtracked stating "So I believe Mr. Adelson did say if the effort was to be made to get those Metro Detroit districts closer to the 30 to 40% range that would be an excellent use of time." (PX64 at 16).

253.    Apparently frustrated, Defendant Eid vented that:

We are going to keep hitting this issue of what we as a Commission are going to call VRA compliant based on the advice of our attorneys. We need to make a decision here on what is VRA compliance. This is a question I asked last week. I asked what is the highest number we can have that can still be defended in Court. Because I don't think any of us want to be breaking up these communities as much as we are. But we might have to because of VRA, right? The question is how much. And I think we as a Commission might just need to make that decision. Is that number 40%. Is that number 45%. Is that number 30%. I don't know but we have to come up with a decision on what it's going to be otherwise we will just keep

hitting this arbitrary number this looks good but can always get better until we you know decide like what is VRA compliance to us." [(PX64 at 17).]

254.   Seemingly agreeing with Defendant Eid, Defendant Clark stated his opinion that "If Bruce has already said we are compliant we should probably keep it that way. What we're going to do here if we want to make it noncompliant go further north further north until we get it down to 40 percentage or further west. And it's the geography that puts us in a bind in doing that. So I would recommend we stay under Bruce's original recommendations that this is compliant and keep it that way. The Detroit area at this point." (*Id.*)

255.   General Counsel Pastula quickly interjected to refocus the Commissioners back onto the goal of lowering the BVAPs in the Detroit districts:

> I think those districts that were up around and over 50% Mr. Adelson's direction was to try to get those lower, to make the effort to get those lower. Particularly in the Metro Detroit area. And I again cannot speak for him but I remember that day we were doing the Senate maps and the Congressional maps. And I believe the Senate maps was the one where he indicated the districts were still packed at the percentage, they are in that they are currently in and that the effort should be made to make those percentages lower. Because again based only the racial bloc voting analysis, those the percentages of minority voters does not need to be that high in those areas. [(PX64 at 18).]

256.   Defendant Szetela then identified several Senate districts (i.e., 6, 8, 9, 13) with BVAPs above the 40% target. Defendant Rothhorn then announced that he understood Dr. Handley's presentation to say that "if we are in 50%, we are not unpacked it if we are 40%, we have not unpacked it. All those districts [Senate district] 6, 8, 9 and 13 are all in the area if we are 50% range it's just as packed as it was in 2010." (PX64 at 18).

257.   Defendant Clark then expressed his sentiment that he knew "they' wanted the BVAP for Senate District 6 lower but "sometimes you just can't do that because of the distribution of the people." (PX64 at 19).

258.    Defendant Rothhorn, however, nudged back stating "But I think what we can interpret from their advice is if we don't try to get to 35%, we have not done our due diligence and therefore we may be exposing ourselves to a legal risk we might be able to defend ourselves against but can't guaranty that." (*Id.*)

259.    Mr. Morgan then gave a long tutorial on how to increase or decrease the Black population through the technique of either over or under populating the district. (PX64 at 20).

260.    General Counsel Pastula interjected again, confirming Mr. Adelson's directive that the Commission should focus on further decreasing the BVAPs in the identified Detroit-area Senate Districts: "So Mr. Adelson has confirmed that he didn't sign off on either the Senate or the Congressional plan. And I wanted to also address again the narrative that 50% minority is the -- that is not the courts have not supported that wholesale adoption of 50% or 51%." (PX64 at 20).[11]

261.    General Counsel Pastula further made a critical distinction between the racial benchmark for Wayne and Oakland Counties, respectively: "What Dr. Handley's racial bloc voting analysis has given the Commission is the benchmarks and the guide rails for each of the Counties that need to be adjusted. It's Wayne County is 35-40% . . . And Oakland County is 42, 43%. Again that would provide the opportunity to elect. So you don't need districts with 60% minority voting age population in any of those four Counties to achieve compliance." (*Id*.)

262.    Surprised to understand that there was a different racial "threshold" for Wayne and Oakland County, Defendant Rothhorn asked for the numbers to be repeated. (PX64 at 21). General Counsel Pastula explained again that: "Correct and those are supported by the charts in Dr. Handley's presentation for each of the Counties, Wayne and Genesee County the recommendation

---

[11] During her trial testimony, Defendant Szetela identified that the Detroit-area districts had historically been drawn with BVAPs above 50% and had never been struck down as violating the Voting Rights Act. (Chair Szetela, Trial Tr. Vol. I at 88, ECF 112, PageID.3669).

is 35-40% . . . Saginaw County Mr. Vice Chair is 35-45% and Oakland County is 42-43 . . . So the range is not 40 was too low and 45 Mr. Adelson expressed which too high or could be too high. So those were the goals identified again by your racial bloc voting analysis. And the interpretation by your Voting Rights Act counsel." (*Id.*)

263.   With the racial targets clarified, the Commissioners then proceeded to rebalance the BVAPs. (PX64 passim). To facilitate compliance with the racial quota, the Commissioners continued to depend on the racial population dot, circle, or bubble feature of the software which was sometimes referred to as the "African/American theme" or the "[t]he little dots for the African/American people." (PX64 at 14-22, 24, 28, 39-40, 47, 58-60, 93, 141-42).

264.   The Commission started with Senate District 6. (PX64 at 25-26 ("Brought your African/American below 40%. So now you are perfectly in the sweet spot of 35-40 . . . So we moved from 6 we moved from 47.8% voting age non-Hispanic Black voting age population to 39.8")).

265.   The Commission then moved to Senate District 8 and attempted to lower the BVAP which was 43.35% down into the "sweet spot" set by Dr. Handley. (PX64 at 29). During this process, Defendant Lett asked "What's the target for Macomb? Oakland," to which Defendant Rothhorn responded "Oakland County the target is 42 to 43ish." (PX64 at 29).

266.   Next the Commission began evaluating ways to reduce the Black population in Senate District 13 which involved Defendant Witjes drawing the district north into Birmingham because, as Defendant Szetela stated, "We got to get the VRA right and that is number one." (PX64 at 30). Defendant Clark, still apparently uncomfortable with the process, remarks "[w]hen you go into Birmingham, we are stretching this thing all the way from mid-Detroit all the way up there." To which Defendant Szetela responds "[w]hat other way is it to get VRA." (PX64 at 31).

267.    Sort of simultaneously, the Commission was also endeavoring to lower the Black population of Senate District 9 which it accomplished by moving the predominately Black City of Southfield into District 14. (PX64 at 34 ("[W]e want to reduce the African/American population in 9 so what if we took all of Southfield and put it up into 14, wouldn't that possibly take care of all those problems . . . Right. So you will bring 14 down and probably when you do that might have to take 9 into Farmington a little bit. It's like you are working at a puzzle here")).

268.    Defendant Eid then pointed out the nuance of the racial benchmark specific to Oakland County districts: "And I'll point out too because 9 is mostly in Oakland County we can probably get away with that 43% instead of going down to the 40% number." (PX 64 at 39).

269.    After yet more racial balancing, Defendant Witjes expressed satisfaction that "Black voting age population I think we have the districts in question are at 40 or below 40," and that while the Commission "can also run a partisan fairness but I don't think it's going to mat[ter] all that much. It's not going to change from what we ran." (PX64 at 44.)

270.    As racial balancing continued, Defendant Curry objected to the "crazy" shape of Senate District 17; there's "nothing rectangular about that at all hardly. I mean it just looks like somebody just said well we don't care about Detroit." Vice Chair Rothhorn responded that the reason was "related to the VRA. Right where the white and Black populations are balanced so yeah." (PX64 at 49.)

271.    After further jiggering, the Commission successfully moved the BVAP for Senate district 9 to 38.64. As Defendant Rothhorn stated, "Instead of 40.74 which is where we were. I'm going to write it down what is 9 at now 38.64." Chair Szetela than confirmed that "13 remains unchanged at 41%. 15 is at or 13 is at 41, 14 is at 34. 6 is at 39. 8 is at 41 so I think they are all in compliance with this." Vice Chair Rothhorn continued, "Right so and number nine District 9 is

two points lower more in compliance with the VRA. . . . [I]t's even more compliant with 38.6% so I think it's positive with the numbers." (PX64 at 54).

272. Defendant Curry started to object that "it just appears to me everything stays whole if it's white minority or Bangladesh or non-Hispanic, Blacks everybody started together. But looked like Detroit got chopped up and it's a lot of African/Americans there." (PX64 at 59).

273. Vice Chair Rothhorn explained, "The reason I think we are trying to split it is we are trying to get the numbers that we were given from Dr. Handley at 35% with the Black voting age population that is 35% so we did our best to try to draw that with that kind of understanding that the Black voting age population can elect a candidate of choice . . . And it looks like it's splintered. But there is no District in here with a Black community cannot elect its candidate of choice." (PX64 at 60).

274. Defendant Curry then expressed concern that due to the impacts of historic discrimination Black voters in Detroit have lower voter turnout. (*Id.*)

275. During the Commission's afternoon session, Mr. Adelson was able to join the meeting. He said, "as you know it's very important if not essential that Dr. Handley's analysis be followed for compliance . . . A District can be created with whatever the population is unless the election results prove out that minority voters can elbow select their candidates of choice. The other consideration fall by the wayside." (PX64 at 61). But he also said that Dr. Handley's target was based on estimated and that she had not given "an absolutely 35%, 45%" but that instead "[h]aving a range, 35-40%, 40-45%, yeah, I think that's more advisable . . . Remember you are unpacking the districts. You are not concentrating minority voters on the basis of race or color. Beyond the level at which Dr. Handley determined." (PX64 at 62). But then he suggested that the

Commission run the Detroit-area districts through the bellwether election software to see if the districts would perform for Black voters. (*Id.*)

276.    Defendant Eid then expressed his discomfort with the lack of clear guidance from the Commission VRA Legal Counsel:

> Mr. Adelson, I appreciate all of the advice that you give us but I got to be honest I'm becoming increasingly uncomfortable with this direction that we're going under. Because while it is unpacking the districts you know we don't have any District that is close to 90%, 70% or even 60%. But you know the numbers that we are hitting it just makes me question how is that going to work with actually electing a candidate of choice. And I think part of the problem I have with this understanding is the analysis did not include primary election results. So like if we look at District 17 here. We have it at 35.14% Black voting age population. If you have a primary election where there is two Black candidates and a white candidate how is it that you know the candidate of choice is actually going to get elected? I understand that in the general election, yes. All of these districts that we draw are going to be democratic districts. But that's not where the choice actually happens in these areas . . . I don't know if I'm being clear on the question I'm asking. But it's just making me a little uncomfortable having to hit these percentages that are low I would be more comfortable with 45% but 35% thank you Commissioner Curry. [(PX64 at 63).]

277.    Mr. Adelson then gave a very long rationalization that while this is "a data driven legal process" the bottom line was that the Commission did not have voter turnout or primary election data. (PX64 at 65-66). Defendant Curry was not satisfied with Mr. Adelson's no-data response. (PX66-67).

278.    Defendant Rothhorn then represented that: "We are going to build a cushion, Commissioner Curry, because what I hear you saying we need more like 50% more than 35% to justify that." And Defendant Curry responded, "It needs to be higher." (PX64 at 67). This did not occur.

279.    Instead, using the bellwether election function (i.e., general elections and one primary without a Black candidate) on the software, Mr. Adelson showed that for Senate district 6, "the [general election] results seem to play out meaning seems to perform in the language of the

voting rights act to elect candidates of choice." (PX64 at 68). And Mr. Adelson emphasized that in the U.S. Supreme Court's decision *Cooper v. Harris*, involving a district with a 46% or 47% BVAP, the Court "threw out the districts and threw out the map and said that by including voters minority voters beyond what is necessary that was packing." (PX64 at 69).

280.    Using the bellwether general election results and the single 2018 gubernatorial primary without a Black candidate, Mr. Adelson then went district-by-district, inferring that due to the presumption of white crossover voting, each draft district would perform for Black voters. Mr. Adelson even opined that a 27% BVAP district (Senate district 4) would perform for Black voters based on general election results and the single 2018 gubernatorial primary without a Black candidate. (PX64 at 68-83). But, of course, as identified by Defendant Szetela at trial, in retrospect its rather elementary that voters in Wayne and Oakland Counties (most of whom are democrats) will vote for Democrats over Republicans in general elections. This is even more true when those Democratic candidates are, like Joe Biden and Gretchen Whitmer, Caucasian. (Chair Szetela, Trial Tr. Vol. I at 91-92, ECF 112, PageID.3672-73 (explaining that use of the bellwether elections always resulted in the Black candidate of choice (i.e., a democrat) winning the general election)).

281.    Just like the prior mapping sessions, other redistricting criteria like communities of interest and population equality took a backseat to racial line drawing. (PX64 at 13, 24, 27, 48-49, 61, 80). Indeed, Mr. Adelson expressly advised that meeting Dr. Handley's racial target was "essential" and  "[t]he other consideration fall by the wayside." (PX64 at 61)

282.    For example, the Commissioner's continued to elevate meeting Dr. Handley's racial target over their community of interest criteria. PX64 at 13 ("So we need to start by looking at VRA compliance . . . before looking at communities of interest or beyond the VRA we need to make sure we are in compliance with the VRA or it will be an endless circle we are in"), 24 ("Don't

worry if Harper Woods want to be there or community of interest where Harper Woods should be. That should be not something we're looking at. We should be going into looking at just complying with the Voting Rights Act. And if we have to go in there don't let that be a reason as to why because you're thinking about public comment, go straight off the numbers to get where we need to be on with VRA stuff. And then go look at communities of interest"), 27 ("[A]gain we are not focusing on COI so I want to offer this as a way to . . . decrease the non-Hispanic Black"), 48-49 ("[W]hoever's town is split is not going to like the fact their town is split. That is my actual thought on the whole situation here. I think it's VRA compliant. This is what we have been tasked to do here today for this particular map").

283.    By way of further example, Mr. Adelson continued to make clear that lowering the BVAPs in the Detroit area took precedence over the Commission's goals to achieve population equality. (PX64 at 61 ("[I]t's very important if not essential that Dr. Handley's analysis be followed for compliance . . . A District can be created with whatever the population is unless the election results prove out that minority voters can elbow select their candidates of choice. The other consideration fall by the wayside"),  80 ("[R]emember this is not a Congressional plan so you have a lot more leeway under populating and over populating . . . It is really important to stress that because this is not a Congressional plan you are not required to have absolute in your absolute population equality")).

284.    By the end of the October 4, 2021 mapping session, the Commission had created a significantly revised collaborative Senate map, Draft Map 199, 10-4-21 V2 SD, which contained the following six (6) Senate Districts in the Detroit area: SD6 (BVAP 41.2%); SD8 (BVAP 43.35%); SD9 (BVAP 40.03%); SD13 (BVAP 42.45%); SD 14 (BVAP 47.74%); and SD17

(BVAP 36.73%). (PX105 at 1-7; see also see also Senate Mapping Progression Demonstrative, PX136 at 32, 36).

285.    This draft collaborative map created no Senate Districts with BVAPs above 47.55% despite the fact that the Commission had no evidence demonstrating that Black candidates in Detroit could win polarized primary elections in districts with BVAPs below 48%. (Chair Szetela, Trial Tr. Vol. I at 95-96, ECF 112, PageID.3676-77). The Commission's sole purpose in lowing the BVAPs of these districts was to meet the racial target derived from Dr. Handley's racially polarized voting analysis which, again, consisted of general elections and one primary without a Black candidate. (Chair Szetela, Trial Tr. Vol. I at 93-94, ECF 112, PageID.3674-75).

286.    Moreover, Draft Map 199, 10-4-21 V2 SD is materially the same as the Final Linden Plan. As Defendant Szetela testified at trial, "[t]his is not a trial balloon. This is an almost final map that we adjusted for minor things, like, you know, small changes in population and correcting precincts that were split and things like that, but at this point, to use your analogy, the cake was baked. This is the Linden map with very minor changes to it. (Chair Szetela, Trial Tr. Vol. I at 96-97, ECF 112, PageID.3677-78).

### 7.    October 5, 2021 House Collaborative Mapping Session

287.    During the October 5, 2021 mapping session, the Commission, under the direction of Mr. Adelson and General Counsel Pastula, continued to lower the BVAPs of the Detroit-area House districts even further. (PX140 at 1830-1870; Chair Szetela, Trial Tr. Vol. I at 101-06, ECF 112, PageID.3682-87).

288.    To accomplish this goal, the Commission used the systematic pattern recommended by Mr. Adelson to identify draft House districts with BVAPs above the racial target. (PX140 at 1830 ("So are we just going to follow the same process we did before going District by District

looking at VRA?"), 1843 ("District 17 for example it's about 51%. And District 9 about the same. I think that those are perhaps more of an immediate concern as we are going down the list").

289.    Once again, the specific racial "threshold" for Oakland County was explained as being 42% to 43% with some leeway to go to 40% to 45% if necessary. (PX140 at 1843 ("MS. JULIANNE PASTULA: That was certainly accurate, Mr. Vice Chair and I believe that we obtained those ranges from both Dr. Handley's presentation and VRA counsel Mr. Adelson and again the ranges I think for Saginaw County and Oakland County, the 40-45 range. But that 42-43 really was what was pinpointed by your experts").

290.    It was also explained that the specific racial threshold for Wayne County was 35% to 40%. (PX140 at 1844 ("MR. BRUCE ADELSON: That gives us an additional leeway because remember it's 35-40% in Wayne County. 40-45% in Oakland").

291.    Although the Commissioner did not have any racial voting data for Macomb County, it nevertheless utilized the 35% to 40% guidepost from Wayne County. (PX140 at 1848 ("So we want to add population and we want to add Black population. So eight is another this is going to be Wayne County and Macomb County I believe yeah so what are we focusing towards here? Wayne, we said 35 to 40% Macomb we had nothing we are currently at 35.71 so if we raised it to 40, I think we will be okay.").

292.    Once a district was identified as being above the racial target of 35% to 40% for Wayne County or 42% to 43% for Oakland County, the Commission would work collaboratively to reduce the BVAP. (PX140 at 1830 ("[Y]ou are trying to bring down the [non-]Hispanic Black age population a little bit to get it in good balance so maybe the African/American dots would help to see if there is anywhere to pull from"), 1831 ("Just to be clear you're trying to increase the African/American population in one and reduce it in two is that what I'm understanding you're

trying to do?"), 1832 ("[B]eing familiar with this area of Detroit if you take population from two up at the top and put it into one, you're adding more African/American into one. And if you go down where there is the junction of one, two and four, those few precincts right along there are kind of the downtown area and they tend to have a predominately white population. So that might enable you to balance it if you try to take up top and then take at the bottom"), 1846 ("If you pull off the eastern edge of Southfield and put it into 16 you are then shifting the African/American population from 9 to 16 and it should take it in conjunction with what you did up there, that should adjust your balance a bit"), 1855 ("I'm thinking if you just add a little bit more into six since it is under a little bit under populated, that's taking African/American population out'), 1856 ("What about taking a little bit of St. Clair shores that western edge in 6. Isn't that primarily white along there? Add a little more white to bring down your African/American? . . . That is the concept move more white into 11 to adjust the percentage population in 11"), 1867 ("14 is currently a little high on African/American population, right? So ideally, we done want to be putting more of the concentrated African/American part 15 in so I'd say focus on the western edge of Dearborn Heights.")

293.    In order to lower the BVAPs, the Commission continued to have to stretch the Detroit-area districts out into the predominately white suburbs. (PX 140 at 1833 ("I would imagine we would have to go north, correct . . . That would take some of the non-Hispanic Black population out and if we were to expand north in the points, we should be able to get non-Hispanic Black population down so let's try that"), 1860 ("You could make 14 skinnier and flatter, 35 stretch out in between and then 17 skinnier and flatter and it might get you there. But even that I'm not 100% sure if that is going to work").

75

294.     The Commissioners continued to utilize the mapping software's racial population dot thematic or overlay to inform the shape of its Detroit-area districts. (PX140 at 1831, 1837, 1845, 1848, 1854,1859).

295.     But because of the extremely high concentration of Black population in Detroit, the Commissioners continued to have a difficult time drawing reasonably configured House districts that hewed to the racial target. (PX140 at 1837 ("Other than what we did with one and two it looks like we are going in a circle one reduces and the other goes way up high"), 1838 ("And yeah, it's going to look like we are going in circles but we are making progress on the voting age population for non-Hispanic Black population is going down"), 1839 ("This is hard. This is hard to rebalance"), 1860 ("Yeah, I'll be honest with you Cynthia I think this is going to be really, really challenging. Because all of your African population is east")

296.     At one point, Defendant Clark asked whether given communities of interest, a Detroit-area House district with a BVAP of 58% would be acceptable? (PX140 at 1837).

297.     Mr. Adelson gave the following response: "Looking at the law says and what Dr. Handley analyzed and Dr. Handley's analysis is in Wayne County BVAP and Black voters can elect candidates of choice at 35%. So if you make a District a majority minority District when that additional population goes beyond the ability to elect that is where you get into more involved attempts at justification." (PX140 at 1837).

298.     Apparently frustrated, Defendant Clark protested that "But you can't change the places where these people are living. I mean it's so concentrated." (PX140 at 1837).

299.     Mr. Adelson, however, maintained his advice: "Like we had talked about before getting into things in such detail there may be areas and there are some limitations about what you can do. But having a population that is more than 20 points above what Dr. Handley analyzed [it]

raises my eyebrow. So to the extent it can be done absolutely. And if it's impossible or unreasonably then that is justification have to deal with but until that point, I think making reasonable efforts at what the Voting Rights Act and the courts say and what Dr. Handley analyzed I think that that's important." (PX140 at 1837).

300.     Mr. Adelson also continued to run the bellwether election function on the districts and, without surprise, all districts showed an ability of Black voters to elect their candidates of choice in general elections. (PX140 at 1842, 1851, 1858, 1869).

301.     When performing this racial balancing, the Commission was not concerned with Detroit-area neighborhoods. (PX140 at 1833 ("MR. MORGAN: Did you want the neighborhoods on or not yet? CHAIR SZETELA: No we are looking at VRA so no")).

302.     To facilitate the racial balancing, Mr. Adelson continued to advise that the Commission had "leeway" with the population deviation. (PX 140 at 1833).

303.     With regard to the sacrificing of compactness, Defendant Witjes explained that "I feel like I have to be careful how I word this. The compactness scores on the house I have a feeling could potentially be lower, not by us doing it purposely just because how skinny they are and how we have to reach for things and it's not as big of a land mass. So I think we should keep that in the back of our minds and try not to chase a poltergeist we probably won't be able to fix so my thought." (PX140 at 1890-91).

304.     Regarding the "skinny" and "discontiguous" shape of some of the districts, Defendants Witjes and Clark agreed that "Well, that may be true but there really may not be anything else we can do in that situation. If you look at maps currently now it doesn't matter what state you look in, in heavily populated areas there are districts drawn that are maybe blocks wide

just to do something. So, yeah, ideally do we want it to be skinny, no, but I think we just don't have a choice." (PX140 at 1850).

305.    The changes map to the Detroit-are House districts were almost entirely race based. In fact, at one point, Defendant Szetela commented that "I'll be honest with you at this point we are just moving blocks back and forth. So I don't know that you need to know the area to do it." (PX140 at 1853).

306.    By the end of the October 5, 2021 mapping session, the Commission had created a significantly revised collaborative House map, Draft Map 204, 10-5-21 HD, which contained the following seventeen (17) House Districts in the Detroit area: HD1 (BVAP 41.63%); HD2 (BVAP 45.58%); HD3 (BVAP 42.04%); HD4 (BVAP 42.68%); HD5 (BVAP 46.99%); HD6 (BVAP 47.37%); HD8 (BVAP 40.72%); HD9 (BVAP 47.49%); HD10 (BVAP 42.8%); HD 11 (BVAP 49.89%); HD 12 (BVAP 48.8%); HD14 (BVAP 47.68%); HD15 (BVAP 45.86%); HD16 (BVAP 43.93%); HD17 (BVAP 46.35%); HD18 (BVAP 39.85%); and HD21 (BVAP 47.84%). (PX95 at 1-7; see also see also House Mapping Progression Demonstrative, PX136 at 38-44).

307.    Incredibly, this collaborative House map does not contain a single Detroit-area district with a BVAP above 50%. (Chair Szetela, Trial Tr. Vol. I at 107, ECF 112, PageID.3688). The Commission's sole purpose in lowing the BVAPs of these districts was to meet the racial target derived from Dr. Handley's racially polarized voting analysis which, again, consisted of general elections and one primary without a Black candidate. (PX140 1829-1870).

308.    The partisan fairness function of the software was not activated until October 6, 2021. (PX5 at 73; see also Chair Szetela, Trial Tr. Vol. I at 94-95, ECF 112, PageID.3675-76; Vice Chair Rothhorn, Trial Tr. Vol. I at 197, ECF 112, PageID.3778).

309.    On October 11, 2021, General Counsel Pastula emailed Defendant Lange and defined the racial quota as follows: "Wayne & Genesee Counties 35-40% BVAP Oakland & Saginaw Counties 40-45% BVAP." Pastula further stated that "Bruce is sitting next to me and concurs!" (See 10/11/21 Pastula Email attached as **Exhibit C**).

I.    **The Commission Holds Public Hearings on the Draft Maps**

310.    The Commission conducted its second round of public hearings between September and October 2021. (Chair Szetela, Trial Tr. Vol. I at 107-10, ECF 112, PageID.3688-91).

311.    On October 12, 2021, and in advance of the Commission's arrival for the Detroit public hearings, Black leaders held a rally to call for better racial representation in the draft maps offered by the Commission. Former State Senator Adam Hollier (D-Detroit) explained that many of the Commission's draft districts were "not indicative of Black communities" and that "Black people will not win because a majority of the voter base are in suburban communities particularly in primaries where Democratic races are decided." Rep. Helena Scott (D-Detroit) expressed her concern that "[w]e are losing our representation." Rep. Cynthia A. Johnson, (D-Detroit), said "The current plans have diluted our voting bloc" and "will potentially take away all Black representation, potentially all Detroit representation." Rev. Wendell Anthony, president of the Detroit Branch of the NAACP, said during the press conference it's imperative the maps are changed to ensure Black voters aren't marginalized. "We want maps that reflect who we are," he said. (PX130).



312.    On October 20, 2021, the Commission held its public hearing on its draft maps. The hearing was widely attended. Commenters largely focused their ire on the Commission's decision to do away with majority Black districts in the nation's largest majority Black city. They complained that Commission's proposed maps dilute the voting power of Detroiters by putting residents of the overwhelmingly Black city into bacconmandered districts with nearby wealthy and white Oakland and Macomb County suburbs. They urged commissioners to create districts that are majority Black and majority Detroit residents to protect city residents' ability to elect people who represent their needs. (PX66).

---

[12] (PX130).



313.    John Johnson, the Executive Director of the Michigan Civil Rights Commission told the Commission that the draft legislative districts drawn by the Commission "violate Federal civil rights law" because "[t]hey dilute majority minority districts and strip the ability for minority voter to elect legislatures reflect their community and effect any meaningful opportunity to impact public policy and law making." He warned the commission that if it approved any of its draft maps, it would be violating the Voting Rights Act. (PX66 at 65).



---

[13] (PX131).
[14] (PX131).

314.     Former State Representative, Detroit School Board Member and US Congressional Candidate Sherry Gay-Dagnogo asked "How can we advocate for the community when we are cracked into eight parts" and then explained under the previous redistricting bodies there were far more majority Black Senate and House districts. (PX66 at 24-25).



315.     Danielle Steven, retired public servant and member of the Detroit NAACP, stated that the maps do not represent the best interests of black voters. She also noted that the Michigan State Institute for Public Policy highlighted the breaking apart of the geographically compact majority in Detroit. (PX66 at 29).

316.     Take northeast Detroit as an example, said Denise Coats-Robinson, who lives in Southfield but who has deep ties to the city's northeast side. The commission's proposed maps would lump it in with the more affluent and more white areas of Harper Woods and the Grosse Pointe suburbs. (PX66 at 27).

---

[15] (PX131).



317.    Michael Joseph of Oak Park and President of the Detroit Chapter of the Coalition of Black Trade Unionist said: "Your plan for the next ten years denies Black Brown in Michigan the opportunity to select representatives from their neighborhoods to send to Lansing." (PX66 at 19).



318.    Carl Senior, a retired firefighter and emergency medical technician, described himself as "just an ordinary citizen in the City of Detroit" but explained that he was "really

---

[16] (PX131).
[17] (PX131).

outraged at the way these maps are breaking up the north end and eliminating the political power of the people in the City of Detroit." He explained that:

> After college my wife and I got married and decided to move to Detroit. We chose to live in the north end. Our parents moved from Mississippi and Oklahoma to get away from Jim crow to get away from areas they had no political power. And these maps eliminate power, they take away the power of minorities, the Black folks . . . I think it's unfair and I think we should work harder at that. I saw one of your spokespersons on TV last night. That is what convinced me to come here. He said we have angered both the democrats and republicans. We must be doing something right. That's not what I get from that. If you anger everybody you must be doing something wrong. As a paramedic I was taught if you don't know what to do, at least do no harm. These maps are harmful and take away power. They disrupt. They divide. It's unfair. So let me read my sign to you leave the north end alone. Put the north end back together. Keep it intact. Boston Edison, Hamtramck, Highland Park east side of Detroit, Senate District 2 now includes even the Grosse Pointe areas. Don't immigrate us to negate us and leave Black districts intact. Thank you. [(PX66 at 57-58).]

319.    Brook Harris, another Detroit resident, told the Commission her opinion that a "majority of Black Detroit deserves the chance to be represented by Detroiters. Not just people that might share political party." (PX66 at 23).

320.    Detroit Branch NAACP Executive Director Kamilia Landrum urged Commissioners to consider maps submitted to them by the public instead. "Black people fight for Black people differently," Landrum said. "Yes we have allies in other communities, but... we don't just need allies. We need people who represent us, have our experiences and understand us." (PX66 at 80).

321.    Yvette Anderson stated that the Commission needs to have maps that are 51% Black so that Black people can elect candidates of choice. Moreover, she argued that the current maps represent a return to the Jim Crow politics of the past. (PX66 at 16).

322.    Jonathan, a Wayne County Commissioner, argued that with the maps submitted, you would have the lowest number of black elected officials in the state's history. (PX66 at 54).

323.    The president of the Troy branch of the NAACP stated that these maps do not provide for voting rights. They reduce the number of likely black elected officials. (PX66 at 62).

324.    Andrea Bradley-Baskin, a Detroit lawyer and member of the Detroit Branch of the NAACP, said "[w]e want to remind you that the 14th amendment prohibits legislatures and this Commission from engaging in both intentional and raced base voter dilution and racial sorting." (PX66 at 104).

325.    That evening Jon Eguia, an economics and political science professor at Michigan State University, told the Detroit Free Press it is risky for the commission to place so much weight on an analysis that includes just one primary election (and no Black candidate). "Suppose an engineer gives you the estimate that the bare minimum amount of concrete that is enough for a bridge of this kind to hold and not fall apart is 1½ tons," he said. "You will not then infer, 'OK, I'm going to build 20 bridges with exactly 1½ tons.' It will probably hold, but who wants to drive over that bridge?" (PX132 at 4).

**J.      The Commission Meets in Closed Session**

326.    On October 27, 2021, the Commission met in closed session for the ostensible purpose of discussing legal memoranda provided by Commission's Voting Rights Act counsel Bruce Adelson. (Chair Szetela, Trial Tr. Vol. I at 111-37, ECF 112, PageID.3692-3718). But as explained by Defendant Szetela and as demonstrated by the public record, there were ulterior purposes for the meeting including to: (a) convince the Commissioners that the public comments regarding the need for higher BVAPs in the Detroit-districts were incorrect; and (b) coach the Commissioners on how to mask their raced-based redistricting motives with non-racial language and rhetoric. (Chair Szetela, Trial Tr. Vol. I at 111-12, ECF 112, PageID.3692-93).

327.    The meeting was organized by General Counsel Pastula. (Chair Szetela, Trial Tr. Vol. I at 112, ECF 112, PageID.3693). General Counsel Pastula circulated a non-disclosure

agreement for Commissioners and staff to participate in the closed session meeting which purported to obligate Commissioners to keep secret any information disclosed during the closed session. (Chair Szetela, Trial Tr. Vol. I at 112-13, ECF 112, PageID.3693-94). At the beginning of the closed session, General Counsel Pastula advised that the "rules of the closed session" were that "none of the discussion topics or documents may be shared outside of this room" and stated that "everyone has received the confidentiality agreement" and should return signed copies to her or the Suann Hammersmith. (PX71 at 11:18-40). Again, at the end of the meeting, Defendant Clark emphatically emphasized that "Anything discussed in this room today should stay in this room period! Not discussed with anybody!" at which point General Counsel reiterated that this is a confidential discussion and please return your confidentiality agreements to her or Sue Hammersmith. (PX71 at 1:20:50 – 1:21:38).

328.    Defendant Szetela and Defendant Lett both refused to sign the non-disclosure agreement. (*Id.*) In fact, Defendant Szetela, who served as the Commission's Chair at the time, refused to countersign any of the partially-signed agreements and still has possession of the partially-executed agreements which she received from General Counsel Pastula at the secret meeting. (Chair Szetela, Trial Tr. Vol. I at 113-14, ECF 112, PageID.3694-95).

329.    At trial, Mr. Adelson twice denied signing the non-disclosure agreement presented to him at the October 27, 2021 closed session meeting. (Adelson, Trial Tr. Vol. IV at 7, 57-58, ECF 106, PageID.3009, 3059-60). Mr. Adelson in fact stated he could not answer whether non-disclosure agreements promoted transparency in redistricting. (*Id.*) At trial, Defendant Eid also denied having any recollection of being asked to sign a non-disclosure or confidentiality agreement at the October 27, 2021 closed session meeting. (Eid, Trial Tr. Vol. III at 157-58, ECF 104, PageID.2948-49). Contrary to their purported recollections, both men executed the non-disclosure

86

agreements on October 27, 2021. (See Adelson and Eid Confidentiality Agreements, attached as **Exhibit D**).

330.    In any event, the closed session meeting was recorded and ultimately the Michigan Supreme Court ordered that audio recording and the memoranda to be placed in the public record. (Uncontroverted Facts, ECF No. 87, PageID.2091 ⁋ 68). For reasons unknown, the Commission presently hosts that audio recording on a third-party website which requires personally identifiable information to access. (Chair Szetela, Trial Tr. Vol. I at 114, ECF 112, PageID.3695).

331.    At the outset of the meeting, Mr. Adelson instructed the Commission that the Voting Rights Act "does not require any numerical amount of majority-minority districts, indeed, does not even require majority-minority districts at all." (PX71 at 13:00-16). But this advice was not new. It was something that Mr. Adelson had advised throughout the process. And, of course, at this point in time, the Commission's collaborative Senate and House maps did not contain a single majority-Black district in the Detroit area. (Chair Szetela, Trial Tr. Vol. I at 118, ECF 112, PageID.3699).

332.    As Defendant Szetela explained, as a result of the public comments there were Commissioners who wanted to create majority-Black districts in Detroit and her view of the import of this meeting was for Mr. Adelson and General Counsel Pastula to dissuade the Commission from doing that. (Chair Szetela, Trial Tr. Vol. I at 118-19, ECF 112, PageID.3699-3700).

333.    Mr. Adelson and General Counsel Pastula repeatedly referred to the public comments as being "flat out incorrect," "woefully misleading," "infused with misinformation or lack of information," based on "partisan agendas," and even "garbage." (PX71 at 14:36-15:17, 20:43-23:09, 39:37-40:30, 48:28-49:00, 1:03:30-1:04:27, 1:06:37-1:07:53). The import of that advice was "I would strongly advise you to listen to your lawyers not other people's lawyers."

(PX71 at 1:14:37-1:14:59; see also Chair Szetela, Trial Tr. Vol. I at 119-20, ECF 112, PageID.3700-01).

334.     Mr. Adelson advocated strongly for maintenance of the "spoke" concept for the Detroit-area districts and reiterated that "we are not in any way suggesting -- nor will we -- that you pull back and go south of eight mile and stay there -- we are not saying that at all." (PX71 at 53:03-54:24).[18] Mr. Adelson then applauded the Commissioners' purported choice to "unpack" Detroit, calling it a "legacy" and creating more Black opportunity than has been created in "200 years of Michigan history." (PX71 at 1:17:13 – 1:18:40).[19]

335.     Mr. Adelson's advice, however, still concerned Defendant Kellom who stated that she was getting "a little uncomfortable because it sounds like we're being empowered to not change what we've done." "I can't ignore the people that are talking about how Southfield is ripped up, and that is true. How Palmer Park is ripped up, and that is true." "The Detroit area is jacked up and we need to change it. And I don't want us to sit here and start think about ways we can keep it the same." (PX71 at 1:05:00 – 1:06:40).

---

[18] But see Vice Chair Rothhorn, Trial Tr. Vol. I at 195, ECF 112, PageID.3776 ("Do you recall discussing the spoke concept while drafting the Detroit area maps? A. Yes. . . . To achieve that spoke concept required the districts to do, what? A. Move out of the Detroit area where the black population is into the suburbs where the white population is. Q. Was that generally in line with concepts of compactness? A. No. Q. Was it generally in line with following municipal boundaries? A. No. Q. Was it generally in line with the interest of Detroit voters? A. No.").

[19] Defendant Szetela expressed her view that this closed meeting was in part a confidence session with "two consistent themes coming from Mr. Adelson and Julianne Pastula with respect to what we were doing. When there was discomfort -- there was either a carrot or a stick put out. When there was discomfort the stick was, you're breaking the law, you're violating the Voting Rights Act, you're violating the constitution. The carrot was, you're doing something revolutionary, you're doing something legendary, you're going to go down in history of unpacking Detroit and being the savior of the civil rights movement." Chair Szetela, Trial Tr. Vol. I at 79-80, 120-21, ECF 112, PageID.3660-61, 3701-02).

336.    Despite his acknowledging that redistricting was a data driven legal process characterizing competing public viewpoints as being unsupported by data, and continuing to push for the "spoke" concept necessitated by Dr. Handley's racial guidepost, Mr. Adelson conceded there was only one, statewide primary in the Commission's election-results matrix. He then stressed that in a primary field with multiple minority candidates, "it would be very difficult in [his] experience for one [minority candidate] to achieve 50% or more so that that person could be analyzed to be the candidate of choice." So, he continued, "while primaries can provide useful information, please be advised that they're not necessarily dispositive." (PX71 at 17:35-20:15) Then, much later in the meeting, he acknowledged that the only primary election analyzed by Dr. Handley (i.e., the 2018 Gubernatorial democratic primary) there was no cohesion amongst Black voters and without cohesion Section 2 of the Voting Rights Act does is not implicated. (PX71 at 40:35– 42.23).[20]

337.    Using the Commission's decision to keep the City of Flint whole as an analogy, Mr. Adelson signaled to the Commission that "a path forward" would be for the Commission to make community-of-interest based changes to the Detroit-area districts that might increase the

---

[20] Defendant Szetela found Mr. Adelson's contradictory advice to be very confusing: "[A]s we got further along towards final maps Bruce would make statements like that which would cause me to question why we're considering race and trying to create districts under the VRA if by his own admission there is no cohesion, therefore, we don't meet the Gingles standards." (Chair Szetela, Trial Tr. Vol. I at 131-32, ECF 112, PageID.3713-14).

BVAPs and thus assuage some of the adverse public "comments heard over the last week or so." (PX71 at 25:45 -27:40).[2122]

338.    Mr. Adelson stressed, emphasized, insisted, pleaded, and begged that Commission members "don't use phrases about adding black people, subtracting black people, adding white people, subtracting white people" when adjusting maps. "One of the reasons we wanted to have this session is that in looking to the future – looking over the next eight days -- we don't want to give people out there specific paths to challenge what you're doing. Remember . . . legally, race cannot predominate redistricting. It can be one factor of many." He predicted that while racial comments may have been made previously, the focus of litigation would be based what happens moving forward. (PX71 at 23:11-25:09).

339.    Defendant Eid responded, "so, how do we do that without packing the districts?" Defendant Kellom replied, "I think what I hear Bruce saying is the rhetoric and language that we use to justify it. So, like, what we're actually doing in reunifying folks is of course, we're putting certain races together, we know that. But then what we *say* is that we're observing the fact that these areas are uniquely different, like when we think about Detroit. So we're not using the

---

[21] Chair Szetela, Trial Tr. Vol. I at 123, ECF 112, PageID.3704 ("So Mr. Adelson specifically was referencing Flint and talking about Flint and saying that we had done higher black voting populations in Flint based on a community of interest, because they were talking about water issues and we should do the same thing in Detroit. If we want to increase the BVAPs, we can do it, but just give a different excuse than we're doing it to increase the BVAPs, and that was emphasized repeatedly in the meeting, so create a different reason, which being a lawyer I'm, like, that's pretext, create a different reason and say that's the reason so we have a clean record for litigation.").

[22] Chair Szetela, Trial Tr. Vol. I at 132-33, ECF 112, PageID.3713-14 (Mr. Pattwell "[C]an you explain how the Commission could keep a 54 percent BVAP district in Flint but throughout this entire process could not do the same with respect to Detroit? A. I can't explain it because I don't think there's an explanation for it. It makes absolutely no sense why we were being pushed in Detroit to go lower and lower and lower than 54 percent, yet in Flint it was somehow acceptable even though we still had Doctor Handley's analysis that applied to Genesee, which included Flint.").

language that is going to question the maps when it gets to that point. So I think if we go back and look at the cultural aspects and the neighborhoods . . . the places that are completely completely black [laughing] just saying it like that, um, will be, the undertones will be accomplishing what folks want but doing it in a way that still upholds our criterion." (PX71 at 27:38 – 28:46).

340.    After further coaching from Mr. Adelson suggesting the Commissioners focus the future rhetoric or "vibe" on keeping "neighborhoods" and "communities" whole, Defendant Orton stated her understanding that "when we're talking about this -- if we chose to put anything together that we currently have separated – we go back to communities of interest -- it's a communities of interest thing not a VRA thing." (PX71 at 38:03-39:12).[23]

341.    In response to Mr. Adelson's proposed neighborhood approach, Defendant Clark identified that, "Detroit's different and so your comments were it's it appears to be a neighborhood issue and they want to have the neighborhoods consolidated. So we can do that and make minor modifications to the districts we've done. But that to me doesn't fix the problem that they [Black voters] were complaining about. The problem they were complaining about was, in my mind, was that the districts didn't give them [Black voters] the opportunity to elect. And so changing just the neighborhoods, it's not going to change that problem. So the way to change that would be to make the districts compress them so that more the blacks are in Detroit." (PX71 at 45:23 – 48:06).[24]

---

[23] At trial, Defendant Szetela explained, "We were not considering communities of interest at all when we were ripping apart Detroit. We were trying to hit racial quotas . . . We're being coached by what to say in the next eight days to create a record for litigation where we focus on communities of interest to justify any changes we make to the map or justify the maps as they exist as of the day of this meeting." (Chair Szetela, Trial Tr. Vol. I at 126, ECF 112, PageID.3707).

[24] Chair Szetela, Trial Tr. Vol. I at 128-29, ECF 112, PageID.3709-10 (explaining that Detroit neighborhoods, for example, have to do with stretching districts up to Birmingham, its just "cover" to use Defendant Lett's words from the secret meeting).

342.    With respect to Commissioner Eid's concern regarding how the Commission would "protect" itself from Voting Rights Act litigation, Defendant Lett invoked the opinion of longtime Michigan political consultant and Democratic Ingham County Commissioner Mark Grebner: "[C]ommunities of interest was created as a nebulous criteria that the redistricting commission could use later as cover for whatever map it draws. Communities of interest is a will-o'-the-wisp. It's a wreath of smoke. It can be whatever is necessary, the crucial thing is who decides what a community of interest is that gets preserved. The answer? The Commission does. Who gets to review that? Frankly, nobody does. It's up to them. Was it originally intended? Yes. It was built in as nailing Jell-O to the wall." Lett emphasized, "that's exactly what I believe." "That's what we can use now to justify what we're doing." That is how we "provide ourselves with cover." (PX71 at 58:14 -1:01:10). And, contrary to his testimony at trial, Defendant Eid declared "well I agree with everything" Defendant Lett just said. (PX71 at 1:01:42-1:01:50).

343.    Defendant Lett further assured Defendant Kellom that the Commission would make changes to the Detroit-area districts: "Nobody in this room is saying we can't go in and make changes. The only thing that we are saying is when we make those changes, we need to be cognizant of the VRA and how we're going to do that." (PX71 at 1:13:48-1:14:06).

344.    Defendant Orton agreed stating: "Remember the wording. This can all fall under communities of interest." (PX71 at 1:14:54-1:15:13).

345.    While testifying at trial, Mr. Adelson gave a lengthy denial to the effect that he never advised the Defendant Commissioners to lie or use pretext. But the denial did not involve any explanation of his numerous statements during the once secret meeting or the Commissioners'

expressly stated and pretextual understandings of Mr. Adelson's statements. (Adelson, Trial Tr. Vol. IV at 7-13, 57-58, ECF 106, PageID.3009-12, 3059-60).[25]

346.    Moreover, and tellingly, in his Memorandum entitled "The Law of Redistricting, DOJ, and Cautionary Tales" Mr. Adelson advises his redistricting clients to "[b]e mindful of what you say, write, text, post on social media, email…… [a]ll is discoverable in a lawsuit" and "loose lips sink ships." (PX142 at 109-113).



PX142-0109

K.    **The Commission Continues to Work on the Draft Maps**

347.    At this point in time the Commission is four (4) days away from the deadline mandated by the Michigan Constitution and was feeling enormous pressure to complete the maps. (Chair Szetela, Trial Tr. Vol. I at 127, 135, ECF 112, PageID.3708, 3716).

---

[25] But see Chair Szetela, Trial Tr. Vol. I at 128, ECF 112, PageID.3709 ("He's trying to clean up the record by coaching us to say something different for the last eight days with the hope that if we get sued, which seemed pretty likely at that point, that the defense strategy would be to claim that the changes that were made for race were actually done for communities of interest."); Vice Chair Rothhorn, Trial Tr. Vol. I at 193, ECF 112, PageID.3774 (Ms. McKnight: "Did you -- there was testimony earlier about a closed session in October. Do you recall a closed session in October 2021?  A. Yes. Q. Okay. Did you come away from that closed session understanding that you had been directed to lie? A. I came away confused.").

348.    During this late stage of the process, the Commission made very minimal changes to the draft collaborative Senate map but did make meaningful modifications to the draft collaborative House map that had the effect of raising the BVAPs in several Detroit-area districts. (Chair Szetela, Trial Tr. Vol. I at 96-97, 125-27, 135-37, ECF 112, PageID.3677-78, 3706-08, 3716-18; see also Senate and House Map Progression Demonstrative, PX136 at 32-44).

349.    At trial, Defendant Szetela testified that Defendants Kellom and Rothhorn had expressed to her an interest in increasing the BVAPs in the Detroit-area House Districts and had been separately advised by Mr. Adelson that they could do so as long as they used neighborhoods as the ostensible rationale. (Chair Szetela, Trial Tr. Vol. I at 135-37, ECF 112, PageID. 3716-18) ("So MC Rothhorn and Brittni Kellom had called me and told me that they wanted to fix Detroit and they wanted to increase the black voting age population and that they had had a discussion with Bruce Adelson that they could do that as long as they used neighborhoods as the basis.").

### 1.    November 2, 2021 Deliberation and Mapping Session

350.    During the November 2, 2021 mapping session, the Commission, pursuant to the direction of Mr. Adelson and General Counsel Pastula during the closed session meeting, worked on revising certain Detroit-area House districts to raise the BVAPs. At this meeting, neighborhoods were mentioned at least 129 times and communities of interest at least 155 times. (PX73 passim).

351.    At the outset of the meeting, Sarah Howard, counsel for the Michigan AFLCIO's fair maps project, expressed their concern with the lack of primary data in Dr. Handley's racially polarized voting analysis:

> The Michigan AFLCIO does not necessarily categorically disagree the districts below 50% BVAP may satisfy the Voting Rights Act. It may be possible for such Districts to allow the African/American community to elect the representative of its choice. But a theory is one thing and applying it to real life is another. The burden of proof is on the Commission to run a racially polarized voting analysis on each of your draft VRA districts. To assess whether each one would actually allow the Black community to elect the representative of its choice. That analysis must be

taken into account more than just a single primary election. That analysis may show that you need to make adjustments or could prove your districts are fine but you won't know until you check and the people of Michigan won't know either. Thank you again for your work. [(PX 73 at 3).]

352.    Crystal Boyd, Sarah Howard's legal assist, commented next stating:

We wanted to thank you for working towards partisan fairness in your maps. And thank you for being realistic and recognizing the difference between safe seats and swing seats. The State House is by far the most challenging chamber to draw. The fair maps project was intended to show you one way to get to fair maps. Our map is much more compact than your drafts. And keeps many more cities and Counties together especially in Metro Detroit. It also unpacks vote seats across the state in a way that is consistent with communities of interest. And it has a very small republican bias. Hundreds of people have put hundreds of people gave input on our fair maps project. And hundreds have asked you to consider it. Be independent thinkers but please don't be afraid to learn from our efforts. (PX 73 at 4).

353.    Despite the purported neighborhood focus of the mapping session, Mr. Adelson advised the Commission that it could still underpopulate or overpopulate districts if the justification is VRA compliance. (PX73 at 46-47). Similarly, Mr. Adelson advised the Commission that "splitting Government unit boundaries is not an impediment to VRA compliance." (PX73 at 48).

354.    While revising House District 9, Defendant Szetela and Mr. Stigall engaged in a discussion regarding VRA compliance and the Black population. (PX73 at 50 ("MR. KENT STIGALL: Nine went up to 47% non-Hispanic Black. CHAIR SZETELA: It was at 48-42, so that is okay. MR. KENT STIGALL: 5 is at 44.5. CHAIR SZETELA: That is good and still within our VAA range. MR. KENT STIGALL: 110 is 5% high.").

355.    Mr. Adelson immediately interject to protect the Commission's record from a racial gerrymandering claim:

Listening to the conversation I just wanted to reiterate something. As you know we've done Voting Rights Act analysis, Dr. Handley has done racial bloc voting analysis. And I think what is important as we are moving through the Detroit area, the BVAP numbers can be higher and that does not -- that is not a VRA issue. That's

a reuniting neighborhoods. That is a diverse communities under the Michigan Constitution. That's not being done and that is certainly not at our advice to address VRA issues. VRA issues have already been analyzed. But in looking through it just as a reminder looking through the maps and the Detroit obviously the population is very concentrated. It's an urban area. So going higher with the BVAP as you're reuniting the neighborhoods, as we were doing earlier, that is fine under the Michigan Constitution with the criteria number three. The diverse communities and the communities of interest. I just wanted to make that clarification. I think that it's important the BVAP. Number can go up because right now at least as far as the bloc population we are not looking at VRA issues. These are reuniting neighborhood issues, communities of interest consideration. That's a Michigan Constitution issue. [(PX73 at 51).]

356. Despite the neighborhood focus, the software was still employing the racial population feature. (PX73 at 57 ("VICE CHAIR ROTHHORN: As I was doing this I cycled between the African/American theme as well as the Asian theme"), 58 ("CHAIR SZETELA: . . . We got to flip back to Asian I think we are on African/American. MR. KENT STIGALL: So it was"), 80 ("COMMISSIONER ORTON: I'm just wondering in this area would any of the thematic dots help us as we try to pars out these precincts? COMMISSIONER KELLOM: All of it would help Commissioner Orton."), 81 ("MR. KENT STIGALL: Okay, which I guess we were using this [(i.e., racial dots)] earlier. This is what we have used earlier up to build these whole things.").

357. While explaining her changes to a Detroit-area House district, which were purportedly based on communities of interest, Defendant Kellom acknowledged that she "Talked to Bruce about this. And ways to make it better. ***Mr. Adelson also kind of referenced that earlier about how we could increase BVAP.*** So that was my line of thinking." (PX73 at 67) (emphasis added).

358. While explaining her changes to another Detroit-area House district, Defendant Kellom stated "Again we are offering this as a way to move forward in the Detroit area. That honors the COis. The fact that Detroit is hugely compact as Mr. Adelson referenced in terms of demographics in the population and it being an urban City. And then also being a Detroiter . . .

96

listening to abundance or overwhelming comments to reunite some of the neighborhoods in a way that wasn't reflected previously." (PX73 at 69-70).

359.    Defendant Szetela responded pointing out that "I feel that was not consistent with what I was hearing from Detroit. I don't remember Commissioner or individual commenters saying that they wanted neighborhoods put back together. I remember a lot of comments about wanting minority majority districts with more than 50% African/American and I don't remember much of anything about neighborhoods honestly." (PX73 at 70).

360.    At which point, General Counsel Pastula interjected in an attempt to protect the record from a racial gerrymandering claim as agreed in the closed session meeting:

> Yes, and I do believe Commissioner Kellom highlighted a new of those neighborhoods. And again respecting the historical nature of so many of Detroit's neighborhoods, I was looking at what Mr. Stigall was doing. Again for the distinguishing between the first criteria the Voting Rights Act which the Commission engaged that analysis and those compliance activities based on RBV analysis by Dr. Handley. But what I think I hear Commissioner Kellom discussing is, again, the third criteria of diversity and communities of interest. And those important distinctions between those two criterias and the focus of uniting neighborhoods that I believe is again what I hear Commissioner Kellom attempting to do in these efforts. But that wouldn't have VRA implications is my point Madam Chair. That those are two very distinct activities and it would not have a Voting Rights Act component. [(PX73 at 70).]

361.    Defendant Szetela responded: "I feel that really doesn't address my comment. Most of the people were complaining they felt we were not complaining about VRA and not complaining about neighborhoods." (PX73 at 70).

362.    General Counsel Pastula the retorted:

> To address your comment more directly the comments were advocating more than 50% majority minority districts based on VRA which would likely be held to constitute racial gerrymandering. And, again, that would create VRA issues. What -- where I see this conversation happening is not rooted or anchored in the VRA at all. So while I acknowledge that a lot of the comments that you are referencing that were said at the TCF center centered around VRA and those goals that there were

other comments on the portal and in there that referenced the neighborhoods throughout this process. In that, again, based on the neighborhood. [(PX73 at 70).]

363.    Defendant Szetela then made the point that accommodating neighborhoods only required making minimal modifications rather than the large sweeping modifications being accomplished: "So I just am questioning why we need to completely redraw the map to accommodate neighborhoods. It seems like if your concern is neighborhoods, we could have put the neighborhood map back on Yvonne? Commissioner Curry? Okay, I guess I'm just confused as to why you just wouldn't adjust neighborhoods using the existing lines rather than completely redrawing things." (PX73 at 71).

364.    Near the end of the mapping session, Mr. Adelson ran the bellwether election function on the Detroit-area house districts which had been modified to increase their BVAPs. Mr. Adelson advised that all the districts performed for Black voters and, per the closed session agreement, stated as follows to protect the record from a racial gerrymandering claim:

> "I think one of the things that I'd like to say from an experiment standpoint I've seen with worked with and litigated situations where the intent as expressed on the record by redistrict is to increase certain minority populations for one reason, to discriminate against voters on the basis of race. Meaning to pack them into districts solely from their understanding of the Voting Rights Act. From what I understand that's not being done. This is -- as you know we have discussed the VRA analysis and Dr. Handley's analysis. ***And there has been nothing that I'm aware of where any of you have said we need to put more Black people in a certain area beyond what the Voting Rights Act says. When you take that and then look at the reunifying neighborhoods that a different consideration. That is not packing. Because no one is expressing any will intent or Subterfuge to put as many people we can in these places and will alter their ability to participate effectively in politics. I know that may go beyond what you had requested.*** But that is something that struck me in just looking at these numbers that that's not what was discussed from what I understand today. So the numbers to me I think I'm good with them. The I think the numbers are an improvement in the sense of responding to concerns about that I took to be community based." [(PX73 at 119.)[26]]

---

[26] Chair Szetela, Trial Tr. Vol. I at 141, ECF 112, PageID.3722). ("Q. Do you know why he made that weirdly defensive statement? A. Because he's creating the record, in my opinion. That's what he said he wanted to do in the closed meeting and that's exactly what he's doing.").

365.    Defendant Szetela asked Mr. Adelson: "So you're okay with 55%, 54.9%, Black VAP you think that is I just want to confirm that you think that is acceptable." (PX73 at 119).

366.    He responded that he was comfortable because the modifications were in his purported view neighborhood or community based. He then expounded:

> "I'm fine with that from the perspective of what was discussed today. I would not be fine with that if there was a discussion like there had been in North Carolina a few years ago. Let's add as many Black voters to these districts as we can. Or in Alabama. Or an assumption that this number of Black voters is needed to elect candidates of choice would any and little basis. So that's not been discussed. That's none of you have indicated that that's what you want to do. Certainly Commissioner Curry and Commissioner Kellom [(both of whom are Black)] didn't say anything about that." [(PX73 at 119).[27]]

367.    At trial, Defendant Szetela explained the basis of comments during this meeting: "I was extremely uncomfortable with the advice we had been given. And as Commissioner Kellom was discussing on the record that she was planning on reuniting neighborhoods, this was me pushing back on her because I just felt that what was happening wasn't honest. I wanted her to increase the BVAPs. I was in favor of her doing that, but I didn't want her to use this pretext that was pushed on us by Bruce Adelson to do it, and so I said that on the record." (Chair Szetela, Trial Tr. Vol. I at 137-38, ECF 112, PageID.3718-19).

## 2.    November 3, 2021 Deliberation and Mapping Session

368.    At the beginning of the November 3, 2021 meeting, Sarah Howard of the Michigan AFLCIO fair maps project commented that "Last night Mr. Adelson said districts can go as high as 55% BVAP as long as it is a side effect of recognizing a community of interest and not an

---

[27] Defendant Szetela at trial testified that her perception was that Mr. Adelson was using the desire of Defendants Kellom and Curry (who are Black) to increase the BVAPs in the Detroit-area House districts to create a defense to a racial gerrymandering claim. (Chair Szetela, Trial Tr. Vol. I at 140, ECF 112, PageID.3721).

explicit attempt to create a majority minority District. ***This is frankly I'm an astonishing reversal. You must reassess all VRA districts based on community of interest testimony. We doubt for example that Birmingham and Detroit are a genuine community of interest***." (PX74 at 4-5) (emphasis added).

369.    Contrary to Defendant Eid's testimony at trial, at no point between September 7, 2021 and  November 3, 2021, did the Commission have any meaningful transcribed discussion about extending districts from Detroit into Oakland or Macomb Counties due to a lack of population in Detroit or due to population shifts from Detroit to ring suburbs.

370.    The Commission published six proposed plans for the state senate districts and four proposed plans for the state house districts for a 45-day period of public notice-and-comment on November 12, 2021. (Uncontroverted Facts, ECF No. 87, PageID.2091 ⁋ 70). Among those plans were the Hickory plan for the state house districts and the Linden Plan for the state senate districts. (Uncontroverted Facts, ECF No. 87, PageID.2091 ⁋ 72).

371.    The Commission also renumbered the districts from the draft collaborative maps when preparing the Hickory and Linden plans for publication. (Chair Szetela, Trial Tr. Vol. I at 56, 62, 153-54, ECF 112, PageID.3637, 3643, 3734-35).

372.    The following chart shows the correlation between the numbering regime used for the collaborative draft Senate maps referenced herein and the Final Linden Plan. (Senate Map Progression Demonstrative, PX136 at 32-37).

| | | State Senate - BVAP % Map Progression | | | | | |
|---|---|---|---|---|---|---|---|
| District No. (Final) | | 1 | 3 | 6 | 8 | 10 | 11 |
| District No. (Draft) | | 17 | 8 | 9 | 13 | 6 | 5 |
| Map Name | Plan # | BVAP % | BVAP % | BVAP % | BVAP % | BVAP % | BVAP % |
| 9-13-21 V2 SD | 162 | 10.98 | 50.82 | 76.56 | 63.77 | 18.1 | 7.8 |
| 9-14-21 V14 SD | 170 | 10.98 | 47.06 | 76.56 | 63.77 | 49.38 | 11.02 |
| 09-15-21 V16A SD | 165 | 34.86 | 44.87 | 51.99 | 59.06 | 49.38 | 11.02 |
| 10-04-21 V2 SD | 199 | 36.73 | 43.35 | 40.03 | 42.45 | 41.2 | 18.42 |
| 12-27-2023 Linden | 281 | 35.03 | 42.09 | 39.15 | 40.25 | 40.43 | 19.19 |

373.    The following chart shows the correlation between the numbering regime used for the collaborative draft House maps referenced herein and the Final Linden Plan. (House Map Progression Demonstrative, PX136 at 38-44).

| State House – BVAP % Map Progression | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **District No. (Final)** | | 1 | 7 | 8 | 10 | 11 | 12 | 14 |
| **District No. (Draft)** | | 1 | 18 | 8 | 4 | 6 | 11 | 10 |
| **Map Name** | **Plan #** | **BVAP %** | **BVAP%** | **BVAP%** | **BVAP%** | **BVAP%** | **BVAP%** | **BVAP %** |
| 9-13-21 V1 HD | 183 | 28.62 | 79.04 | 54.09 | 42.74 | 65.66 | 43.74 | 38.33 |
| 9-30-21 HD | 193 | 36.58 | 66.54 | 50.37 | 58.44 | 49.23 | 43.74 | 39.21 |
| 10-05-21 V1 HD | 204 | 41.63 | 39.85 | 40.72 | 42.68 | 47.37 | 49.89 | 47.68 |
| Hickory | 280 | 38.03 | 44.29 | 43.7 | 38.79 | 42.82 | 40.99 | 41.11 |

### 3.    Dr. Handley identifies a "Serious Wrinkle" in her 9/2/21 Racial Bloc Voting Analysis

374.    On December 9th, 2021, Dr. Handley emailed Pastula, Adelson, Kim Brace, and Suann Hammersmith, stating: "*I've begun drafting my long-promised written report. As requested, I have undertaken a comparison of the plans on both VRA compliance and partisan fairness grounds. **I have run across a serious wrinkle that I would like to discuss.** Is this possible?*" (See 12/9/21 Handley Email attached as **Exhibit E**) (emphasis added).

375.    On December 10, 2021, Pastula sent an email to Adelson and other legal counsel stating the following: "I did want to circulate the information from the Teams meeting and we can address/more fully discuss when appropriate...***As indicated during the call, the percentage ranges provided by Dr. Handley in her September presentation/charts and utilized during drafting did not correspond to the information shared today. The lack of primary election data generally as well as promised information regarding whether the white candidates are candidates of choice as well as data re: white voter preferences (req. at end of Oct on death threat day) are relevant...*** I will certainly defer to the expertise of Bruce as VRA counsel and Kate's team on these issues but

101

I do not see where there is a clearly identifiable Sec. 2 violation." (See 12/10/21 Pastula Email, attached as **Exhibit F**) (emphasis added).

376.    Around December 12, 2021 Defendant Eid gave an interview to MIRS. The journalist asked Mr. Eid to "explain the reasoning behind connecting the city of Detroit with suburban communities in the legislative districts as opposed to drawing Detroit-only districts?" Defendant Eid gave the following response:

> "A: Early in the process, the ICRC's advisors and other redistricting commissioners flagged how current Detroit-based legislative districts are "packed." African Americans, in some cases, make up 90% of some districts, which dilutes their overall voting power. ***The goal was to "unpack" Detroit. The belief was that by creating districts made up of 35%-40% Black districts, more Black candidates would have a greater opportunity to be part of the legislative process***. Under the three House and three Senate maps, the ICRC created a combined 28 "opportunity districts" as opposed to the current 17 "majority-minority" districts. The ICRC's legal staff assured the Commission the strategy complied with the U.S. Voting Rights Act." [(See MIRS Article, attached as **Exhibit G** (emphasis added)).]

377.    General Counsel Pastula instructed Commission staff not to share the concerns regarding Dr. Handley's racial bloc voting analysis with the Commissioners until the week of December 28, 2021, at which time Pastula planned to make the disclosure by way of another closed session meeting. (PX5 at 69-70).  Defendant Szetela learned of General Counsel Pastula's decision to keep this critical information from the Commission from Suann Hammersmith and Edward Woods. (Chair Szetela, Trial Tr. Vol. I at 145, 135, ECF 112, PageID.3726).

378.    By way of email on December 15, 2021 Defendant Szetela advised General Counsel Pastula as follows:

> "Specifically, I am deeply concerned to have learned that you personally became aware of critical issues with Dr. Handley's VRA analysis earlier this week and, in addition to not notifying the Commission about this alarming development, have also directed staff members, vendors, and the SOS not to alert Commissioners as to the issue until the week of December 28th - almost two weeks away. ***It's my understanding that Dr. Handley has informed you, staff, vendors, and members of the SOS that her analysis was deeply flawed and that, as a result of her flawed***

***analysis, not a single one of our Senate maps are VRA compliant. Accordingly, the Commission will likely need to redraw and republish, at a minimum, our Senate maps with BVAP numbers closer to 45-48%, which will require significant map revisions.*** The alternative is for us to approve non-VRA compliant maps and let our lawyers attempt to defend them, which would be an affront to this entire process." [(PX5 at 69-70).]

379.    Defendant Szetela emailed Dr. Handley on December 27, 2021 to inquire into the concern Michigan State Senate Districts with BVAPs under 47% would not likely perform for Black candidates of choice. (PX5 at 22-23).

380.    Dr. Handley responded explaining that "It is the Democratic primary that is the stumbling block in the senate threshold table (I am referring to State Senate District 1 and the fact that the winner was not the candidate of choice of Black voters in the primary -- she was, however, the minority candidate of  choice in the general). ***Unfortunately we do not have sufficient information to anticipate what might happen in future Democratic primaries in the proposed districts. The reason is that we have only one statewide Democratic primary for which we can recompile results and minority voters were not cohesive in this primary. We simply do not know what would happen in a primary in which minority voters are cohesive****."* (PX5 at 21) (emphasis added).

**L.    Deliberation and Adoption of Final Hickory and Linden**

381.    Dr. Handley issued a final report to the Commission on December 28, 2021, which was amended on January 4, 2022. (Uncontroverted Facts, ECF No. 87, PageID.2092 ❡ 73).

382.    That same day, the Commission held its meeting to vote on the final proposed maps. Additional public comments were received regarding whether the Detroit Area districts complied with the Voting Rights Act. (Uncontroverted Facts, ECF No. 87, PageID.2092 ❡ 74).

383.    One commenter from Detroit reiterated the opinion that "combining suburban and City districts does not make much sense since our needs are quite different." (PX78 at 22).

384.     Another commenter from Detroit expressed concerns regarding a House district that stretches from Detroit up to Clawson. (PX78 at 7).

385.     Defendant Lange opened the meeting with a request to continue redrawing the maps. She stated "I think the consensus with the public comment is everybody wants the maps to be fair. They want more consideration given to communities of interest. More consideration given to VRA. And other things. And I think we owe it to the public, the state to do that." (PX78 at 30-31).

386.     Defendant Kellom agreed stating: "I also happen to think we could do better for the City of Detroit and for people of color all over the State of Michigan in terms of representation to have a more equitable map. And thinking of things that scare me the most and make me uncomfortable as an individual and my integrity that would be my concern more than a timeline or timeframe or sticking to that. Because our people, not numbers. They are not deadlines." (PX78 at 32-33).

387.     Defendant Wagner agreed for the reasons stated by Defendant Kellom. (PX78 at 33).

388.     Sarah Reinhardt with the Michigan Department of State interjected and opined that if the Commission did not adopt final maps it would be "next to impossible" for the Department of State to conduct the 2022 elections with maps drawn by the Commission "[w]hich will have additional legal ramifications for the Commission." (PX78 at 34-35).

389.     Nevertheless, Defendant Szetela agreed with the extension acknowledging that she had concerns with Dr. Handley's analysis and especially where the Commission "received very vigorous public comment particularly around VRA issues and particularly with primaries and

democratic primaries and [whether] these maps actually provide the Black community in Detroit with the ability to elect." (PX78 at 35-36).

390.    Defendants Witjes, Eid, Clark, and Orton expressed concern regarding the timeline for upcoming elections and also expressed their opinion that no matter the revisions made there will be people upset with the final maps. (PX78 at 36-38).

391.    Mr. Adelson then spoke regarding his opinion that the proposed maps complied with the VRA based on Dr. Handley's final analysis:

> I have no concerns based on her analysis that there are VRA compliance issues, issues that need to be addressed. She analyzed by my count more than 70 elections in my three redistricting cycle experience, I've never seen that before. Frankly, I've never participated in analyzing that many elections. And she, her results are quite telling in that they reveal that minority voters have had the opportunity to elect candidates of choice in Michigan over a decade in well over 50% of elections analyzed. That there is no consistent white bloc voting under the jingles test which we can talk more about if you would like as we go forward. And that I was also struck that there are relatively small number of elections like a handful that raise any specific question . . . her report tracks with what we have been doing, tracks with her analysis she presented in September, tracked with what we have done as far as the recompiled election results. But in the end Commissioner you are right, these are predictions and estimates everything you do is a prediction in a sense but that is all you can do. [(PX78 at 39-41).]

392.    Defendant Szetela pushed back on the basis that Dr. Handley's analysis failed to consider primary data critical to the heavily democratic Detroit area and failed to consider low voter turnout amongst Black residents in Detroit. Defendant also raised Dr. Handley's finding in Senate Districts in the Detroit area needed BVAPs of at least 48% to provide ability to elect for Black candidates of choice:

> But [Dr. Handley] specifically raises this concern that if the amount is lower than 47% in a primary the Black community cannot elect candidates of choice in a primary and that the candidate of choice is not going or the person who is elected in that primary will not be their candidate of choice and ultimately, they will be stuck with that choice when we come to the main election. Given our Senate maps, all of them have BVAP ranges between 35-44.78%, our Senate maps VRA compliance if we can go into it looking at again limited analysis on a limited

number of primaries, are we truly comfortable that those districts for the Senate are VRA comply incidents or is there a concern we need to address? [(PX78 at 41-42).]

393.    Mr. Adelson said that he disagreed with Defendant Szetela's characterization of Dr.

Handley's report and essentially argued that the Voting Rights Act was not triggered for the Detroit

area districts due to a lack of cohesion and white bloc voting:

> If Commissioners recommend setting arbitrary percentages not based on significant election analysis and that comment is based on one election then we run a real risk under Supreme Court precedent that we are setting arbitrary percentages of minority voters that would suggest the racial gerrymander. What are the continuing challenges in Michigan which we talked about and Dr. Handley has talked about previously, you have one statewide primary in the last ten years to analyze. Dr. Handley analyzed myriad State House and primary elections and some of them there were multiple minority candidates running. So she was unable to determine who was the minority candidate of choice. More in the other direction and which I think is a very positive direction, that there were significant support between white and Black voters of the same candidate. So in that case there are no racially polarized election. So she did not recommend in her report and I certainly set 48% as a BVAP percentage. She does not say that. She recognizes and I agree the challenges of limited data meaning limited state and legislative primary election results. But that is the universe we are operating in. That has been the universe that we've operated in throughout. That is something that General Counsel and I have continually advocated finding other primary elections to analyze. Dr. Handley did that. And her conclusion is that, yes, without -- with the absence of additional primary election data we have to rely on what we have. What we have are general election results, recompiled election results, the gubernatorial primary from 2018. Which interestingly also is not dispositive because there was no consistent lacked cohesion meaning Black voters supporting the same candidate of choice District by District. So in the main that is something I have been very involved with the last month or so since I saw you going with the data, the elections that we have. And in Michigan you just don't have a lot of state primary election results, legislative election results and please remember that her analysis showed that in approximately 70% of elections minority voters elected candidates of choice and there was no white bloc voting. There was a very important consideration under the jingles precedent. So that is my comments for now, thank you. [(PX78 at 42-43).]

394.    Defendant Eid agreed with "everything Mr. Adelson just said." But he did say he

agreed with Defendant Szetela's interpretation regarding Table 10 of Dr. Handley's Final Report

which showed that BVAPs of at least 48% were needed in the Senate. (PX78 at 43).

395.     Defendant Rothhorn the asked Mr. Adelson to elaborate on his statement that there was no white bloc voting or Black cohesion. After explaining the Gingles test, Mr. Adelson stated again that there was a lack of Black cohesion and white bloc voting:

> In the 70 or so elections that Dr. Handley analyzed there were some elections where Black voters did not always vote cohesively but more to the larger point that there was no consistent white bloc voting and just as an example, as a contrast, in one of the advising another redistricting body recently that is in another part of the country, we were looking at a Federal Court decision where in this particular location whites voted as a bloc almost 90% of the time to prevent minority voters from electing candidates of choice. That is not happening in Michigan. That's what Dr. Handley's analysis reveals. So the reality is you look at both. This cohesiveness issue but also white bloc voting. So just as by contrast if in Michigan 60, 70, 80% of elections showed whites consistently impeding we would have a much different and that is not what the data shows. I understand from the work that I do, outside of the work with the Commission my scholarship and teaching in law school, my writing, my league of work and my litigation, I understand very well what people's concerns are. But just as I told you way back when, when we had our first meeting, I'm an analysis guy. I rely on the analysis. I rely on the data. I don't let my personal opinions get involved. The data and the analysis reflect are reflected in Dr. Handley's report. And they show the absence of usual white bloc voting. They also show that in some elections Blacks don't always support the same candidate of choice. [(PX78 at 44-45).]

396.     Commissioner Kellom then raised a question regarding the need for higher BVAPs because of lower turnout amongst Black voters in Detroit. Mr. Adelson assured her that "Dr. Handley's report she did address issues of voter turnout for example. But she also made I think a couple of really important points that given the population in Detroit that Black voters have the opportunity essentially to control each election because of the number of people that are in Detroit but also the reality that there is significant white cross over voting in democratic primaries because that is one of the more eloquent points she made and I agree with." (PX78 at 45-46).

397.     Mr. Adelson also stated "So the issue of going back to your point about communities of interest, you know, I've been very clear about my opinions on communities of interest and retaining neighborhoods and communities in Detroit, those are conversations we had in October. And in early November." (PX78 at 46).

398.   The Commission then went into its voting process and adopted the Hickory and Linden Plans both of which were renumbered and renamed versions the Commission's collaborative House and Senate maps respectively. (Chair Szetela, Trial Tr. Vol. I at 149-51, ECF 112, PageID.3730-32).

399.   Defendant Szetela voted for both plans because she could not abstain and in order to avoid the constitutional process by which Defendant Benson could randomly selected the final maps. (Chair Szetela, Trial Tr. Vol. I at 177-80, ECF 112, PageID.3758-61).

## VI.   THE COMMISSION'S FINAL MAPS

### A.   Linden Plan

400.   The Commission adopted the Linden Plan by majority vote of 9 to 4 on December 28, 2021. Five members affiliated with neither party, two members who identify as Democrats, and two members who identify as Republicans voted to adopt the Linden Plan. (Uncontroverted Facts, ECF No. 87, PageID.2092 ¶ 75).

401.   As required, the Linden Plan consists of 38 Senate Districts. The following *eight* Senate Districts created by the Linden Plan are partially located within the City of Detroit: **1**, 2, **3**, **6**, 7, **8**, **10**, and **11**. The remaining challenged districts are bolded. (Uncontroverted Facts, ECF No. 87, PageID.2092 ¶ 76).

402.   The following chart reports population and racial demographics for Senate Districts in the Linden Plan:

| DISTRICT | Total Population | | | | Racial Demographics as Percent of Total Population | | | | | Voting Age Population | | Racial Demographics as Percent of Voting Pop | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | All Persons | Target | Dev | Difference | NH White | NH Black | NH Asian | Hispanic | Minority | VAP | % of Total | NH White | NH Black | NH Asian | Hispanic |
| 1 | 270,366 | 265,193 | 1.95% | 5,173 | 38.73% | 34.78% | 0.85% | 19.30% | 61.27% | 201,593 | 74.6% | 42.88% | 35.03% | 0.93% | 16.83% |
| 2 | 260,296 | 265,193 | 1.85% | -4,897 | 61.33% | 24.66% | 1.60% | 8.81% | 38.67% | 188,578 | 72.4% | 61.85% | 24.47% | 1.83% | 7.88% |
| 3 | 268,291 | 265,193 | 1.17% | 3,098 | 39.96% | 42.25% | 10.11% | 2.40% | 60.04% | 212,874 | 79.3% | 41.95% | 42.09% | 9.46% | 2.19% |
| 4 | 259,877 | 265,193 | 2.00% | -5,316 | 74.98% | 14.56% | 2.25% | 6.09% | 25.02% | 214,717 | 82.6% | 74.71% | 13.32% | 2.14% | 4.98% |
| 5 | 260,723 | 265,193 | 1.69% | -4,470 | 62.23% | 19.28% | 9.16% | 3.96% | 37.77% | 205,113 | 78.7% | 65.09% | 18.25% | 8.86% | 3.42% |
| 6 | 269,435 | 265,193 | 1.60% | 4,242 | 44.15% | 39.61% | 5.40% | 2.93% | 55.85% | 205,711 | 76.3% | 48.95% | 39.15% | 5.55% | 2.60% |
| 7 | 258,715 | 265,193 | 2.44% | -6,478 | 39.05% | 45.54% | 4.57% | 7.55% | 60.95% | 208,010 | 80.4% | 40.54% | 44.78% | 4.71% | 6.20% |
| 8 | 267,500 | 265,193 | 0.87% | 2,307 | 47.83% | 40.57% | 1.66% | 2.48% | 52.17% | 206,961 | 77.4% | 52.04% | 40.25% | 1.85% | 2.28% |
| 9 | 260,091 | 265,193 | 1.92% | -5,102 | 71.32% | 4.34% | 17.23% | 3.75% | 28.68% | 206,406 | 79.4% | 73.16% | 4.34% | 16.23% | 3.18% |
| 10 | 260,891 | 265,193 | 1.62% | -4,302 | 47.66% | 44.79% | 4.16% | 2.22% | 52.34% | 207,211 | 79.4% | 50.14% | 40.43% | 3.95% | 1.90% |
| 11 | 267,881 | 265,193 | 1.01% | 2,688 | 66.85% | 20.46% | 2.30% | 2.76% | 33.15% | 204,523 | 76.3% | 72.05% | 19.19% | 2.35% | 2.38% |
| 12 | 270,210 | 265,193 | 1.89% | 5,017 | 75.00% | 12.13% | 1.16% | 2.78% | 25.00% | 207,870 | 76.9% | 81.01% | 11.52% | 1.29% | 2.34% |
| 13 | 258,822 | 265,193 | 2.40% | -6,371 | 73.56% | 8.54% | 13.82% | 3.34% | 26.44% | 213,186 | 82.4% | 73.47% | 8.19% | 12.43% | 2.77% |
| 14 | 262,085 | 265,193 | 1.17% | -3,108 | 82.27% | 6.31% | 5.30% | 4.33% | 17.73% | 218,191 | 83.3% | 80.82% | 5.96% | 5.36% | 1.37% |
| 15 | 260,766 | 265,193 | 1.67% | -4,427 | 68.07% | 14.59% | 8.11% | 6.21% | 31.93% | 221,289 | 84.9% | 66.01% | 13.28% | 8.09% | 5.32% |
| 16 | 262,182 | 265,193 | 1.54% | -3,011 | 89.48% | 2.47% | 0.56% | 5.66% | 10.52% | 213,755 | 81.5% | 88.39% | 2.36% | 0.57% | 4.44% |
| 17 | 266,557 | 265,193 | 0.51% | 1,364 | 84.35% | 4.39% | 0.97% | 6.06% | 15.65% | 209,069 | 78.4% | 85.38% | 4.32% | 1.02% | 4.72% |
| 18 | 268,135 | 265,193 | 1.11% | 2,942 | 83.41% | 4.92% | 1.70% | 4.49% | 16.59% | 205,401 | 76.6% | 85.77% | 4.66% | 1.56% | 3.62% |
| 19 | 262,619 | 265,193 | 0.97% | -2,574 | 76.77% | 11.36% | 2.70% | 5.88% | 23.23% | 211,508 | 80.5% | 77.49% | 10.03% | 2.71% | 4.80% |
| 20 | 262,284 | 265,193 | 1.10% | -2,909 | 75.11% | 9.05% | 2.03% | 8.53% | 24.89% | 200,292 | 76.4% | 78.64% | 8.34% | 1.95% | 6.73% |
| 21 | 271,390 | 265,193 | 2.34% | 6,197 | 68.10% | 11.61% | 2.70% | 8.46% | 31.90% | 205,416 | 75.7% | 73.70% | 11.23% | 2.77% | 7.38% |
| 22 | 264,573 | 265,193 | 0.23% | -620 | 89.50% | 0.65% | 0.78% | 2.86% | 10.50% | 204,483 | 77.3% | 92.17% | 0.65% | 0.83% | 2.37% |
| 23 | 263,780 | 265,193 | 0.53% | -1,413 | 85.17% | 3.66% | 2.70% | 5.03% | 14.83% | 211,880 | 80.3% | 85.65% | 3.52% | 2.62% | 4.05% |
| 24 | 271,211 | 265,193 | 2.27% | 6,018 | 83.91% | 1.69% | 2.41% | 3.77% | 16.09% | 203,066 | 74.9% | 89.06% | 1.70% | 2.44% | 3.24% |
| 25 | 264,345 | 265,193 | 0.32% | -848 | 89.17% | 2.24% | 0.45% | 1.64% | 10.83% | 209,673 | 79.1% | 90.82% | 2.19% | 0.46% | 2.94% |
| 26 | 266,938 | 265,193 | 0.66% | 1,745 | 84.87% | 3.15% | 0.42% | 4.46% | 15.13% | 206,886 | 77.5% | 88.51% | 3.13% | 0.44% | 3.71% |
| 27 | 269,043 | 265,193 | 1.45% | 3,850 | 57.85% | 27.73% | 1.22% | 4.07% | 42.15% | 200,250 | 74.4% | 63.00% | 27.27% | 1.32% | 3.60% |
| 28 | 265,180 | 265,193 | 0.00% | -13 | 78.73% | 4.65% | 5.04% | 5.07% | 21.27% | 210,771 | 79.5% | 81.43% | 4.84% | 5.29% | 4.38% |
| 29 | 263,566 | 265,193 | 0.61% | -1,627 | 55.33% | 16.51% | 4.41% | 18.56% | 44.67% | 200,247 | 76.0% | 60.57% | 15.37% | 4.63% | 15.50% |
| 30 | 264,560 | 265,193 | 0.24% | -633 | 81.65% | 5.68% | 2.38% | 7.62% | 18.35% | 212,420 | 80.3% | 82.52% | 5.06% | 2.30% | 6.18% |
| 31 | 267,918 | 265,193 | 1.03% | 2,725 | 79.46% | 1.56% | 2.85% | 10.84% | 20.54% | 200,843 | 75.0% | 83.32% | 1.41% | 2.92% | 9.22% |
| 32 | 270,401 | 265,193 | 1.96% | 5,208 | 75.58% | 9.07% | 0.52% | 6.01% | 24.42% | 205,945 | 76.2% | 80.98% | 8.80% | 0.55% | 4.92% |
| 33 | 267,378 | 265,193 | 0.82% | 2,185 | 87.59% | 2.51% | 0.43% | 5.12% | 12.41% | 207,138 | 77.5% | 88.65% | 2.99% | 0.43% | 4.33% |
| 34 | 261,805 | 265,193 | 1.28% | -3,388 | 90.54% | 2.22% | 0.72% | 3.76% | 9.46% | 213,991 | 81.7% | 89.33% | 2.34% | 0.72% | 3.01% |
| 35 | 268,708 | 265,193 | 1.33% | 3,515 | 74.07% | 12.21% | 1.54% | 7.75% | 25.93% | 211,487 | 78.7% | 76.92% | 11.30% | 1.55% | 6.32% |
| 36 | 270,486 | 265,193 | 2.00% | 5,293 | 92.65% | 0.35% | 0.36% | 2.03% | 7.35% | 220,106 | 81.4% | 93.79% | 0.30% | 0.37% | 1.55% |
| 37 | 261,707 | 265,193 | 1.31% | -3,486 | 87.54% | 0.73% | 0.59% | 2.45% | 12.46% | 213,146 | 81.4% | 89.30% | 0.75% | 0.57% | 1.95% |
| 38 | 266,616 | 265,193 | 0.54% | 1,423 | 88.14% | 1.65% | 0.69% | 1.74% | 11.86% | 217,404 | 81.5% | 89.52% | 1.90% | 0.72% | 1.43% |
| Assigned | 10077331 | | | | | | | | | | | | | | |
| Total Pop | 10077331 | | | | | | | | | | | | | | |
| Unassigned | 0 | | | | | | | | | | | | | | |

403.    Challenged SD1 has a BVAP of 35.03%. (Uncontroverted Facts, ECF No. 87, PageID.2093 ¶ 78).

404.    Challenged SD3 has a BVAP of 42.09%. (Uncontroverted Facts, ECF No. 87, PageID.2093 ¶ 79).

405.    Challenged SD6 has a BVAP of 39.15%. (Uncontroverted Facts, ECF No. 87, PageID.2093 ¶ 80).

406.    Challenged SD8 has a BVAP of 40.25%. (Uncontroverted Facts, ECF No. 87, PageID.2093 ¶ 81).

---

[28] (Uncontroverted Facts, ECF No. 87, PageID.2092-93 ¶ 77).

407.    Challenged SD10 has BVAP of 40.43%. (Uncontroverted Facts, ECF No. 87, PageID.2093 ⁋ 82).

408.    Challenged SD11 has a BVAP of 19.19%.(Uncontroverted Facts, ECF No. 87, PageID.2093 ⁋ 83).

409.    The Linden Plan was effectively the same collaborative map the Commission had crafted between September 9, 2021 through the October 4, 2021 mapping sessions with very few changes thereafter. (Chair Szetela, Trial Tr. Vol. I at 149-50, ECF 112, PageID.3730-31).

410.    The racial and geographical evolution of the Linden Plan is illustrated by the Senate Map Progression Demonstrative, (PX136 at 32-37), and was explained in detail at trail by Defendant Szetela, (Chair Szetela, Trial Tr. Vol. I at 151-161, ECF 112, PageID.3732-42).

411.    Those two pieces of evidence coupled with the above-cited transcripts of the Commission's relevant mapping sessions and Mr. Trende's qualitative and quantitative analyses prove beyond any reasonable doubt that racial considerations predominately drove the creation of the Linden Plan. (Trende Expert Report, PX20 at 9, 93-120).[29]

**B.**    **Hickory Plan**

412.    The Commission adopted the Hickory Plan by majority vote of 11 to 2 on December 28, 2021. Five members affiliated with neither party, four members who identify as

---

[29] Dr. Rodden admitted that "race is predominant in a plan when race explains the drawing of the districts beyond other factors" and when race becomes "the most important factor in drawing the districts." (Rodden, Trial Tr. Vol. IV at 175-176, ECF 106, PageID.3177-78). In order to discern whether this occurred, Rodden testified that the proper methodology—and one he employed in *Bethune* but did not employ here—is to "examine the districting decisions" to analyze whether there is evidence of "stark racial splits," whether "traditional redistricting principles" (such as compactness, respecting county and township lines, etc.) were subordinated to race, whether there were specific maneuvers to move black voters into or out of districts, whether "pockets" of black voters black voters were "carved out" of certain areas, and performing a map progression analysis that followed the actual decisions made in the drawing of the lines on the maps. (Rodden, Trial Tr. Vol. IV at 176-181, ECF 106, PageID.3178-3183).

Democrats, and two members who identify as Republicans voted to adopt the Hickory Plan. (Uncontroverted Facts, ECF No. 87, PageID.2094 ¶ 84).

413.    As required, the Hickory Plan consists of 110 House Districts. The following fifteen House Districts created by the Hickory Plan are partially located within the City of Detroit: **1**, 3, 4, 5, 6, **7**, **8**, 9, **10**, **11, 12,** 13, **14,** 16, 17. The remaining challenged districts are bolded. (Uncontroverted Facts, ECF No. 87, PageID.2094 ¶ 85).

414.    The following chart reports population and racial demographics for House Districts in the Hickory Plan:

| DISTRICT | Total Population | | | | Racial Demographics as Percent of Total Population | | | | | Voting Age Population | | Racial Demographics as Percent of Voting Pop | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | All Persons | Target | Dev | Difference | NH White | NH Black | NH Asian | Hispanic | Minority | VAP | % of Total | NH White | NH Black | NH Asian | Hispanic |
| 1 | 91,856 | 91,612 | 0.27% ✓ | 244 | 16.79% | 35.26% | 0.33% | 43.92% | 83.21% | 65,520 | 71.3% | 18.67% | 38.03% | 0.38% | 39.49% |
| 2 | 89,622 | 91,612 | 2.17% ✓ | -1,990 | 63.27% | 11.54% | 1.13% | 18.58% | 36.73% | 69,719 | 77.8% | 67.65% | 11.04% | 1.21% | 15.61% |
| 3 | 93,531 | 91,612 | 2.09% ✓ | 1,919 | 51.18% | 33.31% | 2.34% | 8.21% | 48.82% | 66,030 | 70.6% | 52.34% | 32.82% | 2.77% | 7.64% |
| 4 | 90,903 | 91,612 | 0.77% ✓ | -709 | 41.08% | 52.65% | 0.47% | 1.72% | 58.92% | 64,833 | 71.3% | 38.61% | 55.60% | 0.50% | 1.61% |
| 5 | 92,744 | 91,612 | 1.24% ✓ | 1,132 | 36.68% | 55.87% | 1.53% | 1.96% | 63.32% | 71,629 | 77.2% | 38.11% | 55.31% | 1.55% | 1.70% |
| 6 | 93,629 | 91,612 | 2.20% ✓ | 2,017 | 36.10% | 56.66% | 1.15% | 2.03% | 63.90% | 73,324 | 78.3% | 38.54% | 54.93% | 1.31% | 1.79% |
| 7 | 92,948 | 91,612 | 1.46% ✓ | 1,336 | 44.28% | 46.93% | 1.51% | 2.80% | 55.72% | 75,856 | 81.6% | 47.68% | 44.29% | 1.71% | 2.52% |
| 8 | 92,670 | 91,612 | 1.15% ✓ | 1,058 | 41.68% | 45.73% | 4.16% | 2.96% | 58.32% | 76,299 | 82.3% | 44.50% | 43.70% | 4.57% | 2.61% |
| 9 | 90,818 | 91,612 | 1.37% ✓ | -794 | 28.46% | 50.05% | 15.19% | 1.57% | 71.54% | 66,200 | 72.9% | 28.03% | 51.63% | 14.68% | 1.48% |
| 10 | 90,534 | 91,612 | 1.18% ✓ | -1,078 | 53.11% | 38.14% | 2.08% | 2.77% | 46.89% | 74,475 | 82.3% | 53.35% | 38.79% | 2.32% | 2.35% |
| 11 | 91,145 | 91,612 | 0.51% ✓ | -467 | 46.16% | 46.82% | 0.80% | 2.19% | 53.84% | 70,700 | 77.6% | 51.18% | 42.82% | 0.93% | 1.82% |
| 12 | 90,630 | 91,612 | 1.07% ✓ | -982 | 45.97% | 44.46% | 1.33% | 2.45% | 54.03% | 68,955 | 76.1% | 51.03% | 40.99% | 1.28% | 2.08% |
| 13 | 90,393 | 91,612 | 1.33% ✓ | -1,219 | 47.56% | 41.39% | 4.11% | 2.17% | 52.44% | 69,812 | 77.2% | 52.03% | 38.36% | 3.91% | 1.89% |
| 14 | 90,555 | 91,612 | 1.15% ✓ | -1,057 | 38.99% | 43.39% | 10.11% | 2.45% | 61.01% | 69,140 | 76.4% | 43.17% | 41.11% | 9.31% | 2.14% |
| 15 | 92,301 | 91,612 | 0.75% ✓ | 689 | 80.88% | 7.44% | 1.72% | 5.23% | 19.12% | 69,652 | 75.5% | 82.15% | 7.18% | 1.87% | 4.70% |
| 16 | 93,035 | 91,612 | 1.55% ✓ | 1,423 | 34.88% | 56.88% | 0.94% | 2.87% | 65.12% | 72,066 | 77.5% | 38.03% | 54.92% | 1.02% | 2.44% |
| 17 | 90,737 | 91,612 | 0.96% ✓ | -875 | 45.56% | 44.57% | 1.80% | 3.10% | 54.44% | 71,354 | 78.6% | 48.90% | 42.43% | 1.94% | 2.64% |
| 18 | 92,169 | 91,612 | 0.61% ✓ | 557 | 36.50% | 52.03% | 4.21% | 2.71% | 63.50% | 75,714 | 82.1% | 37.44% | 52.16% | 4.12% | 2.40% |
| 19 | 90,931 | 91,612 | 0.74% ✓ | -681 | 60.63% | 24.62% | 7.86% | 2.80% | 39.37% | 72,930 | 80.2% | 61.39% | 25.11% | 8.00% | 2.34% |
| 20 | 93,017 | 91,612 | 1.53% ✓ | 1,405 | 75.60% | 10.28% | 7.26% | 2.68% | 24.40% | 74,684 | 80.3% | 76.85% | 10.20% | 7.42% | 2.25% |
| 21 | 93,876 | 91,612 | 2.47% ✓ | 2,264 | 57.07% | 7.60% | 27.76% | 3.48% | 42.93% | 71,599 | 76.3% | 59.96% | 7.89% | 26.00% | 3.07% |
| 22 | 91,654 | 91,612 | 0.05% ✓ | 42 | 85.05% | 2.23% | 5.67% | 3.19% | 14.95% | 75,487 | 82.4% | 86.64% | 2.24% | 5.33% | 2.34% |
| 23 | 90,719 | 91,612 | 0.97% ✓ | -893 | 70.61% | 4.68% | 14.87% | 4.45% | 29.39% | 76,266 | 84.1% | 71.65% | 4.78% | 14.75% | 4.14% |
| 24 | 91,480 | 91,612 | 0.14% ✓ | -132 | 61.18% | 10.03% | 20.19% | 3.69% | 38.82% | 69,996 | 76.5% | 63.53% | 9.84% | 19.80% | 3.29% |
| 25 | 90,562 | 91,612 | 1.15% ✓ | -1,050 | 64.13% | 20.53% | 4.87% | 4.47% | 35.87% | 73,216 | 80.8% | 66.72% | 19.62% | 4.96% | 3.82% |
| 26 | 91,723 | 91,612 | 0.12% ✓ | 111 | 50.52% | 37.86% | 1.05% | 4.20% | 49.48% | 70,678 | 77.1% | 54.11% | 35.82% | 1.14% | 3.61% |
| 27 | 90,457 | 91,612 | 1.26% ✓ | -1,155 | 84.33% | 3.05% | 1.18% | 6.36% | 15.67% | 73,737 | 81.5% | 86.29% | 2.93% | 1.21% | 5.34% |
| 28 | 91,598 | 91,612 | 0.02% ✓ | -14 | 74.98% | 9.75% | 3.36% | 6.24% | 25.02% | 71,385 | 77.9% | 77.44% | 9.14% | 3.23% | 5.36% |
| 29 | 92,583 | 91,612 | 1.06% ✓ | 971 | 72.48% | 13.17% | 1.38% | 4.48% | 27.52% | 72,381 | 78.2% | 76.05% | 11.83% | 1.46% | 5.42% |
| 30 | 93,460 | 91,612 | 2.02% ✓ | 1,848 | 87.42% | 2.57% | 0.64% | 4.06% | 12.58% | 73,606 | 78.8% | 89.60% | 2.30% | 0.67% | 3.21% |
| 31 | 92,978 | 91,612 | 1.49% ✓ | 1,366 | 72.74% | 16.00% | 1.27% | 4.03% | 27.26% | 73,558 | 79.1% | 74.55% | 15.72% | 1.28% | 3.54% |
| 32 | 92,092 | 91,612 | 0.52% ✓ | 480 | 53.20% | 28.29% | 3.69% | 7.17% | 46.80% | 73,449 | 79.8% | 57.13% | 26.46% | 3.89% | 6.21% |
| 33 | 92,730 | 91,612 | 1.22% ✓ | 1,118 | 68.50% | 7.94% | 11.52% | 5.90% | 31.50% | 74,822 | 80.7% | 70.65% | 7.76% | 11.65% | 5.23% |
| 34 | 92,371 | 91,612 | 0.83% ✓ | 759 | 83.11% | 2.61% | 0.48% | 8.88% | 16.89% | 73,142 | 79.2% | 85.26% | 2.88% | 0.49% | 7.27% |
| 35 | 93,023 | 91,612 | 1.54% ✓ | 1,411 | 89.55% | 1.44% | 0.48% | 4.20% | 10.45% | 71,335 | 76.7% | 90.73% | 1.64% | 0.49% | 3.29% |
| 36 | 89,634 | 91,612 | 2.16% ✓ | -1,978 | 84.12% | 2.73% | 0.69% | 7.00% | 15.88% | 68,621 | 76.6% | 86.65% | 2.74% | 0.72% | 5.44% |
| 37 | 91,456 | 91,612 | 0.17% ✓ | -156 | 78.38% | 6.26% | 1.89% | 6.54% | 21.62% | 71,787 | 78.5% | 81.10% | 6.19% | 2.00% | 5.18% |
| 38 | 93,422 | 91,612 | 1.98% ✓ | 1,810 | 67.57% | 19.03% | 1.75% | 6.63% | 32.43% | 73,770 | 79.0% | 72.12% | 16.97% | 1.68% | 5.18% |
| 39 | 90,270 | 91,612 | 1.46% ✓ | -1,342 | 81.17% | 1.69% | 0.44% | 10.74% | 18.83% | 69,482 | 77.0% | 84.59% | 1.69% | 0.45% | 8.20% |
| 40 | 90,211 | 91,612 | 1.53% ✓ | -1,401 | 77.97% | 7.16% | 4.56% | 4.57% | 22.03% | 69,763 | 77.3% | 80.75% | 6.74% | 4.45% | 3.86% |
| 41 | 91,872 | 91,612 | 0.28% ✓ | 260 | 59.50% | 21.99% | 2.17% | 8.66% | 40.50% | 72,876 | 79.3% | 64.54% | 19.61% | 2.54% | 7.40% |
| 42 | 91,192 | 91,612 | 0.46% ✓ | -420 | 86.29% | 3.44% | 1.09% | 3.41% | 13.71% | 70,454 | 77.3% | 88.31% | 3.13% | 1.11% | 2.69% |
| 43 | 92,518 | 91,612 | 0.99% ✓ | 906 | 88.43% | 0.80% | 0.52% | 5.92% | 11.57% | 70,016 | 75.7% | 90.34% | 0.65% | 0.51% | 4.58% |

---

[30] (Uncontroverted Facts, ECF No. 87, PageID.2094 ¶ 86).

415.    Challenged HD1 has a BVAP of 38.03%. (Uncontroverted Facts, ECF No. 87, PageID.2095 ⁋ 87).

416.    Challenged HD7 has a BVAP of 44.29%. (Uncontroverted Facts, ECF No. 87, PageID.2095 ⁋ 88).

417.    Challenged HD8 has a BVAP of 43.70%. (Uncontroverted Facts, ECF No. 87, PageID.2095 ⁋ 89).

418.    Challenged HD10 has a BVAP of 38.79%. (Uncontroverted Facts, ECF No. 87, PageID.2095 ⁋ 90).

419.    Challenged HD11 has a BVAP of 42.82%. (Uncontroverted Facts, ECF No. 87, PageID.2095 ⁋ 91).

420.    Challenged HD12 has a BVAP of 40.99%. (Uncontroverted Facts, ECF No. 87, PageID.2095 ⁋ 92).

421.    Challenged HD14 has a BVAP of 41.11%. (Uncontroverted Facts, ECF No. 87, PageID.2095 ⁋ 93).

422.    The Hickory Plan was effectively the same collaborative map the Commission had crafted in the September 20, 2021 through the October 5, 2021 mapping sessions with the exception of the limited modifications made by Defendant Kellom during the early November 2021 mapping sessions which raised the BVAPs of a few Detroit-area districts. (Chair Szetela, Trial Tr. Vol. I at 150-51, ECF 112, PageID.3731-32).

423.    The racial and geographical evolution of the Hickory Plan is illustrated by the Senate Map Progression Demonstrative, (PX136 at 38-44), and was explained in detail at trail by Defendant Szetela, (Chair Szetela, Trial Tr. Vol. I at 161-65, ECF 112, PageID.3742-46).

424.    Those two pieces of evidence coupled with the above-cited transcripts of the Commission's relevant mapping sessions and Mr. Trende's qualitative and quantitative analyses prove beyond any reasonable doubt that racial considerations predominately drove the creation of the Linden Plan. (Trende Expert Report, PX20 at 9, 43-81).

## VII.    FINAL REPORTS AND DISSENTS

425.    In August 2022, the Commission issued a Report on 2021 Redistricting. Commissioner Szetela, who chaired the Commission when the District maps were adopted, issued a dissent, as did Commissioners Lange and Wagner. (Uncontroverted Facts, ECF No. 87, PageID.2095 ⁋ 94).

### A.    Defendant Szetela Dissent

426.    Defendant Szetela, a Michigan licensed attorney, stated that "the Commission cannot say with any degree of confidence whether [the Hickory and Linden Maps] will provide minorities, particularly Black voters in the metropolitan Detroit area, with an opportunity to elect their candidates of choice in both primary and general elections." (PX 5 at 3).

427.    She explained that the Commission began drawing maps for the Detroit area with BVAPs around 50%, but the "the Commission's counsel intervened and began aggressively pushing the Commission to reduce the BVAP numbers to as close to the general election percentages (35% to 40%) as possible." This dilution strategy was based on Dr. Handley's findings, but Defendant Szetela criticized the Handley Report for ignoring data showing that a BVAP of at least 48% in Senate Districts and between 47% and 52% in House Districts were necessary for Black voters to have the opportunity to elect their candidates of choice in Democratic primary elections. (PX5 at 6-7)

428.    "The Commission had no data or evidence to suggest that Black voters will have an opportunity to elect candidates of choice in the Democratic primary with BVAP percentages of

113

35%, 40%, or even 45%." "Because VRA compliance requires the ability to elect candidates of
choice in both [primary and general] elections, the Commission should have taken a conservative
approach by using higher BVAP numbers (approximately 48%) when constructing districts in all
maps." (*Id.*)

429.    Defendant Szetela highlighted that the Commission received hundreds of
comments from Detroiters objecting to low BVAPs in the draft maps, expressing concerns of Black
voters being denied an opportunity to elect their candidates of choice in primary elections. Because
Wayne County general elections overwhelmingly favor Democratic candidates, these voters
pleaded with Commissioners that for "Black voters to be able to elect their candidate of choice,
that candidate of choice must be able to succeed in the Democratic primary." Yet when
"Commissioners began questioning the validity of its attorneys' directives to draw districts using
the general election BVAP percentages supplied by Dr. Handley's Report," the Commissioners
were directed to disregard Black voters' comments. (PX5 at 7-9).

### B.    Defendant Lange Dissent

430.    Defendant Rhonda Lange authored a dissenting report. (PX4). In her dissenting
report, Commissioner Lange stated the "criteria for SE Michigan, particularly those in the Detroit
area, of course, the first is VRA, which we were given guidance from Mr. Adelson." (PX4 at 6).

431.    Disagreeing with Mr. Adelson's and Dr. Handley's approach, Defendant Lange
opined that "Commission failed" to "not only consider[] VRA (or possibly gotten a second
opinion) but combined it with COI." (PX4 at 6). "The citizens of Detroit, especially African
American citizens, came out in strong numbers about their COI, even listing exact streets in some
cases." (PX4 at 6).

432.    Ultimately, Defendant Lange thought the maps failed due to the racial targets given
by the Commission's experts. "I think these maps failed because we listened to our experts and a

set of proposed numbers over the voices of the citizens of the state who were told they would get to pick their representatives by having their communities of interest kept intact." (PX4 at 6).

433.    Defendant Lange was frustrated that communities of interest did not play a larger role in drafting the Detroit districts. "I believe we as a Commission could have listened to the African American community and given them the districts that they asked for based off of the COI standpoint, regardless of if those districts were at 51% or even higher as long as it was what the community asked for, but we didn't."  (PX4 at 7).

434.    Regarding the Commission's transparency, Defendant Lange had "grave concerns on this issue." (PX4 at 9). "It is my belief by things I saw, things I personally heard, and things that I read that transparency was lacking!" (PX4 at 9).

435.    Lamenting on the lack of fairness on the redistricting process, Defendant Lange "ask[ed] is it 'fair' that the African American population came out in strong numbers and told us what they wanted, and we didn't prove that?" (PX4 at 10).

436.    Defendant Lange testified at trial that "I stand by my dissent report 100 percent." (Commissioner Lange, Trial Tr. Vol. I at 217, ECF 112, PageID.3798). Specifically, she stood by the concerns noted in her dissent "that the Hickory Plan also disenfranchises African American voters" and her feeling that "these maps failed because we listened to our experts and a set of proposed numbers over the voices of the citizens." (Lange, Trial Tr. Vol. I at 217, ECF 112, PageID.3798).

437.    Defendant Lange was present for the trial testimony of Commissioner Szetela and testified that Commissioner Szetela "fairly characterized the record with respect to the Detroit districts."  (Lange, Trial Tr. Vol. I at 213, ECF 112, PageID.3794).

438. During trial, Defendant Lange testified that she had "concerns regarding meetings taking place that were off the record." (Lange, Trial Tr. Vol. I at 209, ECF 112, PageID.3790). "I felt that there were a lot of conversations taking place outside of public view." (Lange, Trial Tr. Vol. I at 210, ECF 112, PageID.3791). "I know there were conversations taking place because I was receiving text messages." (*Id.*) These text messages were "not submitted into the actual transcripts" and Defendant Lange was "never asked to disclose those text messages from [her] private phone." (Lange, Trial Tr. Vol. I at 210-211, ECF 112, PageID.3791-92).

439. Defendant Lange testified at trial that she "felt that we were looking at numbers based on race and not what the community was asking for." (Lange, Trial Tr. Vol. I at 214, ECF 112, PageID.3795). She testified that while the Commission used that guideline to lower the BVAP in the Detroit districts, they should have considered communities of interest as well. (Lange, Trial Tr. Vol. I at 216, ECF 112, PageID.3797). In her view, Black voters in Detroit did not want to be paired with what would be predominately white districts. (Lange, Trial Tr. Vol. I at 216, ECF 112, PageID.3797).

440. Ultimately, Defendant Lange thought the maps failed due to the racial targets given by the Commission's experts. "I think these maps failed because we listened to our experts and a set of proposed numbers over the voices of the citizens of the state who were told they would get to pick their representatives by having their communities of interest kept intact." Commissioner Lange, Trial Tr. Vol. I at 216, ECF 112, PageID.3797). Defendant Lange testified that she recalled observing the BVAPs in the Detroit area were lowered around September and October of 2021. (Lange, Trial Tr. Vol. I at 212, ECF 112, PageID.3793). As directed by General Counsel Pastula and Mr. Adelson, the "35 to 40 percent" "BVAP target was, what I remember, the primary reason

116

of doing what they were referring to as spokes." (Lange, Trial Tr. Vol. I at 212-213, ECF 112, PageID.3793-94).

### C.   **Defendant Wagner Dissent**

441.   Defendant Erin Wagner authored a dissenting report. (PX3). In her dissenting report, Wagner voiced frustration over the Commission's lack of consideration of public input. "At one point, I even asked General Counsel Pastula if the maps submitted by the citizens to the portal had been vetted by any of our 'expert panel' of witnesses (specifically the Promote the Vote maps, in relation to VRA and the other criteria) so that I could use portions of those in relation to drawing my own and was told they had not been." (PX3 at 2).

442.   "I believe we should have taken more time, as numerous public commenters told us, to come up with maps that every Commissioner could confidently say were our best work." (PX3 at 2).

443.   Defendant Wagner found that the Detroit areas did not reflect communities of interest nor the voice of its people. "Detroit areas seem to reach much farther north than Communities of Interest would warrant. Detroit's voice was by far the largest and loudest and yet we still seem to have allowed that voice to fall on deaf ears." (PX3 at 3).

444.   Defendant Wagner continued to lament this issue. "In the Hickory map, even though we heard numerous COI testimony to keep the Grosse Pointes in the same district as Harper Woods, Saint Clair Shores and nearby Detroit neighborhoods such as Morningside, East English Village, Jefferson-Chalmers, it slices Harper Woods from District 10 and includes it with District 11. Morningside is included in District 9, while District 10 extends beyond East Village to include everything southeast along the Detroit River and cuts off on the northeast side before St. Clair Shores." (PX3 at 3).

445.    In concluding her dissenting report, Defendant Wagner questioned the Commission's transparency and lack of time revising the maps according to public comment. (PX3 at 4).

446.    "Another reason I dissented on these maps is because of the numerous times, as a Commissioner attending remotely, I watched the Commission take breaks and then come back to pass a motion regarding commission business, that was not part of the discussion that took place prior to said break and therefore remote Commissioners were not privy to any discussion. Unfortunately, this called into question the whole matter of 'transparency' for me. I believe had we spent more time in revising maps according to public comment, we could have done a much better job than what we put forth." (PX3 at 4).

447.    Defendant Wagner was present for the trial testimony of Commissioner Szetela and testified that Commissioner Szetela "fairly characterized the Commission's proceedings" and "was pretty accurate." (Wagner, Trial Tr. Vol. I at 222, ECF 112, PageID.3803). Commissioner Wagner did not have a different recollection of any details Commissioner Szetela testified to. (Wagner, Trial Tr. Vol. I at 222, ECF 112, PageID.3803).

448.    Defendant Wagner testified about her comment during the September 13, 2021 meeting when she said "I feel like we are playing Blackjack[.]" (Wagner, Trial Tr. Vol. I at 222, ECF 112, PageID.3803); (PX57 at 64). She testified that "playing Blackjack" was how it felt when changing the districts in Detroit. (Wagner, Trial Tr. Vol. I at 222, ECF 112, PageID.3803). This was due to the Commission "constantly having to drop those BVAP percentages" to "35 to 45 percentages depending on which county we were in.[]" (Commissioner Wagner, Trial Tr. Vol. I at 222-223, ECF 112, PageID.3803-04).

449.     Defendant Wagner testified as to her recollection that Black residents of Detroit did not want to be put into a district with Grosse Pointe and that "we heard a lot that they wanted to elect people that looked like them." (Wagner, Trial Tr. Vol. I at 224, ECF 112, PageID.3805).

450.     Defendant Wagner testified that the Commission did not have the partisan fairness metric tool available for drafting in September and October 2021. (Commissioner Wagner, Trial Tr. Vol. I at 227, ECF 112, PageID.3808). Despite that Wagner expressed concerns about partisan fairness, it did not impact her opinion that racial guidelines governed when drafting the Detroit maps. (Wagner, Trial Tr. Vol. I at 227, ECF 112, PageID.3808).

## VIII.   ELECTION RESULTS

451.     As a result of the Linden and Hickory plans, there is a 65% proportionality deficit in majority-Black legislative districts and a 17% proportionality surplus in white-majority legislative districts. The 2022 elections resulted in a 20% decline in Michigan's Black Legislative Caucus with the City of Detroit being represented by five (5) Black Senators under the 2011 legislatively drawn maps down to a single, now-term-limited Senator in a Senate District 2 which was drafted with only a 24.47% BVAP. (Chair Szetela, Trial Tr. Vol. I at 166-69, ECF 112, PageID.3747-50).

### A.     2022 Detroit-area Senate Democratic Primaries

452.     Senate District 8 has a 40.20% BVAP. The Black candidate of choice, Black candidate Marshall Bullock, lost by 37% to the white candidate of choice, white candidate Mallory McMorrow. Black voters preferred Bullock 76% to 24% and white voters chose McMorrow 96% to 4%:

| Michigan 2022 State Senate Democratic Primaries | Race | Party | Vote | Black Voters | | | | | White Voters | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | EI[1] | 95% confidence interval | EI[2] | ER | HP | EI[1] | 95% confidence interval | EI[2] | ER | HP |
| State Senate District 8 | | | | | | | | | | | | | |
| Mallory McMorrow | W | D | 68.4 | 24.2 | 21.7, 26.6 | 26.0 | 27.2 | 30.9 | 95.9 | 94.3, 97.2 | 97.1 | 97.1 | 90.5 |
| Marshall Bullock II | B | D | 31.6 | 75.8 | 73.4, 78.3 | 73.9 | 72.8 | 69.1 | 4.1 | 2.8, 5.7 | 2.8 | 2.9 | 9.5 |
| Turnout:votes/VAP | | | | | | 20.5 | 17.5 | 18.9 | | | 30.5 | 28.8 | 36.1 |

31

453.    Plaintiffs' expert, Mr. Sean P. Trende, testified that Black voters voted cohesively, voting was racially polarized, and that white voters acted as a block to defeat the Black candidate of choice. (Trende, Trial Tr. Vol. II. at 79-80, ECF 102, PageID.2619-20).

454.    Senate District 1 has a 35.0% BVAP. This race featured a six-candidate primary in 2022. The Black candidate of choice, Brenda Sanders, lost by 10 points to white candidate of choice Erika Geiss, with white voters preferring Geiss over Sanders by 56% to 17%:

| Michigan 2022 State Senate Democratic Primaries | Race | Party | Vote | Black Voters | | | | | White Voters | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | EI[1] | 95% confidence interval | EI[2] | ER | HP | EI[1] | 95% confidence interval | EI[2] | ER | HP |
| State Senate District 1 | | | | | | | | | | | | | |
| Erika Geiss | B | D | 32.3 | 24.3 | 21.6, 27.1 | 23.4 | 21.2 | 21.8 | 55.9 | 50.8, 60.6 | 45.6 | 47.3 | - |
| Brenda Sanders | B | D | 23.3 | 34.0 | 31.8, 36.1 | 33.7 | 38.7 | 40.1 | 16.8 | 13.5, 20.2 | 14.4 | 15.4 | - |
| Frank Liberati | W | D | 22.9 | 13.8 | 12.2, 15.5 | 15.4 | 9.8 | 5.5 | 11.0 | 7.3, 15.2 | 18.0 | 18.4 | - |
| Shellee Brooks | B | D | 9.9 | 13.4 | 12.0, 14.8 | 13.2 | 13.7 | 14.8 | 7.1 | 5.0, 9.3 | 7.2 | 9.1 | - |
| Ricardo Moore | B | D | 7.9 | 11.2 | 10.1, 12.3 | 10.6 | 12.7 | 14.3 | 5.7 | 4.2, 7.4 | 5.5 | 5.1 | - |
| Carl Schwartz | W | D | 3.7 | 3.4 | 2.6, 4.2 | 4.1 | 4.0 | 3.6 | 3.5 | 2.4, 4.8 | 3.8 | 4.7 | - |
| Turnout:votes/VAP | | | | | | 18.3 | 14.2 | 14.3 | | | 9.2 | 7.8 | |

32

455.    Mr. Trende's testimony and expert report showed that Black voters preferred Sanders over Geiss 43.62% to 18.41%, yet Sanders finished with only 7% of the white vote:

| 2022 Senate EI Summary | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| District | BVAP | Black 1st Choice | Black 1st Choice % | Black 2nd Choice | Black 2nd Choice % | White 1st Choice | White 1st Choice % | White 2nd Choice | White 2nd Choice % | Black Cand Margin% |
| Linden l | 35.00% | Brenda Sanders | 43.62% | Erika Geiss* | 18.41% | Frank Liberati | 46.38% | Erika Geiss* | 42.57% | 0.40% |

33

---

[31] (DTX26 at 111).

[32] (DTX26 at 110).

[33] (PX20 at 89); (Trende, Trial Tr. Vol. II. at 75, ECF 102, PageID.2615).

120

456.    Mr. Trende opined that this district was both cohesive and racially polarized, resulting in white voters' candidate of choice prevailing over Black voters' candidate of choice. (Trende, Trial Tr. Vol. II. at 76, ECF 102, PageID.2617).

457.    Senate District 6 has a BVAP of 39.10%. Darryl Brown, the only Black candidate, took only 4.2% of the white vote, while 96% of white voters favored either the white or the Hispanic candidate. Incumbent Hispanic candidate Mary Cavanagh was the choice of Black and white voters and won by eight points:

| Michigan 2022 State Senate Democratic Primaries | Race | Party | Vote | Black Voters | | | | | White Voters | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | $EI^1$ | 95% confidence interval | $EI^2$ | ER | HP | $EI^1$ | 95% confidence interval | $EI^2$ | ER | HP |
| **State Senate District 6** | | | | | | | | | | | | | |
| Mary Cavanagh | H | D | 43.9 | 49.4 | 46.9, 52.0 | 47.4 | 47.9 | 46.6 | 50.0 | 43.8, 56.8 | 41.4 | 45.0 | 50.0 |
| Vicki Barnett | W | D | 35.8 | 13.1 | 10.9, 15.4 | 14.3 | 13.4 | 16.3 | 45.9 | 38.5, 52.4 | 57.2 | 52.2 | 43.2 |
| Darryl Brown | B | D | 20.2 | 37.5 | 35.2, 39.7 | 38.8 | 38.5 | 37.1 | 4.2 | 2.5, 6.2 | 3.2 | 2.7 | 6.8 |
| *Turnout:votes/VAP* | | | | | | 19.7 | 17.2 | 19.4 | | | 17.3 | 16.7 | 17.4 [34] |

458.    Mr. Trende testified and explained that there is Black voter cohesion and polarization in this district. Notably, Candidate Cavanaugh was not the black candidate of choice until after she became an incumbent.

459.    In the 2020 Democratic primary election for former House District 10, Cavanagh was the clear white candidate of choice, defeating two Black candidates. (Trende, Trial Tr. Vol. II. at 78, ECF 102, PageID.2618). Moreover, the 2018 Senate primary for previous Senate District 5, which makes up a substantial portion of Linden Senate District 6, featured Black candidate Betty Jean Alexander and white candidate David Knezek. Alexander won this race with a 52.5% BVAP. (PX20 at 22). While Alexander won the Black vote 68% to 32%, she lost the white vote 73% to 27%. (DTX026 at 89). The same was true in the 2014 election in former Senate District 5, which was a "highly polarized" and "overwhelming block voting" race. Black candidate of choice

---

[34] (DTX26 at 110).

Shanelle Jackson took less than 3% of the white vote while white candidate of Choice David Knezek took 86% of the white vote. (PX20 at 84); (Trende, Trial Tr. Vol. II. at 90-91, ECF 102, PageID.2630-31).

460.    Senate District 3 has a BVAP of 42.10%. In this election, Stephanie Chang took a majority of Black votes and white votes, defeating Black candidate Toinu Reeves 83% to 17%:

| Michigan 2022 State Senate Democratic Primaries | | | | Black Voters | | | | | White Voters | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 95% confidence | | | | | 95% confidence | | | |
| | Race | Party | Vote | EI$^1$ | interval | EI$^2$ | ER | HP | EI$^1$ | interval | EI$^2$ | ER | HP |
| State Senate District 3 | | | | | | | | | | | | | |
| Stephanie Chang | A | D | 82.8 | 77.2 | 75.1, 79.2 | 76.3 | 73.5 | 73.0 | 93.4 | 90.8, 95.7 | 92.3 | 93.4 | - |
| Toinu Reeves | B | D | 17.2 | 22.9 | 20.8, 24.9 | 23.8 | 26.6 | 27.0 | 6.6 | 4.3, 9.2 | 7.7 | 6.6 | - |
| *Turnout:votes/VAP* | | | | | | *16.8* | *15.3* | *15.0* | | | *13.2* | *11.5* | - |

[35]

461.    Mr. Trende testified and explained that there is Black voter cohesion and polarization in this district. Chang was not the black candidate of choice until after she became an incumbent. (Trende, Trial Tr. Vol. II. at 76, ECF 102, PageID.2616).

462.    In the 2018 Democratic primary for the former Senate District 1 (which now makes up a sizeable portion of Linden Senate District 3 and part of Linden Senate District 1), Chang won a 45.1% BVAP district over Black candidate of choice Alberta Tinsley-Talabi by winning 76% of the white vote to Tinsley-Talabi's paltry 27%. (Trende, Trial Tr. Vol. II at 77, ECF 102, PageID.2617); (DTX26 at 89).

463.    Senate District 10 has a BVAP of 40.43%. The only candidate was a white Democrat who hailed from Macomb County. This 2022 primary election was unopposed as a result of the low BVAP and presence of an incumbent white Senator Paul Wojno. (PX20 at 89).

464.    Senate District 11 has a BVAP of 19.19%. (PX20 at 22). Monique Owens, the first Black mayor of Eastpointe and only Black candidate, received 54.7% support from Black voters

---

[35] (DTX26 at 110).

and 19.8% of the white vote. (DTX24 at 36). Veronica Klinefelt, the white candidate, received 45.3% support from Black voters and 80.2% from white voters. (DTX24 at 36). Veronica Klinefelt was the winning candidate:

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| SD 11 | Owens | 54.7% | (43.0%, 66.3%) | 78.47% | No CoC | Klinefelt* | 80.2% | (74.1%, 86.0%) | 100.00% | CoC | No Black CoC |
| | Klinefelt* | 45.3% | (33.7%, 57.0%) | | | Owens | 19.8% | (14.0%, 25.9%) | | | |

Table 14: RPV Analyses for Linden Senate Districts, 2022

* indicates the winning candidate.

465.    While neither Mr. Trende (PX20 – 89) nor Dr. Handley (PX16-11) analyzed this election, the Commission's expert witness, Dr. Palmer, identified Monique Owens as the Black candidate of choice with a 78% probability. (Palmer, Trial Tr. Vol. V at 203, ECF 108, PageID.3453). In previous elections, Dr. Handley found Monique Owens to be the Black candidate of choice. (Palmer, Trial Tr. Vol. V at 204, ECF 108, PageID.3454).

**B.    2022 Detroit-Area House Democratic Primaries**

466.    House District 1 has a BVAP of 38.03%. (Uncontroverted Facts, ECF No. 87, PageID.2095 ¶ 87). Both candidates, Tyrone Carter and Jermaine Tobey, are Black. (Trende Trial Tr. Vol. II at 101, ECF 102, PageID.2641); (PX20 at 42).

Table 9

| District | BVAP | Black 1st Choice | Black 1st Choice % | Black 2nd Choice | Black 2nd Choice % | White 1st Choice | White 1st Choice % | White 2nd Choice | White 2nd Choice % | Black Cand Margin% |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 2022 House EI Summary | | | | | |
| Hickory 1 | 38.00% | Tyrone Carter* | 62.00% | Jermaine Tobey | 11.85% | Tyrone Carter* | 61.66% | Jermaine Tobey | 38.34% | – |

467.    Tyrone Carter was the only incumbent in this race, was the Black candidate of choice, and prevailed. (Trende Trial Tr. Vol. II at 101, ECF 102, PageID.2641); (PX20 at 42).

468.     House District 7 has a BVAP of 44.29%. (Uncontroverted Facts, ECF No. 87, PageID.2095 ⁋ 88). Kimberly Edwards, the Black candidate, prevailed against two white candidates. (DTX26 at 113). However, Kimberly Edwards, was an incumbent and only received 37.22% of the white vote. (PX20 at 42).

Table 9

| 2022 House EI Summary | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| District | BVAP | Black 1st Choice | Black 1st Choice % | Black 2nd Choice | Black 2nd Choice % | White 1st Choice | White 1st Choice % | White 2nd Choice | White 2nd Choice % | Black Cand Margin% |
| Hickory 12 | 41.00% | Kimberly Edwards | 84.00% | Richard Steenland* | 15.84% | Richard Steenland* | 62.78% | Kimberly Edwards | 37.22% | 3.80% |

469.     House District 8 has a BVAP of 43.70%. (Uncontroverted Facts, ECF No. 87, PageID.2095 ⁋ 89). In this race, two Black candidates took 64% of the Black vote and three white candidates took 87% of the white vote, with the white candidate of choice prevailing. (DTX26 at 113).

| APPENDIX C3 Michigan 2022 State House Democratic Primaries | | | | Estimates of Voting Patterns by Race in 2022 Democratic Primary | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Black Voters | | | | | White Voters | | | | |
| | Race | Party | Vote | EI[1] | 95% confidence interval | EI[2] | ER | HP | EI[1] | 95% confidence interval | EI[2] | ER | HP |
| State House District 8 | | | | | | | | | | | | | |
| Mike McFall | W | D | 37.8 | 24.7 | 20.4, 29.1 | 24.5 | 23.5 | 27.6 | 56.5 | 47.9, 64.3 | 53.9 | 54.6 | - |
| Durrel Douglas | B | D | 21.6 | 31.6 | 27.5, 35.6 | 33.1 | 31.9 | 26.8 | 9.0 | 4.4, 14.9 | 8.1 | 9.7 | - |
| Ernest Little | B | D | 17.2 | 32.3 | 29.0, 35.7 | 33.6 | 33.2 | 29.3 | 3.9 | 1.7, 7.0 | 0.7 | -1.1 | - |
| David Soltis | W | D | 14.0 | 3.8 | 2.4, 5.5 | 3.8 | 2.1 | 6.3 | 24.0 | 17.0, 30.4 | 26.5 | 26.7 | - |
| Ryan Nelson | W | D | 9.4 | 7.5 | 5.0, 10.2 | 8.8 | 8.8 | 10.0 | 6.6 | 3.2, 10.9 | 10.2 | 10.4 | - |
| Turnout:votes/VAP | | | | | | 14.6 | 13.4 | 13.8 | | | 14.0 | 13.4 | - |

470.     House District 10 has a BVAP of 38.79%. (Uncontroverted Facts, ECF No. 87, PageID.2095 ⁋ 90). Both candidates were Black. (DTX26 at 113). The Black candidate of choice, Joe Tate, was the incumbent and prevailed in this race. (PX20 at 42).

Table 9

| | | | | | | 2022 House EI Summary | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| District | BVAP | Black 1st Choice | Black 1st Choice % | Black 2nd Choice | Black 2nd Choice % | White 1st Choice | White 1st Choice % | White 2nd Choice | White 2nd Choice % | Black Cand Margin% |
| Hickory 10 | 38.80% | Joe Tate* | 90.00% | Toni Mua | 9.90% | Joe Tate* | 93.48% | Toni Mua | 6.52% | — |

471.    House District 11 has a BVAP of 42.82%. (Uncontroverted Facts, ECF No. 87, PageID.2095 ¶ 91). This election featured nine candidates, with the four Black candidates were the top four vote-getters among Black voters, while the top two vote-getters among white voters were a Hispanic candidate and a white candidate. (DTX26 at 114).

| APPENDIX C3 Michigan 2022 State House Democratic Primaries | | | | Estimates of Voting Patterns by Race in 2022 Democratic Primary | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Black Voters | | | | | White Voters | | | |
| | Race | Party | Vote | $EI^1$ | 95% confidence interval | $EI^2$ | ER | HP | $EI^1$ | 95% confidence interval | $EI^2$ | ER | HP |
| State House District 11 | | | | | | | | | | | | |
| Veronica Paiz | H | D | 18.9 | 6.6 | 3.0, 10.9 | 12.6 | 9.5 | 6.9 | 27.1 | 16.3, 37.3 | 24.4 | 25.4 | 23.1 |
| Ricardo White | B | D | 18.1 | 22.2 | 18.5, 26.0 | 22.1 | 22.6 | 23.8 | 15.6 | 7.1, 24.5 | 14.7 | 14.2 | 14.4 |
| Alex Manwell | W | D | 15.3 | 6.7 | 4.2, 9.7 | 7.2 | 8.0 | 9.7 | 22.0 | 12.3, 31.2 | 22.2 | 22.0 | 21.1 |
| Regina Williams | B | D | 14.5 | 24.2 | 20.7, 27.7 | 23.3 | 23.6 | 21.7 | 6.5 | 2.8, 12.1 | 7.1 | 7.4 | 9.2 |
| Athena Lynn Thornton | B | D | 10.2 | 18.7 | 15.6, 21.7 | 18.4 | 17.1 | 15.6 | 4.1 | 1.7, 7.3 | 3.4 | 3.9 | 4.8 |
| Marvin Cotton Jr. | B | D | 7.8 | 17.1 | 14.3, 19.7 | 16.5 | 15.1 | 13.4 | 3.1 | 1.3, 5.6 | 1.1 | 1.0 | 2.2 |
| David Maynard | | D | 7.2 | 1.7 | .8, 2.9 | 2.4 | 2.5 | 4.4 | 9.0 | 4.1, 14.5 | 11.3 | 12.3 | 9.7 |
| Paul Robert Francis | W | D | 4.9 | 1.6 | .8, 2.6 | 1.5 | 1.3 | 2.8 | 7.9 | 4.8, 11.2 | 7.5 | 8.5 | 10.6 |
| Patrick Biange | W | D | 3.0 | 1.2 | .6, 2.1 | 1.0 | 0.5 | 1.5 | 4.6 | 2.3, 7.1 | 5.0 | 5.4 | 5.0 |
| Turnout:votes/VAP | | | | | | 14.8 | 12.3 | 10.6 | | | 14.6 | 15.0 | 14.6 |

472.    House District 12 has a BVAP of 40.99%. (Uncontroverted Facts, ECF No. 87, PageID.2095 ¶ 92). In this election, Kimberly Edwards, the Black candidate, defeated the white candidate taking 42% of the white vote. (DTX26 at 114).

| APPENDIX C3 Michigan 2022 State House Democratic Primaries | | | | Estimates of Voting Patterns by Race in 2022 Democratic Primary | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Black Voters | | | | | White Voters | | | |
| | Race | Party | Vote | $EI^1$ | 95% confidence interval | $EI^2$ | ER | HP | $EI^1$ | 95% confidence interval | $EI^2$ | ER | HP |
| State House District 12 | | | | | | | | | | | | |
| Kimberly Edwards | B | D | 51.9 | 83.4 | 73.1, 91.7 | 85.8 | 85.9 | 83.0 | 42.0 | 20.6, 65.6 | 17.9 | 18.0 | - |
| Richard Steenland | W | D | 48.1 | 16.7 | 8.3, 26.9 | 14.1 | 14.0 | 17.0 | 58.0 | 34.4, 79.4 | 82.2 | 82.0 | - |
| Turnout:votes/VAP | | | | | | 14.3 | 12.0 | 10.3 | | | 8.4 | 10.0 | - |

473.    House District 14 has a BVAP of 41.11%. (Uncontroverted Facts, ECF No. 87, PageID.2095 ⁋ 93). In this election, the Black candidate, Donavan McKinney, defeated two white candidates. The two white candidates split 60% of the white vote. (DTX26 at 114).

| APPENDIX C3 Michigan 2022 State House Democratic Primaries | Race | Party | Vote | Estimates of Voting Patterns by Race in 2022 Democratic Primary | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Black Voters | | | | | White Voters | | | | |
| | | | | $EI^1$ | 95% confidence interval | $EI^2$ | ER | HP | $EI^1$ | 95% confidence interval | $EI^2$ | ER | HP |
| State House District 14 | | | | | | | | | | | | | |
| Donavan McKinney | B | D | 59.3 | 80.6 | 77.8, 83.2 | 82.8 | 82.2 | 80.4 | 39.5 | 31.1, 48.7 | 26.0 | 25.8 | - |
| Kristina Lodovisi | W | D | 28.4 | 13.9 | 11.7, 16.5 | 12.7 | 13.4 | 14.1 | 42.3 | 33.0, 50.2 | 50.5 | 49.5 | - |
| Aaron Delikta | W | D | 12.3 | 5.4 | 4.0, 7.1 | 4.7 | 4.5 | 5.6 | 18.2 | 12.7, 23.1 | 24.2 | 24.7 | - |
| Turnout:votes/VAP | | | | | | 13.2 | 12.8 | 13.8 | | | 8.8 | 9.1 | - |

474.    House District 5 has a BVAP of 55.30%. (PX20 at 42). The 2022 Democratic Primary featured two Black candidates and three white candidates. Reggie Davis, a Black candidate, received 62.4% support from Black voters and was the Black candidate of choice. (PX17 at 35). Davis was defeated by Natale Price, who was the clear white candidate of choice in a polarized race. (PX17 at 35).

**Table 12:** RPV Analyses for Hickory House Districts, 2022

| District | Black Voters | | | | | White Voters | | | | | Result | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cand. | Est. | 95% CI | Pr(c1>c2) | Status | Cand. | Est. | 95% CI | Pr(c1>c2) | Status | | |
| HD 5 | Davis | 62.4% | (58.9%, 65.5%) | 100.00% | CoC | Price* | 63.1% | (57.1%, 69.1%) | 100.00% | CoC | Polarized | |
| | Hughes | 15.6% | (13.2%, 17.9%) | | | Wooddell | 22.5% | (17.8%, 27.4%) | | | | |

475.    House District 6 has a BVAP of 54.90%. (PX20 at 42). The 2022 Democratic Primary two Black and one white candidates. Regina Weiss, the white candidate and an incumbent, defeated both Black candidates and received 62.0% of the overall vote. (PX16 at 12).

APPENDIX C3
Michigan
2022
State House
Democratic Primaries

Estimates of Voting Patterns by Race in 2022 Democratic Primary

| | | | | Black Voters | | | | | White Voters | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Race | Party | Vote | EI[1] | 95% confidence interval | EI[2] | ER | HP | EI[1] | 95% confidence interval | EI[2] | ER | HP |
| **State House District 6** | | | | | | | | | | | | | |
| Regina Weiss | W | D | 62.0 | 44.1 | 41.4, 46.9 | 42.7 | 41.7 | 41.6 | 91.2 | 87.9, 94.0 | 82.0 | 82.1 | 84.6 |
| Danielle Hall | B | D | 14.8 | 24.5 | 22.5, 26.4 | 23.8 | 23.3 | 24.4 | 3.4 | 1.6, 5.6 | 5.6 | 5.4 | 5.0 |
| Myya Jones | B | D | 14.8 | 21.5 | 19.6, 23.5 | 22.1 | 23.2 | 22.3 | 3.3 | 1.4, 5.9 | 7.0 | 6.8 | 5.9 |
| Mark Murphy | | D | 8.4 | 9.9 | 8.4, 11.4 | 11.1 | 11.8 | 11.7 | 2.1 | .9, 3.9 | 5.5 | 5.7 | 4.5 |
| *Turnout:votes/VAP* | | | | | | 17.4 | 15.9 | 18.0 | | | 33.2 | 32.6 | 38.8 |

## PROPOSED CONCLUSIONS OF LAW

### I.  EQUAL PROTECTION CLAIMS

1.  Because race predominated in the Commission's redistricting process, strict scrutiny applies to the Linden and Hickory maps.

2.  Strict scrutiny requires the Commission's use of race in redistricting to have been narrowly tailored to satisfy a compelling government interest.

3.  Defendants have articulated only one compelling interest here: VRA compliance.

4.  A compelling interest exists under VRA § 2 only if Defendants had good reason to think that all three *Gingles* preconditions are met.

5.  That good reason has to be based on evidence the Commission had in its possession at the time it was allowing race to predominate in the redistricting process.

6.  Defendants had no good reason to think that the first *Gingles* precondition was met because they never prepared or requested the preparation of a demonstration map. Accordingly, Plaintiffs are entitled to judgment on all their remaining Equal Protection claims.

7.  Defendants had no good reason to think that the second *Gingles* precondition was met because Mr. Adelson told them there was a lack of cohesion among Black voters in Detroit-area districts. Accordingly, Plaintiffs are entitled to judgment on all their remaining Equal Protection claims.

8.     Defendants had no good reason to think that the third *Gingles* precondition was met because Dr. Handley concluded that even at very low BVAPs, the Black candidate of choice always win, i.e., white voters do not vote sufficiently as a block to defeat the Black candidate of choice. Accordingly, Plaintiffs are entitled to judgment on all their remaining Equal Protection claims.

9.     Defendants' use of race in the redistricting process was not narrowly tailored to advance any purported interest in VRA compliance, either. The racial targets that Defendants used to draw Detroit-area districts—35-40% BVAP in Wayne County and 42-43% BVAP in Oakland County—was based on general-election data that did not show what BVAP levels would allow Black voters to elect candidates of choice in those counties' primaries. In no way could Defendants have reasonably believed that the VRA § 2 compliance *required* such low BVAPs. Accordingly, Plaintiffs are entitled to judgment on all their remaining Equal Protection claims.

10.     Defendants also had no analysis supporting the use of such low BVAPs for districts that bridged Wayne County and Macomb County. Accordingly, Plaintiffs are entitled to judgment on all their remaining Equal Protection claims involving districts that include Macomb County.

## II.     <u>VOTING RIGHTS ACT CLAIMS</u>

11.     Plaintiffs satisfied *Gingles* factor one because, unlike Defendants, they prepared a demonstration map which shows that it is possible to draw 10 majority-minority House districts and 5 majority-minority Senate districts in the Detroit area.

12.     Plaintiffs' demonstration map is reasonably configured because it complies with traditional redistricting criteria.

13.     Traditional redistricting criteria do not include communities of interest (which are assumed to be reflected in political boundaries), partisan fairness, or the effect on incumbents.

14.     All Plaintiffs except Smith and Stephen-Atara reside in a majority-minority district on the proposed maps.

15.     Plaintiffs have also satisfied the so-called Senate Factors.

16.     With respect to each of the remaining VRA-challenged districts, Plaintiffs have satisfied *Gingles* factors two and three and the totality of the circumstances because they showed that Black voters are cohesive in these districts, white voters consistently vote as a block to defeat Black candidates of choice, and Black candidates of choice are unlikely to prevail in elections where that candidate of choice is not an incumbent.

17.     Accordingly, Plaintiffs are also entitled to judgment on all their remaining VRA claims.

Respectfully submitted,

*/s/ John J. Bursch*
John J. Bursch (P57679)
BURSCH LAW PLLC
9339 Cherry Valley Ave SE, #78
Caledonia, Michigan 49316
(616) 450-4235
jbursch@burschlaw.com
*Attorney for Plaintiffs*

Michael J. Pattwell (P72419)
James J. Fleming (P84490)
Amia A. Banks (P84182)
CLARK HILL PLC
215 S Washington Square, Ste. 200
Lansing, MI 48933
(517) 318-3100
mpattwell@clarkhill.com
jfleming@clarkhill.com
abanks@clarkhill.com
*Attorneys for Plaintiffs*

Dated: December 4, 2023