**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

DONALD AGEE, JR. et al.,

                  Plaintiffs,

    v.

JOCELYN BENSON, et al.,

                  Defendants.

**Case No. 1:22-CV-00272-PLM-RMK-JTN**


**POST-TRIAL BRIEF OF THE**
**MICHIGAN INDEPENDENT CITIZENS**
**REDISTRICTING COMMISSION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................................ii

STATEMENT ...............................................................................................1

DISCUSSION ..............................................................................................2

I.  Plaintiffs Did Not Prove Their VRA Claims ........................................... 2

    A.  The First Precondition ..................................................................... 2

    B.  The Second and Third Preconditions ............................................. 4

    C.  The Totality of the Circumstances ................................................. 8

II.  Plaintiffs Did Not Prove Their Equal Protection Claims ......................... 12

    A.  Race Did Not Predominate ........................................................... 13

    B.  The Challenged Districts Are Narrowly Tailored ........................ 26

CONCLUSION .......................................................................................... 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez,*
138 S. Ct. 2305 (2018) ........................................................................*passim*

*Abrams v. Johnson,*
521 U.S. 74 (1997) ....................................................................................... 3

*Alabama Legislative Black Caucus v. Alabama,*
575 U.S. 254 (2015) ............................................................................*passim*

*Allen v. Milligan,*
599 U.S. 1 (2023) ................................................................................*passim*

*Banerian v. Benson,*
589 F. Supp. 3d 735 (W.D. Mich. 2022) ..................................................... 3

*Banerian v. Benson,*
597 F. Supp. 3d 1163 (W.D. Mich. 2022) ................................................... 3

*Bartlett v. Strickland,*
556 U.S. 1 (2009) ....................................................................................9, 10

*Bethune-Hill v. Virginia State Bd. of Elections,*
580 U.S. 178 (2017) ............................................................................*passim*

*Bethune-Hill v. Va. State Bd. of Elections,*
368 F. Supp. 3d 872 (E.D. Va. 2019) ........................................................31

*Bethune-Hill v. Virginia State Bd. of Elections,*
326 F. Supp. 3d 128 (E.D. Va. 2018) ................................................... 31, 32

*Brnovich v. DNC,*
141 S. Ct. 2321 (2021) ................................................................................ 6

*Clarke v. City of Cincinnati,*
40 F.3d 807 (6th Cir. 1994) .....................................................................5, 8

*Cooper v. Harris,*
581 U.S. 285 (2017) ............................................................................*passim*

*Cottier v. City of Martin,*
604 F.3d 553 (8th Cir. 2010) ...................................................................... 5

*Covington v. North Carolina*,
  316 F.R.D. 117 (M.D.N.C. 2016) ............................................................31

*Detroit News, Inc. v. Indep. Citizens Redistricting Comm'n*,
  976 N.W.2d 612 (Mich. 2021) ..............................................................25

*Easley v. Cromartie*,
  532 U.S. 234 (2001). (*Cromartie II*) ............................ 13, 15, 20, 21

*Fisher v. Univ. of Texas at Austin*,
  579 U.S. 365 (2016)..............................................................................31

*Fusilier v. Landry*,
  963 F.3d 447 (5th Cir. 2020) ...............................................................12

*Gaffney v. Cummings*,
  412 U.S. 735 (1973)..............................................................................21

*Georgia v. Ashcroft*,
  539 U.S. 461 (2003)..............................................................................10

*Gonzalez v. Harris Cnty., Tex.*,
  601 F. App'x 255 (5th Cir. 2015) ......................................................... 3

*Growe v. Emison*,
  507 U.S. 25 (1993) ................................................................................ 7

*Harding v. County of Dallas, Texas*,
  948 F.3d 302 (5th Cir. 2020) ...............................................................11

*Harris v. Ariz. Indep. Redistricting Comm'n*,
  578 U.S. 253 (2016)..............................................................................27

*Harvell v. Blytheville Sch. Dist. No. 5*,
  71 F.3d 1382 (8th Cir. 1995) ................................................................ 8

*Johnson v. De Grandy*,
  512 U.S. 997 (1994)......................................................................6, 9, 12

*Johnson v. Hamrick*,
  296 F.3d 1065 (11th Cir. 2002) ........................................................... 5

*League of United Latin Am. Citizens v. Perry*,
  548 U.S. 399 (2006)..........................................................................3, 10

*League of Women Voters of Michigan v. Indep. Citizens Redistricting Comm'n*,
  509 Mich. 885 N.W.2d 595 (2022)......................................................22

iii

*Lee v. City of Los Angeles,*
    908 F.3d 1175 (9th Cir. 2018) ...................................................................24

*Levy v. Lexington Cnty., S.C.,*
    589 F.3d 708 (4th Cir. 2009) ...................................................................4, 5

*Lewis v. Alamance Cnty., N.C.,*
    99 F.3d 600 (4th Cir. 1996) ............................................................. 4, 5, 8, 33

*Luna v. Cnty. of Kern,*
    291 F. Supp. 3d 1088 (E.D. Cal. 2018) ......................................................... 3

*Merrill v. Milligan,*
    142 S. Ct. 879 (2022) ...............................................................................27

*Miller v. Johnson,*
    515 U.S. 900 (1995) ..........................................................................*passim*

*Monroe v. City of Woodville, Miss.,*
    881 F.2d 1327 (5th Cir.1989) ....................................................................11

*NAACP v. City of Niagara Falls, N.Y.,*
    65 F.3d 1002 (2d Cir.1995) ....................................................................... 8

*Ollier v. Sweetwater Union High Sch. Dist.,*
    768 F.3d 843 (9th Cir. 2014) ....................................................................25

*Robinson v. Ardoin,*
    2023 WL 7711063 (5th Cir. Nov. 10, 2023) .......................................... 13, 19

*Rucho v. Common Cause,*
    139 S. Ct. 2484 (2019) .............................................................................21

*Ruiz v. City of Santa Maria,*
    160 F.3d 543 (9th Cir. 1998) ..................................................................... 8

*Rural W. Tennessee Afr.-Am. Affs. Council v. Sundquist,*
    209 F.3d 835 (6th Cir. 2000) ..................................................................... 8

*Shaw v. Hunt,*
    517 U.S. 899 (1996) (*Shaw II*) ............................................................ 18, 19

*Shaw v. Reno,*
    509 U.S. 630 (1993) (*Shaw I*) ............................................................. 12, 20

*Thornburg v. Gingles,*
    478 U.S. 30 (1986) ...........................................................................*passim*

*United States v. Angelos*,
    417 F. App'x 786 (10th Cir. 2011) ...................................................................25

*United States v. Brewer*,
    783 F.2d 841 (9th Cir. 1986) ..........................................................................25

*Uno v. City of Holyoke*,
    72 F.3d 973 (1st Cir. 1995) ............................................................................ 7

*Voinovich v. Quilter*,
    507 U.S. 146 (1993) ................................................................................ 11, 20

*Wis. Legislature v. Wis. Elections Comm'n*,
    595 U.S. 398 (2022) .......................................................................................31

**Statutes**

52 U.S.C. § 10301, et. seq. ................................................................................. 2

**Other Authorities**

Mich. Const. Article IV, § 6(13)(d) ..................................................................21

Mich. Const. Article IV, § 6(13)(e) ..................................................................22

U.S. Const. Amendment XIV, § 1 .....................................................................26

## STATEMENT

"Redistricting is never easy." *Abbott v. Perez*, 138 S. Ct. 2305, 2314 (2018). It was uniquely difficult in Michigan in 2021. The census was late, it reported that Detroit was underpopulated, and the inaugural Independent Citizens Redistricting Commission (the Commission) was tasked with implementing new constitutional criteria, including a mandate of partisan fairness. Commissioners courageously fulfilled their duties, ultimately giving broad support to the Linden and Hickory plans, which are the product of—more than anything—compromise. The Hickory plan received 11 of 13 votes, and the Linden plan 9 of 13. DTX49-MICRC_009951-52, 009964 (12/28/2021).[1] No commissioner was fully satisfied, but Michiganders obtained what they voted for, an improvement over how redistricting "had been historically done," 2.TR 63:10-12.

Commissioners were united in their concern for ensuring the equal opportunity that §2 of the Voting Rights Act (VRA) guarantees Black voters. Although some commissioners were divided in how to achieve that, disagreements were in good faith, and, even now, nobody "is accusing anybody of trying to intentionally harm people." 1.TR 215:20-21. The Commission ultimately achieved the right balance of criteria. The Linden and Hickory plans, including the districts challenged here, provide equal opportunity; no one factor predominated; and the Commission had as strong a basis in evidence as was possible to justify its §2 goals. The Court should enter judgment for the Commission.

---

[1] An enclosed addendum compiles pages from the Commission's record (DTX49) cited in this brief and pages illustrating its application of neutral districting principles.

## DISCUSSION[2]

### I. Plaintiffs Did Not Prove Their VRA Claims

The trial evidence did not establish any VRA violation. VRA §2 prohibits any voting "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. §10301(a). Such a violation occurs if "members of a [protected] class…have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* §10301(b). A redistricting plan may violate §2 if it results in "the dispersal of blacks into districts in which they constitute an ineffective minority of voters or…the concentration of blacks into districts where they constitute an excessive majority." *Thornburg v. Gingles*, 478 U.S. 30, 46 n.11 (1986).

Plaintiffs must prove "three threshold conditions": that the relevant group is "'sufficiently large and geographically compact to constitute a majority' in some reasonably configured legislative district"; that the group is "politically cohesive"; and that a white majority votes "'sufficiently as a bloc' to usually 'defeat the minority's preferred candidate.'" *Cooper v. Harris*, 581 U.S. 285, 301-02 (2017) (citation omitted). "If a plaintiff makes that showing, it must then go on to prove that, under the totality of the circumstances, the district lines dilute the votes of the members of the minority group." *Abbott*, 138 S. Ct. at 2331.

### A. The First Precondition

Plaintiffs did not prove that five senate and ten house majority-minority districts can be "reasonably configured." *Allen v. Milligan*, 599 U.S. 1, 19 (2023) (citation omitted). As this Court has recognized, Dkt.81 at 7, PageID.2035, the first-precondition inquiry "should take

---

[2] We locate the findings of fact we propose to the Court within the governing legal framework to indicate the precise legal significance we assign each point and to present the minimum of factual disputes we consider necessary to the adjudication. *See* 5.TR 256:23-257:9.

into account traditional districting principles such as maintaining communities of interest." *Abrams v. Johnson*, 521 U.S. 74, 92 (1997) (quotation marks omitted); *accord League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 432-33 (2006) (*LULAC*). But Mr. Trende was merely "trying to find 50 percent plus one districts," 2.TR 27:19-20, and did not implement the Commission's communities of interest, 2.TR 67:9-10, or its partisan-fairness obligations, 2.TR 110:4-10. Mr. Trende's legal opinion that §2 "trumps all these" state-law requirements, 2.TR 113:17, is circular. Liability does not arise without reasonably configured alternatives, and that requires at least "consideration" of state-law "principles," *Luna v. Cnty. of Kern*, 291 F. Supp. 3d 1088, 1113 (E.D. Cal. 2018), especially those that are compelling, *see Gonzalez v. Harris Cnty., Tex.*, 601 F. App'x 255, 260 (5th Cir. 2015).

Michigan's redistricting criteria are compelling. Voters recently enacted them into the constitution, and they define what a reasonably configured district is in Michigan. *See Banerian v. Benson*, 589 F. Supp. 3d 735, 736–37 (W.D. Mich. 2022); *Banerian v. Benson*, 597 F. Supp. 3d 1163, 1167 (W.D. Mich. 2022). Mr. Trende's contention that political-subdivision boundaries should replace the Commission's community-of-interest goals, 2.TR 39:7-14, 46:18-21, contravenes the constitutional structure, where "county lines are expressly part of a different (and lower-ranked) criterion altogether." *Banerian*, 589 F. Supp. 3d at 738. Nor (despite Detroit's high Black population) is there reason to assume that more than the existing number of majority-minority districts would satisfy the partisan-fairness requirement, which required "unpacking" Detroit politically. *See* §II.A.2.b, *infra*. Plaintiffs built their case around "the way [redistricting] had been historically done," 2.TR 63:10-12, *see also* 2.TR 69:3-5, tracking lines of "historical segregation," 2.TR 113:4-5, and building high concentrations of Black and Democratic voters in Detroit-based districts to Republican benefit, 4.TR 130:21-

131:13; DTX25-9, 17, 35-36, 41. Michigan voters had compelling reasons for demanding something new. Plans that dismantle their criteria are not reasonably configured.[3]

**B.    The Second and Third Preconditions**

Plaintiffs also did not prove the second and third preconditions. Because §2 "requires that minorities have an equal opportunity to participate not only in primary elections but also in general elections," "these two phases of the single election cycle must be separately considered and analyzed." *Lewis v. Alamance Cnty., N.C.*, 99 F.3d 600, 616 (4th Cir. 1996). The parties agree that the general elections are not a barrier to equal opportunity under the enacted plans, DTX26-3; 2.TR 134:12-19, which is the probable result of the Commission's effort to ensure equal opportunity, *see* §II.B, *infra*. Plaintiffs focus on Democratic primary elections, but do not establish either the second or third (or both) preconditions as to any district.

**1.    Minority Cohesion**

The Court requested briefing on the standard of cohesion for multi-candidate primaries. 5.TR 256:5-16. The Court, however, has answered that question in granting summary judgment on HD8 and HD11, finding that the Black voters were near-evenly split in each district's Democratic primary between their top choices, *see* Dkt.81 at 9-10; *see* DTX26-AppC3. The Court correctly concluded that cohesion is absent where "black voters are split between multiple candidates." Dkt.81 at 9. Other courts have applied the same standard. *See Levy v. Lexington Cnty., S.C.*, 589 F.3d 708, 720 (4th Cir. 2009) (quoting *Monroe v. City of Woodville, Miss.*, 881 F.2d 1327, 1332 (5th Cir.1989)).

---

[3] No remaining Plaintiff has been shown to reside in two of the demonstration majority-minority senate districts. 2.TR 170:12-25, 173:14-24; PX20-125. Plaintiffs lack standing to seek the full scope of relief they seek.

That standard follows from *Gingles*, which identified cohesiveness as a necessary element of causation: "If the minority group is not politically cohesive, it cannot be said that the" redistricting system "thwarts distinctive minority group interests." 478 U.S. at 51; *see* 4.TR 226:23-227:5. Where the minority vote is "split"—so that more minority voters oppose than support the candidate a slim (or non-existent) plurality of its members supports—a court can infer neither distinctive minority interests nor causation. *Levy*, 589 F.3d at 720. It remains unproven "that blacks prefer certain candidates whom they could elect in a single-member, black majority district." *Gingles*, 478 U.S. at 68. Here, it cannot be assumed that Black-preferred candidates would have prevailed in majority-minority reconfigurations of HD8 or HD11. To relax the standard would render every election result evidence of cohesion. *See Levy*, 589 F.3d at 720 n.18 (criticizing decision declining to "consider" elections lacking a minority-preferred candidate when they "demonstrate a lack of political cohesiveness").

Besides the 2022 primaries in HD8 and HD11, contests on record cutting against cohesion include the 2018 statewide Democratic primary; the 2022 Democratic primary in Congressional District 13; 2018 Democratic primaries in HD2, HD3, HD4, HD5, HD6, SD2, SD5, SD6, SD7; the 2014 Democratic primary in HD7; and the 2022 Democratic primaries in SD1 and SD11 (which the Court also dismissed on summary judgment, Dkt.81 at 10, PageID.2038). *See* DTX24 Tbls.7-14; DTX26-74, 109-110. These elections are evidence against Plaintiffs' claims on the second precondition.

## 2.    Legally Significant White Bloc Voting

The remaining contests do not support a finding that "white bloc voting…can generally 'minimize or cancel' black voters' ability to elect representatives of their choice." *Gingles*, 478 U.S. at 56. This must "usually" be the outcome, *id.* at 63, which requires proof that Black-preferred candidates lose more often than not. *See Clarke v. City of Cincinnati*, 40

F.3d 807, 812 (6th Cir. 1994); *Johnson v. Hamrick*, 296 F.3d 1065, 1076 (11th Cir. 2002); *Cottier v. City of Martin*, 604 F.3d 553, 560 (8th Cir. 2010) (en banc); *Lewis*, 99 F.3d at 616. The VRA does not mandate (as Plaintiffs propose) that "a black candidate of choice always win[]." 2.TR 89:16-17, *see also* 2.TR 76:8-10. "[T]he ultimate right of § 2 is equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race." *Johnson v. De Grandy*, 512 U.S. 997, 1014 n.11 (1994); *see also Brnovich v. DNC*, 141 S. Ct. 2321, 2337-38 (2021). Because §2 does not remedy "the mere inability to win a particular election," the third precondition generally requires "a pattern of racial bloc voting that extends over a period of time." *Gingles*, 478 U.S. at 56.

   a.   The fundamental facts are undisputed, 2.TR 72:17-19, and show that Black-preferred candidates usually prevail. In the challenged house districts before the Court (HD1, HD7, HD10, HD12, and HD14), Black-preferred-candidates won every 2022 Democratic primary. 2.TR 135:14-20; DTX26-11. Of the five contested Democratic primaries in the remaining challenged senate districts (SD1, SD3, SD6, SD7 and SD8), Black-preferred candidates won three (in SD3, SD6, and SD7). DTX26-11. Of all districts above 25.5% BVAP, white and Black voters preferred the same candidates in 13 of 27 Democratic primaries, and Black-preferred candidates prevailed in 4 others. *Id.* The 2022 Democratic primaries saw 23 of 27 Black-preferred candidates progress to the general elections. *Id.*

   The story from last decade's contests is the same. In 38 contested Democratic house primaries from 2014 through 2020, candidates receiving cohesive Black support lost just two races, and one was in a district of 27% BVAP. DTX26-9. In 10 contests Democratic senate primaries, candidates receiving cohesive Black support lost two contests. DTX26-7. Black-preferred candidates prevailed in districts with BVAPs of 26%, 27%, 36%, 47%, and 48%. DTX26-7, 9. In at least 18 contested primaries, white and Black voters preferred the same

candidates. *Id.* In Detroit-area congressional contests, Black-preferred candidates went three for four. DTX26-4.

On the whole, Black-preferred candidates have failed to reach the general elections only about 8% of the time. Black voters have at least an equal opportunity in Democratic primaries.

b. Plaintiffs do not adequately address this wealth of data. There is no Donald Rumsfeld fight-with-the-data-you-have basis for §2 liability. 2.TR 124:1-2. The VRA "does not assume the existence of racial bloc voting; plaintiffs must prove it." *Growe v. Emison*, 507 U.S. 25, 42 (1993) (citation omitted). Plaintiffs have not done so here.

Because the vote-dilution inquiry "is district specific," *Gingles*, 478 U.S. at 59 n.28, Plaintiffs have no viable claim against any remaining house district or SD3, SD6, and SD7. Turning to SD1—which did not see Black cohesion, *see* §I.B.2.a, *supra*—Plaintiffs' claim there fails for the additional reason that the 2022 alleged Black-preferred candidate was not defeated by "white bloc voting." *Gingles*, 478 U.S. at 54. The white-preferred candidate (Frank Liberati) also lost in a fractured primary. DTX24-36 (Table 14). Minorities of both white and Black communities joined forces to elect Erika Geiss, *id.*, who now leads the Michigan Legislative Black Caucus, 2.TR 139:21-140:2. Plaintiffs' claim against SD8 also falls short because it proves "the mere inability to win a particular election." *Gingles*, 478 U.S. at 56. "One swallow does not a summer make, and the results of a single election are unlikely, without more, to prove the existence or nonexistence of embedded racial cleavages." *Uno v. City of Holyoke*, 72 F.3d 973, 985 (1st Cir. 1995) (Selya, J.).

Plaintiffs theorize that election results in some districts are "mutually probative" in others. 2.TR 97:11-18. But that approach works against them. The substantial data showing equal opportunity outweighs the data Plaintiffs favor. They pluck out contests with low

crossover voting, but have little to say of the 13 2022 primaries where white *majorities* supported Black-preferred candidates, including in districts below 50% BVAP (e.g., SD3, SD6, HD10, HD13, HD1, HD3, and SD2). DTX26-11. Plaintiffs say incumbency distorts the results, but the inquiry looks to voters, not candidates, *see Clarke*, 40 F.3d at 814, and Black voters have successfully voted out incumbents, including in HD7 (45.9% BVAP) where a Black-preferred challenger (who is Black) beat a white incumbent, DTX26-113, and elected candidates to open seats, such as HD12 (42.6% BVAP), and HD14, (42.7% BVAP). DTX26-114. Viewed in their totality, the results show that the SD8 outcome was anomalous, not the other way around.

Plaintiffs at times suggest a theory of "electoral apartheid," *NAACP v. City of Niagara Falls, N.Y.*, 65 F.3d 1002, 1016 (2d Cir.1995), contending that successes of Black-preferred candidates who are not Black are not probative. *See, e.g.*, 2.TR 77:10-17, 105:6-8. But their witnesses attested that a Black-preferred candidate need not be Black. 2.TR 124:10-13; 1.TR 42:2-4. Courts agree. *Ruiz v. City of Santa Maria*, 160 F.3d 543, 551 (9th Cir. 1998), *Lewis*, 99 F.3d at 607; *Harvell v. Blytheville Sch. Dist. No. 5*, 71 F.3d 1382, 1386 (8th Cir. 1995). To be sure, "white-white elections" may have lower probative value than elections presenting a racial choice, *Rural W. Tennessee Afr.-Am. Affs. Council v. Sundquist*, 209 F.3d 835, 840 (6th Cir. 2000), but the elections at issue here fall in that latter camp, involving Black support for a candidate who is not Black over one or more Black candidates, *see* DTX26-88, 110. Moreover, Black-preferred candidates who are Black have frequently prevailed. DTX26-113-114. The third precondition is unmet under these circumstances.

## C.    The Totality of the Circumstances

Plaintiffs have not "prove[n] that, under the totality of the circumstances, the district lines dilute the votes of the members of the minority group." *Abbott*, 138 S. Ct. at 2331. The

inquiry requires "an intensely local appraisal of the design and impact of the" districts and "a searching practical evaluation of the past and present reality" to determine "whether the political process is equally open to minority voters." *Gingles*, 478 U.S. at 79 (quotation marks omitted). The Supreme Court recently reiterated that §2 cases are "rarely…successful," that "[f]orcing proportional representation is unlawful," that redistricting "is primarily the duty and responsibility of the States," and that §2 must be read to "limit judicial intervention to those instances of intensive racial politics where the excessive role of race in the electoral process denies minority voters equal opportunity to participate." *Allen*, 599 U.S. at 29-30 (quotation and alteration marks omitted). This is not such a case.

1.      The Linden and Hickory plans provide at least as much, if not more, minority opportunity than Plaintiffs' favored scheme. Although §2 does not mandate crossover districts, states may create them "as a matter of legislative choice or discretion." *Bartlett v. Strickland*, 556 U.S. 1, 23 (2009) (plurality opinion). Supreme Court precedent recognizes that crossover districts "may serve to diminish the significance and influence of race by encouraging minority and majority voters to work together toward a common goal." *Id.* at 23. Majority-minority districts "rely on a quintessentially race- conscious calculus aptly described as the 'politics of second best,'" and the Supreme Court has discouraged them in "communities in which minority citizens are able to form coalitions with voters from other racial and ethnic groups, having no need to be a majority within a single district in order to elect candidates of their choice." *Johnson*, 512 U.S. at 1020 (citation omitted). For this reason, "States can—and in proper cases should—defend against alleged §2 violations by pointing to crossover voting patterns and to effective crossover districts." *Bartlett*, 556 U.S. at 24. To compel majority-minority districts even where crossover districts may perform would "tend

to entrench the very practices and stereotypes the Equal Protection Clause is set against." *Johnson*, 512 U.S. at 1029 (Kennedy, J., concurring in part and concurring in the judgment).

In this case, the Commission properly "create[d] a greater number of [crossover] districts in which it is likely," but "perhaps not quite as likely as under" a plan with a lesser number of "safe," majority-minority districts, "that minority voters will be able to elect candidates of their choice." *Georgia v. Ashcroft*, 539 U.S. 461, 480 (2003); *see Bartlett*, 556 U.S. at 23-25 (similar). The Hickory plan delivers 16 Detroit-area house districts and 6 senate districts at or above 35% BVAP. *See* PX010-19, 22. It is not possible to create that number of majority-minority districts. 2.TR 27:19-28:4. Given that wider opportunity net, Black-preferred candidates need not win "every single time," 2.TR 76:7-8, to fare as well, if not better, than under Plaintiffs' proposal of 5 senate and 10 house majority-Black districts. In 2022, Black-preferred candidates progressed past the Democratic primary stage in 14 house districts (which beats 10) and in 5 senate districts (which matches 5). *See* DTX26-11. The Commission's method is superior to Plaintiffs', given that BVAPs correlate poorly to Black-preferred-candidate success, which, e.g., occurred in a 26% BVAP district (SD2) but not a 56% BVAP district (HD5). *See* DTX26-7, 11. This is no case for "judicial intervention." *Allen*, 599 U.S. at 30. "States retain broad discretion in drawing districts to comply with the mandate of § 2," *LULAC*, 548 U.S. at 429 (citation omitted), and the Commission properly exercised that here.

2.    No evidence demonstrates that Plaintiffs' proposal is superior to the enacted plans. Mr. Trende did not analyze his plans' likely performance. 2.TR 109:9-110:10. A §2 claim cannot succeed without evidence that the "alternative to the districting decision at issue would…enhance the ability of minority voters to elect the candidates of their choice." *Abbott*, 138 S. Ct. at 2332. In *Abbott*, a §2 challenger's illustrative remedial plan created a second

majority-Latino district in a county where the challenged plan created only one. *Id.* But the second district was not proven to be a "performing Latino district," and the Supreme Court reversed the lower court's liability ruling. *Id.* at 2332-34. Likewise, the Fifth Circuit rejected a §2 claim where the "plaintiffs did not offer any evidence at trial that would show how" candidates preferred by the relevant group "would fare in commissioner elections under their Remedial Plan." *Harding v. County of Dallas, Texas*, 948 F.3d 302, 311 (5th Cir. 2020). This case is no different.

Crossing the 50% BVAP line does not establish improvement: "an alternative map containing an additional majority-minority district does not necessarily establish an increased opportunity." *Id.* at 310. "[T]he creation of majority-minority districts[] does not invariably minimize or maximize minority voting strength. Instead, it can have either effect or neither." *Voinovich v. Quilter*, 507 U.S. 146, 154 (1993). "Which effect the practice has, if any at all, depends entirely on the facts and circumstances of each case." *Id.* There is no evidence that Plaintiffs' plans will perform as they hope. Their approach will take Michigan "down the slippery slope" of needing "new designs which segregate blacks into greater and greater concentrations" to rig outcomes, until "the goal of an open and pluralistic political process, where groups bargain among themselves, is transformed into one of proportional representation by persons beholden for office to discrete ethnic groups." *Monroe v. City of Woodville, Miss.*, 881 F.2d 1327, 1329 (5th Cir. 1989) (citation omitted).

3.    Most so-called Senate Report factors are either neutral or cut against Plaintiffs. *See Gingles*, 478 U.S. at 36-38 (listing factors). First, racially polarized voting—though present—is not extreme, as white and Black voters often prefer the same candidates, including in primaries. *See* DTX26-004, 011. Second, Black candidates are not denied access to any slating process. Third, Black and Black-preferred candidates are well represented in

Michigan's government, as the house speaker is a Black Democrat for the first time in history. 3.TR 123:19-23. It is hyperbole to compare Michigan in 2020s to "Alabama in the 1960s." 2.TR 80:10-11. The Black caucus is large and thriving, and Democratic majorities that control both legislative chambers are more likely than Republican majorities to respond to minority concerns. Macomb county elected its first Black representatives in 2022, including one who beat a white incumbent. 3.TR 122:3-14. Finally, the policies underlying the Linden and Hickory plans "lie[] at the heart of representative government and thus must be treated with great respect." *Fusilier v. Landry*, 963 F.3d 447, 460 (5th Cir. 2020). Plaintiffs' requested relief would override voter-approved criteria and revert the State to redistricting "the way it had been historically done," 2.TR 63:10-12. Michigan's choice against that is compelling.

Under the totality of circumstances, Black voters have equal opportunity. Plaintiffs' demand that Black candidates win "every single time," 2.TR 76:7-8, contravenes precedent holding that "minority voters are not immune from the obligation to pull, haul, and trade to find common political ground, the virtue of which is not to be slighted in applying a statute meant to hasten the waning of racism in American politics." *Johnson*, 512 U.S. at 1020. Black voters, candidates, and advocacy and political groups have shown themselves able and willing to do that. 2.TR 231:6-15; 3.TR 122:11-123:10. The plans need not guarantee their full political hopes to satisfy §2. The Linden and Hickory plans are more than sufficient.

## II.    Plaintiffs Did Not Prove Their Equal Protection Claims

The trial evidence did not prove any equal-protection violation. The Equal Protection Clause prohibits an unjustified, predominant use of race in redistricting. *See Shaw v. Reno*, 509 U.S. 630, 642 (1993) (*Shaw I*). However, given the "sensitive nature of redistricting and the presumption of good faith that must be accorded legislative enactments," courts must "exercise extraordinary caution" before concluding that districts were configured for

predominantly racial reasons. *Miller v. Johnson*, 515 U.S. 900, 911 (1995). If race "was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district—i.e., if race was the "dominant and controlling rationale" for a district's lines—then that use of race nonetheless withstands constitutional scrutiny if it is narrowly tailored to serve a compelling state interest. *Id.* at 913, 916, 920. The plans satisfy both inquiries.

## A.      Race Did Not Predominate

It is the "plaintiff's burden...to show" predominance for each "particular district." *Miller*, 515 U.S. at 916. That is "a high bar." *Robinson v. Ardoin*, __F.4th__, 2023 WL 7711063, at *11 (5th Cir. Nov. 10, 2023). "Race must not simply have been *a* motivation for the drawing of a majority-minority district, but the *predominant* factor motivating the legislature's districting decision." *Easley v. Cromartie*, 532 U.S. 234, 241 (2001). (*Cromartie II*) (internal citations and quotation marks omitted). This is a "demanding" standard, *id.* (citation omitted), that "applies district-by-district," *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 262 (2015) (*ALBC*).

### 1.      District Evidence

Plaintiffs did not make an adequate "district-by-district" showing. *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 191 (2017). The Court "must consider all of the lines of the district at issue," evaluated in "the districtwide context." *Id.* at 192. But Plaintiffs ignored many challenged districts, and most district lines, and generally treated the Detroit region "as an undifferentiated whole," *ALBC*, 575 U.S. at 262. The district-by-district testimony the Commission sponsored went unrebutted. The most probative evidence shows that numerous factors received "equal weighting." *See Allen*, 599 U.S. at 31 (plurality opinion); *Robinson*, 2023 WL 7711063, at *11; 3.TR 25:6-9.

13

a.      *Senate Plan*. In the senate plan, SD1 satisfied "many different criteria," achieving "a more fair and proportional map," responding to community comment that Melvindale shares common interests with Lincoln Park, and effectuating compromise with conflicting community views implemented in the house plan. 3.TR 94:8-95:13; *see* DTX49-MICRC_005667-70 (9/9/2021). SD1 tightly adheres to Detroit neighborhood district lines. DTX21. Plaintiffs put on little evidence of SD1 (which was SD17 in some draft maps). *See* 1.TR 154:7-8. In passing, they acknowledged its BVAP rose from below to above 35% BVAP, 1.TR 155:15-23; *see* PX136-32, which undercuts their "[d]raw it to the floor" theory of the case, 1.TR 58:11-12. And it is not difficult to achieve a 35% BVAP in Detroit. *See* §II.A.2.a. SD1 is compact, contiguous, and otherwise compliant with traditional criteria, *see* DTX7-1, which were not "cast aside." *Bethune-Hill*, 580 U.S. at 190. Race did not predominate.

SD3, which closely tracks neighborhood lines, DTX21, was configured to combine the territory of many regional house districts, combining the downtown educational hub with Wayne State University and uniting a Bengali community of interest between Macomb and Wayne County. 3.TR 99:19-100:4; DTX49-MICRC_005732, 005742 (9/13/2021). Plaintiffs' sole contention concerning SD3 is that the BVAP of a predecessor (labeled SD8) fell from 50% to just above 40%. 1.TR 159:21-160:7; PX136-0032[4]; DTX7-3. But its basic configuration remained constant across drafts. PX136-32. Thus, the BVAP reduction was not difficult and did not dictate "the essential basis for the lines drawn." *Bethune-Hill*, 580 U.S. at 799. Marginal changes in this densely populated area yield large demographic movements without racial predominance. *See* 4.TR 46:12-20. While Plaintiffs allege a target of 35% to 40% BVAP applied to all districts, *see* §II.A.2.a, *infra*, the Commission missed it in this district (as in many). No such target could have predominated.

---

[4] SD3 is mislabeled "SD13" in Plaintiffs' demonstrative and some testimony. *See* 1.TR 154:10-16.

SD7 was configured to combine similar communities, including Pontiac and Southfield, 3.TR 101:19-102:7; *see* DTX49-MICRC_006171 (9/20/2021), and to maintain Detroit neighborhoods, DTX21. Plaintiffs made little mention of SD7, *see* 1.TR 56:10-18, and did not meet their "demanding" burden, *Cromartie II*, 532 U.S. at 241.

SD8 was configured to combine similar communities like Royal Oak, Ferndale, and Berkley, and it assumed a north-to-south shape to facilitate "a more fair political outcome," 3.TR 104:20-105:6, and a "mix of resources" among similar communities, DTX49-MICRC_010001 (9/9/2021 5PM). Every draft of SD8 straddled Wayne and Oakland Counties, *see* PX136-32, before Plaintiffs contend race was seriously considered. While Plaintiffs fault SD8 for incorporating both suburban Birmingham and urban Schoolcraft, 2.TR 212:22-25; 4.TR 99:22-25, HD5 also incorporates both communities, *see* DTX3-5; *see also* 3.TR 105:19-22, and its BVAP exceeds 55%, PX020-19. A 40% BVAP ceiling—which SD8 overshot—does not explain that shared configuration. The Commission's partisan-fairness goal (applicable to both SD8 and HD5) does. *See* §II.A.2.b, *infra*.

SD10 was configured to combine industrial Warren with similar neighborhoods of Wayne County, *see* DTX49-MICRC_005834 (9/14/2021), and to unite a Chaldean community on the district's west side, *see* DTX49-MICRC_009438 (11/4/2021). Its configuration also bore ripple effects of maneuvers in its neighbors to the east and west. 3.TR 109:22-113:22. Plaintiffs' assertion that the Commission reduced the BVAP of its predecessor by drawing it into Detroit, 1.TR 152:3-9, is difficult to follow, since its BVAP rose, PX136-32. In any event, the contemporaneous transcript shows careful maneuvering in SD10 to implement "a lot of comments about the lakeshore." DTX49-MICRC_005834 (9/14/2021). Plaintiffs' burden is unmet.

It is also unmet in SD11. That district's BVAP rose from 7.8% to 19.19%, PX136-32, which does not fit Plaintiffs' theory of the case, *see* 6.TR 22:4. SD11 was drawn for "many reasons," including combining "linked" communities "such as Eastpointe and Roseville." 3.TR 114:7-12; *see* DTX49-MICRC_007328 (9/30/2021). Race was not proven to predominate.

b.  *House Plan*. In the house plan, HD1 is highly compact, DTX3-1, and was configured to combine Detroit's downtown with Downriver neighborhoods like Delray, Springwell, and Clayton and to follow neighborhood lines, 3.TR 76:2-24; DTX19; *see* DTX49-MICRC_005729-30 (9/13/2021). Plaintiffs' evidence shows it experienced a modest BVAP increase with little change to "the design of the district as a whole," *Bethune-Hill*, 580 U.S. at 192. *See* PX136-38. Plaintiffs neither addressed HD1 at trial nor proved predominance.

HD7 was configured to ensure a fair plan, bring together similar communities in Ferndale (Oakland County), Palmer Park and Royal Oak (Wayne County) and to unite a local LGBT community straddling the county line. 3.TR 78:8-79:2; *see* DTX49-MICRC_010008, 010019 (9/9/2021 5PM), DTX49-MICRC_008771 (10/28/2021). Every iteration of HD7 (sometimes labeled HD18) incorporated these communities and crossed Eight Mile Road from Detroit into Oakland County. PX136-39. A 40% BVAP ceiling could not have predominated: an October 5 version of the district met that supposed target (39.85%), but the Commission ultimately enacted a *narrower* configuration of the same district *overshooting* it (44.29%). *See id.* Plaintiffs did not meet their burden.

HD8 was configured to group Detroit's educational hub, including the cultural center, North End, Tech Town, and Wayne State University, and to unite other similar communities like Hazel Park and Madison Heights, with a border matching I-75. 3.TR 82:18-83:14; *see* DTX49-MICRC_006080 (9/16/2021 5PM). All drafts of the district spanned Wayne and

Oakland Counties, PX136-40, and it grew narrower to accommodate community-of-interest concerns in neighboring districts, 3.TR 81:22-82:15. A 40% ceiling could not have predominated: the Commission had almost satisfied it but enacted a version above 43% BVAP. PX136-40.

HD10 is the "lakeshore district," drawn to meet "constant requests…to keep lakeshore communities together because they have a unique need" and to unite the five municipalities of Grosse Pointes. 3.TR 84:5-85:1; *see* DTX49-MICRC_005754 (9/13/2021). Every rendition of HD10 (no matter the BVAP) follows this basic concept, PX136-41, and could not have been predominantly race-based. Plaintiffs' evidence shows the BVAP changes were small, and their theory—that HD10 took in "more and more of Detroit" to "drop[] that BVAP," 1.TR 164:15-23—is difficult to follow, given Detroit's high BVAP.

HD11 combines St. Clair Shores (a commercial port) with similar industrial neighborhoods south of Eight Mile Road, follows Detroit neighborhoods, and accommodates concerns in neighboring districts. 3.TR 86:9-88:1. Every iteration of this district spanned Wayne and Macomb Counties, and its basic configuration remained stable across drafts. *See* PX136-42. Plaintiffs did not prove racial predominance.

HD12 combined industrial Eastpointe and similar neighborhoods in Detroit—and with Roseville to the north—in recognition of the number of residents who commute between these places. 3.TR 88:24-90:24; *see* DTX49-MICRC_007328 (9/30/2021). All versions met these goals, and there is no discernible pattern in BVAP alterations (which rose and fell erratically) from which to infer predominant racial intent. *See* PX136-43. Plaintiffs paid little attention to this district at trial.

HD14 is a highly compact district, DTX4-14, configured to unite similar communities north and south of Eight Mile Road. 3.TR 91:5-20. Plaintiffs' evidence disproved

predominance: the first draft version *met* the supposed target and the enacted version—which became more compact—overshoots it. PX136-44. This district, too, went largely neglected in Plaintiffs' case.

### 2.   Statewide Evidence

Plaintiffs rely mostly on a statewide narrative. While the Court may consider "evidence pertaining to an area that is larger or smaller than the district at issue," such as "a common redistricting policy toward multiple districts," the "ultimate object of the inquiry" remains "the district as a whole." *Bethune-Hill*, 580 U.S. at 192. Plaintiffs did not persuasively connect their expansive claims to district lines, their lead percipient witness did not explain the bases for the lines drawn, and evidence of the Commission's broader policies undercuts Plaintiffs' position.

a.   *Statewide Racial Goals.*  Plaintiffs say the Commission read Dr. Handley's report to set a "[p]ercentage…to hit." 6.TR 22:4. But it is unclear what that means. While Plaintiffs allege the "BVAP target" was between "35 percent" and "40 percent," 1.TR 48:20-24 (Pattwell); *see also* 6.TR 15:22-23 (Bursch), the Commission missed that range more often than not. DTX18-24, 41; 3.TR 51:24-53:25; Comm'n PPT 21. The question is whether "[r]ace was the criterion that, in the State's view, could not be compromised," *Shaw v. Hunt*, 517 U.S. 899, 907 (1996) (*Shaw II*), and the alleged target could be and was compromised, including where draft districts hit it and enacted districts missed. Plaintiffs in closing changed course, complaining of a "narrow 36 to 44 BVAP range." 6.TR 20:18-20. But no evidence suggests a 44% target. *See, e.g.*, 1.TR 216:7-9 (alleging a "35 to 40 percent BVAP guideline"). This new theory describes the districts Plaintiffs elected to challenge, not the Commission's "motivation" in drawing them, *Miller*, 515 U.S. at 910.

18

Plaintiffs' preoccupation with semantics—target, benchmark, guidepost, guardrail, guideline, 6.TR 22:3, 3.TR 124:17-140:9—missed the salient question whether racial considerations yielded to other goals. *Shaw II*, 517 U.S. at 907. They did. The witnesses agreed there was no "hard and fast number" and that the Commission "had to balance that objective with the other criteria." 1.TR 199:4-19 (Rothhorn); *see also* 1.TR 58:6-10 (Szetela); 3.TR 15:9-14, 61:8-10 (Eid); 3.TR 35:20-21 (Adelson). Four commissioners attested that race did not predominate. 3.TR 54:8-20 (Eid); 1.TR 190:16-19 (Rothhorn); 1.TR 208:2-7 (Curry); 1.TR 226:13-20 (Wagner). That is credible in light of the record as a whole, including that the only evidence of a non-negotiable rule was the level not to "go below," i.e., a floor, 1.TR 40:2-3, not a ceiling, 1.TR 58:6-10; *see also* 1.TR 223:7-12. Given Detroit's high BVAP, a 35% BVAP floor would not have been constraining enough to become the "dominant and controlling rationale," *Miller*, 515 U.S. at 913.[5]

Besides, even a fixed "[t]arget," 6.TR 22:3, would not satisfy Plaintiffs' demanding burden. While a jurisdiction's decision to "adopt[] and appl[y] a policy of prioritizing mechanical racial targets…provides evidence that race motivated the drawing of particular lines," *ALBC*, 575 U.S. at 267, "an express racial target is just one consideration" and "does not automatically constitute racial predominance." *Robinson*, 2023 WL 7711063, at *10. If the law were otherwise, "racial predominance" would have "plague[d] *every single…map ever adduced* at the first step of *Gingles*," as they were all "created with an express target in mind." *Allen*, 599 U.S. at 32 (plurality opinion). Plaintiffs' contrary position conflicts with Supreme Court precedents that remanded for fact-finding, even though it was undisputed (in one) that Alabama "prioritiz[ed]" prior BVAP thresholds "above all other districting criteria," *ALBC*, 575 U.S. at 267-68, and (in another) that Virginia configured 12 districts "with a goal of

---

[5] It is contested that there was even a floor. 3.TR 130:22-25.

ensuring that each district would have a [BVAP] of at least 55%." *Bethune-Hill*, 580 U.S. at 182, 193; *Allen*, 599 U.S. at 32-33 (plurality opinion).[6]

Plaintiffs did not prove "a direct and significant impact on" district configurations. *ALBC*, 575 U.S. at 274. They presented no evidence of the number of residents of different races who were moved in and out of districts. *See id.* Plaintiffs cite what they call "bacon" shaped districts and allege there is "no explanation" for that "other than race." 6.TR 13:16-17. That is not true. No challenged district "is so bizarre" as to be "unexplainable on grounds other than race." *Shaw I*, 509 U.S. at 644 (citation omitted); *compare* DTX052-6. Moreover, many challenged districts lack an elongated shape, and do not support the "bacon-mander[ing]" trope, 6.TR 13:14-19, while many elongated districts fall outside the BVAP ranges alleged to produce it. For example, HD1 (38% BVAP), HD10 (38%), HD11 (42%), HD14 (41%), SD6 (39%), SD 7 (45%), and SD8 (40%) do not "stretch out" in a "bacon-like" manner, 2.TR 20:14-16, and yet meet (or approach) the supposed target. DTX3-1, 10, 11, 14; DTX6-6, 7, 8; DTX18-38. By comparison, HD5 (55% BVAP), HD6 (55%), HD15 (8%), HD54 (7%), HD58 (8%), SD11 (19%), and SD13 (8%) miss the range but are as long and narrow as any other districts. DTX3-5, 6, 15, 54, 58; DTX6-11, 13. The "common redistricting policy toward multiple districts," *Bethune-Hill*, 580 U.S. at 192, that produced these shapes was not racial.

b.      *Partisan Fairness*.   Politics better explain the lines. In racial-gerrymandering cases, "[c]aution is especially appropriate...where the State has articulated a legitimate political explanation for its districting decision, and the voting population is one in which race and political affiliation are highly correlated." *Cromartie II*, 532 U.S. at 242. In such cases, it

---

[6] While commissioners understood the VRA would override state-law criteria, 6.TR 14:14-17, that simply demonstrates "obedience to the Supremacy Clause," *Voinovich v. Quilter*, 507 U.S. 146, 159 (1993), not a predominant racial motive.

is the challenger's burden to prove "that race *rather than* politics predominantly explains" each challenged district's "boundaries." *Id.* at 243.

Here, the Commission was forbidden to create plans that "provide a disproportionate advantage to any political party," as "determined using accepted measures of partisan fairness." Mich. Const. art. IV, §6(13)(d). Contrary to Plaintiffs' suggestion, 4.TR 197:7-21, *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019), ratified this goal, explaining that "state constitutions can provide standards and guidance for state courts to apply" in determining political fairness and citing Michigan as an example. *Id.* at 2507. Supreme Court precedent has for generations recognized states' legitimate interest in "aim[ing] at a rough scheme of proportional representation of the two major political parties." *Gaffney v. Cummings*, 412 U.S. 735, 738 (1973). It would be passing strange if states could overcome allegations of racial gerrymandering with evidence of "political goals" benefiting one party, *Cromartie II*, 532 U.S. at 247, but not where "fairness" predominated, *Gaffney*, 412 U.S. at 752.

Here, the political-fairness requirement was highly constraining and drove configurations connecting Detroit with its suburbs. Because "Democrats in Michigan" are "concentrated" in Detroit, "a plan that's drawn without regards for partisanship will generate extremely Democratic districts," which in turn "makes for an inefficient distribution of support across districts." 4.TR 118:23-119:2 (Rodden). The Commission enacted plans with greater partisan efficiency than the average of simulative plans blind to political considerations, 4.TR 138:23-139:3, and that required that it "unpack Detroit" politically. 4.TR 135:17; *see* 3.TR 39:7-15. Commissioners understood that bringing fairness measures towards zero (perfect fairness) required that Detroit-centered districts be drawn into the suburbs. 1.TR 33:19-25 (Szetela); 1.TR 195:25-196:23 (Rothhorn); 1.TR 225:25-226:20 (Lange); 3.TR 41:5-9 (Eid). Contrary to Mr. Trende's speculation, 2.TR 28:18-29:5, line-

drawing in Detroit was crucial to Michigan's fairness requirement because of the "knock-on-effects for the suburbs," 4.TR 152:17-25, resulting in "a large number of suburban districts that are extremely competitive," 4.TR 146:7-10. Demographic constraints, in fact, prevented the Commission from achieving ideal fairness scores: it had to fend off a lawsuit alleging the Hickory plan is unconstitutionally biased toward Republican interests, *see League of Women Voters of Michigan v. Indep. Citizens Redistricting Comm'n*, 509 Mich. 885, 971 N.W.2d 595 (2022), and Commissioner Szetela criticized all three plans for Republican tilt, PX005-12-13. To satisfy these criticisms would have required unpacking Detroit even more than the Commission could reasonably accomplish.[7]

Plaintiffs observe that a tool that automatically calculated partisan-fairness metrics was not enabled in the Commission's mapping software until October. 1.TR 94:2-25. But the Commission had begun working towards fairness compliance much earlier. It was advised of its fairness obligations in August, which included an admonition against political packing, DTX13-6, and commissioners relied on election results in assessing political performance, *see, e.g.*, DTX49-MICRC_005865 (9/14/21). The software tool measured fairness of statewide plans, not of individual districts or areas, and could not have been used before October, 1.TR 173:17-19 (Szetela); 3.TR 206:7-13 (Adelson), but that did not render political considerations subordinate. Commissioners could, and did, upload data into third-party-sponsored software—which is reputable and reliable, 4.TR 127:2-22 (Rodden)—as they drafted in September, 3.TR 36:4-38:7. The Commission evaluated not only the congressional plan in this way, 6.TR 15:13-18, but "[e]very single" map. 3.TR 38:4-7. The partisan implications of each district were available to every commissioner all the time. When the fairness tool was enabled and Dr. Handley began evaluating plans, she was "really impressed" that the "initial"

---

[7] It is also not surprising that Detroit-area incumbents dislike the plan, 2.TR 224:20-22, given that incumbency protection is prohibited, *see* Mich. Const. art. IV, §6(13)(e).

effort fell "within the guidelines" for partisan fairness. 1.TR 216:22-217:3 (Szetela). That occurred on purpose.[8]

Besides, the predominance inquiry, which looks to "the design of the [enacted] district as a whole," *Bethune-Hill*, 580 U.S. at 192, does not discount motives based on when they are effectuated. Commissioners significantly revised plans in October, *see, e.g.*, 1.TR 193:15-17 (Rothhorn), running fairness measures hundreds of times, 3.TR 44:23-46:4. Racial goals did not override political ones.

    *c.*   *Additional Factors.* The Commission weighed additional factors. One was Detroit's sharp population decline, as "population has shifted toward the neighboring suburb counties." 3.TR 18:1-5. To achieve "population equality," *Allen*, 599 U.S. at 31 (plurality opinion), the Commission had to reduce representation in the area, 3.TR 20:6-8, or "draw[] in a way to match where the population shifted," i.e., "north of Wayne County into the suburb counties of Oakland and Macomb," 3.TR 23:19-22, given the limited options available, *see* 3.TR 21:7-11. That dynamic imposed additional constraints that drove the line-drawing.

The Commission also gave overriding consideration to "communities defined by actual shared interests." *Miller*, 515 U.S. at 916. Like the congressional plan, the Hickory and Linden plans were "animated by a principle of self-determinism," where "public comments...drove the Commission to recognize...particular communities of interest in different parts of the State—which in turn led the Commission to draw the district lines as it

---

[8] In the October 27 closed session, Commissioner Szetela (supporting Mr. Adelson's advice) observed that BVAPs of Detroit-area districts in an advocacy group's senate plan were nearly identical to those in the Commission's plans, PX071 32:20-33:40, which likely resulted from the similar fairness goals, given that the advocacy group touted its plan's elimination of "partisan bias," DTX49-MICRC_008225 (10/20/2021).

did." *Banerian*, 597 F. Supp. 3d at 1167. As shown, these concerns motivated the highest and lowest levels of map-making. *See* §II.A, *supra*.

The record does not support Plaintiffs' allegation that all considerations but race were "pretext[s]…cooked up at secret meeting on October 27." 6.TR 57:19-21. For one thing, community-of-interest goals fill transcripts well before that date. *See, e.g.*, DTX49-MICRC_005514-17, 005526 (9/7/21); DTX49-MICRC_005559, 005562, 005576-77, 005596–97, 005603 (9/8/21); DTX49-MICRC_005661-65, 005667-70, 005680, 005683-85, 009986-96, 009999, 010001-02, 010004, 010008, 010011-13, 010019 (9/9/2021). By comparison, Plaintiffs rely on only four transcripts addressing race-related goals. *See* 3.TR 124:20-143:7; PX63; PX64; DTX49-MICRC_007781 (10/6/2021), DTX49-MICRC_007938 (10/7/2021). The Commission received more than 30,000 public comments, all of which commissioners reviewed, 3.TR 12:10-14; the challenged plans surgically follow neighborhood lines (which was no pretext); and commissioners collaborated in process of constant compromise, line by line, 3.TR 98:5-12, 1.TR 53:8-17. It is unlikely that any one purpose could predominate. *Compare Lee v. City of Los Angeles*, 908 F.3d 1175, 1183–84 (9th Cir. 2018) (finding no basis for predominance finding from two councilmembers' motives not necessarily shared by others), *with Cooper*, 581 U.S. at 295, 313-14 (redistricting controlled by two legislators), *and Bethune-Hill*, 580 U.S. at 184-85 (similar). And, where the Commission itself exists because Michiganders "wanted a fair map," 3.TR 57:21, it is implausible that Detroit-area districts were "modified for [no] reason other than race," 1.TR 105:11-13.

For another thing, Plaintiffs mischaracterize the October 27 meeting. There was nothing nefarious about a closed session for legal advice. As Commissioner Szetela explained in supporting it, the purpose was to "allow us to freely discuss attorney/client matter with our lawyers freely and openly," PX071-10, and only later did a divided Michigan Supreme Court

deny the Commission this "common tool," *id.*; *see Detroit News, Inc. v. Indep. Citizens Redistricting Comm'n*, 976 N.W.2d 612 (Mich. 2021). The Commission had in good faith recorded the session to account for that contingency.

During the session, Mr. Adelson "strongly" advised against racially predominant redistricting, PX071 26:45-26:56, that there is no "magic number," PX071 34:30-34:54, and that public comments could (and should) be considered if they concerned community rather than unjustified racial targets, PX071 29:00-32:20, 34:00-36:06. That was sound advice. Impassioned public advocacy for a 50% BVAP threshold prompted the session. PX071 36:30-37:00; 3.TR 57:5-16; *see also* 1.TR 109:4-110:6; 3.TR 56:4-58:9. Mr. Adelson warned against that approach, echoing Supreme Court precedent. *See Abbott*, 138 S. Ct. at 2334 (striking down majority-minority district "demanded" by advocacy group). Commissioners were not advised to lie or cite communities of interest as a pretext for racial goals. 3.TR 61:14-18.

    d.    *Expert Opinion*. Mr. Trende's qualitative analysis consisted of his "personal opinions and speculations" about motive, *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 861 (9th Cir. 2014), which were neither proper nor persuasive, *see, e.g.*, *United States v. Brewer*, 783 F.2d 841, 843 (9th Cir. 1986) (finding expert testimony of that nature improper); *United States v. Angelos*, 417 F. App'x 786, 797 (10th Cir. 2011) (similar).

Mr. Trende's quantitative opinions did not speak to "the essential basis for [any] lines drawn." *Bethune-Hill*, 580 U.S. at 189. Moreover, Mr. Trende's simulation analysis did not "accurately represent[] the districting process in" Michigan and "ignored…criteria" that bound the commission. *Allen*, 599 U.S. at 34; 4.TR 160:25-163:23; 5.TR 162:24-165:5. Mr. Trende did not simulate statewide plans, did not account for the partisan-fairness mandate, and did not attempt to disentangle racial and political goals. 5.TR 165:11-14. All criticisms the Supreme Court levied against simulations in *Allen* apply equally here. *See* 599 U.S. at 33-

37. Mr. Trende's compactness analysis fared no better, as the same relationship between district compactness and racial demographics he purports to uncover appear under race-blind plans, so "[t]he relationship he's observing is about political geography and shapes and population distributions and not about race." 5.TR 161:2-9; DTX24-23.

### B.    The Challenged Districts Are Narrowly Tailored

The Commission's consideration of race, even if predominant, did not "deny" anyone "the equal protection of the laws," U.S. Const. Amend. XIV, §1, because it "was narrowly tailored to achieve a compelling interest." *Bethune-Hill*, 580 U.S. at 193 (citation omitted). Because Congress's "ban on electoral changes that are discriminatory in effect…is an appropriate method of promoting the purposes of the Fifteenth Amendment," *Allen*, 599 U.S. at 41, VRA compliance is a compelling interest, *Bethune-Hill*, 580 U.S. at 194-96; *Abbott*, 138 S. Ct. at 2315.

The narrow-tailoring requirement "insists only that the legislature have a strong basis in evidence in support of the (race-based) choice that it has made," not that it prove "its action was actually necessary to avoid a statutory violation." *Bethune-Hill*, 580 U.S. at 194 (quotation and alteration marks omitted). That is because a racial-gerrymandering claim, which addresses racial classifications, is "analytically distinct from a vote dilution claim," which addresses voting mechanisms that "minimize or cancel out the voting potential of racial or ethnic minorities." *Miller*, 515 U.S. at 911. Accordingly, "[t]he question is whether the State had '*good reasons*' to believe" racial choices were "necessary to avoid liability," not whether it accurately "determine[d] *precisely* what minority population" the VRA "demands." *Bethune-Hill*, 580 U.S. at 195-96. The Commission's racial considerations, even if predominant, amply satisfy this test.

### 1.     The Commission's Strong Basis in Evidence

A compelling interest arises under §2 if the redistricting authority "has good reason to think that all the '*Gingles* preconditions' are met." *Cooper*, 581 U.S. at 302. The Commission had precisely that.

Commissioners recognized these conditions may be satisfied before the census release, 1.TR 21:15-21, and foresaw VRA litigation, 1.TR 31:6-14. The Commission retained a VRA expert, Dr. Handley who has about 40 years of experience as a VRA practitioner and academic, 4.TR 205:18-20, and sits "at the top of the list" of "go-to" DOJ Voting Rights Section experts, 3.TR 185:15-24, and a VRA attorney, Mr. Adelson, who served in the DOJ Voting Rights Section attorney, received two outstanding achievement awards in the second Bush administration, and frequently advises redistricting authorities, 3 TR 178:4-10. His advice to the Arizona Independent Redistricting Commission (far from being "extreme," 1.TR 25:20-21) was unanimously ratified by the Supreme Court. *See Harris v. Ariz. Indep. Redistricting Comm'n*, 578 U.S. 253 (2016) (affirming *Harris v. Ariz. Indep. Redistricting Comm'n*, 993 F. Supp. 2d 1042, 1058 (D. Ariz. 2014)). The Commission also retained "litigation counsel with experience in the Voting Rights Act and equal protection." 1.TR 31:8-9.[9] Aided by experts—but not delegating its duties, *see, e.g.*, 3.TR 138:16-19—the Commission took the VRA seriously and arrived at as sound a result as possible under "the considerable disagreement and uncertainty" surrounding §2, *Merrill v. Milligan*, 142 S. Ct. 879, 883 (2022) (Roberts, C.J., dissenting).

a.     The Commission had good reasons to believe the Detroit-area minority community is "sufficiently large and geographically compact to constitute a majority" in

---

[9] All Commission hires received some negative public criticism, the Commission's litigation counsel for Republican affiliations, and its VRA counsel for Democratic affiliations, 3.TR 15:15-17:6. Though Plaintiffs emphasize the latter (but not the former), *see* 1.TR 24:9-29:10, they tie this evidence to no case issue.

reasonably configured districts. *Cooper*, 581 U.S. at 301 (citation omitted). Early draft house and senate maps contained districts in Detroit exceeding the 50% BVAP mark, often by large margins. *See, e.g.*, PX104-6; PX101-6; PX-090-9-10; PX-094-21-22; *accord* 1.Tr 56:5-6. Indeed, the principal concern was that "the districts around Detroit…were highly packed," 1.Tr 33:23-24; *see also* 1.TR 42:16-19, into "an excessive majority," *Gingles*, 478 U.S. at 46 n.11. Some draft districts had BVAPs exceeding 60% and 70% while neighboring draft districts fell well below 30% BVAP. *See, e.g.*, PX104-6; PX090-9. Those numbers indicated multiple opportunity districts could (if needed) exceed 50% BVAP.

The Commission did not need "a demonstration map" to justify §2 compliance. 6.TR 23:23-24:2; 1.TR 45:22-46:1. It had reason to believe the precondition may be satisfied from draft plans and did not need to determine what a future §2 plaintiff would "actually" present, *Bethune-Hill*, 580 U.S. at 801. Accordingly, it does not follow from Plaintiffs' failure to satisfy this test, *see* §I.A, *supra*, that the Commission lacked reasons to believe *some* plaintiff could.

b.     The Commission also had good reasons to believe that—without opportunity districts—future plaintiffs could meet the second and third preconditions. It had what may be the most thorough polarized-voting analysis ever prepared at the map-drawing stage. *See* 4.TR 95:14-22.

Dr. Handley analyzed all 13 statewide general-election contests between 2012 and 2020, more than 50 district-level elections between 2018 and 2020 (which she culled down to 31 around Detroit), and "over 30 Democratic primaries." 4.TR 210:20-211:24. She examined these during the redistricting process, 4.TR 212:8-15, and compiled her iterative work in one final report, 4.TR 213:2–10; DTX17. She disclosed these analyses in "[p]ieces…at different periods of time," 4.TR 213:6-10, as more data (which are difficult to collect) became available, 4.TR 217:4-8. Plaintiffs are incorrect to suggest this information was not disseminated in time

to inform the Commission's work, *see* 4.TR 216:25-217:8, which their own evidence refutes, 1.TR 37:25-38:12.

Statewide general elections, reconstituted within counties having sufficient BVAP to produce reliable estimates of racial voting patterns, revealed that "voting was, in fact, racially polarized." 4.TR 214:6-7. All such elections in Oakland County, and more than half in Wayne County, displayed polarization. DTX48-9. Black cohesion exceeded 90%, DTX26-46-47 (page 22-23 Dec. 2021 Rep.), confirming that "a significant number of minority group members usually vote for the same candidates." *Gingles*, 478 U.S. at 56. And white voters cohesively voted against the Black-preferred candidates in Wayne and Oakland Counties, DTX26-46-47 (page 22-23 Dec. 2021 Rep.), such that, without districts designed to afford equal opportunity, "a white bloc vote [would] normally…defeat the combined strength of minority support plus white 'crossover' votes" in general elections. *Gingles*, 478 U.S. at 56. Dr. Handley advised the Commission "to create districts that provided black voters with an opportunity to elect their candidates of choice." 4.TR 214:21-25.

Plaintiffs incorrectly suggest the third precondition was unmet, given meaningful crossover voting and given that Black-preferred candidates won the total votes of Wayne and Oakland Counties. 5.TR 41:25-43:24. The Commission had to configure single-member districts *within* counties. 5.TR 106:4-20. Dr. Handley algebraically determined that districts with BVAPs below 35% in Wayne County and 40% in Oakland County would not likely provide equal opportunity. *See* DTX26-41-51. Draft maps failed that analysis. For example, one draft senate plan included districts exceeding 60% and 70% BVAP (labeled SD13 and SD9) surrounded by districts with BVAPs of 10.98% (SD17), 14.2% (SD19), 26.99% (SD10), and 12.03% (SD7). PX104-6-7. One house plan contained districts between 60% and 80% BVAP (e.g., HD6, HD14, HD17, and HD18) neighboring districts below 30% BVAP

(e.g., HD1, HD3, HD7, and HD19). *See* PX090-9-10. The Commission had good reasons to believe districts were cracked[10] and packed. On that foundation, the Commission's counsel warned of §2 liability. *See* PX005-45; 1.TR 57:2-17. Justifications for §2 compliance get no better than that.

### 2.    The Commission's Narrowly Tailored Use of Race

The Commission's consideration of race was narrowly tailored.

a.    Racial considerations are narrowly tailored under the VRA if they adhere to "a functional analysis of the electoral behavior within the particular election district." *Bethune-Hill*, 580 U.S. at 194 (citation and alteration marks omitted). Dr. Handley advised "a district-by-district functional analysis to determine what an effective minority district was." 1.TR 45:22-23; 3.TR 59:4-13; 4.TR 215:5-15. She advised that the Commission not "simply set an arbitrary demographic target (e.g., 50% black voting age population)," DTX48-11, echoing the Supreme Court's condemnation of "a mechanically numerical view" of VRA dictates, *ALBC*, 575 U.S. at 277; *see Cooper*, 581 U.S. at 305-06. Dr. Handley measured turnout and white crossover voting to algebraically calculate the percentage BVAP necessary to ensure equal opportunity, DTX48-12-17; 4.TR 236:3-237:23, which exposed vulnerabilities in actual plans before the Commission, *contrast Cooper*, 581 U.S. at 304.

The Commission avoided pitfalls identified in decisions condemning high racial targets chosen with no analysis of crossover voting and turnout. *See Cooper*, 581 U.S. at 305–06; *Wis. Legislature v. Wis. Elections Comm'n*, 595 U.S. 398, 404 (2022); *Covington v. North Carolina*, 316 F.R.D. 117, 175–76 (M.D.N.C. 2016) (three-judge court), *aff'd*, 581 U.S. 1015 (2017); *Bethune-Hill v. Virginia State Bd. of Elections*, 326 F. Supp. 3d 128, 175–80 (E.D. Va. 2018) (three-judge court). Indeed, the Commission's plans mirror remedial plans developed

---

[10] It is therefore untrue that Dr. Handley's analysis would deem any Detroit-area district an opportunity district. 1.TR 68:10-16.

in §2 litigation, *see Singleton v. Allen*, 2023 WL 6567895, at *16 (N.D. Ala. Oct. 5, 2023), and racial-gerrymandering litigation, *see Bethune-Hill v. Va. State Bd. of Elections*, 368 F. Supp. 3d 872, 882-89 (E.D. Va. 2019) (finding—based on general-election data—that districts with BVAPs below 50% would likely perform). In suggesting the Commission should have acted on an "instinct" to maintain prior district BVAPs or a "48 percent" target, 1.TR 167:9-168:2, Plaintiffs get things backwards, *see Bethune-Hill*, 326 F. Supp. 3d at 176–77 (condemning threshold derived without evidence); *ALBC*, 575 U.S. at 276 (criticizing goal of "maintaining the same population percentages" of past plan). Notably, Mr. Trende configured his plans to hit racial targets, 2.TR 114:1-2, without a functional analysis of performance, 2.TR 109:9-110:10. The Commission's plan cannot be condemned by reference to other race-based choices that are concededly not narrowly tailored.[11] *See Fisher v. Univ. of Texas at Austin*, 579 U.S. 365, 386 (2016) (finding race-based choice properly tailored when comparator was also race-based).

There is no dispute that the Commission tailored its map-drawing to Dr. Handley's functional analysis (which Plaintiffs cite as the problem). Whereas draft plans placed a few districts with 60% and 70% BVAPs next to districts well below 30% BVAP, *see, e.g.*, PX104-6-7; PX090-9-10, the Linden plan provided 6 opportunity districts, ranging from 35% BVAP to 44.8% BVAP, and the Hickory plan provided 16, *see* PX020-19-22, evening out district BVAPs and remedying the cracking and packing, *see* PX136-32, 38-44. The Commission did not do more than was reasonably necessary. Its accuracy as to this range was (at best) loose, and it did not insist on bringing all districts in the area below 50% BVAP.

b. Plaintiffs' contention that the Commission should have looked to primary, not general, elections is orthogonal to the narrow-tailoring inquiry, which asks whether the

---

[11] Nor can they be condemned by reference to prior plans, prepared with different criteria, which the Commission did not use as a starting point. 1.TR 33:17-25.

redistricting authority had "'good reasons' for thinking that the [VRA] demanded" the "steps" it actually took, *Cooper*, 581 U.S. at 301 (citation omitted), not whether other bases in evidence might support alternative choices. Having found probable §2 liability from general-election data, the Commission was justified in remedying it. It did not have to guess that future plaintiffs would look to primary data. Supreme Court precedent has looked to "general elections" in the narrow-tailoring inquiry, *see id.* at 295, 301-06, and Plaintiffs' arguments based on primary results are properly directed to their §2 claims, not to their equal-protection claims.

Regardless, the available primary data did not change the analysis. Dr. Handley analyzed all available primary elections and found they were not "particularly relevant to the mapmaking process for a number of reasons." 4.TR 226:9-10. There was only one statewide primary (which is necessary to calculate the percent needed to win), and it did not exhibit Black cohesion. 4.TR 226:12-16. Half the legislative primaries were not polarized, 4.TR 226:17-18, and Black-preferred candidates prevailed in most polarized contests, 4.TR 226:19-20. Further, Dr. Handley observed that, where Black-preferred candidates lost in polarized primaries, "there wasn't a clear relationship between the percentage BVAP of the district that they lost in and the loss of the candidate." 4.TR 226:22-227:5. District lines did not appear to pose a barrier to minority opportunity in the primaries. 5.TR 30:25-32:7.

Plaintiffs offer no adequate response. They focus on the few elections where minority-preferred candidates did not prevail. 4.TR 223:1-15. But, had the Commission afforded those elections outsized weight, and applied a BVAP threshold based on them across districts, *that* would *not* have been narrowly tailored. *Bethune-Hill*, 326 F. Supp. 3d at 176–77. Besides, Dr. Handley conducted a check of primaries at the end of her analysis, comparing election outcomes to BVAP levels, observed Black-preferred-candidate successes within the range

inferred from general election data, and concluded equal opportunity would be provided within those ranges in the primaries. DTX48-18-19. This fortified the Commission's already strong basis in evidence.

Plaintiffs pivot to contending that this data undermines the Commission's use of race at all. 6.TR 11:21-12:4, 24:4-9. But Mr. Trende admitted the data show race had to be considered, 2.TR 122:17-18, and Plaintiffs ignore that §2 "requires that minorities have an equal opportunity to participate…in general elections." *Lewis*, 99 F.3d at 616. The likely §2 liability as to general elections justifies the Commission's decisions.

      c.     Plaintiffs' remaining arguments "ask too much from state officials charged with the sensitive duty of reapportioning legislative districts." *Bethune-Hill*, 580 U.S. at 195. They discount many election outcomes, contending that some are less probative because they involve Black incumbents, and emphasize a few they consider probative. *See*, *e.g.*, 5.TR 67:4-19. But the question "is what the black voters are doing," there are many "instances in which black voters will vote for the challenger over an incumbent," and Dr. Handley justifiably did not regard that information as probative. 5.TR 67:22-68:1. State officials need not guess in advance which elections future plaintiffs will argue are (and are not) probative.

Plaintiffs also criticize Dr. Handley for not examining voting patterns in Macomb County. 5.TR 36:16-23. But "there was not a sufficient number of black voters or sufficient number of variation in the percentage black voters to actually produce numbers for Macomb County." 5.TR 36:16-21. The narrow-tailoring inquiry spares states from "competing hazards of liability," *Abbott*, 138 S. Ct. at 2315 (citation omitted), and does not demand the impossible. Moreover, the Macomb districts actually performed as opportunity districts in 2022. 3.TR 122:3-14.

Finally, Plaintiffs contend the Commission should have yielded to public comments demanding a 50% plus one quota. 1.TR 138:10-11. The Supreme Court condemned that approach in *Abbott*, observing that public advocates "may have an overly expansive understanding of what § 2 demands." 138 S. Ct. at 2334. The Commission correctly looked to its "basis in evidence." *Bethune-Hill*, 580 U.S. at 195.

## CONCLUSION

The Court should enter judgment for the Commission on all claims.

Dated: December 4, 2023                    Respectfully submitted,

                                          /s/ David H. Fink

BAKER & HOSTETLER LLP                      FINK BRESSACK
Katherine L. McKnight                      David H. Fink
E. Mark Braden                             Nathan J. Fink
Richard B. Raile                           38500 Woodward Ave., Suite 350
Dima J. Atiya                              Bloomfield Hills, Michigan 48304
1050 Connecticut Ave., NW,                 (248) 971-2500
Suite 1100                                 dfink@finkbressack.com
Washington, D.C. 20036                     nfink@finkbressack.com
(202) 861-1500
kmcknight@bakerlaw.com
mbraden@bakerlaw.com                       *Counsel for Defendants, Michigan Independent*
rraile@bakerlaw.com                        *Citizens Redistricting Commission, and Douglas*
datiya@bakerlaw.com                        *Clark, Juanita Curry, Anthony Eid, Rhonda*
                                          *Lange, Steven Terry Lett, Brittni Kellom,*
                                          *Cynthia Orton, M.C. Rothhorn, Rebecca*
BAKER & HOSTETLER LLP                      *Szetela, Janice Vallette, Erin Wagner, Richard*
Patrick T. Lewis                           *Weiss, and Dustin Witjes, each in his or her*
Key Tower, 127 Public Square, Suite 2000   *official capacity as a Commissioner of the*
Cleveland, Ohio 44114                      *Michigan Independent Citizens Redistricting*
(216) 621-0200                             *Commission*
plewis@bakerlaw.com

BAKER & HOSTETLER LLP
Erika D. Prouty
200 Civic Center Drive
Suite 1200
Columbus, Ohio 43215
(614) 228-1541
eprouty@bakerlaw.com

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.2(b)(ii), Counsel for the Commission certifies that this brief contains 9,978 words, as indicated by Microsoft Word 365, inclusive of any footnotes, citations, and quotations, and exclusive of the caption, signature block, tables, attachments and exhibits, and any certificates.

Dated: December 4, 2023                    Respectfully submitted,

                                           /s/ David H. Fink