# ADDENDUM

# Part 3

# OCTOBER 7, 2021

# OCTOBER 7, 2021

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> COMMISSIONER ORTON: You could try a different District if you are more comfortable.

>> COMMISSIONER VALLETTE: Do you have a suggestion? .

>> MR. KENT STIGALL: You may move a precinct don't want to say improves but enhances the direction you have been going previously.

>> COMMISSIONER ORTON: Where is District 35?

>> VICE CHAIR ROTHHORN: Mr. Adelson did you have a comment?

>> MR. BRUCE ADELSON: Yes, I want to pick up on something that Kent said from a fairness standpoint in moving and continuing to keep the districts in the direction that we talked about yesterday, that I believe there are some new thematic maps that have a precinct level partisan choices.

That may be a way to narrow down which District shift from a precinct shift from the population deviation perspective.

That might be something that would be useful. The margins and I recognize and agree with Kent that some of these Directors are pretty close from the partisan standpoint.

So rather than even experimenting just target some precincts that don't affect the partisanship.

>> VICE CHAIR ROTHHORN: Commissioner Witjes?

>> COMMISSIONER WITJES: I was keep looking in the map and I don't know if this was mentioned but 79 needs some work in regards to population for sure.

>> VICE CHAIR ROTHHORN: Excellent, what I want to do because I think I see some numbers and I think Mr. Adelson was trying to recognize we may have a new tool this morning that Mr. Stigall wants to orient us to.

>> MR. KENT STIGALL: We have two numbers here and I picked the 2016 Presidential election because we can only do one.

So what it does is the number on top will be the greater number.

Red will be the republican number and blue will be the democrat number.

For example in this precinct I have highlighted here was 1114 votes for republican, 500 for democrat.

The polar opposite of that are opposite is over here where we have 462 votes for democrat, 397 for republican.

So when you look at those numbers, this is just an example to use wherever you want to use it.

If you move this precinct into 40 you would be increasing the republican margin.

If you move this precinct into 65, you would be moving out more republican votes than democrat votes.

So this would be increasing the percentage at which the democrats won 40.

So if we go back to 40, just you know picking one spot, so that number, if we move that precinct over to here, this number would go up, not down I believe, if that is correct because there is twice as many.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

You would be moving whatever population out but you're moving more red votes than blue votes.

   >> VICE CHAIR ROTHHORN: That is helpful Mr. Stigall.

   >> MR. KENT STIGALL: This would be the opposite if you move this precinct here you would be moving it more blue votes than red votes.

Either one achieves the same goal but if you have having to lower the population in 40 and you want to keep it over 50% democrat, you would move out the higher red number.

   >> VICE CHAIR ROTHHORN: Thanks for that orientation, Commissioner Witjes then I want to get it back to Commissioner Vallette.

   >> COMMISSIONER WITJES: What are the titles to get those on the screen.

   >> MR. KENT STIGALL: There is a methodology for this.

Can you see the screen? So president D16 I selected that and I had add dem and put it right here.

Then I selected this one and said add republican.

So it's called and then I saved it so I can pop right into it and I called it press 16.

And you can do that with any one of the elections at a time.

So if I come here, it's easier to flip between them. I thought I could go up here and flip between them fairly quickly, okay?

   >> VICE CHAIR ROTHHORN: There was another one can you bring it back up? There was another one pres16 and looked like there was a 0.

There is D, R, yep so if you continue on the list there was another one.

   >> MR. KENT STIGALL: That would be other probably is my guess where they combine whatever.

   >> VICE CHAIR ROTHHORN: The green party the others.

   >> MR. KENT STIGALL: Libertarian, green.

   >> VICE CHAIR ROTHHORN: All of them that are not, so it's the balance of the District the votes in the District so to speak.

   >> MR. KENT STIGALL: That is done fairly frequently.

   >> VICE CHAIR ROTHHORN: It's not going to help us necessarily with sort of balancing our partisan fairness at this point.

Mr. Adelson.

   >> MR. BRUCE ADELSON: Just as a point, the tool Kent is showing and as he indicated it's one election and shows what the partisan balance is.

I think by checking the composite index as you know has many elections, we can make sure we are not over adjusting, that we are adjusting with to use a metaphor with a meat cleaver instead of a scalpel.

It's a good safety check to make sure the adjustments are not unsupportable.

   >> VICE CHAIR ROTHHORN: I see you but want to ask a question of Mr. Adelson. We have a great suggestion to use the Presidential 16.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

Because the numbers are significantly different.

Here, this little precinct here, yeah, I'm guessing it could swing back and forth.

That's still a 10% over a 10% difference.

But the point being if the numbers are disparate that is probably how it has been for a few years.

>> VICE CHAIR ROTHHORN: Thank you Mr. Stigall and thank you for your patience and did you have something you wanted to share.

>> COMMISSIONER WEISS: Looking at percentages down there if I read this like in 65 in 2020 it was 497 for Biden.

But then you go to 2016 for Clinton it was 4943. It did drop a little.

I guess you answered my question.

But could it be in a particular District if we were to swap, let's say it's close, but then the next election it goes drastically one way and if we use that information doesn't that change what we are trying to do? .

>> MR. KENT STIGALL: That is why we keep an eye on the index.

All this is for is to kind of give you an idea what may or may not work.

Ultimately like Mr. Adelson was saying you keep an eye on these numbers.

For example, this one right here, you know, if I wanted to raise this number, I would move this District out because 40 I know is high on population.

If I wanted to lower this number, I would go and find a precinct that has the blue number on top this one or this one.

If I move this out of 40 it would lower.

That is a tiny precinct and probably wouldn't do much but that is the idea.

It just gets me pointed in the right direction.

>> COMMISSIONER WEISS: That answers my question, I was just curious.

>> VICE CHAIR ROTHHORN: Okay thank you. Thanks for that explanation, Mr. Brace did you have something to add to this?

>> KIM BRACE: Yes, the thing to keep in mind is that if you look at the overall election results, the 2016 election was the closest one of all three Presidential ones. So that gives you a much closer look at where a precinct might make a difference because that's the closeness that is there in the 2016 results.

It was not as close in 2020 or in 2012.

So it gives you some barometer.

But Kent is right, you need to ultimately look at the overarching composite to see whether you're really swinging the District, or not.

You could end up swinging it a little bit in a given election but really taking a look at what is going on, on the overall timetable is the key.

And keep in mind what I've always said to you, to all of you, is remember that matrix, that or not the matrix but the steppingstones that I've talked about early on is the

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

difference in terms of the composition and the votes takes place at each stage of the steppingstone.

So it will be different Presidential versus non-Presidential years and different in Presidential vote versus U.S. Senate vote or Governor's vote.

>> VICE CHAIR ROTHHORN: Thank you Mr. Brace.

Thank you very much.

And thank you for the reminder.

This is an instructive and useful session and want to go back to Commissioner Vallette to begin.

She is doing our plan deviation working on plan deviation.

We did right the area that we had chosen.

And by the way we are working towards 5% plan deviation we are 8.76 significant reduction from yesterday already so we are and we are in the area of 60.

I think you were suggesting Commissioner Vallette you were thinking about maybe a different area or do you feel you have enough tools that you may want to stay in this area? The floor is yours.

>> COMMISSIONER VALLETTE: Well, I do think that 65 was on our list. But.

>> VICE CHAIR ROTHHORN: 65 is not.

60 is.

>> COMMISSIONER VALLETTE: Okay.

>> MR. KENT STIGALL: 40 is also high.

>> COMMISSIONER VALLETTE: They are both high so I'm sorry I just don't understand this.

>> VICE CHAIR ROTHHORN: It's a lot of complexity.

>> COMMISSIONER VALLETTE: I thought I was confused before and you guys talked and I have no idea.

I kind of wish you would just talk English because I don't understand what you guys are talking.

>> VICE CHAIR ROTHHORN: Yes, it is a lot Commissioner Vallette would you like some assistance?

>> COMMISSIONER VALLETTE: Please.

>> VICE CHAIR ROTHHORN: General Counsel please.

>> MS. JULIANNE PASTULA: Good morning to the Commission.

First of all and Commissioner Vallette just for clarification are you asking for English as relative to the partisan data?

>> COMMISSIONER VALLETTE: I thought we were adjusting the population.

>> MS. JULIANNE PASTULA: Partisan data the usefulness the Commissioners will be able to see the break down by precinct so that if the Commission would like to make changes relative to partisan issues that that can happen.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> COMMISSIONER ORTON: Can we see the partisan spreadsheet on the bottom?

>> MR. KENT STIGALL: Yes, so just going by percentages, I think you need to be moderately careful about moving more democrats out of 65 than republicans.
If you want to maintain this differential.

>> COMMISSIONER ORTON: Wait, Zoom out.
Is it -- it's 40 we want to move out of.

>> MR. KENT STIGALL: Yes, ma'am, okay.

>> COMMISSIONER ORTON: Okay you can Zoom back in now.

>> MR. KENT STIGALL: I will zoom the top of it and we can work our way down if there is something you want to do. There again I would be more careful if you want to maintain this differential, you know, to move a bigger red number out than blue number.

>> COMMISSIONER VALLETTE: Can you go back up north?

>> COMMISSIONER ORTON: We don't want to be the highest.
How much population are we over? .

>> MR. KENT STIGALL: I believe it was 6,000.
No, yeah 5840, 3.5%.
I'm going to hit the info button on this precinct.
And quickly glance at the total pop. That's 1800 people.
You will be moving 1800 there.
You are moving 3,000 here.
This precinct has 3300.
This precinct goes all the way across the District so unless you are using blocks you wouldn't move the whole precinct.
That precinct has 2800.
All right I'll shut up now.

>> COMMISSIONER ORTON: Scroll back up and in a little so we can see again.

>> COMMISSIONER VALLETTE: Can you move north just a little? Okay so those two, the 568 and the 761.

>> MR. KENT STIGALL: Okay I'll do them one at a time if that is okay.
4,000 would be the next one.
That puts you 1.1%.
Now you can move you know 65 would have to move redistribute it to the neighbors.

>> COMMISSIONER VALLETTE: So can you put the one, the last one back into 40 and move the one north of that? .

>> MR. KENT STIGALL: Okay this last one I will put into 65.

>> COMMISSIONER VALLETTE: Put it back in for 40.

>> MR. KENT STIGALL: Put it back into 40.

>> COMMISSIONER VALLETTE: Yes, and move the one that says Detroit Metropolitan airport.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272          MICRC_007880

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> MR. KENT STIGALL: Okay here are the deviations for 40.

This number went down 1.5%, I think.

Deviations over all for 40 are still you know about 1% over.

So it looks to me like this District and this District, I mean precinct are about the same total population.

The difference is this has 761 blue votes.

This had 360 red votes.

This was the opposite basically.

935 red votes, 490 blue votes.

So when you took this one out it lowered the -- when you moved this District over here, it lowered this number.

When you moved this District.

>> COMMISSIONER ORTON: Our advantage.

>> MR. KENT STIGALL: Precinct over here it increased that number.

>> COMMISSIONER ORTON: So it looks like 65 needs population.

Is that in the area?

>> COMMISSIONER VALLETTE: It's right here.

>> COMMISSIONER ORTON: That is it.

So light no it's over so it needs to give population.

>> MR. KENT STIGALL: You have a few potential recipients.

For 56 and 67 can hold a chunk and 66 can still hold some.

Sorry I did that one.

62 can hold some.

So basically all these can hold some of the data.

>> VICE CHAIR ROTHHORN: Thank you Mr. Stigall Commissioner Eid did you want to try to get in too?

>> COMMISSIONER EID: I want to say taking the airport Detroit airport out of 40 we are creating this kind of weird strip in between Taylor and Romulus.

I don't understand why we.

>> VICE CHAIR ROTHHORN: We have a huge willow run airport and Detroit airport that is a huge community of interest they actually share.

Like the idea that one community of interest and another that is an economic community of interest that is wonderful potentially.

>> COMMISSIONER EID: Which airport.

>> VICE CHAIR ROTHHORN: Willow run and Detroit airport northwest of Belleville willow run airport.

>> COMMISSIONER ORTON: What is the population of 20? 20 is pretty much even so you could move some numbers there if you really wanted to and it is the -- it's you know 70% democrat so whatever you put in there is not going to really lower that, make a difference.

---

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

And if I remember correctly, we didn't sort of do the fine tuning so it is a District that was adjusted and I think because of partisan fairness.

&gt;&gt; COMMISSIONER CLARK: Let's go to 21.

Let me see where that is and I will choose between the two of those.

&gt;&gt; VICE CHAIR ROTHHORN: That is another VRA District with that shape it has to be.

&gt;&gt; COMMISSIONER CLARK: Color code that one VRA so then I guess I'll go back down to 61 and work.

So 61 is not a VRA District.

&gt;&gt; VICE CHAIR ROTHHORN: It's not.

It is partisan fairness District, a partisan fairness is what I was trying to say Commissioner Clark.

You may want to look at the, yeah, the adjustments and the electoral results.

&gt;&gt; COMMISSIONER CLARK: Yeah, let's do that right at first.

61.

&gt;&gt; VICE CHAIR ROTHHORN: And it's not, yeah.

You got some freedom.

I think if you stay out of 40 and 60 you may be.

&gt;&gt; COMMISSIONER CLARK: Yeah, I'm not going to touch 40 and 60.

I think if we move a little further west and I hate to do this, then we will be probably moving, geez, then we would be moving -- now we got 61, we got overpopulated.

So we need to take some off of that.

&gt;&gt; VICE CHAIR ROTHHORN: Almost 4,000.

&gt;&gt; COMMISSIONER CLARK: Yeah, so, good.

Okay let's work on -- well, let's work on that and then we will see what happens with the partisan fairness.

So where is 65? It needs a few.

And where is 62, it needs a few.

And not a whole lot and then 61 we have to shed 4,000 thereabouts.

Okay, so let's start the furthest west District.

&gt;&gt; MR. KENT STIGALL: I'd like to point out that 63 can hold some too if you decide to smooth it across.

I suggest looking at the whole region because 71 if you make this all perfect and 71 you have to modify, because it's high so 71 could go to 63, so if you keep your changes over in here you will be good over there.

&gt;&gt; COMMISSIONER CLARK: Yeah, I think so too.

I mean 66 is just a spec high too so.

Let's move that the furthest the pink one the furthest one north and then 61 is let's add that to 62.

&gt;&gt; MR. KENT STIGALL: This Township there?

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> MR. KENT STIGALL: It's all of it then.

I got it.

>> COMMISSIONER EID: Okay let's move to the bottom of District 2.

Let's switch so we are in voting precincts now let's switch back to Townships.

And let's go Romulus, South Gate and Wyandotte into District 1.

So it's that part, uh-huh.

>> MR. KENT STIGALL: This entire Township?

>> COMMISSIONER EID: That entire Township.

>> MR. KENT STIGALL: Into District 1.

>> COMMISSIONER EID: Into District 1, yes.

And then to the right both South Gate and Wyandotte.

>> MR. KENT STIGALL: South Gate.

>> COMMISSIONER EID: And Wyandotte both into District 1.

Okay, now north of Romulus do you see Wayne? .

>> MR. KENT STIGALL: Yes.

>> COMMISSIONER EID: Let's assign that into District 1.

Now, let's see, can we Zoom out and see where we are at? Okay, so now we need to adjust for both population and for VRA to make the percentages closer to what we have to do according to our analysis.

So.

>> VICE CHAIR ROTHHORN: Commissioner Eid I want to acknowledge what you are doing is helping us -- I guess help us know maybe walk us through some of the communities of interest that you said you wanted to give Detroit a different alternative. Do you have sort of in mind some of the communities you are doing or just partisan fairness?

>> COMMISSIONER EID: I did not look at partisan fairness when doing this until after it was already drawn.

And ran the numbers on.

No in my opinion Southfield is closely aligned with Detroit.

And also Troy is more closely aligned with the rest of Oakland County than it is with Macomb County.

We've also by adding Warren back into Macomb County we kept Warren with Macomb County.

So I think that it is a community of interest that's -- we also added Romulus where the Detroit Metro airport is located in a District back with Detroit.

And added a couple of Down River precincts sorry Down River Townships which are the Townships more closely aligned with Detroit than Monroe Down River which we've also heard about in the house map we already looked at.

But we added the ones that are more closely associated to Detroit back with Detroit.

So I think it really helps Oakland County.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

I think it helps Wayne County and Macomb County to have a configuration that is similar to this.

>> VICE CHAIR ROTHHORN:  Thank you.

>> COMMISSIONER EID:  That is just my opinion.

I want to give the public a choice so they can tell us.

>> VICE CHAIR ROTHHORN:  Thank you for helping me understand the changes I appreciate it.

>> COMMISSIONER EID:  There are negatives and pros and cons to any decision we make is I think it does put some of the Yemeni and Bengali community that was in District 6 it takes them out of 1 and puts them into 6.

However I think that communities acknowledged that it's a spread out community.

And we still will Hamtramck and the surrounding areas of Hamtramck in District 1 here.

Which I think is a good compromise.

>> VICE CHAIR ROTHHORN:  Okay thank you Commissioner Eid.

Continue are those all the changes?

>> COMMISSIONER EID:  This is the general gist of it, the other changes are for VRA and making the population okay.

So let's make the population okay first.

So let's Zoom up.

We are going to go in between districts 6 and 10 right now.

>> MR. KENT STIGALL:  6 and 10.

>> COMMISSIONER EID:  A little further so you see Oakland.

Okay put all of that in ten.

So we are.

>> MR. KENT STIGALL:  All in ten.

>> COMMISSIONER EID:  We are not splitting Oakland Tony more.

Okay and now let's take that to the left.

White Lake and Highland can we go south a little bit? .

>> MR. KENT STIGALL:  Repeat that.

>> COMMISSIONER EID:  Zoom out and go right, yep, perfect.

So where are we?  The font is a little small so it's a little hard to read.

>> MR. KENT STIGALL:  I will enhance that so it's a little more legible.

>> COMMISSIONER EID:  Wonderful 7 is what I was looking at.

So do you see where 7 is on the border of Northville and Novi?  So we are going to put Northville into 7.

>> MR. KENT STIGALL:  Northfield.

>> COMMISSIONER EID:  That is part of 3.

>> MR. KENT STIGALL:  Okay.

>> COMMISSIONER EID:  Northville and also supports a community of interest.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                    MICRC_007933

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

We heard a lot of Ann Arbor associating with the more highly educated parts of Oakland County so we are going to go specifically Novi so we will go in a little bit of Novi to get the correct population.

>> MR. KENT STIGALL:  Do we take the town?

>> COMMISSIONER EID:  Take the town.

So now we are going to go into Novi but let's go to the precinct level.

>> MR. KENT STIGALL:  Okay.

>> COMMISSIONER EID:  Let's switch to voter precincts because we need to add a little bit more into 7.

So we are going to take 1591, 2436.

>> MR. KENT STIGALL:  2346.

>> COMMISSIONER EID:  2346 and go across to the right.

>> MR. KENT STIGALL:  Like that?

>> COMMISSIONER EID:  Like that.

Just deselect 2886 now assign that to 7, please.

So that population is within 0.

Okay, now let's look at District 3.

We are going to look at Commerce Township.

So it's north of Novi.

Perfect.

We are going to put more of Commerce Township into District 3.

Than it currently is in either map.

So we are going to take that precinct, 3107, 2966, 2539, 3519.

>> MR. KENT STIGALL:  The precinct.

>> COMMISSIONER EID:  2109, that's fine.

2284.

Yep, and those are going to be in six.

And then the rest is going to be in ten.

Can you Zoom out?  I think we are missing one.

Oh, the top one as well.

Yep, that one.

>> MR. KENT STIGALL:  That puts 3 within 37 people.

>> COMMISSIONER EID:  Wonderful.

Let's look at District 10.

District 10 is short 5,000.

Let's Zoom out slightly.

We can see where that is.

Okay, so Washington Township that one, yep, the one to the north, we are going to take the top three precincts off of there and put them into ten.

Perfect.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

Let's move down to the bottom of this and the southern line between 2 and 3 do you see those precincts.

>> MR. KENT STIGALL:  2 and 3 or 1 and 2?

>> COMMISSIONER EID:  1 and 2 you are in the right spot all of the precincts there all of those put them into one.

And the two to the left of it put it in one.

And then the couple of precincts right above Wayne, those you see that strip?  Yep.

We are just going to square it off.

>> MR. KENT STIGALL:  All four of these?

>> COMMISSIONER EID:  All four of them.

Okay, so one and two are good.

There is something going on with six.

It's between six and ten.

>> VICE CHAIR ROTHHORN:  Your plan deviation looks pretty good.

>> COMMISSIONER EID:  It's go about to get a tad bit better.

>> MR. KENT STIGALL:  A moment ago you said it's good for now and looking in the area.

>> COMMISSIONER EID:  Deviation is between 6-10.

>> MR. KENT STIGALL:  You can swap or split the difference, yep.

>> COMMISSIONER EID:  One moment.

Let me just rebuild the plan on my end because something is not adding up.

>> MR. KENT STIGALL:  These are total population numbers and I don't know if you recognize the number.

>> VICE CHAIR ROTHHORN:  Commissioner Eid earlier you were asking for other Commissioners to help.

Do you want help now or do you want thoughts?

>> COMMISSIONER EID:  So this is the general gist of it.

We can look at six and ten and adjust a few Counties here and there to get the overall population down.

But this is the gist of it as close enough to the final version.

That is in my head to work.

So I don't know if we want to run the numbers first and then I do want to get Commissioner Clark's opinion because I know he had a configuration that looked awfully similar to this one.

But yeah, like I said I think this is really helps Oakland County.

I think it helps Wayne County by including Southfield and Detroit.

We have Commissioner Kellom on as well and I would love to see her thoughts on it.

>> VICE CHAIR ROTHHORN:  Commissioner Witjes has a thought, no.

So Commissioner Clark, Commissioner Kellom?  Any thoughts?  I cannot see your videos if you are giving indication.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                    MICRC_007936

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

Because he is from the Detroit area that is my understanding is he is trying to give us an alternative collaborative map so may I suggest right now that we have two things we want to do and look at the partisan fairness numbers and VRA District.

So let's look at VRA and make sure we do have the districts drawn and Commissioner Eid do you want for walk us through that?  Have you looked at that?

&gt;&gt; COMMISSIONER EID:  The districts that we drew on the base map were at about 52%.

So we have District 2 here that includes part of Oakland County so I think it would be appropriate to cushion that a little bit because Oakland County according to Dr. Handley was 42-43%.

This gives it less than a 2% cushion at 44.9%.

And I think for District 1, 43.6% is pretty darn close to about 41-42% we had before.

But I'm not a VRA expert if our expert would like to comment and maybe you know what we have been doing is looking at election results.

And we can.

Now would be an appropriate time for feedback on that.

&gt;&gt; VICE CHAIR ROTHHORN:  Mr. Adelson is not in the room at the moment but we could General Counsel do you want to weigh in?

&gt;&gt; MS. JULIANNE PASTULA:  Certainly thank you so much Mr. Chair.

So Mr. Adelson stepped out for a meeting and will be returning shortly.

Prior to the partisan fairness the VRA any of those considerations, the plan deviation of .47% the justifications for that would need to be extraordinarily clear.

Because the previous plan was at .18 deviation and remember this is Congressional.

So we are down to one person one vote.

So I would -- or if you would like to run the numbers to just get a sense of what they are for partisan fairness but I did want to flag the plan deviation.

&gt;&gt; VICE CHAIR ROTHHORN:  Thank you for that.

&gt;&gt; COMMISSIONER EID:  Can I fix that real quick.

&gt;&gt; VICE CHAIR ROTHHORN:  Please do.

&gt;&gt; COMMISSIONER EID:  Let's look at the one Township we were looking at.

Washington Township.

We are just going to take a little bit more of that and put it in ten.

Do you see where that part Juts up is right there.  We will put that into ten.

The other way.

&gt;&gt; MR. KENT STIGALL:  That into ten?

&gt;&gt; VICE CHAIR ROTHHORN:  Commissioner Eid?

&gt;&gt; COMMISSIONER EID:  I'm sorry six is too low.

&gt;&gt; MR. KENT STIGALL:  Six is lower ten is higher so you need to do the opposite of what you were looking at.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

We will eventually we are fixing I think Anthony is fixing right now the plan deviation then we look at VRA then partisan fairness then he will try to get it back to you Commissioner Clark.

>> MR. KENT STIGALL: All of that area is 2200.

We can remove some of it or whatever.

>> COMMISSIONER EID: Assign it for now then we can remove some.

Okay this brings it down to 0.2.

>> VICE CHAIR ROTHHORN: 0.2 yes.

>> COMMISSIONER EID: Yeah, so let's run it or do we want a VRA analysis or do we want to run it until we get there first.

>> VICE CHAIR ROTHHORN: Let's look so I think the VRA it's one and two, right, you have already talked about 43% we are within the Black voting age population but should look at particular District 2 where Middle Eastern north African right we want to look at that election results from the El-Sayed primary to make sure District 2 still has an opportunity to elect.

That is probably the most significant.

>> COMMISSIONER EID: And the other one did that, did the District 2 as drawn have that? I don't recall that it did.

>> VICE CHAIR ROTHHORN: It's taxing my memory at this point too.

I don't know either.

Commissioner Witjes?

>> COMMISSIONER WITJES: I suggest we run partisan fairness and we wait to do this particular piece until Dr. Adelson is in the room.

>> VICE CHAIR ROTHHORN: How you feeling Commissioner Eid?

>> COMMISSIONER EID: I agree.

We can wait.

He is the expert and would rather get his advice directly.

>> VICE CHAIR ROTHHORN: Okay. So sorry, Mr. Stigall we will one the partisan fairness.

Thank you.

>> MR. KENT STIGALL: Here is your lopsided margin advantage is 4%.

>> COMMISSIONER EID: Okay do you mind if I kind of go through this? Like we did yesterday? So I have the numbers for the base collaborative map too in front of me that is map 200 on the portal.

10-05-21V1CD number 200 again.

So lopsided margins test for that one was 7%.

With only changing Detroit and not touching the west side of the state at all.

It's down to 4%.

Let's move on to mean median difference.

So this went from 3.5% to 2.2%.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

Let's move on to the next one efficiency gap, so that went from 8.7 to 0.8%.

Seats votes ratio this was 6.2% with 6 democratic seats and 7 republican seats.

It's flipped to 1.5% with 7 democratic seats and six republican seats.

So all four of these measures still favors republicans.

It's just much closer to 0 than it was before.

>> VICE CHAIR ROTHHORN:  Commissioner Orton?

>> COMMISSIONER ORTON:  How can you say they all favor republicans there are more democratic seats than republican seats?

>> VICE CHAIR ROTHHORN:  The other margins he was suggesting the seats votes ratio I think is the majority is reflected in the number of seats.

But the efficiency gap, the mean median difference and lopsided margin leans republican.

Do you want to show those again?  Do you want to walk us through that again?

>> COMMISSIONER ORTON:  I understand that but he said all of these.

And this one does not.

>> VICE CHAIR ROTHHORN:  Got it thank you.

>> COMMISSIONER EID:  From my understanding of the measure that one does too because it still takes democrats 1.5% more votes to win a seat than republicans.

>> COMMISSIONER ORTON:  General Counsel could you explain that? I thought it was explained differently.

>> MS. JULIANNE PASTULA:  My apologies through the Chair to Commissioner Orton.

Can you -- Commissioner Eid can you restate, make the statement again and I can clarify.

>> COMMISSIONER EID:  I had stated that all four of the measures still favor republicans.

My understanding of the seats to votes ratio is that in this case the seat share basically what it means is to get an equal number of seats the democrats need 53.8% even though they get 52.3% of the vote.

And the difference is 1.5%.

Which is what it says in column K.

>> MS. JULIANNE PASTULA:  So you're referencing the bias the proportionality metric in column K to make assumption.

>> COMMISSIONER EID:  That is my understanding of how this metric of the floor worked.

>> MS. JULIANNE PASTULA:  So the clarification would be, again, that --

Commissioner Orton, I'm not able to extrapolate that data from this.

It's my understanding of the golden rule of seats versus votes is that the -- is again the party that receives the majority of votes that should be reflected.

And a small gap is okay.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

We can look at the date on this plan by opening it and running the partisan fairness and what other reports?

&gt;&gt; VICE CHAIR ROTHHORN:  Let's start with partisan fairness.

&gt;&gt; MR. KENT STIGALL:  Okay, so here it is I'm going to leave this file right here. We can come back to it.

Just let me save this, no, so I will close it down out of the way so I will save this right here and open up the working plan, the plan we will work on or somebody is going to work on.

&gt;&gt; VICE CHAIR ROTHHORN:  That would be Commissioner Kellom.

&gt;&gt; MR. KENT STIGALL:  As she makes edits, we can run them and compare them side by side.

&gt;&gt; VICE CHAIR ROTHHORN:  Roth very good.

And we were trying to be methodical and have been up to this point.

Will you help us remember, Mr. Adelson, what our method is and how we adjust for partisan fairness?

&gt;&gt; MR. BRUCE ADELSON:  Be happy to.

Should we wait until we see the numbers or should we do that now?

&gt;&gt; VICE CHAIR ROTHHORN:  I guess we have the numbers up and they were going to be there for comparison but that is how we start, right?  So let's walk through the numbers there.

Do you want to walk us through Mr. Adelson.

&gt;&gt; MR. BRUCE ADELSON:  5.7% lopsided advantage.

We are not comparing this to another plan.

We are just looking at it in isolation.

&gt;&gt; VICE CHAIR ROTHHORN:  This is our base line.

&gt;&gt; MR. BRUCE ADELSON:  Let's go to the mean median difference.

3.4%.

Efficiency gap.

6.2%.

Yes.

The Senate seats ratio.

So this shows 50/50 proportionality bias about 2.3% and in line with the vote shares about 52% democratic and about 48% republican.

&gt;&gt; VICE CHAIR ROTHHORN:  They are consulting.

&gt;&gt; CHAIR KELLOM:  I see.

&gt;&gt; MS. JULIANNE PASTULA:  Mr. Stigall, may you please leave seats votes up while we carve uncle?  Thank you.

&gt;&gt; VICE CHAIR ROTHHORN:  They are not consulting they are carbunkling.

&gt;&gt; COMMISSIONER CLARK:  Is that a legal term MC?

&gt;&gt; VICE CHAIR ROTHHORN:  Apparently.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                    MICRC_007956

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> MR. KENT STIGALL: So this is a starting point if you want to start.

And this column is not supposed to be there.

There, that makes a whole lot more sense.

>> COMMISSIONER KELLOM: Okay.

>> MR. KENT STIGALL: 2434.

>> CHAIR KELLOM: Was somebody going to say something it sounded like it.

>> VICE CHAIR ROTHHORN: You have the floor.

>> CHAIR KELLOM: Kent can we go back to what is happening? Never mind.

I don't have to ask.

Can we go back to the map so I can see where the districts are? .

>> MR. KENT STIGALL: So what I did was the plan I downloaded and it was the base map for the Senate I put a tag name on it so two days from now or whenever I'm back here this is the plan y'all completed and chose to start this plan with.

So this plan is a copy of that as of right this moment.

Okay and here is the plan that is a copy of the base Senate District map.

And where do we start?

>> CHAIR KELLOM: Can we Zoom in just a little bit.

I'm warning to say District 7 but I'm not sure.

>> MR. KENT STIGALL: I will just Zoom to it and if you want to look at it, we will do it. District 7 is on Lake St. Clair.

>> CHAIR KELLOM: Where is the other one 2434.

Okay and what's -- can you Zoom into 16? .

>> MR. KENT STIGALL: District 16?

>> CHAIR KELLOM: Uh-huh.

>> MR. KENT STIGALL: Is north of Detroit Rochester Hills.

>> VICE CHAIR ROTHHORN: Commissioner Kellom we do have the tool that allows us with the democrats, republicans, the single vote excuse me the elections, the results of a single election.

I'm not sure if I'm making it clear what -- are you aware of that tool that we have now?

>> CHAIR KELLOM: Let me see it then I will say "Yes" or "No."

>> VICE CHAIR ROTHHORN: I think Kent is bringing it up right now.

>> MR. KENT STIGALL: We have been doing the 2016 Presidential.

>> VICE CHAIR ROTHHORN: Yes.

>> MR. KENT STIGALL: So there is the two, it's the democrats and the republicans. They will be in the representative color of blue and red.

The higher number whichever gets the most votes will be the top digit displayed.

In this case we are looking at just this is County.

So it's 343087 democrat votes, 289136.

As we Zoom in, it will put this similar number up for the precinct.

So this precinct had 902 red votes.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> COMMISSIONER CLARK: There is more population down at the lower one.

>> CHAIR KELLOM:

>> COMMISSIONER CLARK: I'm not sure because the other precinct is bigger, yeah.

>> VICE CHAIR ROTHHORN: Go ahead Mr. Stigall.

>> MR. KENT STIGALL: This highlighted has 2200. This had essentially 2500. And also went over, it's 2300, so only 150 people difference between that and that.

>> CHAIR KELLOM: I'm indifferent as to which up we take to be completely honest. I will take the smaller one just for the fact of esthetic.

>> COMMISSIONER CLARK: Our objective to make a lakeshore District here, so and we don't want to go too far toward the Lake.

So either one is fine.

>> CHAIR KELLOM: All right.

>> MR. KENT STIGALL: Very small changes, tenths of a percent.

Senate districts are fairly large and move a larger number of people to affect percentage change.

>> VICE CHAIR ROTHHORN: Commissioner Orton?

>> COMMISSIONER ORTON: Could we see the active matrix for two to see if Brittini could move some of 7 in 2 and grab a little more of six.

It's already pretty high.

>> MR. KENT STIGALL: To is higher and six is.

Well you can move if you move two into five it's probably not going to be what you want to see.

These are all red precincts, not that this is one election, not that one election tells the tale.

>> COMMISSIONER KELLOM: What if we took more of the mount Clemens area?

No, don't touch that, okay.

>> MR. KENT STIGALL: The mount Clemens area from what I can see and one of the other Commissioners couple point it out the blue numbers on top means there is more blue votes in there than red.

So.

>> CHAIR KELLOM: I don't know how I completely didn't even, okay.

So that is not an idea.

You were saying pulling some of two into five.

But.

>> MR. KENT STIGALL: Putting an eyeball on it they are all red precincts so I would expect putting them this here would drive the percent, it would make it more red than blue.

Which may not be what you want to do.

>> VICE CHAIR ROTHHORN: The wrong direction.

>> CHAIR KELLOM: I don't want to do that.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> COMMISSIONER ORTON:  I don't think five was close though so maybe it does not matter so much with five.

>> VICE CHAIR ROTHHORN:  We are working on 7 aren't we, yes because I had… forgive me, I forgot we are not working on five but working at the population with five, not necessarily the partisan fairness level is that accurate.

Does that make sense to you Commissioner Kellom?

>> CHAIR KELLOM:  It does, I just didn't want to completely make five like a dumping District and disregard what is happening with five.

In the interest of being concise let's move some of -- let's assign that lower portion the southern portion of two to five.

Head north where we were my apologies.

>> VICE CHAIR ROTHHORN:  Border of two and five.

>> CHAIR KELLOM:  And areas with the higher red numbers let's take that up to the blue line maybe and we may not need to take all of it.

>> MR. KENT STIGALL:  This is 1700 people that is 2300.   I'm just kind of bouncing through them.

That is almost 5,000.

1800.

>> VICE CHAIR ROTHHORN:  Looks like you want to move about 2000 maximum to split the difference.

>> CHAIR KELLOM:  Bigger was 559303 what is that? .

>> MR. KENT STIGALL:  That is 2100.

2174 excuse me.

>> VICE CHAIR ROTHHORN:  Worth a shot.

>> CHAIR KELLOM:  Then I mean that is the one that I will be reassigning, Kent, okay.

>> MR. KENT STIGALL:  So now two is less than 1% over, five is 2.17% under.

>> VICE CHAIR ROTHHORN:  You positively affected the plan deviation so we are heading in the right direction so how are you feeling.

We are close to a break time around 4:00.

>> COMMISSIONER KELLOM:  If you want me to finish, we can.

If you want to take a break, I'm indifferent to either choice honestly.

>> VICE CHAIR ROTHHORN:  Go ahead Commissioner Orton.

>> COMMISSIONER ORTON:  I think you are heading in the right direction and keep on going if you want.

>> CHAIR KELLOM:  Okay, all right, so we need more of what now, what is happening?  We need to put some more folks in five.

>> VICE CHAIR ROTHHORN:  And to sort of I think our goal was to work on the partisan fairness in District 7.

>> CHAIR KELLOM:  Exactly.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                    MICRC_007966

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> VICE CHAIR ROTHHORN: So did we achieve that? I think we were moving in the right direction.

>> CHAIR KELLOM: It's close and it needs more blue.

>> VICE CHAIR ROTHHORN: It needs more blue and that may be where you want to stay focused or less red.

>> CHAIR KELLOM: Uh-huh and trying to keep in mind with Commissioner Clark what he said about maintaining the lakeshore District so I don't want to touch. I could say get rid of 591 and 676, put that in District 5. But I don't know without others chiming in if that is necessarily the best choice for that.

>> VICE CHAIR ROTHHORN: Commissioner Orton.

>> CHAIR KELLOM: That is why I'm being silent.

>> VICE CHAIR ROTHHORN: You get a thumbs up 591 and 676.

>> CHAIR KELLOM: Those are the two I was thinking. So you can add that as sign that to five, Kent, please.

>> VICE CHAIR ROTHHORN: Commissioner Clark?

>> COMMISSIONER CLARK: I was just going to suggest that as well so I think we are on the right track.

>> CHAIR KELLOM: Okay.

>> MR. KENT STIGALL: Glancing over back at it you are almost at 50/50.

>> VICE CHAIR ROTHHORN: Keep on trucking.

>> MR. KENT STIGALL: And 7 is 1.13% low and 5 is getting better. So did you say assign 676 to five.

>> CHAIR KELLOM: I did, I did.

>> MR. KENT STIGALL: 7 is at 2% low. That is one election so it may somewhere along the line balance what this is.

>> VICE CHAIR ROTHHORN: Commissioner Orton?

>> COMMISSIONER ORTON: So the performance index we are looking at is not just including that one election.

>> VICE CHAIR ROTHHORN: Composite.

>> MR. KENT STIGALL: More of.

>> COMMISSIONER ORTON: So we just need to take more from six at the bottom, I think, and funnel it up a little more and see what happens. See if we can do it.

>> COMMISSIONER KELLOM: Kent, you can add that little curve 334, 356, 289, 459, like kind of go in the area.

>> MR. KENT STIGALL: Do it one at a time?

>> CHAIR KELLOM: Yes. I was naming the numbers to get you in the right spot.

>> MR. KENT STIGALL: Looks like a highway and I will use that as a border. And six is starting to get a little lower. Now six is 1.5% low and 7 is 1.33.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

So we looked at focused minority matrix and I mean on any given day that is a 50/50 District probably.

>> CHAIR KELLOM:  That would be my version as close as I'm going to get but I will have to see what other folks have to say.

Commissioner Orton I know you were giving me that.

>> COMMISSIONER ORTON:  You knew I had my mic on.

To help our numbers on our map which is what we are going for we have to actually get it to flip to 50.01 at least so we got to keep going.

>> VICE CHAIR ROTHHORN:  Commissioner Eid?

>> COMMISSIONER EID:  I don't know in this helps it might or might not.

>> CHAIR KELLOM:  Take those Kent, go ahead Commissioner Eid.

>> COMMISSIONER EID:  Commissioner Szetela e-mailed us last night with a few edits to this collaborative plan that she says does what we are trying to accomplish. Now she is not here today.

But maybe we could do an overlay and see what those changes are and see if we want to apply them and if they do work.

I don't know so I don't know if it's these changes in 7 or 5 but and got it on this one at 6:30.

>> CHAIR KELLOM:  I'm not opposed to doing that if it's okay and there is not some weird clause we don't know about and maybe presenting another Commissioner's work. But I'm not opposed to exploring that suggestion.

I'm just more interested in what will get us to the numbers we are looking for but also makes most sense visually in keeping all the other criteria that we have in mind.

That is my one voice opinion.

>> VICE CHAIR ROTHHORN:  Go ahead Commissioner Kellom and you did ask Kent to assign those to districts.

>> CHAIR KELLOM:  The ones I was taking advantage of seeing his cursor like take those and see what happens.

>> MR. KENT STIGALL:  Move 2100 people.

>> VICE CHAIR ROTHHORN:  It was further north.

>> MR. KENT STIGALL:  873, 2700 people.

>> VICE CHAIR ROTHHORN:  Commissioner Eid maybe what I will suggest is maybe we can ask when we have our break because we are going to try to take a break soon then we can talk about the downloads not during the break but we will talk about it and take the time to do the download.

>> MR. KENT STIGALL:  Now our 7th direction is 2.39% low.

5 is a solid .46% high.

And minority race now it just really seems like we need to move chunks to do basically 1% of the Senate District is basically 2650 total population which would mean roughly

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> COMMISSIONER EID: If Commissioner Kellom would like me to I would.

>> CHAIR KELLOM: Come on, please, this is too much.

>> COMMISSIONER EID: Base collaborative Senate map we started with had a lopsided margin test of 5.7%.

These changes bring it to 4.5%.

Let's look at mean median difference next.

The original plan was at 3.4%.

This is now at 2.2%.

Let's look at efficiency gap.

That was at 6.2% previously.

Now does that say 3.4%?

>> CHAIR KELLOM: It does.

>> COMMISSIONER EID: And finally the seats to votes ratio was previously at 2.3% with having an 18 democratic seats and 18 republican seats.

That is down to 0.3% with 20 democrat seats and 18 seats.

>> VICE CHAIR ROTHHORN: I think you men 19 and 19 instead of 18 and 18.

>> COMMISSIONER EID: That is what I meant thank you.

>> VICE CHAIR ROTHHORN: Thanks Commissioner Eid and .3% that is where we are at.

How would you like to proceed Commissioner Kellom?

>> CHAIR KELLOM: Proceed in vain that acknowledges because I know other Commissioners might have had thoughts based upon partisan fairness numbers because there were others that wanted to see the numbers so it's my turn but I want to move in a way that has consensus on what is the right direction to go.

>> VICE CHAIR ROTHHORN: Is there any discussion Commissioners, any thoughts how Commissioner Kellom can proceed.

>> CHAIR KELLOM: I said I was going to use Chair Szetela's lines to guide 7 and maybe the movement with five.

>> COMMISSIONER EID: I believe Commissioner Lett had his hand up first.

>> COMMISSIONER LETT: I agree with Commissioner Clark and Commissioner Szetela's plan is an individual Commissioner plan and should be viewed that way if certainly there is no reason that Commissioner Kellom cannot use part of it as guidance, I would also like to see the percentages, the population percentages so that we can see exactly what it is we have seen the partisan fairness we need to go back and look at the rest of the figures that we always look at, maybe they are so far out of whack we can't use them and I doubt that is the case.

It has plan deviation of 4.93.

>> VICE CHAIR ROTHHORN: For the Senate is under the 5% mark is that what we were looking for 5% okay so it's within sort of our range and I think we had is that what you wanted to sort of look at.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272          MICRC_007973

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> COMMISSIONER LETT: The usual stuff we look at.

>> VICE CHAIR ROTHHORN: The Polsby Popper are you thinking compactness? I think it's partisan fairness and plan deviation and VRA. So maybe just VRA then move to Commissioner Eid then Clark so let's look at the VRA.

These are for -- which districts? I guess Mr. Adelson can you help us walk through or do you have -- how can we best proceed to do VRA analysis on this map that is from Commissioner Szetela?

>> MR. BRUCE ADELSON: Look at 6 the results for 6 and 8, please? .

>> MR. KENT STIGALL: District 6, District 8 and 6 is 65 percentage democrat, District 8 is 79% democrat and by the years Biden Trump 2020, 63% Biden, 36% Trump.

In District 6, District 8 is 79% Biden, 21% Trump.

I guess 2012 we have Obama with 70% in six, 84% in eight.

Romney is 30%.

And 16%.

Peters 64. James 36 in District 6. In District 8 it's 79% Peters.

21% James.

Stabenow was 65% in District 6.

78% in District 8.

James was 36%.

And District 6, 21% in District eight.

So District 8 Whitmer is 70%.

Schuette was 31%.

Whitmer was 55 percent and District 6 Schuette was 44%.

44.5%.

In District 6.

Dillard was 43.25%.

Johnson was 57% in District 6, District 8 Dillard was 58%.

And Johnson was 41.6.

>> MR. BRUCE ADELSON: So the elections for six and eight the margins are particularly in eight are narrower than their comparable districts we have seen previously.

The biggest exception I see is in District eight, the…could you go to the end? Thank you.

Secretary of State race that is one of Dr. Handley's bellwether elections.

This, that -- in that election, I'm getting confused.

>> MR. KENT STIGALL: Did I read the wrong line highlighted there is District 8.

>> MR. BRUCE ADELSON: So go to the end.

>> MR. KENT STIGALL: 76% Dillard, 24% Johnson.

>> MR. BRUCE ADELSON: That is in 8.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

I'm glad that you explained that because.

>> VICE CHAIR ROTHHORN: I think it was six that was more narrow.

>> MR. BRUCE ADELSON: Six is narrow and I was looking at 7.

>> MR. KENT STIGALL: When I scrolled, I got of line and margins narrower than other plans we have seen but all bellwether elections prove out where the candidates of choice perform so this District does appear to both districts appear to afford minority candidates of choice or minority voters, the opportunity to elect candidates of choice. The only difference from previous iterations is the margin is narrower.

Which is I just point that out observationally rather than opining whether that is determinative.

The margins are still pretty big even though they are not as big as in other plans.

>> VICE CHAIR ROTHHORN: Are those the only districts to do VRA analysis on?

>> MR. BRUCE ADELSON: I was trying to get a handle on this just looking at some representative District but we can certainly look at additional ones to get a clear idea. Why don't I look at 19.

And 17, please.

This is 19.

>> MR. KENT STIGALL: Before we even start looking at them, I'm trying to get it all lit up.

So that line right there is 19.

So I'm going to do just Biden.

I mean just direction 19 all the way across.

74% Biden.

26% Trump in 2020.

And 2012 Obama got 75% while Romney got 25%.

Peters I'm getting ready to mess up again, Peters 75% James is 25%.

Stabenow is 75%.

James is 25%.

Whitmer was 75%.

Schuette was 25%.

Dillard was 62%.

While Johnson was 38%.

That was for 19.

>> MR. BRUCE ADELSON: Look at 17.

>> MR. KENT STIGALL: Or reverse order? We are back now so we have a large democrat margin or republicans index wise.

70 Biden 30 Trump in 20.

80% Obama, 20% Romney.

In 12.

Peters in 20 and for the Senate race had 75%.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272          MICRC_007975

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

While James had 25%.

>> VICE CHAIR ROTHHORN:  You want to be on 17.

>> MR. KENT STIGALL:  Here I go again, you know.

Maybe this is just too complex for me.

>> VICE CHAIR ROTHHORN:  You're doing great Mr. Stigall.

>> MR. KENT STIGALL:  All right 17 so Peters is 70, James is 30%.

Stabenow is 71%.

While James was 29% in 2018.

Governor's race Whitmer at 73% and Schuette had 27%.

And for Secretary of State it was 71% Dillard or 72%.

Compared to 28 for Johnson.

>> MR. BRUCE ADELSON:  Thank you.

The same is with the previous District the election results are across the board show significant margins for the minority candidates of choice.

So this District based on just what we looked at does seem to give minority voters the opportunity to particularly buy voters the opportunity to elect candidates of choice.

>> VICE CHAIR ROTHHORN:  All right and with that we said, okay, is that sort of a VRA.

>> MR. BRUCE ADELSON:  That is a VRA let's put a check on it and move on to our next assignment.

>> VICE CHAIR ROTHHORN:  That was Commissioner Lett's question and Commissioner Eid then we will get to Commissioner Clark.

>> COMMISSIONER EID:  Okay so two things.

One I would ask if we can look at 19, 10 and maybe 9 at El-Sayed primary.

I'm not sure if we did or not.

>> VICE CHAIR ROTHHORN:  Do you have your mic on I can't hear you very is well.

>> COMMISSIONER EID:  We should look at the primary election data for the El-Sayed election for 19, 10 and perhaps nine.

We may have done that already but I'm not sure.

>> VICE CHAIR ROTHHORN:  I don't remember.

>> COMMISSIONER EID:  What I was going to say I think if Commissioner Szetela were here today she would use her turn to incorporate some of this into the collaborative map.

So going forward since the data is better and since it still seems not to mess up communities of interest, we already identified I think we should look at the collaborative map and use the overlay to configure it this way and be done with it.

>> VICE CHAIR ROTHHORN:  Commissioner Orton?

>> COMMISSIONER ORTON:  I don't agree with that, there are a lot of changes and unless we want to digest all of this, I think it should be a separate her map.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

The distinction between subsection 14 is when you are able to do that at the final stages of your work those maps are submitted for the Commission's consideration.

So they are treated differently at this stage of the process and later in the process.

You may submit an individual map at this stage under subsection nine and again under subsection 14 it's how they treated in the process are slightly different and I wanted to make sure the Commissioners were aware of that because there has been quite a bit of conversation over the last day and a half in regard to individual and collaborative maps.

>> CHAIR SZETELA: So it's your position that they could submit two?

>> MS. JULIANNE PASTULA: You can submit one plan for each type.

>> COMMISSIONER LETT: That is one.

>> MS. JULIANNE PASTULA: Under subsection nine and under subsection 14 they can submit a plan for the Commission's consideration.

>> COMMISSIONER LETT: That is two.

My interpretation if they submit one now that carries over to 14.

They can only submit one plan.

>> MS. JULIANNE PASTULA: Mr. Chair.

>> VICE CHAIR ROTHHORN: You have the floor if you want to respond.

>> MS. JULIANNE PASTULA: I would.

That is a very interesting statement.

And I would like to report back to the Commission on that.

Thank you, Commissioner Lett.

>> VICE CHAIR ROTHHORN: Thank you.

It is Commissioner Kellom's turn and her hand is raised.

But we did not actually get to Commissioner Eid's request, which was to review 9, 19 and 10 for the gubernatorial was it gubernatorial? Elections the primaries.

Thank you, Mr. Stigall, for bringing that up.

Do we know which District you've highlighted or? .

>> MR. KENT STIGALL: Highlighted is District 9.

>> VICE CHAIR ROTHHORN: Okay.

>> MR. KENT STIGALL: I'm going to try to be more cautious and stay online.

>> VICE CHAIR ROTHHORN: Thank you.

>> MR. KENT STIGALL: The state primary I will get the labels straightened out hopefully tonight El-Sayed got 12419.

Was this Whitmer?

>> VICE CHAIR ROTHHORN: Yes.

>> MR. KENT STIGALL: 20,000 and the third person got 9500.

I don't recall all their names.

>> VICE CHAIR ROTHHORN: That is okay that is Thanedar and he received almost 10,000 and Whitmer received 20,000.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                    MICRC_007978

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

And then we want to move to District ten which is right below it which is okay so El-Sayed received 11,000.

&gt;&gt; MR. KENT STIGALL: El-Sayed 11,000, Whitmer was 17,842 and then 6361.

&gt;&gt; VICE CHAIR ROTHHORN: At this point 9 and 10 did not have an opportunity to elect at the level that we were expecting potentially.

&gt;&gt; MR. KENT STIGALL: Primary.

&gt;&gt; VICE CHAIR ROTHHORN: Primary then we want to get to District 19.

&gt;&gt; MR. KENT STIGALL: 9 and 10.

&gt;&gt; VICE CHAIR ROTHHORN: I'm hesitant to call this out with Mr. Adelson but he is busy at the moment so, yeah.

&gt;&gt; MR. KENT STIGALL: We can read through the election results.

&gt;&gt; VICE CHAIR ROTHHORN: I was hoping that we might I think we should pause for a moment, sorry.

Is this District 9 you have highlighted.

&gt;&gt; MR. KENT STIGALL: District ten.

I'm going to double check it.

Yes, that is definitely ten

&gt;&gt; VICE CHAIR ROTHHORN: We have highlighted District 10. And it was 9, 10 and 19 that Commissioner Eid requested that we do an analysis on the primary gubernatorial primary with El-Sayed in the left and Thanedar in the middle and Whitmer on the right. And we don't have total election right now highlighted is District ten with 11,000 for El-Sayed, 6,000 for Thanedar and 17 almost 18,000 for Whitmer. And then just above it is District 9 with 12000 per El-Sayed, 9,000 for Thanedar and then 20,000 for Whitmer.

&gt;&gt; MR. BRUCE ADELSON: District at the top.

&gt;&gt; VICE CHAIR ROTHHORN: That is District 8 which is also where the Yemeni population is concentrated with Hamtramck and into the Bangladeshi Yemeni, yeah. So that is District 8.

&gt;&gt; MR. BRUCE ADELSON: Well thank you.

General Counsel and I were talking about this before.

The we have gone through a lot of it iterations of different maps and my recollection is El-Sayed won in two districts.

Now I don't recall which map where that was, but these numbers are even differ than the margins.

And one of those elections as I recall he received 42%.

That is not reflected here.

&gt;&gt; VICE CHAIR ROTHHORN: This is the Dearborn population where there is a large percentage overwhelming, but nine and ten had portions of it and why Commissioner Eid was suggesting to look at it.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                    MICRC_007979

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> COMMISSIONER EID:  The District that incorporates Dearborn so okay in the house map we had two or three that elected El-Sayed from the Dearborn, Dearborn Heights area.

In the Senate map I believe we only had one that incorporated 19, we had another that got close but we changed it and it was not the area of ten and 9 but changed it to achieve the correct VRA numbers.

And we were left with one at that point which was 19.

>> MR. BRUCE ADELSON:  Highlight is District population where the primary results show the Middle Eastern community electing El-Sayed candidate of choice.

And is there in this map that is the District there is no second.

>> VICE CHAIR ROTHHORN:  This is what Szetela incorporated and included Highland Park and Hamtramck in District 8 and opportunity to elect is a second District.

I don't know that eight in our initial map prior to her changes had that opportunity as a Senate District.

Can we go back to look at the numbers because I remember that in our earlier discussion, he did appear to be the victor in one of them but let's just confirm that.

>> MR. KENT STIGALL:  This is District 27 and El-Sayed won this District 27,000 to 24,000 and that is District 27.

>> VICE CHAIR ROTHHORN:  He is from the Ann Arbor.

>> MR. BRUCE ADELSON:  He is from the Ann Arbor area.

There is a Detroit area District that we were looking at before when we were scrolling down.

>> MR. KENT STIGALL:  District 8 is also highlighted.

>> MR. BRUCE ADELSON:  That is okay that is it, that is district eight.

So there appear to be two districts now where the Middle Eastern community by inference is able to elect El-Sayed as the candidate of choice.

Mr. Eid the you just highlight for me in District 8 what part of the District that community might predominant?

>> COMMISSIONER EID:  Hamtramck and the areas directly north of Hamtramck and directly east because that is where the Yemeni population is in the area.

>> VICE CHAIR ROTHHORN:  Also further north into the Warren area.

So into the Oakland County area.

So this does create that community of interest, that is sort of two distinct ones. So I think what Commissioner Eid, the southern location if you will and then there was a northern strip that went in Oakland County area.

>> MR. BRUCE ADELSON:  In District 8 with a Middle Eastern community.

>> VICE CHAIR ROTHHORN:  Bangladeshi and Yemeni population.

I don't know that the Bangladeshi are choosing El-Sayed.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> MR. BRUCE ADELSON:  Okay so that is interesting and the margin and District 8 the margin is closer but there does seem to be ability to elect the El-Sayed as the candidate of choice of the Middle Eastern community.

>> VICE CHAIR ROTHHORN:  Commissioner Eid that wraps up your question, all right, so I'm not seeing any other hands.

Commissioner Kellom?  We are back to you.

>> CHAIR KELLOM:  I think contrary to some thought or opinion actually I'm going to integrate Chair Szetela's changes into the collaborative map.

>> VICE CHAIR ROTHHORN:  She offered them in the spirit and did not want to offer them as her's as much as she was trying to help us struggle less but this is her map. So I don't think it's appropriate to actually work from this.

This is her map.

I understand that.

Mr. Stigall? .

>> MR. KENT STIGALL:  This is the map I have the outline overlaid on the work map that had been edited and working on earlier today.

>> VICE CHAIR ROTHHORN:  Correct, uh-huh.

And for what it's worth Commissioner Kellom I do think her District 7 and 5 I mean you can continue working on that and see if the changes are incorporated and not change anything else and I think that would respect some other Commissioners wishes. It's just an opportunity.

Commissioner Orton?

>> COMMISSIONER ORTON:  So one major difference I see with District 7 is we had a lakeshore District I believe it went all the way around and her's cuts it in half so I'm just concerned with you know we had spent so much time on communities of interest and things and now we are drastically changing is my only comment about that.

>> VICE CHAIR ROTHHORN:  I'm glad you pointed that out, I did not see it Commissioner Witjes?

>> COMMISSIONER WITJES:  I advocate for the lakeshore District for sure.

But having to stretch all the way to the tip of clay, I always thought was a little bit kind of a stretch.

But I do agree since we worked on that particular piece together, we shouldn't make that change until we are all here or do anything with 7 and the lakeshore but by definition that is a lakeshore District.

>> VICE CHAIR ROTHHORN:  Forgive me I am glad you pointed that out because I did not see that change.

It really was as Commissioner Kellom was struggling to try to find which way to go into two and where to go in two.

What I saw in the overlay was that there was a way that might work. That was primarily.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272          MICRC_007981

# OCTOBER 8, 2021

# OCTOBER 8, 2021

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> CHAIR SZETELA: Mr. Stigall?

>> MR. KENT STIGALL: If it's the will of the Chair I can bring up yesterday's partisan or run it now and save it and we can look at it as we go.

Just in the background, if it would be slicker.

>> CHAIR SZETELA: If you do that.

>> MR. KENT STIGALL: Let's run it real quick and doesn't take but a minute.

>> CHAIR SZETELA: Anthony once that report is up if you can compare it and read it off on your spreadsheet that would be helpful.

>> MR. KENT STIGALL: This shall be the starting point but not necessarily the ending point of where we want to go with it.

So I will save this and then with a different name.

And we can continue and we can lay them side by see if we so choose.

The lopsided margins on this plan it should match up to what Anthony has 6.3% lopsided margin.

Mean median difference is 3.4%.

Efficiency gap of 6.4%.

And seats are 55-55.

That is where we are at right here, right now.

I'm going to safe this plan with the spreadsheet with a different name and we can run it on the plan as it's edited and you will have them side by side if you so choose.

Does that meet, satisfy.

>> CHAIR SZETELA: Yes, if you can please do that and Commissioner Orton.

>> COMMISSIONER ORTON: Could we also make note of the plan deviation and can we run compactness as well? Just so we have everything to compare? .

>> MR. KENT STIGALL: We will back up here and run the compactness.

And what I'm going to do now is save it as a PDF so it's a little easier to read and it's up.

Well, if I get this straight, I will save it as a PDF.

And it's going to be and we will put it in the same folder as this is the current plan that we are editing.

I will put it in the same folder.  I'm going to give it just a -- so this will be the first one and it will be in the work plan so when we run it again, we will come right back to the same place.

I'm going to go open up the PDF so we can Zoom in and out and actually read it.

And that's the PDF report.

So we can look at them at the same time.

And I understand we have just been really studying the first Polsby Popper.

And this is the most compact .65 District 83.

Least compact is .1 District 53.

So this report is saved, you know, in the same plan folder and it's number one.

So we can run this at any time.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> COMMISSIONER EID:  Just a couple thoughts.

First, I'm glad that we let Commissioner Lange make the changes that she wants on this collaborative map because it's her turn and we can determine later you know how many we want to bring forward.

But I think it's very good we let her do that.

Without having a whole bunch of smoke about it like the last few days.

My opinion on the District is that we've had public comments for do you know what actually I can't say my opinion yet because we have not run the numbers so we should probably do that first.

>> CHAIR SZETELA:  Kent, can you rerun this plan with run the report the partisan fairness so we can take a look at it.

>> MR. KENT STIGALL:  I can do it right now.

>> CHAIR SZETELA:  And the compactness as well.

>> MR. KENT STIGALL:  So this is the new plan.

I can bring up the old plan and lay it beside it unless somebody has the numbers.

Either way you want to do it.

>> CHAIR SZETELA:  Anthony do you have the numbers and want to read them off?

>> COMMISSIONER EID: .

>> MR. KENT STIGALL:  Go ahead Anthony, I'll just click through it.

>> COMMISSIONER EID:  Okay so these are the numbers for the changes that Commissioner Lange made on this map.

Previously we were at a 6.4% sorry we were 6.3% lopsided margins test.

We are now at a 6.8%.

Let's move on to mean median difference.

Previously we were at 3.4%.

Now we are at 3.8%.

So move on to efficiency gap previously we were at 6.4%.

Now we are at 7.4%.

Let's move on to the seats to votes ratio.

Previously we were at 2.3%.

With a 50/50 split.

Now we are at 3.2% with a 54 democrat seat and a 56 republican seats.

>> CHAIR SZETELA:  Thank you Commissioner Eid.

All right so next Commissioner in line to have a turn is Commissioner Lett.

>> COMMISSIONER LETT:

>> CHAIR SZETELA:  Commissioner Orton?

>> COMMISSIONER ORTON:  I would like to see the Senate map that we were working on early yesterday.

>> MR. KENT STIGALL:  This was the plan.

This was went over yesterday.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                    MICRC_008041

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

This was the plan when it was posted online and looked at online by Commissioner member, it had an irregularity in it and it was fixed online and then copied back down.

So I'm going to open this up.

It should be identical.

Left off yesterday on this plan.

We were doing the partisan adjustments in this area.

Between five and seven.

We can do like we did yesterday.

Copy, paste all the deviations into a spreadsheet, sort them and see where we are at again.

>> COMMISSIONER ORTON: I know which District I want to work on.

First of all I would like to say 7 was left partially changed.

I think the numbers still work like we didn't throw anything way out of balance but we may want to put it like it was before it was partially change and Anthony do you want to say something first?

>> COMMISSIONER EID: I wanted to clarify I previously said the previous house map was 50 democratic seats versus 50 republican seats.

That was a percentage the percentage was 50/50.

The seats were 55 democrat to 55 republican.

And that changed to 54 democrat to 56 republican.

>> CHAIR SZETELA: Thank you for that clarification, Mr. Eid.

>> COMMISSIONER ORTON: So which reminds me before I want to work on 14 because we left it out of balance.

I don't think we meant to do that.

So before I do that, can we do the same thing? Run a report and keep that so that we can compare, make sure we don't do something we don't want to do.

>> MR. KENT STIGALL: Right here.

>> COMMISSIONER ORTON: Sorry?

>> CHAIR SZETELA: I think also if with we are reverting things back, do we want to make this a clone? That is what we have been doing so Kent if you can make a clone a new version that way if we are not happy.

>> MR. KENT STIGALL: So what I will do is run all these reports, leave it, make a copy of it and that way they will all be in the right folder, separate and unique.

>> CHAIR SZETELA: Thank you.

>> MR. KENT STIGALL: This is the partisan fairness features.

I don't know if anybody's jotting these down but we will be starting.

I'm going to rename this to a current name.

So we have 4.5% lopsided.

Mean median 2.8.

Efficiency gap 3.2.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

Seats votes 20dem, democrat, 18 republican.

Okay?

>> COMMISSIONER ORTON:  Thank you.

>> MR. KENT STIGALL:  I'm going to leave that name as is, just the way, well, we will see.

So now we will run the compactness.

Not that compactness analysis generated.

And we will just go down here.

So the most compact is .66 District 21.

Least compact at .21 is District 17.

.66 for 21, .21 for 17.

I'm going to save this.

>> CHAIR SZETELA:  General Counsel?  General Counsel quick question.

Did Moon or anyone else give us a range about what's reasonably compact?  I know we have that for Dr. Handley but do we have something like that?  To me the numbers don't really mean very much to me because I don't know what is reasonably compact and what is not reasonably compact.

>> MS. JULIANNE PASTULA:  That is an excellent question Madam Chair.

So for the compactness measures, the let me just not look at my notes for the compactness measures the closer you get to one is more compact.

And the closer you get to 0 is the least compact.

So you want to get -- that is how you want to approach that.

>> MR. KENT STIGALL:  This is where we repaired it.

So it's just this plan with that one little repair in it.

So now I'm going to copy it.

And give that a long name and starting today.

It would be V1SD I'm going to open the plan which we created which is a duplicate of yesterday's work.

So my question is do we want to make the list of the District deviations and differences?  And sort them out like we did yesterday?

>> COMMISSIONER ORTON:  I think right now I would just like to bring District 14 into deviation -- into the accepted deviation.

So if you would Zoom in to the line between north, the northern border.

And put it on precincts, please.

>> MR. KENT STIGALL:  These are the democrat, republican votes for the 2016 Presidential election I believe.

We can double check it.

>> COMMISSIONER ORTON:  Okay I don't think that -- let's see 14.

>> MR. KENT STIGALL:  We can just use them for reference if nothing else to identify.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                    MICRC_008043

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

Would you like to read them?

>> COMMISSIONER EID: Sure, so I think this was a good idea to run these because I quite like the changes you made as it brought the population deviation down.

Previously the lopsided margins test was at 4.5% and it is still at 4.5%.

The mean median difference was at 2.2% now it's 2.7%.

>> VICE CHAIR ROTHHORN: I had 2.8% previously.

>> COMMISSIONER EID:

>> VICE CHAIR ROTHHORN: It went down from 2.8 to 2.7.

>> COMMISSIONER EID: That is what I have as well.

The decimal was off and it was rounding somehow 2.8% to 2.7%.

And then did you also have 3.4% previously?

>> VICE CHAIR ROTHHORN: For the efficiency gap.

>> COMMISSIONER EID: Yes.

>> VICE CHAIR ROTHHORN: I had 3.2.

>> COMMISSIONER EID: Okay really? Maybe I noted these down wrong.

I think you have it.

>> MR. KENT STIGALL: We can open it right back up and we can do that if it would make everybody more comfortable pop in there and look at it 3.2 on this plan for efficiency gap.

And .3% positionally bias.

Seats 2018 democrat.

>> VICE CHAIR ROTHHORN: Yes, and looks like I think that, yeah, that is the same so that is unchanged.

So we did have small improvements, yeah.

In the right direction.

So only with the mean median from 2.8 to 2.6.

>> MR. KENT STIGALL: Now I can go in and look up that other file.

>> VICE CHAIR ROTHHORN: Lopsided was 4.5 and it stayed the same.

>> MR. KENT STIGALL: This is where we started right here remember I saved it right in there.

And wait a second, I couldn't find it, just a moment, I know why because it's in a different folder name.

It is in.

>> VICE CHAIR ROTHHORN: Commissioner Clark do you have your hand raised?

>> COMMISSIONER CLARK: I do.

The numbers we are looking at when I looked at seven, it ended up to be 50.1 democrat 49.9 republican.

Which I think is the direction that we wanted to go.

So is this the original with those numbers? .

Agee et al. v. Benson et al., Case No. 1:22-cv-00272   MICRC_008049

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

Just a moment.

I'm going to assign that to 14.

>> COMMISSIONER ORTON: Yes, thank you.

>> MR. KENT STIGALL: This says 50.42 in this index so this is the part.

So let's go look at the statewide.

Statewide it is more democrat.

So that's the difference between looking at that index for just these races.

And the index for looking at all statewide races.

You see democrats are actually winning that District.

So, in fact, it is a democrat District according to all statewide races.

>> COMMISSIONER ORTON: That is with the partial changes that we made? .

>> MR. KENT STIGALL: Yes.

>> COMMISSIONER ORTON: Can someone who is more familiar with the area look at the concurrent configuration and see if we are splitting up some communities unnecessarily that we really should keep together.

I don't know like Grosse Pointe park area.

>> MR. KENT STIGALL: We can watch these numbers here to get a very detailed result.

But you can see it out of 800,000 votes for each party over 800 there is only roughly 3,000 separating them.

So it literally a 50/50 in my opinion observation.

>> COMMISSIONER ORTON: If no one sees any changes that we really should make then I think we should leave it as is because the numbers are good.

I'm sure we will hear if peep want it differ.

>> CHAIR SZETELA: Commissioner Eid then Commissioner Rothhorn?

>> COMMISSIONER EID: You helped the numbers and brought the population deviation down so I think that is great.

>> VICE CHAIR ROTHHORN: I just want with the partisan fairness because we are getting the seats votes ratio that looks like it's actually reflective of the poll with such a low .3, like it feels but I also recognize the efficiency gap is not quite 0.

So wonder if there are any experts that can help us.

I know we need sort of composites and we need multiple margins. But I'm struggling with do we need to get to one measure close to 0? Do we need to sort of keep trying to get the efficiency gap to 0? Can we look at the seats votes ratio like what we got here which is so close? .3%.

Right and it does reflect the majority of the population which is democratic is electing majority of the seats with such a low margin I'm tempted to say we have done a good job but no efficiency gap and heard from people it should be close to 0 so I'm really struggling can you help please?

>> CHAIR SZETELA: What is that?

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> VICE CHAIR ROTHHORN: Efficiency gap was I think at 3.2.

>> MS. JULIANNE PASTULA: Correct so thank you Mr. Vice Chair.

So the efficiency gap being at 0, again, a lot of the very passionate public comment was for everything to be equal.

That is not what your constitutional language is.

Now, the seats to votes ratio, again, as Dr. Handley said, the rule for the seats to vote ratio is that the party that wins majority of seats should be represented or excuse me, that wins majority of votes should be reflected as winning majority of seats.

You have a map where it's evenly split, which is also appropriate.

A small gap is also appropriate in the favor of the party that would win that has won the most votes in prior elections.

So in the State of Michigan here today that would be the democrats.

The seat to vote if it charged particularly when the gap is that small, it would reflect a change in the voting pattern of the state.

That is the goal of that.

Your other measures are not required to be 0.

They are not required to be equal.

It is that they shall not provide a disproportionate advantage.

And I know that we received further guidance from Dr. Handley on those measures and those ranges and for the efficiency gap, specifically.

The range was let me pull up.

One moment it's loading for the efficiency gap, the creators of the efficiency gap and I'm looking at slide number 7 from Dr. Handley's presentation, the creators of the measure argued that the 8% threshold above which that the 8% threshold was what should be considered unconstitutional and then in another series of cases a separate expert had testified that 7% or higher should be considered legally significant.

So again the guidepost there 8% certainly would be the recommendation and then if 7% we would look at what the other measures demonstrated.

But there is nothing in any of the guiding principles in the Constitution that mandate 0% or equal or any of those things.

I did want to acknowledge again that that was heavily advocated for in public comment.

But it was also heavily advocated for that the Commission draw competitive districts throughout the process which does not align with the Constitution.

>> VICE CHAIR ROTHHORN: Thank you I realize you said this multiple times to us and I really appreciate.

I think I'm finally getting it thank you thank you thank you for the repetition.

I mean I feel like wow, wow, and that is our Senate and we are pretty good.

Wow.

>> MS. JULIANNE PASTULA: We were complementing the numbers earlier this week.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

Yep, that is it so can we open that up and if you have -- go ahead, why don't you do that please.

>> MR. KENT STIGALL: Copying this correct?

>> CHAIR SZETELA: Copy that and make a clone.

And again if you can title it 100821V1HDRAS.

Okay now we will do the same process pulling in a shape file from plan 214.

And then 214 under the State House, that one right there.

Commissioner Eid?

>> COMMISSIONER EID: I just have a question about the base.

Is this the base that we started on this morning? Or the base that has the changes that Commissioner Lange made earlier today?

>> CHAIR SZETELA: This does not have Commissioner Lange's changes.

So before we do anything else I want to run the partisan fairness report on this plan.

>> MS. JULIANNE PASTULA: Madam Chair.

>> CHAIR SZETELA: Yes.

>> MS. JULIANNE PASTULA: Thank you.

We are running the partisan fairness on the base plan that is 10721V1HD?

>> CHAIR SZETELA: Yes.

>> MS. JULIANNE PASTULA: Thank you.

>> CHAIR SZETELA: Plan 217.

>> MR. KENT STIGALL: This is where you are currently at with it.

>> CHAIR SZETELA: Lopsided 6.3.

>> MR. KENT STIGALL: 6.3 is lopsided.

The mean median MMD is 3.4.

Efficiency gap is 6.4.

Seats votes ratio is 55-55.

Minus 2.3 for the democrats.

2.3 for the republicans.

50/50%.

55-55 seats.

>> CHAIR SZETELA: All right thank you.

So let's go into the plan.

And I want to Zoom in to District 69, 68, 67 that whole area there.

And we are going to start with District 70 so go a little to the left.

It's Jackson, yeah, so a little bit to the left.

Okay so we are going to just take those areas all the way to Chelsea and put them in Jackson so assign into 70.

>> MR. KENT STIGALL: Follow the red boundaries and this is 70, 66, okay I'll start there.

If I miss something or just stop me.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

Can you check Dexter just above there? Just it's in the green.

That upper bump up.

I could see that, yep.

So that is 66.

Can you put them into 66? Thank you.

Can we Zoom out and make sure everything stayed this time and save it? And then if it did then let's run that report and see if this made any improvement.

>> MR. KENT STIGALL: That is the only one.

You got 68 here does that look familiar?

>> CHAIR SZETELA: Yep, yeah.

And there needs to be some work on the deviation but I'm not super worried about that right now.

>> MR. KENT STIGALL: Still open.

It could not delete it and start a new one.

>> CHAIR SZETELA: I have that problem all the time.

Just rerun it.

Once you close it you can just rerun it.

>> MR. KENT STIGALL: Because it deletes the previous one.

>> CHAIR SZETELA: And replaces it, yep, the prior was 6.3 so that is an improvement.

3.1 down from 3.4.

Down from 6.4.

[ Mr. Stigall is off mic ]

We can't hear him.

>> CHAIR SZETELA: That is down from 2.3 on the prior plan and instead of having a 55-55 balance, it's now proportional to the approximately to the vote share.

Not quite perfect but better than it was.

All right.

All right any comments? Are we ready to break for lunch?

>> VICE CHAIR ROTHHORN: Thanks for helping us with the house.

The house was the hardest one, there are so many districts and yeah thanks for making, yeah, a big push.

>> CHAIR SZETELA: Commissioner Eid?

>> COMMISSIONER EID: Yeah, you know I think this is another example of where.

>> CHAIR SZETELA: Can you fix that, Kent? Thank you.

>> COMMISSIONER EID: Blissfield all by itself there.

>> CHAIR SZETELA: Just put it in -- well, can you Zoom out? I'd rather you just put it into 62 because, yeah, I just put it into 62 because just ignore my red lines and go with what the rest of the map is.

I'm sorry Commissioner Eid go ahead I'm sorry I did not mean to cut you off.

# OCTOBER 11, 2021

# OCTOBER 11, 2021

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

Known publicly on the portal as 226.

Plan number 100821V1SD.

Did you bring that up?  Looks like we got it up.

So again this had further adjustments by Commissioner Orton I believe for partisan fairness is that accurate?  For population.

Okay so for population.

So it's very similar to the prior one it just had some adjustments for population.

Commissioner Lett?

   >> COMMISSIONER LETT:  Again are there any reasons anybody has not to bring this map forward?

   >> CHAIR SZETELA:  No.

   >> COMMISSIONER LETT:  If not I move we bring it forward.

   >> CHAIR SZETELA:  Notice how we all looked at you Commissioner Witjes like yes.

All right we have a motion on the floor by Commissioner Lett to bring forward plan Spruce also known as 226 on our portal.

Code name 100821V1SD to the public hearing.

Is there any debate or discussion on the motion?  Hearing none let's go ahead and vote all in favor of allowing this map to be brought to the public hearings raise your hand and say aye.

All opposed please raise your hand and say nay.

The ayes prevail and this map will be presented to the at the public hearings.

we will now move on to the house.

Questions I always skip the questions.

Sorry.

   >> MS. SARAH REINHARDT:  Thank you.

Did the Commission consider incumbent elected officials or any candidates for office when drawing this draft proposed map?

   >> CHAIR SZETELA:  No.

   >> MS. SARAH REINHARDT:  Did the Commission consider City County and Township boundaries when drafting this proposed map.

   >> CHAIR SZETELA:  Yes.

   >> MS. SARAH REINHARDT:  Is this map reasonably compact?

   >> CHAIR SZETELA:  Yes.

Commissioner Witjes.

   >> COMMISSIONER WITJES:  This thought came into my head and I don't want to forget it.

Is there any way for us to put the code names for the maps that we're approving on the portal so that they can see that instead of just the name?  So they have a chance to start giving comments by referring to those instead of just the numbers.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> CHAIR SZETELA: All right, is this version two is open.

Can we see down by the Battle Creek Albion area to see yes so that is the same.

And then if you scroll back up towards Midland that would be helpful, I think to everybody.

Okay so this is the one that has Midland with Bay City.

Is this, yep.

>> MR. KENT STIGALL: Yes, it is.

And the colors.

>> CHAIR SZETELA: So this map is code name Peach.

Number 228.

Also known as 100821V2HD.

>> MR. KENT STIGALL: Madam Chair do the other plans have this 87 in it? I think that may be.

>> VICE CHAIR ROTHHORN: The first one did.

>> CHAIR SZETELA: I think they all do.

Commissioner Lett?

>> COMMISSIONER LETT: Again is there any reason we should not bring this forward to the public hearings? And if not then I would move that they be -- this one be advances to the public hearings.

>> CHAIR SZETELA: Okay so a motion by Commissioner Lett to advance code name Peach 228, 1008V2HD to the public hearings is there any discussion or debate on the motion? Seconded by Commissioner Clark.

All right all in favor of advancing this plan to the public hearings please raise your hand and say aye.

All opposed please raise your hand and say nay.

All right the ayes prevail and the plan will be advanced to public hearings.

Sarah Reinhardt.

>> MS. SARAH REINHARDT: Was this map reasonably compact?

>> CHAIR SZETELA: Yes.

>> MS. SARAH REINHARDT: Did the Commission consider incumbent elected officials or any candidates for office when drafting this draft proposed map?

>> CHAIR SZETELA: No.

>> MS. SARAH REINHARDT: Did the Commission consider County, City and Township boundaries when drafting this draft proposed map?

>> CHAIR SZETELA: Yes.

>> MS. SARAH REINHARDT: Thank you.

>> CHAIR SZETELA: All right we are going to move on to Pine.

Which is 100821V1HDRAS.

So yep, right there.

And it is identified as 227 on the portal.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                    MICRC_008168

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

She is requesting that we look at it because it doesn't have that Battle Creek Albion was it Albion combination and also doesn't have that zig-zag District.

It's got really big deviation though.

Commissioner Witjes?

>> COMMISSIONER WITJES:  If there is no changes to be made to this map, I move that we move map 10621V2HD forward for public hearings with the code name beach.

>> CHAIR SZETELA:  I love beach trees what can I say.

We have a motion made by Commissioner Witjes to move house map 215, 100621V2HD with the code name beach before public hearing.

Do we have a second?  Commissioner Weiss.

So we have a motion and a second.

All in favor of advancing map or any discussion or debate on the motion? Commissioner Lett go ahead.

>> COMMISSIONER LETT:  That gives us seven now, right?

>> CHAIR SZETELA:  This would be the fourth house map.

This is a house map.

>> COMMISSIONER LETT:  State, is that what we're talking about?

>> CHAIR SZETELA:  No not yet.

This is a house map.

>> MS. JULIANNE PASTULA:  Madam Chair.

>> CHAIR SZETELA:  General Counsel.

>> MS. JULIANNE PASTULA:  I believe this is from the portal plan 215.

>> CHAIR SZETELA:  Yes.

>> MS. JULIANNE PASTULA:  I believe that this map doesn't have the fairness measures or anything run yet.

So the Commission might want to take care of that order of business prior to voting.

You might want to table this and have a look and have Mr. Adelson has arrived we are very happy to have him back with us in Michigan.

But again filling in just that tracking form and running those partisan fairness measures for this map and again for the Congressional 187 that was also brought forward today.

>> CHAIR SZETELA:  Okay, Commissioner Lange?

>> COMMISSIONER LANGE:  This map initially was the one that I had changed initially I want to say with the Midland.

And then after that when there were changes made to Battle Creek and the other area, so I believe that made like a .4% on the partisan fairness.

A deviation from what it was originally when it had the long narrow area.

Don't quote me on it.

But I'm pretty sure it was like a .4% or something like that.

>> CHAIR SZETELA:  Kent if you could go ahead and run that right now the partisan fairness that would be helpful.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

Commissioner Lett did you have a comment?

>> COMMISSIONER LETT:  Just looking at the map the plan deviation is extremely high at 11.2.

>> MR. KENT STIGALL:  I'd like to also mention we have not spent much time really doing any plan deviation other than one plan.

I mean just to be fair about it, we didn't really work on it.

We only had done it to one plan.

>> CHAIR SZETELA:  So I see the lopsided margins are 8.2 can we look at the mean median?  Mean median is 4.4.

What is the efficiency gap?  9.9.

And then the last one which would be the seats votes.

So it's very republican leaning too.

6% proportionality bias.

51-59.

Commissioner Witjes?

>> COMMISSIONER WITJES:  Well even though it scores quite high on the partisan fairness measures again I think it would be good to bring forward for the fact the public can be like I like this idea for these particular districts can you see if you can incorporate this into plan XY or Z.

So I mean, I'm done never mind.

>> CHAIR SZETELA:  I understand your thought process but feel people can do that by looking at the portal right now because it's already out there.

I worry about bringing a map that's not compliant and this does not appear to be compliant just based on the efficiency gap and everything.

The deviation is high and we can fix later but overall it looks like this map is going to need a lot of work.

Commissioner Rothhorn?

>> VICE CHAIR ROTHHORN:  And that was my thought is like I think we didn't work on this one.

We worked on like we worked on this one and that you know that zig-zag the west coast and Albion Battle Creek helped us move the efficiency gap.

We did work on this one and which led us to the other ones to get the numbers down.

Yeah.

So I'm just -- that is why I think we left this one, yeah, and moved on.

>> CHAIR SZETELA:  Commissioner Clark?

>> COMMISSIONER CLARK:  Yeah, I would suggest that if one of the Commissioners wants this map included that they take it, get it in compliance and submit it as an independent map.

>> CHAIR SZETELA:  I would concur with that.

Commissioner or General Counsel.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                    MICRC_008172

# OCTOBER 20, 2021

# OCTOBER 20, 2021

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

I don't know where communities of interest is defined.

It seems like a fairly nebulous thing.

I hope you would define that there are many ways to define it.

And I hope that you will give it your best shot in the next go around thank you.

>> CHAIR SZETELA:  Thank you for addressing the Commission.  Number 42.

>> Promote the vote, a coalition of partners of civic groups including NAACP and access and Detroit action and others has submitted maps to the Commission which were fair and equitable for all citizens.

Promote the vote utilized same data and adhered by the same criteria required by the Michigan Constitution to create the maps.

Our legislative maps have been gerrymandered for decades to protect whichever political party was in charge.

Which silenced hundreds, thousands of voters.

Promote the vote's maps eliminate partisan bias while adhering to important map drawing criteria required by the Constitution.

These maps that were submitted to you recently ensure that there are no wasted votes.

And address partisan gerrymandering and create fair districts for all people in Michigan.  Thank you.

>> CHAIR SZETELA:  Thank you for addressing the Commission.  Number 43.

>> Yes, my name is Kate.

I'm from Livonia Michigan.   Thank you all for your very hard work.

I come before this Commission today to argue for partisan fairness in these maps.

The purpose of proposition two was to produce maps that were nonpartisan and fair to all Michigan voters.

The time for partisan ship comes with the campaigns.

Through the quality of the candidates, the quality of their campaigns.

And they win or lose based on that.

And not because of the percentage of voters in a particular area.

Who are republican or democrat.

Please also draw the maps that comply with the Voting Rights Act.

Okay, I want to speak again about Livonia.

I have spoken before about it.

And specifically I want to talk about the House District maps for Livonia.

The maps currently split Livonia into three House Districts.

Besides creating a huge problem for the City clerk and for the mayor it is splitting Livonia into three districts that disadvantage the citizens of Livonia who will be confused who the representative is.

And how can a representative fairly represent a District containing a chunk of Livonia, half of Redford and a chunk of northwest Detroit?  That is unfair to African/Americans as

# OCTOBER 28, 2021

# OCTOBER 28, 2021

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

To Commissioner Lange's point, her plan might be very different but some of the other plans are very similar.

If Commissioner Szetela drew a map it's based on another map and 80% of the Districts are the same and she can say these are the ones that are different and we can look at the map and see what they are and that's one thing.

Second thing just a tip, if the Districts are slightly different but the concepts are the same.

You can say we have a north Grand Rapids seat and a south Grand Rapids seat and the concept is the same, you can move forward without committing to an exact different in that area.

If you understand the differences then you understand the plan.

>> CHAIR SZETELA: Okay.

So it seems like there is interest in starting with a debrief because we never had a debrief.

So do we want to go session by session? Just in general? We don't want to do Detroit and what stood out from Detroit? Okay.

So I think it's clear we've had sort of discussions generally around Detroit, Flint, and Ottawa County and those are the big three.

Do we want to start with Detroit and talk about observations and move on?

>> That's fine.

>> MS. SARAH REINHARDT: Madame Chair would it be helpful for me to quickly scribe the debriefing considerations to have in your mind while you're talking about this?

>> CHAIR SZETELA: Sure.

>> MS. SARAH REINHARDT: For debriefing commissions will discuss feedback and themes from Public Hearings, considerations and suggested changes for COIs, additional COIs, suggested changes and input from RPV and VRA line drawing consultants.

If you like while you're making changes, I can document the changes and then we will have a nice list for you all to examine.

>> CHAIR SZETELA: Okay.

Thank you.

Ms. Reinhardt.

So how we want to proceed on Detroit? I think there are two easy ones that came up. Banglatown.

Adding in the two precincts and we all received maps.

Palmer Park, wanting to include that in Ferndale and Oak Park and Huntington Woods because of the LGBTQ community there.

Two simple small changes.

Any thoughts or comments on those? Commissioner Clark?

>> COMMISSIONER CLARK: I think there's a third.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

One individual talked about a street being split and that was an easy one.

I think that we could handle relatively easy.

It was in Detroit.

There was a street.

>> CHAIR KELLOM: It was the dexter Davis and I think it was Laughlin worth Lynwood, does that sound right?

>> CHAIR KELLOM: I'm describing the area.

Lynwood is over there.

Yep.

Hold on one second.

>> COMMISSIONER CLARK: I don't see any reason why we shouldn't take those into account.

Those are neighborhood types of things that I think are appropriate at this point.

I think there's the bigger issue that we have to talk about.

>> VICE CHAIR ROTHHORN: The other piece that was maybe easy was the idea that there was a Latino District moving the line west.

I wrote down something like into 17 from 19.

I wasn't able to understand all of it, but the comment was mostly about increasing the effectiveness of the Latino representation in 17 by moving the line west from central, I wrote down, from District 19.

I think these are all house maps, related to house maps and there was something else about Melvindale has a large Yemen that should be included in Arab Districts we've drawn.

If we're talking about moving a line -- the other one that I recognize is that the Cherry map complete the Boston Edison neighborhood.

In general we might want to do a review of all the neighborhoods and I believe people know which neighborhoods are okay to split and which are not okay to split.

Recognizing we want to walk through those neighborhoods.

>> CHAIR SZETELA: Yeah, and I think that also gets into the broader sort of topic of discussions about how we've divvy up Detroit and relooked at the maps to keep neighborhoods together because they're easy to keep together that way.

Commissioner Eid and then Commissioner Kellom.

>> COMMISSIONER EID: I agree with everything that's been said.

I heard a few different things.

Some of which have been mentioned.

Bringing the neighborhoods back together.

The house map, we have specific comments that mentioned the South field area for that.

We've also heard that was already stated on the house maps, the difference in those precincts between District two and District ten.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                    MICRC_008772

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

I also have some notes here from people in Troy wanting to be with Oakland County.

I have some notes about the Arab community wanting Dearborn Heights to remain whole and to be a second District along with Dearborn.

And just generally speaking by my account it seemed like the most preferred maps were maple, pine, and cherry.

And, you know, actually, I heard some good comments from the Spanish and Latino, Latina community about our maps.

That community seemed to have liked what we did by enlarge.

   >> CHAIR SZETELA:  Commissioner Kellom.

   >> CHAIR KELLOM:  Anthony highlighted what I was going to say and Commissioner -- if you want to take notes of what we were talking about just for clarity -- specifically the gentlemen from the Dexter area.

   >> CHAIR SZETELA:  I looked at my maps because I drew a map of what he was saying, Laughton street move from number one to number two and I drew the map. Dexter Lynwood area.

Windemere Park.

   >> CHAIR KELLOM:  And keeping the Roseville community together and when we go back and mend some of these neighborhoods and that's all I wanted to say and Commissioner Lange I think has her hand up.

I don't know if you saw that.

   >> CHAIR SZETELA:  Yes.

And in the neighborhood discussion there was a lot about is East English Village, Morningside?  Something.

   >> CHAIR KELLOM:  Morningside and Cornerstone.

   >> CHAIR SZETELA:  Cornerstone, yep.

Morningside east English Village.

   >> CHAIR KELLOM:  This is a little bit more specific.

Someone made a reference to District 21 and wanting horizontal Districts in the wood ward 8-mile area and that's just a configuration suggestion.

   >> CHAIR SZETELA:  Yep.

Okay.

And the last one I would raise up is there were requests for Congressional maps to switch Southfield and Northville.

We're getting a little out of Detroit.

Sorry.

South Lyon and Southfield.

Right now Northville is pushed up and south Lyon is pushed into Wayne County.

You're keeping the communities in their Counties and the other would be the API community in Novi.

There was a precinct or two left out and they want pulled back in.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning.  The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

Commissioner Eid and Commissioner Roth owner Commissioner Lange.

>> COMMISSIONER LANGE:  It's not particularly in Detroit but I want to make sure special consideration is given to the (inaudible) community.

I want to make sure we give consideration to them.

Thank you.

>> CHAIR SZETELA:  Thank you.

Commissioner Eid and then Commissioner Rothhorn.

>> COMMISSIONER EID:  I was going to say it's loud and kind of hard to hear.

Let's try to be clear so that welcome all hear each other.

>> CHAIR SZETELA:  Because the room is small, when people is having side conversations, it's picking up on the microphones.

>> I'm sorry.

>> CHAIR SZETELA:  All right.

Commissioner Rothhorn.

>> VICE CHAIR ROTHHORN:  The seat community that was an African immigrant community that was a smaller -- it's not clear that it's a small change because when I was able to try and draw my map, I lost it so I can't actually speak to it at this point but I have a note about this.

Between south feed and north park there was a Jewish community.

>> CHAIR KELLOM:  Orthodox Jewish.

>> CHAIR SZETELA:  Oak park.

>> VICE CHAIR ROTHHORN:  There were maps given and I have not been able to look into it but Commissioner Lange was lifting up these smaller communities that we may have included, somehow recognizes that we can include them and all of these changes that I think I'm addressing I think are house map changes, I think.

Commissioner Szetela lifted up we have Congressional maps.

I would like to offer I would like to look at with Anthony Skinnell drew it and recognize the shift and he's been really clear to us and he has an interest in -- looking at that if we're going to look at Congressional maps and looking at how many Communities of Interest, he has included in that.

>> CHAIR SZETELA:  All right.

Anything else about the general metro Detroit area?  Commissioner Clark?  We've discussed all the things that keep communities together.

COI types of things and I also heard a major theme in Detroit and that thing was that the citizens of Detroit want to be kept together as a whole.

I think it's something we need to look at and discuss as we go forward.

>> CHAIR SZETELA:  Commissioner Witjes.

>> COMMISSIONER WITJES:  I heard that as well but the way I'm analyzing that is saying that they want to be both together and packed together is still illegal.

The fact they say we want to be packed together is a violation of the VRA.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> CHAIR SZETELA:  We have to comply with the voting act.

>> COMMISSIONER WITJES:  Trying to adhere to what the individuals wanted in Detroit, that's a fine line between giving people what they want and giving people what they want that is illegal.

>> COMMISSIONER CLARK:  I wouldn't call it illegal but noncompliant.

>> CHAIR SZETELA:  Your mic is not on.

>> COMMISSIONER CLARK:  I think we should take a look at it.

I think in fairness for the people who got up and spoke about this -- and there were a lot that got up to talk about this -- in fairness we should look at whether or not we can make adjustments and maybe we can't but it's worth discussion.

I would really like Brittni's and Juanita's upon that.

>> CHAIR SZETELA:  Commissioner Kellom.

>> CHAIR KELLOM:  Commissioner Clark, thank you.

I totally agree.

I think as we all know there can be information gaps between what the public understands and what we've been working with and if we pay attention to Detroit's rich history and the fact that it is predominantly a City of color that has many neighborhoods and folks that have to have this kind of united voice because I heard that as well.

I think we can find a middle ground between the switches that we -- that they would like us to make.

We're kind of honing in on these neighborhoods and I think we'll find we'll have positive outcomes that don't necessarily put into question our map inside general and I think that will be the happy ground.

Because Detroit is a different place, much like Flint.

We heard those folks say it's a unique city and it has to be observed as much and I think my fellow Detroiters did an excellent job representing that.

I heard the concerns as well that we have an obligation to comply.

With it, as well, I think it's our obligation as we're making decisions in Detroit and I would like to say the same thing in Flint, to be very verbal as we're reassessing to explain why.

As a point of education, I think we can do a better job of doing that and using some of the things we've heard from the community so we're not silently drawing and talking the whole time and giving shout outs and nods to the enabled we've heard and I think if we do it bravely and together it will be absolutely fine.

>> CHAIR SZETELA:  Any other comments from Commissioners?

>> VICE CHAIR ROTHHORN:  Maybe one because I think we're trying to also paint a big picture here.

One of my understanding is the public is asking for partisan fairness.

We haven't mentioned it and I feel like that's one of the things we have it balance as we adjust, making sure we're getting increasingly fairer and representational and recognizing that it's right that we have to go in priority.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

The other piece I feel like is that I don't know that the public has asked us to get these done right the first time.

That's part of what I want to lift up.

My intention is to get this right the first time.

That's really a major, yeah, theme in my heart that we have to somehow, yeah.

>> CHAIR SZETELA:  Yeah, so Ann Arbor is off on the west side but in terms of partisan fairness, all of my individual maps changed what we were doing in Ann Arbor for the purpose of creating better partisan fairness and it drove down the efficiency gap in the mean median by making the change inside Ann Arbor.

A lot of our maps maintain Ann Arbor as a community but if you look at the top ten in the state and what we've done with the rest of them, Ann Arbor is in the middle and the only city we haven't split up.

There's a lot of Public Comments to split up in one way share or form for partisan fairness and to equally split up the community.

I think we need to look for it as well and how we're treating Ann Arbor and not preserve this special status and we have other communities we're dividing up.

Commissioner Kellom and Commissioner Lett.

>> CHAIR KELLOM:  I thought about what Commissioner Clark just said of keeping Detroit together because of what they said and I think that's true and it celebrates the spirit of community there and wanting to continue to build on resources and I challenge us and this is also for Members of the public that are watching and Kim Brace that's his hand up as well in case you can't see, we encourage representation but we also look for ways that we can positively add growth to that community because I think that's a deeper job that we have in the way we are designing and reimagining through redistricting.

That is it.

>> CHAIR SZETELA:  Thank you Commissioner Kellom.

I did see Kim Brace's hand up but I'm focusing on Commissioner comments right now.

Commissioner Clark and then Commissioner Lett and then Commissioner Eid.

>> COMMISSIONER CLARK:  Thank you Madame Chair.

I want to go back to your comment about Ann Arbor and efficiency gap.

My objective here is to focus more on COIs and the items we heard of what the individuals at the hearings thought would be the best approach.

My objective is not necessarily to continue to decrease the partisan fairness and the efficiency gap in particular.

If it even went up .1% it wouldn't bother me.

I they we're well in scope.

I think what we have to do is look out for the people and what they think is the correct approach and apply that as most appropriately as we can as we move forward.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272          MICRC_008776

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> CHAIR SZETELA: Ann Arbor there are hundreds of comments on the portal and we've received Public Comments as well asking for Ann Arbor to be split up.

>> COMMISSIONER CLARK: That's fine but the objective shouldn't be to keep driving down to .1 or zero and that may happen.

That's great.

In my mind is to take into consideration more of the Community of Interest and what the people said they feel is more appropriate than what we have to and focus on that and we have to balance it.

I realize we have to balance it.

The main objective shouldn't be to drive the efficiency gap down.

We should be being looking forward to the people until the neighborhood.

>> CHAIR SZETELA: I don't see that as being an either or choice.

I think we can achieve partisan fairness and protect community interest.

It is a Constitution at criteria.

We shouldn't ignore it.

>> COMMISSIONER CLARK: I'm not saying we should ignore partisan fairness.

You look at the Constitution, COIs and keeping the neighborhoods together and so forth are higher priority than the partisan fairness so I think that should be our focus as we make the adjustments.

>> CHAIR SZETELA: Commissioner Lett and then Commissioner Eid and then Commissioner Lange.

>> COMMISSIONER LETT: In listening to the comments, while they all use different words, they're really all saying the same thing that we need to look at these and make whatever adjustments we need to make to make them as fair as we can.

Keeping in mind one of my favorite sayings, don't let the perfect get in the way of the good.

And I have to really disagree with Commissioner Rothhorn.

He said we need to get it right the first time.

Well, we're on about the 33rd time on some of these maps so we really need to try to get it right the last time and that's what we're working on and everybody I'm hearing talked to is trying to do that.

And we've had some philosophical comments about what should be and what shouldn't be but I think we need to move forward with debriefing the rest of the five meetings.

We've kind of done Detroit and move on.

And then get down to looking at the maps because that's really what we need to be doing.

Thank you.

>> CHAIR SZETELA: Okay.

Commissioner Eid?

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> COMMISSIONER EID: I mean I think we can do both, respect Communities of Interest and achieve partisan fairness.

In regards to Ann Arbor, Commissioner Szetela, you were speaking about in the Senate configuration for all the maps; is that correct?

>> CHAIR SZETELA: I believe so and I believe in the house too.

I would have to look at individual maps.

>> COMMISSIONER EID: I agreement I think also if we did do that, we heard voices at the Detroit public hearing from the west Bloomfield area that they weren't really happy with being with northern Oakland County and they would rather be with southern Oakland County and that's one of the ways of doing that by changing the configuration of Ann Arbor and you would open more room for that type of configuration.

I really like this debriefing session and I think this is good and I agree with Commissioner Lett that this should keep going.

>> CHAIR SZETELA: Commissioner Lange.

>> COMMISSIONER LANGE: I agree about the keep going but I want to make a point to Doug's point.

In the Constitution it says nothing about the efficiency gap.

We had Dr. Handley give us guidelines that stated if we stayed within a certain range these would be acceptable measures as it says in the Constitution.

So this idea of getting this efficiency gap down to zero, while tearing apart certain areas that have asked to be remained, Communities of Interest, as I've seen, as I've spoken out about, is about acceptable in my opinion and I just wanted to add that on to what Commissioner Clark was saying.

>> CHAIR SZETELA: Commissioner Witjes.

>> COMMISSIONER WITJES: I totally disagree with that statement.

We have to take partisan fairness into account.

It doubt specifically say efficiency gap but it does say we take into furs of fairness --

>> CHAIR SZETELA: So they definitely fall within the criteria of things we have to consider.

>> COMMISSIONER LANGE: Can I get legal counsel to comment on that so that I have a clear understanding, then?

>> CHAIR SZETELA: General Counsel did you follow what was just said?

>> MS. JULIANNE PASTULA: Thank you so much Madame Chair.

Good morning.

Yes, Commissioner Lange that was an accurate statement that those have been accepted by the courts.

>> CHAIR SZETELA: Commissioner Lange did you have a follow-up?

>> COMMISSIONER LANGE: That's not my question.

My question is as far as the reading of the Constitution, do we have to get the efficiency gap as close to zero to the Constitution.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                    MICRC_008778

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

They were prying and I don't know if they're still doing it but they were going to transfer some river front property to a tribe to build a casino.

My supposition is that some corporation that's sponsored by the indigenous people are trying to make that happen.

Not necessarily the local indigenous people.

>> VICE CHAIR ROTHHORN: I think that's accurate.

>> CHAIR SZETELA: I think the problem is you have a community that's vastly distributed, at large in part because of forced assimilation and historic inequities but that makes it hard to draw a map to accommodate them because they're spread out all over the place. We tried hard where we knew there are Indian reservations to keep the communities together.

I know that group did submit multiple maps.

Promote the vote map as well as other maps but those maps were whole state maps but it makes it hard to identify what areas we need to target and they weren't focused down and I know Members had spoken to the groups asking for them to submit Communities of Interest so it's easier for us to make changes and hopefully they do so. Commissioner Clark?

>> COMMISSIONER CLARK: I agree with Steve stair scattered all over in smaller groups and it's hard to look out for their interest when that happens.

One of the other things that I got out of the Lansing hearing and I heard it at other hearings as well -- it deals with student voices being represented.

They felt many colleges were split in different Districts.

Oakland University, Rochester Hills, Auburn Hills.

Those are two different Districts and they want them consolidated into one.

I thought I would bring that up.

>> CHAIR SZETELA: Commissioner Lett.

>> COMMISSIONER LETT: While certainly the college students and the ones we heard from voiced that opinion, I didn't hear any of the citizens from east Lansing, full year round residents, backing that up.

My recollection? Hear in this area in east Lansing, when they changed the rules back in the day that college students could register to vote in east Lansing, east Lansing weren't very excited about that because there were 40,000 people here who were going to control the vote.

While we have a legitimate right to be heard there is a counter veiling process from the full-time tax paying residents.

>> CHAIR SZETELA: I think also particularly with college communities students don't necessarily live on campus and they're spread throughout the community and it's an issue of dispersion and how do you group those people together and frankly another factor to consider is the transient effect of college students.

People rent there for ten years.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

They're there for four years and move on.

Maybe eight if they go to graduate school.

It depends.

Go ahead Commissioner Eid.

>> COMMISSIONER EID: So I've been a college student for 11 years now.

Just saying.

>> CHAIR SZETELA: That's not something to be proud of Anthony.

>> We're also hoping for you.

>> COMMISSIONER EID: I have 3-degrees and I'm working on a fourth.

I'll take it.

The reason I say that is because while yes most college students and undergrad are at schools for four years, they're also important because the impact especially on a state legislature side that college policies on students last way beyond ten years and you're talking about how much funding colleges get which impacts how much loans a student has to take and the interest rate on those student loans and I think we're well aware of the student debt crisis going on the in the country right now.

Not saying that I agree that the whys of putting east Lansing and Lansing back together is a good idea because I don't agree with that.

I believe the college community is better served with them being split but we shouldn't just forget about the college people's voices because the effects that these policies has on them does last between years.

>> CHAIR SZETELA: Commissioner Lett.

>> COMMISSIONER LETT: Don't take my comments that way.

They weren't meant to that way.

The college students provide a significant voting block for whatever District they're in.

I personally know of individuals who have been elected by going through all of the dorms on east Lansing campus and working the crowds to get votes and got elected based upon the students' votes for them.

They are definitely a political force and we need to take that into account.

I'm not saying to dismiss it.

But I am saying there's a counter veiling weight out there also that we need to consider.

>> CHAIR SZETELA: Commissioner Clark.

>> COMMISSIONER CLARK: I would like some clarification Steve on the comment you made that east Lansing students were required to register and vote in east Lansing. Is that a administrate requirement or just an east Lansing requirement?

>> COMMISSIONER LETT: Way back in the day students were required -- and I'm going from memory -- to register from their home, where they lived.

That changed.

They could register from their they were in east Lansing or Ann Arbor and vote there and that dynamic changed what went on what went on in college towns.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

I understand why we are saying it's not our responsibility but we do know the impact of the decisions that we are making.

If I wanted to highlight that, so that we could have more qualitative discussions if possible.

I know that is not everyone's perspective or view but I will speak for myself as a Commissioner when I think about drawing lines that is what I'm considering is what this will mean ten years from now.

For folks that are already suffering and experiencing different issues no matter what color they are and no matter where they live.

>> CHAIR SZETELA: Commissioner Eid?

>> COMMISSIONER EID:

>> CHAIR SZETELA: I want everybody to know it's so hard for me after five days of public comment not to say Thank you for addressing the Commission. Every time someone speaks.

I'm trying to hard so if it slips out once, please forgive me.

>> COMMISSIONER KELLOM: You can say thank you Rebecca it's fine.

>> CHAIR SZETELA: Thank you for addressing the Commission. Commissioner Kellom.

>> COMMISSIONER EID: On a different note I want to say we also heard in regards to the house map once again concerns from the Arab American community.

Mainly centered around Dearborn and Dearborn Heights and wanting those to be closer to the prior configuration that we had before.

But at this one we also heard from the Chaldean community which was nice to hear from.

Being a community that is spread out in Oakland and Macomb County.

So just wanted to acknowledge that.

>> CHAIR SZETELA: All right, any other comments? Commissioner Witjes?

>> COMMISSIONER WITJES: I wanted to save this until the very end.

But.

>> CHAIR SZETELA: Oh, no.

>> COMMISSIONER WITJES: There is one comment in I believe it was Flint that really irked and wanted to address my opinions on the matter.

Someone stated that partisan fairness is gerrymandering by a different name.

It's the exact opposite.

Of gerrymandering.

And ensuring that districts are fair.

So I wanted to raise that at the public hearing but I bit my tongue.

But I did want to give my opinion on that fact, on the public record.

So hopefully if the individual is watching this, they know how I feel on the matter.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272     MICRC_008803

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

But the second step is you could basically prepare a matrix of the six plans and just say, you know, in the UP, the three districts in the UP are exactly the same and five of the six plans.

You just have a check box.

So that might be something you could prepare after as we look through this.

   >> CHAIR SZETELA: Okay, Ms. Reinhardt?

   >> MS. SARAH REINHARDT: Thank you.

So just from a process standpoint to clarify.

   >> CHAIR SZETELA: You are really quiet.

   >> MS. SARAH REINHARDT: Just from a process standpoint to clarify you all are going to be reviewing the maps but not making changes at this time.

Or do you plan on making changes to each of the maps?

   >> CHAIR SZETELA: I think what the plan is we are going to look at the maps as a means of reducing the number of maps we are looking at and narrowing it down.

Then at that point we could make potential changes to a map or maps.

   >> MS. SARAH REINHARDT: Thank you.

   >> VICE CHAIR ROTHHORN: I think I'm wondering right one of the things we are dealing with is we do have to look at metrics.

We have the fact is that we've got from our analysis, from our Lisa Dr. Lisa Handley said we are 52% democratic state.

Right and that seats-votes ratio feels like an important piece.

What I mean is if we start with it imbalanced the reason we moved in the direction is because I think many of us, I heard it from Commissioner Orton and I really resonate with it I don't need the efficiency gap to be 0.

But I don't want to start backwards if we have something that actually is more representational.

That's the part that is really challenging for me.

I do think there is a metric and maybe we can't agree on it but that is the hard part for me.

I should not say backwards but just like the idea that fairness does we have a metric that helps us understand proportional and we are 52-48.

And that was shared with us.

And so I feel like we should start with something.

Because these districts we are going to have to adjust to get to that representation and if we have already done the work to deny it at this point feels like, yeah.

And yeah.

   >> CHAIR SZETELA: Commissioner Orton?

   >> COMMISSIONER ORTON: Well, I think I'm not quite sure if I'm understanding what you're saying.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

But I think if we are going to go through this exercise where we look at each of the map, we know they are each within you know close to the range we are wanting.

So if we look at each of the maps and then we are trying to kind of consolidate, fix some areas it may change.

Some of the metrics so we will have to look at it again in the new.

>> CHAIR SZETELA:  I think MC's point is why start with something we already did that to.

So like oak map is the base like, Elm map is the base line.   We made changes to that map to make it better and so why like particularly I'm just going to pick on the oak map.

So the oak map the partisan balance is 54 democratic 56 republican seats with a negative yeah, it's flip-flopped negative partisan bias of democrats with the seats that is a pretty huge imbalance.

Efficiency gap and the margin 3.8 in favor of republicans.   Looking at that why would we consider making changes to the map when we can go up to the Peach map or the Pine map and now we've got 55-55 or 56-54.

Either of which are better.

So why would we start with the one that is the most poor performing and hope to change it.

Reality is we already did change it with Peach and Pine.

Mr. Morgan.

>> MR. MORGAN:  What I would say it would be pretty simple to just put those in the matrix as well and look District by District and just understand what the differences are.

Because if you have two maps maybe when you looked at the and when you say looking at the data you are only talking here about the partisan fairness data.

There is other data as well.   But the point is that if you were to look at, say, you know the first two I guess it's Elm and cherry, no, I don't know whatever the two are that you say one is an improvement on another one, at least you can quantify it.

And say well how are they different?  So the difference is these Districts are 80% the same and we changed two districts or five districts or whatever it is.

Then you can say okay that's the change.

Then you understand what it is.

>> VICE CHAIR ROTHHORN:  Thank you for that.

That is helpful.

>> CHAIR SZETELA:  What you are contemplating is are we doing like shape files or just bringing them up and comparing region by region using PDFs?

>> MR. MORGAN:  Do it first by PDFs because that is again something during the break maybe we could contemplate printing those if you think that is a good way to go.

And then just the views are not identical, but they are close.

And I think if we can look at the views and you can see what they look like and see if that is a logical way to proceed then you can say, yes, John do more of that.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

Or, no, we want something different.

So let me show, you pick the Elm plan first.

>> CHAIR SZETELA: Yes.

>> MR. MORGAN: What I'm going to do is to give you an idea what I have ready right now I will show those JPG or the different regions just for that plan.

I can compare two regions or sorry one region over multiple plans as well.

So let me just start with the Elm plan.

Sorry so what I have eight different views.

There is a north which is UP, Central and south which is sort of the larger picture.

So this is the Central not region but this is the Central view let's just call it a view.

And then I've got a separate one for Lansing and Grand Rapids.

So that is two more.

So that is five.

And I've got the thumb as six.

I've got Oakland and Macomb blow up which is 7 then the 8th is Wayne County.

So those are kind of standardized-ish views.

So this Central map you've got again you can kind of see what the districts are in the big picture.

There is in this plan there is a District 34 here, 35 in the middle, 33 down here.

You can see 36, one and 15 and in the thumb it's all there.

I'm just going to cycle through the next one.

So this is focused more on Grand Rapids.

So you've got a District 22.

Which is over in Ottawa County.

You have a north Grand Rapids.

A south Grand Rapids.

And then for this purposes this let's just say this is the Kent north District.

There is some Counties associated with that.

So when I show you this view for another plan, you will see roughly the same four districts, there will be a District here, a District here, here and here.

And so that is the idea you can compare those four districts across multiple plans.

This is the Lansing area.

It's just zoomed in more or less on Lansing.

So you're looking generally at two different seats in the various plans.

This is Oakland County.

And Macomb County.

And it shows you how many districts are roughly in the area so you have 18, 14, 16, you have a 11 that crosses into Wayne.

9 which is primarily Wayne with some of Oakland.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

Then you can see the other districts that are coming out of Wayne and then five and 7 are primarily Macomb County districts.

Then here is a southern.

Which you can sort of see the districts so there is 1, 2, 3, 4, 5, and 6, 7 in this view essentially.

Just Ann Arbor, I'm including here because it's a better visual.

And then here is the thumb.

And while it does not focus on the thumb, I think we generally know what the outline of the Huron Bay is.

So there is a District here.

Here.

And here.

So you can see those.

And then here is the UP version.

So the UP version there is generally going to be three districts and you will touch a fourth or a fifth here.

Those are the views sort of cutting the state down into bite sized chunks that we can look at.

And then also, again, with each of these plans, all I did was I created a document that would be printable, that is just the matrix for that plan.

So it's the overview tab of the Autobound.

Then I also have got, which is viewable a little harder to print, but we can figure out a way around that, and this is the partisan fairness spreadsheet.

So I have that information for each of the six Senate districts.

And then there is also a way we can overlay them in the redistricting software.

But that gets much more complicated if you're doing more than, say, two or three.

So, again, if you want to look at each plan, sorry, let me just to clarify what I have.

Then here is a version where let's just pick one that is relatively simple.

Here is the UP.

These are all six plans.

With just the view of the UP.

So this one is, let's see, I don't know the tree names are throwing me a little bit, this is 104.

  >> CHAIR SZETELA: This is, Elm.

That is cherry.

  >> MR. MORGAN: Yes, and then here is another one.

  >> CHAIR SZETELA: And that is Spruce.

  >> MR. MORGAN: Right, okay.

  >> VICE CHAIR ROTHHORN: There is no changes yet, correct?

  >> MR. MORGAN: Yeah, you are not seeing any.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

We could look a little more carefully but generally you have 38, well actually let's be more careful.

So here is your 38 and 37 in the Elm.

So we can look to the interocular test as they say.

All right, so we've got and then this appears to be basically the same.

And if we overlaid them, they would be the same.

And then this is the third plan.

I believe it's also the same for this is the Spruce.

And then this one is a different one.

>> CHAIR SZETELA: That is my individual map.

>> MR. MORGAN: Right, so that is, okay that has got your name on it.

>> CHAIR SZETELA: That's the same.

>> MR. MORGAN: That is the same, right.

And so now this one is.

>> CHAIR SZETELA: That is Rhonda's.

>> MR. MORGAN: Not Senator Senate place Lange, right? So that is different.

>> CHAIR SZETELA: Yep.

>> MR. MORGAN: Okay.

>> VICE CHAIR ROTHHORN: So when should we -- what is in your process should we talk about this or just keep going interocular just looking?

>> MR. MORGAN: What I'm trying to do is give you the tools I have handy.

So now you have all six views of just basically those three things.

So if you were doing a matrix, you could say let's look, five of the plans those three districts are exactly the same.

One plan they are different.

How is it different.

You know, is it you could look at the metric and say it's different on the metric or the metrics are basically the same but a different configuration of populations.

You could quantify it with a different name.

You could say, well, in this you know this District how do you quantify what the differences are.

You can use the metrics that is helpful but you can use a quick descriptor to say the real difference is Sault St. Marie is different.

Or it probably is more to do with the District 36.

Or since we have the author of the plan here, we could ask the author of the plan.

>> CHAIR SZETELA: Okay so it looks like for the Upper Peninsula region Eid Szetela Pine Spruce and Elm are the same.

Is everybody seeing that the same? The Lange map has some changes to the Upper Peninsula.

Anybody disagree with this assessment?

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> MR. MORGAN: We could focus on the areas where the boundaries are like you can see this boundary line is what you are really looking at here between 37 and 38. Then the outer boundary of 37 and 36.

So again this is you said Elm.

>> CHAIR SZETELA: 04 is, Elm.

That is cherry.

>> MR. MORGAN: So it looks like it's the same boundary here and here so same. And then this is just.

>> CHAIR SZETELA: That is Spruce.

>> MR. MORGAN: Spruce is the same with this boundary, right? And looks like it's the same there.

>> CHAIR SZETELA: Uh-huh.

>> MR. MORGAN: And you know we could look a little more carefully to see if 36 is exactly the same or not.

Okay and then this is.

>> CHAIR SZETELA: That is my individual.

>> MR. MORGAN: Individual, okay.

And that appears to be the same.

Is it? Maybe it's not.

No, it appears to be the same.

>> CHAIR SZETELA: I did not make any changes that I remember.

>> MR. MORGAN: As the author you can say I didn't make any changes and now you know it's the same.

Now this is different.

So what is different is from my read on in the numbers are different.

So you know we may consider this might be a good time to renumber things or not.

And it looks like the primary difference is Sault St. Marie is the community, the City, the Township around it, the Sue is in with the rest of the western UP.

And District -- it's numbered District 2 but basically the Traverse City north to the bridge is configured a little differently.

And then this District is you know it's configured differently.

We could describe how it is configured for those three districts.

And this is the Eid map, which is I think if I'm looking at this it's the same boundary in 38 and 37 and presumably 36.

>> CHAIR SZETELA: Commissioner Eid do you remember making changes? Okay, yep.

Okay.

All right, do you want to move on to another region or does anyone else want to look at this further?

Agee et al. v. Benson et al., Case No. 1:22-cv-00272    MICRC_008814

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> VICE CHAIR ROTHHORN: I think this is where -- so Commissioner Lange I think earlier you were saying like it might be useful to talk about.

Is this a good time for you to talk about that change or do you want to help us understand why you did it differently or is this not the right time?

>> COMMISSIONER LANGE: That is up to the Commission as a whole.

>> CHAIR SZETELA: We are here go ahead.

>> COMMISSIONER LANGE: I don't know what you want to know.

Obviously, they are different for the UP.

My maps obviously were not based on any of the collaborative maps.

I did them all based on VRA.

One vote, one person.

Population and communities of interest to the best of my recollection.

The UP split was different because I was trying to remember and mind you, I could not get the thematics or the dots on our mapping thing to work for me at the time.

So I was trying to remember where the bands of the American Indian populations in the UP were.

I know from doing my own research that there was quite a few in the Baraga County.

I also took into consideration community of interest as far as Marquette saying they wanted to be with them.

I tried to split as few as what I could to maintain the population.

As we go south, there was comments about people from certain Counties relating more to the west side of the state.

So I tried to incorporate that.

The District that also looks like steps, those are rural areas.

It also includes my area.

It was population wise taking in consideration how rural they are and trying to get the population correct.

If you went even lower to the -- I don't know how low you want to go.

I mean are we looking at just this portion?

>> CHAIR SZETELA: You can just stop because we didn't go down that far on the map so you can kind of stop there.

>> MR. MORGAN: If I may again, I brought this up in Autobound and overlaid.

Since we have five of the District plans are the same, I used the Elm plan as the base and overlaid the one District plan that is a little bit different.

So if you decided again this is where you would look towards in just a general sense rather than discarding a map you can take an idea from a map and add it in to your maps moving forward.

So if you decided you like Commissioner Lange's map in this area, you could you know, do those three districts in that way.

And you could just put them into your plan.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

That's one way to handle it.

>> CHAIR SZETELA: Commissioner Clark and then Commissioner Orton?

>> COMMISSIONER CLARK: Yeah, Rhonda, it's hard for me to see part of the map but you have Cheboygan going to the west rather than the east on this.

>> COMMISSIONER LANGE: Point to Cheboygan here.
I'm bringing up the map myself.

>> CHAIR SZETELA: It's the same as ours.

>> COMMISSIONER CLARK: It's the same as ours.

>> CHAIR SZETELA: Just in the UP she has the line different and 36.

>> COMMISSIONER CLARK: That is what I couldn't see.

>> CHAIR SZETELA: Yeah.

>> COMMISSIONER CLARK: Thanks.

>> CHAIR SZETELA: Commissioner Orton?

>> COMMISSIONER ORTON: I couldn't see it well but I believe it's all the same except like between 36 and 37, the line is on top of each other.
Is that right?

>> MR. MORGAN: Yeah, on this boundary that is correct.
So if you think about it this way in the combination of 38 and 37, there are differences.
Sorry but the outer edges are the same between 38 and 37 as it gets down here.
And then 36 is different here.
With the Elm plan has Arenac, Saranac, Iosco and Ogemaw. And Commissioner Lange's map goes to Osceola and Clare.

>> COMMISSIONER ORTON: I would think our next step we take is either take these two ideas forward since there is only two ideas here or talk about them and see if we want to change anything and incorporate them together.

>> VICE CHAIR ROTHHORN: I would agree and seems how we want to move forward.

>> CHAIR SZETELA: Do we want to move forward on a Section by Section or map by map basis?

>> VICE CHAIR ROTHHORN: The part that makes me nervous is doing UP down I feel we want to go population centers.
That is the only other thing I would say so yeah, I think we learned right as we did map that we needed to be in the population centers and sort of move out from there to understand all the ripples, right, that is what I mean.
If we are rippling that is the only part.

>> MR. MORGAN: If I may if you want to postpone any votes or decision making, you could just make a note and say these are the differences.
So you understand now what the differences are and there are many.

>> CHAIR SZETELA: Which is what I'm doing.
Commissioner Lange?

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                    MICRC_008816

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning.  The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> COMMISSIONER LANGE:  I'd like to comment on that population about the ripple effect coming from the more populated areas.

That ripple effect, the rural areas still have voices too.

And they should be given just as much consideration as the urban areas.

So that ripple effect let's concentrate on the urban areas and however it affects the rural areas is not going to fly with me.

I'm sure that is not how you meant it.

It's kind of how it came across.

Because the rural areas do have their own concerns.

And I don't want them discounted because there is more urban areas that might take more time.

But their voice is no less important than anybody else in the state.

>> CHAIR SZETELA:

>> VICE CHAIR ROTHHORN:  I won't disagree with you but I do recognize too the makeup of the urban and rural is very different.

The racial makeup for me is my concern.

There has been historical legacies of the right the Black population not getting representation early on.

So that is all I'm suggesting is that to recognize that we are doing something historic here.

That we are trying to make a difference with people who have been marginalized for centuries.

That's what I'm recognizing.

>> CHAIR SZETELA:  Okay, so John if we can move on to another area, I think everybody has had to take notes about what the differences are here.   If we can move to the west side and compare those maps.

>> MR. MORGAN:  I will just call that Grand Rapids.

>> CHAIR SZETELA:  Grand Rapids area.

>> MR. MORGAN:  So we will do that and again are you liking this style so far?  Just in terms of comparison.

>> CHAIR SZETELA:  Yes.

>> MR. MORGAN:  Again at the break, you know, if you like the style then I could have another member of the team try to prep some other maps possibly.

Okay so we will bring up Grand Rapids.

>> CHAIR SZETELA:  Thank you.

>> MR. MORGAN:  Shall I start and do the all six together?  Does that work okay?

>> CHAIR SZETELA:  Yep.

>> MR. MORGAN:  Looking at the reference this is so-4 so this is, Elm.

You will see different configurations let's talk about what we have here.

So there is one District here that is primarily Ottawa County.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

There is a Grand Rapids north, Grand Rapids south.

And then the fourth District is the treatment of Kent.

I'm trying to de-emphasize in this discussion these two districts because they are primarily in another region.

So this is basically a view that gives you three basically four districts, okay, so this is the Elm plan.

And this is the cherry plan, okay, and they are probably the same.

And, again, you know I don't recall there being substantial changes in this area.

This is another plan.

So this is the Spruce plan, I think.

&gt;&gt; CHAIR SZETELA:  Yes Spruce.

&gt;&gt; MR. MORGAN:  It appears the Districts are the same just for those four districts. And this.

&gt;&gt; CHAIR SZETELA:  That is my individual.

&gt;&gt; MR. MORGAN:  This is your individual plan.

So this appears to be the same for those four districts.

So four out of four.

All right, and now this is Commissioner Lange's District.

So, again, even though this is a different configuration, I'm primarily focusing on one District here and the differences you know you can see that this has Muskegon whereas other districts didn't.

And then you have a north and a south Grand Rapids configured differently but still generally north and south.

And then de-emphasizing the southern and really picking the north.

You could go either way.

You could say okay this is the fourth District or this is the fourth District.

I would tend to say it's this number six.

So six, 7, 11 and 12.

And again different configuration.

And then I believe this is the Eid plan and I think this is a little different though.

&gt;&gt; CHAIR SZETELA:  It has a little drop down there.

&gt;&gt; MR. MORGAN:  So there is a difference here so again it's 1, 2, 3, 4 districts and it is a little different.

It does not -- these Townships are not being taken in the south.

So somewhere along the way you know this plan is going to have to rotate that population out of view in some other way.

Okay, so it looks like there is probably three different options that are being looked at in this area.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> CHAIR SZETELA: So can we go back to one of the prior collaborative ones and compare it against Anthony's? So he brings down into three that part goes up into 33 instead.

Okay, that is helpful.

>> MR. MORGAN: We have not looked at the specific metrics but you can also do that, isolating these four districts if you wanted to could bring up the metrics for each of these four districts and look at your partisan numbers, your demographic numbers if you wanted to.

>> CHAIR SZETELA: Okay, all right any questions Commissioner Eid?

>> COMMISSIONER EID: So how about we start with focusing on the differences between the north Grand Rapids and south Grand Rapids District for all these.

Because it looks like there is only one difference.

And from there we can look at other areas.

So to accomplish that it seems that either the you know elm cherry of Spruce would be a base map and I would pick one of those to put down as a base then I can bring up the Eid map on top of it and the Lange map on top of it separately.

Then you could compare them.

>> CHAIR SZETELA: Don't you have Elm open right now?

>> MR. MORGAN: I do.

>> CHAIR SZETELA: Can you just layer on Elm since it's already open?

>> MR. MORGAN: Yes, no problem.

>> CHAIR SZETELA: Mr. Brace?

>> KIM BRACE: Yes, I love what John has been doing to help you guys out.

The one thing that I would just be cautious of is when you're talking about the matrixes that have been developed, either the partisan one or the Voting Rights Act one, those tend to look at overall plans, not the individual regions that we're looking at.

So just be cognizant of that.

Don't get confused by bringing up a partisan index for the Grand Rapids area because it's so much impacted by other things around there.

So just be cognizant of potentially keeping those kind of concepts a little bit separated.

>> MR. MORGAN: And to build on what Kim said, we have the data available.

And then if you are looking again with comparison for the four or five districts in the view you could look at the individual numbers if you wanted to.

They are just available.

And I think Kim's point is especially when you're looking at the plan as a whole you wouldn't take the regional approach.

>> CHAIR SZETELA: Commissioner Lett?

>> COMMISSIONER LETT: I know John was saying if we wanted to have the same system with the Congress and house, did we decide we wanted to do that? He had to tell people.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> CHAIR SZETELA: Yeah, I think we do.

>> MR. MORGAN: Okay, all right, so again during the break I will try to confer with Kim and Kent and see if we can move forward and that and I will focus on the Senate today.

This is the Lange version.

You can see it's different.

But it's already here so let's look at that first so that you just understand what the differences are.

And it is different.

So you know in this case you have Ottawa associated with districts to the south most of Ottawa County and this takes Muskegon and I believe Grand Haven and this part of Ottawa.

And then it looks like in this case the Grand Rapids north seat instead of going into Ottawa it stays in Kent County.

And then the Grand Rapids south seat again the red line it's a different boundary.

I don't know whether that is closer to the Wealthy Street boundary or not.

And then it takes a Township over here.

And looks like it takes a little more over in this area.

So again conceptually even though you will see there are differences in metrics, on these seats they are conceptually a Grand Rapids north, Grand Rapids south, and then Ottawa to the Lake.

And then your remainder District again this is where because they are different it's hard to tell what is what.

But the area of the District that has most of Kent County would go up to Newaygo and it looks like it goes, hang on.

I have another plan on.

Let me turn that off.

Right so the District 6 is more similar to the Elm plan District 34 but without Muskegon. So those are the differences.

I guess if I had to describe it the differences are really the treatment of Muskegon.

Muskegon is in an Ottawa focused District here or in the Elm it's Muskegon plan along the lakeshore.

All right.

Then you want me to bring up the Eid variation.

>> CHAIR SZETELA: Yes, the Eid version, the Eid creation.

>> MR. MORGAN:

>> CHAIR SZETELA: Commissioner Orton?

>> COMMISSIONER ORTON: Maybe while we are there or when we are at each one it would be helpful if the Commissioner who created that could explain the reasoning behind.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

So we can see if that is something we want to consider or not.

>> CHAIR SZETELA: Commissioner Lange?

>> COMMISSIONER LANGE: Okay for Grand Rapids obviously, yes, north, south split or however you want to say it.

I tried to include Rockford.

We received public comment Rockford saw themselves as a bedroom suburbs of Grand Rapids.

There are definitely some rural areas out on the outskirts of Kent County.

So I tried to put those with more rural areas.

I tried to make sure that and this map confused me so I'm bringing up my own.

I made sure that Cascade which is where the airport is was included with the City.

And also Ada because we had a lot of comments about Ada so I made sure those were included because there was a lot of back and forth about whether they should or whether they shouldn't agree Cascade should be with Grand Rapids, it holds their airport.

That's pretty much the split for Grand Rapids.

I tried to look on the map to try to expand it and bring it.

The best I could.

I honestly it was almost a straight other than certain districts.

I wanted to try and at least keep voting precincts together

I tried not to go down to the block level.

When we get into the big City, bigger cities sometimes it's hard.

So that's kind of how some of the you will see I guess little points stick up, but that is the reasoning for that.

I tried to keep whole precincts whole and not split up by blocks is that good enough for Grand Rapids for the Commission?

>> COMMISSIONER ORTON: What about the Muskegon area?

>> COMMISSIONER LANGE: The Muskegon area was a little harder because there was conflicting about putting it with Grand Rapids and raising the voices.

We also had public comment about it being an agricultural in certain areas plus a lakeshore community.

So trying to take into consideration I knew that at one point you were trying to work the maps over into Grand Rapids.

So this was something different.

It was kind of about options for the public to look at.

And pretty much communities of interest.

I wanted to make sure and keep Muskegon whole.

The City of Muskegon.

Which was very important because that's where the population as far as your communities of colors go.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                    MICRC_008821

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

And I also know that Grand Haven well Ottawa County had talked about the diversity they have also with the Hispanic population.

So I was hoping that I could still get a little bit of a grouping in there to maybe lift voices up.

Again, my -- I was not able to get I call them the dots up.

So whether or not I did a good job.

But I figured if it was bad, the public would let me know.

I don't know how else to put it.

I'm just going to be honest.

And again I tried to maintain Township lines the best I could.

I tried to maintain in certain areas the County lines.

If the population allowed for it.

>> CHAIR SZETELA: Okay, Mr. Morgan?

>> MR. MORGAN: Yeah, and also if you wanted to, you could bring up the spreadsheets or you know and I take out those four districts and just look at them side by side if you wanted to.

That's another option.

>> VICE CHAIR ROTHHORN: While we are here, yes.

>> CHAIR SZETELA: I would like to do that.

We have what 24 and 11, 23 versus 12, oh, boy going to get confused 22 versus 8 and 34 versus what? 34.

>> MR. MORGAN: This is where you really do have a difference.

So in this case I would call six is the one that is you know kind of Kent County focused.

But it's almost like 6 and 34 are more congruent because Commissioner Lange's six as far as I can see is basically the same as 34 except for not having Muskegon.

That's a pretty substantial difference.

So.

>> CHAIR SZETELA: Is there anything else?

>> MR. MORGAN: So you want to look at the two plans side by side or do you want to look at Commissioner Eid's version as well?

>> CHAIR SZETELA: Well I think we want to look at the metrics for this plan versus Elm.

I'm concerned about voting rights population.

>> MR. MORGAN: Okay, well, all right.

Sorry Commissioner Eid it looks like.

>> CHAIR SZETELA: Commissioner Lange actually has her hand up.

>> COMMISSIONER LANGE: I just want to give one more comment about Muskegon.

And as far as the County goes there was also public comment about Oceana Newaygo and Muskegon being kept together because of the school systems.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

The Agriculture and there was a special program and I don't recall off the top of my head that affects the school aged kids there.

It sounded like less we will just say some of the lower income, less fortunate type of school systems.

I don't remember exactly how they put it.

But there was a special program put in place for those three Counties according to public comment.

So I was trying to accommodate that the best I could also with population.

>> CHAIR SZETELA:

>> MR. MORGAN:  So in this case, this is the Elm the overview tab from the Elm plan and it's the same but saved in an excel file.

And so what I will do is I will do a comparison of these.

>> CHAIR SZETELA:  Are you going to do a comparison or put them side by side?

>> MR. MORGAN:  Because of the District numbers I think it will be better for me to pull them out and put them in like side by side.

>> CHAIR SZETELA:  Okay.

>> MR. MORGAN:  Something close to that.

>> CHAIR SZETELA:  Wasn't sure how you would do comparison with the differing District numbers.

>> MR. MORGAN:  They are not going to be exact but you will be close in some of the areas.

So in the base plan the Elm plan we have, sorry, 23, 22, 23, 24 and I guess 33.

We say 11 is closer to 24 and 12 is closer to 23.

>> CHAIR SZETELA:  Uh-huh.

>> VICE CHAIR ROTHHORN:  Thank you, John, this is great.

>> MR. MORGAN: Again for purposes of discussion here we are going to say 7 is close to 22.

Okay so the most congruent districts are 11 and 12 and 23, 24.

So you can look at the metrics across here.

>> VICE CHAIR ROTHHORN:  I think was the Black voting age population is one of the reasons we were looking at a southern and northern Grand Rapids District.

>> MR. MORGAN: Okay so again the reference here so the northern one is 24.

So and the Elm plan the African/American population on that is 5%.

And then in the Lange it's 8%.

Non-Hispanic African/American population.

Then you also have the total minority percentage so in this case it's 21.7.

And then in the other seat, which is the southern seat, 23 and 12.

So it's 15 percentage African/American in 23 and 12%, 12.2% in 12.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                    MICRC_008823

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

And then again, we are looking at in the District 22 and the Elm configuration it's 1% non-Hispanic Black and in the -- this is where Muskegon is with Grand Haven it's 9% for African/American and Hispanic numbers are here as well.

So this version of 22 has some of the Hispanic population, is higher than in this.

But I do think Commissioner Lange was saying the Hispanic population would have been in the southern part of Ottawa County.

That's my understanding.

And then the districts that are very different are going to be 33 and 6.

And again this doesn't show a lot on those differences.

But again we know that they are very different because Muskegon is in with District 7 here.

>> VICE CHAIR ROTHHORN:  Right, so one of the things we can maybe look at is the southern right where she is including Cascade Township which includes more of the Grand Rapids area, that is southern District, which was 12 on her map, right?

>> MR. MORGAN:  Yes, it's 12 and it has a different dividing line here but it does include Cascade.

So Cascade is in 12.

And it's not in 23.

>> VICE CHAIR ROTHHORN:  Right but includes Georgetown also, okay.

>> MR. MORGAN:  No, I think Georgetown is.

>> VICE CHAIR ROTHHORN:  In another one.

>> MR. MORGAN:  Yeah.

>> VICE CHAIR ROTHHORN:  Okay, thank you.   Can you go back to the numbers again, please?  And 12 District 12 was I see it now, okay.

>> MR. MORGAN:  Since we are looking at numbers now, if you brought up Commissioner Eid's version, we could add them to the comparison and you would have all three plans in one spreadsheet if you wanted to.

>> VICE CHAIR ROTHHORN:  Right, okay, that makes sense to me.

How do other Commissioners feel?  Okay I'm seeing some nodding heads.

Commissioner Eid?

>> COMMISSIONER EID:  So mine doesn't have any Grand Rapids changes.

It just has changes to the areas around Grand Rapids.

That is because I didn't want to change the collaborative Grand Rapids configuration that we deliberately made.

We can still look at it if y'all want.

>> VICE CHAIR ROTHHORN:  I think Mr. Morgan was suggesting is then we have -- this is the best -- this is an alternative to it.

That does have the Cascade, Ada in the Senate maps.   I think, yeah, they wanted us to make sure we got it right in the house maps also.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

Is that your memory, Commissioner Lange? I can't remember if it was in the Senate maps and the house maps that we didn't have it, correct?

>> COMMISSIONER LANGE: It was in both.

And when they said about Ada and Cascade the comments were when you were doing the Grand Rapids 6 or however, they called it, that Cascade and Ada should be included in some of those districts that combined with Grand Rapids.

But it was definitely saying that Cascade and Ada were associated with and a part of Grand Rapids as the City goes.

And the big one was Cascade because of the airport.

>> MR. MORGAN: And, again, I would just say that in this case, you might be able to -- if you like the way Commissioner Lange has dealt with Ada and Cascade you could take those districts only and put them into a version of the collaborative plan if you wanted to.

That would be something that would be relatively easy to do as a module just put that in or not.

>> VICE CHAIR ROTHHORN: I think it's the read I want to get the Black voting age population and a read or a coalition District or something like that.

It feels like what would be helpful for me.

I'm wondering if Mr. Adelson has a thought?

>> MR. BRUCE ADELSON: Commissioner Rothhorn I appreciate you know what you are saying and the thought of a coalition District.

I think for now we are very interested as your process unfolds.

And we can certainly address the issues that you're mentioning as you go forward.

I think that the -- as you said, looking at the minority population the way you mentioned, I think that that is always significant.

As the Commission moves forward with whichever maps and reconfigurations the Commission decides we will be able to talk about that more in the future if that is okay with you.

>> VICE CHAIR ROTHHORN: Absolutely.

At this point there is a 39% versus 36% and that is significant.

I'm just going to bookmark that and bring up that question later for a coalition District.

>> MR. BRUCE ADELSON: I think that is a great point.

>> CHAIR SZETELA: Okay, so are we going to look at Commissioner Eid's Grand Rapids area or not? I feel if there is no changes this probably is not something we need to do.

>> MR. MORGAN: There is the partisan fairness spreadsheet if you wanted to look at those districts on that data as well.

>> CHAIR SZETELA: I'm not particularly interested in looking at like an individual District for partisan fairness.

I feel like it's a whole map analysis.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

Personally.

I don't know if anyone -- I don't want to look District by District.

>> VICE CHAIR ROTHHORN:  I think we were actually given that very advice we can't look at it so.

>> CHAIR SZETELA:  We can't.

Okay, so okay can we move on to another region and try to cover another region before we go to lunch?  I'm sorry Commissioner Eid?

>> COMMISSIONER EID:  So is this do you think this is the time where we might want to make the change to at least the collaborative version?  For that wealthy Fulton Street or should we do that after we are done?

>> CHAIR SZETELA:  We have not picked a map to work off so no so we would have to do it five times.

No, we need to settle on a map first.

Okay so Mr. Morgan, can you bring up another region?  I don't know what your next region is.

>> MR. MORGAN:  Let's go ahead and do the south because that's not you know, there is six or seven Districts that are kind of in that area.

And I think it's just a bigger picture to look at, at this level.

So in this view again these are the Districts that I would just point out.

So you have a District here that's Benton Harbor.

You have the District that's along the border with Indiana and Ohio.

You have a Kalamazoo focused District.

I don't know again what you would name this District but it's outside of Kalamazoo.

I'm going to skip over the Lansing area.

And then you've got Jackson, if you wanted to include Ann Arbor in this discussion I would just because it's easy to see it in this view.

And then you've got Monroe and Lenawee.

So 1, 2, 3, 4, 5, 6, 7 districts roughly and you will see configurations so focusing on the 7 districts generally.

And this is the Elm map.

So I will move on to the next one.

And this is the cherry map.

So I'm going to go backwards first so we can look back at the Elm map.

And here is the cherry map.

So the configurations are fairly similar for these four.

I don't know if there is any actual differences in them.

So that's one where we probably look side by side and say they are the same in this area.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> CHAIR SZETELA: Yeah, if I remember correctly some of those changes were made for plan deviation so they are small but they are bringing the plan deviation down below 5%.

>> MR. MORGAN: This is the next one.

So this is the Spruce.

So looks like these four districts are the same.

It looks like they are basically the same.

>> CHAIR SZETELA: So that is my individual map which splits Ann Arbor.

>> MR. MORGAN: Okay, so the primary difference here, these four Directors are roughly the same.

But there is substantial difference in Ann Arbor so this is Ann Arbor going west.

Ann Arbor north going west.

Including Jackson.

So, again, if I had to describe this, you know, I would say this is Ann Arbor Jackson.

And this is greater Ann Arbor Ypsilanti and then I don't know what this would be called.

And then the Monroe Lenawee combination is similar.

Just a slightly different Township configuration.

And you know those are differences.

And then here is Commissioner Lange's map.

And these are different in these area the Kalamazoo seat is not too far off, different Township configurations.

The border District doesn't go all the way to the Lake.

We are skipping over Lansing.

I'm just going to Zoom in a little bit here.

This has a split of Ann Arbor with Monroe.

And then the balance of Ann Arbor but not including Jackson.

>> CHAIR SZETELA: Okay.

>> MR. MORGAN: Again if you were doing a grid it looks like four of the plans are basically the same and we have one more.

And this is, did I miss it? Hang on.

>> VICE CHAIR ROTHHORN: I think the southwest corner of District 9 in Lange's map is also significantly different.

There is I think it's Allegan and Van Buren that are together there? If I remember correctly, if I remember the Counties names.

>> MR. MORGAN: This is Van Buren and this is Allegan.

>> VICE CHAIR ROTHHORN: That is Allegan up there.

>> MR. MORGAN: This is let's see that is the Lange version.

And then this is the other version.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272            MICRC_008827

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> VICE CHAIR ROTHHORN:  I'm just remembering if I remember that is one of the things we wrote down in our little right that there was a native population and agricultural connection with those two.

That is all I'm trying to remember.

Anyway okay.

>> MR. MORGAN:  And here is the Eid version here.

And this is also different.

So in this case you've got Cass here.

Kalamazoo to Battle Creek.

So that is a little different.

You've got Ann Arbor to Jackson.

And then this has Ann Arbor going into the Detroit area.

To Novi.

So in this case you probably have three variations, generally one through four are the same.

Including the Szetela option of yours is different sorry I guess you have four options.

So the collaborative maps are the same and individuals are different.

>> CHAIR SZETELA:  Yep, my map changes Ann Arbor but that is it.

Then Eid and Lange have many changes.

>> VICE CHAIR ROTHHORN:  Right.

>> MR. MORGAN:  Exactly.

So I don't know how you know if you would make a chart of those in some way but that would be again just understanding what you have if you are going to discuss and negotiate things.

>> CHAIR SZETELA:  Any comments or thoughts about these?  Commissioner Eid and then Commissioner Orton.

>> COMMISSIONER EID:  Well, I can tell you why I made those changes.

>> CHAIR SZETELA:  Go ahead.

>> COMMISSIONER EID:  If that is what y'all would like.

It's pretty simple really.

I was trying to both respect communities of interest and do better on partisan fairness.

And I think a configuration like this does both of those.

Because every District there represents a community of interest.

It may not be a community of interest that I agree with or that we all agree with.

But it is a community of interest.

And the partisan fairness numbers are a heck of a lot better than some of the maps.

As Battle Creek and Kalamazoo we talked about earlier Berrien, St. Joe and Cass together.

It has Hillsdale, Branch, Calhoun and the remainder of Jackson and Kalamazoo Counties together.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                    MICRC_008828

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

And then it has parts of Jackson, the City of Jackson, and the County of Jackson with Washtenaw County.

And you know I think we have heard all of the collaborative maps have that Z configuration for Ann Arbor and Ypsilanti.

And I think one of the avenues we might want to look at is breaking up that area.

If you do that it also allows you to maintain other communities of interest for example the Ann Arbor to Novi community of interest.

And then going more into Oakland County the West Bloomfield Farmington Hills Commerce Township community of interest.

Which this does.

Then you can have like Waterford and White Lake be with the other northern Oakland County areas such as independence Township.

So, yeah, that is the gist of it.

>> CHAIR SZETELA: Okay, all right so to explain what I did with my map can we go back to mine? Because it really is that Ann area.

Can you Zoom into Ann Arbor a little bit.

Yep so, we received abundant public comment about breaking up Ann Arbor.

And we also received quite a bit of comment about Jackson wanting to be with the west side of Ann Arbor.

So I.

>> VICE CHAIR ROTHHORN: West side Washtenaw.

>> CHAIR SZETELA: No Jackson being with the west side of Ann Arbor, both, so that was why I made this change.

And it dramatically improves the overall performance of the map.

It drops the efficiency gap to .7 and the mean median to .6 then still preserves those communities of interest.

Without having to make other wholesale changes to the map.

So it's just that small change in those two districts dramatically improves the map.

Rhonda did you want to comment on your map?

>> COMMISSIONER LANGE: I did my best to take into consideration communities of interest.

We had a lot of comments about the border Counties, keeping them on the border. We had comments and I'm not exactly sure if I got that right or not.

12th hour mapping.

I kept recalling Michiana. And I may have, I'll admit it, I may have gotten the Counties wrong but the corner Counties there and I don't know if that is what they referred to as Michiana but remember public comment on that.

Some major ones there is debate about Ann Arbor and Ypsilanti.

Keep them together.

They are a community of interest, split them up.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> COMMISSIONER EID: So we spent a lot of time looking at all these maps and Senate configurations.

What are everyone's thoughts on them?

>> CHAIR SZETELA: My personal thought is cherry and Spruce incorporate everything that is in Elm so I think we should cross Elm off the list and focus on cherry and Spruce for the collaborative.

Because there's nothing in Elm that is not in cherry or Spruce.

That we've seen.

And if it is a change then it's actually an improvement over what we had.

>> VICE CHAIR ROTHHORN: That is what I have in my notes as well.

Anybody have anything different?

>> CHAIR SZETELA: Commissioner Clark?

>> COMMISSIONER CLARK: Yeah, I mean, I think Spruce should be the base that we work off of.

And then I would also because it does incorporate everything that's in Elm.

And cherry is a little different but not that significantly different.

And Spruce was the last one that we actually did collaboratively.

So.

>> CHAIR SZETELA: Cherry is a collaborative map too.

>> COMMISSIONER CLARK: The last one.

>> CHAIR SZETELA: Cherry was the last one.

>> COMMISSIONER CLARK: Not according to the dates that were on the maps.

>> CHAIR SZETELA: Maybe you are right.

>> COMMISSIONER CLARK: That is what I was looking at.

But I also think we should bring forward Rhonda's map because I think she has got some really good ideas in there.

I don't agree with everything in her maps but there are certain areas that I think we could use to incorporate into this Spruce map.

That is my opinion on this.

>> CHAIR SZETELA: I think we should go off the cherry map because the cherry map already has less than 5% plan deviation whereas the Spruce is going to require us to make all of those changes to bring down the plan deviation.

>> COMMISSIONER CLARK: Plan deviation is within spec.

>> CHAIR SZETELA: No it's not.

>> COMMISSIONER CLARK: What is it.

>> CHAIR SZETELA: Almost 9%.

8.58%.

It's way off.

Spruce.

Yeah.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> CHAIR SZETELA: I think for Spruce and cherry there is no need to look at Elm because they were based off of it and improve so why not throw Elm in the dumpster of history especially because its metrics are terrible.

>> VICE CHAIR ROTHHORN: There are ideas I like.

Like there are ideas in there that is what I mean.

Not the whole map we are throwing out that is all.

>> CHAIR SZETELA: What ideas would you change and if you change to what is in Elm you are going back to that.

>> VICE CHAIR ROTHHORN: I apologize not the whole of the map but the idea in the map.

It was a useful exercise.

I don't need to say any more.

It's how we talk about it.

>> CHAIR SZETELA: Right.

But I mean I think what is the point of looking at metrics if we are not going to look at metrics? I mean what is the point of having them if we are just going to say well let's consider them all because they are clearly Spruce and cherry, I think are comparable in terms of their metrics.

The Lange map and the Elm map are significantly performing at a lower level.

So why would we start working off of.

To me it's like the discussion is at this point Spruce or cherry what are we starting with and go from there.

Not you know not my individual map.

Not Anthony's individual map, Spruce versus cherry.

Which one do we want to go with, what are the differences between those two?

Because they have the most similar metrics and they perform the best.

They both have 2018 seats votes ratio and a .03.

Bias.

They one has 3.1 efficiency gap the other has 3.4.

One has 2.7 mean median the other has 2.2 so one is a little higher in one area and one is a little lower in the other.

One has a lower population deviation in specs the other does not.

That could be a factor but why go to Elm with efficiency gap of 6.2 and mean median of 3.4 and seats vote ratio of 1919.

With a negative 2.3 against democrats when we have two better maps? Like it just doesn't make any sense to me, it's nonsensical.

>> VICE CHAIR ROTHHORN: Can we get rid of Elm to start with something else or is it too early.

>> CHAIR SZETELA: Commissioner Orton?

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> COMMISSIONER ORTON:  Instead of I don't know if this works but instead of choosing to just get rid of something why don't we choose the one or two we want to work on and those ideas are still out there if we see that we want to incorporate any of those?  As we are working on it.

>> CHAIR SZETELA:  So Commissioner Weiss first and then Mr. Morgan.

>> COMMISSIONER WEISS:  All right, I understand MC's thinking.

But I like Rebecca's thinking better.

I go by that because I have the map here or not the map but the sheet and that was my top pick why?  Because the numbers are better.

So my suggestion was going to be this morning let's just start with this map.

And see if we could improve on it if it's possible.

And maybe take a couple ideas.

Of course you might have to go back to the Elm map but it's my impression we started with, ELM and improved it to Spruce and improved it when we went to cherry if that is the case why not start with the cherry map thank you.

>> CHAIR SZETELA:  We should compare Spruce and cherry what are the differences between those two maps.

What do we want to keep.

Mr. Morgan.

>> MR. MORGAN:  I was getting back to the idea of a matrix where you are comparing.

If you are isolating and want to compare Spruce and cherry then you know you can bring up the different what are the differences.

>> CHAIR SZETELA:  Commissioner Clark?  Commissioner Rothhorn, Commissioner Eid Clark then Commissioner Eid.

>> COMMISSIONER CLARK:  This question is for Bruce.

When you look at the metrics for the Senate here, does any of these plans raise a red flag for you?

>> MR. BRUCE ADELSON:  Commissioner Clark I appreciate the question.

Are you asking in which of the categories or all of the categories?

>> COMMISSIONER CLARK:  Correct.

>> Livonia Redford west Detroit.

>> MR. MORGAN:  Individual districts on the screen are you looking at individual districts or entire plan?

>> COMMISSIONER CLARK:  I'm looking at the entire plan.

>> MR. BRUCE ADELSON:  What we have on the screen those are for these metrics of the -- these areas per plan.

So just looking at just these it's difficult for me to say whether one is and at this point I would be reluctant to say one is off the table.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

Because you are just deciding which maps you want to move forward with in order to contemplate adjustments.

And looking at the numbers in isolation is difficult to make a determination.

What I would say though is as you go forward and as you contemplate changes, I would recommend that one of the more challenging metrics to me is the plan deviation.

The plan deviation takes a lot of time.

But I think the important point in that is as you move further from there is no equal requirement.

But as you get closer to 10%, you need to justify more why.

And the justification could include lots of reasons.

But keep in mind that if you have maps that vary in deviation 4.5, 6.5, 7%, that as you go further up, you will need to provide more of an explanation for the record about why you chose a plan with a higher deviation than a plan with a lower one.

So my thought in general is that the deviation tends to be among the more vexing metrics to meet.

Because there are a lot of changes that have to be made.

And I think in addition to that, the changes that you may contemplate have switches this deviation and numbers are going to change we have seen that before.

So being mindful of that and mindful of everything that went into I don't remember what the plan was where you spent a lot of time before you went out to the second round of hearings adjusting the deviation.

It's a slog, it's painstaking.

No question about it.

But I think that as you contemplate where you are going in the next seven days, think about that.

That keep in mind that deviation, to me it's not the most important number.

I'm not suggesting that.

But it can be one of the more challenging numbers to get to.

So I know that that really does not address your -- the question about which one may be appear better or appear more problematic.

But because it's difficult to assess that.

But keep in mind what the deviations are.

I think that can be a good one for now.

   >> COMMISSIONER CLARK:  Thank you.

   >> CHAIR SZETELA:  Anyone else have a question?  Anthony?

   >> COMMISSIONER EID:  Well, it's not a question.

It's more of the same discussion we were having earlier.

I mean, you know, we spent a lot of time looking at these maps.

And how I view it, is we should be using either the cherry or Spruce map to make further changes on.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

In my book.

I've watched him.

He is good.

Maybe it would help.

&gt;&gt; CHAIR SZETELA: What do you want him to show us I'm not clear what you say.

&gt;&gt; COMMISSIONER WEISS: Bring the deviation down and get it a little closer if that is possible.

I don't know.

That is why I'm saying.

We don't know how to do it that way but he should.

&gt;&gt; CHAIR SZETELA: It just takes time to bring it down.

We have seen that.

&gt;&gt; COMMISSIONER WEISS: Do we want to waste time doing that.

&gt;&gt; CHAIR SZETELA: You don't need to with cherry.

That is the point.

It's already there.

&gt;&gt; COMMISSIONER WEISS: Right that is what I was thinking.

&gt;&gt; CHAIR SZETELA: We did it in an open meeting and it was a pain in the tukus.

So Rhonda Lange?

&gt;&gt; COMMISSIONER LANGE:

&gt;&gt; COMMISSIONER CURRY: Erin had her hand up first.

&gt;&gt; COMMISSIONER LANGE: The overall plan deviation is right now for cherry?

&gt;&gt; CHAIR SZETELA: 4.93.

&gt;&gt; COMMISSIONER LANGE: If we look at plan deviation, I would like to state mine is 2.23%.

Just wanted to throw that out there.

&gt;&gt; CHAIR SZETELA: Thank you.

Commissioner Curry did you say something? I thought you said someone.

&gt;&gt; COMMISSIONER CURRY: I was looking at Erin's hand has been up for the longest.

&gt;&gt; CHAIR SZETELA: We cannot see her on the screen and Commissioner Wagner we cannot see you on the screen.

&gt;&gt; COMMISSIONER WAGNER: Quite all right I understand.

I was going to chime in and similar to what Commissioner Kellom and Commissioner Eid were saying let's start with the one with the best metrics.

And then let's compare them to individual maps because there has been quite a few of Commissioner Lange's that I have liked as well.

So that was just my two cents.

&gt;&gt; CHAIR SZETELA: All right Commissioner Orton did you have your hand up as well?

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> VICE CHAIR ROTHHORN: So the 7 and then the 8 including Highland Park. Or not including Highland Park in 8 it's either 17 or 8 and trying to understand that or remembering like this is the improvement, I think.

Right, the -- there is a reason we moved to cherry, there is a reason we moved Highland Park into District 8 out of 17.

>> CHAIR SZETELA: Yep.

>> VICE CHAIR ROTHHORN: I think 8 was also where we are preserving the Bengali community and 17 if I remember correctly has a lot of the Latin X community.

>> CHAIR SZETELA: Yes.

>> VICE CHAIR ROTHHORN: Where is the LBGT community we wanted to highlight that I think it's the palmer.

>> CHAIR SZETELA: Palmer Park.

>> COMMISSIONER KELLOM: Further northwest Detroit.

>> VICE CHAIR ROTHHORN: Is that in 8?

>> CHAIR SZETELA: Right under Oak Park see the diagonal line below 13 I think on this map we have most of it in except that little jut out from 14.

Can you Zoom in a little bit more John and show us.

That is Palmer Park right there.

The diagonal comes down.

And I'm not sure if that little part of 14 is part of Palmer Park or not.

I don't think it is.

I thought it was between the two diagonals.

>> COMMISSIONER KELLOM: I'm sorry 6 mile Woodward area.

So immediately admittedly my strong suit is not looking at a map like this and knowing. I will always have to have neighborhoods so I'm going to say that loud and clear for everyone.

>> CHAIR SZETELA: Is it possible John, to bring up the neighborhood map on top of this?

>> COMMISSIONER KELLOM: Names not just the outline of neighborhoods.

>> MR. MORGAN: I will do that.

>> VICE CHAIR ROTHHORN: In terms of process we are still trying to understand Spruce and cherry.

And do we feel like there is things -- that maybe what we were talking about. Holding Taylor keeping Taylor whole for example one did, the other didn't and trying to understand it.

>> CHAIR SZETELA: But I mean I think most of that is just plan deviation trying to bring down the plan deviation and get it down.

Because you know it's almost half of what the other plan is.

And that is because of all those small changes.

>> VICE CHAIR ROTHHORN: So I guess.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> CHAIR SZETELA:  Palmer Park right there, yep, a little to the east.

Yep, right there.

So it's included in this map.

Palmer Woods Palmer Park and Sherwood forest.

Commissioner Orton?

>> COMMISSIONER ORTON:  Maybe there is a question about plan deviation being low versus communities of interest.

Because we have neighborhoods broken up and things.

>> VICE CHAIR ROTHHORN:  Which I think is where Mr. Adelson was saying we really have to justify it and be willing to justify it whether it's a higher population, yeah.

>> CHAIR SZETELA:  I mean let's look in the Detroit area.

Like these neighborhoods are together.

So can we Zoom out a little bit, John?  And so we have that cornerstone village English village down there where we need to maybe make a correction.

It's hard with the names on it.

>> MR. MORGAN:  I can turn the names off for the moment.

>> VICE CHAIR ROTHHORN:  Madison.

>> CHAIR SZETELA:  That would be helpful.

That is split, yeah.

This is so confusing to look at now.

Okay, so does anyone find this confusing to look at as I do?  I feel like I can't tell what is where with this on.

Can we take the neighborhood lines off and focus on the differences between Spruce and cherry and see if there is anything we want to incorporate?

>> COMMISSIONER KELLOM:  That is fine with me.

I was saying that for that specific moment.

If you were asking me a question about Detroit, then Commissioner Kellom would like the label of neighborhoods so I can make sure that I'm making number one the right choice and also well, yeah, that's all I want to say, that I'm making the right choice.

>> CHAIR SZETELA:  I feel like we are stuck in decision paralysis.

Commissioner Eid?

>> COMMISSIONER EID:  Okay, well, how about we get out of that decision paralysis.

Is everyone okay with continuing to go with cherry as far as the collaborative map moving forward?

>> COMMISSIONER VALLETTE:  I agree we are just looking and looking and looking and not doing anything.

Let's pull up a map, decide that is the one and compare it to the other one and make the changes that we want to make.

We already started the meeting talking about the things that we wanted to look at.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

I was going to say John can do it real quick.

>> VICE CHAIR ROTHHORN: On the website.

>> MR. MORGAN: Where.

>> CHAIR SZETELA: Michigan.gov MICRC.

The maps.

>> CHAIR SZETELA: Hold on I'm logging in too.

>> COMMISSIONER WEISS: Let's see if it is better or worse.

I don't know.

I'm pretty good yet.

There you go.

Can you hide everything except for Lange and cherry so that we can kind of compare them? It's just easier when they are right next to each other.

So we can see it on the screen.

So right now the Senate maps are in the blue.

So the cherry has a lopsided margin of 4.5.

The Lange map has a lopsided margin of 5.6.

The cherry map has a mean median of 2.2.

The Lange map has mean median of 4.4.

The cherry has efficiency gap of 3.4.

Lange has efficiency gap of 6.1.

The democratic seats under the cherry are 20 with a democratic bias of .3%.

And the Lange is 19 with a negative democratic bias so bias against democrats of negative 2.3.

Republican seats are 18.

With a negative bias against republicans of negative .3.

And the Lange is 19 with a positive republican balance of 2.3.

Is that helpful?

>> COMMISSIONER WEISS: Yes.

>> CHAIR SZETELA: Okay, so the plan deviations are within spec.

Okay so going back I think to the cherry map, which is what I think we want to do, we were in the Detroit area.

And we've confirmed that Palmer Park is with oak you know Ferndale Oak Park Huntington Woods which was requested.

The other things we need to check in this map are the wind mere park area Dexter Lynn wood but that was actually the house map so I don't know if we need to worry about it in this map.

So we will save that for later.

Bangla Town.

There was concern about two precincts and I'm waiting to see if someone has that map.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272          MICRC_008876

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> VICE CHAIR ROTHHORN:  And just in the housing split because of Highland Park that we were working on that Mr. Stegall brought our attention to.

>> MR. MORGAN: Do you want neighborhoods in Detroit or Novi?

>> CHAIR SZETELA:  Neighborhoods in Detroit.
I guess we can take a peek at Novi really quick because I don't think it affects this map. Any preference?  Okay let's bring back up cherry and take a look at Detroit with the Detroit neighborhood overlay.

>> MR. MORGAN:  Neighborhoods of Detroit are on the map.

>> CHAIR SZETELA:  We are not seeing your screen.

>> MR. MORGAN:  Okay.

>> MR. MORGAN:  Well they are still there.

>> CHAIR SZETELA:  I'm sure they are.  I'll take your word for it.
Commissioner Kellom do you want to lead this look and see if there is anything you want to change?

>> COMMISSIONER KELLOM:  Well you know I'm going to ask for what you all don't like and that is the labels.
Thank you, John.

>> MR. MORGAN: If you want to do this systematically this District 5 only has a few neighborhoods to consider.

>> COMMISSIONER KELLOM:  Okay, so, yeah, you could I mean that looks like Mohican some of the neighborhoods in Detroit Detroiters don't always use the neighborhood names.
So are you all wanting to take that small area where it's split and put that into 5?  It's such a small little.

>> MR. MORGAN:  Or go the other way and put it in six.

>> COMMISSIONER KELLOM:  That is true.

>> CHAIR SZETELA:  It up to you.
I don't think it hurts to put it into five.

>> COMMISSIONER KELLOM:  I say put it into five.

>> VICE CHAIR ROTHHORN:  And I think my understanding is that the reason we put this on our list was because we do understand that neighborhoods are important and we you know so if there is someone who can help us understand right the two right Commissioner Kellom, Commissioner Curry if you can help us understand which ones where there is egregious and they cannot remain divided that is what I think we are trying to do.
If you understand something like hey it's okay, yeah.

>> COMMISSIONER KELLOM:  I got it.

>> CHAIR SZETELA:  Commissioner Kellom is correct some neighborhoods have a stronger identity than others.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                    MICRC_008888

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

And so for some neighborhoods maybe it is not such a big deal but for others it might be.

>> COMMISSIONER KELLOM: So that would be the areas that go ahead John.

>> MR. MORGAN: What I was going to say I brought up the other plan for reference. You know, so in the other plan it looks like that's not in.

>> COMMISSIONER KELLOM: I don't think it would make a huge difference. I have not heard anyone reference that area. They have been more like large scale suggestions as it relates to like the Eastpointe Harper Woods the whole east side so we can kind of scan around go ahead.

>> MR. MORGAN: Hold the decision on this for the moment and let's scan and see other options.

Okay so this is maybe, maybe not.

But there is one.

>> COMMISSIONER KELLOM: Erin has a hand because I know you all can't see her.

>> CHAIR SZETELA: Commissioner Wagner?

>> COMMISSIONER WAGNER:

>> CHAIR SZETELA: If you are talking, we can't hear you.

>> COMMISSIONER WAGNER: Thank you.

I am trying to juggle the phone and the computer.

But for those of you that are familiar with the Grosse Pointe area, did we hear testimony that cornerstone village belongs in with them as well?

>> COMMISSIONER KELLOM: They did not want to be with the points.

Cornerstone morning side and east English village wanted to remain together.

>> CHAIR SZETELA: Yep, they are all Detroit neighborhoods.

We did.

She is asking if cornerstone wants to go with Grosse Pointe.

Yeah, sorry.

All right keep going Commissioner Kellom.

>> COMMISSIONER KELLOM: Yep, what I see on my little screen looks good. I don't see anything right now that needs to be shifted.

>> MR. MORGAN: I'm going along the border.

We see here District 5 now there is a split neighborhood here between 6 and 7.

>> COMMISSIONER KELLOM: I don't think that would make much of a difference outer drive, Hayes, Commissioner Curry do you have any thoughts on that?

>> COMMISSIONER CURRY: No, English village is pretty much to their self in Detroit here.

So Hayes is doing their thing over there.

So I don't think it would make that much difference.

>> COMMISSIONER KELLOM: Okay.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> MR. MORGAN: You want to go ahead and put all of this into six or leave it split?

>> COMMISSIONER KELLOM: Put it into six.

>> COMMISSIONER CURRY: Yeah.

>> MR. MORGAN: Okay so that puts that neighborhood whole.

>> COMMISSIONER KELLOM: Uh-huh.

What is that little curious piece?

>> MR. MORGAN: That is following the precinct boundary instead of a block boundary.

>> COMMISSIONER KELLOM: Okay.

>> MR. MORGAN: Here is the downtown by Greektown.

>> COMMISSIONER KELLOM: That looks fine to me.

>> MR. MORGAN: So leave it split?

>> COMMISSIONER CURRY: What Street is that?

>> COMMISSIONER KELLOM: I was going to say Zoom in to The Street before I say yes.

I.

>> CHAIR SZETELA: I think it's Michigan avenue.

>> MR. MORGAN: Here is Jefferson avenue is here.

>> COMMISSIONER CURRY: That is Jefferson avenue.

>> CHAIR SZETELA: Down at the bottom.

>> COMMISSIONER KELLOM: That is the gold coast.

>> CHAIR SZETELA: Yep.

>> COMMISSIONER CURRY: You can leave them split because they are more or less split any how you know.

The way they are made.

Because of the large streets down there.

Larn and Michigan Ave and all that.

>> MR. MORGAN: Okay.

>> COMMISSIONER CURRY: Right Brittini, don't you think?

>> COMMISSIONER KELLOM: You can call me sister Kellom that is fine. I appreciate.

[ Laughter ]

>> MR. MORGAN: Okay there is a split neighborhood between 8 and 17.

>> COMMISSIONER CURRY: I'm not familiar.

>> COMMISSIONER KELLOM: Piety hill don't split that.

>> MR. MORGAN: All into 17? Or this into 8?

>> CHAIR SZETELA: What is the population.

>> COMMISSIONER KELLOM: Put it in 8.

>> CHAIR SZETELA: Versus 8.

>> MR. MORGAN: 8 from 17.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

I will mute for a minute.

&gt;&gt; MR. MORGAN: Okay as I'm going through here the census blocks are on two sides.

Well, you know, the census blocks are split by the neighborhoods.

So you have to decide which way you want to go.

Do you want to go back.

&gt;&gt; CHAIR SZETELA: Can you show houses, are there houses in that triangle there? Because I'm just.

&gt;&gt; COMMISSIONER CURRY: Yeah, if there is houses near Dexter and Finkle you can kind of keep them together.

I think Oakman is more of a Chaldean neighborhood.

&gt;&gt; CHAIR SZETELA: Yeah.

&gt;&gt; COMMISSIONER CURRY: Come on sister Brittini.

&gt;&gt; COMMISSIONER KELLOM: You would not be able to hear me over the train.

I didn't have anything to say.

I realize when we were at the bus it was the lodge and I don't think that was Woodward.

&gt;&gt; COMMISSIONER CURRY: That is not Woodward.

&gt;&gt; CHAIR SZETELA: Can we Zoom in? I feel that is not houses.

&gt;&gt; MR. MORGAN: Hospital.

&gt;&gt; CHAIR SZETELA: Lynn wood something supply.

&gt;&gt; COMMISSIONER CURRY: Probably Lynn wood.

&gt;&gt; CHAIR SZETELA: Lynn wood something.

&gt;&gt; MR. MORGAN: Pipe and supply it's a business.

&gt;&gt; CHAIR SZETELA: So those are businesses and then Robinson academy.

&gt;&gt; COMMISSIONER CURRY: That is a school.

&gt;&gt; CHAIR SZETELA: That is a school.

So is that okay to have them into 17? Because they are not houses? Or do we want to put them back the other way?

&gt;&gt; COMMISSIONER CURRY: What do you think put the businesses in 17 or the which ones?

&gt;&gt; CHAIR SZETELA: I think what he is doing is good.

So put.

&gt;&gt; COMMISSIONER KELLOM: That is good.

&gt;&gt; CHAIR SZETELA: North of oak man Boulevard.

North of Oakman Boulevard.

&gt;&gt; COMMISSIONER CURRY: Uh-huh.

&gt;&gt; CHAIR SZETELA: Is there a little triangle we have left out right now? Right there, what is that?

&gt;&gt; COMMISSIONER CURRY: What is that? Anthony, you would probably know. What is that?

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> COMMISSIONER KELLOM: He filled it in.

She was not asking what is it, let's fix it I think that is what Chair Szetela was saying.

>> MR. MORGAN: A median between two highways.

>> COMMISSIONER CURRY: Okay.

>> CHAIR SZETELA: Oh, yeah, can we go back to the non-satellite map? And can we grab that last area.

Well it's part of Dexter Finkle so I would say leave it where it is.

All right, so Zoom back out again.

Yeah. That is part of Dexter Finkle so I say leave it.

All right anything else in that area? We got a little bit where are we?

>> VICE CHAIR ROTHHORN: Davidson Schoolcraft and Littlefield community.

>> COMMISSIONER CURRY: They are pretty good together the Davidson and Littlefield is good, everything else looks pretty good.

>> CHAIR SZETELA: Yeah.

>> VICE CHAIR ROTHHORN: Davidson is 13 and Schoolcraft and Littlefield is in 17.

So they are not necessarily together.

So what do you think? But they are okay the way they are?

>> COMMISSIONER CURRY: They are okay.

>> VICE CHAIR ROTHHORN: Okay.

>> COMMISSIONER KELLOM: Yep.

>> CHAIR SZETELA: I know, happy homes.

>> COMMISSIONER CURRY: And northwest community.

>> COMMISSIONER KELLOM: What is that little strip? Never mind.

I think we already fixed that.

That little line that was by Dexter, Finkle, Davidson, Schoolcraft where it looks like 17 kind of bleeds in the area.

>> CHAIR SZETELA: Yeah, that was part of the same precinct, yep.

Do you want to fix that part just below where it says David son Schoolcraft where it's part of Oakman yeah though three little precincts, do we want to move those into 17?

>> COMMISSIONER KELLOM: I would like to.

>> CHAIR SZETELA: Along with the blurb going in Littlefield.

John, can we put those into 17? Okay and just fix Littlefield put Littlefield together with that line and I think that will be good.

Because there is houses there.

All right, yeah, we are saving.

Dude.

Why did you say that, Steve? It won't happen.

Right, okay, all right anything else?

>> COMMISSIONER KELLOM: No I don't see anything blaring there.

>> CHAIR SZETELA: Brightmoore together.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

Commissioner Clark has a question.

>> COMMISSIONER CLARK:  Juanita after we went past Boston Edison you said that was not Woodward that road we are looking at.

>> COMMISSIONER CURRY:  Boston Edison goes up to Woodward. Boston Edison is a very pretty nice.

>> COMMISSIONER CLARK:  Yeah, I know where it is.

>> COMMISSIONER CURRY:  Yeah, so it runs into Woodward but, no, it is not.

>> COMMISSIONER KELLOM:  I said it was the lodge that curvature I was describing that I saw and said it was Woodward it was not, in fact, Woodward. Even though there are pieces of Boston Edison on both sides of Woodward that particular strip was the lodge is what I was correcting myself.

>> COMMISSIONER CLARK:  I thought your comment was that was not Woodward, that road so okay.

>> MR. MORGAN:  This is another split neighborhood if you want to adjust this or not.

>> COMMISSIONER CURRY:  That is Plymouth and what?

>> COMMISSIONER KELLOM:  And Hubble.

>> COMMISSIONER CURRY:  I don't know how would we adjust that.

>> COMMISSIONER KELLOM:  Put it into 19.

>> MR. MORGAN:  Yep.

>> COMMISSIONER KELLOM:  You could assign it to 19 is what he is asking.

>> COMMISSIONER CURRY:  Okay that will be good Szetela se how many people are in there though?

>> COMMISSIONER KELLOM:  That is what I was going to say.

>> VICE CHAIR ROTHHORN:  19 is 5,000 under so it's okay.

>> COMMISSIONER CURRY:  That would help it, yeah.

>> CHAIR SZETELA:  Okay.

>> COMMISSIONER KELLOM:  Thank you Commissioner Rothhorn.

>> CHAIR SZETELA:  Okay.

>> MR. MORGAN:  You have pride area split.

>> COMMISSIONER CURRY:  What is pride area?

>> CHAIR SZETELA:  I don't know.

>> COMMISSIONER KELLOM:  That is what I was explaining.

>> COMMISSIONER CURRY:  It's a new name and I'm not familiar with that name. The streets around there, what streets are around there?

>> CHAIR SZETELA:  Does Commissioner Wagner have her hand up.

>> COMMISSIONER KELLOM:  I think she just left it up but you can check.

>> CHAIR SZETELA:  Commissioner Wagner did you have a comment or question?

>> COMMISSIONER WAGNER:  No I left my hand up, sorry about that.

>> CHAIR SZETELA:  Okay, okay.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> COMMISSIONER CURRY: I think pride area is an area they built into you know the new Meijer's. I think that is over near pride area.

>> COMMISSIONER KELLOM: Close to Brightmoore.

>> COMMISSIONER CURRY: That is that new little area they are building up.

>> MR. MORGAN: Fullerton maybe.

>> COMMISSIONER CURRY: That is it, yeah.
The other side of Grand River or somewhere.

>> COMMISSIONER KELLOM: I don't know if that is that area.

>> COMMISSIONER CURRY: Yeah, there is grand river, that is it, yeah.

>> COMMISSIONER KELLOM: Okay all right Commissioner Curry, all right, all right.

>> COMMISSIONER CURRY: If I don't know anything else.

>> COMMISSIONER KELLOM: You know that area.

>> COMMISSIONER CURRY: I know Detroit period.
I've been here all my life.
All over Detroit.

>> CHAIR SZETELA: So do you want to grab the rest of that triangle and put it in the pride area community? Do we want to put that triangle into 17? I think it probably makes sense.

>> COMMISSIONER KELLOM: I think so, yes.

>> CHAIR SZETELA: So grab that triangle cutoff triangle and put it into 17.

>> MR. MORGAN: That is a trapezoid.

>> CHAIR SZETELA: That is a what? Geometric shape.

>> VICE CHAIR ROTHHORN: What if we actually put 13 so 13 is under and 17 is over.
Maybe it doesn't make that much difference.

>> CHAIR SZETELA: 13 is under and 17 is over.
We will see.

>> COMMISSIONER CURRY: I would keep some of 13 with Grand River and 96 area because when you get to that new little place what we just talked about, what was that? The little place they built in.

>> COMMISSIONER KELLOM: Pride area community.

>> COMMISSIONER CURRY: That is more of a business area where they put new little businesses in.
There is not that many houses right there on that particular triangle.

>> CHAIR SZETELA: Anywhere else?

>> COMMISSIONER CURRY: They want to keep grand Mont and what else was that together, keep grand Mont.

>> CHAIR SZETELA: And we checked that, they are together Grandmont, Rosedale Park, Westwood, Fremont in one and North Rosedale and Minock Park and they are altogether so we are good there.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                    MICRC_008895

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> MR. MORGAN: Neighborhood split in three districts here.

>> COMMISSIONER CURRY: Okay.

>> COMMISSIONER CURRY: That is the Brightmoore area.

>> COMMISSIONER KELLOM: 19 is under.

Is that Brightmoore neighborhood? Can we Zoom all the way in.

>> COMMISSIONER CURRY: A lot of houses over there.

>> COMMISSIONER KELLOM: Brightmoore is over here.

>> MR. MORGAN: In 9 and Schoolcraft Southfield if we follow the line this is the entire neighborhood and it's in three different districts, 1, 2, 3.

>> COMMISSIONER CURRY: Would probably be okay, yeah Brittini?

>> COMMISSIONER KELLOM: I don't know that is okay.

>> COMMISSIONER CURRY: Okay I did not hear anybody complaining about it.

>> CHAIR SZETELA: Yeah.

>> COMMISSIONER KELLOM: Can we Zoom so I can see the names of the street? And it's split into how many different, four pieces?

>> MR. MORGAN: Three different districts the pink portion is in District 9.

This is District 19.

And this is District 13 over here.

>> COMMISSIONER KELLOM:

>> MR. MORGAN: Here is the Interstate.

>> COMMISSIONER KELLOM: Could we at least put that little area of 19 into 9 but I'm not looking -- that could be too much population, I'm not sure.

>> COMMISSIONER CURRY: It's going to be too much.

>> MR. MORGAN: It's relatively small population probably.

These are census blocks.

>> CHAIR SZETELA: It's right off the freeway so it does tend to have a lot of businesses along there.

Yeah.

>> COMMISSIONER KELLOM: I say put it into 9.

>> CHAIR SZETELA: Add that to 9 and see what it does.

Hopefully we will still be within specs.

>> COMMISSIONER CURRY: What is that? What is that, John?

>> MR. MORGAN: These are just areas that I didn't get with the clicks.

>> COMMISSIONER CURRY: Okay.

>> CHAIR SZETELA: You what?

>> VICE CHAIR ROTHHORN: 19 is our largest deviation.

>> CHAIR SZETELA: Okay.

Thank you for saving as always.

>> MR. MORGAN: Now it's split just between two districts.

Over here you have Holcomb community and Berg-Lasher is split.

---

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                    MICRC_008896

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> COMMISSIONER CURRY: I have not heard anyone really complaining about the splits over there.

I know that there are a lot of businesses kind of around that area.

So maybe that probably why they are split because of the businesses out there.

I have a strong opinion about that.

I mean it looks funky because it looks like a stair step but what is happening in 14? Is it under.

>> MR. MORGAN: Take some of this in 14 or you could.

>> COMMISSIONER KELLOM: Let's try to even it out a little bit.

>> COMMISSIONER CURRY: Keep both of the Berg and Evergreen, Lasher.

>> COMMISSIONER KELLOM: What did you say Commissioner Curry what was your suggestion?

>> COMMISSIONER CURRY: Looking at Berg and Lasher and Evergreen and Lasher so work with that a little bit or whatever.

>> COMMISSIONER KELLOM: John are you going to assign the other little.

>> MR. MORGAN: Like that.

>> COMMISSIONER KELLOM: Like that John.

>> MR. MORGAN: Do you want to put the Holcomb community in nine?

>> COMMISSIONER KELLOM: I would but I want Commissioner Curry to say.

>> COMMISSIONER CURRY: It would like a little more neater what happened to that? He just pulled his tooth out.

What are the streets there John?

>> MR. MORGAN: It's by Lasher it's the burg neighborhood is mostly single family houses.

>> COMMISSIONER CURRY: I know where that is but I'm talking about where the thing looked like a tooth that was being pulled that line.

What streets are those? I can't see the streets.

>> MR. MORGAN: Yep, just a moment.

Sorry.

>> MR. MORGAN: 7-Mile and this is a shopping center Renaissance village apartments and Apollo market.

>> COMMISSIONER CURRY: I would not worry about that.

Those are all businesses.

>> MR. MORGAN: Okay and this little portion of the neighborhood.

>> CHAIR SZETELA: I was going to ask about that are we moving that too into 14.

>> COMMISSIONER CURRY: Those are houses what you think Brittini?

>> COMMISSIONER KELLOM: Chippewa and those are mostly houses over there aren't they?

>> COMMISSIONER KELLOM: All of that is.

Can you move that into 14?

---

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                    MICRC_008897

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> MR. MORGAN: I bike through the neighborhood and this is kind of like the back end is wilderness.

>> COMMISSIONER KELLOM: Nothing past that because then it would not make sense.

>> CHAIR SZETELA: Start to get in park River Rouge runs through. It's the wild lands.

>> COMMISSIONER KELLOM: I like River Rouge.

>> CHAIR SZETELA: Yes.

>> VICE CHAIR ROTHHORN: Before we leave this area too much that is 19 is our largest deviation and 17 has extra.
Meaning 17, 19 we are under populated by 6,000.
And 17 is over.
So I just and because we are working on neighborhoods what I'm hoping you might be able to help us do is between 17 and 19 because they do touch, I think further north John.

>> CHAIR SZETELA: Aviation 19 we need in 19.

>> VICE CHAIR ROTHHORN: We need to reduce it.
Excuse me we need to add to 19.

>> COMMISSIONER CURRY: Can you put Delray in spring wells?

>> MR. MORGAN: Delray and spring wells are in the same District.

>> COMMISSIONER CURRY: Okay.

>> CHAIR SZETELA: See that Aviation sub right there.

>> MR. MORGAN: Yes.

>> COMMISSIONER KELLOM: Put that.

>> MR. MORGAN: Put it into 19.

>> CHAIR SZETELA: Aviation, it's a neighborhood.
Has a particular style of houses.

>> COMMISSIONER CURRY: Yeah, that is where Brittini it kind of changed the looks of some of the houses over there and building up that neighborhood.

>> CHAIR SZETELA: There is Oakman Boulevard by the way.

>> COMMISSIONER CURRY: One area is a totally different culture than another area so where are we at on that? I can't hardly read this.
I need my glasses on.

>> COMMISSIONER KELLOM: It's small.

>> CHAIR SZETELA: Commissioner Eid?

>> COMMISSIONER EID: So I understand this is a plurality District but we are still and I think these are all good changes we have made but just want to be aware we are dropping the BVAP quite a bit.
We almost dropped it below 34% but it went back up with the last change.
So we should just be careful making sure we have that number in mind too.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                    MICRC_008898

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> COMMISSIONER CURRY:  Yeah, that is true.

>> COMMISSIONER CURRY:  What area is this in?

>> VICE CHAIR ROTHHORN:  In 17.

>> CHAIR SZETELA:  Anybody else we see along here we need to adjust?

>> COMMISSIONER CURRY:  I'm through when you get that far up.

>> COMMISSIONER KELLOM:  Commissioner Curry you better sit back up in your Chair no way.

>> COMMISSIONER CURRY:  I may not know that area but and all the different neighborhoods have made a great change in the past couple of years.
So I'm not too familiar with what is going on but I know where they are but when you get up more towards the north, I'm not too familiar with what is happening in that particular neighborhood.

>> CHAIR SZETELA:  Last area I think John is trying to get our focus on is far well and we've got a little Pershing do we want to change anything here Davidson, do you want to move any of these lines around?

>> COMMISSIONER CURRY:  I didn't hear anybody talking about it and I probably would.

>> COMMISSIONER KELLOM:  How come I see District 17 at the bottom?

>> CHAIR SZETELA:  Yeah, that is weird.
It says districts in view but it's not showing us districts in view.

>> COMMISSIONER KELLOM:  That is not going to help me make any decisions.

>> VICE CHAIR ROTHHORN:  Maybe move the two or three blocks in Pershing.

>> COMMISSIONER CURRY:  Homes over there so maybe they are satisfied.

>> CHAIR SZETELA:  We are moving them into 6 or 8?

>> VICE CHAIR ROTHHORN:  Into 8.

>> COMMISSIONER KELLOM:  Sorry thank you, thank you, thank you.
The wrong way.

>> CHAIR SZETELA:  Do you want to put that in the cube?  And is that neighborhood divided, is that Krainz Woods?  I'm not familiar with that at all?  Do we want to put that into six?  Do we want to put that in six.

>> COMMISSIONER CURRY:  We should be careful because these are new neighborhoods that have popped up where Duggan planted a whole lot of nice new homes there so the neighborhoods.

>> COMMISSIONER KELLOM:  You are asking if Krainz Woods goes in 6.

>> CHAIR SZETELA:  We are below population there and could balance it out if we put the whole community in.
That is what I was thinking.

>> COMMISSIONER KELLOM:  Including Krainz Park?

>> CHAIR SZETELA:  I'm not sure how much population or leave it.

>> MR. MORGAN:  You have the Mohegan region you can put it in six.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> COMMISSIONER KELLOM:  I would say put it in six.

>> CHAIR SZETELA:  What is the population of five?  I'm not seeing five, okay, but five is more under so would we want to take away from five but no I'm thinking not I would say just leave it.

>> MR. MORGAN:  That is a District you might change on the north end any way.

>> COMMISSIONER KELLOM:  I really wanted five to come down lower into Hamtramck but that is an out loud confession.

>> COMMISSIONER CURRY:  More southwest?

>> VICE CHAIR ROTHHORN:  Can we add to five in the Mohegan region?  Are you against taking that sliver and adding it to five and taking it out of six and into five so Mohegan region is complete all in different five?

>> COMMISSIONER KELLOM:  I knew what you meant. It can be totally complete.

>> COMMISSIONER CURRY:  I'm not familiar with the name Mohegan region and.

>> VICE CHAIR ROTHHORN:  Is it okay because of the population?

>> CHAIR SZETELA:  Go ahead and add those blocks in just into we are adding into five, right.

>> VICE CHAIR ROTHHORN:  Yes.

>> CHAIR SZETELA:  Ones that are currently in six and that yeah add those blocks in.

>> MR. MORGAN:  6 is 2%.

>> COMMISSIONER KELLOM:  2% what.

>> MR. MORGAN:  Under now do you want to add the Krainz Woods to six?

>> CHAIR SZETELA:  I would think so.

>> COMMISSIONER CURRY:  We probably need to see the streets so we can tell the names.

>> COMMISSIONER KELLOM:  I think it's fine to add it to six.

>> COMMISSIONER CURRY:  It probably is fine.

>> COMMISSIONER CURRY:  I'm stepping back you guys.

>> MR. MORGAN:  Trying to save the plan and I think the computer may be protesting.

>> CHAIR SZETELA:  Just give it a second. Yep.

>> COMMISSIONER CURRY:  We got 12 more minutes then we can go home.

>> COMMISSIONER KELLOM:  Commissioner Curry.

>> CHAIR SZETELA:  Commissioner Curry you are home.

>> COMMISSIONER CURRY:  I'm not comfortable. Just sitting in a Chair all day like you guys. I feel just like I feel like.

>> CHAIR SZETELA:  Our hearts are bleeding.