# ADDENDUM

# Part 4

# OCTOBER 29, 2021

# OCTOBER 29, 2021

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

Without objection the Commission will continue deliberations.

All right so yesterday.

>> MR. MORGAN: Okay, I made a new copy of it with today's date.

>> CHAIR SZETELA: Commissioner Clark did you have a comment?

>> COMMISSIONER CLARK: I'd like to address a subject once John brings the map up.

>> CHAIR SZETELA: Could you repeat that.

>> COMMISSIONER CLARK: I would like to address a subject once the map is up. It's up.

It's relative to the Detroit area.

I'd like to take a look at District 7.

And I'd like to complete the lakeshore on it.

So I think the appropriate thing to do is to bring up the Spruce map and lay it on top of that.

Or and I will show you exactly what I'm talking about.

>> MR. MORGAN: Okay.

>> VICE CHAIR ROTHHORN: Commissioner Clark we did get that public comment.

>> COMMISSIONER CLARK: It's exactly I think the last individual or previous one to him discussed.

>> VICE CHAIR ROTHHORN: I guess what I'm saying you might not even need the overlay. You might just want to.

>> COMMISSIONER CLARK: It will be helpful so.

>> VICE CHAIR ROTHHORN: Okay.

>> COMMISSIONER CLARK: For people online that might be watching or whatever. I mean we are pretty familiar with it.

We've had some discussion on this previously.

And I went back and I looked at the other Senate maps last night.

And the Spruce map identifies this as the approach that I feel we should take.

Anthony's individual map did the same.

Then there was one other that had this configuration that I'm going to talk about.

So it's a pretty wide accepted approach.

And I think it reinforces the communities of interest up in the anchor Bay Area.

So if you take a look at this, the area from new Baltimore around anchor Bay, yeah, that one there.

I think that should be rolled into 7.

Okay to complete the lakeshore District.

Lakeshore District as I see it is there is the lakeshore District in the thumb which that area is currently with.

But the thumb is very agricultural.

And it's more tourist oriented.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

And this area people live there.

It's not as tourist area.

So I think it's more associated with District 7 as it goes south to the Detroit river, okay?

So I would encourage us to take this Section of 25, as the individual who just talked about this.

And incorporate that into 7.

And complete the lakeshore District coming down Lake St. Clair.

They have a lot of things in common.

There is a lot of flooding in the area.

Significant problem for them.

We don't hear about that up in the thumb area.

And I know they have a bridge problem up in the anchor Bay Area too that needs some attention.

So I would like to see us do that.

And we will get comments from other people go ahead.

    >> CHAIR SZETELA: So the reason why I did this is because it creates more balanced districts.

And I don't really think that tip of the Bay there has much in common with Grosse Pointe or St. Clair shores or mount Clemens or new Baltimore.

They are very rural up there, nowhere as densely populated as the other areas.

And I think what the man was referring to is grabbing a few precincts not even the whole thing.

Because marine City is not a heavily populated area at all.

    >> COMMISSIONER CLARK: 3 precincts there I'm not sure.

    >> CHAIR SZETELA: We have to Zoom in more.

John, can you Zoom in more? And can we also see the -- can you change the matrixes to Directors in view so we can see the populations on those two districts? Commissioner Lange?

    >> COMMISSIONER LANGE: I like the idea when it was shown in other maps there was positive feedback on that.

So I would be all for doing it.

    >> CHAIR SZETELA: There was also positive feedback on doing it this way too.

As I said like the cherry map has the most comments out of any map that we have 400 plus comments in favor of the map.

Plus all the hundreds of comments we received at the public hearings in favor of this map.

With this configuration.

So.

    >> COMMISSIONER CLARK: But the comments on the map are generic to the entire state not just this specific area.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272    MICRC_008919

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

Yeah, we are still within what we need to be within.

And then we don't have to make any further adjustments if necessary.

So.

>> CHAIR SZETELA:  Can you reverse it so we can look at the Hispanic and Black voting age population and then put it back in?  For 7.

>> MR. MORGAN:  Okay so do you want me to undo what I just did.

>> CHAIR SZETELA:  Undo and you can redo it.

>> VICE CHAIR ROTHHORN:  Right now with it it's 23 minority percentage.

>> CHAIR SZETELA:  15%.

>> MR. MORGAN:  That is the District 7 number.

>> CHAIR SZETELA:  Yes, looking at 7.

>> COMMISSIONER KELLOM:  Chair Szetela I have a question.

>> CHAIR SZETELA:  Sure go ahead Commissioner Kellom.

>> COMMISSIONER KELLOM:  Can someone quickly state since I'm just now joining what this kind of back and forth is?

>> CHAIR SZETELA:  Commissioner Clark wants to include the rest of the Bay in with District 7.

>> COMMISSIONER KELLOM:  Okay.

>> CHAIR SZETELA:  He says it's necessary for a lakeshore District.

So what is it?

>> VICE CHAIR ROTHHORN:  It's not too much.

16%.

>> CHAIR SZETELA:  Put it back.

>> COMMISSIONER CLARK:  Put it back.

I think I want to make some other changes.

>> MR. MORGAN:  Okay.

>> COMMISSIONER CLARK:  To get the number down.

Minority population is pretty high.

The minority population is pretty high for that area.

>> CHAIR SZETELA:  It's not a VRA District but no.

>> COMMISSIONER CLARK:  That one and the next one down, okay, now what I want to do is where that City is 41 just above that I want to change that to green.

Lime green, not the other.

I don't know if the other is gray or green.

>> MR. MORGAN:  This is where you were before we reversed the changes.

>> COMMISSIONER CLARK:  Correct, I believe so.

About 6,000, yeah.

So that keeps the lakeshore together.

The Lake St. Clair lakeshore.

Yeah.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

And I look at the population and yeah, it's over it's 6,000.

But I look at the percentage is .3% over.

Which I think is in line.

Yeah, that is what I want to propose and I think we should do.

I think it keeps the community of interest of Lake St. Clair issues together.

All the way down to the Detroit river.

And this is some significant issues that they all have to deal with.

And the same issues that they are dealing with south of the Detroit river for the flooding and that.

And we've put them together.

To make this happen.

So, yeah, that is what I want to propose.

And get comments from the others.

>> VICE CHAIR ROTHHORN:  What I'm looking at is again I'm focused on process and I do -- I like this and feels like a good compromise and feels like we did not change the numbers too much.

It feels we are listening to people and getting closer to something.

What I'm looking at though is also like the 25 is now our largest population deviation so what I'm thinking about in terms of process whenever we make a change like this let's just note if that I'm looking at the right hand corner, the orange block, so what I'm thinking is now the 25 is out of whack it's also the one that is going to make our plan deviation we will remediate it the most.

So if we can because we adjusted 7 let's also just try to say okay, how are we going to fix 25 while we are here.

We just changed it and thinking of process when we did this.

We did this yesterday too.

It's looking at if we make a change and one of the districts around it pops up and we can affect our plan deviation let's address it.

The second thing I'd like to do is suggest somehow because we do need to look at partisan fairness because we did not look at it yesterday and we are trying to talk about how we do that today.

Let's just make like somehow let's just you know say when do we look at it?  How are we going to monitor ourselves?  And recognize somehow, we need to be aware of it as we make changes.

If we make too many changes all at once we won't be able to understand if we are going forward or, yeah, how do we do it.

>> CHAIR SZETELA:  Commissioner Orton?  Then Commissioner Kellom.

>> COMMISSIONER ORTON:  Two things.

Right where John's cursor is right where the screen is District two is low by about the same amount that District 25 is high.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> CHAIR SZETELA: Thank you.

>> VICE CHAIR ROTHHORN: If I may the seats votes ratio seems to be the one, I'm monitoring the most.

I don't need to see anything other than seats votes ratio.

I don't know how the Commissioners feel but I'm okay jumping straight to that.

>> MR. MORGAN: Do you want me to go through all the other tabs?

>> CHAIR SZETELA: Commissioner Eid and Commissioner Orton?

>> COMMISSIONER EID: They all go together.

So I think we should look at the seats to votes ratio changes as the efficiency gap changes.

And they all kind of change as the efficiency gap changes.

It gets lower the seats votes ratio changes so let's look at all of them.

Originally the map as we had it come out the second round of public hearings before we made the changes yesterday it was at 4.5%.

Lopsided margin.

2.2% on the mean median difference.

3.4% on the efficiency gap.

And the seats to votes ratio was 20 democratic to 18 republican.

With 0.3% bias.

Now that doesn't include the changes that were made yesterday evening.

But let's.

>> CHAIR SZETELA: I think Mr. Morgan he is asking you to click on the tabs.

So we have the 4.5.

>> VICE CHAIR ROTHHORN: That is the same.

>> MR. MORGAN: This is the lopsided margin.

>> CHAIR SZETELA: Yep.

>> MR. MORGAN: This is the mean median.

>> VICE CHAIR ROTHHORN: 2.2 also the same.

>> CHAIR SZETELA: This is the efficiency gap.

>> CHAIR SZETELA: 3.2.

>> VICE CHAIR ROTHHORN: That has gone down a little bit from 3.4%.

But there is no way at this point for us to know if that is due to the Detroit changes that Commissioner Kellom and Commissioner Curry made yesterday or the changes that Commissioner Clark made today.

Let's go to the next one.

Okay and this is also the same 0.3 percent with a 20 to 18 ratio.

>> CHAIR SZETELA: Commissioner Clark?

>> COMMISSIONER CLARK: Thank you Madam Chair.

Yes so, my opinion is the change that's proposed really reinforces our COI area.

And it does not impact the numbers at all.

---

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

Factoring in also what.

>> CHAIR SZETELA:  Again.

>> COMMISSIONER CLARK:  What happened yesterday.

>> CHAIR SZETELA:  We did not do what I asked so I don't know that that's true or not.

So if you're trying to reassure me in some way.

>> COMMISSIONER CLARK:  I'm not, I'm making a comment to the public and to the Commission.

>> CHAIR SZETELA:  You guys done want to look at partisan fairness let's not.

What I was asked for we didn't do.

So we've done something else so can we just unless there is continued discussion on this can we move on and continue working on the map?

>> COMMISSIONER CURRY:  Why don't you take a vote and get through with it.

>> CHAIR SZETELA:  There is nothing to vote on.

Let's unless there is continued comments on the partisan fairness you have the basis proposed base line.

Let's move on.

>> COMMISSIONER CURRY:  Okay stop bringing it up.

[ Laughter ]

>> CHAIR SZETELA:  All right so is there anything else we want to change?

Commissioner Kellom I know that there was and Commissioner Wagner there was something with Detroit with Jefferson Chalmers is that what it was?

>> VICE CHAIR ROTHHORN:  Yes.

>> CHAIR SZETELA:  I see it, Jefferson Chalmers.

John is it possible if you can change the colors between 6 and 7 just it's a little hard for me to see.

>> MR. MORGAN:  Okay.

>> CHAIR SZETELA:  Thank you.

That is much easier to see.

So we have why isn't eight showing up on our districts in view?

>> VICE CHAIR ROTHHORN:  8 is over there.

>> CHAIR SZETELA:  I see it thank you, thank you, thank you.

>> VICE CHAIR ROTHHORN:  Want somebody else to read it?

>> CHAIR SZETELA:  What do you mean?  Well I'm just going to read off the numbers is all so 7 right now is 6,000 over.

8 is 3200 under.

And 6 is 3,000 under.

Kind of the thought process was pulling out Jefferson Chalmers.

What is it that you wanted to do Commissioner Kellom?

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> VICE CHAIR ROTHHORN:  Adding Jefferson Chalmers to 7 and Moross-Morang in 6 that is swapping in the public comment if I got it correct is that correct Commissioner Wagner and Commissioner Kellom.

>> CHAIR SZETELA:  Did you want to leave or MC to do it?

>> COMMISSIONER KELLOM:  It's fine for MC to do it and you articulated what I said and I don't have to take ownership of the swap.

>> VICE CHAIR ROTHHORN:  Go ahead John.

>> MR. MORGAN:  I will point out here this is the boundary of the other plan. So starting with Jefferson Chalmers sorry starting with these neighborhoods into 6.

>> CHAIR SZETELA:  I'm just curious what is the rationale the person gave for wanting to make this change.

>> VICE CHAIR ROTHHORN:  Jefferson Chalmers area is more of a coastal I think he said a coastal community.

>> COMMISSIONER KELLOM:  It's part of the gold coast.

>> MR. MORGAN: That goes in 6 and start with Jefferson Chalmers into 7.

>> VICE CHAIR ROTHHORN:  Correct, thank you. Okay.

>>

>> MR. MORGAN:  That reflects the change you requested.

>> VICE CHAIR ROTHHORN:  We are all set.  Thank you. And I'm wondering so if that is it, and so within deviation one of my memories is we have not quite finished that what Mr. Stigall highlighted for us yesterday, that idea that, yeah, Highland Park, right the actual municipal boundary actually divides houses. And so we may want to look at that before we leave the Detroit area and other things we may have forgotten.

>> CHAIR SZETELA:  Honestly for that one that is the municipal boundary, that is where it is.

>> COMMISSIONER KELLOM:  That is the real boundary.

>> CHAIR SZETELA:  They are well accustom the precinct clerks as to what house is in what area. It's not a point of confusion because Highland Park is a separate municipality from Detroit. So I don't think that is a change we need to dig in to.

>> COMMISSIONER KELLOM:  And I would agree it's the City inside of a City.

>> CHAIR SZETELA:  Yep. It's just not needed. It's weird but it's not needed.

>> VICE CHAIR ROTHHORN:  I'm okay with that, thank you.

>> CHAIR SZETELA:  All right are we -- anything else in the Detroit proper area?

>> VICE CHAIR ROTHHORN:  Is there anything else on the list from yesterday?

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> CHAIR SZETELA:  We have things for Detroit Metro but Detroit itself.

On the list from yesterday we have API concerns around Novi which I'm not sure affect the Senate map or not.

And then also and there was a comment today that lifted this up again Troy Rochester Hills API as well.

So we have those two areas to look at Metro Detroit from an API perspective.

If we can kind of go out to Novi first and take a look because I'm not sure if it's this map.

I feel it might be the house map they were talking about for that particular area.

So can we if you go to the left outside of Livonia west.

That's where we are going to get to Novi.

Okay so Novi is together on this map so that is not the concern on this map.

So that is a house map concern.

House map.

So can we go up to Troy which is currently in blue number 16.

Commissioner Eid.

>> COMMISSIONER EID:  Well, I think what we are going to have to decide because the changes are going to meld into Oakland County.

Especially Novi is what are we going to do with Ann Arbor?  Because if we change Ann Arbor it's probably Ann Arbor and Novi are close to each other.

We've had we've seen two configurations.

One that brings Novi into it.

The other that does your north and south split which I think also works and does not bring Novi into it.

Do we want to do that now?  Because it's going to affect Novi or do we want to just do this and then go to there.

>> CHAIR SZETELA:  I was going to come to Ann Arbor last.

So and I don't know that that's necessarily going to affect Novi but I think in terms of the specific comment about API for Novi it is not implicated for this map.

Because Novi is together and it's the house map where we have is precincts and Novi split up.

So we don't need to worry about that specific thing here.

That does not mean we might not make changes later.

So all right so 16 there were some comments about the Sikh community in  Troy and Rochester Hills and Sterling Heights.

And so I think we kind of need to look at that just Asian American in general.

Because Sikh would fall under Asian American in the census.

But I think the complication here is John can you pull up the map so we can see a little bit more south?  Because Troy is the southern part of District 16.

Yes.

So they want to bring in more of Sterling Heights.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

I'm wondering if there is a particular concentration north or south for Sterling Heights. And you know, can you scroll down to District 6 on the matrix so we can see what the API is now in 6 and then look at so in 6 the API is 3, 3.65.

3.95 sorry.

Misreading.

And then 16 it is 15.

Quite a difference.

15.87.

And then 8 is Bangla Town and that is 9.64.

Okay so can we Zoom in to the border between Sterling Heights and Troy? And put on the thematic dots for Asian and see if we can see if maybe there is a different way to draw that line to keep communities together.

There is something we missed.

So just that precinct there.

What are the percentages you have it sat at now? 14%.

So if I remember correctly because that is 14% that is actually going to bring down our percentage is that accurate? Was that a yep to me or? Okay.

   >> MR. MORGAN: In District 8 you are trying to add it.

   >> CHAIR SZETELA: Add it in 16 it's not going to improve the numbers.

But it will add more community members then.

   >> MR. MORGAN: Generally speaking yes you could trade out other population to change the numbers.

   >> CHAIR SZETELA: Commissioner Eid?

   >> COMMISSIONER EID: Just a suggestion, so first off, I'm not sure the Sikh community identifies as Asian American.

I'm not sure they put that on the census.

The Sikh community is not too different from the Chaldean community and actually it matches the areas match up pretty well with being you know Troy Rochester Hills Sterling Heights West Bloomfield Farmington Hills.

They might, I'm just not sure that they do.

But if we can look at the top of 16, the northern areas, does this go into Oakland Township? Yeah, it does.

That might be an area to look at moving and taking Oakland Township out of it and instead including more of Shelby and a little bit more of Sterling Heights.

You can put Utica in 16 and you take out Oakland and put more of Shelby in there.

How we have the dots right now they match up pretty well.

Yeah, we can go down too.

   >> CHAIR SZETELA: I was going to say I thought we were quite careful in this area. We were trying to keep together...Commissioner Clark it would be helpful if we have a map.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272        MICRC_008936

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> COMMISSIONER CLARK:  Taking Oakland Township I would take the northern part of Oakland Township.

It's very less populated.

And the southern part of it is really integrated in the Rochester Hills.

>> CHAIR SZETELA:  Commissioner Rothhorn.

>> VICE CHAIR ROTHHORN:  If we had a map one of the things, I wrote down from the Chaldean commenter in Grand Rapids, and again like our map the portal does not work as well as I would like for me.

Maybe others can find it but 68370 or 2 I'm not sure if it was a 3 or 2683 or 68270 does that sound accurate.

>> CHAIR SZETELA:  Chaldean?  Not the Sikh.

>> VICE CHAIR ROTHHORN:  The Sikh representative in Detroit did not give us a map.

Because you were asking for a map because of Commissioner Eid's comments that is why I'm sharing that.

Because there was a reference to a plan.

>> CHAIR SZETELA:  For Chaldean.

>> VICE CHAIR ROTHHORN:  Correct.

>> CHAIR SZETELA:  Not Sikh.

>> VICE CHAIR ROTHHORN:  Correct and I don't know if it's house or Senate.

>> CHAIR SZETELA:  Are we sure it's this map the concern is about, is it possible it was a house map?  That is what I'm kind of wondering.

>> VICE CHAIR ROTHHORN:  Yes, you got it we may be okay here.

>> CHAIR SZETELA:  I feel like we drew this very specifically to keep together the AAPI community.

And what?  Yeah, okay so let's just move on from here.

Because I don't think this is an issue for this map.

Because looking at the numbers I think unless anybody disagrees, I think this shows pretty clearly that this map is doing what they ask.

Okay.

All right so Ann Arbor and then Anthony did you have something about West Bloomfield too?  Like what was.

>> COMMISSIONER EID:  Yeah, at the Detroit hearing especially during the virtual public comment we heard from people from West Bloomfield and/or charred Lake Sylvan Lake referencing the Chaldean community of interest there.

The Jewish community of interest there, and they brought up that they don't want that area to be with the northern part of Oakland County.

Waterford, independence Township, Springfield Holly and would rather be basically with either District 9 or 11 as we have it drawn.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> CHAIR SZETELA:  Can we pull the map over so I can see what he is talking about?  Pull it so nine, there we go.

You're talking about District 18.

>> COMMISSIONER EID:  Yes District 18.

>> CHAIR SZETELA:  Repeat what you just said.

>> COMMISSIONER EID:  See that with the Township of West Bloomfield and Orchard Lake the square on the south right corner.

>> CHAIR SZETELA:  Where Sylvan Lake and Keego Harbor are.

>> COMMISSIONER EID:  All of those essentially.

It's my strong opinion that they should be with either 11 or 9 somehow.

Now that takes some reconfiguring but then if you do that you can also make a better 18 by putting all of the northern Oakland County Townships together.

Any thoughts on that?  I know Janice is from the area as well.

It's a bigger change.

>> CHAIR SZETELA:  So you want to put Orchard Lake West Bloomfield down with Novi-ish, Farmington-Ish and then do what with the rest of 18?

>> COMMISSIONER EID:  Then you move up on 18.

You include the rest of Oakland County with 18.

>> CHAIR SZETELA:  But why would you want to push that down?

>> COMMISSIONER EID:  Orchard Lake West Bloomfield.

>> CHAIR SZETELA:  Yes.

>> COMMISSIONER EID:  Cultural communities do not extend to Oakland County.

They are situated in Orchard Lake West Bloomfield and Walled Lake Commerce but do not go up into independence or Highland or White Lake or Waterford.

>> CHAIR SZETELA:  Okay.

>> COMMISSIONER EID:  I feel that is what honestly the main along with splitting up Ann Arbor on my individual map it has that change.

And it is one that I feel very strongly about.

In fact, I feel so strongly about it that if we make that change on this collaborative map it is likely that I would retract my individual map.

So I hope we take into account.

We can pull up the shape overlay perhaps.

And look at it if that is what the Commission chooses.

But again it goes back to Ann Arbor.

Because if we split Ann Arbor there is probably a way to do it where it brings in all of these Oakland County Townships as well.

>> CHAIR SZETELA:  Commissioner Vallette?

>> COMMISSIONER VALLETTE:  I agree with Commissioner Eid.

I think that those upper northern communities would be better with the other ones.

I agree with what he is saying.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

For VRA and minority based reasons.

So...this is the layer for Commissioner Szetela's plan.

Okay so let's make those changes to districts 27 and 29.

That follow the outline of that layer.

We are going to have one probably that's 27 be the northern portion and 29 be the southern portion.

>> MR. MORGAN: Okay so 29 is here and you want to put this entire southern portion into 29?

>> COMMISSIONER EID: Yeah, it doesn't matter which one is which.

We need one to be 27, one to be 29.

Whichever way is easier for you to facilitate that change.

>> COMMISSIONER EID: Once we are done with Ann Arbor it gets a lot speedier because we can go to Townships mainly.

>> MR. MORGAN: There is geography issues here so I'm taking my time with it. But working quickly.

>> MR. MORGAN: I'm going to go ahead and save this and reimport it because there is probably a geography problem.

>> COMMISSIONER ORTON: A triangle to the west a little bit more southwest corner and looked like there was unassigned or something.

>> VICE CHAIR ROTHHORN: Just move the decimal point is all.

And it's 4.6 we would be fine.

HSP is State House plan.

>> MR. MORGAN: Shape file

>> VICE CHAIR ROTHHORN: Thank you.

>> MS. SARAH REINHARDT: Commissioner Eid or Madam Chair while we are saving down here could you provide any additional justification for the change to this District?

>> COMMISSIONER EID: We are making a few changes here.

These changes are for the following reasons.

We are making two districts out of Ann Arbor.

Part of that is for community of interest reasons.

We've heard communities of interest ranging from Jackson to Ann Arbor.

And we've also heard people that say they want Ann Arbor to be split in order to have more representation.

And what this will end up doing is also having a better configuration for Oakland County. The changes I mentioned earlier including West Bloomfield Orchard Lake with the more southern parts and being able to recombine some of the northern parts of Oakland County.

It does that also bringing down the partisan fairness numbers to be closer to 0.

So supports both criteria three and criteria four.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                    MICRC_008958

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

And probably criteria six as well.

As far as maintaining municipality and County lines.

>> MR. MORGAN: I saved the plan, brought it back in and looks like it's following the line.

Do you want to run a contiguity check?

>> COMMISSIONER EID: No, we will do that at the end.

Let's follow the line on 27 as well over west.

I believe 29 there are some changes westward as well.

>> MR. MORGAN: You want these Townships of Washtenaw County into 27?

>> COMMISSIONER EID: That's correct.

>> COMMISSIONER EID: Eagle eye Orton.

>> MR. MORGAN: So continuing all the Townships?

>> COMMISSIONER EID: Exactly.

Top on the left do you see Marshall over there, that little part of 29 that is jutting out.

>> MR. MORGAN: Okay.

>> COMMISSIONER EID: Put that into 3.

Okay now let's go eastbound.

Do you see that one Township? That is in red in District 30? Yep, let's put that into 29.

Okay and then further eastward superior and Salem Counties.

Yeah Townships, thank you, not Counties.

>> MR. MORGAN: You wanted superior and Salem into 27 or 29?

>> COMMISSIONER EID: 29.

Okay let's move up to 18.

Okay Zoom in on Lyon and South Lyon there on the bottom left.

Move those into 18.

And then West Bloomfield, Orchard Lake, Keego Harbor, Sylvan Lake into 11.

Go left go Commerce Township.

We will go to the precinct level.

The right side of it.

The eastward side.

That is, yep, so the northern part of it, those right precincts, let's add those to 11.

>> MR. MORGAN: Population 3107?

>> COMMISSIONER EID: North of that.

>> MR. MORGAN: Adding those to 11?

>> COMMISSIONER EID: Adding those to 11.

At 2696.

Let me get my population numbers up.

2966, 2939, 2968.

Okay and then Wixom let's assign that to 18.

And 18 needs a little bit more around that area.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272          MICRC_008959

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> COMMISSIONER EID:  Second, I have a question for our VRA expert because 27 and 19 did not have that population needed as you indicated, would that be preferable then what I had started to originally do in splitting up 9 and 10? Because the reason I took this type of configuration because I did not want to touch 9 or 10 due to those minority considerations.

Because nine and ten do have that population.

See what I'm saying?

>> MR. BRUCE ADELSON:  Commissioner that is a great question.

Each one has its own challenges and its own I guess do and don't.  And it's different and Dr. Handley's analysis addresses black voting power, ability to elect in Wayne County and not in Asian voting strength in the Ann Arbor area.

So there are several considerations.

With also with the Asian community, even though their population wasn't high enough to control an election to be a majority or even a plurality, the potential maybe to have an influence District where you can have some influence on the outcome of an election.

I can't speak to the electoral patterns in Ann Arbor.

So 12% arguably you have more influence than 5% but I couldn't tell you based on data who votes for whom.

That is different in Wayne County where we have the data for that.

So that to me is the distinction.

Also with nine you have an ability to elect, opportunity to elect clear District based on analysis.

Ann Arbor as it was originally configured would be at best an influenced District.

Then I also raise the point too when you do divide a minority community that is always something to be alert to in the decision making.

Thank you.

>> CHAIR SZETELA:  Okay can we go ahead and run that for us, Mr. Morgan?

>> COMMISSIONER EID:  I did make note of the original numbers.

Before we made these changes as it was originally saved in version one.

It was 4.5 for lopsided margin test 2.2 for mean median difference, 3.2 for efficiency gap and a seats to votes ratio of 20-18.

With a bias of 0.3%.

>> CHAIR SZETELA:  Favor the democrats and the rest are republican leaning is that correct?  Lopsided and we cannot hear you.

Efficiency gap and republican.

>> MR. MORGAN:  That is what we have.

>> COMMISSIONER CLARK:  28, 29.

>> Can you turn on your microphone?  Thank you.

>> CHAIR SZETELA:  I don't have my mic on I'm sorry.

I thought it was 27 and 29.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                    MICRC_008966

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

So 68 and 57.

>> COMMISSIONER EID:  Let's go through the numbers.

Lopsided margin test.

I didn't see that one.

>> CHAIR SZETELA:  3.4

>> COMMISSIONER EID:  It's gone from 4.5 to 3.4 favoring republican.

Mean median difference is gone from 2.2 to 1.1 in favor of republicans.

2.2 to 1.1.

Efficiency gap went from 3.2 to 0.6% favoring republicans.

And the last one so we went from 20dem and 18R to 21dem and 17R.

And the bias increased from 0.3% democratic to 2.9% democratic.

>> CHAIR SZETELA:  I want to look at the swing on that too.

So can you close it out and I will have you rerun it.

>> MR. MORGAN:  Okay, just a second.

>> CHAIR SZETELA:  Yep.

>> COMMISSIONER CLARK:  Your purpose is to look at the Delta.

>> CHAIR SZETELA:  Just to look at the change of how it swings.

Like how stable it is.

>> MR. MORGAN:  What did you want me to run?

>> CHAIR SZETELA:  Close that because we will rerun the report but for the 2020 Presidential and we will run it for the 2016 Presidential and just see what happens with the numbers when we look at those two Presidential elections, how much does it swing. We can do 2012 those are the three Presidential elections that we have.

>> VICE CHAIR ROTHHORN:

>> MR. MORGAN:  For the State Senate plan?

>> CHAIR SZETELA:  Yes, the same plan you are in just rerun the report.

>> MR. MORGAN:  With Presidential elections.

>> CHAIR SZETELA:  Start with 2020 we will look at that then look at 2016 and then we can look at 2012 as well.

>> VICE CHAIR ROTHHORN:  Can you help us know because this is the first time, I'm seeing this and it may be helpful let us know what you are analyzing and yeah.

>> CHAIR SZETELA:  So I've had some discussions with Dr. Handley about this and there will be more follow-up on it.

But our totals are weighted average of the elections then when you dive down into individual elections for plans so we have plans right now particularly for the Congressional where the metrics look about the same.

So the mean median efficiency gap they are all .6, .7 mean median is 2.something but then when you look at individual elections you see some of the plans have huge swings. So that's what I'm looking for is so instead of doing yeah Biden versus Trump to see how much does this map swing.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

That gives you just a little bit more information about the stability of the plan.

   >> VICE CHAIR ROTHHORN: What you are saying also Dr. Handley was saying this is a good idea is that true?

   >> CHAIR SZETELA: Right when you are comparing different plans to dig into the lower level it's something you can consider looking at as well.

It's just another point of data to look at and say okay, you know, because like I said particularly for the Congressional that was something I was looking into.

Because our Congressional plans are so close and yet there is some that have very significant swings year to year.

So this is 2020.

Presidential, right? So this is lopsided margin.

   >> MR. MORGAN: 2020 election for one election.

   >> CHAIR SZETELA: For one election 2.9 republican.

Can we see mean median? 0.8.

Republican we look at the efficiency 2.3.

Republican and then let's look at the seats votes.

And then Commissioner Eid go ahead.

   >> COMMISSIONER EID: Well I was going to say if you want to go down this route then I think you are probably going to do this, we should look at 2016 as well because a different party won each of those.

   >> CHAIR SZETELA: Those are the two I think are most because they show a swing. So, yeah, that is exactly what I want to do.

I want to look again so we got that.

So we can close this.

We have it.

And then rerun it.

For 2016 Clinton versus Trump.

And then we are going to see some different numbers.

Yeah, Bruce do you have any thoughts looking in the election years versus going with the composite?

   >> MR. BRUCE ADELSON: I think to your point Commissioner, if you are looking at one election with a democratic nominee won and another election with a republican nominee won you could get that comparative sense of difference.

And then compare that to the -- the overall analysis that Dr. Handley did using all of the elections.

So I think using two elections like that is you get a much more accurate sample than just picking one election with one outcome.

Two elections with different outcomes I think is better.

   >> CHAIR SZETELA: Commissioner Rothhorn?

Agee et al. v. Benson et al., Case No. 1:22-cv-00272        MICRC_008968

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> VICE CHAIR ROTHHORN:  And what I think Commissioner Szetela is trying to help us understand is that there is a stability that we have because we have ten years of election data and so we have a stable.

But when we look into the individual more than one individual race, right we see swings. And so the I'm just trying to understand the stability factor.

Like why don't we just look at the one all ten years, right and understand okay we are good.

We have to look at the other ones to understand if there is more of a swing with more current numbers.

And that, yeah, help me unpack this.

>> MR. BRUCE ADELSON:  Picking two elections with different outcomes.

I heard comments at some of the public hearings just pick one election.

Pick like 2020.

Well 2020 the democrat won so you are already going to have some degree of bias. But then if you are looking at two elections where one the republican nominee won, one the democratic nominee won that is much more efficient I think as Dr. Handley explained than just taking one at a time.

Because that is something I think we have been consistent about too.

That shows bias that is in isolation.

Using her approach of looking at all the elections and picking two where the outcomes were different that just gives you additional potentially additional information.

>> VICE CHAIR ROTHHORN:  It sounds like the swing you're looking for right is if it's a large swing then we see instability that we don't see with a very stable ten years of election.

Is that right?  So we are getting more data right.

So the swing is what we are looking for.

Right to make sure we get a more stability District.

>> MR. BRUCE ADELSON:  I think between those two elections that there is that potential.

But I think for us it's more it's fairer in that you're not just skewing it by picking one election with one outcome.

You are picking two elections with different outcomes.

One for each party.

>> VICE CHAIR ROTHHORN:  The District that we have drawn or the whole state map we have drawn we might, okay, this helps you understand like the variance or the swings that we see helps us choose a more stable set of maps instead of districts.

>> CHAIR SZETELA:  How I think of it I used to teach college classes so think of it from being back in school and how your grades work.

So maybe you've got four students who have Bs and then but when you dig into that and you look and you've got one student who is consistently a B student one who has A

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

and Cs one has all As and a terrible grade maybe they got in a car accident and missed a test and you have one an AB and C.

You can't Judge a map just looking at a single number but when you look at other numbers you can evaluate especially when we try to compare maps how do the happens compare.

So looking into the 2020 versus the 2016 these are two elections with very different results.

If you have a map that is swinging wildly to me that is a less reliable map than a map that I would expect some swings but like two to 3% swing one way or another.

Or within our margin of what we are looking for say up to five.

To me that's a more trustworthy accurate map than one that is going 0-11.

So that's what I'm looking for is that swing because to me it helps me understand the plan.

Like I would expect more republican bias in the 2016 election because Trump won that year and there was a wave of republican votes.

And then 2020 was the opposite.

So same thing with Obama in 2012 I would expect there to be less republican bias and more democratic swing in that.

So I expect some bias.

But what I'm looking for are things where there is significant bias that I wouldn't expect because that tells me there is an issue with the under lying plan.

Mr. Brace?

>> KIM BRACE: Yes.

I'm happy to come in on this discussion.

It is an important discussion.

And it's something that we've always tended to look at and why we try to put in as much data as possible.

Because in politics and in elections you do see the changes that take place.

Certainly over this past decade and by looking at the individual contests, which is how we've set this up so that you can do that, you've got the ultimate flexibility.

We've created the composite score so that we kind of take individual bias out.

But we give you the capability of looking at the individual ones and be able to run the comparisons and see how it looks.

So I think this will give you the ultimate, what is the wide variety of what we might see.

>> CHAIR SZETELA: Thank you Mr. Brace.

Can we see Mr. Morgan those last numbers you ran and go ahead Mr. Lett?

>> COMMISSIONER LETT: We are at the order of the day.

>> CHAIR SZETELA: 1.9 lopsided margin this is 2016, yep.

>> MR. MORGAN: Correct.

>> CHAIR SZETELA: Mean median 2.1 republican.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

Efficiency gap is 3.5.

Republican.

Seats vote is 18.

20.

In favor of republican with a negative 2.5 bias for democrat.

So that is exactly what I'm talking about the swing.

So just to wrap up so we can move on so when you look at the overall for the lopsided margin, version three, the composite is 3.4 republican.

When you look at the 2020, it goes 2.9 republican.

For the 2016 it goes 1.9 republican.

Mean median it goes 1.1 republican for the composite.

To .8 for the 2020 Presidential.

Then up to 2.1 for the 2016.

So for the efficiency gap we have 0.6.

For the composite.

2.3 for the 2020.

Again leaning republican.

3.5 leaning republican for 2016.

And then in the seats votes we see that swing where we have 2117 for the composite but if you look at 2020 it's 2018 then if you look at 2016 it's 1820.

So there is swings but they are still within the 5% that we talked about earlier.

Go ahead Commissioner Eid?

>> COMMISSIONER EID: Well, I mean what is most striking to me comparing those two elections is in the election where republicans won, they won the most seats 20-18. The election where the democrats won, they won the most seats and it was the same ratio 20-18.

I'm kind of surprised it's 20-18 given the composite score.

So that is surprising to me actually.

But it works and on both elections, it seems like you know the party that won the most votes wins the most seats.

>> CHAIR SZETELA: Commissioner Witjes?

>> COMMISSIONER WITJES: Not jumping the gun here but we are going to Midland next right.

>> CHAIR SZETELA: Going to Midland.

>> COMMISSIONER WITJES: This map is Midland City with the Tri-Cities, or no?

>> CHAIR SZETELA: I believe it is.

>> COMMISSIONER WITJES: Okay.

>> CHAIR SZETELA: You want to handle Midland Dustin?

>> COMMISSIONER WITJES: I don't.

[ Laughter ]

DISCLAIMER:  This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning.  The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> COMMISSIONER WAGNER:  Present; attending remotely from Charlotte, Michigan.

>> MS. SARAH REINHARDT:  Richard Weiss?

>> COMMISSIONER WEISS:  Present.

>> MS. SARAH REINHARDT: Dustin Witjes?

>> COMMISSIONER WITJES:  Present.

>> MS. SARAH REINHARDT:  12 Commissioners are present.

And there is a quorum.

>> CHAIR SZETELA:  Thank you, Ms. Reinhardt.

We are continuing on working through the maps and shifting over to the Grand Rapids area.

So if we can shift over to Grand Rapids and who would like to lead this?  Commissioner Orton?

>> COMMISSIONER ORTON:  Not to lead it but before we do that since we've been talking about the different metrics and looked at the different elections, I wonder if we could have Mr. Adelson talk to us about Lisa Handley's advice or the information, she gave us.

>> MR. BRUCE ADELSON:  Thank you Commissioner I would be happy to.

The metrics that are being used like the efficiency gap and lopsided margins for example, these are methods that have been used in Court.

They have been endorsed by the courts.

They are recognized by the courts.

These are methods that they are accustomed to using.

There are many methods to evaluate, this is partisan fairness and in some states competitiveness.

These are the methods that Dr. Handley selected as you know.

These are methods that are widely accepted.

They are not controversial.

They are not revolutionary.

They are not untried.

Each metric gives you a different number and result which amounts to eventually looking at the margin to see if that is consistent with the conclusions of Dr. Handley about the where the predominant of the vote is in the State of Michigan today.

Looking at her analysis involved three elections rather than one.

One election tends to skew the result depending on who the winner is of the Presidential election.  So at the end of the day from our perspective, the looking at the four metrics, looking at the string of elections to quote Mr. Morgan is consistent.

This is consistent analysis across the board.

Using a string of elections is more consistent than just cherry picking and using one.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

That partisan bodies may do political may do because they are naturally trying to skew the result in a partisan way.

This is not a partisan body.

It's not an elected body.

It's not a legislature, it's not a political party.

So looking at things from our perspective in a way that are defensible, that is consistent, those are the most advisable.

The decisions about how what particular efficiency gap or lopsided margin the Commission chooses as a body to accept as far as maps are concerned of course is a Commission decision.

If there were a margin in any map that was inconsistent, that was an out liar, I'm not going to throw numbers out but something that would be obvious on site to all of us, that is something that we would advise against doing.

But picking what -- however far you think the efficiency gap should go and how however many, what you think the seat margin should be is a Commission decision.

Based on the partisan fairness analysis and we are certainly here to answer any questions about numbers going forward.

But that's going to be very important discussion over the next week.

Does that help?

>> COMMISSIONER ORTON: Yes.

So you're saying using the string if that is what we are calling of elections, the group of elections that Dr. Handley gave us to use in our analysis is what we should be doing.

>> MR. BRUCE ADELSON: Well that is the most defensible.

I think you can pick different elections like Commissioner Szetela 2020, 2016 to get additional metric or additional bit of information.

Which having additional information I think can typically be a good thing.

But as far as making decisions, rather than picking as I said one election as your bellwether one election as your benchmark is not as defensible as going through those consistent elections where we have this, this and this.

So not just taking one snapshot out of time in one year.

That's a more of a best practice, more of a defensible position to take in deciding based on the breath of the analysis and the election.

>> CHAIR SZETELA: Commissioner Rothhorn?

>> VICE CHAIR ROTHHORN: To dive in deeper the Ann Arbor when we did do that analysis one of the things that Commissioner Eid lifted up was that in the seats vote ratio in particular between 2020 and 2016 there was a flip, right.

And so I think if I'm hearing you correctly right that is additional information that helps us understand the districts we have drawn are with that configuration not just the Ann Arbor but the whole state map what we looked at helped us see we have proportional

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

and a relatively balanced map with the change we made with Ann Arbor is that accurate?  Meaning what Commissioner Eid lifted up.

   >> MR. BRUCE ADELSON:  I think to your point it's an additional data point, additional point of information that you can take as far as you want to take it.
But it still is going to come down to the nitty-gritty decision how far do you go.
How far in choosing maps, what is the seat differentiation, what is the efficiency gap difference that the body decides is the map you wish to approve or move forward.
So as you know there are a lot of numbers.
And there are the efficiency gap goes one way.
The seat margin goes another way.
The discussion, the informed discussion of, well, but how low should we go.
Or how what should this percentage be that is for discussion and debate.

   >> VICE CHAIR ROTHHORN:  Okay thank you.

   >> CHAIR SZETELA:  Commissioner Eid?

   >> COMMISSIONER EID:  If we are able to maintain all of the other constitutional criteria is closer to 0 on those numbers better?

   >> COMMISSIONER LETT:  Loaded question.

   >> MR. BRUCE ADELSON:  I wish you were a student in one of my classes.
We would have a lot of fun.

   >> COMMISSIONER EID:  11 years yesterday maybe I will add a couple more.

   >> MR. BRUCE ADELSON:  I'm not going to say taking things you know, out of whether it's out of context or just taking a snapshot in a way.
That I I'm not going to say one is better or not.
That the -- you have four tests that you are using.
And it's up to you in your discussions to decide which one is better perhaps.
And how far do you go?  How far is what you consider the body considers individual Commissioners decide is the best.
Or one is better than the other.
But that's not for me to say.

   >> CHAIR SZETELA:  Commissioner Eid?

   >> COMMISSIONER EID:  Well if it's up to us to decide it's certainly in my opinion that closer to 0 while maintaining the communities of interest and all of our other criteria is more fair.
That's what the numbers say.
Even on that last map.
In my opinion.
Three of the four numbers still were republican leaning but all of them were closer to 0.
That is a decision for all of us as our esteemed counsel just told us.
So.

   >> CHAIR SZETELA:  Commissioner Lett?

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> COMMISSIONER LETT: There was one today on the comment.

Leave it where it is.

>> CHAIR SZETELA: Yep.

I remember that.

Okay, any thoughts, comments? Commissioner Orton? I saw your hand.

>> COMMISSIONER ORTON: Is there anything left on the list or can we take a look.

>> CHAIR SZETELA: Southwest Grand Rapids and northern Wyoming but I believe that was a house concern because they are together in this map.

And then not for this map Grand Rapids Kalamazoo was a discussion point but that was Congressional and not for this obviously.

What else do we got? That's it for this area.

>> COMMISSIONER ORTON: Could we Zoom out and kind of see maybe not the whole thing at once.

But, yeah, go down to the bottom.

>> CHAIR SZETELA: There was a comment about Parchment with Kalamazoo and I don't know if that impacts this map or not.

It might have been a house map.

I see Kalamazoo so Parchment.

>> COMMISSIONER ORTON: Parchment is with Kalamazoo.

>> CHAIR SZETELA: That is not an issue with this map.

It's the house map.

Yeah.

We had some comments about the UP.

Did we address Sheboygan west rather than east Ross common Benzie have we gone to Gaylord yet? I feel it's been a long day.

We looked at it and said we didn't need to.

Yeah, Commissioner Witjes.

>> COMMISSIONER WITJES: Can I see the UP real quick? And Zoom in to the Sault St. Marie area.

These particular County splits I know I brought them up.

Do we want to potentially look at these here? Or keep them as is? I am on the fence either way.

So.

>> CHAIR SZETELA: Commissioner Rothhorn.

>> VICE CHAIR ROTHHORN: I believe one of the reasons we did this there was a large population of native indigenous populations in Sault St. Marie and we headed west to Traverse City area with District 37.

>> COMMISSIONER WITJES: So then that was my recollection as well.

The only concern I have there between 38 and 37 then is that one Township that's really long that juts into 37.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> CHAIR SZETELA: Rerunning for partisan analysis for 2020 and 2016 so we have the same numbers for version three and we will go back to version three again so Brittini can make her changes.

>> COMMISSIONER CLARK: Just for comparison.

>> CHAIR SZETELA: Yes.

>> MR. MORGAN: This is the one you want to look at before you made changes this morning?

>> CHAIR SZETELA: Which was version one.

Yeah, that was the right one yes.

>> MR. MORGAN: The one before the Ann Arbor changes is version one.

>> CHAIR SZETELA: Yes.

So version one has that change up near the new Baltimore area but otherwise there is no other changes in it other than the changes we did yesterday obviously.

>> MR. MORGAN: Okay this should be the correct plan.

So there's no change this Ann Arbor.

But there is the lakeshore change in District 7.

So I believe this is the correct plan.

And what did row want me to run please?

>> CHAIR SZETELA: I want you to run the partisan fairness partisan fairness for the 2020 Presidential election and we will write down the numbers and we will do the same thing for 2016.

Then we will go back to the other version.

It's further up.

Yep, there it is by Biden and Trump.

I mean, yeah, close like we made changes to it yesterday.

So and then Doug made a change this morning.

So it just doesn't have like the Ann Arbor and Grand Rapids changes.

And honestly Ann Arbor is what really changes things around so.

So 4.1 lopsided margin what is the mean median? 1.5.

Okay.

What is efficiency.

4.9 big change there.

19-19.

Negative 1.4D.

And then 1.4 republican.

So can you close that out? We don't necessarily have to save it and just run it again for 2016.

So Clinton versus Trump.

Lopsided margin is 3.2 still leaning republican.

Mean median is 3.3.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                    MICRC_009000

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

Leaning republican.

Efficiency 6.2.

Leaning republican.

And seats vote is 17-21.

Negative 5.1 bias, okay.

So we went from a map that looked great.

So 4.5 I wouldn't and shouldn't say that because people online will screen 4.5 republican for the lopsided margin.

And then it had 2.2 republican lean mean median, 3.2 efficiency gap and seats vote ratio of 20-18 with a .3 democratic lean.

When you run it for 2020 it goes from 4.5 lopsided margins down to 4.1.

The mean median goes from 2.2 to 1.5.

The efficiency gap increases from 3.2 to 4.9.

And the seats vote ratio breaks evenly 19-19 which is actually biased against democrats 1.4%.

If you go to 2016, we see even more radical changes.

So it goes I shouldn't say radical that is probably not the right word more changes goes 4.5 all the way to 3.2 lopsided margins so that seems more favorable but the mean median goes 2.2 to 3.3.

In the efficiency gap goes from 3.2 to 6.2.

And then the seats votes switch from 2018 democratic to republican.

To 17 democrat to 21 republican which is a negative 5.1 bias for democrats.

So that is what I'm talking about with the swing.

That when you look at the composite .3D, that is not the whole story.

You kind of got to look deeper.

   >> VICE CHAIR ROTHHORN: Does it reflect so 2020 was the election where there were more democrats no excuse me 2020 yeah more democrats and 2016 was more republicans.

   >> CHAIR SZETELA: Yep.

   >> VICE CHAIR ROTHHORN: When we looked at the Ann Arbor District like there was a correlation what is the correlation here?

   >> CHAIR SZETELA: So when you have the original map does not split Ann Arbor. So the version one that I just read to you does not split Ann Arbor and has seats votes ratio of 20-18 with a .03 democratic lean so very small democratic lean.

The version three has a 21-17 seats vote for the composite.

And a 2.9 democratic lean. But when you run it for the 2020 Presidential election the seat vote for 2020 is 20dem, 18 republican and the year where Trump was elected 2016 it shifts 18-20.

And the efficiency gap never goes above 3.5.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

So there is less variability in that version 3 map with Ann Arbor being split.
Commissioner Eid?

>> COMMISSIONER EID:  So I think to sum it up which is what I think what Commissioner Rothhorn was asking for, before the Ann Arbor changes, when on the Senate maps if you ran the 2016 numbers, republicans won on 17-21 margin was that what it was, 2016.

>> CHAIR SZETELA:  2016 for which one?

>> COMMISSIONER EID:  2016.

>> CHAIR SZETELA:  Which map?

>> COMMISSIONER EID:  Version one.

>> CHAIR SZETELA:  Version one 2016 republicans won 21 seats to 17 democratic seats.

>> COMMISSIONER EID:  Which is the election they won all be it by a very small margin.
In 2020 where the democratic candidate won by a large margin a larger margin than in 2016, they did not win the most seats with version one.

>> CHAIR SZETELA:  It was tied 19-19.

>> COMMISSIONER EID:  Verse once we made the Ann Arbor changes 20-18 flipped based on which party won the most votes.

>> CHAIR SZETELA:  Yes, and then 2016 it flipped again based on which party won the most votes.

>> COMMISSIONER EID:  Does that help answer your question?

>> VICE CHAIR ROTHHORN:  The answer is yes but I still have this nagging sort of I know these political numbers can be manipulated, right.
I think we are looking at these because these are the most recent ones and are included in our composite election results and Dr. Handley said use the composite.
The reason we are breaking these two out is because they are more recent and help us understand the composite.
And in a nuanced way.
Is that fair to say? Mr. Adelson?  Like we are looking for a nuisances here that is not and the courts will not uphold this so I think what we have to decide is how we are going to make this decision.
Ann Arbor is not, yeah, like we have to understand it.
We will keep Ann Arbor split the way we are or not?

>> MR. BRUCE ADELSON:  As we come down to the end of the day and on Friday and the end of the week, yes, I mean I agree.
I think that these decisions are ultimately up to you.
And as you said with the consistency of the composite election results.
That seeing that consistency -- tool are defensible and then deciding which -- how far do you want to go.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                    MICRC_009002

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> COMMISSIONER EID: If Commissioner Kellom is satisfied with those satisfied before we adjourn can we just run the numbers real quick and see if they changed them.

>> CHAIR SZETELA: Partisan fairness, yeah.

>> COMMISSIONER EID: I doubt they changed very much.

But just to make sure.

>> MR. MORGAN: Okay you want the partisan fairness for this with all of the changes that we made today.

Okay these are the numbers.

>> CHAIR SZETELA: 3.3.

6.2, not good changes.

Yeah.

>> COMMISSIONER EID: That changed a lot, yeah.

Is this the right one? Are we looking at the right thing.

>> MR. MORGAN: I will double check.

>> CHAIR SZETELA: I feel like that is the 2016 old map.

>> MR. MORGAN: I'll run it again.

And.

>> CHAIR SZETELA: The version one map but who knows.

>> COMMISSIONER EID: I think you have to click on partisan fairness.

>> CHAIR SZETELA: Partisan fairness, there you go.

I've done this too many times.

>> MR. MORGAN: There may be an issue it's going to run the same report under the same name.

>> CHAIR SZETELA: Yeah.

You got to close the other one.

4.6.

Lopsided margin.

>> COMMISSIONER EID: Increase from 3.4.

>> CHAIR SZETELA:

>> MR. MORGAN: I can tell you what happened if you want.

>> CHAIR SZETELA: That is all right.

We don't need to know.

>> MR. MORGAN: Okay.

>> CHAIR SZETELA: So with the mean median.

1.2.

Okay.

1.2.

The old one what was it, 1.1.

Efficiency is 3.4.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> VICE CHAIR ROTHHORN: It was .6.

>> CHAIR SZETELA: And the seats votes, yep.

>> VICE CHAIR ROTHHORN: It was 2.9.

>> CHAIR SZETELA: And if we, yeah, so if you look at District 7, the changes of taking out Detroit flipped District 7 to a republican District which is what the change is coming from.

>> MR. MORGAN: If you took less of the area on the Algoma or whatever it is it would change it back and change all your metrics.

>> VICE CHAIR ROTHHORN: For what it's worth 7 is like 49, 50 like yeah.

>> MR. MORGAN: Reverse that and make it 50-49 and the metrics.

>> CHAIR SZETELA: It was 51.1 before.

>> VICE CHAIR ROTHHORN: Okay right.

>> CHAIR SZETELA: All right so.

>> COMMISSIONER EID: What do we think? Those changes seemed to make the numbers worse.

Do we maybe want to keep the Detroit change that was made in 13 and 7 but revert the changes made in District 7 or what does everyone think?

>> CHAIR SZETELA: Let's come back on Monday and talk about it then because we are over time at this point.

All right, that concludes our deliberations for today.

We don't have any minutes to approve I don't believe.

And no staff reports.

Correspondence received in advance of the meeting is included in the Commissioner's meeting materials.

Future agenda items.

Announcements.

As items on the agenda are completed a motion to adjourn is in order motion made by Commissioner Witjes and seconded by Commissioner Lett is there any discussion or debate on the motion? All in favor raise your hand and say aye.

All opposed say nay.

The motion carries and the meeting is adjourned at 5:05 p.m.

Thank you.

# NOVEMBER 1, 2021

# NOVEMBER 1, 2021

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> MR. KENT STIGALL: So y'all wanted to use the Whitmer; is that correct? And who else.

>> COMMISSIONER LANGE: Whitmer and Schuette.

>> MR. KENT STIGALL: And Schuette was the republican.

>> COMMISSIONER LANGE: Yes.

>> MR. KENT STIGALL: Okay.
And I don't know why it says divide by zero here.

>> CHAIR SZETELA: Maybe do percentage instead of.

>> MR. KENT STIGALL: Yeah, I clicked the wrong one. Let me try this again. Should be the actual number. Whitmer. Other way around? Yes, that is probably what did it.

>> COMMISSIONER LANGE: Let's make sure we have it for the Governor race too because Mr. Schuette was also Attorney General. So I just want to make sure we have it on the correct, it would have been 2018.

>> MR. KENT STIGALL: Okay so there is Schuette. And see how that works, yep. Okay here is the numbers. We can come back to them any time. So the lopsided margin was 6.1%.

>> CHAIR SZETELA: Okay.

>> MR. KENT STIGALL: Mean median is 1.6% republican. Efficiency gap is 0. And the seats is 23-15 and efficiency gap is minus is over 6% proportionality bias is 6%.

>> CHAIR SZETELA: Okay can we rerun it for Snyder? So you have to click on partisan fairness again or it won't do it right.

>> MR. KENT STIGALL: Do what.

>> CHAIR SZETELA: Click on partisan fairness again or it won't do it right.

>> MR. KENT STIGALL: Which one was it again the year.

>> CHAIR SZETELA: 2014 and I believe it was Schuette; is that right? Schuette versus Schauer. Snyder versus who was the democrat.

>> COMMISSIONER LANGE: Shower Schauer or something like that.

>> CHAIR SZETELA: I think it's further down. I think it's past the state like the Senate races because it's a state race so there is Whitmer so it would be further under that so Whitmer. Go down. Snyder right there. So Snyder is the republican. So Schauer is the democrat so democrat is shower and then Snyder is the republican.

>> MR. KENT STIGALL: Who is the republican again?

>> CHAIR SZETELA: Snyder.

>> MR. KENT STIGALL: Snyder.

>> CHAIR SZETELA: SNYDER, there he is I see him there. That is right there, yep.

>> MR. KENT STIGALL: Snyder Schuette.

>> CHAIR SZETELA: Not Schuette, shower, right there, shower is your democrat.

>> MR. KENT STIGALL: And Snyder.

>> CHAIR SZETELA: Snyder, yep.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272　　　　MICRC_009045

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> MR. KENT STIGALL:  Lopsided is 1%.  Mean median is .4.  Efficiency gap is 7.3. And seats are 8.5%.

>> CHAIR SZETELA:  Uh-huh.

>> COMMISSIONER CLARK:  Should we put the democrat on top and the republican?

>> CHAIR SZETELA:  He did.

>> COMMISSIONER CLARK:  He did.

>> MR. KENT STIGALL:  We can look at it again, I just want to make sure.  Which election is it.

>> CHAIR SZETELA:  The 2014 gubernatorial.

>> MR. KENT STIGALL:  So we had Schauer and Snyder.

>> COMMISSIONER CLARK:  Okay, good.

>> MR. KENT STIGALL:  Anymore?

>> CHAIR SZETELA:  Yeah, if we can do the composite and do the two Presidential elections as well so just do the overall.

>> MR. KENT STIGALL:  Well I did the original overall.

>> CHAIR SZETELA:  You have it saved.

>> MR. KENT STIGALL:  I did save that, which one do you want to do.

>> CHAIR SZETELA:  2020 Presidential.  You have to click on partisan fairness first. I know.

>> MR. KENT STIGALL:  Statewide races Biden.

>> CHAIR SZETELA:  Biden and then Trump 20 because there is more than one Trump on there.

>> MR. KENT STIGALL:  Trump 20.

>> CHAIR SZETELA:  Yep.

>> MR. KENT STIGALL:  Lopsided 1.7.  Mean median is .6.  Efficiency gap is .5.  And seats is 3.9.  21-17.

>> CHAIR SZETELA:  Okay can we do the same for the 2016 election which is Trump versus Clinton? .

>> MR. KENT STIGALL:  16 not Trump but Clinton.  16 Trump.  1.9.  2.1.  3.4.  And minus 2.5 for democrats, yep.  Yep.

>> CHAIR SZETELA:  Pull up I'm sorry I had the microphone off pull up the overall composite and Commissioner Clark you had a comment.

>> COMMISSIONER CLARK:  Wanted to look at District 7 numbers that is my comment.

>> CHAIR SZETELA:  Sorry.

>> COMMISSIONER CLARK:  I want to look at them from a composite index perspective.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                    MICRC_009046

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> MR. KENT STIGALL: You want to look at the, I will just run it again just because I can. Statewide democrats. Statewide republican. The lopsided is 4.6 republican. 1.2 republican. 3.4 republican. And minus .3 republican.

>> CHAIR SZETELA: Okay .3 for democrats negative for republicans, depending on which party you are looking at.

>> MR. KENT STIGALL: So close.

>> COMMISSIONER CLARK: Is this the composite?

>> CHAIR SZETELA: We are good.

>> COMMISSIONER CLARK: Looking at the numbers with the changes I made, not with this, the numbers are relatively very close. So I see my opinion is I see no need to change.

>> CHAIR SZETELA: And that is what I was telling you. I think it's fine and you accommodated a community of interest and Commissioner Kellom made some changes to accommodate another community of interest. And I don't see any reason to change it but I mean I'm just won't person, if other people, I think it's good.

>> COMMISSIONER CLARK: So I'm going to yield back and I don't see any changes on District 7. We will move on.

>> CHAIR SZETELA: Did you want to look at VAP at all? He has the map up, did you want to look at that?

>> COMMISSIONER CLARK: No. I'm good.

>> CHAIR SZETELA: Okay.
All right, so any other -- did you have an Ann Arbor District you wanted to put up.

>> COMMISSIONER CLARK: I did not hear.

>> CHAIR SZETELA: Did you have an alternate Ann Arbor District you wanted to pull up?

>> COMMISSIONER CLARK: I did and do you want me to Zoom in and bring it up? Would that be easier.

>> CHAIR SZETELA: Did you send it to Kent?

>> COMMISSIONER CLARK: I can.

>> CHAIR SZETELA: Okay because like I told you I drew an alternative one too if you want to consider that.

>> COMMISSIONER CLARK: Let's look at them both.

>> CHAIR SZETELA: What is the will of the body? I feel we got a lot of comments today liking this, we got a few who didn't like it. I mean I drew an alternative to sort of put the more rural areas down to address some of those concerns go ahead Commissioner Witjes.

>> COMMISSIONER WITJES: I have a question do alternative maps at this point still require 24 hours in advance before we pull them up to the Secretary of State media?

>> COMMISSIONER CLARK: It's not an alternative.

>> CHAIR SZETELA: It's not alternative just showing a different configuration.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> COMMISSIONER LANGE: My question is were we not going to vote on how many we would bring forward before we decide which ones were going to go forward? I'm just.

>> CHAIR SZETELA: Yeah, I think that remains to be seen. I think for we don't have multiple maps at this point for the Senate. We are certainly not limiting other Senate maps so just a vote on this particular map. Commissioner Witjes?

>> COMMISSIONER WITJES: Just a thought on that because that is an excellent question, I would say in regards to the total maps we should be at or below what we brought for public comment. I know this is completely unrelated to what we are voting on, talking about the number of maps to move forward and keep in the back of your mind in my opinion it would have to be the same number we brought forward on the second around of public hearings or less.

>> CHAIR SZETELA: All right so restating the motion we have a motion by Commissioner Witjes seconded by Commissioner Lett to advance map 102921SD version 3 for the State Senate to publish it for 45 day public comment period and consideration by the public and consideration for us for a vote after that 45 day period expires. Is there any discussion or debate on the motion?

>> COMMISSIONER WITJES: I just request a roll call.

>> CHAIR SZETELA: Absolutely Commissioner Eid?

>> COMMISSIONER EID: I think it's a good map. I think it's a great map actually supports communities of interest. Supports all of the VRA considerations we've been looking at. The data that was just ran had 2014 and republicans won the election. They won the most seats. 2016 republicans won the election slightly and they slightly got the most seats. 2018 democrats won in a blowout and they got the most seats. 2020 the same thing, democrats won and they got the most seats. And the composite scores of all ten years of election history show that it's a fair map on you know, accepted measures of partisan fairness. It looks compact to me. And I think we did consider County, Township and municipality lines. So I like the map, in support of it.

>> CHAIR SZETELA: All right and yes just to confirm this map was called the cherry. So this is version 3 of the cherry map as adjusted by the Commission. All right we are going to take a roll call vote on that motion, sorry Commissioner Orton?

>> COMMISSIONER ORTON: One more thing Kent can we just see the spreadsheet, the partisan fairness again for the composite scores on this? Sorry, I did not write them down.

>> MR. KENT STIGALL: Let me make sure this would be the right, so this would be the last one run. I'm just going to run it again to make sure we are not -- it doesn't take but a second, right? Okay this is the current lopsided margin favors the republicans 4.6%. Mean median is 1.2%. The efficiency gap is 3.4. And the seats to votes is 2018 proportionality bias is .3.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                    MICRC_009051

# NOVEMBER 2, 2021

# NOVEMBER 2, 2021

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

republican. With a bias against democrats of negative 3.22. It also has a plan deviation of 8.44. The Peach house plan.

>> COMMISSIONER ORTON: Which one was that?

>> CHAIR SZETELA: Oak so Peach has 6.3 lopsided margin which is .5% lower than oak. It has a mean or a mean median of 3.4 which is .4% lower than oak. It has efficiency gap of 6.4 which is a percentage point lower than oak. It has a democratic to republican seat balance of 55-55. Whereas oak was 54 democrat 56 republican. With a negative bias against democrats of negative 2 point 3 versus 3.33 with the oak. Then the Pine has a lopsided margin of 5.8 which is lower percentage point lower than oak. And half a percentage point lower than Peach. On a mean median of 2.7. Versus 3 -- and efficiency gap of 5.7 versus 6.4 and 7.4 with the Peach and oak respectively. Seat balance of 56 democrats to 54 republicans which is still a negative bias against democrats of negative 1.4%. So best performing is Pine. Middle is Peach. Worst performing is oak. Commissioner Orton?

>> COMMISSIONER ORTON: What is the population deviation on Pine?

>> CHAIR SZETELA: It's 4.9% and Peach is 8.3. And oak is 8.4. Did everyone get all that or do you want me to repeat it? Good, now can we look at individual maps? .

>> MR. KENT STIGALL: Turning off Peach, Pine and oak or oak Peach and Pine. Turning on, 101321V1. CSO fixed turn that on. That is going to be the red plan. Next up is 101321RAS. It should be green, I'm sorry. And then the ten 0921DJC, should be make that blue because it's supposed to be blue. Keep me from losing it. That would be the CSO which is, yeah, CSO.

QUESTION: Kent, you muted yourself.

>> MR. KENT STIGALL: DJC is blue. Looking at the same sequence. This order here is red, blue, red, green, blue. Just kind of go up to the top again and do the visual scan. This looked pretty subtle. I believe that looks the same as the previous plans even but we can lay them back in public ones. We start seeing a difference in all three plans Midland there is one Township here moved. Otherwise they are all pretty similar. One Township here moved. Then we have you know a variety of packed here. We will go through them one at a time when we come back to it. Two plans the RAS and the RAS plan is different from the other two around Flint. One side of Flint really, not all of it. Actually it's probably just one District. And then of course when we get down to the Detroit area you start seeing where the RAS plan varies from the other two plans. A little here, a little there. More so at South Lyon, Brighton. Maybe at Ann Arbor. And then we get where the CSO and the DJC plan the CSO plan varies from the other two plans in Carlton south of Taylor. Right there. Coming across there is one Township difference for the RAS. From the others. Probably and then we have the Battle Creek, Calhoun area. Shows a difference. Probably the next probably the biggest difference besides the Detroit and Midland is this, these districts here. The blue and red, I guess I don't know. The blue plan which is Doug Clark or DJC plan goes up the coast fairly

DISCLAIMER:  This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning.  The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

they have in common is the Midland and Midland Township and the northern part of pretty much the same or very similar I should say.  And they differ in these two areas.

>> CHAIR SZETELA:  Commissioner Rothhorn?

>> VICE CHAIR ROTHHORN:  So it seems like we want what I'm thinking about those are the ideas we want to take with us, right, the Midland area, Benton Harbor and the Detroit area.  And it seems like we've got in order to make a decision again we are trying to figure out what adjustments we want to make before we make a decision.  I'm thinking about right ideas like from these the individual Commissioners map and different ideas and we have got new data from yesterday that talks about VRA districts.  Because these are so small and potential coalition districts and I know we have right from the Flint hearings and Detroit hearings we heard help us feel reflected.  Help us feel like we can actually elect a representative.  I want to recognize ideas and then there is also I want to suggest before I feel comfortable voting for a map to go forward, I really want to make sure that we get some sort of analysis right that says like we can make changes here.  Specifically in the Detroit and the Flint area based on this coalition District data to help us understand that we are being responsive particularly to those communities and these population centers that have been historically marginalized.

>> CHAIR SZETELA:  Commissioner Orton?

>> COMMISSIONER ORTON:  Well, I think didn't we decide all of our independent maps were based on Pine.  Is that accurate?

>> CHAIR SZETELA:  I'm not sure with yours.  You didn't say one way or another.

>> COMMISSIONER CLARK:  I'm not sure either but as I reflect back to the hearings, the last five hearings, Pine was mentioned more than any of the others.

>> COMMISSIONER ORTON:  And it has the best matrix so I would say we should start there and make improvements.

>> CHAIR SZETELA:  I'm going to share because I have the, share the metrics because I have it open.  So this is our -- Sarah's spreadsheet that I pulled.  But I got rid of everything other than just the house so we can see it.  But yes, these are sorted and ranked.  By best performing to bottom performing.  So and then if you notice two of them have the plan deviation below 5 again.  So that would be Pine and Szetela.  And I agree we should start with Pine.  I think that is a good jumping off spot.  I think we should my thoughts are incorporate possibly Cynthia's changes to Battle Creek from her map and then also one of your changes, I'm not sure whose from Midland as well.  Or, you know, go through the list.  But I think like using Pine as a jumping off point.  We heard about it the most, it has the best metrics in terms of deviation and overall performance.

And we can overlay mine for the Ann Arbor area later if we want to look at Saginaw and Ann Arbor and what I did there and designed side if we want to make those changes too.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272          MICRC_009163

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> COMMISSIONER CLARK: I would like to make sure we look at the lakeshore over on the west side of the state.

>> CHAIR SZETELA: Oh, yeah, because we got to adjust that. Yep.

>> MR. KENT STIGALL: Madam Chair.

>> CHAIR SZETELA: Yes.

>> MR. KENT STIGALL: I would just like to mention that the total population deviations, that is fairly easily adjusted. We learned how to do it fairly quickly. So you know to bring one down a percentage or two wouldn't take long. Just depends on what you want to do.

>> CHAIR SZETELA: Right. All right, so Benton Harbor. Is there any further thoughts or in agreement we will start with Pine and make our changes from there? Okay, all right, so Mr. Stigall can you bring up the Pine map? I would suggest saving it as a new version just so we have a record of changes and will work from the list we have from the meetings and we will look into those other concepts that we talked about.

>> MR. KENT STIGALL: Madam Chair, I'll name the new Pine plan Pine V2.

>> CHAIR SZETELA: Yes.

>> MR. KENT STIGALL: That way we know it's based on.

>> CHAIR SZETELA: Let me find my list, somewhere.

>> MR. KENT STIGALL: So where would we like to start? I'm going to check to make sure.

>> CHAIR SZETELA: Work on our list like we have done before because we had a bunch of comments from public hearings and we kind of did this for the rest of the maps. So let's start with Bangla Town in Detroit area. And apparently there is like two precincts we left off in that area.

>> MR. KENT STIGALL: Where is that at.

>> CHAIR SZETELA: Number one and two, I believe it's number two.

>> MR. KENT STIGALL: Down in here.

>> CHAIR SZETELA: Two and ten so between two and ten if you go up a little further on the line, a little higher.

>> MR. KENT STIGALL: This is Hamtramck right here.

>> CHAIR SZETELA: Yep, and does someone have the map? I had the map at one point. There is apparently two precincts that they requested we move because we have it split. Yeah, no, they wanted moved from ten into two. So kind of holding this up for the camera so people can see.

>> VICE CHAIR ROTHHORN: I'm going to bring it to you so you can see.

>> CHAIR SZETELA: Submitted at public hearings this part of our public record and there is just two precincts that we neglected to include with the rest of the Hamtramck area that they have asked that we include. So small change, easy fix.

>> MR. KENT STIGALL: I identified it. It's this Jutting out part and it's recommending it go into District two which is over here.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                         MICRC_009164

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> CHAIR SZETELA:  Pine V2, right?  Pine V2.  We are doing a composite here, right? .

>> MR. KENT STIGALL:  Okay the lopsided margin is 5.9% republican.  The mean median is 3.1% republican.  Efficiency gap is 5.7.  Seats to votes or proportionality bias is 1.4 percent in favor of the republicans and seat count is 56-54 in favor of democrats.

>> CHAIR SZETELA:  And can you scroll down a little bit?  Because I see 31.  Can we stop so I can grab the number.  I'm looking for percentages in two Directors 31 which is part of Midland is 58.4 republican and I think it was 56 was the other District we changed?  And that is why the metrics went up because we flipped what was a democratic District to two republican districts so that is why our metrics have changed.  Okay, the old one was the same, yep.

>> MR. KENT STIGALL:  Seat difference.

>> CHAIR SZETELA:  Let's go back to the map and let's we did Bangla Town.

>> MR. KENT STIGALL:  I'm going to save this.

>> CHAIR SZETELA:  Yep.

>> MR. KENT STIGALL:  Save as.  So I saved that.  Now what do we want to do here?

>> CHAIR SZETELA:  Go down to Detroit area and looking for Dexter Lynn wood area and a line we were requested to move near wild mere park move one to two at Lawton Street and looking at border between number 1 and 2.

>> COMMISSIONER CURRY:  Madam Chair that is wild mere.

>> COMMISSIONER KELLOM:  Windemere.

>> COMMISSIONER CURRY:  Wildemere.

>> CHAIR SZETELA:  Can we put on the neighborhood overlay?  Because that would be helpful.  Is that the neighborhood overlay or is that another map?

>> VICE CHAIR ROTHHORN:  That is not the neighborhood map.

>> CHAIR SZETELA:  That is someone else's map.

>> MR. KENT STIGALL:  This is the one that was sent to me more recently by a Commissioner or.

>> CHAIR SZETELA:  Neighborhood ideas.

>> MR. KENT STIGALL:  1027 is a newer one.

>> CHAIR SZETELA:  Current City Detroit neighborhoods.

>> MR. KENT STIGALL:  Sorry about that.

>> CHAIR SZETELA:  That is okay.
Can we Zoom in a little bit, I'm looking for a particular name.

>> MR. KENT STIGALL:  Let me turn off some of this stuff.  There is too much going on here.

>> CHAIR SZETELA:  Yeah.  I think it's right there.  I actually see it, I see it.

>> MR. KENT STIGALL:  Okay where are we at?

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                    MICRC_009174

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> CHAIR SZETELA: Okay just bring your cursor up a little bit more, a little bit more and go to the left a little bit. There you go right there. Wildemere park.

>> MR. KENT STIGALL: So all this neighborhood either in one or two.

>> CHAIR SZETELA: Asking to move from number one to number two at Lawton Street. Actually so Zoom out for a second. I think the request was to move the purple into to make that part of two. So that area in the purple for Wildemere park, put it into two is what the request was. So we are keeping that neighborhood together but it will be in two. Is that consistent with everybody else's recollection? This is the map I drew at the time.

>> VICE CHAIR ROTHHORN: This is not the same area where we were with Bangla Town?

>> CHAIR SZETELA: No, this is different a man who spoke about Lawton road mark Payne that is right.

>> MR. KENT STIGALL: Most of the neighborhood is in one and this is the only part in two so we want to take the larger part and put it in two?

>> CHAIR SZETELA: I don't know our Detroit area folks do you have any say on this? The gentleman asked us to move the west of Wildemere park into number two but actually from a numbers perspective it makes more sense to take the parts that are currently in two and move them into one and that way the neighborhood is together. Is there any preference one way or another?

>> COMMISSIONER CURRY: I think he was mostly concerned with keeping the neighborhoods together and not splitting from across One Street to Another Street if I am not mistaken that is what I was hearing. But if you're still connecting them the way that you have it, that should be pretty good.

>> CHAIR SZETELA: So what way is this?

>> VICE CHAIR ROTHHORN: This way we would be putting it in two and it's a clean line. Yeah.

>> CHAIR SZETELA: I think he is saying do it the other way, put it into one and then you're moving less population so there is less for us to correct.

>> VICE CHAIR ROTHHORN: I totally understand, I just know.

>> MR. KENT STIGALL: Yes.

>> CHAIR SZETELA: That is what was asked for.

>> MR. KENT STIGALL: That is the area in two. We can put the whole.

>> CHAIR SZETELA: Can we see the population deviation for one? It did not seem to make much of a difference for two. It's still within specs. And one is still within specs.

>> VICE CHAIR ROTHHORN: Exactly.

>> CHAIR SZETELA: All right so I think that is good then. Any concerns about that? All right easy fix. We did Bangla Town and did that and look at Grandmont and Rosedale and Cornerstone, Morning Star, East English Village. I believe Rosedale is just to the actually I think I see part of it. If we can pull the map, pull it so it's in 15 right

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

now and go up a little bit, I see grand Mont right there, yep. I see Rosedale park. What else do we have there? .

>> MR. KENT STIGALL: This neighborhood here is slightly fragmented see how 16 comes around and connects by one City block and then takes up this area.

>> CHAIR SZETELA: So it looks like that's going to be quite a bit of changes. What we were asked to do is put north Rosedale park Minock park, what was the other one grand Mont and grand Mont two altogether and right now we have them split. However we have accommodated that in two other maps. So Juanita?

>> COMMISSIONER CURRY: Yeah, I'm just thinking. I know that in that area, I'm not sure how far the drive is from there but one of the large NAACP men have a building there in that area. I'm sure he doesn't -- they may not want to be split. He has a large, large congregation. Plus he is NAACP for Michigan, Detroit. So we need to kind of keep whatever they ask for together. I can't quite remember. I don't know if Brittini remembers or any of you all remember. But that is this area.

>> COMMISSIONER KELLOM: I remember. I would say it's worth the work to put the Rosedale parks in the grand Mon, t community back together because they share a community center and built a neighborhood recently to stay together and edify that community and that is important to them in the Senate map. I'm sorry the house I'm sorry I misspoke.

>> CHAIR SZETELA: Commissioner go ahead.

>> VICE CHAIR ROTHHORN: That might help us the lay over. It's right to help us draw it because like you said these are big changes and I think we have looked at some, I say we, Commissioner Kellom and I drafted a few maps that might help us draw this and fix those areas and it will impact the rest of you know the map. That is I think what we are recognizing so what I'm thinking about is recognizing that these are significant and important changes absolutely.

>> CHAIR SZETELA: Kent can we pull the map down a little bit so we can see the green area Evergreen outer drive. Looking at this from a perspective if we bring in north Rosedale park in the purple which is 15, we then isolated that Evergreen outer drive so we will have to bring that into 17. And then adjust the border of 14 with 17 to make that happen, right? Does that make sense to everybody? So Kent can we give that a shot? Can we bring north Rosedale park and I think I can't remember if it's Minock.

>> COMMISSIONER CURRY: Minock.

>> CHAIR SZETELA: Minock bring that into 15 and put Evergreen outer drive into 17 then we will have to make further adjustments between 14 and 17 to sort of accommodate that.

>> COMMISSIONER CURRY: Okay what is this line?

>> CHAIR SZETELA: Not the whole way. I think it's Grand River.

>> COMMISSIONER CURRY: That is the boundaries for Grand River.

>> CHAIR SZETELA: I think so yeah.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                    MICRC_009176

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> COMMISSIONER CURRY: I think everything on the what do I say the north or south side of grand river they should be more into the same districts and everything on the other side of that on the south side or the what is that? South and south and west should kind of be together. So if we can kind of keep that like that, that would be good. If we can keep those people that is in the Evergreen outer drive area with McNichols and Evergreen area, keep them all kind of together I think that would be a good thing. And am I kind of saying that correctly, Brittini? Do you see that the way I see it? .

>> COMMISSIONER KELLOM: I understand what you're saying. I also was waiting for the overlay that I created.

>> COMMISSIONER CURRY: Okay let's see the overlay if we can.

>> CHAIR SZETELA: I swear north Rosedale goes up to outer drive.

>> COMMISSIONER CURRY: North Rosedale do it does.

>> CHAIR SZETELA: That's what I thought. Kent, do you see where you have that little part curving off to the west, I swear that is part of north Rosedale park because it goes up to outer drive.

>> MR. KENT STIGALL: One precinct split by the neighborhood line so do you want to put it in 15 or put it in 17 or split the precinct?

>> CHAIR SZETELA: I would keep it in 15 because I think that line is wrong on our neighborhood map. Because north Rosedale goes to outer drive and that is just north of where the boundary is on this map. Add in the Section of blocks just to the east of what you currently have selected.

>> MR. KENT STIGALL: Do it at the block level is that what we are saying?

>> CHAIR SZETELA: You can do the blocks that are in the current shaded area for north Rosedale and grab those blocks that are above where that curved line is because that curved line is outer drive.

>> COMMISSIONER CURRY: Where the curve takes you, Madam Chair.

>> MR. KENT STIGALL: Here as well.

>> COMMISSIONER CURRY: Madam Chair wherever that curve takes you, it takes you to that big NAACP man's what is his name? We were all there. MC what was his name? We were there.

>> VICE CHAIR ROTHHORN: Mark Payne, no Qument.

>> COMMISSIONER CURRY: No, what is his name, Brittini? .

>> COMMISSIONER KELLOM: Are you talking about Reverend Wendell Anthony. His church fellowship chapel.

>> COMMISSIONER CURRY: It runs into that and they want to be kept together, I'm sure.

>> COMMISSIONER KELLOM: I don't know what, okay, that is a totally different subject. I will just keep focused on something else.

>> COMMISSIONER CURRY: Yeah. But he is the NAACP president for around the Detroit area.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                    MICRC_009177

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> MR. KENT STIGALL: I will move in the median and just making a straight line for appearances for population.

>> CHAIR SZETELA: I see what you're doing. Now can we Zoom out and see where we are at? .

>> MR. KENT STIGALL: It's my understanding this area that is in green call it Evergreen outer drive is what was going to be moved to 17.

>> CHAIR SZETELA: Wondering if it makes more sense to move the smaller neighborhood underneath it and move that into 14 rather than trying to move a whole bunch into 17 any thoughts? Are we connecting them? What are our numbers? .

>> MR. KENT STIGALL: At this point 17 is even and 14 and 15 need a lot or 15 needs to give up, 15 has to give up some.

>> CHAIR SZETELA: Commissioner Rothhorn?

>> VICE CHAIR ROTHHORN: Chair Szetela you are asking for thoughts and I think there is a thought an idea on this overlay I think Commissioner Kellom was waiting for.

>> CHAIR SZETELA: Can we bring up that overlay? Do we have that, Kent.

>> VICE CHAIR ROTHHORN: I think it's what you had earlier.

>> MR. KENT STIGALL: Yes, it is, that is why it's there.

>> CHAIR SZETELA: Okay.

>> MR. KENT STIGALL: I'm going to turn off the.

>> CHAIR SZETELA: That is the one that is the 27 ideas, right? .

>> MR. KENT STIGALL: Yes, that right there.

>> CHAIR SZETELA: Okay.

>> MR. KENT STIGALL: And it's the let me change the color so we can see it. It was actually up there. We just couldn't see it like we wanted to. It's the lighter colored red line.

>> VICE CHAIR ROTHHORN: I think if you Zoom out a little bit it still sort of has the strips runs east west and enough neighborhood changes and I'm going to try to summarize this Commissioner Kellom and let me know if this is accurate. Minimizing the cuts and still goes east west and VRA compliance it's just holding more neighborhoods together that Commissioner Kellom thought could be held together. Again this is an idea and it may reflect what the people in Detroit were asking for excuse me one idea, right, that says this is this represents our neighborhoods our communities better and we may be able to elect better. So it's again I think it's the idea. It does reflect what you were saying Commissioner Szetela. That little block that is cut out and goes into a different District. But it's hard to see with the neighborhood lines and also that area, yeah.

>> CHAIR SZETELA: Yeah so, I would suggest putting that block of 17 into 14 and then we will have to further balance.

>> MR. KENT STIGALL: Put this in 14.

>> CHAIR SZETELA: Yep, and then that is connecting those.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                    MICRC_009178

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> CHAIR SZETELA:  From 36 to 110 do we want to make that change?  Put it into 110 then we have to adjust because that is a pretty big population move.

>> CHAIR SZETELA:  Looks like it will work.  If you take it out of 36 and put it into ten, I mean I guess yeah ten will have to come down.

>> CHAIR SZETELA:  Yeah.  Okay can you go ahead and move that?  So move that into 110.  So now 110 is a little over.  So 36 is good.  35 is currently under so we can take a little bit and put it into 35.

>> MR. KENT STIGALL:  Well, you have the community the gray dots community of interest and a fair number in five now.  And five is sitting at 1600 down.

>> CHAIR SZETELA:  So what are you suggesting?  What are you looking?  Microphone, Kent microphone.

>> MR. KENT STIGALL:  I'm looking at these Asian communities here.  In District 5.  And these are Asian communities.  Or populations that are.  So I looked at five and see that it's 1600 light.  You know, so and right now District five is 62% minority.  11% non-Hispanic.  So I was just thinking maybe you want to put some of these communities in with this community here.

>> CHAIR SZETELA:  Commissioner Rothhorn.

>> VICE CHAIR ROTHHORN:  Just thinking about the question is I can't remember if this was also the Chaldean District.  I remember I think West Bloomfield and Sterling Heights is my memories.  Any other population here that might not show up with Asian coalition districts anything we have learned?  It's a question.

>> COMMISSIONER EID:  There is the northern part of Farmington Hills the part that is closer to West Bloomfield that is currently in District 9.  And 110.  But I think our West Bloomfield District that has West Bloomfield with some of Commerce is fine how it is here.  So I wouldn't recommend making any changes to that.  Yeah, so that is about it for me.

>> CHAIR SZETELA:  Can you pull the view down a little bit?  I want to see the last precinct at the top in 36.  What is the Asian population in that one?  Can you -- I see the dot there and I'm just wondering what is it.

>> MR. KENT STIGALL:  2200 people.

>> CHAIR SZETELA:  Okay, 36.

>> CHAIR SZETELA:  Yeah, Mr. Adelson?

>> MR. BRUCE ADELSON:  Thank you Commissioner.  A couple points.  If the you know, as I understand from the discussion of reading these, the Asian neighborhoods back together again and re-unifying them.  If the Commission is inclined on the same line I think where the cursor is now in District 5 that is one of the large Asian American communities in this community.  One of the things that I always have to remind myself the smaller the dot the smaller the population.  This is one of the larger Asian American community dots.  So that would be a consideration.  Just also as another FYI, you are the Supreme Court has been saying for decades that it is okay legally to over or under

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                    MICRC_009183

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> COMMISSIONER CLARK: Could we do a quick review of the Grosse Pointe area particularly Grosse Pointe Woods and make sure that it's whole?

>> CHAIR SZETELA: I don't think it is and I thought that was done for VRA purposes I'm pretty sure it was.

>> COMMISSIONER CLARK: If it was then that is acceptable, I think.

>> CHAIR SZETELA: That northern part next to Harper Woods.

>> COMMISSIONER CLARK: Correct.

>> CHAIR SZETELA: Westerly I thought we did that intentionally for VRA.

>> COMMISSIONER CLARK: I can't remember to be honest with you.

>> CHAIR SZETELA: Commissioner Orton?

>> COMMISSIONER ORTON: Just before we go into the big changes maybe we should run the partisan fairness again.

>> CHAIR SZETELA: Yes, great idea. You're dividing by 0 I think you need to rerun it. That is going to make you click on partisan fairness again. It didn't. Good. Yeah. Not focused. Statewide, yeah. Yeah. All right.

>> MR. KENT STIGALL: Lopsided margins is 5.8% favoring the republican.

>> CHAIR SZETELA: Uh-huh.

>> MR. KENT STIGALL: Mean median difference is 3.1% favoring republican. Efficiency gap is 5.7% favoring republican. And then the seats to votes proportionality bias is 1.4% favoring republican. And the seat count is 56, 54 democrat.

>> CHAIR SZETELA: So virtually no change. There was a .1 drop in the lopsided margin. All right, do we want to before we start making some bigger changes, do we want to save a new version as version three? Yeah, all right so let's save this as version three. And my suggestion is that we start with Grand Rapids, Lansing first because I think they affect each other. And then Battle Creek and Benton Harbor because I think they affect each other too. But I know we have specifically received proposed maps redrawing the Lansing area and the Grand Rapids area and we can do them incrementally too if you guys want to do that. We can do Lansing and then save a new version and then do Grand Rapids and you know do it that way. Or we can kind of do it all on one map. Commissioner Eid then Commissioner Witjes.

>> COMMISSIONER EID: Putting Saugatuck into the lakeshore District?

>> CHAIR SZETELA: Not yet, no. Commissioner Orton go ahead.

>> COMMISSIONER ORTON: I don't think in a house map we can go up that far because it's already as skinny as it can get.

>> CHAIR SZETELA: Uh-huh.

>> COMMISSIONER WITJES: I'm not opposed starting in those areas but would it make more sense to look at the Detroit area because the ripple effect there is going to be much, much larger?

>> VICE CHAIR ROTHHORN: I was going to say the same thing. We have all the Commissioners that can help us currently present.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                     MICRC_009198

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

at whether it's you know whatever the number is so let's just select it and see how many people we are dealing with.

>> VICE CHAIR ROTHHORN: Between 18 and 3 is kind of that area that might benefit. But I think we also want to be really clear about what coalition area is. Who is here and yeah how do we want to assign it, what districts shall we make. I see Commissioner Orton's hand.

>> COMMISSIONER KELLOM: I don't want to make that by myself.

>> MR. KENT STIGALL: The highlighted area has population of 29,010. Which is roughly 3.5% of a District. I mean, I'm just actually it's more like 30% of a District I'm sorry. That is 29. So that is a 30% of a District just for a rough idea. That's.

>> VICE CHAIR ROTHHORN: Thank you Mr. Stigall. Commissioner Orton?

>> COMMISSIONER ORTON: I see that 3 and 18 are significantly low. But there must be one that is high or is there one that is high? Is there another one that is out of whack? Somewhere on the list? .

>> COMMISSIONER KELLOM: Unassigned.

>> COMMISSIONER ORTON: There are no districts that are significantly over?

>> VICE CHAIR ROTHHORN: Looks like our largest District is 71, right? Based on just what I'm seeing in the orange, right, at the top. 71 is 71 the under.

>> MR. KENT STIGALL: Next to this unassigned is one can take let's say 6,000 of them. Three can take let's say 9,000. So that is 15 of the 29. And 18 can take, could I mean theoretically take 9,000. So now we are let's just say now we are at 20,000 between 1, 3 and 18. 21 you know can take 1500, 2000. 8 can take 1500, 2000. You probably could distribute them all amongst those districts or fairly close.

>> COMMISSIONER KELLOM: So let's try that Kent, please.

>> MR. KENT STIGALL: I just don't know how you want to do it.

>> COMMISSIONER KELLOM: Yeah, I know I know. But so let's take in population or areas that are closer to like the neighboring districts if that makes sense. That is the way I'm thinking about it.

>> CHAIR SZETELA: Commissioner Orton?

>> COMMISSIONER ORTON: I'm just wondering in this area would any of the thematic dots help us as we try to pars out these precincts? .

>> COMMISSIONER KELLOM: All of it would help Commissioner Orton.

>> CHAIR SZETELA: Commissioner Lett?

>> COMMISSIONER LETT: I think the dots are good. The other thing would be you might want to put the neighborhoods up here. I think MC is trying to do what Detroit wants done. I'd be looking for Commissioner Curry and Commissioner Kellom to say what is the unassigned yellow that we are looking at. Should it go one way or another. That is what the idea here is.

>> COMMISSIONER KELLOM: Can we have, yeah, never mind Kent you are doing it.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                    MICRC_009217

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> MR. KENT STIGALL: Okay, which I guess we were using this earlier. This is what we have used earlier up to build these whole things. And this is the neighborhood low layer that has previously been used as a reference.

>> COMMISSIONER KELLOM: Russell Woods Dexter and Lynn wood.

>> MR. KENT STIGALL: These are whole and this is that major road is Jefferies. 96.

>> CHAIR SZETELA: Commissioner Curry?

>> COMMISSIONER CURRY: And they are also pretty much the Black African neighborhoods too. So if you could, they are probably somewhere you can -- knowing the nationality where they can still have things in COI together. It would, well, you can put.

>> COMMISSIONER KELLOM: 1446 pull that into what is that District 1.

>> MR. KENT STIGALL: Looks like we can put this whole across here roughly.

>> CHAIR SZETELA: So Commissioner Rothhorn, can you facilitate this discussion? So I can focus on other things.

>> VICE CHAIR ROTHHORN: Absolutely.

>> MR. KENT STIGALL: So I'm going to assign 1446, 1365, 835 to 1. Is that the will of the Commission? .

>> COMMISSIONER KELLOM: Yes.

>> COMMISSIONER CURRY: Yeah.

>> MR. KENT STIGALL: These three right here.

>> COMMISSIONER CURRY: Yes.

>> COMMISSIONER KELLOM: Yes.

>> VICE CHAIR ROTHHORN: Shall we complete the neighborhood there before we move on? .

>> MR. KENT STIGALL: We can go as far as -- we will finish that right there. I see what you're saying now. I would kind of move my way around this area, adding the population to the districts. For example this neighborhood runs from down here where my cursor is goes north and then curves and comes across. So with the population we are trying it may be hard to keep that District. You may be able to take three.

>> COMMISSIONER KELLOM: Yeah, that is what I was going to suggest because that is like I mean it's up there but the Russell Woods oak land community, that is a strong community.

>> COMMISSIONER CURRY: Uh-huh.

>> MR. KENT STIGALL: Okay, so we will do -- we will start.

>> COMMISSIONER KELLOM: Assigning those areas to District 3.

>> VICE CHAIR ROTHHORN: I see Commissioner Curry nodding her head so keep going.

>> MR. KENT STIGALL: I was going to go up and start with...

>> VICE CHAIR ROTHHORN: We have the Boston Edison neighborhood split again at the lodge rather than we thought it was Woodward but it's not actually Woodward but

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                    MICRC_009218

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

looks like the lodge freeway is a natural sort of split between for the Boston Edison is that okay for natural split?

>> COMMISSIONER CURRY: Yes.

>> VICE CHAIR ROTHHORN: Okay very good.

>> MR. KENT STIGALL: Okay, so three still needs a bunch. 18 needs a bunch. 18 needs a bunch so you know do we start here and get like these neighborhoods into 18?

>> VICE CHAIR ROTHHORN: I'm seeing Commissioner Curry nodding her head and you are thinking.

>> MR. KENT STIGALL: There is a bunch of ways you can do it, go this way or that way.

>> VICE CHAIR ROTHHORN: We still have the baggily neighborhood and I don't know if you saw that in 18.

>> COMMISSIONER KELLOM: I did see it, But you know give and take so we will see. Because, yeah, and so Pilgrim village can be assigned to 18. I agree with Commissioner Curry's assessment.

>> MR. KENT STIGALL: Move that across to 18, okay. That is not what we wanted sorry about that.

>> COMMISSIONER KELLOM: Don't apologize.

>> VICE CHAIR ROTHHORN: Commissioner Weiss was offering his eraser for you.

>> MR. KENT STIGALL: I need it.

>> VICE CHAIR ROTHHORN: Kent has got it, all right.

>> VICE CHAIR ROTHHORN: The Oakman Boulevard does it need to stay in 3? .

>> COMMISSIONER KELLOM: If you heard my muttering to myself.

>> COMMISSIONER CURRY: What are the communities around oak man I can't read this.

>> VICE CHAIR ROTHHORN: North is Dexter Finkle Commissioner Curry and we have Russell Woods. Do you need something more Like Street names to know? What are you asking for?

>> COMMISSIONER CURRY: Not necessarily.

>> MR. KENT STIGALL: Spindle Oakman.

>> COMMISSIONER KELLOM: Lynn wood.

>> COMMISSIONER CURRY: Lynn wood is not Oakman needs to be kind of not that close to Dexter Finkle but they are all like one neighborhood to another neighborhood. But Oakman Boulevard is predominately, what is it, Chaldeans? Then when you look at Finkle and Dexter they are predominately Black African/Americans. So.

>> VICE CHAIR ROTHHORN: We are trying to decide what do you think 18 for District 18 or District 3 for that Dexter Finkle Oakman what do you think?

>> COMMISSIONER CURRY: They would probably need to go into three possibly.

>> COMMISSIONER KELLOM: I was going to say three but I wanted Commissioner Curry to talk about it.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272          MICRC_009219

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> VICE CHAIR ROTHHORN: We will go Dexter Finkle Boulevard in 3 and Mr. Stigall you had your hand up did you want to say something.

>> MR. KENT STIGALL: Three goes across and cuts it off and 18 needs population. You can bring it down into there and Dexter. Finkle because 18 is still low so I think.

>> COMMISSIONER KELLOM: Put Dexter Finkle in 18, Russell Woods I would like to go into three if that is possible assigned to three. I might be jumping and I know you are doing one thing at a time.

>> MR. KENT STIGALL: Those are census blocks crossed off a little bit. I don't know I don't understand why I want over there.

>> VICE CHAIR ROTHHORN: Commissioner Szetela identified the neighborhood lines may not the overlay we are using for the neighborhoods may not actually be an accurate reflection of how the people perceive the neighborhoods so is it okay to leave it the way what do you think? .

>> COMMISSIONER KELLOM: This is an area where the neighborhood name is this is genuine to this area. There is a strong Oakman community, there is a strong Dexter Lynn wood community so the names do reflect this area and people identify say I'm from Dexter and Lynn wood as the commenter talked about. Payne, Mark-Payne this is near where he was discussing.

>> VICE CHAIR ROTHHORN: What Mr. Stigall is pointing out is that the block the actual census block the lowest layer that we have crosses the neighborhood divide. So we can't actually split it between Dexter Finkle and Oakman the 76 is what Mr. Stigall has highlighted and that is the census block. Which crosses over. So at this point we can't divide a census block.

>> COMMISSIONER CURRY: Can you just put that little bit with Oakman then? .

>> MR. KENT STIGALL: What I can do is an option is to bring in the aerial photography and you will maybe see where most of the homes are. If most of the homes are, you know, north of the line you do one thing. If most of the homes are south of on the south side.

>> COMMISSIONER CURRY: A lot of homes on Oakman side and I don't know how it is over there.

>> MR. KENT STIGALL: So.

>> VICE CHAIR ROTHHORN: Sorry Commissioner Orton has her hand.

>> COMMISSIONER ORTON: I'm just wondering for the layer lines do we only have the neighborhood on or do we also have the overlay that Brittini and MC did? Because if they are both on maybe some of those lines are that.

>> MR. KENT STIGALL: We do not have the previous District lines turned on because this area was totally unassigned in that plan. So this is an area that is left over from that plan. It's really hard to tell.

>> COMMISSIONER CURRY: I would think.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272      MICRC_009220

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> MR. KENT STIGALL: This part up in here is fairly unpopulated compared to the time. And looks like most of the homes are on oak man Boulevard community side.

>> COMMISSIONER CURRY: They probably are and that is a whole new Oakman community, that is that community. So maybe there is not that many homes across that where we are trying to put something is that what we are saying?

>> VICE CHAIR ROTHHORN: I think the question right now it's where the community homes are in the Oakman Boulevard is actually assigned to the Dexter Finkle neighborhood. I know it's a hard choice but I'm wondering if you feel okay with leaving it in 18. Again for population reasons or for whatever reason.

>> COMMISSIONER CURRY: Yeah, because both of them are oh, I'm sorry.

>> VICE CHAIR ROTHHORN: Go ahead Commissioner Kellom.

>> COMMISSIONER KELLOM: I was going to say I wanted that area to go with 18. That's fine. That is what I thought we were doing. That is fine to leave it in 18.

>> VICE CHAIR ROTHHORN: What about and the Chalfont to the west do you want to add that to 18? And then what I'm thinking about is we need to add.

>> COMMISSIONER KELLOM: That is fine.

>> VICE CHAIR ROTHHORN: Okay then we can go into three with Oakman Boulevard.

>> COMMISSIONER KELLOM: I misunderstood what you were asking I said it altogether and waiting for him to go to Russell Woods my apologies. Chalfont and Dexter Finkle can go into 18.

>> VICE CHAIR ROTHHORN: Then that Section in 21 is overpopulated but should be okay.

>> MR. KENT STIGALL: Roughly 120 people.

>> COMMISSIONER CURRY: It's near Lynwood and Davidson so that would probably be okay.

>> VICE CHAIR ROTHHORN: Add that to 21.

>> COMMISSIONER KELLOM: Assign it to 21.

>> VICE CHAIR ROTHHORN: I'm thinking we want to leave we want to complete Bagley neighborhood and even Fitzgerald for 18 so I think we want to leave 18 under populated. 18 and 21 are going to be kind of tricky to fix now but let's stay focused on three. 18 can go up there.

>> MR. KENT STIGALL: 21 and 18 whatever. There is opportunity up there.

>> VICE CHAIR ROTHHORN: Okay so let's stay in the Detroit area in three. And we are assigning those to three at this point is that right Commissioner Kellom? Commissioner Curry? .

>> COMMISSIONER KELLOM: Russell Woods and.
In Oakman community.

>> MR. KENT STIGALL: The rest of this into three? .

>> COMMISSIONER KELLOM: Yep.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> MR. KENT STIGALL: So we have I would suggest highlighting all this area and see how much population is left in there to deal with. Or just approximately any way. We don't have to be exact but have an idea.

>> COMMISSIONER KELLOM: Can we assign Russell Woods to three as you are doing that? .

>> MR. KENT STIGALL: I was going to see what we have here.

>> VICE CHAIR ROTHHORN: We are painting ourselves in a corner here potentially.

>> MR. KENT STIGALL: I want to know what we got. Just approximately. We don't need to get down to that, that area is 17,000 so where can we put, a little less than 17,000, let's call it 15,000. So 3 can still take 5,000. And leave 12000.

>> VICE CHAIR ROTHHORN: 18 can take another 5 roughly.

>> MR. KENT STIGALL: This is not touched by 18 because that is why I was looking at it was 18 well it touches right there. You could almost put all of this into 18 whatever that is. And that would give you some you know room for.

>> VICE CHAIR ROTHHORN: I see Commissioner Kellom nodding potentially is that accurate Commissioner Kellom? .

>> COMMISSIONER KELLOM: I was nodding and saying, yeah, I think I like that suggestion.

>> MR. KENT STIGALL: And we have the northwest community split right here.

>> COMMISSIONER KELLOM: It would keep it together.

>> MR. KENT STIGALL: We can take all of that and put it into over here I don't know.

>> VICE CHAIR ROTHHORN: But that is only you know that is about 2000 maybe.

>> MR. KENT STIGALL: It's 4,000.

>> VICE CHAIR ROTHHORN: 25.

>> MR. KENT STIGALL: Right at 2100, 3300 you are right I'm sorry.

>> VICE CHAIR ROTHHORN: So maybe the 962 is what I was thinking about the Littlefield down below too.

>> MR. KENT STIGALL: Come all the way down.

>> VICE CHAIR ROTHHORN: Littlefield 962 where the three is. Just to the right.

>> MR. KENT STIGALL: So we can take a look at it and we can always put it back. That is probably not what I want to do. It's much slower when you have to use blocks all the time. That is 2700. Gosh.

>> VICE CHAIR ROTHHORN: Let's leave it there Commissioner Kellom? Commissioner Curry? .

>> COMMISSIONER KELLOM: Yes, that is fine.

>> VICE CHAIR ROTHHORN: Again just to add a little bit more population to 18 should we go north or west to happy homes or south to Littlefield community? I know we won't break up Oakman but where to grab more.

>> COMMISSIONER KELLOM: Go to Littlefield but Commissioner Curry you might have a different thought. You are.

MICRC_009222

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> VICE CHAIR ROTHHORN: You are on mute Commissioner Curry but we can see your lips moving.

>> COMMISSIONER CURRY: Grand River is like a main road so where are we trying to put it at?

>> VICE CHAIR ROTHHORN: Trying to move it so that we are moving it out of sort of the orange District into the dark gray District and moving it into 18 because 18 needs population.

>> COMMISSIONER CURRY: Okay, well.

>> COMMISSIONER KELLOM: And that is the Davidson Schoolcraft and northwest community. We would be putting Littlefield community in with them in 18.

>> COMMISSIONER CURRY: Littlefield would probably be good over there, yeah, that is not too far from those streets. They are in the community. They have communities of interest there.

>> MR. KENT STIGALL: You can come right through here and go all the way across.

>> COMMISSIONER KELLOM: Let's try that Kent please assigning that chunk, Littlefield and a piece of the Grand River 96 area into 18.

>> MR. KENT STIGALL: I'll select the area and y'all holler at me if I'm doing something stupid.

>> COMMISSIONER KELLOM: I'm not going to holler at you.

>> MR. KENT STIGALL: I'm used to it. I've been married almost 40 years.

>> COMMISSIONER KELLOM: Bless you.

>> MR. KENT STIGALL: Yeah.

>> MR. KENT STIGALL: Just to be consistent I'm going to assign the 0 blocks so they are nice straight lines.

>> COMMISSIONER KELLOM: Thank you.

>> MR. KENT STIGALL: It will look better when you print maps or people just looking at them, they won't look jagged. If it's not jagged nobody questions it. Where is 18 now? So 18 is still a good number. I'm going to put this back into three. Just for appearances. Now I would suggest putting as much as you can.

>> COMMISSIONER CURRY: Into three.

>> MR. KENT STIGALL: Wherever into three. And negotiate between 3, 18 and 1, maybe even 21. But 18 can go north too. So.

>> COMMISSIONER KELLOM: Russell Woods and Nardin Park assign that to three.

>> MR. KENT STIGALL: Okay.

>> COMMISSIONER KELLOM: That little chunk in Dexter and Lynn wood too.

>> MR. KENT STIGALL: I was going to go up here and get these into three. They will be left off otherwise. Now three is over.

>> COMMISSIONER KELLOM: I'm sorry go ahead.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                    MICRC_009223

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> MR. KENT STIGALL: So three is you know really over. So one can take 3,000 and we still have some unassigned. But then some of that unassigned could go into eight as well.

>> COMMISSIONER KELLOM: I was going to put Boston Edison in with eight.

>> MR. KENT STIGALL: We can do that now.

>> COMMISSIONER KELLOM: Yeah.

>> MR. KENT STIGALL: If that is I don't know what this historic Atkinson is two blocks north, south. Put this.

>> COMMISSIONER CURRY: It's okay.

>> VICE CHAIR ROTHHORN: It's okay to add it to eight with Boston Edison and historic Atkinson.

>> MR. KENT STIGALL: If we need to back them out, we can back them out whatever needs to be done.

>> COMMISSIONER KELLOM: Take that little piece.

>> MR. KENT STIGALL: I don't know if you see it but it splits the census blocks so it's a matter of these and any of them which way do, they go. Do that I go to this side? Or this 8? My inclination would put them in eight.

>> COMMISSIONER CURRY: Eight.

>> MR. KENT STIGALL: They are altogether no matter where they are at.

>> COMMISSIONER CURRY: Uh-huh.

>> MR. KENT STIGALL: Now eight has gone through the roof so I mean.

>> VICE CHAIR ROTHHORN: Commissioner Eid?

>> COMMISSIONER EID: Yeah well 3 and 8 are both high. One is low. So the unassigned area is to assign it to one then we will look at the difference between three and eight after.

>> MR. KENT STIGALL: Right like the north side of 18 still can take population. So if you go up this way.

>> COMMISSIONER EID: 18 is low right now? .

>> MR. KENT STIGALL: No, 18 is just about right.

>> COMMISSIONER EID: I see but still one is low and we have this area right next to one.

>> MR. KENT STIGALL: Right with the idea I was going to go this way with one as far as we can, 1, 3 and 8, 319, 337. So it should work.

>> COMMISSIONER CURRY: It will pan out, yeah.

>> MR. KENT STIGALL: Because that is 6%. That is 5% between three districts. None of them should have to -- just depend on exactly. The problem is you get into the neighborhoods how you split neighborhoods.

>> COMMISSIONER CURRY: Yes.

>> MR. KENT STIGALL: We put this into one. Is that the idea? .

>> COMMISSIONER KELLOM: Assign Virginia park into one.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> MR. KENT STIGALL: So basically, we need to get one to take more, three and eight. And there is a little bit right there. I'm just going to stick that in three right now just to get it assigned.

>> VICE CHAIR ROTHHORN: Eight is our largest District in terms of the population plan deviation. So we probably want to address that.

>> MR. KENT STIGALL: Three and eight have to both come down and my observation.

>> VICE CHAIR ROTHHORN: How about adding so that little corner Dexter Lynn wood just above just north of Boston Edison the gate way community that corner that is in eight add it to three.

>> COMMISSIONER CURRY: Add it to two.

>> VICE CHAIR ROTHHORN: So the pink District is three.

>> MR. KENT STIGALL: And two can take some population too. I mean that is completed and I wrapped all the way around. So but then again, we get into you know having to divvy up neighborhoods and making that decision, that hard decision. Okay tell me what you want, where are we at? Pick a spot. To get.

>> COMMISSIONER KELLOM: Do we want to go this is a tough one. 18, no 18 is.

>> MR. KENT STIGALL: We can put Commissioner Rothhorn's, put some of this into three and then push one up in there and split two. Probably be best if you are going to split a community to split one rather than two.

>> VICE CHAIR ROTHHORN: Commissioner Eid?

>> COMMISSIONER EID: Well.

>> COMMISSIONER CURRY: Split one.

>> COMMISSIONER EID: Three used to be a Dearborn District or was a District where we had identified that the Arab American community had the opportunity to elect the candidate of choice. So if it comes down to deciding between neighborhoods it might be a good idea to think about which of the minority groups in the neighborhood vote the same way using our analysis from yesterday because I think this change on three might have changed those election results. So we got to see.

>> COMMISSIONER KELLOM: I mean, the -- that was not in response to you Commissioner Eid. I'm sorry. I was just thinking about that area really can go either way as long as they stay together. I really don't.

>> MR. KENT STIGALL: I'm sorry Commissioners the computer is thinking. That is a nice way of putting it.

>> COMMISSIONER KELLOM: Commissioner Curry, three and eight, the oranges and the tan District have too much population.

>> COMMISSIONER CURRY: If you can put some of that in one. How far is -- where is one at? How far over? .

>> COMMISSIONER KELLOM: One is the pink and purple.

>> COMMISSIONER CURRY: How far over does it go to the south? .

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

32 went down this way then 28 goes that way and this goes that way. 32 could come across and 28 go across. You know there is a hundred ways to do it.

&gt;&gt; COMMISSIONER EID: What other District is low besides 25 so we have 34, that is low 20,000. What other districts are out of.

&gt;&gt; COMMISSIONER CURRY: That's just about it 34 and 25.

&gt;&gt; MR. KENT STIGALL: Well 34 and 25. Let me turn them all on and we will take one eyeball test. 25, 34. Of course we still have some like 22 is almost 5% low. But there is a bunch of unassigned down there too. 22 is down around Monroe it's north of Monroe. So I mean it's not Monroe. Nowhere near it.

&gt;&gt; COMMISSIONER EID: 34.

&gt;&gt; MR. KENT STIGALL: South is Trenton Grosse Ile so 22 can come here

&gt;&gt; VICE CHAIR ROTHHORN: Let's assign that to 22 Down River to 22 while we are here. So it's 30,000 over.

&gt;&gt; MR. KENT STIGALL: We got them. It was mostly this area down in here.

&gt;&gt; VICE CHAIR ROTHHORN: And 13 so between 13 and 22 we can now balance because 13 is under populated. 13 is right next and Allen Park. This is all down river, this is where we can actually massage.

&gt;&gt; MR. KENT STIGALL: You have 10,000 high but if you did that change right there it would make.

&gt;&gt; VICE CHAIR ROTHHORN: Again it's where it's so important we have coalition Districts and lots of voting age population that you know I want to try to respect. And I'm just thinking about that area. It's all Down River. And 13 and 22 we can we got the highest District and the lowest District. The most populated and the most under populated. So where should those lines go?

&gt;&gt; COMMISSIONER EID: I say we can park in 13.

&gt;&gt; VICE CHAIR ROTHHORN: Lincoln Park in 13 please. And I see Commissioner Curry is nodding her head and Commissioner Kellom too so put Lincoln Park municipality. Do we want voting precincts or Townships? We don't want to do Townships? .

&gt;&gt; MR. KENT STIGALL: We will do precincts.

&gt;&gt; VICE CHAIR ROTHHORN: With your microphone on is that what you're going to do.

&gt;&gt; MR. KENT STIGALL: It's on right now. Dog gone you guys. You are mean. I have to put up with that. Total lack of respect. You got me rattled now, see? All right, so that area is 40,000.

&gt;&gt; VICE CHAIR ROTHHORN: We are 10,000 over.

&gt;&gt; MR. KENT STIGALL: The idea is you can move down and maybe take this. Shall I assign it?

&gt;&gt; VICE CHAIR ROTHHORN: I do remember Southgate and Wyandotte wanted to be together so I'm not sure.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> MR. KENT STIGALL: You can make that happen. Put this in 13 and this goes in 22.

>> VICE CHAIR ROTHHORN: Okay try to balance it out please Kent and seeing nodding heads there from Commissioner Curry so let's do it.

>> MR. KENT STIGALL: I'm going to highlight everything from South Gate runs all the way up here, doesn't it? The lower half, just select it. That is 30,000. So and 22 is 10,000 under so you are shifting the issue but not...

>> VICE CHAIR ROTHHORN: Shifting it but not fixing it. But, yeah.

>> MR. KENT STIGALL: Moving the problem. Well, what if you put more of this with Lincoln Park?

>> VICE CHAIR ROTHHORN: Commissioner Curry has an idea.

>> COMMISSIONER CURRY: Lincoln Park is more closer to Allen Park instead of Ecorse. So is there any way we can do that? .

>> MR. KENT STIGALL: Allen Park and Lincoln Park appear to be together. Because that is Allen Park right here.

>> COMMISSIONER CURRY: Yeah okay.

>> MR. KENT STIGALL: Lincoln Park here.

>> COMMISSIONER CURRY: Okay so Ecorse is a little dip from them. Maybe to River Rouge, can you get any of River Rouge? .

>> MR. KENT STIGALL: One is even so if we take much out of it, we have to probably add some to it. And you can probably add to it from eight or three because they are already high. So that may help. And River Rouge I mean that is a lot highlighted.

>> COMMISSIONER CURRY: River Rouge, okay, River Rouge Ecorse and Melvindale and Lincoln Park they are all like together. They are just one walk across the street from each other. And that is how close they are. And Detroit. The southwest part of Detroit.

>> VICE CHAIR ROTHHORN: What I'm concerned about Commissioner Curry I think this is also where I remember the Latin community, there was a, yeah, this is where we wanted to keep together a community of interest.

>> COMMISSIONER CURRY: Keep that close to Lincoln Park can you do that?

>> VICE CHAIR ROTHHORN: In District 1 there is almost 40% Hispanic community if you look at the voting age. I think that's, yeah, I just don't want to dilute that if we can.

>> COMMISSIONER CURRY: Don't dilute it then.

>> VICE CHAIR ROTHHORN: Okay.

>> COMMISSIONER KELLOM: I'm quiet because I don't have -- that was my thought Commissioner Rothhorn. I don't know that I have a great solution for that.

>> VICE CHAIR ROTHHORN: Right so what I'm wondering do we feel like this exercise has been useful for me but right because we have tradeoffs and what we recognize is right we can't just bring in half ideas. We almost have to bring in a whole

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                              MICRC_009229

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> VICE CHAIR ROTHHORN:  I see Commissioner Curry nodding her head. Commissioner Kellom, are you.

>> CHAIR SZETELA:  What is 18 at population wise?  I'm sorry.

>> MR. KENT STIGALL:  18 is still carrying 18,000.

>> CHAIR SZETELA:  We are over so let's go to the top.

>> MR. KENT STIGALL:  25 is 9.

>> CHAIR SZETELA:  Trying to get to 25 because that is 9 under, right?  Am I reading that right.

>> MR. KENT STIGALL:  Yes and 32 is 14 over and 34 is 19 under.

>> CHAIR SZETELA:  Okay, all right just doing a quick look to see what else we had floating around.

>> CHAIR SZETELA:  Let's pull it back so I can see more of the map.  So we have 18 currently overpopulated.  We are going to pull up to the top.  We are trying to move.  So 18, 34 is the coast so we got the coast.  We've got 25 and we have 32.  So 32 is over. 25 is under.  34 is under.  And 18 is over.  So we're going to move 15,000 up into 32 by bringing down Troy.  That's going to change our 21 a little bit.  We will have to make adjustment there.

>> MR. KENT STIGALL:  21 is a little light, in a way you are putting some of 18 into 21 just depending on how you look at it.

>> CHAIR SZETELA:  Okay.

>> VICE CHAIR ROTHHORN:  I think this is where there were neighborhoods between 18-21 we might want to make whole.  This is again the Bagley neighborhood.

>> CHAIR SZETELA:  This is not Royal Oak we are outside of Detroit.

>> VICE CHAIR ROTHHORN:  18 and 21 before we start moving too much, I know that was one of the reasons we were trying to do this is to make those neighborhoods whole so if we are going to, yeah.

>> CHAIR SZETELA:  Okay so.

>> MR. KENT STIGALL:  You are talking about down in here.

>> VICE CHAIR ROTHHORN:  Yes.

>> CHAIR SZETELA:  So I'm having to take from 21 to get through to 32, right?  So.

>> VICE CHAIR ROTHHORN:  Yes.

>> CHAIR SZETELA:  Can we put Bagley into 21.  Let's see what those precincts are population wise.

>> MR. KENT STIGALL:  This actually is quite a few of them in there.  There is a lot of ways to do it.

>> CHAIR SZETELA:  If we are specifically trying to make Bagley whole.

>> MR. KENT STIGALL:  Is that what we are doing.

>> CHAIR SZETELA:  Commissioner Curry and Kellom is that what we are doing.

>> COMMISSIONER KELLOM:  Fitzgerald and the Grove would be helpful.

>> MR. KENT STIGALL:  This one add that one.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> MR. KENT STIGALL: Obviously I should have. That is a bunch of water. Okay, I think that will -- unassigned areas, that is always never good. Put that in 18?

>> VICE CHAIR ROTHHORN: Yes, please.

>> MR. KENT STIGALL: Yes. Looks like that should be in two because that is the neighborhood line. But that is yall's call.

>> VICE CHAIR ROTHHORN: Kent is going to ask and somebody respond.

>> MR. KENT STIGALL: So that should go in 8.

>> COMMISSIONER KELLOM: So, you were telling me, Commissioner Rothhorn, not if I wanted to.

>> MR. KENT STIGALL: Somebody say yes. Lopsided margin is 6.3% favoring the republicans. The mean median is 3.3 favoring republican. Efficiency gap is 6.5% favoring republican. 6.6. I don't know what I said, I meant 6.6. Proportionality bias is 2.3% in favor of republicans. But the seats are even 55-55. 2.3% bias favoring republicans.

>> CHAIR SZETELA: I think that is probably the closest comparison, oak, Clark, Peach. Those all were similar metrics. Can we save the map for now and just save that partisan fairness? And I think we have other changes we wanted to make. Do we want to start moving onto those?

>> MR. BRUCE ADELSON: Excuse me, Madam Chair, before that did you want to look at election numbers?

>> CHAIR SZETELA: If you can look at the numbers that would be great.

>> MR. KENT STIGALL: My apologies, I lost the headings. And I will get them fixed but that is the Governor's primary.

>> CHAIR SZETELA: We want to look too at the primary for Dearborn in particular because Dearborn.

>> MR. BRUCE ADELSON: Look at bellwether where the majority candidates were up.

>> MR. KENT STIGALL: I did not see that. Did I. So what districts were? It didn't load up. I know the big change was like 1, 2, 4, 6, 11, 12, 10.

>> MR. BRUCE ADELSON: How about we look at...I think you just mentioned three districts.

>> MR. KENT STIGALL: 1, 2 and 3 we can do at the same time because they are together. So we have, yeah, the democrat overall performance is 90 some percent for 1, 2 and 3. Biden carried one, two and three, 89%, 92% and 89%. Trump was 10.8, 7.1 and 10-4-7. That is districts 1, 2 and 3. Obama in 2012 carried these three districts 95.2, 97 and then 95%. Romney had 4.8, 2.9, and 5.21. Senate 2020 Peters carried these three districts 89, 93, 90. James had 11%, 7%, 9%.

>> MR. BRUCE ADELSON: Kent, can we go to the right and look at 2014 Secretary of State and 2017 gubernatorial, please?

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                    MICRC_009253

# NOVEMBER 3, 2021

# NOVEMBER 3, 2021

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> CHAIR SZETELA:  Right if we need to.  Do version -- this is version two.  So do version four.

>> COMMISSIONER CLARK:  As long as we have access to the original number of it and any changes.

>> CHAIR SZETELA:  Let's clarify what numbers you're looking at are you talking about the minority populations or the partisan fairness or both?  Might not be a bad idea to just run, oops I'm sorry Kent, I spoke too.

>> MR. KENT STIGALL:  I was getting ready to copy this plan.

>> CHAIR SZETELA:  If you can just clone it and make it version four.

>> MR. KENT STIGALL:  Yeah.  And before we close for the day or upload or anything, y'all want to rename these if they go forward, correct?  Because these get posted to the.

>> CHAIR SZETELA:  I think we will keep this Pine version four for now because it is still based on the same framework.  And I do have the map, the numbers from I think this is the most current, it's the last Page.  Pine version two composite and Anthony let me know if these are 6.3 for lopsided margin.  That's version three.  Okay.

>> MR. KENT STIGALL:  I still have them in here.  We can bring them up and lay them side by side when we need to.  I mean you will have the most recent.

>> CHAIR SZETELA:  Version two 5.9 and 3.1.

>> COMMISSIONER ORTON:  5.8.

>> CHAIR SZETELA:  Okay, all right, thank you.  Commissioner Orton?

>> COMMISSIONER ORTON:  It might be a good idea though to also see the minority numbers before we change.

>> MR. KENT STIGALL:  I can open them up right now.  There it is.  If y'all want to note them again this is Pine.  Well, let me run them again.  It should be right 5.8%.  Mean median 3.1.  Efficiency gap 5.7.  Republican favoring.  And then this seats for this version is positionalty bias is 1.4% favoring the republicans.  Seat count is 56-54.  Favoring democrats.

>> CHAIR SZETELA:  Okay.

>> MR. KENT STIGALL:  So.

>> CHAIR SZETELA:  Let's look at the active matrix for 75, 76, 78, 79 and then 83 I'm sorry 86.  I misspoke.

>> MR. KENT STIGALL:  Okay so you don't want to look at just.

>> CHAIR SZETELA:  We want to see what the minority populations are.

>> MR. KENT STIGALL:  Yes, I'm backing up here.

>> CHAIR SZETELA:  Just the active matrix.

>> MR. KENT STIGALL:  75 is 708, 7.08.  Non-Hispanic Black.  76 is 7.14.  78 is 26.2.  77 is not modified.  79 is 5.8.  I guess 86 is in there.  That is 14.1.

>> CHAIR SZETELA:  78 is also 19.2 percent Hispanic.

>> MR. KENT STIGALL:  Yes, that's actually.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                    MICRC_009293

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> VICE CHAIR ROTHHORN: 86 also has a significant Hispanic population.

>> MR. KENT STIGALL: 79 has 14.6 Hispanic. 86 is 8.9. 14.159 Hispanic Black. And 12.3 Hispanic. I think that covers.

>> CHAIR SZETELA: Can you do me a favor, where the total minority says 82.76, put the cross in the corner and pull it down. Thank you. Thank you.

>> MR. KENT STIGALL: So there is also going to be changes probably in 77 as well. But that is a very small it's 90% non-Hispanic white. I'm just looking at this population here. Somehow it goes around. This will be unassigned.

>> CHAIR SZETELA: Did you get that all done? You got that all done? .

>> MR. KENT STIGALL: So 77 is 1%. And 9.8 minority. This District here 78 shows 53% minority. 79 is 27% minority. 76 is 23% minority. 23.2. 86 is 39.3 minority.

>> CHAIR SZETELA: All right I think that is good. Is everyone satisfied? Yep. All right so if we can start making those changes to the Grand Rapids area, I'd say start with 76 and fill it in.

>> MR. KENT STIGALL: Does it matter if I start with 75.

>> CHAIR SZETELA: Start where you want to start.

>> MR. KENT STIGALL: I can only keep track with one unit. We will do 75 right here.

>> VICE CHAIR ROTHHORN: While Kent is doing that one of the things, I notice Byron Center which is south of us here that was also split in our current map so this District or this redistricting allows them to potentially be whole.

>> COMMISSIONER CLARK: At the moment they are not assigned, are they?

>> VICE CHAIR ROTHHORN: Byron Center is currently split between 77 and another District and they are south so yeah.

>> CHAIR SZETELA: I was going to ask I thought it was south.

>> VICE CHAIR ROTHHORN: The line there for what it's worth it's all voting precincts and it's at the Fulton Street.

>> COMMISSIONER CLARK: Personally I think it should stay at Fulton.

>> CHAIR SZETELA: Yes, Commissioner Clark?

>> COMMISSIONER CLARK: We got this map from the portal and they provided a map which is great. Did they provide any justification on the changes at all?

>> CHAIR SZETELA: Yeah, it was to put more of the Hispanic community together. And then preserve the Cascade and Ada connection bringing those back into so keeping the communities together and what else was there? I thought there was something else as well.

>> VICE CHAIR ROTHHORN: I was going to say every public I shouldn't say every public comment but today this morning they were speaking to those.

>> COMMISSIONER CLARK: Yeah, I realize that, yeah.

>> CHAIR SZETELA: Commissioner Orton.

>> COMMISSIONER ORTON: While you are in 78 there is a little tiny block over to the west on the river. It's no population but, yeah.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> VICE CHAIR ROTHHORN:  Thank you Mr. Stigall Commissioner Witjes?

>> COMMISSIONER WITJES:  I saw something wrong.

>> VICE CHAIR ROTHHORN:  Mr. Stigall you were identifying Wayland.

>> MR. KENT STIGALL:  I just saw a number earlier when we were Zooming in.

>> VICE CHAIR ROTHHORN:  Our population deviation it's 6.3.  So we got better but still have, yeah, I think we are -- I think we can be within we want to be within 5 or 10 I think it's 10% is that correct?  We want to be within 5%.  Okay, Commissioner Adelson?

>> MR. BRUCE ADELSON:  I think that that's a good, rough guideline because that is half the ten% range.  Remember the ten% although it's not a safe harbor it's a number or guardrail number not to go beyond it and 5% gets you close to 5% puts you in a good place.

>> MR. KENT STIGALL:  That is a total of 10% plus or minus five%.

>> MR. BRUCE ADELSON:  5% deviation is plus or minus 2.5%.

>> COMMISSIONER WITJES:  Is there any other area we can go look at and potentially change this in?

>> VICE CHAIR ROTHHORN:  There is and wondering we have changes in the Lansing area.

>> COMMISSIONER WITJES:  Let's go there.

>> VICE CHAIR ROTHHORN:  So I think we thank you for your work, Commissioners.  We are going to -- Commissioner Eid?

>> COMMISSIONER EID:  Can we just run the numbers and see if it changes anything.

>> VICE CHAIR ROTHHORN:  Partisan fairness numbers correct, can you do that Mr. Stigall, please? .

>> MR. KENT STIGALL:  Yes.  Madam Chair, the lopsided margins is 5.8% favoring republican.  The mean median difference is 3% favoring republican.  Efficiency gap is 5.7 favoring republican.  Seats to votes, the proportionality bias I think this is the same as prior.  1.4 percent favoring republican.  Seats favor the democrats 56-54.

>> CHAIR SZETELA:  Okay, Commissioner Orton?

>> COMMISSIONER ORTON:  Could I see the population deviation one more time? .

>> MR. KENT STIGALL:  Certainly.  Total population deviation is 6.33.

>> CHAIR SZETELA:  Is that coming from this area or somewhere else?  Sorry.  Like the Grand Rapids area?

>> VICE CHAIR ROTHHORN:  The population deviation is not coming from like there is other districts, we did adjust in the Grand Rapids area.  And got the numbers back to sort of where they were.  But they are, yeah, 71 and 27 are now our largest and smallest and not in the Grand Rapids area.  I think that is your question.

>> CHAIR SZETELA:  That was my question.

>> VICE CHAIR ROTHHORN:  We were going to move on to the Lansing area and as introduction since we have Commissioner Wagner with us too, I wanted to offer one of

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> CHAIR SZETELA: Well I mean I was going to suggest we actually create a new version before we do that. Before we change that. So do you want to run the numbers now and see where they are at and decide if we even want to do that? Thoughts? I like data. Data is good.

>> COMMISSIONER EID: Yeah, let's see if what I said was actually right.

>> CHAIR SZETELA: So can we saved, right? Please tell me we saved.

>> MR. KENT STIGALL: Oh, yeah, multiple times. I promise you.

>> CHAIR SZETELA: So let's run the partisan fairness, see where we are at.

>> MR. KENT STIGALL: It's coming, I know it's coming.

>> MR. KENT STIGALL: Lopsided margins is 5.2 percent in favor of republican. Mean median difference is 2.9% in favor of republican. The efficiency gap is 4.3% in favor of republican. The seats to votes is .5% proportionality with 57-53 in favor of the democrats.

>> CHAIR SZETELA: That and just to be clear that was an improvement over what we had. We had 5.8 for the lopsided it's not 5.2. We had 3.0. It's now 2.9. The biggest drop was in the efficiency gap which was 5.4 and if you remember we are trying to stay below 5 we are 4.3 and the seats votes are 57-53 with a 0.5% favor of democrats versus republicans. I think that's a lot better.

>> COMMISSIONER EID: I think you have it backwards.

>> CHAIR SZETELA: Did I say republicans versus democrats. It's in favor.

>> COMMISSIONER EID: It's in favor of democrats with the greater seat share compared to the vote count.

>> CHAIR SZETELA: But it's half a percent.

>> COMMISSIONER EID: I'm just saying.

>> CHAIR SZETELA: You are right. Previous seat count was 56-54. If you actually like take 110 votes or 110 seats times 52.3 it comes out to 57.5 is the proportionality so we are there. We are good. Better. Yeah. We still have to fix. I think we should probably maybe have some discussion about that. I don't know. The lakeshore. Do we want to try to fix the lakeshore? I guess my question to Mr. Adelson is, is this District acceptable from a legality because it was so thin and stretched out there were some concerns about whether we could -- whether it was legally justifiable, Commissioner Witjes did you have a comment before he answers?

>> COMMISSIONER WITJES: I was going to say we could defend it. The compactness is going to be all sort of messed up on this so in M -- number 7 on our list it's a true community of interest as far as I would say. Plus we have the comments to back it up so we can use the same rationale what we did in Flint here because people said this is a good District for the lakeshore. I have my own reasons as to why it's good for pollution that comes up through Michigan and hits there. But I think it's a valid idea for a District based on just those couple ideas alone.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                    MICRC_009344

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> MR. BRUCE ADELSON: Sure, the election results are as far as margin they are improved or comparable to yesterday. So and yesterday we had there were four districts, now there are three districts with large Arab American populations am I correct about that?

>> CHAIR SZETELA: Microphone.

>> COMMISSIONER EID: I believe District 2 is also a District here because I did not change it. And I think that is what we looked at yesterday.

>> CHAIR SZETELA: Yes, we did.

>> MR. KENT STIGALL: 6300 El-Sayed to 3200 to 3300.

>> CHAIR SZETELA: Commissioner Orton.

>> COMMISSIONER ORTON: Bruce or Mr. Adelson did you look at the overall demographics of those and make sure if there is any VRA districts we didn't mess anything up?

>> MR. BRUCE ADELSON: It seems to me that the that there was a swap with two of the districts. But that the other districts, the districts appear to be strengthened over all for Black residents of Detroit in those districts. So the numbers to me all looked pretty good. And with the improvement of the electoral margins and also have the Arab American population in these three adjoining or nearby districts it seems to me to be a good change.

>> CHAIR SZETELA: All right can we run some partisan fairness reports? .

>> MR. KENT STIGALL: I'm sorry, I'm off track here. The lopsided margins is 5.3%. Favoring republicans. Mean median is now at 2.7% favoring republicans. Efficiency gap is 4.3% favoring republicans. Seats votes ratio the proportionality bias is still at .5%. The seat count still favors democrats 57-53.

>> CHAIR SZETELA: All right so very little change. So the lopsided margin went up by .1 from 5.2 to 5.3. The mean median actually went down by .2 from 2.9 to 2.7. The efficiency gap stayed the same at 4.3. And then the mean or societies -- seats votes ratio stayed the same. All right, okay, so it's just about 6:00 we are scheduled to take a break. So hearing no objections it is 5:58. We will recess until 6:10. Hearing no objections we are in recess until 6:10.

[ Recess ]

>> CHAIR SZETELA: As Chair of the Commission I call this meeting of the Michigan Independent Citizens Redistricting Commission back to order at 6:15 p.m. will the secretary please call the roll.

>> MS. SARAH REINHARDT: Please announce during roll you are attending remotely as whereas you are physically attending from, I will start with Doug Clark.

>> COMMISSIONER CLARK: Present.

>> MS. SARAH REINHARDT: Juanita Curry.

>> COMMISSIONER CURRY: Attending remotely from Detroit, Michigan. Anthony Eid?

Agee et al. v. Benson et al., Case No. 1:22-cv-00272          MICRC_009359

# NOVEMBER 4, 2021

# NOVEMBER 4, 2021

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> VICE CHAIR ROTHHORN: Let's do that Mr. Stigall will you help reading them out loud? It's very small, the font is very small at this point so could you read them out loud or make it bigger, please? .

>> MR. KENT STIGALL: Understood. If I make it bigger, we cover up the map. So 8 is 43% non-Hispanic Black.

>> COMMISSIONER ORTON: And Asian too please.

>> MR. KENT STIGALL: Asian is 4.57%. And 28 is 5% non-Hispanic Black. 13.75% non-Hispanic Asian.

>> VICE CHAIR ROTHHORN: 13.75.

>> MR. KENT STIGALL: Looking at 43 and 4.5 for 8 District 8, 5% and roughly 14% for 28.

>> VICE CHAIR ROTHHORN: Okay so we are going to assign that precinct that you -- where we have 17.74% Asian population to 28.

>> COMMISSIONER ORTON: I see though it goes down so it's going to cutoff that other precinct.

>> VICE CHAIR ROTHHORN: Yeah, so.

>> COMMISSIONER ORTON: Either have to go to blocks or take more than one precinct.

>> VICE CHAIR ROTHHORN: Okay, and we also have 25. Next to 28 there is in District 25 just north of you, just north a little bit Mr. Stigall yep that block right there into 28. So that is lower. Lower percentage.

>> MR. KENT STIGALL: 4885.

>> VICE CHAIR ROTHHORN: Okay and 28 is under populated do we want to try it? Yeah, because otherwise we are significantly shifting eight in ways that, yeah, we may not be able to...I guess we could go in...let's try the 25 into 28, please. But 25 we did not write the numbers down for 25 and that is okay.

>> MR. KENT STIGALL: See what they are now. So now 25 is 6% low. It is.

>> VICE CHAIR ROTHHORN: Population 6% low is that right.

>> MR. KENT STIGALL: 25 is 6% low.

>> VICE CHAIR ROTHHORN: Okay.

>> MR. KENT STIGALL: And non-Hispanic Black is 7.6 and the non-Hispanic Asian is 6%. While 28 now the numbers percentage wise are ideal, the non-Hispanic Black is 5.31%.

>> VICE CHAIR ROTHHORN: So it went up a little bit.

>> MR. KENT STIGALL: Non-Hispanic Asian is 13.6.

>> VICE CHAIR ROTHHORN: It went down just a little bit. And I think this is where we want to sort of understand if we are trying to remedy 28. Mr. Adelson those changes in 28 may be okay.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272

MICRC_009408

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> MR. BRUCE ADELSON: The changes in 28 seem to BVAP came up a little bit. But the BVAP is low. And it's 5.3%. So I think there is some room. The goal is to reduce the population in which the deviation in which.

>> VICE CHAIR ROTHHORN: 28 which we have done. And our largest population the one that has the most to give is District 8. So that's our and, yeah, so that is our dilemma. I also believe if I'm not mistaken this is the area where the Chaldean community is present. And 25 for the Sterling Heights area. Is that right? Commissioners?

>> COMMISSIONER KELLOM: Yes, and Chaldean area there is Chaldean population in the West Bloomfield area.

>> VICE CHAIR ROTHHORN: I guess so my question was did we potentially impact and make a positive change for the Chaldean community by adding that or is it further north or do we know? We do have those maps, okay, Mr. Stigall? .

>> MR. KENT STIGALL: I was thinking out loud so now 25 is even lower than what 28 was at 6.2% low. And there again you know 10 is going to be the next one probably because it's 3.87% low. I'm just looking, trying to you know.

>> VICE CHAIR ROTHHORN: Help us cycle the population it's appreciated, thank you.

>> MR. KENT STIGALL: Not mess up too bad. So two could give up a tiny bit.

>> VICE CHAIR ROTHHORN: Thank you Mr. Stigall. Commissioner Orton?

>> COMMISSIONER ORTON: Well, I'm not sure what the best move is here. But could we just go back and try taking from eight I mean that is what is going to balance the deviation. So we can just take a look at the numbers and we can always undo it but since that one precinct causes a problem, what about the far left precinct and just see what happens with that?

>> VICE CHAIR ROTHHORN: Agreed. Let's try it.

>> MR. KENT STIGALL: Far left undo this, correct? Put that back into 25.

>> VICE CHAIR ROTHHORN: Yes please.

>> COMMISSIONER ORTON: For now.

>> COMMISSIONER KELLOM: Take the top half of District 8 you are saying and push it into 25. Yes, I agree with that and what I was just talking to Bruce about.

>> MR. KENT STIGALL: What do we want to do here? Take this precinct or go across this line?

>> COMMISSIONER KELLOM: I think take the precinct right.

>> COMMISSIONER ORTON: The left precinct.

>> MR. KENT STIGALL: 28 is 2.53. I think we -- have y'all been trying to get them under 2.5 or at 2.5 approximately.

>> COMMISSIONER ORTON: Yes, but let us see the numbers before you move.

>> VICE CHAIR ROTHHORN: So 28 the BVAP did decrease just under 5%. Yeah, and I can't see when the.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                    MICRC_009409

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

large a number. And then 18 could, you know, give up a little bit. I don't know if there is little precincts in these areas. We have to Zoom in and look at them.

>> VICE CHAIR ROTHHORN: We will try to add a thousand in ten and take hundreds potentially from 18 and potentially from 12 and try to find the path maybe do we want to start again with a couple hundred? Or just a hundred? 12 to move into 10? Go ahead Commissioner Curry.

>> COMMISSIONER CURRY: Probably a couple hundred since he said hundreds.

>> VICE CHAIR ROTHHORN: So we will have to be at the block level. And so those blocks and I mean the people who are familiar with these neighborhoods that that's what I think I'm looking for is trying to help those Commissioners, those of us who know, yeah, who know more, please help us make these choices.

>> COMMISSIONER KELLOM: So the Ferndale, Pleasant Ridge, Royal Oak Community kind of effortlessly blends together. And that is also a community where we talk about the LBGTQIA and resources there in the northwest side of Detroit, loves that area. So it's a very bonded Section. So that is why much like Commissioner Clark spoke about Rochester Hills, there is some areas that should be considered I guess just more thoughtful so before we just start shoving people.

>> VICE CHAIR ROTHHORN: Where we are zoomed in to, is in the right area?

>> COMMISSIONER KELLOM: Yes, just describing that whole little neighborhood same thing with Hazel Park Oak Park and all kinds of is this meld those are like the first suburbs after you cross 8 mile and the Coolidge 9 mile area something to think about.

>> VICE CHAIR ROTHHORN: Commissioner Orton.

>> COMMISSIONER ORTON: I don't know this area at all but the first row in 18 where he zoomed in the long row it looks like it's part of the neighborhood to the right of it that is in eight so if we chose those to keep that all of that together that would be good.

>> COMMISSIONER CURRY: Brittini didn't Hazel Park have a racehorse area? That seemed like something like.

>> COMMISSIONER KELLOM: They did. That is the other end, I know what you are talking about kind of by 696 it's no longer there. But yeah.

>> COMMISSIONER CURRY: That is what I was looking at right up in there.

>> VICE CHAIR ROTHHORN: All right that is the area, correct Commissioner Kellom? Commissioner Orton is that what we are looking at?

>> COMMISSIONER ORTON: Not meaning that much but if it takes it that is fine and I was talking about the first strip.

>> VICE CHAIR ROTHHORN: A thousand and a contiguous area and looks like it's clean. It's the thousand and we have an 18 can give that up. And we are moving it into 8. Do we need to look at numbers? And I'm thinking when I say numbers, I'm looking at Black voting age population or do we feel comfortable this is okay and I would believe

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> MR. KENT STIGALL: Excuse me, okay, Commission District 8 is now 43.75% Black. And District 18 is now 45.34% Black. Asian and Hispanic population are well below 5, well one is 4.47. What other District? 8? We have not dealt with 10 yet.

>> VICE CHAIR ROTHHORN: What we are about to do so 8 is, yeah, so we have a couple hundred to take out of 8 because we want to keep it a little bit overpopulated if we can. And we are going to move it into ten so where should we yeah so then we will also take a little bit out of 12 then.

>> MR. KENT STIGALL: If need be.

>> VICE CHAIR ROTHHORN: If need be, so Commissioners help me. Is that -- what is that line that is sort of on the west of 10 and east of 8? Is that a County line? Is that a major road? Is that something we should cross or should we not cross it? .

>> MR. KENT STIGALL: This is the County line.

>> COMMISSIONER CURRY: Yes.

>> COMMISSIONER KELLOM: It's Dequinder road that is the area the Bengali community describes, starts kind of like you know their COI.

>> VICE CHAIR ROTHHORN: We don't want to cross that I believe. What I'm hearing we may want to take from 12 rather than sort of disrupt that community. Is that.

>> COMMISSIONER KELLOM: I'm also not in love with the way and this is not always about looks but the way District 8 looks. So yeah.

>> VICE CHAIR ROTHHORN: Any changes.

>> COMMISSIONER KELLOM: We can go into ten a bit. I would not be against it. But that is just not my decision so that is just my thought.

>> VICE CHAIR ROTHHORN: Again thinking about the careful moves we want to make, I know this was drawn, right, with your with COIs in mind so as we are moving and changes neighborhoods go ahead Commissioner Curry.

>> COMMISSIONER CURRY: Didn't Bengali say they are located in Warren and that is in 25 the bottom part of 25 along with 10, probably kind of go together some kind of way?

>> VICE CHAIR ROTHHORN: I think that is accurate. What you're saying is accurate, yep. So then again, I'm thinking so Commissioner Kellom did you want to sort of fix 8 before we sort of try to do massage 10 or do we want to move into 10.

>> COMMISSIONER KELLOM: Move into 10 is fine because I can't process that quickly about what to do with my lightning bolt 8.

>> VICE CHAIR ROTHHORN: Go ahead Commissioner Stigall.

>> MR. KENT STIGALL: Excuse me 10 needs almost a roughly a thousand.

>> VICE CHAIR ROTHHORN: Right.

>> MR. KENT STIGALL: So I don't know how y'all feel about it. This whole side over here is higher numbers except for whatever.

>> VICE CHAIR ROTHHORN: Adding to 10 from 8. Okay so very good.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272          MICRC_009419

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> MR. KENT STIGALL: We can cut down on the lightning bolt if necessary but I don't know the neighborhoods.

>> COMMISSIONER CURRY: Do you have some names you can put on it so we can kind of see the streets? .

>> MR. KENT STIGALL: Yes, this is Cadillac heights and this is Davidson.

>> COMMISSIONER CURRY: Familiar with Davidson.

>> MR. KENT STIGALL: Anything across this line well right there.

>> VICE CHAIR ROTHHORN: I was going to say let's add Conan garden.

>> MR. KENT STIGALL: Took this piece in the northeast Central District.

>> VICE CHAIR ROTHHORN: Yes please.

>> MR. KENT STIGALL: We can select the blocks and just see what happens.

>> COMMISSIONER CURRY: Yes.

>> VICE CHAIR ROTHHORN: Thanks Commissioner Curry.

>> COMMISSIONER CURRY: You are welcome.

>> MR. KENT STIGALL: It's not going to quite do it but gets it in the ballpark.

>> COMMISSIONER CURRY: Okay.

>> MR. KENT STIGALL: This is only 111 but it does cleanup and follow the neighborhood line.

>> VICE CHAIR ROTHHORN: Sounds good.

>> MR. KENT STIGALL: Okay assign that to ten?

>> VICE CHAIR ROTHHORN: Yes, please.

>> MR. KENT STIGALL: Let me try that again. Ten still needs a thousand but if we continue to improve neighborhoods.

>> VICE CHAIR ROTHHORN: Uh-huh so two is fine. I think I don't think we want to move.

>> MR. KENT STIGALL: I went too far.

>> VICE CHAIR ROTHHORN: Yep. And.

>> MR. KENT STIGALL: Well for example, two you see how this Davidson seems to be split right here. So if you took a little bit of this two and put it in ten, you would be you know doing the neighborhood thing again. This is Davidson.

>> COMMISSIONER KELLOM: Kent, try that, please.

>> MR. KENT STIGALL: Okay.

>> VICE CHAIR ROTHHORN: This is sort of the area of the LBGTQ neighborhood. So do we have I mean I have that portal submission pulled up.

>> COMMISSIONER KELLOM: That is the Hamtramck area.

>> VICE CHAIR ROTHHORN: So that is not.

>> MR. KENT STIGALL: This is Bangla Town right here. Buffalo, Charles here.

>> VICE CHAIR ROTHHORN: That is not 8 mile, sorry.

>> MR. KENT STIGALL: This is McNichols.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> COMMISSIONER KELLOM:  Also known as 6 mile.

>> VICE CHAIR ROTHHORN:  Yep, yep, yep, I'm with you.

>> MR. KENT STIGALL:  So now excuse me ten still needs a little bit more but we are down to you know just hundreds. 12.

>> COMMISSIONER KELLOM:  What is happening with 12? .

>> MR. KENT STIGALL:  12 has mount Olivet.

>> COMMISSIONER KELLOM:  Take that please.

>> MR. KENT STIGALL:  Take that Section?

>> COMMISSIONER KELLOM:  Yes, Kent.

>> VICE CHAIR ROTHHORN:  You will also learn how to use your microphone too.

>> VICE CHAIR ROTHHORN:  We will get there Kent. So we will make this change and it's 34 as our lowest populated and number five District 5 is our highest. So we may this may help us get our plan deviation under. But not quite. But yeah, I think we have made it whole. Let's see if we can find District 5.

>> MR. KENT STIGALL:  Southfield Oakland Farmington Hills.

>> COMMISSIONER CURRY:  Right there.

>> MR. KENT STIGALL:  Nine is over as well.

>> VICE CHAIR ROTHHORN:  Mine is over, I thought.

>> MR. KENT STIGALL:  Under.

>> VICE CHAIR ROTHHORN:  9 is under and 5 is over; is that correct? .

>> MR. KENT STIGALL:  Yes, side by side so it's just a matter.

>> VICE CHAIR ROTHHORN:  Can you help us here Commissioner Kellom?

>> COMMISSIONER KELLOM:  Absolutely. We got to give some to 9.

>> VICE CHAIR ROTHHORN:  I think we are looking at sometimes it's useful I think we are in the hundreds or are we looking at a thousand Kent to get us under that population? .

>> MR. KENT STIGALL:  Hundreds will get it done.

>> COMMISSIONER CURRY:  We need hundreds.

>> MR. KENT STIGALL:  Move a thousand it will be even better. So I mean.

>> VICE CHAIR ROTHHORN:  Let's shoot for a thousand.

>> MR. KENT STIGALL:  You can do part or a whole precinct if there is a whole precinct. As a matter of fact you can move 2000 like this whole precinct here or 1800 or 2153 any of those would work. You can go.

>> COMMISSIONER KELLOM:  I thought we were going 5-9 not 9-5? .

>> MR. KENT STIGALL:  I'm stupid.

>> COMMISSIONER KELLOM:  You won't talk about yourself now stop it.

>> MR. KENT STIGALL:  1748 you can come all the way over here and get 2800, 2500.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                    MICRC_009421

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> COMMISSIONER ORTON: A piece on the side just that little so I'm thinking and we can see what one of them does.

>> MR. KENT STIGALL: 2162 would be right in the ballpark as far as your percentages.

>> COMMISSIONER KELLOM: Let's try that as sign that to 34, please.

>> VICE CHAIR ROTHHORN: Yowzah you did it.

>> MR. KENT STIGALL: Dropped well below 5%.

>> VICE CHAIR ROTHHORN: Okay all right thank you Commissioners for that. And we are within our plan deviation and we are ready to run the partisan fairness numbers and look at this plan which is the merged I just want to make sure we are on Magnolia correct?

>> COMMISSIONER KELLOM: Yes, thank you all for the teamwork. I appreciate that.

>> VICE CHAIR ROTHHORN: You're welcome. Do we have we have not looked at Benton Harbor before we did any other changes, we were going to run partisan fairness so we did this to get Magnolia for partisan fairness and after that and I should acknowledge right thank you Chair Szetela has joined us. And I think it was around 1:40.

>> COMMISSIONER ORTON: 1:40 just noting your present for the record.

>> MR. KENT STIGALL: We have a lopsided margin of 6.1% favoring the republicans and mean median difference is 3.1% and efficiency gap is 6.1% favoring republicans and seats to votes is 2.3% favoring republicans and the seat count is 55-55. Any comments.

>> COMMISSIONER CLARK: What was the first number.

>> CHAIR SZETELA: 6.1.

>> VICE CHAIR ROTHHORN: We have the numbers Commissioner.

>> COMMISSIONER KELLOM: Kellom I was going to see if buddy Bruce had any thoughts with the partisan fairness numbers.

>> VICE CHAIR ROTHHORN: Version five is the closest do you have the numbers Szetela?

>> CHAIR SZETELA: Version five which we worked on lopsided margin is 5.3 the mean median was 2.7, so a little lower the efficiency gap was 4.3 and the seats votes was 57 to 53 with a negative .5% against democrats, .5% in favor of republicans. No it's the other way. It's in favor of republicans.

>> MR. KENT STIGALL: Excuse me Madam Chair I have both the plans the spreadsheets up here we can look right at them if you want. The top is Magnolia the bottom is Pine V5. So the lopsided margin is 6.1, Magnolia, 5.3 for Pine, V5, favoring republicans. The mean median difference is 3.1% Magnolia favoring republicans. For Pine V5 is 2.7% favoring republicans.

>> CHAIR SZETELA: Okay.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                    MICRC_009429

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> MR. KENT STIGALL: Efficiency gap is 6.1% favoring republicans. Magnolia. And Pine V5 is 4.3% favoring republicans. Magonolia2.3% favoring republicans. The seat count is even at 55-55 for the two parties. The seat the proportionality bias for Pine V5 is .5% republican count. The seat count is 57-53 democrat.

>> COMMISSIONER CLARK: If we took the map and promoted it at this point, do you feel that it took care of the issues that the people of Detroit had when we were at the TCF center?

>> COMMISSIONER KELLOM: Thank you Commissioner Clark that is a loaded question. I would say overall, yes. If we had time and tweaking, of course, I would like to create a little bit more representation as we pushed up across 8 mile and play with those numbers. But I think would make us more responsive to the comments in the community of Detroit. One thing I can stand by mostly if not all of the neighborhoods in Detroit are back together.

>> COMMISSIONER CLARK: Okay great. And Juanita what is your opinion?

>> CHAIR SZETELA: Commissioner Curry are you on? Is she on? You might be muted Commissioner Curry.

>> MR. KENT STIGALL: Madam Chair I'm trying to make some of the districts more contrasting so we can more easily see the variety of District shapes.

>> VICE CHAIR ROTHHORN: Commissioner Weiss do you have a question? What if or a maybe. What if we looked at 28 and 21 to see if there is something we can tweak simple and not too drastic and maybe improve that plan deviation a little bit. I don't want to spend more than five minutes on it and look at the numbers.

>> CHAIR SZETELA: Do we need to do that if it's below 5%.

>> COMMISSIONER WEISS: It would not hurt if it's simple, real simple.

>> CHAIR SZETELA: Between which one and which one?

>> COMMISSIONER WEISS: Look at 28 or 21 and see if it could be done shifting one or the other if one is too high or low to borrow from a District and I would take a few minutes to do and see if it helps.

>> CHAIR SZETELA: Go ahead Commissioner Rothhorn.

>> VICE CHAIR ROTHHORN: Commissioner Weiss one thing we have to do excuse me we have to evaluate whether we want to do it or have to do it is around the Flint area is a difference between version five and Magnolia so we will be shifting districts and the plan deviation may shift because of that so I'm not against doing it. I know we do have a limited amount of time and know we will be making some bigger changes like you were saying.

>> COMMISSIONER WEISS: That was the other thing if it's all right I like what you are saying thank you.

>> CHAIR SZETELA: Commissioner Witjes?

>> COMMISSIONER WITJES: I see Commissioner Weiss wanting to try something.

>> CHAIR SZETELA: If you want to go take a look take a look.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                    MICRC_009430

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> VICE CHAIR ROTHHORN: Highlighting because we got comment on TCF and this morning so yeah, I just want to make sure it's in there.

>> COMMISSIONER KELLOM: Can you put the neighborhood overlay with the actual words with the labels so we will just be faster for this?

>> CHAIR SZETELA: Yep.

>> MR. KENT STIGALL: This is 7-Mile right there.

>> CHAIR SZETELA: And Woodward.

>> COMMISSIONER CURRY: When you get to Royal Oak you have a lot of just regular families over there.

>> COMMISSIONER KELLOM: This is literally where I grew up. So Palmer Park and do you see it MC.

>> COMMISSIONER CURRY: Palmer Park I'm there almost that is my area too, where I do a lot of business at.

>> COMMISSIONER KELLOM: Schultzs, northwest Detroit palmer Woods University District Bagley community all of it is included. On the portal they were suggesting a horizontal orientation but as you can see and I don't want to speak for everyone else the neighborhoods are kept sequentially whole visually. So.

>> COMMISSIONER CURRY: I think it's pretty good, don't you Brittini? I think it's pretty good. We will know between now and tomorrow. Maybe too late to make any changes but that is the best we can do, I think.

>> VICE CHAIR ROTHHORN: Just from what it looks like to me like it is between 18 and 21 so it's not totally whole and I think we may not be able to have it totally whole as presented on their map here. In the Senate excuse me in the House Districts but in the Senate districts, yeah, we can get there. We are not able to accommodate it in the House District. Okay.

>> CHAIR SZETELA: I do think the bulk of the community is in 18 in this map.

>> COMMISSIONER CURRY: Okay so.

>> CHAIR SZETELA: Commissioner Clark?

>> COMMISSIONER CLARK: I suggest we take one last look at the numbers because we made some changes and then I'd like to put forth a motion if the numbers are acceptable, we move it to the 45 day period.

>> CHAIR SZETELA: Sure so Kent already ran the numbers I believe and has a report, Commissioner Eid?

>> COMMISSIONER EID: Yeah, I'd like to see the numbers, but there is one more area I'd like to examine and that's the Chaldean community in Sterling Heights I think we can edit that a little bit so they are more represented.

>> COMMISSIONER CURRY: Okay.

>> COMMISSIONER CLARK: Which community is that?

>> COMMISSIONER EID: Chaldeans.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                    MICRC_009438

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> MR. KENT STIGALL: So this is Magnolia as it sits right now. The lopsided margin is 5.7% favoring the republicans. The mean median difference is 2.9%. Favoring republicans. The efficiency gap is 5.4% favoring republicans. And then the proportionality bias is 1.4% favoring republicans. The seat count is 56-54 favoring democrats.

>> CHAIR SZETELA: Could you repeat the first one again 5.9? .

>> MR. KENT STIGALL: It is 5.7 for the lopsided margin favoring republicans.

>> CHAIR SZETELA: Thank you.

>> MR. KENT STIGALL: Okay.

>> COMMISSIONER CURRY: Now is that a 0 as we can get that? You know they kept on saying keep it really 0-0 or something. Is that as close as we can get it?

>> VICE CHAIR ROTHHORN: It's better it's better.

>> COMMISSIONER CURRY: Okay that is as close as we can get it then probably.

>> VICE CHAIR ROTHHORN: I don't know about that.

>> CHAIR SZETELA: Commissioner Eid?

>> COMMISSIONER EID: Well, it's better than it was earlier. It's still not as good as Pine version five that we adopted yesterday. So we might want to look at making more edits to get it to that same level of partisan fairness maybe.

>> COMMISSIONER CURRY: Yeah, that is what they were talking about.

>> COMMISSIONER WITJES: I second Doug's motion.

>> CHAIR SZETELA: Okay so well we can create an alternative draft for I know Commissioner Eid just mentioned making additional changes.
It sounds like he may have intention to improve partisan fairness so we have a motion and a second. Commissioner Clark seconded by Commissioner Witjes to advance this map to the 45 day public comment period is there any discussion or debate on the motion? Commissioner Kellom?

>> COMMISSIONER KELLOM: Just something quick I support Commissioner Eid's effort to continue to improve the map because I'm sure there are small tweaks and something he has thought about for getting here so I would like to give him that opportunity to do so. That is all.

>> CHAIR SZETELA: Commissioner Eid?

>> COMMISSIONER EID: Well I mean before motioning to advance it I think we should look at that Chaldean community. Seems we looked at darn near every other community in the state. So I think trying to figure out a way that they are represented since they are a cohesive minority community that also votes differently from the rest of the Arab community, I think we should do that first before you know making a motion and seeing what it does. I mean we got a little bit of time here so.

>> CHAIR SZETELA: I'm not disagreeing with you but we have a motion and a second so if you don't want to approve this map you would have to vote no at this point

Agee et al. v. Benson et al., Case No. 1:22-cv-00272  MICRC_009439

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> MR. KENT STIGALL: I'm looking at it and I have to share it. So from this was the column of precincts I believe that had the largest number. He was referring to. And this is one precinct coming through here. And it crossed this way.

>> CHAIR SZETELA: Yeah, so can we also put on the Indian Asian population dots? I thought we drew in this way because we were trying to keep together the Indian population. So we might be like switching one community of interest for another potentially.

>> MR. KENT STIGALL: We need to get to at least the precinct level. So this is the Asian combined. We had Native American is that what you're saying?

>> CHAIR SZETELA: No Asian I thought we were trying to keep the Asian population together in this District. You can see that is exactly what we did, that is what I remembered.

>> MR. KENT STIGALL: Most of that, this column of that Commissioner Eid had posted you know most of it I mean it's in 28 other than the population right here and a little bit right there.

>> COMMISSIONER EID: I see the Chaldean being split up 28, 25 and a little of 23 how I'm looking at this map. If we map what is on Dr. Handley's analysis, then you will see it goes from 28 to 25 and into 23 just a little on 23 mostly split on 28 and 25 but I understand this was drawn for this purpose and we might have to decide which community of interest to go with here. If we do have to make that decision, I mean I obviously am going to advocate for the Chaldean community Novi is there but I think we have Szetela so go ahead.

>> COMMISSIONER EID: I think we have made other districts 110 for example that we made to have a very high Asian population. We have other districts like District 2 and District 8 that have high and District 10 that have high Bengali populations but we have yet to have a Chaldean District. So we should keep that in mind too.

>> CHAIR SZETELA: Commissioner Curry go ahead.

>> COMMISSIONER CURRY: Did we keep Dearborn together and I don't know if they are Chaldeans but that is one population that we tried to keep together there, right?

>> COMMISSIONER EID: We definitely did. Do it for Dearborn and I think the Dearborn District looks great but the important differentiation between Arab community and Dearborn and the Chaldean and Sterling Heights is they vote differently. Dr. Handley's analysis showed that by and large in Dearborn the voting goes with you know similar to how African/Americans vote. For the democratic candidate where the Chaldeans in Sterling Heights seem to be voting for the republican candidate. So it's a little bit of a different community.

>> COMMISSIONER CURRY: What is the other culture voting for are they republicans or democrats or what?

>> CHAIR SZETELA: Muslim Arab Americans, are you talking about the Indian or are you talking about.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                    MICRC_009442

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> CHAIR SZETELA: But you're not getting the concentrated area you're trying to get to. To do that you have to cut all the way across 25 then you will orphan that District below and then we will really have to.

>> COMMISSIONER EID: Take the precinct that is highlighted and you can take the vertical precinct and if it doesn't work, we can see we tried.

>> CHAIR SZETELA: It's a separate version go ahead and knock yourself out.

>> COMMISSIONER EID: Okay so the precincts in 28 the top three since they are connected to 25 then we then won't have to go in 32 let's put those into 25.

>> MR. KENT STIGALL: Put those into 25.

>> COMMISSIONER EID: That is 8,000 people-ish.

>> COMMISSIONER CURRY: Yeah almost.

>> COMMISSIONER EID: Okay so now 28 the precinct you highlighted before and then the vertical precinct that is there or we don't even have to do that precinct. We can go one more eastward.

>> MR. KENT STIGALL: 8500.

>> COMMISSIONER EID: Assign that to 28.

>> MR. KENT STIGALL: I'm sorry, I will go over here. We should see if it had a difference on partisan fairness, it might or might not and not sure how 28 was previously so maybe we should look at that now.

>> CHAIR SZETELA: Do you have the old partisan fairness open? .

>> MR. KENT STIGALL: I can bring it up.

>> CHAIR SZETELA: Look at 28 and 25.

>> MR. KENT STIGALL: Districts 25 and 28 were 50/50 on 25 and 28 was pretty close to 55. Taking 48.5 and 50.3 to 49.7.

>> COMMISSIONER EID: They were already technically this is just a composite I don't think it's accurate for democrat or republican and let's run the numbers to see if it had significant change.

>> MR. KENT STIGALL: District 25 is now didn't change at all. District 28 essentially didn't change, it moved it a tenth.

>> COMMISSIONER EID: Two precincts.

>> CHAIR SZETELA: The districts.

>> COMMISSIONER EID: Did the overall number change or 5.7 before.

>> MR. KENT STIGALL: This is 51.3 if I remember.

>> CHAIR SZETELA: 51.4 so virtually no change.

>> MR. KENT STIGALL: That is definitely within the margin of error.

>> CHAIR SZETELA: Can we see the lopsided margin? I thought I saw 5.7 there at the top and then the mean median, it should all be the same.

>> MR. KENT STIGALL: My guess is it can't change. Your elections didn't change. Mean median 2.9. Efficiency gap 5.4. Seats are 56-54, 1% bias and should not have been a change.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                    MICRC_009445

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

this might stop some of that shift can we run partisan fairness on the map for the 2020 election and for the 2016 election? And the reason why it's shifting so much if you look at the break down now, we have a lot of districts because it's a house map but we have a significant number of directions that are at like 50.1% both sides. So it's creating a lot of flux in the plan. Commissioner Kellom.

>> COMMISSIONER KELLOM: If this is something as a Commission, we like to limit confusion in so many plans can we take one out and then have this one be advanced?

>> CHAIR SZETELA: No.

>> COMMISSIONER KELLOM: Not at this very moment.

>> CHAIR SZETELA: We can go with three potentially. I know you are like Heavens to Betsy.

>> COMMISSIONER KELLOM: Lots of other words, yeah, uh-huh.

>> CHAIR SZETELA: Yeah, and I mean people might not like it so we might not get it advanced.

>> CHAIR SZETELA: This is Magnolia at the moment it's 1.1 because of the District copy of the Magnolia file. Lopsided margin is 5.7 for republican you may have written this down already. Mean median difference is 2.9.

>> CHAIR SZETELA: Composite right.

>> MR. KENT STIGALL: Yes, and efficiency gap is 5.4. And then the seats votes ratio is 56-54 favor of democrats with the republicans having a proportionality bias of 1.4% positive or favorable.

>> CHAIR SZETELA: So partisan fairness for the 2020 election and you have to click on partisan fairness or it might not work.

>> MR. KENT STIGALL: It's fine.

>> CHAIR SZETELA: So Biden and Trump 20.

>> MR. KENT STIGALL: And Trump 20. Lopsided margins is 5.1% favoring republicans. Mean median is 2.4 favoring republicans. The efficiency gap is 5.3 republicans seats to vote is 56-54 favoring republicans. Proportionality bias is 2.3%.

>> CHAIR SZETELA: Okay can we rerun that for so the takeaway on this is the democrats actually won greater percentage of the votes 51% but yet they have fewer seats. If you look at 2016.

>> VICE CHAIR ROTHHORN: Your mic is off Mr. Stigall.

>> MR. KENT STIGALL: I will save it so if you ever want to reference it. Press 20 partisan fairness. Then we go back to Clinton 16.

>> CHAIR SZETELA: Trump 16.

>> MR. KENT STIGALL: Trump 16. So 5.7% is the lopsided margin. Favoring republicans. Mean median difference is 4.4% favoring republicans. Efficiency gap is 9.2 favoring republicans. Seats to votes was 8.1% favoring republicans. Republican seats 64-46. It improving significantly from 16-20.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

this might stop some of that shift can we run partisan fairness on the map for the 2020 election and for the 2016 election? And the reason why it's shifting so much if you look at the break down now, we have a lot of districts because it's a house map but we have a significant number of directions that are at like 50.1% both sides. So it's creating a lot of flux in the plan. Commissioner Kellom.

>> COMMISSIONER KELLOM: If this is something as a Commission, we like to limit confusion in so many plans can we take one out and then have this one be advanced?

>> CHAIR SZETELA: No.

>> COMMISSIONER KELLOM: Not at this very moment.

>> CHAIR SZETELA: We can go with three potentially. I know you are like Heavens to Betsy.

>> COMMISSIONER KELLOM: Lots of other words, yeah, uh-huh.

>> CHAIR SZETELA: Yeah, and I mean people might not like it so we might not get it advanced.

>> CHAIR SZETELA: This is Magnolia at the moment it's 1.1 because of the District copy of the Magnolia file. Lopsided margin is 5.7 for republican you may have written this down already. Mean median difference is 2.9.

>> CHAIR SZETELA: Composite right.

>> MR. KENT STIGALL: Yes, and efficiency gap is 5.4. And then the seats votes ratio is 56-54 favor of democrats with the republicans having a proportionality bias of 1.4% positive or favorable.

>> CHAIR SZETELA: So partisan fairness for the 2020 election and you have to click on partisan fairness or it might not work.

>> MR. KENT STIGALL: It's fine.

>> CHAIR SZETELA: So Biden and Trump 20.

>> MR. KENT STIGALL: And Trump 20. Lopsided margins is 5.1% favoring republicans. Mean median is 2.4 favoring republicans. The efficiency gap is 5.3 republicans seats to vote is 56-54 favoring republicans. Proportionality bias is 2.3%.

>> CHAIR SZETELA: Okay can we rerun that for so the takeaway on this is the democrats actually won greater percentage of the votes 51% but yet they have fewer seats. If you look at 2016.

>> VICE CHAIR ROTHHORN: Your mic is off Mr. Stigall.

>> MR. KENT STIGALL: I will save it so if you ever want to reference it. Press 20 partisan fairness. Then we go back to Clinton 16.

>> CHAIR SZETELA: Trump 16.

>> MR. KENT STIGALL: Trump 16. So 5.7% is the lopsided margin. Favoring republicans. Mean median difference is 4.4% favoring republicans. Efficiency gap is 9.2 favoring republicans. Seats to votes was 8.1% favoring republicans. Republican seats 64-46. It improving significantly from 16-20.

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> CHAIR SZETELA: Can we try one more the 2018 gubernatorial election which is Whitmer versus Schuette? .

>> MR. KENT STIGALL: Looking for it there it is so it.

>> CHAIR SZETELA: 2018 I think it's further up. It's above Snyder because that is 2014 there is Whitmer and Whitmer is the democrat and Schuette is the republican. Where is he a little further down because those are all, yep, right there. Schuette, 18.

>> MR. KENT STIGALL: Okay, lopsided margin is 6.4. Favoring republicans. The mean median difference is 2%. The efficiency gap is .6% republican. The seats to votes favor the democrats 66-44. And the democrats have the propositional bias of 5.5%.

>> CHAIR SZETELA: All right so now if we can go in the plan and make these proposed changes and see what everybody thinks and maybe rerun some reports. So what I see is 2348.

>> CHAIR SZETELA: 48 you will bring up into Brighton.

>> MR. KENT STIGALL: And 49 okay.

>> CHAIR SZETELA: Yeah so, I mean it's probably easiest to start with 48 and bring that up.

>> MR. KENT STIGALL: Follow the blue line.

>> CHAIR SZETELA: Into Brighton.

>> MR. KENT STIGALL: I can do that. Sorry Dustin. We kept Livingston whole in every other map we have so it's their turn. Yep, and if you can put those in.

>> MR. KENT STIGALL: To 50.

>> CHAIR SZETELA: 48. It can't stay there.

>> CHAIR SZETELA: Go to 49 and extend it to Wixom, yep. Fix 21 and make it all 21.

>> MR. KENT STIGALL: This area into 21.

>> CHAIR SZETELA: Into 21.

>> MR. KENT STIGALL: Okay.

>> CHAIR SZETELA: Put that is area into 22. And 23 will extend into the little jog out there. So we will go in Ann Arbor and cause blocks in 48 to change and assign them for now and we will go and fix them. We love Ann Arbor. Commissioner Orton, sorry.

>> COMMISSIONER ORTON: While he is making the changes can you describe why you chose these changes or the lines where they are or whatever?

>> CHAIR SZETELA: So I mentioned a couple times that I want to preserve the Asian community on the east side of Ann Arbor and I think this does this. Bringing Brighton in with the north side of Ann Arbor I think it makes a lot of sense from communities of interest perspective and we had people comment on that specifically that Brighton and Ann Arbor have a lot of connections between them. We have also heard people take the alternate view but like I said every other map we have not put them together and I thought it would be good on this map to try. And then again it

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> CHAIR SZETELA:  Can we just put it back in 50?  That should solve that error.

>> MR. KENT STIGALL:  Yes.

>> CHAIR SZETELA:  If you can just put that into 23.

>> MR. KENT STIGALL:  Okay.
Deviation now is below 5%.

>> CHAIR SZETELA:  Can we scroll out so everybody can see what I did.

>> MR. KENT STIGALL:  What we looking at.

>> CHAIR SZETELA:  The Ann Arbor so people can see around Ann Arbor.  A little further west there you go.  I just broke up Ann Arbor a little differently broke it in four and then tried to bring in that east Asian I'm sorry east Ann Arbor Asian community.  Went up into Brighton.  And I mean, any comments, thoughts, questions?  I'm sure they will be and Brighton will be.  Can we run the partisan fairness and see if it makes a difference?  Commissioner Eid?

>> COMMISSIONER EID:  Check the Asian American demographic population in 23.

>> CHAIR SZETELA:  I did not Commissioner Curry?

>> COMMISSIONER CURRY:  We had comments this morning saying they did not want Ann Arbor split especially four ways.  They didn't want it split.  I don't know how they were going to keep them on but someone made a comment that they did not want Ann Arbor split.

>> MR. KENT STIGALL:  This plan has the lopsided Madam Chair the lopsided margin is 5.3% in favor of republicans.

>> CHAIR SZETELA:  Okay.

>> MR. KENT STIGALL:  The mean median is 2.7% in favor of republicans.  The efficiency gap is 4.3 percent in favor of republicans.

>> CHAIR SZETELA:  Okay.

>> MR. KENT STIGALL:  Seats to votes ratio is .5% and the democrats have the seats 57-53.

>> CHAIR SZETELA:  Okay so by comparison the base plan, the lopsided margins is 5.7, we have 5.3 here.  The mean median is 2.9 on the base plan we have 2.7 here.  The efficiency gap is 5.4 on the base and this is 4.3 here.  And then the seats vote is, was 56-51 with a negative 1.4 positive 1.4 lean.  This one is 57 over 53 with a negative half percent over positive half percentage favoring republicans.  It improved all the metrics which is what I thought it would do Commissioner Witjes?

>> COMMISSIONER WITJES:  Lopsided of the mean median again.

>> CHAIR SZETELA:  Uh-huh bless you.

>> MR. KENT STIGALL:  Lopsided margin 5.3% in favor of republicans.  Mean median difference MMD, is 2.7% favoring republicans.

>> CHAIR SZETELA:  Commissioner Witjes?

>> COMMISSIONER WITJES:  Since I do it all the time and the numbers are decent, I believe this map be moved forward to the 45 day public comment period.

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                    MICRC_009480

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

>> CHAIR SZETELA: Let's go ahead Commissioner Lett call the question. Commissioner Witjes called the question I thought it was Commissioner Lett. All in favor of advancing this map to the 45 day public comment.

>> COMMISSIONER WITJES: Roll call.

>> CHAIR SZETELA: Is there more discussion or debate on the motion.

>> COMMISSIONER CURRY: Are we running the numbers Madam Chair.

>> CHAIR SZETELA: General Counsel is telling us that is not appropriate at this point.

>> MS. JULIANNE PASTULA: To clarify the motion can be withdrawn or amended but what I'm saying as it stands now you have a motion to forward this map to the table so if the Commission would like to do something different, a motion to amend to get more numbers could be made. The motion could be withdrawn. The motion could be modified. There is a variety of options before the Commission at this point. I was merely pointing out that you do have a pending motion.

>> CHAIR SZETELA: Thank you General Counsel.

>> COMMISSIONER LETT: I have a question.

>> CHAIR SZETELA: Yes.

>> COMMISSIONER LETT: General Counsel wouldn't it be part of discussion if members wanted to compare the numbers prior to the vote?

>> MS. JULIANNE PASTULA: Through the Chair to Commissioner Lett the Commissioner could certainly continue that conversation if it chose. But the discussion and debate is on the base the actual motion is whether to move the map forward or not. So again talking about the fairness numbers and that might be seen as an extension of the actual motion. But the motion is to adopt not to examine further.

>> COMMISSIONER LETT: I understand that but I think the discussion from the Commissioners is to take a look at those before the vote. So are you.

>> CHAIR SZETELA: Does anyone object to that? If no one objections I say run the numbers the data is good, right, okay so this is the 2020 election.

>> MR. KENT STIGALL: 2020 election between president Biden and former president Trump. So the lopsided margin is 5% favoring republican. The mean median difference is 2.4% favoring republican. And the efficiency gap is 5.2% favoring republican. And the proportionality bias is 2.3% favoring republicans with the republicans having 56 and the democrat having 54 seats.

>> CHAIR SZETELA: Okay can we look at 2016? .

>> MR. KENT STIGALL: Yes. Wasn't there a 28? 2016 is Clinton and former president so lopsided margins in 2016 Presidential election.

>> CHAIR SZETELA: 5.6.

>> MR. KENT STIGALL: 5.6 favoring republicans mean median difference 3.7 favoring republicans. Efficiency gap is 9.2%. Favoring republicans. Proportionality

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                    MICRC_009482

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

bias was 8.1% favoring republicans with republicans winning having 64 seats and the democrats 46 seats.

>> CHAIR SZETELA: Okay and then can we run the 2018 Whitmer Schuette election? .

>> MR. KENT STIGALL: Lopsided margin 6.4% favor of republicans. The mean median difference is 1.8% favoring republicans. The efficiency gap was .5% favoring republicans. The seats to votes favored the democrats by proportionality bias 5.5% in favor of democrats. Number of seats favor democrats 66-44.

>> CHAIR SZETELA: For comparison purposes can we bring up was it Pine three that we advanced? .

>> MR. KENT STIGALL: Pine five.

>> CHAIR SZETELA: Okay Pine five. I don't think we ran all this analysis on Pine five before we adopted it. We only did the composite so we have more data so can we just is this the composite for Pine five that you have? That would be the only one we had on it.

>> MR. KENT STIGALL: I believe it is.

>> CHAIR SZETELA: Composite for Pine five is efficiency gap of 5.3. And let's look at the mean median.

>> VICE CHAIR ROTHHORN: Lopsided margin.

>> CHAIR SZETELA: I misspoke.

>> MR. KENT STIGALL: I will run it again and have it sitting in front of you.

>> CHAIR SZETELA: Okay.

>> MR. KENT STIGALL:

>> CHAIR SZETELA: You are running this again for Magnolia.

>> MR. KENT STIGALL: 1.1.

>> CHAIR SZETELA: Okay.

>> MR. KENT STIGALL: Magnolia1.1 is above Pine V5 they have the same lopsided margin of 5.3%.

>> CHAIR SZETELA: Okay.

>> MR. KENT STIGALL: Same mean median difference of 2.7%.

>> CHAIR SZETELA: Okay.

>> MR. KENT STIGALL: The efficiency gap is the same for both at 4.3%. And they have the same proportionality bias of .5% favoring the democrats favoring the republicans with the democrats having 57-53 seats for republicans.

>> CHAIR SZETELA: Do we need to see more or they are identical. Any other discussion or debate? Let's go ahead and vote again Mr. Eid?

>> COMMISSIONER EID: Sorry guys, lot to say today evidently. Getting some laughs, huh? So I just I don't know what the rush is, right. This map whatever we are going to call it it's just a slight improvement over the previous one. So why have both? Right. And my only fear is we are going to keep improving it which we should do try to

DISCLAIMER: This is NOT a certified or verbatim transcript, but rather represents only the context of the class or meeting, subject to the inherent limitations of realtime captioning. The primary focus of realtime captioning is general communication access and as such this document is not suitable, acceptable, nor is it intended for use in any type of legal proceeding.

keep improving it if we can but we will have a whole bunch of maps what are everyone's thoughts? Are we going to retract Magnolia one and only have this one? Are we going to have both of them? You know in my eyes it's the same map just slightly improved. The data shows it is very slightly improved. It's about .1 to .3 on the...every measure respective of the election years they are in. For example let's just take 2020 Presidential election 5.1 to 5.0. We take the that is for lopsided margins and for efficiency gap wait I'm sorry it goes 5.3 to 5.2 so again that is a .01 change so it's pretty much the same. All of the seats to votes ratios for each election were also the same. So again I just don't know how many maps we want to have. It's just a slight improvement over the previous configuration.

>> CHAIR SZETELA: Commissioner Orton and I can address it. Commissioner Clark.

>> COMMISSIONER ORTON: Well I think this was done for partisan fairness reasons. It does make a very slight change but it does not make a slight change to some of these areas. It's some significant change to a few areas so I don't see the harm in putting it out there and getting public comment on both ways.

>> CHAIR SZETELA: Commissioner Clark?

>> COMMISSIONER CLARK: I'm not looking at it from a data perspective. I'm looking at it from a community of interest perspective. Ann Arbor now is split three ways. And you really feel that they are going to accept that very well? In Brighton? You may, I don't.

>> CHAIR SZETELA: Working there you know spending a lot of time there, yeah, I don't think so.

>> COMMISSIONER CLARK: And I think Dustin had some concern over Brighton being changed as well. So I'm kind of looking at it from that perspective. And like Anthony indicated you know the numbers are basically the same as one of the other maps. So I think that's what we have to take into account when we vote. That as well as the numbers.

>> CHAIR SZETELA: So what I would say on that is Pine version five which is the first map we approved does have the same metrics. However, Pine version five does not include the changes to Detroit. So this map includes the changes to Detroit and then alters the Ann Arbor area to achieve the same numbers we originally had with Pine verse five. So I think this is an improvement because we are keeping those Detroit changes that the people in Detroit spoke so eloquently about wanting. And also maintaining the partisan fairness balance we had with the Pine version five. So I think this is improvement and it is different and I think it's worthy of submitting to the public for their consideration because I think people wanted changes this Detroit but I think people also want partisan fairness. We've heard about both. So this is giving them both. All right let's vote do you want to do a roll call?

Agee et al. v. Benson et al., Case No. 1:22-cv-00272                    MICRC_009484