# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

DONALD AGEE, JR., an individual, *et al.,*

        Plaintiffs,

v.

JOCELYN BENSON, in her official capacity as the Secretary of State of Michigan, *et al.*;

        Defendants.

Case No. 1:22-cv-00272

**Three-Judge Panel Appointed Pursuant to 28 U.S.C. § 2284(a)**

## PLAINTIFFS' POST-TRIAL BRIEF

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................. i

INDEX OF AUTHORITIES ........................................................................ iii

INTRODUCTION AND SUMMARY OF ARGUMENT ............................... 1

ARGUMENT ................................................................................................. 5

I.    Plaintiffs are entitled to judgment on their Equal Protection
claims.................................................................................................. 5

    A.    Race predominated in the Commission's redistricting
process, so strict scrutiny applies. ......................................... 5

        1.    The contours of an Equal Protection claim for racial
gerrymandering ............................................................. 5

        2.    Race predominated in the Commission's map
drawing. ........................................................................ 7

    B.    The Commission cannot assert a compelling interest in
VRA compliance because it had no good reason to think
all the *Gingles* preconditions were met. ................................. 38

    C.    The Commission's racial considerations were not narrowly
tailored in any event because the Commission lacked a
strong basis in evidence for the race-based choices it
made.......................................................................................... 42

II.    Plaintiffs are entitled to judgment on their VRA claims................. 44

    A.    Unlike the Commission, Plaintiffs prepared a
demonstration map. ................................................................ 45

    B.    The parties do not disagree on the Senate factors................. 45

    C.    Each of Plaintiffs' challenged VRA districts satisfies
*Gingles* factors two and three and the totality of the
circumstances. ......................................................................... 49

        1.    Senate District 8 ............................................................ 51

        2.    Senate District 1 ............................................................ 52

        3.    Senate District 6 ............................................................ 53

4.      Senate District 3 ............................................................ 54

5.      House District 1, 7, 10, 12, and 14 ............................ 55

III.    Remedy ...................................................................................... 57

CONCLUSION .................................................................................... 58

# INDEX OF AUTHORITIES

## <u>CASES</u>

*Abbott v. Perez*, 138 S. Ct. 2305 (2018) .................................................................. 6, 43

*Alabama Legislative Black Caucus*, 575 U.S. 254 (2015) ................................. 3, 6, 42

*Arkansas State Conference NAACP v. Arkansas Board of Apportionment*, ___ F.4th ___, 2023 WL 8011300 (8th Cir. Nov. 20, 2023), ............................................................................................................................. 4, 44

*Bartlett v. Strickland*, 556 U.S. 1 (2009) .................................................................. 39

*Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. 178 (2017) ................... 6, 34

*Black Pol. Task Force v. Galvin*, 300 F. Supp. 2d 291 (D. Mass. 2004) .................... 39

*Bush v. Vera*, 517 U.S. 952 (1996) ............................................................................... 6

*Coca v. City of Dodge City*, No. 22-1274-EFM, 2023 WL 2987708  (D.Kan. Apr. 18, 2023) ............................................................................. 44

*Cooper v. Harris*, 581 U.S. 285 (2017) .............................................................. 3, 6, 39

*Hirabayashi v. United States*, 320 U.S. 81 (1943) ....................................................... 5

*Levy v. Lexington County, S.C.*, 589 F.3d 708 (4th Cir. 2009) .................................. 49

*Miller v. Johnson*, 515 U.S. 900 (1995) ................................................................... 5, 6

*NAACP v. Arkansas Board of Apportionment*, __ F.4th __, 2023 WL 8011300 (8th Cir. Nov. 20, 2023) ................................................................... 44

*Pope v. County of Albany*, 94 F. Supp. 3d 302 (N.D.N.Y. 2015) ............................... 45

*Rucho v. Common Cause*, 139 S.Ct. 2484 (2019) ...................................................... 37

*Ruiz v. City of Santa Maria*, 160 F.3d 543 (9th Cir. 1998) ...................................... 50

*Shaw v. Hunt*, 517 U.S. 899 (1996) ............................................................................. 6

*Shaw v. Hunt*, 517 U.S. 899 (1996) ............................................................................. 6

*Thornburg v. Gingles*, 478 U.S. 30 (1986) ........................................................ passim

*Turtle Mountain Band of Chippewa Indians v. Jaeger*, No. 3:22-cv-22, 2022 WL 2528256 (D.N.D. July 7, 2022) ................................................................... 44

*United States v. Eastpointe*, 378 F. Supp. 3d 589 (E.D. Mich. 2019) ...................... 39

*Washington v. Davis*, 426 U.S. 229(1976) ....................................................... 5

*Wisconsin Legislature v. Wisconsin Elections Comm'n*, 142 S. Ct. 1245 (2022) .................................................................................................................. 43

## **OTHER AUTHORITIES**

42 U.S.C. § 1983 ....................................................................................... 4, 44

MCL 168.163 ................................................................................................ 57

Senate Report No. 97-417, at 28 (1982) ...................................................... 46

## **RULES**

Fed. R. Civ. P. 15(a)(2) ................................................................................. 45

## INTRODUCTION AND SUMMARY OF ARGUMENT

The People of Michigan amended the Michigan Constitution to ensure that *everyone* had a seat at the redistricting table. The newly selected Commissioners embraced the opportunity to make that goal a reality. There was just one problem: this was an inexperienced group; none had ever been involved in redistricting. Accordingly, they hired experts.

Those experts failed the Commissioners—and Black voters in Detroit. The Commission's Voting Rights Act expert, Dr. Lisa Handley, conducted her initial VRA analysis based on 13 general elections and one Democratic primary for state-wide office, the 2018 gubernatorial election. She ruled out the gubernatorial election's relevance because there was no Black candidate of choice. That left only the 13 general elections. Given Dr. Handley's extensive VRA work in the South—where the ability of Black voters to elect candidates of choice depends entirely on the general election—she initially did not see this as a problem. But Dr. Handley now admits that her general-election analysis is inadequate to determine whether Black voters can elect their candidates of choice in Detroit *primaries*.

Using those 13 general elections, Dr. Handley concluded Black voters could elect their candidate of choice if the Black Voting Age Population was in the 35-40% range in Wayne County and the 42-43% range in Oakland County. The Commission's VRA Counsel, Mr. Bruce Adelson, and its General Counsel, Ms. Julianne Pastula, demanded that the Commissioner adhere to those ranges, so much so that Commissioners believed they were "exposing ourselves to a *legal risk*" if they did not reach them. *E.g.*, PX064-0019.

As a result, race predominated in the drawing of the Hickory and Linden plans. All other objectives—partisan fairness, communities of interest, changing populations—fell aside as the Commissioners attempted to hit Dr. Handley's ill-founded racial ranges. As a result, the Hickory and Linden plans must satisfy strict scrutiny. But the plans fail both prongs of that analysis.

*First*, as the Commission admits, it could only use racial considerations if it "had a compelling interest in VRA compliance." Comm'n Br. in Support of Mot. for S.J. at 29, PageID.666. "A compelling interest exists under Section 2 [only] if the redistricting authority has good reason to think that all [three] *Gingles* preconditions are met." *Id.* (quotation omitted, referencing *Thornburg v. Gingles*, 478 U.S. 30 (1986)). But Mr. Adelson admitted at trial that the Commission never prepared nor requested preparation of a demonstration map that would have indicated that the first *Gingles* precondition was met. Trial.Tr.VI.62, PageID.3064. And Dr. Handley's general-election analysis showed that Black voters had no trouble electing their candidates of choice—which meant the Commission had no good reason to believe that *Gingles* precondition three could be met.

Indeed, according to Dr. Handley, her supplemental analysis of Detroit-area primaries concluded that Black voters in Detroit *easily* elected their candidates of choice. Accordingly, the plans fail the compelling interest prong of the strict-scrutiny inquiry, the Commission has no defense to its use of race, and Plaintiffs are entitled to judgment as a matter of law on their Equal Protection claims for House Districts 1, 7, 8, 10, 11, 12, and 14 and Senate Districts 1, 3, 6, 8, 10, and 11.

_Second_, Dr. Handley's general-election analysis loaded the dice when Commissioners tried to ascertain whether Black voters could elect candidates of their choice in very low-BVAP districts. Of the 13 general elections that Dr. Handley analyzed, she singled out four as "Bellwether Elections" because they involved a Black candidate or Black running mate. The data underlying these Bellwether Elections was incorporated into the Commission's mapping software so that Commissioners could hit a VRA-compliance button and quickly determine whether any hypothetical district would allow Black voters to elect the candidate of their choice. But because the Bellwether Elections were based on _general_ elections—where Black candidates of choice in Detroit _always_ prevailed, no matter how low the BVAP—the VRA-compliance button was a rubber stamp. No matter what lines the Commission drew, the VRA-compliance button always indicated that Black voters could always elect candidates of choice.

That hapless Bellwether Election button was the exact opposite of "narrow tailoring," which requires the redistricting authority to have a "strong basis in evidence in support of the (race-based) choice that it has made." _Alabama Legislative Black Caucus_, 575 U.S. 254, 278 (2015) (citation omitted). Based on the record before the Commission at the time of redistricting, _Cooper v. Harris_, 581 U.S. 285, 302-03 (2017), the Commission had _no_ basis in evidence to believe VRA compliance _required_ such low BVAP targets. Given these undisputed facts, Plaintiffs are again entitled to judgment as a matter of law on their Equal Protection claims for all remaining challenged House and Senate Districts.

That leaves Plaintiffs' VRA claims. As a threshold matter, the Eighth Circuit's recent decision in *Arkansas State Conference NAACP v. Arkansas Board of Apportionment*, ___ F.4th ___, 2023 WL 8011300 (8th Cir. Nov. 20, 2023), is of no moment. In hundreds of decisions, the Supreme Court and lower courts have adjudicated cases where private plaintiffs brought VRA § 2 claims. This Court should follow their lead. And even if this Court is inclined to follow *Arkansas State*, then it should grant Plaintiffs leave to file an amended complaint adding a claim seeking to enforce § 2 as a "law[ ]" of the United States under 42 U.S.C. § 1983.

On the VRA merits, Plaintiffs have a demonstration map that satisfies *Gingles* factor one, and the parties agree the so-called "Senate factors" are met. As explained below in Section II.C, Plaintiffs also satisfy *Gingles* factors two and three and the totality of the circumstances with respect to each of the VRA-challenged districts. Accordingly, Plaintiffs are entitled to judgment on their VRA claims as well.

That leaves the proper remedy. Michigan cannot use the existing maps if they are illegal. At the same time, it seems unlikely the Commission will be able to procure a new VRA analysis, draw new Senate and House maps, hold numerous public hearings around the State, and vote on both plans sufficiently in advance of the April 24, 2024 candidate filing deadline—much less the upcoming January 30, 2024 special primary date for two open, Detroit-area House seats. Plaintiffs are ready to submit a compliant map the Court could simply adopt. Alternatively, the Court could appoint a Special Master to create one. Regardless, the Court should enter judgment for Plaintiffs.

## ARGUMENT

I.   **Plaintiffs are entitled to judgment on their Equal Protection claims.**

The Commission's hearing transcripts and the testimony at trial established by a preponderance of the evidence that race predominated in the drawing of all the challenged districts. Accordingly, the Commission's maps must satisfy strict scrutiny and be narrowly tailored to advance a compelling government interest. But the only compelling interest the Commission has advanced is VRA compliance, and the Commission had no good reason to think that all the *Gingles* preconditions were met, as Mr. Adelson told the Commission on October 28, 2021. In addition, the Commission's racial considerations were not narrowly tailored because the Commission lacked a strong basis in evidence that the VRA *required* such low, race-based ranges. Accordingly, Plaintiffs are entitled to judgment on their Equal Protection claims.

### A.   Race predominated in the Commission's redistricting process, so strict scrutiny applies.

#### 1.   The contours of an Equal Protection claim for racial gerrymandering

The Equal Protection Clause prevents the government from purposefully discriminating based on race. *Washington v. Davis*, 426 U.S. 229, 239 (1976). Race-based classifications "are by their nature odious to a free people whose institutions are founded upon the doctrine of equality." *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943).

The Equal Protection Clause prohibits the government from treating citizens along racial lines, including when creating voting districts. *Miller v. Johnson*, 515 U.S. 900, 911 (1995). A plaintiff bringing an Equal Protection racial gerrymandering

claim must first prove that "race was the predominant factor motivating the … decision to place a significant number of voters within or without a particular district." *Id.* at 916. Racially gerrymandered district maps are "constitutionally suspect … whether or not the reason for the racial classification is benign or the purpose remedial." *Shaw v. Hunt*, 517 U.S. 899, 905 (1996). A plaintiff merely need show that race was the predominant factor behind the "decision to place a significant number of voters within or without a particular district." *Cooper*, 581 U.S. at 291 (quoting *Johnson*, 515 U.S. at 916). This entails demonstrating that the redistricting plan considered race above other traditional redistricting factors. *Id.* Racial considerations predominate when mapmakers purposefully establish a set racial range or target. *Cooper*, 581 U.S. at 300.

If race was the predominant consideration in drawing districts, then the map must satisfy strict scrutiny. *Bush v. Vera*, 517 U.S. 952, 958-59 (1996). The burden then shifts to the government to prove that its race-based sorting of voters was narrowly tailored to achieve a compelling governmental interest. *Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. 178, 193 (2017). This showing must be made based on the record before the Commission at the time of redistricting. *Cooper*, 581 U.S. at 302-03. Compliance with the VRA can be a compelling interest. *Abbott v. Perez*, 138 S. Ct. 2305, 2315 (2018). Avoiding potential VRA litigation is not. *Shaw v. Hunt*, 517 U.S. 899, 911 (1996). "Narrow tailoring" requires the redistricting authority to have a "strong basis in evidence in support of the (race-based) choice that it has made." *Alabama Legislative Black Caucus*, 575 U.S. at 278.

## 2.    Race predominated in the Commission's map drawing.

In the Commission's efforts to meet its BVAP targets, it took the Black population in Detroit and combined it "with almost entirely white portions of Macomb and Oakland Counties," creating long, thin, "bacon-like districts" in the House:

Figure 17



Trial.Tr.II.20, PageID.2560; PX020-0045-47. And, because the Commission had only one historical House district that fell between 34.3% BVAP and 50.9% BVAP, the Commission was "flying blind" with respect to the likely performance of Black-preferred candidates in districts the Commission was drawing in the 35-40% BVAP range. Trial.Tr.II.18-19, PageID.2258-59; PX020-0019.

The situation was the same for the Senate map, with the Commission connecting poor Black areas with wealthy white suburbs creating long districts connected in Detroit, exhibiting a "pinwheel" shape:



Figure 44

Trial.Tr.II.22, PageID.2562; PX020-0094-96. Again due to a lack of historical Senate districts with such low BVAPs—only one historical Senate district that fell between 34.0% and 45.4% BVAP (the latter BVAP being higher than *any* of the BVAPs in the Linden Plan)— "the Commission was flying just as blind with the Senate plan as they were with the House." Trial.Tr.II.21-22, PageID.2561-62; PX020-0022.

Now, consider the evidence regarding *how* the Linden and Hickory districts came to be drawn with such strange shapes and low BVAPS. The entirety of the

Commission's proceedings is in the record, and discussing every instance where Commissioners and Commission staff discuss racial targets would far exceed the word limit for this post-trial brief. The Court can get a more fulsome sense of the frequency and depth of those discussions in Plaintiffs' Proposed Findings of Fact and Conclusions of Law ¶¶ 168-309. But Plaintiffs will provide a flavor here.

1. As Chair Szetela testified at length, Dr. Handley and Mr. Adelson used Dr. Handley's general-election analysis to recommend a 35-40% BVAP range for Wayne County and a 40-45% BVAP range for Oakland County, later adjusted to 42-43% BVAP. *E.g.*, Trial.Tr.I.39-40,52, PageID.3620-3621, 3633; PX064-0056, PX140-0747. Commissioners were instructed: "[d]on't go below that [BVAP] level." Trial.Tr.I.40, PageID.3621.

With hindsight, Chair Szetela now understands that Dr. Handley made a mistake focusing on general elections instead of primary elections; in heavily Democratic Detroit, "whoever is selected in the primary is going to take the seat." *Id.* But at the time, she helped Dr. Handley and Mr. Adelson reach their racial targets:

>> COMMISSIONER LANGE: I'm getting on board with Commissioner Orton here. I need some type, and I mean no disrespect but I need set boundaries on what we need to go.
It's going to make our job a lot easier so we are not guessing.
So if I could get something that said 35-45% if you stay within that you're good. That is going to help me.
Especially in areas that we're not familiar with.
I think that's what Commissioner Orton and she can correct me if I'm wrong but I think we are looking for a direct guidance as far as an absolute number so help, please.
>> CHAIR SZETELA: Yeah, Commissioner Lange that is my understanding of what we are looking for is we are trying to bring things between 35-40% because based on Dr. Handley's analysis of racially polarized voting that those percentages would enable minority candidates to elect their candidate of choice in the Metro Detroit area because it's so highly concentrated and so highly democratic.

Q&A REPORTING, INC.      CAPTIONS@ME.COM      Page 24

PX063-0024

9

General Counsel Pastula agreed and encouraged the Commission to "make a list" of districts that exceeded a 40% BVAP and therefore "need to be adjusted" to conform to the racial targets; Chair Szetela announced that the Commission would follow that suggestion— "come up with a list" of districts exceeded 40% BVAP—and that's how the Commission proceeded:

>> MS. JULIANNE PASTULA:  Thank you Madam Chair yes, I was going to highlight Dr. Handley's racial block voting analysis and offer to the Commission when you were drawing the original districts the range for Detroit was 35-40%, Oakland County was above 40%.
So it's based on the area you were in, that is why that's why I flagged the 40% to kind of go through and have that just as the identifier to use.
And then see what area you're in and then you can that will provide the further guidance.
So again the goal is looking at the chart the data chart that will show the equal population deviation, it will show the Black voting age population, and that will enable the Commission to go through line by line and flag any issues either with equal population or with the Black voting age and my recommendation again I know District 18 was one of them but rather than try to remember or call out which districts might need to be looked at my recommendation is that you start with number 1 on the chart and just look through the data to identify what districts would need to be adjusted even if you just make a list and then go back and start fixing them.
Was that helpful?
>> COMMISSIONER LANGE:  It is now I'm looking for Dr. Handley's report again so thank you.
>> CHAIR SZETELA:  Why don't we make it simple and do what you suggested General Counsel and come up with a list.
I think that would be easy so Metro Detroit area and I'm just going to start writing this down so right now we have District two and John you want to go ahead.
>> MR. MORGAN:  Since Commissioner Orton was still asking for a comparison of the boundaries of the two different plans, we also went through the exercise yesterday of showing the demographics of both of those two side by side.
So I could do that both like we have the spreadsheet on one view and then the map on the other.
>> CHAIR SZETELA:  That would be helpful.
>> COMMISSIONER CURRY:  Madam Chair.
>> CHAIR SZETELA:  Yes, Commissioner Curry?
>> COMMISSIONER CURRY:  While we went on that my screen has went very foggy, fuzzy, I can't see people or whatever so if they can straighten that out camera men.

PX063-0025

When Commissioner Clark opined that preliminary maps with Wayne County districts *above* a 35-40% BVAP were perhaps "okay," Chair Szetela explained they had to reduce BVAPs to "35-40 for VRA purposes per the direction of Bruce Adelson":

>> COMMISSIONER CLARK: Yeah, could you review what metrics we are trying to get towards? You indicated that Bruce gave us some different direction.
I agreed with what Anthony said that I thought he felt that this map was okay, so what is our target.
>> CHAIR SZETELA: Do you remember Dr. Handley's report where she broke down for Wayne County for the racial polarized voting and gave a chart with percentages that is what Bruce was mentioning last week and that's what I'm referring to.
The very last Page where she listed the percentage of voters in that particular demographic that you needed in order for it to be an opportunity to elect District.
And for Metro Detroit region it was 35%.
So that is what Bruce was saying to us last week and said it repeatedly we should aim between 35-40% African/American because those numbers it is VRA compliant, they can elect their candidate of choice and his point that he mentioned was why would you put 50 or 60% African/American in a population if you can achieve compliance with 35 so that was kind of his point.
>> COMMISSIONER CLARK: You are trying to reduce the African/American population.
>> CHAIR SZETELA: To 35-40 for VRA purposes per the direction of Bruce Adelson.
>> MR. MORGAN: I'm going to just back up one here.
It looks like the program is not actually assigning the population.
So I'm going to rebuild that plan.
It will just take a moment.
>> COMMISSIONER VALLETTE: Okay.
>> CHAIR SZETELA: Is it locked by any chance or just being.
>> MR. MORGAN: That is a possibility I'll look at that too.
>> CHAIR SZETELA: Commissioner Orton?
>> COMMISSIONER ORTON: So I guess we can't get clarification from Mr. Adelson until 1:00.

PX064-0015

When Commissioner Clark complained that was impossible, Vice Chair Roth-horn explained that, per "legal counsel," "if we don't try to get to 35%, we have not done our due diligence and therefore we may be exposing ourselves to a legal risk":

>> COMMISSIONER CLARK:  As I look at the numbers in the active matrix, I'm looking at the percent of voting population.
And on District 6 we are 47%.
Which is below that 50 margin, 50% margin.
Now know they want it lower but sometimes you just can't do that because of the distribution of the people.
>> VICE CHAIR ROTHHORN:  I think what the challenge is that we have to interpret our legal counsel's they are not precise because we are the ones that have to do it.
But I think what we can interpret from their advice is if we don't try to get to 35%, we have not done our due diligence and therefore we may be exposing ourselves to a legal risk we might be able to defend ourselves against but can't guaranty that.
I don't think they are suggesting it's a legal risk.
There is so many unknowns and I think that is why we are trying.
>> CHAIR SZETELA:  So Richard did you have a comment?  Okay, Mr. Morgan.

Q&A REPORTING, INC.                CAPTIONS@ME.COM                Page 19

Agee et al. v. Benson et al. Case No. 1:22-cv-00272

PX064-0019

Chair Szetela's Dissenting Report summarizes this. After the Commission completed preliminary districts in metro Detroit, "The Commission's counsel intervened and began aggressively pushing the Commission to reduce the BVAP numbers to as close to the general election percentages (35% to 40%) as possible." PX005-0006; *accord, e.g.*, PX005-0045 (9/13/2021 email from Pastula to Szetela and Rothhorn, warning that regarding higher-BVAP districts, the Commission will not be "able to justify the numbers coming out of today to a court"). "Despite Dr. Handley's analysis showing that the required BVAP for primary elections was likely higher than the required BVAP for general elections, the Commission acquiesced to its counsel and redrew each of its existing maps in the Metropolitan Detroit area based on the general election BVAP 'targets' of 35% to 40%." PX005-007. *Accord* Proposed Findings of Fact and Conclusions of Law ¶¶ 112-130.

Defendants called only one Commissioner witness, Mr. Eid, who testified the Commission did not use racial "targets" in map drawing. Trial.Tr.III.104-105, PageID.2803-2804. Mr. Eid repeatedly denied that the Commission used a "target such as 50 or 51 percent in drawing the maps" because "that would be illegal to have a specific target like that" and "there was no target that the Commission had to hit." Trial.Tr.III.12-13, PageID.2803-04. When asked his understanding of a "BVAP target," he swore "there was no BVAP target." Trial.Tr.III.47-48, PageID.2838-39. When specifically asked whether a "BVAP range of 35 to 40" was adhered to, he "vehemently disagree[d] with that statement." Trial.Tr.III.48, PageID.2839.

But on cross exam, Mr. Eid was repeatedly impeached by the transcripts of the Commission's map-drawing hearings. He *himself* expressly used the word "target" at least twice, once to describe a 41.2% BVAP for District 4 as the "target we are going for," and later when he inquired as to what was the "target we need to hit?" Trial.Tr.III.127,130, PageID.2918,2921. He also admitted that other Commissioners used the word "target" to describe the metro-Detroit BVAP. For example, Commissioner Lett asked, "what's the target for Macomb?" Trial.Tr.III.133, PageID.2924. Commissioner Rothhorn stated the "target" for Oakland was "42 to 43 percent" *Id.* And General Counsel Pastula approved of the Commissions' work in "moving closer to that targeted 35 to 40 percent" as "moving in the right direction[.]" Trial.Tr.III.128, PageID.2919. The Commission also repeatedly used numerous synonyms for target, referring to it as the "range… we need to get to", a "threshold", a "benchmark", "guide rails", and "guidepost." Trial.Tr.III.127-140, PageID.2918-2931.

13

And although he was loathe to admit it at trial, during the Commission mapping process, even Mr. Eid came to understand that because the Commissioners had relied on Dr. Handley's general-election analysis in setting BVAPs, Black voters were going to have trouble electing their candidates of choice in primaries:

>> COMMISSIONER EID:  So before we go and look at the election results, I just have something that I'd like to get clarity on.
That might help the rest of the Commissioners too who I believe might be struggling with this.
Mr. Adelson, I appreciate all of the advice that you give us but I got to be honest I'm becoming increasingly uncomfortable with this direction that we're going under.
Because while it is unpacking the districts you know we don't have any District that is close to 90%, 70% or even 60%.
But you know the numbers that we are hitting it just makes me question how is that going to work with actually electing a candidate of choice.
And I think part of the problem I have with this understanding is the analysis did not include primary election results.
So like if we look at District 17 here.
We have it at 35.14% Black voting age population.
If you have a primary election where there is two Black candidates and a white candidate how is it that you know the candidate of choice is actually going to get elected?  I understand that in the general election, yes.
All of these districts that we draw are going to be democratic districts.
But that's not where the choice actually happens in these areas.
So I don't know if that helps.
I don't know if I'm being clear on the question I'm asking.
But it's just making me a little uncomfortable having to hit these percentages that are low I would be more comfortable with 45% but 35% thank you Commissioner Curry.
   >> COMMISSIONER CURRY:  Absolutely I'm in full agreement with you.
   >> COMMISSIONER EID:  I know that is a message relayed to me by other Commissioners as well so I think just some clarity on that would really help me.
   >> COMMISSIONER CURRY:  Yes.

Q&A REPORTING, INC.                    CAPTIONS@ME.COM                    Page 63

DTX-049-07483

Defendants also called Commission VRA counsel, Mr. Adelson, who testified that there were no racial "magic numbers." Trial.Tr.III.195, PageID.2986. He, too, was impeached by the transcripts of the Commission's map-drawing hearings:

- At the September 2, 2021 meeting where Dr. Handley presented her VRA analysis (based solely on general-election data) and recommended the 35-40% BVAP range for Wayne County, Mr. Adelson told the Commissioners that if they "add on population to" a 40% BVAP, "the courts constitute that as packing." Trial.Tr.IV.82, PageID.3084.

- As the Commissioners turned to drawing the Detroit-area districts, Mr. Adelson instructed them that a 35% BVAP would be "right on the nose" but he "like[s] to build in a little bit of cushion" so "36 percent" would be o.k. Trial.Tr.IV.83, PageID.3085.

- He told the Commission that a district which is "approximately 35, 37 percent black" was "pretty good." Trial.Tr.IV.84, PageID.3086.

- Mr. Adelson said that if the "black population is in the 40s, in the mid-40s, that has the *potential* to be okay," suggesting the numbers should be lower. Trial.Tr.IV.85, PageID.3087.

- He instructed the Commission that having a Detroit-area BVAP in the 49-52% range (consistent with the *low* end of the Detroit-area BVAPs in the last redistricting process), "would be difficult to justify." *Id.*

- Mr. Adelson reassured Commissions that in his experience, "districts elect in the 35 percent [minority voter] range." Trial.Tr.IV.86, PageID.3088.

- Referring to Dr. Handley's September 2, 2021 analysis, he reminded the Commission that "her threshold" for Wayne county "is the 35 to 40 percent," but that in Oakland County, since "one of the candidates of choice lost [in the general election] at 35 percent," that "40 percent is probably a better starting place." Trial.Tr.IV.88, PageID.3090.

- At this point in his cross-exam, Mr. Adelson suggested that perhaps the Commission hearing transcripts—the *official* transcripts—were "not an actual reflection of [his] actual speech." *Id.*

- When Commissioner Eid highlighted a district with a 46% BVAP and asked whether they were "trying to get a little lower to about 40 percent," Mr. Adelson responded, "I think with following Doctor Handley's analysis, 40 percent is the area that I would look at." Trial.Tr.IV.88-89, PageID.3090-91.

- Mr. Adelson reminded the Commissions that "according to Doctor Handley's analysis that in Wayne Conty, Wayne County can elect candidates of choice at 35 percent VAP." Trial.Tr.IV.89-90, PageID.3091-92.

- As for process, Mr. Adelson told Commissioners:

> Q.   Middle of the page, Mr. Adelson:   I think that I would
> recommend focusing on the percentages and comparing them to
> Doctor Handley's percentages for Wayne County which, as I
> recall, is 35 to 40 percent.
>
>         Accurate?
> A.   Yes.

Trial.Tr.IV.90, PageID.3092. And:

> Q.   And then again, this is exactly right.   The voting age
> population that is needed to elect candidates of choice and
> her range in what we discussed, what she and I discussed,
> which I'm comfortable with, is that 35 to 40 percent.
> Accurate?
> A.   Yes, those are the words.

*Id.* Yet again:

> Q.   Mr. Adelson, this is you speaking again.   The range that I
> believe Doctor Handley and I talked about in Wayne, the Wayne
> County part of greater Detroit, would be 35 to 40, but, again,
> I have to stress there is no absolute drop dead number.
> That's what you said?
> A.   Yes.

Trial.Tr.IV.92, PageID.3094. And:

16

> Q.    Same transcript, page 0075.  Mr. Adelson, this is you.
> Okay.  Doctor Handley in her analysis referenced Oakland
> County as having a 40 percent, approximately, threshold not
> 35 percent.  Is that what that says?
>
> A.    Yes, that's what it says.
>
> Q.    And Vice Chair Rothhorn responds:  We had 42 to
> 43 percent; is that correct?
>
> A.    That's what it says.
>
> Q.    And you respond, that is a good kind of benchmark guide
> post; is that correct?
>
> A.    Yes.

*Id.* Confirming:

> Q.    Mr. Adelson, this is you.  That gives us an additional
> leeway because, remember, it's 35 to 40 percent in Wayne
> County, 40 to 45 percent in Oakland, so I think that should be
> looked at as well.  Did I read that correctly?
>
> A.    Yes.

Trial.Tr.IV.93, PageID.3095. And again:

17

Q.   Mr. Adelson, looking at the law says, and what Dr. Handley analyzed and Doctor Handley's analysis is, in Wayne County BVAP and black voters can elect candidates of choice at

---

cv-00272-PLM-RMK-JTN   ECF No. 106,  PageID.3096   Filed 11/07/23   Page 94 of 247

94

---

35 percent.  Did I read that correctly?

A.   Yeah, that's what I said.

Trial.Tr.IV.93-94, PageID.3095-96. *Accord* Plaintiffs' Proposed Findings of Fact and Conclusions of Law ¶¶ 198-309.

Mr. Adelson further testified that he worked "closely" with General Counsel Pastula to advise the Commission about its VRA obligations. Trial.Tr.IV.55-56, PageID.3057-3058. And General Counsel Pastula also used Dr. Handley's general-election analysis, repeatedly, to drive home the point that the BVAP target range for Wayne County was 35-40% and 42-43% for Oakland County.

For example:

>> MS. JULIANNE PASTULA: Yes, thank you Madam Chair.

So Mr. Adelson has confirmed that he didn't sign off on either the Senate or the Congressional plan.

And I wanted to also address again the narrative that 50% minority is the -- that is not the courts have not supported that wholesale adoption of 50% or 51%.

What Dr. Handley's racial bloc voting analysis has given the Commission is the benchmarks and the guide rails for each of the Counties that need to be adjusted.

It's Wayne County is 35-40%.

Genesee is 35-40.

Saginaw is 40-45%.

And Oakland County is 42, 43%.

Again that would provide the opportunity to elect.

So you don't need districts with 60% minority voting age population in any of those four Counties to achieve compliance.

---

Q&A REPORTING, INC.     CAPTIONS@ME.COM     Page 20

PX064-0020

Agee et al. v. Benson et al. Case No. 1:22-cv-00272

General Counsel Pastula characterized these targets as "the interpretation [of

Dr. Handley's racial bloc voting analysis] by your voting Rights Act counsel [Mr.

Adelson]":

>> VICE CHAIR ROTHHORN: General Counsel I need those numbers one more time please because I think yeah, I just assumed 35% was for each one but there is a different threshold for each County is what I'm hearing you say so I'm going to write those down.

>> MS. JULIANNE PASTULA: Correct and those are supported by the charts in Dr. Handley's presentation for each of the Counties, Wayne and Genesee County the recommendation is 35-40%.

>> VICE CHAIR ROTHHORN: Wayne and Genesee.

>> MS. JULIANNE PASTULA: Uh-huh.

35 to 40 got it.

>> MS. JULIANNE PASTULA: Saginaw County Mr. Vice Chair is 35-45% and Oakland County is 42-43 and I wrote ish which is a legal term.

So the range is not 40 was too low and 45 Mr. Adelson expressed which too high or could be too high.

So those were the goals identified again by your racial bloc voting analysis.

And the interpretation by your Voting Rights Act counsel.

PX064-0021.

19

Finally, recognizing that Mr. Eid's credibility was "subject to doubt based upon conflicting testimony," Trial.Tr.V.241, PageID.3491, Defendants called Mr. Stigall, who helped the Commission with the mapping software at meetings. On direct, Mr. Stigall testified that he attended every Commission meeting except one, Trial.Tr.V.219, PageID.3469, and Defendants repeatedly tried to get Mr. Stigall to say that he couldn't recall the Commission using racial targets or other factors as a pretext for race in map drawing. *E.g.* Trial.Tr.V.234-36,240,245, PageID.3484-86,3490,3495. But on cross-exam, Mr. Stigall was impeached with the transcripts from the Commission's hearings showing that Commissioners frequently directed Mr. Stigall to use the software's "racial dot theme" to ensure they were drawing districts that hit Dr. Handley's and Mr. Adelson's racial targets. *E.g.*, Trial.Tr.V.247-254, PageID.3497-3504; *see also* Proposed Findings of Fact and Conclusions of Law ¶¶ 153, 164, 176, 188, 191, 199, 222, 294, 356. The obvious conflict between the record and Mr. Stigall's testimony was so stark that Mr. Stigall blamed the discrepancies on the fact that he "really didn't listen to a lot of conversations" during the Commission proceedings, Trial.Tr.V.250, PageID.3500, causing much of the courtroom to laugh (though this was not recorded in the Trial Transcript).

2. At various times, the Commission has claimed that it was motivated primarily by non-racial factors in map drawing, including communities of interest, partisan-fairness, and shifting population. Those claims are contradicted directly by the transcripts of the Commission's map-drawing hearings.

a.     Communities of interest

At trial, Mr. Eid testified that the Commission's bacon-mandered maps were the result of keeping communities of interest together. Trial.Tr.III.76,81-91, PageID.2867,2872-2882. But poor Black neighborhoods in Detroit are not "communities of interest" with the wealthiest white suburbs in Oakland and Macomb counties. Trial.Tr.IV.99-101, PageID.3101-3103. The transcripts of the Commission's proceedings demonstrate that the Commissioners understood that the VRA "trumps" communities of interest:

> >> COMMISSIONER ORTON:  Looking at this overall, I have a comment which I think will be very unpopular.
> But I think it's maybe worth having a discussion about.
> The only way I see to make these districts make more of these Directors more balanced racially is to break up communities of interest.
> Because the only places I see are Hamtramck, Dearborn, Dearborn Heights, and the Grosse Pointes that you know show as not African/American.
> We know that there are certain populations in certain communities of interest in those and other areas.
> But I think we need to discuss what trumps.
> And we know that is VRA.

DTX049-06429. Indeed, when Commissioner Orton expressed discomfort with how many communities of interest the Commission was "splitting up," Mr. Adelson reiterated that state criteria are superseded by the 14th Amendment and the VRA:

21

>> COMMISSIONER ORTON: So my feeling is I'm uncomfortable with the amount of communities and communities of interest that we are splitting up but from a Voting Rights Act perspective, Mr. Adelson can you give your opinion?

>> MR. BRUCE ADELSON: Yes, thank you.

You know, just this discussion the last couple minutes really shows you know kind of being on the knife's edge in the sense of that I understand is very clear that you're weighing, competing considerations.

And I think that the issues about communities of interest and keeping sort of communities together are I've read a lot of public comments in general and I understand that that is a significant consideration.

I would tack back a little bit to Dr. Handley's analysis and the maps of the 2010 legislative districts that you really can have a sense of where they are now.

And her analysis of suggesting where the one of the considerations should be going forward.

So I think that as you saw in what you were doing, clearly the demographics change. We will have to look at the election results of course and see what they show.

But I think that the -- I would be more comfortable over all thematically that there may be districts last we talked about that are minority populations in access of let's say 10, 12 and 11 just using districts as examples.

There may be.

But we are not at that point yet of being able to say absolutely you know we tried six, seven or eight, I'm just making up a number of ways of approaching things.

So I think that you know the certainly from my perspective and looking at compliance, the 14th amendment of the U.S. Constitution of the Voting Rights Act are aside from your constitutional considerations Federal law is supersedes state law.

DTX049-06619. Chair Szetela understood this as a "constitutional ranking of criteria" that meant VRA first, *then* communities of interest and partisan fairness:

>> CHAIR SZETELA: So we have a constitutional ranking of criteria.

So you know Voting Rights Act, communities of interest then we get to partisan fairness. So keeping in mind those other ones are ranked higher the adjustments have to take that into account before we start adjusting but again the goal would be to bring those percentages down a little bit if we could otherwise do so taking into account 123 first, right?

>> DR. LISA HANDLEY: I would say that is a legal question.

>> CHAIR SZETELA: Not surprising I'm a lawyer.

DTX049-07382

Commissioner Witjes got it; don't worry about communities of interest until *after* "VAR stuff":

>> COMMISSIONER WITJES:  Don't worry if Harper Woods wants to be there or community of interest where Harper Woods should be.
That should be not something we're looking at.
We should be going into looking at just complying with the Voting Rights Act.
And if we have to go in there don't let that be a reason as to why because you're thinking about public comment, go straight off the numbers to get where we need to be on with VAR stuff.
And then go look at communities of interest.

Q&A REPORTING, INC.                    CAPTIONS@ME.COM                   Page 24

DTX049-07444

So did Vice Chair Rothhorn:

>> VICE CHAIR ROTHHORN:  I think you are speaking to many of us who are challenged by it and if we refer back to criteria number one as VRA and we are trying to achieve compliance and we've drawn communities of interest, drawn with communities of interest in mind and trying to get voting rights compliance which is number one not number three so I think unfortunately that is the shortest and quickest answer to your question.
I know it hurts believe me.

DTX-49-07510. Ironically, so did Commissioner Eid:

>> COMMISSIONER EID:  Sorry one more follow-up because of communities of interest, 13 was drawn in particular to preserve communities of interest as an LGBTQ community there.
And therefore right there is a number of it's been difficult to then draw other districts.
So thinking about communities of interest and what I heard you say was to try.
And because of that community of interest as a number 3 the Voting Rights Act is number one.
It's worth trying.

Q&A REPORTING, INC.                    CAPTIONS@ME.COM                   Page 80

DTX-049-06201

And in case any of the Commissioners forgot that the VRA was the "number one criterion" above communities of interest, Mr. Adelson was there to remind them:

>> MR. BRUCE ADELSON:  That is exactly right the voting age population that is needed to elect candidates of choice and her range and what we discuss, what she and I discussed, which I'm comfortable with is that 35-40%.
So there is no question that the districts are dramatically improved for that metric.
But I think there are since the courts will be looking at her analysis that there is some additional tinkering to do.
As I was saying earlier, I think one of the choices that is on the table is of course where do you go.
We've talked about that before.
Where do you go when that is going to impact commenters preferences on keeping communities whole or not keeping communities whole.
That's something that I'm happy to address more going forward.
But the you know as you know the Voting Rights Act is the number one criterion together with one person one vote in the U.S. Constitution.
So that I understand that that policy choice is complicated in a sense.
But then in another sense from my perspective it's not complicated.
But I don't have to decide on the adjustments.
That will be a policy choice going forward.
But it really is the key rhetorical question I think is where do you go.
And what can you do to come more in line with what Dr. Handley concluded.

PX062-0108. In sum, "*before* looking at communities of interest," the Commissioners understood that had to comply "with the VRA or it will be an endless circle":

>> COMMISSIONER WITJES:  So that's where we need to start.
So we need to start by looking at VRA compliance even though Dr. Adelson is not here we know what we are looking for and before looking at communities of interest or beyond the VRA we need to make sure we are in compliance with the V RA or it will be an endless circle we are in.

PX064-0013. And so that was the Commission's focus, even if that meant disregarding public comments; first VRA, then communities of interest:

>> COMMISSIONER WITJES:  Don't worry if Harper Woods wants to be there or community of interest where Harper Woods should be.
That should be not something we're looking at.
We should be going into looking at just complying with the Voting Rights Act.
And if we have to go in there don't let that be a reason as to why because you're thinking about public comment, go straight off the numbers to get where we need to be on with VAR stuff.
And then go look at communities of interest.

Q&A REPORTING, INC.                    CAPTIONS@ME.COM                    Page 24

PX064-0024

Agee et al. v. Benson et al.   Case No. 1:22-cv-00272

Commissioners understood well that the VRA *always* takes precedent over communities of interest—that is, until the Commission's secret, October 27, 2021 meeting. That was where Mr. Adelson provided the Commission with his memo indicating the VRA did not require majority-minority districts at all. Trial.Tr.I.118, PageID.3699. At this point, the Commission had already "done away with every single black majority district in any map." *Id.* So the purpose was to deter Commissioners from being swayed by Black voters in Detroit and groups like the Michigan Civil Rights Commission, whom Mr. Adelson accused of peddling "misinformation" and General Counsel Pastula said they were advancing "garbage" opinions. Trial.Tr.I.118-21, PageID.3699-3702.

At that meeting, Mr. Adelson referenced litigation at least five separate times while urging the Commissioners to "create a new record and a record that's going to be focusing on *communities of interest* instead of race to try to prevent courts from looking back at [the Commission's] prior transcripts where [they were] very expressly and explicitly drawing districts based on race." Trial.Tr.I.121-22, PageID.3702-3703

25

(emphasis added). Commissioners embraced that advice with at least three agreeing that communities of interest are "like jello being nailed to the wall, and whatever we say our reason is the reason, and no one is going to be able to question it." Trial.Tr.I.124-25, PageID.3705-3706. (Although Mr. Eid said his comments were "taken out of context," on the audio clip played for the Court he "agreed with everything" Commissioner Lett said about using communities of interest as cover for the Commission's use of race, Trial.Tr.III.161-62, PageID.2952-53.)

As Chair Szetela put it, "We were not considering communities of interest at all when we were ripping apart Detroit. We were trying to hit racial quotas." Trial.Tr.I.126, PageID.3706. Communities of interest were "talking points being provided by counsel," where the Commission was "coached by what to say … to create a record for litigation where we focus on communities of interest to justify any changes we make to the map or justify the maps as they exist as of the day of [the secret] meeting." *Id.* Mr. Adelson was "trying to clean up the record by coaching [the Commissioners] to say something different for the last eight days [of the process] with the hope that if we get sued, which seemed pretty likely at that point, that the defense strategy would be to claim that the changes that were made for race were actually done for communities of interest." Trial.Tr.I.128, PageID.3709.

b.    Partisan fairness

The Commission also acknowledged partisan fairness took a backseat to race. Vice Chair Rothhorn explained the Commission wanted to have as much VRA compliance *before* moving to partisan fairness:

> >> VICE CHAIR ROTHHORN:  Because of the way we want to work today to use our time in order to actually have a partisan fairness we want to have a voting rights analysis first.
> Because that is our first criteria in the Constitution, we want to have as much compliance regarding the voting rights as possible before we move to the fourth criteria which is partisan fairness so that is the task today is to in those districts in Detroit and with our VRA expert with us in the room today yes that is the task.
> >> COMMISSIONER CLARK:  I may or some other Commissioner may have something outside of the Detroit area that we would want to deal with on the Voting Rights Act as well.
> So just want to point that out.
> I would for this area at this point I would rather pass and let Commissioner Curry you know she is very familiar with the area, have her.
> >> VICE CHAIR ROTHHORN:  Thanks Commissioner Clark, Commissioner Curry we are to you.
> And Commissioner Curry you were with us yesterday.

Q&A REPORTING, INC.                    CAPTIONS@ME.COM            Page 15

PX063-0015

Agee et al. v. Berson et al., Case No. 1:22-cv-00272                 MICRC_007220

Indeed, the Commission could only analyze partisan fairness on a statewide basis and only if it had a completed map, and General Counsel Pastula instructed the Commissioners that the Constitution "actually prohibits" them "from considering the election results while they are mapping":

> >> MS. JULIANNE PASTULA:  I would thank you so much Vice Chair Rothhorn.
> So very briefly I wanted to highlight again for the benefit of the public that partisan fairness according to subsection 13 of the Constitution, which sets forth the ranked criteria that the Commission is legally required to follow, the language regarding partisan fairness is districts shall not provide a disproportionate advantage to any political party.
> A disproportionate advantage to a political party shall be determined using accepted measures of partisan fairness.
> That language does not require and actually prohibits the Commission from considering the election results while they are mapping.
> Accepted measures of pardon sand fairness and measures are run on statewide plan.
> Which the Commission run on statewide plans.

Q&A REPORTING, INC.                    CAPTIONS@ME.COM            Page 66

PX063-0066

Agee et al. v. Berson et al., Case No. 1:22-cv-00272                 MICRC_007271

27

>> MS. JULIANNE PASTULA:  What I would recommend is that the Commissioner consider doing is for the active matrix to scroll starting with 1 and glance at the districts, anything that is higher than 40% for the Black voting age population and the population difference I mean just to glance at and just go down the list and then when we get to I anticipate number 6, number 18, and others that those quote unquote fixes can be dealt with and then this map can be ready for the partisan fairness analysis.

That would be my recommendation.

And if the Commission was desiring of having an alternate house map, then the map that is the product of this analysis could be used to start the clone for the new one.

But this would that changed.

PX063-0021

Like Vice Chair Rothhorn, General Counsel Pastula recommended hitting the Commission's VRA target BVAPs, *then* having Dr. Handley run the partisan-fairness measures:

>> MS. JULIANNE PASTULA:  My suggestion was and Mr. Morgan was very helpful with it, however the data is best displayed but that the Commission start with the data chart and look at the list starting with one and I would recommend starting with a higher than 40% Black voting age population be looked at.

This will also give the Commission an opportunity to look at their population numbers at this time and that way by the time we get to District 110 we will know this map is okay for -- to have Dr. Handley run the partisan fairness measures.

So that would be my recommendation is just scrolling down the data and if there is anything, again, that looks percentages that look kind of high, the Commission can take a closer look.

But again with the modifications that the Commission has made, again, looking at the current data percentages would be what I would recommend and then when we see those districts, we can address them and make sure that all of them are addressed is my goal.

By going through the chart in this fashion.

>> VICE CHAIR ROTHHORN:  Okay so our Chair has returned.

So I'm going to turn it over to Chair Szetela and.

>> CHAIR SZETELA:  Yep so, I will take over from here.

First, I'd like to remind everyone, take it off?  Commissioner Woods were you going to ask me to remind everybody?

>> MR. EDWARD WOODS:  Yes.

>> CHAIR SZETELA:  That is what I was about to do remind everybody we are required to wear masks in the building so if everybody could get their masks on, I would appreciate that.

This map we have open right now just so I'm oriented this is a full map we have of the full state with the changes I had suggested yesterday.

Is that.

>> MR. MORGAN:  Yes, that's correct.

I made the changes as directed.

We stipulated I would do that.

Q&A REPORTING, INC.          CAPTIONS@ME.COM          Page 22

Agee et al. v. Benson et al.  Case No. 1:22-cv-00272    PX063-0022

And, at General Pastula's direction, the Commission's mapping software expert, Kim Brace, "hid" the partisan-fairness data until at least October 6, 2021, *after* the Senate map had already been essentially finalized on October 4, 2021:

| From: | Pastula, Julianne (MICRC) |
|---|---|
| Sent: | Wednesday, October 6, 2021 7:12 PM |
| To: | kbrace@aol.com |
| Cc: | Hammersmith, Suann (MICRC); Szetela, Rebecca (MICRC); Rothhorn, MC (MICRC); Reinhardt, Sarah (MDOS); Badelson1 |
| Subject: | Partisan Data/Partisan Fairness Measures |
| Importance: | High |

Dear Kim,

We urgently need to have a telephone conference this evening to address this issue.  The manner in which the partisan data is being presented does not assist the Commission in determining how and where to make focused adjustments to districts.  The "trial and error" approach being employed today is far too time consuming and does not have any cognizable methodology.  Even worse the time spent is not resulting in productive improvements.  Given that the Commission only has 3 days left to finalize its draft proposed maps this must be addressed immediately.

On or about August 6th, I expressed concern with the display of partisan data as the Commissioners were focusing on the displayed political data and because we don't have competitiveness as a criteria, drawing with partisan data was inappropriate.  At the time, you indicated it could be "hidden" leading me to believe it is in the active matrix.  We need to discuss a more productive way forward so the Commission can interact with partisan data in a more meaningful and time efficient way.

I have taken the liberty of sending an invite for 8:30 pm.  I acknowledge you are traveling to the East coast, please advise an alternate time this evening is needed.

Sincerely,

**Julianne Pastula**

**PX005-0073**

As Chair Szetela explained, as of October 4th—when most of the work on the House map was done and *all* the work on the Senate map was complete—the Commission had not even undertaken a partisan-fairness evaluation "because the functionality" to measure it in the mapping software "wasn't enabled." Trial.Tr.I.94, PageID.3675. As just noted, General Counsel Pastula had directed the software mapping drawers "to hide the political data and the partisan data" (other than Dr. Handley's "Bellwether" rubber stamp), so that the Commissioners had a software "version installed that did not allow [them] to access the partisan fairness data." *Id.*

Mr. Eid testified that he used third-party partisan-fairness software online and presented data to the Commission regarding *Congressional* districts, but notably absent was any mention of the State Senate and House districts. Trial.Tr.III.37, PageID.2828. There is no evidence that such data was presented to the Commission while Senate and House mapping proceeded.

In sum, the Commission was "[a]bsolutely not" using partisan-fairness goals to draw its maps. Trial.Tr.I.89, PageID.3670. The Commission had to "bake the cake" first by satisfying the racial targets they believed necessary to satisfy the VRA's legal requirements, then "put icing on it later" by looking at factors like partisan fairness. Trial.Tr.I.89-90, PageID.3670-3671.

c.      Shifting population

Like everything else, race predominated shifting population considerations. When Vice Chair Rothhorn suggested the Commission could *under* populate a district to hit the racial targets that Dr. Handley and Mr. Adelson provided, Mr. Adelson endorsed that approach because, in his view, only Congressional plans require absolute population equality:

30

>> VICE CHAIR ROTHHORN:  Is this an opportunity just to clarify it is for is basically overpopulated.

We could under populate to try to attempt that 35 to 40% with I is in Genesee County that is what Dr. Lisa Handley gave us we are 27%.

What I'm hearing you very clearly, we don't right the voting results help us understand this is an opportunity to elect.

And if we want to respect that idea that we need a cushion and that maybe even the voters especially the Black voters want a cushion we could attempt to do that.

So I'm just going to put that in my notes we could under populate it and achieve some more parody potentially is that also accurate?

>> MR. BRUCE ADELSON:  Commissioner Rothhorn that is a great point.

Under remember this is not a Congressional plan so you have a lot more leeway under populating and over populating.

The Supreme Court has been clear that compliance with the Voting Rights Act as well as the equal protection clause of the 14th amendment are legitimate state interests in redistricting, that do permit some level of under or over population.

It is really important to stress that because this is not a Congressional plan you are not required to have absolute in your absolute population equality.

PX140-0798

In case Commissioners were confused on that point, Mr. Adelson repeatedly reminded, first endorsing a 2.9% population deviation, then 5%, then 12-13%, then instructing the Commissioners that the population deviation can be whatever they want it to be, provided the Commission was hitting its VRA BVAP targets:

>> MR. BRUCE ADELSON:  Keep in mind with the population that the since this is not a Congressional map so you have more room to play with the deviations.

If this were a Congressional map it would have to be much lower but 2.9 deviation up or down in the direction, we are going I think is for now I think is fine.

PX063-0075

>> VICE CHAIR ROTHHORN:  Our population deviation it's 6.3.  So we got better but still have, yeah, I think we are -- I think we can be within we want to be within 5 or 10 I think it's 10% is that correct?  We want to be within 5%.  Okay, Commissioner Adelson?

>> MR. BRUCE ADELSON:  I think that that's a good, rough guideline because that is half the ten% range.  Remember the ten% although it's not a safe harbor it's a number or guardrail number not to go beyond it and 5% gets you close to 5% puts you in a good place.

>> MR. KENT STIGALL:  That is a total of 10% plus or minus five%.

>> MR. BRUCE ADELSON:  5% deviation is plus or minus 2.5%.

>> COMMISSIONER WITJES:  Is there any other area we can go look at and potentially change this in?

>> VICE CHAIR ROTHHORN:  There is and wondering we have changes in the Lansing area.

>> COMMISSIONER WITJES:  Let's go there.

PX140-1161

>> MR. BRUCE ADELSON:  This is more of a general comment and I'm going to propose a mindset change and I appreciate and really note strongly that you are really working very hard with the population and keeping the population deviation as low as possible.

I would suggest a bit of a mind shift about that and the population deviation if they exist beyond the 2, 3, 4% can be justified so I would suggest particularly in Detroit that the two most prominent factors are population over all demographically in the election results.

I'm not really seeing anything that comes close to being problematic from a deviation standpoint.

Deviation is judged on the plan as a whole.

This is not a Congressional plan where you have really done it.

You have some room to play with assuming you can legally justify the deviation so I would respectfully suggest a bit of a mind switch particularly in urban areas that the demographic population and election results are often can be more significant than the population deviation.

You're doing so well with the deviations.

I mean I've done Districting where initial Districting are 12, 13%.

Deviations are not coming in close to that.

As I said in the urban areas, I would suggest a bat of looking at things a little bit differently than in more rural areas where you have more issues with capturing population across a wide area.

PX140-b-0036

32

>> MR. BRUCE ADELSON:  Good afternoon and yeah, I think an orientation might be good because just in the time that I've been here there have been a lot of adjustments. But I also have a couple of things to say before we do that.
You know as you know it's very important if not essential that Dr. Handley's analysis be followed for compliance.
And there are different forms of that analysis depending on what County we are looking at whether it's Oakland, Wayne, Genesee, and Saginaw and election results tell the story.
A District can be created with whatever the population is unless the election results prove out that minority voters can elbow select their candidates of choice. The other consideration fall by the wayside.

PX140-0779

And in any event, a movement of population out of Detroit doesn't *require* pairing poor, Black inner-city neighborhoods with wealthy, white suburban neighborhoods.

2. Plaintiffs' expert, Sean Trende, confirmed the racial focus. He used "both a qualitative and a quantitative approach" to conclude that both the Hickory and Linden plans "were drawn with race as the predominate factor," and that partisan and other considerations could not be the explanations. Trial.Tr.II.23-60, PageID.2563-2600. This fact was confirmed by the Commission's districts' lack of compactness, PX020-0049-62 (House); PX020-0098-106 (Senate), numerous county splits, PX020-061 (House); PX020-0106, district cores, PX020-0106-07 (Senate only), and an extensive simulation analysis, PX020-0063-81 (House), PX020-0107-19 (Senate).

The testimony of Defendants' expert, Mr. Rodden, did not materially conflict with Mr. Trende's. Mr. Rodden admitted "race is predominant in a plan when race explains the drawing of the districts beyond other factors" and when race becomes

33

"the most important factor in drawing the districts."   Trial.Tr.IV.175-176, PageID.3177-78.   To discern whether this occurred, Rodden said the proper methodology—and one he employed in *Bethune*[1] but did not employ here—is to "examine the districting decisions" to analyze whether there is evidence of "stark racial splits," whether "traditional redistricting principles" (such as compactness, respecting county and township lines, etc.) were subordinated to race, whether there were specific maneuvers to move black voters into or out of districts, whether "pockets" of black voters black voters were "carved out" of certain areas, and performing a map progression analysis that followed the actual line-drawing decisions made. Trial.Tr.IV.176-81, PageID.3178-3183.

Mr. Rodden admitted he did none of that analysis here. Trial.Tr.IV.176-181, PageID.3178-3183. He also admitted that this type of "direct" evidence of the map-drawers' intent was critical—yet he admitted that he never reviewed a single transcript or meeting minute in forming his expert report. Trial.Tr.183-186, PageID.3185-3188.  If he had, he would have seen direct evidence that race was the Commission's predominate and most important consideration:

---

[1] *Bethune v. Virginia State Board of Electors,* U.S. District Court for the Eastern District of Virginia, Case No. 3:14-cv-00852.

All right, I'm sorry.

>> COMMISSIONER LETT: So we are looking at 25% white, 63.3 non-Hispanic Black.

75% total minority.

Are there any districts northeast or west that are going to change those numbers? Folks?

>> VICE CHAIR ROTHHORN: I think if we get into Warren, I think that is above and Commissioner Orton and then Commissioner Clark.

>> COMMISSIONER ORTON: Maybe the African/American theme would help that.

>> COMMISSIONER LETT: Sure, the dots, please.

>> VICE CHAIR ROTHHORN: Commissioner Clark?

>> COMMISSIONER CLARK: Yeah, you will find East Point to be predominately African/American.

And I think as you go further west it's less.

>> VICE CHAIR ROTHHORN: Maybe one of the struggles here too Commissioner Lett is East Point does identify with Detroit.

So to not put it with Detroit maybe, yeah.

Even though it's African/American I don't think we want to sort of cut it off from Detroit. So if you move east and include and sort of leave the lefs say if you don't go towards Warren for example and if you just sort of continued sort of east in an easterly curve following District 6, and you took in East Point and then went past East Point. North of East Point is there a whiter population up there? Anybody know? To help balance the District? And I think that is what you're asking for Commissioner Lett to help balance this and know which direction to go in.

>> COMMISSIONER LETT: Of course I am.

COMMISSIONER CLARK: I think Roseville is north of East Point.

>> VICE CHAIR ROTHHORN: Go ahead Commissioner Clark.

>> COMMISSIONER CLARK: I don't know.

All along the border of 8 mile we are still confronted with you know pockets of African/Americans.

I don't know what you can avoid but I think East Point then north of East Point is going to be predominately Black.

>> MR. KENT STIGALL: That area contains 10,000.

>> COMMISSIONER ORTON: Okay assign that, please.

So this is still part of Detroit, right? And someone was saying that East Point associates with Detroit, so maybe we should go that direction.

So can you Zoom out a little bit? Okay, will you choose East Point? .

>> MR. KENT STIGALL: That is 34,000 you could put all of it in there.

>> COMMISSIONER ORTON: Can we also put on the African/American theme.

.

>> MR. KENT STIGALL: I'm going to select it.

>> COMMISSIONER ORTON: Okay, approximately 34,000 people.

>> COMMISSIONER ORTON: Okay assign that, please.

I don't think we are going to be able to get up into lower minority areas.

So that might be a problem.

So it looks to me like in order to try to balance it more racially, we would have to split this into two and do two spokes up.

Do people feel that's what we should try?

>> COMMISSIONER KELLOM: Yes, Commissioner Orton that is Commissioner Kellom.

I support that.

>> COMMISSIONER ORTON: Okay, then, Kent, we will -- so I'll just give direction, if anyone else has reasons that we should do something different pipe in.

>> COMMISSIONER EID:  Yeah, I don't think we need to split it up.
Because non-Hispanic Black population is only 36%.
So I wouldn't want to see that get lower by splitting it up.
Maybe just take some off the top and see.
    >> VICE CHAIR ROTHHORN:  The top you mean the north.
    >> COMMISSIONER EID:  Yes.
    >> VICE CHAIR ROTHHORN:  Right but we do get whiter as we go north for the north
so I think right because we took the spoke mentality.
The question is whether we can have that, yeah, that balance of population of the
minority and the majority, majority being the white population and African/American
being the minority and if we have that we are trying to, yeah, break up Detroit so that we
have more balanced districts with Black and white.
And so that is why I was thinking east west rather than north, south, right because it's
does that make sense?
    >> COMMISSIONER EID:  No, I agree.
I think our I mean we are nowhere near being packed now.
I mean the Black population is only at 36% so.
    >> VICE CHAIR ROTHHORN:  The wisdom that comes from that community right to
spread that wisdom out if you will further north, and Cynthia I guess what I'm asking I do
appreciate the idea that I'm continuing to Chair if you wouldn't mind directing are you
okay?
    >> COMMISSIONER ORTON:  So I think one issue that we're probably thinking of is
that one District that I had deselected out of that area.
There's not much left if we don't put it in this District, there is not a lot of
African/American population left to put it with.
So that they would have an opportunity to elect.

PX140-b-0094

Commissioners expressly admitted the "intent" in moving Huntington Woods

and "logic" for that decision was to move a heavily Black area in north Detroit and

mix it with Huntington Woods:

some thousand over 18 and now you want to take off this portion?

>> CHAIR SZETELA: That portion ideally, I would like to add in Huntington Woods if we can so to me, I think that will create a more balanced District but we will see.

>> COMMISSIONER CURRY: Yeah.

>> CHAIR SZETELA: MC says to put up the Thematic dots again.

>> MR. MORGAN:  I was selecting by Township.

>> CHAIR SZETELA: He was teasing me because he said do you want to put them up?  No I don't need them.

Well we need them so okay.

[ Laughter ]

>> COMMISSIONER CLARK?

>> COMMISSIONER CLARK:  You mentioned your intent is to take some of the districts out of is that Detroit or Redford?

>> CHAIR SZETELA: That north part is Detroit.

>> COMMISSIONER CLARK:  Take them out of Detroit and add in Huntington Woods what is the logic for that?

>> CHAIR SZETELA: Trying to balance the population Black and white.

>> COMMISSIONER CLARK: I think we are going to have three precincts in Detroit that can only move north into Southfield that is predominately Black as well.

>> CHAIR SZETELA: What do you mean three precincts there is one that will fill the void.

>> COMMISSIONER CLARK: Okay I will wait until I see what the result is.

>> MR. MORGAN:  So at this point we are taking these three neighborhoods outcome prized of maybe 12 precincts.

It's 662 over.

---

Q&A REPORTING, INC.                    CAPTIONS@ME.COM                    Page 30

PX140-c-0030

Mr. Rodden admitted that: (a) the factual record does not support partisan fairness as justification, (b) partisan fairness is preempted by numerous other criteria under the Michigan Constitution and is therefore not a viable defense, and (c) there is no such thing as "generally accepted" measures of partisan fairness, as the Supreme Court has *rejected* the use applied to the maps.  Trial Tr.IV.191-198, PageID.3193-3200 (citing *Rucho v. Common Cause*, 139 S.Ct. 2484, 2052 (2019))

3. Finally, in General Counsel Pastula's October 11, 2021 internal email and Mr. Eid's MIRS public interview on December 12, 2021, there are frank admissions that racial targets were used. Proposed Findings of Fact and Conclusions of Law ¶ 309, 376. The result? With respect to every district remaining in the case except Senate District 11, the Commission lowered the BVAP to a narrow target range between 35.03% and 44.29% (Proposed Findings of Fact and Conclusions of Law ¶¶ 403-08, 414-21):





(Note that BVAP percentages can vary by small amounts from expert to expert. Dr. Handley, for example, defined Black as non-Hispanic Black alone. PX020-0010.)

In sum, by any measure, race did not just predominate, it was essentially the Commission's exclusive criteria. Why? Because Mr. Adelson and General Counsel Pastula erroneously instructed the Commissioners that if they did not meet Dr. Handley's 35-40% BVAP target for Wayne County and 42-43% BVAP target for Oakland County—based on county-wide, non-probative general-election results—then the maps would likely be invalidated for violating the VRA.

**B.    The Commission cannot assert a compelling interest in VRA compliance because it had no good reason to think all the *Gingles* preconditions were met.**

The Commission says that it had "a compelling interest in VRA compliance," i.e., "good reason to think that all the *Gingles* preconditions are met." Comm'n Br. in Support of Mot. for S.J. at 29, PageID.666 (cleaned up). Not true, based on the evidence the Commission had before it at the time it was drawing the maps.

Start with *Gingles* factor one, which asks whether a minority group can make up "more than 50 percent of the voting-age population in the relevant geographic area." *Bartlett v. Strickland*, 556 U.S. 1, 18 (2009). This question is most often answered through illustrative maps that, using traditional redistricting principles, demonstrate the *possibility* of creating a threshold number of majority-minority districts. *Black Pol. Task Force v. Galvin*, 300 F. Supp. 2d 291, 299 (D. Mass. 2004); *United States v. Eastpointe*, 378 F. Supp. 3d 589, 602 (E.D. Mich. 2019).

But the Commission never prepared a demonstration map. Trial.Tr.IV.247, PageID.3064. Indeed, the Commission never even *requested* that a demonstration map be prepared. *Id.* In its summary judgment briefing, the Commission relied exclusively on the report of Plaintiffs' expert, Mr. Trende, to show that it reasonably believed that *Gingles* factor one was satisfied. Comm'n Br. in Support of Mot. for S.J. at 29, PageID.666 (citing Trende.Rep.22, 81-82, JA00329, JA00388-89). But the Commission did not have that report when it used race to draw the House and Senate maps, so that does not prove anything. *Cooper*, 581 U.S. at 302-03 (redistricting authority's showing must be made based on record before it at time of redistricting). So the Commission's potential defense fails at the very first step.

The Commission also lacked a reasonable belief that *Gingles* factor two was satisfied: Black voter cohesion. *Gingles*, 478 U.S. at 56. As the Commission "got further along towards final maps," Mr. Adelson "would make statements"—like the ones he made at the Commission's secret October 27, 2021 meeting—that caused Chair Szetela "to question why we're considering race and trying to create districts

under the VRA if by his own admission there is no cohesion, therefore, we don't meet the *Gingles* standards." Trial.Tr.I.133, PageID.3714.

And the Commission's evidence was strikingly lacking when it comes to *Gingles* factor three: that a white majority "vote[s] sufficiently as a bloc usually to defeat the minority's preferred candidates." *Gingles*, 478 U.S. at 56. To begin, Dr. Handley analyzed this factor based on counties and a statewide analysis; she performed *no* district-by-district analysis whatsoever. Trial.Tr.V.46, PageID.3296.

In addition, the only evidence the Commission had for this factor when it began drawing maps was Dr. Handley's initial report. That report included *no* Macomb County analysis. Trial.Tr.V.36, PageID.3286. So to the extent the Commission was using race when it drew districts connecting poor, inner-city Detroit neighborhoods with wealthy, suburban communities in Macomb County—*e.g.*, Senate Districts 3, 10, 11, and 12 and House Districts 10, 11, 12, 13, and 14—the Commission had no basis under *Gingles* factors two *or* three to believe that race-based map drawing was necessary. Trial.Tr.V.37-38, PageID.3287-88.

But even as to Wayne and Oakland County, Dr. Handley's report focused exclusively on the 13 general elections, and those election results did *not* show that white voters voted cohesively as a block to defeat Black candidates of choice; in fact, they showed the exact opposite. In Oakland County, the Black candidate of choice won 10 out of 13 elections. Trial.Tr.V.41-44; PageID.3291-94. And in Wayne County, the Black candidate of choice won 13 out of 13. Trial.Tr.V.45-46, PageID.3295-96. (Although Dr. Handley was not aware of the winning candidate in the elections she

studied, the results of these elections are collected in Tab 1.) So at the time the Commission was mapping, it had no basis to conclude that Black candidates of choice were losing elections in Wayne and Oakland County due to white bloc voting, and thus no basis to believe that *Gingles* factor three was satisfied.

The only other data Dr. Handley provided to the Commission was her December 28, 2021 report, submitted the same day the Commission approved the Hickory and Linden plans. There is no record evidence suggesting this was provided to the Commission any earlier than December 28th. And that additional data did not support any reasonable belief that white, Detroit-area voters acted as a block to prevent Black candidates of choice from being elected. As Dr. Handley testified, the Black candidate of choice *succeeded* 50% to 92.9% of the time in the 2018 and 2020 Democratic primaries that she analyzed. DDX004. Though this analysis was flawed—demonstrating that Dr. Handley knew almost nothing about the primaries' candidates, *see* Trial.Tr.V.83-98, PageID.3333-48—it provided no basis to believe that *Gingles* factor three was satisfied. And that's exactly what Mr. Adelson told Commissioners on October 28, 2021: that the data revealed a lack of Black cohesion and white bloc voting. Proposed Findings of Fact and Conclusions of Law ¶ 395.

In sum, the Commission could justify its use of race in drawing maps *only* if it reasonably believed, based on evidence in its possession at the time, that the *Gingles* preconditions were met. Yet the Commission had no demonstration map, so *Gingles* factor one was not satisfied. And Dr. Handley's general-election analysis showed the Commission that *Gingles* factor three was not satisfied either. Because the

Commission is unable to show as a matter of law that it had a compelling interest (VRA compliance) to use race in drawing maps, Plaintiffs are entitled to judgment on all their remaining Equal Protection claims.

### C. The Commission's racial considerations were not narrowly tailored in any event because the Commission lacked a strong basis in evidence for the race-based choices it made.

Independent of the Commission's lack of a compelling interest to use race (i.e., a good reason to think that all the *Gingles* preconditions were met), the Commission's race-based map drawing lacked "narrow tailoring," i.e., a "strong basis in evidence in support of the (race-based) choice that it has made." *Alabama Legislative Black Caucus*, 575 U.S. at 278.

In its summary judgment briefing, the Commission asserted that its "data-driven approach may be the most thorough and precise a federal court has ever seen in any redistricting case" because it "relied on Dr. Handley's exhaustive analysis." Comm'n Br. in Support of Mot. for S.J. at 30, PageID.667. But at trial, Dr. Handley's admissions contradicted this.

To begin, shortly before the Commission approved the final maps, Chair Szetela expressed concern to Dr. Handley that the Commission was basing its line drawing on Dr. Handley's general-election analysis, which did not account for Detroit-area primaries. On December 27, 2021, the day before the Commission voted to approve the Hickory and Linden maps, Dr. Handley confirmed Szetela's fears: "Unfortunately, we do not have sufficient information to anticipate what might happen in future Democratic primaries in the proposed districts. … We simply do not know what would happen in a primary in which minority voters are cohesive." PX005-

021. Dr. Handley's "exhaustive" analysis did not even begin to consider whether Black voters could elect the candidate of their choice in Detroit-area primaries—the most important VRA consideration.

Moreover, the Supreme Court has repeatedly emphasized that when it comes to VRA § 2, data must be analyzed district-by-district. *E.g.*, *Abbott v. Perez*, 138 S. Ct. 2305, 2332 (2018); *Wisconsin Legislature v. Wisconsin Elections Comm'n*, 142 S. Ct. 1245, 1250 (2022). And as noted, the Commission's district-by-district analysis of VRA compliance consisted of Dr. Handley's Bellwether Elections rubber stamp: "no matter how low you draw the BVAP, the bellwether button says the district performs for black voters." Trial.Tr.I.150, PageID.3731.

So the Commission had a strong basis in evidence to believe that the race-based districts it was drawing would allow Black candidates of choice to prevail in *general* elections. But the Commission had *no* evidentiary basis to believe the race-based districts it was drawing would perform for Black candidates of choice in Detroit-area primaries. Based on the evidence the Commission had in its possession at the time it drew and approved the maps, it lacked "any data on Democratic primaries." Trial.Tr.I.146, PageID.3727. In other words, the Commission drew Detroit-area districts with shockingly low BVAPs "without any data to support bringing them so low. The data just isn't there." *Id.* Because the Commission cannot show narrow tailoring—much less that the VRA *required* 35-40% and 42-43% racial targets—Plaintiffs again are entitled to judgment on their Equal Protection claims.

## II.     Plaintiffs are entitled to judgment on their VRA claims.

Before delving into the evidence of Defendants' VRA violations, Plaintiffs will briefly address the Eighth Circuit's decision in *NAACP v. Arkansas Board of Apportionment*, __ F.4th __, 2023 WL 8011300 (8th Cir. Nov. 20, 2023), which held that private parties lack standing to asserts claims under VRA § 2 because it does not create a private cause of action. Notably, the NAACP plaintiffs in that case never requested leave to amend to assert their VRA claim under 42 U.S.C. § 1983 in the trial-court proceedings. 2023 WL 8011300, at *12. So the *only* question the court addressed was "whether the Voting Rights Act itself contains a private right of action to enforce § 2." *Id.*

That pleading failure is important, because courts in two recent decisions have held there is a rebuttable presumption that a VRA § 2 claim can be enforced under section 1983. *Turtle Mountain Band of Chippewa Indians v. Jaeger*, No. 3:22-cv-22, 2022 WL 2528256, at *5 (D.N.D. July 7, 2022); *Coca v. City of Dodge City*, No. 22-1274-EFM, 2023 WL 2987708, at *5 (D. Kan. Apr. 18, 2023). Those decisions would be consistent with the many dozens of VRA § 2 cases filed by private plaintiffs that the Supreme Court and lower federal courts have routinely resolved without ever questioning the propriety of the action having been filed by private plaintiffs.

Here, of course, Defendants have not made the argument that Plaintiffs lack a cause of action under VRA § 2. But if Defendants raise the *Arkansas Board of Apportionment* decision in their post-trial brief, or if the Court is otherwise concerned about its authority to decide Plaintiffs' VRA § 2 claims, then Plaintiffs should be granted leave to amend their complaint to make clear that they also assert their VRA

claims under 42 U.S.C. § 1983. Such leave "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). If there is any further controversy over Plaintiffs' ability to pursue their VRA § 2 rights via a § 1983 claim, then the Court should order supplemental briefing on that question. (If the Court rules in favor of Plaintiffs on their Equal Protection claims, then no VRA ruling would be necessary.)

### A.      Unlike the Commission, Plaintiffs prepared a demonstration map.

Whereas the Commission did not prepare House and Senate demonstration maps to show that *Gingles* factor one was satisfied, Plaintiffs did, in conformance with traditional redistricting principles. PX020-0023 (House); PX020-0082 (Senate). All remaining Plaintiffs except Smith and Stephen-Atara reside in a majority-minority district on the proposed maps. Trial.Tr.II.66, PageID.2606; PX020-0122-25. And those demonstration maps show that it is possible to draw ten majority-minority Black districts in the House and five in the Senate while honoring traditional redistricting principles. Trial.Tr.II.63-70, PageID.2603-2610.

### B.      The parties do not disagree on the Senate factors.

The totality-of-the-circumstances component of a VRA claim "tend[s] to show a pattern and history of discrimination and a need for redress." *Pope v. County of Albany*, 94 F. Supp. 3d 302, 310 (N.D.N.Y. 2015) (cleaned up).  This entails analyzing the factors from the Senate Report on the 1982 VRA amendments which include: (1) the history of voting-related discrimination; (2) the extent of racially polarized voting; (3) the use of voting practices that enhance the opportunity for discrimination against the minorities; (4) the exclusion of members of the minority group from

candidate slating processes; (5) the extent to which minorities bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; (6) the use of overt or subtle racial appeals in political campaigns; and (7) the extent to which minorities have been elected to public office in the jurisdiction. *Gingles*, 478 U.S. at 44-45, (citing S.Rep. No. 97-417, at 28-29 (1982), U.S. Code Cong. & Admin. News at 177, 205-207). A VRA plaintiff is not required to prove all or a certain number of these factors. S.Rep. No. 97-417, at 29. These factors are non-exhaustive and may include other probative evidence, for example, whether elected officials are unresponsive to the particularized needs of minorities. *Gingles*, 478 U.S. at 45.

The parties do not disagree that the Senate factors have been established. Dr. Brad Lockerbie provided expert testimony and opined in his expert report that "Plaintiffs satisfied the Senate factors." Trial.Tr.II.193, PageID.2733; PX019-0005,19. Michigan's history of discrimination is "long lasting and pervasive going all the way back to the original constitution in which African Americans were precluded from voting and serving on juries." *Id.*, PageID.2722. Voting in Oakland and Wayne counties is racially polarized, which is unsurprising given the history of discrimination he investigated. *Id.*, PageID.2726. This is consistent with Dr. Handley's report provided to the Commission on December 28, 2021, PX016-0041— though Dr. Handley relied on general elections instead of primaries. Trial.Tr.II.186-187, PageID.2726-2727. Dr. Lockerbie described the disparities the Black community continues to endure today due to past discrimination, including the "quite dramatic"

46

educational and economic disparities, housing segregation, and racial harassment. *Id.*, PageID.2720-2730. Among other effects, the Black community is less likely to vote and participate in the political process. PX019-0016,19.

Dr. Lockerbie described discriminatory practices and procedures, including public comments to the Commission "that the current process was racially discriminatory." Trial.Tr.II.188, PageID.2728. Dr. Lockerbie testified about racial appeals, including one campaign that campaigned on "Getting the blacks out of Southfield." *Id.* His expert testimony and report noted the Black community's diminished influence on the political process, including the low Black candidate success-rate, and the "high-tech lynching." *Id.*, PageID.2723-24. This low success rate results in diminished Black candidate emergence and "just cycles downward." *Id.*, PageID.2731. Detroit Black voters "most certainly [do] not" feel their elected officials are responsive. *Id.* Dr. Lockerbie reviewed all the transcripts from the Commission's public meetings and found only negative comments from Detroit Black voters, including "a multitude of negative statements made about the Redistricting Commission drawing plans such that Blacks would not have their voice heard." *Id.*

Dr. Lockerbie agrees with Mr. Adelson's "History of Discrimination" memorandum, PX021, and its conclusion that there is a "pattern and history of discrimination against the Detroit Black community." Trial.Tr.II.192-193, PageID.2732-2733. And Dr. Lockerbie and Mr. Adelson agree that Plaintiffs have met the Senate factors. "[T]here is no dispute whatsoever between Mr. Adelson and me with regard to that [the Senate factors]." *Id.*, PageID.2742.

That Plaintiffs have satisfied the Senate factors is further strengthened through the testimony of former Detroit legislators Virgil Smith and LaMar Lemmons. Pertinent to Senate factors 1, 3, and 5, both testified at length about the racial tribulations of campaigning while Black in the white dominated suburbs of western Wayne and southern Oakland and Macomb Counties ranging from low engagement from white residents (i.e., 10% or less) to outright harassment and racial intimidation. While campaigning in predominately white Allen Park, Senator Smith was reported for solicitation and the police were called.  Trial.Tr.II.208, PageID.2748. Senator Smith's white fellow campaigner "did not have the same problem." *Id.*

Senator Smith testified that Black candidates campaigning in predominately white areas "have a hard getting them to answer the door for us" and experience white voters' anger and feeling that Black candidates should "leave our Detroit problems in Detroit, and we have no business being out there." *Id.*, PageID.2750. Representative Lemmons testified about his similar hostile experiences, noting the "difficulty in reaching out to the white community," the lower "like[ihood] to open the door," "pulling guns on people who knocked on their doors," being "cursed out," and "called the N word." *Id.*, PageID.2772.

Rep. Lemmons and Sen. Smith testified how white representative from white suburban areas do not attend to legislative issues important to Black voters in urban areas—car insurance rates, land-value taxes, and emergency-manager laws. *Id.*, PageID.2751,2760-2761. This neglect is exacerbated by the racial design of the Linden and Hickory plans, which allows white candidates from predominately white

areas to win Democratic primary elections without spending meaningful time campaigning in predominately Black areas. Sen. Smith testified that this is exactly what happens. *Id.*, PageID.2752. Yet these white candidates still prevail in a Democratic primary over the Black candidate of choice. As Senator Smith explained, "[t]he longer these maps stay in play, we won't have any Black representation [.]" *Id.*, PageID.2752.

There is no material dispute of fact that Plaintiffs satisfy the Senate Factors.

## C.  Each of Plaintiffs' challenged VRA districts satisfies *Gingles* factors two and three and the totality of the circumstances.

To begin, it is necessary to address how to determine Black candidates of choice in multi-candidate elections. While the Sixth Circuit does not appear to have addressed this specific question, other circuits have. The Fourth Circuit says simply that it is the candidate who garnered the most minority votes:

> If such candidates can be considered minority-preferred candidates of choice in an election in which the top vote-getter received more than 50 percent of the vote, we see no reason why a similarly popular candidate—one that would have been elected had the election been held only among African–American voters—should not also be considered a minority-preferred candidate of choice in an election in which no candidate received 50 percent or more of the minority vote. *See, e.g., Ruiz v. City of Santa Maria*, 160 F.3d 543, 552 (9th Cir.1998). Thus, we find that in elections in which no candidate receives a majority of the minority vote, *a candidate may still be labeled a minority-preferred candidate of choice if that candidate would have been elected had the election been held only among minority voters, so long as an individualized assessment of that candidate supports that conclusion.* [*Levy v. Lexington County, S.C.*, 589 F.3d 708, 717-18 (4th Cir. 2009) (emphasis added).

The Ninth Circuit follows the same rule: "a candidate who receives sufficient votes to be elected if the election were held only among the minority group in question

49

qualifies as minority-preferred." *Ruiz v. City of Santa Maria*, 160 F.3d 543, 552 (9th Cir. 1998). In so holding, *Ruiz* addressed a split among the circuits over a broader question—how to determine "which candidate in a given election is a minority-preferred candidate." *Id.* The Ninth Circuit declined to follow the Third, Eighth, Tenth, and Eleventh Circuits, which use a "totality of the circumstances theory and require district courts to conduct election specific analyses of anecdotal evidence such as whether minorities mobilized to support the candidate." *Id.* (citations omitted). Instead, the Ninth Circuit followed the Second, Fourth, and Sixth Circuits, which "use an objective test that considers which candidate receives the most votes from minority voters." *Id.* (citations omitted).

The Ninth Circuit considered an "anecdotal evidence" analysis to be a "dubious judicial task, and one that can degenerate into racial stereotyping of a high order." *Id.* (citation omitted). Moreover, "many of the extrinsic factors relied upon by the courts adopting the totality of the circumstances analysis do not necessarily bear a correlation with how all minority voters feel about a candidate, only how activist groups feel," such as the mobilization factor. *Id.* In contrast, a bright-line rule like the one used in the Second, Fourth, and Sixth Circuits "is based on the premise that the ballot box provides the best and most objective proxy for determining who constitutes a representative of choice." *Id.* (quotation omitted).

This Court should likewise adopt the bright-line rule over the subjective totality-of-the-circumstances analysis, which is generally consistent with the testimony of Mr. Trende and Dr. Handley. *Contra* Trial.Tr.V.205-206, PageID.3455-

3456 (Dr. Palmer alone requires greater than 50% Black-voter support). Given the preponderance of the evidence standard, it also makes sense to consider in multi-candidate elections the percentage of Black and white votes that went to Black and white candidates, respectively. With that background, consider the evidence of *Gingles* factors two and three on a district-by-district basis.

### 1. Senate District 8

This is an easy district for VRA analysis. In a 40.20% BVAP, the Black candidate of choice, Black candidate Marshall Bullock, lost by a shocking 37% to the white candidate of choice, white candidate Mallory McMorrow. While Black voters chose Bullock 75.8% to 24.2%, white voters chose McMorrow 95.9% to 41%:

| Michigan 2022 State Senate Democratic Primaries | Race | Party | Vote | Black Voters | | | | White Voters | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | $EI^1$ | 95% confidence interval | $EI^2$ | ER | HP | $EI^1$ | 95% confidence interval | $EI^2$ | ER | HP |
| **State Senate District 8** | | | | | | | | | | | | | |
| Mallory McMorrow | W | D | 68.4 | 24.2 | 21.7, 26.6 | 26.0 | 27.2 | 30.9 | 95.9 | 94.3, 97.2 | 97.1 | 97.1 | 90.5 |
| Marshall Bullock II | B | D | 31.6 | 75.8 | 73.4, 78.3 | 73.9 | 72.8 | 69.1 | 4.1 | 2.8, 5.7 | 2.8 | 2.9 | 9.5 |
| *Turnout:votes/VAP* | | | | | | *20.5* | *17.5* | *18.9* | | | *30.5* | *28.8* | *36.1* |

DTX-26-111. As Mr. Trende testified—and no one disputed—Black voters voted cohesively, voting was racially polarized, and white voters acted as a block to defeat the Black candidate of choice. Trial.Tr.II.79-80, PageID.2619-20. And while Defendants suggest this lopsided vote was because of a viral speech that McMorrow gave about the transgender community, Mr. Trende explained that's "exactly what the Voting Rights Act is trying to forestall"— "issues that white candidates can use to drive a wedge between themselves and the black community." Trial.Tr.II.82, PageID2622. More likely than not, Black candidates of choice will be unable to win this district in future elections.

## 2.      Senate District 1

This district with a 35.0% BVAP featured a six-candidate primary in 2022, one where the Black candidate of choice, Brenda Sanders, lost by 10 points to white candidate of choice Erika Geiss, with white voters selecting Geiss over Sanders by a landslide, 55.9% to 16.8%:

| Michigan 2022 State Senate Democratic Primaries | Race | Party | Vote | Black Voters | | | | | White Voters | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | EI[1] | 95% confidence interval | EI[2] | ER | HP | EI[1] | 95% confidence interval | EI[2] | ER | HP |
| **State Senate District 1** | | | | | | | | | | | | | |
| Erika Geiss | B | D | 32.3 | 24.3 | 21.6, 27.1 | 23.4 | 21.2 | 21.8 | 55.9 | 50.8, 60.6 | 45.6 | 47.3 | - |
| Brenda Sanders | B | D | 23.3 | 34.0 | 31.8, 36.1 | 33.7 | 38.7 | 40.1 | 16.8 | 13.5, 20.2 | 14.4 | 15.4 | - |
| Frank Liberati | W | D | 22.9 | 13.8 | 12.2, 15.5 | 15.4 | 9.8 | 5.5 | 11.0 | 7.3, 15.2 | 18.0 | 18.4 | - |
| Shellee Brooks | B | D | 9.9 | 13.4 | 12.0, 14.8 | 13.2 | 13.7 | 14.8 | 7.1 | 5.0, 9.3 | 7.2 | 9.1 | - |
| Ricardo Moore | B | D | 7.9 | 11.2 | 10.1, 12.3 | 10.6 | 12.7 | 14.3 | 5.7 | 4.2, 7.4 | 5.5 | 5.1 | - |
| Carl Schwartz | W | D | 3.7 | 3.4 | 2.6, 4.2 | 4.1 | 4.0 | 3.6 | 3.5 | 2.4, 4.8 | 3.8 | 4.7 | - |
| *Turnout:votes/VAP* | | | | | | *18.3* | *14.2* | *14.3* | | | *9.2* | *7.8* | - |

DTX026-110. Mr. Trende's analysis showed that Black voters preferred Sanders over Geiss 43.62% to 18.41%, yet Sanders finished with only 7% of the white vote, finishing far behind Frank Liberati and Geiss:

| **2022 Senate EI Summary** | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| District | BVAP | Black 1st Choice | Black 1st Choice % | Black 2nd Choice | Black 2nd Choice % | White 1st Choice | White 1st Choice % | White 2nd Choice | White 2nd Choice % | Black Cand Margin% |
| Linden 1 | 35.00% | Brenda Sanders | 43.62% | Erika Geiss* | 18.41% | Frank Liberati | 46.38% | Erika Geiss* | 42.57% | 0.40% |

PX020-0089; Trial.Tr.II.75, PageID.2615. Mr. Trende opined that this district was both cohesive and racially polarized, resulting in white voters' candidate of choice prevailing over Black voters' candidate of choice. Trial.Tr.II.76, PageID.2617. More likely than not, Black candidates of choice will be unable to win this district in future elections.

### 3.    Senate District 6

In the 2022 election, incumbent Hispanic candidate Mary Cavanagh was the choice of Black and white voters and won by eight points in a district with a 39.10% BVAP:

| Michigan 2022 State Senate Democratic Primaries | Race | Party | Vote | Black Voters | | | | | White Voters | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | EI[1] | 95% confidence interval | EI[2] | ER | HP | EI[1] | 95% confidence interval | EI[2] | ER | HP |
| **State Senate District 6** | | | | | | | | | | | | | |
| Mary Cavanagh | H | D | 43.9 | 49.4 | 46.9, 52.0 | 47.4 | 47.9 | 46.6 | 50.0 | 43.8, 56.8 | 41.4 | 45.0 | 50.0 |
| Vicki Barnett | W | D | 35.8 | 13.1 | 10.9, 15.4 | 14.3 | 13.4 | 16.3 | 45.9 | 38.5, 52.4 | 57.2 | 52.2 | 43.2 |
| Darryl Brown | B | D | 20.2 | 37.5 | 35.2, 39.7 | 38.8 | 38.5 | 37.1 | 4.2 | 2.5, 6.2 | 3.2 | 2.7 | 6.8 |
| *Turnout:votes/VAP* | | | | | | *19.7* | *17.2* | 19.4 | | | *17.3* | *16.7* | *17.4* |

DTX026-110. But going back to the 2020 Democratic primary election for former House District 10, Cavanagh was the clear white candidate of choice, defeating two Black candidates; so, she was not the black candidate of choice until after she became an incumbent. Trial.Tr.II.78, PageID.2618. Darryl Brown, the only Black candidate in the 2022 Senate District 6 contest, took just 4.2% of the white vote, while 95.9% of white voters favored either the white or the Hispanic candidate. *Id.*

The 2018 Senate primary for previous Senate District 5, which makes up a substantial portion of Linden Senate District 6, featured Black candidate Betty Jean Alexander and white candidate David Knezek. Alexander won because the old Senate district had a *much* higher BVAP—52.5%, PX020-0022. And she needed that cushion because while Alexander won the Black vote 68% to 32%, she lost the white vote 73% to 27%. DTX026-089.

The same was true in the 2014 election in former Senate District 5. Black candidate of choice Shanelle Jackson took less than 3% of the white vote (finishing

out of the top two) while white candidate of Choice David Knezek took 86% of the white vote—"highly polarized" and "overwhelming bloc voting." PX020-84; Trial.Tr.II.90-91, PageID.2630-31. Jackson was only able to prevail because the district had a 52.50% BVAP. Indeed, Mr. Trende testified that of the 30 or so Black candidates who ran in Detroit-area 2014 and 2018 Senate elections, *not one* ever received "more than a third of the white vote." Trial.Tr.II.92, PageID.2632.

So in this district, there is Black voter cohesion and polarization. More likely than not, Black candidates of choice will be unable to win this district in future elections.

### 4.  Senate District 3

In the 2022 election, Asian candidate Stephanie Chang took a majority of Black votes and white votes in this 42.10% BVAP district, defeating Black candidate Toinu Reeves 82.8% to 17.2%:

| Michigan 2022 State Senate Democratic Primaries | Race | Party | Vote | Black Voters | | | | | White Voters | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | EI[1] | 95% confidence interval | EI[2] | ER | HP | EI[1] | 95% confidence interval | EI[2] | ER | HP |
| **State Senate District 3** | | | | | | | | | | | | | |
| Stephanie Chang | A | D | 82.8 | 77.2 | 75.1, 79.2 | 76.3 | 73.5 | 73.0 | 93.4 | 90.8, 95.7 | 92.3 | 93.4 | - |
| Toinu Reeves | B | D | 17.2 | 22.9 | 20.8, 24.9 | 23.8 | 26.6 | 27.0 | 6.6 | 4.3, 9.2 | 7.7 | 6.6 | - |
| *Turnout:votes/VAP* | | | | | | *16.8* | *15.3* | *15.0* | | | *13.2* | *11.5* | - |

DTX026-110. As Mr. Trende testified, Chang is popular with all voters—now that she's an incumbent. Trial.Tr.II.76, PageID.2616. But in the 2018 Democratic primary for the former Senate District 1 (which now makes up a sizeable portion of Linden Senate District 3 and part of Linden Senate District 1), Chang won a 45.1% BVAP district over Black candidate of choice Alberta Tinsley-Talabi by winning 76% of the

white vote to Tinsley-Talabi's paltry 27%. Trial.Tr.II.77, PageID.2617; *accord* DTX026-089. This despite the fact that Tinsley-Talabi took 47% of the Black vote—a near majority—in a six-candidate race. DTX026-089. Interestingly, Black candidate of choice Tinsley-Talabi endorsed Black candidate Reeves in the 2022 election against Chang, yet Reeves received only 7% of the white vote. DTX026-110.

So in this district, there is also Black voter cohesion and polarization. More likely than not, Black candidates of choice will be unable to win this district in future elections.

In sum, across the Senate districts, Black and white voters will prefer Black and white candidates, respectively, and that as incumbents are termed out, it is entirely possible the low BVAPs will mean "zero black Senators from Detroit within a couple of cycles." Trial.Tr.II.94, PageID.2634.

### 5.   House District 1, 7, 10, 12, and 14

To be sure, the 2022 election results for these five House districts is not particularly probative. District 1 featured two Black candidates. DTX026-112. District 7 featured one Black candidate who prevailed against two white candidates, DTX026-113, but the Black candidate, Kimberly Edwards, was an incumbent (taking only 37.22% of the white vote, PX020-0042). District 10 featured two Black candidates. DTX026-113. In District 12, a Black candidate defeated a white candidate, taking 42% of the white vote. DTX026-113. And in District 14, a Black candidate prevailed where two white candidates split 60% of the white vote. DTX026-114.

That said, there is more probative 2022 data. Election results for House District 4 show strong Black cohesiveness (two Black candidates received 98% of the

Black vote while one middle-eastern candidate received 2%) and polarization (the middle-eastern candidate took 72% of the white vote). DTX026-112. The same is true of House District 8, where two Black candidates took 64% of the Black vote and three white candidates took 87% of the white vote, with the white candidate of choice prevailing in a 43.70% BVAP district. DTX026-113. And these districts are probative of their neighbors, Trial.Tr.II.97, PageID2637, with District 4 running alongside District 1, and District 8 running right between Districts 7 and 14, PX020-0017.

Similarly, though white incumbent Lori Stone won the Black and white vote in House District 13, she prevailed only 53% to 47% over Black candidate Myles Miller among Black voters, but 91.5% to 8.5% among white voters. DTX026-114. And in House District 11, a bit of a mess with nine candidates, the four Black candidates were the top four vote-getters among Black voters, while the top two vote-getters among white voters were a Hispanic candidate and a white candidate. DTX026-114. District 13 runs parallel between Districts 12 and 14, and District 11 runs parallel between Districts 10 and 12. PX020-17.

Moreover, the very probative Senate Districts 8 and 1 subsume House District 7 and 1, respectively. *Compare* PX020-20 *with* PX020-17. The probative Senate District 3 subsumes House District 14. *Id.* And the 2014 and 2016 House elections in former districts that make up the challenged districts likewise show Black cohesive voting, polarized voting, and Black candidates of choice finding it difficult to win even in districts with much higher BVAPs. Trial.Tr.II.102-106, PageID.2642-46.

In sum, "we consistently see black and white voters coalescing around different candidates, and white voters in particular do not vote for, in these open seat races, black candidates." Trial.Tr.II.106, PageID.2646. "[Y]ou're flirting with an environment where the House black caucus will fit into the backseat of an Uber XL by the end of the decade." Trial.Tr.II.107, PageID.2657.

## III.    Remedy

If the Court concludes Plaintiffs are entitled to judgment on either their Equal Protection or VRA claims in any Senate or House district, then that map must be invalidated and a new map adopted. Timing becomes a problem. Under MCL 168.163, the candidate filing deadline for the offices of Michigan state senate and state representative is the "fifteenth Tuesday before the August primary." Next year's primary is scheduled for Tuesday, August 6, 2024, so the candidate filing deadline is Tuesday, April 23, 2024, at 4:00 pm. And candidates need to know where the district lines are weeks before so they can submit the proper paperwork and the required fee or minimum number of petition signatures.

That's a problem for a Commission process that will require substantial work and a new round of statewide public meetings. And it presents an impossibility for the special elections set for two recently vacated seats in the Michigan House of Representatives, which have a January 30, 2024 special primary date and an April 16, 2024 special general-election date. The 13th district House seat includes Macomb and Wayne counties, and the 24th district House seat is in Wayne County. Though neither district is technically part of this lawsuit, both districts will be impacted if this Court strikes down neighboring districts.

57

If the parties are unable to settle this case, Plaintiffs have compliant proposed maps that the Court could simply adopt. Alternatively, the Court could appoint a Special Master to draw a map. Finally, the Court could impose the previous redistricting maps. Given the complexity of this issue, Plaintiffs recommend a status conference and an expedited round of supplemental briefing if the Court rules in favor of Plaintiffs on any of their claims.

## CONCLUSION

Plaintiffs respectfully request judgment in their favor on all remaining Equal Protection and VRA claims, plus their attorney fees and costs. Plaintiffs also request an appropriate remedy ensuring Michigan's House and Senate maps honor the rights of Detroit-area Black voters rather than using arbitrary BVAPs based on irrelevant general-election results.

Respectfully submitted,

*/s/ John J. Bursch*
John J. Bursch (P57679)
BURSCH LAW PLLC
*Attorney for Plaintiffs*
9339 Cherry Valley Ave SE, #78
Caledonia, Michigan 49316
(616) 450-4235
jbursch@burschlaw.com

Michael J. Pattwell (P72419)
Jennifer K. Green (P69019)
James J. Fleming (P84490)
Amia A. Banks (P84182)
CLARK HILL PLC
*Attorneys for Plaintiffs*
215 S. Washington Sq., Ste. 200
Lansing, MI 48933
(517) 318-3100

mpattwell@clarkhill.com
jgreen@clarkhill.com
jfleming@clarkhill.com
abanks@clarkhill.com

Dated: December 4, 2023