UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DONALD AGEE, JR. *et al.*,               )
                          Plaintiffs,    )
                                         )          No. 1:22-cv-272
v.                                       )
                                         )          Three-Judge Court
JOCELYN BENSON, in her official          )
capacity as the Secretary of State       )
of Michigan, *et al.*,                   )
                          Defendants.    )
_____  )

        KETHLEDGE, J., delivered the opinion of the court in which MALONEY, J., joined, and
NEFF, J., joined in the result.  NEFF, J., delivered a separate concurring opinion.

## OPINION AND ORDER

        KETHLEDGE, Circuit Judge.  "Under the Equal Protection Clause, districting maps that
sort voters on the basis of race are by their very nature odious."  *Wisconsin Legislature v.
Wisconsin Elections Commission*, 595 U.S. 398, 401 (2022) (per curiam) (internal quotation marks
omitted).  The plaintiffs here are nineteen African-American Detroiters who live in thirteen
different Michigan House and Senate districts that each include a portion of Detroit.  They contend
that—in Michigan's 2021 redistricting of its state legislative districts—the boundaries of their
districts were drawn predominantly on the basis of race.  Those district lines were drawn by the
newly created Michigan Independent Citizens Redistricting Commission—a body of 13 citizens,
chosen at random, who came to their task with no experience in redistricting and no knowledge of
election law.  But they hired experts to guide them—notably their "voting rights act legal counsel,"
Bruce Adelson, and a political scientist, Dr. Lisa Handley, along with their general counsel,
Julianne Pastula.

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

Legislative redistricting is usually performed by state legislatures, which usually do not create a contemporary record of their every move during that process.  But here the Commission did create such a record: every decision they made, every word they spoke, was recorded in real time in a body of transcripts that runs some 10,000 pages.  In that respect the record here is unique among redistricting cases litigated in federal court.   That record makes clear that the commissioners relied heavily on their experts' advice, particularly with regard to compliance with the federal Voting Rights Act, 52 U.S.C. § 10301.  And the record shows, overwhelmingly, that those experts—Adelson, especially—expressly told the commissioners, scores if not hundreds of times, to sort Detroit-area voters into different districts on the basis of race.

Specifically, Adelson and Pastula told the commissioners that, to comply with the Voting Rights Act ("VRA"), they must limit the "black voting age population"—known as "BVAP" in redistricting jargon—to approximately 35-45%.  That proposition is without support in the Supreme Court's VRA caselaw.   Yet the record further shows that the commissioners did as their experts said—with great difficulty, and misgivings throughout, and over the vociferous objections of Detroit residents at the time—so that, in the end, the Commission limited the percentages of black voters, in the districts at issue here, to the racial targets their experts had given them.  And so—in a city whose African-American population is almost 80%—the BVAPs of every Detroit-area district here, with one exception, fell within 35-45%.  The exception was Senate District 11, which has a BVAP of 19.19%; but the record shows that most of the African-American voters in that district were put there to lower the BVAP of an adjacent district to the target range.

The record here shows overwhelmingly—indeed, inescapably—that the Commission drew the boundaries of plaintiffs' districts predominantly on the basis of race.  We hold that those districts were drawn in violation of the Equal Protection Clause of the U.S. Constitution.

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

I.

A.

1.

Every ten years, after a federal census mandated by the Constitution, the states redraw their electoral districts "to account for any changes or shifts in population."  U.S. Const. art. I, § 2; *Georgia v. Ashcroft*, 539 U.S. 461, 489 n.2 (2003).  State legislatures usually draw the new district lines. *See Rucho v. Common Cause*, 139 S. Ct. 2484, 2495 (2019).  Until recently, Michigan was no exception.  Following the 2010 decennial census, for instance, the legislature drafted and adopted maps for the state senate and house.  In Detroit, where 77.9% of residents are black, these maps included two senate and ten house districts with black-voter populations greater than 50%.

In November 2018, however, Michigan voters approved a state constitutional amendment that vested the power to redraw legislative-district lines in an "Independent Citizens Redistricting Commission" of citizen laypersons.  Mich. Const. art. IV, § 6.  As amended, the Michigan Constitution required the Commission to "abide by the following criteria in proposing and adopting" new redistricting plans, "in order of priority:"

(a) Districts shall be of equal population as mandated by the United States constitution, and shall comply with the voting rights act and other federal laws.

(b) Districts shall be geographically contiguous. Island areas are considered to be contiguous by land to the county of which they are a part.

(c) Districts shall reflect the state's diverse population and communities of interest. Communities of interest may include, but shall not be limited to, populations that share cultural or historical characteristics or economic interests. Communities of interest do not include relationships with political parties, incumbents, or political candidates.

(d) Districts shall not provide a disproportionate advantage to any political party. A disproportionate advantage to a political party shall be determined using accepted measures of partisan fairness.

(e) Districts shall not favor or disfavor an incumbent elected official or a candidate.

3

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

    (f)  Districts shall reflect consideration of county, city, and township boundaries.

    (g)  Districts shall be reasonably compact.

Mich. Const. art. IV, § 6(13).  (We will refer to these criteria as the "Michigan criteria.")

    In 2020, Secretary of State Jocelyn Benson formed the new Commission by randomly selecting 13 candidates—four Democrats, four Republicans, and five independents—out of a group of more than 9,000 applicants who had expressed an interest in serving on it.  Redrawing legislative-district lines (*i.e.*, "redistricting") is complicated business, both legally and factually. So the Commission began to hire staff, including specialists in mapping software, an executive director, and a general counsel, Julianne Pastula.  In September 2020, the Commission began holding meetings; all of them (save one toward the end of the process) were open to the public— and all of them were transcribed.

2.

    The Michigan constitution makes compliance with federal law—including the Voting Rights Act and the federal constitution—a categorical imperative in Michigan redistricting.  Mich. Const. art. IV, § 6(13)(a).  And the federal constitution's Supremacy Clause, U.S. Const. Art. VI, cl. 2, itself would invalidate any district lines drawn in violation of federal law.  *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015).  The Commission, for its part, recognized early on that Michigan's demographics—particularly Detroit's heavily concentrated African-American population—would require close attention to the VRA in the redistricting process.  As the Supreme Court has put it, § 2 of the VRA requires that—when a minority group is large and compact enough to elect its preferred candidates, as black voters obviously are in Detroit—those voters cannot be broken up and "submerged in a larger white voting population" that usually defeats the minority group's preferred candidates.  *Cooper v. Harris*, 581 U.S. 285, 301-02 (2017)

4

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

(cleaned up).  Separately, the federal Equal Protection Clause bars a state—absent an extremely good reason—from "separating its citizens into different voting districts on the basis of race." *Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. 178, 187 (2017) (cleaned up).

In February 2021, the Commission held a hearing in which it heard from practitioners of federal election law.  Among them was Leah Aden of the NAACP Legal Defense Fund, who warned that partisan justifications might be used to break up majority-black legislative districts:

> [Y]ou're going to hear people say vote dilution is not happening. This is about party. This is not about race . . . . You're also going to hear we can't create this geographically compact minority community. . . . And I want it to be in your head that if minority voters are harmed to achieve partisan power or partisan power is an excuse to harm minority voters, each of those can run afoul of the Constitution and the voting rights act.

MICRC Tr. at 2102.

The Commission also heard from David Becker, formerly of the Department of Justice's Civil Rights Division.  By way of background, as a practical matter, in "safe" Democratic districts—like districts in and around Detroit—the dispositive election is the Democratic primary, not the general election; for whoever wins the primary will win the general.  (The same dynamic holds, of course, for safe Republican seats.)  Whether black voters in Democratic districts can elect their preferred candidates, therefore, depends on whether those candidates can win the Democratic primary elections.  Becker therefore urged the Commission as follows:

> Another thing I really want to stress to you it's really going to be important to look at primary election results.  It's not just going to be about general elections.  As we know there are places in every state, certainly Michigan, where the outcome of the primary is determinative of the general election. . . . And in those places, you have to look at primary elections.

*Id.* at 2106.

Later, the Commission retained Dr. Lisa Handley, an expert in analyzing voting data for purposes of compliance with the VRA.  The Commission also retained Bruce Adelson as its

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

"voting rights act legal counsel."  Adelson began practicing law in 1984, worked in the Department of Justice from 2000 to 2006, and was counsel to the Arizona redistricting commission in 2011.

### B.

The Michigan constitution required the Commission to draft and approve legislative maps no later than November 1, 2021.  Mich. Const. art. IV, § 6(7).  But the COVID-19 pandemic delayed the Census Bureau's release of its 2020 census data; and so the Commission did not begin any drafting until August 2021, when that data arrived.

### 1.

*The Commission's September 2, 2021 meeting.*  This meeting set the course for a great deal of what followed in the next two months.  During this meeting, Handley and Adelson alike sought to advise the Commission about the VRA's requirements.  Handley addressed the commissioners first, and went through a power-point presentation in which she said that "redistricting plans cannot crack or pack a geographically concentrated minority community across districts or within a district in a manner than dilutes their voting strength."  *See* Def.'s Ex. 48 at 3.  Cracking occurs when a racial group's members are dispersed "into districts in which they constitute an ineffective minority of voters."  *Cooper*, 581 U.S. at 292 (cleaned up).  As an example of unlawful "cracking," Handley cited (ironically enough, given what shortly followed) the example of a compact racial group that had been broken into five districts, in each of which the group's members constituted only 35% of the district's voters:

No. 1-22-cv-272
*Agee et al. v. Benson et al.*



*See* Def.'s Ex. 48 at 3.  As an example of unlawful "packing," Handley offered the example of the same compact racial group—this time packed into a district where it constitutes 100% of voters, thereby denying the group potential majorities in two other districts:



*Id.*  Rather than crack or pack districts with large numbers of minority voters, Handley said, the Commission should draw districts that "provide minority voters with the opportunity to elect their candidates of choice."  MICRC Tr. at 5383-84.  To do otherwise—in areas (like Detroit) where minority voters had previously succeeded in electing their preferred candidates—would likely

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

violate the VRA.  *Id.* at 5378-86.  Handley therefore sought to identify the BVAP necessary for black voters to have that "opportunity."  *Id.* at 5384.

That number in part depended on the percentage of white voters, in particular districts, who vote as a "bloc"—meaning they usually prefer white-preferred candidates over black-preferred ones—as opposed to white voters who "cross over" to support black-preferred candidates.  *Id.* at 5379, 5384.  The greater the white-bloc voting, the higher the BVAP necessary for black voters to elect their preferred candidates; and the greater the "white crossover" voting, the lower the BVAP necessary to elect black-preferred candidates.

Handley's role in advising the Commission was to analyze election data and then to determine, for different districts, what those necessary black-voter percentages might be.  To that end, as relevant here, Handley said she had analyzed the election results in two counties—Wayne (which includes Detroit) and Oakland—for 14 statewide elections in Michigan since 2012 (e.g., the presidential elections in 2016 and 2020).  (Handley did not analyze any election results for Macomb County because black voters are scarce there.)  But only one of Handley's 14 elections, the 2018 Democratic gubernatorial primary, was a primary election—which, as the DOJ's David Becker had explained, is the election that determines the winning candidate for "safe" seats.  *Id.* at 5381.  And that primary election played no role in Handley's analysis because black voters had not shown any clear preference in it.  *See* R.108 at PageID 3287.  Meanwhile, the other 13 elections that Handley analyzed were all general elections—in which voters (black or white) affiliated with the same party usually vote for the same candidate, regardless of what their preferences might have been in the primary.  MICRC Tr. at 5381-82.

Based only on that general-election data, however, Handley told the Commission that it need not create majority-black districts in order to comply with the VRA.  Instead—without any

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

mention of the differences between primary and general elections in Detroit-area districts—

Handley said that black voters in Oakland and Wayne counties could consistently elect their

preferred candidate in districts with BVAPs as low as 35 and 40%:

> In Oakland County, 35% is going to work. 40 percent looks like it might work. In
> Wayne County where we have a lot more white crossover vote 35% might well
> work. I'm not advocating that you draw the districts at this amount. I'm advocating
> that you keep in mind that the districts do not have to be majority-minority in
> composition[.]

*Id.* at 5386.

Bruce Adelson then addressed the Commission—and he did advocate, then and ever after,

that the Commission "draw the districts" at the BVAPs that Handley had specified. Adelson said

that Handley's analysis would be "very crucial" and "very important" "going forward for the

Commission[.]" *Id.* at 5389. He added:

> But to the point about packing, remember that the [sic] if a district can be
> established through analysis to be able to elect candidates of choice of the minority
> community at, let's say 40%, if you add on population to that, the courts constitute
> that as packing.

A commissioner asked, "how do we ensure that we don't unpack it and then it becomes

cracked? And therefore, we are not in compliance in the other direction? How do we ensure that?"

*Id.* at 5390. Handley responded:

> you look at the recompiled election results to make sure that the districts you have
> drawn are effective minority districts. So those four contests I mentioned earlier as
> bellwether contests [namely, the 2012 U.S. presidential, the 2014 secretary of state,
> the 2018 gubernatorial, and 2020 U.S. presidential general elections] will be in the
> redistricting package and as you draw . . . you can hit the button that will tell you
> how those candidates are doing in the proposed district.

*Id.* The "recompiled election results" to which Handley referred, however, came from the general

elections she had analyzed. The "button" for measuring how black-preferred candidates "are doing

9

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

in the proposed districts," therefore, would measure their success only in general elections, not Democratic primaries.

General Counsel Pastula added that "Dr. Handley's analysis and her findings and Mr. Adelson's conclusions he is able to draw from those findings will certainly impact the [Commission's] critical work going forward in redistricting." *Id.* at 5391. And software consultant Kim Brace told the Commission about another piece of information that would be available to them throughout the districting process: "when you draw you will have the racial percentages on the districts as they are being created so you will see what is the racial characteristics of the District." *Id.* at 5393.

2.

*Map-drawing begins.* About a week later, the Commission began drawing Detroit-area senate districts. At first, the Commission focused on a variety of the Michigan criteria when mapping, including communities of interest (or "COIs"). For example, Commissioner Rebecca Szetela expressed concerns about the "complex demands of COIs" around Hamtramck including the "Latin X community" and the "environmental concerns" common to communities in southwest Detroit. *Id.* at 5672. And Commissioner Anthony Eid recommended keeping together several communities near where he had grown up. *Id.* at 5675. But the Commission was also worried about "packing" black voters—as its experts had recently defined that term—into districts. On September 9, Commissioner MC Rothhorn asked the mapping specialists to pull up the "layer with the dots that allow[] you to see the racial composition of the areas." *Id.* at 5676. Adelson concurred, since they were then mapping in "one of the counties that Dr. Handley analyzed to say there is racially polarized voting, I think we need to have the dots." *Id.* at 5677.

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

The Commission soon began to wrestle with the tension between preserving communities of interest, on the one hand, and what they understood—again, based on what their experts had told them—as "VRA compliance," on the other.  On September 13, for example, Rothhorn asked the other commissioners to "watch those numbers [*i.e.*, racial percentages] as we add districts." *Id.* at 5733.  Eid acknowledged the difficulty of drawing districts in an area with a "very large minority population," and said, "I don't know a way to get around it unless we start drawing these districts into the suburbs." *Id.*  Likewise, Commissioner Douglas Clark said that "the only way to resolve that is to go into the suburbs but that is not what the people want. . . That is what I heard in the two town halls or public hearings we had in Detroit." *Id.*  General Counsel Pastula responded:

> The districts . . . do not appear to be able to be unpacked unless you go in the suburbs. . . . And while I certainly acknowledge and respect the public comment received, the Voting Rights Act being the first criteria is going to need to be respected and adhered to.

*Id.* at 5734.

Later, Commissioner Szetela echoed this advice.  Clark had emphasized that residents of some Detroit neighborhoods near Grosse Pointe—a wealthy, mostly white city next door—had said specifically "during the hearings that they don't want to be associated with Grosse Pointe because all the money tends to or all the influence tends to flow to Grosse Pointe because they have more money." *Id.* at 5747.  Szetela responded that "I'm trying to balance the Voting Rights Act" against those concerns "because [the] Voting Rights Act is our number one" criterion and "I don't want to have a super concentrated District." *Id.*  When she finished drawing, she told the Commission to look "at the percentages of African/Americans in District 8.  It's just below 50% so it's still a minority majority District based on Dr. Handley's reporting but it's not packing people in which is exactly what I was trying to accomplish." *Id.* at 5748.

11

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

Later in the same meeting, Rothhorn told Clark to use the racial-dots tool while mapping

because "this is another VRA area and we may want to be aware of the Black white" population.

*Id.* at 5765.  At the end of the day on September 13, the Commission saved a draft senate map

(Draft Map 162) that included three majority-minority districts.  As relevant here, the districts that

became Senate Districts 1, 3, 6, 8, 10, and 11 had the following BVAPs:

| District No. | | 1 | 3 | 6 | 8 | 10 | 11 |
|---|---|---|---|---|---|---|---|
| | Date | BVAP | BVAP | BVAP | BVAP | BVAP | BVAP |
| Senate Map Plan 162 | 9/13/2021 | 10.98 | 50.82 | 76.56 | 63.77 | 18.1 | 7.8 |

That evening, Pastula sent Szetela—who had just been elected Chair of the Commission—

an email in which she expressed "Significant Concerns" that she and Adelson shared about that

day's mapping session.   Specifically, Pastula told Szetela:

> Bruce [Adelson] and I are very concerned and alarmed about the drafting of the
> packed districts that is occurring during today's mapping session.  While the work
> is preliminary and future steps can be taken to remediate—this will become much
> more difficult the more packed districts that are drawn.  In addition to not being
> able to justify the numbers coming out of today to a court, these drafts also create
> expectations on behalf of the public that will also be difficult to address moving
> forward.

Pl.'s Ex. 5 at 45.  Pastula added that it would be "critical" for the Commission to use the bellwether-

elections tool in the "areas where the VRA was implicated," and that the "Commission is running

out of time and [has] an enormous amount of work to do."  *Id.*

The next morning, the mapping specialists installed the "bellwether-elections" tool and

taught the Commission how to use it.  *See* MICRC Tr. at 5803-05.  Adelson then went into a long

monologue in which he emphasized the following:

> One of the things that I would strongly advise and something that we will be talking
> a lot about over the next couple of weeks is really study and internalize, Lisa

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

>  Handley's, Dr. Handley's PowerPoint. . . . I have read her Power Point virtually every day for the last few weeks. . . .
>
>  Packing means adding or including additional minority voters [beyond] the ones needed to elect what we call candidates of choice. . . .
>
>  So look at the percentages here [in Handley's presentation].  Black VAP and percent of the vote and you kind of get a sense of [sic] to highlight in a real way and again going back to the vitality of Dr. Handley's PowerPoint how the districts are created and how many people from which backgrounds are included. . . .
>
>  And what I would suggest in moving forward in the areas where you are now, typically aim for Black populations in the 40-45% range.  It's a rough estimate. . . . [A]nd remember that the aim, *the requirement of the law is to avoid packing minorities into districts above and beyond the percentage at which analysis* [meaning Handley's analysis] *is determined they need to elect candidates of choice.*

*Id.* at 5810-12 (emphasis added).

Over the next two days, the Commission tried to "unpack" Detroit's majority-black districts.  For example, Commissioner Brittni Kellom—herself a Detroiter—said she was "thinking about utilizing Bruce to look at the Metro Detroit area and kind of unpack." *Id.* at 5825.  Adelson responded that she should "remember Dr. Handley's analysis" because "there is good general white cross over support in Wayne County." *Id.* at 5826.  He also said the 36% black-voter population in a draft district was "close to the line" and "I always like to be cautious and not do it exactly 35%, 36% right on the nose.  I like to build in a little bit of a cushion." *Id.*  Clark advised Kellom to follow a road boundary while drafting, because that would help to "dilute the Black population." *Id.* at 5842.  Later, as Commissioner Cynthia Orton drafted districts in western Detroit, Adelson said that "District 13 is 71% over all minority and 62% Black population.  So I would suggest that all will need to be looked at as well." *Id.* at 5871.  Chair Szetela suggested drawing in Detroit narrowly, "like a spoke coming out" from downtown, so that the Commission could "balance" and "get rid of the highly concentrated [African-American] districts." *Id.* at 5872.

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

On September 15, Rothhorn imitated the "spoke" concept and explained that he was trying to "decrease the minority percentage [] to have a more balanced Black-white ratio." *Id.* at 5896-5902. The Commission also began to employ the bellwether-elections tool to see whether black-preferred candidates would prevail in the draft districts—which they always did, because the tool measured the success of Democratic candidates in general elections for Democratic safe seats. *See, e.g., id.* at 5876.

Yet some commissioners expressed concern with the way they were drawing maps. Commissioner Juanita Curry—who was herself from Detroit—said, "I'm just a little off on keeping some places whole and some places not . . . . For instance like Detroit we split it up some." Szetela responded that Adelson had directed the Commission to split up the city to comply with the VRA:

> [W]e specifically split up Detroit because our expert, Bruce Adelson had—was uncomfortable with the districts we originally came up with because they were highly concentrated African/American communities to the point where he said that it would likely violate the [VRA]. And so he had indicated that we should try to get those percentages down to maybe 40% African/American population.

*Id.* at 5937.

By September 15, the Commission had completed its first full senate map (Draft Map 165) which reduced the number of black-majority districts in Detroit from three to two:

| District No. | | 1 | 3 | 6 | 8 | 10 | 11 |
|---|---|---|---|---|---|---|---|
| | Date | BVAP | BVAP | BVAP | BVAP | BVAP | BVAP |
| Senate Map Plan 162 | 9/13/2021 | 10.98 | 50.82 | 76.56 | 63.77 | 18.1 | 7.8 |
| Senate Map Plan 165 | 9/15/2021 | 34.86 | 44.87 | 51.99 | 59.06 | 49.38 | 11.02 |

3.

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

*Mapping continues.* Beginning five days later, from September 20 to 28, the Commission drafted its initial Detroit-area house map. Adelson reiterated at the outset that "[a]ny district that has majority-minority VAP I think you should aim to let's see what we can do to kind of potentially unpack that based on Dr. Handley's analysis. . . . Because just as Dr. Handley said if you can elect [at] 35%, 40% then why would you add 40, 50% minority population?" *Id.* at 6204. Yet the Commission struggled to do what Adelson said. Commissioner Eid, for instance, said, "So I'm just trying to think about how we are going to do this because I mean the population density [of] African/Americans is so high in Detroit it's probably going to cause a problem with packing unless we have some districts that people may view as oddly shaped[.]" *Id.* at 6205. Szetela agreed: "I don['t] really know what to do because the Senate districts you saw we sort of stretched them out and I don't know how to do it with House Districts and I don't know how we can avoid having house [districts] that are going to be like 75, 85% African/American[.]" *Id.* at 6205-06.

Rothhorn—who had just been elected Vice Chair—then began mapping the area that became House District 1 in southwest Detroit. At first he drew boundaries based on communities of interest, such as "Greektown" and the "Latin X community[.]" *Id.* at 6210-12. But Rothhorn checked the draft district's racial percentages continually as he drew. *Id.* at 6213. Then Szetela drew what became House District 2—which had a "Bengali community" that she did not "want to split[.]" *Id.* at 6219. But that made the district's BVAP too high: "now the problem is it's 77% African/American. I think that's where the challenge is. So is there anything I can do about that?" *Id.* at 6219. Adelson responded, "I think that [] in exploring the other areas around this District and downtown and greater Detroit there may be other populations that either you could include, you could take some of two and add them to other parts of the City." *Id.* at 6219. Rothhorn echoed Adelson, telling Szetela "that Hamtramck could be another spoke heading north" and that this

15

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

"will dilute the Black population.  I shouldn't say dilute right.  It would be more balanced."  *Id.* at 6220.

Szetela took that advice, and found that "making that change makes a difference.  It brings [it] down [] to 54% African/American from where it was."  *Id.* at 6220.  Adelson approved, saying the Commission had done:

> a substantial job with [the] percentage of the Black population.  It kind of shows you that there are ways to approach it.  Wherever you find the population east, west or north because I mean you brought it down, I think almost 25% without doing too many adjustments.  So I think that you'll find other ways going forward so that [] with this concept of whether it's going north or whatever direction I think you will be able to find population to balance the District.

*Id.* at 6221.  Rothhorn noted the map's new configuration:  "Detroit has spokes."  *Id.* at 6222.  Szetela finished drawing the district and explained that she tried to "draw a District that is compliant with the Voting Rights Act by not packing the African/American community."  *Id.* at 6223.

The Commission thereafter repeatedly used the racial-dots tool to identify high-density African-American communities and then to dilute them using the spoke method.  For example, Szetela and Clark collaborated to draw what became House District 10.  Clark feared that "[w]e are going to end up with an African/American population that is going to be pretty significant."  *Id.* at 6410.  Szetela recommended "grabbing population" from "the Grosse Pointes[.]"  *Id.* at 6411.  Clark countered, "that eastern part of Detroit specifically said they don't want to be part of Grosse Pointe."  *Id.*  But Szetela said "we have to remember that VRA is first on our list.  And so we have to look at accommodating VRA first.  And if that requires Grosse Pointe to do it, I think that is where we need to look first."  *Id.*  The Commission then added several Gross Pointe communities to the map, with Adelson assuring them that "the west of Grosse Pointe park does elect [minority] candidates of choice[.]"  *Id.* at 6411-16.  But Adelson later said that the BVAP in an adjacent

16

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

district—what became House District 11—was still too high, and that having a "minority population that is so in excess of [Dr. Handley's] opportunity to elect percentage would be difficult to justify." *Id.* at 6420, 6426, 6433.  Clark adjusted the district lines and explained that "what I'm trying to do is reduce the Black population." *Id.* at 6434.

Adelson frequently used the bellwether-elections tool to check the Commission's draft districts for "VRA compliance." *See, e.g.,* 6454-56, 6467-68, 6474.  Vice Chair Rothhorn, for instance, finished drawing what became House District 15 and said that he had been "mostly concerned about vote dilution." *Id.* at 6440.  Adelson then used the bellwether-elections tool and reported that, in the district, "across the board the candidates of choice win." *Id.* at 6441.

Later, Orton drafted what became House Districts 12 and 13.  She initially focused on District 12 and tried to keep certain neighborhoods together, such as Eastpointe and Detroit. *Id.* at 6476.  But soon she asked the mapping specialist:  "Can we also put on the African/American theme," i.e., the racial-dots tool. *Id.*  Then Orton said, "I don't think we are going to be able to get up into lower[-percentage] minority areas.  So that might be a problem.  So it looks to me like in order to try to balance it more racially, we would have to split this into two [districts] and do two spokes up." *Id.*  Commissioner Kellom agreed with that approach. *Id.*  Orton then continued drafting.  In what became District 12, she retained a precinct because it added "a little more white population in to balance it." *Id.* at 6479.  Adelson again used the bellwether-elections tool to confirm that the district elected African-American candidates of choice "across the board." *Id.* at 6481.

Rothhorn summarized the Commission's work—in what became House Districts 12, 13, and 14—as "trying to peel off pieces or create spokes, chutes and ladders to create a, yeah, a more racially balanced District." *Id.* at 6515.  Adelson said the Commission was trying "not to pack

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

voters of color, Black voters beyond the point at which they can elect candidates of choice," but urged the Commission to "please be aware of the terminology" it used to describe its work. *Id.* at 6515-16.

As mapping continued, some commissioners became concerned with how the Commission was breaking up communities of interest to create racially balanced districts.  For example, Rothhorn said, "We are being challenged here in our House District and you know with sincere apologies to breaking up a COI but I think we had to do that with Grosse Pointes like we are going to have to make hard choices." *Id.* at 6573.  Orton added, "I'm really uncomfortable with all the communities of interest we are cutting up." *Id.*  Adelson acknowledged those concerns, but said "if you look at those districts that were created, I mean there were some hard choices that were made.  And acute awareness of what the imperatives were but you created some districts that right now seem pretty strong. As far as Voting Rights Act issues and maintaining the ability to elect." *Id.* at 6575.  Orton remained concerned:  "So my feeling is I'm uncomfortable with the amount of communities and communities of interest that were are splitting up [] from a Voting Rights Act perspective." *Id.* at 6619.  Adelson responded at length:

> You know, just this discussion the last couple minutes really shows you know kind of being on the knife's edge in the sense of that I understand is very clear that you're weighing, competing considerations.  And I think that the issues about communities of interest and keeping sort of communities together are I've read a lot of public comments in general and I understand that that is a significant consideration. . . But I think it is very important from a compliance standpoint to look at the ranked criteria and the number one criteria is the U.S. Constitution and Federal law.

*Id.* at 6618-19.

On September 23, Commissioner Steven Lett drafted what became House District 26, west of downtown Detroit.  He asked for the racial-dots "thematic," drew the district boundaries, and ended with a black-voter population of 34.5%. *Id.* at 6724, 6726.  Rothhorn said that percentage

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

was "a little bit low," but Lett responded that Handley's report had said districts with those

percentages "elected a candidate of choice."  *Id.* at 6727.  Adelson interjected that in "Wayne

County, the percentage of the vote where a Black candidate would win at 35% VAP. Yes. Wayne

County performs in that respect . . . . So I think to your point, yes, according to Dr. Handley's

analysis that in Wayne County, Wayne County can elect candidates of choice at 35% VAP."  *Id.*

at 6727.

Then came a dissonant note, as Adelson conceded the importance of data from party

primaries.  He said:

> often in areas where there is a propensity to elect minority candidates of choice, the
> elections are often decided in the primary.  Rather than the general.  So having
> primary results to not compare with but to supplement general results is really
> important.  In my experience it's certainly something I've always been able to look
> at.  We had a lot of primary results in Arizona for example.  So I think that it is
> important to have.

*Id.* at 6729.  Orton asked, "will we get that information?"  *Id.*  But the discussion meandered

elsewhere and she did not get an answer.

That same day—September 23—General Counsel Pastula reminded the Commission that

"partisan fairness" was another criterion to consider.  She explained, though, that "partisan fairness

is measured on a statewide plan."  *Id.* at 6712.  That meant the Commission could measure partisan

fairness only when it finished a statewide plan, rather than as it went along.  Nor did the

Commission yet have a software tool to evaluate partisan fairness.  *See* R.112 at PageID 3675.

In that same meeting, Pastula gave the Commission some more specific BVAP numbers

that it should strive to meet:  "for Saginaw County looking at notes I have 40% to 45, Genesee was

35-40%. Saginaw is 40% so I wanted to make sure that I updated that from my prior statement.

And Oakland County I wrote 42-43% just to be different there but for Saginaw County 40% would

be the appropriate measure."  MICRC Tr. at 6768.  Orton said that recently she "could not get to

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

that threshold of the 35-40% or maybe it was 40% in that County"; Pastula responded that she

"would encourage the Commission to do their best efforts at this time." *Id.*

For the next several days, the Commission almost exclusively mapped outside of Detroit.

On September 28, the Commission completed its draft house map and saved it as Draft Map 183.

As relevant here, the districts that became House Districts 1, 7, 8, 10, 11, 12, and 14 had the

following BVAPs:

| District No. | | 1 | 7 | 8 | 10 | 11 | 12 | 14 |
|---|---|---|---|---|---|---|---|---|
| | Date | BVAP | BVAP | BVAP | BVAP | BVAP | BVAP | BVAP |
| House Map Plan 183 | 9/28/2021 | 28.62 | 79.04 | 54.09 | 42.74 | 65.66 | 43.74 | 38.33 |

4.

*September 29 to 30:  Revisions to House map.*  The Commission then revised its initial

maps with the aim of what Pastula called "compliance analysis." *Id.* at 7168.  The Commission

began with areas outside of Detroit, and discussed making changes based on the Michigan criteria

of "communities of interest," "partisan fairness," and not favoring incumbents. *Id.* at 7162-63.

Adelson then interjected:  "I also wanted to make the point that as you recall . . . I believe these

were the State House districts in the Wayne County area.  That several of them are . . . have the

appearance of being packed.  And that is something that must be addressed.  That is one of the

changes I envision."  He added, "I don't have a list of things . . . [an] inclusive list [that] must be

addressed.  But the [p]acked districts are [an] absolute." *Id.* at 7164.

The discussion then returned to mapping outside of Detroit, to different ways of measuring

partisan fairness, and to Dr. Handley's upcoming visit to the Commission—her first since the

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

outset of its map-drawing—to give a presentation on partisan fairness.  But Adelson again steered

the Commission back to "packing" and the VRA:

> your legal team agrees that Friday is significant in that Dr. Handley will hopefully
> be able to present partisan fairness.  But it is important and I'm sorry I'm going to
> speak for you.  I will speak in one voice that the legal team strongly believes there
> are issues in addition of course to the partisan fairness.  There are many voting
> rights issues and just in talking about the packed districts in Wayne County . . . So
> there are other considerations.  Certainly we agree with the partisan fairness and
> that is significant.  But there are other issues.

*Id.* at 7167.

At this point, the Commission began to revise house districts in the Detroit area, which

Szetela called "bacon strip districts," based on their shapes extending to the northern suburbs.  *Id.*

at 7194.  She then made changes to draft House Districts 14, 15, and 17—west of downtown

Detroit—and noted that she had lowered those districts' BVAPs:  "So you can see that [District

14] dropped from 74% African American to 61 . . . And then 15 dropped from 62.7 to 50.2.  And

17 dropped from 69.29 to 56.4."  *Id.* at 7198.  Adelson responded that the "percentages are still

higher than Dr. Handley's analysis but I think that is a good start to adjusting and to be more in

line with her racially polarized voting analysis and the ability to elect.  So while . . . the Black

population is still higher than her analysis determined it is still significantly improved from what

it had been previously."  *Id.*  Rothhorn asked, "Do we need to look at the election results?"  *Id.* at

7199.  Adelson responded, "as far as the election results, as I recall these districts all proved out

pretty well.  I think that I would recommend focusing on percentages and comparing them to Dr.

Handley's [BVAP] percentages for Wayne County which as I recall is 35-40%[.]"  *Id.*  He added

that the Wayne County districts required "additional tinkering" which "is going to impact

commenters' preferences on keeping communities whole."  *Id.*  "But," he reminded them, "the

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

Voting Rights Act is the number one criterion together with the one person one vote in the U.S. Constitution." *Id.*

The Commission followed Adelson's guidance, concluding that the only way to reach the BVAPs in Handley's report was to continue to stretch districts into predominately white suburbs. *Id.* at 7199-7200. For several Wayne County house districts Rothhorn suggested changes that would "better comply with [the] VRA bringing down the Black voting age population to a range that is closer to 40%." *Id.* at 7201. Adelson approved, saying the Commission was "figuring out the percentages [corresponding] with Dr. Handley's analysis." *Id.* at 7202.

Again, however, some commissioners raised concerns about the lengths they had gone toward that end. For example, Commissioner Dustin Witjes asked, "Looking at the districts we have, how much thinner can they get and how much further can they exten[d] out before they are one precinct or one actual voting precinct wide?" *Id.* at 7219. Commissioner Orton then expressed that she thought the house map was already "VRA compliant" in Detroit and that they should "pay attention to communities of interest" going forward. *Id.* at 7222. Commissioner Janice Vallette agreed. *Id.* at 7222-23. But Adelson said that the district that became House District 11 had a "64% non-Hispanic Black voting age population" and that the BVAP for what became House District 7 was "almost 77% non-Hispanic Black voting age population . . . these numbers are well in [ex]cess of what Dr. Handley analyzed. And in [ex]cess of what I've advised the Commission." *Id.* at 7223. Pastula agreed and "strongly encourage[d]" the Commission to "start fixing them." *Id.* at 7224.

But Commissioner Rhonda Lange was still focused on communities of interest. Specifically, she said, "I understand VRA []comes above other criteria but we have a criteria of community of interest so if we receive input of community of interest that says they absolutely do

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

not want to be split and that drives up the African/American population, then is there leeway in

that VRA because we are accommodating for a community of interest which is also part of our

state Constitution?"  *Id.* at 7225.  Adelson responded:

> your question goes right to the core of one aspect of redistricting there are
> competing values and there will be people who may be satisfied or not satisfied.
> But the bottom line is that if keeping communities of interest, not splitting them,
> having them implicates the packing of minority voters, the dilution of minority
> voters then the number one criteria is the Federal criteria . . . . the bottom line is the
> Federal criteria are the absolute priority.  And there may be communities of interest
> that are not able to be included in certain districts because they implicate Voting
> Rights Act problems.

*Id.* at 7225.

Pastula then recommended that the Commission identify any district "that is higher than

40% for the Black voting age population[,]" so that "those quote unquote fixes can be dealt with

and then this map can be ready for the partisan fairness analysis. . . . I would recommend that

anything with higher than 40% Black voting age population be looked at."  *Id.* at 7226-27.  Szetela

said, "I think what she is suggesting [is] we just go down the districts one by one and anything that

is over 40% look if we can rebalance it."  *Id.* at 7228.  Orton said, "this is a densely populated

minority population City so does that mean anything above 40% is not VRA compliant?"  *Id.* at

7229.  Szetela said, "Commissioner Lange, that is my understanding of what we are looking for is

we are trying to bring things down to 35-40%[.]"  *Id.*  Pastula then referenced Dr. Handley's report

and again offered concrete guidance:  "the range for Detroit was 35-40%, Oakland County was

above  40%.    So  it's  based  on  the  area  you  were  in,  that  is  why,  that's  why

. . . I flagged the 40%."  *Id.* at 7230.  She recommended that the Commission could "just make a

list and then go back and start fixing them."  *Id.*

The Commission then resumed mapping.  It started by revising what later became House

Districts 7 and 11 because they had the "highest" black-voter percentages at 76% and 64%,

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

respectively.  *Id.* at 7232.  Commissioner Curry first revised what became District 7, and acknowledged that she needed to "reduce" the black-voter population there to "40, 45" percent. *Id.* at 7234.  Curry made adjustments that "took out a lot of African/American population."  *Id.* at 7235.  Yet the BVAPs remained high, so Curry determined that the "only way to go is up north" to reduce them.  *Id.* at 7239.  She did so and reduced the BVAP for that district from "over 75% to about 60%."  *Id.* at 7240.  Commissioner Eid said that result was "not perfect but headed in the right direction."  *Id.*

Eid then revised what became House District 11, adding predominately white suburban areas, including Grosse Pointe Woods—which reduced the district's BVAP from 64% to 53%.  *Id.* at 7241.  But several commissioners again complained that they had disregarded what the public had said about preserving communities of interest in that area.  *Id.* at 7241-42.  Commission Orton, for instance, said "I still think we should try and keep the communities of interest together . . . . I hate to split them up."  *Id.* at 7242.  Eid responded, "I agree with you.  And I hate to split them up but I think for this house map I don't see another way to do it because that is where the white population is around Detroit . . . . we need to get [the map] to be compliant."  *Id.*  Commissioner Clark echoed Orton's critique saying, "that Section of Detroit at the public hearings [said] they did not want to be connected with Grosse Pointe."  *Id.*  But General Counsel Pastula responded that they should continue to strive to reach their "goal" of reducing the districts' BVAPs to the percentages listed Handley's analysis.  *Id.* at 7243.  Eid responded that "I will just continue to finish fixing this."  *Id.*

Around this time, Adelson and Pastula had sidebar conversations with Chair Szetela and Vice Chair Rothhorn.  According to Szetela, "the hammer came down on the Commission" and Adelson and Pastula said the Commission needed to "stop thinking about communities of interest,

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

to stop thinking about keeping municipal boundaries together" and instead "solely focus on race because we needed to bring these districts down."  R.112 at PageID 3662-63.

Accordingly, Szetela then developed an alternative map that brought "percentages down in most districts below 40%."  MICRC Tr. at 7270-71.  She presented this map to the Commission and said she "did what Mr. Adelson asked and tried to lower the numbers," but acknowledged that, to do so, she had created "some crazy sho[e] string districts."  *Id.* at 7271.

The Commission thereafter continued working on what became House Districts 10 and 11. Some commissioners observed that the districts had not yet reached the "35-40%" goal for Wayne County.  *Id.* at 7277.  Adelson responded that the changes were an "improvement" and that the Commission was "moving in the right direction" but was not "finished."  *Id.*  He encouraged the Commission to continue its "systematic approach" of "going down the list literally of the districts and looking at the voting age population."  *Id.* at 7279.

Later, Commissioner Kellom revised what became House District 8, reducing its black-voter percentage to 56.  *Id.* at 7279-80.  Adelson encouraged her:  "Well look at what you've done in just a few minutes.  You are diversifying the district and addressing [] the compliance concerns." *Id.*  He then told the Commission to "keep to that systematic approach."  *Id.* at 7281.  But some commissioners sought further guidance.  Commissioner Eid, for instance, asked, "What is the highest percentage [a district] can be to fend off legal challenges in the future?"  *Id.* at 7283. Adelson, referring to what became House District 8, said "there is no like absolute magic bullet . . . but 53.85% yes, it's an improvement."  He added, "my feeling is that there is more to be done here.  Because I am [loth] to just say creating 54, 55, 56% majority minority districts in an area that analysis is determined, Black voters can elect at percentages lower.  I'm not prepared to do that."  *Id.* at 7283.

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

The Commission then reduced the black-voter population in several districts by connecting downtown African-American communities with still more suburban ones.  That led Szetela to tell the Commission that "I think we can accomplish what Mr. Adelson is suggesting we do.  It's just going to require a little creativity."  *Id.* at 7343-44.  Later, Commissioner Clark commented on the development of the map:  "we took those spokes and went so far north and so far west. . . . But it's a tradeoff.  I mean we have to get compliant so we have to do something and we made the decision to go the route with the spokes."  *Id.* at 7348.  By the end of the day on September 30, the Commission had produced Draft Map 193.

| District No. | | 1 | 7 | 8 | 10 | 11 | 12 | 14 |
|---|---|---|---|---|---|---|---|---|
| | Date | BVAP | BVAP | BVAP | BVAP | BVAP | BVAP | BVAP |
| House Map Plan 183 | 9/28/2021 | 28.62 | 79.04 | 54.09 | 42.74 | 65.66 | 43.74 | 38.33 |
| House Map Plan 193 | 9/30/2021 | 36.58 | 66.54 | 50.37 | 58.44 | 49.23 | 43.74 | 39.21 |

The next day, the Commission paused mapping while Dr. Handley gave a presentation on partisan fairness.  She provided several metrics to measure partisan fairness and presented "some political fairness scores for some of the plans" the Commission had already drawn.  *Id.* at 7375.  Handley said she was "surprised and pleased" to see that their efforts "to adjust the VRA numbers" were "producing better measures" for partisan fairness.  *Id.* at 7410.  She also explained that the mapping specialists were developing a partisan-fairness tool that "was almost ready" and which would allow it to "run political fairness reports whenever you have a plan that you want to run it on."  *Id.* at 7375.

Dr. Handley also reiterated Pastula's point that this analysis "can only be done off of a complete plan."  *Id.* at 7380.  And Handley, Adelson, and Szetela reminded the Commission that

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

the state constitution elevated other criteria, including "compliance" with the Voting Rights Act, over partisan fairness. *Id.* at 7382, 7386-87.

5.

*October 4:   Revisions to Senate map*.   On October 4, the Commission began its "compliance analysis" of the senate map.  At first some commissioners were confused, thinking they had already drawn a VRA-"compliant" senate map.  Adelson was absent at this time, but General Counsel Pastula said that Adelson "didn't sign off" on the senate plan and that it would be "an excellent use of time" to "get those Metro Detroit districts closer to the 30 to 40% [BVAP] range." *Id.* at 7436, 7440.  She reiterated her earlier guidance:

> I wanted to also address again the narrative that 50% minority is the—that is not the courts have not supported that wholesale adoption of 50% or 51%.  What Dr. Handley's racial bloc voting analysis has given the Commission is the benchmarks and the guide rails for each of the Counties that need to be adjusted.  [In] Wayne County [it] is 35-40%.  Genessee is 35-40.  Saginaw is 40-45%. And Oakland County is 42, 43%. Again that would provide the opportunity to elect. So you don't need districts with 60% minority voting age population in any of those four Counties to achieve compliance.

*Id.* at 7440.  Pastula referred to these percentages as "the goals identified [] by your racial bloc voting analysis. And the interpretation by your Voting Rights Act counsel," meaning Adelson. *Id.* at 7441.  Clark expressed frustration with this goal, responding: "Now [I] know they want it lower but sometimes you just can't do that because of the distribution of the people." *Id.* at 7439. Rothhorn replied:  "I think what we can interpret from [our legal counsel's] advice is if we don't try to get to 35%, we have not done our due diligence and therefore we may be exposing ourselves to a legal risk we might be able to defend ourselves against but can't guarant[ee] that." *Id.*

The Commission duly started to revise its senate map.  Commissioner Vallette worked on what became Senate District 10, employing the spoke technique to stretch the district "back up north" to reduce its black-voter population. *Id.* at 7441-42. Rothhorn approved: "Looks like [the

27

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

district] has reduced from 47.3 to 45.8 so you are definitely heading in the right direction, Janice."

*Id.* at 7442.  Rothhorn also asked Vallette to consider communities of interest as she drew the

district.  *Id.* at 7444.  But Witjes interjected:  "Don't worry" about the "community of interest

. . . That should [] not [be] something we're looking at.  We should be going into looking at just

complying with the Voting Rights Act."  *Id.*  Commissioner Vallette soon finished working on the

district, and Szetela said:  "Brought your African/American [population] below 40%.  So now you

are perfectly in the sweet spot of 35-40."  *Id.* at 7446.

Next, Commissioner Richard Weiss adjusted what became Senate District 3.  Rothhorn

said  "we are currently at 43.25 so you want to try to get it to 35-40" BVAP, and reminded him

that "we are not focusing on COI."  *Id.* at 7446-47.  Szetela also suggested that Weiss try and find

"more white populations" and that his "best bet is going to look up along the border into Oakland

County."  *Id.* at 7447.  Weiss did so; as he reached into Oakland County, Commissioner Lett

interjected, "What's the target for Macomb? Oakland[.]"  Rothhorn responded, "Oakland County

the target is 42 to 43ish."  *Id.* at 7449.  Weiss reduced the black-voter population, finished drafting,

and again Szetela said, "you are in the sweet spot at this point."  *Id.* at 7450.

Commissioner Witjes then revised what became Senate Districts 6 and 8.  *Id.*  As with the

other districts, he sought to dilute the black-voter population in each by "going north."  *Id.*  In what

became District 8, for instance, he drew the district north to include the entire the city of

Birmingham—one of the wealthiest communities in Michigan, where the median household

income is $151,556—thereby uniting it with portions of Detroit, where the median household

income    is    $37,761.    Birmingham    city,    Michigan,    U.S.    Census    Bureau,

https://www.census.gov/quickfacts/fact/table/birminghamcitymichigan/PST045222 (last  visited

Dec.    21,    2023);    Detroit    city,    Michigan,    U.S.    Census    Bureau,

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

https://www.census.gov/quickfacts/fact/table/detroitcitymichigan,MI/PST045222 (last visited Dec. 21, 2023).

Commissioner Clark was alarmed, saying, "When you go into Birmingham, we are stretching this thing all the way from mid-Detroit all the way up there." *Id.* at 7451. Szetela replied, "What other way is [there] to get VRA [compliance]?" *Id.* Rothhorn observed: "Started [at] 57.32 now we are 44.13 nice work." *Id.* at 7453. Witjes asked, "What does it need to go down to?" *Id.* Szetela answered, "Wayne is 40 ideally. 35-40%." *Id.* Witjes then reduced what became District 8's black-voter population to 41.77%, and began working on what became District 6. *Id.* at 7455. Szetela said he should "balance" the district by going north: "you're going to bring it into Farmington and that will reduce your African/American population." *Id.* Witjes managed to reduce the district's black-voter population to 40.7%. *Id.* at 7464. He explained: the "rationale for these adjustment[s] this is taking into account the Voting Rights Act and looking at the voting age population and the Black voting age population to make them so that they . . . so the districts are able to elect candidates of choice." *Id.*

At this point, as before, some commissioners aired concerns. Eid said, "I don't like splitting up Canton and I don't like splitting up Farmington . . . . if we have to split both of them, we have to split it but I would rather them be whole." *Id.* at 7468. Curry added that what became Senate District 1 looked "crazy" and "terrible," and said, "I mean it just looks like somebody just said well we don't care about Detroit." *Id.* at 7469. Rothhorn responded, "I think the reason it's drawn if my understanding is correct Commissioner Curry it's related to the VRA. Right where the white and Black populations are balanced." Curry retorted, "It may be balanced but it looks too crazy." *Id.* Sarah Reinhardt, attending on behalf of the Michigan Secretary of State's office,

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

then reminded the Commission that compactness was the state constitution's "lowest ranked criteri[on]."  *Id.* at 7470.

The Commission thereafter revised what became Senate Districts 5, 6, and 13.  *Id.* at 7470. Because the districts bordered one another, the black-voter population fluctuated as commissioners made changes.  *See e.g.*, *id.* at 7470-76.  Ultimately, though, the Commission continued to lower the percentages towards the goals provided by Adelson and Pastula.  As this process went on, Commissioner Curry continued to express concern about splitting up communities of interest.  But Rothhorn responded that, "the reason I think we are trying to split it is we are trying to get the numbers that we were given from Dr. Handley at 35% with the Black voting age population that is 35%[.]"  *Id.* at 7480.  Adelson agreed, saying "as you know it's very important if not essential that Dr. Handley's analysis be followed for compliance."  *Id.* at 7481.  He added, "the Supreme Court has made it very clear that if you pack voters, if voters are put in a District in [ex]cess of what racial bloc voting analysis shows, that's an issue.  And I know we have talked about that. And we are going to continue to adhere to it."  *Id.*

Adelson later said the Commission should not try to adhere to single number of "35%, 45%"; instead, he said, "having a range, 35-40%, 40-45%, yeah, I think that's more advisable." *Id.* at 7482.  Eid then responded with his own doubts about the premises of Handley's analysis:

> I'm becoming increasingly uncomfortable with this direction that we're going under.  Because while it is unpacking the districts you know we don't have any District that is close to 90%, 70% or even 60%.  But you know the numbers that we are hitting it just makes me question how is that going to work with actually electing a candidate of choice.  And I think part of the problem I have with this understanding is the analysis did not include primary election results.  So like if we look at District 17 here.  We have it at 35.14% Black voting age population.  If you have a primary election where there is two Black candidates and a white candidate how is it that you know the candidate of choice is actually going to get elected? I understand that in the general election, yes.  All of these districts that we draw are going to be democratic districts.  But that's not where the choice actually happens in these areas.

30

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

*Id.* at 7483.  Adelson acknowledged that the Commission had data for only one statewide primary election—"the 2018 gubernatorial primary," which Handley had said was not probative in her analysis—but Adelson said "we have to work with what we have."  *Id.* at 7485.  He added that this circumstance "is something that is a little different for me.  I really have not been in a situation where so few contested primary elections are on the table."  *Id.*

Later, Adelson used the bellwether-elections tool (which one could fairly call a "general-elections tool") to check the Commission's work.  Again he found that African-American "candidates of choice prevail" in what became Senate District 10.  And again he said that "it's important to remember the U.S. Supreme Court has been absolutely clear that if you put additional minority voters into a District beyond what is needed to elect candidates of choice that's an issue." *Id.* at 7489.  (Adelson never provided any legal support for that assertion.)

During this process, Adelson approved the "42-43%" goal for Oakland County, calling it a "good kind of benchmark guidepost."  *Id.* at 7495.  He also told the Commission that—unlike Congressional plans, for which the Supreme Court requires the population of each district to be very nearly the same—the Commission had "a lot more leeway" to deviate from that rule in drawing state legislative districts.  *Id.* at 7500.  Adelson also said he approved of changes the Commission had recently made.  *See, e.g., id.* at 7509.  Eid said the opposite:  "I don't like the changes at all," adding, "while it's better for or might be better for VRA reasons it's really much worse for community of interest reasons."  *Id.* at 7510.  But Rothhorn reminded him that the "VRA" was "criteria number one," adding, "I know it hurts believe me."  *Id.*

The Commission then determined that it had achieved its VRA compliance goals.  Only then did it turn to partisan fairness and "compactness" considerations.  In doing so, however, the Commission focused almost exclusively on districts outside of the Detroit area.

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

The Commission accordingly made no further changes to the Detroit-area districts and saved its new draft as Draft Map 199.  The number of districts with black-voter population percentages above 50% now stood at zero—making Draft Map 199 "an almost final map."  R.112 at PageID 3677.

| District No. | | 1 | 3 | 6 | 8 | 10 | 11 |
|---|---|---|---|---|---|---|---|
| | Date | BVAP | BVAP | BVAP | BVAP | BVAP | BVAP |
| Senate Map Plan 162 | 9/13/2021 | 10.98 | 50.82 | 76.56 | 63.77 | 18.1 | 7.8 |
| Senate Map Plan 165 | 9/15/2021 | 34.86 | 44.87 | 51.99 | 59.06 | 49.38 | 11.02 |
| Senate Map Plan 199 | 10/04/2021 | 36.73 | 43.35 | 40.03 | 42.45 | 41.20 | 18.42 |

6.

*More house revisions.*  The House map still had some districts with BVAPs above 50%, however, and on October 5, the Commission returned to revising it.  The Commission decided to use the "same process" it did in the senate, "going District by District looking at VRA[.]"  MICRC Tr. at 7639.  As before, the commissioners used the "African/American dots" tool to help them see black-voter populations as they mapped.  *Id.* at 7640.  The first to draft that day, Commissioner Weiss, told the mapping specialist he did not want to use the software's neighborhoods overlay— a tool for keeping neighborhoods whole if the Commission so chose—because "we are looking at VRA."  *Id.* at 7642.  He then adjusted the district based primarily on its black-voter population percentage.  *Id.*

Next up, Commissioner Witjes worked on what became House District 10.  *Id.*  He too focused on bringing the black-voter population in line with Adelson's prior guidance.  *Id.*  Szetela

32

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

commented on his adjustments: "Brought it down quite a bit," and "we have room to go north." *Id.* at 7463. Witjes brought the percentage "below 40%" and asked whether the "40% sweet spot still appl[ies]." *Id.* at 7644. Adelson replied, "I think providing leeway, a little cushion here . . . is important." *Id.* In what became District 11, however, Witjes' changes had increased the black-voter population above 50%. *Id.* at 7646. Clark asked, "Would it be acceptable to keep it that way?" *Id.* Adelson responded, "Looking at [what] the law says and what Dr. Handley analyzed and Dr. Handley's analysis is in Wayne County BVAP and Black voters can elect candidates of choice at 35% . . . . if you make a District a majority minority District . . . you get into more involved attempts at justification." *Id.* Clark replied, "But you can't change the places where these people are living. I mean it's so concentrated." *Id.* Adelson answered, "there are some limitations about what you can do. But having a population that is more than 20 points above what Dr. Handley analyzed [] raises my eyebrow. So to the extent it can be done absolutely. And if it's impossible or unreasonabl[e] then that is [a] justification [we] have to deal with but until that point, I think making reasonable efforts at what the Voting Rights Act and the courts say and what Dr. Handley analyzed I think that that's important." *Id.* Witjes then continued mapping, sought to bring the percentages in both districts into line with Adelson's directives, and succeeded. *See id.* at 7647-48. Adelson then checked the districts using the bellwether-elections tool and (as in every other instance) confirmed that "they all performed." *Id.* at 7650-51.

As commissioners continued to revise the other Detroit-area districts, Adelson and Pastula repeatedly reminded them of their targeted black-voter population percentages. *See e.g.*, *id.* at 7652. Adelson, for example, said, "remember it's 35-40% in Wayne County. 40-45% in Oakland." *Id.* at 7653. The commissioners commented along the same lines as they worked. For example, Szetela told Clark that "when you add African/American population" to a district "you

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

have to take some off somewhere else." *Id.* at 7655. Clark followed her advice and Szetela

observed, "you are down to 48 now 47" percent black-voter population. *Id.* at 7656. Adelson

applauded the effort: "Commissioner Clark, I think your adjustments have really made a lot of—

have a lot of positive effect." *Id.* The Commission then worked further to "dilute," as

Commissioner Lett put it, the black-voter populations in what became Districts 1, 7, 8, 10, 11, 12,

and 14. *See id.* at 7642-7679.

At this point, Dr. Handley joined the meeting remotely and gave the Commission a second,

brief presentation on partisan fairness. For the most part she discussed some other states' plans

that scored badly on various partisan-fairness metrics. Pastula said, "none of the plans that the

MICRC has put through have come close to those numbers . . . so that is very good news for the

Commission indeed." *Id.* at 7683. The Commission then returned to revising house districts

outside the Detroit area. At the end of the day on October 5, the Commission saved their House

map as Draft Map 204. By that point, they had reduced the number of Detroit-area districts with

BVAPs above 50% to zero.

| District No. | | 1 | 7 | 8 | 10 | 11 | 12 | 14 |
|---|---|---|---|---|---|---|---|---|
| | Date | BVAP | BVAP | BVAP | BVAP | BVAP | BVAP | BVAP |
| **House Map Plan 183** | 9/28/2021 | 28.62 | 79.04 | 54.09 | 42.74 | 65.66 | 43.74 | 38.33 |
| **House Map Plan 193** | 9/30/2021 | 36.58 | 66.54 | 50.37 | 58.44 | 49.23 | 43.74 | 39.21 |
| **House Map Plan 204** | 10/05/2021 | 41.63 | 39.85 | 40.72 | 42.68 | 47.37 | 49.89 | 42.80 |

The Commission completed further revisions to the house maps on October 6, but these

did not affect the Detroit-area districts. *See id.* at 7726-34.

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

7.

*"Compliance" analyses.*  From October 6 to 11, the Commission did a partisan-fairness

and population-deviation "compliance analysis" of its draft house and senate maps.  *See, e.g.*, *id.*

at 7733-34.  It began with the draft house map.  From the start, the Commission recognized that

by "achieving VRA compliance we did get better partisan fairness scores."  *Id.* at 7735.  It then

decided to take a "systematic approach" to improve those scores.  *Id.*  In doing so, however, the

Commission also decided that since the districts in Detroit were "drawn that way for VRA reasons

[it] might be a better idea to look at the other areas outside of Metro Detroit" to improve those

metrics.  *See id.* at 7737-81; 7867-77.  Later, Adelson echoed this point:  "my suggestion is we

avoid districts that have VRA implications" and that the Commission work on "districts that are

not in the Metro Detroit area."  *Id.* at 7781.  The Commission followed this guidance:  "we do not

want to mess with 17, 14, because those are the VRA districts", *id.* at 7782; "The reason I didn't

[change those districts] is because they are two VRA districts", *id.* at 7785; "This was a VRA

District that we tried really hard to get it as high as possible African/American vote.  And we had

lots of comments from Mr. Adelson that we should keep it as good as we got it", *id*. at 7802; "I

don't want to go back into Detroit.  I think it's a spider's web to try to sort out again.  I think we

got it as I recall the way we want it", *id.* at 7816.  This approach worked and changes in other areas

improved the maps' partisan fairness metrics.  *See id.* at 7826.

The Commission simultaneously addressed population deviations in their draft plans.  As

to the so-called "VRA districts," however, Adelson repeatedly told the Commission not to worry

too much about population deviations, reiterating that "VRA compliance is a legitimate rationale

for population[] deviations."  *Id.* at 7835.  He then recommended "looking at districts first that are

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

out of the VRA semicircle . . . . And then we can see where we are at that point." *Id.* Again, the

Commission followed his advice and reduced the population deviations in districts outside of the

Detroit-metro area. *See, e.g., id.* at 7836-52; 7896-7902.

The Commission then turned to the draft senate map, addressing partisan fairness and

population deviations simultaneously "to kill two birds with one stone." *Id.* at 7960. As before,

the Commission sought to avoid significant changes to VRA districts: "14 was drawn that way

with Pontiac for VRA reasons so we might not want to change that one too much", *id.* at 7960;

"Are we identifying also VRA districts where we want to not change the deviation?", *id.* at 7961;

"Before any changes are made maybe we should jot down the VRA numbers just to make sure we

don't mess something up", *id.*; "That is a VRA let's put a check on it and move on", *id.* at 7976;

"We decided we had that as good as we could possibly get it for VRA and did not want to touch

that at all. So I think we have to undo that", *id.* at 7983; "there was something about 11 that we

need to be careful of. But it does not seem to be a VRA District", *id.* at 8044; "District 11 did not

have a significant Black age voting population, right?", *id.*; "I just wanted to point out that several

of these districts are delicately balanced as far as minority population . . . . Just as an FYI as the []

adjustments are being made", *id.* at 8046; "we are not going to be able to get [perfect partisan-

fairness scores] because of how we have drawn some of the VRA districts to be compliant . . . . So

I think this is a good map", *id.* at 8053. The Commission eventually made small changes to what

became Senate Districts 1, 3, 10, and 11. *See id.* at 7987-88. As it did so, however, the

Commission continually checked its racial-percentages tool to ensure that it did not compromise

its VRA goals. *See, e.g., id.* at 7991-94.

Later, the Commission returned to the draft house map and made further revisions to

improve partisan fairness and population deviation. *Id.* at 8074. Again it focused on districts

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

outside of Detroit.  *See, e.g.*, 8074-8081.  The Commission was careful to avoid moving black-voter population percentages out of the target ranges.  *See, e.g., id.* at 8081-86.  But it found (as Orton pointed out) that the "VRA districts that we worked so hard on" had caused the largest population deviations.  *See id*. at 8087-88.  Orton said "I just have to accept [the deviations in VRA districts] . . . I mean we may be able to make some improvements but I don't think we will be able to change the plan deviation."  Clark agreed.  But Adelson again reassured the Commission that "compliance with the Voting Rights Act" was a "legitimate state justification" for the deviations.  *Id.*

Yet Szetela thought they could reduce deviations in VRA districts without "making changes to the VRA levels[,]" because "we know where the African/American population is" around those districts.  *Id.* at 8089.  Witjes pushed back, saying these districts "were carefully crafted with VRA in mind.  So if we were to start messing with that, we could be opening up another can of worms."  *Id.*  at 8090.  Szetela persisted and she (and other commissioners) later made small changes to what became House Districts 10 and 11, among others.  *See id.* at 8090-91.  But the Commission made sure those changes did not move the black-voter population percentages beyond Adelson's numbers.  *See, e.g., id.* at 8090-8102.  Throughout this process, commissioners frequently used the racial-dots tool and referred to the "African/American" or "Black voting population."  *See id.* at 8102-03.  After one such reference, Adelson (seemingly for the purpose of the record) interjected:  "The changes that are being made have nothing to do with race.  Race is not predominating these decisions as you are trying to equalize your population deviation."  *Id.* at 8103.

Remarkably, by negative implication, Adelson then suggested that race *could* lawfully predominate when drawing the so-called VRA districts:  "So if decisions were being made[,] *if*

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

*race was the primary consideration without having anything to do with the VRA, that is another*

*issue*." *Id.* at 8104 (emphasis added.)  But these changes, Adelson said, were "deviation related."

*Id*.

By the end of October 8, the Commission had completed Draft House Plan 227, which it

later named "Pine."

| District No. | | 1 | 7 | 8 | 10 | 11 | 12 | 14 |
|---|---|---|---|---|---|---|---|---|
| | Date | BVAP | BVAP | BVAP | BVAP | BVAP | BVAP | BVAP |
| **House Map, Pine** | 10/08/2021 | 41.63 | 39.85 | 40.72 | 42.05 | 48.00 | 49.89 | 42.80 |

The Commission had also completed Draft Senate Plan 220, which later it named "Cherry."

| District No. | | 1 | 3 | 6 | 8 | 10 | 11 |
|---|---|---|---|---|---|---|---|
| | Date | BVAP | BVAP | BVAP | BVAP | BVAP | BVAP |
| **Senate Map, Cherry** | 10/07/2021 | 37.04 | 42.84 | 40.64 | 42.45 | 36.63 | 20.02 |

Neither map had any Detroit-area districts with black-voter populations above 50%.

C.

*Public reaction to the draft plans.*  The Commission then commenced a new round of

public hearings throughout Michigan; the one that matters here was held in Detroit, at the TCF

Center, on October 20.  Before that hearing, however, Detroit-area current and former state

lawmakers, along with other community leaders, held a press conference in which they sharply

criticized the Commission's proposed maps.  *See* Pl.'s Ex. 130 at 2.  A news publication reported

that one legislator said, "[t]he commission has drawn zero [black majority districts], and that's an

unacceptable change . . . . That doesn't elect Black candidates, it doesn't do Black people any

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

good, it is not helpful to our community, it is not helpful to our issues." *Id.* at 3.  Another legislator

said, "The current plans have diluted our voting bloc . . . .  It will potentially take away all Black

representation, potentially all Detroit representation." *Id.* at 4.  The president of the Detroit Branch

of the NAACP added, "We want maps that reflect who we are." *Id.*

Likewise, in the days before the TCF hearing, Michigan State University's Institute for

Public Policy and Social Research published an analysis of the Commission's proposed plans.  Its

conclusions were unequivocal.  The draft Senate plans, it said

> are extremely unusual in engineering maps without a single majority-Black
> district. . . . These maps appear to deliberately dilute concentrations of Black voting
> age population above 50%, to create instead as many districts as possible in which
> the Black vote constitutes a large majority above 35%. . . . [T]he probability that
> plans like these without a Black-majority district arise by chance are remote.
> Rather, these plans' outcome with no majority-Black district, and twice as many
> districts with a large minority of Black voters as in most other plans, is attained by
> design, following the advice to the Commission formulated by its VRA Legal
> Counsel [*i.e.*, Adelson] and its VRA Consultant [*i.e.*, Handley].

*See* Jon X. Eguia, "Michigan Redistricting Draft Map Analysis," at 46,

https://ippsr.msu.edu/sites/default/files/SOSS/IPPSRRedistrictingReportvOct20v1.1.pdf   (last

visited Dec. 21, 2023).

The MSU Institute's assessment of the House plans was similar:

> The 2011 redistricting map arguably packed Black voters around Metro Detroit so
> that the number of such Black-majority districts increased to eleven . . . These
> [proposed] plans go in the opposite direction to an extraordinary extreme, arguably
> cracking the large majorities of Black voters to studiously avoid configuring a
> single district that would cross the 50% threshold of Black voters.  By diluting the
> concentration of Black voters in the districts with the greatest share of them, these
> plans manage to generate an improbably high number of districts with over 40%
> and over 35% of Black voters.

*Id.* at 64.  In summary, the Institute concluded, the "absence of majority-Black districts is

extraordinary, and impossible to arise except by careful design." *Id.* at 75.

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

The reaction of Detroit residents at the TCF hearing itself, one can fairly say, was vociferous.  Over the course of nine hours, more than 200 residents commented on the proposed plans.  Most commenters were highly critical; a plurality of them complained specifically about cracking and the absence of any black-majority districts.  A handful of examples are enough to convey the hearing's tenor.  A former state legislator said, "it was not for you to peel off parts of Detroit and throw them in communities we have nothing in common with. Bloomfield Hills, Birmingham, Canton, Farmington, Madison Heights, New Baltimore and Sterling Heights.  How can we advocate for the community when we are cracked into eight parts[?]"  *Id.* at 8223.  Another commenter said, "Your plan for the next ten years denies Black [and] Brown [people] in Michigan the opportunity to select representatives from their neighborhoods to send to Lansing."  *Id.* at 8218.  Another said:

> I'm really outraged at the way these maps are breaking up the north end and eliminating the political power of the people in the City of Detroit. . . .  It's unfair. Put the north end back together. Keep it intact. Boston Edison, Hamtramck, Highland Park east side of Detroit, Senate District 2 now includes even the Grosse Pointe areas.  Don't immigrate us to negate us and leave Black districts intact.

*Id.* at 8256-57.  Another Detroiter said:  "We know that you can draw better maps for Black Michiganders.  Honor the Voting Rights Act to ensure Black people are able to elect leaders that look like themselves.  Let's not return to the Jim [C]row politics of old."  *Id.* at 8215.  Another said, "we want to ensure that Black folks are kept [a] majority minority [in] our districts."  *Id.* at 8220; *see also, e.g.*, *id.* at 8233, 8241, 8261, 8320.  Another cut to the heart of their complaints, saying a "majority of Black Detroit deserves the chance to be represented by Detroiters.  Not just people that might share [a] political party."  *Id.* at 8222.

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

Some commenters made legal observations.  The Executive Director of the Michigan Civil Rights Commission, for example, told the commissioners that its draft Detroit-area districts "violate Federal civil rights law":

> They dilute majority minority districts and strip the ability for minority voter to elect legislatures [that] reflect their community and effect any meaningful opportunity to impact public policy and law making.  If you approve any of your maps, we believe that you will be violating both Federal statutory and case law.

*Id.* at 8264.  And an NAACP member cited a legal rule about which the Commission had heard very little during its own meetings:  "[W]e do not appreciate the way the maps have been drawn to date.  We want to remind you that the 14th [A]mendment prohibits legislatures and this Commission from engaging in both intentional and race[] based voter dilution and racial sorting."  *Id.* at 8303.

### D.

*The "closed session."*  On October 27—nine days before its November 5 deadline for publishing maps ahead of the 45-day public comment period—the Commission held its first meeting after the TCF hearing.  It promptly voted to go into "closed session" (meaning closed to the public)—something it had never done before—to discuss two purportedly "privileged and confidential" memoranda from Adelson.  *Id.* at 8754.  The meeting was not transcribed at the time; but it was recorded.  (The Michigan Supreme Court later ordered the recording to be made public.)

General Counsel Pastula began the meeting by announcing the "rules of the closed session," namely that "none of the discussion topics or documents may be shared outside of this room."  R.126-1 at PageID 4571.  The commissioners had been told to sign a confidentiality agreement:  Pastula said, "everyone [has] received the confidentiality agreement," and told the commissioners to return to their signed copies to her or Sue Ann Hammersmith, the Commission's

41

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

Executive Director.  *Id.*  Adelson—who did not attend the TCF hearing—then took the floor,

saying among other things:

> We [*i.e.*, himself and Pastula] have become concerned that there is so much
> misinformation out there.  We wanted to have an opportunity to set the record
> straight in a sense, provide our advice, provide you with information about what
> the law actually says[.]"

*Id.* at PageID 4573.

Adelson insisted that the VRA "does not require any numerical amount of majority-

minority districts; indeed, does not even require majority-minority districts at all."  *Id.* at PageID

4572.  The public comments to the contrary at the TCF hearing, Adelson said, were "woefully

misleading."  *Id.* at PageID 4578.  Throughout the closed session, Adelson and Pastula variously

described these comments as "infused with either misinformation or lack of information," based

on "specific agendas," and "flat out incorrect."  *Id.* at PageID 4578, 4596, 4608.

Adelson also discussed the lack of primary data available to the Commission during its

mapping process.  But he reassured the commissioners that, "while primaries can provide useful

information, please be advised that . . . they're not necessarily dispositive."  *Id.* at PageID 4577.

Adelson also discussed the importance of the Commission's record for the purpose of any future

litigation challenging the maps, saying:

> one of the things we have to stress, emphasize, insist on, plead, beg and say please,
> please don't use phrases about adding black people, subtracting black people,
> adding white people, subtracting white people.

*Id.* at PageID 4579.  He added, "one of the reasons we wanted to have this session is that in looking

to the future, looking over the next eight days, we don't want to give people out there specific

paths to challenge what you're doing.  Remember . . . legally, race cannot predominate

redistricting.  It can be one factor of many."  *Id.*

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

Adelson then referenced one of the Commission's earlier decisions to keep together
communities of interest in the Flint area. *Id.* at PageID 4580-81.  He said that "a path forward"
for the Commission might be to mimic that approach in the Detroit-area districts, "rather than
focus on race predominantly." *Id.*   Eid asked, "so, how do we do that without packing the
districts?" *Id.*  Commissioner Kellom replied:

> I think what I hear Bruce saying is the rhetoric and language that we use to justify.
> So, like, what we're actually doing in reunifying folks is of course, we're putting
> certain races together, we know that.  But then what we say is that we're observing
> the fact that these areas are uniquely different, like when we think about Detroit.
> So we're not using the language that is going to question the maps when it gets to
> that point.  So I think if we go back and look at the cultural aspects and the
> neighborhoods . . . the places that are completely black [laughing] just saying it like
> that, um, will be, the undertones will be accomplishing what folks want but doing
> it in a way that still upholds our criterion.

*Id.* at PageID 4581-82.  Adelson suggested that the commissioners focus their future discussions
on keeping "neighborhoods" and "communities" whole. *See id.* at PageID 4582-86.  Orton echoed
his advice: "when we're talking about this, if we choose to put anything together that we currently
have separated, we go back to the communities of interest, it's a communities of interest thing not
a VRA thing." *Id.* at PageID 4588.  Clark then replied to Adelson:

> Detroit's different.  And so your comments were—it appears to be a neighborhood
> issue and they want to have the neighborhoods consolidated.  So we can do that and
> make minor modifications to the districts we've done.  But that to me doesn't fix
> the problem that they [Black voters] were complaining about.  The problem they
> were complaining about was, in my mind, was that the districts didn't give them
> [Black voters] the opportunity to elect.  And so changing just the neighborhoods,
> it's not going to change that problem.  So the way to change that would be to make
> the districts compress them so that more of the blacks are in Detroit.

*Id.* at PageID 4594.  Commissioner Lett offered a suggestion about how the Commission could
make changes to Detroit-area districts:

> [C]ommunities of interest was created as a nebulous criteria that the redistricting
> commission could use later as cover for whatever map it draws. Communities of
> interest is a will-o'-the-wisp.  It's a wreath of smoke. It can be whatever is

43

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

> necessary, the crucial thing is who decides what a community of interest is that gets preserved. The answer? The Commission does. Who gets to review that? Frankly, nobody does. It's up to them. Was it originally intended? Yes. It was built in as nailing Jell-O to the wall. . . . that's what we can use now to justify what we're doing. And it's in the amendment. They put it in there. So let's use what we got.

*Id.* at PageID 4602. Lett concluded by saying the Commission could use communities of interest to "provide ourselves with cover. We can do it. Tomorrow." *Id.* at PageID 4602-03. Commissioner Eid responded: "I agree with everything Steve [Lett] just said." *Id.* at PageID 4603-04.

But Kellom said, "I can't ignore the people that are talking about how Southfield is ripped up, and that is true. How Palmer Park is ripped up, and that is true . . . . the Detroit area is jacked up and we need to change it. And I don't want us to sit here and start think about ways we can keep it the same." *Id.* at PageID 4607. Lett reassured Kellom: "Nobody in this room is saying we can't go in and make changes. The only thing that we are saying is when we make those changes, we need to be cognizant of the VRA and how we're doing that." *Id.* at PageID 4612. Pastula added, "I would strongly advise you to listen to your lawyers" on this topic. *Id.* at PageID 4613. Orton agreed and reminded Kellom: "remember the wording. This can fall under communities of interest." *Id.*

As the closed session wound up, Clark then reminded the other commissioners: "Anything discussed in this room today should stay in this room period . . . . Not discussed with anybody." *Id.* at PageID 4617. Pastula then reminded them all to return their signed confidentiality agreements. *Id.*

## E.

*Post-TCF changes.* Over the next week, the Commission finalized its draft senate and house maps. The Commission made minimal changes to the draft senate maps, none of which

44

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

substantially affected the BVAPs in Detroit-area districts.  *See* R.112 at PageID 3677-78; MICRC

Tr at 8919-47, 9003-15.  According to Szetela, however, Kellom and Rothhorn came to her and

said they "wanted to increase the black voting age population" some Detroit-area house districts

and that they had "had a discussion with Bruce Adelson that they could do that as long as they

used neighborhoods as the basis."  R.112 at PageID 3718.

On November 2, the Commission began revising the draft house maps.  *See* MICRC Tr. at

9157.  At first, commissioners made only "small changes" to improve metrics such as population

deviation.  *See, e.g., id.* at 9164-9200.  But then Rothhorn announced that he and Kellom had been

"working together" on an "overlay" that included some "major changes" to certain Detroit-area

districts.  *Id.* at 9199-9201.  Kellom and Rothhorn said that they had done so because they were

concerned about the comments the Commission had received at the TCF hearing, and wanted to

"honor[] our third criteria of diversity and COIs."  *Id*. at 9199-9204.  Orton asked whether the map

affected "VRA districts."  *Id.* at 9202.  Kellom responded, "yes"; but Rothhorn said, "yes and no

we don't know if we got it right.  It's more communities of interest changes."  *Id.*

The Commission decided to create an alternate map based on Kellom and Rothhorn's

overlay.  To do so, it deleted most of the districts in Detroit and drew new ones based on the

overlay.  *Id.* at 9202.  As the draft progressed, Kellom explained that their map "honors the COIs"

by reuniting "some of the [Detroit] neighborhoods."  *Id.* at 9206-07.  She also said that Adelson

had told them that, with that rationale, they "could increase BVAP" in Detroit-area districts.  *Id.*

at 9204.

Szetela responded that Kellom's suggestion "was not consistent with what I was hearing

from Detroit.  I don't remember [] individual commenters saying they wanted neighborhoods put

back together.  I remember a lot of comments about wanting minority majority districts with more

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

than 50% African/American and I don't remember much of anything about neighborhoods honestly." *Id.* at 9207.

Pastula interjected, "I think what I hear Commissioner Kellom discuss is, again, the third criteria of diversity and communities of interest" and that "the focus of uniting neighborhoods that . . . I hear Commissioner Kellom attempting to do . . . . wouldn't have VRA implications . . . . would not have a Voting Rights Act component." *Id*. at 9207.  Pastula added that if "the comments were advocating more than 50% majority minority districts based on VRA," then that "would likely be held to constitute racial gerrymandering.  And, again, that would create VRA issues.  What—where I see this conversation happening is not rooted or anchored in the VRA at all."  *Id*.  In the same vein, Kellom said, "this whole week I've been talking about neighborhoods.  I specifically did not mention the VRA." *Id.* at 9208.  Curry added, "communities of interest is all about neighborhoods." *Id.*

Chair Szetela was skeptical:  "I think to me the biggest issue is you're mentioning these communities of interest but when we collaboratively mapped, we discussed many, many communities of interest," but "what is happening here is that you and [Rothhorn] and Commissioner Curry have individually decided which communities of interest you think are important for this area.  And you're asking us as a collective to just accept them without consideration[.]" *Id.* at 9209.  But Lett responded, "I think [Rothhorn] is trying to do what Detroit wants done." *Id.* at 9217.

The Commission moved ahead with the new draft.  Kellom and Rothhorn's overlay guided the mapping process, but the Commission also continued to rely on the racial-dots tool and their knowledge of the racial makeup of the area as they mapped:  "I think the dots are good", *id.* at 9217; "they are also pretty much the Black African neighborhoods too", *id*. at 9218; "when you

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

look at Finkle and Dexter they are predominately Black African/Americans", *id.* at 9219; "if it comes down to deciding between neighborhoods it might be a good idea to think about which of the minority groups in the neighborhood vote the same way", *id.* at 9225; "7 is 68% nonwhite", *id.* at 9237.  But Commissioner Kellom continued to try and justify the changes on other grounds while the mapping progressed:  "This is about the Detroit community," so "open up your hearts and your minds.  This comes from a very sincere place."  *Id.* at 9230.

The new draft revised what became House Districts 1, 7, 8, 10, 11, 12, and 14.  *See, e.g., id.* at 9240, 9253.  The Commission eventually reached a stopping place and decided to check the map's "demographics," i.e., black-voter percentages.  Some other Detroit-area house districts now had BVAPs above 50%.   Adelson commented on these changes:

> This is—as you know we have discussed the VRA analysis and Dr. Handley's analysis. And there has been nothing that I'm aware of where any of you have said we need to put more Black people in a certain area beyond what the Voting Rights Act says. When you take that and then look at the reunifying neighborhoods that is a different consideration. . . . I think the numbers are an improvement in the sense of responding to concerns about that I took to be community based. So those are my thoughts.

*Id.* at 9256.

Szetela asked, "So you're okay with 55%, 54.9% Black VAP . . . I just want to confirm that you think that is acceptable."  *Id.*  Adelson answered, "I'm fine with that from the perspective of what was discussed today."  *Id.* at 9256-57.

The Commission's meeting the next day, November 3, began with a short public-comment period.  A regular observer of the Commission's meetings, Sarah Howard of the AFL-CIO Fair Maps Project, commented on the revisions made the day before.  Specifically, she questioned why communities of interests had been honored then but not before:

> Last night Mr. Adelson said districts can go as high as 55% BVAP as long as it is a side effect of recognizing a community of interest and not an explicit attempt to

47

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

> create a majority minority District. This is frankly [] an astonishing reversal. You
> must reassess all VRA districts based on community of interest testimony. We
> doubt for example that Birmingham and Detroit are a genuine community of
> interest. And find it very objectionable they had to protest the low BVAP targets.
> You missed out on a ton of community of interest data because they were under the
> incorrect impression their communities of interest didn't matter for this analysis.

*Id.* at 9264-65.  The Commission thanked her for comments and moved on.

Over the next two days, the Commission revised house districts in other areas of Michigan. None of these changes, however, substantially affected the November 2 adjustments to the Detroit districts.  *See id. at* 9399-9400 (pointing out that the Commission imported all the November 2 Detroit-area districts into the map finalized on November 4).  On November 4, the Commission made its final edits to the Detroit-area house districts.  In doing so, it again reviewed black-voter populations and "VRA compliance" for many of those districts.  (*E.g.*, "That is an Oakland County VRA District where we are trying to keep it above 40", *id.* at 9406; "This is one of our VRA districts we did not want to mess with", *id.* at 9407; "Black voting age population is 44.17", *id.* at 9410; "District 18 is now 45.34% Black", *id.* at 9419.)

At the close of their work on November 4, the Commission named its house map "Hickory," renumbered its districts, and advanced it to a 45-day public comment period.  *See id.* at 9484-85.  The Commission also renamed its last senate draft "Linden," renumbered its districts, and advanced it to public comment.  *Id*. at 9503.  The final black-voter population percentages for all the Detroit-area districts at issue here were as follows:

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

| District No. | | 1 | 3 | 6 | 8 | 10 | 11 |
|---|---|---|---|---|---|---|---|
| | Date | BVAP | BVAP | BVAP | BVAP | BVAP | BVAP |
| **Senate Map Plan 162** | 9/13/2021 | 10.98 | 50.82 | 76.56 | 63.77 | 18.1 | 7.8 |
| **Senate Map Plan 165** | 9/15/2021 | 34.86 | 44.87 | 51.99 | 59.06 | 49.38 | 11.02 |
| **Senate Map, Cherry** | 10/07/2021 | 37.04 | 42.84 | 40.64 | 42.45 | 36.63 | 20.02 |
| **Linden Plan** | 12/28/2021 | 35.03 | 42.09 | 39.15 | 40.25 | 40.43 | 19.19 |

| District No. | | 1 | 7 | 8 | 10 | 11 | 12 | 14 |
|---|---|---|---|---|---|---|---|---|
| | Date | BVAP | BVAP | BVAP | BVAP | BVAP | BVAP | BVAP |
| **House Map Plan 183** | 9/28/2021 | 28.62 | 79.04 | 54.09 | 42.74 | 65.66 | 43.74 | 38.33 |
| **House Map Plan 193** | 9/30/2021 | 36.58 | 66.54 | 50.37 | 58.44 | 49.23 | 43.74 | 39.91 |
| **House Map, Pine** | 10/08/2021 | 41.63 | 39.85 | 40.72 | 42.05 | 48.00 | 49.89 | 42.80 |
| **Hickory Plan** | 12/28/2021 | 38.03 | 44.29 | 43.70 | 38.79 | 42.82 | 40.99 | 41.11 |

F.

1.

*Developments before final votes.* The Commission set a date of December 28 for votes on its final plans. On December 9, however, Dr. Handley sent an email to Pastula, Adelson, Kim Brace (a software-mapping consultant), and Executive Director Suann Hammersmith, in which Handley said she had begun writing a report for the Commission, but had "run across a serious wrinkle that I would like to discuss. Is this possible?" R.114-6 at Page ID 3982.

49

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

Apparently that discussion took place within a day or so, by way of a "Teams" meeting;

because the next day Pastula sent an email to the Commission's "Legal Team" of outside counsel

(all or most of them litigators, including three who have represented the Commission in this case).

Pastula referred back to Handley's September 2 presentation to the Commission—which provided

the "analysis" on which all the Commission's BVAP efforts had been based—and reported the

following:

> I did want to circulate the information from the Teams meeting and we can address/more fully discuss when appropriate how to present this information to our client [*i.e.*, the Commission] prior to their vote. As indicated during the call, *the percentage ranges provided by Dr. Handley in her September presentation/charts and utilized during drafting did not correspond to the information she shared today*. The lack of primary election data generally as well as promised information regarding whether the white candidates are candidates of choice . . . are relevant.

 R.114-7 at PageID 3984 (emphasis added).

Apparently one of the participants in the "Teams" meeting told Chair Szetela about it;

because on December 15 she emailed Pastula as follows:

> I am deeply concerned to have learned that you personally became aware of critical issues with Dr. Handley's VRA analysis earlier this week and, in addition to not notifying the Commission about this alarming development, have also directed staff members, vendors, and the [Secretary of State staff] not to alert Commissioners as to the issue until the week of December 28th—almost two weeks away. It's my understanding that Dr. Handley has informed you, staff, vendors, and members of the [Secretary of State staff] that her analysis was deeply flawed and that, as a result of her flawed analysis, not a single one of our Senate maps are VRA compliant. . . . In addition, it's my understanding that you were hoping to conceal this information from the public by having yet another closed session the week of the 28th, which contradicts our mission, vision, and values.

Pl.'s Ex. 5 at 69.

On December 27, Szetela also emailed Handley directly, and pointedly asked whether "for

the Michigan State Senate, districts with BVAP of 47% or lower" are "able to elect candidates of

50

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

choice." *Id.* at 21-22.   Handley replied that the "minority preferred candidate wins all of the general election[s] above 35%" black-voter population.   But she added:

> Unfortunately, we do not have sufficient information to anticipate what might happen in the future Democratic primaries in the proposed districts.  The reason is that we have only one statewide Democratic primary for which we can recompile results and minority voters were not cohesive in this primary.  We simply do not know what would happen in a primary in which minority voters are cohesive.

*Id.* at 21.

2.

On December 28, at 10 a.m., the Commission reconvened to approve the final senate and house maps.  Some commissioners said they were unhappy with the maps; others said they were happy with them.   Szetela suggested that "we make some changes to accommodate public comments . . . particularly around VRA issues and particularly with primaries and democratic primaries and are these maps representative and do they actually provide the Black community in Detroit with the ability to elect.  I think these are things we need to think seriously about[.]" *Id.* at 9877.   Eid and Pastula alike said there was no time for that.  So did Secretary of State Benson's representative at the meeting.  *See* MICRC Tr. at 9875, 9878-80.

Apparently, Dr. Handley had provided the Commission with her "report" an hour or two before (she undisputedly gave it to them that same day).  Rothhorn's impression of the report was that further "analysis must be undertaken" to confirm that black-preferred candidates could actually prevail in districts with the BVAP numbers that Handley had given them on September 2. *Id.* at 9880.  Adelson gave a lengthy response in which (to summarize) he said that "I have no concerns based on her analysis that there are VRA compliance issues, issues that need to be addressed." *Id.* at 9881.  Szetela replied:

> So, Mr. Adelson, so my specific concern reading Dr. Handley's report is that when we were in Detroit . . .  the comment we heard over and over and over again is you

51

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

> have to look at the primaries and we all know this is true especially in Districts that are heavily leaning democratic or republican the primary is where the real action is at for the election, whoever wins the primary is going to win the seat in that particular District.
>
> And so we heard that very specific comments that we have to look at the primaries and very specific concerns about voter turnout which is also addressed in *Handley's* report as well and specifically the concern that when you have 35% or less than a certain number in districts which are supposedly VRA districts, those percentages for the Black community are not going to translate to the ability to win primary elections. And what I'm seeing in Dr. Handley's report is she has since validated that concern.

*Id.* at 9882-83.  Adelson answered:

> I disagree with your characterization of Dr. Handley's report she did not say 48% BVAP is required for bloc voters to elect candidates of choice. Much of the contrary. . . And her conclusion is that, yes, without—with the absence of additional primary election data we have to rely on what we have. What we have are general election results, recompiled election results, the gubernatorial primary from 2018.

*Id.* at 9883-84.

Szetela said that Dr. Handley's report "was a canary in the coal mine" and that she "continue[d] to have concerns because I want to make sure we do right by Detroit. I want to make sure we do right by the Black population, with our ability to elect who they want to elect." *Id.* at 9884-85.  Kellom said she had "the same concern." *Id.*  But Adelson said that "this is not October or early November.  And there are issues that have been discussed with the reality of the calendar. So you know I appreciate your comments and your including me in the discussion." *Id.* at 9888.

The Commission proceeded to adopt—as its final redistricting plans—the "Linden" plan for the Senate and the "Hickory" plan for the House.  The Linden plan reduced the number of majority-black senate districts in the Detroit area from two to zero; the Hickory plan reduced the same numbers for the House from ten to six.  None of the districts challenged here have BVAPs at 50% or higher.

52

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

G.

In March 2022, plaintiffs brought this suit against the Commission and Michigan Secretary of State Jocelyn Benson.  In their complaint, plaintiffs challenged seven Detroit-area senate districts (1, 3, 5, 6, 8, 10, and 11) and ten Detroit-area house districts (1, 2, 7, 8, 10, 11, 12, 13, 14, and 26) under both the U.S. Constitution's Equal Protection Clause and § 2 of the Voting Rights Act.   The parties thereafter filed cross-motions for summary judgment.  We denied plaintiffs' motion and granted defendants' motion in part.  Specifically—on various grounds, some of them jurisdictional—we granted summary judgment to defendants on four of plaintiffs' equal-protection claims (against House Districts 2, 13, and 26, and Senate District 5) and on eight of plaintiffs' VRA claims (against House Districts 2, 8, 11, 13, and 26, and Senate Districts 5, 10, and 11).  We denied summary judgment to defendants on thirteen of plaintiffs' equal-protection claims (namely, against House Districts 1, 7, 8, 10, 11, 12, and 14, and Senate Districts 1, 3, 6, 8, 10, and 11).  All those claims proceeded to a six-day bench trial, held in November 2023.

At trial, the parties called eleven fact witnesses, including six commissioners (Szetela, Rothhorn, Curry, Lange, Wagner, and Eid), Bruce Adelson, Dr. Lisa Handley, Virgil Smith (a former state senator from Detroit), and LaMar Lemmons III (a former house representative from Detroit).  We discuss their testimony as relevant below.  The parties also presented the testimony of five experts:  Sean Trende, Dr. Handley, Dr. Brad Lockerbie, Dr. Maxwell Palmer, and Dr. Jonathan Rodden, all of whom submitted an expert report (Trende also submitted a supplemental report).  Their testimony, as it turns out, is less important to our decision here.  The parties also submitted more than 100 exhibits as evidence, including a complete transcript of the Commission's proceedings, which totaled 10,603 pages.  About 1800 pages of that transcript are particularly

53

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

important here.  This court has reviewed all the evidence in the record, including every page of the Commission's transcript.

## II.

The Fourteenth Amendment's Equal Protection Clause "limits racial gerrymanders in legislative redistricting plans." *Cooper*, 581 U.S. at 291.  Specifically—absent some compelling interest which a racial gerrymander is narrowly tailored to serve—the Equal Protection Clause bars a State "from 'separating its citizens into different voting districts on the basis of race.'"  *Id*. (quoting *Bethune-Hill*, 580 U.S. at 187).

To prove an unconstitutional racial gerrymander, a plaintiff must prove that "'race was the predominant factor motivating'" the State's "'decision to place a significant number of voters within or without a particular district.'" *Cooper*, 581 U.S. at 291 (quoting *Miller v. Johnson*, 515 U.S. 900, 916 (1995)).  To make that showing, a plaintiff must show that the State "subordinated other factors" to "racial considerations."  *Id.* (cleaned up).  A plaintiff can make that showing "even if the evidence reveals that [the State] elevated race to the predominant criterion in order to advance other goals, including political ones." *Id*. at 291 n.1; *see also Miller*, 515 U.S. at 914 (stating that the "use of race as a proxy" for "political interest[s]" is "prohibit[ed]").

We determine predominance district-by-district, though a plaintiff, "of course, can present statewide evidence in order to prove racial gerrymandering in a particular district."  *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 263 (2015) (emphasis omitted).  A plaintiff can show racial predominance "though 'direct evidence'" of the State's intent, or circumstantial evidence, or "a mix of both."  *Cooper*, 581 U.S. at 291.  Evidence of "an announced racial target that subordinated other districting criteria" is important evidence "that race predominated" in drawing a district.  *Id.* at 300-01; *see also Ala. Legis. Black Caucus*, 575 U.S. at 267.

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

A.

The record here is almost oceanic in its direct evidence of intent.  The relevant state actor in this case is the Commission.   And the entirety of the Commission's proceedings—the commissioners' every word, as they drew every district, line-by-line, and often precinct-by-precinct—was transcribed.  The thousands of pages of those transcripts reveal not only the commissioners' every move as they drew and redrew legislative-district lines; it reveals also their reasoning, their motivations, their misgivings, in real time as they worked.  In that respect this case is singular.  We have carefully considered all the evidence in the record, including the testimony of six commissioners at trial, some two years after the fact.  But the transcripts of the Commission's proceedings are by far the most important and most probative evidence in the record here.  Our findings based on this record now follow.

1.

Our first group of findings concern the Commission's mapping process for Detroit-area districts generally.

a.

*BVAP targets for Detroit-area districts.*  First, the Commission plainly acted under the constraint of across-the-board racial targets as it drew the boundaries of Detroit-area districts.  By way of background, and to reiterate somewhat, Dr. Handley advised the Commission—on September 2, 2021, at the outset of its map-drawing process—about the BVAPs necessary for black voters to be able consistently to elect their "candidates of choice."  Specifically, she said, "[i]n Oakland County, 35% is going to work.  40 percent looks like it might work.  In Wayne County where we have a lot more white crossover vote 35% might well work."  MICRC Tr. at 5386.  (Those percentages were based only on general-election data, which rendered them close

55

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

to useless in predicting the success of black-preferred candidates in contested primary elections; but neither she nor Adelson flagged that distinction for the Commission.  *See, e.g.*, Def.'s Ex. 48 at 16-17.)  Bruce Adelson then told the Commission that Handley's analysis would be "very crucial[,] very important" for the Commission's map-drawing in those counties.  More to the point, Adelson treated those BVAPs as a ceiling, not a floor, in drawing districts in those counties. Specifically—on September 2, in his capacity as the Commission's "voting rights act legal counsel"—Adelson told the commissioners that BVAPs higher than Handley's numbers would amount to "packing" in violation of the VRA.  He told them on September 2:

> But to the point about packing, remember that the [sic] if a district can be established through analysis to be able to elect candidates of choice of the minority community at let's say 40%, if you add on population to that, the courts constitute that as packing.

MICRC Tr. at 5389.

Handley's numbers—plus what Adelson sometimes called a "cushion" of about 5%— yielded target BVAPs of 35-40% in Wayne County and about 40-45% (sometimes narrowed to 42-43%) in Oakland County.  *See, e.g.*, *id.* at 7230 ("the range for Detroit was 35-40%, Oakland County was above 40%."); *id.* at 7440 ("What Dr. Handley's racial bloc voting analysis has given the Commission is the benchmarks and the guide rails for each of the Counties that need to be adjusted.  [In] Wayne County [it] is 35-40% . . . . And Oakland County is 42, 43%."); *id.* at 7495 ("Dr. Handley in her analysis referenced Oakland County as having a 40% approximately [sic] threshold, not 35% . . . . 42-43% . . . . That is a good kind of benchmark guidepost."); *id.* at 7563 ("remember it's 35-40% in Wayne County.  40-45% in Oakland.").  And Adelson thereafter told the commissioners, more than 100 times—sometimes directly, sometimes more obliquely—that BVAPs in excess of those targets, in districts in those counties, would potentially violate the VRA. *See, e.g.,* MICRC Tr. at 5810 ("One of the things that I would strongly advise and something that

56

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

we will be talking about a lot over the next couple of weeks is really study and internalize Lisa
Handley's, Dr. Handley's PowerPoint . . . . And what I would suggest in moving forward in the
areas where you are now, typically aim for Black populations in the roughly 40-45% range."); *id.*
at 6201 ("Any District that has majority-minority VAP I think you should aim to let's see what we
can do to kind of []potentially unpack that based on Dr. Handley's analysis. . . .  Because just as
Dr. Handley said if you can elect 35%, 40%, then why would you add 40, 50% minority
population?"); *id.* at 6688 ("I have to go back to what Dr. Handley analyzed and concluded in
early September.  That her threshold is the 35-40%.  Which is I agree with that."); *id.* at 7199 ("I
think that I would recommend focusing on the percentages and comparing them to Dr. Handley's
percentages for Wayne County which as I recall is 35-40%."); *id.* at 7481 ("And it is the Supreme
Court has made it very clear that if you pack voters, if voters are put in a District in [ex]cess of
what racial bloc voting analysis shows, that's an issue.  And I know we have talked about that.
And we are going to continue to adhere to it[.]"); *id.* at 7482 (regarding the cushion: "So I think as
Dr. Handley and I had said previously since they are estimates they are not adhering to absolute
35-40% is not something that in my cautious preference that I necessarily would recommend.
Having a range, 35-40%, 40-45%, yeah, I think that is more advisable."); *id.* at 7646 ("Looking at
[what] the law says and what Dr. Handley analyzed and Dr. Handley's analysis is in Wayne County
BVAP and Black voters can elect candidates of choice at 35%. So if you make a District a majority
minority District when that additional population goes beyond the ability to elect that is where you
get more involved attempts at justification."); *see also id.* at 5650, 5813-15, 5816, 5821, 5822,
5826, 5828, 5834, 5844, 5845, 5847, 5849, 5871, 5876, 5877, 5881, 6189, 6201, 6202, 6203, 6217,
6219, 6221, 6419, 6420, 6426-27, 6430-31, 6432, 6433, 6445, 6446, 6454, 6508, 6513, 6515-16,
6525-26, 6526, 6566-67, 6568, 6573, 6574-75, 6596, 6619-20, 6625, 6633-34, 6672, 6684-85,

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

6688, 6717, 6718, 6721-22, 6725, 6726-27, 6935, 6948, 7068-69, 7070, 7071, 7073, 7164-65, 7167, 7181, 7183, 7186, 7187-88, 7189, 7192-93, 7198, 7199, 7201, 7223-24, 7225-26, 7272, 7277, 7279, 7280, 7281, 7282, 7283-84, 7284, 7285, 7286, 7287, 7289, 7345, 7346, 7347, 7481, 7482, 7484-85, 7487, 7489, 7493, 7494, 7495, 7497, 7499, 7500, 7504, 7509, 7515, 7539, 7559, 7560, 7580, 7641, 7644, 7646, 7649, 7651, 7652, 7656, 7660, 7662, 7666, 7688, 7690, 7692-93, 7693-94, 7731, 7768, 7781, 7784, 7785, 7835, 7883, 7904, 8046, 9103, 9959.

The Commission's general counsel, Julianne Pastula, likewise repeatedly advised the Commission to reduce the BVAPs in Detroit-area districts to the target ranges. *See, e.g., id.* at 7226 ("What I would recommend is that the Commissioner consider doing is for the active matrix to scroll starting with 1 and glance at the districts, anything that is higher than 40% for the Black voting age population and the population difference I mean just to glance at and just go down the list and then when we get to I anticipate number 6, number 18, and others that those quote unquote fixes can be dealt with and then this map can be ready for the partisan fairness analysis"); *id.* at 7227 ("start with the data chart and look at the list starting with one and I would recommend anything with a higher than 40% Black voting age population be looked at"); *id.* at 7229 ("start again with the list at District 1 and look at that the Black VAP, if it's above that 40% particularly in the Metro Detroit area how can that minimized . . . look at the Black voting age population and proceed from there"); *id.* at 7436 ("So I believe Mr. Adelson did say if the effort was to be made to get those Metro Detroit districts closer to the 30 to 40% range that would be an excellent use of time"); *id.* at 7438 ("I think those districts that were up around and over 50% Mr. Adelson's direction was to try to get those lower, to make the effort to get those lower.  Particularly in the Metro Detroit Area"); Pl.'s Ex. 5 at 45 (email to Szetela:  "Bruce and I are very concerned about

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

the drafting of the packed districts that is occurring during today's mapping session"); *see also id.*

at 5734, 5921, 6672, 6767, 6768, 7230, 7243, 7440, 7441.

The commissioners fully internalized these BVAP targets, and not only complied with

them but exhorted each other to do so.  *See, e.g., id.* at 6434 (Clark:  "what I'm trying to do is

reduce the Black population"); *id.* at 6640 (Rothhorn: "And I do think that the margins with you

know 36% was the threshold that was established by Lisa [Handley] so I think we are not too far

over that [at] 38%.  I think Bruce has said right 40% . . . At this point what we have done is a nice

job of unpacking the old districts and getting a better . . . racially mixed balance."); *id.* at 7439

(Rothhorn: "But I think we can interpret from their advice is if we don't try to get to 35%, we have

not done our due diligence and therefore we may be exposing ourselves to a legal risk we might

be able to defend ourselves but can't guarant[ee] that."); *id.* at 7283 (Eid: "I know our analysis has

said that it only takes about 35-40% of Black voting age population to elect candidates of choice

for [the black] community.  But I think my most basic question is: What is the highest percentage

it can be to fend off legal challenges in the future?"); *id.* at 7435 (Szetela: "So that is what Bruce

was saying to us last week and said it repeatedly we should aim between 35-40%

African/American because those numbers [are] VRA compliant."); *see also id. at* 5733, 5747,

5748, 5757, 5766, 5829*,* 5834*,* 5843, 5847, 5871, 5872, 5875, 5898, 5899, 5903, 5904, 5912, 5914,

5915, 5917, 5918, 5919, 5924, 5926, 5937, 5967, 6204, 6205, 6215, 6220, 6221, 6410, 6411, 6412,

6414, 6427, 6429, 6434, 6436, 6438, 6458, 6482, 6511, 6512, 6515, 6518, 6523, 6558, 6559, 6560,

6563, 6565, 6571, 6572, 6573, 6589, 6590, 6596, 6602, 6613, 6614, 6617, 6622, 6637, 6640, 6661,

6662, 6663, 6664, 6668, 6669, 6670, 6671, 6673, 6674, 6675, 6680, 6682, 6683, 6685-86, 6716,

6717, 6718, 6720, 6723, 6764, 6765, 6766, 6768, 6769, 6773-74, 6774, 6782, 6783, 6785, 6786,

6787, 6788, 6804, 6805, 6806-07, 6821, 6852, 6853, 6860, 6900, 6937, 6937-38, 6939, 6940,

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

6946, 6947, 7068, 7070, 7074-75, 7075, 7168, 7169, 7173, 7182, 7185, 7188-89, 7190, 7191,

7194, 7197, 7198, 7200, 7201, 7219, 7219-20, 7220, 7221, 7222, 7223, 7225, 7227, 7229, 7229-

30, 7230, 7231, 7231-32, 7232, 7233, 7234, 7235, 7235-36, 7236, 7237, 7238, 7240, 7241, 7242,

7242-43, 7243, 7244, 7270-71, 7273, 7275, 7276, 7277, 7278, 7283, 7285, 7287, 7289, 7343,

7343-44, 7344, 7346, 7348, 7349, 7433-34, 7434, 7435, 7436, 7436-37, 7438, 7439, 7440, 7441,

7442, 7443, 7444, 7445, 7446, 7447, 7448, 7449, 7450, 7451, 7464, 7468-69, 7469, 7472, 7473,

7474, 7475, 7476, 7478, 7479, 7480, 7481, 7483, 7484, 7492, 7509-10, 7510, 7513, 7514, 7515,

7516, 7517, 7558-59, 7560, 7576, 7578, 7580, 7581, 7582, 7622-23, 7627, 7639, 7648, 7649,

7651, 7652, 7653, 7654, 7655, 7656, 7657, 7658, 7659, 7660, 7662, 7663, 7664, 7665, 7667, 7668,

7669, 7672, 7675, 7676, 7677, 7679, 7685-86, 7687, 7688, 7689, 7691, 7695, 7696, 7697, 7698,

7699, 7726, 7727, 7728, 7729, 7730, 7733, 7735, 7781, 7785, 7802, 7822-23, 7883, 7891, 7896,

7896-97, 7901, 7903-04, 7904, 7905, 7926, 7931, 7949, 7960, 8099, 8100, 8840, 8859, 8883,

8898, 9011, 9321, 9357-58, 9942.

Relatedly, the commissioners equated hitting their BVAP targets with VRA compliance.

Indeed, the commissioners used the terms "VRA" or "VRA compliance" as synonyms for hitting

their BVAP targets. Those references are too numerous to collect here—they appear *passim*

throughout the transcripts of the Commission's work on Detroit-area districts (which the

commissioners called "VRA districts"). But we offer some examples along those lines. *See, e.g.*,

*id.* at 7201 (Rothhorn: "[T]hat is changed because of [sic] to better comply with VRA bringing

down the Black voting age population to a range that is closer to 40% actually reducing it."); *id.*

at 7229 (Orton: "So we are going to go through and we are going to look at anything above 40%

because we want to be [sic] make sure that the whole plan is VRA compliant."); *id.* at 7343-44

(Szetela: "District 2 was originally 60.73%. Voting age population African/American it's now

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

down to 46. 3 was 28 and I brought it up to 40 so it's a little more balanced. 6 was 64%. It's now

down to 48%. 8 was 52% it's now down to 35%. 14 was at 59% it's now down to 49%. 15 was

at 49% it's now down to 42%. And then 18 which was one of our big problem districts was at

76% and it's now down to 38%. So I have on that list three districts that are above 50, a 53.24

which is 4, 51.9, 50.89 but everything else is below 50%. So like I said it's just a thought. I mean

I think we can accomplish what Mr. Adelson is suggesting we do. It's just going to require a little

creativity and like I said I certainly don't think this is a final map. We could definitely move some

of these lines make things a little fatter or skinnier to make them not look so long and skinny but

the point is I think it's a little closer to a VRA compliant plan than what we had."); *id.* at 7445

(Szetela: "Yeah, I think you accomplished VRA with 6. You are just a hair over 40% and we are

supposed to be between 35-40 so you are good there."); *id.* at 7474 (Rothhorn: "District 9 is lower

so it's even more compliant with 38.6% so I think it's a positive with the numbers."); *see also id.*

at 5733, 5747, 5748, 5757, 5765, 5767, 5829, 5834, 5843, 5847, 5871, 5872, 5875, 5898, 5899,

5903, 5904, 5912, 5914, 5915, 5917, 5918, 5919, 5924, 5925, 5926, 5937, 5967, 6204, 6205, 6215,

6216, 6220, 6221, 6223, 6410, 6411, 6412, 6414, 6427, 6428, 6429, 6434, 6436, 6438, 6458-59,

6482, 6511, 6512, 6515, 6516, 6523, 6559, 6560, 6563, 6563-64, 6564-65, 6566, 6571, 6572,

6573, 6589, 6590, 6596, 6602, 6613, 6614, 6617, 6622, 6638, 6640, 6661, 6662, 6663, 6664, 6668,

6669, 6670, 6671, 6673, 6674, 6675, 6680, 6682, 6683, 6685-86, 6716, 6717, 6718, 6720, 6724,

6764, 6765, 6766, 6768, 6769, 6773-74, 6674, 6782, 6783, 6785, 6786, 6787, 6788, 6804, 6805,

6806, 6821, 6822, 6852, 6853, 6860, 6900, 6913, 6937, 6938, 6939, 6940, 6946, 6947, 7068, 7070,

7074, 7075, 7168, 7169, 7173, 7182, 7185, 7188-89, 7190, 7191, 7194, 7197, 7198, 7200, 7201,

7219, 7220, 7221, 7222, 7225, 7227, 7228, 7229, 7229-30, 7231, 7231-32, 7232, 7233, 7234,

7235, 7236, 7237, 7238, 7240, 7241, 7242, 7242-43, 7243, 7244, 7270-71, 7273, 7275, 7277,

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

7278, 7285, 7287, 7343, 7343-44, 7344, 7346, 7348, 7433, 7433-34, 7435, 7436, 7436-37, 7438,

7439, 7440, 7441, 7442, 7443, 7444, 7445, 7446, 7447, 7748, 7449, 7450, 7451, 7452, 7464, 7469,

7472, 7474, 7476, 7478, 7480, 7483, 7493, 7509-10, 7510, 7513, 7515, 7516, 7517, 7520, 7558-

59, 7576, 7578, 7580, 7581, 7582, 7622-23, 7626, 7639, 7642, 7647, 7667, 7675, 7679, 7685,

7696, 7698, 7699, 7726, 7727, 7729, 7781, 7785, 7802, 7822, 7883, 7891, 7896, 7896-97, 7901,

7903, 7904, 7905, 7926, 7931, 7960, 8053, 8095, 8159, 8942, 9102.

Next—crossing the line from direct to circumstantial evidence, albeit barely—the

commissioners continually monitored the BVAPs of Detroit-area districts as they drafted them,

using the racial-percentages tool that Kim Brace had told them about on September 2.  *See, e.g.,*

*id.* at 7277 (Orton: "Okay, so before you did this . . . the voting age Black population in District 4

was 41.2% which is quite a bit closer to the target that we are going for.  Now it's a lot higher . . .

. I thought we were going 35-40% so [it is] way out from what I'm thinking."); *id.* at 7446 (Szetela:

"Brought your African/American below 40%.  So now you are perfectly in the sweet spot of 35-

40.  All right."); *id.* at 7453 (Rothhorn: "Started 57.32 now we are 44.13 nice work."); *id.* at 7449

(Lett: "What's the target for Macomb? Oakland."  Rothhorn:  "Oakland County the target is 42 to

43ish."  Lett: "We are kind of splitting the difference right now."); *id.* at 7464 (Rothhorn: "Correct

so [this district] went from 50 to 40.7% so that is excellent."); *id.* at 7657 (Clark: "So eight is

another this is going to be in Wayne County and Macomb County I believe yeah so what are we

focusing towards here?  Wayne, we said 35 to 40% Macomb had nothing [and] we are currently

at 35.71 so if we raised it to 40, I think we will okay."); *see also id.* at 5733, 5748, 5757, 5829,

5838, 5843, 5875, 5898, 5902, 5917, 5924, 6213-14, 6219, 6221, 6414, 6422, 6425, 6426, 6428,

6432, 6433, 6436, 6471, 6483, 6484, 6511, 6518, 6525, 6562, 6565, 6572, 6581, 6615, 6617, 6617,

6618, 6633, 6640, 6670, 6671, 6676, 6678, 6683, 6684, 6686, 6724, 6726, 6765, 6774, 6785, 6804,

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

6937, 7194, 7198, 7229, 7231-32, 7232, 7235, 7236, 7236, 7240, 7241, 7270-71, 7275, 7276,

7277, 7278, 7280, 7282, 7283, 7288, 7343, 7344, 7435, 7438, 7439, 7442, 7443, 7444, 7445, 7446,

7447, 7448, 7449, 7452, 7453, 7454, 7455, 7456, 7457, 7460, 7464, 7473, 7474, 7475, 7476, 7479,

7480, 7481, 7484, 7487, 7488, 7493, 7494, 7495, 7496, 7497, 7499, 7500, 7501, 7502, 7503, 7512,

7513, 7514, 7515, 7539, 7558, 7560, 7561, 7576, 7580, 7639, 7642, 7643, 7646, 7647, 7649, 7651,

7652, 7653, 7654, 7655, 7656, 7657, 7658, 7659, 7660, 7662, 7663, 7664, 7665, 7669, 7671, 7672,

7676, 7677, 7687, 7731, 7749, 8046, 8102, 8103, 8104, 8159, 8856-57, 8859, 8862, 8898, 8924,

8942, 9007, 9008, 9011, 9102, 9103, 9133, 9204, 9217, 9218, 9219, 9237, 9330, 9357.

Further circumstantial evidence of the Commission's BVAP targets is that—with one exception—the BVAPs for all the districts challenged here fell within them. Admittedly, the Commission's BVAP target ranges were not always perfectly clear as the commissioners and their counsel referred to them throughout the Commission's work on these districts. Those targets did not take the form of positive law. But those references always fell within a BVAP range of 35-45%, which tracks Handley's original numbers plus Adelson's "cushion." And though Detroit's population is almost 80% African-American, 12 of the 13 districts at issue here ended up with BVAPs between 35.03% and 44.29%. The only exception is Senate District 11, which has a BVAP of 19.19%. And most of the African-American voters in that district were put there in order to lower the BVAP of an adjacent district. *See infra* at II.A.3.a.vi.

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

b.

*Subordination of other criteria.*  We also find that the Commission subordinated all other redistricting criteria to their target BVAPs in Detroit-area districts.  Indeed, commissioners did so expressly.

First, the commissioners subordinated the criterion of "partisan fairness" to hitting their BVAP targets in Detroit-area districts.  Partisan fairness ranks fourth in the hierarchy of the Michigan redistricting criteria, well after compliance with federal law (and specifically the VRA), which comes first.  Mich. Const. art. IV, § 6(13).  And (as noted above) the Commission equated hitting their BVAP targets with VRA compliance.  Meanwhile, the Commission could not measure partisan fairness without a completed draft map (house or senate) for the entire State.  Dr. Handley herself told the Commission as much when she presented to the Commission on October 1.  MICRC Tr. at 7380 ("And you have to have a complete plan.  This can only be done off a complete plan.").  Thus, partisan fairness is barely mentioned in the Commission's meetings until October 6, when the Commission began its first partisan-fairness assessment (of its first completed drafts of house and senate maps).

When the Commission did turn to this criterion, they expressly avoided making any substantial partisan-fairness revisions to the Detroit-area districts, for fear of upsetting their "VRA compliance" (for which, again, hitting the BVAP targets was a proxy).  On October 6, as the Commission began its "partisan fairness" assessment, Adelson advised the Commission not to make changes to Detroit-area districts on account of partisan fairness:

> [M]y suggestion is we avoid districts that have VRA implications.  We have a list of several other districts and some other possibilities.  So in the interest of facilitating the partisan fairness adjustments our recommendation would be to move to districts that are not in the Metro Detroit area.  And address other districts as we can.

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

. . .

> Our recommendation is we avoid those [Detroit-area districts].  Because adjusting in those areas will just make things unnecessarily complicated.  I think that there are a lot of areas that potentially we can look at that just don't implicate these considerations, thank you.

*Id.* at 7781-82; *see also id.* at 6189 ("[I]f you can achieve other goals that are lower down on the list of criteria [than VRA], that's a policy choice for you all.  If they conflict, the Voting Rights Act, the 14th amendment win."); *id.* at 7167 ("[Y]our legal team agrees that Friday is significant in that Dr. Handley will hopefully be able to present partisan fairness.  But it is important and I'm sorry I'm going to speak for you.  I will speak in one voice that the legal team strongly believes there are issues in addition of course to the partisan fairness.  There are many voting rights issues and just in talking about the packed districts in Wayne County . . . . So there are other considerations.  Certainly we agree with the partisan fairness and that is significant.  But there are other issues."); *id.* at 7784, 7785-86, 7904.

Dr. Handley likewise reminded the Commission that, whereas "it's going to be a balancing act between voting rights and partisan fairness," it is "not an equal *balance because the Voting Rights Act trumps partisan fairness*."  *Id.* at 7409 (emphasis added); *see also id.* at 7386 (stating with regard to partisan fairness:  "But especially, again, you have the Voting Rights Act and other things you have to consider."); *id.* at 7387 ("Again this is probably a legal question more, but it seems to me the [Michigan] Constitution does prioritize for you. And you know what comes first and what comes next."); *see also id.* at 7382.

The Commissioners followed this guidance.  *See, e.g., id.* at 7782 (Eid: "But we do not want to mess with 17, 14, because those are the VRA districts.  Probably five as well just because of how it looks drawn."); *id.* at 7785 (Eid: "The reason I didn't [change these districts is] because they are two VRA districts."); *id.* at 7785 (Orton: "We spent so many hours getting those balanced

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

I think we should ignore or leave those alone . . . . We are trying to get partisan fairness.  But that is a VRA issue, right?"); *id.* at 7816 (Commissioner Clark: "I agree Steve and I don't want to go back into Detroit.  I think it's a spider's web to try to sort out again.  I think we got it as I recall the way we want it.  And so we should deal with everything outside that at this point."); *id.* at 7960 (Eid: "14 was drawn that way with Pontiac for VRA reasons so we might not want to change that one too much."); *id.* at 8053 (Eid: "For example lopsided margins test that one especially we are not going to be able to get it to 0 because of how we have drawn some of the VRA districts to be compliant."); *id.* at 7520, 7521, 7544, 7737, 7781-82, 7884, 7891, 7897, 7905, 7940.

The Commission likewise subordinated preservation of communities of interest to their "VRA compliance" (for which, again, hitting the BVAP targets was a proxy).  Indeed, the commissioners frequently expressed their unhappiness about it.  *See, e.g., id.* at 5747 (Szetela: "I appreciate and I did give it some thought but I'm trying to balance the Voting Rights Act against preferences because Voting Rights Act is our number one so I'm trying to make sure we don't get concentrated populations like we have in District nine . . . we received public commentary saying they did not want to be with Grosse Pointe and it's kind of mixed but doing it this way will us a more balanced from a voting rights and secondary is communities of interest."); *id.* at 6429 (Orton: "Looking at this overall, I have a comment which I think will be very unpopular.  But I think it's maybe worth having a discussion about. The only way I see to make these districts make more of these Districts more balanced racially is to break up communities of interest.  Because the only places I see are Hamtramck, Dearborn, Dearborn [H]eights, and the Grosse Points that you know show as not African/American.  We know that there are certain populations in certain communities of interest in those and other areas.  But I think we need to discuss what trumps.  And we know that is VRA."); *id.* at 7242 (Eid: "And I hate to split them up but I think for this house map I don't

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

see another way to do it because that is where the white population is around Detroit.  We've already covered you know the other areas like Livonia for example.  And Dearborn as well, which was split up the other day.  So, I mean, I'd be welcome to any advice from anybody to figure out a way to not split it up but I think right now what we've heard is this map is currently not compliant and we need to get it to be compliant."); *id.* at 7444 (Witjes: "Don't worry if Harper Woods wants to be there or community of interest where Harper Woods should be.  That should be not [sic] something we're looking at.  We should be going into looking at just complying with the Voting Rights Act.  And if we have to go in there don't let that be a reason as to why because you're thinking about public comment, go straight off the numbers to get where we need to be on with [VRA] stuff.  And then go look at communities of interest."); *id.* at 7510 (Eid: "I mean I understand why we did it to become VRA compliant . . . . But it does have a significant change on communities of interest. . . . I think while it . . . might be better for VRA reasons it's really much worse for community of interest reasons."); *id.* (Rothhorn, responding to Eid: "I think you are speaking to many of us who are challenged by it and if we refer back to criteria number one as VRA and we are trying to achieve compliance and we've drawn communities of interest, drawn with communities of interest in mind and trying to get voting rights compliance which is number one not number three so I think unfortunately that is the shortest and quickest answer to your question. I know it hurts believe me."); *see also id.* at 5671, 5899-90, 5912, 5914, 5915, 5917-18, 6202, 6411, 6412, 6436, 6573, 6617, 6618, 6619, 6621, 6622, 6685-86, 6774, 6804, 7242, 7348, 7450-51, 7468, 7469, 7822.

We therefore find, as to the Commission's mapping process for Detroit-area districts generally, that the Commission adopted "an announced racial target" to which it "subordinated other districting criteria[.]"  *Cooper*, 581 U.S. at 300.

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

2.

The Commission (in this litigation) disputes that finding on various grounds.   The evidentiary bases, for most of the Commission's arguments as to racial predominance generally, are a modest number of citations to the trial transcripts.  The Commission has little to say about the 10,000-page contemporary record of its actions, or about the voluminous evidence of predominance catalogued above.  But we address its handful of arguments in turn.

a.

The Commission first argues—citing trial testimony that in total runs just over two pages— that "[f]our commissioners attested [at trial] that race did not predominate."  R.115 at PageID 4015.  But as an initial matter, the Commission's chair, Rebecca Szetela, testified before those four commissioners did; and since their testimony refers to hers, we briefly recite some of hers first.

Szetela's testimony echoed in large part the Commission's hearing transcripts themselves. At trial, Szetela testified that—after Dr. Handley provided the Commission with the results of her racially polarized voting analysis on September 2—Adelson repeatedly told the commissioners that the "requirement of the law is to avoid packing minorities into districts above and beyond the percentage at which analysis is determined they need to elect candidates of choice."  R.112 at PageID 3640; *compare, e.g.,* MICRC Tr. at 5810 (Adelson: "Packing means adding or including additional minority voters typically the ones needed to elect what we call candidates of choice.").

 Szetela also testified that, "[o]nce we had received that analysis from Lisa Handley it became all about race . . . . At the direction of Mr. Adelson."  R.112 at PageID 3652; *compare, e.g.,* MICRC Tr. at 7439 (Rothhorn: "I think what we can interpret from [our legal counsel's] advice is if we don't try to get to 35%, we have not done our due diligence and therefore we may

68

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

be exposing ourselves to a legal risk [for a VRA violation] we might be able to defend ourselves against but can't guarant[ee] that."). Relatedly, Szetela testified that—with Adelson's encouragement—the Commission drew districts that stretched into areas where it knew "that white voters" lived. R.112 at PageID 3646. She also testified, as to the line-drawing process, "we're just focused on bringing down the black population in Detroit, stretching those districts out into the suburbs surrounding Detroit to add white voters, making the districts thinner and skinnier within Detroit to reduce black voters and trying to hit those targets of 35 to 40 percent and 45 to 50 percent." *Id*. at PageID 3651. That districting strategy was necessary, Szetela testified, "[b]ecause the population is just so concentrated that if you pull black people out of one neighborhood and move them into another neighborhood in Detroit, it's just not going to fix the problem because that's where people live." *Id*. at 3684. The results of the line-drawing process itself support all those assertions.

Szetela also testified that, "[a]ny time there was a conflict between a community of interest and Voting Rights, the Voting Rights Act prevailed." *Id.* at 3663-64; *compare, e.g.*, MICRC Tr. at 6619-20 (Adelson: "I think that the issues about communities of interest and keeping sort of communities together as I've read a lot of public comments in general . . . . But I think it is very important from a compliance standpoint to look at the ranked criteria and the number one criteria is the U.S. Constitution and Federal law."); *id.* at 7242 (Eid: "So, I mean, I'd be welcome to any advice from anybody to figure out a way to not split it up but I think right now what we've heard is this map is currently not compliant and we need to get it to be compliant."). For example, Szetela testified that, when the Commission drafted Senate District 8, it "grab[bed] Birmingham, which is an extraordinarily wealthy [and] white area," and "pulled [it] into Detroit." R.112 at PageID 3734; *compare, e.g.*, MICRC Tr. at 7451 (Clark: "When you go into Birmingham, we are

69

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

stretching this all the way from mid-Detroit all the way up there."  Szetela:  "What other way is it

to get VRA [compliance]?").  She likewise testified that, as to Senate District 3, the Commission

drew the lines from inner Wayne County to "out farther into Macomb and Oakland counties" to

add white voters.  R.112 at PageID 3741-42; *compare e.g.,* MICRC Tr. at 7449 (Szetela: "I think

it's good.  I think you brought [the BVAP] down . . . you are right in the sweet spot at this point.").

Yet Anthony Eid—the first of the four commissioners whose testimony the Commission

now cites—disagreed with Szetela's testimony.  Eid was the Commission's principal fact witness

at trial.  In testimony that the Commission now cites, Eid said that "there was no BVAP target and

we could not use a target" in the Commission's map-drawing in Detroit-area districts.  R.104 at

PageID 2852.  But that assertion is belied not only by hundreds of citations to the contemporary

record cited above, but by Eid's own statements during the mapping process.  For example, on

September 30, 2021, alone, Eid said all of the following:

> What is the Black VAP on [draft house district] 21 currently?  Still 64 so it's still
> high, higher than I think we would like it to be.

> I hate to split them [*i.e.*, a Grosse Pointe COI] up but I think for this house map I
> don't see another way to do it because that is where the white population is around
> Detroit.

MICRC Tr. at 7241-42.

> I think the purpose [of some changes Eid had just made to the map] was to shift the
> Black voting age percentage from District 4 I'm sorry District 6 which was at 67%
> lower.  So now instead of having one District way over on the percent we [ne]ed to
> hit we have two that are close to being around the 45-55% range which I think is
> more in line with what we need to get than the 68% range it was at before.

*Id.* at 7277.

> what is the actual target we need to hit.  As you said earlier, we are not going to be
> able to get to 35-40 percent for every one of these Detroit districts I mean I don't
> see a way to do it.

*Id.* at 7283.  Similarly, on October 4, Eid said:

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

> Mr. Adelson, I appreciate all of the advice that you give us but I got to be honest I'm becoming increasingly uncomfortable with this direction we're going under. . . . But it's just making me a little uncomfortable having to hit these percentages that are low I would be more comfortable with 45% but 35% thank you Commissioner Curry.  (Who then says:  "Absolutely I'm in full agreement with you.").

*Id.* at 7483.   The Commission also cites the following testimony from Eid with regard to predominance:

> This was a multi-factorial and multi-variable process that included many different variables, as we've talked about today and will talk about over the next few days, and it created a situation where we took a holistic view at all of the variables and not just one.  There was not one issue that predominated over this process.

R.104 at PageID 2845.  Eid's testimony as to racial predominance, however, was palpably rote and rehearsed.  He repeated over a dozen times, for example, that the Commission had "many reasons" for its line-drawing decisions in the districts at issue here.  *See id.* at PageID 2867, 2869, 2872, 2874, 2876, 2877, 2879, 2882, 2885, 2892, 2895, 2900, 2905, 2912.  All that testimony was more scripted than probative.

Finally, though we take no pleasure in mentioning it, cross-examination revealed that—the year before Eid joined the Commission—another public entity had formally sanctioned Eid for dishonesty.  *Id.* at PageID 2943, 2945-47.  And Eid's testimony before us was by turns implausible and evasive.  In demeanor and substance alike, Eid was not a credible witness.

The other three commissioners whom the Commission cites now were on the whole credible witnesses.  Commissioner MC Rothhorn, for example, was an open, direct, and engaging witness.  In testimony the Commission cites here—and in response to a question whether "the Commission let issues of race dominate this criteria"—Rothhorn answered, "[m]y personal memory is no, and it sure seemed like it when [Szetela's] testimony was being given, but my memory is no."  R.112 at PageID 3771.  A few minutes before, however, Rothhorn testified that

71

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

his memory on this issue was "foggy" and that "[Szetela's] memory was really great."  *Id.* at

PageID 3766.  And in nearly the same breath Rothhorn testified that, "I think with the first criteria

being population and the Voting Rights Act, it was very important to get that one right first."  *Id.*

Rothhorn also agreed that many of the Commission's revisions to its maps involved "lowering the

black voting age population," and that the purpose of those revision was "I think to comply with

the Voting Rights Act."  *Id.* at PageID 3765.  Relatedly, Rothhorn testified that the Commission

had used the "spoke" concept in mapping, and that its purpose was to "[m]ove out of the Detroit

area where the black population is into the suburbs where the white population is."  *Id.* at PageID

3776.   And when asked "[w]ere you ever yelled at for drawing districts in Detroit that had BVAP

levels that were too high[,]" Rothhorn answered:

> So, I certainly appreciate the sentiment.  I don't—I honestly don't remember, but I
> remember extreme tension and feelings of—yeah, that feeling of being yelled at
> or—yeah.

*Id.* at PageID 3772.

In the contemporary record, too, Rothhorn regularly discussed the Commission's BVAP

target.  For example, on one occasion he told a commissioner, "[w]e are currently at 43.25 so you

want to try to get it to 35-40" percent BVAP and reminded him that "we are not focusing on

communities of interest.  MICRC Tr. at 7446-47.  Later, he told another commissioner that in

"Oakland County the target is 42 to 43ish."   *Id.* at 7449.  He also said, "I think what we can

interpret from [our legal counsel's] advice is if we don't try to get to 35%, we have not done our

due diligence and therefore we may be exposing ourselves to a legal risk we might be able to

defend ourselves against but can't guarant[ee] that."  *Id.* at 7439.

The Commission also cites the testimony of Juanita Curry.  Specifically—in response to

the question whether "the Commission let issues of race dominate in its application of this

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

criteria"—Curry testified that, "[t]o my knowledge, I was not even thinking on that level at all

throughout my whole process.  It never dawned on me that we would even do anything like that

so, no."  R.112 at PageID 3789.  But Curry's memory of the Commission's proceedings was

perceptibly shaky at trial.  *See, e.g.*, *id.* at PageID 3784-85.  And during the Commission's meetings

themselves, for example, her revisions to one district "took out a lot of African/American

population."  MICRC Tr. at 7235.  Yet the BVAP for that district remained high, and she said the

"only way to go is up north" to reduce it.  *Id.* at 7239.

Finally, the Commission cites the testimony of Erin Wagner.  Specifically—in response to

a question whether "the Commission allowed partisan fairness to take priority over other

considerations"—she testified:

> I think, yes, we did—we did do that, but I also think that we just—we were 13
> citizens that didn't know what we were doing, and we were looking to people that
> were, you know, told—we were told were experts, so of course you're going to lean
> on expert's opinion.

R.112 at PageID 3807.

But Wagner also testified that she had felt like mapping Detroit-area districts was like

playing "Blackjack," explaining:

> we were listening to all the people in Detroit and all the African American people
> state what their communities of interest were, and I was under the assumption, like
> [Rothhorn], that communities of interest was the main thing, but when we were
> given the percentages that we had to get down by, we were constantly having to
> drop those BVAP percentages down.

*Id.* at PageID 3803-04.

The testimony of none of these witnesses remotely displaces any of our findings based on

the voluminous record evidence catalogued above.

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

b.

The Commission also asserts that "[p]olitics better explains the lines" of the districts at issue here.  R.115 at PageID 4016.  As support, the Commission invokes not a word from the contemporary record of its work.   And the Commission concedes that—unlike the racial-percentages tool, which the Commission employed on its mapping software from day one—its partisan-fairness tool was not activated until early October 2021.  *Id.* at PageID 4018.   Yet the Commission asserts that "the Commission" evaluated "every single" one of its completed maps for partisan fairness as they worked in September.  *Id.* (alteration omitted).   As support, the Commission cites the following testimony from Eid, which reads in full:

> Every single time we completed a map, before we got our own internal partisan fairness tool, I would upload our completed maps into [third-party online] software to figure out if we were on the right track or not.

R.104 at PageID 2829.

We have no reason to doubt that Eid did as he said—on that point his testimony was credible—but to say on the basis of this testimony that "the Commission" did these evaluations is an overstatement.  And meanwhile the commissioners said hardly a word about partisan fairness during their September mapping.

The Commission otherwise cites the testimony of one of its expert witnesses, Jonathan Rodden.   Specifically, quoting Dr. Rodden, the Commission says that, "[b]ecause 'Democrats in Michigan' are 'concentrated' in Detroit, 'a plan that's drawn without regards for partisanship will generate extremely Democratic districts,' which in turn 'makes for an inefficient distribution of support across districts.'"   R.115 at PageID 4017 (citing R.106 at PageID 3120-21).   But the evidence afforded by Rodden's testimony was purely circumstantial:  his point, simply stated, was

74

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

that the district lines at issue here improved the partisan fairness of the Commission's maps, and thus one might infer that partisan fairness was the object of the Commission's map-drawing.

So far as the direct evidence of the Commission's intent was concerned, however, Rodden had nothing to say. He admitted on cross-examination that he had not "read the transcripts of the Commission meetings" or done anything else to learn about the direct evidence available in this case. R.106 at PageID 3175-76, 3186. He also admitted that the statements of "the map drawers themselves, can provide critical evidence" of what predominated in their decision-making. *Id*. at PageID 3188. More to the point, Rodden said he had testified in another redistricting case—the *Bethune-Hill* case that the Supreme Court eventually decided in 2017. *Id*. at PageID 3176. And Rodden admitted that, in *Bethune-Hill*, he *did* review the contemporary record of the map drawers' work "in painstaking[] detail," and indeed made that record the basis of his testimony there. *Id.* at PageID 3180. But Rodden did none of that work here. (In fairness to Rodden, he explained that the Commission's counsel had not asked him to review the contemporary record, which itself yields an inference.) Rodden's testimony was therefore an abstraction, without any connection to the Commission's record. His testimony does nothing to rebut the direct evidence that partisan fairness was subordinated to racial line-drawing for the districts at issue here.

All that said, the Commission did strive to improve partisan fairness in districts outside the Detroit area. But when the Commission drew Detroit-area (or "VRA") districts, as shown above, it pointedly did not allow considerations of partisan fairness to intrude. The boundaries of the districts at issue here—stretching far into Oakland County and even beyond M-59 in Macomb—did improve the 2021 maps' partisan-fairness scores. But that was merely a byproduct of the Commission's racial line-drawing. What improved those scores was the Commission's decision intentionally to distribute African-American voters across a greater number of districts around

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

Detroit.  That racial line-drawing reduced Democratic majorities in general elections, leading to higher partisan-fairness scores—to the detriment, plaintiffs say, of their ability to elect their preferred candidates in Democratic primaries.  Partisan fairness had little to do with the boundaries of the districts at issue here.

c.

The Commission's next argument as to predominance is that it "gave overriding consideration to communities defined by actual shared interests."  R.115 at PageID 4019-21 (internal quotation marks omitted).  As support, the Commission does rely on 18 citations—most of them to only a page or two—to the Commission's meeting transcripts.  *Id.* at PageID 4020.  Seven of those citations are to discussions about communities of interests in areas well outside Detroit, including Muskegon County (near Lake Michigan, north of Grand Rapids), Lansing, Ann Arbor (some 45 miles away from Detroit), and Monroe County (ditto).  *See* MICRC Tr. at 5514-17, 5526, 5559, 5562, 5576-77, 5596-97, 5603.  Those discussions are irrelevant here.

The remaining 11 citations are to discussions among commissioners on a single day—namely September 9, 2021, which was the Commission's first day of drafting its Detroit-area senate maps.  *See id.* at 5661-65, 5667-70, 5680, 5683-85, 9986-96, 9999, 10001-02, 10004, 10008, 10011-13, 10019.  Two of those 11 citations are to discussions about communities of interests that the Commission eventually split up—such as the Downriver community of interest whose fragmentation, four days later, distressed Commissioner Witjes.  *Compare id.* at 5680 *with* 5912; *see also id.* at 10004.  Those discussions likewise do not support the Commission's point.

That leaves nine citations to different parts of the September 9 transcript.  The Commission offers no explanation as to why these discussions (or any of the discussions it cites) support its assertion that communities of interest were an "overriding consideration" or even on par with the

76

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

Commission's BVAP targets as it drafted Detroit-area districts.  Instead we just get the bare cites.

Nor do we see these discussions as supportive of the Commission's point.  In two of them, rather, Adelson or a commissioner warns the group to be mindful of the districts' BVAPs.  *See id.* at 10008, 10013.  And the remaining seven citations are simply to pages where a commissioner talks about a community of interest.  None of these seven discussions involve talk of any tradeoff between COIs and the BVAP targets, or between COIs and any other criteria at all.  Moreover, at the end of the mapping process, not a single one of the Commission's Detroit-area Senate districts had a BVAP exceeding the 35-45% target range.  None of these 18 citations to the meeting transcripts, therefore, undermine our conclusion—based on all the evidence cited above—that the Commission subordinated communities of interest to hitting its BVAP targets.

Two other points bear mention regarding the Commission's assertion about "communities defined by actual shared interests."  At trial, two former state legislators from Detroit—Virgil Smith and Lamar Lemmons III—provided a ground-level perspective on what some of these Detroit-area districts were like.  In 2022, Smith was the campaign manager for an incumbent state senator, Marshall Bullock of Detroit, who ran in the Democratic primary in the newly drawn Senate District 8.  R.102 at PageID 2748.  That district reaches north to include all of Birmingham. And in that election white voters rejected Bullock by a margin of 96% to 4%—which allowed their preferred candidate, from a Detroit suburb, to win the primary and then the general election.  R.71-1 at PageID 1076.  Smith testified about the difficulty that black candidates have campaigning in predominantly white suburbs—where, he explained, "the issues [that voters care about] are completely different."  R.102 at PageID 2750.  Smith testified that "the more affluent the territory got" as Bullock's supporters were canvassing, the less likely it was that voters would answer the door.  *Id.* at PageID 2754.  He testified:  "We have a hard time getting them to answer the door for

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

us, and if we can't get them to answer the door for us, how can we sell ourselves as a candidate to the new voters?" *Id.* at PageID 2750.  And the attitude of some voters, he testified, was that "we have no business being out there."  *Id.*  Lemmons testified similarly, saying that he would hire white canvassers to cover those areas.  *Id.* at PageID 2773.

Second, as a circumstantial matter, that the Commission put cities like Gross Pointe, Bloomfield Hills, and Birmingham—some of the wealthiest cities in Michigan, where Porsches and Range Rovers are commonplace, and Cadillacs more numerous than Chevrolets—in the same districts as some of the poorest neighborhoods in Detroit, itself belies the idea that "communities of interest" were paramount in drawing these districts.  We reject the Commission's argument on this point also.

d.

More briefly, we likewise reject the Commission's argument—to which it devotes a single paragraph in its brief—that the reason the Commission extended its Detroit-area districts into Oakland and Macomb County was that the population in Detroit had declined since the 2010 census.  *See* R.115 at PageID 4019.  Nowhere in the contemporary record do we see any of the commissioners saying anything to that effect.  Instead, they uniformly said they drew those "spokes"—as far north as Bloomfield Hills in Oakland County, and all the way to M-59 in Macomb—to reduce the percentages of black voters in those districts.  *See, e.g.*, MICRC Tr. at 5902, 6157, 6482.  The Commission's characterizations of its actions in this regard are *post hoc*.

In sum, therefore, we reject the Commission's contention that it did not adopt racial targets that predominated over other criteria in drawing Detroit-area districts.

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

e.

Finally, in the interest of completeness, we do address one argument that the Commission has not made:  namely, that inclusion of six black-majority districts in its final House Plan (called "Hickory") tends to show that the Commission did not have a 35-45% BVAP target in drawing Detroit-area districts.  By way of background (and to reiterate somewhat), the Commission released its proposed House and Senate plans for public comment on October 11.  *See id.* at 8164, 8169.  In both those plans the number of majority-black districts in Detroit stood at zero.  Nine days later, on October 20, the Commission held its public hearing at the TCF Center.  And there—not to put too fine a point on it—the Commission endured a nine-hour pounding from Detroit residents who were distressed, above all, about the proposed absence of any majority-black districts for their city.

A week later, before resuming any of its mapping work, the Commission (at the urging of its lawyers) took the extraordinary step of going into a closed session, where everything they said, Pastula announced, must remain confidential.  During that session, Adelson said that "one of the things we have to stress, emphasize, insist on, plead, beg and say please, please don't use phrases about adding black people, subtracting black people, adding white people, subtracting white people."  R.126-1 at PageID 4579.  He then said that "a path forward" for the Commission—toward what, he did not expressly say, but the context, before and after, makes clear enough that he was alluding to raising the BVAPs in some districts—would be to invoke "communities of interest."  *Id.* at PageID 4572.  Kellom and Orton understood his point, with Orton saying, "when we're talking about this, if we choose to put anything together that we currently have separated, we go back to communities of interest.  It's a community of interest thing, not a VRA thing."  *Id.* at PageID 4588.  Lett then spoke more directly, saying that the Commission could define

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

communities of interest however it likes, and so COIs could give the Commission "cover." *Id.* at

PageID 4603.

Szetela testified that, before the Commission's meeting the next day, Rothhorn and Kellom

spoke to her and said that "they wanted to fix Detroit and they wanted to increase the black voting

age population and that they had had a discussion with Bruce Adelson that they could do that as

long as they used neighborhoods as the basis." R.112 at PageID 3718. (Adelson had many sidebar

discussions with commissioners. *See, e.g.*, *id.* at PageID 3767 (Rothhorn); *id.* at PageID 3611

(Szetela)). Based in part on what followed, we find that testimony credible.   During the

Commission's meeting on November 2—the first day it worked on its house maps after the TCF

hearing—Adelson told the commissioners the following:

> [G]oing higher with the BVAP as you're reuniting the neighborhoods, as we were
> doing earlier, that is fine under the Michigan Constitution with the criteria number
> three.  The diverse communities and the communities of interest.  I just wanted to
> make that clarification.

MICRC Tr. at 9188.

Rothhorn then said that he and Kellom had been working on some "major changes" to the

house maps.  *Id.* at 9199-9201. Kellom explained that "we are offering this as a way to move

forward in the Detroit area" and "reunite some of the neighborhoods."  *Id.* at 9206-07.  Szetela

objected, saying "I don't remember Commissioner or individual commenters saying that they

wanted neighborhoods put back together.  I remember a lot of comments about wanting minority

majority districts with more than 50% African/American and I don't remember much of anything

about neighborhoods honestly."   *Id.* at 9207.   Pastula interjected:   "I think what I hear

Commissioner Kellom discuss is, again, the third criteria of diversity and communities of interest

. . . [and] the focus of uniting neighborhoods[.]"  *Id.*

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

The Commission then moved forward with revisions according to Rothhorn and Kellom's proposal.  Then they checked the BVAPs for the house districts.  That showed two things.  First, that in five House Districts—namely, House Districts 4, 5, 6, 9, 16, and 18 (districts not challenged here), the BVAP rose up above 50%.  Second, that in House Districts 1, 7, 8, 10, 11, 12, and 14 (which are challenged here), the BVAPs remained relatively stable—and indeed in House Districts 1, 10, 11, 12, and 14, the BVAPs dropped even further (though still within the 35-45% range).  When they were done, Adelson said:  "So the numbers to me I think I'm good with them. The I think the numbers are an improvement in the sense of responding to concerns about that I took to be community based. So those are my thoughts."  *Id.* at 9256.

From this sequence of events—beginning with the criticism the commissioners had endured at the TCF hearing—one could easily conclude that they invoked "neighborhoods" (mentioned 125 times in that day's meeting) and "communities of interest" (mentioned 99 times) as pretexts, or "cover" (as Lett had said), for simply wanting to raise the BVAPs in some house districts.  (Six of them, as it turned out in the final house plan.)  And thus one could easily conclude that raising those BVAPs amounted to just so much more racial-line drawing.

But we need not make that determination here.  For even if one accepts the "neighborhoods" rationale for those changes, that would mean only that the Commission carved out an exception—in those six house districts—to the BVAP targets that predominated in the Commission's mapping process for Detroit-area districts generally.  None of the BVAPs in the Commission's Detroit-area senate districts changed materially after the TCF hearing.  Those districts lines were thus still based on the BVAP targets that predominated before.  The same is true for the seven house districts at issue here.  It remains true, therefore, that the Commission

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

drew its Detroit-area district lines—including the lines for every house and senate district at issue here—based predominantly on its racial targets.

3.

Racial gerrymandering claims apply "to the boundaries of individual districts." *Ala. Legis. Black Caucus*, 575 U.S. at 262.  Yet what we have already said, in the preceding 81 pages, should be enough to decide this case:  the Commission generally drew its Detroit-area districts based predominantly on race, and the districts here were no exception.  But again, in the interest of completeness (and with apologies for some repetition) we will examine the evidence specific to each district at issue here.  That evidence only confirms that race predominated in drawing each of these districts.

a.

We begin with Senate Districts 1, 3, 6, 8, 10, and 11.  The Commission drafted those districts (and others in Detroit) principally on September 9, 13, 14, and 15, 2021, on October 4, 11, 28, and 29, 2021, and on November 5, 2021.  The Commission adopted the final version of the plan—renamed the Linden plan—on December 28, 2021.  As enacted, each district's black-voter percentage (apart from SD11) fell within the range prescribed by Bruce Adelson.

| District No. | | 1 | 3 | 6 | 8 | 10 | 11 |
|---|---|---|---|---|---|---|---|
| | Date | BVAP | BVAP | BVAP | BVAP | BVAP | BVAP |
| Linden Plan | 12/28/2021 | 35.03 | 42.09 | 39.15 | 40.25 | 40.43 | 19.19 |

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

(i)

*Senate District 1.*  This district (which began as Senate District 17) is located entirely in

Wayne County, and has a black-voting age percentage of 35.03.



As initially drafted (on September 13), this district ran from Melvindale and River Rouge

(at its north end) down along the Detroit River through Trenton and Gibraltar (at its south end).

So drafted, its black-voter percentage was 10.98.  But the Commission thereafter looked for other

districts—with lower BVAPs—where it could put black voters to "balance out the population in

Detroit."  MICRC Tr. at 5912.  This district was one of them.

Specifically, the Commission removed from this district mostly white neighborhoods

further south ("Downriver") and added mostly black neighborhoods in central Wayne County

(including part of Davison-Schoolcraft and Dexter Linwood).  *See id.* at. 5911-12.  But when it

first did so (on September 15), Commissioner Witjes objected:

> Szetela: Go down . . . and try to fix that quickly.  By taking off some of the Down
> River community.  So we are going to work from the bottom. Go to the Township
> level. Commissioner Witjes?

83

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

> Witjes: Why exactly are we messing with the down river community on the south border based on all the praise that we receive that that's basically a perfect District from everyone that lives there.
>
> Szetela: Because we are going to have to, to balance out the population in Detroit.
>
> Witjes: I disagree completely.
>
> Szetela: Okay.
>
> Witjes: I mean where are you drawing this conclusion from out of curiosity? Because I don't see it.
>
> Szetela: From what our voting rights expert indicated our populations were too packed.

*Id.* at 5912.  Those changes and similar ones increased the district's BVAP from 10.98% to 34.86%.  Yet on October 4, once the district had taken form, Commissioner Curry complained about its "crazy" and "terrible" shape.  This exchange followed:

> Rothhorn: I think the reason it's drawn if my understanding is correct Commissioner Curry it's related to the VRA.  Right where the white and Black populations are balanced so yeah.
>
> Curry: It may be balanced but it looks too crazy.

*Id.* at 7469.   The Commission's Secretary, Sarah Reinhardt, then reminded Curry that "compactness" was the Commission's "lowest ranked criteria."  *Id.* at 7470.  But Curry again objected, this time speaking more generally about how the Commission had "chopped up Detroit."

*Id.* at 7479.  Rothhorn again tried to explain why the Commission had "split Detroit":

> The reason I think we are trying to split it is we are trying to get the numbers that we were given from Dr. Handley at 35% with the Black voting age population that is 35% so we did our best to try to draw that with that kind of understanding that the Black voting age population can elect a candidate of choice.  I don't think there are any districts even though they may not look like it.  And it looks like it's splintered.  But there is no District in here with a Black community cannot elect its candidate of choice.

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

*Id.* at 7480.  When the Commission completed Senate Plan 199 (on October 4), the district that became Senate District 1 had a black-voter percentage of 36.73.  The Commission thereafter made only minor adjustments to the senate maps; and the enacted version of this district—Senate District 1—has a black-voter percentage of 35.03.

(ii)

*Senate District 3.*  This district has a black-voter percentage of 42.09 and encompasses parts of Wayne, Oakland, and Macomb County.



The district runs from the Detroit River (including Belle Isle) through Hamtramck, all the way up to 14 Mile Road—where it combines at its north end parts of Clawson (in Oakland County) and parts of Warren (in Macomb County).

Here, too, the contemporary record shows that race predominated when the Commission drew this district.  In its initial form, Senate District 3 (which began as Senate District 8) was majority-black, with a BVAP of 50.82%.  But the Commission thereafter deliberately reduced that number to comport with Adelson's directive.  On October 4, for instance, while Commissioner Weiss was leading the mapping session, he asked:

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

> Weiss: All right, I guess I'm looking here and are we going to try to do something with [this district]?
>
> Rothhorn: Yes. We are currently at 43.25 [BVAP] so you want to try to get it down to 35-40.
>
> Weiss: Yes, I don't think my eraser is big enough.
> . . . .
> Szetela: Just for the public listening, MC Rothhorn was discussing with Commissioner Weiss the populations we are looking at . . . [including what became Senate District 3] . . . . And just directing him those are the districts we are trying to remedy and bring into compliance.
>
> Weiss: All right my suggestions from anybody? I guess I need some help on this one.
> . . .
> Rothhorn:  I can help too.  One of the things I believe that District [] is where again we are not focusing on [communities of interest] so I want to offer this as a way to . . . decrease non-Hispanic Black . . . . And increasing our VRA compliance.

*Id.* at 7446-47.  Rothhorn thereafter suggested moving the district slightly north (into what was then Senate District 16).  Commissioner Weiss did so, namely, by "add[ing] a little more of Clawson"—an Oakland County suburb with a white population over 91%.  *Id.* at 7448; *see* Clawson city, Michigan, U.S. Census Bureau, https://www.census.gov/quickfacts/clawsoncitymichigan (last visited Dec. 21, 2023).  After Weiss did so, Commissioner Lett asked:

> Lett: What's the target for Macomb? Oakland.
>
> Rothhorn: Oakland County the target is 42 to 43ish.
>
> Lett: We are kind of splitting the difference right now.
>
> Szetela: Yep.

MICRC Tr. at 7449.  The black-voter percentage dropped accordingly, and Szetela remarked: "I think it's good.  I think you brought it down so as [Lett] said you are right in the sweet spot at this point."  *Id.*

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

That same afternoon, Rothhorn asked Adelson to "help" the Commission determine whether this district, with its African-American population, still provided black voters with the opportunity to elect their candidates of choice.  He explained:

> [W]e deliberately tried to unpack [several districts, including what became Senate District 3] because those are the highest percentages. And we brought them down significantly.  And if you would like those numbers, I can give those to you.

*Id.* at 7487.  Adelson agreed, remarking:

> We talked about a systematic approach to compliance and that is very important for the record and record keeping in general so I would like to . . . work our way down the list.

*Id.*  When the Commission got to what became Senate District 3—which at that point had a black-voting percentage of 43.35—Adelson confirmed that "all reveals candidates of choice being elected . . . [a]cross the board so I think for now let's put an okay and go to our next District."  *Id.* at 7493.

The Commission thereafter made only minor adjustments to this district—and the black voting age percentage stayed virtually frozen; as adopted by the Commission, Senate District 3 has a black-voter percentage of 42.09.

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

(iii)

*Senate District 6.*   This district has a black-voting age population of 39.15% and encompasses parts of both Wayne and Oakland County.



The Commission reached that BVAP in Senate District 6 (which began as Senate District 9) by moving Southfield (a predominantly black city) into what became Senate District 7 (which in an earlier map was Senate District 14).  Simultaneously, it brought Farmington (a predominately white city) into Senate District 6.

When the Commission began mapping on October 4, the black-voter percentage in this district was 51.99:

> Szetela:  I think you need to take Black population at this point.  What you can do by bringing [this district] down.
> . . .
> Orton: Well from what I think [what became Senate District 6] is overpopulated . . . . So . . . we want to reduce the African/American population in [this district] so what if we took all of Southfield and put it up into [another district] wouldn't that possibility take care of all those problems?
>
> Rothhorn: I think that is what Commissioner Lett was suggesting too.
>
> Szetela: Right.  So you will bring [another district] down [into Southfield] and probably when you do that might have to take [what became Senate District 6] into Farmington a little bit.  It's like you are working at a puzzle here. Shifting things around.
> . . .

88

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

> Szetela: Yes, balance [it] out and then you're going to bring it into Farmington and that will reduce your African/American population.
>
> . . .
>
> Eid: And I'll point out too because [what became Senate District 6] is mostly in Oakland County we can probably get away with that 43% [BVAP] instead of going down to the 40% number.
>
> Szetela: That's true.

*Id.* at 7452-59.  By removing Southfield (mostly black) and adding Farmington (mostly white), the black-voter percentage fell by over 10%—down to 40.03%.  Later on October 4, Rothhorn confirmed that these adjustments had the desired effect: "Correct so [this District] went from 50 to 40.7[%] so that is excellent."  *Id.* at 7464.  Commissioner Witjes replied:

> Yep, perfect.  So I think I'm done at this particular point then for rationale these adjustments [are] taking into account the Voting Rights Act and looking at the voting age population and the Black voting age population to make them so that . . . the districts are able to elect candidates of choice and by definition . . . we are taking into account diverse population of the State of Michigan.  Erasers down.

*Id.*  At trial, Szetela testified specifically about this district, confirming what the contemporary record shows:

> We reconfigured [this District] to bring it farther over into kind of the Livonia area, bring in white voters there, because Southfield has a significant black population so we needed to go west on that one to reduce the BVAP.  And so, again, we're just stretching things out into areas where we know that white voters are making these districts in Detroit skinner, narrower to cut down the black population.

R.112 at PageID 3645-46.

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

(iv)

*Senate District 8.*  This district has a black-voting age population of 40.25% and crosses the county line between Wayne and Oakland County.



When the Commission first drafted this district (which began as Senate District 13), its shape was wide—stretching mostly east to west—and it encompassed large portions of predominantly black neighborhoods in Southfield and Lathrup Village (both in Oakland County). So drafted, its black-voter percentage was 63.77.  But on September 15—two days after Pastula told Szetela that she and Adelson were "alarmed" by that number—the Commission reduced the black-voter percentage by narrowing the district and stretching it north to south.  *See* Pl.'s Ex. 5 at 45.  That day, Rothhorn explained their "rationale," saying, "the reason I'm doing this . . .  is to decrease the minority percentage, right, to have a more balanced Black-white ratio and not just Black and white but nonwhite and white balance."  *Id.* at 5898.  He further explained:

> I'm comparing it and we reduced it and it's relatively high and it's important – what I'm thinking about is flagging this in terms of VRA right in terms of the notes that we will follow-up with Bruce on it but this is in terms of, yeah and it's too high, the percentage is too high and want to chip away at it. What I found is trying to improve

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

> the percentage of 13. . . .  So moving west. I wasn't able to improve the minority percentage.
>
> We have high minority populations in Lathrup Village and Southfield and definitely in the Detroit area so [another district] we have to go further north. And so what I'm going to do is suggest in [what became Senate District 8] any way we, yeah, I guess I'm going to suggest that we have to keep it but I want to get closer to the population. So I want to take off the northern so I think the southern end we have to keep unless other people have ideas. This is where you know again to decrease the minority percentage and increase the white or you know the people of color are too high at this point.

*Id.* at 5899.  A few minutes later, however, Lett told Rothhorn, "looking at the percentages on voting whites and Blacks . . . it appears to me there is a lot of work that's got to be done to get the percentages down under 50."  *Id.* at 5903.  Rothhorn responded:

> Yeah, so maybe so what I'm hearing you say [Lett] which acknowledges [this District] is not good. . . . let's keep playing because we know this one has to change. . . . [this District] is not okay.

*Id.* at 5904.

Yet at the end of that day's mapping session, the Commission had reduced the black-voter percentage to 59.06—just four points lower than it had been two days before.  Thus, on October 4, the Commission again sought to reduce that percentage.  They did so by further narrowing its shape and driving north into predominantly white suburbs—indeed as far as Birmingham, which is 87% white, and whose residents have a median household income of $151,556:

> Witjes: Let's go – let's keep going north . . . . Go as far into Birmingham. Anyone have a thought?
>
> Szetela: I'm sorry could you repeat that.
>
> Witjes: [This District] extending north into Birmingham.
>
> Szetela: Why not. We got to get the VRA right and that is number one so.
>
> Mr. Morgan: Birmingham not Troy?

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

>Clark: When you go into Birmingham, we are stretching this thing all the way from mid-Detroit all the way up there.

>Szetela: What other way is it to get VRA.

>Curry: That is okay. You can do that.

>Clark: I know we can do it.

*Id.* at 7450-51; *see also* Birmingham city, Michigan, U.S. Census Bureau, https://www.census.gov/quickfacts/fact/table/birminghamcitymichigan/PST045222 (last visited Dec. 21, 2023).

That change reduced the black-voter percentage significantly, from almost 60% down to 48%. *See* MICRC Tr. at 7452 (Witjes: "So . . . 48% Black voting age population so it's going down."). But it also increased the district's overall voting-age population, making it overpopulated (for purposes of achieving "equal population" in all districts) by roughly 36,000 people. *Id.* Commissioner Witjes therefore suggested a solution—namely, to remove "piece[s]" of Detroit, so that both the total voter-percentage and the black-voter percentage decreased simultaneously. *See* MICRC Tr. at 7452-53. Those changes had the desired effect:

>Witjes: And what was the percentage that [this District] should go down.

>Rothhorn: Started 57.32 now we are 44.13 nice work.

>Witjes: What does it need to go down to?

>Szetela: Wayne is 40 ideally. 35-40%.

*Id.* at 7453. By the end of the day on October 4, the Commission had reduced the black-voter percentage slightly more, to 42.45%. And after October 4, the Commission made only minor changes to the district; as enacted, Senate District 8 has black-voter percentage of 40.25. Commissioner Szetela explained at trial what the contemporary record shows:

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

>     [This District] was originally entirely up in Oakland County with just a very small
>     amount in Detroit.  We've now brought it down, almost half of it into Detroit. . . .
>     And so, again, we're just stretching things out into areas where we know white
>     voters are making these districts in Detroit skinnier, narrower to cut down the black
>     population.

R.112 at PageID 3645-46.

(v)

    *Senate District 10.*   This district encompasses parts of Wayne and Macomb County and

has a black-voter percentage of 40.43.  Its shape is irregular, running north to south—from roughly

19 Mile Road down to 8 Mile Road—where its southernmost portion hooks east into Wayne

County.



    On October 4, this district (which began as Senate District 6) had a black-voter percentage

of 49.38.  As a result, Szetela identified this district as one where "we [] still have some VRA work

to do[.]"   MICRC Tr. at 7438.   Rothhorn agreed, reminding the group to keep Dr. Handley's

racially polarized voting analysis in mind:

>     It might help Commissioners if you are looking at Lisa Handley's presentation Page
>     20 the map that shows the State House districts and the State Senate districts for

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

> the 2010 maps what she shows on that Page 20 is the areas that are packed and what
> she describes as the most packed is 50% to 70% meaning if we are in 50%, we are
> not unpacked [] and if we are 40%, we have not unpacked it.
>
> The map shows where we should target.  All those districts [including what became
> Senate District 10] are all in the area if we are 50% range it's just as packed as it
> was in 2010.  That's kind of the map I'm reading here.

*Id.*

Commissioner Vallette then led the mapping session during which the Commission
modified this district's boundaries.  To reduce the black-voting age percentage, Vallette narrowed
the district and extended its northern edge further into Macomb County—all the way up into
Sterling Heights and past 19 Mile Road.  *Id.* at 7443.  Those changes reduced the BVAP to a "hair
over 40%"; but (as with Senate District 8) they also caused an increase in the district's overall
voting age population, making it overpopulated by roughly 7,000 people.  *Id.* at 7445.  Szetela
noted, however, that the district as amended had "accomplished" VRA compliance and that—
though still slightly overpopulated—it fell "within" an appropriate "deviation."  *Id.*  But then Orton
suggested a simple solution:

> Orton:  [I]f you took some . . . more of the higher Black population [in this District]
> . . . and put it [another district] that's going to decrease the population over all and
> it will make [the BVAP] under 40% probably.

*Id.*  Vallette thereafter moved a predominantly black precinct "south of 8 mile" into the district
adjacent (which became Senate District 11).  As a result, both the total voter-percentage and the
black-voter percentage decreased:

> Vallette: I think I'm good.
>
> Rothhorn: Yes you are.
> . . . .
> Szetela: Brought your African/American below 40%.  So now you are perfectly in
> the sweet spot of 35-40.  All right.

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

*Id.* at 7446.  Senate District 10 thereafter changed only slightly; in the map completed on October 4, its black-voter percentage was 41.2.  As enacted in the Linden plan, that number is 40.43.

(vi)

*Senate District 11*.  This district (which began as Senate District 5) has a black-voter percentage of 19.19 and is located almost entirely in Macomb County.



Its shape is long and narrow, stretching from just south of 8 Mile Road (in Wayne County) all the way past 24 Mile Road in Macomb Township.  As the Commission did with Senate District 1, it looked for other districts to add black voters to "balance out" Detroit.  MICRC Tr. at 5912. This district was one of them.  As Szetela testified at trial: "So, again, we're trying to reduce black population [in other districts] and that requires us to grab more white population, and that also shifts some of the black population into a district where there's very little black population.  So we [took] Eastpoint[e] . . . which is predominantly black, [out of Senate District 10], and we put it into a mostly white district [Senate District 11]."  R.112 at PageID 3737.  And when asked,  "So if you're black and you live in Eastpoint[e], why did the Commission put you in an 80 percent

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

white district[,]"  Szetela answered: "[b]ecause we had to reduce the black voting population in the district adjacent to it."  *Id.* at PageID 3739.

The contemporary record confirms the accuracy of Szetela's testimony.  For example, on October 4, Commissioner Vallette "[took] the top tier from Eastpointe" out of what became Senate District 10 and put it into what became Senate District 11—which, Rothhorn observed, "reduced" the BVAP in Senate District 10 "from 47.3 to 45.8 so you are definitely heading in the right direction."  MICRC Tr. at 7442; *see also id.* ("Okay so at this point you have most of Eastpointe [in what became Senate District 11].")"; *id.* at 7443 ("Again Janice for context you started 47.83 non-Hispanic Black age population [in what became Senate District 10] so you are definitely working in the right direction.").

Thus, the Commission moved a substantial number of voters into this district based on their race.  And as enacted in the Linden plan, the black-voter percentage in Senate District 11 is 19.19.

b.

We next consider House Districts 1, 7, 8, 10, 11, 12 and 14.  The Commission drafted those districts (and others in Detroit) principally on September 20, 21, 22, 29, and 30, 2021, on October 5, and 8, 2021, and on November 2, 3, 4, and 5, 2021.  The Commission adopted the final version of its house plan—the Hickory plan—on December 28, 2021.  As enacted, each district's black-voter percentage fell within the range prescribed by Bruce Adelson.

| District No. | | 1 | 7 | 8 | 10 | 11 | 12 | 14 |
|---|---|---|---|---|---|---|---|---|
| | Date | BVAP | BVAP | BVAP | BVAP | BVAP | BVAP | BVAP |
| Hickory Plan | 12/28/2021 | 38.03 | 44.29 | 43.70 | 38.79 | 42.82 | 40.99 | 41.11 |

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

(i)

*House District 1*.  This district has a black-voter percentage of 38.03.



On September 30—the day that Pastula advised the Commission to review its draft districts one-by-one to ensure that their BVAPs fell in the range specified by Dr. Handley's report—the Commission skipped over House District 1 because, at that point, its black-voter percentage was only 36.58.  *See id.* at 7226-39.

When the Commission sought to revise the house districts for "VRA compliance" (on October 5), Weiss said that House District 1 "looks good."  *Id.* at 7639.   But he also noticed that an adjacent district—which became House District 2—was "a little high", so suggested the Commission "maybe . . . swap some stuff out here[.]"  *Id.*  Szetela soon asked, "Just to be clear you're trying to increase the African/American population in one and reduce it in two is that what I'm understanding you're trying to do?"  *Id.* at 7641.  Weiss replied: "Yes at least that's what I'm thinking.   Any suggestions Chairperson?"   *Id.*  Szetela then suggested that, based on her "familiar[ity]" with Detroit, "if you take population from two up at the top and put it into one,

97

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

you're adding more African/American into one . . . . [s]o that might enable you to balance it[.]" *Id.* at 7641.  Weiss thereafter did so, and the black-voter percentage rose to nearly 40.  *Id.* at 7642 ("now we are 39.9").

The Commission thereafter used the bellwether-election tool to confirm that black candidates could still elect their candidate of choice (in general elections, given its limitations); and unsurprisingly, it showed that black candidates of choice (Democrats) won in landslides.  *See id.* at 7649 ("District 1 is for the election results as configured now 87 for Biden, 13 for Trump, 91 for Clinton, 9 for Trump, Obama 94, Romney 6 . . . .").  Adelson utilized this as a teaching moment, to again remind the Commissioners about the dangers of "packing":

> Election results are all uniform and play out and indicate this is a [district] that performs where minority candidates of choice can be elected but going back a little bit to my discussion [from earlier] . . . . Here this is a district where the margins are very strong.  So rhetorically if you were going to add additional minority population here, wouldn't that be packing?  That's not necessary to elect candidates of choice. That's the key metric.
>
> So the margins were close like 50.1 to 49.9, yeah, I think that that would make sense.  But when you have margins like this, the difficulty is in justifying it why did you do that?  What would be constitutional rationale?  If you will so that is part of seeing in real time since the election results all play out strongly, that's the Voting Rights Act metric, ability to elect.

*Id.*  at 7649-50.

The black-voter percentage thereafter stayed remarkably stable; as enacted in the Hickory Plan, House District 1 has black-voter percentage of 38.03.

98

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

(ii)

*House District 7.*  This district has a black-voter percentage of 44.29.  It is long and narrow, stretching from Davison-Schoolcraft (in Wayne County) through Royal Oak (in Oakland County) up to 12 Mile Road.



When the Commission began mapping on September 30, the district that became House District 7 had a black-voter percentage of over 75—and Adelson therefore identified it as a "serious district[]" that "has[s] significantly more [black] population than Dr. Handley recommended in her analysis."  *Id.* at 7223.  Rothhorn confirmed as much a few minutes later, saying, "I think I heard [what became House District 7] for example is one that needs to be fixed."  *Id.* at 7224.  So did Curry:  "I think . . . Bruce said that it was [the district that became House District 7] . . . [that was] over packed and maybe we could look [at it]."  *Id.* at 7231.  Pastula suggested that the Commission "scroll" down the list and identify "anything that is higher than

99

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

40% for the Black voting age population"; she also noted that House District 7 was one she "anticipate[d]" the Commission would fix. *Id.* at 7226. A few minutes later, Pastula again told the Commission to look at the district that became House District 7 (among others) to see how the black-voter percentage "can be minimized." *Id.* at 7229; *see also id.* at 7243 (Pastula) ("The data for [what became House District 7] is . . . 76.72 Black VAP [which] would be considered a packed District so what we were trying to do is utilizing the racial bloc voting, which the Commission with the percentage by which the minority voting population would have the opportunity to elect candidates of choice . . . . so I hope that was helpful in what the goal is.").

Szetela thereafter suggested that the Commission start there: "So [this district] is definitely the highest," it "has 76% African/American. . . . We can certainly start with [what became House District 7]." *Id.* at 7232. As Curry began to lead the mapping session, Rothhorn gave her a reminder:

> Rothhorn: I think our goal Commissioner Curry is to reduce [the BVAP].
>
> Curry: 40, 45.
>
> Rothhorn: Correct, yep.

*Id.* at 7234. Curry thereafter made several adjustments, one of which was to "put[] some of the African/American population from Detroit" into an adjacent district. *Id.* at 7234. Curry then asked "so we need to get rid of about how many more, unpack how many more?" *Id.* at 7325. Rothhorn explained that, consistent with the "spoke concept," the Commission would need to draw the district further north: "[S]o we have taken away the Black population now add a white population in order to significantly reduce [the BVAP] and it looks like based on" the black-voter "theme" "it needs to be north to Berk[ley] and I don't know what you think about as far as Berk[ley] being able to fit with this District and I think that is part of what we are struggling with." *Id.* at 7236.

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

Curry then made some additional adjustments whose specifics are unclear from the record, but in any event the BVAP went down as result.  Rothhorn confirmed:  "Going to watch the numbers for the . . . Black voting age population so we reduced it by 13% ." *Id.* at 7239.  Rothhorn then added, in apparent frustration how the district was drawn, "Mr. Adelson is asking us to experiment and don't want to sacrifice people's lives in the way they want their districts drawn but we do need to try it." *Id.*  By the end of the day on September 30, the district that became House District 7 had a black-voter percentage of 66.54.

On October 5, the Commission shifted what became House District 7 further east, thereby reducing the black-voter percentage substantially, to 39.85.  In November, however, the BVAP for this district increased slightly.  Clark said that a higher BVAP for this district "would further support what I heard at the TCF center of having more higher percentage African/American population that they have today so I think that would help what I heard at TCF." *Id.* at 9416.  As approved in the Hickory Plan, House District 7 has a black-voter percentage of 44.29.

(iii)

*House District 8.*  This district has a black-voter percentage of 43.7.  It is long and narrow, running from Midtown Detroit (in Wayne County) through Madison Heights (in Oakland County) and up to 14 Mile Road.

No. 1-22-cv-272
*Agee et al. v. Benson et al.*



On September 30, Adelson advised specifically that House District 8, which at that time had a black-voter percentage of 53.85 and was far more compact, was "still a little on the high side," so he suggested "go[ing] back and see if we can make some further refinements." *Id.* at 7282.  But Eid was apparently confused, so he asked Kellom (who was leading the mapping session) for clarification, saying, "We are saying eight is still on the high side being at 53.85%?" *Id.*  That led to the following exchange:

> Kellom:  So Commissioner Eid I was getting mixed messages I heard what Bruce said about that. And because I thought that 53 was high.  But he said it's not that high considering so I was going to stop my turn.  But then we got more hands so I'm going to stop talking and I want a specific direction in terms of what to do.
>
> Adelson:  Commissioner Kellom, I don't want you to use the term direction but I will say I wish you and I continued our collaboration with District eight to further our compliance refinement.  And that the population that we will need to adjust from 8, that will you know obviously affect the connected districts.  But I think that

Case 1:22-cv-00272-PLM-RMK-JTN   ECF No. 131,  PageID.4806   Filed 12/21/23   Page 103 of 116

*Agee et al. v. Benson et al.*

> – my recommendation is you and I continue with eight to see how we can further improve the population[.]
>
> . . . .
>
> Rothhorn:  I think through the actions of Mr. Adelson and Kellom they will try to experiment to see if they can get it lower.
>
> . . . .
>
> Adelson:  But 53.85% yes, it's an improvement.  Yes, it is moving in the right direction.  But my feeling is that there is more to be done here.  Because I am just [loth] to say creating 54, 55, 56% majority minority districts in an area that analysis is determined, Black voters can elect at percentages lower.  I'm not prepared to do that.  So the axiom that Commissioner Rothhorn with all due respect kind of said in my head is try.  There is still more trying to do.  We are not at the end of the line yet.

*Id.* at 7283-84.  Kellom thereafter continued to reduce the black-voter population, during which Adelson suggested "there may be places to adjust to the north . . . . Which I think . . . does not have a significant BVAP population so that is just the suggestion [as] another place to look for adjustments." *Id.* at 7284.  Kellom did so, drawing the district further north in Oakland County (namely, into Royal Oak and Madison Heights); that "adjustment" reduced the black-voter percentage from 54 to 50, which Adelson said was "a big improvement."  *Id.* at 7285, 7287.

On October 5, while the Commission worked on other house districts south and west of House District 8 to ensure compliance, it "[a]ccidentally" "balanced" the black-voter percentage in House District 8—namely, by reducing it further, to 35.71.  *Id.* at 7648 (Rothhorn: "I think you may have balanced 8 it was 53.9[.]").  The Commission thereafter reviewed this district with Adelson, and Clark asked: "So eight is another this is going to be in Wayne County and Macomb County I believe yeah so [what] are [we] focusing towards here?  Wayne, we said 35 to 40% Macomb had nothing [and] we are currently at 35.71 . . . so if we raised it to 40, I think we will be okay." *Id.* at 7657.  Adelson replied: "Commissioner Clark and particularly if you are moving population from Wayne County areas, I think that is the zone to look for[.]"  *Id.*  He added, however, that "this District is underpopulated [as a whole] so there is some room to grow here."

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

*Id.*  Commissioner Clark thereafter "put the Black population on the screen" and suggested "add[ing]" from what became House District 14 "into" House District 8.  That change slightly increased the black-voter percentage in House District 8, to 37.98.  *Id.*  Szetela then asked Adelson:

> Szetela:  8 with 37.98 and we have ten with 42.53 so I mean we could try to balance them more but they are still both going to be about 40 is that acceptable?
>
> Adelson: Is that mainly in Wayne County?
> . . . .
> Szetela: Eight I would say is more in Oakland County.
>
> Clark: Eight goes a little further north than Oakland . . . .
>
> Szetela: Eight does come all the way down so yeah, I would say they are 50/50. . . .
>
> Adelson: [W]e can see if there are some additional judgments to make with the aim of hitting Dr. Handley's marks and then we can look at the elections.

*Id.* at 7658.  Commissioner Clark then "move[d] some" non-black population into what became House District 10 to "increase" the black voter-percentage in House District 8.  *Id.*

In November, however, the Commission noticed that House District 8 was overpopulated. *See id.* at 9406 (Rothhorn: "The District that has the most to give is House District 8.").  But Szetela reminded the group that House District 8 is an "Oakland County VRA district where we are trying to keep it above 40."  *Id.*  Accordingly, the Commission increased House District 8's black-voter population slightly by removing white portions of Madison Heights in Oakland County.  *See id.* at 9410 (Kellom:  "sorry I was just double checking the African/American population in Madison Heights and it's 8.51% so yes that is fine"); *id.* (Rothhorn: "Black voting population increased with that change.  And may reflect what our fellow Detroiters were asking for. . . . And yeah, I think we are going to go with that.").  As finally approved, the black-voter percentage in House District 8 is 43.70.

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

(iv)

*House District 10.*  This district has a black-voter percentage of 38.79.



The Commission began drafting House District 10 (which began as House District 4) on September 21.  Clark immediately noted that, since "[w]e've got a large portion of Detroit left . . . . We are going to end up with an African/American population that is going to be pretty significant."  *Id.* at 6410.  Szetela recommended that they draw a "spoke" which (she said) would create more "balance[]."  *Id.*  But Clark responded that it made little sense to group together "that eastern part of Detroit" with Grosse Pointe, which has the "majority of the money."  *Id.* at 6411.  Szetela reminded Clark that "that VRA is first on our list.  And so we have to look at accommodating VRA first.  And if that requires [uniting those neighborhoods] to do it, I think that is where we need to look first."  *Id.*  The Commission thereafter modified several other districts, and by September 28 the black-voter percentage for this district was 42.74.  Yet on September 30, the Commission adjusted several districts south and west of House District 10, and in doing so increased the black-voter percentage to 58—which was "substantially more out of the range than we wanted."  *Id.* at 7277 (Orton: "Okay, so before you did this . . . the voting age Black population in District 4 was 41.2% which is quite a bit closer to the target that we are going for.  Now it's a lot higher . . . . I thought we were going 35-40% so [it is] way out from what I'm thinking.").

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

Thus, on October 5, the Commission stretched this District farther north to reduce its black-voter percentage.  As Witjes explained, "I would imagine we would have to go north, correct? We got to take away some too."  *Id.* at 7642.  The Commission thereafter narrowed the lower half of this district, and then extended its reach up to the Wayne-Macomb County border, which reduced the black-voter percentage substantially—all the way to 40%.  *See id.* at 7643 (Szetela:  "Brought it down quite a bit.").  Witjes then asked Adelson: "as District Four is below 40%.  And 40% sweet spot still apply?"  Adelson replied: "As we talked about yesterday, I think providing some leeway, a little cushion here I think that is important."  *Id.* at 7644.  The Commission then made a few more adjustments, which (by the end of that day's mapping session) increased this District's BVAP to 42.68%.

The Commission thereafter made only minor adjustments in November, which decreased the black-voter percentage further, to 38.79.

(v)

*House District 11.*  This district has a black-voter percentage of 42.82.

No. 1-22-cv-272
*Agee et al. v. Benson et al.*



When the Commission began mapping on September 30, House District 11 (which began

as House District 6) had a black-voter percentage of over 65.66.  Adelson therefore identified it as

a "serious district" that "ha[s] significantly" more black "population than Dr. Handley

recommended in her analysis."  *Id.* at 7223.  Pastula thereafter advised the Commission to "start

again with the list at District 1 and look at [] the Black VAP, if it's above that 40% particularly in

the Metro Detroit area how that can be minimized and I know from the chart . . . it's also [what

became House District 11]."  *Id.* at 7229.  Szetela then noted that what became House District 11

"definitely" had one of the "highest" black-voter populations.  *Id.* at 7232.  The Commission

thereafter began adjusting other districts, but Eid suggested "go[ing] to" what became House

District 11, since it was "64%" BVAP.  *Id.* at 7241.  Accordingly, the Commission added to this

District a significant portion of Grosse Pointe Woods (to the north), and removed a portion of

Harper Woods (to the south), which brought this district's BVAP "significantly lower."  *Id.* at

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

7241, 7277.  By the end of the day on September 30, the Commission had adjusted the black-voter percentage down to 49.23.

On October 5, the Commission again identified each house district with black-voter percentages higher than 40-45, and thereafter sought to reduce those percentages.  *See, e.g., id.* at 7639.  In what became House District 11, the Commission accomplished that goal by again "expand[ing] [the district] north" further into Macomb County, as far as St. Clair Shores.  *Id.* at 7644; *id.* at 7643 (Szetela: "With . . .[what became House District 11] we have room to go north" because it "kind of lead[s] out of Detroit."); *id.* at 7644 (Witjes: "now [what became House District 11] needs to expand north").  Those changes and others reduced this district's BVAP a little more, to 47.37.  *See id.* at 7665 (Szetela:  "What about taking a little bit of St. Clair shoes that western edge . . . isn't that primarily white along there.  Add a little more white to bring down your African/American?").

In November, the Commission modified the district again by adding more white population in Macomb County, thereby reducing the black-voter population to 42.82—where it remained when the Commission adopted the Hickory Plan in December.

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

(vi)

*House District 12.*  This district has a black-voter percentage of 40.99.



Throughout the mapping process, the black-voter percentage in House District 12 (which began as House District 11) remained right around 43.  On October 5, however, the Commission modified several adjacent districts, and the BVAP in what became House District 12 exceeded 50%.  *See id.* at 7663 (Rothhorn: "the Black voting age population [in what became House District 12 was] 51.58 and went up to 61 so we are back down again").  Thus, the Commission sought to reduce it—specifically, by extending the district farther north to include more white population. *Id.* at 7664 (Lett:  "The only thing I'm trying to do right now is get the percentage down on [what became House District 12].");  *id.* (Orton:  "Well I'm thinking if you just add a little bit more into" the district adjacent "since it is [] a little bit under populated, that's taking African/American population out [so] that will help the number [what became House District 12], I think.");  *id.* at 7665 (Clark: "That is the concept move more white into [this District].").  Those adjustments and

109

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

others, which Adelson remarked moved "the numbers . . . in a positive direction" reduced the black voter percentage to 49.89, which Szetela noted was still "a hair high."  *Id.* at 7666.

In November—after Adelson's admonition at the closed session meeting—the Commission modified what became House District 12 by extending it even farther north, through Roseville and up to 13 Mile Road in Macomb County.  The Commission ostensibly aimed in part to keep the "Roseville community together," in its effort to "mend some of these neighborhoods." *Id.* at 8773.  The Commission also excised portions of House District 12's southern end in Wayne County.  Those changes together reduced the black voter percentage down to 40.99.

(vii)

*House District 14*.  This district has a black-voter percentage of 41.11 and encompasses parts of Wayne and Macomb County.



Throughout September and October, House District 14 (which began as House District 10) extended from the western half of Warren (in Macomb County) all the way down to just north of Eastern Market in Detroit (in Wayne County).  For much of that time, this district's BVAP

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

remained just below 40.  But on October 5, that number increased slightly because the Commission reduced the black-voter population in districts to the east and south.  *See, e.g., id.* at 7643 (Orton: "It seems like [what became House District 14 is] now really high."); *id.* (Witjes:  "That [increase] happened because of how we are adjusting.").   The Commission thereafter sought to bring the BVAP for this district back down.  *See id.* at 7657 (Clark:  "Okay so [what became House District 14] is overpopulated so let's take a look at the border of 8 and [what became House District 14] and let's see if we can move some Black population.  We may impact [what became House District 14] by doing that percentage wise."); *id.* at 7658 (Clark:  "Go to the top and Madison Heights and move some from eight into [what became House District 14] . . . . And that will bring non-Black population into [what became House District 14] which should reduce it a little.").   After the Commission made a few more changes that reduced this District's BVAP further, Adelson approved: "I think the percentages there has been some positive movement . . . with the percentages but that is my only offhand thought."  *Id.* at 7660.  By the end of the day on October 5, the black-voter percentage in what became House District 14 was 42.8.

In November, however, the Commission modified the district when it incorporated the "draft overlay" map proposed by Rothhorn and Kellom.   Rothhorn nevertheless reminded the Commission that what became House District 14 was "one of those VRA districts."  *Id.* at 9410.  As enacted in the Hickory Plan, House District 14 has a black-voter percentage of 41.11.

c.

Based on all the evidence cited above—including both the Commission's race-based targets in drafting the Detroit area, and the district-specific evidence just described—we conclude

111

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

that  the boundaries of all the districts at issue here were drawn predominantly on the basis of race.

Indeed the record before us permits no other conclusion.

## B.

We make shorter work of the Commission's backup argument that its race-based line-drawing can survive strict scrutiny.  Plaintiffs have shown that the lines for their districts were drawn predominantly on the basis of race, which means those districts "cannot be upheld unless they are narrowly tailored to achieving a compelling state interest."  *Wis. Legis.*, 595 U.S. at 401 (quoting *Miller*, 515 U.S. at 904).  The Supreme Court has assumed, without deciding, that compliance with the VRA can be a compelling interest that supports drawing districts along racial lines.  *Id.*  To that end, the Commission first asserts that, in the 2011 plan, Detroit-area districts had been "packed" in potential violation of the VRA.  (Notably, no Detroit voters themselves ever chose to challenge the districts.)  And the Commission argues that it had "good reasons to think" that Section 2 of the VRA itself required the Commission to reduce the BVAPs of plaintiffs' districts to between 35-45%.  *See Cooper*, 581 U.S. at 293.

That argument is meritless.  The Commission repeats to us what Adelson so often told the commissioners:  that BVAPs above 35-45% in these districts would amount to "packing" African-American voters in violation of the VRA.  The Supreme Court recognized the possibility of packing claims in *Thornburg v. Gingles*, when it said that a state could violate § 2 by concentrating black voters "into districts where they constitute an excessive majority."  478 U.S. 30, 46 n.11 (1986).  In the 37 years since, however, the Court has yet to hold that any district violated § 2 on grounds of packing.

The Commission had little reason to think these districts could be the first.  Begin with what the Supreme Court actually said in *Thornburg*:  that an "excessive *majority*" of black voters

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

could amount to packing in violation of the VRA.  *Id.* (emphasis added).  Yet here the racial targets limited these plaintiffs to a political *minority* in their districts.  True, in one case—30 years ago—the plaintiffs argued that the VRA required the state to change a majority-minority district to a minority-minority one.  But the Supreme Court did not recognize that as a valid theory under § 2 then—it decided the case on other grounds—and it has not done so since.  *Voinovich v. Quilter*, 507 U.S. 146, 154 (1993).  Moreover, in every case where the Supreme Court has found vote dilution in violation of § 2, it ordered the creation of a *majority*-minority (*e.g.*, majority-black) district—rather than a minority-minority one, which is what (per Adelson's advice) the Commission confined itself to here.  And the Commission's theory would make the BVAP floor necessary for "opportunity" districts under the VRA also a BVAP ceiling in those same districts.  *See* MICRC Tr. at 5810-12.  The Supreme Court has never said anything like that.

     Thus, the Commission's theory of potential liability, at best, is highly speculative.  And speculative reasons are not "good reasons for thinking that the [VRA] *demanded*" the racial line-drawing employed here.  *Wis. Legis.*, 595 U.S. at 404 (emphasis in original; internal quotation marks omitted).

     Nor did the Commission have anywhere near an adequate basis for the factual premise of its theory:  namely, that black voters could in fact elect their preferred candidates at the BVAP levels prescribed for the districts here.  Everyone agrees that the elections in these districts are decided in the Democratic primaries, not the general election.  Yet Handley's analysis lacked any primary-election data that was relevant to whether black voters could elect their preferred candidates at these BVAP levels.  Even Adelson admitted as much.  And Handley herself admitted to Szetela, at the eleventh hour, that "we simply do not know" how black-preferred candidates would fare in Democratic primaries.  Yet these experts told the commissioners again and again—

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

based on general-election data alone—that black-preferred candidates would "perform well" in these districts.  That was a grave disservice to everyone involved with this case, above all the voters themselves.

All the districts in this case were drawn in violation of the Equal Protection Clause of the U.S. Constitution.  Finally, given that holding, we need not reach plaintiffs' § 2 claim under the VRA.

*     *     *

We enjoin the Secretary of State from holding further elections in these districts as they are currently drawn.  And we will direct that the parties appear before this court in early January to discuss how to proceed with redrawing them.

**IT IS SO ORDERED.**

Date:  December 21, 2023                    /s/ Raymond M. Kethledge___
                                            Raymond M. Kethledge
                                            United States Circuit Judge


                                            /s/ Paul L. Maloney_____
                                            Paul L. Maloney
                                            United States District Judge


                                            /s/ Janet T. Neff_____
                                            Janet T. Neff
                                            United States District Judge

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

NEFF, District Judge, concurring in the result.

Although the majority reaches the correct result, I write separately because I believe the opinion is unnecessarily harsh to the Commission, Bruce Adelson, and Lisa Handley.

"Redistricting is never easy," *Abbott v. Perez*, 138 S. Ct. 2305, 2314 (2018), and is generally accomplished behind closed doors, either by legislators or the courts so there is no way to watch it being done. In 2018, the people of Michigan overwhelmingly voted to open the doors and take the politicians out of the redistricting process with the ultimate goal of creating more fair maps. To that end, the Michigan Independent Redistricting Commission—comprised of thirteen randomly selected lay citizens—is now entrusted with making the reapportionment decisions in Michigan. The process is conducted in full view of the public, the media, and any interested group or individual. The majority opinion makes that point throughout, quoting extensively from the 10,000+ page transcript of the Commission's work and uses the commissioners' own words to establish that the process was fatally flawed.

The thirteen civic-minded commissioners had a difficult job with scant preparation and nearly no experience in the reapportionment process. A difficult task became nearly impossible for the Commission when the pandemic hit in 2020. The Michigan Constitution required the Commission to publish proposed redistricting plans no later than September 17, 2021, and to adopt final plans by November 1, 2021. Mich. Const. art. IV, §§ 6(7) and 6(14)(b). The pandemic caused a six-month delay in the census data, and the Commission did not start map-drawing until mid-August 2021.

Commissioner Erin Wagner succinctly described the difficulty facing the commissioners, "we were 13 citizens that didn't know what we were doing, and so we were looking to people that . . . we were told were experts, so of course you're going to lean on an expert's opinion." (ECF No. 112 at PageID.3807.) The Commission's experts—Mr. Adelson and Dr. Handley—are highly

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

respected in the redistricting field.  Dr. Handley is one of the leading experts and has testified about redistricting and voting rights in numerous courts across the nation.  Here, she provided her racial bloc analysis but readily admitted that she did not have the most probative primary elections results until very late in the process.  (ECF No. 106 at PageID.3219.)  Mr. Adelson also has an extensive resume, including acting as the Voting Rights Act counsel for the Arizona Independent Redistricting Commission in 2011.

In the face of such a daunting task, the extensive quotes of the Commission's work reflected all the best that could be expected: they took the work seriously, they worked hard to learn the job, they cooperated and collaborated, and they wanted to do the job well and right.  Any suggestion otherwise does a disservice to the men and women who undertook a very difficult and unprecedented task.  There was no history to follow or learn from and no role model to lead the way and to set a standard.

I do not believe that there was any ill intention by any individual in this case.  In many respects, the adopted maps may have accomplished the ultimate goal of being more "fair."  Previous maps commonly divided districts based on lines of historical segregation.  (*See* ECF No. 102 at PageID.2653.) Were these old districts drawn predominately based on race or for another legitimate reason?  We will never know because everything happened behind closed doors.  Everything is public now.  And the unique circumstances of this reapportionment process led to an extensive record of race predominating in the line drawing of certain districts.  This finding, however, should not take away from the fact that the Commission worked extensively hard throughout this extremely difficult process to do what it thought was right.