UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| DONALD AGEE, JR. et al.,<br><br>                Plaintiffs,<br>v.<br><br>JOCELYN BENSON, et al.,<br><br>                Defendants. | Case No. 1:22-CV-00272-PLM-RMK-JTN<br><br>**THE COMMISSION'S RESPONSE TO THE COURT'S ORDER FOR SUPPLEMENTAL BRIEFING ON THE REMEDY ISSUE** |

**STATEMENT**

On December 21, 2023, the Court held that several of Michigan's house and senate districts violate the Equal Protection Clause, and it enjoined future use of those districts. *See* Opinion and Order, Doc.131, at 114, PageID.4817. The Court then requested from the parties "supplemental briefing on the remedy issue considering the looming election season." Order, Doc.132, at 1, PageID.4820. This is the response of the Michigan Independent Citizens Redistricting Commission (the Commission) to that order.[1]

Although the Commission is a comparatively new institution, it finds itself in a familiar position for redistricting authorities of finding its plans held to contravene federal law. Fortunately, the principles governing the next stages of this suit are settled. As the body with legislative power to configure redistricting plans in Michigan, the Commission must be afforded a reasonable opportunity to fashion remedial districts. There is time for that to occur.

---

[1] The Commission has yet to provide direction to the undersigned counsel concerning a potential appeal from the Court's liability ruling. This memorandum assumes the liability ruling and injunction will remain undisturbed for the sake of argument only and does not concede the correctness of the ruling or abandon any potential appeal positions.

1

The Commission desires that opportunity and is likely to succeed in fashioning remedial districts if it is afforded an appropriate time period to do so. This Court must stay its hand while the legislative process progresses, but it will ultimately have the responsibility to review any plans the Commission enacts for federal-law compliance and the power to fashion remedial districts (based on State policy) if the Commission's effort does not succeed. The Court has authority to take precautionary steps as the legislative process occurs, which may include retaining a special master and collecting the data and information necessary to make an informed judgment. However, the Court's role does not include influencing or intervening in the legislative process as it occurs. We explain these positions in further depth below.

> **A.  The Commission Must Receive a Reasonable Opportunity to Fashion and Enact Remedial Legislative Districts**

The framework governing the remedial process in this Court is settled. The Supreme Court has "said on may occasions" that "reapportionment is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court." *Chapman v. Meier*, 420 U.S. 1, 27 (1975); *see also Growe v. Emison*, 507 U.S. 25, 34 (1993). "Absent evidence that these state branches will fail timely to perform that duty, a federal court must neither affirmatively obstruct state reapportionment nor permit federal litigation to be used to impede it." *Growe*, 507 U.S. at 34.

As applied where federal courts find a redistricting plan unconstitutional, this principle requires courts "to afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan." *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978). "[A] legislature's 'freedom of choice to devise substitutes for an apportionment plan found unconstitutional, either as a whole or in part, should not be restricted beyond the clear commands' of federal

law." *North Carolina v. Covington*, 138 S. Ct. 2548, 2554 (2018) (citation omitted); *see also, e.g.*, *United States v. Brown*, 561 F.3d 420, 435 (5th Cir. 2009) ("[A]t least in redistricting cases, district courts must offer governing bodies the first pass at devising a remedy[.]"). This remedial opportunity was afforded in the most recent redistricting case resolved in the Supreme Court. *See Caster v. Allen*, No. 2:21-cv-1536-AMM, 2023 WL 6005545, at *3 (N.D. Ala. Sept. 5, 2023) ("Because federal law dictates that the Alabama Legislature should have the first opportunity to draw a remedial plan, we gave the Legislature that opportunity."). And just a few months ago, when a district court afforded a state legislature an unreasonably short time to remedy a likely violation of the Voting Rights Act, the Fifth Circuit issued a writ of mandamus commanding that court to afford additional time. *See In re Landry*, 83 F.4th 300, 306–07 (5th Cir.) (Jones, J., for the court), stay denied, 144 S. Ct. 6 (2023); *see also Robinson v. Ardoin*, 86 F.4th 574, 586 (5th Cir. 2023) ("[W]e agree with the ruling that the Louisiana Legislature has time to create its own remedial plan. Our decision will give the Legislature an opportunity to act or to inform the district court that it will not.").

These principles apply with enhanced force here. The Michigan Constitution, in a provision recently adopted by Michigan's voting public, establishes the Commission as the body responsible to configure legislative and congressional districts, affords it "legislative functions" that are "exclusively reserved to" it, and directs the Michigan Supreme Court to "remand a plan to the commission for further action if the plan fails to comply with the requirements of this constitution." Mich. Const. art. 4 § 6(1), (19), and (22). The Constitution further provides: "In no event shall any body, except the independent citizens redistricting commission acting pursuant to this section, promulgate and adopt a redistricting plan or plans for this state." *Id.* art. § 6(19). The Commission therefore qualifies as the "legislature or other

3

body" vested with redistricting authority, whose prerogative this Court is bound to respect and which must receive a reasonable opportunity to redistrict. *Growe*, 507 U.S. at 34.

To be sure, there are limited instances where a federal court may undertake the "unwelcome obligation" to redistrict in the first instance, i.e., where "those with legislative responsibilities do not respond" or where "the imminence of a state election makes it impractical for [the legislative body] to do so." *Wise*, 437 U.S. at 540 (citations omitted); *see also Perry v. Perez*, 565 U.S. 388, 391–92 (2012) (holding that state's inability to obtain Voting Rights Act § 5 preclearance meant "it thus fell to the District Court ... to devise interim plans"). This case does not qualify for these narrow exceptions. The Commission has not failed to "respond," that could only occur after a reasonable opportunity to redistrict, and there is time for the Commission to redistrict prior to the 2024 elections.

### B. There Is Time for the Commission To Do Its Remedial Work, With Appropriate Review from This Court

There is sufficient time for the Commission to redistrict in advance of the 2024 election cycle, and it is likely to succeed in doing so with a reasonable opportunity.

1. The 2024 primary election will occur on August 6, 2024, with early voting set to begin on July 7, and a deadline for candidates to file nominating petitions and other qualification papers of April 23. *See* Michigan Secretary of State, August–November 2024 Election Dates.[2] The upshot is that voting will not begin until some six months after the Court's January 5, 2024, remedial hearing.

---

[2] https://www.michigan.gov/sos/-/media/Project/Websites/sos/Election-Administrators/August-November-2024-Calendar-2023-10-18.pdf (visited Dec. 28, 2023).

That time frame will allow this Court to provide the Commission with a reasonable opportunity to redistrict and to review enacted plans that emerge from that process or fashion a remedy, if necessary. The Commission can likely achieve its redistricting task if afforded approximately 11 weeks. That would afford commissioners five weeks of map-drawing time and permit a full 45-day notice-and-comment period directed by the Michigan Constitution. Mich. Const. art. IV, § 6(14)(a). To be sure, the Commission may take the position that the 45-day notice-and-comment period does not apply in this remedial setting. *See* Mich. Const. art. 4 § 6(22) (lacking specificity on what procedure governs a "remand"). But it would be optimal to adhere to the full notice-and-comment process to stave off future challenges and to maximize public input on proposed plans. Moreover, all Commission map-drawing hearings will be public, members of the public will be entitled to present views, and the Commission will solicit input from the portal on its website. Consequently, it can achieve the constitutional purpose of implementing public input in all events.

If the Court believes there is insufficient time before the April 23 candidate filing deadline to afford the Commission this opportunity, it should consider a short extension of that deadline. The Court has jurisdiction and equitable discretion to undertake that step, it is the least intrusive of election-timeline modifications that courts engage in, and similarly situated courts have taken that approach. *See, e.g.*, *Sixty-Seventh Minn. State Senate v. Beens*, 406 U.S. 187, 201 n.11 (1972) ("If time presses too seriously, the District Court has the power appropriately to extend the time limitations [for candidates to qualify for the ballot] imposed by state law"); *Williams v. Jefferson City Council*, No. 4:03-cv-0002, 2003 WL 1562565, *10 (S.D. Ind. Feb. 19, 2003) (extending by 11 days the candidate filing deadline so candidates could qualify under remedial city council plan adopted by the Court to remedy Equal

Protection violation in city council plan). *See also, e.g., Larios v. Cox,* 305 F. Supp. 2d 1335, 1342-43 (N.D. Ga. 2004) (three-judge court) ("there is no reason why the court could not extend [the candidate qualification] period if this proves to be necessary to ensure constitutional elections"); *United States v. Dallas Cty. Comm'n, Dallas Cty., Ala.*, 850 F.2d 1433, 1441 (11th Cir. 1988) (indicating court authority to stay candidate qualification period pending appeal from imposition of court-ordered school board election plan to remedy Section 2 violation); *Singleton v. Merrill,* 582 F. Supp. 3d 924, 936, 1034 (N.D. Ala. 2022) (extending by 14 days the candidate qualification deadline after entering preliminary injunction of Alabama's congressional plan under Section 2 of the Voting Rights Act to afford the Legislature an opportunity to enact remedial plan); *Robinson v. Ardoin*, 605 F. Supp. 3d 759, 858 (M.D. La. 2022) (extending candidate qualification deadline to enable Legislature an opportunity to enact remedial congressional plan following preliminary injunction entered against that plan under Section 2 of the Voting Rights Act), *order stayed*, 142 S. Ct. 2892 (2002), *stay vacated*, 143 S. Ct. 2654 (2002), *vacated on other grounds*, 86 F.4th 574 (5th Cir. 2023).

2. The Commission is likely to enact remedial districts if afforded the above-described opportunity. While the Commission is currently experiencing divisions among its membership, which might (or might not) prevent it from enacting plans under the ideal constitutional procedure, the Michigan Constitution creates several successive adoption procedures, with relaxed standards at each phase, such that enacted plans are very likely to emerge from a remedial process before the Commission.

At the first step, adoption "requires a majority vote of the commission, including at least two commissioners who affiliate with each major party, and at least two commissioners

who do not affiliate with either major party." Mich. Const. art. IV, § 6(c). If that procedure succeeds, the plans receiving these vote thresholds becomes the legally operative plan.

If no plan satisfies that threshold, the Commission enters a second voting phase, which involves a variation on ranked-choice voting. *See id.* art. IV, § 6(c)(i)–(iii). At that stage, each Commissioner "may submit one proposed plan for each type of district," each commissioner then "shall rank the plans submitted according to preference," each plan is assigned a value "inverse to its ranking among the number choices," and the plan with the highest value prevails." *Id.* That process is highly likely to yield enacted house and senate plans.

If two or more plans "are tied" after the ranked-choice voting phase, the Michigan Constitution establishes a procedure "where the secretary of state shall randomly select the final plan from those" that are tied. *Id.* art. IV, § 6(iii). And, as a final escape hatch, the Constitution provides that, "[i]f no plan meets the requirements of this subparagraph, the secretary of state shall randomly select the final plan from among all submitted" at the ranked-choice voting phase. *Id.* Thus, regardless of the Commission's ability to agree on remedial plans, the process is nearly certain to produce enacted plans. As the constitutional text reflects, even plans enacted under this fallback legislative options would be preferable—as far as Michigan's sovereign interests are concerned—to plan configured by a federal court.

3. This Court's role begins where the Commission's ends. Plans configured by legislative bodies at a remedial phase are generally subject to review by the court that issued the judgment necessitating that process. *See Covington*, 138 S. Ct. at 2552–53; *Caster*, 2023 WL 6005545, at *46. The Court will have the opportunity to determine whether the enacted plan remedies the violations it perceived and whether it is otherwise compliant with federal law.

7

At that stage, the presumption of good faith applies. *Caster*, 2023 WL 6005545, at *49; *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018). If enacted plans are determined to remedy the perceived violation and otherwise comply with federal dictates, this Court would lack authority to intervene further, such as by selecting for implementation a plan it prefers for policy reasons. *Covington*, 138 S. Ct. at 2554 (reversing lower court for selecting configuration that "had nothing to do" with the violation).

If the Court were to find enacted remedial plans deficient under federal law, it would be permitted to reject them to that extent, consistent with equitable principles. *Caster*, 2023 WL 6005545, at *52. Assuming—without conceding—that the Court would be justified under the contemplated remedial procedure in proceeding from that point to fashion its own remedy, *cf. Covington*, 138 S. Ct. at 2553–54, the Court's role would remain limited. *See Perry*, 565 U.S. at 393. A court in effectuating a remedy is prohibited from making "the sort of policy judgments for which courts are, at best, ill suited," and it "should take guidance from the State's recently enacted plan in drafting an interim plan," so that the "reflects the State's policy judgments on where to place new districts and how to shift existing ones in response to massive population growth." *Id.* at 393. Although it is difficult to predict specifics at this point, this principle would presumably require that the Court begin with the newly enacted plan(s) and make the minimum number of changes necessary to bring it into compliance with federal dictates. *See Covington*, 138 S. Ct. at 2554. This again confirms the need for a legislative remedial attempt before the Court undertakes any redistricting to guide its discretion in such a task (if it is ever needed).

### C. The Court Has Limited (but Effectual) Authority to Take Remedial Actions Before Reviewing the Commission's Forthcoming Work

A federal court's role between entering an injunction against a redistricting plan and reviewing a legislatively adopted remedy, or fashioning its own, is typically "to conduct no substantive proceedings." *Robinson*, 86 F.4th at 601; *see also Growe*, 507 U.S. at 33 (holding that lower court "should have stayed its hand" as state actors attempted to remedy equal-protection violation (citation omitted)). Federal courts frequently set deadlines to inform legislative bodies of when they expect to proceed with judicial remedial proceedings in the absence of a legislative remedy. *See, e.g.*, *Robinson*, 86 F.4th at 601. As noted, the deadline must afford a reasonable redistricting opportunity that properly balances state sovereign prerogatives with the federal interest in ensuring a compliant plan is in place before upcoming elections.

Before a reasonable deadline expires, the Court's role should be limited, so that the state process can run its course without federal judicial interference. *See Wise*, 437 U.S. at 539 (holding that "the federal courts should make every effort not to pre-empt" state redistricting efforts).

1. The Court requested briefing on "the efficacy of a special master" in this case. Order at 1, PageID.4820. It is common for courts overseeing remedial redistricting matters to employ special masters. *See, e.g.*, *Covington*, 138 S. Ct. at 2554. A special master's role can include issuing reports to provide the Court with impartial views on the viability of plans before the Court, including legislatively adopted plans, and drafting or modifying plans in the event a judicial redistricting becomes necessary. *See Bethune-Hill v. Va. State Bd. of Elections*, 368 F. Supp. 3d 872 (E.D. Va. 2019). These roles may ultimately be appropriate here, and it may be appropriate for the Court to employ a special master before it begins any remedial

judicial process. The undersigned counsel can provide names of reputable special masters on request, including at the January 5 hearing.

The Court's order goes further and suggests a special master appointed by the Court may "assist the Commission in meeting its stringent timeframe" and "act as a liaison to this Court as the Commission performs its duties." Order at 1, PageID.4820. There is some ambiguity in that language that may call for additional clarity from the Court. However, to the extent the Court is contemplating an active role on its part, including through an agent of the Court, in the Commission's remedial process, that would appear to be improper.

The process of deference to legislative actors necessarily entails a period where a district court must "stay[] its hand," *Growe*, 507 U.S. at 33 (citation omitted), and "make every effort not to preempt" the legislative process, *Wise*, 437 U.S. at 539. That principles excludes an active role for a district court in seeking to influence the legislative process, including through a court-appointed special master. As noted, the Court's role is to review the Commissioner's work once it is complete or to issue a remedy (or modify a remedy) if the Commission fails in its effort or enacts plans that do not comply with federal law. In the interim, however, the Commission enjoys the prerogative of employing advisers of its choosing and implementing "legitimate state policy judgments," *Perry*, 565 U.S. at 394, subject to the caveat that its work will ultimately be subject to judicial review. We are aware of no case in which a federal court tasked with evaluating a redistricting remedy, or a remedy analogous to that, has appointed a special master to advise a state actor as it fashioned remedial legislation or act as a liaison with the court during the legislative or policymaking process.

That type of process would raise various additional concerns. One, of course, is that this Court's jurisdiction is subject to "the rule against advisory opinions," *Flast v. Cohen*, 392 U.S. 83, 96 (1968), and directing a court-appointed special master to advise the Commission would seem to run afoul of that rule. Another is that such an arrangement may create dignitary harms impacting both institutions concerned. For example, a special master might urge the Commission to take a specific approach that, upon subsequent inspection, this Court ultimately rejects. The appearance of a scenario where a judicially appointed agent baits a state body into one choice only for the judicial body to reject it—or similar scenarios that might plausibly arise—could cause consternation to the disservice of both bodies. Another is that formulating advice to the Commission, which is traditionally the role of lawyers, consultants, and policymakers about a matter with significant political implications, would seem to stretch judicial resources and competence in ways that are untenable. That approach would bring the Court too far into the "political thicket." *Evenwel v. Abbott*, 578 U.S. 54, 58 (2016) (quoting *Colegrove v. Green*, 328 U.S. 549, 556 (1946)).

2. None of this is to suggest that the Court lacks the tools it needs to exercise its proper function. Several tools are available to the Court to ensure it has a timely opportunity to undertake its remedial roles, and some have already been mentioned, including reasonable deadlines to redistrict before this Court begins a remedial process; the employment of a special master who is prepared to begin analysis promptly when that deadline occurs; and, if necessary, a modest delay of the candidate-qualification deadline to ensure sufficient time for both legislative and judicial processes to run their courses. The Court has additional means to protect its ability to enforce federal dictates.

First, it would be appropriate for the Court to direct periodic status updates from the Commission's counsel concerning the progress of the redistricting and to inform the Court if the legislative process will not produce an enacted plan. Given the Michigan Constitution's framework governing the Commission's map-drawing, regular progress updates will keep the Court informed of the Commission's work and afford the Court, and parties, the opportunity to raise any concerns about whether the process will produce enacted plans and whether a transition to a judicial redistricting process may become necessary.

Second, the Court will have the benefit of adversarial briefing at the remedial stage and may accept submissions from *amicus curiae* about potential district configurations and potential deficiencies in any plans the Commission adopts.

Third, although the Court is not properly situated to influence the Commission's redistricting process, Plaintiffs and their counsel are not so encumbered. Under Michigan law and the constitutional right to petition the government, Plaintiffs and their counsel may present plans to the Commission, data or expert analysis, and argumentation as to what they believe a remedial plan will accomplish. Such advocacy would not speak for the Court, but it would signal to the Commission what district configurations would likely draw objections during the Court's review process. Likewise, the Commission will hear from other interested parties about issues likely to arise in litigation. This will be valuable to the Commission in its effort to comply with federal law.

## CONCLUSION

As outlined above, the Court should afford the Commission a reasonable opportunity to enact remedial redistricting plans.

Dated: January 2, 2024    Respectfully submitted,

*/s/ Nathan J. Fink*

FINK BRESSACK
David H. Fink (P28235)
Nathan J. Fink (P75185)
38500 Woodward Ave., Suite 350
Bloomfield Hills, Michigan 48304
(248) 971-2500
dfink@finkbressack.com
nfink@finkbressack.com

*/s/ Richard B. Raile*
BAKER & HOSTETLER LLP
Katherine L. McKnight
E. Mark Braden
Richard B. Raile
Dima J. Atiya
1050 Connecticut Ave., NW, Suite 1100
Washington, D.C. 20036
(202) 861-1500
kmcknight@bakerlaw.com
mbraden@bakerlaw.com
rraile@bakerlaw.com
datiya@bakerlaw.com

BAKER & HOSTETLER LLP
Patrick T. Lewis
127 Public Square, Suite 2000
Cleveland, Ohio 44114
(216) 621-0200
plewis@bakerlaw.com

*Counsel for Defendants, Michigan Independent Citizens Redistricting Commission, and Douglas Clark, Juanita Curry, Anthony Eid, Rhonda Lange, Steven Terry Litt, Brittni Kellom, Cynthia Orton, M.C. Rothhorn, Rebecca Szetela, Janice Vallette, Erin Wagner, Richard Weiss, and Dustin Witjes, each in their official capacities as Commissioners of the Michigan Independent Citizens Redistricting Commission[3]*

---

[3] Commissioners Clark, Rothhorn, and Witjes have resigned. When those seats are filled, the new commissioners will be automatically substituted as parties pursuant to Fed. R. Civ. P. 25(d).

## CERTIFICATE OF COMPLIANCE

I hereby certify, pursuant to W.D. Mich LCivR 7.3(b), that excluding the portions of this Brief not included in the word count pursuant to the rule, this Brief numbers 3,557 words. The Brief was drafted using Microsoft Word (Office 365, Version 2302) and counsel relied on this software to generate the word count.

/s/ Nathan J. Fink<br>
Nathan J. Fink