# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | |
|---|---|
| DONALD AGEE, JR., an individual, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>JOCELYN BENSON, in her official capacity as the Secretary of State of Michigan, *et al.*,<br><br>Defendants. | Case No. 1:22-cv-00272<br><br>**Three-Judge Panel Appointed Pursuant to 28 U.S.C. § 2284(a)** |

## PLAINTIFFS' SUPPLEMENTAL BRIEF ON PROPOSED REMEDY

## INTRODUCTION

The Court's December 21, 2023, opinion recognized that the Commission flagrantly disenfranchised Black voters by drawing legislative districts based predominantly on race in violation of the Equal Protection Clause. (ECF No. 131, the "Opinion"). Accordingly, the Court invalidated 13 Michigan Senate and House districts with extraordinarily low BVAPs and directed the parties to brief the appropriate remedy.

The Court should appoint a special master to draw revised maps for the beleaguered Commission. Just since the Opinion's issuance, three Commissioners resigned as did the Commission's VRA counsel. Two Commissioners lodged ethics complaints and initiated investigations against each other. This led Chair Szetela to request this Court's protection from retaliation for her truthful trial testimony. When it came time to adopt a strategy for moving forward at a recent public meeting, the Commission could not cobble together a quorum to hold a vote because multiple Commissioners did not return after a closed session. The Commission and its members appear more intent on cannibalizing each other than functioning as a cohesive group to draw a set of acceptable maps.

Soon, three new Commission members will be drawn from a hat and thrown into an urgent map-drawing process with no VRA counsel and zero training, compared to the entire *year* of rigorous training the Commission received before drawing a single map—one that, notably, still got it wrong. It is unrealistic to ask the Commission to adopt compliant maps given its disarray and the need for expediency.

As established at trial, the Commissioners require professional guidance to draw legally compliant maps. Election deadlines are looming, and the Secretary of State admitted in her post-trial brief that she is already several weeks behind in election preparation. Worse, numerous Commissioners have shown no remorse for the harm they caused to the citizens of Detroit or for the $5 million of taxpayer money they lavished on defense counsel to preserve their unconstitutional actions.

The only solution in these unique circumstances is the appointment of a special master to serve as an expert cartographer with input from both sides. The Secretary of State, metro-Detroit voters, and political candidates alike all need to know the district lines to prepare for the upcoming election, and a special master will ensure that everyone's interests are protected and propose a map within a matter of weeks.

The Court's remedial order should also mandate a special election for the State Senate—which would ordinarily not occur until 2026—alongside the House election set to take place in the fall of 2024. Plaintiffs and hundreds of thousands of similarly situated Black voters in Detroit have been disenfranchised since the faulty maps were first used in the 2022 election. Every day that passes further violates their constitutional rights. A special election will remedy that ongoing violation.

## ARGUMENT

### I. The Court Should Appoint a Special Master to Assist the Commission.

"Redistricting is primarily the duty and responsibility of the State[.]" *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018) (quotations omitted). But "when those with [such] responsibilities do not respond" or when "the imminence of a state election makes it

impractical for them to do so," it becomes the "unwelcome obligation" of the federal court to devise a reapportionment plan. *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978); *Chapman v. Meier*, 420 U.S. 1, 27 (1975) (when a redistricting body fails in its task, "the responsibility falls on the District Court and it should proceed with dispatch to resolve this seemingly interminable problem").

Appointment of a special master is a common remedy in redistricting cases.[1] *E.g.*, *Bethune-Hill et al. v. Virginia State Board of Elections*, 368 F. Supp. 3d 872, 877 (E.D. Va. 2019); *Singleton v. Allen*, __ F. Supp. 3d __, 2023 WL 5691156 (Dec. 5, 2023, N.D. Ala.) ("The Supreme Court has since held that a district court does not abuse its discretion by ordering a Special Master to draw a remedial map to ensure that a plan can be implemented as part of an orderly process in advance of election") (citation omitted); *Personhuballah v. Alcorn*, 155 F. Supp. 3d 552, 555–56 (E.D. Va. 2016) (appointing special master after district found to be a racial gerrymander in violation of the Equal Protection Clause).

The Court need not give the original redistricting body a second bite at the apple before appointing a special master. *North Carolina v. Covington*, 138 S. Ct.

---

[1] Federal Rule of Civil Procedure 53(a)(1) provides "[u]nless a statute provides otherwise, a court may appoint a master only to: (A) perform duties consented to by the parties; (B) hold trial proceedings and make or recommend findings of fact on issues to be decided without a jury if appointment is warranted by: (*i*) some exceptional condition; or (*ii*) the need to perform an accounting or resolve a difficult computation of damages; or (C) address pretrial and posttrial matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district." "Preparing a timely and suitable plan of congressional districts thus presents an exceptional condition that requires the appointment of a Special Master to assist the Court." *Rodriguez v. Pataki*, 207 F.Supp.2d 123 (S.D.N.Y., April 25, 2002).

2548, 2553–54 (2018) (rejecting defendant's argument that the district court "abused its discretion by arranging for the special master to draw up an alternative remedial map instead of giving the General Assembly—which 'stood ready and willing to promptly carry out its sovereign duty'—another chance at a remedial map," because the court "had its own duty to cure illegally gerrymandered districts through an orderly process in advance of elections" and "'providing the General Assembly with a second bite at the apple' risked 'further draw[ing] out these proceedings and potentially interfer[ing] with the 2018 election cycle'").

While the Court's order inquired whether a special master should "assist" the Commission but not "necessarily draw the maps," the circumstances here are unprecedented. Commission members are resigning in droves and engaged in infighting. Accordingly, Plaintiffs request the Court enlist a special master to work collaboratively with the parties to the extent possible but to also have veto power over the Commission (Ex. A, Proposed Appointment Order). As shown below, the record is replete with support for such a remedy.

**(1) The Chaotic Commission Is In No Position to Draw New Maps.**

As the last two weeks show, the Commission is cratering and in no position to draw new maps that would give the Secretary of State and candidates sufficient time to prepare for the April primary deadline. For example:

    a. Commissioners Dustin Witjes, Douglas Clark and M.C. Rothhorn have all resigned.[2]

---

[2] https://www.detroitnews.com/story/news/local/michigan/2023/12/26/3-redistricting-commissioners-to-be-replaced-following-resignations/72033554007/, last visited Dec. 31, 2023.

4

b. Commissioner Anthony Eid is under investigation for allegedly tailoring maps to benefit two of his personal friends who were running for office. His future involvement in the Commission is uncertain.[3]

c. Eid had previously been investigated by the Commission for taking a job with a non-profit who bragged on its website: "Our Democracy Workgroup partners *engaged with MICRC right up until they approved the final maps. On multiple occasions, the MICRC changed course and edited their maps in real-time, directly impacted by our partners' public comments*[.]"[4] After the maps were complete, the non-profit offered Eid a job, though he resigned from the position after accepting it in the wake of the Commission's investigation.

d. Commission Chair Szetela has publicly objected to Eid's involvement in any future map-drawing because "there's a pretty strong contingent of commissioners who frankly feel that (Eid) should never touch one of our maps again." (Ex. C, Gongwer Article dated 12/18/23).

e. In response, Eid "liked" a third-party post with a photo of Chair Szetela reading: "Michigan Redistricting Commission needs to draw the new maps, then self-destruct. I'm sick of these people. Time to get real jobs." (Ex. D, Eid Post).

f. On his way out the door, Commissioner Witjes served an official notice upon the Secretary of State seeking to have Chair Szetela's seat deemed vacant for "undermining" the Commission with her truthful testimony to this Court. This retaliatory act prompted Szetela to seek this Court's protection. (Ex. E, 12/27/23 Letter to Panel).

g. Despite resigning, Commissioner Witjes showed up at the Commission meeting held the following week on December 28th to reiterate publicly that his letter seeking Chair Szetela's removal for "sabotage" was proper despite his resignation. He also openly urged the Commission to "appeal and appeal hard" this Court's ruling.[5]

---

[3] "Redistricting Commissioners Claim Colleague Tailored Maps for Candidates" Detroit News, December 16, 2023, https://www.detroitnews.com/story/news/politics/2023/12/16/redistricting-commissioners-claim-colleague-tailored-maps-for-candidates/71934006007, last visited Dec. 29, 2023.

[4] https://www.wkar.org/wkar-news/2023-07-05/redistricting-commission-members-new-job-raises-ethics-questions (emphasis added); *see also* Trial Tr.III.151, PageID.2942.

[5] "Divided Michigan redistricting commission unable to act after three members leave early" Detroit Free Press, December 28, 2023, https://www.freep.com/story/news/politics/elections/2023/12/28/redistricting-commission-divided-court-ruling-appeal/72049321007/, last visited Jan. 1., 2024.

5

h. On December 28, 2023—at the most recent public meeting—the Commission's VRA legal counsel, Bruce Adelson, abruptly resigned, effective December 29.[6] The Commission's former General Counsel Julianne Pastula had already resigned in 2022 following the lawsuit in which the Michigan Supreme Court ordered the closed-door meeting audio be disclosed to the public.[7] Neither position has been filled.

i. The Commission held a special meeting to vote on whether to appeal the Court's Opinion. But after returning from a lengthy closed-door session, it could not muster a quorum to hold the necessary vote because so many members left the meeting early.[8]

In short, the Commission is dysfunctional and incapable of quickly drawing legally compliant district maps. And even if the Commission could draw new maps quickly, the Michigan Constitution (though not this Court) requires the Commission to hold time-consuming public hearings across the State before voting to approve the maps. Mich. Const. Art. IV, § 6(8)-(10). A Court-ordered map is the only realistic solution.

**(2) New Commissioners Are Entirely Unprepared to Participate and the Commission's Experts Are Either Incompetent or Have Resigned, Necessitating Outside Professional Expertise.**

In response to the resignations, Secretary Benson announced that three new Commissioners would be chosen on January 3, 2024, via random selection.[9] That

---

[6] *Id.*
[7] "Michigan redistricting panel's top attorney quits amid two court challenges" The Bridge-Michigan, January 26, 2022, https://www.bridgemi.com/michigan-government/michigan-redistricting-panels-top-attorney-quits-amid-two-court-challenges, last visited January 1, 2024.
[8] "Divided Michigan redistricting commission unable to act after three members leave early" Detroit Free Press, December 28, 2023, https://www.freep.com/story/news/politics/elections/2023/12/28/redistricting-commission-divided-court-ruling-appeal/72049321007/, last visited Jan. 1., 2024
[9] https://www.michigan.gov/sos/resources/news/2023/12/26/michigan-department-of-state-to-host-random-selection-on-jan-3, last visited December 27, 2023.

6

means a *quarter* of this Commission is brand new and uneducated in the map-making process. The training provided to the current Commissioners was extensive—as it should be, since none of them had any redistricting background.

The original Commissioners received more than 35 distinct educational sessions covering the Commission's conflict of interest policies, how to comply with FOIA and the Open Meetings Act, what the governing criteria are under the Michigan constitution, Voting Rights Act compliance, Communities of Interest definitions, how to analyze census data, how to use the electronic mapping software, how to evaluate partisan fairness metrics, and the like. (Ex. F, Training Sessions). Presenters ranged from legal experts to statisticians to political scientists to representatives from the Attorney General's office to more than a dozen academics. *Id*. This intense training spanned an entire year. *Id*. Only then did the Commissioners even start the map-drawing process, and they *still* got it wrong.

By January 3rd, nearly a quarter of the Commission will be brand new and lack the dozens (if not hundreds) of hours of training the rest of the Commissioners had. Yet they will be expected to complete an emergency map-drawing process. Plus, the Commission also now lacks both a General Counsel and VRA counsel, so it is unclear who is going to coordinate this training for the new members or guide the Commission's map-drawing activities.

The need for a professional mapmaker in the form of an experienced special master is critical. As this Court observed, the nascent Redistricting Commission was comprised of Michigan citizens "who came to their task with no experience in redis-

7

tricting and no knowledge of election law." Op., p. 1, PageID.4704. The Commissioners admitted at trial that they relied heavily on experts. Per Commissioner Erin Wagner: "we were 13 citizens that didn't know what we were doing, and so we were looking to people . . . we were told were experts, so of course you're going to lean on an expert's opinion." Op., p. 115, PageID.4818.

But at this point, no "experts" are left for the Commission to lean on. Adelson and Pastula resigned. And while Dr. Handley remains, it was her work that disenfranchised Plaintiffs as part of the trio who "expressly told the commissioners, scores if not hundreds of times, to sort Detroit-area voters into different districts by race[]" and to "limit the 'black voting age population'—known as the 'BVAP' in redistricting jargon—to approximately 35–45%"—a proposition that is "without support in the Supreme Court's VRA caselaw." *Id.* at PageID.4704–05. The lack of a VRA attorney is especially problematic because VRA compliance does not disappear for the revised maps; it is still a constitutionally mandated criterion.[10] Yet the Commission is not nimble regarding the hiring of experts. It must follow the public Request for Proposal ("RFP") process applicable to all State contracts. Conversely, this Court can simply *order* this expert guidance in the form of a special master.

Another issue that militates strongly in favor of having a special master control the map-drawing process instead of inexperienced Commissioners is that the next

---

[10] See Mich. Const. Art. IV, § 6(13)(a) ("The commission shall abide by the following criteria in proposing and adopting each plan . . . Districts shall be of equal population as mandated by the United States constitution, and shall comply with the voting rights act and other federal laws.").

8

round of mapping will be even *more* complex than the last one. Certain districts are either wedged in between two that have been invalidated or are adjacent to one that was invalidated (for example, House Districts 13 and 25) and those districts may *also* need to be revised in order to achieve compliant maps.[11] For example, in *Bethune-Hill*, 368 F. Supp. 3d at 373, the Court invalidated 11 districts as racial gerrymanders in violation of the Equal Protection Clause and appointed a special master "to assist [the Court] in preparing a remedial plan." But given the overlap between districts, the plan ultimately approved contained changes to more than *double* the amount of districts that were originally invalidated—25. *Id.* at 881 n. 12. Here, an expert cartographer can minimize the impact to surrounding districts and avoid wildly expanding the scope of the revisions. As an example only, a set of remedial maps developed by Plaintiffs' expert, Sean Trende—an experienced mapmaker who has previously served as a special master in redistricting litigation—demonstrates it is feasible to draw compliant, race-blind maps (with minimal impact to the surrounding districts) in less than five hours. (Ex. B, Trende's Declaration and Sample Maps).

Judge Neff sympathetically observed that the Commission had "no history to

---

[11] *Bethune-Hill*, 368 F. Supp. 3d at 877–78 (reasoning that "eleven invalidated districts are located in four distinct groupings, and some . . . are adjacent to one another. The invalidated districts themselves frequently span multiple municipalities, and many cities and counties have been split between invalidated districts and surrounding non-challenged districts. In choosing a remedial plan, we endeavor to minimize the number of districts affected by our revisions, recognizing that districts immediately adjacent to the districts may be subject to significant changes.") (citing *Abrams v. Johnson*, 521 U.S. 74, 86 (1997) (affirming the propriety of remedial maps that change districts even if not directly invalidated by the court to the extent necessary to ensure compliance with legal requirements)).

9

follow or learn from and no role model to lead the way and to set a standard." Opinion, Op., p. 116, PageID.4819. A special master would supply precisely that guidance and leadership now.

### (3) The State Needed the Final Maps Ready In December—Four Months Before the Primary—Thus, the Parties Are Already Behind.

According to the Secretary of State, updates to the "qualified voter files" (or "QVF") need to be completed "in time to accommodate candidates seeking to run in the relevant primary election cycle." (ECF No. 113, PageID.3816–17). This process takes the Bureau of Elections "about four months" and the deadline for candidates seeking to run for the House this year is April 23, 2024. *Id.* Thus, working backward, the State should have started working with compliant maps <u>on December 23</u>—two weeks ago. Indeed, in the last election cycle, "[s]hortly after the Commission adopted the plans in December 2021, the Bureau began working to update the QVF." *Id.* That means that in the last election, the State had already begun its election preparations at this point.

The Secretary of State acknowledged in her post-trial brief that "the window for granting any relief effective to the 2024 cycle is closing fast," and "unless relief is ordered quickly, the Secretary does not believe it remains possible for the voter list to be updated to implement new plans in time for the 2024 election cycle." *Id.*, PageID.3818. Otherwise, this Court may also have to move election deadlines, which could wreak further havoc.[12] The Court's appointment of a special master now

---

[12] *E.g., Sixty-Seventh Minnesota State Senate v. Beens*, 406 U.S. 187, 201 (1972) (discussing election deadlines and noting "[i]f time presses too seriously, the District Court has the power appropriately to extend the time limitations imposed by state

10

increases the likelihood that such disruption and voter confusion can be avoided. Accordingly, the Court should appoint a special master and largely bypass the Commission (with the exception of collaborative work processes) in the interest of time given the upcoming election. *E.g., Covington, supra; Rodriguez v. Pataki*, 207 F. Supp. 2d 123, 125 (S.D.N.Y. 2002) (appointing special master five months before a primary and observing that the "eleventh hour is upon us, if indeed has not already passed").

**(4) Despite Looming Election Deadlines, the Commission Has Not Committed to Re-Engage in Map-Drawing.**

The Commission is moving at a glacial pace with zero urgency. For example, the Commission—knowing full well the Court's decision would be handed down any day—adopted a meeting calendar in mid-December that set just *one* meeting in each of the months of January and February. (Ex. G, MICRC 12/14/23 Agenda and 2024 Calendar). The newly adopted 2024 Meeting Calendar currently has no special meetings set for possible map revisions. *Id.* At the meeting held December 28, 2023, no special meetings were discussed.[13] When Chair Szetela and Commissioners Lange and Wagner advocated for "fixing" Detroit due to the Court's decision, they were quickly sidelined, and the Commission instead went into closed session to discuss an appeal. When it re-entered the public meeting, the Commission had lost so many members that it lacked a quorum and could not vote on anything—not an appeal, not

---

law."); *Larios v. Cox*, 305 F. Supp. 2d 1335, 1342-43 (N.D. Ga. 2004) (the "court has broad equitable power to delay certain aspects of the electoral process if necessary" in a racial gerrymandering suit).

[13] A video of the Commission's last meeting is available at: https://www.youtube.com/watch?v=AywyjLrqJoI, last visited December 30, 2023.

11

special meeting dates, and certainly not a strategy to deal with a re-mapping process. The Court should rely primarily on a special master as set forth in Plaintiffs' proposed Special Master Appointment Order, which contains all requirements under Fed. R. Civ. 53(b)(2).[14] (See Ex. A, Proposed Appointment Order).

**B.     The Court Should Order Special Elections for the Re-drawn Senate Districts.**

When constitutional voting rights are infringed, the Court "has not merely the power but *the duty* to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." *Louisiana v. U.S.*, 380 U.S. 145, 154 (1965) (emphasis added). "'It is within the scope of [a court's] equity powers to order a governmental body to hold special elections' to redress constitutional violations." *League of Women Voters of Michigan v. Benson*, 373 F. Supp. 3d 867, 961 (E.D. Mich.), vacated on other grounds, quoting *Arbor Hill Concerned Citizens v. Cty. of Albany*, 357 F.3d 260, 262 (2d Cir. 2004) (reversing district court's order that refused to hold special election and requiring county to hold special election after district court invalidated electoral maps as violative of the VRA);

---

[14] Plaintiffs submit that any of the following individuals would be qualified to serve in this role: (1) Matt Rexroad, Fabian Valdez, or Ryan Gardiner from the Redistricting Insights firm, (2) Paul Mitchel or Liz Stitt from the Redistricting Partners firm; or (3) Professor M.V. Trey Hood III from the School of Public and International Affairs at the University of Georgia. Plaintiffs have not reached out to these individuals to determine if they are interested to limit *ex parte* contact with the potential special masters. The Plaintiffs would also stipulate to the appointment of two special masters, as joint special masters have been utilized in other cases. *See* Ex. H, *In re Decennial Redistricting Pursuant to The Constitution of Virginia*, Redistricting Appointment Order dated Nov. 19. 2021 (order appointing Sean Trende and Bernard Grofman as co-special masters); *Singleton v. Merrill*, Case No. 21-cv-1291, Order Appointing Special Master and Appointing Expert Cartographer dated Feb. 7, 2022.

*Marks v. Stinson*, 19 F.3d 873, 889 (3d Cir. 1994) (holding that "[i]f the district court finds a constitutional violation, it will have authority to order a special election" regarding state senate district); *Griffin v. Burns*, 570 F.2d 1065, 1080 n.15 (1st Cir. 1978) (affirming district court's power to "call a special election" to remedy constitutional violation to voting rights); *Ketchum v. City Council of City of Chicago, Ill.*, 630 F. Supp. 551, 565 (N.D. Ill. 1985) ("Federal courts have often ordered special elections to remedy violations of voting rights. Prospective relief alone is 'of little consequence to the many voters who sought to vote… and could not do so effectively.'")

Courts weigh three factors in considering whether to order a special election: (1) "the severity and nature of the particular constitutional violation"; (2) "the need to act with proper judicial restraint when intruding on state sovereignty"; and (3) "the extent of the likely disruption to the ordinary processes of governance if early elections are imposed." *North Carolina v. Covington*, 581 U.S. 486, 488 (2017).

The first factor weighs strongly in favor of special Senate elections here. "[T]he right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights." *League of Women Voters*, 373 F.Supp.3d at 958 (finding the nature of the constitutional violation "extremely grave" where the gerrymandering "subverts the fundamental purpose of legislative apportionment" which is to provide "fair and effective representation for all citizens") (citing *Reynolds*, 377 U.S. at 562).

On the second factor, "in cases involving unconstitutional burdens on the right to vote . . . numerous courts . . . have concluded that shortening the terms of elected

13

officials and ordering a special election does not unduly intrude on state sovereignty, particularly when the constitutional violation is widespread or serious." *Covington*, 270 F. Supp. 3d at 896. In *League of Women Voters*, 373 F. Supp. at 959, the Court specifically held that shortening a Michigan senator's term of office was not unduly intrusive, reasoning "[w]e similarly find that the fact that a special Senate election would truncate the four-year terms of senators is not 'unduly intrusive' given the gravity and extent of the constitutional violations at issue in this case" because "[w]hile senators may be disappointed that their four-year terms will be reduced to two years, the sentiment of the legislators elected under an unconstitutional apportionment plan does not outweigh the constitutional rights of millions of Michiganders to elect their senators under constitutional maps."

Lastly, where (as here) the normal election cycle already provides for an election of some kind, the "disruption" factor is nil. In *League of Women Voters,* just like this case, the request was merely to "order a special Senate election on the *same date* as the regularly scheduled general elections in November 2020" so "[n]o additional election would be scheduled; voters would simply cast their votes for one additional office on election day (both in the primary and in the general election)." *League of Women Voters*, 373 F. Supp. at 959. Because "the special Senate election would occur on a regular election day and at a regularly scheduled interval, it would not result in any additional election being held during the calendar year, and there would little risk of voter confusion or low turnout." *Id.*

The next regularly schedule election for the Michigan House will occur on

14

August 6, 2024, but the Senate election is not scheduled until two years later (in 2026). If the Court leaves the current schedule in place, Plaintiffs (and other Black voters) will remain disenfranchised in the Senate for two additional years. It would be unconscionable to Plaintiffs and Black voters in Detroit to saddle them with candidates selected through a racially gerrymandered process. Accordingly, the Court should order the State to hold a special election in 2024 for the Senate.

Respectfully submitted,

*/s/ John J. Bursch*
John J. Bursch (P57679)
BURSCH LAW PLLC
9339 Cherry Valley Ave SE, #78
Caledonia, Michigan 49316
(616) 450-4235
jbursch@burschlaw.com
*Attorney for Plaintiffs*

Michael J. Pattwell (P72419)
Jennifer K. Green (P69019)
James J. Fleming (P84490)
Amia A. Banks (P84182)
CLARK HILL PLC
*Attorneys for Plaintiffs*
215 S. Washington Sq., Ste. 200
Lansing, MI 48933
(517) 318-3100
mpattwell@clarkhill.com
jgreen@clarkhill.com
jfleming@clarkhill.com
abanks@clarkhill.com

Dated: January 2, 2024