# EXHIBIT E

# Rebecca Szetela
517-898-9366 • szetelar@michigan.gov

December 27, 2023

The Honorable Judge Raymond M. Kethledge
United States Court of Appeals for the Sixth Circuit
540 Potter Stewart US Courthouse
100 E. Fifth Street
Cincinnati, Ohio 45502-3988
*Via First Class Mail and Email at: markus_hayes@ca6.uscourts.gov*

The Honorable Judge Paul L. Maloney
United States District Court for the Western District of Michigan
137 Federal Building
410 W. Michigan Avenue
Kalamazoo, Michigan 49007
*Via First Class Mail*

The Honorable Judge Janet T. Neff
United States District Court for the Western District of Michigan
401 Federal Building
110 Michigan Street NW
Grand Rapids, Michigan 49503
*Via First Class Mail and Email at: janet_neff@miwd.uscourts.gov*

   *Re: Retaliation Against Select Commissioners in Agee v. Benson, Case No. 1:22-cv-272*

Dear Honorable Judge Kethledge, Honorable Judge Maloney, and Honorable Judge Neff:

  As you are aware, I am one of the members of the Michigan Independent Citizens Redistricting Commission ("MICRC") who testified in the *Donald Agee v. Jocelyn Benson, et. al.* matter currently pending before this Court. I am writing on behalf of myself and other members of the MICRC who were subpoenaed by the Plaintiffs and testified in the *Agee* case (the "Testifying Members"). I request this Honorable Court accept this letter as a mechanism to raise serious concerns about the MICRC's acts of retaliation and the risk of further retaliation against the Testifying Members.

  These acts of retaliation include a pending attempt to remove me from my position as Commissioner. On or about December 19, 2023, MICRC Commissioner Dustin Witjes ("Witjes") filed a "Request for Declaration of Vacancy – Commissioner Rebecca Szetela" ("Request"), in which Witjes seeks to remove me from my position as Commissioner because I allegedly "actively collaborated with opposing counsel, ***undermining*** the collective will of the commission" and thus "creat[ed] undue challenges for our legal team in defending our maps." Witjes further stated that cooperation with the Plaintiffs was an "overt act of what can only be

*Rebecca Szetela*

517-898-9366 • szetelar@michigan.gov

described as ***sabotage***" and is "unacceptable." I have attached a copy of Witjes's Request to this letter. With the blessing of the MICRC's General Counsel, Nate Fink, the MICRC will be evaluating Witjes's Request on January 11, 2024. Commissioner Anthony Eid has also made public statements revealing that he collaborated with Witjes on the Request and supports the attempts to remove me from the MICRC. On December 18, 2023, the day before the Release was filed with the Secretary of State, Commissioner Anthony Eid was quoted in a press interview mirroring the language of Witjes's Request: "'*She said it under oath that she went on her own volition and reached out to plaintiffs to … provide them with information to help their case, essentially to **undermine** the commission,' Eid said. Eid said he felt this was an act of **sabotage** on Szetela's part.*" *Gongwer News*, December 18, 2023, p. 5-6, attached. While the removal action appears to be currently focused on me, the other Testifying Members are equally vulnerable to such acts of retaliation and have already been subjected to lesser forms of retaliation. Further, one Testifying Member, MC Rothhorn, has already resigned. His abrupt resignation raises questions as to whether acts of retaliation or threats of acts of retaliation by the MICRC may have motivated his decision to resign.

  Retaliating against the Testifying Witnesses is an abuse of the judicial process, can disrupt and interfere with the administration of justice, and displays contempt for this Court. No Testifying Witness should be subject to removal, threats of removal, or other retaliatory acts as a result of cooperating with or being subpoenaed to testify by the Plaintiffs in this matter. Such actions by the MICRC or its Commissioners, staff, consultants, or counsel should not be countenanced by this Court.

  Thus, I am requesting that, in any supplemental orders pertaining to the drafting of remedial maps, that the MICRC, its individual Commissioners, staff, consultants, and counsel be directed to refrain from or enjoined from taking any actions to retaliate against the Testifying Members from the *Agee* case. I also request such other orders as this Honorable Court deems equitable, just, and appropriate.

  Thank you for consideration of this request.

        Sincerely,

        *Rebecca Szetela*

        Rebecca Szetela
        Commissioner
        Michigan Independent Citizens Redistricting Commission

# *Rebecca Szetela*

517-898-9366 • szetelar@michigan.gov

*cc (Via Email):*

John J. Bursch, *jbursch@burschlaw.com*
Michael J. Pattwell, *mpattwell@clarkhill.com*
James J. Fleming, *jfleming@clarkhill.com*
Amia A. Banks, *abanks@clarkhill.com*
David H. Fink, *dfink@finkbressack.com*
Nathan J. Fink, *nfink@finkbressack.com*
Richard B. Raile, *rraile@bakerlaw.com*
Katherine L. McKnight, *kmcknight@bakerlaw.com*
E. Mark Braden, *mbraden@bakerlaw.com*
Dima J. Atiya, *datiya@bakerlaw.com*
Patrick T. Lewis, *plewis@bakerlaw.com*
Heather S. Meingast, *meingasth@michigan.gov*
Erik A. Grill, *grille@michigan.gov*
Edward Woods III, *woodse3@michigan.gov*
Erin Wagner, *WagnerE2@michigan.gov*
Rhonda Lange, *LangeR2@michigan.gov*
Juanita Curry, *CurryJ5@michigan.gov*

Honorable Jocelyn Benson
Secretary of State of Michigan
Department of State
Lansing, MI 48918

Subject: Request for Declaration of Vacancy - Commissioner Rebecca Szetela

Dear Madam Secretary Benson,

I, Dustin J. Witjes, a commissioner in good standing of the Michigan Independent Citizens Redistricting Commission, am officially notifying the commission, in accordance with section 6(3)(e) Article 4 of the Michigan Constitution, to consider declaring the office held by Commissioner Rebecca Szetela vacant.

The commission, established by the voters of the State of Michigan in 2018, is designed to consist of 13 individuals, with 4 identifying as Democratic, 4 as Republican, and 5 as non-affiliated. Throughout our tenure as commissioners, we have consistently emphasized the importance of speaking with one unified voice, resolving disagreements through voting on crucial decisions, and standing united behind the outcomes of those votes.

Regrettably, it has come to my attention that Commissioner Szetela, through sworn testimony [Exhibit 1], actively collaborated with opposing counsel, undermining the collective will of the commission. Her engagement extended beyond mere communication, involving the provision of information in person, actions that should have been directed through our legal counsel rather than independently pursued. Commissioner Szetela, though an attorney, was not the commission's legal representative, and proper protocol would have dictated working directly through our counsel. Her actions would have been ill advised. It has also become apparent that Commissioner Szetela continues to work with plaintiffs through affidavits [Exhibit 2].

This overt act of what can only be described as sabotage is unacceptable. The commission had retained the services of Baker Hostetler and Fink Bressack, two law firms, to assist in defending our legally drawn district maps for the State of Michigan. At no point did the commission authorize or vote to permit any commissioner to work directly with opposing counsel. Commissioner Szetela's actions ran counter to the collective will of the commission, creating undue challenges for our legal team in defending our maps.

It is crucial to highlight that Commissioner Szetela was among those who dissented, either in part or in whole, with the final approved maps, suggesting that her actions may have been motivated by personal disagreement rather than a commitment to the commission's objectives.

It is unprecedented for a named defendant in a case to actively collaborate with plaintiffs in a civil action against the will of the public body to which the defendant belongs. This conduct constitutes "neglect of duty, gross misconduct in office, or inability to discharge the duties of office"; grounds for removal according to Article IV, Section 6, Sub-section 3 of the Michigan Constitution.

This commission is a commission of 13, not a commission of one. Such acts of defiance against the will of the commission contradict our core principles.

For the aforementioned reasons and in light of sworn statements made in open court, I, Dustin J. Witjes, formally propose that the office held by Commissioner Rebecca Szetela be declared vacant through a vote in accordance with the commission's rules of procedure. I recommend that the vacancy be promptly filled in accordance with state law.

Sincerely,

Dustin J. Witjes
Commissioner - Michigan Independent Citizens Redistricting Commission

**EXHIBIT 1: Pages 170 - 173 First volume of transcripts.**

```
 1   tender the witness.
 2           JUDGE MALONEY:  All right.  Thank you.  It's 2:45.
 3   We'll take 15 minutes and resume at three o'clock for cross.
 4           Thank you.
 5           THE CLERK:  All rise, please.  Court is in recess.
 6        (Recess taken at 2:48 p.m.; reconvened at 3:03 p.m.)
 7           THE CLERK:  All rise, please.  Court is in session.
 8   You may be seated.
 9           JUDGE MALONEY:  We're back on the record in Agee
10   versus Benson.
11           Ms. McKnight, you may inquire.
12           MS. McKNIGHT:  Thank you, Your Honor.  We have an
13   agreement from plaintiff that they'll provide us with a list
14   of the audio time stamps and they'll do it by today so we're
15   able to review them.
16           JUDGE MALONEY:  Terrific.  Thank you.
17                       CROSS EXAMINATION
18   BY MS. McKNIGHT:
19   Q.   Good afternoon, Ms. Szetela.
20   A.   Good afternoon.
21   Q.   Thank you for your time today and your work on the
22   Commission.
23   A.   Thank you.
24   Q.   Have you corresponded with plaintiffs' counsel prior to
25   today?
```

```
 1    A.   You mean writing them letters?
 2    Q.   Any type of correspondence.
 3    A.   I'm not sure what you mean by correspondence.  You mean
 4    e-mails, letters?
 5    Q.   Any of that and then we can break it down by type.
 6    A.   Yes.
 7    Q.   What types of correspondence have you had with them?
 8    A.   A few e-mails.
 9    Q.   Have you had any calls with them?
10    A.   I honestly don't think so.
11    Q.   And about what time did you -- what timeframe were those
12    e-mails sent and received?
13    A.   I would say within the last month, maybe.  I'm not a
14    hundred percent sure.
15    Q.   And did you e-mail them first or did they e-mail you?
16    A.   I reached out to them.
17    Q.   Okay.  And let's start with that first e-mail of you
18    reaching out to them.  What did you say in that e-mail?
19    A.   From memory, I told them that I had information that I
20    thought might be useful to their case and that I would like to
21    speak with them, is my recollection.
22    Q.   Okay.  And did you ever speak with them?
23    A.   Yes.
24    Q.   Okay.  And so you did speak with them by phone?
25    A.   No.  I met with them in person.
```

```
 1   Q.   I see.  Okay.  How many meetings did you have with them?
 2   A.   Two.
 3   Q.   And about when were those meetings?
 4   A.   I would say within the last month or so.
 5   Q.   Okay.  Within the last two weeks?
 6   A.   One was within the last two weeks.  One was a little
 7   longer ago than that, like maybe four weeks ago.
 8   Q.   And what caused you to reach out to plaintiffs' counsel?
 9   A.   Because I felt that there were facts that were not being
10   presented to the Court that I think are relevant to this case.
11   Q.   And when you sent e-mails to them, did you include any
12   attachments on the e-mail?
13   A.   No.
14   Q.   Okay.  And then the meeting that you had that was within
15   the last two weeks, what did you discuss at that meeting?
16   A.   Exhibits and testimony.
17   Q.   And then the meeting four weeks ago, what did you discuss
18   with plaintiffs' counsel?
19   A.   Just generally I directed them towards transcripts that
20   had information that I thought might be useful to their case.
21   Q.   You said that meeting was about four weeks ago.  We stand
22   here at November 1.  Does October 1 sound about right for that
23   meeting?
24   A.   When did the strike against GM and Ford start?
25   Q.   I'm not here to answer questions.
```

| | |
|---|---|
| 1 | A. I don't know exactly. I can't tell you exactly without |
| 2 | looking at a calendar. I know that the strikers were striking |
| 3 | when I went to the first meeting so it was in that timeframe. |
| 4 | Q. And what did you share with them in that first meeting? |
| 5 | A. Just the transcripts I thought they should look at. |
| 6 | Q. And then at the second meeting that you had two weeks ago, |
| 7 | did you discuss your testimony with them? |
| 8 | A. Somewhat, yes. |
| 9 | Q. Okay. What did you discuss with them about your |
| 10 | testimony? |
| 11 | A. Just generally the flow of what they were going to ask |
| 12 | starting from the beginning of the Commission through December |
| 13 | of 2021. |
| 14 | Q. Commissioner Szetela, I'd like to ask you a question about |
| 15 | partisan fairness. |
| 16 | A. Sure. |
| 17 | Q. Isn't it true that partisan fairness measurements can only |
| 18 | be done on a full state-wide plan? |
| 19 | A. Yes. |
| 20 | MS. McKNIGHT: Let's pull up PX15-19. |
| 21 | BY MS. McKNIGHT: |
| 22 | Q. Commissioner Szetela, do you remember testifying about |
| 23 | this chart in your direct testimony? |
| 24 | A. Yes. |
| 25 | Q. Can you explain to the Court the difference between a |

**Exhibit 2: Affidavit from Commissioner Szetela via Plaintiffs post-trial brief (12/04/23):**

Case 1:22-cv-00272-PLM-RMK-JTN   ECF No. 114-5,  PageID.3968   Filed 12/04/23   Page 2 of 14

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DONALD AGEE, JR., an individual, et al.,

    Plaintiffs,

v.

JOCELYN BENSON, in her official capacity as the Secretary of State of Michigan, et al.;

    Defendants.

Case No. 1:22-cv-00272

Three-Judge Panel Appointed Pursuant to 28 U.S.C. § 2284(a)

**AFFIDAVIT OF REBECCA A. SZETELA**

STATE OF MICHIGAN   )
                                    ) ss.
COUNTY OF WAYNE     )

    I, Rebecca A. Szetela, having been first duly sworn, deposes and states as follows:

    1.    I have personal knowledge concerning the statements contained in this Affidavit, and if called to testify, can testify competently to the facts stated in this Affidavit.

    2.    I have served as a Commissioner with the Michigan Independent Citizens Redistricting Commission ("MICRC") since November of 2020.

    3.    There are thirteen commissioners on the MICRC, including Commissioner Anthony Eid.

1



# Monday, December 18, 2023

Listen to the Article

## Redistricting: Szetela Files Paperwork To Have Eid Removed

A member of the Independent Citizens Redistricting Commission on Friday accused a colleague of misconduct – alleging he drew districts to help his acquaintances gain elected office – an allegation the commissioner vehemently denied.

The matter is just another instance of drama between commissioners since their mapmaking work was completed in late 2021, with Commissioner Rebecca Szetela again accusing Commissioner Anthony Eid of using his position on the commission for either personal or political gain.

Szetela on Friday filed a notice to have Eid removed from his post and his seat declared vacant. Eid's removal would ultimately be a commission decision, requiring 10 commissioners to vote for his removal at an upcoming meeting.

At present, Szetela only has the support of Commissioner Rhoda Lange, a frequent critic of the commission's work and practices, and potentially Commissioner Erin Wagner, who has been Lange's ally when she's lodged complaints in the past.

Eid, in an interview with Gongwer News Service, denied the allegations and pointed to Szetela causing disruptions in the commissioners' work by going after her colleagues and ICRC administrative staff, including its attorneys, when they disagreed with her.

Szetela, in response, told Gongwer that it wasn't personal, and that as attorney by trade, she was "a rules follower" who wanted to ensure public trust in what was by all accounts a messy process.

Szetela's filing states that she believes Eid abused his position to draw House District 20 in favor of Democrats, knowing that a Bloomfield-area activist, current Rep. Noah Arbit, would be running for office. Szetela also stated she believed Eid made House District 15 favorable for a college acquaintance, Bilal Hammoud, who unsuccessfully ran in the 2022 Democratic primary but lost to current 15th District Rep. Erin Byrnes.

Like Eid, Arbit denied having known the commissioner prior to his work on the ICRC and first met Eid at a public hearing to gain input on potential mapping decisions.

A copy of the filing was provided to Gongwer News Service, but it will be made publicly available when the commission sets its next meeting date. A Department of State spokesperson said a copy of the notice will be attached in upcoming meeting materials.

The existence of the document was first reported by The Detroit News.

Szetela claims that Eid described himself as "friends" with Arbit. She claims to have observed Eid spending a significant amount of time talking to Arbit at a June 2021 meeting. Arbit submitted a community map on July 18, 2021, and later announced his House candidacy August 27, 2021.

The commissioner wrote Eid became "intently focused on redrawing the House and Senate districts that included West Bloomfield and Orchard Lake" and began "advocating for changes to the already-drawn House and Senate districts that contained West Bloomfield and Orchard Lake — the very areas identified by Arbit in his draft map."

Szetela further claimed Eid privately contacted commissioners and consultants outside of public meetings and suggested revisions affecting West Bloomfield, Orchard Lake, Sylvan Lake and Keego Harbor. Eid resides in Orchard Lake.

Various text messages between Szetela and Eid were highlighted in the notice filed with the Department of State.

Eid attended what Arbit called a fundraiser for his campaign in 2022, with the two posing for a picture posted to Arbit's Instagram account,

but Eid said it was actually a townhall and he attended a similar one for a Republican candidate, who is Chaldean like Eid and a member of his church.

The 15th District allegations read along the same lines, accusing Eid of actively making the district safely Democratic to assist Hammoud, who attended Wayne State University at the same time as Eid. The two were noted to be members of the Student Senate together.

Szetela wrote that, as with Arbit, Eid previously described Hammoud as his "friend" in discussions with MICRC commissioners, staff and consultants. She claims Eid was also witnessed speaking to Hammoud at length at MICRC events.

"In what can be charitably described as a curious twist of fate," Szetela wrote, "Hammoud also happened to work on the implementation of Proposal 2 as an employee of the Michigan Department of State, as is evident from the banner picture on his LinkedIn page (displaying him at a Department of State event discussing the MICRC)."

Szetela and Lange posited Eid used his position to benefit them, even though Hammoud handily lost the district. Still, they said the Arbit connection was cause to remove him from his post.

"When a member of the MICRC prioritizes personal relationships with friends who are politicians or candidates for office in making map-drawing decisions, it results in political power being taken from the people and placed into the hands of a select few — who can manipulate the maps to their benefit," Szetela wrote in the filing. "These types of back-room dealings were the very type of transactions that Michigan voters had sought to prevent by implementing Proposal 2. … Eid has fallen well short of these standards."

A U.S district judge overseeing *Agee v. Benson*, a lawsuit alleging the commission made race a predominant factor in building districts in violation of the U.S. Voting Rights Act, could very well nullify key districts and soon call the group back to the drawing board. Szetela has all but sided with the plaintiffs in their belief the commission violated Section 2 of the VRA.

In an interview with Gongwer, Szetela said she was concerned Eid could influence the maps if they are called back, and she filed the complaint to limit his access to any new maps.

"Frankly, there's more than just these two cases. There's been multiple complaints that have come into the commission about side discussions and districts being drawn favorably to Democratic candidates. But we weren't aware of that until after the maps were approved," Szetela said. "Now, we're aware of that as commissioners, and there's a potential that we could have to draw maps again. And if that happens, there's a pretty strong contingent of commissioners who frankly feel that (Eid) should never touch one of our maps again."

It would take 10 commissioners to vote in favor of removing Eid. Szetela said it was hard to tell if she had the votes.

"There's a general consensus that Commissioner Eid is not honest among commissioners, whether they're going to be willing to remove him or not remains to be seen. If they aren't willing to remove him, I think there's other things and steps that we can take to limit his ability to impact maps, such as not allowing him to draw on collaborative maps, or maybe just redrawing anything that he does if he has a turn," she said. "There are other things we can do. This is kind of the first step and if we don't achieve what Commissioner Lange and I are asking for, there are other … things coming to kind of protect the public from this sort of malfeasance."

Eid called the allegations preposterous, and another example of Szetela sowing chaos as a commissioner. He was confident that Szetela didn't have the votes to remove him and that most commissioners would stand by him if a vote occurred.

"Rebecca has been throwing my name in the dirt for quite some time now," Eid said. "I'm not very concerned. I think that anyone who's been paying attention to the process can see through these veiled accusations. It's not only that she's come after me. It seems like she has come after every person that disagrees with her. She came after our old general counsel, that led to her resigning. She has come after other commissioners. It just seems like there's a pattern … and I find it very

interesting this happening now after she accused our lawyers of having a conflict of interest."

**SZETELA AT THE FOREFRONT OF SEVERAL DISPUTES:** In the past year, Szetela has questioned Eid's fitness for his post and was instrumental in raising conflict of interest concerns against him when he obtained a job with social justice nonprofit. Eid eventually resigned from his job with Michigan Voices, which was involved in public comment that had an impact on end-game map changes.

It was the second time Eid accepted employment, but then quickly resigned from a group involved in the making of district maps. In 2022, Eid took a job with Asian and Pacific Islander American Vote at the same time the group was involved in a lawsuit against the commission. The group, sometimes called APIA, also requested the commission to "keep the Bengali community together" during the map-making process. Eid left the APIA after two weeks.

Szetela's complaint led to an investigation, but commissioners in charge of the inquiry said no violations occurred.

During the final throes of the mapmaking process, former General Counsel Julianne Pastula abruptly resigned following a public dispute over legal advice that Szetela raised. While Pastula did not say why she was resigning, their dispute was front and center for the public to see. Pastula now works for the city of Detroit.

More recently, Szetela questioned the ability of commissioners Doug Clark and Dustin Witjes to serve since they are no longer residing in Michigan. Clark is seeking cancer treatment out of state but said he still has a residence in Michigan. Witjes moved to Illinois for work.

As the group was gearing up for the November bench trial in *Agee*, Szetela confronted the ICRC with a proposal to allow the body, which is funded by taxpayer resources, to pay for individual legal representation outside of the firms hired to defend the commission and its maps in court. She was concerned the body's litigation attorneys were mispresenting her in appearances in filings.

Testimony from Szetela and a dissent she filed after the maps were adopted would later become evidence used by the *Agee* plaintiffs at

trial.

"She said it under oath that she went on her own volition and reached out to plaintiffs to … provide them with information to help their case, essentially to undermine the commission," Eid said.

Eid said he felt this was an act of sabotage on Szetela's part.

Eid further argued that aside from not being friends with either Arbit or Hammoud, Orchard Lake and its adjacent West Bloomfield was his home, and that he had a deep interest in listening to public comment from that area.

"It's a Middle Eastern community of interest. So, she's right, I did take special interest in those two districts, but it wasn't to help one person or another. It's because I'm a part of those communities, and it's because I wanted to listen to the public comments in those two communities," Eid said. "From folks who, at least in West Bloomfield, have had a history of being systemically gerrymandered for political gain, and in Dearborn and Dearborn Heights, the Middle Eastern community, who to this day, doesn't have a checkbox on the census. The population is a VRA protected group. I just wanted to make sure that the people in that community had their say, at having the chance to have representation. The public comments for both of those configurations were vast. They're some of the highest public comment that we had."

Szetela has long said the commission didn't do enough to listen to public commentary that would have maybe helped them draw better maps. Although Eid said he was doing that, Szetela said there was a key difference: the potential relationship he had with Arbit and Hammoud.

"I want to make it very clear, I am not saying Arbit or Hammoud told Eid to go draw districts for them. I don't know if that happened or not. However, Anthony has an obligation as a commissioner to make sure he's not drawing districts to favor a candidate running for office," she said. "It's perfectly fair for Arbit to submit a map. It's perfectly fair for Hammoud to submit a map. What's not OK is for Anthony to then take that map, knowing that they're running for office or knowing that they're planning on running for office, inserting into the commission maps and not make any mention of it to the commissioners."

In an interview, Arbit told Gongwer that Szetela's accusations were "patently absurd."

"It's the height of lunacy, frankly," referencing a tweet from a Gongwer reporter in 2021 showing that Eid was not the only one to help create the district in which he ran in and won. "I know that the commission is having a lot of inner turmoil, and it seems this is sort of another symptom of that — where they're kind of sniping at each other and going at each other's throats."

Arbit argued that greater West Bloomfield was an area where Republicans, who were in control of the 2010 mapmaking process, "took a butcher's knife to Lisa Brown's district to gerrymander her out of office, to divide her base of support, which was the Jewish community, to create a basically two red districts out of a blue leaning seat in West Bloomfield."

West Bloomfield is one of the only communities in the entire state of Michigan that we could find that was gerrymandered and divided in the 2010 map, Arbit said.

"That is also something that was recognized by the community, which is why I was far from the only person to speak before the redistricting commission to talk about greater West Bloomfield being kept together," Arbit said. "There were literally probably 50 or so people, you can go on the portal, you can look, I mean, there are just so many comments about it."

Arbit denied knowing Eid personally, having only met him during the redistricting process, and that he had not decided to run for office well after he spoke to Eid and before the maps were finalized in late December 2021.

ICRC Executive Director Edward Woods III, in a statement, said the commission will review Szetela's and Lange's allegations "and render a finding in compliance with the Michigan Constitution and its Rules of Procedure."

Szetela said she didn't believe her recent allegations against commission members had worn their patience thin or made them unwilling to work with her.

"I think at the end of the day, they respect my opinion, and we might ultimately disagree and they might ultimately say, 'No, we're not going to vote to remove Mr. Eid,' but they respect the fact that I'm raising it," Szetela said. "There's no bias here. There's no politics. It's about we are stewards of the public; we have an obligation to follow the law. And to the extent I see it's not being followed, I'm going to raise that up and bring it to the attention of the public because I think it's my obligation to do that."

— By Ben Solis

Back to top

Copyright 2023, Gongwer News Service, Inc. All rights reserved.

Terms of Service    Privacy Policy