UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DONALD AGEE, JR *et al.*,  )
        Plaintiffs,  )
              )
v.  )
              )    Civil Case No.:1:22-cv-272
JOCELYN BENSON, in her official )
capacity as the Secretary of State of  )
Michigan, *et al.*,  )
        Defendants.  )
              )

# Brief of the Michigan Senate as Amicus Curiae

Collins Einhorn Farrell PC
Kari Melkonian (P72012)
James J. Hunter (P74829)
4000 Town Center, Floor 9
Southfield, Michigan 48075
(248) 355-4141
Kari.Melkonian@ceflawyers.com
James.Hunter@ceflawyers.com
Attorneys for Michigan Senate

## Table of Contents

*Index of Authorities* ............................................................................................................. iii

*Introduction* ........................................................................................................................... 1

*Argument* ................................................................................................................................ 2

    I.  A special Senate election in 2024 is not favored under *Covington*'s equitable balancing test ................................................................................................................. 3

        A.  Severity and nature of the constitutional violation ..................................... 5

        B.  Disruption to ordinary processes of governance ......................................... 8

        C.  Intrusion on state sovereignty ......................................................................... 9

    II.  Judicial restraint also counsels against imposing a Senate special election in this case ..................................................................................................................................... 12

*Conclusion* ............................................................................................................................ 13

*Certificate of Compliance* .................................................................................................. 14

*CERTIFICATE OF SERVICE* ......................................................................................... 15

# Index of Authorities

*Cases*

*Bd. of Educ. of Shelby Cnty., Tenn. v. Memphis City Bd. of Educ.*,
No. 11-2101, 2013 WL 4039044 (W.D. Tenn. Aug 7, 2013) .................................................. 3, 9

*Cf. Clarke v. Wis. Elections Comm'n*,
--- N.W.2d ----, 2023 WL 8869181 (Wis. Dec. 22, 2023) ........................................................... 3

*Chatfield v. League of Women Voters of Mich.*, 140 S. Ct. 429 (2019) ..................................... 2, 7

*Chisom v. Roemer*, 853 F.2d 1186 (5th Cir. 1988) ........................................................................ 3

*Donatelli v. Mitchell*, 2 F.3d 508 (3d Cir. 1993) ......................................................................... 11

*Fairley v. Forrest Cnty., Miss.*, 814 F. Supp. 1327 (S.D. Miss. 1993) .......................................... 3

*Gregory v. Ashcroft*, 501 U.S. 452 (1991) .................................................................................... 9

*League of Women Voters of Mich. v. Benson*,
373 F. Supp. 3d 867 (E.D. Mich. 2019), *vacated on other grounds*,
*Chatfield v. League of Women Voters of Mich.*, 140 S. Ct. 429 (2019) .............................. passim

*North Carolina v. Covington,* 581 U.S. 486 (2017) ............................................................. passim

*Reynolds v. Sims*, 377 U.S. 533 (1962) .......................................................................................... 9

*Rucho v. Common Cause,* 139 S. Ct. 2484 (2019) ........................................................................ 7

*Thomas v. Beals*, No. 3:22-cv-427, 2022 WL 3038458 (E.D. Va. Aug. 1, 2022) ................... 3, 13

*United States v. City of Houston*, 800 F. Supp. 504 (S.D. Tex. 1992) ............................... 2, 8, 12

*White v. Weiser*, 412 U.S. 783 (1973) ......................................................................................... 12

*Other Authorities*

https://www.legislature.mi.gov/documents/historical/miconstitution1908.htm ....... 10

*Constitutional Provisions*

Mich. Const. (1908) Art. V, §§ 2–3 ............................................................................................. 10

Mich. Const. Art. IV, § 2 .............................................................................................................. 10

Mich. Const. Art. IV, § 54 ............................................................................................................ 11

## Introduction

The Michigan Senate, as proposed amicus curiae, respectfully submits this brief to address the legal framework governing the plaintiffs' request that the Court order special elections in 2024. *See* ECF # 136, at 13–16, PageID.4855-58.

In its December 21, 2023 scheduling order, the Court directed the parties to submit supplemental briefing on the issue of remedies no later than January 2, 2024 — three days before the hearing on the matter. The scheduling order specifically requested that the parties' submissions include briefing on "the efficacy of a special master with a portfolio to assist the Commission in meeting its stringent timeframe" in redrawing the House and Senate districts found to be constitutionally defective. ECF 132. The plaintiffs indeed devoted most of their supplemental brief to the special master issue. But they also urged the Court to adopt another remedy: a mandate that special elections for the redrawn Senate districts (whether they be redrawn by the Commission, a special master, or some combination thereof) be held in 2024, rather than in 2026 as is required by Michigan's Constitution. ECF 136, at 13–16, PageID.4855-58. Defendants, the Commission and its members, submitted their own supplemental brief on the same day, but did not address the issue of Senate special elections. ECF 135. (This is not surprising, given that the Commission's brief was filed before the plaintiffs' brief and the Court had not ordered the parties to address the question.)

The Senate no longer bears the responsibility for decennial redistricting in Michigan, and it expresses no opinion in this brief on the other remedies under discussion or on the underlying merits of the case. It has a manifest interest, however, in the question

1

of Senate special elections that the plaintiffs have now raised. Because that extraordinary remedy is now on the table, the Senate has sought the Court's permission to file this brief and address that request.

While the Senate is uniquely positioned to comment on this potential remedy, it would hardly be alone in feeling its effects if imposed. Millions of Michigan voters would experience the consequences of court-ordered off-cycle elections in some, but not all, of their 38 Senate districts. Instituting a Senate special election in 2024 would thwart the public policy enshrined in Michigan's Constitution, truncating the terms of not only the affected incumbent senators, but also the class of senators elected in 2024 to shortened two-year terms. Further, it would introduce yet more uncertainty into a redistricting process and electoral system already experiencing growing pains, undermining the predictability and stability crucial to the democratic process's legitimacy. The Senate urges the Court to exercise its discretion not to mandate Senate special elections in 2024.

## Argument

Plaintiffs assert correctly that federal courts have the power to set early elections in legislative districts that have been ordered redrawn to remedy violations of the Constitution's equal protection clause or the Voting Rights Act. *See, e.g.*, *League of Women Voters of Mich. v. Benson*, 373 F. Supp. 3d 867, 961 (E.D. Mich. 2019), *vacated on other grounds, Chatfield v. League of Women Voters of Mich.*, 140 S. Ct. 429 (2019).

But "[o]rdering new elections is a drastic remedy for reasons that should be obvious." *United States v. City of Houston*, 800 F. Supp. 504, 506 (S.D. Tex. 1992). Most fundamentally, it is a drastic form of interference in a state's control of its own elections—

2

a type of judicial intervention that is, in all events, "a serious business . . . not to be lightly engaged in." *Fairley v. Forrest Cnty., Miss.*, 814 F. Supp. 1327, 1345 (S.D. Miss. 1993) (quoting *Chisom v. Roemer*, 853 F.2d 1186, 1189 (5th Cir. 1988)). It has the effect of unseating, or curtailing the terms of, the people's chosen representatives, even if the districts in which that choice was manifested were drawn in an impermissible manner. *See Thomas v. Beals*, No. 3:22-cv-427, 2022 WL 3038458, at *14 (E.D. Va. Aug. 1, 2022) (noting that a special election truncating legislators' terms from two years to one year would amount to "commutation by an unelected judiciary [that] would disregard the will of the voters, who elected the Delegates to two-year terms"). And it imposes burdens on election administrators, affected legislators, and the voters alike—the voters not least of these, given the reduced turnout, confusion, and apathy that often accompanies special elections. *Bd. of Educ. of Shelby Cnty., Tenn. v. Memphis City Bd. of Educ.*, No. 11-2101, 2013 WL 4039044, at *6 (W.D. Tenn. Aug 7, 2013).

Special elections are thus a tool to be used sparingly rather than the "standard remedy," even where constitutional violations have been found. *Cf. Clarke v. Wis. Elections Comm'n*, --- N.W.2d ----, 2023 WL 8869181, at *18 (Wis. Dec. 22, 2023). As explained further below, precedent and principles of judicial restraint both weigh against the special election remedy urged by the plaintiffs.

I. **A special Senate election in 2024 is not favored under *Covington*'s equitable balancing test.**

The Supreme Court's per curiam decision in *North Carolina v. Covington,* provides some guidance to federal courts facing the decision whether to administer such strong

3

medicine. 581 U.S. 486 (2017). There, a three-judge district court held in 2017 that 28 of North Carolina's legislative districts were the result of unconstitutional racial gerrymandering. *Id.* at 487. To remedy this violation, it ordered not only that the affected districts be redrawn, but that the terms of the legislators elected in 2016 be truncated from two years to one year, and that special elections be held in the fall of 2017 for additional one-year truncated terms in those districts. *Id.* In doing so, the district court observed succinctly that "the injury caused by allowing citizens to continue to be represented by legislators elected pursuant to a racial gerrymander" outweighed any cost of ordering special elections. *Id.*

The Supreme Court reversed, agreeing with North Carolina that the district court "failed to meaningfully weigh any equitable considerations." *Id*. at 488. Before a district court fashions a remedy, it "must" undertake an "equitable weighing process" that takes into account "what is necessary, what is fair, and what is workable[.]" *Id*. at 488.

Noting that it had never before addressed—much less approved—the appropriateness of a special election as a remedy for a racial gerrymander, the Court began with the cautionary note that "in the context of deciding whether to truncate existing legislators' terms and order a special election, there is much for a court to weigh." *Id.* It proceeded to outline the factors that should be balanced in that weighing process: "[O]bvious considerations include [1] the severity and nature of the particular constitutional violation, [2] the extent of the likely disruption to the ordinary processes of governance if early elections are imposed, and [3] the need to act with proper judicial restraint when intruding on state sovereignty." *Id.* These factors are not exclusive; rather,

4

"they are among the matters a court would generally be expected to consider in its 'balancing of the individual and collective interests' at stake." *North Carolina,* 581 U.S. at 488 (citation omitted). The Supreme Court also left the relative weight of these factors "(or others)" to district courts. *Id.*

On remand, after engaging in a more thorough application of the balancing test mandated by the Supreme Court, the district court panel declined to order a special election. *Covington v. North Carolina,* 270 F. Supp. 3d 881 (M.D.N.C. 2017). Taken together, the *Covington* factors disfavor the imposition of a Senate special election in this case, too.

### A.  Severity and nature of the constitutional violation.

Plaintiffs argue that the first *Covington* factor favors a special election solely because of the fundamental importance of the right to vote, noting that "the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights." ECF 136, p. 13, PageID.4855 (quoting *League of Women Voters*, 373 F. Supp. 3d at 958). It is true, of course, that the right to vote is fundamental. But the Supreme Court's balancing test presupposes an injury to the right to vote: it guides courts in fashioning a remedy where such a violation has already been found. Arguing that a particular case warrants the extraordinary remedy of a special election because of the *general* importance of suffrage in the American system overlooks *Covington*. In that case, the Supreme Court warned against "minimal reasoning [that] would appear to justify a special election in *every* racial-gerrymandering case—a result clearly at odds with our demand for careful case-specific analysis." 581 U.S. at 489. Plaintiffs' notion that a special

5

election is necessary because the right to vote is important is the "minimal reasoning" that *Covington* rejected.

Instead of this abstract view, the first prong of the *Covington* test requires the Court to consider how deeply the constitutional violation at issue infects the state's electoral system as a whole, and how qualitatively egregious was the responsible state actors' violation. For example, on remand—suitably chastened by the Supreme Court—the district court in *Covington* addressed the geographic scope of the racial gerrymander there, noting affected "dozens" of districts stretching all across the state:

> All told, the unconstitutional racial gerrymanders identified by this Court and affirmed by the Supreme Court impact nearly 70% of the House and Senate districts, touch over 75% of the state's counties, and encompass 83% of the State's population—nearly 8 million people. . . . [T]he districting plans at issue thus represent the *most extensive unconstitutional racial gerrymander ever encountered by a federal court*.

*Covington,* 270 F. Supp. 3d at 892 (emphasis added).[1] Another dimension of the "severity" of a constitutional violation may be the malicious intent of the map-drawers. In *League of Women Voters*, the Eastern District of Michigan panel found that the first *Covington* factor weighed in favor of a special election, in the context of a partisan gerrymander, where the evidence showed "the map-drawers and legislators designed the Enacted Plan with

---

[1] The court there found, under these extreme circumstances, that the first *Covington* factor weighed in favor of a special election, though not enough to tilt the overall balance toward ordering such a remedy.

6

the specific intent to discriminate against Democratic voters." *League of Women Voters*, 373 F. Supp. 3d at 958.[2]

Here, by comparison, the Court has held that six of Michigan's 38 Senate districts, all in the metropolitan Detroit area, were the result of an unconstitutional racial gerrymander. Any dilution of the right to vote on the basis of race is of grave importance and demands a remedy, but the geographic scope of the violation is smaller than in *Covington* — or in *League of Women Voters*, where the court found that 10 Michigan Senate districts had been unconstitutionally drawn. *See League of Women Voters*, 373 F. Supp. 3d at 944–46. This fact counsels against ordering a special election.

The contrast on the question of intent may be still more important and instructive. While the Court's opinion states that the district lines in question were drawn predominantly on the basis of race, it notes that the Commissioners themselves were acting on the guidance of their expert consultants that doing so was necessary for Voting Rights Act compliance. Without questioning the Court's conclusion that this guidance was wrong as a matter of law, these first-time Commissioners acted in the open, in transcribed public sessions, and without any evident intent to disenfranchise voters. *Cf.* ECF 131, p. 116, PageID.4751 ("In the face of such a daunting task, the . . . Commission's work reflected all the best that could be expected[.]") (concurring opinion). The first

---

[2] The court in *League of Women Voters* ordered special elections, but the elections never occurred because the Supreme Court later vacated that judgment. It remanded the case to the district court for reconsideration in light of *Rucho v. Common Cause,* 139 S. Ct. 2484 (2019), which held that partisan gerrymanders are non-justiciable. *Chatfield v. League of Women Voters of Mich.*, 140 S. Ct. 429 (2019).

*Covington* factor weighs less strongly in favor of a special election here than in more extreme cases.

### B. Disruption to ordinary processes of governance.

Plaintiffs argue that the disruption to Michigan's ordinary processes of governance from a 2024 Senate special election will be "nil." ECF 136, p. 14, PageID.4856. In support of this assertion, they cite only the court's opinion in *League of Women Voters*, which concluded—in an order issued in April 2019—that instituting Senate special elections in 2020 to coincide with the already-scheduled House elections would cause little disruption to the ordinary rhythms of Michigan elections. *Id.* (citing *League of Women Voters*, 373 F. Supp. at 959).

The compressed timeline that Senate special elections would face here makes *League of Women Voters* distinguishable. As the Plaintiffs themselves note in urging the services of a special master, the candidate filing deadline for the primary election is April 23, 2024. Even if the Court were to issue its order on remedies immediately after the January hearing, neither affected voters nor potential candidates would be on notice of the applicable new Senate district lines until remedial maps were drawn and approved. Thus, prospective candidates, who would otherwise not need to do so until late 2025 or early 2026, would likely have well less than three months to take the necessary steps to establish campaigns and enter the race. *Cf.* ECF 136, p. 3, PageID.4845 ("Election deadlines are looming[.]"). *See also City of Houston*, 800 F. Supp. at 506 ("A special election also tends to skew the process of candidate selection. Potential candidates must decide to run, and to change their personal and professional schedules dramatically, on much

8

shorter notice than they would face in preparing for a regular election cycle[.]"); *Bd. of Educ. of Shelby Cnty.*, No. 11-2101, 2013 WL 4039044, at *6 (noting that among equitable factors to consider in whether to order a special election is "whether the short time frame would discourage people from running").

Moreover, while a Senate special election that coincides with other pre-planned elections may place a less onerous administrative burden on election officials than one ordered from scratch, Plaintiffs' assertion that there will be *no* cost is unsupported. If, as they claim elsewhere in their brief, the Secretary of State is "already several weeks behind in election preparation," ECF 136, p. 3 PageID.4845, then it stands to reason that the preparation of new ballots and preparation of other administrative infrastructure for at least a half-dozen new Senate districts would at the very least heighten the burdens of compliance with any Court order.

### C. Intrusion on state sovereignty.

"Through the structure of its government, and the character of those who exercise government authority, a State defines itself as a sovereign." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). Accordingly, the federal courts have long cautioned that the task of remedying states' violations of federal law in their electoral systems must rigorously avoid "requiring precipitate changes that could make unreasonable or embarrassing demands on a State in adjusting to the requirements of the court's decree." *Reynolds v. Sims*, 377 U.S. 533, 585 (1962).

Michigan's Constitution provides that senators shall serve four-year terms, and that these terms will be coextensive with the governor's term in office. Mich. Const. Art.

9

IV, § 2. Michigan's 38 senators thus serve terms double the length of their House counterparts, are far fewer in number than the 110 Representatives, and represent constituencies more than twice as large. There are deep, longstanding policies underlying this structure that the people of Michigan have ratified—serving values that have been recognized since the framing of the U.S. Constitution and enshrined in the constitutions of most states. The distinct function of an upper house, as noted in the federal Constitution's ratification debates, is inextricable with these twin features:

> The necessity of a senate is not less indicated by the propensity of all single and numerous assemblies to yield to the impulse of sudden and violent passions, and to be seduced by factious leaders into intemperate and pernicious resolutions. . . . All that need be remarked is, that a body which is to correct this infirmity ought itself to be free from it, and consequently *ought to be less numerous*. It ought, moreover, to possess great firmness, and consequently ought to hold its authority by a *tenure of considerable duration*.

The Federalist No. 62 (emphasis added). When Michigan enacted its new (and current) constitution in 1963, it lengthened Senators' terms from two years to four, aligning itself with the policy judgment that longer terms enhance senatorial expertise and promote independence from the near-constant demands of the election cycle. *Cf.* Mich. Const. (1908) Art. V, §§ 2–3 (predecessor constitution, enacted in 1908, providing that Senators and Representatives alike served two-year terms).[3]

There can be no question that Michigan has an interest in not truncating the terms of senators who were elected to serve a full four-year term in 2022. It also has an interest

---

[3] *See* https://www.legislature.mi.gov/documents/historical/miconstitution1908.htm.

in not truncating the terms of any senators elected in a 2024 special election—a process that would be necessary to preserve the constitutionally mandated four-year cycle of Senate elections. *See Donatelli v. Mitchell*, 2 F.3d 508, 519 (3d Cir. 1993) ("The state has a legitimate interest in not ousting a senator in the middle of the four-year term which he was elected to serve."). The Senate shares that interest, both as an institution and on behalf of the members who would be individually affected.[4]

Any intrusion on Michigan's sovereignty would fall just as significantly on Michigan voters. *Some*, but not all, Michigan voters would have three Senate elections in four years and would be represented by half-term senators who had less time in office—and, more to the point, less independence from the demands of the election cycle—than senators elsewhere in the state. *Some*, but not all, Michigan voters would be served by senators who had less time to develop expertise in constituent services and the finer points of legislating. That these disadvantaged Michigan voters would be precisely those residing in the impacted Senate districts only highlights that a special election can be a double-edged sword.

\*\*\*

---

[4] Because of the constitutional amendment to the state's legislative term limits approved by the Michigan voters in 2022, truncating the terms of senators elected in 2022 could have a particularly acute impact on those senators who were "grandfathered in" to the new term-limit rules and are entitled to serve through the 2026, but would find themselves potentially unable to seek re-election in 2024 and thus barred from serving the back half of the term to which they had been elected by their constituents. *See* Mich. Const. Art. IV, § 54.

11

The relatively confined scope of the constitutional violations found in this case—coupled with the weighty, unbalanced intrusion on Michigan's chosen electoral structure that imposing a special election in only a small minority of the State's Senate districts would entail—weigh against the application of that remedy here.

## II. Judicial restraint also counsels against imposing a Senate special election in this case.

In redistricting cases as in other arenas touching so closely on questions of federalism, federal courts must narrowly tailor the remedies that they impose. *White v. Weiser*, 412 U.S. 783, 797 (1973). Without question, a federal court has a responsibility, in all but the most unusual cases, to ensure that further elections are not held under an unconstitutional districting regime. But that responsibility does not necessarily bring with it an imperative to order that new elections in redrawn districts occur immediately.

Rather, "proper judicial restraint" must be exercised. *Covington*, 581 U.S. at 488. Judicial restraint may lead a court to allow a remedy to be instituted in sync with the state's own electoral schedule. *See, e.g., City of Houston*, 800 F. Supp. at 505–06 (noting that special elections should be reserved for "egregious circumstances" and determining that remedial districts could be implemented on the jurisdiction's normal electoral schedule). The counsel of judicial restraint is all the more warranted where, as here, the form of relief represented by the special election would necessarily impact other districts than those directly tainted by the constitutional violation. As the analysis of the *Covington* factors above demonstrates, a special election remedy would, at the very least, bring significant costs along with its benefits.

In circumstances like these, where the violation itself is not statewide but a number (as yet unknown) of Senate districts that are not themselves unconstitutionally drawn will likely have to be altered to effect a remedy, the differential effects on Michigan voters of a special election—with its attendant consequences—would only be heightened. The redrawn maps themselves may be the least restrictive means of correcting the equal protection violation, but it does not follow that ordering a Senate special election for those redrawn districts, on a compressed time frame and in contravention of Michigan's constitutional structure, comports with judicial restraint. *See, e.g.*, *Thomas*, 2022 WL 3038458, at *15.

## Conclusion

For the reasons set forth above, the Court should decline to order special Senate elections in redrawn districts for 2024.

    Respectfully submitted,

    Collins Einhorn Farrell PC

    By: */s/ James J. Hunter*
    Kari Melkonian (P72012)
    James J. Hunter (P74829)
    4000 Town Center, Floor 9
    Southfield, Michigan 48075
    (248) 355-4141
    Kari.Melkonian@ceflawyers.com
    James.Hunter@ceflawyers.com
    Attorneys for Michigan Senate

Dated: January 5, 2024

**Certificate of Compliance**

In accordance with Local Rule 7.2(b)(ii), I certify that this brief complies with the word-count limitation set forth in Local Rule 7.2(c). I used a proportionally-spaced font, Book Antiqua, at 12 point. According to my word-processing system, Microsoft Word 2016, this brief contains 3,516 countable words.

Respectfully submitted,

Collins Einhorn Farrell PC

By: */s/ James J. Hunter*
Kari Melkonian (P72012)
James J. Hunter (P74829)
4000 Town Center, Floor 9
Southfield, Michigan 48075
(248) 355-4141
Kari.Melkonian@ceflawyers.com
James.Hunter@ceflawyers.com
Attorneys for Michigan Senate

Dated: January 5, 2024

**CERTIFICATE OF SERVICE**

I hereby certify that on January 5, 2024, I electronically filed the foregoing instrument with the Clerk of the Court using the ECF system, and that a copy was electronically served on all counsel of record via the ECF system and to any counsel not registered to receive electronic copies from the court, by enclosing same in a sealed envelope with first class postage fully prepaid, addressed to the above, and depositing said envelope and its contents in a receptacle for the U.S. Mail.

Respectfully submitted,

Collins Einhorn Farrell PC

By: */s/ James J. Hunter*
Kari Melkonian (P72012)
James J. Hunter (P74829)
4000 Town Center, Floor 9
Southfield, Michigan 48075
(248) 355-4141
Kari.Melkonian@ceflawyers.com
James.Hunter@ceflawyers.com
Attorneys for Michigan Senate

Dated: January 5, 2024