UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| DONALD AGEE, JR., an individual, *et al.*,<br><br>　　　　Plaintiffs,<br><br>v.<br><br>JOCELYN BENSON, in her official capacity as the Secretary of State of Michigan, *et al.*,<br><br>　　　　Defendants. | Case No. 1:22-cv-00272<br><br>**Three-Judge Panel Appointed Pursuant to 28 U.S.C. § 2284(a)** |

**PLAINTIFFS' OBJECTION TO PROPOSED SPECIAL MASTER BERNARD GROFMAN**

Plaintiffs submit the following objection to the Court's proposed special master, Bernard Grofman, Ph.D. ("Dr. Grofman"), pursuant to the Scheduling Order Regarding Redistricting, which invited the parties to submit written objections if they believed that "Dr. Grofman has a conflict of interest that would disqualify him for serving as Reviewing Special Master, or that his appointment is otherwise objectionable[.]" (ECF No. 156). As set forth below, Dr. Grofman has numerous conflicts of interest that require his disqualification:

**Summary of Objection**

1.　Dr. Grofman has extensive ties with both the Commission's legal counsel at Baker Hostetler and with the Commission's VRA expert, Dr. Lisa Handley. Indeed, Dr. Grofman has co-authored more than two-dozen works with Dr. Handley, including one article that the Commission recently credited as "pioneering" the same

1

racial-target methodology this Court roundly rejected in its opinion invalidating the Senate and House districts at issue in this case. Due to these deep professional and philosophical ties, Plaintiffs question Dr. Grofman's objectivity. More important, these ties and shared philosophy should disqualify Dr. Grofman as the proposed "Reviewing Special Master," tasked with evaluating the remedial maps for legal violations, since his VRA approach is identical to the one this Court has already criticized and rejected.

### Specific Objections to Dr. Grofman

2. In the Scheduling Order Regarding Redistricting, the Court indicated it intends to appoint Dr. Grofman to serve as the "Reviewing Special Master" whose task will be to "evaluate the Commission's remedial plan and to advise the court as to whether, in his opinion, that plan lawfully remedies the constitutional violations identified in this court's December 21, 2023, opinion and order" (the "Opinion") and "also advise the court regarding Dr. Barber's plan in the event that the court asks him to do so." (ECF No. 156, PageID.5151).

3. Plaintiffs object to using Dr. Grofman in that role, as he has written and worked extensively with Dr. Handley, whom this Court largely discredited in its Opinion due to her flawed VRA approach, which included setting fixed BVAP targets for each district. ECF No. 131, PageID.4705 (noting that limiting the "'black voting age population'—known as 'BVAP' in redistricting jargon—to approximately 35-45%" is a "proposition… without support in the Supreme Court's VRA caselaw"). The Court also criticized Dr. Handley's repeated advice to the Commission that Black voters

would be able to elect their candidates of choice based on general election data alone and concluded this advice was a "grave disservice to everyone involved with this case, above all the voters themselves." *Id.* at PageID.4817.

4. Notably, Dr. Grofman's name appears *27 times* on Dr. Handley's Curriculum Vitae. (Exhibit A, EDS Contract w/ Dr. Handley's Curriculum Vitae, pg. 109-111).[1] The two have written more than two dozen books and articles together, including numerous VRA-related publications on the very subject at issue in this case, including "Minority Success in Non-Majority Minority Districts: Finding the 'Sweet Spot'" and "Minority Voting Equality: the 65 Percent Rule in Theory and Practice." *Id.* They also wrote an amicus brief to the United States Supreme Court (along with the Commission's other proposed special master candidate, Nathaniel Persily) in *Bartlett v. Strickland*, 556 U.S. 1 (2009). *Id.* It is not realistic to expect that Dr. Grofman will be able to provide an independent review of the Commission's and Dr. Handley's going-forward work because Dr. Grofman and Dr. Handley share the same philosophy when it comes to the VRA and Black voters.

5. Dr. Grofman also has professional ties with the Commission's legal counsel at Baker Hostetler—in particular, Mark Braden, who previously served as litigation counsel and defended the Commission's VRA-justified map-drawing approach at trial, but who is now transitioning to the Commission's VRA counsel.

---

[1] Exhibit A is publicly available on the Commission's website:
https://www.michigan.gov/micrc/-/media/Project/Websites/MiCRC/ContractsAndBids/MICRC_Election_Data_Services_Contract.pdf?rev=e83bcac97a994be09523471f19c9a222&hash=7C0BEC8D8A47C8BBA2EDADD9312B5CB7

3

Mr. Braden wrote a chapter in a book co-authored by Dr. Grofman entitled *Election Reform in the United States after Bush v. Gore*, eds. Grofman & Alvarez, Chapter: "Entering the Political Thicket" (Cambridge University Press, 2013).[2] Again, it is not realistic to expect that Dr. Grofman will provide objective criticism of VRA work done by Mr. Braden and Dr. Handley.

6. Plaintiffs are gravely concerned about Dr. Grofman's perceived bias due to these relationships. But that concern is dwarfed by the real problem, which is that Dr. Grofman will continue to espouse the same ill-fated VRA analysis that plagued the Commission to date. In fact, in the Commission's Supreme Court Emergency Application for Stay, it defended the "racial target" approach it employed during the map-drawing process *by citing to an article authored by Dr. Handley and Dr. Grofman,* whom the Commission credits with "pioneering" the Commission's approach:

> Dr. Handley and Mr. Adelson advised the Commission not to pick "an arbitrary demographic target (e.g., 50% black voting age population) for all minority districts across the jurisdiction," but instead to look to "[a] district-specific, functional analysis . . . to determine if a proposed district will provide minority voters with the ability to elect minority-preferred candidates to office." App. 247a; see App. 008a–09a. *To that end, Dr. Handley utilized the method she developed in the pioneering article Grofman, Handley, & Lublin, Drawing Effective Minority Districts: A Conceptual Framework and Some Empirical Evidence*, 79 N.C.L. Rev. 1383 (2000–2001). . . This method uses a mathematical formula that accounts for levels of black cohesion, white crossover voting, and turnout by race to calculate the percentage BVAP at which districts would afford black voters in the area a realistic opportunity to elect their candidates of choice… Dr. Handley determined that BVAP percentage to be 35% in Wayne County and 40% in Oakland County.

---

[2] https://www.bakerlaw.com/professionals/e-mark-braden/, last visited January 11, 2024.

4

(Exhibit B, 1/9/2024 Application for Stay, p. 11) (emphasis added).

7. In other words, the Commission credits Dr. Grofman with inventing the exact methodology this Court deemed invalid. ECF No. 131, PageID.4705 (noting that limiting the "'black voting age population'—known as 'BVAP' in redistricting jargon—to approximately 35-45%" is a "proposition [that] is without support in the Supreme Court's VRA caselaw").

8. Despite knowing the Court had already emphatically rejected Dr. Grofman's redistricting theory, and that Dr. Grofman and Dr. Handley were of the same ilk, the Commission listed Dr. Grofman on its initial list of special master candidates anyway. (Exhibit C, Email dated Jan. 4, 2024 at 2:16 pm). That approach is consistent with the Commission's decision to continue relying on Dr. Handley as its VRA expert, to retain Mr. Braden as its VRA attorney, and to attack this Court's VRA reasoning in the Supreme Court Application for Stay.[3] In response to the Court's ruling, the Commission and its advisors are unrepentant.

---

[3] The Commission—including its new VRA counsel, Mr. Braden, who appears as counsel on the Commission's Emergency Application for Stay filed last week in the U.S. Supreme Court—wrongly accuses this Court of (1) failing to "examine Dr. Handley's polarization analysis or identify any error of methodology (or anything else) in it," (2) ignoring "the evidence before the Commission that Detroit-area districts did not need BVAP majorities to enable black voters to elect candidates of their choosing, due to white crossover voting," (3) "inexplicably claim[ing] in its stay ruling that 'the Commission had no data indicating how African American candidates of choice performed in the Democratic primaries in Detroit,'" (4) "oddly announc[ing] that 'everyone agrees' the primary elections supply the relevant information, which was not true and clearly erroneous," and (5) suggesting that the Commission should have used higher BVAP targets when such an approach "cuts against everything [the Supreme] Court has said in recent years about narrow tailoring." (Exhibit B, 1/9/2024 Emergency App. for Stay, pp. 28–33) (citations omitted).

5

9. Importantly, the Court has admonished the Commission to ensure this same, discredited VRA approach is *not* employed going forward:

> JUDGE KETHLEDGE: So, the Commission has retained your firm as VRA -- replacement VRA counsel; is that correct? … [M]y concern or at least something I want to get reassurance about is that, you know, we just adjudicated these lines unconstitutional. We made a determination, which is unchallenged apparently, that these lines were drawn predominately based on race, and we made a determination that racial line drawing was not supported by a compelling interest and that it wasn't narrowly tailored. We made that determination. That part it looks like is being challenged, and that's fine… *I'll be candid with you, I mean, a concern I have is whether the Commission is going to get the same legal advice that it got before which led it to adopt racial targets of 35 to -- racial caps, frankly, of 35 to 45 percent of African American voters in these districts, and I guess that's my concern.* Are they going to – the Supreme Court is being told [in the Commission's appeal papers] that's fine and the VRA somehow requires that, and *are these commissioners again going to be told what they were told before, that you have to stay within this range or else it's going to violate the VRA? . . . I'm concerned about that…* I -- I just – I would be *gravely concerned*, having read the thousands of pages that I read for the commission's proceedings, *if we start seeing anything like the same advice being given to the Commission that lead us here.*

(1/5/2024 Hrg. Trans., pg. 43-44, ECF No. 155, PageID.5117-18) (emphasis added). The Commission's decision to continue using Dr. Handley and to retain Mr. Braden heightens the concern that the same VRA advice will be recycled to the Commission. And Dr. Grofman's appointment as the "Reviewing" Special Master, despite sharing the same views as Dr. Handley and Mr. Braden, ensures that the Court will receive no truly independent analysis of that discredited approach.

10. It is worth noting that in the Commission's Supreme Court Application for Stay, the Commission faults this Court for not providing guidance as to what is expected for VRA compliance purposes moving forward—seemingly looking to *the Court* to serve as the Commission's VRA expert and provide it with a legal memorandum in the form of an inappropriate advisory opinion by the judicial branch.

6

(Exhibit B, 1/9/2024 Application for Stay, pp. 5-6.) The Commission told the Supreme Court that the remedial phase here will be "uniquely difficult because the district court did not identify what federal law requires in this instance—whether it be 15 majority-minority districts; some smaller number of supermajority districts; or a race-blind draw," going so far as accusing the Court of setting "the Commission out to sea in a rudderless boat" due to a lack of VRA guidance for its future remedial work. *Id.* Plaintiffs agree that the Commission is currently functioning like a rudderless boat. But Dr. Grofman is not the captain likely to right the course. He is a professional colleague and shares the same VRA philosophy as the two VRA experts who already guided the Commission boat into the rocks.

11. Lastly, in addition to their substantive objections, Plaintiffs have a logistical concern regarding Dr. Grofman. During the parties' recent court-ordered meet and confer, the Commission proposed Dr. Grofman as a potential special master candidate, then voluntarily removed him from the Commission's list because when the Commission's counsel reached out to him to inquire as to his availability, Dr. Grofman responded that he did not have time for the engagement because he was recently appointed as the special master in the Wisconsin redistricting dispute. ("I put [Dr. Grofman] as an honorable mention. We were unable to confirm his availability.") (1/5/2024 Hrg. Trans., pg. 64-65, ECF No. 155, PageID.5138-39). According to the appointment order from that case, this does appear to be the case, as Dr. Grofman is required to submit his written report to that court by February 1, 2024. (Exhibit D, Order Appointing Bernard Grofman and Jonathan Cervas dated

7

Dec. 23, 2023, pg. 4). As a result, it appears Dr. Grofman is unavailable to assist in this matter due to the urgent timeline required—wholly aside from this relational and philosophical conflicts.

Dated: January 16, 2024                    Respectfully submitted,

*/s/ Jennifer K. Green*
Michael J. Pattwell (P72419)
Jennifer K. Green (P69019)
James J. Fleming (P84490)
Amia A. Banks (P84182)
CLARK HILL PLC
215 S. Washington Sq., Ste. 200
Lansing, MI 48933
(517) 318-3100
mpattwell@clarkhill.com
jgreen@clarkhill.com
jfleming@clarkhill.com
abanks@clarkhill.com

John J. Bursch (P57679)
BURSCH LAW PLLC
9339 Cherry Valley Ave SE, #78
Caledonia, Michigan 49316
(616) 450-4235
jbursch@burschlaw.com
*Attorneys for Plaintiffs*

8