## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

DONALD AGEE, JR., an individual, *et al.*,

            Plaintiffs,

v.

JOCELYN BENSON, in her official capacity as the Secretary of State of Michigan, *et al.*,

            Defendants.

Case No. 1:22-cv-00272

**Three-Judge Panel Appointed Pursuant to 28 U.S.C. § 2284(a)**

**PLAINTIFFS' OBJECTIONS TO DEFENDANTS' REMEDIAL STATE HOUSE PLAN**

## INTRODUCTION

Defendants' adopted remedial map is an improvement over the racially gerrymandered House map this Court struck down in its December 2023 ruling. But it is still not acceptable. To begin, the remedial map is gerrymandered to ensure that no incumbents must face each other. Because of the immense advantage that incumbents enjoy, that virtually ensures that the results of the 2022 election—conducted using the invalidated House map—will essentially be locked in for the foreseeable future, perpetuating the constitutional harm Plaintiffs have already suffered. As numerous courts have held, "attempts to ensure an incumbent will prevail in his or her new district—have the potential to embed, rather than remedy, the effects of an unconstitutional racial gerrymander in a proposed remedial districting plan." *Covington v. North Carolina*, 283 F. Supp. 3d 410, 431–33 (M.D.N.C.), aff'd in part, rev'd in part, 585 U.S. 969 (2018) (collecting cases).

This incumbent gerrymander was no accident. Despite several Commissioners making odd and unprompted professions on the record that they did *not* consider incumbency, a Monte Carlo analysis performed by Dr. Trende shows there was only a 1% chance of the Commission drawing a map that paired no incumbents.[1] And another Monte Carlo analysis shows that the adopted map is still a racial gerrymander, an outlier compared to the maps drawn primarily by other Commissioners.

How could this happen if the Commission was not considering race this time around? One reason is the adopted map retains three districts (i.e., House Districts 16, 17, and 18) that exemplify the racially-motivated "spoke" concept that *was* core to the Commission's first round of drafting. The Court will recall from the trial that the Commission accomplished its racial gerrymander in the Hickory map by drawing long, bacon-shaped districts that began in Detroit and stretched out into the suburbs. Yet when given the chance to adopt race-neutral districts reflecting traditional redistricting criteria—like a map proposed by Commissioner Szetela—Defendants doubled down on their previous strategy in the adopted map, which almost entirely preserves the Hickory strategy of spoked western districts. The Court should decline to adopt a map which retains districts that are indistinguishable from districts drawn primarily with race in mind.

---

[1] A Monte Carlo analysis is a type of computational algorithm that uses repeated random sampling to obtain the likelihood of a range of results of occurring. This was one of the simulation tools Dr. Trende discussed at trial showing that the Hickory map was a racial gerrymander, since it was an outlier among the range of samples.

Another reason is two districts (House Districts 10 and 12) were configured primarily based on race to "balance" Black Voting Age Population ("BVAP") for purported "VRA compliance." Defendants again chose to diminish the Black voting strength of Eastpointe (and a portion of northeast Detroit) by pairing it with the predominately white lakeshore community of St. Clair Shores, and by pairing the predominately Black City of Harper Woods (and a portion of northeast Detroit) with the predominately white, ultra-wealthy Grosse Pointes. That strategy continues to perpetuate racial discrimination, dilute Black voting power, and defy communities of interest.

A third reason is that the Commission effectively outsourced its drafting function to Mr. Gilmer-Hill, the Electoral Chair of the Metro Detroit Democratic Socialists of America. A shocking 93.7% of the adopted map is identical to the Tiger Lilly map Mr. Gilmer-Hill submitted; the only real difference is a major amendment to Districts 10 and 12, also prompted by Mr. Gilmer-Hill. Because Mr. Gilmer-Hill operated behind closed doors, we don't know if he used race. But his map performs like he did.

By repeating and ensconcing its mistakes from the racially gerrymandered Hickory map, the Commission violates the Voting Rights Act. The adopted map includes eight majority-Black House districts (numbered 4, 5, 7, 8, 9, 11, 16, and 18) and three additional House districts (numbered 10, 12, and 17) that closely track the Hickory map's racial targets. The adopted map's scheme remains well below the ten majority-Black House districts contained in the 2011 House map. And it is also less

than the ten reasonably configured majority-Black House districts capable of being drawn today. For all these reasons, this Court should reject the adopted map.

## A FEW TROUBLING FACTS

On February 28, 2024, Defendants adopted a final remedial plan for the Michigan House of Representatives dubbed "Motown Sound FC E1" ("Remedial State House Plan"). ECF No. 167, PageID.5382-84. But who influenced the final resting place of the boundary lines of Defendants' Remedial State House Plan? And why? Surely, part of the answer can be found in Defendants' public transcripts spanning January 11, 2024, through February 28, 2024. Yet those transcripts are obscured by the considerable number of constantly changing draft remedial plans and Defendants' later promotion of a total of ten draft remedial plans for public review and comment. ECF No. 165, PageID.5367.[2] Those transcripts show that Commissioners Eid and Kellom dominated the limited shaping of what ultimately became Defendants' Remedial State House Plan. See, e.g., 1/18/24 MICRC Tr. at 57, 63, 64, 65, 67, 68, 69, and 72; 1/23/24 MICRC Tr. at 81-82; 1/24/24 MICRC Tr. at 13, 72-73; 1/25/24 MICRC Tr. at 31-35 and 44-46; 2/1/24 MICRC Tr. at 32-41, 56-62, 76-80, 84, 91; see also 1/31/24 MICRC Video Recording at minute mark 4:12:00–4:39:30, https://www.youtube.com/watch?v=C7ER7Bbi7DE.

---

[2] The transcripts from most of Defendants' remedial mapping sessions may be accessed at https://www.michigan.gov/micrc/meeting-notices-and-materials. Notably, and despite longstanding written and verbal requests from Plaintiffs' counsel to counsel for the Defendant Commission and Defendant Secretary of State, see 1/26/24 Bursch Correspondence, attached as **Exhibit E**, several of the transcripts of the Defendants' mapping sessions have still not been published (as of March 8, 2024 at 3:43 pm).

To appreciate the full answer to the Remedial State House Plan's origin, the Court must trace the lineage of "Motown Sound FC E1" back to the beginning. As explained by Dr. Trende, "Motown Sound FC E1" evolved from "Motown Sound," which itself evolved from "Riverwalk FC" and "Spirit of Detroit," which find *their* origin in "Tiger Lily," collectively referred to here as the "Family of Maps." See Trende Report on Remedial House Plans at 3-8, attached as **Exhibit A**; see also 1/24/24 MICRC Tr. at 13, 72-73; 2/1/24 MICRC Tr. at 32-41, 56-62, 76-80, 84, 91.

This Family of Maps is unique from all the other draft remedial maps drawn by Commissioners in public hearings and submitted for public comment in that the Family of Maps dramatically over-favors incumbents by not placing a single incumbent in the same house district, and by not creating any open seats. Trende Report on Remedial House Plans, **Exhibit A** at 10-24.[3] This Family of Maps is also unique in that the maps all closely resemble each other. *Id*. at 3-8. The overlay map of Tiger Lily (the beginning) and Motown Sound FC E1 (the end) vividly depicts this reality:

---

[3] Tellingly, Defendants' Hickory plan impacted incumbents to a remarkably greater extent than Defendants' Remedial State House Plan. *E.g.*, Sergio Martínez-Beltrán, *Redistricting may oust half of incumbents in Michigan, analysis finds*, The Bridge-Michigan, (Nov. 23, 2021), https://www.bridgemi.com/michigan-government/redistricting-may-oust-half-incumbents-michigan-analysis-finds



Alarmingly, "Tiger Lily" was neither drafted by Defendants nor drafted in an

open meeting. *Contra* Mich. Const. Art. IV § 6 (5), (10), (11). It was drafted behind

closed doors and *submitted* to Defendants on January 24, 2024, by Christopher Gilmer-Hill, a Harvard educated software developer. Mr. Gilmer-Hill is a Michigan Democratic party precinct delegate who serves as the "Electoral Chair" of the "Metro Detroit Democratic Socialists of America." Gilmer-Hill Social Media Account Package, attached as **Exhibit D**. Mr. Gilmer-Hill is far from a non-partisan, and his Democratic Socialist peers have bragged about his Tiger Lily map being amongst the final remedial maps up for proposed adoption, albeit under a different moniker. *Id*.

They were spot-on. The Remedial State House Plan and Tiger Lily share *93.7% of the same population*. Trende Report on Remedial House Plans, **Exhibit A** at 7-8. The populations in House Districts 2, 5, 6, 11, 14, 17, and 18 are identical in both maps. *Id*. The only material population changes come from the dilutive racial gerrymander of grouping Eastpointe/Detroit with St. Clair Shores, and then Harper Woods/Detroit with the Grosse Pointes, all to achieve the racial targets this Court struck down. *Id*. at 5-8. As discussed below, these amendments to House Districts 10 and 12, proposed by Commissioner Eid, also originated with Mr. Gilmer-Hill.

Plaintiffs have no way to know who really drafted Tiger Lily, or to identify all the considerations that went into crafting that map—such as race or incumbency protection. But empirical evidence shows that Tiger Lily and its progeny are masterful incumbency protection plans, score poorly on the gerrymander index—far worse than the other maps drawn by Commissioners in open meetings—and fail to afford the level of Black electoral opportunity readily available in a wide array of reasonably configured districts not drawn to protect incumbents. *Id*. at 10-35.

## STANDARD OF REVIEW

After finding unconstitutional race-based discrimination, courts have the independent duty to ensure that the government's remedial plan "so far as possible eliminate[s] the discriminatory effects of the past as well as bar[s] like discrimination in the future." *Louisiana v. United States*, 380 U.S. 145, 154 (1965). This means that "courts must ensure that a proposed remedial districting plan completely corrects—rather than perpetuates—the defects that rendered the original districts unconstitutional or unlawful." *Covington v. North Carolina*, 283 F. Supp. 3d 410, 431 (M.D.N.C.), aff'd in part, rev'd in part, 585 U.S. 969 (2018) ("*Covington I*") (citing *Abrams v. Johnson*, 521 U.S. 74, 86 (1997)). Numerous courts have acknowledged that they must (1) review a state's proposed remedial districting plan to ensure it completely remedies the identified constitutional violation, *and* (2) ensure that the remedial plan "is not otherwise legally unacceptable." *Id.* at 424–25 (collecting cases).

Relief in redistricting cases is "fashioned in the light of well-known principles of equity." *Reynolds v. Sims*, 377 U.S. 533, 585 (1964) (cleaned up). Courts must undertake an "equitable weighing process" to remedy the legal violations they have identified, *NAACP v. Hampton County Election Comm'n*, 470 U.S. 166, 183, n. 36 (1985), taking account of "what is necessary, what is fair, and what is workable," *New York v. Cathedral Academy*, 434 U.S. 125, 129 (1977) (cleaned up). A district court's equitable powers are "broad, for breadth and flexibility are inherent in equitable remedies." *Brown v. Plata*, 563 U.S. 493, 538 (2011) (cleaned up).

In exercising this broad equitable power, "[e]vidence drawn from the liability phase and the Court's prior findings form the backdrop for the Court's determination of whether the Remedial Plan so far as possible eliminated the discriminatory effects of the original plan." *Singleton v. Allen*, No. 2:21-CV-1291-AMM, 2023 WL 5691156, at *43–44 (N.D. Ala. Sept. 5, 2023), appeal dismissed sub nom., *Milligan v. Co-Chairs of Alabama Permanent Legislative Comm. on Reapportionment*, No. 23-12922-D, 2023 WL 6568350 (11th Cir. Oct. 3, 2023) (cleaned up).

## OBJECTIONS

### I.    Defendants' Remedial State House Plan Violates the Michigan Constitution and Prejudices Black Voters by Favoring Incumbents Elected Under the Unconstitutional and Racially Gerrymandered Hickory Plan.

Throughout the remedial drafting phase, several Defendants—without prompting and quite awkwardly—professed on the record that the Commission did *not* favor or disfavor incumbents when crafting potential remedial districts. See 1/17/24 MICRC Tr. at 14[4]; 1/24/24 MICRC Tr. at 21[5]; 2/1/24 MICRC Tr. at 77-78[6], 86[7].

---

[4] Commissioner Lett: "I will not consider an advantage to any political party or person. I do not look up the political party that is in those districts, nor will I consider or favor or disfavoring any person or candidate since I don't know who they are representing there. Certainly I can look them up, but I won't do that."

[5] Commissioner Lett: "The Districts as far as I know do not favor or disfavor an incumbent or potential candidate. I certainly, in my drawing of maps previously and now in submitting this one, have not looked to see who the representative was."

[6] Chair Orton: And we did not favor or disfavor any incumbent elected official or candidate and I don't know if you said that already but I did not hear it. Commissioner Eid: I did not say that but that is correct.

[7] Chair Orton: "And districts do not favor, or disfavor incumbent elected officials or candidates because we did not look at that."

Some of these representations were undoubtedly fair assertions; after all, most of the Commission's draft remedial maps pitted incumbents against each other in one or more of the draft remedial districts. Trende Report on Remedial House Plans, **Exhibit A** at 10-24.[8]

But incumbent neutrality was decidedly *not* the case when it came to the Family of Maps. These maps are expertly drawn incumbency protection plans. In fact, the Remedial State House Plan and its lineage (which includes Motown Sound FC E1, Motown Sound, Riverwalk FC, Spirit of Detroit, and Tiger Lily), astoundingly managed not to double-up incumbents in even a single district. Representative Regina Weiss, the House District 6 incumbent, declared it "miraculous that no incumbents were drawn together" and volunteered that "[i]t's not something they [(i.e., the Commission)] even look at or consider, and a lot of us do live pretty closely together. It was just by happenstance and chance that it didn't happen." Ben Solis, *Detroit-Area Dems In Redrawn Districts Are Ready To Roll Despite Changes*, Gongwer, (Mar. 1, 2024), https://www.gongwer.com/news/?a=630430101, attached as **Exhibit C**. Representative Veronica Paiz, the House District 11 incumbent, admitted that she didn't want to run against one of her colleagues and had even contemplated moving if she had been drawn into a district with another incumbent. *Id.*

The Monte Carlo analysis shows that it was indeed "miraculous" that the Commission would adopt a map pairing no incumbents elected based on the racially-

---

[8] Accord Ben Solis, Redistricting Commission Begins Redrawing Detroit-Area House Map, Gongwer, (Jan. 16, 2024), https://www.gongwer.com/news/?a=630100101, attached as **Exhibit B**.

motivated Hickory map. Dr. Trende ran a race- and incumbency-blind computer simulation model which drew 100,000 different remedial house district configurations in the Detroit area. Of those 100,000 unique configurations, nearly 99,000 placed incumbents in more or more of the same districts. In other words, there was only a 1% chance that the Commission would draw a map with no paired incumbents in the new districts. As Dr. Trende explains, these findings are statistically significant and show a high probability that Defendants' Remedial State House Plan was, in fact, gerrymandered to favor incumbents. See Trende Report on Remedial House Plans at 24, attached as **Exhibit A**.

This matters for two reasons. First, the Michigan Constitution expressly provides that "[d]istricts shall *not* favor or disfavor an incumbent elected official or a candidate." Mich. Const. Art. IV § 6(13)(e) (emphasis). Second, the Remedial State House Plan perpetuates the discriminatory effect of the now-stricken Hickory map.

Numerous courts have recognized that remedial maps drawn to protect incumbents elected under racially gerrymandered maps, or incumbents elected under maps drawn in violation of the Voting Rights Act, are not fully remedial because they perpetuate the discriminatory effect of the stricken plan by favoring that plan's incumbents. "[A]ttempts to ensure an incumbent will prevail in his or her new district—have the potential to embed, rather than remedy, the effects of an unconstitutional racial gerrymander in a proposed remedial districting plan." *Covington I*, 283 F. Supp. 3d at 431–33 (collecting cases). "[A]lthough efforts to protect incumbents may be legitimate in some circumstances, in this remedial posture and

given the historical record currently before the Court, the City Council's desire to protect incumbents who had been elected to racially gerrymandered districts must give way to its duty to completely remedy the constitutional violation." *Jacksonville Branch of NAACP v. City of Jacksonville*, No. 3:22-CV-493-MMH-LLL, 2022 WL 17751416, at *16–17 (M.D. Fla. Dec. 19, 2022), appeal dismissed, No. 22-14260-HH, 2023 WL 4161697 (11th Cir. June 6, 2023) (cleaned up).

As demonstrated by Dr. Trende's race- and incumbency-blind computer simulations, Defendants' predominate interest in avoiding incumbency pairings perpetuates the racial taint of the Hickory Plan and removed 99% of the possible race-blind district configurations Defendants could have adopted to remediate their racial gerrymander—including every single one of the draft plans that was *not* part of the Family of Maps. The Remedial State House Plan contravenes the Court's previous ruling by doubling down on the harm the Hickory map caused.

We may never know whether Commissioners were working behind the scenes with Mr. Gilmer-Hill to draft an incumbent-protection plan, whether Mr. Gilmer-Hill was himself working with other political operatives and used as the unofficial spokesperson and proponent of the Tiger Lily Map, or whether this was all just a happy coincidence. It doesn't matter. The fact that the Commission ensconced its racial gerrymander by protecting every last one of the incumbents, standing alone, is fatal to the Remedial State House Plan.

## II.   Defendants' Remedial State House Plan Remains the Product of Race-Based Line Drawing.

### A. Remedial State House Districts 16, 17, and 18 Preserve the Commission's Racially Motivated "Spoke" Concept.

The Hickory Plan's House Districts 16, 17, and 18 were elongated "spoke" districts running east to west from predominately Black areas of Detroit and Southfield to predominately white areas of Livonia and Farmington Hills. Hickory Plan. PX96 at 3. While there are presently no Plaintiffs residing in these three districts, the record before the Court showed—and the Court acknowledged—that these bacconmandered districts were drawn primarily based on race and are, without any serious question, unconstitutional racial gerrymanders.[9]

Yet despite having the option to adopt the Szetela 4 Plan—which replaced the Hickory Plan's western spoke districts with race-neutral districts reflecting traditional redistricting criteria—Defendants opted to adopt instead the Remedial State House Plan, a map which almost entirely preserves the Hickory map's three racially gerrymandered western spoke districts.

---

[9] *E.g.*, Opinion and Order, ECF No. 131, PageID.4724 (acknowledging that then House Districts 14, 15, and 17 were drawn as westerly spokes to lower the BVAPs of those districts), PageID.4733 (quoting Commissioner Eid's concern that the BVAP of then House District 17 was drawn too low to provide Black opportunity), PageID.4770 (finding "as to the Commission's mapping process for Detroit-area districts generally, that the Commission adopted 'an announced racial target' to which it 'subordinated other districting criteria'"), and 4785 ("the Commission drew the entire Detroit-area with race as its predominant consideration"). Accord 9/30/21 MICRC Tr. (PX63) at 82-85, 138-143 (numerous discussions regarding the need to create the western spoke districts for the collaborative house map to comply with the racial targets).



Hickory, with Proposed Map Overlaid

As Dr. Trende explains, Defendants' decision to both retain these spoke districts and adopt Commissioner Eid's amendment to House Districts 10 and 12 explains why Defendants' Remedial State House Plan still scores as an outlier racial gerrymander in a Monte Carlo analysis. Trende Report on Remedial House Plans at 24-35, attached as **Exhibit A**; see also *GRACE, Inc. v. City of Miami*, No. 1:22-CV-24066-KMM, 2023 WL 4853635, at *8 (S.D. Fla. July 30, 2023) (holding that "even if the Remedial Plan was enacted in a facially race-neutral manner, circumstantial evidence may yet demonstrate that the plan unconstitutionally sorted voters based on race"). Whereas as all the other proposed Commission maps fell within a reasonable range of a Monte Carlo analysis—particularly the map proposed by

Commission Szetela—the Remedial State House Plan fares as poorly on a racially gerrymandering scale as did the Hickory map. *Id.*

Since Plaintiffs are entitled to a complete remedy, and this Court is operating within its equitable jurisdiction, Plaintiffs request that the Court reject any plan which preserves racially gerrymandered districts from the Hickory Plan. Such plans do not remedy the racial discrimination Plaintiffs have already suffered. And adopting such maps will likely subject the racially gerrymandered western spoke districts to future challenges from Black voters residing therein. *Abrams*, 521 U.S. at 86 (holding a remedial districting plan cannot be sustained if it "would validate the very maneuvers that were a major cause of the unconstitutional districting").

### B. By Isolating the Black Communities of Eastpointe and Harper Woods within Predominately White Districts, Remedial State House Districts 10 and 12 Dilute Black Voting Strength.

When crafting House Districts 10, 11, and 12 of the Hickory Plan to meet their racial targets, Defendants employed a racially dilutive strategy of keeping St. Clair Shores separate from the Grosse Pointes (despite identifying them as communities of interest) and keeping Eastpointe largely separated from Harper Woods and Detroit (despite identifying them as communities of interest, too). To accomplish that racial goal, the Commission lumped Eastpointe with Roseville—despite those areas *not* being communities of interest—and portions of Detroit and Harper Woods with St. Clair Shores (same). *See, e.g.*, Hickory Plan, PX96 at 3; 9/30/21 MICRC Tr. (PX140) at 644-45 (discussing the reasons for lowering the BVAP of House District 10); Opinion and Order, ECF No. 131, PageID.4719-21, 4735-36, 4807-13 (acknowledging

15

that the racial gerrymander of the Hickory Plan districts 10, 11, and 12 cut against communities of interest); PageID.4798-99 (recognizing the necessary isolation of Eastpointe to racially gerrymander Senate District 11 of the Linden Plan).

Defiantly, Defendants' Remedial House Districts 10 and 12 use the same isolationist strategy to accomplish the same racially dilutive goal as the Hickory Plan: districts with BVAPs around 45%, almost the same racial target that Mr. Adelson, Dr. Handley, and General Counsel Pastula gave to Defendants during the initial map-drawing process this Court struck down. Specifically, Remedial House District 10 has a BVAP of 43.8%, with House District 12 at 45.9%.  ECF No. 131, PageID.4808, 4812; Remedial State House Plan VRA Data, attached as **Exhibit F**.

The only difference this time around was tactical. Remedial House Districts 10 and 12 now pair Eastpointe/Detroit with St. Clair Shores and Harper Woods/Detroit with the Grosse Pointes. Viewed in context of Defendants' previous racial machinations, the racially dilutive gerrymander in the Defendants' Remedial State House Plan is transparent. The configurations of Remedial House Districts 10 and 12 therefore do not remediate the racial gerrymander; they perpetuate it. E.g., 2/22/24 MICRC Tr. at 32-33 (Black citizens expressing frustration with the pairings).

To appreciate how these districts came to be, the Court must look to the YouTube video recording of Defendants January 31, 2024 meeting because the Michigan Secretary of State has not yet published the written transcript of this drafting session that took place more than a month ago.[10]

---

[10] 1/31/24 MICRC Video Rec. https://www.youtube.com/watch?v=C7ER7Bbi7DE

Midway through the meeting, in light of purported "VRA compliance" concerns with the Spirit of Detroit map,[11] Defendant Eid directed the amendment of House Districts 10 and 12, including the pairing of Eastpointe, Harper Woods, and portions of northeast Detroit with the wealthy, predominately white lakeshore communities of St. Clair Shores and the Grosse Pointes.[12] The amendments were substantial revisions moving over 64,000 residents amongst districts based entirely on racial considerations that conflicted with communities of interest.

As seen in the video, Defendant Eid's amendment was actually a proposal from none other than Mr. Gilmer-Hill, who suggested altering his previously submitted map.[13] The next day, Defendants Kellom and Eid formally made these changes to the Spirit of Detroit map and renamed this iteration Motown Sound. 2/1/24 MICRC Tr. at 32-41, 56-62, 76-80, 84, 91. This was Black-vote dilution, plain and simple.

## III.   Defendants' Remedial State House Plan Minimizes Black Opportunity, Possibly in Violation of the Voting Rights Act.

Defendants' Remedial State House Plan contains eight majority-Black House Districts (*i.e.*, 4, 5, 7, 8, 9, 11, 16, and 18) and three additional House Districts (i.e., 10, 12, and 17) that closely track the racial target Defendants used when drafting the stricken Hickory Plan. **Exhibit F**.

---

[11] E.g., 1/29/24 MICRC Tr. at 23-46; 1/30/24 MICRC Tr. at 5, 9-18, 20-26, 30-40; 2/22/24 MICRC Tr. at 28-29, 38-40, 64-67.

[12] See Commissioner Eid Amendment, 1/31/24 MICRC Video Rec. at minute mark 4:12:00 – 4:39:30 https://www.youtube.com/watch?v=C7ER7Bbi7DE

[13] See Chris Gilmer-Hill Public Comment, 1/31/24 MICRC Video Recording at minute mark 20:09-22:00, https://www.youtube.com/watch?v=C7ER7Bbi7DE.

This is less than the ten majority-Black House Districts contained in the 2011 State House Plan. ECF No. 114, PageID.3836, at ⁋ 63. And this is less than the ten reasonably configured majority-Black House Districts capable of being drawn today.

Dr. Trende's race-blind computer simulations of remedial house districts show that it is possible to draw up to ten reasonably configured majority-Black remedial house districts. Trende Report on Remedial House Plans at 9-10, 24-35, attached as **Exhibit A**. This is consistent with Dr. Trende's finding from his January 18, 2023 Expert Report where he "was able to draw 10 such districts, though it is possible that an 11th could be drawn with more aggressive county splitting." January 18, 2023 Trende Expert Report (PX20) at 22-26. The Commission acknowledged this, too. But Defendants instead rejected the proposed remedial house plan submitted by Commissioner Szetela that contained ten majority-Black house districts and another district with a BVAP of 43.5%. Szetela 4 VRA Data, attached as **Exhibit G**.[14]

Defendants have not shared publicly any material analysis to support their collective decision to deprive Black voters in the Detroit area of the additional majority-Black districts capable of being reasonably configured within the region. Defendants have not shared any meaningful analysis demonstrating that Remedial State House Districts 10, 12, and 17 are likely to perform for Black voters. Nor have Defendants shared any analysis showing that Black voters in Remedial State House Districts 10, 12, and 17 do not vote cohesively, or that White voters in those districts

---

[14] In addition, the Michigan Democratic Party Black Caucus was also able to draw a proposed map with 10 majority-Black districts https://mdpblackcaucus.com/updates.

will not vote as a bloc to defeat the Black candidate of choice. Defendants haven't even show this configuration is necessary VRA compliance.

In the end, it is hard to fathom how three supposed crossover districts would better maintain Black voting rights as they existed under the 2011 House map versus three majority-Black districts with no crossover or white-bloc voting analyses. *Baldus v. Members of Wisconsin Gov't Accountability Bd.*, 849 F. Supp. 2d 840, 857 (E.D. Wis. 2012) (the government cannot "deprive a minority group of one majority-minority district and substitute for that two influence districts" because Section 2 of the Voting Rights Act provides minority groups "assurance that a bird in the hand really is better than two in the bush even though everyone realizes that a good hunter might actually snare both of the latter"). This is yet another reason to reject the Commission's Remedial State House Map.

## CONCLUSION

This Court gave Defendants a more-than-fair opportunity to right the wrongs perpetuated in the map-drawing process that resulted in the Hickory Plan. Defendants squandered that opportunity by outsourcing their map-drawing function to a mysterious, outside political operative, endorsing an incumbent-protection plan that locks in the racial gerrymander this Court struck down, breaking communities of interest to yet again pair poor, Black Detroit voters with rich, white, suburban voters, and adopting a Remedial State House Plan that is just as racially gerrymandered as the Hickory Plan and still reduces the number of Black-majority districts by 20% compared to the 2011 House map. One glance is all it takes to see

why the Motown configuration was picked from the bunch. Most of the proposed maps placed at least one pair of incumbents in the same district. Bergamot 1 pairs together Reps. Paiz and Edwards, and Reps Price and Weiss.  Bergamot 2 retains the latter pairing.  Willow pairs together Reps. Edwards and Xiong as well as Reps. Scott and McFall. Yet Defendants chose the one Family of Maps that locked into and perpetuated the racial discrimination.

For all these reasons, Plaintiffs respectfully request that the Court reject Defendants' Remedial State House Plan. Detroit Black voters and the People of Michigan deserve better than an incumbency protection plan comprised of half measures. They deserve a state house plan that *completely* remediates the unconstitutional and racially gerrymandered plan Defendants have thrusted upon Detroit Black voters—one that has ten Black-majority districts.

Respectfully submitted,

/s/ John J. Bursch
John J. Bursch (P57679)
BURSCH LAW PLLC
*Attorney for Plaintiffs*
9339 Cherry Valley Ave SE, #78
Caledonia, Michigan 49316
(616) 450-4235
jbursch@burschlaw.com

Michael J. Pattwell (P72419)
Jennifer K. Green (P69019)
James J. Fleming (P84490)
Amia A. Banks (P84182)
CLARK HILL PLC
*Attorneys for Plaintiffs*
215 S. Washington Sq., Ste. 200
Lansing, MI 48933
(517) 318-3100

mpattwell@clarkhill.com
jgreen@clarkhill.com
jfleming@clarkhill.com
abanks@clarkhill.com

Dated: March 8, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on March 8, 2024, I electronically filed the above document(s) with the Clerk of the Court using the ECF System, which will provide electronic copies to counsel of record.

Respectfully submitted,

/s/ John J. Bursch
John J. Bursch (P57679)
BURSCH LAW PLLC
*Attorney for Plaintiffs*
9339 Cherry Valley Ave SE, #78
Caledonia, Michigan 49316
(616) 450-4235
jbursch@burschlaw.com

Michael J. Pattwell (P72419)
Jennifer K. Green (P69019)
James J. Fleming (P84490)
Amia A. Banks (P84182)
CLARK HILL PLC
*Attorneys for Plaintiffs*
215 South Washington Square
Suite 200
Lansing, MI 48933
(517) 318-3100
mpattwell@clarkhill.com
jgreen@clarkhill.com
jfleming@clarkhill.com
abanks@clarkhill.com