FILED - KZ
March 18, 2024 2:43 PM
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
ems   Scanned by ES/3/18

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DONALD AGEE, JR. *et al.*,
    Plaintiffs,

v.

JOCELYN BENSON, in her official
capacity as the Secretary of State
of Michigan, *et al.*,
    Defendants.

No. 1:22-cv-272
Three-Judge Court.

<u>REPORT OF THE REVIEWING SPECIAL MASTER, BERNARD GROFMAN</u>

March 15, 2024

## I. BACKGROUND

1. The Court in its opinion of December 21, 2023 unanimously held that the Michigan Independent Citizens Redistricting Commission (hereafter MI-IRC) violated the Equal Protection Clause of the U.S. Constitution when it drew the boundaries of thirteen state legislative districts predominantly on the basis of race. It enjoined the Secretary of State, Jocelyn Benson, from holding further elections in those districts as they are currently drawn. It allowed the MI-IRC to propose a new map to remedy the violations found in its initial submission, with deadlines specified by the Court, and time allowed for comment. In its scheduling order ( filed 1/11/2024), the Court appointed two special masters, one (Dr. Bernard Grofman) to review any new map proposed by the MI-IRC to remedy the violations found by the Court, and one (Dr. Michael Barber) to prepare a contingency map in the event that the new map proposed by the MI-IRC again failed to satisfy the Equal Protection Clause of the U.S. Constitution.

2. After I affirmed that I had no conflict of interest in the case, and that my time schedule permitted me to serve, upon my appointment as the Reviewing Special Master, I reviewed the relevant documents in the case, with particular attention to the Court opinion and the Court order. I also reviewed the geographic and demographic features of the map found to be unconstitutional, with a focus on the area in and around Detroit and Wayne County which was the area of constitutional concern.

3. As a political science specialist on elections, redistricting, and voting rights I am familiar with the issues in the case -- as viewed from a social science perspective. I have served as court-appointed consultant or Special Master for federal courts in number of recent cases involving the vote dilution standards of the Voting Rights Act of 1965 as subsequently amended and/or the equal protection standard laid down in the *Shaw v. Reno* line of jurisprudence, and I have also recently worked for courts in state court cases involving issues of partisan gerrymandering.[1]

4. After the MI-IRC released information about the ten maps that had been introduced as potential remedy plans, I reviewed data on those maps. To assist me I brought in a technically sophisticated former student, Zachary Griggy who had previously served as my assistant on several previous cases where I was the special master or senior court consultant.. After the new MI-IRC remedial map was available on March 2, I studied that map. By looking at comparisons between it and the previous map found unconstitutional, I considered how the new map sought to remedy the equal protection and voting rights issues that led to the invalidation of the previous map I also considered how this new map compared to the other potential remedial maps introduced to the MI-IRC.

5. My analyses make use of theoretical foundations rooted in social science methodology and my own previous research and service as a special master or senior court-appointed consultant.

    A. There are conflicting considerations that go into map-making which inevitably involve tradeoffs among competing desiderata,[2] and thus there is no such as a perfect

---

[1] Grofman is Distinguished Research Professor of Political Science at the University of California, Irvine. He has over 350 published articles, book chapters and research notes, along with 6 co-authored books (from Cambridge University Press (4), Oxford University Press (1) and Yale University Press (1)), and over 20 co-edited books, with an extensive corpus of research on topics such as redistricting, voting rights, comparative electoral rules, and political party competition. In 2010 he received an honorary Ph.D. from the University of Copenhagen for his work on electoral systems. In 2017 he received the Charles Merriam Award of the American Political Science Association (awarded biennially) for lifetime achievement in the field of applied Public Policy.. His work has been cited by members of the U.S. Supreme Court in around a dozen cases over a period of four decades. Within the past ten years he has served as a special master or senior consultant to state and federal courts, including congressional and legislative redistricting cases in Virginia, North Carolina, New York, and Wisconsin, and cases involving local jurisdictions in Georgia, Utah, and Virginia. Previously he had worked as an expert witness or consultant to both Republican and Democratic organizations, as well as to the NAACP and the Voting Rights Section of the U.S. Department of Justice in cases in some of these same states but also in another half dozen states.

[2] For example, in Michigan, there are a variety of criteria specified in the state constitution, as amended in 2018.
 (a) Districts shall be of equal population as mandated by the United States Constitution and shall comply with the Voting Rights Act and other federal laws.

map. Nonetheless, there are some criteria which must be satisfied in terms of the U.S. Constitution and standards derived from it, such as "one person, one vote" as well as the Supreme Court's interpretations of the implications of the Civil War Amendments and the role of Congress in implementing them, i.e., the racial preponderance test specified in *Shaw v. Reno* 509 U.S. 630 (1993), and the statutory test for vote dilution specified in *Thornburg v. Gingles* 478 U.S. 30 (1986).

B. We may classify districts in terms of the likely ability of members of a given (protected) racial or ethnic community to elect candidates of choices into three mutually exclusive and logically exhaustive categories (with further subdivisions possible within the cases that fall into the third category):

> i. *majority-minority districts* -- where a given minority constitutes a majority of the citizen voting age population in the district. See *Bartlett v. Strickland* 556 U.S. 1 (2009).
>
> ii. *realistic opportunity to elect districts*—There are two conditions that need to be satisfied. First, a given minority must constitutes a sufficiently substantial proportion of the eligible electorate in the primary electorate of one of the major political parties that they constitute a majority of that primary electorate even though they do not constitute a majority of the overall (voting) population in the district. Second, the majority of the voters in the district belong to the party of whose primary voters the minority community constitutes a majority. In this case, if the minority community is cohesive, then it can elect a candidate of choice for the party nomination in that primary. And, if there is sufficient crossover voting for the nominee of that party from supporters of the party who are not in that same racial or ethnic group, then the group can be successful in electing a candidate of its choice (the primary winner). We note, however, that a "realistic opportunity to elect district" is not the same thing as a "safe seat." If there is not sufficient support for the minority candidate of choice who is the party nominee of a given party from non-minority members of that same party then the minority can lose the general election. Even a majority-

---

(b) Districts shall be geographically contiguous. Island areas are considered to be contiguous by land to the county of which they are a part.
(c) Districts shall reflect the state's diverse population and communities of interest. Communities of interest may include, but shall not be limited to, populations that share cultural or historical characteristics or economic interests. Communities of interest do not include relationships with political parties, incumbents, or political candidates.
(d) Districts shall not provide a disproportionate advantage to any political party. A disproportionate advantage to a political party shall be determined using accepted measures of partisan fairness.
(e) Districts shall not favor or disfavor an incumbent elected official or a candidate
(f) Districts shall reflect consideration of county, city, and township boundaries
(g) Districts shall be reasonably compact.
Mich. Const. art. IV, § 6(13).

.

      minority district may not be a "safe seat" if the minority community is not politically cohesive[3] or if there are substantial turnout differences between minority and non-minority voters. On the other hand, we also note that a "realistic opportunity to elect" district is not the same thing as what has been called an "influence" district. Unlike a mere "influence district," where the minority community might be expected to be large enough to hope to have its views seriously taken into account by the elected representative, in a realistic "opportunity to elect" district, as the labeling indicates, the minority community can expect to have a realistic opportunity to <u>choose</u> a representative whom it prefers via a party primary and then the general election.

    iii.   *districts that do not fall into either of the two categories above.*

C. While *Bartlett v. Strickland*, 556 U.S. 1 (2009) clarifies the language of *Thornburg v. Gingles*, 478 U.S. 30 (1986) on the standards for litigating a claim of vote dilution under Section 2 of the Voting Rights Act, by indicating that such a claim requires (at minimum) that the plaintiffs show that an additional (geographically compact) district in which the minority community constitutes a majority of <u>the citizen voting age population</u> can be drawn. Nonetheless, subsequent cases have made it clear that jurisdictions are not required to draw citizen voting age majority-minority districts to satisfy the requirements of the Voting Rights Act. Defendants can rebut a claim that they have violated the VRA by providing a compelling showing that the district drawn in lieu of the majority minority citizen voting age district is one that provides a realistic "opportunity to elect" to the minority community. *See Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254 (2015). The Alabama standard has been implemented in subsequent cases at the trial court level, such as *Personhuballah v. Alcorn*, 155 F. Supp. 3d 552 (E.D. Va. 2016), a Virginia congressional case in which I served as special master for a three-judge federal court.

D. Relatedly, while it might appear that there is an inherent conflict between as the requirement that race not be a preponderant motive in map-making, as laid down in *Shaw v. Reno*, 509 U.S. 630 (1993), and the requirements for race-conscious districting in the Voting Rights Act of 1965[4], this issue has also been clarified in

---

[3] Reduced minority group political cohesion may occur in settings where there is a non-minority incumbent. In situations where there are multiple minority candidates in the primary, the voting patterns should be regarded as potentially racially polarized when the minority community gives its votes to candidates from that community. Here, while the voting pattern may not reflect political cohesion in support for a <u>single</u> minority candidate of choice, I would still characterize support of the minority community going almost entirely to candidates of that community as a politically cohesive pattern of choice. But the absence of concentration of the minority vote may nonetheless lead to the electoral loss of a minority candidate of choice favored by the plurality of minority voters.

[4] Using the language in *Thornburg v. Gingles* 478 U.S. 30 (1986), we note that

*Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254 (2015). *Alabama* makes it clear that, when the use of race is required for the implementation of the Section 2 non-vote-dilution standard of the Voting Rights Act of 1965 as subsequently amended, this use of race is constitutionally permitted.[5]

E. We also note that the right that is protected is for the minority community to have an equal opportunity to elect a candidate of choice. That candidate need not be a member of the minority community, though usually s/he is. On the other hand, even in districts where that minority community is not a majority of either the primary or general electorate, there may be circumstances in which the minority community elects a candidate of choice and/or where descriptive representation of the minority community occurs.

F. There is now a well-developed repertoire of mutually complementary social science tools to estimate when a district constitutes a "realistic opportunity to elect." For partisan elections, such tools must take into account the two stage nature of those elections, i.e., the fact that they normally involve both a primary and a general election. Amng the most common techniques are the use of statistical tools such as ecological inference, ecological regression, and homogenous precinct analysis, to estimate actual voting patterns (and turnout levels) in particular elections of different racial (or ethnic) groups using data on the racial (and ethnic) composition of voting tabulation units (precincts). Another approach projects into the districts in a challenged or proposed map the results from one or more statewide elections ( a technique sometimes known as "recompiling."). Relatedly, estimated turnout data by race from statewide elections/statewide primaries may be projected into proposed districts to see if the minority community had a potential majority of the primary electorate of a given party in the various districts. Similarly, using data on a set of statewide elections, such as that provided in Dave's Redistricting App, we may

---

Section 2 prohibits denying minority voters "an equal opportunity' to `participate in the political process and to elect representatives of their choice'" where the minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district" and is "politically cohesive," and where the majority "votes sufficiently as a bloc to enable it ... to defeat the minority's preferred candidate." These are sometimes referred to as the three *Gingles factors*.

[5] *Shaw* holds that map-drawers either not subordinate "traditional districting principles" to racial considerations, 509 U.S. at 642, or, if they do, the district lines must be "narrowly tailored to further a compelling governmental interest," *id.* at 643. In *Personhuballah*, a *Shaw*-type case, that three-judge Court cited previous rulings to observe that: "On its face, § 2 [of the Voting Rights Act] does not apply to a court-ordered remedial redistricting plan, but we will assume courts should comply with the section when exercising their equitable powers to redistrict." 155 F. Supp. 3d at 565 (quoting *Abrams v. Johnson*, 521 U.S. 74, 90 (1997)).

examine which party is expected to constitute a majority of the general election electorate in the various proposed districts.[6]

---

[6] For a discussion of some of these techniques, *see* Bernard Grofman, *A Primer on Racial Bloc Voting Analysis*, in The Real Y2K Problem: Census 2000 Data and Redistricting Technology (Nathaniel Persily ed., 2000); Bernard Grofman, Lisa Handley & David Lublin, *Drawing effective minority districts: A conceptual framework and some empirical evidence*, 79 N.C. L. Rev. 1383 (2001); David Lublin, Lisa Handley, Thomas Brunell, & Bernard Grofman, *Minority Success in Non-Majority Minority Districts: Finding the 'Sweet Spot,'* 5 J. Race, Ethnicity, and Pol. 275 (2020)

## II. EVALUATING THE PROPOSED MI-IRC MAP

6. The Michigan Independent Redistricting Commission was ordered to redraw Michigan House Districts 1, 7, 8, 10, 11, 12, and 14 and any other districts as reasonably necessary to cure the unconstitutional racial gerrymanders no later than February 2, 2024. And it did so.

1. The new map offered by the Michigan Independent Redistricting Commission redrew districts 1-14 and 16 that will be the focus of attention of this Report.. The MI-IRC has assisted evaluations of its new map by providing extensive documentation along with block equivalency and shape files. I have worked with this data using Dave's Redistricting App, a free publicly available, easy to use software package. That allows me to examine overall populations, voting age populations, and citizen voting age populations by race and Hispanic heritage as well as providing projected outcomes of partisan elections into the districts. DRA also provides compactness scores on a variety of compactness measures, and a variety of measures of partisan bias, The MI-IRC website also provide links to its own primary-based turnout-by-race VRA analyses, its own partisan bias analyses, and its own report on compactness.

2. The scope of the 2024 remedial redrawing was very extensive in terms of total population shifts across the 15 districts. In particular, if we look at which district in the 2022 map provided the plurality of the population in each district of the 2024 proposed map, and account for the complication of some districts in the 2022 map making up the plurality of more than one district in the new map, we find that, among these 15 districts, the overlap between the 2024 map and the 2022 map is only 57.4%.[7] Moreover the MI-IRC has made substantial geographic shifts in 6 of the 7 districts that were invalidated in the previous litigation. In the one partial exception, district 1, there are demographic changes which, though not that large in percentage terms, potentially have important substantive consequences.[8]

3. Most important for evaluative purposes are the ways in which the lines in the new map were changed to be responsive to the need to remedy constitutional violations and other issues raised in public comment.. I identify below four key features of the new map.

---

[7] If, instead, we simply identify districts by district number and ask for the percentage of each 2024 district that comes from its correspondingly numbered 2022 district, then we find a retention overlap of only 44.9%. But this percentage is misleading due to the lack of a perfect correspondence in numbering: many 2024 districts are drawn primarily from areas distinct from the district's geographical location in 2022, in some cases, such as 2024 districts 7 and 11, there is a complete disjunction.

[8] See below.

(a) the 2022 map had an excessive number of extrusions that placed pieces of Wayne County (usually pieces with substantial Black population) together in a district with a portion of a different county. The 2024 proposed map, looking only at districts 1-14 and 16, reduces the number of districts with pieces of both Wayne and Macomb from 5 to 2 and reduces the number of districts with pieces of both Wayne and Oakland from 4 to 2.

(b) Dearborn, with a high middle eastern/North African origin population, was fragmented in the 2022 map; it is kept largely whole in the 2024 remedial map in District 3.

(c) Looking only at districts 1-14 and 16, the 2022 map had 5 Black citizen voting age majority districts (districts, 4, 5, 6, 9,and 16) ; the 2024 map has 7 black citizen voting age majority districts (districts 4, 5, 7, 8, 9, 11, 16). Districts 8 and 11 were not previously majority minority.[9] In all but one of the 2024 Black majority CVAP districts, the Black citizen voting age population is between 67% and 91%, and even in the one with lowest Black CVAP (55.35%), District 16, the African-American community clearly has a realistic opportunity to elect a candidate of choice in the Democratic primary.[10] In fact, District 16 is currently represented by a Black representative (a former incumbent in a different district) who won the Democratic primary with 88% of the vote. Her opponent was also African-American. All seven Black majority CVAP districts are overwhelmingly Democratic districts and thus the Democratic primary winner should win the general election in these districts.

(d) looking only at districts 1-14 and 16 the 2022 map had 8 districts with between a 35% and a 50% African-American citizen voting age population, while the 2024 proposed map has only 3 such districts, but all are above a 40% Black citizen voting age population (districts 1, 10, 12) . It is clear these three districts, like the seven Black majority CVAP districts, are essentially certain to elect a Democrat. .Below we consider indicia suggesting a candidate of choice of the Black community also has a realistic opportunity to win the primary election in each of the latter three districts.

    i.    District 1 is currently represented by a Black representative ( a former incumbent in a different district) who won with 78% of the vote in the 2022 primary. The changes in district 1 from 2022 to 2024, though not that large in population terms, involve a slight increase in the African-American CVAP share of the

---

[9] Comparisons are made difficult by changes in numbering and the fact that some districts, e.g., 2022 district 6, have been partitioned into 3 districts in the 2024 map.

[10] In fact, District 16 is currently represented by a Black representative (a former incumbent in a different district) who won the Democratic primary with 88% of the vote. Her opponent was also African-American.

        district. (from 40.8% to 43.4%).[11] The MI-IRC primary vote analysis shows, on average, 38% of the primary electorate are Black Democrats with white Democrats at 16.8%.[12]

  ii.    District 12 is currently represented by an African-American who won the Democratic primary against a White opponent who was an incumbent, with a victory margin of under 300 votes. The Black CVAP in that district has been increased slightly from 2022 to 2024, from 42.9% to 46%. The MI-IRC primary vote analysis in its map shows, on average, 43% of the primary electorate are Black Democrats and white Democrats are 25.1%. Running against the white incumbent in 2022, District 12 was certainly not a safe seat for the choice of the African-American community. However, I would characterize its 2024 version as one in which the minority community has a realistic opportunity to elect a candidate of choice.[13]

  iii.    District 10 has an African-American representative who is currently the Speaker of the House. That House member won his primary in 2022 overwhelmingly, with 81.4% of the vote. African-American CVAP in the district was marginally increased from 40.56% to 43.03%. from 2022 to 2024. The MI-IRC primary vote analysis in its map shows, on average, average, 37.3% of the primary electorate are Black Democrats and white Democrats are 26.3%.[14] The configuration of the district changed dramatically from 2022 to the 2024 proposed

---

[11] This district has a combined minority population (Black plus Hispanic) that continues to constitute an overwhelming majority of the district's citizen voting age population; 2024 changes increased the Hispanic CVAP share of the district from 25.9% to 27.6%. Note that here (and elsewhere) I am referencing citizen voting age percentages as reported on Dave's Redistricting App, not voting age population.

[12] The remainder are mostly Hispanic.

[13] To repeat an earlier point, a "realistic opportunity to elect" district is not a guaranteed safe seat for candidates of the minority group, but even a majority-minority district need not be such if the minority community is not unified around a single candidate.

[14] It would be possible to reconfigure District 10 to become a 70%+ white district in which the Grosse Point communities were paired with St. Claire Shores; but doing so would require eliminating a realistic opportunity to elect district and replacing it with a white district that crossed county lines to pick up white population. The only gain from this shift in terms of minority representation would come from taking Detroit area population previously located in District 10 in the proposed MI-IRC remedial map, and "rippling" that population to add to a district that was already a realistic opportunity to elect district in the 2024 map and converting that district into a Black majority CVAP district. But making this shift does not constitute a real gain in minority representation and would thus both raise issues of vote dilution and issues of a race preponderant motive in creating a new multi-county heavily white district that includes a portion of Wayne County. Also, there might be implications for partisan balance in creating a new heavily white district.

map; while various Grosse Point communities remain within the district, the portion of Detroit that was previously in the district (drawn in a southwest direction) has been replaced by a portion of Detroit to the west. The 2022 version of District 10 was one of the handful of least compact districts in the 2022 map. The 2024 proposed map increases the compactness of this district dramatically on both the Polsby-Popper and Reock measures.

4. Among districts 1-14 and 16, the MI-IRC has chosen to draw seven Black majority citizen voting age districts and three districts where the African-American community has a realistic opportunity to elect candidates of choice.[15] Assuming the *Gingles* preconditions are met, the former districts are required by the Voting Rights Act, and latter districts are dictated by the racial geography (the overwhelmingly high African-American population in the Detroit area and the proximity of the latter three districts to ones that are majority Black in CVAP). Moreover, as compared to the rejected 2022 map, districts 1-14 and 16 are drawn in such a fashion as to limit the number of heavily African-American districts drawn with a piece of Wayne County and a piece of another county extending to the north, and overall compactness has been very marginally improved (in part because of changes in the configuration of district 10).

5. Despite the considerable scope of the changes made from the rejected 2022 map to the 2024 proposed remedial map, I would characterize the new MI-IRC map as *narrowly tailored* to remedy the previously found constitutional violations. That is because changes in at least 15 districts, all of which are either ones found unconstitutional or ones bordering on one or more districts found unconstitutional, were essentially necessary to remedy the problems with the previous map while simultaneously assuring population balance in all the affected districts.

6. Absent constitutional violations, deference is given to the map drawn by the entity legally entitled to do so. There are always multiple ways in which maps can be drawn. I did not identify major flaws with the MI-IRC map that would suggest it failed to address the race-related constitutional concerns of the Court. Accordingly, as per the instructions of the Court order, I do not review the map provided by Dr. Barber as a possible back-up map. Moreover, since this is a federal case dealing with issues related to race, I do not address in this Report issues that I view as only state-law related, such as assessment of partisan fairness, or whether incumbents have been "improperly" maintained in their districts. From my social science perspective, I view the MI-IRC as having been able to address and remedy the race-related constitutional defects in its previous map, but the decision as to whether its remedy is an adequate one is, of course, a legal decision for this Court.

---

[15] My own conceptual analyses of possible map configurations indicate that it is possible to draw more than seven Black majority citizen voting age districts in this same area, but in the MI-IRC remedial map some possible majority Black citizen voting age districts have been drawn as realistic opportunity to elect districts instead.

*Bernard Grofman*

MARCH 15, 2024