# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | |
|---|---|
| DONALD AGEE, JR., an individual, *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>JOCELYN BENSON, in her official capacity as the Secretary of State of Michigan, *et al.*,<br><br>    Defendants. | Case No. 1:22-cv-00272<br><br>**Three-Judge Panel Appointed Pursuant to 28 U.S.C. § 2284(a)**<br><br>**PLAINTIFFS' RESPONSE TO REPORT BY REVIEWING SPECIAL MASTER BERNARD GROFMAN** |

## INTRODUCTION

The Report of Reviewing Special Master Dr. Grofman confirms the most salient point of Plaintiffs' Objection to Defendants' Proposed Remedial Plan ("Objection"): more majority Black districts could have been drawn. The Commission's current proposed House remedial map has seven majority-minority districts and three "opportunity" districts. Plaintiffs' expert (Sean Trende), the Commission (based upon other maps they considered during the remedial process), and now Dr. Grofman all agree the number of majority-minority districts could easily be higher.

Dr. Grofman does not opine on the critical issue of whether the Commission's changes provide a full remedy when the adopted remedial map locks in the results of the 2022 election that took place under the racially gerrymandered Hickory map. Dr. Grofman expressly ignores the issue of "whether incumbents have been 'improperly' maintained in their districts." ECF No. 170, PageID.5806.

Finally, Dr. Grofman's report is startingly slim as to whether the adopted remedial map corrects the prior Equal Protection violations, focusing instead on the map's Voting Rights Act (VRA) compliance. That's an odd approach because this Court never reached Plaintiffs' VRA claims, and Dr. Grofman was tasked solely with evaluating whether the proposed map cured the Equal Protection violations.

In the end, nothing in Dr. Grofman's report changes Plaintiffs' conclusion in their Objection. While the proposed remedial map is a step in the right direction, it does not go far enough to provide a complete remedy to Plaintiffs.

## ARGUMENT

**I.   Dr. Grofman's Report Focuses Primarily on VRA Analysis, Not Equal Protection.**

On December 21, 2023, this Court invalidated 13 Michigan House and Senate districts because they were drawn in violation of the Equal Protection clause. Opinion and Order, ECF No. 131. As part of the remedial phase, the Court appointed Dr. Bernard Grofman as the Reviewing Special Master and tasked him with filing a report "regarding whether the plan adopted by the Commission lawfully remedies the constitutional violations identified in this court's December 21, 2023, opinion and order." Scheduling Order Regarding Districting, ECF No. 156, PageID.5153.  Despite being directed to opine as to whether the proposed remedial plan remedied the Equal Protection violations, Dr. Grofman's late-filed Report focuses almost entirely on potential VRA violations—a claim this Court did not reach. Opinion, ECF No. 131, PageID.4817. For example, the Report pays minimal attention to traditional

2

gerrymandering considerations such as county splits and respect for municipal boundaries.

This approach is particularly troublesome because this Court issued no findings of fact or conclusions of law on Plaintiffs' VRA claims. So, Dr. Grofman's Report is based on evidence and conclusions that are not part of any factual record. See *Pendergrass v. Raffensperger*, Case No. 21:cv:05339, N.D. Ga., Dec. 28, 2023 Order (noting the impropriety of seeking "to litigate a whole new basis for a Section 2 violation involving a combination of three minority groups at the remedial stage of their case… This is the type of challenge to a remedial districting plan that demands development of significant new evidence and therefore is more appropriately addressed in a separate proceeding") (citing *Covington v. North Carolina*, 283 F. Supp. 3d 410, 427 (M.D.N.C.), aff'd in part, rev'd in part, 138 S. Ct. 2548 (2018)).

Further, the most critical VRA-related finding Dr. Grofman posits is contrary to the record. Dr. Grofman asserts that a minimal 40% BVAP target renders certain districts in the proposed remedial map (*i.e.*, districts 1, 10, and 12) "opportunity" districts, and that this low threshold is adequate under the VRA so those three districts should be considered "performing" districts:

> [L]ooking only at districts 1-14 and 16 the 2022 map had 8 districts with between a 35% and a 50% African-American citizen voting age population, while the 2024 proposed map has only 3 such districts, but all are above a 40% Black citizen voting age population (districts 1, 10, 12). It is clear these three districts, like the seven Black majority CVAP districts, are essentially certain to elect a Democrat… a candidate of choice of the Black community also has a realistic opportunity to win the primary election in each of the latter three districts. [ECF No. 170, Report, p. 8, PageID.5804].

Yet the trial record was replete with evidence that a 40% BVAP was *not* sufficient.

3

For example, as set forth in Dr. Sean Trende's expert report, the BVAPs for the Hickory map were too low for Black voters to compete, the Hickory plan was likely to reduce the number of districts where Black voters could elect their candidate of choice, and there was no evidence supporting the MICRC's conclusion that districts with 35% to 40% BVAPs would enable Black voters to win competitive Democratic primaries. Joint Appendix at 41, ECF No. 71-1, PageID.995; *id.* at 42, ECF No. 71-1, PageID.996; *id.* at 122-123, ECF No. 71-1, PageID.1076-1077.

Further, it appears the new 40% litmus test has been simplified from the "bellweather" general election results—which, as shown at trial, yielded essentially a "rubber stamp" for all districts as "performing" even when there was no data to suggest how they would perform in a primary—to an even more dumbed down approach: the only question Dr. Grofman and the Commission's VRA counsel seem to need answered is what percent of Black voters voted in the primary. ECF No. 170, Report, p. 8, PageID.5804; 01/31/2024 MICRC Tr. at p. 27-28 (VRA counsel stating "if you have a District that's 45% of African/American turnout, is that—is the Black community likely to control that democratic primary? … I don't need to... take my socks off to do the math here, yeah, it's pretty likely that most of the time that 45% there will be sufficient white cross over voting to make that work… We looked at it and if 40% of or 45% of the democratic primary is Black and we are just going to think that it's likely they are going to control that").[1]  Using this flawed methodology, the

---

[1] The transcripts from Defendants' remedial mapping sessions may be accessed here: https://www.michigan.gov/micrc/meeting-notices-and-materials.

4

Commission's current proposed House remedial map has a mere seven majority-minority districts and three "opportunity" districts with lower BVAPs that *might* perform. In its Opinion, this Court made the following point about these low BVAPs:

> Nor did the Commission have anywhere near an adequate basis for the factual premise of its theory: namely, that black voters could in fact elect their preferred candidates at the BVAP levels prescribed for the districts here. Everyone agrees that the elections in these districts are decided in the Democratic primaries, not the general election. Yet Handley's analysis lacked any primary-election data that was relevant to whether black voters could elect their preferred candidates at these BVAP levels. Even Adelson admitted as much. And Handley herself admitted to Szetela, at the eleventh hour, that "we simply do not know" how black-preferred candidates would fare in Democratic primaries.

ECF No. 131, Opinion, p. 113-14, PageID.4816-17.[2] Now, the rubber-stamp general election data has been replaced with an overly simplistic view of how many Black voters turn out in the primaries.[3]

Tellingly, Dr. Grofman buries the lead in a footnote where he admits that the Commission *could have easily drawn another majority Black district*. Dr. Grofman acknowledges that the Commission's proposed map only draws seven Black majority districts but that "it is possible to draw more than more than seven." ECF No. 170, Report, p. 10, n.15, PageID.5806. Plaintiffs agree that the Commission could (and

---

[2] Notably, these were the same concerns Plaintiffs raised in their objection to Dr. Grofman's appointment—*i.e.*, that Dr. Grofman would recycle the previously-rejected VRA approach given his extensive professional ties with Dr. Handley. ECF No. 159.

[3] This is further refuted by the results of the January 30, 2024, democratic primary special elections. In House District 13, LaMar D. Lemmons, a Black candidate, was defeated in favor of a non-Black candidate, Mai Xiong. And in House District 25, two Black candidates, Melandie Hines and Shannon Rochon, combined to receive 12.63% of the vote while the two candidates that received the first and second highest percentage of votes were both white candidates.
https://mvic.sos.state.mi.us/votehistory/Index?type=C&electionDate=1-30-2024

5

should) have drawn more Black majority districts—particularly since (a) numerous versions of the maps the Commission considered during the remedial phase had more majority-minority districts, (b) Plaintiffs' expert Sean Trende submitted a proposed map to show it was easily possible to draw more such districts, and (c) the Black Caucus submitted a proposed map that drew more majority-minority districts. Dr. Grofman agrees: more majority-minority districts were not difficult to include.

## II. The Changes Allegedly Made for "VRA Compliance" Were Not Narrowly Tailored Tweaks: They Were Overhauls.

Dr. Grofman also says that the Commission's race-based decisions were narrowly tailored. But this conclusion is vague, conclusory, and lacking any of the detailed factual analysis of why those race-based decisions were made.

For its part, the Commission claims that, based on an "innovative approach" created by its VRA counsel, the Commission analyzed certain data and that Braden "advised that minor adjustments" should be made to the Tiger Lily/Spirit of Detroit map, and that the Commission should only "tweak" the plans for this purpose. ECF No. 169, p. 6-7, PageID.5509-5510. The Commission then says that it looked at race for that narrow purpose and only made "tweaks" to HD 10 and 12 areas.

This narrative is belied by the record. During the meeting where Mr. Braden advised that "minor" adjustments and race-based "tweaks" were acceptable, Commissioner Muldoon disagreed that the changes they were making to the precursor to Motown Sound (i.e., when it was still being called Spirit of Detroit) were only "minor" adjustments:

6

> I mean I understand narrowly but *this to me is not narrow*. This is a large, I mean it was what 30,000 people change. *That to me is not narrow. It's half a District*. [01/31/2024 MICRC Tr. at p. 53 (emphasis added)].

Later, Commissioner Muldoon lodged the same objection again:

> I think we kind of covered everyone's opinion at that point because you tried to do it without it twice. And if we couldn't succeed then the third time you just almost have to unfortunately. Because otherwise *I think we will make huge changes, that is half the District changed*. [*Id.* at p. 54 (emphasis added)].

Commissioner Langue agreed that the changes were not narrowly tailored:

> COMMISSIONER LANGE: I think Commissioner Muldoon made a very good point. I would be more comfortable if it was blindly done and ran a second time. He made the point of the 30,000 to add so then it's at what point is it no more or no longer narrowly tailored if you don't get it at that point then you are grabbing more of a certain race and then more. *You can't really consider it narrowly tailored any more.*

*Id.* (emphasis added). Thus, by some of the Commissioners' own admissions, these were not minor tweaks but wholesale redrafting of both districts (Districts 10 and 12) based on race.

### III. Dr. Grofman's Report Ignores that the Remedial Map Progression Unpaired Four Incumbents That Were Previously Double-Bunked.

The most obvious flaw in the Commission's proposed map is that it locks in the results of the 2022 election that took place under the racially gerrymandered Hickory map by insulating every incumbent from having to run against another incumbent. Given the advantage of incumbency, this feature (not a bug) of the remedial map locks in the results of the Commission's racial discrimination for the next decade. This is not a state-law issue but an issue of remedy that this Court can and should address.

7

Critically, Dr. Grofman offers no opinion as to whether the Commission's changes provide a full remedy to the Plaintiffs; he declined to address "whether incumbents have been 'improperly' maintained in their districts." ECF No. 170, Report, p. 10, PageID.5806. He also states that "whether its remedy is an adequate one is, of course, a legal decision for this Court." *Id.*

But as Plaintiffs explained in their Objection, the adopted remedial map does *not* provide an adequate remedy. All the other maps the Commission considered and rejected pair incumbents, allowing at least some Black voters to elect their candidate of choice going forward. Motown Sound, the map the Commission just happened to pick, does not. "If the Commission set out to avoid incumbent pairings, it seems to have done a very poor job… Indeed, most of the Commission's maps did inadvertently pair incumbents." ECF No. 169, Commission Response, p. 36, PageID.5539. Precisely. All the other maps pair incumbents. Defendants' adopted map stands oddly alone, a 1-in-100 fluke that protects every incumbent.

It makes no difference, of course, whether the Commission considered incumbent pairings in making its decision. Whether the Commission provided a proper remedy is not an intent- or knowledge-based criteria; the map either objectively protects incumbents (and thus locks in the racial discrimination baked into the 2022 election) by avoiding incumbent pairs or it does not. And it cannot be disputed that the adopted remedial map protects incumbents—the earlier version of the adopted map (Lily) pitted four incumbents against each other. The map the Commission ultimately adopted (Motown Sound FC E1) moved all four incumbents to different

8

districts. Dr. Grofman's Report does not refute this factually, nor does he address its impact on whether the new districts cure the effects of the racially gerrymander Hickory-map election.

As shown below, the Lily map "double-bunked" two incumbents i.e., pitted them against each other in the same district:



Specifically, Natalie Price and Regina Weiss appeared in the same district as did Helena Scott and Donavan McKinney.

The next iteration of the map, Tiger Lily, carefully maneuvered Lily's lines to unpair those incumbents. The following image shows precisely how these maneuvers were made by overlaying the Lily map on the Tiger Lily map, with the light blue dotted lines showing how the new lines benefitted the double-bunked incumbents:



The light blue dotted lines between Natalie Price and Regina Weiss show how their districts were split to protect each incumbent, the same as Donavan McKinney and

Helena Scott.[4] These light blue dotted lines demark the Tiger Lily districts (which were not changed in the final Motown Sound FC E1 map, as it relates to incumbents), that were ultimately adopted in the final Motown Sound FC E1 map:



Figure 5: Location of Incumbents, Tiger Lily Map

Again, the Commissioners' "intent" is irrelevant. The only question is whether the Commission made choices that locked in the 2022 election results under the racially gerrymandered Hickory map, which it undeniably did. But as noted in

---

[4] The evolution of the final map proposed by the Commission is as follows: it started as the Lily, then was changed and renamed Tiger Lily, then it was changed again and became Spirit of Detroit, then Motown Sound, then Motown Sound FC E1.

11

Plaintiffs' Objection to the adopted remedial map, it is notable that the adopted remedial map materialized under suspect circumstances, despite the Commission's counsel warning Commissioners of the risk that would result from using maps (or even portions of maps) from outside sources. Because Dr. Grofman does not address this problem, Plaintiffs briefly recap the circumstances here.

At the Commission's meeting on January 31, 2024—a meeting at which Mr. Chris Gilmer-Hill appeared twice to offer his changes to draft maps after having already submitted two maps via the public portal on January 18 and January 24—one public commenter urged the Commission not to disregard a map just because "you can't prove that it was drawn race blind." The very next commenter advised the Commission, "It's your intent that matters, not the intent of those who submitted maps for your consideration." 01/31/2024 MICRC Tr. at 3-4.

In response, the Commission's legal counsel rightly warned that it was risky to use maps submitted by third parties since such maps were not created in public and it is impossible to know whether they were drawn race blind, explaining: "there are risks involved in considering these maps, right? Again, we don't know how the maps were drawn… none of us were in the room while these maps were being drawn. So there is some potential risk involved… there are risks that the Commission should take into consideration as it relates to the maps that were not drawn, you know, in a public forum like these other maps were." *Id.* at 10-11.

Counsel reiterated that the maps "you receive from outside sources" could be drawn without regard to the requisite criteria, noting: "the concerns are the ones we

expressed… to use to the plans going forward is the question of whether or not they used race… I would be concerned if you took them as presented to you if you believe that race was used in drafting them… they become your plans when you make the decisions on them. So I think that there is a degree to which you can use parts of these plans." *Id.* at 12-13.

In response, Commissioner Lett proposed that the Commission *could* use third-party plans but then walk through the Michigan constitution criteria, and that by doing so, it "insulates us [the Commission] somewhat from the comments that we've been concerned with, that perhaps race predominated a little more than it should have." *Id.* at 13. Commissioner Eid (now Chair Eid) agreed that "personally, I don't have an issue with considering third-party maps." *Id.* at 15.

Other Commissioners voiced their discomfort with using third-party maps. Commissioner Lange, who testified at trial, stated: "Since we are bringing up the outside maps again… I still have problems with it. I think it would be one thing if these were maps based on a community of interest or an individual community of interest or even several. But we are talking full on maps of an entire, you know, 7, 8, 9, 10, up to 15 districts actually they submitted maps for the entire state. This is our job to do the maps, not theirs." *Id.* at 14-15.

Notwithstanding these warnings from counsel, Commissioners went ahead and apparently used a third-party map. On January 18, 2024—the same day the Commission drew what eventually became Lily—Mr. Chris Gilmer-Hill appeared and informed the Commission during the public comments portion of the meeting that he

13

had uploaded a proposed map via the public portal.[5] On January 24, Mr. Gilmer Hill submitted Tiger Lily. On January 31, 2024, Gilmer-Hill returned once again with additional proposed changes and a new map that he claimed would make the maps VRA compliant and also make some of the districts "safe" from a "competitiveness" standpoint.[6] At one point in the mapping process, a Commissioner asked Commissioner (now Chair) Eid if he was using a sample map uploaded by the advocacy group "Promote the Vote," and he said he was not. But Chair Eid candidly acknowledged he was using the map uploaded by Gilmer Hill, *not* map changes driven by any of his fellow Commissioners:

> COMMISSIONER EID: I've not looked at the Promote the Vote map since whenever we put it forward last week. I was specifically referencing the public comment from earlier today. I would have to double check, but I think the guy's name was Chris. And he suggested putting St. Clair shores in 12. And the Grosse Pointes, the Grosse Pointes with Harper Woods, morning side, East English Village in District 10. I think we did the opposite here. We flipped District 12 and 10 but that is what I was going on. Any other thing that will look similar to is merely coincidence. 01/31/2024 MICRC Tr. at 51.

Thus, when additional changes were made to the map, it just so happened to be the same day that Chris Gilmer-Hill uploaded another proposed map with those

---

[5] Ex. A, Gilmer Written Comments and Map Uploads to Public Portal; for Gilmer Hill's spoken public comments on same, see: https://www.michigan.gov/micrc/-/media/Project/Websites/MiCRC/MISC-10/11824-MICRC-Meeting-Transcripts.pdf?rev=c807b50449424667afe457d361875b0e&hash=A1D7F7BA5E32FEA01904F85A9CA14775 at p. 5.

[6] Ex. A, Gilmer Written Comments and Map Uploads to Public Portal; for Gilmer Hill's spoken public comments on same, see: https://www.michigan.gov/micrc/-/media/Project/Websites/MiCRC/MISC-11/1_31_24-MICRC-Meeting-Transcript.pdf?rev=4eddcc11c30e4a01b9ae510c5c0c13d4&hash=0E631E8F864C76452036838E8384D448, p. 7.

same changes. Mr. Gilmer-Hill also attended the February 1, 2024, Commission meeting and helpfully offered not one, but two separate comments when his commentary went beyond the time limit allowed.[7] And as Plaintiffs pointed out in their Objection, Mr. Gilmer-Hill is not a random concerned citizen trying to draw fair maps. He is a Harvard educated software developer and political operative with ties to the Democratic Socialists of America. ECF No. 168, PageID.5397-5398.

In short, the Tiger Lily was adopted wholesale on January 31, renamed to Spirit of Detroit, then Motown Sound, and finally to Motown Sound FC E1, the Commission's final remedial map. But regardless of the map's origin, case law demands that incumbents not be protected in remedial maps because it solidifies the remnants of the previous gerrymander. "[C]ourts likewise have expressed concern that remedial districts drawn to protect incumbents elected under an unlawful or unconstitutional plan may serve to perpetuate the identified violation." *Covington v. North Carolina*, 283 F.Supp.3d 410, 431-32 (M.D.N.C., 2018), *aff'd in part, rev'd in part*, 585 U.S. 969 (2018) (citing cases). As a result, even if the Commission (and Gilmer-Hill) drew the adopted remedial map race blind, that map's protection for incumbents does not afford a complete remedy. *Covington*, 283 F.Supp.3d at 434 (citing cases) ("As to the first argument—that the race-blind criterion immunizes the proposed remedial districts from any claim of racial gerrymandering—the Supreme

---

[7] https://www.michigan.gov/micrc/-/media/Project/Websites/MiCRC/MISC-10/2124-MICRC-Meeting-Transcript.pdf?rev=a27993efc86b4fdd8a12396e844bd2d4&hash=3A4CF9A2023D23A80F44040F7A327F9F, p. 14 and 17.

15

Court long has recognized that a statute enacted by a state legislature to remedy an unconstitutional race-based election law can perpetuate the effects of the constitutional violation, and thereby fail to constitute a legally acceptable remedy, even when the remedial law is facially race-neutral."). Moreover, this Court "need not defer to a state-proposed *remedial plan*, however, if the plan does not *completely remedy* the violation[.]" *Covington*, 283 F. Supp. at 431 (quoting *Harvell v. Blytheville Sch. Dist. No. 5*, 126 F.3d 1038, 1040 (8th Cir. 1997), and *Abrams v. Johnson*, 521 U.S. 74, 85 (1997)).

Because the Commission's remedial map protects incumbents, it embeds the racial gerrymander. And Dr. Grofman's Report says nothing refuting Plaintiffs' map progression, which shows that strangely specific changes were made to un-bunk four incumbents. Accordingly, the adopted remedial map should be rejected.

## IV. Dr. Grofman's Lack of Analysis Cannot Be Cured by the Supplemental Remedial Reports of Drs. Rodden and Palmer.

The Commission, wisely anticipating that Dr. Grofman would fail to address the incumbency-protection problem, tries to fill the gaps with new expert reports by Dr. Rodden and Dr. Palmer. Those reports do not move the needle.

To begin, Dr. Palmer's report fails to prove anything for the same reasons as the Reviewing Special Master's report. The Commission had its chance to litigate the VRA issues at trial; it does not get a second bite at the apple to raise new VRA theories in the remedy phase that cannot be subjected to the crucible of cross-examination at trial. Allowing Defendants to argue at the remedial phase that a district with a BVAP of 42% likely complies with the VRA defies this Court's instructions to "just don't

16

draw lines based on race." ECF No. 155, PageID.5120. And the Court has already rejected this argument, calling it "meritless." ECF No. 131, PageID.4815.

Dr. Rodden's report likewise fails to solve the incumbency-protection problem.[8] Dr. Rodden hypothesizes that "[i]f the Commission set out to avoid incumbent pairings, it seems to have done a very poor job. Indeed, most of the Commission's maps did inadvertently pair incumbents." ECF No. 169-1, PageID.5554. But that's the point: all of the Commission's maps paired incumbents except the one the Commission selected.

Dr. Rodden likewise criticizes the simulation maps prepared by Dr. Trende for not following neighborhood boundaries. Yet when Dr. Rodden runs his own set of simulations, he doesn't force them to follow neighborhood boundaries either. These nitpicks do not change the reality that the Commission has—inadvertently or intentionally—cemented the results of the 2022 House election that this Court has already declared to have disenfranchised Black voters.

## V. Plaintiffs Should Be Given an Opportunity to Submit a Proper Remedial Map.

Following this Court's issuance of its opinion striking down the Hickory and Linden maps, Plaintiffs asked this Court for an opportunity to submit their own map.

---

[8] Dr. Rodden's primary trial contribution was his testimony that Dr. Trende's simulations were flawed because they failed to account for politics, Trial.Tr.Vol.IV., PageID.3153-3155, 3162-3166, and that VRA Counsel Adelson's "spoke" concept was necessary to achieve desired political outcomes, *id.*, PageID.3048-3053. Notably, the Commission created several (unadopted) maps that abandoned the spoke context but maintained the Hickory map's partisan-fairness metrics, proving Dr. Trende right and Dr. Rodden wrong. Dr. Rodden's criticisms of Dr. Trende's methods are still unfounded.

17

The Commission repeatedly objected and said that only they—the appointed Commissioners—should have the first crack at redrawing maps, and the Court's Scheduling Order did not provide Plaintiffs such an opportunity. ECF No. 155, Hrg. Trans. 1/5/24, p. 25, PageID.5099; ECF Nos. 158, 164, 156.

At a February 2024 press conference, an unaffiliated *non-party*, the Congressional Black Caucus, unveiled a map that it showed to the media. But that map was not drawn by Plaintiffs or Dr. Trende. There was a detailed process governing the parties' objection protocol, and Plaintiffs have followed it.

That said, the Commission continues to self-destruct. After this Court concluded that, in "demeanor and substance alike," Commissioner "Eid was not a credible witness" whose trial testimony "was by turns implausible and evasive," Opinion, ECF No.131, PageID.4774, his fellow Commissioners promoted him to Chair.[9] And at the same meeting, Commissioners overwhelmingly voted themselves a 40% pay raise, applied retroactively to the drawing of the House map, *id.*, a process which appears to have been driven largely by the secret maps and map amendments of a third-party political operative. Plaintiffs respectfully submit that they should be given a chance to propose a truly remedial map, a submission that could be accomplished within a business day or two.

---

[9] LeBlanc, *Michigan redistricting commission votes to give itself a 40% pay raise*, The Detroit News (Mar. 21, 2024), https://www.detroitnews.com/story/news/politics/2024/03/21/michigan-redistricting-commission-votes-to-give-itself-a-40-pay-raise/73053920007/

## **CONCLUSION**

The analysis of Reviewing Special Master Dr. Grofman does nothing to rehabilitate the Commission's adopted remedial map, a map which perpetuates the racial discrimination that infected the Hickory map by protecting every single incumbent elected under that map and by failing to draw a sufficient number of majority-minority districts.

Dated: March 25, 2024                                        Respectfully submitted,


*/s/ John J. Bursch*
John J. Bursch (P57679)
BURSCH LAW PLLC
9339 Cherry Valley Ave SE, #78
Caledonia, Michigan 49316
(616) 450-4235
jbursch@burschlaw.com

Michael J. Pattwell (P72419)
Jennifer K. Green (P69019)
James J. Fleming (P84490)
Amia A. Banks (P84182)
CLARK HILL PLC
215 S. Washington Sq., Ste. 200
Lansing, MI 48933
(517) 318-3100
mpattwell@clarkhill.com
jgreen@clarkhill.com
jfleming@clarkhill.com
abanks@clarkhill.com

*Attorneys for Plaintiffs*