UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| DONALD AGEE, JR. *et al.*,<br>　　　　　Plaintiffs,<br><br>v.<br><br>JOCELYN BENSON, in her official<br>capacity as the Secretary of State<br>of Michigan *et al.*,<br>　　　　　Defendants. | No. 1:22-cv-272<br><br>Three-Judge Court |

**OPINION AND ORDER**

PER CURIAM.  On December 21, 2023, we unanimously held that the Michigan Independent Citizens Redistricting Commission violated the Equal Protection Clause of the U.S. Constitution when it drew the boundaries of thirteen state-legislative districts—seven House districts, and six Senate—predominantly on the basis of race.  We therefore enjoined the Michigan Secretary of State, Jocelyn Benson, from holding further elections in those districts as they are currently drawn.  *See* ECF No. 131.  The Commission has now submitted a revised House plan, to which the plaintiffs have submitted several objections.  We have reviewed the record before us and now overrule those objections.

I.

A.

As a matter of course, under Michigan law, the State will hold elections for every seat in the State House later this year.  We therefore ordered the Commission to adopt a remedial House map before those elections take place.  *See* ECF No. 156.  (The Commission will prepare a remedial Senate map in the coming months.)  We also appointed two special masters to assist the court during the remedial map-drawing process.  First, we appointed Dr. Michael Barber to prepare

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

and recommend an alternative remedial-districting plan for the court's adoption in the event the Commission failed to provide an acceptable one. *See* ECF No. 158. Dr. Barber submitted that plan and report to the court on February 2, 2024. Second, we appointed Dr. Bernard Grofman to evaluate the Commission's remedial plan and to offer the court his advice as to whether that plan lawfully remedies the constitutional violations identified in our December 21, 2023, opinion and order. *See* ECF No. 164.

Meanwhile, the Commission adopted several procedures for drawing its revised maps. Two are relevant here. First, the Commission unanimously voted to "establish a map-drawing process" that began "by all Commissioners proceeding with no consideration of race and with race turned off wherever possible on any map drawing software." *See* 1/11/2024 MICRC Tr. at 44-45. That resolution also provided that—after the Commission had "prepared" a draft map in race-neutral fashion—it would send the map to its new Voting Right Act counsel, Mark Braden, for analysis. *Id.* Second, the Commission chose to draw its remedial district lines from a blank slate. *See* MICRC Tr. 1/11/24 at 42; 1/16/24 at 11, 18.

The Commission eventually put forward 10 different districting plans for public comment. Of those 10 plans, a plan called "Motown Sound" received the most public support. Specifically, according to Dr. Jonathan Rodden—whose findings on this point the plaintiffs do not dispute—the Motown Sound plan was "mentioned favorably" by 106 of the 174 people who spoke at the Commission's February 2024 public hearings in Detroit. ECF No. 169-1, Pg. ID 5546. By contrast, the second most-popular map—"Spirit of Detroit"—was mentioned favorably by 17 speakers. *Id.*

As adopted, the remedial plan departs significantly from the Hickory plan, in which we invalidated seven House districts in our December 2023 order. The Hickory plan featured

2

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

"spokes" northward into Oakland and Macomb counties, whose purpose and effect, we found, was to reduce the "black voting age population" ("BVAP") in Detroit-area districts. That plan appeared as follows:



| District No. |            | 1     | 7     | 8     | 10    | 11    | 12    | 14    |
|--------------|------------|-------|-------|-------|-------|-------|-------|-------|
|              | Date       | BVAP  | BVAP  | BVAP  | BVAP  | BVAP  | BVAP  | BVAP  |
| **Hickory**  | 12/28/2021 | 38.03 | 44.29 | 43.70 | 38.79 | 42.82 | 40.99 | 41.11 |

Of the seven districts that we held were unconstitutionally drawn, the Commission's remedial plan completely redrew the boundaries of six—namely, House Districts 7, 8, 10, 11, 12, and 14. The boundaries for those districts now run principally from east to west, rather than north to south. The Commission also materially altered the boundary of House District 1—by removing the northeastern peak of the old district (which stretched into inner Wayne County, as far as Corktown and Woodbridge) and by drawing the new district further south, to encompass both River Rouge and Ecorse. To accommodate the substantial changes to the unconstitutional districts, the Commission also redrew the boundaries of eight other districts in the Detroit area—namely,

3

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

House Districts 2, 3, 4, 5, 6, 9, 13, and 16. As a result of these changes, the number of Detroit-area districts that cross the boundary between Wayne County, on the one hand, and Oakland or Macomb, on the other, dropped from nine to four; and the number of majority-black districts in the Detroit area increased from six to eight. In addition—as to the seven districts at issue here—the remedial plan created three majority-black districts, whereas before there were none.



| District No. | | 1 | 7 | 8 | 10 | 11 | 12 | 14 |
|---|---|---|---|---|---|---|---|---|
| | Date | BVAP | BVAP | BVAP | BVAP | BVAP | BVAP | BVAP |
| **Motown Sound** | 3/1/2024 | 36.11 | 57.97 | 68.39 | 43.82 | 67.27 | 45.85 | 13.63 |

B.

The Commission submitted its remedial House plan to this court on March 1, 2024. Two weeks later, on March 15, Dr. Grofman submitted a report in which he concluded that the Commission had "addressed and remedied the race-related constitutional defects in its previous map." ECF No. 170, Pg. ID 5806 (alterations omitted). Among other things, Grofman observed that the remedial plan both "limit[s] the number" of districts "drawn with a piece of Wayne County

4

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

and a piece of another county extending to north," and generally features more compact districts. *Id*. Grofman also opined that the "scope of the 2024 remedial redrawing was very extensive in terms of total population shifts" across all districts, and that those changes were "necessary to remedy the problems with the previous map while simultaneously assuring population balance in all the affected districts." *Id*. at Pg. ID 5803, 5806.

Meanwhile, on March 8, the plaintiffs filed three objections to the remedial plan. Specifically, the plaintiffs argue that the remedial plan impermissibly favors incumbents elected under the unconstitutional plan; that the remedial plan "possibly" violates the Voting Rights Act by not including more majority-black districts; and that five of the remedial districts were again drawn on the basis of race.

II.

When a court holds that district lines violate federal law, the court must typically afford the relevant state actor an adequate opportunity to prepare its own remedial-redistricting plan. *See McDaniel v. Sanchez*, 452 U.S. 130, 150 n.30 (1981) (collecting cases). During the process of drawing a remedial plan, the Supreme Court has said, the federal court should restrict the state actor only as required by "the clear commands of federal law." *North Carolina v. Covington*, 585 U.S. 969, 979 (2018) (internal quotation marks omitted).

A.

As an initial matter, the plaintiffs allege that the Commission "outsourced" its map-drawing function to a member of the public, Christopher Gilmer-Hill. Specifically, the plaintiffs say that the Commission's remedial plan is virtually identical to a proposed plan (named "Tiger Lily") that Gilmer-Hill submitted through the Commission's public-comment portal in January 2024. And

5

the plaintiffs assert that, because those plans substantially overlap, the Commission simply incorporated Gilmer-Hill's map as its own.

The record does not support that assertion. To the contrary, the contemporary record of the Commission's proceedings shows that Gilmer-Hill took a draft plan configured by the Commission, proposed some changes to that plan, and then submitted it for the Commission's consideration through the public-comment portal. *See* Christopher Gilmer-Hill Public Comment, https://www.michigan-mapping.org/submission/p9928 (last viewed March 27, 2024). Thus—as the Commission's expert, Dr. Jonathan Rodden, points out—the Commission's remedial plan substantially overlaps with Gilmer-Hill's plan because Gilmer-Hill's plan retained some 84% of what the Commission had already drawn. *See* ECF No. 169-1, Pg. ID 5551. True, the Commission later adopted some of the changes that Gilmer-Hill had proposed. *See, e.g.*, 1/25/24 MICRC Tr. at 21, 48-49. But that hardly means—as the plaintiffs allege—that the Commission "outsourced" its map-drawing function to Gilmer-Hill. On the record before us here, rather, that allegation is hyperbole.

B.

1.

The plaintiffs' first objection is that the remedial plan impermissibly favors Detroit-area incumbents, including the seven representatives elected in the unconstitutional districts in 2022. Specifically, the plaintiffs point out that, under the remedial plan, none of the Detroit-area House incumbents reside in the same district—which means that none of them will face off against each other in the next election.

The plaintiffs see two problems with that aspect of the remedial map. First, the plaintiffs say, "the Michigan Constitution expressly provides that 'districts shall not favor or disfavor an

6

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

incumbent elected official or candidate.'" Pl. Obj. at 11 (quoting Mich. Const. art. IV, § 6(13)(e)) (alteration omitted). That is true enough. But the Supreme Court has long held that "federal courts are barred from intervening in state apportionment in the absence of a violation of federal law." *Voinovich v. Quilter*, 507 U.S. 146, 156 (1993) (alteration omitted); *see Covington*, 585 U.S. at 979. And the plaintiffs offer no basis to conclude that we can intervene on the basis of state law here.

Second, the plaintiffs argue that—by avoiding contests between incumbents—the remedial plan "perpetuates the discriminatory effect" of the old plan. Pl. Obj. at 11. That argument runs as follows: under the remedial plan, each Detroit-area incumbent is placed in his or her own district; incumbents have advantages that render them "virtually" certain to win again; and thus, each incumbent elected in 2022—including the seven elected in unconstitutional districts—will be elected again, thereby "perpetuating the constitutional harm" of the prior districts. *Id.* at 1, 11.

That argument assumes a degree of passivity among Detroit-area voters that finds little support in the record here. To the contrary, the record shows an energized electorate that was profoundly unhappy with the racial gerrymander that we later invalidated in our December 2023 order. And in six of the seven districts at issue here, African-American voters will have markedly more power to elect their candidate of choice in 2024 than they did in 2022. Specifically, three of the redrawn districts (7, 8, and 11)—as opposed to zero in the Hickory plan—are majority-black. In addition—according to the Commission's new VRA counsel—three other redrawn districts (1, 10, and 12) are now "opportunity" districts (in VRA jargon), based on an analysis of *primary-* election data. *See* ECF No. 169-2, Pg. ID 5578; ECF No. 168-7, Pg. ID 5498. That is exactly the kind of data the plaintiffs have long argued is relevant here; and the plaintiffs do not dispute that

7

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

black voters in Districts 1, 10, and 12 will have an opportunity to elect their candidates of choice. Whether the voters in these six districts choose to retain their incumbents, therefore, is up to them.

That leaves one redrawn district with an incumbent representative and a relatively low BVAP. But the Supreme Court has never suggested that a remedial plan must arrange for the removal of every incumbent in the old plan. To the contrary, that would assign the federal courts a more intrusive role in the redistricting process than the Supreme Court has envisioned. *See, e.g., Abbott v. Perez*, 585 U.S. 579, 603 (2018) ("Federal-court review of districting legislation represents a serious intrusion on the most vital of local functions."); *Chapman v. Meier*, 420 U.S. 1, 27 (1975) ("Reapportionment is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court.").

The two district-court cases that the plaintiffs cite (in one of which the court was partially reversed) are clearly distinguishable from this one. *See Covington v. North Carolina*, 283 F. Supp. 3d 410, 431 (M.D.N.C. 2018), *aff'd in part and rev'd in part*, 585 U.S. 969 (2018); *Jacksonville Branch of NAACP v. City of Jacksonville*, No. 3:22-CV-493-MMH-LLL, 2022 WL 17751416, at *1 (M.D. Fla. Dec. 19, 2022). In each of those cases, the district court found that the relevant state actor had made only minimal changes to the districts that the court had found unconstitutional. *See Covington*, 283 F. Supp. 3d at 435-40; *Jacksonville*, 2022 WL 17751416, at *16-17. Here, by contrast, the Commission completely redrew Districts 7, 8, 10, 11, 12, and 14. As noted above, those districts now run east-west rather than north-south. Indeed, in two of them—Districts 7 and 11—there is a "complete disjunction" between the old district and the new. ECF No. 170, Pg. ID 5803 n.7. District 1 was also significantly revised, though not as much as other districts were. But in all these districts the incumbent will face a substantially different group of voters than the ones

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

who elected him or her in 2022—thereby eroding the advantages of incumbency. For all these reasons, we overrule this objection.

2.

Another of the plaintiffs' objections is that the remedial plan "possibly" violates the VRA—because the Commission drew only eight majority-minority districts, whereas (the plaintiffs say) it could have drawn ten. Yet the plaintiffs make close to zero effort to show that the remedial plan actually violates the VRA. Nor do they offer any authority for the proposition that—when a state map is struck down on Equal Protection grounds—the state bears the burden of affirmatively demonstrating that its remedial plan does not violate the VRA. And this objection "embrac[es] just the sort of uncritical majority-minority district maximization that" the Supreme Court has "expressly rejected." *Wisconsin Legislature v. Wisconsin Elections Comm'n*, 595 U.S. 398, 403 (2022) (citing *Johnson v. De Grandy*, 512 U.S. 997, 1017 (1994)). Indeed, that kind of race-conscious "maximization" can itself give rise to a racial gerrymander. *Id*. at 404. We overrule this objection.

3.

The plaintiffs' remaining objection—in contrast to the preceding one, which invited racial line-drawing—is that, in five districts in the remedial plan, the Commission impermissibly sorted voters on the basis of race. Three of those districts are House Districts 16, 17, and 18. We have not adjudicated those districts to be unconstitutional—indeed we have not adjudicated any claim about them at all—because individual voters have standing to challenge only the district in which they live. *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 263 (2015); *see United States v. Hays*, 515 U.S. 737, 744-45 (1995). And here the plaintiffs admit that none of them live

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

in Districts 16, 17, or 18. Pl. Obj. at 13. The plaintiffs therefore lack standing to challenge anything about those districts.

That leaves Districts 10 and 12, as to which the plaintiffs' argument is lightly developed. Their argument is that these districts retained a "racially dilutive gerrymander" in the remedial plan—specifically, the plaintiffs say, because Commissioner Eid "directed the amendment of House Districts 10 and 12, including the pairing of Eastpointe, Harper Woods, and portions of northeast Detroit with the wealthy, predominately white lakeshore communities of St. Clair Shores and the Grosse Pointes." Pl. Obj. at 16-17.

The plaintiffs are correct that, on January 31, Eid revised Districts 10 and 12 as they were then set forth in two draft maps—namely the Spirit of Detroit, versions B and C (neither of which were put forward for public comment). *See, e.g.*, 1/31/24 MICRC Tr. at 47-50; 108. But the next day, when Commissioner Kellom began revising the districts, she discarded all of Eid's revisions and began working on her own map, which she called Motown Sound. 2/1/24 MICRC Tr. at 33. Kellom's changes did overlap to a large extent with those that Eid had suggested the day before. But Kellom explained that her goal was to "draw a map that is a mix of what different COIs have asked for." 2/1/24 MICRC Tr. at 35, 39. That is not to say that Kellom's invocation of communities of interest was sacrosanct. But Kellom's assertion in that regard has some basis in the record, given the Commission received nearly a dozen public comments asking for the Commission to keep Harper Woods together with the Grosse Pointe communities. *See, e.g.*, ECF No. 169-4, Pg. ID 5783-5796. And the plaintiffs' assertion that these districts were redrawn "with the same racially dilutive goal as the Hickory plan" is nothing more than conclusory. Pl. Obj. at 16. Indeed, that assertion does not square with the facts: the BVAP in District 10 rose from 38.8% in the Hickory Plan to 43.8% in the remedial plan, and in District 12 rose from 41% to 45.9%.

10

No. 1-22-cv-272
*Agee et al. v. Benson et al.*

Moreover, in both districts, as revised in the remedial plan, a plurality of voters in the Democratic primary are African-American; and in both districts—based on primary data, again in an analysis that the plaintiffs do not challenge here—black voters will have an opportunity to elect their candidates of choice. *See* ECF No. 169-2, Pg. ID 5578; ECF No. 168-7, Pg.ID 5498. We therefore overrule this objection.

\*    \*    \*

On the record and objections before us here, federal law provides us no basis to reject the Commission's remedial House plan. The plaintiffs' objections are overruled, and the Secretary of State may proceed to implement the Commission's remedial House plan for the 2024 elections.

**IT IS SO ORDERED.**

Date: March 27, 2024

/s/ Raymond M. Kethledge
    Raymond M. Kethledge
    United States Circuit Judge

/s/ Paul L. Maloney
    Paul L. Maloney
    United States District Judge

/s/ Janet T. Neff
    Janet T. Neff
    United States District Judge