UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DONALD AGEE, JR. *et al.*,                                    No. 1:22-cv-272
                          Plaintiffs,                        Three-Judge Court.

v.

JOCELYN BENSON, in her official
capacity as the Secretary of State
of Michigan, *et al.*,
                          Defendants.

<u>REPORT OF THE REVIEWING SPECIAL MASTER, BERNARD GROFMAN
RE MICHIGAN STATE SENATE</u>

July 11 , 2024

I.      **BACKGROUND**

1.  The Court, in its opinion of December 21, 2023, unanimously held that the Michigan Independent Citizens Redistricting Commission (hereafter MI-IRC) violated the Equal Protection Clause of the U.S. Constitution when it drew the boundaries of seven State House districts and six State Senate districts predominantly on the basis of race. It enjoined the Secretary of State, Jocelyn Benson, from holding further elections in those districts as they were then drawn. It allowed the MI-IRC to propose new maps for the State House and the State Senate to remedy the violations found in its initial submissions, with deadlines specified by the Court, and time allowed for comment. In its scheduling order (filed 1/11/2024), the Court appointed two special masters, one (Dr. Bernard Grofman) to review any new map for the State House proposed by the MI-IRC to remedy the violations found by the Court, and one (Dr. Michael Barber) to prepare a contingency map in the event that the new map for the State House proposed by the MI-IRC again failed to satisfy the Equal Protection Clause of the U.S. Constitution. Pursuant to the Court's instructions I filed a Report on the Michigan State House remedial map on March 15, 2024

1

2. I have no conflict of interest in either the State House or the State Senate portion of the litigation, and my time schedule has permitted me to now serve in my reappointment as the Reviewing Special Master in the State Senate portion of the case pursuant to the Court's specified deadlines.

3. I reviewed the relevant documents in the case, with particular attention to the Court opinion and the Court order with respect to State Senate elections. I also reviewed the geographic and demographic features of the proposed remedial Senate map with a focus on the area in and around Detroit and Wayne County which was the area of constitutional concern. In particular, I examined demographic and geographic information for Michigan state Senate districts in the new map proposed by the Michigan Commission in late June. I also compared the new proposed map to the map previously found to have unconstitutional elements. My focus is on senate districts 1, 3, 6, 8, 10, and 11, since these are the only ones found unconstitutional. I considered how the new proposed map sought to remedy the equal protection and voting rights issues that led to the invalidation of the previous map.

4. I incorporate portions of my previous Report on the Michigan State House in my present Report

5. As a political science specialist on elections, redistricting, and voting rights I am familiar with the issues in the case -- as viewed from a social science perspective. I have served as court-appointed consultant or Special Master for federal courts in a number of recent cases involving the vote dilution standards of the Voting Rights Act of 1965 as subsequently amended and/or the equal protection standard laid down in the *Shaw v. Reno* line of jurisprudence, and I have also recently worked for courts in state court cases involving issues of partisan gerrymandering.[1]

---

[1] Grofman is Distinguished Research Professor of Political Science at the University of California, Irvine. He has over 350 published articles, book chapters and research notes, along with 6 co-authored books (from Cambridge University Press (4), Oxford University Press (1) and Yale University Press (1)), and over 20 co-edited books, with an extensive corpus of research on topics such as redistricting, voting rights, comparative electoral rules, and political party competition. In 2010 he received an honorary Ph.D. from the University of Copenhagen for his work on electoral systems. In 2017 he received the Charles Merriam Award of the American Political Science Association (awarded biennially) for lifetime achievement in the field of applied Public Policy. His work has been cited by members of the U.S. Supreme Court in around a dozen cases over a period of four decades. Within the past ten years he has repeatedly served as a special master or senior consultant to state and federal courts, including congressional and legislative redistricting cases in Virginia, North Carolina, New York, and Wisconsin, and cases involving local jurisdictions in Georgia, Utah, and Virginia. Previously he had worked as an expert witness or consultant to both Republican and Democratic organizations, as well as to the NAACP and the Voting Rights Section of the U.S. Department of Justice in cases in some of these same states but also in another half dozen states.

6. To assist me I brought in a technically sophisticated former student, Zachary Griggy who had previously served as my assistant on several previous cases where I was the special master or senior consultant to a court, including working as my research assistant on the State House portion of this litigation.

7. My analyses make use of theoretical foundations rooted in social science methodology and my own previous research and service as a special master or senior court-appointed consultant.

   A. There are conflicting considerations that go into map-making which inevitably involve tradeoffs among competing desiderata,[2] and thus there is no such as a perfect map. Nonetheless, there are some criteria which must be satisfied in terms of the U.S. Constitution and standards derived from it, such as "one person, one vote" as well as the Supreme Court's interpretations of the implications of the Civil War Amendments and the role of Congress in implementing them, i.e., the racial preponderance test specified in *Shaw v. Reno*, 509 U.S. 630 (1993), and the statutory test for vote dilution specified in *Thornburg v. Gingles*, 478 U.S. 30 (1986).

   B. We may classify districts in terms of the likely ability of members of a given (protected) racial or ethnic community to elect candidates of choices into three mutually exclusive and logically exhaustive categories (with further subdivisions possible within the cases that fall into the third category):

      i. *majority-minority districts* -- where a given minority constitutes a majority of the citizen voting age population in the district. *See Bartlett v. Strickland*, 556 U.S. 1 (2009).

---

[2] For example, in Michigan, there are a variety of criteria specified in the state constitution, as amended in 2018.
 (a) Districts shall be of equal population as mandated by the United States Constitution and shall comply with the Voting Rights Act and other federal laws.
 (b) Districts shall be geographically contiguous. Island areas are considered to be contiguous by land to the county of which they are a part.
 (c) Districts shall reflect the state's diverse population and communities of interest. Communities of interest may include, but shall not be limited to, populations that share cultural or historical characteristics or economic interests. Communities of interest do not include relationships with political parties, incumbents, or political candidates.
 (d) Districts shall not provide a disproportionate advantage to any political party. A disproportionate advantage to a political party shall be determined using accepted measures of partisan fairness.
 (e) Districts shall not favor or disfavor an incumbent elected official or a candidate
 (f) Districts shall reflect consideration of county, city, and township boundaries
 (g) Districts shall be reasonably compact.
Mich. Const. art. IV, § 6(13).

ii.    *realistic opportunity to elect districts*—There are two conditions that need to be satisfied. First, a given minority must constitute a sufficiently substantial proportion of the eligible electorate in the primary electorate of one of the major political parties that they constitute a majority of that primary electorate even though they do not constitute a majority of the overall (voting) population in the district. Second, the majority of the voters in the district belong to the party of whose primary voters the minority community constitutes a majority. In this case, if the minority community is cohesive, then it can elect a candidate of choice for the party nomination in that primary. And, if there is sufficient crossover voting for the nominee of that party from supporters of the party who are not in that same racial or ethnic group, then the group can be successful in electing a candidate of its choice (the primary winner). We note, however, that a "realistic opportunity to elect district" is not the same thing as a "safe seat." If there is not sufficient support for the minority candidate of choice who is the party nominee of a given party from non-minority members of that same  party, then the minority can lose the general election. Even a majority-minority district may not be a "safe seat"  if the minority community is not politically cohesive[3] or if there are substantial turnout differences between minority and non-minority voters. On the other hand, we also note that a "realistic opportunity to elect" district is not the same thing as what has been called an "influence" district. Unlike a mere "influence district," where the minority community might be expected to be large enough to hope to have its views seriously taken into account by the elected representative, in a realistic "opportunity to elect" district, as the labeling indicates, the minority community can expect to have a realistic opportunity to <u>choose</u> a representative whom it prefers via a party primary and then the general election.

iii.    *districts that do not fall into either of the two categories above.*

C.  While *Bartlett v. Strickland*, 556 U.S. 1 (2009) clarifies the language of *Thornburg v. Gingles*, 478 U.S. 30 (1986) on the standards for litigating a claim of vote dilution under Section 2 of the Voting Rights Act, by indicating that such a claim  requires (at minimum)  that the plaintiffs show that an

---

[3] Reduced minority group political cohesion may occur in settings where there is a non-minority incumbent. In situations where there are multiple minority candidates in the primary, the voting patterns should be regarded as potentially racially polarized when the minority community gives its votes to candidates from that community. Here, while the voting pattern may not reflect political cohesion in support for a <u>single</u> minority candidate of choice, I would still characterize support of the minority community going almost entirely to candidates of that community as a politically cohesive pattern of choice. But the absence of concentration of the minority vote may nonetheless lead to the electoral loss of a minority candidate of choice favored by the plurality of minority voters.

additional (geographically compact) district in which the minority community constitutes a majority of <u>the citizen voting age population</u> can be drawn. Nonetheless, subsequent cases have made it clear that jurisdictions are not required to draw citizen voting age majority-minority districts to satisfy the requirements of the Voting Rights Act. Defendants can rebut a claim that they have violated the VRA by providing a compelling showing that the district drawn in lieu of the majority minority citizen voting age district is one that provides a realistic "opportunity to elect" to the minority community. *See Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254 (2015). The Alabama standard has been implemented in subsequent cases at the trial court level, such as *Personhuballah v. Alcorn*, 155 F. Supp. 3d 552 (E.D. Va. 2016), a Virginia congressional case in which I served as special master for a three-judge federal court.

D.  Relatedly, while it might appear that there is an inherent conflict between as the requirement that race not be a preponderant motive in map-making, as laid down in *Shaw v. Reno*, 509 U.S. 630 (1993), and the requirements for race-conscious districting in the Voting Rights Act of 1965[4], this issue has also been clarified in *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254 (2015). *Alabama* makes it clear that, when the use of race is required for the implementation of the Section 2 non-vote-dilution standard of the Voting Rights Act of 1965 as subsequently amended, this use of race is constitutionally permitted. [5]

E.  We also note that the right that is protected is for the minority community to have an equal opportunity to elect a candidate of choice. That candidate need not be a member of the minority community, though usually s/he is. On the other hand, even in districts where that minority community is not a majority

---

[4] Using the language in *Thornburg v. Gingles*, 478 U.S. 30 (1986), we note that Section 2 prohibits denying minority voters "an equal opportunity' to `participate in the political process and to elect representatives of their choice'" where the minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district" and is "politically cohesive," and where the majority "votes sufficiently as a bloc to enable it ... to defeat the minority's preferred candidate." These are sometimes referred to as the three *Gingles factors.*

[5] *Shaw* holds that map-drawers either not subordinate "traditional districting principles" to racial considerations, 509 U.S. at 642, or, if they do, the district lines must be "narrowly tailored to further a compelling governmental interest," *id.* at 643. In *Personhuballah*, a *Shaw*-type case, that three-judge Court cited previous rulings to observe that: "On its face, § 2 [of the Voting Rights Act] does not apply to a court-ordered remedial redistricting plan, but we will assume courts should comply with the section when exercising their equitable powers to redistrict." 155 F. Supp. 3d at 565 (quoting *Abrams v. Johnson*, 521 U.S. 74, 90 (1997)).

of either the primary or general electorate, there may be circumstances in which the minority community elects a candidate of choice and/or where descriptive representation of the minority community occurs.

F. There is now a well-developed repertoire of mutually complementary social science tools to estimate when a district constitutes a "realistic opportunity to elect." For partisan elections, such tools must take into account the two stage nature of those elections, i.e., the fact that they normally involve both a primary and a general election. Amng the most common techniques are the use of statistical tools such as ecological inference, ecological regression, and homogenous precinct analysis, to estimate actual voting patterns (and turnout levels) in particular elections of different racial (or ethnic) groups using data on the racial (and ethnic) composition of voting tabulation units (precincts). Another approach projects into the districts in a challenged or proposed map the results from one or more statewide elections (a technique sometimes known as "recompiling."). Relatedly, estimated turnout data by race from statewide elections/statewide primaries may be projected into proposed districts to see if the minority community had a potential majority of the primary electorate of a given party in the various districts. Similarly, using data on a set of statewide elections, such as that provided in Dave's Redistricting App, we may examine which party is expected to constitute a majority of the general election electorate in the various proposed districts.[6]

---

[6] For a discussion of some of these techniques, *see* Bernard Grofman, *A Primer on Racial Bloc Voting Analysis*, in The Real Y2K Problem: Census 2000 Data and Redistricting Technology (Nathaniel Persily ed., 2000); Bernard Grofman, Lisa Handley & David Lublin, *Drawing effective minority districts: A conceptual framework and some empirical evidence*, 79 N.C. L. Rev. 1383 (2001); David Lublin, Lisa Handley, Thomas Brunell, & Bernard Grofman, *Minority Success in Non-Majority Minority Districts: Finding the 'Sweet Spot,'* 5 J. Race, Ethnicity, and Pol. 275 (2020)

## II.      EVALUATING THE PROPOSED MI-IRC SENATE MAP

1. The Michigan Independent Redistricting Commission was ordered to redraw Michigan State Senate Districts 1, 3, 6, 8, 10, and 11 and any other districts as reasonably necessary to cure the unconstitutional racial gerrymanders no later than June 27, 2024. The proposed remedial map offered by the Michigan Independent Redistricting Commission redrew fourteen Senate districts: 1-11, 13, 23 and 24.

2. The MI-IRC has assisted evaluations of its new proposed State Senate map by providing extensive documentation along with block equivalency and shape files. I have worked with this data using Dave's Redistricting App, a free publicly available, easy to use software package. That allows me to examine overall populations, voting age populations, and citizen voting age populations by race and Hispanic heritage as well as providing projected outcomes of partisan elections into the districts. DRA also provides compactness scores on a variety of compactness measures, and a variety of measures of partisan bias, The MI-IRC website also provide links to its own primary-based turnout-by-race VRA analyses, its own partisan bias analyses, and its own report on compactness.

3. As noted by plaintiffs' expert Sean Trende in his expert witness report attached to the Plaintiffs' statement of non-Objection of July 2, 2024, the new changed districts are, on average, (slightly) more compact than their 2022 equivalents. Moreover, the heavily minority districts are not substantially less compact than the non-minority districts. In addition, Trende notes that the new proposed map has the same overall likelihood of electing Democrats as the previous map. And there are no issues with respect to population equality across districts in the new proposed Senate map.

4. Most important for evaluative purposes are the ways in which the lines in the new map were changed to be responsive to the need to remedy the specific constitutional violations involving racial preponderance in map-drawing. I identify below three key features of the new proposed map.


(a) The scope of the 2024 remedial redrawing of the State Senate was extensive in terms of total population shifts across the fourteen districts. In particular, if we look at which district in the 2022 map provided the plurality of the population in each district of the 2024 proposed map, especially after we recognize the complication of an imperfect equivalence between the districts in the 2022 map and those with the same number in the 2024 proposed map (see especially districts 6 and 8). As shown in plaintiffs' expert Sean Trende's expert witness report attached to the Plaintiffs' statement of July 2, 2024, we find (Figure 2) that, among these 14 districts, the overlap between the 2024 proposed map in terms of population (core retention) and the 2022 map is only 65.5%. However, even this low proportion is misleading vis-à-vis how much the map has been changed in ways relevant to remedying the previously identified constitutional violations. As Dr. Trende notes, in none of the six invalidated districts is there more than a 60% overlap with the district's previous configuration. Indeed, via a retabulation of the data in Trende's expert

7

witness report, the most dramatic population changes come in the six invalidated districts. The data reported by Trende on core retention (Figure 2) shows that the average population continuity in those  six districts is only  53.8%.[7]

(b) The MI-IRC has made substantial demographic shifts in all six of the districts that were invalidated in the previous litigation, especially with respect to African-American voting age population percentages that had been found to have been deliberately lowered in the process of line-drawing. The rejected map had no African American majority districts.[8]  The new proposed map now has two of the six unconstitutional districts as African American majority districts with respect to voting age population (VAP) or citizen voting VAP  ca. 2020 (districts 3 and 6) and a third district (district 1) whose heavily African-American population clearly demonstrates it to be a minority opportunity district vis-à-vis both the general election and the Democratic party primary.[9]   In addition, except for district 7, whose  status is somewhat ambiguous (see discussion below) and district 2 (currently represented by a minority incumbent) all the other redrawn districts are overwhelmingly non-minority in composition and are represented by White incumbents.

---

[7] There are two different ways to calculate core retention: in one we match 2024 districts with the districts that have the same number in 2022; in the other we match 2024 districts with the 2022 district it most resembles in terms of population overlap. I have calculated core retention in both ways and end up with essentially identical conclusions: the districts found to be unconstitutional have, on average, been dramatically changed, far more so that is the case, on average, for the districts not found to be unconstitutional. Indeed, the core retention percentages I get from the two calculations are identical to two significant digits (table omitted). The invalidated districts have kept, on average, barely more than half their previous population

[8] Dearborn and the MENA population in its vicinity continues to be maintained reasonably intact in a single district in the new proposed  district configuration.

[9] However, I should also note that, even under the previous unconstitutional map, districts 1 and 6 have African American incumbents and district 3 has a minority incumbent -- although my understanding is that some of those incumbents will be prevented by term limits from running again.

| unconstitutional districts -as redrawn in 2024 proposed remedial Senate map | African-American CVAP est. 2020 (DRA) | White CVAP est. 2020 (DRA) | Dem Partisan Lean (DRA) | Rep Partisan Lean (DRA) |
|---|---|---|---|---|
| 1 | 50.3 | 35.8 | 80.4 | 17.1 |
| 3 | 81 | 14.1 | 94 | 4.2 |
| 6 | 82.9 | 13.6 | 90.1 | 8 |
| 8 | 10.3 | 79.9 | 54.3 | 43.5 |
| 10 | 16.4 | 75.7 | 65.6 | 31.4 |
| 11 | 19.4 | 74.7 | 54.4 | 42.8 |
| other changed districts of special interest | | | | |
| 2 | 10 | 82.5 | 62.1 | 35.1 |
| 7 | 51.2 | 40.4 | 68.7 | 29.5 |

9

(c) Moreover, the MI-IRC has made substantial geographic shifts in all six of the districts that were invalidated in the previous litigation. The 2022 map had an excessive number of extrusions that placed pieces of Wayne County (usually pieces with substantial Black population) together in a district with a portion of a different county in such a fashion as to limit the Black population share in the district. See second tabulation below. The 2024 proposed map does not have this property, since African American population in Wayne/Detroit has, along straightforward geographic contiguity lines, been aggregated in reconfigured proposed districts 1, 3, and 6. And populations in other counties have also been greatly consolidated in districts in the proposed remedial map. See first tabulation below with county-level data on the proposed remedy map and compare it with the second tabulation on the actual 2022 map.

| Proposed 2024 District | Wayne Co. | Oakland Co. | Macomb Co. | Other Cos. |
|---|---|---|---|---|
| 1 | 100% | | | |
| 2 | 100% | | | |
| 3 | 100% | | | |
| 4 | 100% | | | |
| 5 | 100% | | | |
| 6 | 100% | | | |
| 7 | | 100% | | |
| 8 | 48.16% | 51.84% | | |
| 9 | | 68.20% | 31.80% | |
| 10 | | 71.92% | 28.08% | |
| 11 | | | 100% | |
| 13 | | 100% | | |
| 23 | | 89.01% | | 10.99% |
| 24 | | | 100% | |

Highlighted districts are the same number as overturned district

| 2022 Senate Districts | Wayne Co. | Oakland Co. | Macomb Co. | Other Cos. |
|---|---|---|---|---|
| 1 | 100% | | | |
| 2 | 100% | | | |
| 3 | 62.86% | 18.48% | 18.65% | |
| 4 | 100% | | | |
| 5 | 100% | | | |
| 6 | 76.68% | 23.32% | | |
| 7 | 10.09% | 89.91% | | |
| 8 | 36.70% | 63.70% | | |
| 9 | | 71.16% | 28.84% | |
| 10 | 36.84% | | 63.16% | |
| 11 | 4.67% | | 95% | |
| 13 | 26.82% | 76.18% | | |
| 23 | | 100% | | |
| 24 | | 38.82% | 50.03% | 11.15% |

Highlighted districts are the same number as overturned district

5. Dr. Trende's expert witness report (at p. 7) indicates that it is possible to draw four Black majority citizen voting age districts for the Michigan Senate in the vicinity of Wayne County and Detroit. I have independently verified that this assertion is correct.

6. The Commission labels District 7 an additional (fourth) realistic opportunity to elect district, because, by their estimates, African American potential voters in the Democratic primary outnumber potential non-African American voters in that primary. But the margin they estimate is very small (31.2% vs. 30.6%). See 405_CraneA1_VRA_Map. I regard the classification of District 7 as a "realistic opportunity to elect" district as somewhat problematic, though not obviously wrong, since my own calculations as to citizen voting age population (based on data in Dave's Redistricting App) also suggest that African-American potential voters in the Democratic primary in District 7 are likely to outnumber potential non-African-American voters in that primary, but not by a large margin.

7. The most straightforward way to draw an additional African-American majority district is in terms of modification of the proposed remedial map by converting District 7 to a majority African-American district by adding a small portion of African-American population from Detroit in a way that does not affect the present three majority minority or realistic opportunity to elect districts in the Detroit and Wayne area.  But African American population can also be added to District 7 by slightly reconfiguring the district and its neighbors even without drawing on population from Detroit in such a fashion that an argument for District 7 being a "realistic opportunity to elect" district (though not actually a majority African-American district) can be substantially strengthened. Thus, there is a potential Section 2 issue vis-à-vis District 7. However, because the Court has not addressed Section 2 claims and because in my view a resolution of such claims would necessarily require an evidentiary hearing and expert witness testimony beyond what has been provided by the Commission or the trial record, and because District 7 was not previously held to be unconstitutional, and was apparently not substantially changed from its previous form in the 2022 redrawing of the Senate map, I regard concerns about District 7 vis-à-vis Section 2 of the Voting Rights Act as falling outside the scope of my review of the proposed remedial Senate map vis a-vis racial preponderance issues. I regard such concerns as best addressed, if at all, in new litigation under Section 2 of the VRA after the next election has provided additional evidence about the degree of minority opportunity found in district 7.[10] However, this is, of course, a legal question for the Court to determine.

8.      Absent constitutional violations, judicial deference is given to the map drawn by the entity legally entitled to do so. There are always multiple ways in which maps can be drawn. I did not identify major flaws with the MI-IRC new proposed Senate map that would suggest it failed to address the race-related constitutional concerns of the Court

---

[10] However, I would also note that, if there were a non-minority incumbent present in district 7 in the next election, the ability of that district to provide its full potential for opportunity of the minority community to elect a candidate of choice would be delayed But my understanding of Michigan term limit laws (which may be in error) indicates that the present incumbent would be term limited out.

13

with respect to the districts found to be unconstitutional. In sum, I regard the proposed
Senate remedial map as one which, from a social science point of view, adequately
addresses the constitutional concerns of the Court by offering a plan in which race is not a
preponderant motive and in which the criteria specified by the Michigan Constitution are
satisfied. The conclusion that the new proposed map satisfactorily addressed the issues
that led to the previous Senate map being found unconstitutional is also reached by
Plaintiffs in their Statement of Non-Objection on July 2, 2024.


*Bernard Grofman*

July 15, 2024

14