UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| DONALD AGEE, JR. et al., <br><br> Plaintiffs, <br><br> v. <br><br> JOCELYN BENSON, et al., <br><br> Defendants. | Case No. 1:22-CV-00272-PLM-RMK-DML <br><br> **RESPONSE OF THE MICHIGAN INDEPENDENT CITIZENS REDISTRICTING COMMISSION TO REPORT OF THE REVIEWING SPECIAL MASTER REGARDING MICHIGAN STATE SENATE MAP** |

The reviewing special master, Dr. Grofman, agrees with the parties that the remedial senate plan (the Crane plan) of the Michigan Independent Citizens Redistricting Commission (the Commission) "adequately addresses the constitutional concerns of the Court by offering a plan in which race is not a preponderant motive and in which the criteria specified by the Michigan Constitution are satisfied." ECF No. 188 at 14, PageID.5922. There is no basis for this Court to enjoin the Crane plan. *See North Carolina v. Covington*, 585 U.S. 969, 979 (2018) (per curiam); *Abrams v. Johnson*, 521 U.S. 74, 85 (1997) ("In the absence of a finding that the legislature's reapportionment plan offended either the Constitution or the Voting Rights Act," a federal court is "'not free . . . to disregard the political program' of the state legislature." (citation omitted)).

Most importantly, Dr. Grofman agrees with the parties that the Crane plan "has made substantial demographic shifts in all six of the districts that were invalidated in the previous litigation." ECF No. 188 at 8, PageID.5916. Because it does not carry forward past racial motivation this Court found in the prior plan (the Linden plan), the Crane plan remedies the violation. *See Covington*, 585 U.S. at 978. Dr. Grofman also finds no basis to believe new racial considerations entered the line-drawing. *See* ECF No. 188 at 14, PageID.5922 (concluding

that "race is not a preponderant motive"). There is then no argument or evidence that the Crane plan violates the Constitution.

Like Plaintiffs' expert, Dr. Trende, Dr. Grofman offers no objection founded in the Voting Rights Act (the VRA). But, like Dr. Trende, Dr. Grofman's position on VRA compliance is more tentative than the case warrants. The Commission responds to his VRA position here.

### A. The Court Has No Legal or Evidentiary Basis to Enjoin the Crane Plan

As an initial matter, Dr. Grofman acknowledges that the record is insufficient to establish a VRA violation and proposes that the question be left for future litigation. ECF No. 188 at 14, PageID.5922. This conclusion, if nothing else, renders an injunction untenable. For one thing, the VRA question Dr. Grofman raises pertains to Crane plan's district 7 (SD7). District 7 in the Linden plan was not enjoined, and no Plaintiff has been shown to reside in SD7 as redrawn. Hence, it is not established that the Court has jurisdiction to consider potential defects in SD7. *See United States v. Hays*, 515 U.S. 737 (1995); *see* ECF No. 175 at 9–10, PageID.5854-55.

Moreover, VRA liability cannot be found unless the "exacting requirements" of Section 2 are met. *Allen v. Milligan*, 599 U.S. 1, 30 (2023). The Court would first have to find that the three so-called *Gingles* preconditions are proven: (1) "the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district," (2) "the minority group must be able to show that it is politically cohesive," and (3) "the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Thornburg v. Gingles*, 478 U.S. 30, 50–51 (1986); *see Abrams*, 521 U.S. at 91–92. "If a plaintiff

makes that showing, it must then go on to prove that, under the totality of the circumstances, the district lines dilute the votes of the members of the minority group." *Abbott v. Perez*, 585 U.S. 579, 614 (2018).

No evidence meets these standards. This Court overruled VRA objections to the house remedial plan (Motown Sound) because Plaintiffs made "close to zero effort to show that the remedial plan actually violates the VRA." ECF No. 175 at 9, PageID.5854. Here, there is *no* VRA-based objection. Nor could there be. As to the second and third preconditions, Dr. Grofman provides no evidence of minority cohesion or legally significant white bloc voting. *See Growe v. Emison*, 507 U.S. 25, 42 (1993) ("Section 2 'does not assume the existence of racial bloc voting; plaintiffs must prove it.'" (citation omitted)). As to the first precondition, Dr. Grofman proposes "that it is possible to draw four Black majority citizen voting age districts for the Michigan Senate in the vicinity of Wayne County and Detroit." ECF No. 188 at 13, PageID.5921. But the first precondition is not so easily satisfied. Proposed majority-minority districts must be "reasonably configured," *Wisconsin Legislature v. Wisconsin Elections Comm'n*, 595 U.S. 398, 402 (2022), which requires compliance with "traditional districting principles such as maintaining communities of interest and traditional boundaries," *Abrams*, 521 U.S. at 92 (citation omitted). There is no evidence before the Court satisfying that standard. As shown below, § C, Dr. Grofman's discussion of alternative configurations suggests that the standard cannot be met.

Finally, the Court cannot in this posture conclude that Section 2 liability exist under the totality of the circumstances. *See Wisconsin Legislature*, 595 U.S. at 405.

### B. All Probative Evidence Shows That the Crane Plan Provides the Opportunity Dr. Grofman Suggests May Be Required

Not only is there an absence of evidence showing a VRA defect; overriding evidence proves there is no defect. VRA liability cannot lie without proof of "the possibility of creating more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice." *Johnson v. De Grandy*, 512 U.S. 997, 1008 (1994). Dr. Grofman and Dr. Trende both propose that the requisite number of opportunity districts in Metropolitan Detroit is four. ECF No. 185-1 at 7, PageID.5904; ECF No. 188 at 13, PageID.5921. While that assertion is like wrong, *see* § C, *infra*, the mark is satisfied in all events.

Dr. Grofman agrees with the Commission that three Detroit-area districts (SD1, SD3, and SD6) in the Crane plan are "clearly" opportunity districts. ECF No. 188 at 8, PageID.5916. Indeed, accounting for citizenship, each (including SD1) is a majority-minority district.[1] *See id.* at 9, PageID.5917. Regardless, Dr. Grofman is correct that, while an *illustrative* district proffered to establish Section 2 liability must be a majority-minority district, *see Bartlett v. Strickland*, 556 U.S. 1, 18, (2009) (plurality opinion), an enacted district challenged under Section 2 can *satisfy* the VRA even if it falls below the majority-minority mark, *Cooper v. Harris*, 581 U.S. 285, 287 (2017); ECF No. 188 at 4–5, PageID.5912-13. By consequence, because SD1 clearly affords at least equal Black opportunity, it satisfies the VRA whether or not it is considered a majority-minority district. ECF No. 188 at 8, PageID.5916.

---

[1] Citizenship (viewed through the Citizen Voting Age Population (CVAP) metric) is highly probative, given that non-citizens lack voting rights. *See League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 429 (2006).

Dr. Grofman, however, questions the Commission's view that SD7 is also an opportunity district (for a total of four), calling that assertion "somewhat problematic, though not obviously wrong." ECF No. 188 at 13, PageID.5921. But the assertion is not problematic. Dr. Grofman independently confirms "that African-American potential voters in the Democratic primary in District 7 are likely to outnumber potential non-African-American voters in that primary." *Id.* Thus, SD7 provides at least equal electoral opportunity to Black voters in the Democratic primary. Dr. Grofman balks at that conclusion only because this advantage is "not by a large margin." *Id.* That is unduly hesitant in both factual and legal respects.

On the facts, Dr. Grofman places too much weight on the estimated voter *pool* and ignores estimated *turnout*. The Commission's VRA expert, Dr. Maxwell Palmer, estimates that Black voters in SD& hold a 31.2% to 30.6% edge over white voters in the Democratic primary pool, but a much more robust superiority in actual primary turnout—54% to 41% in 2018 and 50% to 45% in 2022. Ex. A, Expert Report of Dr. Palmer ¶ 7. Black voters, if they are cohesive, can decisively prevail over white voters, even if they are cohesive, in SD7. Because elections are decided by voters who turn out, not merely by those registered, turnout estimates provide probative information that cannot be ignored.[2] *Cf. Wright v. Sumter Cnty. Bd. of Elections & Registration*, 301 F. Supp. 3d 1297, 1318 (M.D. Ga. 2018), *aff'd*, 979 F.3d 1282 (11th Cir. 2020) ("While African Americans do outnumber whites on the voter rolls, the

---

[2] Evidence of high Black participation also signals that key totality-of-circumstances factors, requiring proof that "the level of black participation is depressed," *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1568 (11th Cir. 1984) (citation omitted), cut against Section 2 liability. *See Salas v. Sw. Texas Jr. Coll. Dist.*, 964 F.2d 1542, 1556 (5th Cir. 1992) ("[T]he high incidence of Hispanic registration in the District is persuasive evidence that Hispanic voters are not deterred from participation in the political process because of the effects of prior discrimination, including unemployment, illiteracy, and low income.").

5

voting booth is another story."); *Uno v. City of Holyoke*, 72 F.3d 973, 986–87 (1st Cir. 1995) (discussing the significance of low turnout).

On the law, Dr. Grofman misses that Section 2 guarantees only equal "opportunity," 52 U.S.C. § 10301(b), not success, let alone "by a large margin," ECF No. 188 at 13, PageID.5921.[3] "Properly conceived, the results test protects racial minorities against a stacked deck but does not guarantee that they will be dealt a winning hand." *Uno*, 72 F.3d at 982. The point of Section 2 "is to provide a level playing field on which minority candidates—like all candidates—will be exposed only to the routine vicissitudes of the electoral process, not to special impediments arising out of the intersection of race and the electoral system." *Id.* at 986; *see also Smith v. Brunswick Cnty., Va., Bd. of Sup'rs*, 984 F.2d 1393, 1400–01 (4th Cir. 1993). Here, where the Democratic primary pool in SD7 consists of more Black than white registered voters, and where Black primary turnout is likely to exceed white turnout by a comfortable margin, the district provides the even playing field Section 2 requires. Just as "minority voters are not immune from the obligation to pull, haul, and trade to find common political ground," *Johnson*, 512 U.S. at 1020, Section 2 does not relieve them of the duty to vote, *see Salas*, 964 F.2d at 1556 ("Obviously, a protected class is not entitled to § 2 relief merely because it turns out in a lower percentage than whites to vote."). Viewed under the correct legal standard, SD7 affords the requisite equality of opportunity. Whether or not—and how—Black voters exercise that opportunity is up to them.

---

[3] Dr. Grofman, of course, speaks only "from a social science point of view," ECF No. 188 at 14, PageID.5922, and rightly does not weigh in on the governing law.

### C. No Evidence Establishes Four Opportunity Districts as the Section 2 Baseline

Besides, no competent evidence supports the assumption that Section 2 mandates four Detroit-area opportunity senate districts. As explained, the first *Gingles* preconditions requires proof that additional minority opportunity is available—by means of illustrative majority-minority districts that are reasonably configured in accord with traditional districting principles, including communities of interest and traditional boundaries. *Wisconsin Legislature*, 595 U.S. at 402; *Abrams*, 521 U.S. at 88; *see also, e.g.*, *Holder v. Hall*, 512 U.S. 874, 880–81 (1994) (explaining the analytical role of a "benchmark for comparison" in Section 2 cases); *Reno v. Bossier Par. Sch. Bd.*, 528 U.S. 320, 334 (2000) (similar discussion).

Dr. Grofman notes that he "independently verified" that "it is possible to draw four Black majority citizen voting age districts for the Michigan Senate in the vicinity of Wayne County and Detroit." ECF No. 188 at 13, PageID.5921. But he did not submit his alternative configurations for this Court's or the parties' review. *See Magnolia Bar Ass'n, Inc. v. Lee*, 994 F.2d 1143, 1151 n.6 (5th Cir. 1993) (explaining that the first precondition "specifically contemplates the creation of hypothetical districts"); *Abrams*, 521 U.S. at 84 (discounting "late submission" of alternative remedial plan from Justice Department's demographer, which prevented him "from being cross-examined about racial motivations").

Moreover, there are compelling reasons to conclude that Dr. Grofman's proposal would not be reasonably configured. Dr. Grofman proposes that SD7 might be converted "to a majority African-American district by adding a small portion of African-American population from Detroit . . . ." ECF No. 188 at 13, PageID.5921. If that sounds familiar, that is because it is the approach this Court's liability ruling condemns—extending districts north to south into and out of Detroit, spoke-like, to achieve racial goals. *See, e.g.*, ECF No. 131 at

7

88–96, PageID.4793-99 (discussing former senate districts 8 and 11). Indeed, Dr. Grofman's proposed configuration would appear to replicate aspects of Linden plan district 8, which extended from Birmingham down into the Schoolcraft neighborhood of Detroit, despite demographic and cultural differences between these places. ECF No. 131 at 91, PageID.4794; *see also* 3.Tr. 105:16–23, ECF No. 104, PageID.2896. SD7 contains Birmingham, but heeding this Court's ruling, the Commission ended its southern border at Eight Mile Road.

Dr. Grofman's proposal that SD7 cross into Detroit would compel the Commission back into the redistricting approach this Court rejected, and the proposal cannot be reasonably configured under the first *Gingles* precondition. *See, e.g.*, *Milligan*, 599 U.S. at 30 (2023) (holding that "§ 2 never requires adoption of districts that violate traditional redistricting principles" (quotation and alteration marks omitted); *id.* at 43 (Kavanagh, J., concurring) (rejecting reading of Section 2 that would force states "to group together geographically dispersed minority voters into unusually shaped districts, without concern for traditional districting criteria such as county, city, and town lines"); *Abrams*, 521 U.S. at 88 (rejecting advocacy for additional majority-minority district in remedial plan where ("[n]o other plan demonstrated a second majority-black district could be drawn while satisfying the constitutional requirement that race not predominate over traditional districting principles"). At a more basic level, it would be entirely unfair for the Court to strike down Linden district 8 as a racial gerrymander and then strike down SD7 because it is insufficiently like Linden district 8.[4] *See Alexander v. S.C. State Conf. of the NAACP*, 144 S. Ct. 1221, 1267 (2024) (Thomas,

---

[4] The proposal may also in certain respects replicate Linden district 7, which also crossed Eight Mile Road. Although the Court did not adjudicate a claim against that district, the Commission had overriding reasons to view the Court's opinion as discouraging a configuration of SD7 that crosses into Detroit.

J., concurring) (explaining how racial-gerrymandering and Section 2 jurisprudence can place "States in a lose-lose situation").

Perhaps recognizing that his majority-minority proposal is unworkable, Dr. Grofman offers the following enigmatic alternative:

> African American population can also be added to District 7 by slightly reconfiguring the district and its neighbors even without drawing on population from Detroit in such a fashion that an argument for District 7 being a "realistic opportunity to elect" district (though not actually a majority African-American district) can be substantially strengthened.

ECF No. 188 at 13, PageID.5921. Several defects plague this assertion. Most importantly, it does not support Dr. Grofman's thesis that four reasonably configured *majority-minority* districts are possible. *See id.* Dr. Grofman admits that SD7 would "not actually [be] a majority African-American district" without crossing Eight Mile Road. *Id.* The first *Gingles* precondition, however, is not satisfied without proof of an additional, reasonably configured majority-minority district. *Bartlett*, 556 U.S. at 18. There is no Section 2 obligation to bolster "an argument" that SD7 is an opportunity district without predicate proof of a reasonably configured majority-minority district.[5] The use of race in this context, without a threshold showing under the first precondition, would not be narrowly tailored. *See Shaw v. Hunt*, 517 U.S. 899, 916 (1996).

Besides, it is difficult to see how reworking SD7 with "its neighbors" would be effective in terms of minority opportunity or reasonably configured in terms of neutral criteria. As to

---

[5] As noted, it is important to distinguish the Section 2 hypothetical baseline standard (which contains a 50% minority voting-age population threshold) from an enacted plan to be judged against that standard (which need not be 50% minority voting-age population district to pass the test). Here, because Dr. Grofman is proposing a hypothetical legal measuring stick, the 50% rule applies.

minority opportunity, SD7 already contains (for race-neutral reasons) Pontiac and Southfield, which are the predominantly Black regions of Oakland County. Districts to the east and west are predominantly white. It is a mystery how east-west alterations would bolster SD7's claim to opportunity status. As to neutral criteria, it is unclear at best how SD7 could be revised without sacrificing (and, hence, subordinating) non-racial criteria. *See Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. 178, 190 (2017); *Milligan*, 599 U.S. at 30–33 (plurality opinion). SD7 and its neighbors (SD9, SD10 and SD13) are all highly compact, regular, and rectangular districts. To reformulate these to bring more Black residents (from an unknown location) into SD7 would almost certainly inject jagged edges and political-subdivision splits into these districts, snatching irregularity from the jaws of regularity—because of race.

In sum, nothing supports the assertion that Section 2 requires four Detroit-area opportunity districts, and everything Dr. Grofman enigmatically states on the topic signals that it almost certainly does not. Because the VRA and the Constitution are both satisfied, this Court cannot enjoin the Crane plan.

## CONCLUSION

As the parties and the special master all agree, the Court should not enjoin the Crane plan. It should declare that the Secretary of State may administer that plan in future elections.

Dated: July 19, 2024

BAKER & HOSTETLER LLP
Katherine L. McKnight
Richard B. Raile
Dima J. Atiya
1050 Connecticut Ave., NW, Suite 1100
Washington, D.C. 20036
(202) 861-1500
kmcknight@bakerlaw.com
rraile@bakerlaw.com
datiya@bakerlaw.com

BAKER & HOSTETLER LLP
Patrick T. Lewis
Key Tower, 127 Public Square, Suite 2000
Cleveland, Ohio 44114
(216) 621-0200
plewis@bakerlaw.com

BAKER & HOSTETLER LLP
Erika D. Prouty
200 Civic Center Drive
Suite 1200
Columbus, Ohio 43215
(614) 228-1541
eprouty@bakerlaw.com

Respectfully submitted,

/s/ David H. Fink
FINK BRESSACK
David H. Fink
Nathan J. Fink
38500 Woodward Ave., Suite 350
Bloomfield Hills, Michigan 48304
(248) 971-2500
dfink@finkbressack.com
nfink@finkbressack.com

*Counsel for Defendants, Michigan Independent Citizens Redistricting Commission, and Elaine Andrade, Donna Callaghan, Juanita Curry, Anthony Eid, Rhonda Lange, Steven Terry Lett, Brittni Kellom, Marcus Muldoon, Cynthia Orton, Rebecca Szetela, Janice Vallette, Erin Wagner, and Richard Weiss, each in his or her official capacity as a Commissioner of the Michigan Independent Citizens Redistricting Commission*

11

## CERTIFICATE OF SERVICE

I hereby certify that on July 19, 2024, a true and correct copy of the foregoing was filed via the Court's CM/ECF system and served via electronic filing upon all counsel of record in this case.

/s/ David H. Fink
David H. Fink